1    Ahilan T. Arulanantham, SBN 237841
     aarulanantham@aclusocal.org
2    Jennifer Poon, SBN 5468095 (New York)*
     jpoon@aclusocal.org
3    ACLU OF SOUTHERN CALIFORNIA
     1313 West 8th Street
4    Los Angeles, CA 90017
     Telephone: (213) 977-5211/Fax: (213) 977-5297
5
     Emilou MacLean, SBN 319071
6    emi@ndlon.org
     Jessica Karp Bansal, SBN 277347
7    jbansal@ndlon.org
     NATIONAL DAY LABORER
8    ORGANIZING NETWORK
     674 S. La Layette Park Place
9    Los Angeles, CA  90057
     Telephone: (213) 380-2214/Fax: (213) 380-2787
10
     Mark E. Haddad, SBN 205945
11   mhaddad@sidley.com
     Alycia A. Degen, SBN 211350
12   adegen@sidley.com
     Sean A. Commons, SBN 217603
13   scommons@sidley.com
     SIDLEY AUSTIN LLP
14   555 West Fifth Street, Suite 4000
     Los Angeles, CA 90013
15   Telephone: (213) 896-6000/Fax: (213) 896-6600

16   Attorneys for Plaintiffs
     [*Additional Counsel Listed on Next Page*]

17                   UNITED STATES DISTRICT COURT

18                 NORTHERN DISTRICT OF CALIFORNIA

19   CRISTA RAMOS, individually and on behalf          Case No. 3:18-cv-1554
     of others similarly situated; CRISTINA
20   MORALES; BENJAMIN ZEPEDA,                          **CLASS ACTION COMPLAINT**
     individually and on behalf of others similarly
21   situated; ORLANDO ZEPEDA; JUAN
     EDUARDO AYALA FLORES, individually
22   and on behalf of others similarly situated;
     MARIA JOSE AYALA FLORES; ELSY
23   YOLANDA FLORES DE AYALA; HNAIDA
     CENEMAT, individually and on behalf of
24   others similarly situated; WILNA DESTIN;
     RILYA SALARY, individually and on behalf
25   of others similarly situated; SHERIKA
     BLANC; IMARA AMPIE; MAZIN AHMED;
26   and HIWAIDA ELARABI,

27               *Plaintiffs*,

28

v.

KIRSTJEN NIELSEN, in her official capacity
as Secretary of Homeland Security; ELAINE
C. DUKE, in her official capacity as Deputy
Secretary of Homeland Security; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; and UNITED STATES OF
AMERICA,

        *Defendants.*

1   Additional Counsel for Plaintiffs

2   Nicole M. Ryan, SBN 175980
    nicole.ryan@sidley.com
3   Ryan M. Sandrock, SBN 251781
    rsandrock@sidley.com
4   SIDLEY AUSTIN LLP
    555 California Street, Suite 2000
5   San Francisco, CA 94104
    Telephone: (415) 772-1200
6   Fax: (415) 772-7400

7   Amanda R. Farfel, SBN 288126
    afarfel@sidley.com
8   Andrew B. Talai, SBN 300053
    atalai@sidley.com
9   Marisol Ramirez, SBN 307069
    marisol.ramirez@sidley.com
10  SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite 4000
11  Los Angeles, CA 90013
    Telephone: (213) 896-6000
12  Fax: (213) 896-6600

13  Attorneys for Plaintiffs

14  * *pro hac vice* application forthcoming

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INTRODUCTION

2          1.      Plaintiffs in this case are U.S. citizen children, their non-citizen parents, and other

3    non-citizen adults who are in the United States legally, and who have lived in this country

4    lawfully for years, in some cases decades.  They challenge the Department of Homeland

5    Security's ("DHS") new rule for deciding whether to terminate Temporary Protected Status

6    ("TPS") designations for countries facing armed conflict, natural disasters, or other crises that

7    make the return of people from those countries untenable.  Since President Donald J. Trump took

8    office in January 2017, the Administration has announced four such terminations, each one for a

9    country in Latin America, the Caribbean, or Africa.

10         2.      As a result of the Department of Homeland Security's unlawful actions, over

11   200,000 individuals who hold TPS face the imminent loss of their right to live and work lawfully

12   in this country.  Many of them have lived in this country for over twenty years.  In addition, over

13   200,000 U.S. citizen children, each of them with a parent or parents who are TPS holders, face an

14   impossible choice between leaving the only home they have ever known, and growing up without

15   one or both parents.

16         3.      TPS is a form of humanitarian immigration relief that allows individuals from

17   designated countries to live and work lawfully in the United States when they cannot return safely

18   to their country of origin due to armed conflict, natural disaster or other "extraordinary

19   circumstances."  *See* 8 U.S.C. § 1254a.  Congress created TPS to establish formal criteria and

20   procedures to replace more *ad hoc* practices the Executive Branch had used for decades to provide

21   similar relief.  Although some countries are designated for TPS only for short periods, others have

22   been designated for many years, including El Salvador (designated since 2001), Nicaragua

23   (designated since 1999), Sudan (designated since 1997), and Haiti (designated since 2010).

24         4.      Under previous administrations, DHS regularly considered natural disasters and

25   social or economic crises that occurred *after* a country was originally designated for TPS in

26   deciding whether to continue or instead terminate a country's designation.  But after President

27   Trump took office, DHS—without any formal announcement or other explanation—adopted a

28

new, novel interpretation of the TPS statute that eschews consideration of any intervening country conditions.

5. The Administration's new legal rule has dramatically altered the lives of many Americans. More than 270,000 U.S. citizen children have at least one parent with TPS. Many of them are still in school. This country is their home in every legal and practical sense of that word. Yet their parents will shortly lose the right to continue living and working lawfully in this country.

6. Currently, more than 400,000 individuals from ten different countries have TPS. Whether or not they have children, many TPS holders came to this country at a young age and have lived here for most of their lives. They have homes, spouses, jobs, and other profound social ties to their communities that now entwine their lives with this country.

7. Since President Trump took office, DHS has applied its new rule for making TPS determinations to terminate the TPS designations of El Salvador, Haiti, Nicaragua, and Sudan. Through this lawsuit, Plaintiffs challenge the legality of that change on several bases.

8. First, Defendants' new rule violates the constitutional rights of school-age United States citizen children of TPS holders, by presenting them with an impossible choice: they must either leave their country or live without their parents. It is well established that a U.S. citizen has an absolute right to reside in this country. It is equally well established that families have a fundamental right to live together without unwarranted government interference. The Secretary has not even considered the impact on U.S. citizen children of TPS holders, let alone advanced a valid reason for compelling them to make the impossible choice of forgoing one of these rights for the other.

9. Second, Defendants' new rule violates the Fifth Amendment's Due Process Clause in two related respects. The rule violates the Equal Protection guarantee of the Due Process Clause because it was motivated by intentional race- and national-origin-based animus against individuals from what President Trump has referred to as "shithole countries." It arises from the Trump Administration's repeatedly-expressed racism toward non-white, non-European people from other countries.

10.     The new rule also violates the due process protection against arbitrary government invasion of personal liberty.  The new rule constitutes an arbitrary, unexplained abandonment of the government's longstanding interpretation of the TPS statute, on which several hundred thousand people have come to rely.  The Due Process Clause does not permit the government to engage in such arbitrary action when individual liberty interests are at stake.

11.     Finally, Defendants' sudden and unexplained departure from decades of consistent interpretation and corresponding practice violates the Administrative Procedure Act.  This *sub silentio* departure from existing practice, with complete disregard for the reliance interests that years of peaceful residence in this country had engendered, failed to meet the minimum standards of considered judgment that the APA requires.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.  This Court has additional remedial authority under the Declaratory Judgment Act, *see* 28 U.S.C. § 2201 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

13.     The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702.  *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989).  Sovereign immunity does not bar claims against federal officials seeking solely to prevent future violations of federal law (rather than monetary relief). *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

14.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(e)(1) because at least one plaintiff resides in this judicial district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

## INTRADISTRICT ASSIGNMENT

15.     For purposes of Civil Local Rule 3-2(d) and 3-5(b), a majority of the claims of the named plaintiffs arise in Alameda, Contra Costa, and Marin Counties and, thus, this case should be assigned to the San Francisco division.

1

## THE PARTIES

2

### Plaintiffs

3        16.    Plaintiff Crista Ramos, fourteen years old, is a U.S. citizen who was born in

4    Northern California and raised in San Pablo, California, where she now lives.  Her mother is a

5    TPS holder from El Salvador, Plaintiff Cristina Morales.  Crista has a younger U.S. citizen

6    brother.

7        17.    Plaintiff Cristina Morales, thirty-seven years old, was born in El Salvador, and has

8    lived in the United States since 1993.  She has held TPS status since 2001.  Her two children were

9    born and raised in the United States.  She and her family live in San Pablo, California.

10       18.    Plaintiff Benjamin Zepeda, fourteen years old, is a U.S. citizen who was born and

11   raised in Los Angeles, California, where he now lives.  His parents are TPS holders from El

12   Salvador, including his father Plaintiff Orlando Zepeda, and he has a younger sister.

13       19.    Plaintiff Orlando Zepeda, fifty-one years old, was born in El Salvador and has lived

14   in the United States since 1984, thirty-four years ago.  He has been a TPS holder since 2001.  He

15   is the father of two U.S. citizen children who are twelve and fourteen years old.  They live in Los

16   Angeles, California.

17       20.    Plaintiff Juan Eduardo Ayala Flores, thirteen years old, is a U.S. citizen who was

18   born and raised in Washington, D.C.  His mother, Plaintiff Elsy Yolanda Flores de Ayala, is a TPS

19   holder from El Salvador.  He has two older sisters.  One is a TPS holder, Plaintiff Maria Jose

20   Ayala Flores, while the other sister, Joanna Gabriela, is also a U.S. citizen.  He lives in

21   Washington, D.C.

22       21.    Plaintiff Maria Jose Ayala Flores, nineteen years old, was born in El Salvador and

23   moved with her parents to Washington, D.C. as a baby.  She has held TPS status since she was

24   about two years old.  She has two younger siblings who were born and raised in the United States.

25   Maria lives in Washington, D.C. with her family and attends Montgomery College.

26       22.    Plaintiff Elsy Yolanda Flores de Ayala, thirty-eight years old, was born in El

27   Salvador and has lived in the United States since 2000.  She and her husband have held TPS status

28

since 2001.  They have three children, two of whom are U.S. citizens and one of whom is a TPS holder, Plaintiff Maria Jose Ayala Flores.  They live in Washington, D.C.

23.     Plaintiff Hnaida Cenemat, fourteen years old, is a U.S. citizen who was born and raised in Orlando, Florida, where she now lives.  Her younger brother is a U.S. citizen, and her mother, Plaintiff Wilna Destin, is a TPS holder from Haiti.

24.     Plaintiff Wilna Destin, forty-three years old, was born in Haiti, has lived in the United States since 2000, and has held TPS status since 2010.  She is the mother of two U.S. citizen children.  Her husband also has TPS, and her father and brothers live in the United States and are either U.S. citizens, lawful permanent residents, or TPS holders.  Wilna lives with her family in Orlando, Florida.

25.     Plaintiff Rilya Salary, five years old, is a U.S. citizen who was born in Rockledge, Florida.  She now lives in Valrico, Florida.  Her two younger sisters also are U.S. citizens, and her mother, Plaintiff Sherika Blanc, is a TPS holder from Haiti who has lived in the United States since arriving as a child.

26.     Plaintiff Sherika Blanc, twenty-seven years old, immigrated to the United States from Haiti with her parents and two brothers when she was eight years old.  She currently holds TPS and has held either TPS or Deferred Action for Childhood Arrivals ("DACA") status for the last eight years.  She is the mother of three U.S. citizen daughters, all under the age of six.  She and her family live in Valrico, Florida.

27.     Plaintiff Imara Ampie, forty-five years old, was born in Nicaragua and has lived in the United States since 1998.  She and her husband have held TPS status since 1999.  Their two sons, fourteen and eight years old, are U.S. citizens.  She and her family live in Contra Costa County, California.

28.     Plaintiff Mazin Ahmed, nineteen years old, is Sudanese and has lived in the United States since he was fourteen years old.  He came into the country as a child with his mother and two younger siblings.  All have had TPS since 2013 and live in Westbrook, Maine.  Mazin is a student at the University of Southern Maine.

29.     Plaintiff Hiwaida Elarabi, fifty-five years old, is Sudanese and has lived in the United States since 1997.  She has had TPS for more than twenty years, since November 1997. She lives in Newton, Massachusetts with her aunt and her aunt's family, all of whom are U.S. citizens.

**Defendants**

30.     Defendant Kirstjen Nielsen, sued in her official capacity, is currently the Secretary of Homeland Security.  Defendant Nielsen assumed office on or around December 6, 2017.  As the highest-ranking officer for DHS, Defendant Nielsen is responsible for, among other things, "establishing national immigration enforcement policies and priorities."  6 U.S.C. § 202(5).  On or about January 18, 2018, Defendant Nielsen terminated the designation of TPS for El Salvador.

31.     Defendant Elaine C. Duke, sued in her official capacity, is currently the Deputy Secretary of Homeland Security, and served as Acting Secretary of Homeland Security from around July 31, 2017 to December 6, 2017 or thereabout.  As the chief operating officer for DHS, Defendant Duke is responsible for the administration and enforcement of the immigration laws of the United States.  On or about January 18, 2018, Defendant Duke terminated the designation of TPS for Haiti; on or about December 15, 2017, Defendant Duke terminated the designation of TPS for Nicaragua; and, on or about October 11, 2017, Defendant Duke terminated the designation of TPS for Sudan.

32.     Defendant U.S. Department of Homeland Security is a cabinet-level department of the Executive Branch of the federal government, and is an "agency" within the meaning of 5 U.S.C. § 551(1).  DHS includes various component agencies, like the U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").  DHS, together with all of its component agencies, is responsible for administering and enforcing the nation's immigration laws and policies, including the TPS program.

33.     Defendant United States of America includes all government agencies and departments responsible for the implementation, administration, and change in policy concerning the TPS program.

**STATUTORY FRAMEWORK**

34.      Congress established the Temporary Protected Status ("TPS") program through the Immigration Act of 1990.[1]  TPS is a form of humanitarian relief, providing lawful immigration status to eligible foreign nationals who cannot safely return home to war-torn or disaster-stricken countries.  By enacting the TPS statute, which is codified at 8 U.S.C. § 1254a, Congress established formal criteria for relief and set forth predictable procedures.[2]

35.      Under the TPS statute, the Secretary of Homeland Security[3] makes a "designation" determination for a given country.  After consulting with "appropriate" government agencies, the Secretary may designate a foreign state, or any part of that state, for TPS based on: (A) an "ongoing armed conflict within the state" that would "pose a serious threat" to the "personal safety" of the foreign nationals of that state; (B) an "earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions," which makes the foreign state "unable, temporarily, to handle adequately the return to the state" of its nationals, and where the foreign state has "officially" requested a designation; or (C) the existence of "extraordinary and temporary conditions in the foreign state" that prevent foreign nationals from safely returning, and where the temporary presence of those foreign nationals in the United States is not "contrary to the national interest of the United States."[4]

36.      An initial designation period for a given country lasts between six and eighteen months.[5]  Before the designation can become effective, the Secretary must publish a notice in the

---

[1] Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030–36.

[2] The Executive Branch previously used *ad hoc* enforcement mechanisms to allow individuals to remain in the United States for humanitarian reasons.  *See* Adam B. Cox & Cristina Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 501–02 (2009) (discussing use of the "parole power," which is currently codified at 8 U.S.C. § 1182(d)(5)).  Presidents have occasionally exercised their discretion to designate countries for "Extended Voluntary Departure" and "Deferred Enforced Departure."  Somewhat like TPS, both of those delayed-departure practices allowed foreign nationals to lawfully remain and work in the United States while conditions in their homeland were unsafe or return was impracticable.

[3] References to the Attorney General in provisions describing functions transferred from the Department of Justice to the Department of Homeland Security "shall be deemed to refer to the Secretary" of Homeland Security.  *See* 6 U.S.C. § 557.

[4] 8 U.S.C. § 1254a(b)(1).

[5] 8 U.S.C. § 1254a(b)(2), (b)(3)(C).

Federal Register that includes, among other things, a statement of findings, the effective date of the designation, and a tally of eligible foreign nationals.

37.     Once the Secretary has designated a particular country for TPS, individuals from that country (or persons without nationality who last habitually resided in that country) may apply for immigration status under the program.  To be eligible for TPS, however, individuals from a designated country must meet stringent requirements.  These requirements include, among other things, continued physical presence and continued residence in the United States from the most recent date of designation; satisfaction of the criteria for admissibility as an immigrant; lack of disqualifying criminal history; and submission of an application, extensive documentation, and fees.[6]

38.     Congress ensured that individuals who are ultimately granted protected status could enjoy the freedom to live and work in the United States without fear of deportation.  Under the statute, as enacted by Congress, an individual who receives and maintains TPS shall be authorized to engage in employment in the United States; shall not be detained by the Secretary of Homeland Security on the basis of immigration status; and shall not be removed from the United States by the Department of Homeland Security.[7]

39.     Under the TPS statute, the Secretary must periodically re-evaluate country designations.  At least 60 days before a particular designation expires, the Secretary must "review the conditions in the foreign state . . . for which a designation is in effect" and determine whether the country still meets the conditions for TPS.[8]  If the Secretary does not terminate TPS for a particular country, then—by default—the designation will be extended for a period of six months, or by discretion of the Secretary, for a period of twelve or eighteen months.[9]  This periodic-review

---

[6] 8 U.S.C. § 1254a(c)(1); 8 C.F.R. §§ 244.2, 244.4, 244.9.

[7] 8 U.S.C. § 1254a(a)(1), (d)(4).

[8] 8 U.S.C. § 1254a(b)(3).

[9] 8 U.S.C. § 1254a(b)(3)(C).

requirement also entails consultation with appropriate government agencies and, ultimately, publication of notice in the Federal Register.

40.     When a designation for a particular country is terminated, the individual TPS holder's status will typically revert back to his or her original immigration status.[10]

### DEPORTATION OF TPS HOLDERS WILL IMPOSE EXTRAORDINARY HARM ON THEIR MINOR U.S. CITIZEN CHILDREN, AS WELL AS ON THE TPS HOLDERS THEMSELVES AND THEIR COMMUNITIES.

41.     Under the Fourteenth Amendment, children born in the United States, including those of TPS holders, are U.S. citizens with an absolute right to remain in the United States.

42.     As with any child, their well-being and future development are tied to nurturing and stable relationships with their parents.[11]  Science confirms this common sense understanding.  The most important factor in the development of brain architecture—the trillions of connections among and across neurons in a child's brain—is the interactive and responsive relationship between child and parent.[12]  The parent-child relationship promotes healthy brain development and provides the buffering protection necessary to prevent children from experiencing toxic responses to stress.[13]

43.     Children of immigrants acutely suffer when their parents face even the possibility of deportation.  The fear of deportation is directly tied to the prevalence of stress-related illness in children, including higher levels of anxiety and trauma, depression, and family instability.  The "fear of massive deportations"[14] also diminishes the quality of day-to-day relationships between parents and their children, including because the threat of deportation deters parents from taking

---

[10] 8 C.F.R. § 244.19.

[11] Center on the Developing Child at Harvard University, *Three Principles to Improve Outcomes for Children and Families* 3–4 (2017), http://www.developingchild.harvard.edu.

[12] *Id.*

[13] *Id.*

[14] M. Leiner et al., Fear of Massive Deportations in the United States: Social Implications on Deprived Pediatric Communities, 5 Front. Pediatr. 177, 177–78 (2017).

children to school or social events, seeking urgent or preventative health care for themselves and their children, pursuing opportunities for better housing, or reporting fraud, crimes, or abuse.

44.　　The scale of the harm wrought by Defendants' new TPS policies and practices is massive.  TPS holders are the parents of more than 270,000 U.S. citizen children,[15] including approximately 192,700 U.S. citizen children with parents who are Salvadoran TPS holders, and 27,000 U.S. citizen children with parents who are Haitian TPS holders.[16]

45.　　All told, approximately 400,000 TPS holders currently reside in the United States.[17] They live in all fifty states, as well as the District of Columbia and the U.S. territories.  At least ten states are home to more than 10,000 TPS holders each.

46.　　Many TPS holders have resided in the United States for many years.  Over half of Salvadoran TPS holders, and about sixteen percent of Haitian TPS holders, have lived and worked in the United States for more than two decades.[18]  Many TPS holders also arrived in the U.S. at a young age.[19]  Roughly twenty percent of TPS holders from El Salvador, and thirty percent from Haiti, arrived before they turned sixteen years old.

47.　　TPS holders are part of the economic and social fabric of American communities, and give back to this country in many ways.  They are active in civic life and volunteer at schools, neighborhood and work organizations, and religious institutions.[20]  They pay federal, state, and local taxes, and support government social welfare programs.  Experts estimate that, without

---

[15] Robert Warren & Donald Kerwin, A Statistical and Demographic Profile of the US Temporary Protected Status Population from El Salvador, Honduras, and Haiti, 5 J. on Migration & Hum. Sec. 577, 578 (Aug. 2017)

[16] Id. at 581.

[17] Id. at 578; see also Jill H. Wilson, Cong. Research Serv., RS20844, Temporary Protected Status: Overview and Current Issues 4–5 (2018).

[18] Warren & Kerwin, supra note 15, at 581.

[19] Wilson, supra note 17, at 11.

[20] Celia Mejívar, Ctr. for Migration Research, Univ. of Kan., Temp. Protected Status in the U.S.: The Experiences of Honduran & Salvadoran Immigrants 19 (2017).

1   Salvadoran and Haitian TPS holders alone, the U.S. Gross Domestic Product would shrink by at

2   least $132.6 billion[21] and Social Security would lose over $42.5 billion[22] over the next ten years.

3       48.   The net positive economic contributions of TPS holders is not surprising in light of

4   their consistently high employment rate: Eighty-eight percent of Salvadoran TPS holders and

5   eighty-one percent of Haitian TPS holders are employed.  About eleven percent are entrepreneurs,

6   creating jobs for themselves and their communities.[23]  About thirty percent of households where

7   TPS holders reside have mortgages, including 45,500 households with Salvadoran TPS holders

8   and 6,200 households with Haitian TPS holders.[24]  More than half of TPS recipients from El

9   Salvador (fifty-six percent) and Haiti (fifty-seven percent) have health insurance.[25]

10      49.   In light of the overwhelming evidence of the contributions of TPS holders,

11  bipartisan groups of mayors and legislators,[26] business leaders,[27] labor unions,[28] and faith leaders[29]

---

12  [21] Ctr. for Am. Progress, TPS Holders in the United States 1–2 (2017) (estimating that $109.4
13  billion would be lost from GDP over 10 years without Salvadoran TPS workers, and $23.2 billion
    would be lost from Haitian TPS workers).

14  [22] Amanda Baran, et al., Immigrant Legal Resource Ctr., Economic Contributions by Salvadoran,
15  Honduran, and Haitian TPS Holders 5–7 (2017).

    [23] Warren & Kerwin, *supra* note 15, at 582–83.
16
    [24] *Id.* at 577; Ctr. for Am. Progress, *supra* note 21, at 1, 2.
17
    [25] Warren & Kerwin, *supra* note 15, at 583.
18
    [26] Letter from Ed Pawlowski, Mayor of Allentown, Penn., et al. to Kirstjen Nielsen, Sec'y of
19  Homeland Sec. (Jan. 3 2018) (letter from 19 U.S. mayors and Cities for Action, a national
    coalition of more than 175 cities and counties); Letter from Ben Cardin, U.S. Senator, et al. to Rex
20  Tillerson, Sec'y of State, & Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 19, 2017);
    Letter from James P. McGovern, Member of Congress, et al. to Elaine C. Duke, Acting Sec'y of
    Homeland Sec. (Sept. 11, 2017) (bipartisan letter from 116 Members of Congress); Letter from
21  Kirsten Gillibrand, U.S. Senator, et al. to Rex Tillerson, Sec'y of State, & John F. Kelly, Sec'y of
    Homeland Sec. (July 18, 2017) (letter from 26 U.S. Senators).

22  [27] Letter from Neil L. Bradley, Senior Vice President & Chief Policy Officer, U.S. Chamber of
    Commerce, to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 26, 2017); Letter from
23  Embassy Suites Miami Airport, et al. to Marco Rubio, U.S. Senator (Nov. 3, 2017); Letter from
    Tex. Agric. Irrigation Ass'n, et al. to John Cornyn, U.S. Senator (Nov. 3, 2017).
24
    [28] *See, e.g.*, Press Release, UNITE HERE!, Labor Unions Launch Nearly One Million Dollar
25  Campaign to Save TPS (Nov. 16, 2017); Terry O'Sullivan and Stephen Sandherr, *Trump
    Immigration Acts Will Hurt Families, Slow Hurricane Recovery*, Houston Chronicle Feb. 23, 2018
26  (General President of Laborers' International Union of North America, which represents half a
    million workers, calls for extension of TPS).

27  [29] Letter from The Evangelical Immigration Roundtable to Elaine C Duke, Acting Sec'y of
    Homeland Sec. (Nov. 1, 2017); Letter from Faith Leaders & Faith-Based Organizations to Elaine
28

---

1    recognize the need to maintain the TPS program.  To not extend the TPS program "would harm

2    [U.S.] national security interests by undermining the fragile security in these countries," as well as

3    "negatively impact hundreds of thousands of American children."[30]

4    ### U.S. CITIZEN CHILDREN OF TPS HOLDERS

5    ### FACE AN IMPOSSIBLE CHOICE BETWEEN THE CARE

6    ### AND SUPPORT OF THEIR PARENTS,

7    ### AND THE RIGHTS AND BENEFITS OF U.S. CITIZENSHIP.

8    50.    The U.S. citizen children of TPS holders, including the plaintiff children in this case,

9    confront an impossible choice.  On one hand, they can continue to live with their parents, but only

10   by relocating to a foreign country, leaving behind their schools, their communities, and the

11   benefits of living in the U.S.—the only country they have ever known.  On the other hand, they

12   can choose to remain in the U.S., but then must give up living with one or both parents, which in

13   many cases would involve their becoming a ward of the state subject to foster care, or otherwise

14   subject to the supervision of persons who are not their parents.

15   51.    Plaintiff Crista Ramos, fourteen years old, is the eldest child of TPS holder Plaintiff

16   Cristina Morales.  Crista was born in Marin, California, and is now an eighth grade student at

17   Saint Raphael School.  She is currently applying to high school and dreams of being an

18   immigration lawyer.  She lives with her mother, father, and her eleven-year-old brother Diego in

19   San Pablo, California.  Crista worries about what will happen if her mother loses her TPS status

20   and is deported because she depends on her.  She has never lived in or traveled to El Salvador.

21   52.    Plaintiff Benjamin Zepeda, fourteen years old, is the eldest child of TPS holder

22   Plaintiff Orlando Zepeda and TPS holder Lorena Arana.  Benjamin was born and raised in Los

23   Angeles, California, and currently is a ninth grade student at St. John Bosco High School.  He has

24   

---

25   C. Duke, Acting Sec'y of Homeland Sec. (Sept. 17, 2017) (560 faith leaders and 129 national, state, and local faith-based organizations); Letter from the U.S. Conference of Catholic Bishops Migration

26   and Refugee Services et al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 26, 2017).

27   [30] Letter from Dick Durbin, U.S. Senator, et. al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Nov. 9, 2017), *available at* https://www.durbin.senate.gov/newsroom/press-releases/lawmakers-call-for-reversal-of-administration-decision-to-expose-thousands-to-

28   dangerous-deportations.

a younger sister, twelve-year-old Lizbeth.  He and his sister depend on their parents for emotional, psychological, educational, spiritual, and material support.  He has never visited El Salvador and cannot imagine moving there.  He also struggles to consider how much his life would be upended if his parents lost their TPS status and did not have documentation in the United States, moved to El Salvador, or were deported there.

53.     Plaintiff Juan Eduardo Ayala Flores, thirteen years old, is the youngest son of TPS holder Plaintiff Elsy Yolanda Flores de Ayala and TPS holder Juan Amilcar Ayala Rovira.  He has two older sisters, TPS holder Plaintiff Maria Jose Ayala Flores, nineteen years old, who is a college student, and Joanna Gabriela Ayala Flores, seventeen years old, who was born in Washington, D.C.  Juan is a seventh grade student at Washington Latin Public Charter School. Juan's parents are from El Salvador, but he has only been to El Salvador once, in 2009, for about one month to visit his grandmother.  He was born in Washington, D.C., and has lived there his entire life.

54.     Plaintiff Hnaida Cenemat, fourteen years old, is the eldest child of TPS holder Plaintiff Wilna Destin, who was raised in Haiti and has lived in the United States for eighteen years.  Hnaida's younger brother, John, is ten years old.  Hnaida was born in Orlando, Florida, and has lived there her entire life.  She visited Haiti only once for a brief period when she was one year old.  Hnaida is a motivated high school freshman at Dr. Phillips High School.  She is consistently on the honor roll and very active in her school and church.  Her favorite subjects in school are math and science, and she aspires to become an obstetrician/gynecologist because she wants to help people.  She plans to join the Student Council next year, and wants to be on the cheerleading and flag football teams.  Outside of school, she is in her church choir.  Prior to Defendants' decision to end TPS, Hnaida did not understand that it was a legal status that could be terminated.  She is afraid of moving to Haiti with her mother and living in a country that she does not know, but she is also afraid of remaining in the United States with a foster family.  She, her brother, and their parents have spent a lot of time speaking about TPS.

55.     Plaintiff Rilya Salary, five years old, was born in Rockledge, Florida and is the eldest child of TPS holder Plaintiff Sherika Blanc and Jermaine Salary, who is a U.S. citizen.  She

has two younger sisters: Alaya, who is three years old, and Amara, who is less than one year old. Rilya is in kindergarten at Kingswood Elementary School. Rilya has never been to Haiti.

**TPS HOLDERS FACE IRREPARABLE HARM FROM BEING**

**FORCED TO RETURN TO COUNTRIES THEY FLED DECADES AGO.**

56.    TPS holders have built lives in the U.S. over the course of decades, building families and contributing to their communities. The circumstances of the plaintiffs here who hold TPS illustrate the irreparable harm that inevitably will occur if they (and other TPS holders) are deported.

57.    Plaintiff Cristina Morales, thirty-seven years old, was born in San Miguel, El Salvador. She came to the United States from El Salvador at the age of twelve as an unaccompanied minor. Her mother had escaped domestic violence and fled to the United States before her, and Cristina followed. Cristina currently does not have family in El Salvador with whom she is in contact. Cristina's mother advised her to apply for TPS soon after she graduated from high school, immediately after El Salvador was designated for TPS. Cristina has now lived in the United States for twenty-six years and had TPS for seventeen years. Cristina and her husband met when she was in high school, and they have been married since 2008. They have two children, fourteen-year-old Crista, and eleven-year-old Diego. Cristina and her family live in San Pablo, California in a home they have owned since 2008. She is currently the director of the extended care program at the Saint Raphael School, a private Catholic school in Marin County. Cristina struggled to complete the applications for her daughter's high school because of the stress she feels due to the looming expiration of TPS for El Salvador. She is afraid that her family will be divided again, and that she will be forced to return to El Salvador where she has no family and which she fled as a child.

58.    Plaintiff Orlando Zepeda, fifty-one years old, came to the United States from his birth country of El Salvador in 1984, at the age of eighteen years old. He has lived in two homes in Los Angeles, California during the thirty-four years he has lived in the United States. About fifteen years ago, he and his wife, TPS holder Lorena Arana, bought the home in which they now live with their two U.S. citizen children who are twelve and fourteen years old. Orlando was

granted TPS in 2001, when El Salvador was designated.  Orlando has worked for the past eight years providing building maintenance, including with the same company for the last four years. He has also volunteered as a chaplain in prisons and hospitals for nearly twenty years.  His family and life are in the United States, and his children and brother are U.S. citizens.  He has lived in the United States for nearly twice as long as he lived in El Salvador.  He left El Salvador in the middle of the country's violent armed conflict and fears he would not even recognize the country now.

59.     Plaintiff Maria Jose Ayala Flores, nineteen years old, is the oldest daughter of TPS holder Plaintiff Elsy Yolanda Flores de Ayala and TPS holder Juan Amilcar Ayala Rovira.  She arrived in the United States when she was one year old, and has had TPS since she was about two years old.  She discovered she had TPS only when it came time to apply for college, when she realized that her immigration status made her ineligible for many available college scholarships. Since she arrived in the United States, she has only been to El Salvador once, in 2009 for approximately one month to visit her grandmother.  She graduated from high school in 2016 and is currently a sophomore at Montgomery College in Maryland studying mathematics.  She plans to teach math to elementary school students.  She has two younger siblings, Joanna Gabriela and Plaintiff Juan Eduardo.

60.     Plaintiff Elsy Yolanda Flores de Ayala, thirty-eight years old, was born in San Miguel, El Salvador on May 15, 1979.  Her mother, father, and siblings fled El Salvador during the country's brutal civil war in the 1980s, and are now all either U.S. citizens or lawful permanent residents in the United States.  As she was the youngest and unable to travel safely, she remained in El Salvador during the war.  Elsy married Juan Amilcar Ayala Rovira in 2000 in El Salvador.  They traveled to the United States in March 2000 with their daughter, Plaintiff Maria Jose Ayala Flores, who was one year old at the time.  One year later, following the earthquakes in El Salvador and El Salvador's TPS designation, Elsy, her husband, and their daughter obtained TPS.  She now has three children.  In addition to Maria Jose, Elsy and Juan are parents to Joanna Gabriela Ayala Flores, seventeen years old, and Plaintiff Juan Eduardo Ayala Flores, thirteen years old.  Joanna and Juan were both born and raised in the United States.  Elsy has worked as a domestic worker and child-care provider since 2004.  She currently provides child care for two

families.  Since 2000, Elsy and her family have lived in Washington D.C.  She has only been to El Salvador once since she arrived, in 2009 to visit her mother-in-law.  Elsy cannot imagine being forced to return to El Salvador, where she has no family, and being separated from her family in the United States, including possibly her two youngest children.

61.   Plaintiff Wilna Destin, forty-three years old, was raised in Thomassique, a small township in central Haiti.  She fled Haiti in 2000 to seek a better life in the United States after experiencing threats of violence in her hometown.  She received TPS in 2010, following the earthquake in Haiti, and has had TPS since then.  Her father is a U.S. lawful permanent resident.  She also has two brothers in the United States.  One is a U.S. citizen and the other has TPS.  She is married to a TPS holder and is the mother of two children, Plaintiff Hnaida, fourteen years old; and John Walker, ten years old.  Since 2014, she has been a labor organizer with the union UNITE-HERE.  She previously worked at Disney World.  Wilna has lived in Florida for eighteen years.  For the last nine years she has owned a home in Orlando, which she shares with her family.  She is an active member of her community and church, and volunteered to travel to New Orleans after Hurricane Katrina to support the humanitarian relief efforts and help with the cleanup.

62.   Plaintiff Sherika Blanc, twenty-seven years old, was born in Port de Paix, Haiti, and immigrated to the United States with her parents and two brothers when she was eight years old.  Sherika discovered that she was (then) undocumented only when she graduated from high school in 2009 and realized that she could not apply for financial aid to go to college because of her immigration status.  In 2010, soon after she graduated from high school, Haiti was designated for TPS.  Sherika applied shortly thereafter, and has had either TPS or DACA since 2010.  Her TPS status has changed her life by giving her the opportunity to work, buy a car, rent a house, and raise a family.  Her parents and her two brothers have all had TPS since 2010.  Because she could not go to university when she graduated from high school, Sherika trained successfully to become a certified nursing assistant ("CAN") and a healthy unity coordinator ("HUC"), and received her license in 2011.  Since 2015, she has worked as a nursing assistant and HUC at the South Florida Baptist Hospital, in Plant City, Florida.  Sherika is married to a U.S. citizen and together they have

three young daughters: Plaintiff Rilya Salary, five years old; Alaya Salary, three years old; and Almara Salary, eight months old.

63.     Plaintiff Imara Ampie, forty-five years old, was born and raised in Managua, Nicaragua.  In August 1998, at the age of twenty-six years old, Imara traveled to the United States to procure material for her mother's tailoring business.  While she was in the United States, Nicaragua was devastated by Hurricane Mitch and the U.S. government designated Nicaragua for TPS.  She married a Nicaraguan TPS holder, and they are raising two young sons.  Imara is a homemaker and cares for their children.  Imara has lived in the Bay Area for twenty years.  She and her family have owned a home in Contra Costa County in northern California since 2008.  She is concerned that if TPS for Nicaragua is terminated, she and her husband may be forced to return to Nicaragua even though their lives and family are here, and there will be inadequate options to satisfy the health care and educational needs for her family.  Her children would suffer if forced to relocate to Nicaragua, but would also face tremendous obstacles if forced to remain in the United States without their parents.

64.     Plaintiff Mazin Ahmed, nineteen years old, came to the United States with his mother and two younger siblings in 2012, and all have had TPS since 2013.  Mazin is Sudanese and was born in Sudan, but lived in Qatar with his parents and siblings from 1997 until 2012.  He was a baby when he and his family moved from Sudan to Qatar, and left Qatar for the United States with his mother and siblings when he was fourteen years old.  Mazin arrived in the United States in time to start high school, and graduated with honors from Westbrook High School, in Westbrook, Maine where he has lived since he arrived.  He is currently a sophomore majoring in Human Biology at the University of Southern Maine, where he has been the recipient of a merit-based President's Scholar Award.  He plans to study to be a pediatrician.  He does not believe that he could safely return to Sudan, has no right to return to Qatar, and has built a community and excelled in his studies in the United States.

65.     Plaintiff Hiwaida Elarabi, fifty-five years old, is from Sudan but has lived in the United States since 1997 when she arrived with a visitor's visa to visit her aunt and her family— all of whom are now U.S. citizens.  During the time that Hiwaida was in the United States, the

17

security situation deteriorated in Sudan, which was in the midst of a decades-long conflict.  Before

the expiration of her visitor's visa, the U.S. government designated Sudan for TPS and Hiwaida

remained because she could not safely return.  She has now lived in the United States for twenty

years, with her aunt's family.  She has a Bachelor's degree in biochemistry from before she

arrived in the United States, and a Master's degree in Bioinformatics from Brandeis University.

She lives in Newton, Massachusetts and has worked for the last four years at Western Governors

University as an E-Care Coordinator, providing technical support to students.  Prior to that, she

worked for sixteen years as a Health Educator at the Massachusetts Department of Public Health.

Hiwaida is also an entrepreneur who opened up a restaurant in 2015.  She took on extensive debt

to do so, and suffered from the termination of TPS.  While the restaurant was doing well in its

early years, she made the difficult decision to sell it, at great cost, after Defendants terminated

TPS.  She felt that her future was uncertain and she did not know whether she would be able to

sustain the restaurant.

## MOTIVATED BY RACIAL ANIMUS, THE TRUMP ADMINISTRATION CHANGED THE RULES GOVERNING TPS.

66.     The Secretary's adoption of a new rule for making TPS determinations was

motivated in significant part by racial and national-origin animus.  This animus is evidenced by

numerous statements made by President Donald J. Trump and other officials in his administration.

A limited number of those statements are described herein, and they leave no doubt as to the

speaker's racially discriminatory motives against non-white and non-European immigrants.  In

particular, President Trump referred to countries designated for TPS as "shithole" countries a mere

seven days before Defendants terminated Haiti's TPS status.

67.     President Donald J. Trump, along with other officials in his administration, have

repeatedly expressed racially-discriminatory and anti-immigrant sentiments.  On the first day of

his presidential campaign, Mr. Trump categorically labeled Mexican immigrants as criminals and

rapists: "When Mexico sends its people, they're not sending their best. . . . They're sending people

that have lots of problems, and they're bringing those problems with [them].  They're bringing drugs.  They're bringing crime.  They're rapists.  And some, I assume, are good people."[31]

68.     Both during his campaign and after taking office, President Trump has repeatedly compared immigrants to snakes who will bite and kill anyone foolish enough to take them in.[32]

69.     President Trump has made numerous comparable racist, anti-immigrant pronouncements about Haitians, Africans, and Muslims.  For example, in or around June 2017, in a meeting with Secretary of State Rex W. Tillerson and then-Secretary of Homeland Security John F. Kelly, President Trump reportedly said of the 15,000 Haitians admitted to the United States, they "all have AIDS."[33]  At this same meeting, the President, after learning that 40,000 people had entered the United States from Nigeria, reportedly stated that they would never "go back to their huts" in Africa.[34]  In November 2015, then-candidate Trump disseminated a debunked story about celebrations of the September 11, 2001, attacks, involving "thousands and thousands of people" in New Jersey where "you have large Arab populations."[35]  President Trump's many racist statements have been documented and catalogued.[36]

70.     President Trump has directed his racist remarks at the TPS program.  For example, on or about January 11, 2018, several lawmakers gathered with the President in the Oval Office of the White House to discuss a bipartisan immigration proposal.  President Trump grew frustrated

---

[31] *Donald Trump Announces a Presidential Bid*, Wash. Post (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.0b727c71c4c8.

[32] *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC* (Feb 23, 2018), https://www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac.

[33] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://nyti.ms/2DEQLyv.

[34] *Id.*

[35] Glenn Kessler, *Trump's outrageous claim that 'thousands' of New Jersey Muslims celebrated the 9/11 attacks,* Wash. Post (Nov. 22, 2015), https://www.washingtonpost.com/news/fact-checker/wp/2015/11/22/donald-trumps-outrageous-claim-that-thousands-of-new-jersey-muslims-celebrated-the-911-attacks/?utm_term=.88120e0b9d60 (video embedded).

[36] David Leonhardt & Ian Prasad Philbrick, *Donald Trump's Racism: The Definitive List*, N.Y. Times (Jan. 15, 2018), https://www.nytimes.com/interactive/2018/01/15/opinion/leonhardt-trump-racist.html.

when the conversation turned to TPS protections for foreign nationals from certain Latin American and African countries.  "Why," the President asked, "are we having all these people from shithole countries come here?"[37]  He expressed a preference, instead, for immigrants from countries like Norway, which is overwhelmingly white.[38]  President Trump asked "Why do we need more Haitians?"  He insisted that lawmakers "[t]ake them out" of any potential immigration deal.[39]

71.    Senator Dick Durbin, who was present at the January 11, 2018, meeting in the Oval Office, characterized the President's comments as "clearly racial," "hate-filled," and "vile."[40]  Senator Durbin reportedly warned the President that exclusion of immigrants based on those grounds would be "an obvious racial decision."[41]

72.    Secretary Nielsen, who also was present at the January 11, 2018, meeting in the Oval Office,[42] has acknowledged that the President used "tough language."[43]  Although she asserted that she did not know whether Norway was a "predominately white country," she admitted that she "imagine[d] that is the case."[44]

73.    On or about November 6, 2017, White House Chief of Staff John F. Kelly and White House Homeland Security Adviser Tom Bossert repeatedly called Acting Secretary Duke and pressured her to terminate the TPS designation for Honduras.  A former official with

---

[37] Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, Wash. Post (Jan 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[38] *Id.*

[39] *Id.*

[40] Carl Hulse, Inside the Oval Office Immigration Meeting that Left a Senator Stunned, N.Y. Times (Jan. 19, 2018), https://nyti.ms/2DiqhlM.

[41] *Id.*

[42] Walter Shapiro, *Opinion: White People in Norway? Who Knew?*, Roll Call (Jan. 17, 2018), https://www.rollcall.com/news/opinion/kirstjen-nielsen-trump-norway.

[43] *Id.*

[44] *Id.*

knowledge of the exchange said, "[t]hey put massive pressure on her."[45]  Chief of Staff Kelly made the call from Japan, where he was travelling with President Trump.  According to reports, Chief of Staff Kelly was irritated and persistent, warning Acting Secretary Duke that the TPS program "prevents [the Trump Administration's] wider strategic goal" on immigration.[46] In response to this pressure, Acting Secretary Duke reportedly told Chief of Staff Kelly that she would resign her position.[47]

## DHS'S TPS TERMINATIONS WERE BASED ON AN ARBITRARY INTERPRETATION OF THE TPS STATUTE, BREAKING WITH DECADES OF PRIOR PRACTICE WITHOUT EXPLANATION.

74.    Over the past fourteen months, DHS Secretary Kirstjen Nielsen and Acting Secretary Elaine Duke announced the termination of TPS for El Salvador, Haiti, Nicaragua, and Sudan.

75.    To justify those decisions, DHS has adopted a novel interpretation of the TPS statute.  Under prior administrations, DHS or its predecessors considered intervening natural disasters, conflicts, and other serious social and economic problems as relevant factors when deciding whether to continue or instead terminate a TPS designation.  Although no relevant statute or regulation has changed in the intervening decades, the Trump administration's DHS has now taken the position that such factors cannot be considered.

76.    The Administration adopted the new interpretation without a formal announcement to disclose its rationale for making a dramatic change to a decades-old policy.  Instead, the change became public during testimony by then-Secretary Kelly at a Senate hearing on June 6, 2017.  Secretary Kelly stated "the program [TPS] is for a specific event.  In – in Haiti, it was the

---

[45] Nick Miroff, *White House Chief of Staff Tried to Pressure Acting DHS Secretary to Expel Thousands of Hondurans, Officials Say*, Wash. Post (Nov. 9, 2017), https://www.washingtonpost.com/world/national-security/white-house-chief-of-staff-tried-to-pressure-acting-dhs-secretary-to-expel-thousands-of-hondurans-officials-say/2017/11/09/914d3700-c54a-11e7-a441-3a768c8586f1_story.html?utm_term=.a3d52a717ec9.

[46] *Id.*

[47] *Id.*

1   earthquake.  Yes, Haiti had horrible conditions before the earthquake, and those conditions aren't

2   much better after the earthquake.  But the earthquake was why TPS was – was granted and – and

3   that's how I have to look at it."[48]

4       77.    Current Secretary Nielsen has since reiterated the view that "[t]he law does not

5   allow me to look at the country conditions of a country writ large.  It requires me to look very

6   specifically as to whether the country conditions originating from the original designation

7   continue to exist."[49]

8       78.    The Administration has applied its new policy to its TPS decisions.  In at least three

9   announcements terminating a TPS designation, the DHS Secretary explicitly stated that she

10  compared "the conditions upon which the country's original designation was based" with "an

11  assessment of whether those originating conditions continue to exist."[50]  Even where she did not

12  refer to the new policy explicitly, the Secretary's new interpretation of the TPS statute is evident

13  in its TPS termination decisions for El Salvador, Haiti, Nicaragua, and Sudan.

14      79.    El Salvador was the first country designated for TPS, as part of the Immigration Act

15  of 1990.[51]  Advocacy for Salvadorans denied fair asylum processes—while the United States was

16  supporting one of the warring parties in the civil war in El Salvador—was one of the primary

17  motivations for that decision.[52]

18

19

20  [48] *Hearing on the Department of Homeland Security F.Y. 2018 Budget Before the S. Comm. on Homeland Security and Governmental Affairs*, 115th Cong. (June 6, 2017) (statement of Secretary John F. Kelly), *available at* https://www.c-span.org/video/?429383-1/secretary-kelly-travel-ban-injunctions-hobbling-homeland-security-screening-effort&start=5492.

21

22  [49] *Oversight of the United States Department of Homeland Security Before the S. Comm. on the Judiciary*, 115th Cong. (Jan. 16, 2018) (statement of Kirstjen M. Nielsen, Secretary, U.S. Department of Homeland Security).

23

24  [50] Press Release, Dep't of Homeland Sec., Sec'y of Homeland Sec. Kirstjen M. Nielsen Announcement on Temp. Protected Status for El Sal. (Jan. 8, 2018); Press Release, Dep't of Homeland Sec., Acting Sec'y Elaine Duke Announcement on Temp. Protected Status for Haiti (Nov. 20, 2017); Press Release, Dep't of Homeland Sec., Acting Sec'y Elaine Duke Announcement on Temp. Protected Status for Nicaragua & Honduras (Nov. 6, 2017).

25

26  [51] Immigration Act of 1990, Pub. L. 101-649, § 303, 104 Stat. 4978,

27  [52] *See, e.g.*, Katherine Bishop, U.S. Adopts New Policy for Hearings on Political Asylum for Some Aliens, N.Y. Times (Dec. 20, 1990), https://nyti.ms/2tEcmpB.

28

1    80.    El Salvador was most recently designated for TPS on March 9, 2001 after three

2 devastating earthquakes.[53]   All told, various administrations continued TPS for El Salvador eleven

3 times based on a variety of factors and conditions that did not exist at the time of the original

4 designation, and that were unrelated to the earthquakes.[54]   Among other considerations, they cited

5 droughts and a leaf rust epidemic that caused destabilizing food insecurity and malnutrition,[55]

6 health emergencies,[56] subsequent environmental disasters, including another earthquake in 2012,

7

8

9

10    [53] A devastating, 7.6 magnitude earthquake hit El Salvador on January 13, 2001, followed by over
3,000 aftershocks. The earthquakes killed over 1,100 people, damaged or destroyed approximately
11 220,000 homes, 1,696 schools, and 856 public buildings, and affected approximately 1.5 million
people. Designation of El Salvador Under Temporary Protected Status, 66 Fed. Reg. 14,214 (Mar.
12 9, 2001).

13    [54] *See* Extension of the Designation of El Salvador for Temporary Protected Status, 81 Fed. Reg.
44,645, 44,647 (July 8, 2016); Extension of the Designation of El Salvador for Temporary
14 Protected Status, 80 Fed. Reg. 893, 894 (Jan. 7, 2015); Extension of the Designation of El
Salvador for Temporary Protected Status, 78 Fed. Reg. 32,418, 32,419 (May 30, 2013); Extension
15 of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of
Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 77 Fed. Reg. 1710,
16 1711–12 (Jan. 11, 2012); Extension of the Designation of El Salvador for Temporary Protected
Status and Automatic Extension of Employment Authorization Documentation for Salvadoran
17 TPS Beneficiaries, 75 Fed. Reg. 39,556, 39,557–58 (July 9, 2010); Extension of the Designation
of El Salvador for Temporary Protected Status, 73 Fed. Reg. 57,128, 57,129 (Oct. 1, 2008);
18 Extension of the Designation of El Salvador for Temporary Protected Status, Automatic Extension
of Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 72 Fed. Reg.
19 46,649, 46,649–50 (Aug. 21, 2007); Extension of the Designation of Temporary Protected Status
for El Salvador, Automatic Extension of Employment Authorization Documentation for El
20 Salvadorian TPS Beneficiaries, 71 Fed. Reg. 34,637, 34,638 (June 15, 2006); Extension of the
Designation of Temporary Protected Status for El Salvador, Automatic Extension of Employment
21 Authorization Documentation for El Salvador TPS Beneficiaries, 70 Fed. Reg. 1450, 1451 (Jan. 7,
2005); Extension of the Designation of El Salvador Under Temporary Protected Status Program,
22 Automatic Extension of Employment Authorization Documentation for El Salvador, 68 Fed. Reg.
42,071, 42,072 (July 16, 2003); Extension of the Designation of El Salvador Under the Temporary
23 Protected Status Program, Automatic Extension of Employment Authorization Documentation for
Salvadorans, 67 Fed. Reg. 46,000, 46,000–01 (July 11, 2002).

24    [55] Extension of the Designation of El Salvador for Temporary Protected Status, 80 Fed. Reg. 893,
25 895 (Jan. 7, 2015); Extension of the Designation of El Salvador Under the Temporary Protected
Status Program, Automatic Extension of Employment Authorization Documentation for
26 Salvadorans, 67 Fed. Reg. 46,000, 46,000–01 (July 11, 2002).

27    [56] Extension of the Designation of El Salvador for Temporary Protected Status, 81 Fed. Reg.
44,645, 44,647 (July 8, 2016) (identifying that the environmental and social conditions plaguing
28 the country spurred an outbreak of mosquito borne illnesses, including chikugunya and dengue).

1  volcanic eruptions, hurricanes, mudslides and flooding,[57] economic instability, and crime[58] as

2  grounds for continuing TPS.

3          81.    But when terminating TPS for Salvadorans in January 2018, Secretary Nielsen

4  ignored the contemporary realities of life in El Salvador by asking only whether disruptions

5  traceable to the 2001 earthquakes had abated.  The Secretary relied on generic platitudes,[59]

6  ignoring natural and environmental disasters, pervasive gang violence, mass food insecurity, and

7  other humanitarian crises since the 2001 earthquake.

8          82.    Haiti was first designated for TPS by Secretary Napolitano on January 21, 2010 after

9  a 7.0 magnitude earthquake struck the country,[60] killing as many as 300,000 people.[61]  Since then,

10  DHS has provided protection for Haiti under the TPS program from 2011 to 2017.[62]  In continuing

---

[57] Extension of the Designation of El Salvador for Temporary Protected Status, 80 Fed. Reg. 893, 894 (Jan. 7, 2015) (noting that Tropical Storm Barry hit El Salvador in June 2013, causing flooding, and in December 2013, the Chaparrastique volcano erupted in December 2013, forcing thousands of people to evacuate their homes); Extension of the Designation of El Salvador for Temporary Protected Status, 78 Fed. Reg. 32,418, 32,419 (May 30, 2013); Extension of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 77 Fed. Reg. 1710, 1712 (Jan. 11, 2012); Extension of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 75 Fed. Reg. 39,556, 39,558 (July 9, 2010); Extension of the Designation of Temporary Protected Status for El Salvador, Automatic Extension of Employment Authorization Documentation for El Salvadorian TPS Beneficiaries, 71 Fed. Reg. 34,637, 34,638 (June 15, 2006).

[58] Extension of the Designation of El Salvador for Temporary Protected Status, 80 Fed. Reg. 893, 895 (Jan. 7, 2015) (considering that almost half of all Salvadorans lived in poverty, a third were underemployed, and El Salvador's annual GDP growth fell way behind its neighboring countries); Extension of the Designation of El Salvador Under Temporary Protected Status Program, Automatic Extension of Employment Authorization Documentation for El Salvador, 68 Fed. Reg. 42,071, 42,072 (July 16, 2003) (considering that a large number of returnees would "creat[e] social unrest and exacerbat[e] a critical crime situation").

[59] Termination of the Designation of El Salvador for Temporary Protected Status, 83 Fed. Reg. 2654, 2656 (Jan. 18, 2018).

[60] Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010).

[61] See Extension of the Designation of Haiti for Temporary Protected Status, 77 Fed. Reg. 59,943, 59,944 (Oct. 1, 2012).

[62] Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. 23,830 (May 24, 2017); Extension of the Designation of Haiti for Temporary Protected Status, 80 Fed. Reg. 51,582 (Aug. 25, 2015); Extension of the Designation of Haiti for Temporary Protected Status, 79 Fed. Reg. 11,808 (Mar. 3, 2014); Extension of the Designation of Haiti for Temporary

Haiti's status under the TPS program, Secretaries Napolitano and Johnson considered a variety of factors and conditions that arose subsequent to the earthquake, many of which were wholly or partially unrelated to it, including crime, poverty, unemployment, lack of adequate social services,[63] and successive health and environmental disasters, including destruction caused by Hurricane Matthew.[64]

83.   Contrary to his predecessors, when Secretary Kelly continued Haiti's TPS designation in May 2017, he did so for the minimum six months allowed by statute.  He simultaneously cautioned Haitian TPS recipients living in the United States to "make other necessary arrangements for their ultimate departure from the United States" despite concluding, after consultation with the Department of State, that "conditions in Haiti supporting its designation for TPS persist."[65]

84.   On January 18, 2018, one week after President Trump's "shithole countries" comments, Deputy Secretary Duke's decision terminating Haiti's TPS designation was published in the Federal Register.[66]  The justifications made no mention of intervening and ongoing environmental, food, and medical disasters relied upon by prior DHS Secretaries.

85.   Nicaragua was designated for TPS by Attorney General Janet Reno on January 5, 1999 after Hurricane Mitch caused severe damage to the country.[67]  Multiple Attorneys General

Protected Status, 77 Fed. Reg. 59,943 (Oct. 1, 2012); Extension and Redesignation of Haiti for Temporary Protected Status, 76 Fed. Reg. 29,000 (May 19, 2011).

[63] Extension of the Designation of Haiti for Temporary Protected Status, 79 Fed. Reg. 11,808, 11,810 (Mar. 3, 2014); Extension and Redesignation of Haiti for Temporary Protected Status, 76 Fed. Reg. 29,000, 29,001 (May 19, 2011).

[64] Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. 23,830, 23,832 (May 24, 2017); Extension of the Designation of Haiti for Temporary Protected Status, 79 Fed. Reg. 11,808, 11,810 (Mar. 3, 2014); Extension of the Designation of Haiti for Temporary Protected Status, 77 Fed. Reg. 59,943, 59,944 (Oct. 1, 2012); Extension and Redesignation of Haiti for Temporary Protected Status, 76 Fed. Reg. 29,000, 29,001 (May 19, 2011).

[65] Press Release, Dep't of Homeland Sec., Sec'y Kelly's Statement on the Limited Extension of Haiti's Designation for Temp. Protected Status (May 22, 2017).

[66] Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2648 (Jan. 18, 2018).

[67] Hurricane Mitch killed more than 3,000 people, and destroyed an estimated 145,000 homes, ninety health clinics, nearly 350 schools, and seventy percent of Nicaragua's roads. The severe flooding and landslides resulting from Hurricane Mitch buried entire villages and caused more

and DHS Secretaries subsequently agreed that conditions in Nicaragua warranted maintenance of

its TPS designation, which occurred thirteen times in all.[68] Those decisions took into

consideration social, economic, and infrastructural challenges that were not directly attributable to

the hurricane.[69] They cited to environmental disasters that occurred *after* Hurricane Mitch,[70] a

[68] than $1.3 billion of damage. Designation of Nicaragua for Temporary Protected Status, 64 Fed. Reg. 526 (Jan. 5, 1999); Extension of the Designation of Nicaragua for Temporary Protected Status, 81 Fed. Reg. 30,325, 30,326 (May 16, 2016).

[68] The Attorneys General and DHS Secretaries responsible for extending Nicaragua's TPS designation are Attorney General Janet Reno, Attorney General John Ashcroft, DHS Secretary Tom Ridge, DHS Secretary Michael Chertoff, DHS Secretary Janet Napolitano, and DHS Secretary Jeh Johnson. Extension of the Designation of Nicaragua for Temporary Protected Status, 81 Fed. Reg. 30,325 (May 16, 2016); Extension of the Designation of Nicaragua for Temporary Protected Status, 79 Fed. Reg. 62,176 (Oct. 16, 2014); Extension of the Designation of Nicaragua for Temporary Protected Status, 78 Fed. Reg. 20,128 (Apr. 3, 2013); Extension of the Designation of Nicaragua for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries, 76 Fed. Reg. 68,493 (Nov. 4, 2011); Extension of the Designation of Nicaragua for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries, 75 Fed. Reg. 24,737 (May 5, 2010); Extension of the Designation of Nicaragua for Temporary Protected Status, 73 Fed. Reg. 57,138 (Oct. 1, 2008); Extension of the Designation of Nicaragua for Temporary Protected Status, Automatic Extension of Employment Authorization Documentation for Nicaragua TPS Beneficiaries, 72 Fed. Reg. 29,534 (May 29, 2007); Extension of the Designation of Temporary Protected Status for Nicaragua, Automatic Extension of Employment Authorization Documentation for Nicaragua TPS Beneficiaries, 71 Fed. Reg. 16,333 (Mar. 31, 2006); Extension of the Designation of Temporary Protected Status for Nicaragua, Automatic Extension of Employment Authorization Documentation for Nicaragua TPS Beneficiaries, 69 Fed. Reg. 64,088 (Nov. 3, 2004); Extension of the Designation of Nicaragua Under the Temporary Protected Status Program, Automatic Extension of Employment Authorization Documentation for Nicaraguans, 68 Fed. Reg. 23,748 (May 5, 2003); Extension of the Designation of Nicaragua Under the Temporary Protected Status Program, 67 Fed. Reg. 22,454 (May 3, 2002); Extension of the Designation of Nicaragua Under the Temporary Protected Status Program, 66 Fed. Reg. 23,271 (May 8, 2001); Extension of Designation of Nicaragua Under Temporary Protected Status Program, 65 Fed. Reg. 30,440 (May 11, 2000).

[69] Extension of the Designation of Nicaragua for Temporary Protected Status, Automatic Extension of Employment Authorization Documentation for Nicaragua TPS Beneficiaries, 72 Fed. Reg. 29,534 (May 29, 2007).

[70] Extension of the Designation of Nicaragua Under the Temporary Protected Status Program, 67 Fed. Reg. 22,454, 22,454 (May 3, 2002) ("recent droughts as well as flooding from Hurricane Michelle in 2001 compounded the humanitarian, economic, and social problems initially brought on by Hurricane Mitch in 1998"); Extension of the Designation of Nicaragua Under the Temporary Protected Status Program, Automatic Extension of Employment Authorization Documentation for Nicaraguans, 68 Fed. Reg. 23,748, 23,748 (May 5, 2003) ("a prolonged drought as well as flooding from Hurricane Michelle have compromised food security and disrupted reconstruction efforts"); Extension of the Designation of Nicaragua for Temporary Protected Status, Automatic Extension of Employment Authorization Documentation for Nicaragua TPS Beneficiaries, 72 Fed. Reg. 29,534, 29,535 (May 29, 2007) (Hurricane Beta and Tropical Storm Stan which jointly "severely affected thousands of people, destroying houses, medical centers, and schools in October 2005"); Extension of the Designation of Nicaragua for

fractured economic foundation and "chronic poverty," and problems of governance and political tension.[71]

86.     In December 2017, Acting Secretary Duke reversed course.  With a three-paragraph explanation that failed to address any of the intervening conditions considered by previous administrations, the Acting Secretary abruptly terminated Nicaragua's TPS designation.[72]

87.     Sudan was first designated for TPS on November 4, 1997, in the midst of a long-running civil war.[73]  Since that time, successive administrations reviewed Sudan's TPS status and saw fit to maintain TPS protection for the county eighteen times.[74]  Nine of these reviews occurred

---

Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries, 75 Fed. Reg. 24,737, 24,738 (May 5, 2010); Extension of the Designation of Nicaragua for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries, 76 Fed. Reg. 68,493, 68,494 (Nov. 4, 2011) (Tropical Storm Alma in May 2008, Tropical Depression 16 in 2008, Hurricane Ida in 2009, and Hurricane Felix and Tropical Storm Matthew in 2010); Extension of the Designation of Nicaragua for Temporary Protected Status, 78 Fed. Reg. 20,128, 20,130 (Apr. 3, 2013) (Tropical Depression 12E in 2011, which caused an extensive $445 million (USD) in damages); Extension of the Designation of Nicaragua for Temporary Protected Status, 79 Fed. Reg. 62,176, 62,178 (Oct. 16, 2014) (in 2013, Hurricane Barbara, several tropical storms, and heavy seasonal rains caused 15 deaths and affected 12,000 people); Extension of the Designation of Nicaragua for Temporary Protected Status, 79 Fed. Reg. 62,176, 62,178 (Oct. 16, 2014) (a drought in 2014); Extension of the Designation of Nicaragua for Temporary Protected Status, 81 Fed. Reg. 30,325, 30,325 (May 16, 2016) (Nicaragua suffered "a prolonged regional drought" as recent as 2016).

[71] Extension of the Designation of Nicaragua for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries, 75 Fed. Reg. 24,737, 24,738 (May 5, 2010); Extension of the Designation of Nicaragua for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries, 76 Fed. Reg. 68,493, 68,495 (Nov. 4, 2011) (noting a rise in "political tension," "including violent demonstrations and seizures of government offices" which "could hinder the efforts of already-weak local institutions to provide services and help reintegrate returned Nicaraguans.").

[72] Termination of the Designation of Nicaragua for Temporary Protected Status, 82 Fed. Reg. at 59,636–37 (Dec. 15, 2017.).  Acting Secretary Duke delayed the effective expiration date until January 5, 2019 to "provide for an orderly transition."  Id.

[73] Designation of Sudan for Temporary Protected Status, 62 Fed. Reg. 59737 (Nov. 4, 1997).

[74] Extension of Designation of Sudan Under Temporary Protected Status Program, 63 Fed. Reg. 59,337 (Nov. 3, 1998); Extension and Redesignation of Sudan Under the Temporary Protected Status Program, 64 Fed. Reg. at 61,128; Extension of Designation of Sudan Under the Temporary Protected Status Program, 65 Fed. Reg. 67,407 (Nov. 9, 2000); Extension of the Designation of Sudan Under the Temporary Protected Status Program, 66 Fed. Reg. 46,031 (Aug. 31, 2001); Extension of the Designation of Sudan Under the Temporary Protected Status Program, 67 Fed. Reg. 55,877 (Aug. 30, 2002); Extension of the Designation of Sudan Under the Temporary Protected Status Program, 68 Fed. Reg. 52,410 (Sept. 3, 2003); Extension and Redesignation of

---

*after* Sudan's civil war officially concluded in January 2005 with the signing of the

Comprehensive Peace Agreement.  Attorneys General and Secretaries of Homeland Security

consistently considered intervening factors wholly or partially unrelated to the civil war, including

natural disasters, "perennial environmental shocks, such as flooding and droughts," new armed

conflicts, growing poverty,[75] criminal activity, and "deteriorating economic conditions" leading to

"increased food and fuel prices."[76]

88.     Nevertheless, in September 2017, Acting Secretary Duke terminated Sudan's TPS

designation on the ground that "the ongoing armed conflict and extraordinary and temporary

conditions that served as the basis for Sudan's most recent designation have sufficiently improved

such that they no longer prevent nationals of Sudan from returning in safety to all regions of

Sudan."[77]  The Acting Secretary did not even consider, let alone make a finding as to numerous

intervening factors considered by prior administrations in extending Sudan's TPS designation.

## CLASS ALLEGATIONS

89.     Representative Individual Minor Plaintiffs Crista Ramos, Benjamin Zepeda, Juan

Eduardo Ayala Flores, Hnaida Cenemat, and Rilya Salary bring this action under Federal Rule of

---

Temporary Protected Status for Sudan, 69 Fed. Reg. 60,168 (Oct. 7, 2004); Extension of the Designation of Sudan for Temporary Protected Status, Extension of Employment Authorization Documentation for Eligible TPS Beneficiaries, 70 Fed. Reg. 52,429 (Sept. 2, 2005); Extension of the Designation of Sudan for Temporary Protected Status, Automatic Extension of Employment Authorization Documentation for Sudanese TPS Beneficiaries, 72 Fed. Reg. 10,541 (March 8, 2007); Extension of the Designation of Sudan for Temporary Protected Status, Automatic Extension of Employment Authorization Documentation for Sudanese TPS Beneficiaries, 73 Fed. Reg. 47,606 (Aug. 14, 2008); Extension of the Designation of Sudan for Temporary Protected Status, 74 Fed. Reg. 69,355 (Dec. 31, 2009) (extending TPS for 18 months); Extension of the Designation of Sudan for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Sudanese TPS Beneficiaries, 76 Fed. Reg. 63,635 (Oct. 13, 2011); Extension and Redesignation of Sudan for Temporary Protected Status, 78 Fed. Reg. 1872 (Jan. 9, 2013); Extension of the Designation of Sudan for Temporary Protected Status, 79 Fed. Reg. 52,027 (Sept. 2, 2014); Extension of the Designation of Sudan for Temporary Protected Status, 81 Fed. Reg. 4045 (Jan. 25, 2016).

[75] Extension of the Designation of Sudan Under the Temporary Protected Status Program, 68 Fed. Reg. 52,410 (Sept. 3, 2003); *see also, e.g.,* Extension of the Designation of Sudan for Temporary Protected Status, Automatic Extension of Employment Authorization Documentation for Sudanese TPS Beneficiaries, 72 Fed. Reg. 10,541 (March 8, 2007).

[76] Extension of the Designation of Sudan for Temporary Protected Status, 79 Fed. Reg. 52,027 (Sept. 2, 2014).

[77] Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. at 47,228.

Civil Procedure 23(b)(1)(A) and (b)(2), on behalf of themselves and a nationwide class of all similarly situated persons.

90.     Minor Plaintiffs seek to represent the following nationwide class: The U.S. citizen children, from ages five to eighteen, of all TPS holders from El Salvador, Haiti, Nicaragua, and Sudan.

91.     The proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is so numerous that joinder of all members is impracticable.

92.     On information and belief, there are tens of thousands of U.S. citizen children of TPS holders from El Salvador, Haiti, Nicaragua, and Sudan.  Given the dates of TPS designations for those countries, thousands of those children are minors confronted with the possibility of losing either the ability to live in their country or the care and support of a TPS-holder parent.

93.     Due to the actions of Defendants, the U.S. citizen children of TPS holders will be forced to choose between their absolute and fundamental due process right to reside in this country, and their due process right to the care and support of their parents.

94.     The class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2).  Members of the class are subject to a common practice or policy: Defendants' adoption of a new rule that has caused the termination of the TPS designations for their parents' respective countries without any consideration of the impact on the class members—*i.e.*, these American children—or any valid reason justifying the harm that decision imposes on them.  If the TPS termination decisions take effect, these children will be forced by law to choose between their right to reside in this country as citizens, and their right to reside with their parents.  Whether the Due Process Clause permits the government to force these children into that choice presents a common legal question, resolution of which will greatly aid the efficient resolution of this case.

95.     The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Individual Minor Plaintiffs are typical of the claims of their class.  Minor Plaintiffs and the proposed Citizen-Children Class members are the school-aged children, from ages five to eighteen, who are U.S. citizens.  Their parents will be subject to removal once the TPS termination decisions take effect.  Individual Minor Plaintiffs and

their proposed class also share the same legal claims, which challenge the legality of these termination policies and practices under the Fifth Amendment.

96.   The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4).  Individual Minor Plaintiffs seek the same relief as the other members of the class.  In defending their own rights, Individual Plaintiffs will defend the rights of all proposed class members fairly and adequately.

97.   Additionally, the proposed class is represented by *pro bono* counsel from the National Day Laborer Organizing Network ("NDLON"), the American Civil Liberties Union of Southern California, and Sidley Austin LLP.  Plaintiffs' counsel have extensive experience litigating class action lawsuits and other complex cases in federal court, including civil rights lawsuits on behalf of non-citizens.

98.   The members of the class are readily ascertainable through Defendants' records.

99.   Finally, the proposed class satisfies Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(2).  Competing rulings as to whether Defendants must permit the TPS-holding parents of minor U.S. citizen children to reside in the United States could create inconsistent adjudications and establish incompatible standards of conduct governing Defendants' behavior.  In addition, Defendants have acted on grounds that are generally applicable to the class by terminating the TPS designations for El Salvador, Haiti, Nicaragua, and Sudan without considering the massive harm that decision causes to U.S. citizen children or providing reasons to justify that harm.  Thus, final injunctive and declaratory relief is appropriate for the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the Due Process Clause of the Fifth Amendment**

**(Against All Defendants by All U.S. Citizen Children Plaintiffs)**

100.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

101.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."

1    U.S. Const. amend. V.  The guarantee against the deprivation of liberty without due process bars

2    the government from infringing on certain "fundamental" liberty interests, regardless of the

3    procedures involved, unless the action is "narrowly tailored to serve a compelling state interest."

4    *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).

5           102.   Three such fundamental rights are implicated here.  First, the plaintiffs here who are

6    school-aged U.S. citizens have an absolute right to live in the United States.  To compel them to

7    live abroad at any time, let alone in their formative years, would deny them a core aspect of their

8    liberty protected by the Fifth Amendment.  *See, e.g.*, *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001); *Ng*

9    *Fung Ho v. White*, 259 U.S. 276, 284 (1922).

10          103.   Second, for at least so long as these U.S. citizen plaintiffs remain minors, they have

11   a fundamental right protected by both the First and Fifth Amendments to live with and be raised

12   by their parents.  *E.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977); *Board of Dirs.*

13   *v. Rotary Club*, 481 U.S. 537, 545 (1987).

14          104.   Third, the government's decision to end the lawful immigration status of their

15   parents impinges upon the U.S. citizen plaintiffs' constitutionally-protected liberty interests.

16   These American children have a powerful interest in not being compelled to choose between two

17   alternatives when each alternative will deprive them of a substantial, constitutionally-protected

18   aspect of liberty.  *See United States v. Jackson*, 390 U.S. 570 (1968); *cf. New York v. United*

19   *States*, 505 U.S. 144, 176 (1992).

20          105.   In invading these fundamental constitutional rights, Defendants have articulated no

21   substantial governmental interest and have failed adequately to tailor their action to promote any

22   legitimate interest they may have.  Nowhere in the notices terminating the TPS designations for El

23   Salvador, Haiti, Nicaragua, and Sudan, for example, have Defendants identified any risk to the

24   interests of the United States that would follow from allowing the school-aged U.S. citizen

25   children to remain in the United States with their TPS holder parents until the children reach the

26   age of majority.

27          106.   Similarly, nowhere in the notices terminating the TPS designations for El Salvador,

28   Haiti, Nicaragua, and Sudan has the Secretary adequately explained the Secretary's new

1   interpretation of the governing statute, reconciled it with the Secretary's longstanding prior

2   interpretation, or justified its extraordinary invasion of the U.S. citizen children's constitutional

3   rights.

4         107.   Plaintiffs and Minor Plaintiffs' class will suffer irreparable injury resulting from the

5   termination of the TPS designations.

6   **SECOND CLAIM**

7   **Violation of the Equal Protection Guarantee of the**

8   **Due Process Clause of the Fifth Amendment**

9   **(Against All Defendants by All TPS-Holder Plaintiffs)**

10         108.   Plaintiffs reallege and incorporate by reference each and every allegation contained

11   in the preceding paragraphs.

12         109.   The Fifth Amendment contains an implicit guarantee of equal protection that

13   invalidates any official action that in part reflects a racially discriminatory intent or purpose.

14   Classifications based on race or national origin receive exacting scrutiny, and even facially neutral

15   policies and practices will be held unconstitutional when they reflect a pattern unexplainable on

16   grounds other than race.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v.*

17   *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

18         110.   Defendants' decisions to terminate the TPS designations for El Salvador, Haiti,

19   Nicaragua, and Sudan are unconstitutional because they were motivated, at least in part, by

20   intentional discrimination based on race, ethnicity, or national origin.

21         111.   Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of the

22   TPS designations.

23   **THIRD CLAIM**

24   **Violation of the Due Process Clause of the Fifth Amendment**

25   **(Against All Defendants by All TPS-Holder Plaintiffs)**

26         112.   Plaintiffs reallege and incorporate by reference each and every allegation contained

27   in the preceding paragraphs.

28

113.   Due process protections extend to "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  TPS holders are lawfully present in this country. They have significant liberty interests, protected by the Due Process Clause, in a non-arbitrary decision as to the continuation of their TPS status.

114.   The "very essence" of due process is the "protection of the individual against arbitrary action." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 584 (1972).  Any deprivation of liberty or property interests must, at the very least, pass a test of rationality.  The burden on the government is greater when, as here, the liberty interests at stake derive from well-established and significant reliance interests.

115.   The government also has not articulated, and cannot establish, any rational basis for reversing course on decades of established TPS policy and ignoring the current capability of TPS countries to safely receive longtime TPS holders, their families, and their U.S. citizen children.

116.   Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of the TPS designations.

**FOURTH CLAIM**

**Violation of the Administrative Procedure Act**

**(Against All Defendants by All TPS-Holder Plaintiffs)**

117.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

118.   The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

119.   Among other things, the APA empowers the federal courts to "hold unlawful and set aside agency actions, finding, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The right of review

1  under the APA includes a right to judicial review of "executive agency action for procedural

2  correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

3         120.   To engage in procedurally appropriate decision-making, an agency must ordinarily

4  "display awareness that it is changing position," and may not "depart from a prior policy sub

5  silentio." *Id.* at 515.  The APA requires an agency to provide "more substantial justification"

6  when "its new policy rests upon factual findings that contradict those which underlay its prior

7  policy," or "its prior policy has engendered serious reliance interests." *Id.*

8         121.   Defendants' termination of the TPS designations for El Salvador, Haiti, Nicaragua,

9  and Sudan constitutes "final agency action for which there is no other adequate remedy in a court"

10  pursuant to 5 U.S.C. § 704, because the Defendants' termination results in the TPS Holders' loss

11  of TPS "automatically and without further notice or right of appeal," 8 C.F.R. § 244.19.

12         122.   Defendants' adoption of a new, drastically narrower interpretation of the TPS statute

13  was arbitrary, capricious, and contrary to law in violation of the APA because it represented a

14  sudden and unexplained departure from decades of decision-making practices and ordinary

15  procedures.  By shifting the decision-governing standard for country designations without

16  explanation, Defendants have ignored a clear statutory command and engaged in procedurally

17  flawed decision-making.  Further, Defendants changed their policy without taking into account the

18  serious reliance interests that their prior policy had engendered.

19         123.   Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of the

20  TPS designations.

21  / / /

22  / / /

23  / / /

24

25

26

27

28

**PRAYER FOR RELIEF**

Individual Plaintiffs, on behalf of themselves and others similar situated, ask this Court to grant the following relief:

1. Declare that Defendants' termination of the TPS designations for El Salvador, Nicaragua, Haiti, and Sudan, was unconstitutional under the Due Process Clause of the Fifth Amendment and unlawful under the Administrative Procedure Act;

2. Vacate Defendants' unlawful termination of the TPS designations for El Salvador, Nicaragua, Haiti, and Sudan;

3. Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concern or participation with any of them, from implementing or enforcing the decisions to terminate the TPS designations for El Salvador, Nicaragua, Haiti, and Sudan;

4. Alternatively, certify this case as a class action lawsuit as proposed herein, appoint Individual Minor Plaintiffs Crista Ramos Benjamin Zepeda, Juan Eduardo Ayala Flores, Hnaida Cenemat, and Rilya Salary as class representatives of their class and the undersigned counsel as class counsel;

5. And enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concern or participation with any of them, from rescinding the immigration status of those TPS holders who have school-aged U.S. citizen children for so long as the children remain age five to eighteen;

/ / /

/ / /

/ / /

6.  Grant an award of attorneys' fees and costs; and

7.  Grant any other and further relief that this Court may deem fit and proper.


Date:  March 12, 2018                          Respectfully submitted,

                                               SIDLEY AUSTIN LLP


                                               /s/ Sean A. Commons*
                                               Mark E. Haddad
                                               Nicole M. Ryan
                                               Alycia A. Degen
                                               Sean A. Commons
                                               Ryan M. Sandrock
                                               Amanda R. Farfel
                                               Andrew B. Talai
                                               Marisol Ramirez

                                               ACLU OF SOUTHERN CALIFORNIA


                                               /s/ Ahilan T. Arulanantham
                                               Ahilan T. Arulanantham
                                               Jennifer Poon

                                               NATIONAL DAY LABORER
                                               ORGANIZING NETWORK


                                               /s/ Emilou MacLean
                                               Emilou MacLean
                                               Jessica Karp Bansal

                                               Attorneys for Plaintiffs

* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.