Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | | |
|---|---|---|
| CRISTA RAMOS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | NO. C 18-01554 EMC |
| | ) | |
| KIRSTJEN NIELSEN, et al., | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | |
| _____ | ) | Thursday, May 17, 2018 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

AMERICAN CIVIL LIBERTIES UNION
1313 West Eighth Street
Suite 200
Los Angeles, California  90017
BY:  **AHILAN T. ARULANANTHAM, ESQ.**

AMERICAN CIVIL LIBERTIES
 UNION FOUNDATION
39 Drumm Street
San Francisco, California  94111
BY:  **WILLIAM S. FREEMAN, ESQ.**

SIDLEY AUSTIN LLP
555 California Street
San Francisco, California  94104
BY:  **RYAN M. SANDROCK, ESQ.**

NATIONAL DAY LABORER ORGANIZING NETWORK
675 S. La Layette Park Place
Los Angeles, California  90057
BY:  **EMILOU MACLEAN, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
 Official Reporter, U.S. District Court

(Appearances continued, next page)

**<u>APPEARANCES, CONTINUED</u>:**


For Defendants:
                         U.S. DEPARTMENT OF JUSTICE
                         Federal Programs Branch
                         20 Massachusetts Avenue, N.W.
                         Washington, D.C.  20529
                    **BY:  RHETT D. MARTIN, ESQ.**

| | |
|---|---|
| 1 | **Thursday - May 17, 2018**                                    **1:35 p.m.** |
| 2 | P R O C E E D I N G S |
| 3 | **THE CLERK:**  Calling Case C-18-1554, Ramos versus Nielsen. |
| 4 | Counsel, please come to the podium and state your name for |
| 5 | the record. |
| 6 | **MR. ARULANANTHAM:**  Good afternoon, Your Honor.  Ahilan |
| 7 | Arulanantham for the plaintiffs. |
| 8 | **THE COURT:**  Good afternoon.  Thank you. |
| 9 | **MR. FREEMAN:**  Good afternoon, Your Honor.  William Freeman |
| 10 | for the plaintiffs. |
| 11 | **THE COURT:**  All right, thank you. |
| 12 | **MR. SANDROCK:**  Good afternoon, Your Honor.  Ryan Sandrock |
| 13 | for plaintiffs. |
| 14 | **THE COURT:**  Great.  Good afternoon. |
| 15 | **MS. MACLEAN:**  Good afternoon, Your Honor.  Emilou Maclean |
| 16 | for the plaintiffs. |
| 17 | **MR. MARTIN:**  Good afternoon, Your Honor.  Rhett P. Martin |
| 18 | for the defendants. |
| 19 | **THE COURT:**  Thank you for coming. |
| 20 | I called this because I thought that we should probably have |
| 21 | an early CMC to talk about where this case is going, in light of |
| 22 | the fact that the plaintiffs have indicated that they may be |
| 23 | seeking preliminary injunctive relief in view of an upcoming |
| 24 | deadline, which I think is November 2nd, is when the first group |
| 25 | of potential people may be losing their TPS status, as well as |

1    the government's indication they are going to be filing soon a

2    motion to dismiss, and how that all fits both in terms of case

3    management scheduling and the issue of discovery.

4         And there is some interrelationship, because while I

5    understand the government's argument about the need and the

6    desire and the appropriateness of deferring discovery until we

7    resolve the jurisdictional issues, on the other hand, should

8    this case proceed notwithstanding -- or some portion of the case

9    proceed, notwithstanding the jurisdictional challenge, we have

10   to make sure we have enough time to have whatever discovery is

11   going to happen, leading up to the preliminary-injunction

12   hearing which needs to be briefed and argued with sufficient

13   time so that we don't find ourselves at the end of the time

14   stick there.  So I thought it would be useful to have that

15   discussion.

16        But before we kind of get into the meat of that issue, I

17   want to make sure I understand exactly what the issues -- the

18   legal theory is here.  And I'm sure I'm going to learn more as

19   we go along, but I thought it would be useful to hear from the

20   outset some basic things.

21        So for instance, is it the plaintiffs -- is the plaintiffs'

22   challenge in part, does it claim that the new policy violates --

23   is inconsistent with the TPS statute?  Or that its enactment was

24   a procedural violation of the APA?  Or that its enactment -- I

25   understand, I guess, the constitutional theory there was

1    motivated by animus or factors that are improper.

2        So I guess one question:  Is this a challenge to a statutory

3    interpretation?  Or more the way and the process by which the

4    new policy came about?

5        **MR. ARULANANTHAM:**  Sure, Your Honor.

6        And just -- I apologize, I haven't been here before.  Would

7    you like me to (Indicating) --

8        **THE COURT:**  Yes.

9        **MR. ARULANANTHAM:**  Okay.

10       Your Honor, as it's pled in the complaint, it's only a

11   challenge under *FCC v. Fox* to the absence of an explanation to

12   -- for the change in interpretation that the new administration

13   has taken.  We have looked at and are still looking at whether

14   there is also an inconsistency with the statute, itself.

15       And, you know, that's an argument that we could conceivably

16   make --

17       **THE COURT:**  That is not being asserted at this point.

18       **MR. ARULANANTHAM:**  That is not being asserted at this point.

19       **THE COURT:**  And with respect to the absence of explanation,

20   now, is that cast -- let me make sure I understand -- in terms

21   of an APA violation?  Or is there some other sort of larger

22   principle or other principle outside the APA?

23       **MR. ARULANANTHAM:**  It is -- it's definitely an APA violation

24   in our view, Your Honor.

25       We also argue under the Fifth-Amendment due-process clause,

even as to TPS holders, themselves, that where you have an
entirely unexplained in our view irrational change in policy
which has had a dramatic effect on people's lives, that even
under rationality-based review, there's a due-process problem
with the change that the new administration has undertaken with
respect to how it interprets the TPS rules.

**THE COURT:**  All right.  So with respect to the due-process
claim, it sounds like you are relying on a rational basis or
irrational basis review, not strict scrutiny or fundamental
rights.

**MR. ARULANANTHAM:**  As to that claim.  There's three
constitutional claims in the case.  Two of them are for TPS
holders, and one is for the American children in the case.

For the two TPS-holder claims, one of them is the equal
protection claim.  In our view that -- the papers don't, you
know, set this forth, but we think it's motivated by racial
animus.  And we can prove that.

And certainly, under the Ninth Circuit law, I think *ARCE* is
the case about the Mexican-American studies program at the
University of Arizona.  And -- and a bunch of other law
implementing the *Arlington Heights* decision, we think that's
subject to heightened scrutiny.

The due-process claim as to TPS holders is the one I just
mentioned to Your Honor earlier.  That's subject to
rational-basis scrutiny, I think.  At least, we plead the

1    complaint on the assumption that it's subject to rational-basis

2    scrutiny.

3        And then there's the separate claim as to the U.S. citizen

4    children where there's not a lot of -- there's not a single

5    strand of doctrine on exact claims just exactly like this one

6    that will give you a simple answer as to what scrutiny level

7    applies.

8        You have cases about burdens on the family and the integrity

9    of the family, like *Moore v. City of East Cleveland*.  Which

10   suggested some form of heightened scrutiny.

11       You've got cases in the immigration context about the burden

12   on U.S. citizens when they're trying to petition their family

13   members, or even other people like professors we want to invite

14   to a university to talk, or something where it's a different

15   standard of review, it's called facially legitimate and

16   bona fide review in those cases.  Those are for people who are

17   outside the country who are trying to come here.

18       So I think the answer to what standard of review governs

19   that claim will probably be found in some combination of those

20   cases.  And we haven't briefed that yet.

21       **THE COURT:**  As I recall, *Moore versus East Cleveland* is one

22   of those cases that academicians refer to as "rational basis

23   with a bite."

24       **MR. ARULANANTHAM:**  That's correct, Your Honor.

25       **THE COURT:**  One of the first cases in that arena.

1    **MR. ARULANANTHAM:**  Yes.

2    **THE COURT:**  And so, then, with respect to your position, let

3    me ask one more question about equal protection.

4        You're not alleging as part of your theory then that the

5    selection of these four countries constitutes unequal treatment

6    of similarly-situated others, that this is not singling out

7    certain countries based on some criteria that's --

8    **MR. ARULANANTHAM:**  No, Your Honor.  We don't say, for

9    example, that there is a comparator group of other TPS countries

10   involving white people that were treated differently from these

11   TPS countries.  Instead, our argument is just that racial animus

12   motivated the decision against these TPS countries.

13       And I don't think that there's a requirement that you have a

14   comparator if you have other evidence of direct racial animus,

15   which we have here.

16   **THE COURT:**  And one question that I can already tell has

17   come up and I'm sure will be subject to further litigation is

18   when we say "animus," whose animus?

19       Is it the head of DHS?  Is it a combination of people?  Is

20   it the President?  Who --

21   **MR. ARULANANTHAM:**  Yes, Your Honor.  There's going to be a

22   lot of litigation about that, if we can manage to get that far.

23       But I think one important sort of jumping-off point from the

24   complaint, we already have allegations which are very public

25   news sources that people in the administration -- sorry, in the

1   White House were pressuring the DHS Secretary with respect to

2   the decision on Honduras -- there's actually reporting about

3   that particular interaction.

4       You have the Secre- -- excuse me, by then he's in the White

5   House -- Kelly, who had previously been the Secretary of DHS,

6   calling Duke, who is the person who is making the decision, the

7   acting Secretary of DHS, and pressuring her as to the decision

8   on Honduras.  So I think that is one channel in which you could

9   imagine that the President's own racial animus could be

10  infecting the TPS decision.

11      And I think where you have that kind of evidence, then you

12  can also look to other factors.  Like:  Did anybody in the State

13  Department actually recommend that TPS be terminated?  Did the

14  people who were in the embassies in these countries say that

15  this was a good idea to terminate TPS?

16      And if it turns out that the overwhelming evidence from at

17  least most of the agencies involved who were consulted was that

18  the decision should go one way, but then it goes another way,

19  that is evidence -- not by itself, by any means, but when

20  coupled with this other history of pressure that we know was

21  happening, that could be evidence that racial animus infected

22  the decision.

23      **THE COURT:**  All right.  Well, that's a nice segue into the

24  next question.  And that is, there's talk about the

25  administrative record.  And I'm not sure what that looks like

1    here.

2        But just to get the proper nomenclature, will there be a

3    debate over sort of what should be in the administrative record?

4    Or do the parties agree that there is some administrative

5    record, but you's are looking for extra-legal -- or extra-record

6    documents beyond what properly would be called the

7    administrative record?

8    **MR. ARULANANTHAM:**  So we haven't gotten to the -- the

9    parties haven't gotten to a discussion of that yet.  We did

10   request the administrative record as part of the early discovery

11   requests that we have made.

12       We haven't -- we have met and conferred about different

13   things, but we haven't actually discussed that particular

14   request.  So I'm not sure what the government's position is on

15   it.

16       I think, anyway, our position will be that the

17   equal-protection claim and the citizens children claim, at least

18   those two, should not be limited to the administrative record.

19       I think there's -- it's more complicated whether the

20   due-process claim for TPS holders, you know, whether that claim,

21   the one that I said was subject to rational-basis review, I

22   think that's a more complicated question whether that claim has

23   to be limited to the administrative record or not.  But

24   obviously, we're not -- that's a couple steps down the road.

25       But I think -- we're looking forward to seeing what the

1    government compiles and the administrative record for these

2    decisions, before asserting that more would be needed.

3        It might even be that everything that we need -- I kind of

4    doubt it, but, you know, maybe everything we need to litigate

5    the equal-protection and due-process claims also could perhaps

6    be in the administrative record.  It's just hard to know until

7    we've seen it.

8        **THE COURT:**  All right.  And then finally let me ask you --

9    and I'll get to the timing question.  I will ask the government

10   for its views of course, as well.

11       But in light of Judge Alsup's case and the Supreme Court's

12   granting of cert with -- actually, a reversal, with the clear

13   indication that a motion to dismiss, particularly if it were

14   based on jurisdictional grounds, should be heard first before

15   there is any kind of at least extensive discovery, what's your

16   view of the impact of that, and how this Court should heed that?

17       **MR. ARULANANTHAM:**  So Your Honor, I should say, we read that

18   order before we wrote the discovery request that we made to the

19   government.  So it wasn't a surprise to us that that was cited

20   in their papers.

21       You know, it says in it that it is limited to the specific

22   facts of this case.  That those the words actually appear in the

23   order.

24       I think it's very different from our case for a number of

25   reasons.  The most important one being there's no U.S. citizen

1    children in that case.  So, you know, and that's -- that is a

2    challenge to a policy of enforcement discretion.

3        And the central -- that is, the DACA program is a policy of

4    enforcement discretion, a policy not to seek deportation against

5    a certain population of people.  And the core of the

6    jurisdictional dispute there is about this case *Heckler v.*

7    *Chaney*, which is -- which is the case which holds that the

8    Executive's enforcement discretion decisions are subject to

9    limited, if any, judicial review.

10       So just as a threshold matter, we are in a very different

11   box here.  The government has not even argued that the APA

12   provision which bars judicial review over discretionary

13   decisions applies here.

14       I don't think they could make that argument, because the TPS

15   statute as a whole, the entire thing is a codification of a set

16   of constraints on Executive discretion.

17       Once you -- you have the discretion to make -- to designate

18   a country TPS, as -- with temporary protected status.  But once

19   you've done that, the conditions under which you then either

20   continue, or instead, terminate that decision are extensively

21   regulated in the statute.

22       That's why -- they say they're referring to the different

23   jurisdiction-stripping provision which is just, you know,

24   relevant to certain TPS decisions.  So, you know, very, very

25   different in a jurisdictional posture.

1        The other thing --

2        **THE COURT:**  Well, one could argue -- I don't want to get too

3   deep in this because we're going to hear this probably in a

4   couple of weeks, or several weeks.

5        But I assume that the response would be:  This is a very

6   specific jurisdictional stripping provision because it says that

7   the designation, you know, of states to be afforded TPS

8   status -- which, you know, is what we're talking about here --

9   would not be subject to judicial review.

10        So, you know, one could argue it seems, on its face, kind of

11   almost on point.

12        **MR. ARULANANTHAM:**  Right.  So, two thoughts, Your Honor.

13        First, just with respect to the *Regents* order, the Judge

14   Alsup case, my point was that if we're to read a general

15   principle in the Supreme Court's order in that case, the general

16   principle surely has to be something about enforcement

17   discretion claims.

18        And when they say:  On these specific facts, you really

19   should decide the motion to dismiss before you permit further

20   expansion of the administrative --

21        **THE COURT:**  I took it that the main fact was that the motion

22   could obviate discovery entirely.  And it makes sense to hear

23   that motion.

24        I understand that can't always be the fact, because it often

25   is a case that somebody brings outside of this context a

```
 1   12(b)(6) motion.  We hear that all the time.  And there's all
 2   sorts of skirmishes about whether discovery should be stayed or
 3   not.
 4        And typically, even if there is a jurisdictional challenge,
 5   for instance, subject-matter jurisdiction, or some kind of
 6   abstention doctrine or something else that's in the offing out
 7   there, that doesn't mean that there's -- no discovery goes
 8   forward.  Sometimes it is; sometimes it's not.
 9        MR. ARULANANTHAM:  Exactly, Your Honor.  And I was just
10   trying to say, so given that fact, they're not saying that you
11   always stay discovery where you have a motion to dismiss.
12        I was searching for:  Is there some more generalizable
13   principle in this case, given that it doesn't actually stand for
14   that?
15        And whatever that principle must be, I would think it's not
16   something that would govern a different kind of subject matter
17   jurisdiction argument involving a different statute for a
18   different scheme.  You know, this isn't the exercise of
19   discretion in the same kind of way.
20        As to that statute particularly, looking forward to that
21   argument, Your Honor, when the time comes in a few weeks.  But
22   in a nutshell, it's not about whether they were right in
23   deciding that conditions in Haiti have changed or conditions in
24   El Salvador have changed.
25        Our dispute -- in this way I think we're different also from
```

1   other TPS cases which have been brought.  You know, our argument

2   is they used to interpret the statute one way, which is that you

3   -- if there's a hurricane in Haiti, and then 12 months later

4   there's another hurricane, you can look at the second hurricane

5   to decide whether or not to extend TPS.  You don't only look at

6   the originating condition.  And then they changed that.

7        And it's in Secretary Kelly's testimony to -- I think it's

8   the Judiciary Committee, and Secretary Nielsen's to the Homeland

9   Security Committee -- maybe I have that backward.  But there is

10  public testimony in the Congress where they say:  We're only

11  allowed to look at the original designation.  So they have

12  changed the way you read the statute.

13      **THE COURT:**  Therefore, that is not within the meaning of the

14  statute, the jurisdictional provision of the statute, a, quote,

15  determination --

16      **MR. ARULANANTHAM:**  Determination.

17      **THE COURT:**  -- of the AG with respect to the designation.

18      **MR. ARULANANTHAM:**  That's right, Your Honor.  And

19  "determination" is a term of art.  You work see that in *McNary*

20  *v. C.S.* -- *Haitian Refugee Center*.  And there are other cases

21  interpreting that word in other immigration jurisdictional

22  provisions.  And that's -- we're getting now a lot into what we

23  will be briefing.

24      But that word "determination," it has a specific meaning in

25  the context of the immigration statutes.  And it's not -- if you

1   challenge the weighing, if you say:  Oh, the government says

2   that the houses have been rebuilt in the earthquake, no,

3   actually they haven't been rebuilt in the earthquake.  You know,

4   the government is wrong about the percentage of infrastructure

5   harm that remains.  That's about the determination.

6       What we are challenging is a legal rule:  How -- how are we

7   to understand the effect of post-designation disasters or later

8   civil conflict and other kinds of problems that influence the

9   country's ability to take back its nationals?

10      And it is just a legal question that really doesn't have

11  anything to do with the particular decision -- assessment of

12  conditions on the ground, which is what the determination is

13  about.

14      **THE COURT:**  All right.  So going back to the topic of how

15  should the Court account for the Supreme Court's action, one is:

16  It's a different statute.

17      And you would argue perhaps, you know, different well, it's

18  a different context although it's a similar issue, because it's

19  about whether or not this Court has jurisdiction or not.

20      **MR. ARULANANTHAM:**  Yes.

21      **THE COURT:**  And whether that should precede any discovery.

22  And you are saying the calculus may be different here because

23  it's a different statute and a different --

24      **MR. ARULANANTHAM:**  That's right, Your Honor.

25      And then, you know, the very first point I made was U.S.

1   citizen children are clearly outside the jurisdiction-stripping

2   scheme.   They're just a completely different matter.   The

3   government is saying there's a 12(b)(6) problem with that.

4        So this goes to the other point you were making, Your Honor.

5   Surely the Supreme Court order doesn't mean the 12(b)(6) motions

6   also have to wait -- or have to come before any discovery ever

7   occurs.   And so we've got a claim involving U.S. citizen

8   children, which is obviously not subject to any

9   immigration-related jurisdiction-stripping provision, which is

10  not present in the DACA case.

11       And then the last point I would make about it is just that

12  our discovery requests are much, much narrower than the

13  discovery requests that the Supreme Court stopped in the *Regents*

14  case.   They asked for -- I believe it's any communication on any

15  DACA-related subject between anyone at any time and the person

16  who made the decision on DACA.   You know, we're asking for

17  memoranda or guidance or policy documents.

18       You know, ours aren't about everything involving TPS.

19  They're really limited to this question of how you interpret the

20  TPS statute and this new rule.

21       So, for example -- this has also come out in public

22  reporting now.   According to one article, there is a memo which

23  says that the mid-term elections -- that looks at the effect of

24  the mid-term -- of the TPS decisions on the mid-term elections.

25  That sounds troubling, if that's true.   You know, that's a very

1    narrow thing, right.

2        This is about:  What criteria do you consider in the TPS

3    statute.  And that's something that, in our view, would fall

4    within our discovery request.  It's not like every email that

5    anybody ever wrote to anybody else about TPS.

6        So, you know, I could go on to describe -- I'm actually

7    happy to do it.  We can walk through our discovery request --

8        **THE COURT:**  I have looked at it.

9        Let me ask you, because some of your document requests are

10   very specific.  Some of them, of course, use the term

11   "administrative record" which is something that will -- might be

12   subject to debate.

13       But for instance, when you ask for records considered or

14   relied on concerning whether to extend or terminate the TPS

15   designations, depending on how you construe that, does that

16   mean -- again, to borrow from the APA -- all records reviewed

17   directly or indirectly?  And how far down the subordinate chain

18   do you go?

19       I mean, if you construe that broadly, that can mean anything

20   anybody within DHS, you know, five levels below the Secretary,

21   so long as there is a possibility that person may have filtered

22   up some memo or something.  And all memoranda directives,

23   guidance, position papers, statements of policy or practice

24   received, prepared, considered by DHS about what factors to

25   consider.

```
 1        So, I mean some of these look -- that's your interrogatory.
 2   And then you ask --
 3        MR. ARULANANTHAM:  Documents.
 4        THE COURT:  -- documents.
 5        MR. ARULANANTHAM:  (Inaudible)
 6        THE COURT:  So I mean, one could construe that to be fairly
 7   broad.
 8        MR. ARULANANTHAM:  Two thoughts, Your Honor.
 9        Just that one in particular, that last clause about what
10   factors to consider?
11        THE COURT:  Yeah.
12        MR. ARULANANTHAM:  That's, in our view, what limits that
13   more than it might otherwise appear.  Because it's not about --
14   it's memoranda that are discussing:  What factors should we
15   consider?
16        THE COURT:  Not the specifics of Haiti or --
17        MR. ARULANANTHAM:  Right, exactly.
18        THE COURT:  (Inaudible)
19        MR. ARULANANTHAM:  So, so, it might be that there's some
20   bleed-over, and that's an issue that you might have to get into.
21        But what we're really interested in is:  How do you define
22   the criteria for making that determination?  Not what went into
23   it particularly.
24        But, a memo which said:  You don't look at the things that
25   happened after the originating hurricane or earthquake because
```

1  those are irrelevant.  That's, that's what we're, you know, most

2  interested in for that.

3      The other point I would make, Your Honor, is I think we've

4  had thus far -- knock on wood -- very cooperative interactions

5  with the government (Indicating).  And I think if they come back

6  and said:  We don't understand what you mean by this, or does

7  this refer to every email ever written involving TPS, you know,

8  give us a chance to have a conversation about that and try to

9  narrow it.

10     **THE COURT:**  What about your Request No. 5, documents,

11  records considered or relied on concerning whether to extend,

12  with respect to these four countries?

13     **MR. ARULANANTHAM:**  Can you tell me what number that is,

14  Your Honor?

15     **THE COURT:**  5, Document Request No. 5.

16     **MR. ARULANANTHAM:**  Excuse me, Your Honor.

17     So we had put this "sufficient to show" language in to try

18  to narrow that, rather than referring to all documents involved

19  in the -- you know --

20     **THE COURT:**  So what does that mean, "documents sufficient to

21  show the contents of records"?

22     Is that different than the records, themselves?  Or --

23     **MR. ARULANANTHAM:**  Yes.  As I read it, it's just the -- yes.

24  I do think that's both different from the documents, themselves,

25  and also distinguishing from all of them.

1          In other words, if you can point us to the contents of what

2     you considered, that would satisfy that --

3          **THE COURT:**  So it's not necessarily the records, themselves,

4     but if there was, for instance, an inventory or a log or --

5          **MR. ARULANANTHAM:**  Exactly.  Like, is there a memo from the

6     domestic policy office of the White House that is among the set

7     of memos that were considered in deciding TPS?

8          So when the government says:  It's only the Secretary's

9     decision, nobody else is involved, well, is there actually a log

10    of the memos which shows that people from the White House were

11    talking to people in the DHS about this?  That would be an

12    example of something like that.

13         **THE COURT:**  All right.

14         Let me hear from the government, then, your views on the

15    various questions.

16         I guess, if you have any comments about -- I mean, we're not

17    here to argue the 12(b)(6) motion yet, but number one, the

18    framework of what we're dealing with sounds like they're not

19    necessarily challenging a statutory interpretation yet, but

20    really, an APA compliance, and then there are these

21    constitutional claims.

22         **MR. MARTIN:**  Right.  So, on that point, Your Honor, we had

23    hoped to be able to file our motion to dismiss before this

24    hearing, but we were unable to.  Because, as we heard from

25    plaintiffs, the underlying premise of all of their claims is

1  this new rule idea that somehow the current administration

2  changed the factors that it considers in making TPS

3  designations.

4      And even a cursory look at prior TPS terminations in the

5  Federal Register show that that's just not true.  Every

6  administration since 1990 when TPS was enacted has terminated a

7  TPS-designated nation for a country.

8      And for instance, in --

9      **THE COURT:**  Based on the original condition, only?

10     **MR. MARTIN:**  It varies.  And the Federal Register notices

11 will show the variety of factors that are considered.  But many

12 of them, yes, only on the original conditions.

13     And in fact, in terminating Montserrat in 2004, Secretary

14 Tom Ridge terminated it because Montserrat is a Caribbean

15 volcanic island.  A volcano triggered the initial designation.

16 Subsequent eruptions were occurring because it's a volcanic

17 island.  And the basis for termination was that the condition

18 was therefore a permanent condition endemic to the island, and

19 therefore, not temporary, under the statute.  So there is one

20 from 2004 where the TPS was terminated because of the

21 intervening factors.

22     Similarly, for Angola, which I believe was in 2003, it was

23 terminated despite very serious ongoing humanitarian crises that

24 had resulted from a decades-long civil war there because the

25 civil war, itself, had ended, even though the refugee flight was

1    a problem, and food security was a problem.

2        The Obama administration, in terminating TPS for Ebola

3    countries in Africa, all stated the reason was that the

4    countries had recovered from the initial outbreak.

5        And so this idea that there was ever an implicit or unspoken

6    or tacit sort of rule that other administrations were applying

7    that somehow has been departed from here is just -- is not true.

8        **THE COURT:**  The examples that you cite, did the

9    administration also look at contemporary conditions, and further

10   conclude those did not warrant the extension of TPS status?  Or

11   was it just those were ignored, and they only looked at the

12   original --

13       **MR. MARTIN:**  Well, in the Federal Register notices, as you

14   will see, some -- the degree of the explanations have varied

15   from the H. W. Bush administration to the Clinton

16   administration, on throughout.  They're very -- the notices are

17   very different.

18       But -- for instance, every extension of TPS for Nicaragua

19   through George W. Bush and Obama said the basis for the

20   extension was it had not recovered from the original damage in

21   1998 resulting from Hurricane Mitch.  And sometimes intervening

22   factors were thwarting that initial recovery effort.  But that

23   was the basis given for the extensions for Nicaragua.

24       And on this point, Your Honor, the basis for the allegation

25   that there is a new rule were these two statements by

1  Secretary Kelly and Secretary Nielsen before Congress.  Neither
2  one said that they were ignoring intervening events.  What both
3  said is that TPS cannot be based on -- I think Secretary Nielsen
4  put it as:  The country writ large.  It can't be based on
5  persistent endemic problems in the country.  It has to be a
6  temporary problem.
7      So many of the factors that plaintiffs are alleging that the
8  defendants here ignored -- for example, they say for
9  El Salvador, Secretary Nielsen ignored contemporary conditions
10 in El Salvador.  Well, that's really just an argument -- that's
11 really, despite what they say, a quibble with the statute,
12 itself, which provides temporary belief (sic) based on momentary
13 events.  It's not providing permanent relief based on problems
14 that are endemic to a country.  And you can see that in the
15 Montserrat example.
16     **THE COURT:**  So, I understand your arguments on the merits,
17 which I'm sure we are going to get into deeper.
18     **MR. MARTIN:**  Sure.
19     **THE COURT:**  And then you have, of course, the jurisdictional
20 argument --
21     **MR. MARTIN:**  Uh-huh.
22     **THE COURT:**  -- to start with.
23     What -- let me ask you, putting aside the timing for a
24 second, let's say, at some point if there's something left after
25 a motion to dismiss and there's got to be at least an

administrative record for -- on the APA claim, and perhaps some aspect of any other claim that might survive.

What is your thought about what the administrative record is going to look like?  Since this was not a formal --

**MR. MARTIN:**  Right.

**THE COURT:**  This is an informal agency action, right?

**MR. MARTIN:**  Your Honor, I will say that this is currently in flux, because in the thirty years of the TPS statute, neither the former AG or now the Department of Homeland Security has sort of treated these as record-review type cases, and they have never been successfully sued to the point where they would have to produce one.

And I can say that they are voluminous.  That -- that DHS is very nervous about being able to produce any of these within 60 days, even.  And because of the volume, and there are other subsidiary issues, a lot of the documents requested would be classified, which requires an interagency review.

**THE COURT:**  Well, when you say they're voluminous, can you give me some idea?  What are the kinds of things that would be included?  That you feel would be included --

**MR. MARTIN:**  Well, following the standard of anything directly or indirectly relied upon, you know, just -- and again, Your Honor, these are very preliminary numbers.  We're just sort of trying to run searches to figure this out.  We're looking at 100,000 types of documents, perhaps.

1      **THE COURT:**  So would it, in all likelihood, encompass such

2   things -- if you look at some of the specific requests here,

3   communications with the State Department, for instance, or --

4   yeah, diplomatic cables from an overseas State Department

5   facility and this sort of -- would that be included as part of

6   the administrative record, as something that --

7      **MR. MARTIN:**  Probably not, at this point, would be our

8   thinking about that.  A lot of these materials would be

9   deliberative, Your Honor, so those would not be included with

10  the administrative record.

11     **THE COURT:**  So what is an example of what would be, then?

12     **MR. MARTIN:**  For example, what has -- we sort of have

13  informally called the "decision packet" which is the, you know,

14  the materials that were before the Secretary that she sort of

15  signed, that laid out the conditions in the country, and

16  receiving input from USCIS, and --

17     **THE COURT:**  That's sort of like the final document that's

18  then put before the Secretary?

19     **MR. MARTIN:**  That's an example, yes.

20     **THE COURT:**  All right.  And anything that went into such

21  documents, would that be in the administrative record?

22     **MR. MARTIN:**  Depending upon what level of sort of input

23  we're thinking about here.  I mean, if -- be the people who

24  communicated directly with her, probably.

25     I mean, if we're going, you know, three, four, five tiers

1   down, at this point that is not something that we were thinking

2   we would include.

3       **THE COURT:**  So when you say there could be 100,000 types of

4   documents, if we're looking at documents that she reviewed and

5   the documents that perhaps those who directly communicated with

6   her reviewed, and it sounds like you're going to -- your intent

7   is to exclude deliberative-process-privileged documents, I'm

8   trying to conceptualize how that amounts to 100,000 documents.

9       **MR. MARTIN:**  Well, I mean, I think at this point we had

10  looked at 14 initial custodians.

11      And again, Your Honor, not all of them may have reported

12  directly to her.  We're still in the preliminary stages of this.

13  But again, these are four administrative records that we're

14  seeking here.  This is not a single administrative record.  By

15  two different decision-makers.

16      **THE COURT:**  Okay.  Well, let's talk about -- let me ask, so

17  what has been the meet-and-confer between the parties so far?

18  With respect to what might be produced and what might not be

19  produced.

20      **MR. MARTIN:**  I want to be clear at this point, Your Honor,

21  that it's the defendants' position that no discovery or

22  administrative record would be proper, and that this case will

23  be dismissed on 12(b)(1) grounds.  I know plaintiffs disagree

24  with that.

25      So, to the extent that we have discussed this, that has been

1    the position that we have communicated.

2       **THE COURT:**  So you haven't actually gotten to the point of

3    talking -- if we do end up having to produce, put together a

4    administrative record, you haven't had a substantive discussion

5    about --

6       **MR. MARTIN:**  That's correct, Your Honor.

7       **THE COURT:**  -- what's included, and what's going to be

8    deemed subject to deliberative-process privilege, how that might

9    be adjudicated if there's a dispute.

10      **MR. MARTIN:**  Right.

11      **THE COURT:**  And your forecast is if there were an order put

12   together and the administrative record were to respond to the

13   documents as submitted here, that -- how long would it take to

14   assemble that?

15      **MR. MARTIN:**  My client has informed me that it would be all

16   but impossible to do it earlier than 60 days for any of them,

17   particularly all four.

18      And it's also important to note, Your Honor, that the time

19   pressure that we are supposedly under here is being driven

20   really by Sudan in November, and to a lesser extent, Nicaragua

21   which expires next January, a few months later.  And so the need

22   for all four of these records immediately isn't apparent.

23      And it's also important to note that the decision for Sudan

24   was announced in September of 2017.  And formally published in

25   the Federal Register in October, 2017.

 1          You know, I understand plaintiffs need time to put their

 2     case together, but nevertheless, they waited five months before

 3     filing this suit, and now come and say:  We need discovery

 4     outside of the normal course, you know, before serious

 5     subject-matter jurisdiction questions have been raised and

 6     serious 12(b)(6) questions have been decided.  And want all of

 7     the administrative records and all of this discovery.

 8          And --

 9          **THE COURT:**  Well, let me ask you.  If one were to focus on

10     the most immediate issue that's going to arise first, which is

11     Sudan --

12          **MR. MARTIN:**  Uh-huh.

13          **THE COURT:**  -- what's your understanding of what the

14     administrative record -- obviously there's going to be some

15     overlap because there's some --

16          **MR. MARTIN:**  Right.

17          **THE COURT:**  But if one were to focus on, let's say, that

18     first round, that first country whose timeline comes up first,

19     what will that do to the size?

20          If you eliminate three other countries, what will that do to

21     the size of the administrative record?

22          **MR. MARTIN:**  It's difficult for me to say at this point,

23     Your Honor, because the preliminary searches that we have done

24     don't have the materials segregated out in a way that I could

25     make a plausible representation about what the size of that

1    would be.

2         I could immediately ask my client and get back to you

3    quickly, if you would like.

4         **THE COURT:**  Well, I mean, one thing I think that should be

5    done.  This is what I want to talk to you -- because you're

6    going to file your motion to dismiss no later than the 21st, is

7    what I saw?

8         **MR. MARTIN:**  Yes, correct.

9         **THE COURT:**  Which is next Monday.

10        **MR. MARTIN:**  Yeah.

11        **THE COURT:**  That would normally imply -- and I don't think

12   we want to do any kind of elongated schedule here, because of

13   the -- under our normal rules, the opposition would be due two

14   weeks thereafter, which is June 4th.  Reply, June 11th.

15        And since my calendar is normally on Thursdays, what I'm

16   thinking right now is to hold it slightly in advance, give

17   myself a little less time, but in view of the potential time

18   frame here, is to hear this on the 22nd, specially set this for

19   Friday, the 22nd, in the morning.

20        And see if we -- you know, figure out where we're going to

21   go from there.

22        **MR. MARTIN:**  We were going to recommend an accelerated

23   schedule if the plaintiffs would agree.  So --

24        **THE COURT:**  Well, if the plaintiffs are willing to

25   accelerate the opposition and everything else, I could move it

1    up even more.

2          But since this is a significant -- maybe I should hear from

3    the plaintiffs whether you -- in the interest of trying to get

4    as many issues decided and figure out the scope of this case

5    between now and your preliminary-injunction motion, do you have

6    any thoughts about the briefing schedule on the motion to

7    dismiss?

8          **MR. ARULANANTHAM:**  Your Honor, we will accommodate the

9    Court's and the government's schedule to hear the motion to

10   dismiss as fast as needed.  So if Your Honor wanted to have a

11   hearing on the motion to dismiss on June 22nd -- that's what we

12   are talking about, correct?

13         **THE COURT:**  That's what I have now.  That kind of gives

14   everybody the normal briefing schedule.

15         **MR. MARTIN:**  We were wanting to propose the 15th for the

16   hearing, if that were possible.  But, again, that accelerates

17   their opposition.

18         **THE COURT:**  It would accelerate opposition, and probably

19   your reply, to a certain extent.

20         **MR. MARTIN:**  And my reply, yes.

21         **MR. ARULANANTHAM:**  And I know one thing that we had

22   discussed but haven't come to ground on was pages, which I think

23   is relevant to this timing question, because depending on --

24   that's a lot of the pages to write in a short time, if we get an

25   expansion as we had discussed.

1      But anyway, we are comfortable accommodating the Court's

2  schedule to hear the motion to dismiss quickly.  And we can do

3  it on the -- yeah, the time provided to the -- the normal

4  schedule, if needed.

5      You know, we had thought and talked a little bit at one

6  point about combining the preliminary-injunction and

7  motion-to-dismiss briefing so that we had four briefs instead of

8  six.  That actually what Judge Chhabria had done in the *Saravia*

9  case, which is sort of a similar posture.

10     But that was assuming a world where we did have some

11 discovery prior to --

12     **THE COURT:**  Sounds like even if I were to order discovery,

13 it's going to take them some time to --

14     **MR. ARULANANTHAM:**  That's what I wanted to ask you about,

15 Your Honor.

16     The point about there being hundreds of thousands of

17 documents in the administrative record, you know, the

18 administrative-record requests are -- I also don't understand

19 quite how those two things can be squared, how -- if we're only

20 talk about the things the Secretary was considering, there can

21 still be hundreds of thousands of them.

22     But anyway --

23     **THE COURT:**  Well, so one approach, just so we can kind of

24 maybe combine everything here, is to set a fairly tight timeline

25 to resolve the motion to dismiss.  Which doesn't mean

1    necessarily we have to go to a complete standstill and do

2    nothing in the meantime.

3        That means, I would think, over the next three or four

4    weeks, number one, there could be a meet-and-confer, and to have

5    a substantive discussion about what might be in and what might

6    be out.

7        Think about the timing.  If what's being driven is a

8    preliminary-injunction relief that's needed most immediately for

9    those who are from Sudan whose timeline is up first, you know,

10   maybe, you know, we concentrate on that or do something.  Or

11   Sudan and Nicaragua -- I mean, there are various combinations

12   here.  At least to set up, number one, what the parties can

13   agree to and not disagree as to what the record might look like.

14       So then by the time, for instance, we get here on the motion

15   to dismiss which I'll hear, we can double that up and have that

16   as a discovery conference.  Because presumably the issue

17   about -- that the Supreme Court looked at, and that confronted

18   Judge Alsup will more or less be moot, because I will have

19   decided, you know, the 12(b)(1) and, I don't know, the 12(b)(6)

20   as well motion there, then it's really just a question of what

21   should be in -- what should be produced, if anything, and how

22   quickly.

23       But if you've already now then met and conferred and teed

24   up, you know, a core set of documents that are -- undisputably

25   should be produced, and then we have, you know, a second and

1   third set of other areas that are in dispute, I could be in a

2   position to try to adjudicate that in the meantime, with an

3   indication to the government that they should be prepared to

4   start producing this stuff quickly, should I -- should something

5   survive the 12(b)(1) and 12(b)(6) motion.

6       And therefore, if we could get actual discovery done

7   starting in -- if it -- if it comes to that, starting in June

8   and July, my intent was to start setting a briefing schedule

9   perhaps in August, to be heard in September.

10      **MR. ARULANANTHAM:**  Uh-huh.

11      **THE COURT:**  Rather than wait until the last minute.

12      Plus, I will forewarn the parties now that there is about a

13  10- or 12-day period in October that I'm not available.  That's

14  -- Betty, what is that, October 4 --

15      **THE CLERK:**  October 4 to the 19.

16      **THE COURT:**  19th?  No, 16th.

17      (Off-the-Record discussion between the Court and Clerk)

18      **THE COURT:**  Well, okay.  If we have to, certainly the 4th

19  through the 16th I'm out of the country, and then the next three

20  days we have court meetings.  But if I had to hear it, then I

21  could in that period.  But it would be more likely after that.

22      And I would rather not have this decision, you know, one

23  week, or on the eve.  I'd rather hear it -- I was going to

24  suggest September 27th as a preliminary-injunction hearing date,

25  to give us enough time and give me enough time to look at this

issue, which would normally imply under the normal five-week

briefing schedule under our local rules, the first filing of the

opening brief on the 23rd of August.

So this way, there would be about a two-month period which,

I'm already being told is sort of what the government thinks it

would take.

But if we can get a running start and not have to then spend

time debating on what should be produced, what shouldn't be

produced, give the government notice that they ought to start

assembling those documents sooner, even if I were to effectively

impose a stay of actual production for the next -- until I

actually hear the motion, we can still accommodate everything.

**MR. MARTIN:**  And my understanding of this is that we would

be prioritizing Sudan, then Nicaragua and the other countries.

**MR. ARULANANTHAM:**  Yes.  I would like to speak to my

co-counsel about all of what you -- Your Honor has laid out.

**THE COURT:**  Sure.

**MR. ARULANANTHAM:**  But in general, the idea of prioritizing

Sudan and Nicaragua, we are amenable to.

I was going to say earlier that there are portions of the

discovery request which are very discrete, and we made the

request separate from the request for administrative record,

which were the last two requests.

**THE COURT:**  Right.  Well, I want you to meet and confer

about that, too, because that may not --

1    **MR. ARULANANTHAM:**  Right.

2    **THE COURT:**  You know.  And if you can't agree, then you can

3    tee it up, because then I'll want to know -- you know, part of

4    this that I'll have to resolve is:  What is the burden?  How

5    many documents you're talking about.

6        So for Request No. 6 or 7 or whatever it is, are we talking

7    about six documents?  And is the problem there the sensitivity

8    of the documents, the relevance of the documents, or not burden?

9        So it would be helpful for you to have that discussion so I

10   know where the disputes are and what the parameters are, because

11   I've got to look at all those factors.  Relevance, privilege,

12   burden, et cetera, et cetera.

13   **MR. ARULANANTHAM:**  Uh-huh.

14   **THE COURT:**  But I understand your point, some of these,

15   already discrete, you're asking for some requests -- some seem

16   broader, but maybe you can specify, like how many levels down

17   from the Secretary, for instance.

18   **MR. ARULANANTHAM:**  Right.  I was even thinking of something

19   like is the RFA -- does the government consider the impact on

20   citizen children when making this decision?  And that's actually

21   quite relevant to the citizen children's claim.

22       I don't know why you'd need to compile the administrative

23   record to figure out the answer to that question.

24   **MR. MARTIN:**  Well, there are -- well, not to interrupt.

25   **THE COURT:**  Yeah.

1          **MR. MARTIN:**  You know, we've just heard that the plaintiffs

2     were not challenging the TPS statute, itself.

3          Nowhere in the TPS statute does it say you need to consider

4     the burden on U.S. citizen children.  And on this point in

5     particular -- and this goes back to why it is important to wait

6     until we have the motions to dismiss resolved -- the Ninth

7     Circuit just this year has already found that a substantive

8     due-process family-integrity claim, identical to the one here

9     was so lacking in color that it didn't have subject-matter

10    jurisdiction in the immigration context.  It's held that

11    repeatedly over the years.  There are dozens of cases from other

12    circuits holding the same.

13         I mean, this claim I think sort of out of the gate will

14    fail, and this is why we are somewhat disappointed we weren't

15    able to get our motion to dismiss to you before, because I think

16    that that particular RFA is the perfect example of why discovery

17    is not appropriate at this time.

18         **THE COURT:**  Well, my inclination right now is because we're

19    going to move forward with the motion to dismiss, so we're

20    talking about essentially a month's time in delay, but I -- I

21    want to use that month's time to have you meet and confer and

22    tee up exactly those issues.

23         **MR. MARTIN:**  Uh-huh.

24         **THE COURT:**  And that way, you can tee up exactly for me so

25    I'll know which categories of documents are in dispute, what are

1   the issues you're going make a relevancy argument that may hinge

2   on the 12(b)(6), 12(b)(1).  And if you win, that's one thing.

3   If you don't prevail, that's something else.  So there is some

4   sense to that.  And so that's what I am inclined to do.

5       Just looking at the schedule, if I had to move it up a

6   week -- it really -- because I do need time after absorbing the

7   brief, it means cutting your time and your time down to a fairly

8   short period of time.  I mean, it can be done.

9       So for instance, if the brief is filed on Monday, and the

10  opposition is due, let's say the 31st, ten days after, I don't

11  know if that's enough time for you.  And then the reply, frankly

12  I would need by the 4th in order to hear it on the 15th.  That

13  gives the reply really the week --

14      **MR. ARULANANTHAM:**  I would love to -- I know for myself I

15  have a supplemental brief in the Ninth Circuit in the *Rodriguez*

16  case --

17      **THE COURT:**  I think we ought to keep this schedule.  I have

18  already shaved some time off on my own time to hear this on the

19  22nd, and I think this is a significant enough motion that I

20  don't want anybody to be short on the briefing on this.  So I'm

21  just going to keep it on the 22nd.  But I also have that hearing

22  as a status conference re: discovery.  And what I'm going to ask

23  the parties to do is to now meet and confer as you would in a

24  normal discovery, sort of, dispute situation and see, number

25  one, what you can come to an agreement on and have some sense --

1    I'd like to know from the government, once we get here on the

2    22nd, of those things that are in dispute, you know, what's the

3    volume, what's -- what are we talking about.

4         And, you know, to the extent I don't know what your

5    position's going to be on deliberative-process privilege, I'd

6    like to know what your position is.  So actually, a week before

7    we get together, I'd like a discovery letter from you all, to

8    the extent you have outstanding discovery issues -- and I assume

9    you probably will -- you know, explain to me what you've agreed

10   to and where the areas of disagreement are, what the key issues

11   are.  And if there's, you know, a couple of key principles or

12   case cites that you want me to look at, I will look at that.

13        And so hopefully we can use the 22nd also to give us some

14   guidance, give you some guidance on any discovery, assuming

15   there's still a case.

16        **MR. ARULANANTHAM:**  Yes, Your Honor.  And we had

17   distinguished in our requests so that at least some of them were

18   all post-decisional.  Like the one about press releases, for

19   example.

20        **THE COURT:**  Yes.

21        **MR. ARULANANTHAM:**  Because we understood that the government

22   would make this argument, but it is our view that it's -- it's

23   not a true privilege, it's a weighing -- well, I don't want to

24   get too far into it, you know, but yes, we have concerns about

25   it.

1          **THE COURT:**  I was curious.  The post-decision, is that meant

2     to reflect upon pre-decisional state of mind?  Or is that --

3     what is the relevance of post-decisional --

4          **MR. ARULANANTHAM:**  Yes.  If -- that it could manifest

5     evidence that this interpretation of the statute was the one

6     that was being utilized.

7          **THE COURT:**  Of course, the other advantage of hearing this

8     on the 22nd, by then we're getting near the end of the term, the

9     Supreme Court's term.  We may learn something.

10         **MR. ARULANANTHAM:**  Yeah.  Yeah.  Your Honor, can I just have

11    a moment to confer to make sure that our scheduling --

12         **THE COURT:**  Yeah.

13         (Off-the-Record discussion between counsel)

14         **MR. MARTIN:**  Your Honor, while he confers, can I raise one

15    other housekeeping matter that co-counsel touched upon?

16         **THE COURT:**  Yeah.

17         **MR. MARTIN:**  We had discussed a 40-page limit --

18         **THE COURT:**  Oh, yes.  We should discuss that.

19         **MR. MARTIN:**  -- for the briefing.  Initially they had said

20    that they would not oppose it, but they didn't want to

21    affirmatively agree to it in the stipulation.  My brief, as it

22    currently is, is 39 pages.  This involves four countries, the

23    history of their TPS designation, some going back almost two

24    decades.  That takes some space to explain.  And their four

25    claims take some space to explain.

 1          So, I understand that the accelerated briefing schedule

 2    might have changed their lack of opposition, but --

 3          **THE COURT:**  All right.  Well --

 4          **MR. FREEMAN:**  I could speak to this briefly, Your Honor.

 5          **THE COURT:**  Yes.

 6          **MR. FREEMAN:**  We have informed the government that we don't

 7    take a position -- in other words, we don't oppose the request,

 8    but we're also conscious of the burdens that any elongated brief

 9    puts on the Court and on the Court's staff.  And all we ask is

10    that if the brief is extended, we get a commensurate extension.

11          **THE COURT:**  Is this a 12(b)(6) and (b)(1)?

12          **MR. MARTIN:**  Yes, sir.

13          **THE COURT:**  So you will address the constitutional claims as

14    well as the jurisdictional stripping, quote-unquote, provisions

15    of the --

16          **MR. MARTIN:**  Correct, Your Honor.

17          **THE COURT:**  We were discussing the --

18          **MR. MARTIN:**  Page limit.

19          **THE COURT:**  -- the page limit, and whether you have any

20    particular views about the 40-page limit, which would apply

21    equally to the opening as well as the opposition.  And then I

22    would limit the -- any reply.  I think we should still adhere to

23    the 15-page limit on any reply.  So --

24          **MR. ARULANANTHAM:**  Yeah, I think where we landed was it

25    seemed like a lot to us, we didn't want to quibble about it, and

1    so our view was we would take no position on it and leave it to

2    the Court.

3        THE COURT:  Okay.

4        MR. ARULANANTHAM:  We want the same number of pages as them,

5    obviously.

6        THE COURT:  Yeah.

7        MR. ARULANANTHAM:  But beyond that, we didn't --

8        THE COURT:  All right.  Well, I will permit it, reluctantly.

9    I'm probably incurring the wrath of my law clerk.  But, given

10   the gravity and the importance of this, I think that -- and the

11   fact that there's two different sets of issues here, one

12   statutory and one having to do with the constitutional

13   principles, I'm going to allow 40 pages for the opening and for

14   the opposition.  Fifteen for the reply.

15       MR. ARULANANTHAM:  Your Honor, I just had one other issue,

16   which was on the question of the timing of the

17   preliminary-injunction hearing, if we are lucky enough to get

18   there.

19       THE COURT:  Yeah.

20       MR. ARULANANTHAM:  So, some -- some of these folks have

21   never lived in this country, unauthorized.  And if November 2nd

22   comes and there is not an extension of TPS, they are going to

23   want to leave the country.  Some of them are in school.  Some of

24   them are employment-authorized, and they will lose the EAD --

25   excuse me -- the employment authorization document when it

1    happens.

2        So maybe we don't have to resolve it now, but I don't know

3    if there were dates -- it's just the September 27th hearing date

4    means -- I don't know how soon a decision would come, but this

5    isn't a situation like there are in some cases where, you know,

6    actually, as long as we get a ruling by November 1st it's sort

7    of all fine.  Some plaintiffs --

8        **THE COURT:**  You need to know further in advance.

9        **MR. ARULANANTHAM:**  So that's why we had actually, when we

10   were talking about combining them -- which I'm not suggesting

11   going back on.  We are entirely in agreement with the Court's

12   plan of having the motion to dismiss heard first, on the

13   shortened time.  But when we were thinking about combining them,

14   we were imagining that it would happen at least somewhat

15   earlier.  So I don't know what the Court --

16       **THE COURT:**  What are you thinking of?

17       **MR. ARULANANTHAM:**  I think August 27th would be a different

18   thing than September 27th.  We don't -- it's a planning issue,

19   so it's not as though there's some kind of hard-fixed time --

20       **THE COURT:**  Part of it I was trying to think about, you

21   know, allowing enough discovery, because that's what your pitch

22   is.

23       **MR. ARULANANTHAM:**  Yes.

24       **THE COURT:**  And whatever way discovery -- there's probably

25   going to be some disagreements; there's probably going to be, if

1   we get to this point, some phased -- you may not get it all; we

2   may talk about rolling discovery; we may talk about other

3   things.  So what I didn't want to do was set it so quick that

4   you wouldn't -- you're not prepared.

5       **MR. ARULANANTHAM:**  Can I make a proposal on this,

6   Your Honor?

7       **THE COURT:**  Yeah.

8       **MR. ARULANANTHAM:**  How about if we also talk to our clients,

9   and on June 22nd, can we set the date for the

10  preliminary-injunction hearing?  Or will too much of the

11  calendar be --

12      **THE COURT:**  No, I can always specially set it.

13      **MR. ARULANANTHAM:**  Could we do that, Your Honor?

14      **THE COURT:**  Yeah.  All right.  Well, right now I'm just

15  going to assume the 27th is the outside date, not going to be

16  any later than that, so it will be some date earlier.

17      And it really depends on you.  If you're ready to file your

18  motion with whatever the state of the record might be, that's

19  your prerogative.  I assume that we would file the normal --

20  follow the normal five-week schedule, and not have to elongate

21  that.  In some cases people like to elongate these, but we just

22  don't have that luxury here.

23      **MR. ARULANANTHAM:**  Understood.

24      **THE COURT:**  So you don't -- just count backwards five weeks,

25  and know -- or forward five weeks.

1      **MR. ARULANANTHAM:**  Yes, Your Honor.

2      **THE COURT:**  And I don't know whether -- are you assuming

3  that there will not be required an evidentiary hearing, that

4  this would be a paper --

5      **MR. ARULANANTHAM:**  That was our assumption.  I hope that

6  we're not going to get into a big fight about how much hardship

7  we're really talking about here.  That's really the only thing

8  that feels likely to generate evidentiary dispute, if they

9  (Indicating) chose to do so.

10      **THE COURT:**  Well, I leave that -- I only mention that

11  because if there is any thought about doing an evidentiary

12  hearing, then I do have to specially set that.  I can't just put

13  that on a regular law and motion.  I've got to set aside a day

14  or afternoon or something.  So you might want to make that

15  decision, so we all know.

16      As it is, I'm willing to specially set this, in any event,

17  provided I don't have a trial or anything else going on.

18      **MR. ARULANANTHAM:**  Okay, Your Honor.

19      **THE COURT:**  So you might check with Betty once -- if you can

20  come to an understanding even before then, and you want to set

21  it, let Betty know, and I can sign off on a stipulation.  All

22  right?

23      **MR. MARTIN:**  Okay.

24      **MR. ARULANANTHAM:**  Okay.  Thank you, Your Honor.

25      **THE COURT:**  All right.  So I'm going direct the parties to

```
 1   meet and confer, start that process.  Submit to me any disputes
 2   a week before.  My normal rule is a letter, a letter process
 3   with page limits on it.
 4        MR. MARTIN:  Yeah.
 5        THE COURT:  I won't strictly adhere to that.  But I don't
 6   want to receive a 20-page single-spaced -- I'm hoping you can
 7   look at it by categories, and tee up any issues, and inform me
 8   of what the legal dispute is with some concise citations.  And
 9   we can --
10        MR. MARTIN:  Thank you, Your Honor.
11        THE COURT:  And if I need more briefing, I can order that.
12   But I'm hoping that -- see if we can cut through some of that.
13        MR. MARTIN:  I don't think either side is interested in
14   writing such a document either, so --
15        THE COURT:  Good.  All right, so we will see you on the
16   22nd.
17        MR. ARULANANTHAM:  Thank you.
18        THE COURT:  Okay?  Thank you.
19        MR. ARULANANTHAM:  Thank you, Your Honor.
20        MR. SANDROCK:  Thank Your Honor.
21        THE COURT:  Thank you.
22        THE CLERK:  Court is adjourned.
23        (Conclusion of proceedings)
24
25
```

1

2

3

4                **<u>CERTIFICATE OF REPORTER</u>**

5        I, BELLE BALL, Official Reporter for the United States

6 Court, Northern District of California, hereby certify that the

7 foregoing is a correct transcript from the record of proceedings

8 in the above-entitled matter.

9

10

11                  /s/ Belle Ball

12          Belle Ball, CSR 8785, CRR, RDR

13           Monday, May 21, 2018

14

15

16

17

18

19

20

21

22

23

24

25