CHAD A. READLER
Acting Assistant Attorney General
Civil Division
JOHN R. TYLER
Assistant Branch Director
RHETT P. MARTIN
Trial Attorney
DC Bar No. 999272
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 305-7538
Fax: (202) 616-8460
Rhett.martin@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTA RAMOS, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br><br>KIRSTJEN NIELSEN, *et al.*,<br><br>              Defendants. | Case No. 3:18-cv-01554-EMC<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT**<br><br>**Judge:  Honorable Edward M. Chen**<br>**Hearing:  June 22, 2018, 10:30 a.m.**<br>**Place:  San Francisco U.S. Courthouse, Courtroom 5, 17th Floor** |

1

**TABLE OF CONTENTS**

2  NOTICE OF MOTION AND MOTION TO DISMISS ...................................................... 1

3  MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

4  INTRODUCTION ............................................................................................................ 1

5  BACKGROUND .............................................................................................................. 3

6      I)    Statutory Background. ........................................................................................... 3

7      II)   TPS Determinations for Sudan, Nicaragua, Haiti, and El Salvador ........................... 6

8          a)  Sudan ...................................................................................................... 6

9              i)   Sudan's Designations, Redesignations, and Extensions ..................................... 6

10              ii) Sudan's TPS Termination ............................................................................ 9

11          b)  Nicaragua ............................................................................................. 10

12              i)   Nicaragua's TPS Designations and Extensions ............................................. 10

13              ii) Nicaragua's TPS Termination ..................................................................... 12

14          c)  Haiti ..................................................................................................... 13

15              i)   Haiti's TPS Designation, Redesignation, and Extensions. ............................... 13

16              ii) Haiti's Termination. .................................................................................. 17

17          d)  El Salvador ........................................................................................... 17

18              i)   El Salvador's TPS Designation and Extensions ............................................ 17

19              ii) El Salvador's Termination ........................................................................ 20

20  ARGUMENT ................................................................................................................ 20

21      I)    This Court Lacks Jurisdiction to Review Plaintiffs' Challenges to

22             DHS's TPS Determinations. ................................................................................ 20

23      II)   Plaintiffs' Claims Fail as a Matter of Law ............................................................ 23

24          a)  Plaintiffs' Due-Process "Family Integrity" Claim (First Claim)

25              Fails as a Matter of Law ..................................................................... 27

26          b)  Plaintiffs Have Failed to Allege an Equal-Protection Violation

27              (Second Claim) ................................................................................. 31

28

c) Plaintiffs' "Arbitrary Action" Due Process Claim (Third Claim)
Must Fail. ........................................................................................ 37

d) Plaintiffs' APA Arbitrary-And-Capricious Claim Must Be
Dismissed. ...................................................................................... 38

CONCLUSION ........................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Aguilera–Montero v. Mukasey,*

    548 F.3d 1248 (9th Cir. 2008) ................................................ 34

*Alvarez v. Dist. Dir. of U. S. Immigration & Naturalization Serv.,*

    539 F.2d 1220 (9th Cir. 1976) ................................................ 33

*Andrade–Garcia v. Lynch,*

    820 F.3d 1076 (9th Cir. 2016) ................................................ 33

*Ashcroft v. Iqbal,*

    556 U.S. 662 (2009) ................................................ 23, 39

*Ayala-Flores v. Immigration & Naturalization Serv.,*

    662 F.2d 444 (6th Cir. 1981) ................................................ 29

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,*

    481 U.S. 537 (1987) ................................................ 31

*Cardenas v. United States,*

    826 F.3d 1164 (9th Cir. 2016) ................................................ 33

*Caviness v. Horizon Cmty. Learning Ctr., Inc.,*

    590 F.3d 806 (9th Cir. 2010) ................................................ 23, 38

*Cervantes v. Holder,*

    597 F.3d 229 (4th Cir. 2010) ................................................ 5

*Cervantes v. INS,*

    510 F.2d 89 (10th Cir. 1975) ................................................ 30

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*

    473 U.S. 432 (1985) ................................................ 34

*City of Rialto v. W. Coast Loading Corp.,*

    581 F.3d 865 (9th Cir. 2009) ................................................ 25

*Cortez–Flores v. INS,*

    500 F.2d 178 (5th Cir. 1974) ................................................ 30

*De Mercado v. Mukasey,*
    566 F.3d 810 (9th Cir. 2009) ............................................................... 29

*Delgado v. INS,*
    637 F.2d 762 (10th Cir. 1980) ............................................................. 30

*Demore v. Kim,*
    538 U.S. 510 (2003) ............................................................................ 22

*Dillingham v. INS,*
    267 F.3d 996 (9th Cir. 2001) ........................................................ 32-33

*Dunn v. INS,*
    499 F.2d 856 (9th Cir. 1974) ............................................................... 33

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ................................................................................ 22

*Espinoza v. Farah Mfg. Co., Inc.,*
    414 U.S. 86 (1973) .............................................................................. 32

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ...................................................................... 33, 37

*Flores–Quezada v. Gonzales,*
    134 F. App'x 202 (9th Cir. 2005) ........................................................ 30

*Gallanosa v. United States,*
    785 F.2d 116 (4th Cir. 1986) ............................................................... 30

*Gebhardt v. Nielsen,*
    879 F.3d 980 (9th Cir. 2018) ............................................................... 28

*Gonzalez–Cuevas v. INS,*
    515 F.2d 1222 (5th Cir. 1975) ............................................................. 30

*Hawaii v. Trump,*
    878 F.3d 662 (9th Cir. 2017), .............................................................. 37

*Hernandez-Mancilla v. Holder,*
    633 F.3d 1182 (9th Cir. 2011) ............................................................. 33

*Krua v. DHS,*
729 F. Supp. 2d 452 (D. Mass. 2010) ................................................................. 22

*Ledezma-Cosino v. Sessions,*
857 F.3d 1042 (9th Cir. 2017) (en banc), *cert. denied,* 138 S. Ct. 643, (2018) ....................... 33

*Marin-Garcia v. Holder,*
647 F.3d 666 (7th Cir. 2011) ............................................................................. 29

*Moore v. City of E. Cleveland,*
431 U.S. 494 (1977) .......................................................................................... 31

*Morales-Izquierdo v. DHS,*
600 F.3d 1076 (9th Cir. 2010), *overruled in part on other*
*ground by Garfias-Rodriguez v. Holder,* 702 F.3d 504 (9th Cir. 2012) (en banc) ....... 28, 30, 31

*Narenji v. Civiletti,*
617 F.2d 745 (D.C. Cir. 1979) ....................................................................... 33, 36

*New York v. United States,*
505 U.S. 144 (1992) .......................................................................................... 31

*Newton v. INS,*
736 F.2d 336 (6th Cir. 1984) ............................................................................. 30

*Ng Fung Ho v. White,*
259 U.S. 276 (1922) .......................................................................................... 31

*Payne-Barahona v. Gonzales,*
474 F.3d 1 (1st Cir. 2007) ............................................................................ 29, 31

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
525 U.S. 471 (1999) ("*AADC*") ................................................................. 3, 34, 36

*Robles v. INS,*
485 F.2d 100 (1973) .......................................................................................... 30

*Romer v. Evans,*
517 U.S. 620 (1996) .......................................................................................... 34

*Singh v. Magee*,

    165 F.3d 917, 1998 WL 904715 (9th Cir. 1998) ......................................................... 30

*Tista v. Holder*,

    722 F.3d 1122 (9th Cir. 2013) ................................................................................ 34, 36

*Trump v. Hawaii*,

    138 S. Ct. 923 (2018) ................................................................................................... 36

*Tuan Anh Nguyen v. INS*,

    533 U.S. 53 (2001) ....................................................................................................... 30

*Tucson Woman's Clinic v. Eden*,

    379 F.3d 531 (9th Cir. 2004) ............................................................................ 33-34, 34

*United States v. Jackson*,

    390 U.S. 570 (1968) ..................................................................................................... 31

*Washington v. Trump*,

    847 F.3d 1151, 1157 (9th Cir.),

    *reconsideration en banc denied*, 853 F.3d 933 (9th Cir. 2017) ................................. 36

*Webster v. Doe*,

    486 U.S. 592 (1988) ..................................................................................................... 22


**STATUTES**

5 U.S.C. § 701(a)(1) ................................................................................................... 21, 39

6 U.S.C. § 557 ................................................................................................................... 3

8 U.S.C. § 1103 ................................................................................................................. 3

8 U.S.C. § 1252(a)(2)(D) ................................................................................................ 23

8 U.S.C. § 1254a ..................................................................................................... *passim*

42 U.S.C. § 2021b ........................................................................................................... 31

Immigration Act of 1990,

    Pub. L. No. 101-649, 104 Stat. 4978 ............................................................................ 3

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

*Extension of Designation & Redesignation of Liberia Under TPS Program,*

   62 Fed. Reg. 16,608-01 (Apr. 7, 1997) ....................................................................... 5

*Designation of Sudan Under Temporary Protected Status,*

   62 Fed. Reg. 59,737-01 (Nov. 4, 1997) ..................................................................... 6

*Extension of Designation of Sudan Under the Temporary Protected Status Program,*

   63 Fed. Reg. 59,337 (Nov. 3, 1998) ........................................................................... 6

*Extension and Redesignation of Sudan Under the Temporary Protected Status Program,*

   64 Fed. Reg. 61,128-01 (Nov. 9, 1999) ................................................................. 6, 7

*Designation of Nicaragua Under Temporary Protected Status,*

   64 Fed. Reg. 526-01 (Jan. 5, 1999) ......................................................................... 10

*Extension of the Designation of Nicaragua Under the Temporary Protected Status Program,*

   65 Fed. Reg. 30,440-01 (May 11, 2001) ................................................................. 11

*Termination of the Province of Kosovo in the Republic of Serbia in the State of the Federal*

    *Republic of Yugoslavia (Serbia-Montenegro) Under the Temporary Protected Status Program,*

   65 Fed. Reg. 33,356-01 (May 23, 2000) ................................................................. 27

*Extension of Designation of Sudan Under the Temporary Protected Status Program,*

   65 Fed. Reg. 67,407-01 (Nov. 9, 2000) ..................................................................... 7

*Designation of El Salvador Under Temporary Protected Status Program,*

   66 Fed. Reg. 14,214-01 (Mar. 9, 2001) ................................................................... 17

*Extension of the Designation of Nicaragua Under the Temporary Protected Status Program,*

   66 Fed. Reg. 23,271-01 (May 8, 2001) ................................................................... 11

*Extension of the Designation of Sudan Under the Temporary Protected Status Program,*

   66 Fed. Reg. 46,031-01 (Aug. 31, 2001) ................................................................... 7

*Extension of the Designation of Nicaragua Under the Temporary Protected Status Program,*

   67 Fed. Reg. 22,454-01 (May 3, 2002) ................................................................... 11

*Extension of the Designation of El Salvador Under the Temporary Protected Status Program,*

   67 Fed. Reg. 46,000-01 (July 11, 2002) ................................................................... 18

*Extension of the Designation of Sudan Under the Temporary Protected Status Program*,

 67 Fed. Reg. 55,877 (Aug. 30, 2002)........................................................................... 7

*Termination of Designation of Angola Under the Temporary Protected Status Program*,

 68 Fed. Reg. 3896-01 (Jan. 27, 2003)....................................................................... 27

*Extension of the Designation of Nicaragua Under Temporary Protected Status Program;*

 *Automatic Extension of Employment Authorization Documentation for Nicaraguans*,

 68 Fed. Reg. 23,748-01 (May 5, 2003) ..................................................................... 11

*Extension of the Designation of El Salvador Under Temporary Protected Status Program*,

 68 Fed. Reg. 42,071-01, 42,072 (July 16, 2003) ...................................................... 18

*Extension of the Designation of Sudan Under the Temporary Protected Status Program*,

 68 Fed. Reg. 52,410-01 (Sept. 3, 2003)...................................................................... 7

*Extension and Re-designation of Temporary Protected Status for Sudan*,

 69 Fed. Reg. 60,168-01 (Oct. 7, 2004) ...................................................................... 7

*Extension of the Designation of Temporary Protected Status for Nicaragua; Automatic Extension*

 *of Employment Authorization Documentation for Nicaragua TPS Beneficiaries*,

 69 Fed. Reg. 64,088-01 (Nov. 3, 2004) .................................................................... 11

*Extension of the Designation of Temporary Protected Status for El Salvador*,

 70 Fed. Reg. 1450-01 (Jan. 7, 2005).......................................................................... 18

*Extension of Designation of Sudan Under the Temporary Protected Status Program*,

 70 Fed. Reg. 52,429-01 (Sept. 2, 2005)....................................................................... 8

*Extension of the Designation of Temporary Protected Status for Nicaragua; Automatic Extension*

 *of Employment Authorization Documentation for Nicaragua TPS Beneficiaries*,

 71 Fed. Reg. 16,333-01 (Mar. 31, 2006) ................................................................... 11

*Extension of the Designation of Temporary Protected Status for El Salvador*,

 71 Fed. Reg. 34,637-01 (June 15, 2006)..................................................................... 18

*Extension of Designation of Sudan Under the Temporary Protected Status Program*,

 72 Fed. Reg. 10,541-01 (Mar. 8, 2007) ...................................................................... 8

*Extension of the Designation of Nicaragua for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries,*
  72 Fed. Reg. 29,534-01 (May 29, 2007) ................................................................. 11

*Extension of the Designation of El Salvador for Temporary Protected Status,*
  72 Fed. Reg. 46,649-01 (Aug. 21, 2007) ................................................................. 18

*Termination of the Designation of Burundi for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Burundi TPS Beneficiaries,*
  72 Fed. Reg. 61,172-02 (Oct. 29, 2007) ................................................................. 26

*Extension of Designation of Sudan Under the Temporary Protected Status Program,*
  73 Fed. Reg. 47,606-01 (Aug. 14, 2008) ................................................................. 8

*Extension of the Designation of El Salvador for Temporary Protected Status,*
  73 Fed. Reg. 57,128-01 (Oct. 1, 2008) ................................................................. 18-19

*Extension of the Designation of Nicaragua for Temporary Protected Status,*
  73 Fed. Reg. 57,138-01 (Oct. 1, 2008) ................................................................. 12

*Extension of Designation of Sudan Under the Temporary Protected Status Program,*
  74 Fed. Reg. 69,355-02 (Dec. 31, 2009) ................................................................. 8

*Extension of the Designation of El Salvador for Temporary Protected Status,*
  75 Fed. Reg. 39,556-01 (July 9, 2010) ................................................................. 19

*Designation of Haiti for Temporary Protected Status,*
  75 Fed. Reg. 3476-02 (Jan. 21, 2010) ................................................................. 13, 14

*Extension of the Designation of Nicaragua for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries,*
  75 Fed. Reg. 24,737-01 (May 5, 2010) ................................................................. 12

*Extension and Redesignation of Haiti for Temporary Protected Status,*
  76 Fed. Reg. 29,000-01 (May 19, 2011) ................................................................. 14

*Designation of Republic of South Sudan for Temporary Protected Status,*
  76 Fed. Reg. 63,629-01 (Oct. 13, 2011) ................................................................. 9

*Extension of Designation of Sudan Under the Temporary Protected Status Program,*

    76 Fed. Reg. 63,635-01 (Oct. 13, 2011) ........................................................ 8

*Extension of the Designation of Nicaragua for Temporary Protected Status and Automatic*

    *Extension of Employment Authorization Documentation for Nicaraguan TPS Beneficiaries,*

    76 Fed. Reg. 68,493-01 (Nov. 4, 2011) ........................................................ 12

*Extension of the Designation of El Salvador for Temporary Protected Status,*

    77 Fed. Reg. 1710-02 (Jan. 11, 2012) .......................................................... 19

*Extension of the Designation of Haiti for Temporary Protected Status,*

    77 Fed. Reg. 59,943-01 (Oct. 1, 2012) ........................................................ 14

*Extension of the Designation of El Salvador for Temporary Protected Status,*

    78 Fed. Reg. 32,418-01 (May 30, 2013) ...................................................... 19

*Extension and Redesignation of Sudan for Temporary Protected Status,*

    78 Fed. Reg. 1872-01 (Jan. 9, 2013) ............................................................ 8

*Extension of the Designation of Nicaragua for Temporary Protected Status,*

    78 Fed. Reg. 20,128-01 (Apr. 3, 2013) ........................................................ 12

*Extension of the Designation of Haiti for Temporary Protected Status,*

    79 Fed. Reg. 11,808-01 (Mar. 3, 2014) ................................................. 14, 15

*Extension of Designation of Sudan Under the Temporary Protected Status Program,*

    79 Fed. Reg. 52,029-01 (Sept. 2, 2014) ........................................................ 9

*Extension of the Designation of Nicaragua for Temporary Protected Status,*

    79 Fed. Reg. 62,176-01 (Oct. 16, 2014) ...................................................... 12

*Extension of the Designation of El Salvador for Temporary Protected Status,*

    80 Fed. Reg. 893-01 (Jan. 7, 2015) .............................................................. 19

*Extension of the Designation of Haiti for Temporary Protected Status,*

    80 Fed. Reg. 51,582-01 (Aug. 25, 2015) ................................................. 15, 26

*Extension of Designation of Sudan Under the Temporary Protected Status Program,*

    81 Fed. Reg. 4045-01 (Jan. 25, 2016) ............................................................ 9

*Extension of the Designation of El Salvador for Temporary Protected Status*,

    81 Fed. Reg. 44,645-03 (July 8, 2016) ........................................................ 19, 20, 26

*Extension of the Designation of Nicaragua for Temporary Protected Status*,

    81 Fed. Reg. 30,325-01 (May 16, 2016) .................................................................... 12

*Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before*

    *Termination of Liberia's Designation for Temporary Protected Status*,

    81 Fed. Reg. 66,059-01 (Sept. 26, 2016) ................................................................... 26

*Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before*

    *Termination of Guinea's Designation for Temporary Protected Status*,

    81 Fed. Reg. 66,064-01 (Sept. 26, 2016) ................................................................... 26

*Extension of the Designation of Haiti for Temporary Protected Status*,

    82 Fed. Reg. 23,830-01 (May 24, 2017) ........................................................ 16, 35, 37

*Extension of South Sudan for Temporary Protected Status*,

    82 Fed. Reg. 44,205-01 (Sept. 21, 2017) ............................................................ 10, 35

*Termination of the Designation of Sudan for Temporary Protected Status*,

    82 Fed. Reg. 47,228-02 (Oct. 11, 2017) ........................................................... 9, 10, 34

*Termination of the Designation of Nicaragua for Temporary Protected Status*,

    82 Fed. Reg. 59,636-01 (Dec. 15, 2017) ......................................................... 12, 35, 37

*Termination of the Designation of Haiti for Temporary Protected Status*,

    83 Fed. Reg. 2648-01 (Jan. 18, 2018) ............................................................... 17, 35

*Termination of the Designation of El Salvador for Temporary Protected Status*,

    83 Fed. Reg. 2654-01 (Jan. 18, 2018) ............................................................... 20, 36

*Extension of the Designation of Syria for Temporary Protected Status*,

    83 Fed. Reg. 9329-02 (March 5, 2018) ...................................................................... 37


**OTHER AUTHORITIES**

H.R. Rep. No. 101-245 (1989).......................................................................... 3, 6, 21

136 Cong. Rec. S17103 (daily ed. Oct. 26, 1990) ........................................................ 3

DHS, Statement by Secretary Johnson Concerning His Directive to Resume

Regular Removals to Haiti (Sept. 22, 2016),

    https://www.dhs.gov/news/2016/09/22/statement-secretary-johnson-concerning-his-directive-

    resume-regular-removals-haiti ............................................................................................ 15, 35

Secretary Nielsen Announcement on Temporary Protected Status for

Honduras (May 4, 2018),

    https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-

    designated-country-honduras ....................................................................................................... 37

CHAD A. READLER
Acting Assistant Attorney General
Civil Division
JOHN R. TYLER
Assistant Branch Director
RHETT P. MARTIN
Trial Attorney
DC Bar No. 999272
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 305-7538
Fax: (202) 616-8460
Rhett.martin@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTA RAMOS, *et al.*,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>KIRSTJEN NIELSEN, *et al.*,<br><br>　　　　Defendants. | Case No. 3:18-cv-01554-EMC<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM IN SUPPORT**<br><br>**Judge:  Honorable Edward M. Chen<br>Hearing:  June 22, 2018, 10:30 a.m.<br>Place:  San Francisco U.S. Courthouse, Courtroom 5, 17th Floor** |

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on June 22, 2018, at 10:30 a.m., before the Honorable Edward M. Chen of the United States District Court for the Northern District of California, in Courtroom 5 of the 17th Floor of the Philip E. Burton Courthouse and Federal Building, 450 Golden Gate Avenue, San Francisco, California, Defendants will move this Court to dismiss all claims in the above captioned matter.

Defendants' motion to dismiss is being made pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  The basis for this motion is set forth more fully in the following Memorandum of Points and Authorities.

Defendants, the United States Department of Homeland Security ("DHS"); Kirstjen Nielsen, Secretary of Homeland Security; Claire M. Grady, Acting Deputy Secretary of Homeland Security (collectively, the "Secretaries"),[1] and the United States of America hereby submit this motion to dismiss.

## MEMORANDUM OF POINTS AND AUTHORITIES
### INTRODUCTION

This action concerns DHS's determinations that the Temporary Protected Status ("TPS") designations for Sudan, Nicaragua, Haiti, and El Salvador should be terminated because those countries no longer meet the statutory standard for continued designation on the basis of armed conflict, natural disasters, or other "extraordinary and temporary conditions." Congress has entrusted to the Secretary of DHS broad, unreviewable discretion to designate countries for TPS while they recover from such conditions. This delegation of authority allows the Secretary to provide the nationals of a designated country who are currently residing in the United States *temporary* relief from removal, as well as work authorization, during the recovery period.[2] TPS is not a grant of asylum, nor is it a permanent grant of lawful immigration status such as lawful

---

[1] Elaine Duke was originally named in her official capacity as Deputy Secretary. She has since retired, and Claire M. Grady has been substituted under Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Persons without nationality who last habitually resided in a designated country may also qualify for such relief and work authorization. 8 U.S.C. § 1254a(a)(1), (c)(1)(A).

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 1

permanent residence ("LPR"). Instead, it is a humanitarian program designed to accord temporary relief from removal to certain aliens who are in the United States when their country of nationality experiences armed conflict, a natural disaster, or other extraordinary and temporary conditions and who are, as a result, temporarily unable to return to their home countries in safety.

Plaintiffs are nine individual TPS beneficiaries and five U.S. citizen children of TPS beneficiaries. Plaintiffs assert four claims challenging the decisions to terminate TPS designations for these countries: 1) a substantive due-process claim alleging a right of citizen children to live in the United States with their non-citizen parents; 2) an equal-protection claim alleging discriminatory animus in the decisions to terminate TPS for these four countries; 3) an allegation that the decisions to terminate TPS constituted arbitrary and irrational action under the Due Process Clause; and 4) a claim that the Secretaries adopted a "new rule" in interpreting the TPS statute that was arbitrary and capricious under the Administrative Procedure Act ("APA").

This Court lacks subject-matter jurisdiction over all of Plaintiffs' claims—both their constitutional and APA arbitrary-and-capricious claims—because the TPS statute expressly prohibits judicial second-guessing of the Secretaries' exercise of their discretion. 8 U.S.C. § 1254a(b)(5)(A) ("There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state[.]").[3] In apparent recognition of this provision, underlying all of Plaintiffs' claims is their attempt to recast their challenge as one to a "new rule" whereby Secretaries Duke and Nielsen purportedly refused to consider events occurring subsequent to the initial TPS designation. Despite Plaintiffs' attempt to plead artfully around the judicial-review preclusion with their "new rule" allegations, their claim is not viable and should be dismissed because, however pleaded, their claims seek review and vacatur of the Secretaries' determinations to terminate TPS. In any event, no such

---

[3] Defendants note that an alien subject to removal following the termination of TPS may later be able to raise constitutional challenges to that termination in his or her removal proceedings. But because review of a challenge to the Secretary's programmatic exercise of discretion is precluded outside of those proceedings, this entire action should be dismissed for lack of subject matter jurisdiction in this Court.

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 2

1    "new rule" exists and, even if it did, it nevertheless would be entirely compatible with the TPS

2    statute itself.

3        Moreover, even if this Court had jurisdiction over any of Plaintiffs' claims, those claims

4    nevertheless fail as a matter of law. Plaintiffs' assertion of a substantive due process right of a

5    citizen child to live with a non-citizen parent in this country has repeatedly been rejected by the

6    Ninth Circuit and other courts of appeals. Plaintiffs' contention that the TPS terminations were

7    either irrational or motivated by animus on the part of Secretaries Duke or Nielsen also fails as a

8    matter of law because Plaintiffs do not allege facts constituting "clear evidence" of "outrageous"

9    discrimination as required by the Supreme Court to state an equal-protection claim in the

10   immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488–91

11   (1999) ("*AADC*"). To the contrary, the explanations Secretaries Duke and Nielsen gave in their

12   *Federal Register* notices for terminating TPS for these countries demonstrate that those actions

13   had a rational basis and thus did not violate the Fifth Amendment's Due Process Clause.

14   Likewise, the explanations provided were consistent with the APA.

15                                     **BACKGROUND**

16   **I)  Statutory Background.**

17        On November 29, 1990, Congress enacted the Immigration Act of 1990, vesting the

18   Attorney General with the power to designate countries for TPS, to extend such designations,

19   and ultimately to terminate such designations. *See* Pub. L. No. 101-649, 104 Stat. 4978. After the

20   establishment of the Department of Homeland Security, that power was transferred to the

21   Secretary of Homeland Security. *See* 8 U.S.C. § 1103; 6 U.S.C. § 557. In enacting the TPS

22   provisions, Congress created a specific statutory structure for providing temporary relief to

23   individuals who might not qualify for asylum, but who would still face dangers in returning to

24   their home countries due to extraordinary but temporary circumstances within those countries.

25   *See, e.g.*, H.R. Rep. No. 101-245, at 14 (1989) (accompanying H.R. 2929); 136 Cong. Rec.

26   S17103, S17108 (daily ed. Oct. 26, 1990), 1990 WL 165401 (Sen. DeConcini). Congress

27   emphasized the temporary nature of the available relief. *See, e.g.*, 136 Cong. Rec. at S17108-09

28

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 3

(Sen. DeConcini) ("This bill would not grant permanent resident alien status."); H.R. Rep. No. 101-245, at 13 (emphasizing that the statute "does *not* create an admissions program").

Before an alien may qualify for TPS, the Secretary of Homeland Security must exercise his or her discretion to designate a foreign state for TPS, which can only be done if the foreign state meets the necessary statutory conditions that would allow its nationals to be eligible for TPS. 8 U.S.C. § 1254a(a). "[A]fter consultation with appropriate agencies of the Government," the Secretary may designate a foreign state only if certain conditions within the foreign state exist. *Id*. § 1254a(b)(1). These include the following:

> **(A)** the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> **(B)** the [Secretary] finds that--
>
>> **(i)** there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
>>
>> **(ii)** the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
>>
>> **(iii)** the foreign state officially has requested designation under this subparagraph; or
>
> **(C)** the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

*Id*. An initial designation can last for only between six and eighteen months, 8 U.S.C. § 1254a(b)(2), but can be extended for six, twelve, or eighteen months at a time if conditions still warrant such a designation, *id.* § 1254a(b)(3)(C). When designating a country for TPS, the Secretary must publish in the *Federal Register* the findings that support such a designation or extension. *Id*. § 1254a(b)(1).

Consistent with the temporary nature of TPS, Congress also requires the Secretary to conduct periodic reviews for each designation at specified intervals. *Id*. § 1254a(b)(3)(A). When conducting these periodic reviews, the Secretary considers, in consultation with the appropriate

agencies of the Government, the current conditions in the foreign state and whether the

conditions that formed the basis of the initial designation are still met. *Id.* If the Secretary decides

that the conditions are no longer met, the Secretary "shall terminate the designation" and

announce the termination by publishing a notice in the *Federal Register* that provides the basis

for the termination. *Id.* § 1254a(b)(3)(B). A termination may not take effect for at least 60 days

after publication of the *Federal Register* notice or, if later, the expiration of the most recent

previous extension of the country designation, *id.*, and the Secretary may delay the effective date

for a reasonable period "in order to provide for an orderly transition," *id.* § 1254a(d)(3). If, on

the other hand, the Secretary "does not determine" that the foreign state "no longer meets the

conditions for designation," then  "the period of designation of the foreign state is extended for

an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18

months)." *See* 8 U.S.C. § 1254a(b)(3)(C).

Apart from terminating or extending a TPS designation, the Secretary may also

redesignate a country for TPS. *See* 8 U.S.C. § 1254a(b); *see also Extension of Designation &*

*Redesignation of Liberia Under TPS Program*, 62 Fed. Reg. 16,608-01, 16,009 (Apr. 7, 1997)

(redesignation of Liberia for TPS and discussing the redesignation authority contemplated by 8

U.S.C. § 1254a(b)). To be eligible under TPS, an alien must have been "continuously physically

present in the United States since the effective date of the most recent designation." 8 U.S.C.

§ 1254a(c)(1)(A)(i). In contrast to a decision to extend a TPS designation, a redesignation can

therefore expand the population of persons eligible for TPS to include those who had entered the

United States after the most recent designation (whether legally or illegally), depending on the

new dates the Secretary establishes for demonstrating continuous residence and continuous

physical presence in the United States under 8 U.S.C. § 1254a(c)(1)(A)(i)-(ii). *See* 8 U.S.C. §

1254a(c); *see also Cervantes v. Holder*, 597 F.3d 229, 233-34 (4th Cir. 2010).

Decisions to extend or terminate a country's TPS designation are based on an assessment

of country conditions to determine whether or not the foreign state continues to meet the

"conditions for such designation," including, as appropriate, foreign policy considerations that

are uniquely within the expertise of the Secretary and the "appropriate agencies of the

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 5

Government" as required by Congress. 8 U.S.C. § 1254a(b)(1), (3)(A). Furthermore, Congress included a provision specifically precluding judicial review of these decisions. *Id.* § 1254a(b)(5)(A) ("There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."). In one of its committee reports considering the TPS legislation, Congress emphasized this judicial review preclusion provision in the following manner: "Moreover, *none* of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review." H.R. Rep. No. 101-245, at 14 (emphasis added).

## II)  TPS Determinations for Sudan, Nicaragua, Haiti, and El Salvador

### a)  Sudan

#### i)   Sudan's TPS Designations, Redesignations, and Extensions

On November 4, 1997, then-Attorney General Janet Reno designated Sudan for TPS based on her determinations that "(1) [t]here exist[ed] an ongoing armed conflict in Sudan and a return of aliens who are nationals of Sudan . . . would pose a serious threat to their personal safety" and "(2) [t]here exist[ed] extraordinary and temporary conditions in Sudan that prevent[ed] aliens who are nationals of Sudan . . . from returning t[o] Sudan in Safety." *Designation of Sudan Under Temporary Protected Status*, 62 Fed. Reg. 59,737-01, 59,737 (Nov. 4, 1997). At that time, there were "no more than 4,000 nationals of Sudan . . . who [were] currently in nonimmigrant or unlawful status and therefore eligible for [TPS]." *Id.* at 59,738. Sudanese individuals who had "been 'continuously physically present' and ha[d] 'continuously resided in the United States' since November 4, 1997" were given one year in which to register. *Id.* After this original designation, Sudan's TPS designation was extended 15 times. It was redesignated three times.

Sudan was first redesignated in November 1999.[4] Then-Attorney General Janet Reno explained that since the original designation in 1997, she and "the Department of State ha[d] continuously examined conditions in Sudan" and "found that . . . the long-running civil war

---

[4] Then-Attorney General Reno first extended Sudan's TPS designation on November 3, 1998. *Extension of Designation of Sudan Under Temporary Protected Status Program*, 63 Fed. Reg. 59,337-01.

continue[d], causing extensive displacement of populations and human rights abuses directed at the displaced." *Extension and Redesignation of Sudan Under the Temporary Protected Status Program*, 64 Fed. Reg. 61,128-01, 61,128 (Nov. 9, 1999). She also noted "that recent statistics show marked increases in both the number and approval of individual asylum claims and Sudanese refugee resettlement in the United States." *Id*. "The findings that these individual Sudanese will face harm upon return to Sudan supports the need to extend and offer TPS to those Sudanese who have arrived in the United States since November 4, 1997." *Id*. Those who had been continuously present and continuously residing in the United States since November 9, 1999 were given until November 2, 2000 to register. *Id*. at 61,128–29. At the time of this first redesignation, there were "no more than 1,000 nationals of Sudan who ha[d] been granted TPS and who [were] eligible for re-registration, and no more than 500 . . . who [did] not have TPS and [were] eligible for TPS under this redesignation." *Id*. at 61,130.

Between the 1999 redesignation and 2004, Sudan's TPS was extended four times. *See Extension of Designation of Sudan Under the Temporary Protected Status Program*, 65 Fed. Reg. 67,407-01 (Nov. 9, 2000); *Extension of the Designation of Sudan Under the Temporary Protected Status Program*, 66 Fed. Reg. 46,031-01 (Aug. 31, 2001); *Extension of the Designation of Sudan Under the Temporary Protected Status Program*, 67 Fed. Reg. 55,877-01 (Aug. 30, 2002); *Extension of the Designation of Sudan Under Temporary Protected Status Program*, 68 Fed. Reg. 52,410-01 (Sept. 3, 2003).

In 2004, then-Secretary of DHS Tom Ridge redesignated Sudan. Secretary Ridge explained that "[a]lthough some progress has been made in the peace negotiations for the North-South conflict, . . . a 12-month extension is warranted because the armed conflict in Sudan continues." *Extension and Re-designation of Temporary Protected Status for Sudan*, 69 Fed. Reg. 60,168-01, 60,169 (Oct. 7, 2004); *see also id.* ("Likewise, the extraordinary and temporary conditions resulting from Sudan's North-South civil war persist."). Then-Secretary Ridge noted "that a framework peace agreement between the Government of Sudan and the Sudan People's Liberation Army (SPLA) was signed in June 2004[,]" but found that "[i]n spite of that progress, the North-South civil war continues without a comprehensive peace agreement to end the civil

war." *Id.* "In addition to the North-South conflict, the conflict in the western region of Darfur ha[d] intensified[,]" with "[u]p to 30,000 civilians hav[ing] been killed[,] [u]p to one million people hav[ing] been displaced from their homes . . , and over 100,000 hav[ing] fled to neighboring Chad." *Id.* (citation omitted).  "One million civilians in Darfur remain[ed] beyond the reach of aid workers due to the ongoing conflict[,]" and "[r]eports of killings, rapes, beatings, looting and burning of property throughout the Darfur region continue[d]." *Id.* (citation omitted).

The Comprehensive Peace Agreement in 2005 ended the North-South civil war and paved the way for South Sudan's secession in 2011. Nevertheless, violence persisted in various regions of Sudan. *See Extension and Redesignation of Sudan for Temporary Protected Status*, 78 Fed. Reg. 1872-01 (Jan. 9, 2013) (detailing the 2005 Comprehensive Peace Agreement and continuing violence). Because of the ongoing instability, successive Secretaries of DHS granted five 18-month extensions for Sudan's TPS after the 2004 redesignation.[5]

Despite the 2005 Peace Agreement and South Sudan's secession, violent conditions persisted, and in 2013, then-DHS Secretary Janet Napolitano redesignated Sudan for the third time. She explained that "[t]here continues to be a substantial, *but temporary*, disruption of living conditions in Sudan based upon ongoing armed conflict and extraordinary and temporary conditions in that country that prevent Sudanese who now have TPS from returning in safety." *Id.* at 1872 (emphasis added). She found that "[c]itizens of Sudan [were] affected by violent conflicts in four distinct areas: Darfur and the three transitional areas along the Sudan-South Sudan border (Abyei, Blue Nile State, and Southern Kordofan)." *Id.* at 1874. While "[i]n some areas of Darfur, Government-rebel clashes declined somewhat . . . rebel factions, bandits, and unidentified assailants" continued to perpetrate violence.

---

[5] *See Extension of Designation of Sudan Under the Temporary Protected Status Program,* 70 Fed. Reg. 52,429-01 (Sept. 2, 2005); *Extension of the Designation of Sudan for Temporary Protected Status* , 72 Fed. Reg. 10,541-02 (Mar. 8, 2007); *Extension of the Designation of Sudan for Temporary Protected Status*, 73 Fed. Reg. 47,606-02 (Aug. 14, 2008); *Extension of the Designation of Sudan for Temporary Protected Status*, 74 Fed. Reg. 69,355-02 (Dec. 31, 2009); *Extension of the Designation of Sudan for Temporary Protected Status,* 76 Fed. Reg. 63,635-01 (Oct. 13, 2011).

Because of these conditions, then-Secretary Napolitano found that both the "armed conflict" and "extraordinary and temporary conditions" prongs of the TPS statute continued to be met. *Id.*; *see* 8 U.S.C. § 1254a(b)(1)(A), (b)(1)(C). Accordingly, she redesignated Sudan "to extend TPS protection to eligible Sudanese nationals who arrived between October 7, 2004 and January 9, 2013." 78 Fed. Reg. at 1874. She also extended Sudan's TPS for 18 months. *Id.* At that time, there were "approximately 300 current Sudanese TPS beneficiaries" and "fewer than 4,000 additional individuals . . . eligible for TPS under the combined redesignations of Sudan and South Sudan." *Id.* at 1875.[6]

After the 2013 redesignation, former DHS Secretary Jeh Johnson extended Sudan's TPS twice. *See Extension of the Designation of Sudan for Temporary Protected Status*, 79 Fed. Reg. 52,027-01, 52,029 (Sept. 2, 2014) (18-month extension); *Extension of the Designation of Sudan for Temporary Protected Status*, 81 Fed. Reg. 4045-01 (Jan. 25, 2016) (18 months). The final extension expired on November 2, 2017.

**ii) Sudan's TPS Termination**

After consultations between DHS and the State Department, then-Acting Secretary Elaine Duke published a notice in the *Federal Register* in October 2017 explaining the basis of her decision to terminate Sudan's TPS. *Termination of the Designation of Sudan for Temporary Protected Status*, 82 Fed. Reg. 47,228-02 (Oct. 11, 2017). As she explained, by that time "[c]onflict in Sudan [was] limited to Darfur and the Two Areas (South Kordofan and Blue Nile States)." *Id.* at 47,230. "However, in Darfur, toward the end of 2016 and through the first half of 2017, parties to the conflict renewed a series of time-limited unilateral cessation of hostilities declarations, resulting in a reduction in violence and violent rhetoric from the parties to the conflict." *Id.* Consequently, she found that "[t]he remaining conflict [was] limited and [did] not prevent the return of nationals of Sudan to all regions of Sudan without posing a serious threat to their personal safety." *Id.*

---

[6] After South Sudan became an independent nation on July 9, 2011, then-Secretary Napolitano granted TPS for South Sudan. *See Designation of Republic of South Sudan for Temporary Protected Status*, 76 Fed. Reg. 63,629-01 (Oct. 13, 2011).

1    Then-Acting Secretary Duke also determined that "[a]bove-average harvests have

2    moderately improved food security across much of Sudan" and that "[w]hile populations in

3    conflict-affected areas continue[d] to experience acute levels of food insecurity, there ha[d] also

4    been some improvement in access for humanitarian actors to provide much-needed humanitarian

5    aid." *Id*. Finally, while noting Sudan's poor human rights record, she concluded that "conditions

6    on the ground no longer prevent all Sudanese nationals from returning in safety." *Id*.

7    Because Sudan no longer met the statutory conditions for TPS, then-Acting Secretary

8    Duke terminated its designation. *See* 8 U.S.C. § 1254a(b)(3)(B). She estimated that there were

9    approximately 1,040 Sudanese nationals receiving TPS benefits at that time. 82 Fed. Reg. at

10   47,230. To allow these individuals to make the necessary preparations and provide for an

11   "orderly transition," she exercised her discretion under the statute to delay the termination for 12

12   months until November 2, 2018. *Id*.; *see* 8 U.S.C. § 1254a(d)(3). At the same time she

13   terminated Sudan's TPS, she extended South Sudan's for 18 months. *See Extension of South*

14   *Sudan for Temporary Protected Status*, 82 Fed. Reg. 44,205-01, 44,206 (Sept. 21, 2017)

15   (explaining that the civil war in South Sudan was "ongoing").

16   **b)  Nicaragua**

17   **i)   Nicaragua's TPS Designations and Extensions**

18   On January 5, 1999, then-Attorney General Janet Reno announced via a notice in the

19   *Federal Register* the designation of Nicaragua for TPS. As she explained, "Hurricane Mitch

20   swept through Central America causing severe flooding and associated damage in Nicaragua."

21   *Designation of Nicaragua Under Temporary Protected Status*, 64 Fed. Reg. 526-01, 526 (Jan. 5,

22   1999). "Based on a thorough review by the Departments of State and Justice, the Attorney

23   General finds that, due to the environmental disaster and substantial disruption of living

24   conditions caused by Hurricane Mitch, Nicaragua is unable, temporarily, to handle adequately

25   the return of Nicaraguan nationals." *Id*. Nicaragua officially requested a TPS designation for its

26   nationals, and because of then-Attorney General Reno's determination that "permitting nationals

27   of Nicaragua . . . to remain temporarily in the United States is not contrary to the national interest

28   of the United States," she designated Nicaragua for TPS under 8 U.S.C. § 1254a(b)(1)(B). 64

Fed. Reg. at 527. At that time, she estimated that there were "no more than 45,000 to 70,000 nationals of Nicaragua . . . in the United States who [were] eligible for TPS." *Id*. Nicaragua's TPS was extended 13 times. It was never redesignated.

At the time of its first extension in May 2000, then-Attorney General Reno noted "that although Nicaragua has made some progress in recovering from Hurricane Mitch, the recovery has been very slow, especially in the areas of housing and infrastructure[,]" and extended its TPS for 12 months. *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 65 Fed. Reg. 30,440-01, 30,440 (May 11, 2000). Likewise, in 2002 then-Attorney General John Ashcroft determined that the situation in Nicaragua was improving significantly and "that a 12-month extension would afford Nicaragua a sufficient amount of time to substantially complete its recovery efforts" and by that time "Nicaragua will have made progress in recovering from the effects of Hurricane Mitch." *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 66 Fed. Reg. 23,271-01, 23,272 (May 8, 2001). "Balancing the need for additional time for recovery efforts with *the temporal nature of the TPS benefit*, the Attorney General determined that a 12-month extension would provide Nicaragua sufficient time to complete its recovery efforts to the point that it can handle adequately the return of its nationals." *Id*. (emphasis added).

However, "delays in disbursements of aid" and subsequent natural disasters "compounded the humanitarian, economic, and social problems initially brought on by Hurricane Mitch in 1998[,]" and its TPS was subsequently extended several times. *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 67 Fed. Reg. 22,454-01, 22,454 (May 3, 2002) (12-month extension); *Extension of the Designation of Nicaragua Under Temporary Protected Status Program*, 68 Fed. Reg. 23,748-01, 23,749 (May 5, 2003) (18-month extension).[7]

These extensions noted that Nicaragua continued to improve but that subsequent events and delays in aid were preventing Nicaragua from fully recovering from the initial devastation

---

[7] *Extension of the Designation of Temporary Protected Status for Nicaragua*, 69 Fed. Reg. 64,088-01 (Nov. 3, 2004) (18 months); *Extension of the Designation of Temporary Protected Status for Nicaragua*, 71 Fed. Reg. 16,333-01 (Mar. 31, 2006) (12-months).

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 11

wrought by Hurricane Mitch. *See Extension of the Designation of Nicaragua for Temporary Protected Status*, 72 Fed. Reg. 29,534-01, 29,535 (May 29, 2007) ("Significant progress has been made in reconstruction following Hurricane Mitch. However, Nicaragua has not fully recovered from the environmental disaster."); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 73 Fed. Reg. 57,138-01, 57,139 (Oct. 1, 2008) ("[T]here continues to be a substantial, but temporary, disruption of living conditions in Nicaragua resulting from Hurricane Mitch[.]"); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 75 Fed. Reg. 24,737-01, 24,738 (May 5, 2010) (noting "substantial, but temporary, disruption of living conditions . . . resulting from Hurricane Mitch"); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 76 Fed. Reg. 68,493-01 (Nov. 4, 2011) (same); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 78 Fed. Reg. 20,128-01 (Apr. 3, 2013) (same); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 79 Fed. Reg. 62,176-01 (Oct. 16, 2014) (same); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 81 Fed. Reg. 30,325-01 (May 16, 2016) (same).

### ii) Nicaragua's TPS Termination

Throughout this time, as discussed in one of then-Secretary Johnson's decisions to extend Nicaragua's TPS designation, the international community continued to provide millions of dollars in aid to rebuild Nicaragua. *Extension of the Designation of Nicaragua for Temporary Protected Status*, 79 Fed. Reg. 62,176-01 (Oct. 16, 2014) (detailing foreign aid efforts). As a result, in December 2017, then-Acting DHS Secretary Elaine Duke found that "[r]ecovery efforts relating to Hurricane Mitch . . . have stabilized, and people are able to conduct their daily activities without impediments directly related to damage from the storm[,]" and accordingly terminated Nicaragua's TPS designation. *Termination of the Designation of Nicaragua for Temporary Protected Status*, 82 Fed. Reg. 59,636-01, 59,637 (Dec. 15, 2017).

In particular, then-Acting Secretary Duke found that "Nicaragua received a significant amount of international aid to assist in its Hurricane Mitch-related recovery efforts, and many reconstruction projects have now been completed." *Id*. "Hundreds of homes destroyed by the

storm have been rebuilt. The government of Nicaragua has been working to improve access to remote communities and has built new roads in many of the areas affected by Hurricane Mitch, including the first paved road to connect the Pacific side of the country to the Caribbean Coast, which is nearly completed." *Id*. "Access to drinking water and sanitation has improved. Electrification of the country has increased from 50% of the country in 2007 to 90% today. Nearly 1.5 million textbooks have been provided to 225,000 primary students of the poorest regions of the country. Internet access is also now widely available." *Id*.

"In addition, Nicaragua's relative security has helped attract tourism and foreign investment." *Id*. "The Nicaraguan economy has strengthened due to increased foreign direct investment and exports of textiles and commodities." *Id*. "Nicaragua's Gross Domestic Product (GDP) reached an all-time high of $13.23 billion (USD) in 2016, has averaged over 5% growth since 2010, and Nicaragua's GDP per capita is higher today than in 1998." *Id*. "Public infrastructure investment has been a high priority for the government, and the government has demonstrated its ability to provide basic services to its citizens." *Id*.

Then-Acting Secretary Duke estimated that there were approximately 5,300 Nicaraguan TPS beneficiaries. *Id*. To allow for these individuals to make an orderly transition, she delayed the termination for 12 months until January 5, 2019. *Id*.

c) **Haiti**

i) **Haiti's TPS Designation, Redesignation, and Extensions**

On January 21, 2010, DHS published a *Federal Register* notice announcing that Secretary of Homeland Security Janet Napolitano designated Haiti for TPS for a period of 18 months. *See Designation of Haiti for Temporary Protected Status*, 75 Fed. Reg. 3476-02 (Jan. 21, 2010). The notice emphasized that "TPS is available only to persons who were continuously physically present in the United States as of the effective date of the designation." *Id*. at 3476. The Secretary designated Haiti based on a review by the Department of Homeland Security and the Department of State of the "conditions in Haiti following the [7.0 magnitude] earthquake" that struck Haiti on January 12, 2010. *Id*. at 3477. Reports described collapse of concrete homes, hospitals overflowing with victims, severe effects on Haiti's critical infrastructure, and

significant damage to major arteries of transportations (including Haiti's main airport) hindering access to and within the country. *Id*. "Given the size of the destruction[,] and humanitarian challenges," the Secretary found that "there clearly exist extraordinary and temporary conditions preventing Haitian nationals from returning to Haiti in safety." *Id*. Individuals were given a "180-day registration period [beginning on] the date of publication of the [*Federal Register*] notice" to apply for TPS. *Id*. at 3476. The Secretary set her designation to last through July 22, 2011. *Id*.

In May 2011, then-Secretary Napolitano announced that she was "both extending the existing designation of Haiti for temporary protected status (TPS) for 18 months from July 23, 2011 through January 22, 2013, and redesignating Haiti for TPS for 18 months, effective July 23, 2011 through January 22, 2013." *Extension and Redesignation of Haiti for Temporary Protected Status*, 76 Fed. Reg. 29,000-01, 29,000 (May 19, 2011). Based on a review by both DHS and the Department of State, the Secretary determined that the "conditions prompting the original designation continue[d] to be met" and further determined that protections should be extended for "eligible Haitians who arrived between January 12, 2010 and January 12, 2011." *Id*. at 29,001.

On October 1, 2012, then-Secretary Napolitano announced an 18-month extension of Haiti's TPS designation through July 22, 2014, but she did not redesignate Haiti. *See Extension of the Designation of Haiti for Temporary Protected Status*, 77 Fed. Reg. 59,943-01 (Oct. 1, 2012). In extending the TPS designation, the Secretary found that, although a "coordinated international effort and strong partnership with the Haitian people resulted in emergency response activities that saved lives and laid a foundation for Haiti to rebuild," "many of the conditions prompting" the previous designations persisted. *Id*. at 59,944.  Secretary Napolitano concluded that "[g]iven the risk of contracting cholera, unsafe living conditions in IDP camps, damaged infrastructure, and a shortage of permanent shelter, it is unsafe for Haitians currently in the United States with TPS to return home." *Id*.

In March 2014, then-Secretary Jeh Johnson once again extended TPS for an additional 18 months through January 22, 2016. *See Extension of the Designation of Haiti for Temporary*

*Protected Status*, 79 Fed. Reg. 11,808-01, 11,808 (Mar. 3, 2014) ("There continues to be a substantial, but temporary, disruption of living conditions in Haiti based upon extraordinary and temporary conditions in that country that prevent Haitians who have TPS from safely returning."). In extending Haiti's TPS designation, the Secretary concluded that "[w]hile the Government of Haiti has made considerable progress in improving security and quality of life of its citizens following the January 2010 earthquake, Haiti continues to lack the adequate infrastructure, employment and educational opportunities, and basic services to absorb the approximately 58,000 Haitian nationals living in the United States under TPS." *Id.* at 11,809.

In the face of the expiration of TPS in January 2016, Secretary Johnson again extended TPS for Haiti for 18 months through July 22, 2017. *See Extension of the Designation of Haiti for Temporary Protected Status*, 80 Fed. Reg. 51,582-01 (Aug. 25, 2015). The Secretary concluded that, "[a]lthough the Government of Haiti has taken significant steps to improve stability and the quality of life for Haitian citizens, Haiti continues to lack the adequate infrastructure, health and sanitation services, and emergency response capacity necessary to ensure the personal safety of Haitian nationals." *Id*. at 51,584. The Secretary found that "most of the earthquake related rubble has been cleared[] and there have been improvements to road conditions," but the "effort to rebuild damaged buildings has been slow." *Id*. at 51,583. Likewise, the Secretary found that there were still housing shortages and that approximately 80,000 individuals still lived in IDP camps, which presented health and safety risks. *Id*. There was also "food insecurity," and "progress ha[d] been slow and limited in restoring Haiti's physical health infrastructure." *Id*. The Secretary also noted the political instability that undermined recovery efforts. *Id*. In light of these combined circumstances, the Secretary made the determination to extend Haiti's TPS designation. *Id*. at 51,583-84.

Although he extended TPS for Haiti in January 2016, Secretary Johnson announced on September 22, 2016, that "the situation in Haiti has improved sufficiently to permit the U.S. government to remove Haitian nationals [who did not have TPS] on a more regular basis." *See* DHS, Statement by Secretary Johnson Concerning His Directive to Resume Regular Removals to Haiti (Sept. 22, 2016), https://www.dhs.gov/news/2016/09/22/statement-secretary-johnson-

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 15

concerning-his-directive-resume-regular-removals-haiti (hereinafter Sec'y Johnson Statement). Previously, the United States had suspended such removals given the conditions in Haiti following the earthquake. *See id*. By September 2016, however, Secretary Johnson determined that conditions had sufficiently improved at that time so as to allow for a resumption of "removals of Haitian nationals in accordance with [DHS's] existing enforcement priorities." *See id.* (noting that those covered by TPS would not be affected by the change in policy). In reaching this determination, Secretary Johnson emphasized that "DHS and the Department of State [were] working with the Government of Haiti and other key partners to resume removals in as humane and minimally disruptive a manner as possible." *Id*.

After the change in Administrations, then-DHS Secretary John Kelly decided in May 2017 that Haiti's conditions still met the statutory criteria for TPS and accordingly extended the designation through January 22, 2018. *See Extension of the Designation of Haiti for Temporary Protected Status*, 82 Fed. Reg. 23,830-01 (May 24, 2017). In particular, Secretary Kelly determined "that a limited, 6-month extension [was] warranted because, although Haiti ha[d] made significant progress in recovering from the January 2010 earthquake that prompted its initial designation, conditions in Haiti supporting its designation for TPS continue[d] to be met at th[at] time." *See id*. at 23,830. The Secretary found that Haiti had "made significant progress in addressing issues specific to the earthquake." *Id*. at 23,832. For example, 96% of individuals living at IDP camps had left those camps, although there were still 55,000 living in the 31 remaining camps. *Id*. Further, although there were still some security concerns, the United Nations announced in March 2017 that the "mandate of the United Nations peacekeeping mission in Haiti [would] end in October 2017" and "be replaced by a new police-only mission focused on rule of law." *Id*. Secretary Kelly concluded, however, that certain factors suggested that TPS should be extended the additional six months. Hurricane Matthew, which had made landfall in Haiti on October 4, 2016, as well as floods in parts of the country in April 2017, had compounded, among other things, existing food insecurity. *Id*. Secretary Kelly also found that the cholera epidemic attributable to the earthquake recovery still strained Haiti's public health system even though progress had been made in combatting cholera. *Id*. With these factors in

mind, Secretary Kelly extended TPS for Haiti for a "limited six-month period" through January 22, 2018. *Id*. at 23,831. He observed, however, that "the Government of Haiti has expressed a desire for its nationals to return to Haiti," and he stated that "[TPS] beneficiaries are encouraged to prepare for their return to Haiti, including requesting updated travel documents from the Government of Haiti." *Id.*

### ii) Haiti's Termination

"After reviewing country conditions and consulting with the appropriate U.S. Government agencies, the Acting Secretary of Homeland Security Elaine Duke determined on November 20, 2017 that conditions in Haiti no longer support[ed] its designation for TPS and therefore terminat[ed] the TPS designation of Haiti." *Termination of the Designation of Haiti for Temporary Protected Status*, 83 Fed. Reg. 2648-01, 2648, 2650 (Jan. 18, 2018) (finding that "the conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met"). The then-Acting Secretary, however, delayed the effective date of the termination until July 22, 2019, 18 months following the end of the current designation, to "provide time for an orderly transition." *Id*. at 2648. In concluding that the TPS designation should be terminated, the former Acting Secretary acknowledged the 2010 earthquake and "subsequent effects" that "formed the basis for [Haiti's] designation," but concluded that Haiti had "made progress recovering." *Id*. at 2650. This progress included the closure of 98% of the IDP sites, the October 2017 withdrawal of the U.N. peacekeeping mission, the successful completion of a presidential election in February 2017, a plan to rebuild Haiti's National Palace beginning in January 2018, a continuing recovery of Haiti's economy, and the lowest levels of cholera in Haiti since the outbreak began. *Id.*

### b) El Salvador

### i) El Salvador's TPS Designation and Extensions

On March 9, 2001, the Immigration and Naturalization Service ("INS") published a *Federal Register* notice announcing that Attorney General John Ashcroft had designated El Salvador for TPS for a period of 18 months. *See Designation of El Salvador Under Temporary*

*Protected Status Program*, 66 Fed. Reg. 14,214-01 (Mar. 9, 2001). The notice explained that El Salvador had suffered a "devastating earthquake" on January 13, 2001, and two additional earthquakes about a month later. *Id.* at 14,214. Due to the "environmental disaster and substantial disruption of living conditions caused by the earthquakes," the Attorney General found that El Salvador was "'unable, temporarily, to handle adequately the return' of its nationals." *Id.* (quoting 8 U.S.C. § 1254a(b)(1)(B)). In so finding, the Attorney General noted that the earthquakes had displaced 17% of the Salvadoran population; damaged or destroyed 220,000 homes, 1,696 schools, and 856 public buildings; and generated losses likely to exceed $2.8 billion. *Id.*

Following its initial designation in 2001, El Salvador's TPS status was continuously extended—but never redesignated—for a total of eleven extensions, the last of which expired on March 9, 2018. In the first extension, in July 2002, the Attorney General explained that, while El Salvador had made "great strides in responding to the immediate humanitarian impact of the earthquakes," much of the country remained devastated. *See Extension of the Designation of El Salvador Under the Temporary Protected Status Program*, 67 Fed. Reg. 46,000-01, 46,000 (July 11, 2002) (extending TPS designation for 12 months). Fewer than one-quarter of homes destroyed by the earthquakes had been replaced; minimal reconstruction had occurred in the healthcare sector; and a drought had further reduced already depleted food stocks. *Id.* at 46,000-01. A 2003 notice similarly reported that while the country had made "progress in its post-earthquake reconstruction effort," much work remained. *See Extension of the Designation of El Salvador Under Temporary Protected Status Program*, 68 Fed. Reg. 42,071-01, 42,072 (July 16, 2003) (extending TPS designation for 18 months). As of that spring, one-third of homes destroyed by the earthquakes had been replaced, but more than three-quarters of damaged roads still required repair, and the majority of damaged or destroyed schools targeted for reconstruction by the U.S. Agency for International Development ("USAID") were still in the "design phase."

1  *Id. Federal Register* notices accompanying subsequent extensions likewise reported slow

2  progress hampered by environmental and other setbacks.[8]

3      By 2012, the Secretary of Homeland Security (having assumed the responsibility of the

4  Attorney General in making TPS designation and extension decisions) reported that all major

5  roads had been reconstructed and about half of homes rebuilt or repaired, while the last damaged

6  hospital had reopened about seven months earlier. *See Extension of the Designation of El*

7  *Salvador for Temporary Protected Status*, 77 Fed. Reg. 1710-02, 1712 (Jan. 11, 2012)

8  (extending TPS designation for 18 months). Despite this encouraging news, the Secretary also

9  reported that around half of the population lacked access to potable water, and the U.N.

10  Development Programme had recently classified El Salvador as among the most vulnerable

11  countries in the world. *Id.* Notices of 18-month extensions in 2013 and 2015 contained similarly

12  mixed reports. *Compare Extension of the Designation of El Salvador for Temporary Protected*

13  *Status*, 78 Fed. Reg. 32,418-01, 32,420 (May 30, 2013) (discussing a $44 million rural water and

14  sanitation improvement program to be completed in 2014, but noting damage caused by a

15  tropical depression in late 2011 and a 7.4 magnitude earthquake in 2012), *with Extension of the*

16  *Designation of El Salvador for Temporary Protected Status*, 80 Fed. Reg. 893-01, 894-95 (Jan.

17  7, 2015) (finding that only around 10% of El Salvador's population still lacked access to

18  drinking water, but describing "substantial setbacks" to infrastructure repairs due to flooding and

19  a volcanic eruption in 2013, as well as a "severe regional drought that is impacting food

20  security").

21      In 2016, Secretary Jeh Johnson extended El Salvador's TPS status once more. *See*

22  *Extension of the Designation of El Salvador for Temporary Protected Status*, 81 Fed. Reg.

23  44,645-03 (July 8, 2016). Secretary Johnson noted that the regional drought had made the

24

---

25  [8] *See Extension of the Designation of Temporary Protected Status for El Salvador*, 70 Fed.
Reg. 1450-01, 1451 (Jan. 7, 2005); *Extension of the Designation of Temporary Protected Status*

26  *for El Salvador*, 71 Fed. Reg. 34,637-01, 34,638 (June 15, 2006); *Extension of the Designation of*
*El Salvador for Temporary Protected Status*, 72 Fed. Reg. 46,649-01, 46,650 (Aug. 21, 2007);

27  *Extension of the Designation of El Salvador for Temporary Protected Status*, 73 Fed. Reg. 57,128-
01, 57,129 (Oct. 1, 2008); *Extension of the Designation of El Salvador for Temporary Protected*

28  *Status*, 75 Fed. Reg. 39,556-01, 39,558-59 (July 9, 2010).

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 19

country "the driest it has been in 35 years" and was projected to cause more than $400 million in agricultural losses. *Id.* at 44,647. The Secretary also expressed concern about the country's housing deficit and crime problems. *Id.* Nonetheless, he acknowledged that "progress has been made in repairing physical damage caused by the 2001 earthquakes," and he—like his predecessors—stressed that TPS re-registration was "limited to persons who have previously registered for TPS under the designation of El Salvador and whose applications have been granted." *Id.* at 44,645, 44,647.

### ii) El Salvador's Termination

In a January 18, 2018, notice, after consulting with the appropriate federal agencies, the current Secretary of Homeland Security, Kirstjen Nielsen, terminated El Salvador's TPS status effective September 9, 2019. *See Termination of the Designation of El Salvador for Temporary Protected Status*, 83 Fed. Reg. 2654-01 (Jan. 18, 2018). Secretary Nielsen found that the "conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met." *Id.* at 2655-56. The Secretary highlighted that recovery efforts relating to the earthquakes had been largely completed; that social and economic conditions had stabilized; that El Salvador has received millions of dollars in international aid, enabling it to complete many reconstruction projects; and that "schools and hospitals have been reconstructed and repaired, homes have been rebuilt, and money has been provided for water and sanitation and to repair damaged roads and other infrastructure." *Id.* at 2656. Secretary Nielsen also found that El Salvador's economic health was improving, with a historically high GDP in 2016 and further increases projected for 2017 and 2020. *Id.* Moreover, the country has regularly accepted the return of its nationals from the United States in recent years, including 20,538 Salvadorans removed by DHS in FY 2016, and 18,838 removed in FY 2017. *Id.*

## ARGUMENT

## I) THIS COURT LACKS JURISDICTION TO REVIEW PLAINTIFFS' CHALLENGES TO DHS'S TPS DETERMINATIONS.

This case should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure because the Court lacks jurisdiction over Plaintiffs' action.  Here, Plaintiffs are

challenging DHS's determination that TPS for Sudan, Nicaragua, Haiti, and El Salvador should be terminated because these countries no longer meet the criteria for continued TPS designation under the INA. But Congress has provided that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS relief. 8 U.S.C. § 1254a(b)(5)(A). This judicial-review preclusion provision forecloses *all* claims in this Court relating to the Secretaries' TPS determinations, constitutional and otherwise. *Id.*; *see also* H.R. Rep. No. 101-245, at 14 ("Moreover, *none* of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review." (emphasis added)); 5 U.S.C. § 701(a)(1) (precluding review under the APA "to the extent" that other "statutes preclude review").

Although Plaintiffs omit any citation to this judicial-review preclusion provision (*see* Compl. ¶ 13 (Dkt. No. 1)), they implicitly try to avoid it by claiming that they "do not challenge the TPS terminations themselves under the APA, but rather the adoption of Defendants' new rule barring consideration of other post-designation events." Joint Discovery Letter at 2 (Dkt. No. 14). Yet, Plaintiffs concede that there is no such "new rule": "no relevant statute or regulation has changed[.]" Compl. ¶ 75. Rather, Plaintiffs seize on two comments made before Congress by then-Secretary John Kelly (who did not make any of the TPS terminations here) and Secretary Nielsen to the effect that they could not look to persistent problems endemic to a country when assessing TPS status, but rather had to examine the *temporary* conditions caused by the types of periodic disturbances contemplated by the statute. *See* Compl. ¶¶ 76, 77. And, as detailed *infra* in Section II, Acting Secretary Duke's and Secretary Nielsen's terminations involved the same considerations and explanations that every decision maker has given in making termination decisions since the enactment of TPS in 1990.

In any event, Plaintiffs' APA arbitrary-and-capricious claim—like their constitutional claims—remains a challenge to the factors and criteria that the Secretaries used in making their respective TPS determinations. *See, e.g.*, Compl. ¶ 122 (alleging Defendants ignored the "serious reliance interests that their prior policy had engendered" in violation of the APA). Congress expressly prohibited such a challenge, and this Court has no jurisdiction to entertain Plaintiffs'

attempt to plead around it by alleging a "new rule"—that does not exist—to serve as a proxy for the underlying TPS determinations entrusted to DHS by statute.

The Court similarly lacks jurisdiction to consider Plaintiffs' due-process and equal-protection claims. Plaintiffs' constitutional claims rest ultimately on a challenge to the Secretaries' determinations that these countries no longer remain eligible for TPS under the INA. *See* Compl. ¶ 105 (due-process family-integrity claim (First Claim) asserting that "[n]owhere in the notices terminating the TPS designations . . . have Defendants identified any risk to the interests of the United States . . . from allowing . . . citizen children to remain in the United States with their TPS holder parents"); *id.* ¶ 111 (equal-protection claim (Second Claim) asserting "arbitrary termination of the TPS designations"); *id.* ¶¶ 115–16 (due-process claim (Third Claim) alleging "arbitrary termination" and no rational basis for "ignoring the current capability of TPS countries to safely receive longtime TPS holders"). This Court could not examine these claims without first probing the myriad foreign-policy, humanitarian, and domestic considerations taken into account by Secretaries Duke and Nielsen—and the sufficiency of their explanations of these considerations—in terminating TPS for these countries. Congress has expressly excluded this examination from the judiciary's remit.  See 8 U.S.C. 1254a(b)(5)(A).

To be sure, "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (citation omitted). But Section 1254a provides a clear statement of such intent. Unlike the provision at issue in *Webster*, which said nothing about judicial review, 8 U.S.C. § 1254a(b)(5)(A) expressly bars such review. *See Krua v. DHS*, 729 F. Supp. 2d 452, 455 (D. Mass. 2010) (dismissing *pro se* plaintiff's equal protection challenge to administration of TPS for Liberia and observing that "TPS determinations are explicitly exempted from judicial review").[9]

---

[9] In *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court found that a preclusion provision barring judicial review of the "Attorney General's discretionary judgment regarding the application" of a statute did not bar the Court's review of the plaintiff's challenge to the statutory framework itself. *Id.* at 516-17 (citation omitted). Here, by contrast, Plaintiffs do not challenge the TPS framework; rather, they challenge a discretionary determination by Secretaries Duke and Nielsen in administering the statute—precisely what the plain terms of the statute foreclose.

1    Moreover, individuals who lose TPS protection may ultimately have an avenue to bring

2  their constitutional claims. Specifically, Congress provided that no provision of the Immigration

3  and Nationality Act "which limits or eliminates judicial review[] shall be construed as precluding

4  review of constitutional claims or questions of law raised upon a petition for review filed with an

5  appropriate court of appeals" in the removal context.  8 U.S.C. § 1252(a)(2)(D).  Thus, for an

6  alien currently registered for TPS who does not otherwise have lawful status and is later ordered

7  removed, this provision could allow the alien to raise a constitutional claim relating to his or her

8  removal for review by the immigration court and, ultimately, the applicable court of appeals.  *Cf.*

9  *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9 (2012) ("*Webster*'s standard does not apply where

10 Congress simply channels judicial review of a constitutional claim to a particular court."). Some

11 current TPS beneficiaries may have other avenues for obtaining other forms of relief such as

12 asylum.

13    In sum, judicial review of Plaintiffs' challenge to determinations by the Secretaries of

14 Homeland Security to terminate TPS is barred by 8 U.S.C. § 1254a(b)(5)(A), and the Court

15 should dismiss Plaintiffs' complaint for that reason alone.

16 **II) PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW**

17    "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

18 accepted as true, to state a claim to relief that is plausible on its face." *Caviness v. Horizon Cmty.*

19 *Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662

20 (2009)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements

21 of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s]

22 devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations omitted). "A claim has

23 facial plausibility when the plaintiff pleads factual content that allows the court to draw the

24 reasonable inference that the defendant is liable for the misconduct alleged." *Caviness*, 590 F.3d

25 at 812 (quoting *Iqbal*, 556 U.S. at 678). Although the court "must take all of the factual

26 allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched

27 as a factual allegation." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[C]onclusory allegations of law

28 and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a

claim." *Id*. (quotation omitted). The application of these principles has to take into account the deferential review required when examining claims in the immigration context.

At the outset, all of Plaintiffs' claims are premised on their unfounded allegation that Acting Secretary Duke and Secretary Nielsen adopted a "new rule for making TPS determinations," and were "motivated in significant part by racial and national-origin animus." Compl. ¶ 66. According to Plaintiffs, "[u]nder previous administrations, DHS regularly considered natural disasters and social or economic crises that occurred *after* a country was originally designated for TPS in deciding whether to continue or instead terminate a country's designation. But after President Trump took office, DHS—without any formal announcement or other explanation—adopted a new, novel interpretation of the TPS statute that eschews consideration of any intervening country conditions." Compl. ¶ 4. This "new rule" theory permeates their due-process claims (First and Third Claims), their equal-protection claim (Second Claim), and their APA arbitrary-and-capricious claim (Fourth Claim). *See* Compl. ¶ 8 ("new rule" violates right to family integrity); *id*. ¶¶ 9, 10 ("new rule" violates equal-protection because "motivated by intentional race- and national-origin-based animus" and constitutes "arbitrary government invasion of personal liberty" in violation of due process), *id*. ¶ 11 (new rule "*sub silentio* departure from existing practice, with complete disregard for the reliance interests that years of peaceful residence in this country had engendered" and violates the APA). Plaintiffs' assertion of a "new rule" is an illusion presumably meant to afford a jurisdictional hook to place Plaintiffs' claims before this Court notwithstanding Congress's express preclusion of review under 8 U.S.C. 1254a(b)(5)(A). It should be rejected.

First, Plaintiffs concede that there is no actual "new rule": "no relevant statute or regulation has changed[.]" Compl. ¶ 75. Nor do they point to any prior "interpretive rule" advising the public of the government's interpretation of the statute. Rather, they contend that previous Administrations considered intervening developments that Secretaries Duke and Nielsen did not consider, and that this alleged difference constitutes a departure from prior policy. Plaintiffs rest their contention on two statements former Secretary John Kelly and Secretary Nielsen made before Congress. *See* Compl. ¶ 76 (John Kelly statement that "the

program [TPS] is for a specific event. In – in Haiti, it was the earthquake. Yes, had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. But, the earthquake was why TPS was – was granted and – and that's how I have to look at it."); *id.* ¶ 77 (Secretary Nielsen statement that "[t]he law does not allow me to look at the country conditions of a country writ large. It requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist."). However, these statements stand for the unremarkable proposition that persistent, endemic problems in a country untethered to the basis for the TPS designation are not the proper basis for *temporary* protected status, and it is this point the Plaintiffs are truly challenging. *See, e.g.*, *id.* ¶ 81 ("Secretary Nielsen ignored the contemporary realities of life in El Salvador[.]"). In any event, a cursory review of the termination notices from previous Administrations refutes Plaintiffs' suggestion that there was a prior rule pursuant to which DHS was obligated to extend TPS based on intervening events.

For example, in 2004, former DHS Secretary Tom Ridge terminated TPS for Montserrat because the volcanic eruption that led to its designation was recurring: "[a]lthough the conditions in Montserrat continue to warrant concern, the Secretary has determined that the volcanic eruptions can no longer be considered temporary in nature. Scientists say that eruptions of the type that have occurred . . . generally last 20 years, but the volcano could continue to erupt sporadically for decades . . . ." *Termination of the Designation of Montserrat Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation*, 69 Fed. Reg. 40,642-01 (Jul. 6, 2004). "Because the volcanic eruptions are unlikely to cease in the foreseeable future, they can no longer be considered 'temporary' as required by Congress when it enacted the TPS statute." *Id.* (citing 8 U.S.C. 1254a(b)(1)(B), (C)). Thus, the repeated occurrence of intervening eruptions was the basis for *terminating* TPS for Montserrat.

Furthermore, prior Administrations repeatedly terminated TPS because the conditions leading to the original designation no longer satisfied the TPS statute's criteria—precisely the standard Plaintiffs allege Secretaries Duke and Nielsen wrongfully utilized here. *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of*

1    *Guinea's Designation for Temporary Protected Status*, 81 Fed. Reg. 66,064-01, 66,065-66 (Sept.

2    26, 2016) (noting that "[w]hile the impacts of the [ebola] epidemic pose a lasting challenge to

3    Guinea's economy and the capacity of its health system to provide treatment for preventable or

4    treatable conditions," "the extraordinary and temporary conditions that prompted Guinea's TPS

5    designation have substantially resolved and no longer prevent nationals of Guinea from returning

6    to Guinea in safety"); *Termination of the Designation of Burundi for Temporary Protected*

7    *Status*, 72 Fed. Reg. 61172-02, 61,173 (Oct. 29, 2007) ("[C]onditions that warranted the initial

8    designation of TPS [for Burundi] in 1997 and the re-designation in 1999 no longer continue to be

9    met.").

10          Indeed, intervening conditions were generally considered by prior Administrations only

11   to the extent that they could be linked to or impeded recovery from the event underlying the

12   designation, as the extensions for the countries at issue here make clear. *See, e.g.*, *Extension of*

13   *the Designation of El Salvador for Temporary Protected Status*, 81 Fed. Reg. 44,645-03 (July 8,

14   2016) ("Recovery from the [2001] earthquakes has been slow and encumbered by subsequent

15   natural disasters and environmental challenges, including hurricanes and tropical storms, heavy

16   rains and flooding, volcanic and seismic activity, an ongoing coffee rust epidemic, and a

17   prolonged regional drought that is impacting food security."); *Extension of the Designation of*

18   *Haiti for Temporary Protected Status*, 80 Fed. Reg. 51,582-01 (Aug. 25, 2015) ("Haiti's ability

19   to recover [from the 2010 earthquake] has been further constrained by political instability.");

20   *Extension of the Designation of Sudan for Temporary Protected Status*, 79 Fed. Reg. 52,027-01

21   (Sept. 2, 2014) ("[T]he Secretary has determined that an 18-month extension is warranted

22   because the armed conflict [in Sudan] is ongoing and the extraordinary and temporary conditions

23   that prompted the May 2013 extension and redesignation continue to exist."); *Extension of the*

24   *Designation of Nicaragua for Temporary Protected Status*, 75 Fed. Reg. 24737-01 (May 5,

25   2010) (noting "substantial, but temporary, disruption of living conditions . . . resulting from

26   Hurricane Mitch").

27          Finally, prior Administrations have terminated TPS despite ongoing problems in the

28   designated countries of the types Plaintiffs allege here. *See, e.g., Termination of Designation of*

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 26

*Angola Under the Temporary Protected Status Program*, 68 Fed. Reg. 3896-01, 3896 (Jan. 27, 2003) (terminating Angola's TPS despite the remaining "challenge of assisting an estimated 4 million displaced Angolan nationals[,]" ongoing "concern that Angola lacks housing, medical services, water systems, and other basic services destroyed by a 27-year-long war[,]" and "as many as 8 million landmines planted in Angolan soil"); *Termination of the Province of Kosovo in the Republic of Serbia in the State of the Federal Republic of Yugoslavia (Serbia-Montenegro) Under the Temporary Protected Status Program*, 65 Fed. Reg. 33,356-01, 33,356 (May 23, 2000) (terminating Kosovo because "[a]lthough conditions remain difficult with bursts of ethnically-motivated violence, the situation in Kosovo cannot now be classified as 'ongoing internal conflict'").

These terminations—like those challenged here—reflect a complex array of considerations and judgments concerning, e.g., a country's ability to adequately accept the return of its nationals, whether an "armed conflict" exists, and whether permitting the aliens to remain in the United States is contrary to the national interest.  This is precisely why Congress has excluded them from judicial review. In sum, there existed no rule, standard, interpretation, pattern, practice, or policy from which Secretary Duke or Nielsen departed in terminating TPS for Sudan, Nicaragua, Haiti, and El Salvador. And, even if such a "new rule" existed it would nevertheless be barred by the INA's preclusion of judicial review of TPS decisions. This Court should therefore dismiss at the outset Plaintiffs' attempt to avoid the judicial-review preclusion by inventing a "new rule" that they attempt to use as a backdoor means of attacking the TPS terminations themselves. Each of Plaintiffs' causes of action likewise fails for the following reasons.

a) **Plaintiffs' Due-Process "Family Integrity" Claim (First Claim) Fails as a Matter of Law.**

Plaintiffs' first cause of action asserts three variations of their due-process claim that citizen minors have a right to live with unlawfully-present parents in this country: 1) that withdrawing TPS for their unlawfully present parents would compel the children to live abroad, Compl. ¶ 102; 2) that they have a First and Fifth Amendment right "to live with and be raised by their parents," *id*. ¶ 103; and 3) that they "have a powerful interest in not being compelled to

choose between [the] alternatives" of remaining in the United States or relocating to their parents' home country, *id.* ¶ 104. These arguments have been made before and failed.

Most recently, the Ninth Circuit rejected this argument in *Gebhardt v. Nielsen*, in which it rejected a plaintiff's claim that he had "a fundamental right to reside in the United States with his non-citizen relatives." 879 F.3d 980, 988 (9th Cir. 2018). In *Gebhardt*, a U.S. citizen sought LPR status for his non-citizen wife and her three non-citizen children. *Id.* at 983. In dismissing his claim, the court explained that "[w]e acknowledge, of course, that individuals have a strong interest in living with their family members. But that interest cannot be so fundamental that it overrides Congress' plenary power in this [immigration] domain." *Id.* "[T]he generic right to live with family is far removed from the specific right to reside in the United States with non-citizen family members." *Id.* (quotation omitted).

Similarly, in *Morales-Izquierdo v. Department of Homeland Security*, the Ninth Circuit rejected a claim by a petitioner who, facing removal, challenged the denial of his application for adjustment of immigration status on the ground that it violated the "substantive due process right of [him] and his family to live together[.]" 600 F.3d 1076, 1091 (9th Cir. 2010), *overruled in part on other ground by Garfias-Rodriguez v. Holder*, 702 F.3d 504 (9th Cir. 2012) (en banc). While noting its "sympathy for [petitioner's] situation," the court explained that no authority suggests "that the Constitution provides [someone] with a fundamental right to reside in the United States simply because other members of [his or her] family are citizens or lawful permanent residents." *Id.* (quotation omitted); *see also De Mercado v. Mukasey*, 566 F.3d 810, 816 n.5 (9th Cir. 2009) (no authority supports the "asserted right to family unity" as a defense to an alien's removal).

The First Circuit decision in *Payne-Barahona v. Gonzales* likewise rejected a "family integrity" claim. In *Payne-Barahona*, a lawful permanent resident of the United States opposed removal after being convicted of an aggravated felony by asserting the *ius tertii* rights of his children to live with their father in this country. 474 F.3d 1, 1 (1st Cir. 2007). In rejecting this claim, the First Circuit explained that "[t]he circuits that have addressed the constitutional issue (under varying incarnations of the immigration laws and in varying procedural postures) have

uniformly held that a parent's otherwise valid deportation does not violate a child's constitutional right." *Id*. at 2. "Nor does deportation necessarily mean separation since the children could be relocated during their minority." *Id*. at 2–3; *see also Ayala-Flores v. INS*, 662 F.2d 444, 446 (6th Cir. 1981) (per curiam) (ruling that although "petitioners wish [their daughter] to reside with them, in Mexico or elsewhere[,]" they "cannot extend their illegal stay by claiming that their deportation will deprive their child of citizenship rights").

The logic of this, and similar decisions, is clear. "[D]eportations of parents are routine and do not of themselves dictate family separation." *Payne-Barahona*, 474 F.3d at 3. "To hold otherwise would create a barrier to removing an illegal alien . . . in any case where that alien has married a United States citizen wife or fathered United States citizen children. Stated another way, to indulge this theory is to hold that an illegal alien with United States citizen family members cannot be removed, regardless of the illegality of that alien's entry into the United States or conduct while within its borders." *Morales-Izquierdo*, 600 F.3d at 1091. "Such a remarkable proposition . . . would radically alter the status quo of our immigration law[.]" *Id*.; *see also Marin-Garcia v. Holder*, 647 F.3d 666, 674 (7th Cir. 2011) ("If an alien could avoid the consequences of unlawful entry into the United States by having a child, it would create perverse incentives and undermine Congress's authority over immigration matters."); *Ayala-Flores*, 662 F.2d at 446 (a contrary rule "would create a substantial loophole in the immigration laws"). Numerous other courts have reached the same conclusion.[10]

---

[10] *See, e.g.*, *Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986) ("The courts of appeals that have addressed this issue have uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children."); *Newton v. INS*, 736 F.2d 336, 343 (6th Cir. 1984) (finding "no constitutional rights of citizenship implicated in the decision to deport" the parents of citizen children); *Delgado v. INS*, 637 F.2d 762, 764 (10th Cir. 1980) ("This Court has repeatedly held that the incidental impact visited upon the children of deportable, illegal aliens does not raise constitutional problems."); *Gonzalez–Cuevas v. INS*, 515 F.2d 1222, 1224 (5th Cir. 1975) ("Legal orders of deportation to their parents do not violate any constitutional right of citizen children . . . ."); *Cortez–Flores v. INS*, 500 F.2d 178, 180 (5th Cir. 1974) ("[D]eportation of a parent does not deprive the child of any constitutional rights."); *Robles v. INS*, 485 F.2d 100, 102 (10th Cir. 1973) (rejecting the argument that it is unconstitutional to break up a family and deprive children of "constitutional right to a continuation of the family unit"); *Cervantes v. INS*, 510 F.2d 89, 92 (10th Cir. 1975) ("The incidental impact on aliens' minor children caused by the enforcement of duly-enacted

The cases on which Plaintiffs rely in their complaint do not support their "family integrity" claim. In *Tuan Anh Nguyen v. Immigration & Naturalization Service*, 533 U.S. 53 (2001) (*see* Compl. ¶ 102), the Supreme Court held that there was no equal-protection violation in a statute that made it more difficult for a foreign-born child with only one citizen parent to acquire citizenship when the citizen parent was the father by requiring the father to go through steps not required of the mother to establish paternity before the child turned 18. *Id*. at 59. In *Tuan Anh Nguyen*, the son of a Vietnamese mother and U.S.-citizen father, who had not established paternity in a timely manner, challenged his deportation (after conviction for an aggravated felony) on the ground that making it more difficult to obtain citizenship via his father violated equal protection. *Id*. at 56–7. In rejecting this argument, the Court explained that the gender-based distinction was justified by the government's interests in "assuring that a biological parent-child relationship exists[,] [which] [i]n the case of the mother . . . is verifiable from the birth itself," *id*. at 62, and ensuring "a relationship . . . that consists of the real, everyday ties that provide a connection between child and citizen parent and, in turn, the United States[,]" *id*. at 64–65. These government interests justified the *denial* of the son's citizenship under the statute. Nothing in *Tuan Anh Nguyen* supports Plaintiffs' claim to an individual right to "family integrity," and the Court consequently *affirmed* the son's deportation order. *Id*. at 73.

Similarly, *Moore v. City of East Cleveland,* 431 U.S. 494 (1977), (*see* Compl. ¶ 103), did not involve immigration but instead a housing ordinance—held unconstitutional—excluding certain family members from the definition of a "single family" dwelling unit. However, the general right to cohabitate with relatives has no applicability to the specific right asserted here—to reside in the United States with a family member who is unlawfully present. *See Morales-Izquierdo*, 600 F.3d at 1091 (rejecting applicability of *Moore* to "family integrity" due-process claims); *Payne-Barahona*, 474 F.3d at 3 (rejecting argument that *Moore* and other "family

conditions on aliens' entrance and residence does not create constitutional problems."); *Flores–Quezada v. Gonzales*, 134 Fed. App'x 202 (9th Cir. 2005) (unpublished opinion) (holding that deportation does not result in deprivation of due process where a child would be denied the Arizona constitutional right to education); *Singh v. Magee*, 165 F.3d 917, 1998 WL 904715, at *3 (9th Cir. 1998) (unpublished opinion) (in *Bivens* action, rejecting any challenge "to a deportation based upon the rights of affected family members").

integrity" cases created a right for an illegally-present parent of a citizen child not to be deported).[11]

Put simply, every case of which Defendants are aware without exception rejects Plaintiffs' asserted rights to live in the United States with an unlawfully present parent and to be free from the choice whether to relocate to a foreign country with a deported parent or remain here. These claims therefore fail as a matter of law and should be dismissed.

**b) Plaintiffs Have Failed to Allege an Equal-Protection Violation (Second Claim).**

Plaintiffs' second claim alleges an equal-protection violation on the ground that the TPS terminations "were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin"—as evidenced by the alleged, and non-existent, "new rule." Compl. ¶ 110; *id*. ¶¶66–73. Plaintiffs have failed adequately to allege that this purported animus—and not the explanations and considerations set forth in the *Federal Register* notices—was the basis for these terminations. Their equal-protection claim should thus be dismissed as a matter of law.

First, this equal-protection claim fails on its face because TPS does not involve classification of groups or ethnicities for favored or disfavored treatment. TPS determinations distinguish between foreign countries based on an assessment of conditions in each country and whether that country has sufficiently recovered from a natural or man-made disaster such that it can safely accept the return of its nationals—not based on race, ethnicity, or any particular characteristic of individual aliens. *See* 8 U.S.C. § 1254a(b)(3)(B) (the Secretary "*shall* terminate"

---

[11] Plaintiffs' other cases are even farther afield. *Ng Fung Ho v. White*, 259 U.S. 276 (1922), (Compl. ¶ 102), concerned whether ethnic Chinese persons had the right to demonstrate their citizenship in a judicial forum before deportation. *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987) (Compl. ¶ 103), held that a California law requiring the Rotary Club to admit women did not violate its First Amendment right to free association. *Id.* at 546. *United States v. Jackson*, 390 U.S. 570 (1968) (Compl. ¶ 104) invalidated a provision of the Federal Kidnaping Act that "impose[d] an impermissible burden upon the exercise of a constitutional right" by compelling a defendant to forego the right to a jury trial to avoid the death penalty. *Id.* at 572. And, finally, *New York v. United States*, 505 U.S. 144 (1992), (Compl. ¶ 104), involved a Tenth Amendment "unconstitutional choice" challenge to a provision of the Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021b *et seq*., that required states either to take title to radioactive waste or be regulated in the handling of that waste by Congress. These cases are irrelevant to Plaintiffs' claims here.

the TPS designation if the foreign state "no longer continues to meet the conditions for designation" (emphasis added)).  The TPS statute thus classifies countries, not individuals.

As a function of that country-specific determination, of course, TPS determinations do have disparate effects upon individuals based on their "national[ity]," a political concept meaning the country to which a person owes permanent allegiance, 8 U.S.C. § 1254a(a)(1); *see id.* § 1101(a)(21) (defining "national"). But, TPS determinations are not made, extended, or terminated *because* of any individuals' race, ethnicity, or national origin. *Cf. Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 95-96 (1973) (explaining that "national origin" is distinct from "citizenship," and concluding that Title VII's prohibition of discrimination on the basis of "national origin" does not extend to "discriminat[ion] on the basis of citizenship or alienage"). They are therefore not inherently suspect just because they involve a particular nation.

Moreover, Plaintiffs have not alleged that they are being treated differently from similarly situated individuals, and this alone is fatal to their equal-protection claim. *See Dillingham v. INS*, 267 F.3d 996, 1007 (9th Cir. 2001) ("In order to succeed on his [equal protection] challenge, the petitioner must establish that his treatment differed from that of similarly situated persons." (citations omitted)).

But, if the Court were to consider Plaintiffs' equal-protection claim under the rubric of immigration classifications, "ordinary rational basis review is the appropriate standard in the immigration context." *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 643, (2018); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard . . . ." (citation omitted)). *Alvarez v. Dist. Dir. of U. S. Immigration & Naturalization Serv.*, 539 F.2d 1220, 1224 (9th Cir. 1976) ("[I]t is clear that classifications made under the immigration laws need only be supported by some rational basis to fulfill equal protection guarantees." (citation omitted)).

This review is highly deferential. "The Supreme Court has 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Cardenas v. United States*, 826

F.3d 1164, 1169 (9th Cir. 2016) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). It is

undisputed that Congress has full authority to determine which aliens may be admitted, and

"[w]hen Congress delegates this plenary power to the Executive, the Executive's decisions are

likewise generally shielded from administrative or judicial review." *Id.* (quoting *Andrade–*

*Garcia v. Lynch*, 820 F.3d 1076, 1080–81 (9th Cir. 2016)); *see also Dunn v. INS*, 499 F.2d 856,

858 (9th Cir. 1974). "Congress regularly makes rules that would be unacceptable if applied to

citizens[,]" and "when the Executive exercises this (delegated) power negatively on the basis of a

facially legitimate and bona fide reason, the courts will n[ot] look behind the exercise of that

discretion[.]" *Fiallo*, 430 U.S. at 792–794; *see also Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C.

Cir. 1979) ("Distinctions on the basis of nationality may be drawn in the immigration field by the

Congress or the Executive. So long as such distinctions are not wholly irrational they must be

sustained.").

"A law will survive rational basis review 'so long as it bears a rational relation to some

legitimate end.'" *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004) (quoting

*Romer v. Evans*, 517 U.S. 620, 631 (1996)). "[I]t is difficult to show that a law violates the equal

protection clause under rational basis review," because such review invalidates only laws "so

irrational or absurd on their face [that] it is clear they can be motivated by nothing other than

animus or prejudice against a group." *Id.* at 543; *see also Romer*, 517 U.S. at 632; *City of*

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448–49 (1985).

Here, Plaintiffs have failed to allege facts sufficient to state an equal-protection claim that

the Secretaries' TPS terminations were either irrational or motivated by animus. First, Plaintiffs

have failed to allege sufficiently that the terminations were arbitrary or irrational because they

cannot meet their "burden to negate every conceivable basis which might support [an

immigration] classification whether or not the basis has a foundation in the record." *Tista v.*

*Holder*, 722 F.3d 1122, 1126–27 (9th Cir. 2013) (quoting *Aguilera–Montero v. Mukasey*, 548

F.3d 1248, 1252 (9th Cir. 2008)). Second, Plaintiffs have failed to allege facts constituting "clear

evidence" of "outrageous" discrimination required to show animus in the immigration context.

*AADC*, 525 U.S. at 488–91.

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 33

1     First, as shown above, the Secretaries' terminations of TPS for Sudan, Nicaragua, Haiti,

2  and El Salvador did not deviate from any previous rule or interpretation—whether express or

3  implied—of the TPS statute. Rather, Secretaries Duke and Nielsen, like previous TPS decision-

4  makers, considered the conditions in the countries at the time the TPS decisions were made after

5  consulting with the relevant government agencies. This process led to their well-explained and

6  thorough decisions that these countries no longer qualified for TPS.

7     For Sudan, Acting Secretary Duke concluded that the violence had been confined to the

8  areas of Darfur and South Kordofan and the Blue Nile States along the Sudan-South Sudan

9  border, that the violence had declined as a result of unilateral cessations of hostilities, and that

10  food security and access to humanitarian aid had increased. *See Termination of the Designation*

11  *of Sudan for Temporary Protected Status*, 82 Fed. Reg. 47,228-02 (Oct. 11, 2017). That this

12  decision was based on a considered analysis of Sudan's conditions—and not some tacit

13  discriminatory animus—is further demonstrated by the fact that she extended TPS for South

14  Sudan at roughly the same time. *See Extension of South Sudan for Temporary Protected Status*,

15  82 Fed. Reg. 44,205-01 (Sept. 21, 2017).

16     Likewise, Acting Secretary Duke made numerous factual findings demonstrating that

17  almost two decades of foreign aid and recovery efforts had significantly restored Nicaragua's

18  infrastructure and economy. *See Termination of the Designation of Nicaragua for Temporary*

19  *Protected Status*, 82 Fed. Reg. 59,636-01 (Dec. 15, 2017). She found that "[h]undreds of homes

20  . . . [had] been rebuilt" and "new roads" had improved "access to remote communities." *Id*.

21  "Access to drinking water and sanitation ha[d] improved[,]" "[e]lectrification of the country

22  ha[d] increased from 50% of the country in 2007 to 90%[,]" "1.5 million textbooks ha[d] been

23  provided to 225,000 primary students of the poorest regions of the country[,]" and "Internet

24  access [was] now widely available." *Id*. "In addition, Nicaragua's relative security has helped

25  attract tourism and foreign investment." *Id*. "Nicaragua's Gross Domestic Product (GDP)

26  reached an all-time high of $13.23 billion (USD) in 2016, has averaged over 5% growth since

27  2010, and Nicaragua's GDP per capita [was] higher today than in 1998." *Id*. And, "the

28  government ha[d] demonstrated its ability to provide basic services to its citizens." *Id*.

DEFENDANTS' MOTION TO DISMISS – No. 3:18-cv-1554 - 34

Similarly, Acting Secretary Duke found that Haiti had "made progress recovering," as demonstrated by the October 2017 withdrawal of the U.N. peacekeeping mission, the successful completion of a presidential election in February 2017, plans to rebuild Haiti's National Palace, general economic recovery, and the lowest levels of cholera since the 2010 earthquake that prompted its designation. *Termination of the Designation of Haiti for Temporary Protected Status*, 83 Fed. Reg. 2648-01, 2650 (Jan. 18, 2018). The reasonableness of this conclusion is buttressed by the fact that former DHS Secretary Jeh Johnson advised in 2016 that "the situation in Haiti [had] improved sufficiently to permit the U.S. government to remove Haitian nationals [without TPS] on a more regular basis." Sec'y Johnson Statement.

Finally, Secretary Nielsen likewise reasonably concluded that El Salvador no longer met the requirements for TPS. As she explained, the recovery efforts relating to the earthquakes had been largely completed after El Salvador received millions of dollars in foreign aid; social and economic conditions had stabilized with the country having historically high GDP in 2016 and future increases projected; and education, water sanitation, and transportation infrastructure all had improved. *See Termination of the Designation of El Salvador for Temporary Protected Status*, 83 Fed. Reg. 2654-01 (Jan. 18, 2018). Moreover, the country had shown its ability to absorb the return of its nationals. *Id*. Plaintiffs may disagree with these conclusions, but have not—and cannot— "negate every conceivable basis which might support" the challenged TPS terminations. *Tista*, 722 F.3d at 1126–27 (quotation omitted)

Second, Plaintiffs have not alleged facts constituting "clear evidence" of "outrageous" discrimination that would be necessary for their equal-protection claim to survive. *See AADC*, 525 U.S. at 488–91 (very high standard for showing animus in the immigration context because of interdependence of immigration policy and "foreign-policy objectives");[12] *Narenji*, 617 F.2d

---

[12] Courts have applied *AADC* in the context of challenges to immigration classifications. *See Kandamar v. Gonzales*, 464 F.3d 65, 74 (1st Cir. 2006) (applying *AADC* in rejecting the claim that DHS's decision to subject nationals from certain countries to NSEERS registration violated equal protection); *Hadayat v. Gonzales*, 458 F.3d 659, 665 (7th Cir. 2006) ("Although [*AADC*] leaves open a narrow exception for the rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome, Hadayat's conclusory comments regarding the allegedly discriminatory effect of NSEERS do not come close to meeting this high burden." (citation omitted)).

at 748 ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." (citation omitted)).

TPS decisions turn on an assessment of whether a *country*'s conditions are so unstable as not to permit the safe return of its nationals or whether the *country's* conditions prevent it from being able to adequately handle the return of its nationals. 8 U.S.C. § 1254a(b)(1). They do not rest on an assessment of the particular characteristics of individual foreign nationals or groups of such individuals. And, Plaintiffs have failed to allege any facts that would show that Acting Secretary Duke's and Secretary Nielsen's thorough explanations set forth in the *Federal Register* were based on anything other than the statutory criteria.

Indeed, Plaintiffs have not alleged that either Acting Secretary Duke or Secretary Nielsen personally harbored any discriminatory animus against the TPS beneficiaries of Sudan, Nicaragua, Haiti, or El Salvador.[13] Instead, the entire basis for their assertion of discriminatory animus rests on statements by the President supposedly relating to Mexico, Haiti, Africa, and Muslims, *see* Compl. ¶¶ 67–70, and alleged calls by White House Chief of Staff John Kelly and Homeland Security Adviser Tom Bossert to Acting Secretary Duke pressuring her to terminate TPS for Honduras, *see* Compl. ¶ 73. These allegations cannot be reconciled with the Secretaries' actual actions.

Acting Secretary Duke did not terminate TPS for Honduras, but in fact she extended it. *Extension of the Designation of Honduras for Temporary Protected Status*, 82 Fed. Reg. 59,630-02 (Dec. 15, 2017).[14] Likewise, she extended TPS for South Sudan around the same time she

---

[13] Although statements by the President were discussed by the court in *Washington v. Trump*, that case concerned an Executive Order that was superseded by a subsequent presidential Proclamation. *Washington v. Trump*, 847 F.3d 1151, 1157 (9th Cir.), *reconsideration en banc denied*, 853 F.3d 933 (9th Cir. 2017), *and reconsideration en banc denied*, 858 F.3d 1168 (9th Cir. 2017), *and cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017). That subsequent Proclamation is now pending before the Supreme Court. *See Trump v. Hawaii*, 138 S. Ct. 923, 924, 199 L. Ed. 2d 620 (2018). In any case, *Washington v. Trump* is distinguishable from the instant case because that case discussed the President's statements in the context of a challenge to a presidential Executive Order.

[14] DHS recently terminated the designation for Honduras, effective January 2020. *See* Sec'y Nielsen Announcement on Temporary Protected Status for Honduras (May 4, 2018),

terminated it for Sudan. Each of these facts undermines any contention that she was not exercising her own judgment and discretion when making TPS decisions, which Plaintiffs have not allege were motivated by animus.[15]

Plaintiffs attempt to leverage these statements by the President to convince this Court to "look behind the exercise of [the Secretaries'] discretion[.]" *Fiallo*, 430 U.S. at 792–794. But, this attempt rests on the premise that the Secretaries made these decisions based on a "new rule"—which, again, does not exist—pursuant to which they did not consider factors the Plaintiffs believe to be important and therefore reached the wrong conclusion with respect to these TPS terminations—conclusions expressly precluded from judicial review. Therefore, so their argument goes, the Secretaries must have secretly harbored a discriminatory motive. Compl. ¶ 9 ("new rule" "motivated by intentional race- and national-origin-based animus").

But, such a conjecture is unfounded by the facts alleged and contradicted at every turn by the facts in the public record. *See, e.g.*, *Caviness*, 590 F.3d at 812 ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." (quotation omitted)). In sum, the Secretaries' TPS terminations for Sudan, Nicaragua, Haiti, and El Salvador were eminently reasonable exercises of their congressionally-entrusted authority and there is no allegation at all that either Secretary made her TPS decisions based on a discriminatory motive. As such, Plaintiffs' equal-protection claim must fail as a matter of law.

### c) Plaintiffs' "Arbitrary Action" Due Process Claim (Third Claim) Must Fail.

Plaintiffs also assert a due-process claim alleging that "[t]he government . . . has not articulated, and cannot establish, any rational basis for reversing course on decades of established TPS policy and ignoring the current capability of TPS countries to safely receive longtime TPS holders, their families, and their U.S. citizen children." Compl. ¶ 115. This claim

---

https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-honduras.

[15] It is also worth noting that John Kelly extended Haiti while he was DHS Secretary based on continuing problems exacerbated by disasters such as Hurricane Matthew in 2016 (an intervening event that plaintiffs contend the current administration has ignored). *See Extension of the Designation of Haiti for Temporary Protected Status*, 82 Fed. Reg. 23,830-01 (May 24, 2017). Likewise, Secretary Nielsen recently extended TPS for Syria. *Extension of the Designation of Syria for Temporary Protected Status*, 83 Fed. Reg. 9329-02 (March 5, 2018).

is premised on the contention that "the liberty interests at stake derive from well-established and significant reliance interests. *Id.* ¶ 114.

As explained in detail above, the Secretaries gave rational reasons for terminating TPS for Sudan, Nicaragua, Haiti, and El Salvador. There has been no reversal of "decades of established TPS policy," and, even if there had been, such a reversal would be entirely consistent with the discretion vested in the Secretaries by Congress and would not be subject to judicial review. Furthermore, Plaintiffs' protestations about the "serious reliance interests" of TPS recipients and their families (*id.* ¶ 120) overlooks that TPS is, by conscious design, a program to provide *temporary* protected status. Plaintiffs' claim here would have the consequence of converting a temporary humanitarian program into a permanent right to remain every time a TPS designation was made. For these reasons, and the reasons stated above, Plaintiffs' "arbitrary action" claim should be dismissed.

### d) Plaintiffs' APA Arbitrary-And-Capricious Claim Must Be Dismissed.

Finally, Plaintiffs assert an APA arbitrary-and-capricious claim over which this Court has no jurisdiction and that is baseless in any event. As explained previously, this Court has no jurisdiction over Plaintiffs' APA claim under 5 U.S.C. § 701(a)(1), consistent with the judicial preclusion provision at 8 U.S.C. § 1254a(b)(5)(A) that precludes all of Plaintiffs' claims. Again, Plaintiffs have attempted to avoid this by alleging that Secretaries Duke and Nielsen utilized a "new rule" that departed from previous government practice of considering intervening events and that this "new rule," not the TPS terminations themselves, is what they are challenging. This "new rule" does not exist and, in any event, Plaintiffs cannot obtain this Court's review of the factors and criteria on which the Secretaries relied and of the sufficiency of their explanations for their decisions through the guise of asserting that they are challenging a change in agency rules.

Moreover, this APA claims fails on the merits, as the sole case cited by Plaintiffs in support demonstrates. *Federal Communications Commission v. Fox Televisions Stations, Inc.*, involved a challenge to the FCC's "fleeting expletive" enforcement policy, which it had formally published, and changed, in a series of documents designed to advise the regulated industries as to what constituted "indecency" under the relevant statute and regulations. 556 U.S. 502, 510–13

(2009). In *upholding* the challenged policy change under arbitrary and capricious review, the Court explained that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better[.]" *Id.* Thus, even if the Secretaries weighed the factors under the TPS statute differently than previous decision-makers, their determinations were plainly "permissible under the statute" and DHS clearly "believe[d] [them] to be better[,]" as evidenced by the reasons given in the *Federal Register* notices. *Id.* Plaintiffs' APA arbitrary-and-capricious claim should therefore be dismissed.

## CONCLUSION

For the reasons stated herein, this Court should dismiss this action with prejudice.

Dated: May 21, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN R. TYLER
Assistant Branch Director

/s/  *Rhett P. Martin*
RHETT P. MARTIN
Trial Attorney
DC Bar No. 999272
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 305-7538
Fax: (202) 616-8460
Rhett.martin@usdoj.gov

1  CHAD A. READLER
   Acting Assistant Attorney General
2  Civil Division
   JOHN R. TYLER
3  Assistant Branch Director
   RHETT P. MARTIN
4  Trial Attorney
   DC Bar No. 999272
5  950 Pennsylvania Avenue NW
   Washington, DC 20530
6  Tel: (202) 305-7538
   Fax: (202) 616-8460
7  Rhett.martin@usdoj.gov

8  *Attorneys for Defendants*

9

10              **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
11

12  CRISTA RAMOS, *et al.,*

13              Plaintiffs,                    Case No. 3:18-cv-01554-EMC

14  v.                                         **[PROPOSED] ORDER**

15

16  KIRSTJEN NIELSEN, *et al.,*

17              Defendants.

18

19

20      This matter comes before the Court on Defendants' Motion to Dismiss.  Upon

21  consideration of Defendants' motion and of all materials submitted in relation thereto, it is

22  hereby ORDERED that Defendants' motion shall be, and it hereby is, GRANTED; and it is

23  further ORDERED that this matter shall be, and hereby is, DISMISSED:

24

25      IT IS SO ORDERED.

26

27  Date:_____          _____
                                          EDWARD M. CHEN
28                                        United States District Judge

            DEFENDANTS' PROPOSED ORDER – No. 3:18-cv-1554