1   Alycia A. Degen (SBN 211350)
    adegen@sidley.com
2   Sean A. Commons (SBN 217603)
    scommons@sidley.com
3   SIDLEY AUSTIN LLP
    555 West Fifth Street
4   Los Angeles, CA 90013
    Telephone: +1 213 896 6010
5   Facsimile: +1 213 896 6600

6   Ahilan T. Arulanantham (SBN 237841)
    aarulanantham@aclusocal.org
7   ACLU FOUNDATION
    OF SOUTHERN CALIFORNIA
8   1313 West 8th Street
    Los Angeles, CA 90017
9   Telephone: +1 213 977 5211
    Fax: +1 213 977 5297
10
    Emilou MacLean (SBN 319071)
11  emi@ndlon.org
    Jessica Karp Bansal, SBN 277347
12  jbansal@ndlon.org
    NATIONAL DAY LABORER
13  ORGANIZING NETWORK
    674 S. La Fayette Park Place
14  Los Angeles, CA  90057
    Telephone: +1 213 380 2214
15  Fax: +1 213 380 2787

16  Attorneys for Plaintiffs
    [*Additional Counsel Listed on Next Page*]
17

18                       UNITED STATES DISTRICT COURT

19                    NORTHERN DISTRICT OF CALIFORNIA

20                             SAN FRANCISCO

21  CRISTA RAMOS, *et al.*,              Case No.  3:18-cv-1554-EMC

22            Plaintiffs,                **PLAINTIFFS' OPPOSITION TO
                                         DEFENDANTS' MOTION TO DISMISS**
23       v.
                                         Date:     June 22, 2018
    KIRSTJEN NIELSEN, *et al.*,          Time:     10:30 a.m.
24                                       Judge:    Hon. Edward M. Chen
            Defendants.                  Dept.:    Courtroom 5, 17th Floor
25

26                                       Complaint Filed:   March 12, 2018
                                         Trial Date:        None set
27

28

1   *Additional Counsel for Plaintiffs*

2   William S. Freeman (SBN 82002)
    wfreeman@aclunc.org
3   ACLU FOUNDATION
    OF NORTHERN CALIFORNIA
4   39 Drumm Street
    San Francisco, California 94111
5   Telephone: +1 415 621 2493
    Fax: +1 415 863 7832
6
    Mark E. Haddad
7   markhadd@usc.edu
    699 Exposition Boulevard
8   Los Angeles, CA 90089-0071
    Telephone: +1 213 675 5957
9
    Nicole M. Ryan (SBN 175980)
10  nicole.ryan@sidley.com
    Ryan M. Sandrock (SBN 251781)
11  rsandrock@sidley.com
    SIDLEY AUSTIN LLP
12  555 California Street
    Suite 2000
13  San Francisco, CA 94104
    Telephone: +1 415 772 1219
14  Facsimile: +1 415 772 7400

15  Amanda Farfel (SBN 288126)
    afarfel@sidley.com
16  Andrew B. Talai (SBN 300053)
    atalai@sidley.com
17  Marisol Ramirez (SBN 307069)
    marisol.ramirez@sidley.com
18  SIDLEY AUSTIN LLP
    555 West Fifth Street
19  Los Angeles, CA 90013
    Telephone: +1 213 896 6640
20  Facsimile: +1 213 896 6600

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

STATEMENT OF ISSUES TO BE DECIDED ....................................................................4

RELEVANT BACKGROUND ............................................................................................5

ARGUMENT .....................................................................................................................10

    I.       THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ALL OF
             PLAINTIFFS' CLAIMS ..........................................................................................10

          A.      Section 1254a(b)(5)(A) Does Not Apply Because It Bars Review Only
                of "Determinations" "Under this Subsection" ..................................................10

          B.      Section 1254a(b)(5)(A) Cannot Bar Constitutional Claims............................13

    II.      PLAINTIFF TPS HOLDERS ADEQUTELY ALLEGE EACH OF THEIR
             CLAIMS FOR RELIEF ..........................................................................................16

          A.      Plaintiff TPS Holders Adequately Allege an APA Violation..........................16

          B.      Plaintiffs Have Stated An Equal Protection Violation.....................................18

          C.      Plaintiffs Have Stated a Fifth Amendment Claim for Arbitrary
                Deprivation of TPS-Holders' Liberty and Property Interests. ........................28

    III.    PLAINTIFFS HAVE STATED DUE PROCESS CLAIMS FOR THE U.S.
             CITIZEN CHILD PLAINTIFFS..............................................................................30

          A.      Defendants' Actions Substantially Burden Two Constitutional Rights .........31

          B.      Forcing the Child Plaintiffs to Choose Between These Constitutional
                Rights Violates Due Process ............................................................................33

          C.      The Rights Described Above Apply in the Immigration Context ...................35

CONCLUSION...................................................................................................................39

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ali v. Hickman*,
  584 F.3d 1174 (9th Cir. 2009) .................................................................................................25

*Alvarez v. Dist. Dir. of U. S. Immigration & Naturalization Serv.*,
  539 F.2d 1220 (9th Cir. 1976) .................................................................................................26

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) .......................................................................................2, 16, 17

*Andrade-Garcia v. Lynch*,
  820 F.3d 1076 (9th Cir. 2016) .................................................................................................26

*Aptheker v. Sec'y of State*
  378 U.S. 500 (1964).................................................................................................................33

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 295 (2016)..................................... *passim*

*Ave. 6E Invs., LLC v. City of Yuma*,
  818 F.3d 493 (9th Cir. 2016) ......................................................................................19, 22, 23

*Back v. Hastings on Hudson Union Free Sch. Dist.*,
  365 F.3d 107 (2d Cir. 2004)....................................................................................................22

*Batalla Vidal v. Nielsen*,
  291 F. Supp. 3d 260 (E.D.N.Y. 2018) .........................................................................22, 23, 27

*Batson v. Kentucky*,
  476 U.S. 79 (1986)...................................................................................................................23

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972).................................................................................................................29

*Bell v. Burson*,
  402 U.S. 535 (1971).................................................................................................................29

*Bittaker v. Woodford*,
  331 F.3d 715 (9th Cir. 2003) ..............................................................................................33, 34

*Bourgeois v. Peters*,
  387 F.3d 1303 (11th Cir. 2004) ..............................................................................................34

*Bowen v. Mich. Acad. of Family Physicians*,
  476 U.S. 667 (1986)......................................................................................................4, 11, 13

*Boyd v. United States*,
  116 U.S. 616, *overruled on other grounds*, *Warden, Md. Penitentiary v. Hayden*,
  387 U.S. 294 (1967).................................................................................................................33

*Bridges v. Wixon*,
   326 U.S. 135 (1945).................................................................................29

*Bustamante v. Mukasey*,
   531 F.3d 1059 (9th Cir. 2008) ...........................................................31, 35, 37

*Cal. Pub. Utils. Comm'n v. Fed. Energy Regulatory Comm'n*,
   879 F.3d 966 (9th Cir. 2018) .............................................................16, 17

*Cardenas v. United States*,
   826 F.3d 1164 (9th Cir. 2016) ..........................................................*passim*

*Ching v. Mayorkas*,
   725 F.3d 1149 (9th Cir. 2013) ...........................................................29

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)......................................................................18, 20, 25

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985).................................................................................29

*Contreras-Aragon v. I.N.S.*,
   852 F.2d 1088 (9th Cir. 1988) ...........................................................34

*Cuozzo Speed Techs., LLC v. Lee*,
   136 S. Ct. 2131 (2016)...........................................................................12

*De Mercado v. Mukasey*,
   566 F.3d 810 (9th Cir. 2009) .............................................................37

*Demore v. Kim*,
   538 U.S. 510 (2003)..........................................................................13, 14

*Dillingham v. I.N.S.*,
   267 F.3d 996 (9th Cir. 2001) .............................................................20

*Doe v. Vill. of Mamaroneck*,
   462 F. Supp. 2d 520 (S.D.N.Y. 2006)....................................................24

*Dunn v. INS*,
   499 F.2d 856 (9th Cir. 1974) .............................................................26

*Elian v. Ashcroft*,
   370 F.3d 897 (9th Cir. 2004) .............................................................34

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)...................................................................16, 17, 18

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)........................................................................16, 17

*Fiallo v. Bell*,
   430 U.S. 787 (1977)................................................................................26

*Garrity v. N.J.*,
   385 U.S. 493 (1967) ................................................................................................................33

*Gebhardt v. Nielsen*,
   879 F.3d 980 (9th Cir. 2018) ...........................................................................................36, 37

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*,
   641 F. Supp. 2d 563 (E.D. La. 2009) ....................................................................................24

*Halet v. Wend Inv. Co.*,
   672 F.2d 1305 (9th Cir. 1982) ...............................................................................................32

*Hart v. Massanari*,
   266 F.3d 1155 (9th Cir. 2001) ...............................................................................................37

*Hernandez-Rivera v. I.N.S.*,
   630 F.2d 1352 (9th Cir. 1980) ...............................................................................................37

*Hunger v. Underwood*,
   471 U.S. 222 (1985) ................................................................................................................25

*Huntington Hosp. v. Thompson*,
   319 F.3d 74 (2d Cir. 2003) .....................................................................................................18

*I.N.S. v. St. Cyr*,
   533 U.S. 289 (2001) ................................................................................................................11

*Immigrant Assistance Project of AFL-CIO v. I.N.S.*,
   306 F.3d 842 (9th Cir. 2002) .................................................................................................12

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996) ...............................................................................................18

*In re J.A.*,
   699 A.2d 30 (Vt. 1997) ..........................................................................................................34

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) .............................................................................................................14

*Johnson v. Johnson*,
   564 P.2d 71 (Alaska 1977) .....................................................................................................34

*Johnson v. Robison*,
   415 U.S. 361 (1974) ................................................................................................................12

*Keene Corp. v. United States*,
   508 U.S. 200 (1993) ................................................................................................................13

*Kerry v. Din*,
   135 S. Ct. 2128 (2015) ......................................................................................................31, 35

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ................................................................................................................37

iv

*Krua v. Dep't of Homeland Sec.*,
   729 F. Supp. 2d 452 (D. Mass. 2010) ........................................................................... 15

*Kwai Fun Wong v. I.N.S.*,
   373 F.3d 952 (9th Cir. 2004) ..................................................................................... 27

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994) ................................................................................................. 30

*Landon v. Plasencia*,
   459 U.S. 21 (1982) ................................................................................................... 36

*Laub v. U.S. Dep't of Interior*,
   342 F.3d 1080 (9th Cir. 2003) ................................................................................... 11

*Ledezma-Cosino v. Sessions*,
   857 F.3d 1042 (9th Cir. 2017) ................................................................................... 26

*Lee Sing Far v. United States*,
   94 F. 834 (9th Cir. 1899) .......................................................................................... 31

*Lefkowitz v. Cunningham*,
   431 U.S. 801 (1977) ................................................................................................. 33

*Loving v. Virginia*,
   388 U.S. 1 (1967) ..................................................................................................... 32

*Mamanee v. I.N.S.*,
   566 F.2d 1103 (9th Cir. 1977) ................................................................................... 37

*Martinez de Mendoza v. I.N.S.*,
   567 F.2d 1222 (3d Cir. 1977) .............................................................................. 4, 38

*McGautha v. California*,
   402 U.S. 183 (1971) ................................................................................................. 34

*Meyer v. Nebraska*,
   262 U.S. 390 (1923) ................................................................................................. 32

*Moore v. City of E. Cleveland*,
   431 U.S. 494 (1977) ................................................................................................. 32

*Morales-Izquierdo v. Dep't of Homeland Sec.*,
   600 F.3d 1076 (9th Cir. 2010) ................................................................................... 37

*Narenji v. Civiletti*,
   617 F.2d 745 (1979) ................................................................................................. 26

*New York v. United States*,
   505 U.S. 144 (1992) ................................................................................................. 33

*Nguyen v. I.N.S.*,
   533 U.S. 53 (2001) ............................................................................................. 26, 31

*Nozzi v. Hous. Auth.*,
    806 F.3d 1178 (9th Cir. 2015) ...........................................................................28, 29

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ...................................................................................17

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ...................................................................................17

*Palmore v. Sidoti*,
    466 U.S. 429 (1984)..................................................................................................38

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)..................................................................................................27

*Perry v. Sindermann*,
    408 U.S. 593 (1972)..................................................................................................34

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)..................................................................................................20

*Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*,
    268 U.S. 510 (1925)..................................................................................................32

*Poland v. Chertoff*,
    494 F.3d 1174 (9th Cir. 2007) ..................................................................................22

*Proyecto San Pablo v. I.N.S.*,
    189 F.3d 1130 (9th Cir. 1999) ..................................................................................12

*Puente Arizona v. Arpaio*,
    76 F. Supp. 3d 833 (D. Ariz. 2015) (rev'd in part on other grounds)........................21

*Ramadan v. Gonzales*,
    479 F.3d 646 (9th Cir. 2007) ...................................................................................15

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)..................................................................................................27

*Reno v. American-Arab Anti-Discrimination Committee ("AADC")*,
    525 U.S. 471 (1999)...........................................................................................25, 26, 27

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993).............................................................................................4, 11, 13

*Rogers v. Rogers*,
    490 So. 2d 1017 (Fla App. 1986)..............................................................................34

*Sessions v. Morales Santana*,
    137 S. Ct. 1678 (2017)........................................................................................26, 37

*Simmons v. United States*,
    390 U.S. 377 (1968)..................................................................................................33

*Smith v. City of Fontana*,
  818 F.2d 1411 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v.*
  *de la Vina*, 199 F.3d 1037 (9th Cir. 1999) ..............................................................29, 32

*Snyder & Assocs. Acquisitions LLC v. United States*,
  859 F.3d 1152 (9th Cir. 2017) ...................................................................................4

*State v. Brown*,
  182 P.3d 1205 (Kan. 2008) ......................................................................................34

*Swedberg v. Marotzke*,
  339 F.3d 1139 (9th Cir. 2003) ...................................................................................5

*Tista v. Holder*,
  722 F.3d 1122 (9th Cir. 2013) .................................................................................26

*Traynor v. Turnage*,
  485 U.S. 535 (1988).................................................................................................12

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973).................................................................................................25

*United States v. Jackson*,
  390 U.S. 570 (1968).................................................................................................33

*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898).................................................................................................31

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)......................................................................................... *passim*

*W. States Paving Co., Inc. v. Wash. State Dep't of Transp.*,
  407 F.3d 983 (9th Cir. 2005) ...................................................................................27

*Wang v. Reno*,
  81 F.3d 808 (9th Cir. 1996) .....................................................................................38

*Webster v. Doe*,
  486 U.S. 592 (1988).....................................................................................13, 14, 15

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972).................................................................................................32

*Zadvydas v. Davis*,
  533 U.S. 678 (2001).................................................................................................35

**Statutes, Regulations, and Rules**

8 C.F.R. § 244.2 ............................................................................................................30

8 C.F.R. § 244.3 ............................................................................................................28

8 C.F.R. § 244.4 ............................................................................................................28

8 C.F.R. § 244.10(b) ......................................................................................................28

8 U.S.C. 1160 ...................................................................................................................11

8 U.S.C. 1252(a)(2)(D) ................................................................................................14, 15

8 U.S.C. 1252(b)(9) ..........................................................................................................13

8 U.S.C. 1254a ........................................................................................................... *passim*

42 U.S.C. 405(h) ...............................................................................................................11

Fed. R. Civ. P. 12(b)(6) .......................................................................................................4

**Federal Register**

Extension of Designation and Redesignation of Liberia Under Temporary Protected
    Status Program,
    62 Fed. Reg. 16,608 (Apr. 7, 1997) .......................................................................8

*Designation of Sudan Under Temporary Protected Status,*
    62 Fed. Reg. 59,737 (Nov. 4, 1997).......................................................................8

*Extension and Redesignation of Sudan Under Temporary Protected Status,*
    64 Fed. Reg. 61,128 (Nov. 9, 1999).......................................................................8

*Termination of the Province of Kosovo in the Republic of Serbia in the State of the*
    *Federal Republic of Yugoslavia (Serbia-Montenegro) Under the Temporary*
    *Protected Status Program,*
    65 Fed. Reg. 33,356 (May 23, 2000) ...................................................................10

*Extension of Designation of Burundi Under the Temporary Protected Status*
    *Program,*
    65 Fed. Reg. 67,404 (Nov. 9, 2000)...................................................................9, 10

*Designation of El Salvador Under Temporary Protected Status,*
    66 Fed. Reg. 14, 214 (Mar. 9, 2001).....................................................................7

*Extension of the Designation of Sierra Leone Under the Temporary Protected Status*
    *Program,*
    67 Fed. Reg. 66,423 (Oct. 31, 2002) .....................................................................9

*Extension and Redesignation of Sudan Under Temporary Protected Status,*
    69 Fed. Reg. 60,168 (Oct. 7, 2004) .......................................................................8

*Extension of the Designation of Nicaragua for Temporary Protected Status,*
    72 Fed. Reg. 29,534, 29,535 (May 29, 2007) .......................................................8

*Designation of Haiti for Temporary Protected Status,*
    75 Fed. Reg. 3,476, 3,477 (Jan. 21, 2010) ...........................................................9

*Extension of the Designation of Nicaragua for Temporary Protected Status,*
    75 Fed. Reg. 24,737, 24,738 (May 5, 2010) .........................................................8

*Extension and Redesignation of Haiti for Temporary Protected Status,*
    76 Fed. Reg. 29,000 (May 19, 2011) .....................................................................9

*Extension of the Designation of Sudan for Temporary Protected Status*,
  76 Fed. Reg. 63,635, 63,636–37 (Oct. 13, 2011)................................................................8

*Extension of the Designation of El Salvador for Temporary Protected Status*,
  77 Fed. Reg. 1,710, 1,712 (Jan. 11, 2012) ......................................................................7

*Extension and Re-designation of Sudan Under Temporary Protected Status*,
  78 Fed. Reg. 1,872 (Jan. 9, 2013) ....................................................................................8

*Extension of the Designation of Haiti for Temporary Protected Status*,
  79 Fed. Reg. 11,808, 11,809 (Mar. 3, 2014)................................................................37

*Extension of the Designation of Haiti for Temporary Protected Status*,
  79 Fed. Reg. 11,808, 11,809-10 (Mar. 3, 2014)..............................................................9

*Extension of the Designation of El Salvador for Temporary Protected Status*,
  80 Fed. Reg. 893, 894-95 (Jan. 7, 2015)..........................................................................8

*Extension of the Designation of Nicaragua for Temporary Protected Status*,
  81 Fed. Reg. 30,325, 30,326–27 (May 16, 2016) ............................................................8

*Extension of the Designation of Honduras for Temporary Protected Status*,
  81 Fed. Reg. 30,331, 30,333 (May 16, 2016) ..................................................................9

*Extension of the Designation of El Salvador for Temporary Protected Status*,
  81 Fed. Reg. 44,645, 44,647 (July 8, 2016)...............................................................8, 37

*Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition
  Before Termination of Guinea's Designation for Temporary Protected Status*,
  81 Fed. Reg. 66,064, 66,065 (Sept. 26, 2016) ..............................................................10

*Extension of the Designation of Honduras for Temporary Protected Status*,
  82 Fed. Reg. 59,630, 59,631 (initially Dec. 15, 2017)...................................................23

*Extension of the Designation of Haiti for Temporary Protected Status*,
  82 Fed. Reg. 23,830, 23,830-32 (May 24, 2017)............................................................9

*Extension of South Sudan for Temporary Protected* Status,
  82 Fed. Reg. 44,205 (Sept. 21, 2017) ............................................................................23

*Termination of the Designation of Sudan for Temporary Protected Status*,
  82 Fed. Reg. 47,228, 47,230 (Oct. 11, 2017)................................................................37

*Termination of the Designation of Haiti for Temporary Protected* Status,
  83 Fed. Reg. 2,648 (Jan. 18, 2018) ..................................................................................9

*Extension of the Designation of Syria for Temporary Protected Status*,
  83 Fed. Reg. 9,329, 9,332 (Mar. 5, 2018)......................................................................23

**Other Authorities**

5B C. Wright & A. Miller, Federal Practice and Procedure § 1356 (3d ed. 2004)..............................5

Betsy Woodruff, *Trump Making 'Nativist' Group's Wish List a Reality*, Daily Beast
  (Mar. 13, 2017), https://thebea.st/2sv7G2h ....................................................................7

Catesby Holmes, *Why Is El Salvador So Dangerous? 4 Essential Reads*, The Conversation (Jan. 10, 2018), https://bit.ly/2LjVIzs....................................................36

Center for Immigration Studies ("CIS"), *A Pen and a Phone* (April 6, 2016), https://bit.ly/2J6z3dr .............................................................................................6

Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. 581, 598, 614 (2011) ...........................21

Jonathan Blitzer, *How Stephen Miller Single-Handedly Got the U.S. to Accept Fewer Refugees*, The New Yorker (Oct. 13, 2017), https://bit.ly/2xCePCx...........................................6, 7

Nick Miroff *et al.*, *U.S. Embassy Cables Warned Against Expelling 300,000 Immigrants. Trump Officials Did It Anyway.*, Wash. Post (May 8, 2018), https://wapo.st/2Hij8CS .....................................................................................24

Peter J. Spiro, *Explaining the End of Plenary Power*, 16 Geo. Immigr. L.J. 339, 342-43 & n.13 (2002)..............................................................................................26

Southern Poverty Law Center, *Extremist Files: Groups*, https://bit.ly/2j9T2Gh ...............................7

**<u>INTRODUCTION</u>**

Plaintiffs are U.S. citizen children, their non-citizen parents, and other non-citizen adults who live lawfully in this country. They all face irreparable harm because the Government has terminated Temporary Protected Status ("TPS") for people from four countries who held that protected status for between eight and twenty-one years. Plaintiffs brought suit because the terminations are the product of an unexplained, radical departure from prior practice, are infected by racial animus, and disregard the constitutional rights of school-aged U.S. citizen children, who must now choose between their parents and their country.

The Government claims this court lacks jurisdiction to halt such blatantly illegal actions. In its view, even if Government officials flipped a coin to determine whether to end TPS—or wrote explicitly, in the termination notices, that they were ending TPS because they did not want "people from shithole countries" (and their children) living here—the federal courts could do nothing.

Defendants' view is not the law. Section 1254a(b)(5)(A) does not bar review of all claims "relating to the Secretaries' TPS determinations." Defs.' Mot. to Dismiss [Dkt. 20] ("MTD") at 21. It bars review only of "any *determination* of the [Secretary] with respect to the . . . termination or extension of a designation[] of a foreign state *under this subsection*." 8 U.S.C. 1254a(b)(5)(A) (emphases added). "Determination" and "under" are terms of art that focus Section 1254a(b)(5)(A) on challenges to the ultimate decision to terminate TPS, not legal disputes about how to interpret the TPS statute or claims arising under other statutes or the Constitution.

Even if Section 1254a did bar Plaintiffs' challenge under the APA to Defendants' new interpretation of the TPS statute, Section 1254a still cannot bar constitutional claims. Courts require Congress to state explicitly an intent to repeal jurisdiction over constitutional claims, because any such repeal would create serious separation of powers concerns. Section 1254a(b)(5)(A) says nothing about constitutional claims, let alone claims brought by U.S. citizens. *Infra*, Part I.

Plaintiffs also have adequately alleged the basis for their claims. Defendants hinge much of their response on a factual assertion: that they have not adopted a "new rule" concerning what factors to consider when conducting statutorily-required periodic reviews to "determine whether the conditions for [TPS] designation continue to be met." 8 U.S.C. 1254a(b)(3)(A). A review of the TPS

1

1    notices confirms that Defendants are wrong. Prior decisions for these four countries consistently

2    assessed harm arising from intervening (*i.e.*, post-designation) disasters, conflicts, or other crises that

3    were unrelated to the event that triggered TPS in the first instance. Moreover, Defendants' position

4    rests on a contested *factual* assertion—one as to which they have resisted discovery. It therefore

5    cannot support a motion to dismiss. In any event, while the existence of a new interpretation is

6    central to Plaintiffs' APA claim, Plaintiffs need not prove Defendants adopted it to prevail on any of

7    their other claims.

8         Because Plaintiffs have plausibly alleged that Defendants radically changed their view on

9    whether to consider intervening crises when making TPS determinations, Plaintiffs have stated a

10   claim under the Administrative Procedure Act ("APA"). Courts have consistently found *unexplained*

11   *departures from prior policies or practices* to violate the APA, whether enacted by formal rule or

12   instead informal practice, particularly when those departures upset reliance interests. *See, e.g.*, *Am.*

13   *Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) ("A central principle of

14   administrative law is that, when an agency decides to depart from decades-long past practices and

15   official policies, the agency must at a minimum acknowledge the change and offer a reasoned

16   explanation for it."). Even if a departure manifests only in a decision itself, the departure still must

17   be meaningfully justified. None of the termination notices come close to satisfying that standard.

18   *Infra*, Part II.A.

19        Plaintiffs have also plausibly alleged that Defendants' actions are motivated by racial animus

20   against Plaintiffs and other "people from shithole countries." If the equal protection guarantee of the

21   Due Process Clause means anything, surely it forbids overt racism. *Vill. of Arlington Heights*

22   *v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). The Ninth Circuit has stated that "when relying

23   on *Arlington Heights* to demonstrate that an action was motivated by a discriminatory purpose,

24   . . . any indication of discriminatory motive may suffice to raise a question that can only be resolved

25   by a fact-finder." *Arce v. Douglas*, 793 F.3d 968, 977-78 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 295

26   (2016). Plaintiffs easily meet that standard. Defendants cannot escape that this Administration has

27   repeatedly directed racist sentiments towards TPS holders, including in the context of their right to

28   stay in this country. Defendants argue that a lower standard of review should apply in the

immigration context. Their arguments are incorrect, but also irrelevant at this stage. No standard of review is low enough to save them from having to explain how the Constitution could possibly permit this Administration's racist attacks on TPS holders. *Infra*, Part II.B.

Plaintiff TPS holders also state a claim under the Due Process Clause for arbitrary actions with respect to TPS. The central element of this claim arises from the statute itself, which gives the DHS Secretary *no discretion* to terminate TPS where conditions warranting it persist, coupled with the important liberty interests in economic security and family integrity created by lawful immigration status. Where a statute creates a mandatory duty that implicates important interests, the Due Process Clause requires that it be administered in a rational manner. That requirement gains particular force where individuals rely on the statute and where it vindicates important liberty interests. Plaintiffs have adequately pled two factual claims—that the Administration adopted a new rule for interpreting the TPS statute and that the Administration acted out of racist motives—each of which independently states a cognizable due process claim for arbitrary state action. *Infra*, Part II.C.

Finally, the U.S. citizen child Plaintiffs adequately allege a separate Due Process claim. Under the Due Process Clause, the Government must have a strong reason to so dramatically burden their right to live in this country and their right to live with their parents, and to impose such burdens *now*, before they reach adulthood. While founded on over a century of established law, Plaintiffs acknowledge that application of these principles in the context of this case is novel. But that is unsurprising. Plaintiffs are unaware of a prior instance in our nation's history where the Government terminated the lawful status of several hundred thousand people who lived here for years without even accusing them of any wrongdoing, thereby forcing thousands of school-aged U.S. citizen children to choose between the exercise of two precious constitutional rights.

Defendants assert that courts have rejected this claim, but they overstate the cases on which they rely. The Ninth Circuit has not held the Government's interest in regulating immigration *always* outweighs a citizen child's interest in living in their country and with their parents. If that were true, then how could a citizen have a cognizable liberty interest in their marriage with a non-citizen living abroad, thereby giving rise to due process rights in the Government's adjudication of the spouse's visa application? *See Cardenas v. United States*, 826 F.3d 1164, 1171-72 (9th Cir. 2016). Rather, the

1   cases rejecting other claims by U.S. citizens concerning their family members must be understood in

2   the context of the interests at stake in those cases. None involved claims by school-age U.S. citizen

3   children seeking to protect their own constitutional rights through temporary protection—just until

4   the children become adults—for parents who have resided here lawfully for years. Nor did any of

5   those cases involve citizen children facing relocation to countries recently designated as too

6   dangerous to accept returning nationals *of any age*. *Cf. Martinez de Mendoza v. I.N.S.*, 567 F.2d

7   1222, 1225-26 & n.8 (3d Cir. 1977) ("[I]f the allegation that de facto deportation of [the citizen

8   child] would expose her to physical danger are correct, they may well be sufficient to raise questions

9   of the constitutionality of such deportation not answered by [prior precedent].").

10   Under analogous due process doctrine in the immigration and family law contexts, the

11   Government must show a significant interest in forcing these children to choose between their

12   parents and their country. It has no such interest here. *Infra*, Part III.

### STATEMENT OF ISSUES TO BE DECIDED

14   1. Whether this Court has subject matter jurisdiction over Plaintiffs' claims notwithstanding

15   8 U.S.C. 1254a(b)(5)(A).

16   2. Whether Plaintiff TPS holders have stated a claim, for purposes of Rule 12(b)(6), for

17   violations of the Administrative Procedure Act, the equal protection component of the Due Process

18   Clause, and the Due Process Clause's prohibition on arbitrary deprivations of liberty.

19   3. Whether Plaintiff U.S. citizen children of TPS holders have stated a claim, for purposes of

20   Rule 12(b)(6), for violation of the Due Process Clause.

### LEGAL STANDARD

22   To establish jurisdiction, Plaintiffs may rely on the complaint's allegations and all reasonable

23   inferences from those allegations. *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d

24   1152, 1156-57 (9th Cir. 2017). Where the Government relies on a jurisdiction-stripping statute,

25   courts begin with "the strong presumption that Congress intends judicial review of administrative

26   action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670, 678-79 (1986). To dismiss,

27   a court must find "clear and convincing evidence" of congressional intent to foreclose review under

28   the statute. *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993). As for Rule 12(b)(6), a motion

1   to dismiss is not an arena for "resolving a contest between the parties about the facts or the

2   substantive merits of the plaintiff's case." 5B C. Wright & A. Miller, Federal Practice and Procedure

3   § 1356, p. 354 (3d ed. 2004). Material outside of the complaint generally should not be considered,

4   as that requires converting a motion to dismiss into one for summary judgment. *See, e.g.*, *Swedberg*

5   *v. Marotzke*, 339 F.3d 1139, 1144, 1146 (9th Cir. 2003).

6                              **RELEVANT BACKGROUND**

7           Defendants' "background" section includes a lengthy description of asserted facts concerning

8   TPS designations, but ignores TPS holders and their children.

9           TPS holders currently reside in every State—many have for decades—with homes, spouses,

10  families, jobs, and other deep social ties to their communities. The TPS-holder Plaintiffs and their

11  U.S. citizen children come from California, Washington, D.C., Florida, Maine, and Massachusetts.

12  Complaint [Dkt. 1] ("Compl.") ¶¶ 51-55, 57-65. The TPS holders work in education, *id.* ¶¶ 57, 65,

13  child care, *id.* ¶ 60, nursing, *id.* ¶ 62, bioinformatics, *id.* ¶ 65, building maintenance, *id.* ¶ 58, and

14  labor organizing, *id.* ¶ 61. Hiwaida Elarabi worked for sixteen years with the Massachusetts

15  Department of Public Health. She also owned a small-business before selling it because of her

16  impending loss of status. *Id.* ¶ 65. Mazin Ahmed and Maria Jose Ayala Flores attend college and

17  aspire to careers in pediatrics and education. *Id.* ¶¶ 59, 64. Other TPS holders engage in extensive

18  volunteer work: Orlando Zepeda volunteered for more than 20 years as a chaplain in prisons and

19  hospitals. *Id.* ¶ 58; *see also id.* ¶ 61.

20          Many TPS holders have children, along with spouses, siblings, and extended family who are

21  U.S. citizens. *See generally id.* ¶¶ 50-65. TPS-holder Sherika Blanc is married to a U.S. citizen and

22  has three U.S.-citizen daughters, ages five (Plaintiff Rilya Salary), three, and less than one. *Id.* ¶ 62.

23  Cristina Morales, Orlando Zepeda, Elsy Yolanda Flores de Ayala, Wilna Destin, and Imara Ampie

24  also have minor U.S. citizen children. *Id.* ¶¶ 57, 58, 60-63.[1]

25          The citizen children Plaintiffs range in age from five to fourteen. They are currently in

26  elementary, middle, and high school. *Id.* ¶¶ 51-55. Like most children, they depend on the support

27

28  _____

[1] Although some non-citizens can adjust their status to permanent residence, often through petitions
filed by their citizen relatives, the Plaintiff TPS holders here do not have straightforward paths to
adjustment according to immigration lawyers with whom they have consulted.

1  and protection of their parents. None of them have ever lived in the country to which their parents

2  will be forced to return if TPS is terminated, and some have never even visited. *Id.* ¶¶ 51-55. They

3  have lived and gone to school here. *Id.* They have all the hopes and dreams of other students,

4  whether to make a career in law or medicine, or just to join the high-school football team. *Id.* ¶¶ 51,

5  54, 64. All of these people's lives, along with several hundred thousand others, will be irrevocably

6  damaged by the Trump Administration's new TPS policies.

7        Defendants make a number of factual assertions about TPS terminations, telling this Court

8  that there "existed no rule, standard, interpretation, pattern, practice, or policy from which Secretary

9  Duke or Nielsen departed . . . ." MTD at 27; *see also id.* at 25.[2] Defendants insist that Plaintiffs'

10 claims of a new rule rest on "unfounded" factual allegations. *Id.* at 24. The Complaint, however,

11 pleads in detail that there is a "new rule," in the sense that there was one practice for assessing

12 intervening conditions in TPS determinations prior to the Trump Administration, but now there is

13 another. Compl. ¶¶ 4, 74-88. Over the course of time, DHS developed a pattern and practice of

14 extending TPS designations based on intervening country conditions. *Id.* ¶¶ 4, 75.[3] Then, suddenly

15 and without explanation, Defendants shifted to a new rule that focuses almost exclusively on

16 whether originating conditions have abated (*e.g.*, devastation from a particular hurricane), regardless

17 of whether substantially similar problems exist, or different problems have arisen, due to intervening

18 events (*e.g.*, later hurricanes, war in a neighboring country, governmental instability), such that the

19 country continues to meet the conditions for a TPS designation. *Id.* at ¶¶ 76, 81.[4]

20 ────────────

[2] Defendants' make these representations, ostensibly based on their "cursory review" of the Federal Register, MTD at 25, but they oppose discovery on this issue. Dkt. 16 at 5-6; Dkt. 14 at 3.

[3] Nothing turns on whether the departure from past TPS decision-making constitutes a new "rule," a "policy," or just a "practice" for purposes of the APA claim. *Infra*, Part II.A.

[4] Defendants' new rule regarding TPS was presaged by a report from an anti-immigrant group. Center for Immigration Studies ("CIS"), *A Pen and a Phone* (April 6, 2016), https://bit.ly/2J6z3dr. The report recommended that "the new president should direct termination of TPS designations that have been in effect for years for several nations, such as El Salvador, which was designated in 2001 as the result of an earthquake and which has been renewed regularly ever since, even though the effects of that earthquake have long since disappeared." *Id.* The report identified that the "direct letter of the law" allowed for the practice followed for decades, and that "a long-term fix will likely require statutory amendment by Congress to be fully effective." *Id.* According to publicly available sources, CIS—designated as a "hate group" by the Southern Poverty Law Center—was an influential source for President Trump's top immigration advisor, and has been "for the first time . . . invite[d] to Immigration and Customs Enforcement stakeholder meeting[s]," and "been in touch with new appointees at the Department of Homeland Security." *See* Jonathan Blitzer, *How Stephen Miller Single-Handedly Got the U.S. to Accept Fewer Refugees*, The New Yorker (Oct. 13, 2017),

1    Two Trump-era Secretaries of Homeland Security described their narrow understanding of

2 the TPS statute. *Id.* at ¶¶ 76-78 (Secretary Nielsen testimony that she can consider only "whether the

3 country conditions originating from the original designation continue to exist."); (then-Secretary

4 Kelly testimony that "in Haiti . . . the earthquake was why TPS . . . was granted and . . . that's how I

5 have to look at it"). These statements contradict prior policy and practice. *Id.* ¶¶ 80-88.

6    Moreover, the designation notices themselves support Plaintiffs' allegations. Pre-Trump

7 Administration TPS designations for the four countries repeatedly relied on intervening conditions,

8 but the recent terminations do not. *Id.* Defendants assert that "intervening conditions were generally

9 considered by prior Administrations only to the extent that they could be linked to or impeded

10 recovery from the event underlying the designation," MTD at 26. Plaintiffs have reviewed every

11 Federal Register Notice regarding TPS. Defendants' selective reading is wrong.

12    For nearly the last two decades, the Attorney General and Secretary of Homeland Security

13 considered intervening conditions when extending or terminating TPS. Numerous examples more

14 than suffice to demonstrate that Plaintiffs' allegations of a new rule are plausible.

15    For example, the Attorney General designated El Salvador for TPS in 2001 because of an

16 "environmental disaster and substantial disruption of living conditions caused by the earthquakes."

17 *Designation of El Salvador Under Temporary Protected Status*, 66 Fed. Reg. 14, 214 (Mar. 9, 2001).

18 In extending El Salvador's TPS status over the next sixteen years, Attorneys General and DHS

19 Secretaries considered such unrelated, intervening factors as the "vulnerab[ility]" of the country's

20 roads "to adverse climatic conditions"—even though "all major roads damaged by the earthquakes

21 appear to have been reconstructed and are functioning," *Extension of the Designation of El Salvador*

22 *for Temporary Protected Status*, 77 Fed. Reg. 1,710, 1,712 (Jan. 11, 2012); the degradation of

23 wetlands by "solid waste, untreated waste water, agrochemicals, and unsustainable resource

24 extraction practices," a "severe regional drought that is impacting food security," and a "leaf rust

25 epidemic" that devastated coffee production and employment in that sector, *Extension of the*

26

27 https://bit.ly/2xCePCx; Betsy Woodruff, *Trump Making 'Nativist' Group's Wish List a Reality*, Daily Beast (Mar. 13, 2017), https://thebea.st/2sv7G2h; Southern Poverty Law Center, *Extremist*

28 *Files: Groups*, https://bit.ly/2j9T2Gh. If given the opportunity to amend, Plaintiffs would include these facts in their complaint.

7

1   *Designation of El Salvador for Temporary Protected Status*, 80 Fed. Reg. 893, 894-95 (Jan. 7,

2   2015); "an outbreak of mosquito borne illnesses, including chikungunya and dengue," the fiscal and

3   unemployment situations, and "[i]ncreasing violence and insecurity." *Extension of the Designation*

4   *of El Salvador for Temporary Protected Status*, 81 Fed. Reg. 44,645, 44,647 (July 8, 2016).

5   Similarly, following the designation of Nicaragua for TPS in 1999 due to Hurricane Mitch,

6   Attorneys General and DHS Secretaries considered a range of unrelated, intervening conditions in

7   extending the country's TPS designation. These included: "damage during subsequent storms,"

8   *Extension of the Designation of Nicaragua for Temporary Protected Status*, 72 Fed. Reg. 29,534,

9   29,535 (May 29, 2007); "electoral fraud," "weak and poorly constructed infrastructure," and

10  "chronic poverty;" *Extension of the Designation of Nicaragua for Temporary Protected Status*, 75

11  Fed. Reg. 24,737, 24,738 (May 5, 2010); volcanic eruptions, and a drought that "negatively

12  impacted livelihoods and food security." *Extension of the Designation of Nicaragua for Temporary*

13  *Protected Status*, 81 Fed. Reg. 30,325, 30,326–27 (May 16, 2016).

14  Sudan reveals the same pattern. Sudan was designated for TPS because of "an ongoing

15  armed conflict" and the existence of "extraordinary and temporary conditions . . . that prevent aliens

16  who are nationals of Sudan . . . from returning to Sudan in [s]afety." *Designation of Sudan Under*

17  *Temporary Protected Status*, 62 Fed. Reg. 59,737 (Nov. 4, 1997).[5] Yet, TPS was extended over two

18  decades in consideration of, for example, "[a] myriad of factors [that] contribute to the ongoing

19  humanitarian crisis" beyond "the effects of conflict and displacement," such as "flooding and

20  droughts, which further compound the country's vulnerabilities and have led to food shortages and

21  budget constraints." *Extension of the Designation of Sudan for Temporary Protected Status*, 76

22  Fed. Reg. 63,635, 63,636–37 (Oct. 13, 2011).

23

---

24  [5] *See also Extension and Re-designation of Sudan Under Temporary Protected Status*, 78
Fed. Reg. 1,872, 1,873 (Jan. 9, 2013) (same reasons); *Extension and Redesignation of Sudan Under*

25  *Temporary Protected Status*, 69 Fed. Reg. 60,168, 60,169 (Oct. 7, 2004) (same reasons); *Extension and Redesignation of Sudan Under Temporary Protected Status*, 64 Fed. Reg. 61,128 (Nov. 9, 1999)

26  (same reasons). Since soon after the enactment of Section 1254a, the Government has read an implied authority to "redesignate" a country for TPS despite it already being designated. *See, e.g.*,

27  *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program*, 62 Fed. Reg. 16,608 (Apr. 7, 1997) (discussing legal authority for redesignation of a country for

28  TPS). The Secretary (and the Attorney General before that) typically relied on this implied redesignation authority to establish a revised date of "continuous residence."

1    Haiti provides even clearer evidence of the new rule. Haiti was designated for TPS in 2010 in

2  light of a devastating earthquake. *Designation of Haiti for Temporary Protected Status*, 75

3  Fed. Reg. 3,476, 3,477 (Jan. 21, 2010).[6] Among factors that prior DHS Secretaries considered in

4  nearly a decade of TPS extensions were Tropical Storm Isaac and Hurricane Sandy, "weak

5  governance; inadequate respect for the rule of law; a deficient judicial system; and a high prevalence

6  of corruption in various branches of government;" and "a high risk of crime, gender-based violence,

7  and exploitation." *Extension of the Designation of Haiti for Temporary Protected Status*, 79

8  Fed. Reg. 11,808, 11,809-10 (Mar. 3, 2014).

9    But then, in an extraordinary Federal Register notice providing a "limited 6-month"

10 extension of TPS for Haiti, DHS Secretary Kelly announced that "[t]he Secretary is committed to

11 making TPS determinations that fully comply with the Immigration and Nationality Act and the

12 intent of the program to provide a temporary form of immigration relief and protection." *Extension*

13 *of the Designation of Haiti for Temporary Protected Status*, 82 Fed. Reg. 23,830 (May 24, 2017).

14 The notice repeatedly suggested TPS would shortly end by, inter alia, warning TPS holders to obtain

15 travel documents. Six months later, Acting Secretary Duke terminated Haitian TPS citing only

16 conditions associated with the 2010 designation and the 2011 redesignation. The notice ignored

17 intervening conditions identified in prior extensions of TPS for Haiti, including human rights

18 violations, "gender-based violence," "threats to personal security," and the effects of "Tropical

19 Storm Isaac" and "Hurricane Sandy." *Compare Termination of the Designation of Haiti for*

20 *Temporary Protected* Status, 83 Fed. Reg. 2,648, 2,650 (Jan. 18, 2018), *with Extension of the*

21 *Designation of Haiti for Temporary Protected Status*, 79 Fed. Reg. 11,808, 11,809-10 (Mar. 3,

22 2014).[7]

23 _____

24 [6] *See also Extension and Redesignation of Haiti for Temporary Protected Status*, 76
Fed. Reg. 29,000, 29,001 (May 19, 2011) (same reasons).

25 [7] These examples are the tip of the iceberg. Plaintiffs have conducted an exhaustive review of all the
TPS notices for all countries, but cannot provide the results here due to space constraints. For
26 examples from countries *not* at issue in this case, *see, e.g.*, *Extension of the Designation of Honduras
for Temporary Protected Status*, 81 Fed. Reg. 30,331, 30,333 (May 16, 2016) (original designation
27 based on a hurricane, but extension considered "subsequent environmental disasters," a "dramatic
increase in mosquito-borne diseases," and massive layoffs in the agricultural sector); *Extension of
the Designation of Sierra Leone Under the Temporary Protected Status Program*, 67
28 Fed. Reg. 66,423 (Oct. 31, 2002) (considering security situation in Liberia); *Extension of
Designation of Burundi Under the Temporary Protected Status Program*, 65 Fed. Reg. 67,404 (Nov.

1   Defendants cite Federal Register notices for other countries, asserting that previous

2   administrations terminated TPS for some countries "because the conditions leading to the original

3   designation no longer satisfied the . . . statute's criteria" and "despite ongoing problems." MTD at

4   25, 26. But Defendants' cherry-picked examples from a few other countries cannot support a general

5   conclusion regarding the TPS decisionmaking process, especially at the motion to dismiss stage. At

6   worst, they would show the absence of any consistent practice (or, more likely, sporadic deviations

7   from the predominant practice), which would still violate the APA.[8]

8   <u>**ARGUMENT**</u>

9   **I.     THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ALL OF
       PLAINTIFFS' CLAIMS**

10

11        **A.     Section 1254a(b)(5)(A) Does Not Apply Because It Bars Review Only of
              "Determinations" "Under this Subsection"**

12        Section 1254a(b)(5)(A) does not bar jurisdiction over Plaintiffs' APA claim because

13   Plaintiffs do not challenge any particular TPS termination decision—*i.e.*, any "determination"—but

14   rather the underlying rule adopted by the Trump Administration for its recent TPS decisions. In

15   addition, Plaintiffs' claims arise under the APA and the Constitution, not "under this subsection."

16   Defendants rely on Section 1254a(b)(5)(A), which provides there "is no judicial review of any

17   *determination* of the Attorney General with respect to the designation, or termination or extension of

18   a designation, of a foreign state *under this subsection*." (emphases added).

19        Defendants' primary response to the distinction Plaintiffs draw between challenges to

20   determinations and challenges to underlying rules, policies, and practices is that there is no new rule

21   (or perhaps any rule at all). But that goes to a factual dispute on the merits. It cannot defeat

22   9, 2000) (considering effects of war in Congo where original designation was related to Burundi's
    civil war).

23

24   [8] The context of Defendants' particular examples suggests they are atypical. For instance, the
    conflict in Kosovo and the Ebola epidemic in West Africa were curtailed so swiftly that intervening
    conditions may have never developed. *See, e.g.*, *Six-Month Extension of Temporary Protected Status
25   Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary
    Protected Status*, 81 Fed. Reg. 66,064, 66,065 (Sept. 26, 2016); *Termination of the Province of
26   Kosovo in the Republic of Serbia in the State of the Federal Republic of Yugoslavia (Serbia-
    Montenegro) Under the Temporary Protected Status Program*, 65 Fed. Reg. 33,356, 33,357 (May
27   23, 2000). Defendants' reference to Montserrat is mysterious. They argue that the "repeated
    occurrence of intervening [volcanic] eruptions was the basis for *terminating* TPS for Montserrat."
28   MTD at 25. If true, that would not disprove either that many other past notices extended TPS due to
    intervening conditions, or that the post-Trump notices do not.

1   jurisdiction, especially at this stage.[9] Because Plaintiffs do not challenge any "determination" to

2   terminate TPS, Section 1254a(b)(5)(A) does not apply.

3        Plaintiffs' position gains strength from "the strong presumption that Congress intends

4   judicial review of administrative action." *Bowen*, 476 U.S. at 670, 678-79 (construing statute stating

5   "[n]o action . . . shall be brought under section 1331 or 1346 of title 28 to recover on any claim

6   arising under this subchapter," as inapplicable to general statutory and constitutional challenges)

7   (quoting 42 U.S.C. 405(h)).

8        The Supreme Court has repeatedly enforced that presumption, including in the immigration

9   context for challenges to agency "determinations." In *McNary v. Haitian Refugee Center, Inc.*, a

10   class brought statutory and constitutional challenges to Government policies and practices

11   administering the special agricultural worker program, which granted legal status to qualifying

12   workers. 498 U.S. 479, 481-84 (1991). The statute barred "judicial review of a determination

13   respecting an application for adjustment of status under [8 U.S.C. 1160, the statute governing special

14   agricultural workers, or (SAW)]." *Id.* at 491 (quoting Section 1160(e)(1)). *McNary* relied on

15   *Bowen*'s "well-settled presumption" to conclude that plaintiffs nonetheless could assert both

16   statutory and constitutional challenges to policies and practices in the SAW program's

17   administration. *Id.* at 496, 498. "Significantly, the reference to 'a determination' describes a single

18   act rather than a group of decisions or a practice or procedure employed in making decisions." *Id*. at

19   492.

20        Two years later, the Court applied *McNary*'s narrow construction of "determination" to

21   another immigration-related jurisdiction-stripping statute that used the same word, and again found it

22   did not foreclose general statutory and constitutional challenges. *Catholic Soc. Servs.*, 509 U.S. at

23   56-58, 63-64. As the Court explained, "the language setting the limits of the jurisdictional bar

24   describes the denial of an individual application, and thus applies only to review of denials of

25   individual applications." *Id.* at 56 (internal quotations and citations omitted). *See also I.N.S.*

26

27   [9] It would be particularly unfair to grant Defendants' motion when Plaintiffs have outstanding
discovery designed to prove the existence of the new rule. *See Laub v. U.S. Dep't of Interior*, 342

28   F.3d 1080, 1093 (9th Cir. 2003) (holding district court should have permitted jurisdictional
discovery where "additional discovery would be useful to establish federal subject matter
jurisdiction").

1   *v. St. Cyr*, 533 U.S. 289, 298 (2001) (applying the "strong presumption in favor of judicial review of

2   administrative action" to find jurisdiction over legal claim).

3         The Ninth Circuit has also repeatedly construed "determination" to not bar jurisdiction over

4   challenges to the constitutionality of the framework or process underlying decisions. *Immigrant*

5   *Assistance Project of AFL-CIO v. I.N.S.*, 306 F.3d 842, 862-63 (9th Cir. 2002) (allowing challenge

6   to INS's interpretation of "known to the government"); *Proyecto San Pablo v. I.N.S.*, 189 F.3d 1130,

7   1138 (9th Cir. 1999) (allowing due process claims, because they did "not seek review of denials of

8   legalization applications, but rather . . . the procedures").

9         The presumption favoring judicial review coupled with Section 1254a(b)(5)(A)'s use of

10   "determination" requires the same result here. While Section 1254a(b)(5)(A) focuses on country-

11   specific decisions rather than individual TPS applications, Plaintiffs' challenge here, like the

12   challenges in prior cases construing "determination," goes to the underlying rules or policies rather

13   than any specific decision. Because Plaintiffs do not challenge any particular decision to terminate

14   TPS for any particular country, they have not challenged a "determination" under it.

15         Section 1254a(b)(5)(A) also cannot bar Plaintiffs' claims because they are not brought

16   "under this subsection." That language limits Section 1254a(b)(5)(A)'s scope to claims arising under

17   the TPS statute, which in this context would cover only claims challenging application of the

18   subsection's provisions to particular factual situations. "A decision of law or fact 'under' a statute"

19   means only a decision regarding "the interpretation or application of a particular provision of the

20   statute *to a particular set of facts*." *Johnson v. Robison*, 415 U.S. 361, 367 (1974) (emphasis added).

21   The Court has interpreted "under" in stripping statutes to not bar claims raised under the

22   Constitution or other statutes. *Id.* (Constitution); *Traynor v. Turnage*, 485 U.S. 535, 542-44 (1988)

23   (statute). The Supreme Court has strongly suggested that APA claims do not originate "under this

24   section" in an analogous context, because arbitrary agency action and action outside of statutory

25   limits originates "under the Administrative Procedure Act," rather than any particular administrative

26   law statute. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2141-42 (2016) (quoting 35 U.S.C.

27   314(d)).

28

1    Thus, Section 1254a(b)(5)(A) lacks "clear and convincing evidence" of congressional intent

2    to foreclose judicial review of Plaintiffs' claims. *Catholic Soc. Servs.*, 509 U.S. at 64.

### B.    Section 1254a(b)(5)(A) Cannot Bar Constitutional Claims

Even if Section 1254a(b)(5)(A) bars Plaintiffs' APA claim, it cannot bar the TPS holders' constitutional claims for two reasons.

*First*, Congress has explicitly referenced constitutional claims elsewhere in the immigration code's jurisdictional provisions, but did not here. *Compare* 8 U.S.C. 1252(b)(9) (precluding "[j]udicial review of all questions of law and fact, *including interpretation and application of constitutional and statutory provisions . . . .*" (emphasis added)). "Where Congress includes particular language in one section of a statute but omits it in another," courts presume the omission is intentional. *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).

*Second*, Congress must speak with exceptional clarity to foreclose judicial review of constitutional claims due to the serious separation of powers problems that such a scheme would create. *Webster v. Doe*, 486 U.S. 592, 603 (1988); *Bowen*, 476 U.S. at 681 n.12. It has not done so here. *Webster* held that Congress had not barred judicial review of due process and equal protection claims arising out of a CIA employee's termination allegedly due to sexual orientation. The statute appeared to grant unfettered discretion to terminate a CIA employee "whenever [the CIA Director] shall deem such termination necessary or advisable." *Webster*, 486 U.S. at 594. But the Supreme Court held this language lacked sufficient clarity to foreclose constitutional claims. *Id.* at 602-04; *see also Bowen*, 476 U.S. at 681 & n.12 (avoiding the "serious constitutional question" were Congress to eliminate all constitutional challenges to Medicare regulations); *Demore v. Kim*, 538 U.S. 510, 517 (2003) (interpreting statute providing discretion in immigration context not to foreclose challenge to legal framework).[10] If those provisions were insufficiently clear to strip federal jurisdiction of constitutional claims, the same is true of Section 1254a(b)(5)(A).

---

[10] Contrary to Defendants' suggestion, MTD at 22 n.9, *Demore*'s reasoning hinged on *Webster*'s clear statement requirement; it is therefore not limited to challenges to a particular statutory framework. *Demore*, 538 U.S. at 517. Moreover, like the *Demore* petitioner, Plaintiffs do not challenge any particular determination. *See* Compl. ¶¶ 4, 11, 75, 76.

13

1    Defendants contend that *Webster* does not apply because TPS holders "may" ultimately be

2    able to bring a constitutional claim in "immigration court and, ultimately, the applicable court of

3    appeals." MTD at 23; *see also id*. (citing Section 1252(a)(2)(D)). Defendants' conditional language

4    is hardly reassuring to the individuals whose lives will be uprooted and the families who risk being

5    torn to shreds unless they can obtain judicial resolution of their challenge to Defendants' TPS

6    policies.[11] But even were it clearly true that a TPS holder could bring these constitutional claims in a

7    future removal proceeding, that would not eliminate the need to apply *Webster*'s interpretive rule.

8    To obtain review in removal proceedings, individual TPS holders would have to wait in this

9    country (in violation of law) and either be arrested and placed in removal proceedings, or turn

10   themselves in to the Government and ask it to initiate removal proceedings. But *McNary* found the

11   possibility of review through that fraught process too uncertain to eliminate the concerns that

12   underlie *Webster*'s interpretive rule. *See McNary*, 498 U.S. at 496-97. As *McNary* explained,

13   "because there is no provision for direct judicial review of the denial of SAW status unless the alien

14   is later apprehended and deportation proceedings are initiated, most aliens denied SAW status can

15   ensure themselves review in courts of appeals only if they voluntarily surrender themselves for

16   deportation. Quite obviously, that price is tantamount to a complete denial of judicial review for

17   most undocumented aliens." *Id.* at 497-98; *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 840

18   (2018) (reading jurisdiction stripping provision as inapplicable where it would leave at least some

19   class members without "any meaningful chance for judicial review").

20   Here too, many TPS holders who wish to challenge the Government's decision will never

21   undergo removal proceedings. Some will simply leave the United States once faced with loss of

22   status and employment authorization. Others will join the eleven million undocumented people in

23   this country, but will not risk turning themselves in for removal proceedings. Even for those

24   eventually arrested and placed into removal proceedings, judicial review would come far too late to

25   prevent many of the harms arising from Defendants' illegal action, including loss of status and

26   employment authorization. Indeed, Plaintiffs will be forced to make decisions about school for their

27

28   [11] For example, individuals with final removal orders may nonetheless obtain TPS. 8 U.S.C. 1254a(a)(5), (c)(2). Defendants say nothing about how such individuals "may" obtain review of the claims raised here.

1   children, employment, ownership of significant assets, and relocation *before* their TPS expires. *See*

2   Compl. ¶¶ 50, 54, 63, 65. For TPS holders and their families, reliance on nothing more than the

3   uncertain prospect of future judicial review of a possible final removal order is "tantamount to a

4   complete denial of judicial review." *McNary*, 498 U.S. at 496-97.[12]

5        In the face of this overwhelming authority, Defendants cite only *Krua v. Dep't of Homeland*

6   *Sec.*, 729 F. Supp. 2d 452 (D. Mass. 2010), for their view that the statute satisfies *Webster*'s clear

7   statement rule. MTD at 22. But the *pro se* plaintiff there made no jurisdictional argument, so the

8   court had no occasion to engage *Webster* and its progeny (or any of the other extensive authority

9   supporting review); the district court's analysis was understandably cursory given the absence of

10  relevant briefing. *See Krua*, 729 F. Supp. 2d at 455. It provides no reasoning sufficient to overcome

11  the strong presumption of review for TPS holders' constitutional claims.

12       Finally, even were this Court somehow to find Plaintiffs' other claims barred, it plainly has

13  jurisdiction over the citizen children's constitutional claim. That claim is not even arguably a

14  challenge to a determination to terminate TPS. The claim asserts that the Constitution requires the

15  Government to put forth a significant interest when it forces school-aged U.S. citizen children to

16  choose between two fundamental rights—remaining in their country and remaining with their

17  parents—and that the Government has no such interest here. The relief sought does not require

18  reversal of the TPS decisions, but instead only some form of temporary status for parents until their

19  children reach adulthood. *See* Compl. at 35 (prayer for relief).

20       Defendants incorrectly assert that Section 1254a(b)(5)(A) bars review of the citizen

21  children's claims because, to decide it, the Court will need to "prob[e]" factors that the Government

22  considered in reaching the TPS determination. MTD at 22. But it will hardly require extensive

23  probing to ascertain that the Government did not consider the impact on the child Plaintiffs. That

---

24  [12] Defendants' argument that *Webster*'s rule against interpreting statutes to preclude review of
25  constitutional claims does not apply because Section 1252(a)(2)(D) preserves review in petitions for
    review of final removal orders also fails for a separate reason. Section 1254a(b)(5)(A) was enacted
26  in 1990. Its terms contain no channeling provision at all. Section 1252(a)(2)(D), in contrast, was
    enacted in 2005 as part of the REAL ID Act, as a general savings clause included alongside many
27  preclusion provisions. *See generally Ramadan v. Gonzales*, 479 F.3d 646, 650-54 (9th Cir. 2007)
    (explaining enactment history and purpose of REAL ID Act). While Section 1252(a)(2)(D)'s reach is
28  appropriately broad, it tells us nothing about what the Congress that enacted Section 1254a in 1990
    would have intended.

1   fact should be clear from the administrative record, and Government counsel has already all but

2   admitted it. CMC Hr'g Tr. May 17, 2018, 37:3-4.

3        Most important, this Court must have jurisdiction over this claim because the Plaintiffs

4   asserting it are U.S. citizens. Immigration courts cannot adjudicate their constitutional claims. If this

5   Court cannot address them, then no court can. Congress did not intend that result, and the

6   Constitution does not permit it.

7   **II.    PLAINTIFF TPS HOLDERS ADEQUTELY ALLEGE EACH OF THEIR CLAIMS
          FOR RELIEF**

8
         **A.    Plaintiff TPS Holders Adequately Allege an APA Violation**
9

10       Plaintiff TPS holders allege that Defendants established a new rule that departed from long-

11  standing policy and practice by refusing to consider intervening natural disasters, conflicts, and other

12  serious social and economic problems when deciding to terminate TPS for El Salvador, Haiti,

13  Nicaragua, and Sudan. Compl. ¶¶ 74-88. Plaintiffs allege that Defendants neither acknowledged nor

14  provided any reason for this shift. *Id.*

15       Defendants do not contest that a *sub silentio* departure from long-standing policy and

16  practice violates the APA. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)

17  ("[T]he requirement that an agency provide a reasoned explanation for its action would ordinarily

18  demand that it display awareness that it *is* changing position. An agency may not . . . depart from a

19  prior policy *sub silentio*. . . ."); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016)

20  (agency violated APA when it promulgated "a regulation that is inconsistent with the Department's

21  longstanding earlier position" without providing "good reasons").

22       Instead, Defendants dispute the facts, saying nothing has changed: DHS had no rule about

23  whether to consider intervening conditions before, and they have no rule now. MTD at 24-27, 38.

24  But at this stage, Plaintiffs' allegations control. They plausibly allege facts reflecting a new rule. *See*

25  *Cal. Pub. Utils. Comm'n v. Fed. Energy Regulatory Comm'n*, 879 F.3d 966, 977-78 (9th Cir. 2018)

26  (agency's assertion of regulatory authority without "acknowledg[ing] its longstanding policy" to the

27  contrary qualified as a change in policy); *Am. Wild Horse Pres. Campaign*, 873 F.3d at 924

28

1    (rejecting Service's argument that challenged action did not reflect policy change where argument

2    "flatly defie[d] . . . repeated official agency statements, and two decades of agency practice").

3         Defendants suggest the lack of any regulation or "formally published . . . documents"

4    describing the prior policy proves none existed. MTD at 38. However, many cases raising

5    unexplained departure claims involved informal guidance or past practice. *See Am. Wild Horse Pres.*

6    *Campaign*, 873 F.3d at 927 (prior policy evinced in part through decades of agency actions); *Cal.*

7    *Pub. Utils. Comm'n*, 879 F.3d at 977-78 (prior policy "evinced in a series of [agency] decisions and

8    statements"); *Encino Motorcars*, 136 S. Ct. at 2119-20, 2123 (prior policy evinced in an opinion

9    letter and a handbook); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir.

10   2007) (prior policy evinced in a series of environmental program plans).

11        Defendants also suggest the termination notices themselves justify their shift in policy. MTD

12   at 39. But the termination notices (like the statements of Secretaries Kelly and Nielson describing

13   DHS's new rule, Compl. ¶¶ 76-78) fail to explicitly acknowledge a change or give *any* reason—let

14   alone a good one—for declining to consider intervening circumstances. The APA requires far more.

15   *See Fox*, 556 U.S. at 515 (APA requires that agency "display awareness that it *is* changing position

16   and . . . show that there are good reasons for the new policy.").[13]

17        Defendants' lack of reasoning is particularly problematic where—as here—serious reliance

18   interests are at stake. *Encino Motorcars,* 136 S. Ct. at 2126-27 (holding APA required "a more

19   reasoned explanation" of agency policy change where car dealerships had structured compensation

20   plans with employees in reliance on prior agency policy); Compl. ¶¶ 56-65 (TPS holders have raised

21   children, become homeowners, and built small businesses).

22        Finally, even if the Court accepts Defendants' version of the facts (which it cannot do at this

23   stage) and finds that DHS had no rule and no consistent prior policy or practice with respect to

24   intervening events—sometimes considering them, sometimes not—such inconsistency is itself

25

26   [13] Defendants attempt to gloss over *Fox's* "good reason" requirement, suggesting that the APA is
     satisfied if DHS "believe[d] [its new rule] to be better." MTD at 39. That is not the law. *E.g.,*
27   *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 967 (9th Cir. 2015) ("assum[ing] the
     Department 'believes' the new policy is better" but holding that Department violated the APA
28   because it failed to "give 'good reasons' for adopting the new policy") (quoting *Fox*, 556 U.S. at
     515).

arbitrary and capricious in violation of the APA. *See Encino Motorcars*, 136 S. Ct. at 2126 (holding that an "'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice'"); *Huntington Hosp. v. Thompson*, 319 F.3d 74, 79 (2d Cir. 2003) ("While an agency is not locked into the first interpretation of a statute it embraces, it cannot simply adopt inconsistent positions without presenting 'some reasoned analysis.'"). Defendants cannot simply consider intervening conditions in deciding whether to extend TPS for El Salvador on one occasion, and then ignore them when deciding whether the next extension is appropriate. "The treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent. That is the very meaning of the arbitrary and capricious standard." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996).

Plaintiffs sufficiently allege that Defendants' unexplained departure violated the APA.[14]

### B.   Plaintiffs Have Stated An Equal Protection Violation

Plaintiffs have plausibly alleged that Defendants' actions regarding the TPS terminations for people from El Salvador, Nicaragua, Haiti, and Sudan violate the equal protection component of the Due Process Clause. *See, e.g.*, Compl. ¶¶ 9, 66, 67, 69, 70, 109, 110. Defendants' motion misrepresents Plaintiffs' allegations, fails to take Plaintiffs' well-pleaded allegations as true, ignores the appropriate governing legal standard, and interposes requirements that the governing law does not. Try as they might, Defendants cannot escape the simple fact that this Administration has repeatedly expressed racist sentiments towards TPS holders and other similarly-situated immigrants, and the substantial evidence that these racist sentiments at least in part motivated Defendants' actions here.

Courts apply strict scrutiny to assess plausible allegations that a defendant was motivated, at least in part, by a discriminatory purpose based on race or national origin. *Arce v. Douglas*, 793 F.3d at 977; *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (noting "official action" such as "when a statute classifies by race, alienage, or national origin" is "subjected to strict scrutiny"). Plaintiffs need not show that discrimination was the sole or primary purpose of the

---

[14] Plaintiffs have not yet taken a position on whether the TPS statute would permit the Government to cease consideration of intervening conditions, even if it did so with adequate notice, reasoned explanation, and in a consistent manner.

challenged action, but only that it was *a* "motivating factor." *Arlington Heights*, 429 U.S. 265–66;

*see also Arce*, 793 F.3d 968, 977 (9th Cir. 2015) (a statute and/or its subsequent enforcement

violates equal protection where, despite facial neutrality, "its enactment or the manner in which it

was enforced were motivated by a discriminatory purpose").

Determining whether discrimination is a motivating factor "demands a sensitive inquiry into

such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S.

at 266. *Arlington Heights* identified a non-exhaustive list of factors that courts should consider,

including (1) "[t]he impact of the official action—whether it bears more heavily on one race than

another"; (2) "[t]he legislative or administrative history . . . especially where there are contemporary

statements by members of the decisionmaking body, minutes of its meetings, or reports"; (3) "[t]he

historical background of the decision . . . particularly if it reveals a series of official actions taken for

invidious purposes"; (4) "[t]he specific sequence of events leading up to the challenged decision";

and (5) "[d]epartures from the normal procedural sequence," which "might afford evidence that

improper purposes are playing a role." *Id.* at 266-68. "A plaintiff need not establish any particular

element in order to prevail." *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016).

Plaintiffs need not plead (or even discover, for summary judgment purposes) a great deal of

evidence to support their claim of race discrimination in order to present it to a trier of fact. "[W]hen

relying on *Arlington Heights* to demonstrate that an action was motivated by a discriminatory

purpose . . . *any indication of discriminatory motive* may suffice to raise a question that can only be

resolved by a fact-finder." *Arce*, 793 F.3d at 977-78 (internal citations omitted, emphasis added).

Accepting, as the Court must, Plaintiffs' non-conclusory allegations as true and reading all

reasonable inferences in their favor, Plaintiffs have satisfied the *Arlington Heights* standard.

*First*, DHS's termination of TPS protections for Salvadoran, Nicaraguan, Sudanese, and

Haitian immigrants obviously affects primarily (if not exclusively) non-European immigrants

generally perceived in this country as non-white. *See Arlington Heights*, 429 U.S. at 266

(considering "[t]he impact of the official action—whether it 'bears more heavily on one race than

another'"). The complaint plausibly alleges that the TPS terminations are part of the

Administration's larger anti-immigrant agenda that has focused on ejecting non-white, non-

19

1  European people from the United States. This anti-immigration agenda is directed at (and has a

2  disparate impact on) non-white immigrants, including those from predominantly Black and Latin

3  American countries. Compl. ¶¶ 9, 66.

4      Defendants appear to argue that a less strict standard of review applies because the TPS

5  terminations are determinations related to *countries* and thus cannot constitute discrimination against

6  *individuals*. MTD at 31. But the President referred to Plaintiffs as "*people* from shithole countries."

7  Compl. ¶ 70 (emphasis added). That manifests racist animus towards individuals, not nations.

8      Defendants also allege "TPS determinations are not made, extended, or terminated *because*

9  of any individuals' race, ethnicity, or national origin," MTD at 32, but this is a factual allegation not

10  easily reconciled with the President's racist statements. Plaintiffs do not allege TPS classifications

11  are invalid because they favor certain countries over others. Rather, Plaintiffs allege Defendants

12  were motivated by racial and national origin animus. This allegation is clearly plausible: TPS

13  provides protections for people from countries whose nationals are predominantly non-white—here,

14  African, Black Caribbean, and Latino/a—and the President has directed a litany of racist vitriol

15  toward these individuals. Compl. ¶¶ 66-70. Accordingly, the Complaint plausibly alleges intentional

16  discrimination on the basis of race and national original, triggering strict scrutiny. *See City of*

17  *Cleburne*, 473 U.S. at 440.

18      Contrary to Defendants' argument, Plaintiffs do not *also* need to show there is a class of

19  similarly situated individuals being treated differently for TPS purposes. *See* MTD at 32 (*citing*

20  *Dillingham v. I.N.S.*, 267 F.3d 996, 1007 (9th Cir. 2001)). *Arlington Heights* requires no comparator

21  group, particularly where there is overt evidence of racism. 429 U.S. at 252.[15] *Dillingham* involved a

22  comparator group, but it did not involve allegations of intentional discrimination. *Dillingham*, 267

23  F.3d at 1006-07 (claim alleged disparate treatment of non-citizens with materially indistinguishable

24  criminal histories). Plaintiffs need not show a comparator group where they challenge a statute or

25  policy based on its discriminatory purpose.[16]

26

27  [15] In any event, President Trump's statements comparing "shithole countries" in Africa and Latin
     America to favored immigrants from overwhelmingly white countries like Norway, *see* Compl. ¶ 70,
     demonstrate disparate impact against a comparator group.

28  [16] *See, e.g.*, *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) (gender discrimination
     challenge to policy favoring veterans); *Arlington Heights*, 429 U.S. at 252 (inquiring into whether

20

1      *Second*, Plaintiffs have pled that the President and others in his administration have

2  repeatedly made statements expressing anti-immigrant, racist sentiment, including statements

3  connected to the TPS terminations. Compl. ¶¶ 66-70; *see Arlington Heights*, 429 U.S. at 266-69

4  (considering statements by decisionmakers and other circumstantial evidence of discriminatory

5  intent). "[The] President referred to countries designated for TPS as 'shithole' countries a mere

6  seven days before Defendants terminated Haiti's TPS status." Compl. ¶ 66; *see also id.* ¶ 70. He also

7  "expressed a preference, instead, for immigrants from countries like Norway, which is

8  overwhelmingly white." *Id.* ¶ 70. During that same meeting, the President asked, "'Why do we need

9  more Haitians?' [and] insisted that lawmakers '[t]ake them out' of any potential immigration deal."

10  *Id.* These statements alone are sufficient to render Plaintiffs' race discrimination plausible at the

11  motion to dismiss stage.

12      But, sadly, there is more. "President Trump has repeatedly compared immigrants to snakes

13  who will bite and kill anyone foolish enough to take them in." *Id.* ¶ 68. During a meeting in or

14  around June 2017, "President Trump reportedly said of the 15,000 Haitians admitted to the United

15  States, they 'all have AIDS.'" *Id.* ¶ 69. At the same meeting, "the President, after learning that

16  40,000 people had entered the United States from Nigeria, reportedly stated that they would never

17  'go back to their huts' in Africa." *Id.* Additionally, "Mr. Trump categorically labeled Mexican

18  immigrants as criminals and rapists: 'When Mexico sends its people, they're not sending their

19  best. . . . They're sending people that have lots of problems, and they're bringing those problems

20  with [them]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume,

21  are good people.'" *Id.* ¶ 67. These are not conclusory allegations. No "unwarranted inferences," *see*

22

23

24  Village's denial of rezoning was motivated by racially discriminatory purpose but not explicitly
    requiring nonprofit developer to show that they were treated differently than similarly situated
25  applicants). Indeed, "the requirement of identifying a similarly situated class is a threshold
    requirement in only a minority of as-applied equal protection cases. Otherwise, the similarly situated
26  requirement is simply a restatement of core Equal Protection concerns, namely, that all persons
    similarly circumstanced shall be treated alike." *Puente Arizona v. Arpaio*, 76 F. Supp. 3d 833, 863
27  n.12 (D. Ariz. 2015) (rev'd in part on other grounds) (internal citations and quotation marks
    omitted); *see also* Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. 581, 598, 614 (2011)
28  (the "similarly situated' requirement "has never been viewed by the U.S. Supreme Court as a
    threshold hurdle to obtaining equal protection review on the merits").

MTD at 23, are necessary, based on these statements, to plausibly allege that Defendants' TPS policies are infected by racism.

Defendants also argue the President's racial animus is irrelevant because the DHS Secretary is the ultimate decisionmaker, MTD at 36, but this is incorrect. Courts have recognized "liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action." *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 277-279 (E.D.N.Y. 2018) (concluding that allegations about racist statements made by President Trump were sufficiently recurring to raise a plausible inference that the decision to end the DACA program was substantially motivated by discriminatory animus); *id.* at 279 (citing *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272-73 (2d Cir. 2016) (discussing "cat's paw" liability, under which an organization may be held liable for employment discrimination when a prejudiced subordinate manipulates an unbiased superior into taking adverse employment action); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 126 & n.18 (2d Cir. 2004) (applying cat's-paw theory to equal-protection claim); *see also Poland v. Chertoff*, 494 F.3d 1174, 1182-84 (9th Cir. 2007) (concluding the influence or involvement of a biased individual in the decision-making process can impute the bias of that individual to the ultimate decision-maker); *Ave. 6E Invs.*, 818 F.3d at 504 ("The presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views."). These doctrines obviously have great force when the agent asserting influence over subordinates is the President of the United States.

*Batalla Vidal* rejected the same argument Defendants now assert. *See Batalla Vidal*, 291 F. Supp. 3d at 279 ("The court rejects, however, Defendants' remarkable argument that the President apparently *cannot* be liable for rescinding the DACA program because only Acting Secretary Duke had the legal authority to end that program.") (emphasis in original). *Batalla Vidal* recognized the "Constitution vests 'executive Power' in the President, not in the Secretary of DHS, who reports to the President and is removable by him at will." *Id.* at 279 (citing U.S. Const., art. II, § 1, cl. 1). The court noted "liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action." *Id.* at 279. Therefore, the court found the

1   President's racist behavior was relevant to the decision to terminate DACA—a decision, like a TPS

2   termination, that is enacted by the DHS Secretary.

3       The President's statements here are even more closely tied to the policy at issue than in

4   *Batalla Vidal* because Plaintiffs allege that the President made specific discriminatory statements

5   about the TPS program and its non-white, non-European beneficiaries, and expressed that he did not

6   want them in this country. Compl. ¶¶ 66, 70. Moreover, Defendant Nielsen was present at the

7   meeting where President Trump said he did not want people from the TPS-designated countries

8   included in any immigration deal and then specifically denigrated people from Haiti. Compl. ¶¶ 70,

9   72. She terminated status for people from Haiti seven days later. *Id.* ¶ 66.[17]

10      Other courts have found racial animus based on contemporaneous statements that were

11   significantly less overtly racist than the President's statements here. *See, e.g.*, *Ave. 6E Invs.*, 818 F.3d

12  

13   [17] Defendants misstate the circumstances of some of the recent TPS decisions in a failed effort to
     deny Defendants' racist intent. Contrary to Defendants' assertion that Acting Secretary Duke

14   "extended" TPS for Honduras, MTD at 36, TPS for Honduras was *automatically* extended because
     the Secretary made no determination at all. Secretary Nielsen has since *terminated* TPS for

15   Honduras. *See Extension of the Designation of Honduras for Temporary Protected Status*, 82 Fed.
     Reg. 59,630, 59,632 (initially Dec. 15, 2017) (automatically extending TPS for 6 months because

16   "the Secretary did not make a determination on Honduras's designation by November 6, 2017, the
     statutory deadline" and advising Honduran TPS holders to "request[] updated travel documents from

17   the Government of Honduras" in apparent anticipation of imminent termination); Press Release,
     Dep't of Homeland Sec., Sec'y of Homeland Sec. Kirstjen M. Nielsen Announcement on Temp.

18   Protected Status for Honduras (May 4, 2018) (announcing termination of TPS status for Hondurans).
     Defendants did recently extend TPS for Syria and South Sudan, but those decisions do not

19   undermine Plaintiffs' discrimination claim. The Syrian extension recognizes the ongoing armed
     conflict, but no other decision could conceivably have been reached. Moreover, the DHS Secretary

20   did not redesignate Syria to include individuals who arrived in the United States after 2016, and
     instead (for the first time in any Syria notice) "identif[ied] incremental improvements in stability."

21   *Extension of the Designation of Syria for Temporary Protected Status*, 83 Fed. Reg. 9,329, 9,331
     (Mar. 5, 2018). Similarly, conditions in South Sudan warranted extension even under the stingiest

22   conceivable interpretation of TPS requirements. That Defendants extended TPS for the 70 South
     Sudanese nationals who have it does not disprove that Defendants acted out of racial animus in

23   denying status to several hundred thousand others. *Extension of South Sudan for Temporary
     Protected* Status, 82 Fed. Reg. 44,205 (Sept. 21, 2017) ("Approximately 70 South Sudan TPS

24   beneficiaries are expected to file for re-registration under the extension."). Plaintiffs need not
     demonstrate animus towards *every* group of similarly-situated people for this Court to find

25   Defendants acted out of racial animus. *Arlington Heights*, 429 U.S. at 266 n.14 ("a consistent pattern
     of official racial discrimination is [not] a necessary predicate to a violation of the Equal Protection

26   Clause. A single invidiously discriminatory governmental act . . . would not necessarily be
     immunized by the absence of such discrimination in the making of other comparable decisions."); *cf.*

27   *Batson v. Kentucky*, 476 U.S. 79, 95-96 (1986) ("For evidentiary requirements to dictate that several
     must suffer discrimination before one could object, would be inconsistent with the promise of equal

28   protection to all.") (citation and internal quotations omitted). Were the Court inclined to consider
     these counter-examples dispositive, Plaintiffs would be entitled to discovery concerning the
     circumstances that led to the Syrian and South Sudan decisions prior to the Court crediting them.

at 505 ("the use of 'code words' may demonstrate discriminatory intent"); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563, 571 (E.D. La. 2009) (finding that "references to 'ghetto,' 'crime,' 'blight,' and 'shared values'" are "nothing more than 'camouflaged racial expressions.'"); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 549 (S.D.N.Y. 2006) (concluding that "the claims and comments made by public officials in Mamaroneck about the day laborers who plied the streets of Mamaroneck looking for work were negative and stigmatizing" and "[t]hat is some evidence of racism"); *see also Arce*, 793 F.3d at 979 (considering campaign statements). The President's statements easily provide sufficient support for Plaintiffs' claim of race discrimination at the motion to dismiss stage.

*Third*, Plaintiffs have pled that the historical background of the TPS terminations illustrates the Trump Administration's larger anti-immigrant agenda. *See Arlington Heights*, 429 U.S. at 260 (considering the historical background of decision in evaluating a discriminatory purpose). White House Chief of Staff John Kelly and White House Homeland Security Adviser Tom Bossert repeatedly called Acting Secretary Duke and pressured her to terminate the TPS designation for Honduras. Compl. ¶ 73. Chief of Staff Kelly also warned Acting Secretary Duke that the TPS program "prevents [the Trump Administration's] wider strategic goal" on immigration. *Id.*[18]

*Fourth*, Plaintiffs have pled that the Administration's recent TPS actions constitute a clear departure from the normal procedure for renewing, extending, and terminating TPS protections. *See Arlington Heights*, 429 U.S. at 267. Plaintiffs have plausibly alleged that DHS adopted a new rule for TPS determinations that failed to consider intervening country considerations, and that this was a radical departure from prior TPS policy and practice. Compl. ¶¶ 1-4.[19]

---

[18] *See also supra*, note 4 (describing recommendation of anti-immigrant hate group Center for Immigration Studies as to TPS).

[19] While the Complaint's allegations suffice to state a claim, there is other publicly-available evidence of racial and national-origin animus infecting Defendants' TPS policy. For example, it has recently come to light that—in an apparent departure from normal procedure—the Department of Homeland Security disregarded the recommendations of U.S. diplomats overseas against TPS terminations for the countries at issue. Nick Miroff *et al.*, *U.S. Embassy Cables Warned Against Expelling 300,000 Immigrants. Trump Officials Did It Anyway.*, Wash. Post (May 8, 2018), https://wapo.st/2Hij8CS ("Tillerson and other Trump officials undermined the State Department's regional experts to advance the White House's immigration objectives"). According to news reports, "embassy cables were received . . . but generated no reply," and were followed by "phone calls" from "Trump senior advisor and immigration hard-liner Stephen Miller . . . telling [DHS] to end TPS

24

1    Defendants argue that the Federal Register notices—and not government discrimination on

2    the basis of race—provide all the reasons for the TPS terminations. MTD at 34-35. But this is a

3    factual assertion that Plaintiffs contest. The Court need not find Defendants explicitly announced

4    their racist intent to deny this motion. Government "officials . . . seldom, if ever, announce . . . that

5    they are pursuing a particular course of action because of their desire to discriminate against a racial

6    minority." *Arce*, 793 F.3d at 978. Facially neutral policies may violate the Equal Protection Clause.

7    *See, e.g.*, *Arlington Heights*, 429 U.S. at 266 (looking to extraneous evidence because "[s]ometimes

8    a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action

9    even when the governing legislation appears neutral on its face."). The equal protection inquiry does

10   not end simply because the reasons stated in the Federal Register appear facially neutral. *See, e.g.,*

11   *Hunger v. Underwood*, 471 U.S. 222, 230-32 (1985) (facially neutral voting prohibition found

12   unconstitutional based on legislative history). Race-neutral justifications may be pretextual cover for

13   racial animus. *Arce*, 793 F.3d at 978 (noting that it is appropriate to examine "whether [officials]

14   have 'camouflaged' their intent" given the unlikelihood of acknowledging discriminatory intent); *see*

15   *also Ali v. Hickman*, 584 F.3d 1174, 1196 (9th Cir. 2009) (a prosecutor's non-race based reasons for

16   peremptorily striking a juror were pretextual).

17       Defendants never even cite *Arlington Heights*. Instead, they contend that only rational basis

18   review applies to Defendants' TPS termination decisions because this case concerns classifications

19   "in the immigration context." MTD at 3, 33-36. Defendants are wrong, but the Court need not

20   resolve the issue. Courts have concluded that government action was irrational for equal protection

21   purposes because it was motivated by animus toward a politically unpopular group. *U.S. Dep't of*

22   *Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("[A] bare congressional desire to harm

23   a politically unpopular group cannot constitute a legitimate governmental interest."); *see Cleburne*,

24   473 U.S.at 448-49 ("[M]ere negative attitudes, or fear . . . are not permissible bases for [a statutory

25   classification]"). Indeed, the facts pled here would state a claim even under the deferential standard

26   for selective enforcement claims from *Reno v. American-Arab Anti-Discrimination Committee*

27

28   anyway." *Id.* Plaintiffs intend to amend their complaint to include these and other facts. They will
     seek discovery regarding the historical background of the Administration's actions.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 3:18-cv-1554-EMC

1  (*"AADC"*), 525 U.S. 471, 488-91 (1999). The President's racist statements directed at TPS holders

2  constitute "clear evidence" of "outrageous" discrimination. *AADC*, 525 U.S. at 488-91.

3        Should the Court choose nonetheless to resolve the standard of review issue, it should reject

4  Defendants' position. None of the binding cases Defendants cite concern intentional race or national

5  origin discrimination. Rather, they concern either challenges to Congressional line-drawing in its

6  classifications among immigrants—*see, e.g.*, *Tista v. Holder*, 722 F.3d 1122, 1126–27 (9th Cir.

7  2013), *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc)—or challenges to

8  denials of admission for individuals abroad, where the Government's plenary power over

9  immigration is at its height. *See, e.g.*, *Cardenas*, 826 F.3d 1164.[20]

10

11  [20] *Ledezma-Cosino v. Sessions* concerned whether Congress could target "habitual drunkards" for exclusion when it did not target other equally undesirable immigrants. The court imposed rational basis review because the classification "neither invaded a substantive constitutional right or freedom" nor identified a government action which "purposefully operates to the detriment of a suspect class." *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1048 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 643, 199 L. Ed. 2d 528 (2018) (citing *Harris v. McRae*, 448 U.S. 297, 326 (1980)). The class at issue in *Hernandez-Mancilla v. Holder* was noncitizens in the United States for less than ten years—as compared to those present for longer time periods. 633 F.3d 1182, 1186 (9th Cir. 2011); *see also Alvarez v. Dist. Dir. of U. S. Immigration & Naturalization Serv.*, 539 F.2d 1220, 1224 (9th Cir. 1976) (finding no equal protection violation for differential treatment of noncitizens from countries not contiguous to the United States, where no race-based discriminatory animus alleged). Defendants cite *Cardenas v. United States* for the proposition that Congress has the power to expel and exclude noncitizens. *See* MTD at 32. However, *Cardenas* did not involve an equal protection challenge at all but rather a challenge to an inadmissibility determination. 826 F.3d 1164, 1167-68 (9th Cir. 2016). *See supra*, Part II.B (discussing *Cardenas*). Defendants rely on *Fiallo v. Bell* for a similar proposition. MTD at 33. However, *Fiallo* involved an equal protection challenge in the context of Congress's power to set a uniform rule for naturalization that discriminated based on gender. It did not involve a claim of race or national origin discrimination. *Fiallo v. Bell*, 430 U.S. 787, 791 (1977). It also has likely been undermined by *Sessions v. Morales Santana*, 137 S. Ct. 1678 (2017) (holding that similar gender-based distinction violated equal protection component of Fifth Amendment). *See* Peter J. Spiro, *Explaining the End of Plenary Power*, 16 Geo. Immigr. L.J. 339, 342-43 & n.13 (2002) ("That *Nguyen* involved the denial of citizenship, rather than the denial or revocation of an immigration benefit, would seem irrelevant for purposes of the plenary power discussion"). *Andrade-Garcia v. Lynch* involved no equal protection challenge, but rather an immigration judge's determination relating to a Convention Against Torture claim. 820 F.3d 1076, 1077, 1083 (9th Cir. 2016) *superseded by* 828 F.3d 829 (9th Cir. 2016. *Dunn v. INS* involved a longstanding Congressionally-drawn classification between the Eastern and Western Hemispheres, not a claim of race discrimination. 499 F.2d 856, 856-57 (9th Cir. 1974). The only case arguably about a national origin classification Defendants cite (outside the selective enforcement context) is *Narenji v. Civiletti*, in which the D.C. Circuit evaluated registration requirements placed on Iranian students after the hostage crisis. 617 F.2d 745, 746-47 (1979). The Government justified such registration as essential to resolve the crisis; *Narenji* construed the classification at issue as "in the field of our country's foreign affairs." *Id.* at 747-48. *Narenji* is best read to apply rational basis in a national emergency implicating foreign policy considerations. Defendants have alleged no such emergency here. To the extent *Narenji* can be construed to require rational basis review for all national origin classifications regarding immigrants, it is wrongly decided for all the reasons stated above.

1    Defendants are also wrong to assert that *AADC*'s heightened standard for "selective

2    enforcement" claims should govern here. *AADC*, 525 U.S. at 488-91. Plaintiffs do not challenge a

3    prosecutorial charging decision where pleading standards are understandably higher. And *AADC*

4    said nothing about discrimination on the basis of race, whether in the context of selective

5    enforcement or more generally. *See Kwai Fun Wong v. I.N.S.*, 373 F.3d 952, 964, 970 (9th Cir.

6    2004) (allowing a challenge to federal immigration decisions allegedly "infected by various kinds of

7    discriminatory animus in violation of the Constitution's guarantees against such bias," and

8    distinguishing *AADC*); *Batalla Vidal*, 291 F. Supp. 3d at 275 (finding *AADC* distinguishable from a

9    case challenging the termination of DACA because "Plaintiffs allege that the categorical decision to

10   end the DACA program . . . was motivated by unlawful animus" whereas *AADC* was a selective

11   prosecution case). The cases Defendants cite that applied *AADC* were also selective enforcement

12   challenges. MTD 35 at n.12 (citing cases involving challenges to removal orders based on violations

13   of national security registration system).

14   To be clear, no Supreme Court or Ninth Circuit case holds that rational basis review is the

15   appropriate standard for intentional race discrimination claims in *any* context, including immigration

16   law. In fact, both the Supreme Court and the Ninth Circuit have made clear that claims of intentional

17   discrimination by the government on the basis of race—such as Plaintiffs allege here—are always

18   subject to strict scrutiny. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291 (1978) ("Racial

19   and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial

20   examination."); *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701,

21   743 (2007) (even discrimination on the basis of race that "may seek a worthy goal" is subject to

22   strict scrutiny); *W. States Paving Co., Inc. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 990 (9th

23   Cir. 2005) (all actions by federal, state, or local government that classify on the basis of race

24   analyzed under strict scrutiny).

25   For all these reasons, the Complaint states an equal protection claim.

26

27

28

1

2

### C.   Plaintiffs Have Stated a Fifth Amendment Claim for Arbitrary Deprivation of TPS-Holders' Liberty and Property Interests.

3

4

Plaintiffs have adequately alleged that the Government's TPS termination decisions implicate

significant liberty and property interests. *Nozzi v. Hous. Auth.*, 806 F.3d 1178, 1190–91 (9th Cir.

5

2015) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972) ("[A] person receiving

6

. . . benefits under statutory and administrative standards defining eligibility for them has an interest

7

in continued receipt of those benefits that is safeguarded by procedural due process.")).

8

Plaintiffs are entitled to non-arbitrary decisionmaking with respect to TPS terminations

9

because the statutory framework *requires* the Government to extend TPS if the statutory criteria are

10

met; it has *no discretion* to terminate TPS where conditions warrant maintaining it. Therefore, the

11

statute gives Plaintiff TPS holders a legitimate claim of entitlement to, and expectation that, once a

12

country is designated for TPS, it will retain such designation where conditions so warrant.

13

In setting forth the requirements for "periodic review" of TPS designations, Congress

14

imposed an automatic, mandatory extension of TPS absent a determination that the foreign state "no

15

longer continues to meet the conditions for designation under paragraph (1)." 8 U.S.C.

16

1254a(b)(3)(C). "If the Attorney General *does not* determine . . . that a foreign state . . . no longer

17

meets the conditions for designation under paragraph (1), the period of designation of the foreign

18

state *is extended for an additional period of 6 months* (or, in the discretion of the Attorney General, a

19

period of 12 or 18 months)." *Id*. (emphasis added). Thus, while the Government has initial discretion

20

whether to *designate* a foreign state for TPS, *see* 8 U.S.C. 1254a(b)(1) (providing that "[t]he

21

Attorney General, after consultation with appropriate agencies of the Government, *may* designate

22

any foreign state . . . .") (emphasis added), the statute provides no such discretion when deciding

23

whether to terminate a designation already made. Indeed, the word "discretion" only appears in

24

subsection 1254a(b)(3)(C), which permits the Government to *lengthen* the automatically imposed 6-

25

month extension to a period of 12 or 18 months. 8 U.S.C. 1254a(b)(3)(C).[21]

26

---

[21] Plaintiff TPS holders' property interest in extension of TPS where the conditions for designation
continue to be met also arises from statutory and regulatory standards defining individual eligibility

27

for an individual's TPS beneficiary status. 8 C.F.R. 244.2, 244.3, 244.4, 244.10(b) (setting forth
eligibility requirements); 8 U.S.C. 1254a(a)(1) (TPS benefits conferred include nondiscretionary

28

removal and work authorization documents).

28

1      Plaintiffs' liberty interest in rational TPS-related decisionmaking also arises from the right to

2   live and work in this country that TPS provides. The Constitution protects individuals from

3   deprivation of these protected interests without due process. *Bridges v. Wixon*, 326 U.S. 135, 155

4   (1945) (deportation "visits a great hardship on the individual and deprives him of the *right to stay*

5   *and live* in this land of freedom" (emphasis added)); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th

6   Cir. 2013) ("The right to live with and not be separated from one's immediate family is a right that

7   ranks high among the interests of the individual and that cannot be taken away without procedural

8   due process.") (quoting *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982)); *Smith v. City of Fontana*,

9   818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*,

10  199 F.3d 1037 (9th Cir. 1999) (liberty interest in right to familial association and companionship as

11  well-established); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) ("We

12  have frequently recognized the severity of depriving a person of the means of livelihood.").

13      Defendants seek dismissal because "TPS is, by conscious design, a program to provide

14  *temporary* protected status." MTD at 38 (emphasis in original). But once the Government confers a

15  benefit that implicates protected interests, it may not terminate that benefit in an arbitrary manner.

16  *Nozzi*, 806 F.3d at 1190-91; *see also Roth*, 408 U.S. at 576; *Bell v. Burson*, 402 U.S. 535, 539

17  (1971). Thus, Plaintiffs' claim does not seek to "convert[] a temporary humanitarian program into a

18  permanent right to remain every time a TPS designation [i]s made," MTD at 38, but instead to

19  require the Government to carry out the statute's periodic review process in a non-arbitrary manner

20  that comports with applicable statutory, regulatory, and constitutional requirements.

21      Defendants plainly failed to meet the minimal due process constraints that require rational

22  decisionmaking, at least for purposes of this motion. The complaint alleges that, over the past 20

23  years the Government made numerous TPS extension determinations that reflected a practice of

24  considering conditions beyond those that justified the country's initial TPS designation. This

25  practice created reasonable expectations among Plaintiff TPS holders that, so long as the conditions

26  for designation continued to be met (and they individually satisfied the requirements for eligibility

27  and re-registration), the Government would extend the TPS designation, along with their individual

28

1   benefits, and they would not be compelled to quit their jobs, sell their homes and businesses, remove

2   their children from school, and leave this country.

3          As alleged in the Complaint, the Trump Administration suddenly adopted a materially

4   different approach to the TPS periodic review process, in violation of Plaintiffs' reasonable settled

5   expectations. *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("Elementary

6   considerations of fairness dictate that individuals should have an opportunity to know what the law

7   is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."). It

8   also alleges that the Trump Administration acted out of racism against non-white, non-European

9   immigrants, a motivation that would also render its behavior arbitrary. These plausible allegations

10  state a claim for a violation of the Fifth Amendment's prohibition on arbitrary decisionmaking.

11  **III.    PLAINTIFFS HAVE STATED DUE PROCESS CLAIMS FOR THE U.S. CITIZEN
            CHILD PLAINTIFFS**

12

13         Defendants err in arguing that prior cases extinguish the important constitutional rights that

14  the U.S. citizen child Plaintiffs assert here. Contrary to Defendants' claim, no court has considered

15  such a claim before. Under principles drawn from analogous contexts, the Government must show a

16  significant interest where it seeks to force tens of thousands of school-aged U.S. citizen children to

17  choose between the exercise of two precious constitutional rights.

18         Defendants claim that these rights are not protected here because courts have rejected claims

19  brought by other children where the Government articulated different interests in deporting their

20  parents. But Defendants identify no interest applicable to *these* parents, all of whom have *lawfully*

21  *resided* here for decades *without significant criminal history*, and none of whom have done anything,

22  let alone a criminal act, to prompt the Government's policy change. Nor do prior cases focus on the

23  particular interests asserted by the child Plaintiffs, who seek to avoid being forced to go to countries

24  *recently labeled unsafe* by keeping their parents here *temporarily*, just until they reach adulthood.

25  Defendants must identify an interest in forcing the children to choose *now*, rather than waiting until

26  they become adults before imposing that heavy burden. They have not done so.

27         Defendants contend that the Government's immigration power renders all such claims

28  meritless—as though these Plaintiffs, unlike all other U.S. children, are somehow less entitled to live

1   here, or are less in need of their parents, simply because their parents are not citizens. But the cases

2   on which Defendants rely are distinguishable for several reasons. MTD at 28 (citing, *inter alia*,

3   *Gebhardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018); *Morales-Izquierdo v. Dep't of Homeland Sec.*,

4   600 F.3d 1076 (9th Cir. 2010)).

5        Defendants' broad reading of the cases they cite cannot be correct, at least in this Circuit,

6   because the Ninth Circuit has recognized that a citizen has a cognizable liberty interest in marriage

7   with a non-citizen, giving rise to due process rights in the adjudication of the spouse's visa

8   application. *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (holding that citizen's

9   "protected liberty interest in her marriage . . . gives rise to a right to constitutionally adequate

10  procedures in the adjudication of her husband's visa application."); *Cardenas v. U.S.*, 826 F.3d 1164,

11  1170-72 (9th Cir. 2016) (narrowing application of *Bustamante*'s test in light of *Kerry v. Din*, 135 S.

12  Ct. 2128 (2015)). These cases foreclose the contention that the Government's plenary power over

13  immigration categorically extinguishes all rights to family integrity. And, as explained below, the

14  child Plaintiffs here have materially stronger claims than did the married individuals in *Bustamante*

15  and *Cardenas*.

16       Moreover, none of Defendants' cases focused on Plaintiffs' forced choice claim – that

17  Plaintiffs have a separate liberty interest in not being *forced to choose* between two fundamental

18  rights absent an important governmental interest, which is absent here. Courts have often applied the

19  forced choice framework in immigration and family law contexts. It applies here, and makes clear

20  that Plaintiffs have stated a claim.

21      **A.    Defendants' Actions Substantially Burden Two Constitutional Rights**

22       For nearly one hundred years it has been indisputable that children born here have "the

23  absolute right" to reside in this country. *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001). *See also United*

24  *States v. Wong Kim Ark*, 169 U.S. 649, 705 (1898) (children born in the U.S. are U.S. citizens, even

25  if their parents are not, and cannot be excluded or denied right of entry). Any action that compels a

26  citizen to live abroad for years unquestionably burdens that right. *Lee Sing Far v. United States*, 94

27  F. 834, 836 (9th Cir. 1899) (children born in the U.S. are citizens "entitled to all the rights,

28  privileges, and immunities, as such, including [the] right to land and remain in the United States").

1   Defendants cite out-of-circuit authority stating that "the children could be relocated during their

2   minority," MTD at 29 (citing *Payne-Barahona v. Gonzales*, 474 F.3d 1, 2-3 (1st Cir. 2007)), but the

3   Government has no power to force the "relocat[ion]" abroad of citizens at any age. To the contrary,

4   the U.S. citizen children have a constitutional right to live here, in their native country.

5       At the same time, these children also have a constitutional right to live with their parents, free

6   from unwarranted governmental intrusion. It is well-established that the government may not

7   "intrud[e] on choices concerning family living arrangements" without significant scrutiny. *Moore v.*

8   *City of E. Cleveland*, 431 U.S. 494, 499 (1977). A child's "interest in her relationship with a parent

9   is sufficiently weighty by itself to constitute a cognizable liberty interest." *Smith v. City of Fontana*,

10  818 F.2d 1411, 1419 (9th Cir. 1987). "[T]he right of family members to live together, is part of the

11  fundamental right of privacy." *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982).

12      The Due Process Clause protects this right from far less severe intrusions than the state-

13  mandated separation of parent and child. For example, *Moore* itself involved a restriction on family

14  living arrangements imposed only by East Cleveland, but no one argued that the family should just

15  move to another city. 431 U.S. at 505-06; *see also Loving v. Virginia*, 388 U.S. 1, 3-6 & n.5, 12

16  (1967) (implying due process violation not cured by option of moving to adjacent state). Similarly,

17  Amish parents could not be compelled to send their children to public high school, even though

18  doing so did not terminate the parent-child relationship. *Wisconsin v. Yoder*, 406 U.S. 205, 232-33

19  (1972). *See also Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) (ban on foreign language instruction

20  impermissibly interfered with "power of parents to control the education of their own"); *Pierce*

21  *v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35 (1925) (compulsory

22  public school "unreasonably interferes with the liberty of parents and guardians to direct the

23  upbringing and education of children under their control"). Similarly, the U.S. citizen children have

24  an exceptionally strong interest, protected by the Due Process Clause, in residing with their parents

25  while they remain minors.

26

27

28

**B.      Forcing the Child Plaintiffs to Choose Between These Constitutional Rights Violates Due Process**

Defendants' actions are unconstitutional because they necessarily force each child Plaintiff to sacrifice one of these two core constitutional rights in order to keep the other, and do so without any rationale even remotely strong enough to justify the inherent cruelty of this forced choice. Just as the Government cannot directly infringe upon the citizen children's rights absent a justified interest in doing so that withstands scrutiny, it cannot do so indirectly by forcing individuals to select *which* right they must give up.

It is often "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968). Courts frequently find such a "choice" between two outcomes – neither of which the Government could accomplish on its own - "is no choice at all." *New York v. United States*, 505 U.S. 144, 176 (1992) (explaining that Congress could not force states to choose which of two actions to undertake, where it could not directly require states to undertake either one). Accordingly, the Due Process Clause bars the Government from compelling citizen children to choose between two constitutionally protected due process liberty interests, absent a showing of an important government interest.

The forced choice doctrine is well-established in various contexts. The Supreme Court has long applied it in criminal law, holding in 1886 that the Government could not force a choice between certain Fourth and Fifth Amendment rights. *Boyd v. United States*, 116 U.S. 616, 621-22(1886), *overruled on other grounds*, *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967); *see also Garrity v. N.J.*, 385 U.S. 493 (1967) ("adher[ing] to" *Boyd*). It reaffirmed that principle in *Simmons*, 390 U.S. at 394; *see also United States v. Jackson*, 390 U.S. 570 (1968) (same, for right to jury trial and right to life); *Lefkowitz v. Cunningham*, 431 U.S. 801, 807-08 (1977) (same, for right against self-incrimination and freedom of association); *Bittaker v. Woodford*, 331 F.3d 715, 724 n.7 (9th Cir. 2003) (forced choice between two fair trial rights impermissible absent compelling interest).

The constitutional prohibition against forcing citizens to choose among their constitutional rights absent important governmental interests also applies in civil contexts. For example, *Aptheker*

*v. Sec'y of State* invalidated a statute barring Communist party members from obtaining passports because individuals could not be compelled under those circumstances to give up freedom of association to travel internationally. 378 U.S. 500, 507 (1964) ("restrictions imposed upon the right to travel cannot be dismissed by asserting that [it] could be fully exercised if" a person were to forgo associational membership). *See also Bourgeois v. Peters*, 387 F.3d 1303, 1324-25 (11th Cir. 2004) (government may not set up checkpoints requiring protesters to choose between exercising First Amendment rights and preserving Fourth Amendment freedom from unreasonable searches).[22]

Courts regularly apply forced choice doctrine in various other civil contexts, including immigration and family law. The Government cannot require an individual in removal proceedings to make "the Hobson's choice" between "the rights conditioned upon his or her [voluntary] departure" and the right to judicial review of a removal order. *Elian v. Ashcroft*, 370 F.3d 897, 900 (9th Cir. 2004); *see also Contreras-Aragon v. I.N.S.*, 852 F.2d 1088, 1094-95 (9th Cir. 1988) (explaining that "the INS may not condition voluntary departure on the relinquishment of a protected right"). And state courts have repeatedly held parents cannot be forced to choose between their fundamental right to custody of their children and free exercise of religion, absent a showing that such religious exercise harms the child. *E.g.*, *Johnson v. Johnson*, 564 P.2d 71, 76 (Alaska 1977) (terminating a parent's rights due to religious affiliation would violate free exercise); *Rogers v. Rogers*, 490 So. 2d 1017, 1019 (Fla App. 1986) (court cannot "*condition* the award of custody upon the parent's curtailment of his or her religious activities or beliefs") (emphasis in original); *State v. Brown*, 182 P.3d 1205, 1212 (Kan. 2008) (similar, for self-incrimination and parental rights); *In re J.A.*, 699 A.2d 30, 31 (Vt. 1997) (same).

In all these contexts, the Government is generally barred from forcing individuals to make such choices absent a sufficiently weighty interest. *See, e.g.*, *Bittaker*, 331 F.3d at 724 at n.7 (requiring compelling interest). *McGautha v. California*, 402 U.S. 183, 213 (1971) ("[t]he threshold

---

[22] The Eleventh Circuit analogized to the closely related unconstitutional conditions doctrine that bars the government from forcing individuals to choose between the exercise of a constitutional right and obtaining a government benefit. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (explaining that government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests," because to do so would permit "a result which [the government] could not command directly").

question is whether compelling the election impairs to an appreciable extent any of the policies

behind the rights involved.").

Thus, due process law from various contexts supports the citizen children's claim that the

Government must demonstrate an important interest to compel them to choose between their country

and their parents. The children allege the Government has not proffered any interest, much less an

important one, that could justify requiring them to forgo one of these two fundamental rights. No

court has rejected such a claim, and it plainly describes an injury this Court may remedy.

**C.      The Rights Described Above Apply in the Immigration Context**

The Government argues the rights described above evaporate in the immigration context, but

they do not. The Ninth Circuit already recognizes that a citizen's liberty interest in marriage with a

non-citizen gives rise to due process rights in the adjudication of the spouse's visa application.

*Cardenas v. United States*, 826 F.3d 1164, 1171-72 (9th Cir. 2016); *Bustamante v. Mukasey*, 531

F.3d 1059, 1062 (9th Cir. 2008).[23] It recognized those rights even in the face of the Government's

"plenary power" to determine who may enter the United States. The Ninth Circuit's recognition of

the right in *Cardenas* and *Bustamante* distinguishes the law governing this circuit from that in, *e.g.*,

the First. *Compare* MTD at 28-29 (citing *Payne-Barahona v. Gonzales*, 474 F.3d 1 (1st Cir. 2007)).

Thus, out-of-circuit authority suggesting that forcing U.S. citizen children to make this horrific

choice implicates no liberty interest whatsoever, MTD at 29 n.10, is contrary to Ninth Circuit law.

Moreover, the Government's interest is weaker here than in those cases, as this case does not

implicate its plenary power to *admit* non-citizens living abroad (as did *Cardenas* and *Bustamante*),

but only its more limited power to *deport* those who have been lawfully present. *Cf. Zadvydas*

*v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into

the United States and one who has never entered runs throughout immigration law."). And Plaintiffs'

interest may well be stronger still, because while the burden on marriage caused by geographic

dislocation is undoubtedly profound, in at least some cases deportation causes the permanent

---

[23] The Ninth Circuit's reasoning drew substantial support in *Kerry v. Din*, 135 S. Ct. 2128 (2015). *See Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring, joined by Justice Alito) (assuming without deciding that visa denial burdened marriage), 2141 (Breyer, J., dissenting, joined by Justices Ginsburg, Sotomayor, and Kagan) (adopting Ninth Circuit view that denial of spousal visa to enter the United States burdened U.S. citizen's rights).

1  termination of parental rights *by operation of law*. *See* David B. Thronson, *Choiceless Choices:*

2  *Deportation and the Parent-Child Relationship*, 6 Nev. L.J. 1165, 1195-97, 1205-07, 1210-14

3  (2006) (explaining that "the alternative to parental care may be institutional care of some form" and

4  a "perhaps permanent" end to the constitutionally protected parent-child relationship).

5       The Government argues that "the Ninth Circuit rejected this argument," MTD at 28, in

6  *Gebhardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018), but *Gebhardt* said nothing whatsoever about

7  forced choice doctrine. Nor does it hold that due process protections evaporate in the immigration

8  context. Instead, *Gebhardt* rejected as insubstantial a challenge to a federal statute barring sex

9  offenders from petitioning for their non-citizen relatives to be admitted as permanent residents,

10  unless the sex offender poses "no risk" to those relatives. *Gebhardt*, 879 F.3d at 988. The

11  Government rejected the petition on the ground that Mr. Gebhardt had not shown he presented "no

12  risk," despite having an individualized opportunity to do so. *Id*. The Court rejected the plaintiff's

13  challenge because the Government's immigration interest outweighed his right to reside with non-

14  citizen family members.[24] *Id*.

15       But the Government has articulated no comparable interest here. TPS-holding parents, by

16  definition, have not committed crimes remotely comparable to the sex offense at issue in

17  *Gebhardt*—indeed, the Government has cited no record of any criminal activity by TPS parents to

18  support termination of TPS. *See* 8 U.S.C. 1254a(c)(2)(B)(i) (exempting from TPS those convicted of

19  a felony or two or more misdemeanors). Nor have they failed any risk assessment. In many cases the

20  Government has affirmatively certified "that permitting the aliens to remain temporarily in the

21  United States is [not] contrary to the national interest of the United States." 8 U.S.C. 1254a(b)(1)(C)

22  (certification requirement for subcategory of designations based on "extraordinary and temporary

23  conditions"). Nor did *Gebhardt* involve a government interest in protecting U.S. citizen children

24  from potential harm, which in this case is significant given that all the countries involved have only

25

26

27

28       [24] *Gebhardt* cited *Landon v. Plasencia*, 459 U.S. 21, 32 (1982), referencing a passage concerning the power over admission, not the power to deport those who have been lawfully present.

1    recently been terminated from TPS. El Salvador, for example, is by some measures the deadliest

2    place on Earth outside a war zone.[25]

3         Defendants also rely (as did *Gebhardt*) on *Morales-Izquierdo v. Department of Homeland*

4    *Security*, 600 F.3d 1076 (9th Cir. 2010)), but the Government's interests were materially stronger

5    there as well. Mr. Morales had twice entered the country unlawfully, and was unlawfully present at

6    the time he sought discretionary relief in the form of adjustment of status. 600 F.3d at 1079, 1091.

7    Moreover, although the court referenced Mr. Morales' family, it did not separately analyze the rights

8    of his spouse or minor children. In contrast, the Supreme Court and other Ninth Circuit cases,

9    including the one on which *Morales* relied for this very point, have distinguished between claims

10   brought by non-citizens and by their U.S. citizen relatives. *De Mercado v. Mukasey*, 566 F.3d 810,

11   816 n.5 (9th Cir. 2009) (distinguishing between petitioners' own constitutional rights and the rights

12   of "other members of their family," not before the court, who were citizens) (cited in *Morales*, 600

13   F.3d at 1091); *see also Cardenas*, 826 F.3d at 1169 (noting *Kleindienst v. Mandel*, 408 U.S. 753

14   (1972) had distinguished between the noncitizen abroad who "had no constitutional right of entry"

15   and citizen professors who had First Amendment rights in hearing him).[26]

16        Plaintiffs acknowledge that other cases have rejected claims involving the impact of

17   deportation on U.S. citizen children. *See, e.g.*, *Mamanee v. I.N.S.*, 566 F.2d 1103, 1106 (9th Cir.

18   1977); *Hernandez-Rivera v. I.N.S.*, 630 F.2d 1352, 1356 (9th Cir. 1980). But, like *Gebhardt* and

19   *Morales*, these cases did not involve the claims asserted here. In addition to the differences described

20   above, three others are significant.

21        *First*, none of the cases involve sending U.S. citizen children to countries that may be unsafe.

22   Here, the complaint alleges that the conditions in the receiving countries remain dangerous. *See*

23   Compl. ¶¶ 80-81 (El Salvador), ¶ 82 (Haiti), ¶ 85 (Nicaragua), ¶ 87-88 (Sudan).[27] Those facts both

---

24   [25] *See* Catesby Holmes, *Why Is El Salvador So Dangerous? 4 Essential Reads*, The Conversation
25   (Jan. 10, 2018), https://bit.ly/2LjVIzs

26   [26] Even if *Morales* could be read to have categorically eliminated the rights of citizen family
     members in the immigration context, that holding would conflict with *Bustamante*, and this Court
27   should follow the earlier decision. *Cf. Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001) (subsequent
     Ninth Circuit panel may not overrule a precedential prior panel decision).

28   [27] The termination notices for Sudan, and recent extension notices for El Salvador and Haiti, further
     suggest that TPS-holders from these countries—and by extension their family members—would be
     at risk if returned to their country of birth. *Termination of the Designation of Sudan for Temporary*

heighten Plaintiffs' interests beyond those described in other cases and create a governmental duty to protect these U.S. citizen children that Defendants, to date, have entirely ignored. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The State, of course, has a duty of the highest order to protect the interests of minor children"). The Third Circuit has suggested that the threat of danger to U.S. citizen children could support a due process claim in this context. In *Martinez de Mendoza v I.N.S.*, a non-citizen mother and her U.S. citizen daughter challenged the INS's refusal to grant a stay of the mother's deportation despite newly available evidence that she and her daughter would be in danger upon return to her country. *Martinez de Mendoza v. INS*, 567 F.2d 1222, 1225-26 & n.8 (3d Cir. 1977). The Court remanded for consideration of the new evidence, noting that "if the allegations that de facto deportation of [the citizen child] would expose her to physical danger are correct, they may well be sufficient to raise questions of the constitutionality of such deportation not answered by [prior precedent]." The Government has an obligation not to place even adult deportees in dangerous conditions where it has played a role in creating them. *Wang v. Reno*, 81 F.3d 808, 818 (9th Cir. 1996) (applying state-created danger doctrine to immigration context). The Government surely has comparable obligations here. These alone distinguish the cases Defendants cite and suffice to state a due process claim.

*Second*, the due process claim advanced here is limited only to those children who are *of school age*. That limitation is significant in two respects. Most obviously, the burden on the family is particularly severe when the Government forces parents to consider leaving minor children, because parents who separate from their children often lose custody. *See* Thronson, *Choiceless Choices*, *supra*. Conversely, Plaintiffs do *not* contest the Government's interest in terminating TPS for parents of children *under* five. For that reason, recognition of the right Plaintiffs assert would not allow every "illegal alien with United States citizen family members" to thereby avoid deportation, MTD at 29 (citing *Morales*), or otherwise "create a substantial loophole in the immigration laws." MTD at

---

*Protected Status*, 82 Fed. Reg. 47,228, 47,230 (Oct. 11, 2017) (suggesting that return to Sudan is only safe for some nationals and only to some parts of the country); *Extension of the Designation of El Salvador for Temporary Protected Status*, 81 Fed. Reg. 44,645, 44,647 (July 8, 2016) (identifying "[i]ncreasing violence and insecurity" and expressing "little confidence the security situation will improve in the short term"); *Extension of the Designation of Haiti for Temporary Protected Status*, 79 Fed. Reg. 11,808, 11,809 (Mar. 3, 2014) ("Haiti's population has faced increased risks to its security and fundamental human rights.").

1    29. Rather, it accommodates the Government's interest in maintaining the integrity of programs that

2    provide temporary status, while also recognizing the significant additional trauma faced by U.S.

3    citizen children who have attended school—sometimes for many years—in this country, and now

4    must either abandon their parents or move to countries entirely foreign to them.

5         *Third*, by asserting their rights only through age 18, the U.S. citizen children here do not seek

6    to protect their parents' right to continue residing here *unlawfully* on a *permanent basis*. *Compare*

7    MTD at 29. All of the parents here are, by definition, *lawful* residents. And the U.S. citizen children

8    assert a right to live with their parents only *until they reach adulthood*. In some cases that will only

9    be a few more years. The Government has never said why it needs these expulsions to occur *now*,

10   rather than allowing a temporary reprieve so that the U.S. citizen children can reach adulthood in

11   their native country with their families intact. This modest request stands in sharp contrast to all

12   prior cases that the Government cites and of which Plaintiffs are aware, which involve requests by

13   non-citizen parents to avoid deportation entirely and live here on a permanent basis.

14        For these reasons, and because none of the cases previously cited addressed the constitutional

15   problem here as one of forced choice between two burdened constitutional rights, the U.S. citizen

16   children have stated a claim under the Due Process Clause.

17                                          **<u>CONCLUSION</u>**

18        For these reasons, the Court should deny Defendants' motion to dismiss.

19

20    Date:  June 4, 2018                          Respectfully submitted,
                                                   SIDLEY AUSTIN LLP
21
                                                   By:  <u>s/ *Alycia A. Degen*</u>
22                                                     Alycia A. Degen
                                                       Sean A. Commons
23                                                     Nicole M. Ryan
                                                       Ryan M. Sandrock
24                                                     Amanda Farfel
                                                       Andrew B. Talai
25                                                     Marisol Ramirez

26

27

28

ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

    Ahilan T. Arulanantham

ACLU FOUNDATION OF NORTHERN
CALIFORNIA

    William S. Freeman

NATIONAL DAY LABORER ORGANIZING
NETWORK

    Emilou MacLean
    Jessica Karp Bansal

    *Attorneys for Plaintiffs*