Pages 1 - 100

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

CRISTA RAMOS; et al.,          )
                               )
          Plaintiffs,          )
                               )
  VS.                          )    NO. C 18-01554 EMC
                               )
KIRSTJEN NIELSEN; et al.,      )
                               )
          Defendants.          )
_____)

San Francisco, California
Friday, June 22, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    ACLU OF SOUTHERN CALIFORNIA
                    1313 West Eight Street - Suite 200
                    Los Angeles, California  90017
               **BY:  AHILAN ARULANANTHAM, ATTORNEY AT LAW**

                    NATIONAL DAY LABORER ORGANIZING NETWORK
                    674 South La Fayette Park Place
                    Los Angeles, California  90057
               **BY:  JESSICA KARP BANSAL, ATTORNEY AT LAW**
                    **EMILOU MACLEAN, ATTORNEY AT LAW**

                    ACLU OF NORTHERN CALIFORNIA
                    39 Drumm Street
                    San Francisco, California  94111
               **BY:  WILLIAM S. FREEMAN, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

                        SIDLEY AUSTIN LLP
                        555 West Fifth Street - Suite 4000
                        Los Angeles, California 90013
                BY:   **ALYCIA A DEGEN, ATTORNEY AT LAW**
                      **AMANDA R. FARFEL, ATTORNEY AT LAW**
                      **ANDREW B. TALAI, ATTORNEY AT LAW**
                      **MARISOL RAMIREZ, ATTORNEY AT LAW**

                        SIDLEY AUSTIN LLP
                        555 California Street
                        San Francisco, California  94104
                BY:   **RYAN M. SANDROCK, ATTORNEY AT LAW**

For Defendants:

                        U.S. DEPARTMENT OF JUSTICE
                        Civil Div. - Federal Programs Branch
                        20 Massachusetts Avenue, N.W.
                        Washington, D.C.  20530
                BY:   **RHETT D. MARTIN, TRIAL ATTORNEY**

<u>**Friday - June 22, 2018**</u>                                        <u>**10:33 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

**THE CLERK:**  Calling case C 18-1554, Ramos versus Nielsen.

Counsel, please come to the podium and say your name for the record.

**MR. ARULANANTHAM:**  Good morning, Your Honor.  Ahilan Arulanantham for the plaintiffs.

**THE COURT:**  All right.  Good morning.

**MS. BANSAL:**  Good morning, Your Honor.  Jessica Karp Bansal for the plaintiffs.

**THE COURT:**  Thank you.

**MR. MARTIN:**  Good morning, Your Honor.  Rhett Martin for the defendants.

**THE COURT:**  All right.  Thank you, Mr. Martin.

Do y'all want to make an appearance?

**MS. DEGEN:**  Good morning, Your Honor.  Alycia Degen for plaintiffs.

**MS. MacLEAN:**  Good morning, Your Honor.  Emilou MacLean for the plaintiffs.

**THE COURT:**  All right.  Thank you.

We are on, first and foremost, this morning for hearing on defendants' motion to dismiss, and I think the first issue we have to address, of course, is the jurisdictional-stripping

1  provision in 2554a; but before we get into that, I just want to

2  make sure I understand exactly what the theory of the

3  plaintiffs are.

4       The plaintiffs are challenging not the designation or

5  undesignation of the four countries *per se* as designated

6  under -- for Temporary Protected Status but the change in the

7  rule or interpretation of that statute; is that right?

8            **MR. ARULANANTHAM:**  That's correct, Your Honor.  As to

9  the APA claim, that's correct, Your Honor.

10           **THE COURT:**  And is the change -- what is the scope of

11 the alleged change?  Is it not considering any current and

12 intervening circumstances or disasters or not considering those

13 which have some exacerbating or prolongation of the originating

14 condition?  And does that make any difference in this case?  I

15 don't know.

16           **MR. ARULANANTHAM:**  Well, I think if you look, for

17 example, at the Nicaragua designation, in 2012 they

18 specifically say the roads were -- you know, I may be mixing

19 them up.  Hold on one moment, Your Honor.

20           **THE COURT:**  Yeah.

21                      (Pause in proceedings.)

22           **MR. ARULANANTHAM:**  If you look at the El Salvador

23 designation, Your Honor, in 2012 when they're extending and

24 they say the roads from the earthquake damage have been

25 repaired but there's other problems with the roads.

1    If you look at Haiti, Haiti is designated because of an

2  earthquake in 2010; but then when it's extended, they look to

3  Hurricane Matthew.  Hurricane Matthew is not caused by the

4  earthquake in 2010.

5    So I think it's clear that there is no way to --

6    **THE COURT:**  And it was not extended because under the

7  rubric of Hurricane Matthew having exacerbated the conditions

8  of the earthquake?  In other words, it in and of itself was a

9  condition that was sufficient to extend TPS?

10    **MR. ARULANANTHAM:**  The exception that you're

11  describing could, I suppose, swallow the rule.  It's difficult

12  at this point to know whether -- you know, how now the

13  government is trying to draw the line to justify the change

14  that's happened; but if you look at the statements that were

15  made by the government officials, and they said, for example,

16  Secretary Kelly (reading):

17    "The program TPS is for a specific event.  In Haiti it

18    was the earthquake.  Haiti had horrible conditions before

19    the earthquake.  Those conditions aren't much better

20    after, but the earthquake was why TPS was granted.  That's

21    how I have to look at it."

22    Does that permit consideration of Hurricane Matthew

23  because it has an exacerbating effect on the earthquake?  I

24  don't know, but they didn't mention Hurricane Matthew when they

25  terminated TPS for Haiti and they had mentioned it previously.

1    So whether the government now wants to try and shoehorn

2    what is, we allege, a change by creating a new conceptual

3    framework and saying you can put, you know, the intervening

4    conditions that they used to consider into this box, I think

5    that's going to be a factual -- I mean, that is a factual

6    dispute then, and we're entitled to show that their *post hoc*

7    explanatory theory can't actually capture all of the actual

8    phenomena here.

9        And so what we're alleging is it used to focus -- permit

10   consideration of intervening conditions.  Now --

11       **THE COURT:**  Irrespective of whether it was

12   specifically tied to exacerbating original condition, some of

13   them were independent of the original condition?

14       **MR. ARULANANTHAM:**  Yes, Your Honor, that it used to

15   permit them regardless of whether or not they were actually

16   exacerbating, and that now the focus is on the originating

17   condition and you don't look at whether they're exacerbating.

18       But, again, as I said, if they want to try to shoehorn

19   everything into this, you know, new account of their changed

20   practice, that's a factual dispute and we're entitled to say

21   that, "Oh, Secretary Kelly didn't understand it that way when

22   he terminated Haiti or when he terminated TPS for El Salvador."

23       Does that answer your question, Your Honor?

24       **THE COURT:**  Yeah, it does.  We may get into some

25   factual questions if we get to, like, Darfur.  Sudan, for

1  instance, that probably has the most extensive analysis of

2  current conditions compared so some other ones.  If you look at

3  El Salvador in the 2016 extension, there are a number of things

4  that were referenced, such as water access, coffee rust

5  epidemic, various things that were cited and that were omitted

6  are not addressed in the 2018 termination.  I guess that's your

7  point.

8      So maybe there's a bit of a mixed record here.  Some

9  statements are a bit more robust than others, but I just want

10 to make sure I understand the theory of your case.

11     **MR. ARULANANTHAM:**  Yes, Your Honor.

12     And to be clear, is what we were saying in the brief we

13 just filed yesterday I guess it was -- it's been a long 24

14 hours -- if, in fact, we have not adequately pled even for

15 12(b)(6) purposes that there is an unexplained departure from

16 the prior practice, then we lose on 12(b)(6) for the APA claim,

17 but that has nothing to do with whether there's a subject

18 matter jurisdiction dispute, 12(b)(1) dispute, based on

19 1254a(b)(5), the jurisdiction-stripping provision.  Because for

20 purposes of that, you presume that there is an unexplained

21 departure or a new rule and ask:  Would the court have the

22 power to remedy that under the APA if, in fact, there is an

23 unexplained departure?

24     And so that whole debate about whether or not there's a

25 new rule, it has nothing to do with the subject matter

1  jurisdiction dispute.  It only has nothing to do with whether

2  or not we have stated a claim.  So we're entitled to

3  discovery -- if we have stated a claim, if we've gotten that

4  far, then we should get to find out what were the documents

5  that Secretary Kelly had in front of him when he made the

6  statement in his testimony.

7       Secretary Nielsen made an even clearer one.  She said

8  (reading):

9            "The law really restricts my ability to extend TPS.

10      The law says that if the effects of the originating

11      event" -- so that's a causation issue -- "do not continue

12      to exist, then the Secretary of Homeland Security must

13      terminate."

14      So what was she looking at when she said that?  Was she

15  looking at a memo that said, "Oh, well, if it's an exacerbating

16  condition, if the hurricane causes the earthquake recovery

17  effort to get worse, then you can look at it"; or was she

18  looking at a memo that said "Originating condition, intervening

19  condition"?  It's very black and white and we're entitled to

20  find out if there is such a memo; and if there is, obviously,

21  then that would suggest that --

22            **THE COURT:**  Well, to get there, you have to get past

23  the very first question.  That is, assuming, for instance, that

24  your assertions of a new policy or new interpretation are true,

25  and that may be disputed, but assuming that that's been alleged

1    and adequately alleged, does that escape the

2    jurisdictional-stripping provision?  That's what I want to

3    address now.  I think that's the most critical question.

4         And so --

5              **MR. ARULANANTHAM:**  I'm happy to start, but I think

6    it's their motion so they should probably begin.

7              **THE COURT:**  Well, it's your motion and I have a couple

8    questions for you, Counsel.

9              **MR. MARTIN:**  Good morning, Your Honor.

10             **THE COURT:**  Good morning.

11        It is fairly clear, is it not, that there is a presumption

12   of review, there's a strong presumption that actions of federal

13   agencies are reviewable but upon a showing of clear and

14   convincing evidence of a contrary legislative intent, that can

15   be overcome?

16        So you have that presumption, and then you have the

17   presumption about review -- judicial review where

18   constitutional claims have been asserted because that raises

19   separation-of-power questions if you were to find that there is

20   no jurisdiction.

21        So starting with that and then combining that with the

22   Supreme Court's decision in the *Catholic Social Services* case

23   and the *McNary* case, which seemed to construe the term

24   "determination" to mean determinations in a sort of

25   case-by-case basis.  If it's an individual, it's an individual

adjustment situation.  If it's a country-by-country under TPS,
you look at each determination, but not to general challenges
to sort of procedures or more systemic policies or changes,
which is what the plaintiffs are alleging here.

        **MR. MARTIN:**  Right.

        **THE COURT:**  So why would, in view of the presumption,
in view of the Supreme Court precedent, which have narrowly
construed the word "determination" to mean sort of individual
determinations and not systemic sort of issues, why would that
preclude judicial review here?

        **MR. MARTIN:**  Well, I think there are a couple of
reasons, Your Honor.  First, 1254a says "any determination" and
it would be impossible to separate out the ultimate decision to
terminate itself from the various balancing of the factors that
the Secretary of Homeland Security had to take into account,
that it sweeps in everything that plaintiffs are trying to
challenge here, whether the new rule or the ultimate
termination itself.

        And I think the distinction between the case here and
*McNary* and the *Catholic Services* can be seen in terms of the
relief.  You know, the relief that was awarded in *McNary* was
not an award of special agricultural worker status.  It was the
right to have a redo of an application for that sought status
in light of new procedures if they prevail upon their claim
that the procedures were in violation of due process.

1    Here plaintiffs are seeking a rescission of the

2    terminations themselves, and there's no way to reach that

3    without reviewing the determination.

4        **THE COURT:**  Well, but the ultimate -- if you're

5    looking at the ultimate relief, the rescission -- if what

6    they're seeking is a rescission of these determinations, that

7    would not preclude a redetermination further that's

8    procedurally correct, for instance.

9        **MR. MARTIN:**  If this were in the *McNary* sort of world,

10   that would be true, Your Honor; but our position is that we're

11   not because, first of all, the new rule doesn't exist, which

12   can be determined on the face of the Federal Register notices

13   alone; and, secondly, even if it did, what they're calling a

14   new rule is part and parcel of the determination itself.  There

15   is no way to segregate out the decision to terminate from --

16       **THE COURT:**  Well, wasn't that true in *Catholic Social*

17   *Services* and *McNary*?  I mean, they were challenging INS's

18   interpretation of certain criteria which determined whether

19   adjustment of status was available or not.  I mean, so it

20   informed the determination in the case and, in fact, they said

21   that ultimately in a deportation context, perhaps, you know,

22   these issues could be raised.

23       So it does -- it is tied up in both situations.  The

24   determination of the systemic problem has an impact on the

25   individual case.  I don't know how you can separate that in

1    either one of those.

2         MR. MARTIN:  Well, in *Catholic Services*, for instance,

3    it was a rule making.  You know, it was a formal rule that was

4    being challenged or regulation that was being challenged.  And

5    in *McNary* it was the formalized procedures about how you would

6    apply for this status.

7         There's nothing like that here.  What we're challenging

8    here is the Secretary's discretionary weighing of the statutory

9    factors that lies -- that has been entrusted to the Secretary

10   by Congress and lies uniquely within the executive's competency

11   over foreign policy.

12        There is no way to extrapolate from that a rule that says,

13   "You know, this particular factor must be weighed this much and

14   this factor must be weighed another," or how the Secretaries

15   come to that decision.  This is -- the determination

16   encompasses, as it says in the statute, any determination,

17   encompasses every aspect of the decision-making process.

18        And so for --

19        THE COURT:  So you would emphasize the word "any"?  Is

20   that why it's broader than just "determination"?  I'm not sure

21   what other word could be used when describing -- if you

22   intended to focus on the determination country by country, the

23   designation, I don't know what other word you would use besides

24   "any."

25        MR. MARTIN:  Well, that is emphasizing that it's

all-encompassing in terms of the factors that the Secretaries are considering, and it's also worth noting that the legislative history says none of the decisions with respect to TPS should be subject to judicial review.

THE COURT:  But it's not specific in terms of -- again, that sort of echoes the language of the statute.  I'm not sure it sheds much light on, for instance, challenges to constitutional or systemic-type issues.

MR. MARTIN:  Well, our position would be that "none" and "any" are both sort of unqualified terms that sweep within them every aspect of the decision-making process.

THE COURT:  What about the fact that in *McNary* the Supreme Court, as part of its analysis, talks about if judicial review were limited, that is a challenge that's of this nature here where there's a constitutional challenge or to the interpretation status challenge, were to be reviewed, it would be only in the context of, for instance, a deportation?

If we got to the removal proceeding, then there would be judicial review but that would be limited to the administrative record and subject to narrow abuse of discretion review, which the court said would not be consistent normally with a constitutional challenge, which then suggests that Congress did not intend to cabin everything with the jurisdictional-stripping statute and to allow room for a broader constitutional challenge.

1          **MR. MARTIN:**  Well, whether it's framed as an APA

2     challenge or a constitutional challenge, Your Honor, at the end

3     of the day, the challenge would require the judiciary to make

4     its own independent assessment of the factors and the

5     sufficiency of the explanation given of those factors in the

6     Federal Register notices, and it is that that the jurisdiction

7     prohibition addresses.

8          **THE COURT:**  Well, I'm not sure I understand that.  So

9     you're saying if there's a constitutional challenge, that would

10    be done within the framework of the APA; and, therefore, even

11    if that were allowed, you would still be limited to the record,

12    that the APA scope of review would be no broader than the scope

13    of review on a removal order?

14         **MR. MARTIN:**  Our position, yes, that the -- if we're

15    talking about the discovery issues for a moment, that the

16    review here must at least start with the administrative record.

17         **THE COURT:**  Of course, there are exceptions under the

18    APA -- I guess we'll talk about that later -- in terms of when

19    you can go beyond the record.

20         But, still, the court, notwithstanding all that, in the

21    *McNary* case, in addition to the fact that the term "a

22    determination" describes a single act rather than a group of

23    decisions or a practice or procedure employed in making

24    decisions, noted sort of the implications.  If you didn't allow

25    for judicial review of constitutional claims or an

1    interpretation claim that's systemic, the normal route of

2    judicial review would be so constricted in the context of an

3    adjustment of status or removal proceeding that that would be

4    inconsistent with the normal way you adjudicate constitutional

5    or broader claims, and that seems to apply here as well.

6          MR. MARTIN:  Well, the -- again, to -- not to be

7    repetitive, but the existence or not of this collateral

8    practice or policy can be determined on the face of the Federal

9    Register notices, and it is our position that the

10   determinations here are consistent and reflect and mirror

11   determinations and extensions and designations given for TPS by

12   every prior Administration, and that on that fact the new-rule

13   theory is a predicate for subject matter jurisdiction here, and

14   plaintiffs have not sufficiently shown that such a new rule or

15   practice exists.

16         THE COURT:  Well, all right.  That gets in part to the

17   merits questions, which we'll get to in a moment, but I'm

18   trying to get to the interpretation question and whether *McNary*

19   and *Catholic Social Services* is really controlling or

20   persuasive to the instant situation.

21         The court in *McNary* also notes that if Congress really

22   intended to limit review to bar broader statutory

23   constitutional challenges, they could have done so and give an

24   example of the kind of language that Congress could have used.

25   And, again, doesn't that argument apply here?

1          **MR. MARTIN:**  Well, Your Honor, there's -- different

2     Congresses have chosen different languages over time for

3     judicial jurisdiction-stripping provisions such as the one

4     here.  The language here is unqualified.  The legislative

5     history confirms that the language is unqualified.  And, again,

6     it's hard for us to see how what plaintiffs are calling the

7     policy or practice could be separated from each individual

8     determination.

9          **THE COURT:**  Well, the court gives an example.  It said

10    that the Congress could have used, as happens in the veterans

11    benefits context, barring review as to -- on all questions --

12    quote, "on all questions of law and fact" as opposed to

13    determination with respect to designation, termination,

14    extension of TPS status.

15         So, I mean, that's just one of several factors but, I

16    mean, it seems like that argument or that concern would apply

17    here as well.

18         **MR. MARTIN:**  Congress could have certainly chosen

19    different language, but the language again here is unqualified

20    and broad; and whether it's any question of law or fact or any

21    determination or I think the legislative history says, you

22    know, none of the decisions, those are all unqualified and I

23    think broader than the provisions in -- examples given in

24    *McNary*.

25         **THE COURT:**  All right.  Well, let me hear from the

1  other side on that point.

2      One, the breadth of the language, the fact that it would

3  seem to literally apply on its face, "any" -- it says "any

4  determination," and your theory would affect that

5  determination.  It may be the challenge is to an underlying

6  broader systemic issue but it does affect any determination.

7      And how do you respond to counsel's comment about the two

8  Supreme Court cases if you look at the relief sought, it is

9  different in kind than the relief sought here?

10     **MR. ARULANANTHAM:**  Yes, Your Honor.  So, first, with

11 respect to "any," the statute in *Demore v. Kim* said no court

12 may set aside any action or decision by the Attorney General,

13 that it wasn't good enough to preclude review of a challenge to

14 that legislation.

15     That happened to be on constitutional grounds, but I think

16 the rationale that the court used was to cite *Johnson v.*

17 *Robison* and *Webster v. Doe*.  If you look at the statute in

18 *Johnson v. Robison*, it said "the decisions of the administrator

19 on any question of law or fact under any law of the Veterans

20 Administration."  That wasn't good enough to preclude review of

21 a constitutional claim.

22     And then *Bowen*, which is four years before the TPS statute

23 is enacted -- so it's clearly they're legislating against that

24 background, that backdrop -- *Bowen* is "No findings of fact or

25 decision of the Secretary shall be reviewed by any tribunal

except as herein provided."  So that's not "any" but it's "no

decision."

     These cases are not about whether they use "any" or "a" or

"no."  They're about the baseline presumption of administrative

review of agency action as Your Honor had stated.

     And some of these statutes are quite a lot clearer than

the statute that we have here.  Unless you say that you intend

to preclude constitutional claims and unless you specify the

scope beyond just determination and say "We're talking about

something much broader," the courts do not read those to

preclude review of constitutional -- of claims that do not go

to the particular determination or decision or whatever you --

whatever you want to call it.

     And --

          THE COURT:  What's an example of language that has

been construed to bar -- is there an example of that to bar

even systemic or constitutional challenges?

          MR. ARULANANTHAM:  There's not an example of one

that's been read to bar constitutional challenges because the

courts have been very careful to avoid the massive

constitutional problem and sort of a conundrum of federal

courts of whether or not they could entirely strip judicial

review of constitutional claims.  This statute is not close to

clear enough to ask this Court to weigh into that extremely

difficult question.

1          Statutory claims -- certainly Section 1252(b)(9) says no

2     question of law or fact -- and I can't remember the exact

3     wording of it.  We cited it in our brief.  But it's question of

4     law or fact, and you heard that in some of the other ones, any

5     question of law or fact.

6               THE COURT:  Yeah.

7               MR. ARULANANTHAM:  That, I think, would preclude legal

8     claims, although they have other scope limitations like "under

9     this subsection."  You know, so the language Your Honor just

10    was referring to with my friend in *Johnson v. Robison*, the

11    Veterans Administration case, says "any question of law or fact

12    under any law administered by the Veterans Administration."

13         And so then we've got that, you know, analogy here because

14    we've got "any determination of the Attorney General with

15    respect to the designation, termination, or extension under

16    this subsection."  And so, you know, there's a separate

17    question:  Well, what does "under this subsection" mean?  And

18    under their view, I don't think it means anything actually.  I

19    don't understand what their theory is for how that phrase

20    limits this provision.

21         But to us, it limits it by specifying that the challenge

22    has to arise from this subsection, that is subsection (b),

23    which is the subsection which gives the Secretary the authority

24    to extend or terminate TPS decisions.

25         And what the statute says is, the Secretary has to

determine -- they use the word "determine" -- that the country
no longer continues to meet the conditions for designation.
And so that's what the statute bars review of.  If you say,
"Oh, we disagree about whether the coffee rust/leaf rust
epidemic actually has abated sufficiently to permit the return
of people to El Salvador," you know, that's the determination
that the statute is directing you to in subsection (b) because
that's what it says, "under this subsection."  If that's your
challenge, then there's a jurisdictional problem; that you're
challenging whether the country no longer continues to meet the
conditions for designation.

     We obviously do not challenge that.  Our challenge is to
the criteria that go into making that determination.  And the
rule that says that the government has to explain and justify
massive revision to the criteria, that arises from the APA.
It's the APA that requires the government to explain when it
engages in a substantial --

          **THE COURT:**  But in the literal sense, changing the
criteria as you allege that results in a termination,
challenging that in a sense is a challenge to the termination.
It's the basis of the termination.

     If they had made a factual basis using the same criteria,
let's say they took all the conditions and considered
intervening hurricanes and volcanoes and droughts and said,
"We've looked at it, determined that they're not as severe

anymore, even though that was only 6 months ago or 12 months

ago," that would I would think you would concede to be a

termination -- a determination that's probably not reviewable

if it's done on the facts, an assessment.

MR. ARULANANTHAM:  Yes.  I'm a little nervous about

conceding to any hypothetical without getting it precisely; but

if it's a challenge to whether or not the country no longer

continues to meet the conditions for designation, if that's the

challenge, then it's barred by the statute.

THE COURT:  Okay.

MR. ARULANANTHAM:  And, Your Honor, this sort of

pertains also to your relief question, the other question you

had.

THE COURT:  Yes.  What about that?

MR. ARULANANTHAM:  So whether or not somebody is a

CSS, whether or not somebody has engaged in a brief, innocent,

or casual departure from the United States so that it

interrupts their presence and bars them from legalizing --

that's the issue in CSS -- obviously if you say, "Oh, they've

wrongly interpreted the phrase 'brief, innocent, or casual

departure,'" the effect is that you undo the denial of the

legalization application and it's a legal question.

And CSS, the effect of the decision is to revoke I think

thousands of denials of legalization of status.  And if you

look at the Ninth Circuit cases that we cite -- *Immigrant*

*Assistance Project*, *Proyecto San Pablo* -- they're extending the application period.  That's the relief they're granting and they're letting people who were denied legalization just do it again.

So then -- and this is standard agency law practice; right?  The court sets aside the administrative agency's decision and you vacate the decision, and that's the relief that you're granted and that's the relief we seek here: Vacate -- set aside the TPS determinations.

That doesn't mean that they're barred by the stripping statutes.  It always depends on the reason why you are saying the action was illegal; and if the reason why the action was illegal is because it was unconstitutional or because there was a problem with the legal interpretation of the underlying rule, then the courts permit it.

And the same is true of *McNary*.  You can see it says in the decision they're reopening the cases of people who were denied legalization under the special agricultural RCRA program.

**THE COURT:**  So the scope of relief is analogous.  It doesn't make the ultimate determination of removability or not but --

**MR. ARULANANTHAM:**  It just means that -- yes, exactly, Your Honor.  You set aside the decision.  If they came back and explained their departure in a reasoned way, I mean, that would

1  be open to the agency to try to come up with a reasoned

2  decision that would justify terminating TPS; or to, I think,

3  perhaps adopt a good faith approach I would say they should

4  reconsider the decision under appropriate legal criteria and

5  they can make a new decision.  Your Honor isn't saying under

6  the new APA claim that they can't make a new decision after you

7  set it aside.

8      Your Honor, there was a little discussion of discovery.  I

9  could save it for later or I can talk about it now.

10     **THE COURT:**  Well, why don't we get through the various

11 claims because discovery may also hinge on the availability of

12 the -- or the viability of the other substantive claims.  So

13 why don't we --

14     **MR. ARULANANTHAM:**  I'll postpone this question about

15 whether the administrative record is sufficient.

16     **THE COURT:**  Right.  Right.

17     **MR. ARULANANTHAM:**  Does Your Honor have further

18 questions as to the --

19     **THE COURT:**  No.  I want to talk about the due process

20 while you're up here to understand the limits and the theory of

21 your due process claim first on behalf of the citizen children.

22     **MR. ARULANANTHAM:**  Your Honor, if I may, excuse me.  I

23 should have said this at the outset but my co-counsel,

24 Ms. Bansal, will be doing the equal protection and APA and TPS

25 holder claims, I'm doing the children's claim, if that's

1    permissible with the Court.

2         **THE COURT:**  All right.  That's fine.

3         What's the limit of your theory?  I mean, if the idea that

4    anything that causes -- and it's not -- that causes separation

5    of parent from the child implicates -- I believe you're talking

6    about substantive due process not procedural due process --

7    implicates a liberty claim that's protected by due process, the

8    government says, well, that would undermine, you know, any kind

9    of -- in any context where a parent is removed because they

10   don't have legal status here or whether a parent is

11   incarcerated or, you know, any such situation.  What's the

12   limit of your theory and what is the scope of review?  If one

13   were to find a liberty interest here, what is the standard of

14   scrutiny?

15        **MR. ARULANANTHAM:**  So let me just answer that last

16   question first.  The scope of review is the review available in

17   *Moore v. City of East Cleveland*, *Pierce v. Society of Sisters*,

18   which is to say the government has to have a significant

19   interest in forcing the child to choose between their --

20        **THE COURT:**  Significant interest more than any

21   conceivable interest under typical rational basis review?

22        **MR. ARULANANTHAM:**  It's sometimes been called rational

23   basis with the teeth as Your Honor noted at the last hearing,

24   and you certainly can win a claim under that as the

25   Supreme Court cases establish, but it's not strict scrutiny.

1    It's not a fundamental right to be denied that force choice,

2    which is the claim that's rejected, for example, in the

3    Ninth Circuit cases the government relies on.

4         To go more broadly to this question about what the

5    limiting principle is, there is clearly an interest that every

6    citizen child has in living with their parents and in this

7    country.  So there's no question in our view that every child

8    has that interest.  That's true regardless of their age and

9    regardless of the reason why the deportation is happening, but

10   it doesn't follow that the immigration law will be destroyed or

11   that there's no way to have deportations of people who have

12   citizen children because this is just a rational basis test;

13   right?

14        So the government has an interest that comes into bear

15   when you do the balancing.  And it doesn't even have to be

16   something that would happen on a case-by-case basis because you

17   can look categorically at the government's interest, like in

18   the Adam Walsh Act in *Gebhardt*.  These are people who have been

19   convicted of sex offenses, and so the government has an obvious

20   manifest interest in protecting the children in that case.

21        You know, here the protection-of-the-children interest

22   runs the other way; right?  These are citizen children of this

23   country who are now potentially going to be sent to places that

24   are dangerous, that our country was very recently describing as

25   too unsafe for the return of any of their nationals.  So that's

1    just a factor that goes into the balance.

2        Similarly --

3        **THE COURT:**  But if you say that the government can

4    assert a categorical interest to satisfy the *Moore* test,

5    doesn't the government have a categorical interest in enforcing

6    the TPS scheme?  And this is a Temporary Protected Status as

7    meant for -- you know, as the purposes set forth in the

8    statute, to provide temporary protection for those from, you

9    know, calamitous-type situations and conditions back in their

10   native country but it's not meant to be a permanent.

11       So why doesn't the government have at least a rational or

12   significant interest in enforcing its TPS scheme that has been

13   enacted?

14       **MR. ARULANANTHAM:**  I think this goes to another way in

15   which our claim is different from all of the claims that are

16   addressed in prior cases, which is the relief we're seeking

17   here is also only temporary, and we're only asking that people

18   be allowed to live with their parents and in their country

19   until they reach the age of adulthood.

20       **THE COURT:**  So would that mean that even if the

21   Secretary had properly made a procedurally proper determination

22   of terminating TPS status, let's say for Sudan, that your claim

23   is that the child would still have a constitutional due process

24   interest not to have his or her parent go back to Sudan even

25   under a properly applied, within the statute, TPS

1   determination?

2   **MR. ARULANANTHAM:**  Yes, Your Honor.  And if we get

3   past the motion to dismiss, we would expect the Court to

4   address this issue on the merits only if the Court first found

5   that the TPS holders had no claim.  So it's only if we lose the

6   APA claim, lose equal protection, lose due process for the TPS

7   holders that the Court would then address this issue.

8   And, yes, it is a right.  Even if -- even if Sudan now no

9   longer meets the conditions for designation, you still have a

10  problem.  You have, you know, Hnaida Cenemat wants to play flag

11  football next year.  They don't play flag football in Haiti.

12  She's a teenager.  She's grown up here her whole life.

13  Even if the Secretary dots all the Is and crosses all the

14  Ts in terminating TPS, you still have now children having to

15  make this very, very difficult force choice.  And so the

16  question the due process clause asks is:  Does the government

17  have a significant interest in forcing them to make that choice

18  now rather than allowing them to wait until they become adults

19  when, you know, obviously children leave their, you know,

20  parents and go off into the world once they become adults?

21  And --

22  **THE COURT:**  And that would apply regardless of the

23  legal -- putting aside TPS, wouldn't your argument apply

24  regardless of the legal immigration status of the parent?

25  **MR. ARULANANTHAM:**  No, Your Honor.  Again, it turns on

1    the government's interests in each particular context.  So, for

2    example, a person who has been here unlawfully, and the

3    government then has a stronger interest in enforcing the

4    immigration law than it does for people who have lived here

5    lawfully between the --

6            **THE COURT:**  So that would overcome the due process

7    rights of the citizen child who was born here, for instance,

8    and would be forced with the same sort of Hobson's choice that

9    you posit about having to go back with their undocumented

10   parent to their home -- to the parent's native country or live

11   without that parent?  That same Hobson's choice would obtain,

12   but you're saying in that instance there's a significant

13   government interest if the person is not here illegally?

14           **MR. ARULANANTHAM:**  Well, it's a different question,

15   Your Honor.  That is -- I'm not saying that that person always

16   loses or maybe they lose, maybe they win, but it's a different

17   question because the government's interest is manifestly

18   stronger.

19       And this just goes to one other point I want to make on

20   this, Your Honor.  There's no question that this claim that

21   we're raising, there's no case before that has addressed this

22   same claim.  It's novel.  But that's not surprising because

23   what we have here is a situation where the government -- as far

24   as we can tell, this has not happened in our country's history.

25       You've got a set of 200 -- actually 400,000 people, all

1    TPS holders, but, you know, more than 200,000 from these

2    countries, who have lived here lawfully for at least 8 years,

3    and in many cases for decades, so they've lived here lawfully

4    for 20 years and now there's not any allegation that they

5    individually did anything wrong.

6         **THE COURT:**  That's not the criteria.  That's not what

7    TPS is set up for.  It's not about wrong or right behavior.

8    It's about conditions -- temporary conditions in the native

9    country.

10        **MR. ARULANANTHAM:**  Yeah, absolutely, Your Honor.  This

11   is an argument that even if the statute were properly followed

12   where you've allowed people to live here lawfully for 20 years,

13   that you cannot then -- I mean, people -- often people have

14   children when they've lived in a place for 20 years.  And so

15   then it gives rise to different kinds of rights than what we

16   have seen in other cases.

17        And if the government had repeatedly, for example, say,

18   canceled the green cards of people who were married on the

19   ground that "We don't want to favor those anymore," or said

20   "Children who are adopted no longer can adjust their status,

21   and so we're getting rid of that," then we would have seen

22   cases like this and this issue would have been addressed.

23   Those are actually, I think, closer analogies to what we have

24   here, people lawfully living here for a long period of time --

25   yes, under a temporary program, it's true, but they're lawfully

1    living here -- and then through no fault of their own the

2    government seeks to take away their status, which puts their

3    children then into this impossible choice.

4        And that's the reason why I think it's different from a

5    situation Your Honor describes where, well, if a person has

6    unlawfully lived here for a long time.  Well, the government

7    hasn't blessed their presence and so its interest in enforcing

8    the immigration law is greater in that instance.

9        You know, a person who --

10       **THE COURT:**  Why is it greater than allowing somebody

11   to come conditionally subject to certain conditions and then

12   determining those conditions no longer apply?  Why doesn't the

13   government have that same interest, say, in enforcing that law

14   as it would in enforcing law that restricts entry in the first

15   place?

16       **MR. ARULANANTHAM:**  And, again, Your Honor, I think it

17   really turns a lot on the fact that this is temporary.  The

18   relief that we're talking about that would be granted here in

19   order to vindicate this constitutional right is also still

20   temporary so it doesn't change the -- it doesn't change the

21   temporary nature of the program.  It just provides the people

22   who have children, those school-age children -- they'll still

23   be forced to endure a brutal choice but they'll be forced into

24   it once they're adults rather than while they're still

25   children.

1          And I think that certainly renders it different from all

2     of the cases that both sides have cited for where what people

3     are seeking is the right to live here permanently.  So if you

4     look at the suspension of deportation cases -- or in *Gebhardt*

5     it's adjustment of status, in *Morales* it's to adjust through

6     marriage -- these are people -- all of these people are trying

7     to win the right to permanently reside in the United States.

8          And usually -- *Gebhardt* is an unusual exception -- usually

9     the plaintiff is the noncitizen.  You know, and here I think if

10    you look at it from the child's perspective because our

11    plaintiff, the lead plaintiff in this case is Crista Ramos, you

12    know, she's a teenager.  She's here in the courtroom today

13    actually as are some of the other children and also their

14    parents in this case.  You know, she is a teenager who has

15    grown up in this country.  From her perspective, there is no --

16    there is no government interest in her being forced to be sent

17    to a country that is -- it's the highest murder rate in the

18    world outside of a war zone, El Salvador is, and --

19          **THE COURT:**  But the action being challenged, that's a

20    consequence of enforcement.  I mean, the action is not directly

21    on her.  She's not being ordered to be deported.  The question

22    is:  Does the government have an interest in removing those who

23    no longer enjoy TPS status or any other legal status?  And I

24    guess the way you would phrase it is removing them now as

25    opposed to waiting until their child reaches majority age.

1          **MR. ARULANANTHAM:**  That's correct, Your Honor.

2          **THE COURT:**  And, you know, I would assume -- I'll give

3   counsel a chance to respond, but I assume the response is, you

4   know, there is an immigration law that sets forth certain

5   requirements and priorities in terms of who can be admitted,

6   under what circumstances, and for how long, and the government

7   has at least a general categorical interest in being able to

8   enforce those laws so long as the laws themselves don't

9   contravene the Constitution.  For instance, you know, if

10  there's another constitutional problem, equal protection

11  problem, it's different.

12          But if it's a lawfully enacted statute, doesn't the

13  government have -- and this is not a compelling-interest test.

14  This is, as you say, rational basis with a bite.  I'm not sure

15  exactly what that means, but a very significantly lower

16  standard of review constitutionally.

17          **MR. ARULANANTHAM:**  Your Honor, I think, if I may, when

18  you say, well, it has to be duly enacted, there may be other

19  constitutional constraints.  I think that is the central issue

20  for us as to whether or not we're going to survive the motion

21  to dismiss on this claim.

22          If the government, for example, could discriminate on the

23  basis of race and say "We want to get rid of all the people

24  who, you know, are" -- I won't use the ugly words -- but, you

25  know, "made some racist statement," and then if Congress wrote

a law that enacted that, the equal protection clause would

constrain the government's power to deport people on that

basis.

The First Amendment does.  There's actually cases that

hold that, *Bridges v. Wixon* and *Bridges v. California*.

**THE COURT:**  And so that's where there are particular

problems, constitutional problems, with the statute or the

ordinance or the Executive Order or whatever it is that's being

challenged.

I'm asking as a stand-alone, this due process argument,

which assumes there's no other problems in order to be able to

assert this claim.  Now, if it's dependent on an APA problem,

on an equal protection problem, then I can understand that; but

if it's a stand-alone and you're saying even if there's no

constitutional -- other constitutional problem with the

statute, even if it complies with the APA, even if it's

administered consistent with the statute, that any termination

of TPS status would have to give way to the minor's rights to

have their parent with them.

**MR. ARULANANTHAM:**  And let -- that's the point of --

the point I was trying to make, perhaps not articulately

enough, earlier was you could have a duly enacted statute that

had an equal protection problem or you could have one that was

a problem just as applied, like in the First Amendment context,

this particular labor organizer or whatever it is; right?

 1          Here, the substantive due process component of the due

 2     process clause is another substantive constraint on the

 3     government's power to write immigration laws even if they are

 4     otherwise duly enacted.  They don't come up a lot because the

 5     government doesn't do this kind of thing very much; but if the

 6     government now wants to force a set of children into this

 7     horrific choice, there is a substantive due process body of

 8     doctrine.  There's plenty of cases that say the family

 9     integrity right is fundamental, the right to stay in the

10     country is absolute.  There's -- there are cases, we cited

11     them, where you can't force choices.

12          THE COURT:  Why wouldn't that apply to every

13     deportation of a parent?

14          MR. ARULANANTHAM:  Right.  So it doesn't apply to

15     every deportation because it only seeks temporary protection.

16     It doesn't -- we're talking about sending people to countries

17     that are -- that have been found to be dangerous, and it's

18     limited to people who are lawfully present for a long period of

19     time.  If you're here for less than five years, this doesn't

20     even kick in.

21          THE COURT:  If somebody were here lawfully but lost

22     that right because, you know, of conduct, for instance, lost

23     their permanent residency right or lost whatever, you know,

24     temporary status right, they're here for a period, even if

25     they're here on a student visa or work visa and then that ends

1    but they had a child during -- if they're here lawfully but at

2    that point that lawful period ends, the visa may be limited to

3    five years or something, are you saying if they've had a child,

4    they can't be removed if they then lose that protection?

5    They've been here lawfully.

6         **MR. ARULANANTHAM:**  Right.  So the lawful -- I mean,

7    there's two different hypotheticals there.  The lawful

8    permanent resident, the statute the way it's written, you don't

9    lose your status unless you've done something wrong, you know,

10   all of that, unless you abandon your status.  There's a tiny

11   loophole, you know, but for the most part, lawful permanent

12   residents only get deported because they are convicted of

13   crimes.

14       And that is really telling because if Congress suddenly

15   said "We're going to strip lawful permanent resident status for

16   all of these people" -- I think they would have -- "for no---

17   not because of any wrongdoing because we're worried about the

18   effect of it on the labor market and we don't care that they

19   have children in high school who are here," then the children

20   might have a constitutional challenge to that, and I think

21   that's actually quite analogous to what we have here.

22        **THE COURT:**  Well, that's lawful permanence.  What if

23   somebody's here lawfully on a temporary status like some kind

24   of visa?

25        **MR. ARULANANTHAM:**  I think the student visa -- and

this is why we have very deliberately limited this claim to school-aged children.  That's both a top barrier, it is once you become an adult, the right no longer -- the interest -- we're not asserting that that interest justifies this -- and also the young -- young age.

If you're younger than 5, we're also asserting that there you're not part of our class.  And the reason for that -- there's two reasons for that.  You know, one reason is because I think it is much harder for a school-age child to move.  I mean, most people wouldn't even move their school-age children from -- you know, in high school from, I don't know, L.A. to San Francisco or something, let alone to Haiti or Sudan.  So there's additional trauma on the child.

But the other reason for it, Your Honor, is because the government then has an interest in avoiding, I don't even like to use these words, but like the anchor baby problem; right? That's what these cases are talking about.  It's, like, people -- you know, the government's interest, you undermine the immigration law if people have children.

But here, the government can run a temporary program and it can run student visas and it can have worker visas, all these things, for periods before the citizen children become of school-age; and once they become of school-age, it's a more complicated question.

And so, you know, your hypothetical, you know, the narrow

1    one where I think there might be a similar claim, you know, I

2    don't know, there's a lot of other interests involved but a

3    person who came here on a student visa and stayed here more

4    than five or eight years -- eight is the shortest time we have

5    in this case -- then, perhaps, you know, they would have, you

6    know, a similar argument.  And that's really, like, the only

7    hypothetical which I think actually could be, you know,

8    potentially similar to the one that we have here.  That hasn't

9    really arisen in the cases much.

10        **THE COURT:**  That suggests that every time -- I mean,

11   when the government issues some kind of temporary status for

12   somebody, that the interest in enforcing the deadlines and the

13   temporary nature of that is not significant, not rational, not

14   whatever the standard is, enough to override, if they have a

15   child, the child's due process rights to have their -- to stay

16   here and have their parents stay with them.

17        **MR. ARULANANTHAM:**  Well, I'd say two things about

18   that.  First, the government has five years.  They can extend

19   TPS once, twice -- these are 18-month extensions -- even three

20   times.  When it goes beyond that, when you're telling people

21   "You can live here for more than five years," that implicates

22   different interests for their children.  You know, their

23   children that are growing up, that's a 5-year-old who's growing

24   up in this country.

25        **THE COURT:**  So it almost becomes like an *estoppel*

1    effect on the government?  If the government goes beyond five

2    years, the government risks not being able to control and

3    terminate TPS status at least for those who have children?

4         MR. ARULANANTHAM:  Until they reach the age of

5    majority, Your Honor.

6         And the alternative, Your Honor, the alternative view, the

7    government's view, and what you'd have to accept, I think, to

8    accept the opposite is that there is no family integrity right

9    here; right?  That the immigration law always categorically

10   trumps the family integrity right no matter what.

11        *Bustamante* --

12        THE COURT:  Well, in between you say there's a family

13   integrity right that's acknowledged that may be sufficient to

14   implicate due process, but the interests in exercising a

15   validly enacted law that's not tainted in some other

16   constitutional way survives rational basis for review.

17        MR. ARULANANTHAM:  Right.  And I guess I don't know

18   why substantive due process in that sense would be subordinated

19   in a way and rendered it weaker somehow than equal protection,

20   the First Amendment, other -- I don't think there's any

21   doctrinal basis for that kind of, you know, lower treatment.

22        And I also --

23        THE COURT:  Well, yes, there is, because you are

24   asserting under the equal protection clause not just rational

25   basis but strict scrutiny because this is based on racial or

1   ethnic animus.

2          **MR. ARULANANTHAM:**  Right.  I --

3          **THE COURT:**  That's a different level of review.  And

4   if that is a cognizable claim, if that claim can be heard, you

5   know, if this Court has jurisdiction over it and you're able to

6   prove that, that's a whole different animal.

7          **MR. ARULANANTHAM:**  Right.

8          **THE COURT:**  If you were just using regular, rational

9   basis for review, courts have rejected all sorts of

10  classifications in the immigration context in that sense.

11         **MR. ARULANANTHAM:**  Yes, yes.  My point only,

12  Your Honor, is that under the government's view, there is

13  actually no substantive due process right that's enforceable

14  here at all because it's immigration law.

15         And so in some of these hypotheticals I'd be curious to

16  hear what they think about those.  Could the government just

17  get rid of all the, say, adoptions on the basis of people who

18  have gotten green cards through adoptions?  They just pass a

19  law tomorrow that says, "Okay.  Those are gone"?  Or all the

20  marriages that are based on green cards, those are gone?

21         Say the government has an interest here.  It's duly

22  enacted.  You can have -- in your deportation hearing you can

23  challenge whether or not you got your green card through

24  adoption or your green card through marriage so you have all

25  the process in the world, but there's no substantive problem

1    there?

2        You know, our view is there is a substantive right that's

3    implicated in these cases.  And *Bustamante and Cardenas* and

4    *Din v. Kerry*, the cases that are about people who are marrying

5    people abroad, where they're U.S. citizens, they're seeking to

6    marry noncitizens who are abroad.  *Bustamante* is very clear

7    that this implicates the substantive -- that's the word they

8    use -- the substantive right to no governmental interference in

9    matters of marriage and family or, you know, something like

10   that, citing the cases that we have been talking about.

11       So the Ninth Circuit has recognized that there is

12   obviously some substantive right here that has to be balanced,

13   and so then the question is whether these very particular

14   factors, whether people have lived here lawfully, where they're

15   going -- the children are going to be sent to countries that

16   are unsafe, where it's a temporary protection, whether those

17   are enough to alter the balancing calculus here compared to,

18   you know, these many other situations where the interests are

19   different.

20       **THE COURT:**  All right.  Let me hear from the

21   government.

22       The government does argue in its brief that there's not

23   even a cognizable interest that, if it were to be recognized,

24   is overridden fairly easily.  I think the government is arguing

25   there's no due process right at all to be recognized.  Is that

the position?

 MR. MARTIN:  Yes.  I mean, that is the first point, Your Honor, that there is no right.

 But even if we were in a world where there were some process of the type of *Bustamante* or *Cardenas*, it's important that the standard there was that the government only had to give a facially legitimate *bone fide* reason, and that was the end of the matter.

 So this -- you know, the idea those cases would somehow support the types of scrutiny of the Secretaries of Homeland Security's decisions here I think would be unwarranted.

 THE COURT:  Well, maybe it's an academic -- I mean, in view of that position, it may be academic whether you recognize any due process right to start with.  Do you have any response to the hypothetical about green cards being revoked when they're based on marriage or adoption, whether any constitutional right would vest in that situation?

 MR. MARTIN:  The government's position is that no constitutional right would vest in that position, Your Honor.

 THE COURT:  But even if it did, you would have -- well, if it did, then you'd have to look at whether there's, I guess as you put it, a facially legitimate valid reason?

 MR. MARTIN:  *Bone fide* reason.

 THE COURT:  *Bone fide* reason?

 MR. MARTIN:  Yeah.

1      **THE COURT:**  What about the argument that this is not

2   asking for full permanent status but really temporary-temporary

3   status really, a status that would be extended tied to the age

4   of the child; and, therefore, it's not as sort of broad or

5   intrusive as affording, for instance, permanent residence to

6   somebody by marriage or something like that?

7      **MR. MARTIN:**  Well, I think two things, Your Honor.

8   First, that's inviting this Court to, you know, create

9   basically a new immigration status out of whole cloth, which

10  goes to the second point, which is that these types of fixes

11  are appropriate for Congress; that the concerns that were noted

12  by plaintiffs' counsel are, you know, legitimate concerns but

13  we have a branch of government that is entrusted with remedying

14  that situation, that this is a legislative fix.  It's not

15  appropriate for judicial construction of a new type of

16  immigration statute.

17      **THE COURT:**  All right.  Let's move on to the equal

18  protection question, which I'd like to hear from plaintiffs'

19  counsel to make sure I understand the scope of that claim.

20      Are you challenging the actual termination -- the

21  determination to terminate the status, TPS status, of these

22  four countries both as sort of directly as well as challenging

23  the change in rule as violative or just the change in rule

24  being motivated by improper purposes?

25      **MS. BANSAL:**  We're challenging both, Your Honor.  The

1    change in rule is one of the elements under *Arlington Heights*.

2    You look to procedural departure and so the change in rule

3    supports the claim of intentional discrimination, but we are

4    not only challenging the change in rule.

5        THE COURT:  But also the substantive determination to

6    terminate?

7        MS. BANSAL:  And not because the conditions in the

8    country are not such as the Secretary found them but because

9    the decision was motivated by intentional race-based

10   discrimination.

11       THE COURT:  Well, the Supreme Court may shed some

12   light --

13       MS. BANSAL:  We were checking our e-mail this morning,

14   Your Honor.

15       THE COURT:  I take it no decision has come down.

16       So in some ways it's hard to adjudicate this since a large

17   part of, perhaps not all of your claim, your theory of equal

18   protection is based on comments made by the President.  And I

19   don't know how much useful it will be to explore the issue

20   since I think the Supreme Court may be looking at that, but it

21   does raise the question of if you -- number one, can you

22   consider those comments made?  Are we limited to time frame?

23   Does that extend to comments that were made not proximate in

24   time but a distance away?  Can you consider the President's

25   comments made while he was a candidate and not a President?

1    And what's the end?   Is there a point where any action taken in

2    this arena by the President can be deemed not tainted?   Is

3    there some purge period?

4        I assume the court is going to -- may make some comment on

5    that but in case it doesn't, I would like to hear your response

6    to the limits problem.

7            MS. BANSAL:   Under current law, obviously, Your Honor,

8    that's the only way we can answer the question, but the court

9    can consider that range of statements.   That the government has

10   an argument here that the statements are not relevant because

11   the ultimate decision-maker was the Secretary, that argument

12   clearly fails under the catspaw theory of discrimination, which

13   is what the court in the Eastern District of New York had in

14   the *Batalla Vidal* case.

15           THE COURT:   Yes.   I'm not so concerned with who's

16   making the statement.   I'm more concerned with how far back can

17   you go, how much of a causal relationship needs to be

18   demonstrated as a foundation to consider these, and what's the

19   limit.

20           MS. BANSAL:   I understand, Your Honor.

21       As to the limit, under the *Arlington Heights* test, it's a

22   very sensitive inquiry, I think is the word the court uses.

23   You look at the totality of the circumstances.   There is no one

24   factor that is controlling.

25       We would assume in good faith, Your Honor, that if this

Court were to find that the TPS terminations at issue here were
infected by discriminatory animus, that the government would go
back and make a good faith effort to redetermine the TPS
designations in a constitutional manner.  And there is nothing
under existing law that would prevent them from doing that even
after a finding by this Court about intentional discrimination.

You could look to, for example, the zoning context.  There
have been, of course, many cases finding that a city made a
discriminatory decision to deny a zoning application, and I'm
not aware of anyone ever suggesting that the city could no
longer deny any zoning applications in the future because that
one instance was infected by discrimination.  Each decision has
to be looked at on its own terms.

THE COURT:  So if the subsequent decision is examined
under the criteria of *Arlington Heights*, notwithstanding an
earlier statement made by a decision-maker, it could -- still
it could withstand equal protection scrutiny?

MS. BANSAL:  That's correct, Your Honor.

THE COURT:  So would the proximity -- what role does
proximity in time have to this analysis?

MS. BANSAL:  I think proximity is relevant.  Under
*Arlington Heights*, the Ninth Circuit has been clear that this
is -- it's really a question for a trier of fact and any
indication of discriminatory intent lead to an issue that can
only be resolved by the trier of fact so proximity goes to

1    that.

2        Our allegations have a tight proximal connection in that

3    there was a meeting about TPS predated by a week some of these

4    TPS terminations at which the President made statements

5    directly about the TPS holders.

6        THE COURT:  And, as I recall, it was in reference in

7    more particularly to Haiti, TPS holders from Haiti and

8    El Salvador?

9        MS. BANSAL:  Those were the terminations that

10   immediately followed the meeting, Your Honor, but the

11   President's statement -- and I don't want to say it to the

12   Court, but I do think his words were important -- he said, "Why

13   are we having all these people from shithole countries come

14   here?"  And a reasonable trier of fact could infer he was

15   speaking about TPS holders in general.  That statement was not

16   tied directly to Haiti.  He made other comments about Haiti.

17       THE COURT:  I'm trying to remember now.  Before he

18   made that comment --

19       MS. BANSAL:  Yes.

20       THE COURT:  -- was the discussion specifically about

21   Haiti and El Salvador?

22       MS. BANSAL:  The discussion was, as we've alleged,

23   Your Honor, as I understood it, about TPS in general.  The

24   countries that were coming up immediately were Haiti and

25   El Salvador.

        **THE COURT:**  So you would contend that his reference
was to all TPS holders?

        **MS. BANSAL:**  Yes, Your Honor.  And we think that's
also supported by the allegations about the pressure that the
White House put on the Department of Homeland Security.  Even
in advance of that meeting in November, we've alleged that the
Chief of Staff at the White House called Acting Secretary Duke,
put tremendous pressure on her to end Honduras, TPS for
Honduras, in the context of saying "The TPS program in general
is contrary to the Trump Administration's goals on
immigration."

        **THE COURT:**  Well, I'm not sure that supports your
claim of racial or ethnic or color animus because if it's to
end TPS generally as an immigration matter, which raises a
question, you know, if there's a general attitude about
immigration, you might even call that anti-immigrant sort of
sentiment, that's not necessarily racial animus.  That could
be -- so I'm not sure.

    I was puzzled by that reference and I'm not sure how that
supports your claim.  A general pressure to end and tighten up
the TPS program is not necessarily one that's expressly race
based.

        **MS. BANSAL:**  Let me clarify, Your Honor.  And I think
you take that pressure is relevant to, one, the President's
involvement in the entire process and whether you could hold

1  the Secretary responsible for the President's animus infecting

2  the process; but it is also relevant because we've alleged that

3  the President's position on the TPS program is due to his

4  animus towards immigrants from nonwhite, non-European

5  countries.

6      So the TPS holders are from specific countries which the

7  President contrasted to countries like Norway, which are mostly

8  white.  So it's not -- our allegation is not that the

9  Administration was opposed to TPS because they're opposed to

10  the program but that TPS was contrary to their overall goals,

11  which were motivated by intentional discrimination towards

12  nonwhite, non-European immigrants.

13          **THE COURT:**  All right.

14          **MS. BANSAL:**  May I --

15          **THE COURT:**  Yeah.  Go ahead.

16          **MS. BANSAL:**  If I could address for a minute,

17  Your Honor, the standard of review.

18          **THE COURT:**  Yes.

19          **MS. BANSAL:**  And the government's primary argument

20  here is that rational basis review applies and because the

21  Federal Register itself doesn't make any race-based claims,

22  they should pass rational basis review.  Obviously *Arlington*

23  *Heights* -- it's our position that *Arlington Heights* applies.

24      But the government cannot satisfy any standard of review

25  here.  They've pointed to no case and we're aware of no case

1   that has applied rational basis review to a claim of

2   intentional race-based discrimination.  But even under rational

3   basis review, a law that's motivated by animus would fail to

4   pass constitutional muster.  That's clear from *Cleburne* and

5   *Moreno*.

6        And as I understand it, the government's response to that

7   is, well, to allege animus in immigration context you need to

8   show outrageous discrimination, and they cite the *AADC* case.

9   That is a case, Your Honor, that is about selective enforcement

10  claims.  It's fundamentally different than this claim.

11       *AADC* was a situation where you had people who are in

12  violation of the law who are challenging their prosecution for

13  violation of the law on the basis of the prosecutor's motive.

14  The result of that -- the court was concerned that the result

15  of success on that kind of challenge would be to delay

16  prosecution of a violation of law or, in the immigration

17  context, to permit an ongoing violation of law.

18       Our plaintiffs are not in violation of law.  This is not

19  an issue where the government is choosing from among a set of

20  people who are in violation of law who to prosecute and we're

21  challenging their motive in doing that.

22       And I think the Ninth Circuit in the *Kwai Fun Wong* case

23  was quite clear that *AADC* is limited to that kind of selective

24  enforcement context and that it does not apply when you are

25  challenging denial of an immigration benefit on the basis of

 1   discriminatory animus.

 2          THE COURT:  All right.  Well, let me hear from the

 3   government on that.

 4       Your assertion that the proper standard of review here is

 5   the *AADC* standard, why is this -- where is there an assertion

 6   of prosecutorial or impingement upon prosecutorial discretion?

 7   This is not a prosecution here.  This really has to do with the

 8   implementation of a statute.

 9          MR. MARTIN:  Well, Your Honor, it's important to note

10   that the *AADC* framework has been applied, particularly in the

11   NSEERS cases, to immigration laws that were distinguished on

12   the basis of countries.  You know, the NSEERS was the selective

13   registration system, and at least the First and the Seventh

14   Circuits applied *AADC* and that rational basis framework to the

15   requirement that individuals from certain countries have to

16   register.

17          THE COURT:  Well, but didn't that -- wasn't that in

18   the context -- remind me.  Was that in the context of either a

19   prosecution or removal proceeding?

20          MR. MARTIN:  Yes, Your Honor.  Yeah.

21          THE COURT:  So that makes some difference, does it

22   not?  I mean, one could analogize removal -- once you get into

23   removal proceedings, it's perhaps similar to a prosecution and

24   to say that people are selectively being, you know, chosen for

25   removal in a way that is based on some allegedly impermissible

criteria and, therefore, seeking court intervention trying to
stop that, it's similar.  Maybe it's not a criminal law
enforcement but it is a law enforcement action that's analogous
to kind of a prosecution for purposes of the
selective-prosecution doctrine.  So I can kind of see that, but
here we're not at that stage it seems to me.

MR. MARTIN:  Well, the predicates that would put us in
that stage are like the NSEERS cases.  You had specific
requirements from individuals from specific countries that, you
know, were distinguishing based upon national origin in NSEERS;
and here you have country-specific determinations that are not
about the characteristics of individuals from these countries
but are about the conditions in those countries on the ground.
And in both cases, the framework is going to be an *AADC*
framework because of the immigration context.

THE COURT:  Well, but that suggests that any kind of
decision, even if it's one based on invidious factors, if it is
a predicate to later removal or later some kind of
individualized process where there's some sanctioning would be
kind of forced under a framework of *AADC* would be a pretty
sweeping proposition.  That would mean normal constitutional
review would be constrained even if you're not actually in a
prosecution.

MR. MARTIN:  Well, it might be sweeping, Your Honor,
but in the context of immigration where you're challenging, you

know, the executive's ability to weigh a myriad of factors --
foreign policy factors, humanitarian considerations, domestic
political considerations -- that the deference to that -- to,
you know, that decision-making process is what *AADC* and the
NSEERS cases, even outside the prosecutorial discretion
context, are counseling.

        **THE COURT:**  Well, that's two different doctrines.  One
is concern about the separation of powers and the court not
intervening too forcefully in the prosecutorial discretion
area, which is one thing.  The mantle of immigration law and
the deference to Congress' plenary part, that's a different
matter.  I mean, that's another basis for deference and a court
treading very lightly but it's not based on the prosecutorial
discretion.  So I'm just -- and I think *AADC* is really about
prosecutorial discretion, selective prosecution.

        **MR. MARTIN:**  Just one thing on that, Your Honor.  The
reasoning for the deference applies with equal force here
because whether it's prosecutorial discretion or the weighing
of the country conditions, both are inherently executive
functions.  So for that reason *AADC* would not be limited to
just the prosecutorial discretion context but it would apply
also to a context here where you have, you know, an inherently
discretionary assessment in consultation with other government
agencies about what realities on the ground in a country like
Sudan or Nicaragua or El Salvador or Haiti are; that the

 1   rationale for deferring to prosecutorial discretion applies

 2   with equal force to -- would apply to equal force to deferring

 3   to the discretion in assessing the factors that are relevant to

 4   TPS here.

 5           **THE COURT:**  Well, that may be a reason why the statute

 6   and Congress enacted a statute to generally bar review of

 7   substantive decisions, and I think that's acceded to by the

 8   plaintiff.  If there was a decision based on analysis of the

 9   facts, on the merits, courts are not going to second-guess, you

10   know, sort of the Secretary's assessment of on-the-ground

11   conditions.

12        But if the decision proves to be motivated by racial

13   animus and not, you know, by an actual assessment of things on

14   the ground, I'm not sure there's a reason for deference there

15   because then the whole reason to defer to the expertise of the

16   agency and the weighing of various considerations, if that's

17   not what's really at play, then there's no basis for that kind

18   of deference.

19        So, I mean, I think the two sort of dovetail that.  Unless

20   you get out of that box and you can prove this was motivated by

21   a reason that's not based on the merits, there would be very,

22   very limited judicial review; but if you can prove that, then

23   it seems to me that normal scrutiny, strict scrutiny would

24   apply to any governmental decision, as would apply to any

25   governmental decision.

1        What's your view about -- I guess, again, we may find out

2    more within days how we are supposed to assess comments and

3    evidence -- but the fact here that there's proximity between

4    the alleged -- the comments that are cited by the plaintiff,

5    the President's comments about "shithole countries" and

6    comparing TPS countries to, like, Norway as an example, that it

7    was within a short time, I think one week before I think the

8    first decision was made with respect to Haiti, or was it Haiti?

9        MR. MARTIN:  I think I might be confused on the time

10   frame.  I think those comments were made after Sudan and

11   Nicaragua.

12        THE COURT:  After?

13        MR. MARTIN:  After.

14        THE COURT:  But before -- it was within a week?  I

15   recall that there was a --

16        MR. MARTIN:  I'm fuzzy on the exact time frame.

17        THE COURT:  Within a short time.

18        MR. MARTIN:  Within a short time, yeah.

19        THE COURT:  So, I mean, whatever the -- wouldn't that

20   normally be deemed fairly probative if this were just any other

21   case, comments made by the decision-maker that shed some light

22   on that decision-maker's attitude in connection with the

23   transaction close in time?  It seems like that would be given

24   weight in a normal case.

25        MR. MARTIN:  Well, if this were a normal sort of

employment discrimination case, yes, Your Honor; but this is
not an employment discrimination context or that other set of
context.

        THE COURT:  But the same logic would apply.  I mean,
the reason why it's given weight in an employment context or in
a zoning context or any other decision-making context is that
just logically, you know, the closer in time it is, the more
likely it may shed light on what the decision-maker was
thinking at the time.

        MR. MARTIN:  Well, Your Honor, again, this is -- you
know, plaintiffs have expressed their view on this argument but
we have a Congressionally designated decision-maker who's a
Cabinet Secretary who makes these decisions, and that is a
reason why this isn't a normal context.  And for that reason,
the President's comments -- our position is they're irrelevant
to the decision-making process here.  And, in fact, some of
plaintiffs' allegations are actually self-refuting on this.
They make a lot of Secretary Kelly's alleged pressure on acting
Secretary Duke regarding Honduras.  She did not terminate
Honduras.  Similarly, with Sudan, she extended South Sudan, and
Secretary Nielsen has extended Syria.

        So when you look at the particular allegations of, you
know, discriminatory pressure here, they fall apart under that
scrutiny.

        THE COURT:  Well, that's a factual question, and I

1  know you've raised that.  It sort of shows that there was not

2  perfect control.  Even assuming that the President's agenda was

3  to end TPS status for any non-white country, that didn't happen

4  in at least three instances; but the fact that it happened in

5  the other four instances may be evidence to the contrary, but

6  that's an evidentiary question.

7      I think their theory is that even though the charged

8  decision-maker by statute was the Secretary, if the Secretary

9  was, in fact, acting under the pressure/influence of the

10  President, then as any -- under typical discrimination theory,

11  those who exerted some influence or pressure, their state of

12  mind can be imputed for liability purposes to the ultimate

13  decision-maker.

14      **MR. MARTIN:**  Well, you know, as you're aware there's

15  other pending litigation on this.  You know, the *Casa v.*

16  *Maryland* case rejected this argument.  *Batalla Vidal* has been

17  certified for interlocutory appeal, and there are other courts

18  considering this issue.  But in all of these cases, it is our

19  position that when you're dealing with a Cabinet Secretary who

20  has authority to make these decisions as delegated by Congress,

21  that this sort of undue pressure, catspaw theory falls apart.

22      **THE COURT:**  Simply because that's the person that was

23  designated to exercise the ultimate power?

24      **MR. MARTIN:**  Yes.  That distinguishes it from a case

25  of a middle manager in the employment context or, you know,

1    these other sort of contexts.

2          **THE COURT:**  I'm not sure.  I mean, ultimately somebody

3    is a decision-maker.  In this case it's designated by statute.

4    In many cases you have to figure out who the decision-maker

5    was.  Was it the supervisor or the manager or the CEO?  But

6    once you've determined who that -- located who that

7    decision-maker is, you also look at those who influenced the

8    decision-maker in determining whether or not there was unlawful

9    discrimination or other invidious type of conduct that was

10   going on.

11         And so I'm not sure the fact that Congress has identified

12   who the ultimate responsible decision-maker is would insulate

13   and prevent review of who the other influencing factors were

14   and whether or not they were tainted by some unlawful

15   motivation.  I'm not aware of, you know, why that would be.

16         **MR. MARTIN:**  Well, fair enough, Your Honor.  You know,

17   this is our position, and we also have a Ninth Circuit decision

18   in DACA that will shed some light on this perhaps.

19         **THE COURT:**  All right.  Let me go to the APA theory

20   then.  And let me ask you.  I understand, you know, there's a

21   whole question of jurisdiction, whether we even get to this on

22   the merits, but if we were to, and I understand the

23   government's denial that there was a change in rule, there is

24   no, quote, new rule, new interpretation --

25         **MR. MARTIN:**  Right.

1              **THE COURT:** -- but if there is jurisdiction, if a new

2      rule or new interpretation is found to have been applied here

3      that is different and discretely different from the prior

4      process, why wouldn't then that be problematic under the

5      Administrative Procedure Act, particularly under the *FCC versus*

6      *Fox Television* case that said that the agency has -- you can't

7      depart from prior policy or practice *sub silentio*, you have to

8      at least give good reasons for it, some explanation, go through

9      a process.

10             **MR. MARTIN:**  Well, the explanations are given, as

11     required by statute, in the Federal Register notices.  They are

12     set out there.  There is no other source of publication for

13     guidelines or interpretation.

14             **THE COURT:**  Well, that's an explanation of the

15     substantive decision, why status is being terminated for Haiti

16     and for El Salvador.

17             **MR. MARTIN:**  Right.

18             **THE COURT:**  What is not explained, and I know this is

19     hard for you to do because your client denies that there was a

20     change, but if there was a change, there is no explanation why

21     that change was made, why the Secretary is no longer

22     considering, for instance, current conditions.

23             **MR. MARTIN:**  Not to avoid the question, but on that

24     point, Your Honor, we are not conceding that the Secretaries

25     did not consider intervening conditions.

1           **THE COURT:**  No, I know that.  I know that's a dispute

2    because in some of the termination notices it talks about some

3    current language like in Sudan, for instance.

4           **MR. MARTIN:**  Right.  Right.  So just to be clear,

5    we're not conceding that we did not do that.

6           **THE COURT:**  Right.  On the other hand, if you look

7    just on the face of the notices compared to the extension

8    notices, the previous extension notice and the current

9    termination notice, there are a number of factors that were

10   just not addressed.  If you look at El Salvador and some of

11   these other countries, a termination -- the extension notice

12   noted certain things and problems, but they were not -- it's

13   just silent in that regard.  So sometimes they're addressed,

14   sometimes they're not.

15          **MR. MARTIN:**  And that would be true for every TPS

16   termination since, you know, the H.W. Bush Administration.  I

17   think if you look at them all, you will see that, you know,

18   some are voluminous in their discussion, some are pretty

19   somewhat short.

20          **THE COURT:**  The prior terminations also omitted

21   discussion of the previous condition that had been cited in the

22   preceding notice?

23          **MR. MARTIN:**  Right.  If you're reading the prior

24   Federal Register notices, you can't discern any pattern of

25   consistency where every single factor that was ever mentioned

in the prior extension is rebutted in the termination.  That's

just not the way things have been handled.

THE COURT:  Well, that does raise a disputed issue.

But assuming for the moment that if the plaintiff were able

to -- they were able to prevail and show that there was a

significant, substantive or, they put it, sudden change, would

that not -- wouldn't that be problematic under the APA since

there's no explanation for that, no reasons set forth?

MR. MARTIN:  No, Your Honor.  Again, not getting to,

like, the merits of whether this actually happened, none of the

cases that plaintiffs cite for the APA claim are like the

situation here.  They all involve some sort of prior public

notice given to the public about how the agency was going to

administer or prosecute a particular statute.

There are -- none of the reliance interests that those

types of public statements would have engendered are at issue

here.  And this is a temporary humanitarian program applied by

different Administrations over, you know, since I guess 1991.

And to try to stitch together a policy based upon inferences in

the Federal Register notices and apply one that exists, and

then they would be binding on future Administrations unless

there was a public statement that they were changing course

would be outside the framework of the APA.

THE COURT:  Are you suggesting there has to be a sort

of proven reliance interest in order to implicate the APA's

1    requirement of some reasoned explanation for a change?

2          MR. MARTIN:  Not that there's a reliance requirement,

3    but that in all of the cases that plaintiffs cite, you're

4    dealing with formalized public communications, either a

5    proposed rule making or as in *FCC v. Fox* you had interpretive

6    guidelines that the FCC was publishing about its fleeting

7    expletive policy.  I mentioned reliance in that context because

8    it is there where in that context the Supreme Court in *Fox v.*

9    *FCC* says, you know, the agency has to give some reason to

10   explain what it's doing and notify that it's doing so.

11         Without any prior express policy, there is -- there would

12   be no requirement to publish on the website or anywhere else

13   how they were administering TPS.

14         THE COURT:  Well, I know you had argued that *Fox*, for

15   instance, the *FCC/Fox* case is different because it concerned

16   formal policies and regulations; but the APA principle about

17   having to at least discuss and explain changes have been

18   applied to practices not just formal policies.  In the *American*

19   *Wild Horse* case *versus Perdue*, I think that was a practice

20   regarding how certain lands were treated.  I don't think there

21   was a formal regulation as I recall.

22         MR. MARTIN:  Well, it's not so much there was a formal

23   regulation, but it was a public policy that had been in place

24   for two decades, I believe, or maybe more than two decades.

25         THE COURT:  And -- well, I take it what we're going to

1    hear from the plaintiffs is that there's been a public policy

2    or practice of accounting for intervening current circumstances

3    before terminating, and that is the change.  I mean, it was

4    public in the sense that if you look at all the explanations

5    and the extensions, what the practice was is made evident and

6    was public.  So why is that any different?

7              MR. MARTIN:  Well, maybe this just collapses to the

8    merits, that that's just not the case.

9              THE COURT:  Right.

10             MR. MARTIN:  And, Your Honor, also, I know that we

11   started this hypothetical with the proviso that there was

12   jurisdiction, but I just want to reiterate that the APA itself

13   would, you know, deprive plaintiffs -- this Court of

14   jurisdiction over that claim because of Section 1254a.

15             THE COURT:  Right.  The jurisdiction-stripping

16   provision.

17             MR. MARTIN:  Yeah, right.

18             THE COURT:  Right, which is where I started because

19   that's a threshold question.  And if the government prevails on

20   that, then none of this is cognizable or --

21             MR. MARTIN:  Right.  I just wanted to reiterate that

22   point.

23             THE COURT:  All right.  Let me hear the response

24   regarding the APA.

25             MS. BANSAL:  Thank you, Your Honor.

I'll start with this question of whether a rule has to be explicitly and formally written down for this general principle that an agency must explain past departures to apply.  As Your Honor said, many of the cases that we've cited do not involve that situation, so in *American Wild Horses* it was a practice over years.  And also the --

THE COURT:  Was that practice embodied in any -- or described in any public -- in other words, here there's kind of an implicit -- you are asserting an implicit practice, an implicit policy.  In *Wild Horse* was that implicit or explicit, the practice of how certain lands were treated?

MS. BANSAL:  I think the case most on point with implicit practice is the *FERC* case, the *California Public Utilities versus FERC*.  In *Wild Horses* the situation was that the agency was taking a very similar position to the government.  Here they were denying that there had been any rule that was ever changed; and in rejecting that argument, the court looked in part to practice.  So the agency had to count the number of horses that were in this disputed territory, and they said, "In your reports where you count the number of horses, you counted the horses from this middle territory, so clearly you thought the middle territory was part of the reserve."

There was also an original forest plan that was incorporated by reference into another document that said that

1    the reserve was part of the -- oh, sorry, that the disputed

2    territory was part of the reserve, so the court looked at both

3    things.

4         The *FERC* case is a case where the rule really was embodied

5    in individual decisions, just as in our case.  So the -- over

6    the course of deciding several cases, the issue had to do with

7    whether you could give an incentive to a utility company for

8    being part of a group that it had no discretion to leave.  So

9    there were incentives given to electricity companies when they

10   made a voluntary choice to join certain groups, and the

11   question was:  Could you give the incentive to a utility

12   company that had no choice but to be part of this group?

13        And in the past the agency had always denied.  In

14   individual cases, the utility company would ask for the benefit

15   and they would say, "No, because your participation in this

16   group is not voluntary so you don't get an incentive to induce

17   your behavior."  They changed that not in a formal

18   announcement, but in a decision granting an incentive to a

19   utility company that was part of this group and had no

20   discretion to leave.  And so the policy, and the court actually

21   says this in the decision, but the policy that was departed

22   from was embodied in prior decisions.

23        It's also the case in the *Bonneville Power Administration*

24   case, Your Honor, where the practice that was departed from was

25   that the agency would always fund a fish passage center

1    whenever this other body had recommended they do so.  It was

2    just in a practice.  They didn't have any rule always from them

3    when the other body says.  It was just a practice, so...

4         **THE COURT:**  All right.  So that brings up the question

5    how clear, and maybe this is a factual dispute here, your

6    theory, your APA theory, and perhaps your -- in part you're

7    seeking to avoid the jurisdictional stripping provision hinges

8    on the existence of a new policy or practice.

9         What's your response factually to the fact that if you

10   look at earlier terminations, they -- many of them also did not

11   refer to prior extension conditions?  And one could argue it

12   looks like, you know, there's no clear pattern here, that you

13   don't always consider all conditions.

14        **MS. BANSAL:**  Well, Your Honor, when -- the first thing

15   I want to clarify is that this practice of considering

16   intervening conditions and describing the intervening

17   conditions and the extensions and terminations is one that

18   developed over time, so the initial termination and extension

19   notices are quite cursory.  There's a giant folder there with

20   all of them.  The initial notices in the 1990 cert are quite

21   cursory.  It's around 2000 where you start to see more detailed

22   explanations in both the extensions and the terminations.

23        Obviously you can't have one rule for terminations and one

24   rule for extensions, so you can't only look at one.

25        As Your Honor has noted, this is a factual question, so to

1    the extent there's any ambiguity about what was considered at

2    this stage, it has to be construed in the light most favorable

3    to the plaintiffs.  But we -- there is a clear difference

4    between the factors, the intervening factors, that are

5    considered before the Trump Administration and after about 2000

6    because before that the notices just say very little.

7         But there's a clear difference between the reasons that

8    are given in that 17-year time period and the reasons that are

9    given under the Trump Administration.

10        We've also --

11        **THE COURT:**  Well, is it accurate that there were prior

12    terminations that didn't address all of the immediately

13    preceding extension justifications?

14        **MS. BANSAL:**  The government has cherrypicked a few

15    examples that they have discussed in their brief that they

16    argue show a failure to consider intervening conditions in

17    terminations.  At best we think -- we think those are

18    cherrypicked examples and that the overwhelming pattern is to

19    consider intervening conditions in both extension and

20    termination notices.

21        To the extent there is no pattern, and the government

22    sometimes considers them and sometimes doesn't, that would also

23    be a violation of the APA to apply one rule in one case and

24    another rule in another case arbitrarily.

25        **THE COURT:**  I don't recall that being a theory you

```
 1   advanced.  I thought your theory is that there's a change, not

 2   that there's been inconsistencies from time to time, therefore

 3   prior Administrations may have violated the APA as well.  I

 4   thought your position is that this Administration has violated

 5   the APA because of a sudden and new change.  That's a different

 6   theory.

 7        MS. BANSAL:  You're correct, Your Honor, and I

 8   apologize if I was confusing.  That is our position.

 9        In response to the government's argument in our opposition

10   brief, we point out that if the Court accepted their version of

11   the facts as true, and sometimes factors are considered and

12   sometimes they aren't, that is a different APA violation.

13   That's not the one that we have alleged here, but that also

14   would violate the APA.

15        THE COURT:  Are there any cases that say how much of a

16   change, how clean, how categorical a change must be in order to

17   invoke the requirement of providing good reasons, et cetera,

18   et cetera, for that?  If there's a subtle shift from, you know,

19   60 percent explanation to 40 percent explanation instead of

20   zero to 100 or 100 to zero, are there any cases that say at

21   what point, how significant, how substantial, how sweeping, how

22   complete must a change be before the APA is implicated?

23        MS. BANSAL:  There aren't any cases I'm aware of,

24   Your Honor, that directly address the question, but you can

25   look at the changes that have -- where the court has applied
```

this test.  So in the *Fox* case, for example, the change was is

one expletive enough to count as indecency or could two count

as indecency.  And the Court explicitly notices -- have noted

that the agency didn't change the definition of "indecency."

It just changed how it was applied.

    There's also, in the *Bonneville Power Administration* case,

Your Honor --

        **THE COURT:**  But there you could see what the change

was in a fairly graphic way; right?  I mean, here you're

looking at a pattern.  I mean, as you say, I mean, they

cherrypicked, but if they can cherrypick enough, then it begins

to look like not so discrete a pattern, if there's enough

examples of that.

        **MS. BANSAL:**  So the question is not how -- I

apologize, Your Honor.  I think I was misunderstanding the

question -- not how subtle the change has to be, but how

clearly the change has to be expressed.

        **THE COURT:**  I guess that's a better way of putting it,

yes.

        **MS. BANSAL:**  We have -- we think that the change is

clear, Your Honor, from the notices, but we have also alleged

numerous statements that reflect a change.  And so it's not

just the notices, but it's, you know, for example,

Secretary Nielsen saying the law does not allow me to look at

the conditions of a country writ large.  Compare that statement

1    with pre-Trump extension and termination notices.  There is a

2    clear change.

3         **THE COURT:**  All right.  To the extent that raises a

4    factual issue, why isn't this -- explain to me again why is

5    this not -- going back to the first question -- a fact-based

6    challenge to jurisdiction as opposed to facial challenge?  And

7    if it's a fact-based challenge, doesn't this Court have the --

8    isn't it charged with having to resolve that fact?

9         **MS. BANSAL:**  Because the government's position,

10   Your Honor, is that there is no jurisdiction over our claims

11   regardless of whether we can prove a new rule or not, their

12   position is that the Court doesn't have jurisdiction to

13   consider whether there has been a rule change.

14        **THE COURT:**  So it's the nature of their challenge that

15   it's saying even if true, there's still no jurisdiction?

16        **MS. BANSAL:**  That is how I understand it, Your Honor.

17   We briefed this in our brief from yesterday, and my co-counsel

18   may be able to elaborate about that.

19        **THE COURT:**  All right.  Well, let me clarify it from

20   the government.  I know that is your argument.  You've made

21   that argument, but -- and is that the gist of your

22   jurisdictional challenge, that even if they could prove it,

23   this statute is so broad and sweeping and unconditional, that

24   it bars judicial review?

25        **MR. MARTIN:**  That is our position, Your Honor, yes.

And there was one thing I might add to the APA discussion.

        **THE COURT:**  Yeah.

        **MR. MARTIN:**  This theory of bringing this within the rubric of the APA threatens to imperil the TPS framework itself because it would not just be terminations that would then be subject to litigation, it would be the designations in the first instance or refusal to designate.  You could imagine a situation where a future Secretary designated a country for TPS and someone who was opposed to that for whatever reason brought an APA lawsuit saying that, you know, the factors weren't considered in the way that they were by prior Administrations, that there was a departure from practice.  Each of the legal theories advanced here would imperil the TPS framework itself by allowing that sort of challenge.  And so I think that that is -- that's another reason why Congress added or barred judicial review here, but I think that that is a consequence of, you know, the way that this case has been litigated if it were allowed to go forward.

        **THE COURT:**  All right.  Let me get a response to that.  Wouldn't your theory have implications for not just terminations but extensions or designations in the first place if any change in -- alleged change in criteria could implicate scrutiny?

        **MS. BANSAL:**  It's hard to think of who would have standing or how the challenge to the extension would come up,

```
 1   but the jurisdictional argument that we present, Your Honor,

 2   certainly is not limited to terminations.  It applies to --

 3           THE COURT:  I'm talking about the APA argument, the

 4   substantive APA argument.

 5           MS. BANSAL:  Prior.  Prior.  Yes, the rule change, the

 6   rule change argument that you can't change rules without giving

 7   an explanation is not limited to a termination.  Although in

 8   the termination, there are unique reliance interests, which are

 9   relevant as far as how detailed the explanation needs to be.

10   And I think the government argued that there were no reliance

11   interests because this policy is not written down, but

12   certainly the TPS holders have come over the years to rely on

13   the fact that their country's TPS designations are extended.

14   They are aware of the conditions in their country, and they

15   have come to rely on the fact that they are not going to be

16   made to return to their countries until those conditions have

17   improved.  And they have come to rely on the fact that that

18   assessment is made looking at the conditions written and not in

19   this narrow way.

20           THE COURT:  Well, let me ask you about that now that

21   you've raised that point.  Aren't those expectation interests

22   as opposed to reliance interests?  Usually reliance interest is

23   a change in position in reliance on something, something you've

24   done that you would not have done otherwise, and I'm not sure

25   what that would be here.  People may expect that they are going
```

 1   to be able to stay here longer, but it is a temporary -- nobody

 2   was promised permanent status here.  So I'm not sure what --

 3   there's no example in the complaint of what people have done in

 4   reliance that they would not have done had they known.  It's

 5   really an expectation that is based on expectation that certain

 6   rules would apply before the TPS status would be terminated.

 7            MS. BANSAL:  It's a reliance interest, Your Honor, and

 8   the example that we give in the complaint that I think is most

 9   close to this question is that plaintiff Hiwaida Elarabi, for

10   example, she's held TPS for 20 years.  In 2015 she made a

11   decision to invest in a restaurant.  She made a decision to

12   start her own business.  When the TPS termination was

13   announced, she sold that business because of the uncertainty,

14   and she sold it at a loss.

15        So people are making decisions about their lives that are

16   different from the decisions they might make if they thought

17   they would have to return to their countries before conditions

18   in their country had actually significantly improved.

19        Another example, Your Honor, is we have several plaintiffs

20   who are, you know, college students.  We have plaintiff Maria

21   Jose Ayala Flores who has decided to study math at college

22   because she wants to be a math teacher.  If she thought that

23   she was going to have to return to her country, she might make

24   a different decision about what to study.  So we do think they

25   are reliance interests and not just expectation interests,

Your Honor.

          THE COURT:  What would be the reliance interest there?

Studying a different subject or not going to college or what?

I'm not sure I understand it.

          MS. BANSAL:  I think the choices that are made could

be, yeah, to not go to college and to instead get a degree in

whatever job is most in need in the other country.

     Decisions are being made with the assumption that people

are able to stay and won't have to return to their countries

until conditions have improved, and I do think people would

make different decisions about what to study, about whether to

go to college, about what job to take, about what business to

invest in.

          THE COURT:  I guess the hard thing about that -- I

mean, I understand what you're saying.  I think the hard part

about that is that it's not like, you know, you're guaranteed

to stay here 10 years and now we're shortening it to 5 years.

It's always 6 months, 6 months, 12 months, 12 months, maybe 18

months.  And it's subject to periodic review.

     And especially given the lack of judicial review on the

merits, it's not so much based on, you know, objective

conditions on the ground by itself, but the Secretary's

assessment of that, which is largely unreviewable under this

statute.  So reliance interests seem to be tempered to some

extent.

1          **MS. BANSAL:**  In a practical way, the reliance interest

2   is the assumption that the Secretary -- maybe the decision is

3   not reviewable, but it will be made in a nonarbitrary way, and

4   that there won't be this sudden change when -- from the

5   plaintiffs' awareness of what's going on in their country

6   nothing has really changed, but the decision that comes out is

7   completely different and is not in line with the decisions that

8   have been made in the previous 20 years.

9          **THE COURT:**  All right.  Let's talk about the discovery

10   issues.  I know some of this is sort of conditional on what

11   this Court decides on the merits, but if we assume for the

12   moment that I find that the jurisdictional-stripping provision

13   of 1254a does not preclude either the constitutional claims or

14   the challenge to the procedural broader systemic change in

15   criteria that the plaintiff allows, that determination is to be

16   narrowly construed to mean the individual country-by-country

17   determination, which is fact based, and that at least there's

18   an APA claim that's been stated once we get past the

19   jurisdictional issue and at least, as alleged, an equal

20   protection claim.

21          I'm less certain about the due process claims.  But

22   assuming there is a constitutional claim and an APA claim and

23   it goes forward, what do we do about discovery and how does

24   this fit into a larger time frame in terms of what is

25   happening?  Because we have to look forward in terms of what

```
 1   the sequence of events are.  I guess the first TPS holders that
 2   will be affected are those from Sudan in November and then
 3   followed by -- what's the next country?
 4            MR. MARTIN:  Nicaragua.
 5            MR. ARULANANTHAM:  Nicaragua in January, Your Honor.
 6            THE COURT:  Nicaragua in January.  And should this
 7   case proceed, we need to give ourselves enough time to
 8   adjudicate whatever we're going to have to adjudicate, and I
 9   want to be able to do that in time enough so that whoever
10   doesn't prevail will have a chance to seek appellate relief or
11   appellate review.  So I don't want to wait until the last
12   minute, which is one reason why I said at the first CMC that I
13   want to make sure that we don't get hung up on discovery or the
14   record and not be able to address the merits of these claims.

15        So I guess the first question I have with respect to this
16   dispute that's ongoing with regard to discovery is assuming
17   that an administrative record has to be put together and
18   produced, what is in the administrative record?  And the
19   administrative record generally should include things that are
20   broad, anything that was directly or indirectly considered by
21   the agency decision-makers.  And so that would seem to
22   encompass not just formal communications, putting aside
23   privileges, but it would -- it would -- anything that was
24   considered directly or indirectly, and that would include
25   things that were considered and seen by those who helped the
```

1    decision-maker under the law as I understand it.

2        So I want to get the parties' sense.  And if that's the

3    case, I'm not sure what else outside the record would be needed

4    here.  But let me hear from the government first because you've

5    begun to look at the potential administrative records, I

6    understand.

7            MR. MARTIN:  Begun compiling them, yes, Your Honor.

8            THE COURT:  Yes.

9            MR. MARTIN:  So as you said, it would be whatever the

10   Secretary herself considered; and then from whatever who was

11   advising the Secretary, what they considered.  And at this

12   point we've identified 15 people who would have had input to

13   the Secretaries at one time or another and are looking through

14   their materials to see, you know, what they relied upon, what

15   they have that might be -- comprise part of the record.

16       It is -- because we're still reviewing the materials, we

17   have, I think, as we mentioned in the letter, down to about

18   35,000 materials from 20 custodians.  You know, obviously those

19   are not all part of the record, but that's the universe of

20   materials that we're reviewing.  And we're also interviewing

21   other people who might have potentially had some input that

22   would have met the criteria of someone who was advising the

23   Secretary.

24           THE COURT:  Now, your letter refers to including

25   formal recommendations and assessments as part of the

1   government agencies but will exclude informal deliberations.

2          MR. MARTIN:  Yes, Your Honor.

3          THE COURT:  I'm not sure what that means, informal.

4   If they are considered directly or indirectly, at least they

5   fall within the *prima facie* definition of what should be an

6   administrative record.  Maybe there's some privileges there,

7   but I -- it seems to me that -- I'm not sure what that means,

8   informal.

9          MR. MARTIN:  Well, so in the context of that

10  paragraph, Your Honor, what we were trying to say was that we

11  are including materials that would normally be deliberative.

12  Because of the statutory framework, the statute requires DHS to

13  consult with other relevant government agencies, so the State

14  Department for instance.  And so materials that in the -- you

15  know, in other types of APA cases would have been deliberative,

16  we are going to be waiving deliberative process privilege rules

17  because of the statutory framework.

18         THE COURT:  Right.

19         MR. MARTIN:  And so in the same informal

20  deliberations, we were saying that we were -- you know, because

21  although we were, you know, waiving privilege with respect to

22  these things under the statute, informal communications and

23  e-mails between various people would be excluded from the

24  record.

25         THE COURT:  Why would those be excluded at least under

1    the normal definition of administrative record as long as it

2    was up for consideration?  It was -- again, even indirectly

3    considered, it should be part of the administrative record.

4            **MR. MARTIN:**  Well, I think the point was that they're

5    informal deliberations.  So, you know, they're deliberative in

6    nature not factual in that those would be normal we will be

7    withholding.

8            **THE COURT:**  Is that because of the deliberative

9    process privilege or you don't think that that even falls

10   within the definition of what's in the administrative record?

11           **MR. MARTIN:**  Well, it would depend upon a particular

12   document.  Sorry.  It's hard -- a little bit hard to answer

13   that in the abstract, so I would say both, Your Honor.  I mean,

14   because some would be deliberative process and then others

15   would be materials we would not consider to be part of the

16   record.

17           **THE COURT:**  All right.  What's -- who's going to argue

18   on the part of the --

19           **MR. ARULANANTHAM:**  Your Honor, I hope after I finish

20   this or at some point before we go, you'll give us a chance

21   just to say two or three very quick things on the equal

22   protection and the due process claims.  It will be very fast.

23   I hope --

24           **THE COURT:**  Why don't you --

25           **MR. ARULANANTHAM:**  Do that now?

1          **THE COURT:**  You mean on the merits?

2          **MR. ARULANANTHAM:**  Yes.

3          **THE COURT:**  Well, why don't you say that now because I

4     want to move to the next stage.

5          **MR. ARULANANTHAM:**  Sure, Your Honor.  Just to refer

6     the Court to, this is now the children's claim, *Martinez*

7     *deMendoza* is a Third Circuit case that says if you're going to

8     an unsafe country, the analysis might be different on one of

9     these *de facto* deportation claims; *Israel v. INS*, which is a

10    Ninth Circuit case cited in the *Bustamante* decision where they

11    hold that conditioning of voluntary departure grant on the

12    promise that the person not marry violates the right to family

13    integrity; and we cite those only to say that we do think there

14    is balancing here.  If the Court agrees, if you can get us that

15    far, then we're in a factual dispute, and we'll bring experts

16    to show the interest and things like that, so we should survive

17    the motion to dismiss if there is any balancing at all to be

18    done on the due process point.

19         And then the only other point my co-counsel asked me to

20    suggest is I know that the Court is -- obviously it's very

21    difficult for everyone with the Muslim ban decision coming.  I

22    wonder if we might allow supplemental briefing on the equal

23    protection claim depending on what the decision says.

24         **THE COURT:**  I may do that.

25         **MR. ARULANANTHAM:**  It's something that the Court can

 1    consider.

 2        On the discovery questions, Your Honor --

 3            THE COURT:  Yes.

 4        MR. ARULANANTHAM:  -- so I think the first thing we

 5    would want is for the defendants to respond to the discovery

 6    requests because we're past 30 days, or the Court to deem them

 7    waived, I suppose, is the other option.  When we had the meet

 8    and confer at the Court's -- because the Court had ordered it

 9    on May 8th, and so the responses were due June 7th.  This is --

10    I'm not talking here about the administrative record; the other

11    discovery requests that we've made.  Those were very targeted,

12    focused on the particular claims that we're talking about here

13    today.

14        For example, the government said in our discussions, our

15    meet-and-confer discussions, that there are documents

16    responsive to Interrogatory 1, it's the only interrogatory, and

17    RFP1, which are guidances or policies about what criteria to

18    consider in the decision.  That seems --

19            THE COURT:  And that would fall within the rubric of

20    an administrative record; right?

21            MR. ARULANANTHAM:  I don't know if it would or not.

22            THE COURT:  Why wouldn't it?

23            MR. ARULANANTHAM:  Because at least they -- as they

24    are defining it, I'm not sure that it would be something that

25    was considered by the -- by the Secretary.  If there was law,

say, from 1995 and some policy guidance that then was the
governing law and the Secretary never looked at it and then
disregarded it, then I'm not sure.  I don't know what they --
what their conception is.  But in our view, it doesn't matter
whether it's not in the administrative record.  It goes to the
unexplained departure claim.  It is an exception to the rule
that you are limited to the administrative record.  Under the
Ninth Circuit law, the *Center for Biological Diversity* case,
which they cite, says that if the agency has not explained its
decision, that's one reason why you might be able to go outside
the administrative record.

    **THE COURT:**  Well, here there's a little bit of a
chicken-and-egg problem, that is whether there was a change in
decision, and part of your discovery kind of goes to that
question.  So it's a little bit of a cart -- which is the cart
and which is the horse here.

    **MR. ARULANANTHAM:**  Well, I think -- but don't we get
the benefit of the chicken-and-egg difference there?  Because
we have pled that there is a new rule, and now we get to --
assuming that we have pled enough to survive the motion to
dismiss, then we should be able to get discovery on that
question.  RFP1 -- and it shouldn't -- it doesn't have to be
limited to the administrative record if what we -- the claim
we're making is that there's an unexplained departure.  So
that's one.

1    Another one, Your Honor, RFP4 asks for communications with

2  outside entities, like Congress or some nongovernmental

3  organizations like anti-immigrant organizations, asking for

4  what communications they had with the government about TPS and

5  what the government said to them.  Those also might help to

6  prove the equal protection claim or the new rule claim.

7    RFP6 and 7 is about the testimony, the materials that were

8  given to the Secretaries when they presented their testimony.

9  That's the testimony that I and my co-counsel were quoting to

10  you, Your Honor, where they sort of sound like they're saying

11  that they're limited to the originating conditions.  We've

12  gotten no response to those.

13    Again, in our meet and confers, the government said we

14  think -- I don't want to put words in my friend's mouth, but

15  something like they have a person going to look to see if there

16  is a packet of material that was given to the Secretary to

17  prepare them for the testimony.  We would like to see the

18  document that was produced.  They've had it now for almost 60

19  days.  So that's our first ask about discovery separate from

20  this administrative record question.

21    And those -- so the last one I should mention, Your Honor,

22  the 30(b)(6) deposition.

23    **THE COURT:**  So the ones that you are prioritizing are

24  requests RFP1 --

25    **MR. ARULANANTHAM:**  4.

1          THE COURT:  -- 4.

2          MR. ARULANANTHAM:  6, 7, the 30(b)(6) deposition, and

3     maybe -- these are in the brief we filed yesterday, Your Honor,

4     so -- in the section of it about the old requests.  I may be

5     missing one, but that's -- that's one ask that we have.

6          THE COURT:  And there are supplemental requests.

7          MR. ARULANANTHAM:  Yes.  So the supplemental requests,

8     Your Honor, I think they sort of circle back to this question

9     we had at the very beginning about whether we should -- whether

10    we're doing now jurisdictional discovery to prove subject

11    matter jurisdiction.

12         THE COURT:  Well, your position is that we don't need

13    to because the challenge that the government has brought is of

14    a legal nature, a facial nature, and I have to resolve this --

15    really interpretation of 1254a is a critical question; and if

16    that -- if I resolve that in favor of the plaintiffs, then

17    there is at least jurisdiction for purposes of considering the

18    rest of the case.

19         MR. ARULANANTHAM:  That's right, Your Honor.  And so

20    Your Honor's order said tell us -- tell the Court what you

21    would ask for specifically.  So we took that order seriously,

22    and we gave you exactly our current best guess as to what we

23    would ask for.

24         But I think what our preference would be would be if the

25    Court were to say, "I find 1254a does not bar this claim, and

1    so it can proceed under summary judgment," then we'll -- I

2    mean, it will look a lot like that but, you know, we did that

3    in two days.  So, you know, we would propound perhaps some more

4    very targeted discovery focused on proving these particular

5    claims.

6         **THE COURT:**  So your priority is, right now as we sit

7    here, is Request for Document Productions 1, 4, 6, and 7, and

8    you say 30(b)(6) deposition.  That would -- is that about the

9    document-gathering process or the merits?

10        **MR. ARULANANTHAM:**  It would be about the merits.  I

11   think it would be -- I mean, it might cover some of the

12   document-gathering process depending on how we timed it, but I

13   think our primary concern in that would be the two areas:  Is

14   there an unexplained departure from prior practice?  Was there

15   a conscious, intentional departure from the prior practice?

16   And then, second, race discrimination and what are the

17   mechanisms by which the President's and White House's racist

18   immigration imperatives were brought to bear on the TPS

19   decision-making process.

20        **THE COURT:**  Well, that's biting off a lot for a

21   30(b)(6) deposition, isn't it?

22        **MR. ARULANANTHAM:**  Perhaps, Your Honor.  Maybe.  But,

23   anyway, my point is those are the things that we would

24   prioritize because we're interested in targeted discovery to

25   get the preliminary injunctions off the ground.

1              THE COURT:  All right.  Well, let me -- yeah, go

2    ahead.

3              MR. ARULANANTHAM:  You had asked about the timing for

4    Sudan and Nicaragua.

5              THE COURT:  Yes.

6              MR. ARULANANTHAM:  In our discussions when they were

7    describing the size of the administrative record that they want

8    to produce, they're very small.  And when you look at these

9    requests that we have focused on as well, I suspect the volume

10   of documents for at least the ones that I just mentioned to you

11   must be extremely small.  And so we don't believe that there's

12   a justification for limiting those to only one or two

13   countries.

14        And also just thinking out -- and, of course, this is,

15   knock on wood, only if we win -- defeat the motion to dismiss,

16   but if we don't do it that way, Your Honor, we're going to file

17   *seriatim* preliminary injunction motions, which is going to be

18   bad.

19              THE COURT:  So what you are intending is one master

20   preliminary injunction hearing?

21              MR. ARULANANTHAM:  Yes.  If we have -- we may have

22   enough already.  We've done a lot more investigation since we

23   were here a month ago.  But if we got the discovery responses,

24   and my conception of what these discovery responses are I think

25   would apply across the decision-making process generally, our

1   hope would be to file one preliminary injunction motion.

2        **THE COURT:**  And let me ask, whether you call it

3   jurisdictional discovery or not, one of your burdens, it seems

4   to me, is to make your case that there has, in fact, been a

5   change, that there is -- that's a lot about what we've been

6   discussing.  Do the supplemental requests go to that question

7   on the merits?

8        **MR. ARULANANTHAM:**  Some of them go to that question

9   and some of them go to equal protection questions.  I'm

10  prepared to talk about -- if you have questions, I'm prepared

11  to talk about those particular requests because some of them

12  are very specific as I'm sure you can see.

13       But our main reason for raising this point about whether

14  it's jurisdictional discovery, or instead sort of pre-summary

15  judgment discovery, is because we would prefer not to have had

16  to produce that now and instead be allowed to get the responses

17  to the discovery we propounded 60 days ago, see what's in

18  there, and then, you know, perhaps proceed further.

19       And it seems somewhat unfair.  Obviously, the Court has

20  been extremely fair.  I don't mean to suggest in general.  But

21  we shouldn't have to do jurisdictional discovery now on what is

22  a merits question without first seeing the responses to the

23  discovery that we already propounded.

24       And, you know, as I said, we read Your Honor's comments

25  last time to say that we ought now to be in a position to

1  discuss the actual discovery disputes.  And obviously we can't

2  do that because they haven't responded.  We don't know.  They

3  haven't said that they have documents or don't specifically.

4  They haven't said what objections they're going to raise.  So

5  that's why our position -- and they've blown the deadline on

6  responding.

7      THE COURT:  What's your position with respect to the

8  production of the administrative record?  Let's say discovery

9  is ordered, responses are ordered to these -- at least to the

10  request for production, and we'll have to talk about the

11  30(b)(6) deposition, what's your view about the production of

12  the administrative record?

13      MR. ARULANANTHAM:  Given the size that they have

14  described it to be, the Court should order they should produce

15  it in 14 days, should order it -- excuse me, should order that

16  it be produced -- I think we said 4 to 10 days rolling

17  production and then 14 for objections.  So assuming there's not

18  a basis to -- yeah, so then, you know, it ought to be 10 days

19  or 14 days.

20      And also, Your Honor, this is something from the *Regent's*

21  order, that if they are excluding evidence from the

22  administrative record based on what would have been an

23  assertion of privilege, the discussion that you and my friend

24  were having earlier, that they log that so that we treat the

25  documents that would otherwise have been properly in the

administrative record but were excluded on the basis of

privilege as though they are withheld documents for which we

could then challenge them.

     THE COURT:  All right.  And looking forward, what is

the timing of the next series of events here given the --

what's going to happen towards the end of the year, November?

     MR. ARULANANTHAM:  We want to file -- we haven't

figured out the exact timing, but I think somewhere in

August-September, somewhere in there we want to file a

preliminary injunction motion.  And so we want the documents in

two weeks if we're -- no later than that; and then if we're

going to have discovery disputes, as Your Honor had suggested,

we'll have them during the summer.

     As for interlocutory, I don't know if it would be

interlocutory, but appeals, Your Honor, if any of the case

survives, our preference would just be to do it simultaneously,

which I know is hard for everyone, but it's really hard for our

clients to live with this, you know, sort of hammer hanging

over their heads, and the decisions that they're making are

extremely, extremely hard.  So I think if we have to litigate

into -- in the Ninth Circuit and the District Court at the same

time, I think we'd rather do that than wait longer to put them

in even more of a difficult position as the deadlines come

closer.

     THE COURT:  You mean to have an omnibus -- I'm not

1   sure what you mean.  You mean to have one single preliminary

2   injunction hearing?

3          **MR. ARULANANTHAM:**  Correct, Your Honor.  I was just

4   referring to -- Your Honor had said, "Oh, well, whichever way

5   my ruling goes, we might want time for -- on the motion to

6   dismiss."  I mean, we might want time for interloc -- I mean,

7   appellate review.

8          **THE COURT:**  I was talking about appellate review if we

9   got to the stage of preliminary injunction because that's where

10  the rubber hits the road.

11         **MR. ARULANANTHAM:**  I understand, Your Honor.

12         **THE COURT:**  I wasn't talking about granting a 1252

13  interlocutory appeal on a motion to dismiss because there will

14  be time enough.  That's why I want to advance the preliminary

15  injunction because then the merits of whatever we rule today

16  here, if it goes forward, can be heard in one, rather than

17  trying to chop it up in pieces.  But it does put a premium in

18  getting this heard well in advance of the November date.

19         **MR. ARULANANTHAM:**  Yes, Your Honor.

20         **THE COURT:**  So you're looking at an August or

21  September filing?

22         **MR. ARULANANTHAM:**  Yes.  To be honest with you, we

23  haven't internally talked to fix a date because we wanted to

24  come here and argue the motion to dismiss, but we'd be happy to

25  provide very shortly with the Court -- to the Court and to the

```
 1   government the date by which we'll file the preliminary
 2   injunction.
 3             THE COURT:  All right.  Well, let me --
 4             THE CLERK:  At the last hearing we set a preliminary
 5   injunction hearing.
 6             THE COURT:  We already set a date, I guess.
 7             MR. ARULANANTHAM:  We set a date for the hearing, yes,
 8   which was September something.  I can't remember.
 9             THE COURT:  And I think didn't we set a date for --
10             THE CLERK:  The motion to be filed August 23rd.
11             MR. ARULANANTHAM:  August 23rd, yes.  Thank you so
12   much.
13             THE COURT:  So we did get ahead of ourselves.  We did
14   set a date already.
15        So that means discovery matters have to be resolved
16   quickly.
17             MR. ARULANANTHAM:  I apologize, Your Honor.  I had
18   forgotten that we had fixed that precise date.
19             THE COURT:  All right.  Let me hear from -- the
20   government's response.
21        What's wrong with producing responses to requests for
22   productions 1, 4, 6, and 7?
23             MR. MARTIN:  Well, if we're moving past the record for
24   the moment, Your Honor --
25             THE COURT:  Yeah.
```

1          **MR. MARTIN:**  -- I could just give you an update on

2     where we are.

3          For Number 4, that is an exceptionally broad request that

4     involves -- would involve looking through the files of numerous

5     agency people.  I mean, this is, you know, not a targeted,

6     discrete request.

7          **THE COURT:**  But the subject matter is fairly discrete.

8     It's about the decision to extend or terminate the designations

9     for these four countries, which all occurred after -- what was

10    the first decision date or discussion on this?

11          **MR. MARTIN:**  November 2017, I believe.

12          **THE COURT:**  Interrogatory Number 1 sets a date of

13    November 8th, 2016.  I forget what the significance of what

14    that date is.  Is that --

15          **MR. MARTIN:**  I believe it's the election date itself.

16          **THE COURT:**  Oh, okay.  Yeah, that was the election

17    date, wasn't it?

18          So it means for a period of about a year, maybe a little

19    more than a year about these four, and I don't know how many --

20    I mean --

21          **MR. MARTIN:**  So maybe it would help elucidate this

22    point if I sort of gave you the numbers on what we have for

23    some of the other --

24          **THE COURT:**  Yeah.

25          **MR. MARTIN:**  So for some of the requests that were --

1   that we were able to formulate meaningful search terms for, for

2   example, Request Number 2 and 3, we have found a total of

3   almost 7,000 documents.  For 6 and 7 -- and it's 14,000

4   documents and families.

5           THE COURT:  For 6 and 7?

6           MR. MARTIN:  No, that was for 2 and 3.

7           THE COURT:  Oh.

8           MR. MARTIN:  For 6 and 7, we're looking at about

9   13,000 documents based on our current search terms.

10          THE COURT:  Those are the number of documents used to

11  prepare Secretary Kelly and then Secretary Nielsen for their

12  testimony?

13          MR. MARTIN:  We're reviewing them to make sure that

14  they're responsive, but based on -- those are the numbers that

15  have come back for the search terms we formulated for those.

16      And, similarly --

17          THE COURT:  I find it a little hard to believe that

18  the Secretary reviewed 12,000 documents to prepare for -- I

19  mean, maybe I underestimate.  I assume that would be narrower

20  once -- well, go ahead.

21          MR. MARTIN:  Well, it probably will be narrower once

22  they're actually reviewed.  You know, these are -- the search

23  terms are just the first sort of step in trying to isolate

24  these documents.

25          THE COURT:  Yeah.

1        **MR. MARTIN:**  I'm just trying to give you a sense of,

2   you know, how much material is out there because of, you know,

3   the vastness of the government agencies and the number of

4   people and the custodians involved.  You know, this isn't a

5   situation where there's just, you know, one file box with

6   everything, and so --

7        **THE COURT:**  But it's a pretty discrete subject matter.

8   I mean, if you look -- the key seems to be 1 and 4.  One is

9   statements, documents about what factors to consider and

10  whether to extend or terminate.  You know, I don't know how

11  much there will be.  That's about the criteria, not the actual

12  decision itself, as I read it.  And there may not be any.  You

13  say that there was no change.  Your response may be there's no

14  documents in that regard.  I don't know.

15       And then 4 is the one that kind of gets to the nub of, you

16  know, what documents were actually considered or what

17  communications there were regarding the decision to terminate,

18  and that seems to me something very closely aligned with what

19  would have to be produced in the administrative record anyway.

20       There's discussions, considerations, communications about

21  terminating the designations for these four countries.  That's

22  what's at issue here.  So that's why I asked the question

23  actually:  Wouldn't this be in the administrative record anyway

24  because if it is, what's the harm in getting that produced

25  whether by way of handing over the administrative record or

1   doing an advance portion of the administrative record?  It

2   seems like this is well within what would normally have to --

3   you know, what would be produced if there were an

4   administrative record.

5          MR. MARTIN:  I think it's certainly true for Number 1,

6   Your Honor, or Interrogatory Number 1 and RFP Number 1.  Four

7   would be a little bit different because we're talking about,

8   you know, communications with members of Congress,

9   international bodies, nongovernmental organizations.  You know,

10  I don't know that that is typically the type of material that

11  would be in the record depending upon who it's coming from

12  within the agencies.

13         THE COURT:  Let me ask -- let me ask the plaintiffs

14  then.  Correspondence with members of Congress, why is that --

15  what's the relevance of that?

16         MR. ARULANANTHAM:  Two ways.  There are a number of

17  members of Congress who wrote advocating the extension of the

18  TPS decisions that then were -- resulted in terminations.  The

19  responses to those may manifest a legal interpretation.

20         And then on the other side, there were Congresspeople who

21  I think were supportive of the termination of TPS, and those

22  communications also may manifest either as to the equal

23  protection claim or as to the APA claim.

24         The other one in there, Your Honor, is about

25  nongovernmental organizations.  The complaint -- I think it may

1    be something we discovered after and is in the response to the

2    motion to dismiss and not in the complaint, but there was

3    communication from anti-immigrant organizations -- well,

4    anti-immigrant organizations, I think it's the Center for

5    Immigration Studies or perhaps it's FAIR, they listed this, the

6    need to end TPS as one of their kind of priority immigration

7    goals.

8            THE COURT:  So, in other words, this may shed light on

9    sort of the knowledge and state of mind and position of the

10   agency, so it's not -- and this could be post -- post-decision?

11           MR. ARULANANTHAM:  It could be, Your Honor.  But the

12   fact -- a trier of fact would get to look at even a

13   post-decision.

14           THE COURT:  Right.  So there's where the difference is

15   between the administrative record, which is generally

16   predecisional, things considered, versus probative value of the

17   state of mind after, and therein lies the difference.  Because

18   if you're asserting an equal protection violation, an invidious

19   purpose, then post-decision statements can shed light as

20   probative of what -- that's why you have to go beyond.  That's

21   your argument why you go beyond the administrative record.

22           MR. ARULANANTHAM:  Absolutely, Your Honor.  So the

23   President's statements about Haiti and El Salvador may shed

24   light on the motive on Sudan and Nicaragua even though those

25   decisions had already been made.

1    **THE COURT:**  And with respect to the 30(b)(6), your

2    plan would be once you get these documents and presumably the

3    administrative record, you would be prepared to do a 30(b)(6)

4    deposition on all these topics?

5    **MR. ARULANANTHAM:**  You know, we haven't spoken

6    internally about whether the topics are two disparate and

7    whether we would want two witnesses for half a day instead of

8    one for seven hours.  That's the discussions we haven't had.

9    But, yes, we would want to have a 30(b)(6) deposition to cover

10   at least the two big buckets, you know, the -- I don't think

11   the due process claim for the children requires a lot of

12   discovery, but the other two, the APA and the equal protection

13   claim, do potentially.

14   **THE COURT:**  All right.

15   **MR. ARULANANTHAM:**  One other thing, Your Honor, when

16   my friend says it's overbroad, there's a lot of documents.

17   Your Honor wanted us not to be in this position today, you

18   know, and then we should have gotten their objection, and we

19   should have had a meet-and-confer about why we need to narrow

20   the search terms.

21   We repeatedly asked them, we said, "Tell us the search

22   terms you're using because we want to narrow them," and they

23   weren't willing to do that today.  So I think -- I'm not sure

24   they should be getting the benefit of saying that now when they

25   had the opportunity to have a substantive discussion, and we

1  could be arguing here about why is your search pulling whatever

2  it was, tens of thousands of documents for this testimony

3  preparation.

4       There must be a packet that was given to the Secretary,

5  "These are the things that you should read in preparation of

6  your testimony."  Why are they doing search terms?

7            THE COURT:  All right.  Let me ask counsel for the

8  government.

9       First, is there any reason why you can't produce the

10  administrative record since you've been working on it for some

11  time now and you have a good fix at least of what you think the

12  administrative record is?

13       And I hope you will take into account the Court's comment

14  about the breadth of the administrative record extending to

15  those materials directly or indirectly considered by any agency

16  decision-makers, why they can't be produced, let's say, in 10

17  days?

18            MR. MARTIN:  I know that we are able to do that for

19  Sudan and Nicaragua.  There are three or four days of technical

20  work that has to be done that gets built into our production

21  deadline.

22       I know that we could do that for Sudan and Nicaragua, and

23  I would ask for Haiti and El Salvador to be able to produce two

24  weeks after that.

25            THE COURT:  All right.  Well, let me -- and with

1   respect to -- so you've not had a meet and confer with counsel

2   with respect to Request for Productions 1, 4, 6, and 7?

3           MR. MARTIN:  We've had two conversations about where

4   we stood; and the fact that we were producing documents, I

5   think plaintiffs' counsel thought we were going to be in a

6   position to say, "You know, here are the X number of

7   documents," and we can -- we give you objections to each one,

8   or something.  I'm not quite sure what they thought we would be

9   doing.

10      But I want to emphasize how much work we have been doing

11  in compiling these documents, and it is more laborious than I

12  think plaintiffs believe, but that is the case.

13      You know, if -- you know, the numbers I gave you just now

14  were just for, you know, just a handful of those documents, and

15  so -- or a handful of those requests, rather.

16          THE COURT:  Well, all right.  So let's put it this

17  way:  I'd like you to meet and confer right after this hearing

18  to talk about the specifics of Requests 1, 4, 6, and 7, and for

19  you to explain what it is you -- the complications and the

20  scope issues and the search terms, that kind of stuff, to see

21  whether there's something you-all can agree to to work that out

22  more quickly.

23      And I will say that my inclination is that -- and I will

24  get out a ruling quickly, if nothing more than a skeletal

25  ruling at least at first so that you know where we're headed

1    with respect to the motion to dismiss.

2         Should this case or parts of this case survive, then I am

3    inclined to order the production in responses to 1, 4, 6, and

4    7; and for then also the parties to meet and confer about the

5    possibility of a 30(b)(6) deposition, and to order that the

6    administrative record be produced quickly because we are coming

7    up upon an August 23rd deadline for filing of a brief, if we

8    get to that point, opening brief on a preliminary injunction

9    motion.  And we don't have time to really delay that because

10   then we're -- you know, the hearing is not until September, and

11   we need to hear this matter before then -- by then.

12        So with that, I'm going to take the matter under

13   submission, and then get out a ruling fairly quickly once I've

14   reviewed some more of the cases that you-all have cited.

15        And then I'd like you to meet and confer on a provisional

16   production or at least provisionally conditionally on if this

17   case were to proceed on the discovery matters that I just

18   mentioned.

19        **MR. MARTIN:**  And just to follow-up on the deadlines

20   for the administrative record, we're going with 10 days from

21   today for --

22        **THE COURT:**  I'll say this for now:  I would say 10

23   days for Sudan and Nicaragua, and within a week after that for

24   El Salvador and Haiti.  All right?

25        All right.  Thank you.

1        **MR. ARULANANTHAM:**  Thank you, Your Honor.

2              (Proceedings adjourned at 12:48 p.m.)

3                    ---oOo---

4

5

6              **CERTIFICATE OF REPORTER**

7        I certify that the foregoing is a correct transcript

8   from the record of proceedings in the above-entitled matter.

9

10  DATE:   Thursday, June 28, 2018

11

12

13

14   _____

15       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25