1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CRISTA RAMOS, et al., | Case No. 18-cv-01554-EMC |
| Plaintiffs, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS** |
| KIRSTJEN NIELSEN, et al., | Docket No. 20 |
| Defendants. | |

In 1990, Congress passed and President George H. W. Bush signed the Immigration Act of 1990, creating the "Temporary Protected Status" (TPS) program. *See* Pub. L. 102-232 (1991). The TPS statute codifies a long-standing practice: "every Administration since and including that of President Eisenhower has permitted one or more groups of otherwise deportable aliens to remain temporarily in the United States out of concern that the forced repatriation of these individuals could endanger their lives or safety." H.R. Rep. 100-627, at 6 (1988). TPS is thus a humanitarian program: it authorizes the Secretary of Homeland Security to temporarily permit nationals from certain countries to live and work in the United States when an ongoing armed conflict, environmental disaster, or other conditions prevent the safe return of those persons to their countries of origin. *See* 8 U.S.C. § 1254a(b)(1)(A)-(C). Since 1990, several countries have received TPS status.

At issue here are the designations for El Salvador, Nicaragua, Haiti, and Sudan. Sudan was designated for TPS in 1997 on account of a brutal civil war. Its TPS designation was extended periodically by every administration until late 2017, when Defendants announced that Sudan's status would be terminated. Similarly, Nicaragua was designated in 1999 due to Hurricane Mitch; El Salvador was designated in 2001 and Haiti in 2010, both on the basis of

devastating earthquakes.  Each country's TPS designation was periodically extended on every occasion until late 2017.  Between October 2017 and January 2018, Defendants announced that TPS status for all four countries would be terminated by November 2, 2018 (Sudan), January 5, 2019 (Nicaragua), July 22, 2019 (Haiti), and September 9, 2019 (El Salvador).

These TPS designations have given rise to a sizeable population of over 200,000 people who have lived in the United States with lawful status pursuant thereto for 10-20 years.  Many have built careers, bought homes, married, and had children—children who are U.S. citizens.

Plaintiffs in this case are TPS-beneficiaries and their U.S.-citizen children.  At the crux of their compliant is an allegation that Defendants, under the President's influence, have adopted a new interpretation of the TPS statute.  Whereas prior administrations evaluated the severity of intervening events when considering whether to extend TPS, the present administration allegedly ignores those events and focuses solely on whether the original rationale for TPS continues to exist.

Plaintiffs assert four legal claims.  First, the U.S.-citizen children between the ages of 5 and 18 allege that Defendants' termination violates their substantive due process rights because the Government—without good reason—is forcing them to choose between living in the United States without their parents or leaving their country of citizenship to return to countries they maintain are unsafe.  Second, Plaintiffs allege that the termination of TPS and adoption of a new interpretation of the TPS statute violates the Constitution's equal protection guarantee because it they were based on President Trump's racial animus against persons from those countries and his alleged disdain for non-white immigrants.  Third, the TPS beneficiaries allege that Defendants have violated their substantive due process rights because they have not advanced a reasonable basis to terminate their TPS status of the countries in question or to change their interpretation of the TPS statute.  Finally, the TPS-beneficiaries allege that Defendants' actions violated the Administrative Procedure Act (APA) because Defendants departed from long-standing policy and practice without acknowledging the change or providing good reasons for it.

Defendants have moved to dismiss on the basis that the Court lacks jurisdcition to hear Plaintiffs' claims or review the Secretary's decisions with respect to TPS.  Defendants also

United States District Court
Northern District of California

United States District Court
Northern District of California

1    maintain that, even if the Court has jurisdiction, Plaintiffs fail to state a claim on any theory.

2         A hearing was held on June 22, 2018.  *See* Docket Nos. 35, 39.  On June 25, 2018, this

3    Court issued a summary order denying the motion (Docket No. 34 ).  This order elaborates on that

4    order and addresses intervening case law.

## I.        FACTUAL BACKGROUND

6         Plaintiffs are nine persons who have permission to live and work in the United States

7    because their countries of origin have been designated for "Temporary Protected Status" (TPS)

8    and four U.S.-citizen children whose parents currently hold TPS status.  *See* Compl. ¶¶ 16-29.

9    The TPS holders come from Sudan, Nicaragua, El Salvador, and Haiti, four countries that have

10   continuously been designated for TPS since 1997, 1999, 2001, and 2010, respectively.  Pursuant to

11   these TPS designations, Plaintiffs with TPS have been lawfully present in the United States from

12   approximately ten to twenty years.  Despite long-standing practice periodically extending TPS

13   designations for these four countries, Defendants announced that TPS would be terminated over a

14   three month period between October 2017 and January 2018.  As a result, over 200,000 residents

15   who have resided in the United States for years, some for decades, stand to lose their permission to

16   live and work in the United States and will be subject to deportation.  Below, the Court

17   summarizes Plaintiffs' personal experiences as well as the history of TPS designations for each of

18   the four countries at issue.

19   A.   Plaintiffs' Backgrounds

20        The following is a sample of Plaintiffs' backgrounds alleged in the Complaint.

21        1.    Hiwaida Elarabi (Sudan)

22        Plaintiff Hiwaida Elarabi is originally Sudanese, but has lived in the United States since

23   1997 with TPS status.  Compl. ¶ 29.  She came to the United States with a valid visitor's visa in

24   1997 to visit her aunt and family (all of whom are U.S. citizens); the security situation in Sudan

25   deteriorated during her stay.  Compl. ¶ 65.  For that reason, the United States government

26   designated Sudan for TPS and Ms. Elarabi was permitted to remain in the United States because

27   she could not safely return to Sudan.  *Id.*  She has spent the past 20 years here because the United

28   States has extended Sudan's TPS designation at every relevant interval.  In the United States, Ms.

1    Elarabi a Master's degree in Bioinformatics from Brandeis University.  *Id.*  For 16 years, she

2    worked as a Health Educator at the Massachusetts Department of Public Health.  *Id.*  In 2015, she

3    borrowed money to open a restaurant.  *Id.*  After Defendants terminated Sudan's TPS designation,

4    she "made the difficult decision to sell it, at great cost" because "her future was uncertain and she

5    did not know whether she would be able to sustain the restaurant."  *Id.*  Now, she must leave the

6    country she has lived in since 1997.

7            2.      Elsy Yolanda Flores de Ayala, Maria Jose and Juan Eduardo (El Salvador)

8           Plaintiff Elsy Yolanda Flores de Ayala was born in El Salvador.  Her mother, father, and

9    siblings fled El Salvador in the 1980s due to the country's brutal civil war, but she could not make

10   the journey because she was too young.  Compl. ¶ 60.  Her immediate relatives are now U.S.

11   citizens or legal permanent residents.  In 2000, Ms. Flores de Ayala married, and migrated to the

12   United States with her daughter, Plaintiff Maria Jose Ayala Flores, a one-year-old at the time.  *Id.*

13   While they were in the United States, devastating earthquakes struck El Salvador.  *Id.*  The United

14   States determined that nationals of El Salvador could not safely return and designated the country

15   for TPS.  *Id.*  Ms. Flores de Ayala and her daughter, Maria Jose, been living in the United States

16   since 2000 with TPS protection.  In the United States, Ms. Flores de Ayala has worked as a

17   domestic worker and child-care provider for over fourteen years.  *Id.*

18          Maria Jose, Ms. Flores de Ayala's daughter, is now 19-year-old.  Compl. ¶ 59.  She was

19   brought to the United States as an infant and has lived virtually her whole life here under the

20   umbrage of TPS.  *Id.*  All her schooling has taken place here.  *Id.*  In 2016, she graduated high

21   school.  *Id.*  She did not learn of her TPS status until she applied for college and realized she was

22   ineligible for many scholarships.  *Id.*  Currently, she is studying mathematics at Montgomery

23   College in Maryland and would like to teach math to elementary students.  *Id.*  However, if

24   Defendants' termination of TPS for El Salvador takes effect, she will be required to leave the only

25   country she has known and will be unable to complete her studies.

26          Ms. Flores de Ayala's youngest son, Juan Eduardo, is a U.S.-citizen.  Compl. ¶ 53.  He was

27   born in the United States and is also a plaintiff in this case.  *Id.*  He is currently in seventh grade.

28   *Id.*  He may have no choice but to return to El Salvador with his parents and siblings, or be

United States District Court
Northern District of California

4

separated from them and placed with another family if he remains in the country of his citizenship to complete his education. *Id.*

### 3. Hnaidi Cenemat and Wilna Destin (Haiti)

The plaintiffs from Nicaragua and Haiti will confront similar hardship. Plaintiff Hnaidi Cenemat is also a U.S.-citizen, fourteen years old, whose mother, Plaintiff Wilna Destin, was born in Haiti but has lived in the United States for 18-years after Haiti suffered from an earthquake that prompted TPS designation. Compl. ¶ 54. Hnaidi is a freshman high school student in Florida, where she is on the honor roll and active in her school and church communities, joining her church choir and aspiring to join the cheerleading and flag football teams at her school in addition to the Student Council. *Id.* She enjoys studying math and science and aspires to become an obstetrician/gynecologist to help others. *Id.* She fears moving to Haiti with her mother—a country she does not know—but she also fears being placed with a foster family in the United States without her mother. *Id.* The situation is no less harrowing for her mother, Wilna. Compl. ¶ 61. Wilna not only fears separation from her daughter, but also does not want to leave behind the life she has built in the United States over the past eighteen years (eight of them with TPS status). *Id.* She owns a home in Florida, is an active member of her community and church, and has worked for a union for the past four years. *Id.* After Hurricane Katrina, she traveled to New Orleans to volunteer with humanitarian relief efforts. *Id.*

### 4. Imara Ampie (Nicaragua)

Plaintiff Imara Ampie was born in Nicaragua, but traveled to the United States in 1998 at the age of 26 to procure material for her mother's tailoring business. Compl. ¶ 63. While she was here, Nicaragua was devastated by Hurricane Mitch. *Id.* The government designated Nicaragua for TPS, so Ms. Ampie stayed here. *Id.* She married another TPS holder and they had two children in the United States, who are both U.S. citizens. *Id.* She has lived here for twenty years. *Id.* She owns a home in California. *Id.* She worries that she will have to return to Nicaragua despite the lives she and her husband have built here, and that she will not be able to satisfy her family's health care and educational needs in Nicaragua. *Id.* Her children would suffer whether they are required to return to Nicaragua or whether they remain in the United States without their

United States District Court
Northern District of California

parents.  *Id.*  She has been here more than half of her adult life.

The plight of other named Plaintiffs are described in ¶¶ 50-65 of the Complaint.  As noted above, over 200,000 other people stand to lose their TPS status.  *Id.* ¶ 2.  Further, over 200,000 U.S.-citizen children have at least one parent who is a TPS holder likely to be deported.  *Id.*

B.      Background of TPS Designations and Terminations

The history of TPS designation for Haiti, El Salvador, Nicaragua, and Sudan is summarized below.

1.      Haiti

Haiti was originally designated for TPS on January 21, 2010 based on the 7.0-magnitude earthquake on January 12, 2010 that prevented Haitians from returning safely.  *See Designation of Haiti for Temporary Protected Status*, 75 Fed. Reg. 3476 (Jan. 21, 2010).  The Secretary described that a third of Haiti's population had been affected by the earthquake and that Haiti's critical infrastructure—including hospitals, food, water, electricity, and telephone supplies—was severely impaired.  *Id.*  Haiti's designation was subsequently extended and re-designated four times by the Obama administration and once by the Trump administration.[1]  Three of the designations cited factors other than the original earthquakes; for example, the 2012, 2014, and 2015 extensions cited subsequent "steady rains . . . which led to flooding and contributed to a deadly cholera outbreak."[2]

On January 18, 2018, Acting Secretary Duke announced that Haiti's TPS designation would be terminated effective July 22, 2019.  *See Termination of the Designation of Haiti for Temporary Protected Status*, 83 Fed. Reg. 2648-01 (Jan. 18, 2018).  The termination notice states that "DHS has reviewed conditions in Haiti" in consultation with other federal agencies and

---

[1]  *See Extension and Redesignation of Haiti for Temporary Protected Status*, 76 Fed. Reg. 29,000-01, 29,000 (May 19, 2011); *Extension of the Designation of Haiti for Temporary Protected Status*, 77 Fed. Reg. 59,943-01 (Oct. 1, 2012); *Extension of the Designation of Haiti for Temporary Protected Status*, 79 Fed. Reg. 11,808-01, 11,808 (Mar. 3, 2014); *Extension of the Designation of Haiti for Temporary Protected Status*, 80 Fed. Reg. 51,582-01 (Aug. 25, 2015); *Extension of the Designation of Haiti for Temporary Protected Status*, 82 Fed. Reg. 23,830-01 (May 24, 2017).

[2]  *Extension of the Designation of Haiti for Temporary Protected Status*, 77 Fed. Reg. 59,943-01 (Oct. 1, 2012); *see also Extension of the Designation of Haiti for Temporary Protected Status*, 79 Fed. Reg. 11,808-01, 11,808 (Mar. 3, 2014) (same); *Extension of the Designation of Haiti for Temporary Protected Status*, 80 Fed. Reg. 51,582-01 (Aug. 25, 2015) (same).

United States District Court
Northern District of California

1  "determined . . . that the conditions for Haiti's designation for TPS—on the basis of 'extraordinary

2  and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from

3  returning safely—are no longer met." *Id.* at 2650.  The notice states that Haiti "has made progress

4  recovering from the 2010 earthquake and subsequent effects that formed the basis for its

5  designation," including that 98% of internally displaced persons sites have closed, and only

6  38,000 of the estimated 2 million Haitians who lost their homes were still living in camps in June

7  2017.  *Id.*  The United Nations had withdrawn its peacekeeping mission in October 2017.  *Id.*  It

8  held a presidential election, and the Haitian government was working to rebuild government

9  infrastructure that had been destroyed.  Economic recovery "has been generally positive." *Id.*

10  Further, "[a]lthough Haiti has grappled with a cholera epidemic that began in 2010 in the

11  aftermath of the earthquake, cholera is currently at its lowest level since the outbreak began." *Id.*

12  Based on these considerations, the Acting Secretary determined that "the conditions for the

13  designation of Haiti for TPS" are no longer met.  *Id.*

14         2.    <u>El Salvador</u>

15         El Salvador was designated for TPS on March 9, 2001 based on a series of earthquakes.

16  *See Designation of El Salvador Under Temporary Protected Status*, 66 Fed. Reg. 14214 (Mar. 9,

17  2001) (citing a "devastating earthquake" causing displacement of 17% of the population,

18  destruction of 220,000 homes, 1,696 schools, and 856 public buildings, and causing losses in

19  excess of $2.8 billion).  El Salvador's designation has been extended 11 times by the Bush and

20  Obama administrations,[3] including due to "a subsequent drought" in 2002,[4] and the effects of

21  _____

22  [3]  *See Extension of the Designation of El Salvador Under the Temporary Protected Status Program*, 67 Fed. Reg. 46,000-01, 46,000 (Jul. 11, 2002); *Extension of the Designation of El*

23  *Salvador Under Temporary Protected Status Program*, 68 Fed. Reg. 42,071-01, 42,072 (Jul. 16, 2003); *Extension of the Designation of Temporary Protected Status for El Salvador*, 70 Fed. Reg.

24  1450-01, 1451 (Jan. 7, 2005); *Extension of the Designation of Temporary Protected Status for El Salvador*, 71 Fed. Reg. 34,637-01, 34,638 (June 15, 2006); *Extension of the Designation of El*

25  *Salvador for Temporary Protected Status*, 72 Fed. Reg. 46,649-01, 46,650 (Aug. 21, 2007); *Extension of the Designation of El Salvador for Temporary Protected Status*, 73 Fed. Reg. 57,128-

26  01, 57,129 (Oct. 1, 2008); *Extension of the Designation of El Salvador for Temporary Protected Status*, 75 Fed. Reg. 39,556-01, 39,558-59 (July 9, 2010); *Extension of the Designation of El*

27  *Salvador for Temporary Protected Status*, 77 Fed. Reg. 1710-02, 1712 (Jan. 11, 2012); *Extension of the Designation of Temporary Protected Status for El Salvador*, 78 Fed. Reg. 32,418-01, 32,420

28  (May 30, 2013); *Extension of the Designation of El Salvador for Temporary Protected Status*, 80 Fed. Reg. 893-01, 894-95 (Jan. 7, 2015); *Extension of the Designation of El Salvador for*

Tropical Storm Stan, the eruption of the Santa Ana volcano, subsequent earthquakes, and Hurricane Ida in the 2010 notice.[5]

On January 18, 2018, Secretary Nielsen announced the termination of TPS effective September 9, 2019. *See Termination of the Designation of El Salvador for Temporary Protected Status*, 83 Fed. Reg. 2654-01 (Jan. 18, 2018).  According to the notice, the Secretary "reviewed conditions in El Salvador" and considered input from other government agencies, and "determined that the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met." *Id.* at 2655-56.  The notice states that recovery efforts relating to the earthquakes have "largely" completed, "social and economic conditions affected by the earthquakes have stabilized," and "people are able to conduct their daily activities without impediments directly related to damage from the earthquakes." *Id.* at 2656.  It also notes that El Salvador has been accepting the return of people removed from the United States, including 20,538 persons in 2016 and 18,838 in 2017.  *Id.* The notice also describes the international aid El Salvador has received since 2001, the completion of "many reconstruction projects," including schools, hospitals, homes, and support for improving water, sanitation, and roads.  The notice also cites "stead[y] improv[ement]" in El Salvador's economy, including a 7% unemployment rate and increases in its gross domestic product.  *Id.*  The notice acknowledges that assistance and resources for returnees are "limited," but that the governments of the U.S., El Salvador, and international organizations "are working cooperatively to improve security and economic opportunities." *Id.*

3. <u>Nicaragua</u>

Nicaragua was originally designated for TPS on January 5, 1999 on the basis of Hurricane Mitch.  *See Designation of Nicaragua Under Temporary Protected Status*, 64 Fed. Reg. 526-01,

---

*Temporary Protected Status*, 81 Fed. Reg. 44,645-03 (July 8, 2016).

[4] *Extension of the Designation of El Salvador Under the Temporary Protected Status Program*, 67 Fed. Reg. 46,000-01, 46,000 (July 11, 2002).

[5] *Extension of the Designation of El Salvador for Temporary Protected Status*, 75 Fed. Reg. 39,556-01, 39,558-59 (July 9, 2010).

United States District Court
Northern District of California

526 (Jan. 5, 1999) ("Hurricane Mitch swept through Central America causing severe flooding and associated damage in Nicaragua," including "substantial disruption of living conditions"). Nicaragua's designation was extended 13 times by the Clinton, Bush, and Obama administrations.[6] Its status was extended several times thereafter, including based on subsequent developments, such as "recent droughts as well as flooding from Hurricane Michelle" in 2002,[7] and subsequent natural disasters and storms.[8]

On December 15, 2017, Acting Secretary Duke announced that Nicaragua's designation would terminate effective January 5, 2019.  *See Termination of the Designation of Nicaragua for Temporary Protected Status*, 82 Fed. Reg. 59636-01 (Dec. 15, 2017).  The termination notice states that "DHS has reviewed conditions in Nicaragua" and that based on the review, "the Secretary has determined that conditions for Nicaragua's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch are no longer met."  *Id.* at 59637.  The Secretary found that "[i]t is no longer the case that Nicaragua is unable, temporarily, to handle adequately the return of nationals of Nicaragua," that recovery efforts "have largely been

---

[6] *See Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 65 Fed. Reg. 30,440-01, 30,440 (May 11, 2000); *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 66 Fed. Reg. 23,271-01, 23,272 (May 8, 2001); *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 67 Fed. Reg. 22,454-01, 22,454 (May 3, 2002); *Extension of the Designation of Nicaragua Under Temporary Protected Status Program*, 68 Fed. Reg. 23,748-01, 23,749 (May 5, 2003); *Extension of the Designation of Temporary Protected Status for Nicaragua*, 69 Fed. Reg. 64,088-01 (Nov. 3, 2004); *Extension of the Designation of Temporary Protected Status for Nicaragua*, 71 Fed. Reg. 16,333-01 (Mar. 31, 2006); *See Extension of the Designation of Nicaragua for Temporary Protected Status*, 72 Fed. Reg. 29,534-01, 29,535 (May 29, 2007); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 73 Fed. Reg. 57,138-01, 57,139 (Oct. 1, 2008); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 75 Fed. Reg. 24,737-01, 24,738 (May 5, 2010); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 76 Fed. Reg. 68,493-01 (Nov. 4, 2011); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 78 Fed. Reg. 20,128-01 (Apr. 3, 2013); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 79 Fed. Reg. 62,176-01 (Oct. 16, 2014); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 81 Fed. Reg. 30,325-01 (May 16, 2016).

[7] *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 67 Fed. Reg. 22,454-01, 22,454 (May 3, 2002).

[8] *See*, *e.g.*, *Extension of the Designation of Temporary Protected Status for Nicaragua*, 71 Fed. Reg. 16,333-01 (Mar. 31, 2006); *Extension of the Designation of Nicaragua for Temporary Protected Status*, 72 Fed. Reg. 29,534-01, 29,535 (May 29, 2007).

9

United States District Court
Northern District of California

completed," that "[t]he social and economic conditions affected by Hurricane Mitch have stabilized," and that "people are able to conduct their daily activities without impediments directly related to damage from the storm." *Id.* Furthermore, the Secretary noted that Nicaragua has received significant international aid, many reconstruction projects have been completed, hundreds of homes destroyed have been rebuilt, the Nicaraguan government has built new roads in many areas affected by Hurricane Mitch, access to drinking water and sanitation has improved, electrification of the country has increased from 50% in 2007 to 90% today, 1.5 million textbooks have been provided to 225,000 primary students of the poorest regions, and Internet access is now widely available. *Id.* In addition, the Secretary noted that Nicaragua's relative security has attracted tourism and foreign investment, cites growth in Nicaragua's GDP, and notes that the State Department has no current travel warning to Nicaragua. *Id.* Based on these considerations, the Secretary "determined . . . that Nicaragua no longer meets the conditions for designation of TPS under section 244(b)(1) of the INA." *Id.*

4.    Sudan

Sudan was designated for TPS in November 1997 due to an ongoing armed conflict and extraordinary conditions preventing nationals from returning safely. *See Designation of Sudan Under Temporary Protected Status*, 62 Fed. Reg. 59737-01 (Nov. 4, 1997) (finding that "a return of aliens who are nationals of Sudan . . . would pose a serious threat to their personal safety as a result of the armed conflict in that nation"). It was periodically extended and/or re-designated for TPS 15 times by the Clinton, Bush, and Obama administrations,[9] often citing factors other than the

---

[9] *Extension of Designation of Sudan Under Temporary Protected Status Program*, 63 Fed. Reg. 59,337-01 (Nov. 3, 1998); *Extension and Redesignation of Sudan Under the Temporary Protected Status Program*, 64 Fed. Reg. 61,128-01, 61,128 (Nov. 9, 1999); *See Extension of Designation of Sudan Under the Temporary Protected Status Program*, 65 Fed. Reg. 67,407-01 (Nov. 9, 2000); *Extension of the Designation of Sudan Under the Temporary Protected Status Program*, 66 Fed. Reg. 46,031-01 (Aug. 31, 2001); *Extension of the Designation of Sudan Under the Temporary Protected Status Program*, 67 Fed. Reg. 55,877-01 (Aug. 30, 2002); *Extension of the Designation of Sudan Under Temporary Protected Status Program*, 68 Fed. Reg. 52,410-01 (Sept. 3, 2003); *Extension and Re-designation of Temporary Protected Status for Sudan*, 69 Fed. Reg. 60,168-01, 60,169 (Oct. 7, 2004); *Extension of Designation of Sudan Under the Temporary Protected Status Program*, 70 Fed. Reg. 52,429-01 (Sept. 2, 2005); *Extension of the Designation of Sudan for Temporary Protected Status*, 72 Fed. Reg. 10,541-02 (Mar. 8, 2007); *Extension of the Designation of Sudan for Temporary Protected Status*, 73 Fed. Reg. 47,606-02 (Aug. 14, 2008); *Extension of the Designation of Sudan for Temporary Protected Status*, 74 Fed. Reg. 69,355-02 (Dec. 31,

1    armed conflict but possibly related, such as forced relocation, human rights abuses, famine, and

2    denial of access to humanitarian agencies.[10]

3          On October 11, 2017, Acting Secretary Elaine C. Duke announced the termination of

4    Sudan's TPS status, to be effective November 2, 2018 in order to permit an orderly transition.  *See*

5    *Termination of the Designation of Sudan for Temporary Protected Status*, 82 Fed. Reg. 47228-02

6    (Oct. 11, 2017).  The notice explains that Sudan's designation was terminated because:

> DHS and the Department of State (DOS) have reviewed the
> conditions in Sudan.  Based on this review and consultation, the
> Secretary has determined that conditions in Sudan have sufficiently
> improved for TPS purposes.  Termination of the TPS designation of
> Sudan is required because it no longer meets the statutory conditions
> for designation.  The ongoing armed conflict no longer prevents the
> return of nationals of Sudan to all regions of Sudan without posing a
> serious threat to their personal safety.  Further, extraordinary and
> temporary conditions within Sudan no longer prevent nationals from
> returning in safety to all regions of Sudan.

13   *Id.* at 47230.  The notice explains that conflict is limited to Darfur and the Two Areas (South

14   Kordofan and Blue Nile states), but that in the 2016-2017 timeframe, the parties in conflict

15   engaged in "time-limited unilateral cessation of hostilities declarations" that "result[ed] in a

16   reduction in violence and violent rhetoric."  *Id.*  "The remaining conflict is limited and does not

17   prevent the return of nationals of Sudan to all regions of Sudan without posing a serious threat to

18   their personal safety."  *Id.*  Additionally, food security has improved, humanitarian actors have

19   been able to provide needed humanitarian aid, and conditions no longer prevent all Sudanese

20   nationals from returning in safety despite the country's poor human rights record.  *Id.*  The notice

21   concludes that, in consideration of these factors, "the Secretary has determined that the ongoing

22   armed conflict and extraordinary and temporary conditions that served as the basis for Sudan's

---

24   2009); *Extension of the Designation of Sudan for Temporary Protected Status,* 76 Fed. Reg.
     63,635-01 (Oct. 13, 2011); *Extension and Redesignation of Sudan for Temporary Protected*
25   *Status*, 78 Fed. Reg. 1872-01 (Jan. 9, 2013) (detailing the 2005 Comprehensive Peace Agreement
     and continuing violence); *Extension of the Designation of Sudan for Temporary Protected Status*,
26   79 Fed. Reg. 52,027-01, 52,029 (Sept. 2, 2014); *Extension of the Designation of Sudan for*
     *Temporary Protected Status*, 81 Fed. Reg. 4045-01 (Jan. 25, 2016).

27   [10]  *See, e.g.*, *Extension of Designation of Sudan Under the Temporary Protected Status Program*,
28   65 Fed. Reg.67,407-01 (Nov. 9, 2000); *Extension of the Designation of Sudan Under the*
     *Temporary Protected Status Program*, 67 Fed. Reg. 55,877-01 (Aug. 30, 2002).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   most recent designation have sufficiently improved such that they no longer prevent nationals of

2   Sudan from returning in safety to all regions of Sudan." *Id.*

3   C.   Defendants' Termination Decisions

4        Plaintiffs question how the conditions in four countries that had been repeatedly designated

5   for TPS by multiple administrations over an eight to twenty year period improve within the span

6   of four months between October 2017 and January 2018.  Plaintiffs contend Defendants "adopted

7   a novel interpretation of the TPS statute."  Compl. ¶ 75.  Previously, "DHS or its predecessors

8   considered intervening natural disasters, conflicts, and other serious social and economic problems

9   as relevant factors when deciding whether to continue or instead terminate a TPS designation," but

10   "the Trump administration's DHS has now taken the position that such factors cannot be

11   considered."  *Id.*  This change occurred without any explicit acknowledgment, announcement, or

12   explanation.  *Id.* ¶ 76.

13        Plaintiffs cite two statements given to Congress by DHS officials as evidence to support

14   those claims.  On June 6, 2017, then-DHS Secretary John Kelly stated that "the program [TPS] is

15   for a specific event.  In – in Haiti, it was the earthquake.  Yes, Haiti had horrible conditions before

16   the earthquake, and those conditions aren't much better after the earthquake.  But the earthquake

17   was why TPS was – was granted and – and that's how I have to look at it."  *Id.* ¶ 76.  Current

18   Secretary Kirstjen Nielson more expressly stated that "[t]he law does not allow me to look at the

19   country conditions of a country writ large.  It requires me to look very specifically as to whether

20   the country conditions originating from the original designation continue to exist."  *Id.*  ¶ 77.

21        Plaintiffs contend this change in approach was not a good-faith change in legal

22   interpretation of the TPS statute.  Instead, they allege Defendants' action was motivated by racial

23   and national-origin animus.  Compl. ¶ 66.  They trace the animus to President Donald J. Trump

24   and others in his administration who have made statements which "leave no doubt as to the

25   speaker's racially discriminatory motives against non-white and non-European immigrants."  *Id.*

26   Most relevant to the TPS terminations at issue here, in a January 11, 2018 meeting with

27   Congressional representatives concerning TPS protections for nationals from Latin American and

28

African countries, in which at least El Salvador and Haiti were specifically discussed,[11] President Trump wondered aloud, "Why are we having all these people from shithole countries come here?" *Id.* ¶ 70.  He expressed a preference, instead, for immigrants from countries like Norway, which is overwhelmingly white.  *Id.*  President Trump asked "Why do we need more Haitians?" and "insisted that lawmakers '[t]ake them out' of any potential immigration deal." *Id.*

Just one week after President Trump's comments, Deputy Secretary Duke announced the decision terminating Haiti's TPS designation, and Secretary Nielsen announced the decision terminating El Salvador's designation.  Compl. ¶¶ 81, 84.  Secretary Nielsen was allegedly present at the meeting with President Trump.  *Id.* ¶ 72.

The White House has allegedly exerted pressure on DHS with respect to recent TPS terminations.  In particular, Plaintiffs allege that in November 2017, White House Chief of Staff John F. Kelly and White House Homeland Security Adviser Tom Bossert "repeatedly called Acting [DHS] Secretary Duke and pressured her to terminate the TPS designation for Honduras." Compl. ¶ 73.  One official with knowledge of the exchange stated that "[t]hey put massive pressure on [Acting Secretary Duke]." *Id.*  Chief of Staff Kelly who allegedly called from Japan while traveling with President Trump, "was irritated and persistent," and "warn[ed] Acting Secretary Duke that the TPS program 'prevents [the Trump Administration's] wider strategic goal' on immigration." *Id.*  The pressure was so severe that Acting Secretary Duke stated she would resign her position. *Id.*

## II.      LEGAL STANDARD

Defendants move to dismiss under both Rule 12(b)(1) and 12(b)(6).

A.      Rule 12(b)(1)

"[A] defendant may challenge the plaintiff's jurisdictional allegations in one of two ways.

---

[11]  Plaintiffs' complaint cites a news article stating that the topic of discussion at the January 11, 2018 meeting was immigrants "from Haiti, El Salvador, and African countries.  *See* Compl. at 20, n. 37 (citing Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, WASH. POST (Jan 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.  The article is incorporated by reference into the complaint.  *See In re NVIDIA Corp. Securities Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014).

United States District Court
Northern District of California

1    A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient

2    on their face to invoke federal jurisdiction.  The district court resolves a facial attack as it would a

3    motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing

4    all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are

5    sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117,

6    1121 (9th Cir. 2014) (citations and quotations omitted).

7         "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations,

8    usually by introducing evidence outside the pleadings.  When the defendant raises a factual attack,

9    the plaintiff must support her jurisdictional allegations with 'competent proof,' under the same

10   evidentiary standard that governs in the summary judgment context.  The plaintiff bears the

11   burden of proving by a preponderance of the evidence that each of the requirements for subject-

12   matter jurisdiction has been met." *Id.* (citations omitted).

13        Here, Defendants concede that they are mounting only a "facial" attack to Plaintiffs'

14   allegations with respect to jurisdiction.  Accordingly, the Court accepts those allegations as true

15   and draws reasonable inferences in their favor.

16   B.    Rule 12(b)(6)

17        In reviewing a motion to dismiss, the Court takes all allegations of material fact as true and

18   construes them in favor of the plaintiffs to determine whether a plausible legal claim has been

19   stated.  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  A claim "has facial plausibility

20   [if the plaintiffs] plead[] factual content that allows the court to draw the reasonable inference that

21   the defendant is liable for the misconduct alleged." *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009).

22   Importantly, "[i]f there are two alternative explanations [for the challenged conduct], one

23   advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's

24   complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216

25   (9th Cir. 2011).  Dismissal is only warranted if Defendants' "plausible alternative explanation is

26   so convincing that [Plaintiffs'] explanation is *implausible*." *Id.* (emphasis in original).

27                              **III.    DISCUSSION**

28        Defendants argue that the Court lacks jurisdiction to review any claim related to

United States District Court
Northern District of California

Defendants' termination of TPS for the four countries at issue and that, even if the Court can consider Plaintiffs' claims, they each fail on the merits.  For the reasons stated in its prior summary order and below, the Court denies Defendants' motion.

A.    Jurisdictional Bar – Dismissal Under Rule 12(b)(1)

Section 1254a(b)(5)(A) of the TPS statute provides:

> There is no judicial review of any determination of the [Secretary of Homeland Security][12] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

8 U.S.C. § 1254a(b)(5)(A).

Defendants construe this provision broadly to preclude review not only of the Secretary's substantive determination with respect to a particular country (*e.g.*, whether conditions in a particular foreign country have abated), but also any generally applicable process, practice, or legal interpretation employed by the Secretary in making such determinations.  The Court first construes the scope of § 1254a and then considers whether Plaintiffs' claims fall within its scope.

1.    Section 1254a Does Not Preclude Challenges to General Collateral Practices

Statutory interpretation begins with the text of the statute. *See Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 802 (9th Cir. 2017).  Construction of a jurisdiction-stripping statute, however, is guided by important overarching principles.  "A strong presumption exists that the actions of federal agencies are reviewable in federal court."  *KOLA, Inc. v. U.S.*, 882 F.2d 361, 363 (9th Cir. 1989); *see also Sackett v. E.P.A.*, 566 U.S. 120, 128 (2012) (explaining that "[t]he APA . . . creates a presumption favoring judicial review of administrative action").  Furthermore, "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."  *Webster v. Doe*, 486 U.S. 592, 603 (1988).  The presumption in favor of judicial review may be overcome "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (citations omitted).  Such indications may be "drawn from 'specific language,' 'specific legislative history,' and 'inferences

---

[12]  Section 1254a vests this authority with the Attorney General, but that power was subsequently transferred to the Secretary of Homeland Security.  *See* 8 U.S.C. § 1103; 6 U.S.C. § 557.

15

of intent drawn from the statutory scheme as a whole,' that Congress intended to bar review." *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) (quotation omitted). Finally, "[e]ven where the ultimate result [of a statute] is to limit judicial review, . . . as a matter of the interpretive enterprise itself, the narrower construction of a jurisdiction-stripping provision is favored over the broader one." *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004). Giving effect to provisions eliminating judicial review raises serious questions as to separation of powers, and raises constitutional concerns. *See Webster*, 486 U.S. at 603 (explaining that a "heightened showing" of Congressional intent is required "in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim").

The TPS statute precludes review of the "any *determination* . . . with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The statute does not define "determination," but it is evident from the statutory context that this provision refers to the designation, termination, or extension of a country for TPS. *Id.* The statute uses the word "determines" or "determination" in connection with the Secretary's initial designation, periodic review, and termination of a TPS foreign-state designation. *See* 8 U.S.C. § 1254a(b)(3)(A) (providing that the Secretary periodically "shall *determine* whether the conditions for such designation . . . continue to be met" and to timely publish "such *determination*"); *id.* § 1254a(b)(3)(B) (if the Secretary "determines" the conditions are no longer met, then he "shall terminate the designation by publishing notice . . . of *the determination*"); *id.* § 1254a(b)(3)(C). There is no clear provision stating "determination" refers to, *e.g.*, general procedures or criteria applied in making such country-by-country determinations.

The Supreme Court has concluded that similar statutes which preclude review of a "determination" of immigration status did not preclude review of collateral practices and policies. For example, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), concerned a jurisdiction-stripping provision related to the "Special Agricultural Workers" (SAW) amnesty program for certain farmworkers. Under the Immigration Reform and Control Act of 1986 ("IRCA"), alien

United States District Court
Northern District of California

farmworkers who were unlawfully present but met certain criteria could apply for adjustment of status.  *See generally* 8 U.S.C. § 1160(a).  The Attorney General was responsible for administering the application process, including a required interview.  The plaintiffs in *McNary* alleged that the "interview process was conducted in an arbitrary fashion that deprived applicants of the due process guaranteed by the Fifth Amendment to the Constitution" because, *inter alia*, they were not apprised of or given an opportunity to challenge adverse evidence, denied the opportunity to present witnesses, were denied access to competent interpreters, and because the interviews were not recorded, inhibiting meaningful review of denials.  *Id.* at 487.  They did not challenge their individual denials on the merits (*i.e.*, the application of the statute's substantive eligibility criteria to their individual case), but rather collaterally challenged the process under which their denials were determined.

The government argued that the *McNary* plaintiffs' claims were precluded from bringing suit because the statute (similar to the TPS statute here) provided that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except [as provided under 8 U.S.C. § 1160(e)(3)(A) of 'an order of exclusion or deportation']."  8 U.S.C. § 1160(e).  The Supreme Court held that "the reference to 'a determination' describes a single act rather than a group of decisions *or a practice or procedure employed in making decisions*."  *Id.* at 492 (emphasis added).  The court found that its interpretation was bolstered by the fact that the statute limited judicial review of such "determinations" to a narrow process; that review was limited to an administrative record related to an individual's eligibility for relief, and was thus inadequate "to address the kind of procedural and constitutional claims" asserted by the plaintiffs.  *Id.* at 493.  The Supreme Court noted that, "had Congress intended the limited review provisions . . . to encompass challenges to INS procedures and practices, it could easily have used broader statutory language," such as "all causes . . . arising under" the statute, or "all questions of law and fact.  *Id.* at 494.  In short, the Supreme Court held that "[w]e agree . . . this language [describes] the process of direct review of individual denials of SAW status, rather than as referring to general collateral challenges to unconstitutional practices and policies used by the agency in processing applications."  498 U.S. at

492.

The Supreme Court applied *McNary* in *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43 (1993) ("*CSS*"). In *Reno*, the Supreme Court considered a challenge to regulations promulgated by the AG pursuant to IRCA with respect to another amnesty program permitting certain aliens to adjust their immigration status. A similar set of jurisdiction-stripping provisions collectively provided that "a determination respecting an application for adjustment of status" could only be reviewed in a single level of administrative appellate review and then "only in the judicial review of an order of deportation." *See* 8 U.S.C. §§ 1255a(f)(1), 1255a(f)(3)(A), 1255a(f)(4)(A), 1255a(f)(1). Although the suit in *Reno* was not the judicial review authorized by the statute, the Court permitted the case to proceed because the plaintiffs' challenge was to the AG's regulations interpreting the statute, rather than an individual determination. The Supreme Court thus held that the jurisdiction-stripping provision did not apply.[13]

Here, Plaintiffs challenge, *inter alia*, DHS's change in interpretation of the TPS statute (a general procedural issue), not an individual determination.[14] The Department's general interpretation of the TPS statute is a question distinct from the Department's designation or termination of a particular country's TPS status.

Contrary to Defendants' argument, the statute's reference to "*any* determination" does not subsume "any" general policies or practices. Rather, the word "any" must be understood in its grammatical context: "any determination . . . *with respect to the designation,* or *termination* or

---

[13]  The Supreme Court then determined that several plaintiffs' claims may not be ripe because they had not yet applied for and been denied adjustment of status under the regulation they challenged. Defendants do not challenge the ripeness of Plaintiffs' claims in this case. Moreover, no such problem appears. In *CSS*, the plaintiffs were unlawfully present in the United States and would not be affected by the problematic regulation unless they applied for adjustment of status and then were denied on the basis of the challenged regulation (rather than on other grounds). In contrast, here, Plaintiffs and others similarly situated have permission to remain in the United States and Defendants' actions will, if undisturbed, strip them of that status.

[14]  *See also Immigrant Assistance Project of AFL-CIO v. I.N.S.*, 306 F.3d 842, 862-63 (9th Cir. 2002) (applying *McNary* to hold that a statute depriving aliens applying for amnesty of "judicial review of a determination respecting an application for adjustment" did not preclude district court jurisdiction over the plaintiffs' "procedural rather than substantive" challenge); *Proyecto San Pablo v. I.N.S.*, 189 F.3d 1130, 1138-41 (9th Cir. 1999) (same).

*extension of a designation*, of a foreign state." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). *See Small v. U.S.*, 544 U.S. 385, 388 (2005) (holding that statutory phrase "convicted in any court" did not include foreign courts); *U.S. v. Alvarez-Sanchez*, 511 U.S. 350, 357 (1994) (holding that "respondent errs in placing dispositive weight on the broad statutory reference to 'any' law enforcement officer or agency without considering the rest of the statute"). In context, "any determination" means the determination to designate, the determination to terminate, and the determination to extend a designation. "Any" modifies but does not define "determinations."

The government cites a House Judiciary Committee report which states that "none of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review," H.R. Rep. No. 101-245 (1989), at 14. That citation is inapt for two reasons. First, this committee report concerns the "Chinese Temporary Protected Status Act of 1989," House Resolution 2929 (101st Congress), which was never passed. Although the judicial review provision in that proposed legislation is similar to the language ultimately included in the general TPS statute passed and codified at 8 U.S.C § 1254a, the latter was part of the Immigration Act of 1990, Pub. L. No. 101-649, Nov. 29, 1990. Defendants have not identified other relevant legislative history pertaining to the legislation actually passed by Congress. In any case, the language cited in this committee report would not provide additional guidance even if it pertained to the TPS statute at issue here. It merely echoes the language of the statute, using the word "decisions" instead of "determinations." That is not clear and convincing evidence of Congressional intent to strip jurisdiction of the courts to review generally applicable policies and practices which transcend individual TPS determination for a particular country.

Finally, the fact that Plaintiffs' challenge might result in vacating the four TPS determinations at issue in this case is not dispositive to the interpretation question at hand. The same was true in *McNary* and *CSS*; both had the effect of vacating individual determinations and requiring the agency to re-consider them after correcting procedural deficiencies and applying the correct legal standard. Similarly, if Plaintiffs prevail here, Defendants would not be compelled to extend each country's TPS designation. Instead, Defendants may make a new determination whether TPS should be extended or terminated once they correct any legal errors identified by the

19

1   Court.

2         2.     <u>Section 1254a Does Not Preclude Colorable Constitutional Claims</u>

3         Plaintiffs' constitutional claims do challenge, *inter alia*, DHS's determinations to terminate

4   each of the four country's TPS status on grounds that do not depend on DHS's general

5   interpretation of the TPS statute.  For example, the U.S.-citizen children allege that Defendants'

6   termination of their parents' TPS status violates their substantive due process rights because

7   "Defendants have articulated no substantial governmental interest and have failed to adequately

8   tailor their action to promote any legitimate interest they may have," and the TPS termination

9   notices do not "identif[y] any risk to the interests of the United States that would follow from

10  allowing the school-aged U.S. citizen children to remain in the United States with their TPS holder

11  parents until the children reach the age of majority."  Compl. ¶ 105.  Similarly, Plaintiffs' equal

12  protection claim alleges that "Defendants' decisions to terminate the TPS designations for El

13  Salvador, Haiti, Nicaragua, and Sudan are unconstitutional because they were motivated, at least

14  in part, by intentional discrimination based on race, ethnicity, or national origin."  Compl. ¶ 110.

15  Finally, the TPS-holder Plaintiffs allege that their due process rights have been violated because

16  "[t]he government also has not articulated, and cannot establish, any rational basis for . . . ignoring

17  the current capability of TPS countries to safely receive longtime TPS holders, their families, and

18  their U.S. citizen children."  Compl. ¶ 115.

19        These challenges are not collateral challenges to broad policies.  Rather, they directly

20  attack the determinations themselves.  Thus, *McNary* and *Reno* do not apply to these challenges.

21  Nevertheless, as noted above, "where Congress intends to preclude judicial review of

22  constitutional claims its intent to do so must be clear."  *Webster*, 486 U.S. at 603.  This

23  "heightened showing" is required "in part to avoid the 'serious constitutional question' that would

24  arise if a federal statute were construed to deny any judicial forum for a colorable constitutional

25  claim."  *Id.* (citation and quotation omitted).

26        Here, Plaintiffs argue that the phrase "under this subsection" in Section 1254a(b)(5)(A)

27  means that the provision does not preclude a legal claim arising under the Constitution or other

28  statutes.  *See* 8 U.S.C. § 1254a(b)(5)(A) ("There is no judicial review of any determination of the

United States District Court
Northern District of California

1    Attorney General . . . *under this subsection*." (emphasis added)).  This argument is not persuasive.

2    Under Plaintiffs' interpretation, the statute only precludes a cause of action arising directly under §

3    1254a; but there is no direct cause of action under § 1254a, so Plaintiffs' interpretation would

4    render the phrase meaningless.  Rather, as the Government contends, "under this subsection" is

5    more reasonably read to describe the "determinations" for which review is precluded, *i.e.*, specific

6    TPS determinations made by the Secretary under the statute.

7         However, there is no "clear and convincing" evidence that Congress intended to preclude

8    the Court from reviewing constitutional challenges of the nature alleged here.  Indeed, as Plaintiffs

9    point out, where Congress otherwise intended to preclude review of *all* constitutional claims in the

10   INA, it said so explicitly.  *See* 8 USC 1252(b)(9) ("Judicial review of all questions of law and fact,

11   *including interpretation and application of constitutional and statutory provisions*, arising from

12   any action taken or proceeding brought to remove an alien . . . shall be available only in judicial

13   review of a final order under this section." (emphasis added)); *see also McNary*, 509 U.S. at 494.

14   Such a clear expression of intent is absent in the TPS statute.[15]  Constitutional concerns counsel

15   for a narrow interpretation of jurisdiction-limiting statutes.  Thus, absent clear evidence of

16   Congressional intent, the jurisdiction-stripping provision should be construed to preclude review

17   only of claims challenging a determination for reasons that are "closely tied to the application and

18   interpretation of statutes" which are committed by statute to the Secretary's discretion.  *See*

19   *Cuozzo*, 136 S.Ct. at 2141-42 (holding that lawsuit challenging U.S. Patent and Trademark

20   Office's decision to institute inter partes review based on the alleged insufficiency of the petition

21

22   [15]  The government cites only one case to support its interpretation that § 1254a precludes review
     of constitutional claims, *Krua v. U.S. Dept. of Homeland Sec.*, 729 F.Supp.2d 452, 455 (D. Mass.

23   2010) (holding that pro se Liberian national's claim that Secretary's TPS designation violated the
     equal protection guarantee because it arbitrarily distinguished between Libyans present in the U.S.

24   before and after Oct. 1, 2002 was precluded from review).  The *Krua* court did not undertake a
     reasoned analysis in construing Section 1254a's jurisdiction-stripping provision so is not

25   persuasive.  In any event, it is not necessarily inconsistent with the Court's holding.  Arguably, the
     Secretary's decision with respect to eligibility cut-off dates for TPS protection is "closely related"

26   to administration of the TPS statute and therefore unreviewable under *Cuozzo*.  *See* 8 U.S.C.
     § 1254a(b)(2)(A) (TPS designation of a foreign state "take[s] effect upon the date of

27   publication . . . or such later date as the Attorney General may specify").  Thus, the plaintiff's
     equal protection challenge based on the differential treatment of Liberians arriving before and

28   after a particular cut-off date established by law could be precluded.  In contrast, Congress did not
     charge the Secretary with making termination decisions on the basis of racial animus.

United States District Court
Northern District of California

for review was precluded by jurisdiction-stripping statute, but expressly holding that "we do not categorically preclude review of a final decision where . . . there is a due process problem with the entire proceeding, nor does our interpretation enable the agency to act outside its statutory limits").

Applying that principle here, Section 1254a does not reflect a clear Congressional intent to preclude this Court from reviewing Plaintiffs' constitutional challenges to the Secretary's determinations.  The substance of Plaintiffs' constitutional challenges is far afield of fact-based criteria that are "closely tied" to administration of the TPS statute.  While the Secretary's evaluation of particular facts based on statutory criteria under 8 U.S.C. § 1254a(b)(1)(A)-(C) may be "closely tied to the application and interpretation of statutes related to" the Secretary's decisions, ascertaining whether the decision is driven by unconstitutional racial animus is not.  Nor is the purely legal question regarding the scope of a person's substantive due process interests against removal (*i.e.*, how to balance an *individual*'s interests with the Government's interests).  Unlike, *e.g.*, a challenge to the Secretary's determination to terminate TPS for a particular country being allegedly arbitrary because the country is not in fact safe, the constitutional claims at issue here do not focus on the factual accuracy of the Secretary's evaluation of specific country conditions, an evaluation which Section 1254a was intended to insulate.  Instead, these constitutional challenges are predicated on facts outside the considerations prescribed (and committed to the Secretary's evaluation) by the TPS statute.

Defendants argue that the *Webster* presumption in favor of judicial review of colorable constitutional claims does not apply here because Congress did not preclude all judicial review but "simply channel[ed] review of a constitutional claim to a particular court."  *Elgin v. Dept. of Treasury*, 567 U.S. 1, 9 (2012).[16]  Defendants' argument rests on the assumption that an alien

---

[16]  In its Reply brief, the Government cites the plurality opinion in *Patchak v. Zinke*, 138 S. Ct. 897 (2018).  In that case, the plaintiff sued the Secretary of the Interior for taking land into trust on behalf of an Indian tribe; after the suit was instituted, Congress passed a statute stripping the district courts of jurisdiction over lawsuits relating to the land.  *Id.* at 902.  The plaintiff argued that Congress violated Article III of the Constitution by improperly directing the results of pending litigation.  *Id.* at 904.  The Supreme Court explained that "Congress violates Article III when it 'compel[s] . . . findings or results under old law,'" but not "when it 'changes the law.'"  *Id.* at 905 (citations omitted, alteration in original).  The court interpreted the new statute stripping jurisdiction as a change in law that was not problematic.  In so doing, the court explained that "Congress generally does not infringe the judicial power when it strips jurisdiction because, with

ordered removed may seek judicial review in the context of removal proceedings of constitutional claims challenging termination of a country's TPS status under 8 U.S.C. § 1252(a)(2)(D).[17]  The argument is flawed for several reasons.

First, Defendants do not concede that review of constitutional claims through those procedures would be available to aliens ordered removed:  Defendants therefore seem to doubt their own premise.

Second, the TPS statute was passed in 1990; the TPS statute did not purport to "channel" review of constitutional claims arising out of TPS country determinations to a particular forum. Congress did not create the judicial review provisions of 8 U.S.C. § 1252(a)(2)(D) until a decade later, when it passed the REAL ID Act of 2005, Pub. L. 109-13, in response to the Supreme Court's decision in *INS v. St. Cyr.*, 533 U.S. 289 (2001).  The Act eliminated district court habeas jurisdiction over orders of removal" and "addressed Suspension Clause concerns raised in *St. Cyr.* by allowing (i.e., reinstating) review in courts of appeal of final removal orders of aggravated felons for 'constitutional claims or questions of law.'"  *Iasu v. Smith*, 511 F.3d 881, 886 (9th Cir. 2007) (quoting 8 U.S.C. § 1252(a)(2)(D)).  The REAL ID Act reflects Congress's intent to channel constitutional challenges to a *removal order*; it does not reflect a Congressional purpose to circumvent constitutional challenges to TPS country determinations; nor was it intended to limit challenges brought by a person who is not facing removal (*e.g.*, a U.S.-citizen).

Third, U.S.-citizen children cannot seek judicial review through that process because they are not aliens who would be ordered removed; Congress therefore could not have intended to channel their claims to appeals from a removal proceeding.

Finally, even for aliens ordered removed, judicial review in removal proceedings would be

---

limited exceptions, a congressional grant of jurisdiction is a *prerequisite* to the exercise of judicial power."  *Id.* at 907.  The plurality opinion's language is inapposite because, as explained above, Congress has not clearly expressed its intent to strip the Court of jurisdiction over Plaintiffs' claims here.  Thus, the question whether Congress *could* strip the district court of jurisdiction over constitutional claims is not necessarily at issue here.

[17]  *See* 8 U.S.C. § 1252(a)(2)(D) (providing that "[n]othing . . . in any other provision of this chapter . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review [of a final order of removal] filed with an appropriate court of appeals in accordance with this section").

United States District Court
Northern District of California

1    ineffective because it would be limited to "the administrative record on which the order of

2    removal is based." *See* 8 U.S.C. § 1252(b)(4)(A).  Plaintiffs would not have an opportunity to

3    develop a record regarding their constitutional claims to support review.

4        For these reasons, Congress has not clearly indicated an intent to preclude jurisdiction over

5    colorable constitutional challenges related to TPS determinations.

6    B.    Motion to Dismiss

7        Plaintiffs bring four claims.  First, they allege that Defendants' adoption of a new

8    interpretation of the TPS statute violates the Administrative Procedure Act insofar as it departed

9    *sub silentio* from a past practice (Count Four).  Second, Plaintiffs bring two separate due process

10   claims on behalf of the TPS-holding parents and the U.S.-citizen children on the basis that

11   Defendants have not advanced a sufficient rationale to justify infringing on their protected liberty

12   and/or property interests (Counts One and Three).  Finally, Plaintiffs allege that Defendants'

13   termination of TPS violates the equal protection guarantee of the Due Process Clause because it

14   was motivated, at least in part, by racial or national-origin animus.  The Court analyzes each claim

15   on which Defendants seek dismissal substantively under Rule 12(b)(6).

16       1.    APA Claim (Count Four)

17            a.    Legal Standard

18       Under the APA, agency action may be set aside if it is arbitrary or capricious.  *See* 5

19   U.S.C. § 706(2)(A).  Under this standard, an agency must "examine the relevant data and

20   articulate a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Assn. of United States,*

21   *Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).  But "a court is not to

22   substitute its judgment for that of the agency" and "should uphold a decision of less than ideal

23   clarity if the agency's path may reasonably be discerned."  *F.C.C. v. Fox Television Stations, Inc.*,

24   556 U.S. 502, 513-14 (2009) (citation and quotation omitted).

25       The APA constrains an agency's ability to change its practices or policies without

26   acknowledging the change or providing an explanation.  "[T]he requirement that an agency

27   provide reasoned explanation for its action would ordinarily demand that [an agency] display

28   awareness that it *is* changing position."  *Id.* at 515 (emphasis in original).  Thus, agencies "may

24

1   not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books,"

2   and "must show that there are good reasons for the new policy." *Id.* (emphasis in original).  An

3   agency need not demonstrate that "the reasons for the new policy are *better* than the reasons for

4   the old one; it suffices that the new policy is permissible under the statute, that there are good

5   reasons for it, and that the agency *believes* it to be better, which the conscious change of course

6   adequately indicates." *Id.* (emphasis in original).

7          This constraint on changes to agency policy is not limited to formal rules or official

8   policies.  It applies to practices implied from the agency conduct.  For example, in *California*

9   *Trout v. F.E.R.C.*, 572 F.3d 1003 (9th Cir. 2009), the plaintiffs challenged the Federal Energy

10  Regulatory Commission's (FERC) denial of their untimely attempt to intervene in a proceeding

11  concerning the renewal of an operating license for a dam and power plant.  In essence, the

12  plaintiffs argued that FERC's decision to grant late intervention requests in three prior

13  adjudications had given rise to an implicit rule that FERC would always grant late requests in

14  certain circumstances, and that FERC was required to offer a reasoned explanation before

15  abandoning that practice.  Although it ultimately held against the plaintiffs, the Ninth Circuit

16  agreed that the alleged change in adjudicative practice was subject to the APA's requirements for

17  reasoned decision-making.  It explained that "while an agency may announce new principles in an

18  adjudicatory proceeding, it may not depart, sub silentio, from its usual rules of decision to reach a

19  different, unexplained result in a single case." *Id.* at 1022(quotation and citation omitted)).

20  Rather, "'if [an agency] announces and follows—by rule *or by settled course of adjudication*—a

21  general policy by which its exercise of discretion will be governed, an irrational departure from

22  that policy (as opposed to an avowed alteration of it) could constitute action that must be

23  overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the

24  Administrative Procedure Act.'" *Id.* at 1023 (quoting *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32

25  (1996)) (emphasis added, alteration in original).  The court proceeded to consider the claim on the

26  merits and held that the agency's prior decisions had *not* "establish[ed] a broad principle that the

27  Commission will allow untimely intervention." *Id.* at 1024.

28          Thus, *California Trout* establishes that a shift in agency practice (as opposed to a formal

rule or policy) is also reviewable under the APA.  Courts have also looked, in part, to whether an

agency's past practice evinces the existence of an implicit rule or policy.  *See*, *e.g.*, *Northwest Env.*

*Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007) (holding that BPA's decision

to stop funding Fish Passage Center and to divert its responsibilities to two other entities after

nearly two decades was arbitrary and capricious where no reasoned explanation was provided);

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017) (after

"longstanding practice" of treating certain land as if it were part of the Wild Horse Territory,

agency's unexplained change in practice was arbitrary-and-capricious, particularly where it

"fail[ed] even to acknowledge its past practice . . . let alone to explain its reversal of course in the

2013 decision").

### b.      Plaintiffs Plausibly Allege a Change in Practice or Policy

Plaintiffs allege that to justify the termination of TPS for El Salvador, Haiti, Nicaragua,

and Sudan, "DHS has adopted a novel interpretation of the TPS statute.  Under prior

administrations, DHS or its predecessors considered intervening natural disasters, conflicts, and

other serious and social economic problems as relevant factors when deciding whether to continue

or instead terminate a TPS designation. . . .  [T]he Trump administration's DHS has now taken the

position that such factors cannot be considered."  Compl. ¶ 75.  Plaintiffs more specifically cite

former Secretary Kelly's June 6, 2017 Senate testimony that "the [TPS] program  is for a specific

event.  In – in Haiti, it was the earthquake.  Yes, Haiti had horrible conditions before the

earthquake, and those conditions aren't much better after the earthquake.  But the earthquake was

why TPS was – was granted and – and that's how I have to look at it."  Compl. ¶ 76.

Additionally, as noted above, Secretary Nielsen later stated that "[t]he law does not allow me to

look at the country conditions of a country writ large.  It requires me to look very specifically as to

whether the country conditions originating from the original designation continue to exist."  *Id.* ¶

77.  Plaintiffs also cite three press releases issued by DHS with respect to TPS for El Salvador,

Haiti, Nicaragua, and Honduras where the Secretary stated that she compared "the conditions upon

which the country's original designation was based" with "an assessment of whether those

originating conditions continue to exist."  *Id.* ¶ 78.

26

Defendants argue that a facial comparison between the termination notices here and prior notices shows that they are in fact consistent, not that any radical change has occurred. Indeed, to state a claim, Plaintiffs must plausibly allege not only that Defendants considered only the "originating conditions" in terminating TPS here, but also that Defendants' prior practice was to the contrary. They have done so here. Prior to October 2017, extension and/or re-designation notices indicate that DHS consistently considered, at the very least, whether intervening events had frustrated or impeded recovery efforts from the originating conditions in Sudan, Haiti, Nicaragua, and El Salvador. For example, in notices regarding Sudan, DHS emphasized *both* the persistence of the armed conflict prompting the original designation *and* consequential problems beyond the conflict itself, which together prevented the safe return of Sudanese nationals.[18] The

---

[18] **Sudan**:

- *Extension and Redesignation of Sudan Under the Temporary Protected Status Program*, 64 FR 61128-01, 1999 WL 1008419 (Nov. 9, 1999) (finding that the armed conflict is ongoing and extraordinary and temporary conditions continue to exist);
- *Extension of Designation of Sudan Under the Temporary Protected Status Program*, 65 Fed. Reg.67,407-01 (Nov. 9, 2000) (noting that the civil war continues and highlighting some of its effects, including forced relocation, destruction of indigenous trading and production systems, and a risk of famine);
- *Extension of Designation of Sudan Under the Temporary Protected Status Program*, 66 Fed. Reg. 46,031-01 (Aug. 31, 2001) (noting that the civil war continues and associated impact, including human rights abuses, displacement, insecurity, and famine);
- *Extension of the Designation of Sudan Under the Temporary Protected Status Program*, 67 Fed. Reg. 55,877-01 (Aug. 30, 2002) (noting ongoing civil war, failure of peace negotiations, and associated human rights abuses, forced displacement, denial of access to humanitarian agencies, and so on);
- *Extension of the Designation of Sudan Under Temporary Protected Status Program*, 68 Fed. Reg. 52,410-01 (Sept. 3, 2003) (same);
- *Extension and Re-designation of Temporary Protected Status for Sudan*, 69 Fed. Reg.60,168-01, 60,169 (Oct. 7, 2004) (same);
- *Extension of the Designation of Sudan for Temporary Protected Status*, 76 Fed. Reg. 63635-01 (Oct. 13, 2011) (concluding that "because the armed conflict is ongoing, although there have been a few improvements . . . the extraordinary and temporary conditions that prompted . . . redesignation persist");
- *Extension and Redesignation of Sudan for Temporary Protected Status*, 78 Fed. Reg. 1872-01 (Jan. 9, 2013) (same because "the conditions in Sudan that prompted the TPS designation not only continue to be met but have deteriorated" and "[t]here continues to be a substantial, but temporary, disruption of living conditions in Sudan based upon ongoing armed conflict and extraordinary and temporary conditions");
- *Extension of the Designation of Sudan for Temporary Protected Status*, 79 Fed. Reg. 52,027-01, 52,029 (Sept. 2, 2014) (same);
- *Extension of the Designation of Sudan for Temporary Protected Status*, 81 Fed. Reg. 4045-01 (Jan. 25, 2016) (same).

same is generally true of Nicaragua and Hurricane Mitch,[19] El Salvador's earthquake,[20] and Haiti's

---

[19] **Nicaragua**:

- *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 65 Fed. Reg. 30,440-01, 30,440 (May 11, 2000) ("The conditions which led to the original designation are less severe, but continue to cause substantial disruption to living conditions in Nicaragua.");
- *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 66 Fed. Reg. 23,271-01, 23,272 (May 8, 2001) ("sufficient damage from Hurricane Mitch persists");
- *Extension of the Designation of Nicaragua Under the Temporary Protected Status Program*, 67 Fed. Reg. 22,454-01, 22,454 (May 3, 2002) (**"[R]ecent droughts as well as flooding from Hurricane Michelle in 2001** *compounded the humanitarian, economic, and social problems initially brought on by Hurricane Mitch in 1998*" (emphasis added));
- *Extension of the Designation of Nicaragua Under Temporary Protected Status Program*, 68 Fed. Reg. 23,748-01, 23,749 (May 5, 2003) (same);
- Extension of the Designation of Temporary Protected Status for Nicaragua, 69 Fed. Reg. 64,088-01 (Nov. 3, 2004) ("Reconstruction of infrastructure damaged by Hurricane Mitch continues.");
- *Extension of the Designation of Temporary Protected Status for Nicaragua*, 71 Fed. Reg. 16,333-01 (Mar. 31, 2006) ("**While progress has been made in reconstruction from Hurricane Mitch, Nicaragua has not been able to fully recover, in part** *due to follow-on natural disasters that have severely undermined progress towards an economic recovery* **that would enable Nicaragua to adequately handle the return of its nationals.**" (emphasis added));
- *Extension of the Designation of Nicaragua for Temporary Protected Status*, 72 Fed. Reg. 29,534-01, 29,535 (May 29, 2007) (concluding no recovery from Hurricane Mitch and noting that subsequent storms have caused the country to remain vulnerable);
- *Extension of the Designation of Nicaragua for Temporary Protected Status*, 73 Fed. Reg. 57,138-01, 57,139 (Oct. 1, 2008) (concluding that disruption from Hurricane Mitch persists and noting that subsequent economic crises and natural disasters have exacerbated issues caused by Hurricane Mitch);
- *Extension of the Designation of Nicaragua for Temporary Protected Status*, 75 Fed. Reg. 24,737-01, 24,738 (May 5, 2010) (country "has not fully recovered from Hurricane Mitch" and that "more recent natural disasters have slowed the recovery from Hurricane Mitch");
- *Extension of the Designation of Nicaragua for Temporary Protected Status*, 76 Fed. Reg. 68,493-01 (Nov. 4, 2011) (describing subsequent natural disasters and noting that "[e]ach of these environmental events has hampered the recovery efforts from Hurricane Mitch");
- *Extension of the Designation of Nicaragua for Temporary Protected Status*, 78 Fed. Reg. 20,128-01 (Apr. 3, 2013) ("[R]ecovery from Hurricane Mitch is still incomplete" and "*subsequent natural disasters . . . hamper[ed] the recovery efforts*" (emphasis added));
- *Extension of the Designation of Nicaragua for Temporary Protected Status*, 79 Fed. Reg. 62,176-01 (Oct. 16, 2014) (same);
- *Extension of the Designation of Nicaragua for Temporary Protected Status*, 81 Fed. Reg. 30,325-01 (May 16, 2016) ("Nicaragua continues to suffer from the residual effects of Hurricane Mitch, and *subsequent disasters have* caused additional damage and added to the country's fragility" which "*exacerbated the persisting disruptions caused by Hurricane Mitch*" (emphasis added)).

[20] **El Salvador:**

- *Extension of the Designation of El Salvador Under the Temporary Protected Status Program*, 67 Fed. Reg. 46,000-01, 46,000 (July 11, 2002) (concluding that "the conditions

earthquake.[21]  As the highlighted language in these footnotes demonstrates, prior administrations considered subsequent, intervening events such as droughts extending TPS status.  In some cases, such intervening events were considered irrespective of whether they had any causal relationship

that warranted TPS designation initially continue to exist" but noting that the recovery "***has been further affected by a subsequent drought***" (emphasis added));

- *Extension of the Designation of El Salvador Under Temporary Protected Status Program*, 68 Fed. Reg. 42,071-01, 42,072 (July 16, 2003) (finding that recovery from earthquake was ongoing and "the conditions that prompted designation . . . continue to be met");
- *Extension of the Designation of Temporary Protected Status for El Salvador*, 70 Fed. Reg. 1450-01, 1451 (Jan. 7, 2005) (same);
- *Extension of the Designation of Temporary Protected Status for El Salvador*, 71 Fed. Reg. 34,637-01, 34,638 (June 15, 2006) (the conditions that initially gave rise to the designation . . . continue to exist");
- *Extension of the Designation of El Salvador for Temporary Protected Status*, 72 Fed. Reg. 46,649-01, 46,649-50 (Aug. 21, 2007) (concluding that "there continues to be a substantial, but temporary, disruption in living conditions . . . resulting from the earthquakes that struck the country in 2001");
- *Extension of the Designation of El Salvador for Temporary Protected Status*, 73 Fed. Reg. 57,128-01, 57,129 (Oct. 1, 2008) (same);
- *Extension of the Designation of El Salvador for Temporary Protected Status*, 75 Fed. Reg. 39,556-01, 39,558-59 (July 9, 2010) (same, but explaining that "***[m]ore recent natural disasters have delayed the recovery from the 2001 earthquakes,***" including Tropical Storm Stan in October 2005, the eruption of the Santa Ana volcano, a series of earthquakes in 2006, and Hurricane Ida in 2009 (emphasis added));
- *Extension of the Designation of El Salvador for Temporary Protected Status*, 77 Fed. Reg. 1710-02, 1712 (Jan. 11, 2012) (noting that El Salvador was "still rebuilding from the devastating 2001 earthquakes" and the efforts "***have been further complicated by more recent natural disasters and by sluggish economic growth***" (emphasis added));
- *Extension of the Designation of El Salvador for Temporary Protected Status*, 78 Fed. Reg. 32,418-01, 32,420 (May 30, 2013) (same);
- *Extension of the Designation of El Salvador for Temporary Protected Status*, 80 Fed. Reg. 893-01, 894-95 (Jan. 7, 2015) (documenting a series of natural disasters that "have caused ***substantial setbacks to infrastructure recovery and development since the 2001 earthquakes***" (emphasis added));
- *Extension of the Designation of El Salvador for Temporary Protected Status*, 81 Fed. Reg. 44,645-03 (July 8, 2016) (same).

[21] **Haiti**:
- *Extension and Redesignation of Haiti for Temporary Protected Status*, 76 Fed. Reg. 29,000-01, 29,000 (May 19, 2011) (concluding that "the conditions prompting the original designation continue to be met");
- *Extension of the Designation of Haiti for Temporary Protected Status*, 77 Fed. Reg. 59,943-01 (Oct. 1, 2012) (concluding that "the extraordinary and temporary conditions that prompted the original January 2010 TPS designation and the July 2011 extension and redesignation persist" and noting that camp conditions were exacerbated by later "steady rains" and ongoing problems of food security);
- *Extension of the Designation of Haiti for Temporary Protected Status*, 79 Fed. Reg. 11,808-01, 11,808 (Mar. 3, 2014) (same); and,
- *Extension of the Designation of Haiti for Temporary Protected Status*, 80 Fed. Reg. 51,582-01 (Aug. 25, 2015) (same).

to the original TPS designation.[22]

In sharp contrast to these prior notices—which were frequently detailed and lengthy—the termination notices for Sudan, Haiti, Nicaragua, and El Salvador are curt and fail to address numerous conditions that justified extensions of TPS status in the most recent notices issued by prior administrations.  The following chart illustrates the types of conditions cited in the prior notices but not discussed in Defendants' termination notices in these four cases.

| Country | Factors Cited to Support Prior Extensions | Termination Notices |
|---|---|---|
| El Salvador | July 8, 2016 Extension: | January 2018 Termination: |
|  | ·    "Subsequent natural disasters and environmental challenges, including hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity" | ·    No reference to subsequent natural disasters |
|  | ·    Prolonged regional drought impacting food security | ·    No reference to regional drought and food security |
|  | ·    A housing deficit of 630,000 because 340,000 houses not yet rebuilt from earthquake | ·    No specific reference or numbers concerning housing deficits, but general statements about reconstruction |
|  | ·    Coffee rust epidemic | ·    No reference to coffee rust epidemic |
|  | ·    More than 10 percent of population lacks access to potable water | ·    No reference to water access |
|  | ·    March 2016 extortion by gangs resulted in weeklong temporary bottled water shortage in San Salvador | ·    No reference to gang extortion |
|  | ·    Violence and insecurity impeding economic growth, particularly $756 in extortion payments to gangs in 2014 alone | ·    No reference to violence and insecurity but general statements that international organizations are working to provide security and economic support |
|  | ·    Corrupt police and judiciary | ·    No reference to corruption |
|  | ·    In 2014, almost a third of the work force was unemployed and lived in poverty | ·    No specific reference to poverty and unemployment but mentions international economic support |

---

[22] *See*, *e.g.*, *Extension of the Designation of Haiti for Temporary Protected Status*, 82 Fed. Reg. 23,830-01 (May 24, 2017) (noting that "lingering effects of the 2010 earthquake remain" despite "significant progress," but **noting that conditions warrant a brief extension due to Hurricane Matthew's October 2016 landfall and heavy rains in April 2017,** though not explicitly discussing any apparent link between those events and the earthquakes).

United States District Court
Northern District of California

| Country | Factors Cited to Support Prior Extensions | Termination Notices |
|---|---|---|
| Nicaragua | **May 16, 2016 Extension**:<br>·      Heavy rains and flooding in October 2014, May 2015, and June 2015 | **December 2017 Termination**:<br>·      No specific reference to 2014-2015 heavy rains and flooding |
| | ·      Earthquakes in April and October 2014 | ·      No specific reference to 2014 earthquakes |
| | ·      Telica volcano erupted 426 times in July 2015 | ·      No specific reference to 2015 volcanic eruptions |
| | ·      A prolonged regional drought and coffee rust epidemic negatively impacting livelihoods and food security | ·      No specific reference to coffee rust epidemic or regional drought |
| Haiti | **May 24, 2017 Extension (Trump Administration)**:<br>·      Hurricane Matthew in October 2016 damaged crops, housing ,livestock, and infrastructure | **January 2018 Termination:**<br>·      No reference to Hurricane Matthew |
| | ·      Heavy rains in late April 2017 killing people, damaging homes, and destroying crops causing food insecurity | ·      No reference to heavy rains |
| | ·      Ongoing cholera epidemic | ·      "Although Haiti has grappled with a cholera epidemic that began in 2010 in the aftermath of the earthquake, cholera is currently at its lowest level since the outbreak began." |
| | **August 25, 2015 Extension (Prior Admin):**<br>·      Cholera epidemic – as of Dec. 2014, 725,000 people affected and 8,800 deceased | ·      Same as above |
| | ·      Food insecurity- as of Jan. 2015, 2.5 million people could not cover basic food needs | ·      No reference to food insecurity |
| | ·      Political instability – after expiration of local and parliamentary mandates in January 2015, protests and demonstrations have turned violent | ·      Mentions February 2017 presidential election without specific discussion of whether there are still violent protests and demonstrations |

31

| Sudan | Jan 25, 2016 Extension: | October 2017 Termination: |
|---|---|---|
| | · In 2014, Sudanese government deployed a new paramilitary service carrying out a campaign that began in April 2014, was renewed December 2014, and continued into 2015, resulting in widespread civilian displacement. | · Acknowledges continuing conflict in Darfur and the Two Areas and stating that "toward the end of 2016 and through the first half of 2017, parties to the conflict renewed a series of time-limited unilateral cessation of hostilities" and that "[t]he remaining conflict is limited and does not prevent the return of nationals of Sudan to all regions of Sudan without posing a serious threat to their personal safety" |
| | · "[A]n increase in criminal activity and intertribal conflict" | · No reference to criminal activity |
| | · "Reports of human rights violations and abuses [which] are widespread, including . . . extrajudicial and unlawful killings" and "abuse . . . of certain populations, including journalists, political opposition, civil society, and ethnic and religious minority groups" | · "Although Sudan's human rights record remains extremely poor in general, conditions on the ground no longer prevent all Sudanese nationals from returning in safety." |
| | · Displacement of 143,000 persons between January and May 2015 and a March 2015 report that 250,000 Sudanese fled to South Sudan and Ethiopia | · Acknowledges that hundreds of thousands have fled but that the remaining conflict is limited and does not prevent their safe return |
| | · 6.9 million people in need of humanitarian assistance. 2 million children suffering from malnutrition. 550,000 from severe malnutrition. | · "Above-harvests have moderately improved food security. While populations in conflict-affected areas continue to experience acute levels of food security, there has also been some improvement in access for humanitarian actors to provide much-needed humanitarian aid" |

This comparison demonstrates the plausibility of Plaintiffs' allegation of a shift from past practice or policy. For every country (although to varying degrees), factors that were explicitly considered recently by prior administrations were wholly absent from the four termination notices issued between October 2017 and January 2018. That supports a plausible inference, corroborated by the statements of former Secretary Kelly and Secretary Nielsen, that Defendants changed their interpretation of the TPS statute so as to focus solely (or nearly solely) on the originating

condition without considering intervening events in making TPS determinations.

There are only two exceptions to this observation. First, Haiti's designation was extended once by former Secretary Kelly under the current administration. *See Extension of the Designation of Haiti for Temporary Protected Status*, 82 Fed. Reg. 23,830-01 (May 24, 2017). This does not undermine Plaintiffs' allegations that the change in policy occurred recently. Indeed, a comparison between Secretary Kelly's extension and Acting Secretary Duke's termination six months later supports an inference of an intervening change in policy or practice: although Secretary Kelly explicitly considered intervening events like Hurricane Matthew in October 2016 and heavy rains in late April 2017, Acting Secretary Duke did not.

Second, arguably the termination notice for Sudan touches, albeit indirectly and with much less specificity, on nearly all of the themes discussed in the most recent extension notice. However, that does not undermine the plausibility that Defendants at some point adopted a new rule or policy as indicated by the discrepancies between the notices for El Salvador, Haiti, and Nicaragua. The arguably more complete discussion with respect to Sudan does not defeat the viability of Plaintiffs' APA claim challenging the change in practice itself; at most, it might affect the scope of Plaintiffs' remedy if, for example, the new rule or policy was not instituted until after Sudan's termination.[23]

Finally, Defendants argue that prior administrations have terminated TPS despite ongoing problems in the designated countries. That fact is not dispositive to the case at bar. The question is whether those ongoing problems were *considered* when the termination decision was made.

---

[23] The Government cited the example of Montserrat, which was initially designated for TPS based on a volcanic eruption in 1997, *see* 62 Fed. Reg. 45686 (Aug. 28, 1997), and then re-designated six times, *see* 63 Fed. Reg. 45864 (Aug. 27, 1998); 64 Fed. Reg. 48190 (Sep. 2, 1999); 65 Fed. Reg. 58806 (Oct. 2, 2000); 66 Fed. Reg. 40834 (Aug. 3, 2001); 67 Fed. Reg. 47002 (Jul. 17, 2002); 68 Fed. Reg. 39106 (Jul. 1, 2003). However, its TPS designation was eventually terminated in 2004 because "the volcanic eruptions can no longer be considered temporary in nature" based on scientists' position that such eruptions "generally last 20 years, but the volcano could continue to erupt sporadically for decades." *See Termination of the Designation of Montserrat Under the Temporary Protected Status Program*, 69 Fed. Reg. 40642-01 (Jul. 6, 2004). This example is inapposite, however, because the termination notice reflected a judgment that the originating condition was not "temporary." Defendants' terminations of TPS for Haiti, Sudan, El Salvador, and Nicaragua are not based on such a finding; rather, they are based on the notion that the originating condition has abated.

United States District Court
Northern District of California

1    The notices confirm Plaintiffs' assertion that under the prior practice, intervening events were at

2    least considered.[24]

3        In sum, Plaintiffs' allegations and a facial review of the termination notices support a

4    plausible inference that Defendants have adopted a new policy or practice without any explanation

5    for the change.  Accordingly, Plaintiffs have stated a claim under the APA, and thus Defendants'

6    motion to dismiss the APA claim is **DENIED**.

7        2.    U.S. Citizens' Children's Due Process Claim to Family Integrity (Count One)

8        The U.S.-citizen children  assert that Defendants have not "articulated [a] substantial

9    governmental interest" to justify intruding on their right to live in the United States, to live with

10   their parents, and against being forced to make a choice between the two, thus violating their

11   substantive due process rights.  *See* Compl. ¶¶ 105-6.

12       "The concept of 'substantive due process' . . . forbids the government from depriving a

13   person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with

14   rights implicit in the concept of ordered liberty.'"  *Nunez v. City of Los Angeles*, 147 F.3d 867, 871

15   (9th Cir. 1998).  To establish a claim, "a plaintiff must, as a threshold matter, show a government

16   deprivation of life, liberty, or property."  *Id.*  The right in question must be one of "those

17   fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and

18   tradition."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation omitted).  "'The

19   protections of substantive due process have for the most part been accorded to matters relating to

20   marriage, family, procreation, and the right to bodily integrity.'"  *Nunez*, 147 F.3d at 871, n.4

21

22   ---
     [24]   *See Termination of Designation of Angola Under the Temporary Protected Status Program*, 68

23   Fed. Reg. 3896-01, 3896 (Jan. 27, 2003) (though originally designating Angola due to an armed
     conflict between the Angolan government and the National Union for the Total Independence of

24   Angola, the termination notice reflects that the Department also considered, inter alia, a continuing
     "separate insurgency led by . . . the Front for the Liberation of the Enclave of Cabinda/Armed

25   Forces of Cabinda," "the humanitarian needs of 380,000 UNITA members and their families," 4
     million displaced persons, a lack of "housing, medical services, water systems, and other basic

26   services destroyed by a 27-year-long war," "8 million landmines planted in Angolan soil" through
     40 percent of the countryside); *Termination of the Province of Kosovo in the Republic of Serbia in*

27   *the State of the Federal Republic of Yugoslavia (Serbia-Montenegro) Under the Temporary*
     *Protected Status Program*, 65 Fed. Reg. 33,356-01, 33,356 (May 23, 2000) (terminating TPS

28   because the original armed conflict had ended, but noting that "conditions remain difficult with
     bursts of ethnically-motivated violence").

United States District Court
Northern District of California

United States District Court
Northern District of California

(citation omitted).  Courts have "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended . . . . lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [the courts]." *Washington*, 521 U.S. at 720 (quotation and citation omitted).

Plaintiffs' assertion that the government's action in terminating TPS status of four countries which foreshadows the deportation of parents of U.S.-citizen children places this case in relatively unchartered waters.

The cases in which courts have referred to a U.S. citizen's right to enter and live in the United States have generally involved direct attempts by the government to obstruct a U.S. citizen's return from abroad, a scenario different from the case at bar.  *See U.S. v. Wong Kim Ark*, 169 U.S. 649 (1898) (confirming that children born in the U.S. are citizens under 14th Amendment and that, therefore, citizen could not be denied entry to the U.S.); *Lee Sing Far v. U.S.*, 94 F.3 834, 836 (9th Cir. 1899) (a U.S. citizen has the "right to land and remain in the United States").[25]  These cases did not involve indirect pressures upon a citizen resulting from action taken against others.  But Plaintiffs have not cited any cases addressing whether the government's application of such indirect pressure may constitute a violation of substantive due process, and if so, under what circumstances.

It is well-settled that children have a liberty interest in living with their parents.  *See*, *e.g.*, *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is a right that ranks high among the interests of the individual and that cannot be taken away without procedural due process." (quotation omitted)).  However, Plaintiffs have not cited any case where this interest was deemed sufficient to prevent the enforcement of a legitimate immigration law to remove a person at the cost of family

---

[25]  *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001) refers to "the absolute right to enter [the United States'] borders," but the Supreme Court was reviewing whether the state could condition acquisition of citizenship of persons born abroad depending on whether citizenship derived from a mother or father.  The court was not squarely confronted with government action frustrating the right to enter the United States.

separation.[26]  The Government cites a litany of cases rejecting the notion that immigration enforcement resulting in family separation inherently violates a U.S. citizen's constitutional rights. For instance, in *Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018), the Ninth Circuit held that U.S. citizen's due process rights were not violated by denial non-citizen wife and her children's visa petitions based on his own sex offense because "the generic right to live with family is 'far removed' from the specific right to reside in the United States with non-citizen family members," and holding that "a fundamental right to reside in the United States with [one's] non-citizen relatives" "would "run[] headlong into Congress' plenary power over immigration." *See Morales-Izquierdo v. Dep't of Homeland Sec.*, 600 F.3d 1076, 1091 (9th Cir. 2010) (holding that "lawfully denying Morales adjustment of status does not violate any of his or his family's substantive rights protected by the Due Process Clause" even "when the impact of our immigration laws is to scatter a family or to require some United States citizen children to move to another country with their parent"), *overruled in part on other grounds by Garfias-Rodriguez v. Holder*, 702 F.3d 504 (9th Cir. 2012) (en banc). *Cf. De Mercado v. Mukasey*, 566 F.3d 810, 816 n.5 (9th Cir. 2009) (stating, in dicta, that "family unity" theory of due process in immigration context is "implausible" because "no authority [has been identified] to suggest that the Constitution provides [alien petitioners] with a fundamental right to reside in the United States simply because other members of their family are citizens or lawful permanent residents").[27]

---

[26]  Plaintiffs cite cases that merely hold that a U.S. citizen has a "protected liberty interest in marriage [that] gives rise to a right to constitutionally adequate procedures in the adjudication of her husband's visa application." *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (holding that U.S.-citizen spouse of Mexican national had liberty interest permitting her to challenge denial of her husband's visa application, but it was limited to assuring that "the reason given [for denial] is facially legitimate and bona fide"); *see also Cardenas v. U.S.*, 826 F.3d 1164, 1170-72 (9th Cir. 2016). But that liberty interest, cited to support a procedural due process claim, did not overcome the government's interest in either case, so long as the government had identified a facially valid and bona fide reason for denying the visa.

[27]  The Government has also cited out-of-circuit cases in accord. *See Payne-Barahona v. Gonzales*, 474 F.3d 1, 1-2 (1st Cir. 2007) (explaining that "[t]he circuits that have addressed the constitutional issue (under varying incarnations of the immigration laws and in varying procedural postures) have uniformly held that a parent's otherwise valid deportation does not violate a child's constitutional right," "[n]or does deportation necessarily mean separation since the children could be relocated during their minority"); *Ayala-Flores v. INS*, 662 F.2d 444, 446 (6th Cir. 1981) (per curiam) (same); *Marin-Garcia v. Holder*, 647 F.3d 666, 674 (7th Cir. 2011) ("If an alien could avoid the consequences of unlawful entry in to the United States by having a child, it would create

Plaintiffs are correct that *Gebhardt*, *Morales-Izquierdo*, and *De Mercado* differ from the instant situation in three senses.  First, they involved persons who were removed or denied an immigration benefit based on criminal conduct, thus heightening the government's interest in removal.  Second, they involved persons seeking a permanent right to remain in the United States whereas Plaintiffs seek only temporary permission for their parents to reside until they reach adulthood.  Third, the children here have a stronger liberty interest because the countries to which they would be forced to return are allegedly unsafe.[28]  But these factors do not appear to have been material to the analysis in these cases.[29]  Accordingly, the government appears to have a persuasive argument.

Plaintiffs also assert the "unconstitutional choice" doctrine in advancing their due process claim.  *See Simmons v. United States*, 390 U.S. 377, 394 (1968) (it is "intolerable that one constitutional right should have to be surrendered in order to assert another").  However, while the Court recognizes that U.S.-citizen children Plaintiffs will face the difficult and unenviable choice between living in the United States or abroad with their parents in a land they have never known, the "unconstitutional choice" doctrine appears inapt.  Virtually all of the cases that Plaintiffs have

---

perverse incentives and undermine Congress's authority over immigration matters.").

[28]  The only case Plaintiffs cite alluding to dangerous conditions as a basis for a constitutional limitation on removal, *Martinez de Mendoza v. I.N.S.*, 567 F.2d 1222 (3d Cir. 1977), does not in fact go so far.  In *de Mendoza*, a Colombian mother with a U.S.-citizen child had been ordered deported, but in her appellate petition identified new evidence that her and her daughter's safety might be endangered if they were deported.  The court held, on statutory grounds specific to the standard of review, that new material evidence required remand to the agency for reconsideration.  The court merely hinted, in dicta, in a footnote, that if the allegations of physical danger "are correct, they may well be sufficient to raise questions of the constitutionality of such deportation." *Id.* at 1225, n.8.  But Plaintiffs have not cited any case in the past 44 years that has relied on this footnote to establish a constitutional rule against deportation in case of dangerous country conditions.

[29]  Plaintiffs also cite *Wang v. Reno*, 81 F.3d 808 (9th Cir. 1996), but it is inapposite.  There, the government had arranged for Wang to be paroled into the United States from China to give grand jury testimony, which the government knew might have been procured through torture.  When Wang arrived, he testified that Chinese authorities tortured him to obtain false testimony.  *Wang* was decided under the state-created danger doctrine: because the government "placed Wang in danger of violating his own conscience and the federal perjury statute, or of facing torture and possible execution in China," *id.* at 819, its own actions created the danger he sought to avoid by return to China.  Plaintiffs' allegations here are dissimilar.  They do not allege the government created a danger specific to Plaintiffs simply by granting temporary protective status to their parents.

cited arise in the criminal prosecution context,[30] or in the immigration context on the narrow question of whether an alien's right to choose voluntary departure could be conditioned on abandonment of the right to judicial review.[31]  Plaintiffs have not cited a case where the forced choice doctrine was applied to prohibit the government from deporting a non-citizen parent from their U.S.-citizen child based solely on the asserted due process interest in family integrity; even though the due process interest was recognized in those cases, it was not sufficient to overcome the government's interests.  To hold that substantive due process bars deportation of parents could have the effect of circumventing the holdings in *Gebhardt*, *Morales-Izquierdo*, and *De Mercado*.

In any event, the nature of Plaintiffs' choice here is arguably different from "unconstitutional choice" cases such as *Simmons*, *Jackson*, or *Elian*.  In those cases, by asserting one right, the individual necessarily extinguished the other.  Here, even if a U.S.-citizen child left the country to live with a parent, they would retain the right to return to and live in the U.S; they would still be legally free to stay or leave.  It is not clear that the forced-choice doctrine would extend to this situation, where the government is not forcing a person to irretrievably relinquish one right in order to exercise another.

---

[30]  *See Simmons*, 390 U.S. at 394 (holding that criminal defendant's testimony to establish standing to request exclusion of evidence under Fourth Amendment could not be admitted against him to demonstrate guilt without violating Fifth Amendment or else defendant is forced to abandon one right in favor of another); *United States v. Jackson*, 390 U.S. 570 (1968) (holding that criminal statute which conditioned unavailability of the death penalty for kidnapping on the defendant's abandonment of right to jury trial was unconstitutional); *Lefkowitz v. Cunningham*, 431 U.S. 801, 807-08 (1977) (invalidating New York law which provided that an officer of a political party who refused to testify before a grand jury or waive immunity against subsequent criminal prosecution would lose his position and be barred from holding any other party or public office for five years unconstitutionally required choosing between First and Fifth Amendment rights); *Bittaker v. Woodford*, 331 F.3d 715, 724 n.7 (9th Cir. 2003) (holding that defendant's right to bring ineffective assistance of counsel claim could not be conditioned on waiving attorney-client privilege with respect to subsequent prosecution); *Boyd v. United States*, 116 U.S. 616, 621-22 (1886) (analyzing whether the search and seizure of a man's papers was equivalent to compelling a person to testify against themselves under the Fifth Amendment and thus an unreasonable search under the Fourth Amendment), *overruled on other grounds, Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967).  Further, *New York v. United States*, 505 U.S. 144, 176 (1992) (holding, inter alia, that legislation regulating disposal of radioactive waste exceeded Congress's enumerated powers insofar as it offered states a "choice" between two unconstitutional alternatives), is inapposite, because it did not involve a forced choice between two constitutional rights but rather the validity of two unconstitutional conditions.

[31]  *See Elian v. Ashcroft*, 370 F.3d 897, 900 (9th Cir. 2004); *see also Contreras-Aragon v. I.N.S.*, 852 F.2d 1088, 1094-95 (9th Cir. 1988).

1    The Court need not resolve these questions at this time, however. *See In re Snyder*, 472

2    U.S. 634, 642 (1985) ("We avoid constitutional issues when resolution of such issues is not

3    necessary for disposition of a case.").  If the challenged action by the Administration were

4    otherwise illegitimate and unlawful, the deprivation of Plaintiffs' liberty interests in family

5    integrity, even if typically insufficient to defeat the government's interest in enforcing valid

6    immigration laws, may be unlawful where it is not be supported by a legitimate government

7    interest. *Cf. Smith v. City of Fontana*, 818 F.2d 1411, 1419-20 (9th Cir. 1987) (state had "no

8    legitimate interest in interfering with [protected] liberty interest [in familial relations] through the

9    use of excessive force by police officers"), *overruled on other grounds*, *Hodgers-Durgin v. de la*

10   *Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999); *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir.

11   2011) (noting that "a bare . . . desire to harm a politically unpopular group [is] not [a] legitimate

12   state interest" (citation and quotation omitted)).  Because Plaintiffs have adequately pled that

13   Defendants' actions violate the APA and equal protection (as discussed below), Plaintiffs' due

14   process claim is sufficiently plausible to proceed at least on that basis.

15        3.      TPS-Beneficiaries' Due Process Claim (Count Three)

16   The TPS-beneficiaries separately allege that, as persons lawfully present in the United

17   States, they have a significant liberty interest protected by the Due Process Clause in non-arbitrary

18   decisionmaking with respect to the continuation of TPS status.  *See* Compl. ¶¶ 113-15.  Plaintiffs

19   assert that Defendants' termination decisions must at least pass a rationality test, and that "[t]he

20   government . . . has not articulated, and cannot establish, any rational basis for reversing course on

21   decades of established TPS policy and ignoring the current capability of TPS countries to safely

22   receive longtime TPS holders, their families, and their U.S. citizen children."  Compl. ¶ 115.

23   Plaintiffs assert two bases for the liberty interest asserted here: a "property" interest

24   conferred by the TPS statute in remaining in the U.S. so long as their countries of origin are

25   unsafe, and a liberty interest based on the right to live and work in the United States conferred by

26   the TPS statute.  The Court analyzes each in turn.

27        a.      Property Interest

28   "[A] person receiving . . . benefits under statutory and administrative standards defining

39

United States District Court
Northern District of California

eligibility for them has an interest in continued receipt of those benefits." *Nozzi v. Hous. Auth.*, 806 F.3d 1178, 1190-91 (9th Cir. 2015) (citation omitted).  A statute does not give a claim of entitlement, however, when availability of the benefit is entirely discretionary.  *See Kwai Fun Wong v. United States*, 373 F.3d 952, 967-68 (9th Cir. 2004) (no procedural or substantive due process interest in "temporary parole status" where "the statute makes clear that whether and for how long temporary parole is granted are matters entirely within the discretion of the Attorney General"); *Meachum v. Fano*, 427 U.S. 215, 228 (1976) (holding that a prisoner has no due process interest against transfer from one prison to another within the same state system, but there was no statute purporting to grant him any entitlement to a particular prison).  To constitute a protected property interest, an individual must have "more than an abstract need or desire" or "unilateral expectation" for a benefit, but rather a "legitimate claim of entitlement" based on, inter alia, "existing rules or understandings that stem from an independent source such as state law," a "statute defining eligibility," a contract "creat[ing] and defin[ing]" certain terms, or some other "clearly implied promise." *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-78 (1972) (holding that public employee had no cognizable property interest in re-appointment for a second term where contract did not provide for renewal).

Defendants contend that TPS designations are entirely discretionary and that Plaintiffs therefore have no legitimate claim of entitlement protected by due process.  That is not entirely correct.  The Secretary is given broad discretion in deciding whether to make an *initial* TPS designation.  *See* 8 U.S.C. § 1254a(b)(1) ("The [Secretary], after consultation with appropriate agencies of the Government, *may* designate any foreign state . . . ." (emphasis added)).  An alien from an undesignated country therefore would not appear to have any legitimate entitlement to receive TPS status.

The same is not true with respect to extensions and terminations, however.  The statute provides that the Secretary "shall" terminate TPS status only if the Secretary "determines . . . that a foreign state . . . no longer continues to meet the conditions for designation under paragraph (1)." 8 U.S.C. § 1254a(b)(3)(B).  If the Secretary does not make that determination, then "the period of designation of the foreign state is extended for an additional period." *Id.* § 1254a(b)(3)(C).  That

40

1    Plaintiffs are entitled to continue receiving benefits until the Secretary makes the determination to

2    terminate pursuant to the process and criteria set forth in the statute brings this case closer to *Nozzi*

3    than *Wong* and *Meachum*.

4            To be sure, Plaintiffs' statutory entitlement is narrower than they suggest.  The statute does

5    not guarantee that a country will continue to be designated for TPS so long as its conditions *in fact*

6    warrant.  Rather, it merely provides that the Secretary "shall *review* the conditions . . . and shall

7    *determine* whether the conditions for such designation under this subsection continue to be met."

8    8 U.S.C. § 1254a(b)(3)(A) (emphasis added).  Because Plaintiffs' "reasonable expectation of

9    entitlement is determined largely by the language of the statute," *Wedges/Ledges of Cal., Inc. v.*

10   *City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994) (citation omitted), they can expect no more

11   than the statutorily-mandated "review" and "determin[ation]."  And, as explained above, the Court

12   generally may not review the Secretary's factual evaluation of country conditions.  Nevertheless,

13   if the Secretary's determination is unlawful for other reasons, Plaintiffs may state a due process

14   claim.  Plaintiffs arguably have a property interest in loss of TPS status, a loss which may not be

15   justified by an unlawful government interest.  Accordingly, to the extent Plaintiffs' challenge is

16   based on a property-entitlement theory, they have at least a plausible claim co-extensive with their

17   ability to prove that Defendants violated the APA or equal protection guarantee.

18                      b.      <u>Liberty Interest</u>

19           Plaintiffs' also assert a liberty interest arising from the fact that the TPS statute permits

20   them to live and work in this country.  *Cf. Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (observing

21   that deportation "visits a great hardship on the individual and deprives him of the right to stay and

22   live and work in this land of freedom").

23           The Court is doubtful whether Plaintiffs can state such a viable due process claim absent

24   Defendants' violation of the APA or Equal Protection.  In essence, Plaintiffs claim that although

25   the protection they received was "temporary" in name, it became "permanent" or "long-term" in

26   actual administration and practice and thus gave rise to important interests protected by due

27   process.  *Cf. Woodby v. I.N.S.*, 385 U.S. 276 (1966) (highlighting "the drastic deprivations that

28   may follow when a resident of this country is compelled by our Government to forsake all the

United States District Court  
Northern District of California

41

United States District Court
Northern District of California

bonds formed here and go to a foreign land where he often has no contemporary identification," and noting that "many resident aliens have lived in this country longer and established stronger family, social, and economic ties here than some who have been naturalized citizens").  But this theory ignores the explicitly *temporary* nature of the TPS status.

Moreover, Plaintiffs' theory, if credited, could undermine the purpose of the TPS statute by deterring this and future administrations from designating and extending TPS designations in order to avoid giving rise to a permanent due process defense against removal.  And it could have implications for other nominally temporary immigration statuses, such as student, H-1 and H-2 visa holders, if the status is extended long enough for the alien to form the types of ties and interests alleged here.  These possible consequences, which in effect could result in a new, judicially-crafted immigration status, might be a reason warranting "reluctan[ce] to expand the concept of substantive due process."  *Washington*, 521 U.S. at 720 (quotation and citation omitted).

While the Court is dubious about whether Plaintiffs' asserted due process liberty interest can overcome the government's interest in enforcing an otherwise valid immigration law, the Court need not resolve the question at this time because Plaintiffs have stated a plausible due process claim at least to the extent that Defendants' termination also violated the APA and/or the equal protection guarantee for the same reasons stated above.

4.      Equal Protection Claim (Count Two)

Plaintiffs allege that both:  (1) the decision to terminate TPS for Haiti, Nicaragua, El Salvador, and Sudan, and (2) Defendants' alleged change in rule, were motivated by racial animus. Defendants do not deny that President Trump's alleged statements evidence racial animus; rather, they argue the President's animus is irrelevant because the Secretary of Homeland Security, not the President, terminated TPS for Sudan, Haiti, Nicaragua, and El Salvador.  Defendants also argue that in order to state an equal protection claim, Plaintiffs must allege the existence of a similarly situated class of people who were treated more favorably for no rational reason.  Finally, Defendants contend that even if Plaintiffs are not required to allege the existence of a comparator group, the Secretary's decisions with regard to TPS are subject only to a highly deferential form of

1    rational basis review, rather than strict scrutiny.

2        After the Court had already issued its order denying the motion to dismiss the equal

3    protection claim ruling, *see* Docket No. 34, the Supreme Court handed down its decision in *Trump*

4    *v. Hawaii*, 585 U.S. ___ (2018).  This Court thereafter invited supplemental briefing whether to

5    reconsider its earlier holding.  For the reasons stated herein, the Court affirms its denial of the

6    motion.

7        The Court first analyzes whether the President's animus is attributable to the Secretary.

8    Then, the Court decides whether a comparator group need be alleged.  Next, the Court discusses

9    whether *Trump v. Hawaii* alters the legal standard or outcome in this case.  Finally, the Court

10   examines whether Plaintiffs' allegations plausibly state a claim under the correct legal standard.

11        a.    President Trump's Alleged Animus is Attributable to the Secretary of

12              Homeland Security

13        Plaintiffs concede that they have not alleged direct evidence of animus by Acting Secretary

14   Duke or Secretary Nielsen.  Defendants claim that this failure is dispositive, notwithstanding

15   President Trump's alleged animus.

16        Defendants are incorrect.  Even if Acting Secretary Duke and Secretary Nielsen do not

17   personally harbor animus towards TPS-beneficiaries from Haiti, El Salvador, Nicaragua, and

18   Sudan, their actions may violate the equal protection guarantee if President Trump's alleged

19   animus influenced or manipulated their decisionmaking process.  For example, in *Poland v.*

20   *Chertoff*, 494 F.3d 1174 (9th Cir. 2007), the Ninth Circuit permitted the animus of a subordinate

21   employee to be imputed to his employer, announcing a general holding that "if a subordinate . . .

22   sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment

23   action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the

24   allegedly independent adverse employment decision was not actually independent because the

25   biased subordinate influenced or was involved in the decision or decisionmaking process."  *Id.* at

26   1182.  Similarly, in *Avenue 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493 (9th Cir.

27   2016), in considering an allegation that a city discriminated against a group of developers to please

28   constituents who had expressed racial animus, the Ninth Circuit held that "[t]he presence of

United States District Court
Northern District of California

community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views." *Id.* at 504.

There is no logical reason why this principle should not apply with equal force when the superior entity or authority (here, the President) influences a subordinate (here, a cabinet member) to perform an action charged to the latter. *See Batalla-Vidal*, 291 F.Supp.3d at 279 (holding that "[i]f, as Plaintiffs allege, President Trump himself directed the end of the DACA program, it would be surprising if his 'discriminatory intent [could] effectively be laundered by being implemented by an agency under his control'"). The central question, simply put, is whether the challenged decision was infected by the tainted influence.

Defendants appear to concede that the White House was involved in the termination decisions, Reply at 9 ("Of course something of this nature would involve the White House . . ."), so they do not necessarily reject this "cats' paw" theory of animus in principle. Instead, they argue that the White House's involvement "does not mean that Secretaries Duke and Nielsen did not independently consider the evidence before them in making their decisions." *Id.* Even if that were the case, however, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr*, 625 F.3d at 1216. Here, the claim of President Trump's influence is plausible; as explained in more detail below, for example, President Trump described Haiti as a "shithole" in a meeting with Secretary Nielsen where he expressed desire not to welcome Haitians in the United States, just days before DHS announced it would terminate Haiti's status. *See* Compl. ¶¶ 66, 720, 72, 81, 84. Whether President Trump's animus altered the outcome of DHS's independent decisionmaking process is a question of fact to be resolved in this litigation.

> b.    Under *Arlington Heights*, Plaintiffs Need Not Rely on a Comparator Group and May Rely Instead on Direct Evidence of Discriminatory Intent

Plaintiffs bring their claim under *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Under *Arlington Heights*, government action may violate equal protection if a discriminatory purpose was one motivating factor. *Arlington Heights*, 429 U.S. at 265-66.

Under this standard, the Court may look behind the stated reasons for government action to other circumstantial evidence to find evidence of discriminatory purpose, such as:

- a decision's historical background "if it reveals a series of official actions taken for invidious purposes;"
- "[t]he specific sequence of events leading up [to] the challenged decision;"
- "[d]epartures from the normal procedural sequence;"
- "[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" and,
- "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."

*Arlington Heights*, 429 U.S. at 267-78.

The Government argues that Plaintiffs must identify a group of similarly situated persons who were treated more favorably to state an equal protection claim. That is incorrect. Plaintiffs may state a claim by alleging that "defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (quotation and citation omitted). While one method alleging a viable claim of discrimination is for the plaintiff to allege that the defendants (i) withheld a benefit from the plaintiff (ii) for which he or she was qualified (iii) which was extended to other similarly situated persons (iv) and that the defendants had no reasonable basis for treating plaintiff differently, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973), there are alternate paths to proving discrimination. A plaintiff need not satisfy the *McDonnell Douglas* framework; *Arlington Heights* permits more generally "a sensitive inquiry into such circumstantial and direct evidence of intent [to discriminate] as may be available." 429 U.S. at 266. As the Ninth Circuit explained in *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158-59 (9th Cir. 2013), "[o]ur cases clearly establish that plaintiffs who allege disparate treatment under statutory anti-discrimination laws need not demonstrate the existence of a similarly situated entity who or which was treated better than the plaintiffs in order to prevail. [That] is only *one* way to survive

45

United States District Court
Northern District of California

1    summary judgment on a disparate treatment claim." (Emphasis in original.) *See Ave. 6E*

2    *Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504-507 (9th Cir. 2016) (holding that

3    plaintiffs stated a claim that city's denial of development permit violated Equal Protection Clause

4    based on statements evidencing racial animus without allegation that similarly-situated developers

5    were treated more favorably). *See also* U.S. Department of Justice, Title VI Legal Manual, ¶ B,

6    available at https://www.justice.gov/crt/fcs/T6Manual6#PID (explaining that *Arlington Heights*

7    and *McDonnell Douglas* are alternative frameworks for proving intentional discrimination).

8         Thus, Plaintiffs need only plausibly plead direct or circumstantial evidence of

9    discriminatory intent; they do not need specifically to plead that a group of similarly situated

10   persons were treated more favorably to demonstrate discriminatory intent.

11                          c.    *AADC* Does Not Apply to This Case

12        The Government argues that, under *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525

13   U.S. 471 (1999) ("*AADC*"), strict scrutiny does not apply in the immigration context even where a

14   claim of animus against a protected group is plausibly alleged. In *AADC*, a group of aliens alleged

15   that the Attorney General had selectively initiated removal proceedings against them on the basis

16   of their political beliefs and affiliations in violation of the First Amendment. The Supreme Court

17   explained that "[a]s a general matter . . . an alien unlawfully in this country has no constitutional

18   right to assert selective enforcement as a defense against his deportation." 525 U.S. at 488-89.

19   However, it did not "rule out the possibility of a rare case in which the alleged basis of

20   discrimination is so outrageous that the foregoing considerations can be overcome." *Id.* at 491.

21        Importantly, the *AADC* standard confining discrimination claims to "outrageous" cases is

22   limited to challenges to the exercise of prosecutorial discretion, *i.e.*, the "discretion to choose to

23   deport one person rather than another." *Kwai Fun Wong v. U.S.*, 373 F.3d 952, 970 (9th Cir.

24   2004). The reason for this limitation stems from the purpose of the *AADC* rule itself: namely, that

25   "in deportation proceedings the consequence [of invading prosecutorial discretion] is to permit and

26   prolong a continuing violation of United States law," and "[t]he contention that a violation must

27   be allowed to continue because it has been improperly selected is not powerfully appealing."

28   *AADC*, 525 U.S. at 490-91. Thus, *Kwai Fun Wong* held that *AADC* did not apply where an alien

1    challenged the discriminatory denial of adjustment of status and revocation of parole rather than

2    the decision to pursue removal.  *See also Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260, 275

3    (E.D.N.Y. 2018) ("Rather than alleging that they in particular are being targeted for removal

4    because of their race—in which case judicial review of their suit would presumably be limited by

5    [the *AADC* standard]—Plaintiffs allege that the categorical decision to end the DACA program,

6    which provided them with some limited assurance that they would not be deported, was motivated

7    by unlawful animus.").

8         This case is similar to *Kwai Fun Wong*.  The challenge here is not to a specific removal

9    decision, where the continued presence of the alien in the U.S. prolongs an established continuing

10   violation of law and the only thing that stands in the way of removal is a claim of prosecutorial

11   misconduct in the selection of persons for removal.  Rather, as in *Kwai Fun Wong*, the challenge

12   here is several steps removed from the prosecutorial decision to seek removal of any particular

13   individual.[32]  Moreover, the challenge here is on a programmatic level; it does not challenge an

14   individualized prosecutorial decision.

15        Although the Government contends that even programmatic challenges to immigration

16   policies independent of prosecutorial discretion in selecting individuals for removal are subject to

17   review under *AADC*, citing *Kandamar v. Gonzales*, 464 F.3d 65 (1st Cir. 2006) and *Hadayat v.

18   Gonzales*, 458 F.3d 659 (7th Cir. 2006), these cases do not support the Government's argument.

19   In *Kandamar*, a Moroccan petitioner was placed in removal proceedings based on statements he

20   made indicating that he had overstayed his visa in an interview required by the National Security

21   Entry-Exit Registration System ("NSEERS") program.  NSEERS required young male

22   nonimmigrant aliens from certain designated countries, including Morocco, to "appear before,

23   register with, answer questions from, and present documents . . . to DHS."  *Kandamar*, 464 F.3d at

24   67.  In his removal proceedings, Kandamar filed a motion to suppress his NSEERS interview

25   statements arguing, in part, that NSEERS "constitutes racial profiling and discrimination based on

26   national origin" and was fundamentally unfair because it was used "to entrap nationals of certain

27

28   ───────────────

[32]  Apart from TPS status, affected individual may have claims for, *e.g.*, adjustment of status,
asylum, or otherwise.

United States District Court
Northern District of California

United States District Court
Northern District of California

1 │ countries." *Id.* at 68.  Tellingly, the First Circuit did not apply *AADC*'s narrow standard of review

2 │ to Kandamar's programmatic attack on NSEERS.  Rather, it applied the traditional level of review

3 │ under the equal protection doctrine for Congressional line-drawing with respect to "immigration

4 │ criteria based on an alien's nationality or place of origin," *id.* at 72, the rational basis test.  The

5 │ Court did not apply the specialized *AADC* test to the challenge to the NSEERS program.

6 │      Separate from this programmatic challenge in the context of his motion to suppress,

7 │ Kandamar argued that he was ordered removed based on national origin; the First Circuit agreed

8 │ that "a person in the same situation [as Kandahar] but not from one of the NSEERS countries

9 │ would not have been placed in removal proceedings."  *Id.* at 74.  But because this aspect of

10 │ Kandamar's challenge pertained to the decision to remove him (rather than the decision to

11 │ interview him pursuant to NSEERS), the First Circuit followed *AADC* and held that "[t]here is

12 │ nothing in this record to demonstrate outrageous discrimination."  *Id.*  Thus, the *AADC* standard

13 │ was only applied to the challenge to the decision to pursue removal.

14 │      In *Hadayat*, the Seventh Circuit considered a similar claim by an Indonesian petitioner

15 │ alleging that he was placed in removal because of NSEERS whereas a similarly situated person

16 │ from another country would not have been.  In that context, the Seventh Circuit applied *AADC* to

17 │ conclude that "Hadayat's conclusory comments regarding the allegedly discriminatory *effect* of

18 │ NSEERS do not come close to meeting [*AADC*'s] high burden."  458 F.3d at 665 (emphasis

19 │ added).  The *AADC* standard was applied because the programmatic attack arose in the context of

20 │ his challenge to removal.  Hadayat contended "he was unconstitutionally targeted for registration

21 │ and removal based on his ethnicity and religion" *id.* at 664-65.

22 │      Thus, *Kandamar* and *Hadayat* are inapposite because they did not apply *AADC* beyond the

23 │ narrow context of direct challenges to the exercise of prosecutorial discretion in removing

24 │ individuals from this country.[33]  *Cf. Wong*, 373 F.3d at 974, 974, n.29 (refusing to "countenance

25 │

26 │ ─────────────────────

27 │ [33]  The Government's reliance on *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) is also inapposite because it has to do with the doctrine of consular nonreviewability with respect to the denial of a visa application, for which judicial review is limited to confirming that the executive branch has cited a "facially legitimate and bona fide reason."  This case does not involve

28 │ the denial of visa applications and the doctrine consular nonreviewability.

1  that the Constitution would permit immigration officials to engage in such behavior as rounding

2  up all immigration parolees of a particular race solely because of a consideration such as skin

3  color," without "address[ing] the question whether racial, ethnic, or religious discrimination

4  against immigration parolees is tested by the usual heightened scrutiny applicable to such

5  classifications").

6                 d.       **_Trump v. Hawaii_ Does Not Require a Different Outcome**

7         In light of the Supreme Court's decision in _Trump v. Hawaii_, 585 U.S. ___, 138 S.Ct. 2392

8  (2018), the Court must determine whether _Trump_ alters that analysis by mandating deferential

9  rational basis review rather than traditional strict scrutiny under _Arlington Heights_ even where

10  government conduct is motivated by race, color, or ethnicity. The Court is not persuaded that

11  _Trump_'s standard of deferential review applies here.

12         In _Trump_, the President had issued a Proclamation which "placed entry restrictions on the

13  nationals of eight foreign states whose systems for managing and sharing information about their

14  nationals the President deemed inadequate" for purposes of "assess[ing] whether nationals of

15  particular countries present 'public safety threats.'" _Id._ at 2404.  The President declared that the

16  restrictions "were necessary to 'prevent the entry of those foreign nationals about whom the

17  United States Government lacks sufficient information'; 'elicit improved identity-management

18  and information-sharing protocols and practices from foreign governments'; and otherwise

19  'advance [the] foreign policy, national security, and counter-terrorism' objectives of the United

20  States.  _Id._ at 2405.  Further, the restrictions "would be the 'most likely to encourage cooperation'

21  [of foreign governments] while 'protect[ing] the United States until such time as improvements

22  occur.'"  _Id._  The Proclamation purported to be an exercise of statutory authority under 8 U.S.C. §

23  1182(f), which permits the President to "suspend the entry of all aliens or any class of aliens"

24  whenever he "finds" that their entry "would be detrimental to the interests of the United States."  8

25  U.S.C. § 1182(f).

26         Notwithstanding the facially neutral text of the proclamation, the _Trump_ plaintiffs alleged

27  in part that the President's vitriolic anti-Muslim statements prior to taking the oath of office and

28  thereafter demonstrated that the proclamation was motivated by religious animus in violation of

United States District Court
Northern District of California

49

the First Amendment's establishment clause.  The principal question on review was what level of scrutiny would apply to the President's Proclamation in light of the alleged religious animus.

The Supreme Court explained that two factors informed the standard of review applied in *Trump*: that "plaintiffs seek to invalidate *a national security directive* regulating the *entry* of aliens *abroad*," and that the executive order was "facially neutral toward religion" and thus required "prob[ing] the sincerity of the stated justifications for the policy by reference to extrinsic statements." *Id.* at 2418 (emphasis added).  The court noted that "[f]or more than a century, this Court has recognized that the *admission* and *exclusion* of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Id.* (emphasis added).  "Because decisions in these matters may implicate 'relations with foreign powers,' . . . such judgments are 'frequently of a character more appropriate to either the Legislature or the Executive.'" *Id.* (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).  Moreover, because the persons in question were foreign nationals abroad seeking admission with "no constitutional right to entry," the scope of review was already "circumscribed"—review was available only to the extent that denial of the alien's admission imposed "burdens [on] the constitutional rights of a U.S. citizen." *Id.* at 2419.  Taking these factors together, the Supreme Court concluded that "[t]he upshot . . . in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and national security is highly constrained." *Id.* at 2419-20 (quoting *Mathews*, 426 U.S. at 81-82 (holding that Congress may condition an alien's eligibility for participation in federal medical insurance on duration of residency and permanent resident status)).  Further, the proposed inquiry could "intrud[e] on the President's constitutional responsibilities in the area of foreign affairs." *Id.* at 2419.

Applying these considerations—the entry of aliens from outside the United States, express national security concerns and active involvement of foreign policy—the Supreme Court applied a standard of review "considers whether the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting procedures." *Id.* at *21.  The Supreme

50

1   Court "assume[d] that [it] may look behind the face of the Proclamation to the extent of applying

2   rational basis review" including consideration of "plaintiffs' extrinsic evidence [of President

3   Trump's anti-Muslim statements]." *Id.* at 2420.  It held, however, that taking these statements into

4   consideration, it would "uphold the policy so long as it can reasonably be understood to result

5   from a justification independent of unconstitutional grounds." *Id.*

6          The case at bar is distinguishable from *Trump* in several respects.  <u>First</u>, Defendants herein

7   did not cite national security as a basis for terminating TPS.  Rather, the stated basis purports to be

8   nothing more than a factual determination that conditions in the ground in four countries no longer

9   meet the statutory criteria of the TPS statute and thus the humanitarian (not national security)

10  purposes underpinning TPS status have been obviated.

11         <u>Second</u>, unlike the Proclamation in *Trump*, Defendants have not claimed that TPS has been

12  terminated for foreign policy reasons.  The government's decision to terminate TPS status was not

13  intended to induce the cooperation or action of a foreign government.  *Compare Trump*, 138 S.Ct.

14  at 2421 (noting that Proclamation was "expressly premised on legitimate purposes: preventing

15  entry of nationals who cannot be adequately vetted and inducing other nations to improve their

16  practices").

17         <u>Third</u>, the TPS-beneficiaries here, unlike those affected by the Proclamation in *Trump*, are

18  already in the United States.  They are not aliens abroad seeking entry or admission who "have no

19  constitutional right of entry" *id.* at 2419;[34] TPS-beneficiaries have been admitted to the United

20  States.  *See Ramirez v. Brown*, 852 F.3d 954, 958-61 (9th Cir. 2017).  As Plaintiffs currently

21  reside lawfully in the United States, *id.*, this case is unlike *Trump*; it does not implicate "the

22  admission and exclusion of foreign nationals," *Trump*, 138 S.Ct. at 2418, who have "no

23  constitutional rights regarding [their] application" in light of the "sovereign prerogative" "to admit

24  or exclude aliens." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).  Hence, the basis for invoking

25

26

27  [34]  Thus, their situation is unlike persons physically present at a United States port of entry who
    had not been admitted but sought to be paroled.  *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1082-
28  83 (9th Cir. 2006) (reviewing agency's discretion to grant parole to alien under a deferential
    "facially legitimate and bona fide" reasons standard).

United States District Court
Northern District of California

1    broad judicial deference to executive action in excluding aliens does not apply.[35]

2          Fourth, relatedly, aliens within the United States have greater constitutional protections

3    than those outside who are seeking admission for the first time.  *See Zadvydas v. Davis*, 533 U.S.

4    678, 693 (2001) (explaining that "certain constitutional protections available to persons inside the

5    United States are unavailable to aliens outside of our geographic borders," *id.*, "[b]ut once an alien

6    enters the country, the legal circumstance changes, for the Due Process Clause applies to all

7    'persons' within the United States, including aliens").  The aliens affected by the President's

8    Proclamation in *Trump* were outside the United States and had "no constitutional rights regarding

9    [their] application," *Landon*, 459 U.S. at 32; the courts could therefore only "engage[] in a

10   circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights

11   of a U.S. citizen."  *Trump*, 138 S.Ct. at 2419.  TPS-beneficiaries in the United States in contrast

12   have ties to the United States, many with deep, long-term ties.  For example, 88% of Salvadoran

13   and 81% of Haitian TPS holders are employed, 11% are entrepreneurs, and 30% (45,500

14   households with Savaldoran TPS holders and 6,200 with Haitian TPS holders) have mortgages.

15   Compl. ¶ 48.  *See Landon*, 459 U.S. at 32 ("[O]nce an alien gains admission to our country and

16   begins to develop the ties that go with permanent residence his constitutional status changes

17   accordingly.").  Although *Landon* refers to permanent resident aliens, the alien's ties to the United

18   States, not his or her formal immigration status, confer increased constitutional protection.  *See*

19   *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections

20   when they have come within the territory of the United States and developed substantial

21   connections with this country."); *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) ("The alien, to

22   whom the United States has been traditionally hospitable, has been accorded a generous and

23   ascending scale of rights as he increases his identity with our society.  Mere lawful presence in the

24   country creates an implied assurance of safe conduct and gives him certain rights[.]"); *see also*

25   *Ibrahim v. Dep't of Homeland Security*, 669 F.3d 983, 997 (9th Cir. 2012) (holding that alien with

26   nonimmigrant student visa had "established 'significant voluntary connection' with the United

27

28   ---
[35]  Indeed, TPS benefits may only be extended to admissible aliens, unless the Government
extends a waiver to inadmissibility.  *See* 8 U.S.C. § 1254a(c)(1)(A)(iii); *id.* § 1254a(c)(2)(A).

United States District Court
Northern District of California

States such that she has the right to assert claims under the First and Fifth Amendments," even though she had left the country and been denied re-entry while outside the country).

Fifth, the executive order at issue in *Trump* was issued pursuant to a very broad grant of statutory discretion: Section 1182(f) "exudes deference to the President in every clause" by "entrust[ing] to the President the decisions whether and when to suspend entry . . .; whose entry to suspend . . .; for how long . . .; and on what conditions." *Trump*, 138 S.Ct. at 2408. In contrast, Congress has not given the Secretary *carte blanche* to terminate TPS for any reason whatsoever. Rather, the TPS statute empowers the Secretary of Homeland Security discretion to initiate, extend, and terminate TPS in specific enumerated circumstances. 8 U.S.C. § 1254a(b). Even though the statute circumscribes judicial review, *see supra*, Congress prescribed the discretion of the Secretary in administering TPS. *Cf. Trump*, 138 S.Ct. at 2424 (Kennedy, J., concurring) ("There are numerous instances in which the statements and actions of Government officials are not subject to judicial scrutiny or intervention. That does not mean those officials are free to disregard the Constitution and the rights it proclaims and protects.").

For these reasons, the facts, legal posture, and legal issues in *Trump* are substantially and materially different from the present case. *Trump* did not address the standard of review to be applied under the equal protection doctrine when steps are taken to *withdraw* an immigration status or benefit from aliens lawfully present and admitted into the United States for reasons unrelated to national security or foreign affairs. *Trump* therefore does not alter the Ninth Circuit's refusal to "countenance that the Constitution would permit immigration officials to . . . round[] up all immigration parolees of a particular race solely because of a consideration such as skin color." *Wong*, 373 F.3d at 974, 974, n. 29. The equal protection guarantee applies with its conventional force to all persons in the United States. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (explaining that the Fourteenth Amendment's "provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality" and holding that the administration of a race-neutral law in a prejudicial manner violates Equal Protection Clause). TPS beneficiaries residing in the United States are such persons. Accordingly, the deferential standard of review in *Trump* does not apply.

e.      Application to Plaintiffs' Allegations

Having clarified that the *Arlington Heights* framework applies to review of Defendants' actions and that President Trump's stated animus may be attributed to the Secretary if he influenced an otherwise independent decision-making process, the Court now reviews whether Plaintiffs' factual allegations plausibly state a claim.

Plaintiffs chiefly rely on a set of anti-immigrant, anti-Muslim comments made by President Trump to support their claim of animus.  As set forth in detail above, President Trump has allegedly expressed animus toward "non-white, non-European people," Compl. ¶ 9, including by labeling Mexican immigrants as criminals and rapists, *id.* ¶ 67, "compar[ing] immigrants to snakes who will bite and kill anyone foolish enough to take them in," *id.* ¶ 68, complaining that 40,000 Nigerians in the United States "would never 'go back to their huts' in Africa," *id.* ¶ 69, and "disseminat[ing] a debunked story about celebrations of the September 11, 2001, attacks [by Arabs living in New Jersey]," *id.*  President Trump also specifically made derogatory comments about Haitians, including that the 15,000 admitted to the United States "all have AIDS," *id.*  One week before TPS was terminated, President Trump asked aloud regarding Latin American and African countries, including Haiti and El Salvador, "Why are we having all these people from shithole countries come here?"  He expressed a preference instead for Norwegians, who are overwhelmingly white.  *Id.* ¶ 70.  The President also asked "Why do we need more Haitians?" and insisted they be removed from an immigration deal.  *Id.* ¶ 70.  Plaintiffs characterize these statements and other evidence as evidence of "racial and national-origin animus."  Compl. ¶ 66.  These allegations are more than sufficient to support a plausible inference of the President's animus based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians, Salvadoreños, Nicaraguans, and Sudanese people in particular. [36]

---

[36]  Insofar as Plaintiffs allege national origin discrimination, *see* Compl. ¶ 111, the Court construes it as a reference to ethnicity in light of the nature of the President's alleged comments relying on stereotypes about the physical or cultural characteristics of persons from the countries in question. *Cf. Wong*, 373 F.3d at 968, n.21 (construing allegation of national origin discrimination as being based on ethnicity); *cf.* 29 C.F.R. § 1606.1 (defining "national origin discrimination" under Title VII of the Civil Rights Act of 1964 to include "denial of equal employment opportunity because of an individual's, or his or her ancestor's place of origin; *or because an individual has the physical, cultural or linguistic characteristics of a national origin group*" (emphasis added)).

United States District Court
Northern District of California

Moreover, Plaintiffs plausibly allege that President Trump's animus was a factor in the TPS termination decisions in question.  According to Plaintiffs' allegations, President Trump repeatedly expressed his animus towards non-white immigrants on the campaign trail and after entering office, and explicitly linked those sentiments to his proposed immigration policies and priorities.  Most directly, at a meeting about TPS on January 11, 2018, President Trump expressed his disdain for persons from Haiti and El Salvador,[37] and his administration then took action to terminate TPS status for those countries a mere 7 days later.  Compl. ¶ 70.  Although the termination of Sudan and Nicaragua in October and December 2017 pre-date the January 11, 2018 meeting, they post-date the other statements made by President Trump reflecting animus against non-white immigrants and other persons of Latino or African origin.  *See* Compl. ¶¶ 67 (categorical labels of Mexican immigrants as criminals and rapists), 69 (complaining that migrants from Nigeria would never "go back to their huts" in Africa); *id.* (disseminating a false anti-Arab rumor about celebrations of the September 11, 2001 attacks in New Jersey).  Thus, Plaintiffs plausibly allege that President Trump harbored racial and national origin/ethnic animus as of the time of all four TPS decisions challenged in this case.

Further, Plaintiffs plausibly allege that President Trump influenced DHS's decision to terminate TPS status.  Most directly, Secretary Nielsen was present at the January 11, 2018 meeting where the President referred to Haiti and El Salvador (at least) as "shithole countries" and questioned why the United States would welcome their people here.  Compl. ¶ 72.  Haiti and El Salvador's TPS designations were terminated seven days later.  *Id.* ¶¶ 81, 84.  Further, Plaintiffs' allege that on November 6, 2017, with respect to Honduras—which is not at issue in this case— the White House Chief of Staff John F. Kelly and White House Homeland Security Adviser Tom Bossert "repeatedly called Acting Secretary Duke and pressured her to terminate the TPS designation for Honduras."  *Id.* ¶ 73.  Kelly was reportedly traveling with President Trump at the

---

[37]  President Trump did not merely call Haiti and El Salvador "shithole countries."  He asked "Why are we having all these people from shithole countries come here?" and "Why do we need more Haitians?"  Compl. ¶ 70.  These are not merely comments about a place, but can reasonably be understood as comments about the *people* who come from those places and their intrinsic worth.  It is reasonable to infer racial or national-origin/ethnic animus from these statements, as confirmed by the reaction of listeners who were present.  *Id.* ¶ 71

United States District Court
Northern District of California

time.  *Id.*  Another news article cited by Plaintiffs (and thus incorporated into the complaint) notes that as early as June 2017 President Trump was "berating his most senior advisers," including then-DHS Secretary John Kelly, about immigrants who had entered the country that year from Afghanistan, Haiti, and Nigeria.  *Id.* ¶ 69, n.33.  Together, these allegations support a plausible inference that the White House has proactively inserted itself into DHS's TPS termination decisions during the relevant time period of October 2017 to January 2018 when the termination decisions were announced as part of its broader agenda on immigration.  Indeed, Defendants effectively concede that President Trump has insinuated himself into the TPS process.  *See* Reply at 9 ("Of course something of this nature would involve the White House . . .").

In light of the allegations above, Plaintiffs have plausibly pled that President Trump's racial and national-origin/ethnic animus was a motivating factor in DHS's TPS termination decisions and thus have plausibly stated an equal protection claim.  Defendants' motion to dismiss is **DENIED.**

## IV.       CONCLUSION

In sum, the Court holds that Section 1254a does not preclude judicial review of Defendants' APA claim to the extent Plaintiffs challenge the sub silentio departure from a prior practice or policy.  Further, Section 1254a does not preclude judicial review of Plaintiffs' constitutional due process and equal protection claims.  Defendants' motion to dismiss under Rule 12(b)(1) is **DENIED**.

Defendants' motion to dismiss is also **DENIED**.  Plaintiffs have plausibly alleged that Defendants' sub silentio departure from a prior practice or policy violates the Administrative Procedure Act (Fourth Claim).  Plaintiffs have also plausibly pled that the TPS termination decisions, as well as Defendants' adoption of a new interpretation of the TPS statute, were motivated by racial and/or ethnic animus in violation of the equal protection guarantee of the

///

///

///

///

United States District Court
Northern District of California

constitution (Second Claim).  Finally, Plaintiffs have plausibly pled that Defendants' termination decisions violate Plaintiffs' substantive due process rights, at least to the extent that the decisions violated the APA and/or equal protection guarantee and therefore did not involve pursuit of a legitimate governmental interest.

This order disposes of Docket No. 20.


**IT IS SO ORDERED**.


Dated: August 6, 2018

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California