# EXHIBIT 12

JAMES D. NEALON - 08/14/2018

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO

4

5    - - - - - - - - - - - - - - x

6    CRISTA RAMOS, et al.,        :

7              Plaintiffs,     :   Case No.

8    v.                         :   3:18-cv-1554-EMC

9    KIRSTJEN NIELSEN, et al.,   :

10             Defendants.      :

11   - - - - - - - - - - - - - - x

12

13        VIDEOTAPED DEPOSITION OF JAMES D. NEALON

14                Tuesday, August 14, 2018

15                Boston, Massachusetts

16

17

18

19

20

21

22

23   Job No.:  LA-187775

24   Pages 1 - 276

25   Reported By:  Dana Welch, CSR, RPR, CRR

1  include the talking points for public consumption        11:19:03
2  related to a specific issue.                             11:19:07
3      Q.  Who produces the public affairs guidance         11:19:09
4  for the Department?                                      11:19:15
5      A.  The Assistant Secretary of public affairs        11:19:15
6  would be ultimately responsible for those talking        11:19:21
7  points.                                                  11:19:23
8      Q.  Okay.  And the next line, number 2, says,        11:19:23
9  "State is notifying our embassy in Haiti."  I think      11:19:31
10  that's fairly self-explanatory.                         11:19:35
11      Number 3 says, "I notified NSC at their             11:19:37
12  request."  What does NSC refer to?                      11:19:41
13      A.  That refers to the National Security            11:19:44
14  Council.                                                11:19:48
15      Q.  Is that the National Security Council at        11:19:48
16  the White House --                                      11:19:50
17      A.  Yes.                                            11:19:50
18      Q.  -- or is there a different National             11:19:51
19  Security Council?  Yes.                                 11:19:54
20      Do you recall the National Security                 11:19:55
21  Council requesting notification about the TPS           11:19:58
22  termination for Haiti?                                  11:20:00
23      A.  You know, I don't specifically remember,        11:20:01
24  but, in general, the White House was keenly             11:20:05
25  interested in the Secretary's decisions related to      11:20:08

| | | |
|---|---|---|
| 1 | TPS.  So it was a standard practice that we would | 11:20:11 |
| 2 | notify them as soon as she had made a decision. | 11:20:16 |
| 3 |     Q.  How did you know that the White House was | 11:20:18 |
| 4 | keenly interested in TPS decisions? | 11:20:21 |
| 5 |     MR. KIRSCHNER:  Objection.  To the extent | 11:20:23 |
| 6 | that this is calling for internal government | 11:20:26 |
| 7 | deliberations, I would request that you not answer. | 11:20:29 |
| 8 | To the extent that you can give a general answer, | 11:20:32 |
| 9 | then feel free to go ahead. | 11:20:34 |
| 10 |     A.  They would tell us directly that they | 11:20:40 |
| 11 | would like to know as soon as the Secretary made a | 11:20:42 |
| 12 | decision. | 11:20:46 |
| 13 |     Q.  When you say "they," who would let you | 11:20:49 |
| 14 | know that they were interested in knowing what the | 11:20:51 |
| 15 | TPS decision was likely to be? | 11:20:54 |
| 16 |     A.  It would be at the staff level of the | 11:20:56 |
| 17 | National Security Council.  I see the name has been | 11:20:59 |
| 18 | redacted here.  It looks like I listed the name in | 11:21:05 |
| 19 | the e-mail and it's been redacted. | 11:21:07 |
| 20 |     Q.  Do you recall the name but are withholding | 11:21:09 |
| 21 | it because of the deliberative process privilege? | 11:21:14 |
| 22 |     MR. KIRSCHNER:  Objection, that is a | 11:21:16 |
| 23 | misrepresentation of the withholding listed in this | 11:21:18 |
| 24 | document. | 11:21:20 |
| 25 |     MS. MacLEAN:  Sorry.  B6. | 11:21:22 |

| | | |
|---|---|---|
| 1 | Q.  Do you recall the name of who the person | 11:21:24 |
| 2 | is that you would have been in communication with? | 11:21:25 |
| 3 | A.  I don't specifically recall, but I -- I | 11:21:27 |
| 4 | can imagine who that person was, yes. | 11:21:30 |
| 5 | Q.  Were there others besides the staff person | 11:21:32 |
| 6 | that you're describing at the National Security | 11:21:42 |
| 7 | Council who are at the White House who expressed | 11:21:45 |
| 8 | interest in the TPS decisions? | 11:21:48 |
| 9 | A.  Not to me. | 11:21:50 |
| 10 | Q.  So when you were engaged with the White | 11:21:52 |
| 11 | House in communications around TPS, is it fair to | 11:21:55 |
| 12 | say that was with the National Security Council in | 11:21:57 |
| 13 | particular? | 11:22:00 |
| 14 | A.  Yes. | 11:22:01 |
| 15 | Q.  And exclusively with the National Security | 11:22:02 |
| 16 | Council in particular? | 11:22:16 |
| 17 | A.  So my recollection is that when I | 11:22:13 |
| 18 | communicated TPS decisions to the White House, I | 11:22:15 |
| 19 | communicated them to the National Security Council, | 11:22:19 |
| 20 | yes. | 11:22:23 |
| 21 | Q.  Did anyone from the White House | 11:22:24 |
| 22 | communicate with you or your team regarding TPS | 11:22:26 |
| 23 | outside of the person that you're thinking of at | 11:22:31 |
| 24 | the National Security Council? | 11:22:34 |
| 25 | A.  Not with me directly.  Whether they | 11:22:36 |

| | | |
|---|---|---|
| 1 | communicated with my team, I wasn't aware of. | 11:22:43 |
| 2 | Q.  So number 3 says, "I notified NSC" -- the | 11:22:49 |
| 3 | name is redacted -- "at their request." | 11:22:56 |
| 4 | Is it fair to say that you're representing | 11:23:00 |
| 5 | that NSC had a general request for information | 11:23:03 |
| 6 | about TPS decisions, not a specific request here | 11:23:06 |
| 7 | about the TPS decision with regard to Haiti? | 11:23:10 |
| 8 | MR. KIRSCHNER:  Objection, confusing, no | 11:23:14 |
| 9 | foundation. | 11:23:18 |
| 10 | A.  I think I can answer.  I recall on a | 11:23:18 |
| 11 | number of TPS decisions, there was an individual at | 11:23:24 |
| 12 | the National Security Council, who was sort of my | 11:23:27 |
| 13 | natural counterpart, with whom I would communicate | 11:23:30 |
| 14 | and who was keenly interested in knowing when a | 11:23:34 |
| 15 | decision had been made and what that decision was | 11:23:39 |
| 16 | so that he could then communicate that decision up | 11:23:42 |
| 17 | his chain of command. | 11:23:45 |
| 18 | Q.  And who was that person? | 11:23:46 |
| 19 | A.  Gary Tomasulo. | 11:23:49 |
| 20 | Q.  Gary -- what's his last name? | 11:23:53 |
| 21 | A.  Tomasulo.  T-o-m-a-s-u-l-o. | 11:23:54 |
| 22 | Q.  Do you know his title? | 11:24:00 |
| 23 | A.  I believe he was the director of | 11:24:02 |
| 24 | trans-border affairs at the NSC. | 11:24:05 |
| 25 | Q.  Do you know what his responsibilities | 11:24:13 |

| | | |
|---|---|---|
| 1 | Security, but obviously, it has to be in a timely | 11:27:20 |
| 2 | way so that the Secretary of Homeland Security has | 11:27:23 |
| 3 | time to consider that input before rendering her | 11:27:26 |
| 4 | decision. | 11:27:28 |
| 5 | Q.  So you started off by saying the way that | 11:27:30 |
| 6 | it's supposed to work and then outlined the | 11:27:33 |
| 7 | process. | 11:27:36 |
| 8 | A.  (Nodding head up and down.) | 11:27:37 |
| 9 | Q.  Is it your recollection that it generally | 11:27:38 |
| 10 | worked in the way that you described? | 11:27:40 |
| 11 | A.  It's my recollection that the State | 11:27:41 |
| 12 | Department was often very slow and late in getting | 11:27:44 |
| 13 | their materials to the Secretary so that she had | 11:27:49 |
| 14 | sufficient time to consider those materials before | 11:27:53 |
| 15 | making her decision. | 11:27:55 |
| 16 | Q.  Do you recall sort of approximately at | 11:27:57 |
| 17 | what stage of the process the Secretary of State or | 11:28:02 |
| 18 | the Deputy Secretary of State engaged with the DHS | 11:28:06 |
| 19 | Secretary or DHS with the recommendations? | 11:28:09 |
| 20 | MR. KIRSCHNER:  Objection, vague.  It's | 11:28:11 |
| 21 | general in the context of the questions at issue in | 11:28:16 |
| 22 | this case. | 11:28:21 |
| 23 | A.  So for example, in the case of Sudan, I | 11:28:22 |
| 24 | believe the Department of State's paperwork was | 11:28:31 |
| 25 | very late in arriving at Homeland Security and I | 11:28:35 |

| | | |
|---|---|---|
| 1 | recall that being an issue. | 11:28:43 |
| 2 |     Q.  In what way was it an issue? | 11:28:44 |
| 3 |     A.  It was an issue in that the Secretary's | 11:28:46 |
| 4 | office -- Secretary of homeland security's office | 11:28:50 |
| 5 | was clamoring for that input so that she would have | 11:28:54 |
| 6 | sufficient time to read it, process it, before | 11:28:58 |
| 7 | having to make her decision. | 11:29:00 |
| 8 |     Q.  You had described at the outset your role | 11:29:01 |
| 9 | as engaging with the State Department and as one of | 11:29:04 |
| 10 | the key entities within the Department of Homeland | 11:29:07 |
| 11 | Security that was engaged with the State | 11:29:10 |
| 12 | Department.  Had you engaged with the State | 11:29:12 |
| 13 | Department in your recollection in the -- in | 11:29:14 |
| 14 | connection with the particular case of the TPS | 11:29:18 |
| 15 | determination of Sudan? | 11:29:22 |
| 16 |     A.  Yes, I believe so.  And the reason I say I | 11:29:23 |
| 17 | believe so is because it's sometimes difficult for | 11:29:26 |
| 18 | me to separate in my mind which TPS decision, a | 11:29:29 |
| 19 | particular phone call, or conversation took place | 11:29:33 |
| 20 | regarding.  But I do recall talking to the State | 11:29:36 |
| 21 | Department about the Sudan paperwork and expressing | 11:29:44 |
| 22 | the Secretary of Homeland Security's displeasure | 11:29:49 |
| 23 | with the lateness of that paperwork. | 11:29:53 |
| 24 |     Q.  Do you recall what the response was from | 11:30:04 |
| 25 | the -- | 11:30:04 |

| | | |
|---|---|---|
| 1 | Q.  So you then described your communications | 12:14:17 |
| 2 | with Mr. Merten as essentially having the backdrop | 12:14:29 |
| 3 | of an expected termination of TPS for Haiti? | 12:14:33 |
| 4 | A.  That's my recollection. | 12:14:36 |
| 5 | Q.  Is it your recollection that that general | 12:14:37 |
| 6 | feeling around the likely imminent end of TPS for | 12:14:38 |
| 7 | Haiti was from the very beginning of your tenure at | 12:14:45 |
| 8 | DHS? | 12:14:48 |
| 9 | A.  I do recall that, because I recall that -- | 12:14:48 |
| 10 | that I got that sense from General Kelly. | 12:14:54 |
| 11 | Q.  Did you have specific communications with | 12:14:56 |
| 12 | General Kelly about that? | 12:14:59 |
| 13 | MR. KIRSCHNER:  Object.  I mean, to the | 12:15:00 |
| 14 | extent this is getting into internal government | 12:15:02 |
| 15 | deliberations of your communications, I would | 12:15:06 |
| 16 | instruct you not to answer. | 12:15:15 |
| 17 | MS. MacLEAN:  You can identify whether | 12:15:15 |
| 18 | this is a question that you would instruct him not | 12:15:15 |
| 19 | to answer or not. | 12:15:15 |
| 20 | Q.  But did you have specific communications | 12:15:19 |
| 21 | that you recall with General Kelly concerning the | 12:15:21 |
| 22 | expected termination of TPS for Haiti? | 12:15:26 |
| 23 | A.  I believe I had one conversation with him | 12:15:29 |
| 24 | about Haiti and TPS. | 12:15:32 |
| 25 | Q.  And was that communication before he left | 12:15:34 |

| | | |
|---|---|---|
| 1 | answer to this question. | 13:34:31 |
| 2 | Q.  So to the extent that you can answer based | 13:34:32 |
| 3 | on what your attorney has advised, are you aware of | 13:34:34 |
| 4 | whether there was any reply from the Secretary of | 13:34:38 |
| 5 | State or his staff to the embassy cables that were | 13:34:41 |
| 6 | received regarding TPS? | 13:34:44 |
| 7 | MR. KIRSCHNER:  Again, objection, this is | 13:34:45 |
| 8 | like foundational.  Like, this is characterizing | 13:34:47 |
| 9 | kind of a sentence in an article that without | 13:34:51 |
| 10 | context I think provides a difficulty in | 13:34:55 |
| 11 | responding, and it's a characterization of how the | 13:35:01 |
| 12 | sentence is stated within the article. | 13:35:04 |
| 13 | Q.  If you understand the question, you can | 13:35:07 |
| 14 | answer the question. | 13:35:11 |
| 15 | A.  So I'm not aware one way or the other that | 13:35:11 |
| 16 | the -- that the cables were answered or that they | 13:35:13 |
| 17 | were not answered. | 13:35:15 |
| 18 | Q.  So the following sentence reads, "In the | 13:35:17 |
| 19 | ensuing weeks, Trump Senior Advisor and Immigration | 13:35:29 |
| 20 | Hardliner Stephen Miller placed phone calls to DHS | 13:35:33 |
| 21 | Chief of Staff Chad Wolf and top Tillerson | 13:35:36 |
| 22 | advisors, telling them to end TPS anyway, according | 13:35:39 |
| 23 | to current and former administration officials who | 13:35:41 |
| 24 | like others spoke on the condition of anonymity." | 13:35:44 |
| 25 | Are you aware of whether Trump Senior | 13:35:47 |

| | |
|---|---|
| 1   Advisor and Immigration -- well, we won't -- we | 13:35:50 |
| 2   won't characterize his position, but that Trump | 13:35:53 |
| 3   Senior Advisor Stephen Miller placed phone calls to | 13:35:56 |
| 4   DHS Chief of Staff Chad Wolf concerning TPS? | 13:36:00 |
| 5           MR. KIRSCHNER:  And on this question, | 13:36:05 |
| 6   Ambassador Nealon, you can answer the question as | 13:36:07 |
| 7   asked about whether you're aware of any phone calls | 13:36:09 |
| 8   between Stephen Miller and Chad Wolf.  To the | 13:36:11 |
| 9   extent the question calls for the nature of those | 13:36:15 |
| 10  communications, I would instruct you not to answer. | 13:36:17 |
| 11      A.  So I was told that such phone calls took | 13:36:21 |
| 12  place, but I didn't and don't have any firsthand | 13:36:25 |
| 13  knowledge of those phone calls. | 13:36:28 |
| 14      Q.  Who told you that the phone calls took | 13:36:35 |
| 15  place? | 13:36:37 |
| 16          MR. KIRSCHNER:  You can answer. | 13:36:37 |
| 17      A.  Chad Wolf and others. | 13:36:38 |
| 18      Q.  Did Mr. Wolf describe to you without -- | 13:36:42 |
| 19  it's a yes-or-no question -- the content of those | 13:36:47 |
| 20  phone calls? | 13:36:50 |
| 21      A.  No, only in the broadest terms, only that | 13:36:51 |
| 22  the phone calls had taken place. | 13:36:56 |
| 23      Q.  The second portion of that sentence reads | 13:36:58 |
| 24  that Mr. Miller also communicated with top | 13:37:07 |
| 25  Tillerson advisors concerning TPS. | 13:37:11 |

| | | |
|---|---|---|
| 1 | "Tillerson told Homeland Security Acting Secretary | 13:38:55 |
| 2 | Elaine Duke that conditions in Central America and | 13:38:58 |
| 3 | Haiti had improved" -- | 13:39:05 |
| 4 | (Interruption by the reporter.) | 13:39:05 |
| 5 | Q.  "Tillerson told Homeland Security's Acting | 13:39:08 |
| 6 | Secretary Elaine Duke that conditions in Central | 13:39:08 |
| 7 | America and Haiti had improved and that TPS | 13:39:15 |
| 8 | protections were no longer warranted.  When the two | 13:39:17 |
| 9 | spoke by phone, Tillerson told Duke ending TPS 'was | 13:39:20 |
| 10 | just something she had to do?'" | 13:39:25 |
| 11 | Are you aware of any conversation like the | 13:39:28 |
| 12 | conversation that is described in this paragraph? | 13:39:34 |
| 13 | MR. KIRSCHNER:  Objection.  Ambassador | 13:39:36 |
| 14 | Nealon can answer the question if he's aware of any | 13:39:40 |
| 15 | conversations between Elaine Duke and Secretary | 13:39:43 |
| 16 | Tillerson about TPS.  I instruct Ambassador Nealon | 13:39:47 |
| 17 | not to answer about the nature of the deliberations | 13:39:51 |
| 18 | between Secretary of State Tillerson and Acting | 13:39:54 |
| 19 | Secretary Duke. | 13:39:58 |
| 20 | A.  Yes. | 13:39:59 |
| 21 | MR. KIRSCHNER:  Sorry.  I -- like the | 13:40:00 |
| 22 | record is not clear, the question of yes, I just | 13:40:02 |
| 23 | want to make it clear in your words what you're | 13:40:06 |
| 24 | referring to as yes so that we're not -- have a | 13:40:09 |
| 25 | lack of clarity on the record. | 13:40:14 |

| | | |
|---|---|---|
| 1 | THE WITNESS:  Thank you. | 13:40:16 |
| 2 | A.  Yes, I'm aware that such a conversation | 13:40:17 |
| 3 | took place in that I was told that such a | 13:40:21 |
| 4 | conversation took place.  I wasn't present for it | 13:40:25 |
| 5 | and had no direct knowledge of it. | 13:40:28 |
| 6 | Q.  And who communicated to you that such a | 13:40:30 |
| 7 | conversation took place? | 13:40:32 |
| 8 | A.  I don't recall. | 13:40:33 |
| 9 | MR. KIRSCHNER:  Again, I think the record | 13:40:38 |
| 10 | is not clear when you say "such a conversation took | 13:40:39 |
| 11 | place."  Again, you're -- it's okay for you to | 13:40:43 |
| 12 | answer questions about whether Secretary of State | 13:40:49 |
| 13 | Tillerson and Acting Secretary Duke had | 13:40:51 |
| 14 | conversations about TPS. | 13:40:54 |
| 15 | The nature of those conversations, I | 13:40:56 |
| 16 | instruct you not to answer.  So when you say "such | 13:40:57 |
| 17 | a conversation took place," I want to make sure the | 13:41:00 |
| 18 | record is clear what you're referring to. | 13:41:02 |
| 19 | A.  So I was told that there was a | 13:41:05 |
| 20 | conversation between Secretary Tillerson and Acting | 13:41:12 |
| 21 | Secretary Duke regarding the TPS decision. | 13:41:18 |
| 22 | Q.  And that conversation happened around | 13:41:25 |
| 23 | October 31st, 2017, in your recollection? | 13:41:29 |
| 24 | A.  So I don't recall the date.  My | 13:41:39 |
| 25 | recollection is that it happened at the time of the | 13:41:40 |

| | | |
|---|---|---|
| 1 | TPS decision. | 13:41:43 |
| 2 | Q.   Okay.  So the last full paragraph of that | 13:41:48 |
| 3 | page reads, "White House Chief of Staff John | 13:41:55 |
| 4 | F. Kelly, who had run DHS from January until July, | 13:42:00 |
| 5 | called Duke from Asia where he was traveling with | 13:42:04 |
| 6 | the President to convey his frustration." | 13:42:07 |
| 7 | Were you aware of whether White House | 13:42:10 |
| 8 | Chief of Staff John Kelly called Acting Secretary | 13:42:13 |
| 9 | Duke concerning TPS? | 13:42:17 |
| 10 | MR. KIRSCHNER:  Again, I will instruct | 13:42:18 |
| 11 | Ambassador Nealon that he can answer the question | 13:42:21 |
| 12 | of whether he's aware of a phone call between | 13:42:23 |
| 13 | General Kelly and Acting Secretary Duke. | 13:42:26 |
| 14 | To the extent the question calls for | 13:42:30 |
| 15 | deliberations during that phone call, I would | 13:42:33 |
| 16 | instruct Ambassador Nealon not to answer. | 13:42:35 |
| 17 | A.   Similarly, I was told that a phone | 13:42:38 |
| 18 | conversation took place between Chief of Staff | 13:42:42 |
| 19 | Kelly and Acting Secretary Duke at the time of | 13:42:46 |
| 20 | the -- of that particular TPS decision. | 13:42:51 |
| 21 | Q.   And who communicated to you that there was | 13:42:54 |
| 22 | such a phone call? | 13:43:01 |
| 23 | A.   I don't recall. | 13:43:02 |
| 24 | Q.   Do you recall whether it was one of the | 13:43:03 |
| 25 | participants of the phone call? | 13:43:09 |

1   I said was that I felt obligated to leave as a          15:25:54
2   political appointee who felt he couldn't fully          15:25:58
3   represent all of the administration's policies.          15:26:04
4       Q.  Are there certain policies that led you to      15:26:07
5   feel obligated to leave?                                15:26:12
6           THE WITNESS:  Do I have to go into this?        15:26:30
7   I mean --                                               15:26:32
8       A.  I'll ask you.  So I feel like I gave you        15:26:34
9   an honest and heartfelt answer --                       15:26:38
10      Q.  I appreciate it.                                15:26:41
11      A.  -- to the question.  And I don't really         15:26:42
12  have more to say than that.  I think if we go back      15:26:45
13  and look at what I said, it stands on its own and       15:26:51
14  that's why I left.                                      15:26:54
15      Q.  Let me ask just maybe one other question        15:26:55
16  more specifically related to this.  And I               15:26:58
17  apologize, I understand that this is after a career     15:27:00
18  of service to the country, I imagine it was an          15:27:03
19  intense decision without putting words in your          15:27:06
20  mouth and a difficult one, and I appreciate that        15:27:10
21  it's a heartfelt answer, and it's on the record,        15:27:12
22  and I understand that there are complications with      15:27:14
23  that.                                                   15:27:16
24          Were the discussions around TPS -- did the      15:27:17
25  discussions around TPS and the administration's         15:27:21

Case 3:18-cv-01554-EMC  Document 96-12  Filed 08/23/18  Page 16 of 22

| | |
|---|---|
| 1  decisions with regard to TPS inform your decision | 15:27:24 |
| 2  to leave? | 15:27:26 |
| 3      A.  You know, I think I said in my original | 15:27:27 |
| 4  answer that in 34 years in government, I won and | 15:27:30 |
| 5  lost hundreds of policy battles, and so I'm not a | 15:27:33 |
| 6  guy who would, you know, get up and take his | 15:27:37 |
| 7  checkerboard with him because he lost a policy | 15:27:40 |
| 8  fight, right?  So that's really not why I left. | 15:27:43 |
| 9          I left really because I didn't feel like I | 15:27:49 |
| 10  could represent the administration, and so I felt | 15:27:53 |
| 11  obligated to leave.  I didn't leave in anger, I | 15:27:56 |
| 12  left in sorrow. | 15:27:59 |
| 13      Q.  I really appreciate that, and I apologize | 15:28:02 |
| 14  for the probing questions on I'm sure a difficult | 15:28:05 |
| 15  topic. | 15:28:10 |
| 16          If I could turn to the op-ed that you | 15:28:12 |
| 17  wrote.  What led you to write the op-ed that you | 15:28:14 |
| 18  wrote here? | 15:28:18 |
| 19      A.  So after 34 years in government, I was | 15:28:19 |
| 20  suddenly unleashed and able to express my opinion | 15:28:30 |
| 21  openly and publicly.  And so I've been doing that | 15:28:36 |
| 22  since I left government, and this is an example of | 15:28:42 |
| 23  that. | 15:28:44 |
| 24      Q.  Were you particularly concerned around the | 15:28:44 |
| 25  decision to terminate TPS for Honduras, has that | 15:28:54 |

| | | |
|---|---|---|
| 1 | paragraphs. | 15:35:42 |
| 2 | A.  Okay. | 15:35:56 |
| 3 | Q.  You say here, "The justifications for | 15:35:56 |
| 4 | termination are two-fold.  The administration | 15:36:06 |
| 5 | reminds us that temporary protected status was | 15:36:08 |
| 6 | always meant to be temporary.  It also argues that | 15:36:12 |
| 7 | the original conditions for which TPS was granted: | 15:36:12 |
| 8 | The devastating Hurricane Mitch in 1998 that killed | 15:36:16 |
| 9 | more than 7,000 people in Honduras alone no longer | 15:36:20 |
| 10 | exists."  Beginning of the next paragraph, "We | 15:36:23 |
| 11 | understand how such arguments would make sense | 15:36:25 |
| 12 | under a strict constructionist view." | 15:36:28 |
| 13 | We spoke about this a bit earlier today. | 15:36:31 |
| 14 | But was it your understanding at the time that you | 15:36:34 |
| 15 | wrote this op-ed that the strict constructionist | 15:36:37 |
| 16 | view of the TPS statute essentially won out in DHS? | 15:36:43 |
| 17 | MR. KIRSCHNER:  Objection, calls for | 15:36:49 |
| 18 | speculation. | 15:37:00 |
| 19 | A.  So whether the strict constructionist view | 15:37:00 |
| 20 | is the ultimate reason why the secretaries made | 15:37:03 |
| 21 | their decisions about TPS, I don't know.  But to | 15:37:07 |
| 22 | answer your question, I believe that a strict | 15:37:10 |
| 23 | interpretation of the statute was an important | 15:37:17 |
| 24 | element in those decisions. | 15:37:20 |
| 25 | Q.  Do you believe that that was the only way | 15:37:22 |

1    that TPS -- the TPS statute could have been          15:37:26

2    interpreted?                                         15:37:31

3         MR. KIRSCHNER:  Objection, calls for a          15:37:31

4    legal conclusion and calls for speculation, and      15:37:34

5    also it's vague and confusing what you mean by that  15:37:40

6    question.                                            15:37:44

7         Q.  If you understand the question, you can     15:37:44

8    answer it.                                           15:37:45

9         A.  So my understanding was that successive     15:37:49

10   administrations had renewed TPS for Honduras long    15:37:54

11   after the conditions that resulted from Hurricane    15:38:04

12   Mitch had begun to dissipate or had dissipated.      15:38:08

13        Q.  So is it your understanding that there was  15:38:15

14   a new interpretation of the TPS statute that didn't  15:38:17

15   allow that under this administration?                15:38:20

16        MR. KIRSCHNER:  Objection, calls for            15:38:22

17   speculation.                                         15:38:26

18        A.  So my understanding, and this is a          15:38:26

19   personal opinion, is that, again, I believe this     15:38:32

20   viewpoint was one of the elements that went into     15:38:37

21   those decisions.  But, yes, I believe that -- that   15:38:39

22   there was a belief among many people in the          15:38:46

23   administration that their hands were tied and that   15:38:49

24   because the statute says that -- that TPS should be  15:38:53

25   based on the existing conditions, that there was no  15:39:00

| | | |
|---|---|---|
| 1 | DHS about TPS and about the termination of TPS.  I | 15:45:52 |
| 2 | want to be very careful about -- about stating | 15:45:57 |
| 3 | unequivocally that those conversations spoke | 15:46:03 |
| 4 | directly about the -- a new interpretation of the | 15:46:07 |
| 5 | statute, because I'm trying to think if I -- if I | 15:46:12 |
| 6 | heard that specifically or not. | 15:46:16 |
| 7 |      So I'm just going to be very careful here. | 15:46:20 |
| 8 | And I don't remember specifically being told that. | 15:46:25 |
| 9 |    Q.  Okay.  And you've mentioned in the course | 15:46:27 |
| 10 | of the deposition a few different ways in which the | 15:46:34 |
| 11 | White House had been involved in communications | 15:46:39 |
| 12 | around TPS.  I just want to be very clear, you said | 15:46:41 |
| 13 | that there are people in the White House who were | 15:46:47 |
| 14 | involved in conversations around the termination of | 15:46:51 |
| 15 | TPS.  Who are the people that you know of directly | 15:46:53 |
| 16 | or indirectly from the White House who were | 15:46:57 |
| 17 | involved in those conversations? | 15:46:59 |
| 18 |    A.  So the name that always came up is Stephen | 15:47:03 |
| 19 | Miller. | 15:47:08 |
| 20 |    Q.  And who was Stephen Miller communicating | 15:47:08 |
| 21 | with? | 15:47:13 |
| 22 |    A.  So, again, this is -- these are things | 15:47:13 |
| 23 | that were told to me.  I don't have any direct | 15:47:17 |
| 24 | knowledge of these conversations.  But he was | 15:47:21 |
| 25 | certainly speaking to the DHS Chief of Staff and he | 15:47:25 |

| | | |
|---|---|---|
| 1 | was certainly speaking to Mr. Hamilton, and he may | 15:47:32 |
| 2 | have been speaking to others. | 15:47:37 |
| 3 | Q.  How do you know that he was speaking to | 15:47:39 |
| 4 | the DHS Chief of Staff?  First of all, which DHS | 15:47:41 |
| 5 | Chief of Staff are you referencing here? | 15:47:46 |
| 6 | A.  Chad Wolf. | 15:47:48 |
| 7 | Q.  And how do you know that he was speaking | 15:47:49 |
| 8 | to Chad Wolf? | 15:47:52 |
| 9 | A.  Chad Wolf told me. | 15:47:53 |
| 10 | Q.  Did he speak to Mr. Wolf more than once | 15:47:55 |
| 11 | about TPS? | 15:47:58 |
| 12 | MR. KIRSCHNER:  Objection, foundation. | 15:47:59 |
| 13 | A.  So I believe Mr. Wolf told me that he had | 15:48:08 |
| 14 | had numerous conversations with Stephen Miller | 15:48:10 |
| 15 | about TPS. | 15:48:13 |
| 16 | Q.  Do you recall when those conversations | 15:48:14 |
| 17 | took place? | 15:48:17 |
| 18 | A.  I don't. | 15:48:18 |
| 19 | Q.  And how do you know that Mr. Miller was | 15:48:20 |
| 20 | having communications with Mr. Hamilton about TPS? | 15:48:24 |
| 21 | A.  Again, I don't have direct knowledge of | 15:48:28 |
| 22 | these conversations, but reference would | 15:48:30 |
| 23 | occasionally be made to them in meetings. | 15:48:34 |
| 24 | Q.  Did Mr. Wolfe elaborate to you the content | 15:48:38 |
| 25 | of the conversations he had with Mr. Miller | 15:48:54 |

1     Q.  I'll skip that.                                16:52:49

2          Do you recall any concerns about whether      16:52:55

3     the Secretary would make a timely decision with    16:52:59

4     regard to the TPS determination of Sudan?          16:53:04

5     A.  Yes, because as we've discussed                16:53:08

6     previously, there was this -- there was this delay 16:53:17

7     in getting the paperwork from the Department of    16:53:25

8     State, which she really wanted to see before she   16:53:28

9     made her decision.                                 16:53:31

10    Q.  I'm going to give you what has previously       16:54:13

11    been marked as Exhibit 7.  This does seem to start  16:54:15

12    at the end and go to the beginning.                 16:54:25

13    A.  Okay.                                           16:54:27

14         Okay.                                          16:55:31

15    Q.  What do you understand this e-mail chain         16:55:31

16    to be referring to?                                 16:55:33

17         MR. KIRSCHNER:  Objection, calls for           16:55:34

18    speculation.                                        16:55:39

19    A.  This seems to be a back and forth about         16:55:39

20    USCIS's input into the Sudan TPS decision.          16:55:47

21    Q.  So if I -- the first e-mail in the chain        16:55:53

22    from August 29th, 2017 at 9:52 p.m., the subject is 16:56:01

23    "Sudan TPS" and the author is Gene Hamilton.  It's  16:56:08

24    obviously redacted in full.                         16:56:16

25         The next e-mail is from Kathy Neubel           16:56:20

1            CERTIFICATE OF REPORTER

2            I, Dana Welch, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell

5    the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause;

7            That said deposition was taken in

8    shorthand by me, a disinterested person, at the time

9    and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13           That before completion of the deposition,

14   review of the transcript [X] was [ ] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18           I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

22   any of the parties thereto.

23           Dated:  August 15, 2018.

24   _____

25   Dana Welch, CSR, RPR, CRR, CRC