# EXHIBIT 18

KATHY NUEBEL KOVARIK - 08/03/2018

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO

 4   - - - - - - - - - - - - - - - - -x

 5   CRISTA RAMOS, et al.,          :

 6                   Plaintiffs,  :  Case No.

 7        v.                       :  3:18-cv-1554-

 8   KIRSTJEN NIELSEN, et al.,      :  EMC

 9                   Defendants.  :

10   - - - - - - - - - - - - - - - - -x

11

12

13            VIDEOTAPED DEPOSITION OF

14      U.S. DEPARTMENT OF HOMELAND SECURITY

15      By and Through Its Corporate Designee

16               KATHY NUEBEL KOVARIK

17                 Washington, D.C.

18               Friday, August 3, 2018

19                    9:35 a.m.

20

21

22

23   Job No.:  LA-185448

24   Pages 1 - 289

25   Reported By:  Joan V. Cain
```

1  currently in the review process by the magistrate          10:14:31
2  judge and have been part of ongoing discussions with       10:14:36
3  opposing counsel, but we certainly have reviewed the       10:14:39
4  letter and -- and take the concerns expressed into         10:14:43
5  account.                                                   10:14:47
6  BY MS. MACLEAN:                                            10:14:54
7      Q    Did you prepare any notes in preparation          10:14:54
8  for your deposition today?                                 10:14:57
9      A    During conversations yesterday and on             10:15:02
10 Wednesday, I did take notes to remind myself of            10:15:04
11 certain facts regarding the four TPS designations at       10:15:09
12 hand.                                                      10:15:17
13     Q    Did you bring those with you today?               10:15:18
14     A    I do not have them.                               10:15:20
15     Q    In total how long have you spent preparing        10:15:48
16 for today's deposition?                                    10:15:50
17     A    I'd say approximately ten hours.                  10:16:08
18     Q    How would you define that time -- divide          10:16:12
19 that time?                                                 10:16:14
20          MR. TYLER:  Objection, vague.                     10:16:14
21          THE WITNESS:  How would you like me to            10:16:21
22 define that time?                                          10:16:23
23 BY MS. MACLEAN:                                            10:16:23
24     Q    Well, you spent -- just to be clear, you          10:16:24
25 spent a few hours in deposition prep I guess over a        10:16:26

| | | |
|---|---|---|
| 1 | couple of days, and then it sounds like you may have | 10:16:30 |
| 2 | spent maybe three or four hours reviewing documents. | 10:16:32 |
| 3 | Is that accurate? | 10:16:36 |
| 4 | A    Maybe six or seven with counsel and maybe a | 10:16:37 |
| 5 | few hours on my own looking at my own notes, talking | 10:16:43 |
| 6 | to myself. | 10:16:48 |
| 7 | Q    Great.  Thank you. | 10:16:51 |
| 8 | MS. MACLEAN:  So we'll mark the letter that | 10:16:56 |
| 9 | has been discussed that was sent by Rhett Martin to | 10:17:01 |
| 10 | Sean Commons as Exhibit 2 for the record. | 10:17:06 |
| 11 | (Deposition Exhibit 2 was marked for | 10:17:08 |
| 12 | identification.) | 10:17:18 |
| 13 | BY MS. MACLEAN: | 10:17:18 |
| 14 | Q    What is your current position at USCIS, | 10:17:19 |
| 15 | Ms. Nuebel Kovarik? | 10:17:23 |
| 16 | A    I am chief of the Office of Policy and | 10:17:25 |
| 17 | Strategy. | 10:17:29 |
| 18 | Q    And when did you begin that position? | 10:17:29 |
| 19 | A    I was appointed to that position on April | 10:17:30 |
| 20 | 2nd of 2017. | 10:17:32 |
| 21 | Q    What was your position before that? | 10:17:34 |
| 22 | A    I was special advisor to the secretary. | 10:17:38 |
| 23 | Q    When did you begin that position? | 10:17:41 |
| 24 | A    Around January -- it might have been on | 10:17:43 |
| 25 | January 26, 2017. | 10:17:46 |

| | | |
|---|---|---|
| 1 | Q    Did you have any informal role with the -- | 10:17:56 |
| 2 | with the department or with the administration | 10:17:59 |
| 3 | prior -- prior to January 26, 2017? | 10:18:02 |
| 4 |      MR. TYLER:  Objection, vague. | 10:18:06 |
| 5 |      THE WITNESS:  Define informal role. | 10:18:08 |
| 6 | BY MS. MACLEAN: | 10:18:10 |
| 7 | Q    Were you serving on any of the transition | 10:18:10 |
| 8 | committees or providing information to the secretary | 10:18:18 |
| 9 | or to the administration prior to that date? | 10:18:23 |
| 10 | A    I volunteered on the transition team. | 10:18:26 |
| 11 | Q    When did you volunteer on the transition | 10:18:28 |
| 12 | team? | 10:18:32 |
| 13 | A    I don't know the exact date.  Up until -- | 10:18:32 |
| 14 | until the inauguration, but I don't remember the | 10:18:36 |
| 15 | start date. | 10:18:39 |
| 16 | Q    Okay.  And what did you do during the time | 10:18:40 |
| 17 | that you were volunteering? | 10:18:44 |
| 18 | A    I discussed immigration policies with the | 10:18:54 |
| 19 | transition team and prepared for the | 10:18:56 |
| 20 | President-elect's first 100 days in office. | 10:19:04 |
| 21 | Q    Approximately how much time did you devote | 10:19:12 |
| 22 | to that volunteer role? | 10:19:15 |
| 23 | A    I don't recall. | 10:19:19 |
| 24 | Q    Could you give me your best guess? | 10:19:21 |
| 25 | A    Given that I don't know when I started, I | 10:19:25 |

```
 1  would say it was a couple of hours during the week.    10:19:27
 2  I had a full-time job on top of that.                  10:19:35
 3      Q    Were you part of an immigration committee     10:19:42
 4  or an immigration group?                               10:19:45
 5      A    It wasn't an immigration group.  I don't      10:19:47
 6  know if it had a formal name.                          10:19:49
 7      Q    Who else was part of that group?              10:19:51
 8      A    There were several dozen or more              10:19:54
 9  individuals.                                           10:19:57
10      Q    Can you recall as many as possible?           10:19:58
11      A    Well, okay.  So on the transition team, a     10:20:17
12  number of people volunteered:  Kate Laborde,           10:20:18
13  L-A-B-O-R-D-E; Andrea Loving; George Fishman;          10:20:26
14  Tiffany Cissna; Gene Hamilton; Jon Feere; John         10:20:35
15  Zadrozny; Lee Francis Cissna; Lora Ries; Tracy         10:20:47
16  Short.  I'm blanking on other names.                   10:21:23
17      Q    Was Dimple Shah a part of that?               10:21:26
18      A    Dimple Shah.                                  10:21:29
19      Q    Was Stephen Miller part of that?              10:21:30
20      A    I don't recall if he was.  I never saw him.   10:21:33
21      Q    Was Jeff Sessions involved in that group?     10:21:36
22      A    I don't -- I don't know.                      10:21:39
23      Q    Was Steve Bannon?                             10:21:45
24      A    I don't know.                                 10:21:46
25      Q    What were you involved with particularly --   10:21:56
```

1   workers?                                                    10:28:38

2      A    Well, the H-1B Visa program, is one program         10:28:41

3   in particular that is rife with fraud and abuse, and        10:28:47

4   there are a number of legislative changes that need         10:28:52

5   to be made.  We were looking at what could be done          10:28:54

6   administratively to protect U.S. workers.  We had an        10:28:58

7   interest in making sure that foreign workers as well        10:29:07

8   as U.S. workers were protected and that employers           10:29:10

9   were living up to their obligation to pay the wages         10:29:15

10  that they claimed to pay and to ensure that                 10:29:18

11  employers were not benching U.S. citizen workers to         10:29:26

12  get around worker protections under the statute.            10:29:29

13     Q    So after your time with the transition              10:29:45

14  team, you became a special advisor to DHS Secretary         10:29:48

15  John Kelly.  How -- how did you initiate that role?         10:29:52

16     A    It was a logical outgrowth of I guess the           10:29:58

17  transition team.  I had applied, like everybody else        10:30:00

18  did, on the Whitehouse.gov web site to be involved,         10:30:08

19  and at the time they were looking for people to             10:30:14

20  start immediately upon inauguration and -- and there        10:30:17

21  was a group of people that started right away, also         10:30:24

22  known as the beachhead team.  We went in                    10:30:29

23  immediately, and I believe everyone was given the           10:30:32

24  same title of special assistant or special advisor          10:30:34

25  to the secretary.                                           10:30:39

```
 1    Q    Who else was part of that beachhead team?        10:30:41
 2    A    There's some overlap with a lot of the           10:30:48
 3  transition team members, but there are many             10:30:50
 4  transition team members that did not.  I don't          10:30:53
 5  recall exactly who started, but I can tell you          10:30:58
 6  around the inauguration time, Gene Hamilton, Lora       10:31:00
 7  Ries, Jon Feere, Julie Kirchner was part of the         10:31:11
 8  beachhead, and I forgot she was on the transition       10:31:20
 9  team, but I never communicated with Julie on the        10:31:23
10  transition team.  That's why I left her out.  Tracy     10:31:25
11  Short I believe started almost after the                10:31:30
12  inauguration.  There were other members of the -- of    10:31:33
13  the, quote, homeland security beachhead team.           10:31:49
14    Q    And what was your role during those first        10:31:53
15  three months before you took the position of chief      10:31:57
16  of the Office of Policy and Strategy?                   10:32:02
17    A    There were two other individuals within the      10:32:10
18  U.S. Citizenship and Immigration Service that were      10:32:15
19  also on this beachhead team that were not on the        10:32:18
20  transition team, and so I worked with those two         10:32:20
21  individuals.                                            10:32:23
22    Q    Who were those individuals?                      10:32:23
23    A    Craig Symons and Carl Risch.                     10:32:24
24    Q    Carl Risch?                                      10:32:29
25    A    Yeah.                                            10:32:29
```

1  documents, review anything -- any material that        10:46:17
2  comes before us.                                       10:46:21
3     Q    So Mr. Prelogar has been with the              10:46:22
4  administration -- been -- been with the department     10:46:24
5  since 2008?                                            10:46:26
6     A    At least.                                      10:46:27
7     Q    Ms. Hamilton, how long has she been with       10:46:28
8  the department?                                        10:46:32
9     A    She served in the INS, so she's been there     10:46:32
10 for a while.                                            10:46:35
11    Q    Okay.  And Mr. Law?                             10:46:36
12    A    He started approximately in October of         10:46:41
13 2017.                                                   10:46:42
14    Q    Where had he been before?                      10:46:46
15    A    Federation for -- I don't know the acronym,    10:46:48
16 but it's FAIR.                                          10:46:56
17    Q    Is it Federation for American Immigration      10:46:57
18 Reform?                                                 10:47:00
19    A    Sure.                                           10:47:01
20    Q    And what was his role there?                    10:47:01
21    A    I think he was a policy advisor.  He may       10:47:08
22 have been a registered lobbyist.  I -- I don't know    10:47:11
23 his exact title.                                        10:47:13
24    Q    Am I missing anyone who had been involved      10:47:22
25 with the TPS?  I think not.                             10:47:24

| | |
|---|---|
| 1    A    To make it clear, Jacob Stubbs receives | 10:47:26 |
| 2   material because when things come through our | 10:47:30 |
| 3   executive secretariat Jacob works with them, and so | 10:47:35 |
| 4   he may touch material.  He doesn't advise me on | 10:47:41 |
| 5   these issues.  He does like to do research on | 10:47:43 |
| 6   country conditions, but he really more deals with | 10:47:47 |
| 7   the paperwork. | 10:47:51 |
| 8    Q    Mm-hmm.  Just to clarify, Mr. Levine had | 10:47:52 |
| 9   been an advisor to the prior chief as well you had | 10:48:06 |
| 10  said, right? | 10:48:10 |
| 11   A    Yes. | 10:48:11 |
| 12   Q    Can you describe your job responsibilities | 10:48:11 |
| 13  generally? | 10:48:13 |
| 14   A    Sure.  As chief I oversee subject matter | 10:48:17 |
| 15  experts in all areas of immigration under the | 10:48:26 |
| 16  portfolio of USCIS.  Our office oversees the policy | 10:48:29 |
| 17  manual, policy memorandum, guidance, Federal | 10:48:38 |
| 18  Register Notices.  It is our job to review all | 10:48:50 |
| 19  documents related to policy generally, and my job is | 10:48:51 |
| 20  also to advise the director on issues related to | 10:48:57 |
| 21  policy.  I work with operators and counsel. | 10:49:00 |
| 22   Q    Sorry.  When you say operators and counsel, | 10:49:11 |
| 23  what do you mean? | 10:49:14 |
| 24   A    I work with other directorates that have | 10:49:14 |
| 25  adjudicatory responsibilities. | 10:49:17 |

```
1     Q    Okay.  What is your decision-making          10:49:19
2  authority at USCIS?                                   10:49:29
3          MR. TYLER:  Objection, vague.                 10:49:31
4          THE WITNESS:  My decision-making              10:49:39
5  authorities, can you clarify?  What I make decisions  10:49:41
6  on?                                                   10:49:45
7  BY MS. MACLEAN:                                       10:49:45
8     Q    Yes.  What you have the -- the authority      10:49:45
9  within the department to make decisions on.           10:49:47
10    A    Most of what we do is ultimately approved     10:49:53
11 by the front office, or we -- my office does a lot    10:49:54
12 of things.  I have decision-making authority over     10:50:05
13 our budget, travel, salaries, personnel issues.       10:50:09
14    Q    Other matters or policy or practice where     10:50:15
15 you have decision-making authority?                   10:50:19
16    A    Only insofar as what may go into a decision   10:50:29
17 memo, but ultimately that's not my -- my              10:50:32
18 decision-making authority.                            10:50:35
19    Q    Who do you communicate with most in your      10:50:38
20 current role?                                         10:50:40
21    A    My Deputy Nathan Stiefel, my senior advisor   10:50:45
22 Robert Law.                                           10:50:49
23    Q    I'm sorry.  Was Nathan -- how long has        10:50:54
24 Nathan Stiefel been at the department?                10:50:56
25    A    He was recently selected this year, so in     10:51:03
```

1   the last six months has he been deputy.                10:51:05

2       Q    And where was he before that?                10:51:09

3       A    He was in the Office of Citizenship within    10:51:15

4   USCIS.                                                 10:51:18

5       Q    For -- for approximately how long, to the     10:51:18

6   extent that you know?                                  10:51:22

7       A    Years.  It may have been before 2008.         10:51:22

8       Q    Okay.  You'd mentioned in response to my      10:51:32

9   question about who you communicate with most Mr. Law   10:51:33

10  and Mr. Stiefel.  Are there others?                    10:51:36

11      A    I communicate with them all.  I communicate   10:51:39

12  with them all.                                         10:51:47

13      Q    How often when Mr. Kelly was the DHS           10:51:48

14  secretary, did you communicate with the DHS            10:51:54

15  secretary in your current role?                        10:51:56

16      A    Infrequently.                                 10:51:58

17      Q    How would you define infrequently?            10:52:00

18      A    I don't recall a time when I directly         10:52:04

19  communicated with him.                                 10:52:06

20      Q    And with -- when Acting Secretary Duke was    10:52:09

21  acting secretary, how often did you communicate with   10:52:17

22  her?                                                   10:52:21

23      A    Not frequently.  I would say a handful of     10:52:21

24  times.                                                 10:52:23

25      Q    When you communicated with then Acting        10:52:24

| | |
|---|---|
| 1        I have a standing meeting every other week | 11:03:20 |
| 2   with my managers, all the chiefs of the divisions. | 11:03:22 |
| 3   I have a standing meeting -- I have standing | 11:03:35 |
| 4   meetings depending on if there are PCCs at the White | 11:03:37 |
| 5   House.  Those might be standing, you know, every | 11:03:46 |
| 6   month. | 11:03:49 |
| 7        Q    Sorry.  What is PCC? | 11:03:49 |
| 8        A    I'm sorry.  I don't even know what it | 11:03:50 |
| 9   stands for.  Policy coordinating committee.  It's an | 11:03:52 |
| 10  interagency meeting. | 11:03:56 |
| 11       Q    Who attends those meetings? | 11:04:00 |
| 12       A    It could be a variety of staff depending on | 11:04:01 |
| 13  the topic.  Those were in place before this | 11:04:04 |
| 14  administration.  It's a way to bring the | 11:04:06 |
| 15  interagencies together to talk about certain issues, | 11:04:08 |
| 16  and then there's a standing meeting on Fridays -- | 11:04:11 |
| 17       Q    Sorry.  Just to be clear, the PCC meetings | 11:04:16 |
| 18  will have sort of different agenda items -- | 11:04:19 |
| 19       A    Yes. | 11:04:21 |
| 20       Q    -- and then depending on what the agenda | 11:04:21 |
| 21  item is, different people will come? | 11:04:24 |
| 22       A    Right.  And then we do an immigration | 11:04:26 |
| 23  meeting at the Executive Office Building or the | 11:04:35 |
| 24  White House on Fridays. | 11:04:40 |
| 25       Q    Who attends that meeting? | 11:04:41 |

| | | |
|---|---|---|
| 1 | A    It's myself -- U.S. Citizenship and | 11:04:43 |
| 2 | Immigration Services could be represented by myself, | 11:04:48 |
| 3 | Craig Symons, or Robert Law. | 11:04:51 |
| 4 | Q    And who else attends? | 11:05:03 |
| 5 | A    There are officials from the Domestic | 11:05:04 |
| 6 | Policy Council as well as Department of Justice. | 11:05:06 |
| 7 | Q    Who from the Domestic Policy Council | 11:05:08 |
| 8 | attends? | 11:05:11 |
| 9 | A    Well, it has varied over time because staff | 11:05:11 |
| 10 | come and go, but John Zadrozny, Theo Wold -- | 11:05:14 |
| 11 | Q    Sorry.  Theo Wold? | 11:05:20 |
| 12 | A    Wold, W-O-L-D.  Morgan Hunter.  There's | 11:05:22 |
| 13 | been a variety.  I mean, a number of staff. | 11:05:32 |
| 14 | Q    And who from the Department of Justice is | 11:05:41 |
| 15 | usually there? | 11:05:45 |
| 16 | A    Dave Whetstone, Chad Mizelle. | 11:05:46 |
| 17 | Q    Mizelle or Yizelle? | 11:05:55 |
| 18 | A    Mizelle.  There are other Department of | 11:05:59 |
| 19 | Homeland Security directorates.  I should note that | 11:06:13 |
| 20 | the Immigration Customs Enforcement as well as | 11:06:15 |
| 21 | Office of Policy within the Department of Homeland | 11:06:16 |
| 22 | Security also attends at times.  And potentially the | 11:06:18 |
| 23 | Department of State may have a represent- -- | 11:06:23 |
| 24 | representative. | 11:06:25 |
| 25 | Q    Mm-hmm.  Does anyone come from the White | 11:06:25 |

| | | |
|---|---|---|
| 1 | House besides the Domestic Policy Council? | 11:06:28 |
| 2 | A    Aside from -- well, Stephen Miller will | 11:06:37 |
| 3 | attend. | 11:06:39 |
| 4 | Q    Regularly? | 11:06:40 |
| 5 | A    Pretty regularly. | 11:06:44 |
| 6 | Q    Anyone else? | 11:06:50 |
| 7 | A    Not that I can think of.  I think they all | 11:06:51 |
| 8 | work for the Domestic Policy Council. | 11:06:54 |
| 9 | Q    Okay.  Has TPS ever come up in that White | 11:06:56 |
| 10 | House immigration meeting? | 11:07:00 |
| 11 | A    If anything, it's mentioned in passing that | 11:07:01 |
| 12 | decisions are coming up, but we don't discuss TPS | 11:07:03 |
| 13 | normally.  These are -- | 11:07:06 |
| 14 | Q    Are -- | 11:07:11 |
| 15 | A    These are issues that we discuss with the | 11:07:12 |
| 16 | Department of Justice. | 11:07:14 |
| 17 | Q    Sorry.  The issues at the White House -- | 11:07:15 |
| 18 | immi- -- at the White House immigration meeting are | 11:07:19 |
| 19 | issues that you discuss with Department of Justice | 11:07:21 |
| 20 | or you discuss TPS with Department of Justice? | 11:07:24 |
| 21 | A    No.  It's issues normally that involve both | 11:07:27 |
| 22 | homeland and the Department of Justice. | 11:07:31 |
| 23 | Q    Okay.  Which of your standing meetings | 11:07:33 |
| 24 | would be -- if -- if any of your standing meetings | 11:07:44 |
| 25 | would be meetings where TPS was discussed, which | 11:07:50 |

| | | |
|---|---|---|
| 1 | know, policy and practice has been when a country | 11:16:35 |
| 2 | that has already been designated for TPS is up for | 11:16:37 |
| 3 | review in these periodic reviews, what would you | 11:16:42 |
| 4 | look to to determine whether the TPS should be | 11:16:46 |
| 5 | extended, terminated, or no decision would be made? | 11:16:50 |
| 6 |     A    I think to answer that question, you need | 11:16:55 |
| 7 | to understand the processes, and that includes | 11:16:56 |
| 8 | the -- the research done by USCIS as well as the | 11:17:02 |
| 9 | Department of State.  The criteria used are the | 11:17:07 |
| 10 | legal standards under the statute, and the best | 11:17:13 |
| 11 | evidence is what is in those decision memos and | 11:17:17 |
| 12 | research. | 11:17:19 |
| 13 |     Q    Were you given any guidance when you | 11:17:35 |
| 14 | started at USCIS with regard to how TPS periodic | 11:17:38 |
| 15 | reviews are conducted? | 11:17:43 |
| 16 |     A    There's no standard policy, no written | 11:17:45 |
| 17 | policy or guidance, and no training. | 11:17:47 |
| 18 |     Q    Do you know if there ever has been any | 11:17:59 |
| 19 | standard written policy guidance? | 11:18:02 |
| 20 |     A    Not that I'm aware of. | 11:18:02 |
| 21 |     Q    Any training that has taken place with | 11:18:08 |
| 22 | regard to TPS periodic reviews? | 11:18:10 |
| 23 |     A    Not that I'm aware of. | 11:18:14 |
| 24 |     Q    When you started in your current position | 11:18:29 |
| 25 | as chief at USCIS, you got into the weeds in TPS | 11:18:30 |

| | |
|---|---|
| 1 very quickly.  Were you given any directives or | 11:18:34 |
| 2 guidance from the secretary or the -- I think then | 11:18:37 |
| 3 acting director about how you should move forward | 11:18:42 |
| 4 with regard to TPS? | 11:18:46 |
| 5     A     Not to kick start our interagency review | 11:18:47 |
| 6 process.  I -- for that process I deferred to my | 11:18:50 |
| 7 staff who had been there, the subject matter experts | 11:18:53 |
| 8 to kick start that process. | 11:18:55 |
| 9     Q     Were you given any guidance about any -- | 11:18:56 |
| 10 beyond kick starting the process, but how you from | 11:19:05 |
| 11 your position as chief and how CIS would look at TPS | 11:19:07 |
| 12 periodic reviews and determinations? | 11:19:12 |
| 13     A     Not that I recall. | 11:19:13 |
| 14     Q     What do you understand about the intents -- | 11:19:25 |
| 15 and I think just a few more questions and then we | 11:19:27 |
| 16 can take a break. | 11:19:29 |
| 17         What do you understand about the intents of | 11:19:31 |
| 18 the TPS statute beyond what's written on the paper? | 11:19:32 |
| 19         MR. TYLER:  Objection, vague.  Calls for a | 11:19:34 |
| 20 legal conclusion. | 11:19:42 |
| 21         THE WITNESS:  You want me to opine on | 11:19:42 |
| 22 the -- the legality or the -- | 11:19:45 |
| 23 BY MS. MACLEAN: | 11:19:45 |
| 24     Q     No. | 11:19:45 |
| 25     A     -- the purpose behind what Congress was | 11:19:47 |

```
 1   intending?                                          11:19:49
 2      Q   Yes, not the legality of it, but the -- the  11:19:50
 3   purpose.  What do you understand that the TPS       11:19:53
 4   statute is intended to achieve?                     11:19:56
 5           MR. TYLER:  I'll object.  This goes beyond  11:20:02
 6   the 30(b)(6) scope.  You're asking this question of 11:20:05
 7   her as a fact witness, if you will, asking her      11:20:07
 8   opinion.                                            11:20:10
 9   BY MS. MACLEAN:                                     11:20:14
10      Q   What is the agency's position about the      11:20:14
11   intent of the statute?                              11:20:16
12           MR. TYLER:  I'll object to that as beyond   11:20:17
13   the scope of the 30(b)(6) notice.  She's speaking as 11:20:19
14   a fact witness now, speaking to her own opinion.    11:20:24
15           THE WITNESS:  The temporary protected       11:20:32
16   status was created by Congress in order to give     11:20:35
17   temporary relief to individuals in the United       11:20:37
18   States.                                             11:20:43
19   BY MS. MACLEAN:                                     11:20:43
20      Q   When you read that, I noticed that you       11:20:44
21   emphasized temporary.  Was there -- is that correct? 11:20:46
22      A   Temporary -- it -- it does say temporary,    11:20:48
23   yes.  I emphasized it.                              11:20:53
24      Q   And is there a reason that you emphasized    11:20:55
25   temporary?                                          11:20:58
```

| | |
|---|---|
| 1     A     Because it's not a long-term legal status. | 11:20:58 |
| 2   It's a temporary status.  There's no reason I -- | 11:21:01 |
| 3     Q   Is that the agency's position as well | 11:21:14 |
| 4   that -- that there's an emphasis and importance on | 11:21:19 |
| 5   the temporary nature of the status? | 11:21:21 |
| 6         MR. TYLER:  Objection.  It is beyond the | 11:21:24 |
| 7   30(b)(6) scope.  You are asking these questions of | 11:21:25 |
| 8   this witness now as a fact witness.  She can only | 11:21:29 |
| 9   provide her own individual opinion. | 11:21:31 |
| 10        THE WITNESS:  I emphasized temporary | 11:21:37 |
| 11  because I think Congress intended to provide | 11:21:45 |
| 12  temporary relief to individuals who are in the | 11:21:47 |
| 13  United States and to protect them if there was an | 11:21:49 |
| 14  event or a reason for their not being able to | 11:21:58 |
| 15  return. | 11:22:01 |
| 16  BY MS. MACLEAN: | 11:22:01 |
| 17    Q   Have you had conversations with people in | 11:22:01 |
| 18  the department about the fact that the -- the | 11:22:06 |
| 19  temporary nature of TPS status should be emphasized | 11:22:12 |
| 20  or prioritized? | 11:22:17 |
| 21        MR. TYLER:  Same objection.  Beyond the | 11:22:18 |
| 22  scope of the 30(b)(6). | 11:22:20 |
| 23        THE WITNESS:  The one time I recall | 11:22:32 |
| 24  emphasizing temporary would be in communicating our | 11:22:32 |
| 25  decisions to the public that it was a temporary | 11:22:41 |

```
1    international operations directorate, also known as      12:18:31
2    RAIO.  This evaluation team consists of maybe a         12:18:37
3    dozen people that do -- their job is to do country      12:18:40
4    condition reports for their directorate and for the     12:18:43
5    work that they do, and we utilize them to provide       12:18:45
6    country conditions on particular countries.  So we      12:18:49
7    reach out to them and ask for their input.              12:18:55
8         We also -- my staff reaches out to the             12:18:59
9    State Department to get their -- to get them to         12:19:01
10   consider a country condition assessment.                12:19:06
11      Q   Sorry.  Around what time do you reach out        12:19:08
12   to the State Department?                                12:19:10
13      A   It could be any time in advance of the 60        12:19:11
14   days.  It most likely could be six months in            12:19:13
15   advance.  Enough time to do the research, to compile    12:19:19
16   it, and to present it in a decision memo draft.         12:19:21
17        My staff begins to write the -- to write           12:19:27
18   the draft decision memo with that input.  It is         12:19:31
19   then --                                                 12:19:41
20      Q   Sorry.  Who from your staff writes that          12:19:41
21   decision memo?                                          12:19:44
22      A   It could be one of my two or three subject       12:19:44
23   matter experts, Brandon, Kathryn.  Yeah.                12:19:48
24        Once they are done writing a draft -- I            12:19:54
25   should note that they also reach out to other --        12:19:57
```

| | | |
|---|---|---|
| 1 | maybe our Office of Performance and Quality that -- | 12:19:59 |
| 2 | that tracks data.  They reach out to our service | 12:20:05 |
| 3 | center operations.  They adjudicate TPS requests as | 12:20:11 |
| 4 | well as adjudicate employment authorization | 12:20:18 |
| 5 | documents that go along with it, and they may | 12:20:20 |
| 6 | provide input as to the number of people who | 12:20:22 |
| 7 | register and apply for EADs, employment | 12:20:25 |
| 8 | authorization documents. | 12:20:34 |
| 9 | The team may also reach out to other | 12:20:34 |
| 10 | components within Department of Homeland Security, | 12:20:37 |
| 11 | including the Office of Immigration Statistics, who | 12:20:39 |
| 12 | keeps all statistics for the department on | 12:20:43 |
| 13 | immigration.  They may reach out to Immigration and | 12:20:47 |
| 14 | Customs Enforcement to get a better understanding | 12:20:51 |
| 15 | and data on removals to that country. | 12:20:56 |
| 16 | So all of that research is compiled into a | 12:21:11 |
| 17 | decision memo.  That decision memo then is drafted | 12:21:12 |
| 18 | for my review, although my senior advisor may look | 12:21:16 |
| 19 | at it and may have edits and return it back to the | 12:21:20 |
| 20 | subject matter experts to make those edits. | 12:21:23 |
| 21 | Q    Sorry.  Who would -- who would make edits? | 12:21:27 |
| 22 | A    My senior advisor Robert Law.  Generally, I | 12:21:30 |
| 23 | like to meet with my staff to go over their first | 12:21:35 |
| 24 | draft to get briefed on the country conditions, to | 12:21:37 |
| 25 | understand the history of the designation.  At which | 12:21:41 |

| | |
|---|---|
| 1  together data from various different sources within | 12:24:24 |
| 2  the Department of Homeland Security? | 12:24:27 |
| 3     A    They rely on the research unit.  They may | 12:24:28 |
| 4  receive data from other -- other sources that they | 12:24:32 |
| 5  talk to our research unit about to verify.  There | 12:24:35 |
| 6  may be statistics or -- or information provided by a | 12:24:39 |
| 7  stakeholder group or maybe it's included in a | 12:24:42 |
| 8  letter.  They may look at that and ask the research | 12:24:45 |
| 9  unit to verify, and that may be included in the | 12:24:48 |
| 10  research. | 12:24:50 |
| 11     Q    And then the subject matter experts are | 12:24:54 |
| 12  ultimately responsible for drafting the memo that | 12:24:57 |
| 13  then goes to you and your senior advisor? | 12:25:00 |
| 14     A    Correct. | 12:25:02 |
| 15     Q    And the senior advisor makes the first set | 12:25:02 |
| 16  of edits to the -- | 12:25:06 |
| 17     A    Generally. | 12:25:07 |
| 18     Q    Generally.  And then it goes back to the | 12:25:08 |
| 19  subject matter experts? | 12:25:10 |
| 20     A    Yes.  I mean, at times they'll share it | 12:25:11 |
| 21  with me to make sure that I agree with his edits, | 12:25:18 |
| 22  and most of the time I defer to his edits or -- or | 12:25:21 |
| 23  ask him to ask the subject matter experts to | 12:25:26 |
| 24  adjudicate them. | 12:25:29 |
| 25     Q    Okay.  And then after the subject matter | 12:25:34 |

| | |
|---|---|
| 1 written in conjunction with Service Center | 13:43:48 |
| 2 Operations.  That draft is provided to my senior | 13:43:54 |
| 3 advisor.  Those comments are adjudicated.  Then it's | 13:43:57 |
| 4 provided to me. | 13:44:04 |
| 5     Q    Just to confirm because you have two senior | 13:44:05 |
| 6 advisors, the senior advisor is the same Mr. Law who | 13:44:08 |
| 7 is involved in the Federal Register process? | 13:44:13 |
| 8     A    So my senior advisor -- I have one senior | 13:44:16 |
| 9 advisor and -- at two different times, so like I | 13:44:18 |
| 10 said, up until October it was -- it was Lawrence | 13:44:23 |
| 11 Levine -- | 13:44:25 |
| 12    Q    It was, sorry, who? | 13:44:25 |
| 13    A    Lawrence Levine. | 13:44:27 |
| 14    Q    Okay. | 13:44:28 |
| 15    A    And then after around October it became | 13:44:28 |
| 16 Robert Law. | 13:44:30 |
| 17    Q    Oh, okay. | 13:44:31 |
| 18    A    So generally it goes through that same | 13:44:36 |
| 19 review, and we adjudicate comments with our subject | 13:44:38 |
| 20 matter experts. | 13:44:41 |
| 21    Q    And just so that I don't ask again, | 13:44:41 |
| 22 whenever you mention senior advisor, you're talking | 13:44:44 |
| 23 about, depending on the time period, either | 13:44:47 |
| 24 Mr. Levine or Mr. Law? | 13:44:49 |
| 25    A    That is correct. | 13:44:51 |

1    Q    Okay.  And then what happens after comments          13:44:52

2   have been adjudicated?                                      13:44:54

3    A    So because the Federal Register Notice               13:44:56

4   impacts other components, including the Service             13:45:00

5   Center Operations which adjudicates the registration       13:45:07

6   in the employment authorization documents, they            13:45:12

7   would review it, but so would our division.  It's          13:45:14

8   known as IRIS.  The acronym stands for identity and        13:45:16

9   records division.  I can't remember what it stands         13:45:20

10   for, IRIS.  They do verification issues and would         13:45:27

11   have input as well.                                        13:45:31

12        And so that Federal Register Notice is               13:45:37

13   circulated in a formal process called the G-1056          13:45:39

14   process, where it goes to the executive secretariat.      13:45:43

15   That executive secretariat tasks each component to        13:45:46

16   review it.  The executive secretariat collects those      13:45:49

17   comments and returns it to my subject matter experts      13:45:52

18   to adjudicate those comments.                              13:45:57

19    Q    Sorry.  And who are the comments from?              13:45:58

20    A    So all those comments are from agency               13:46:01

21   partners.  It could be from the IRIS division, the        13:46:03

22   SCOPS division.  It could be from the Refugee and         13:46:07

23   Asylum International Operations unit.  It could be         13:46:10

24   from -- it's mostly the chief counsel's office.  So       13:46:13

25   all of the comments from the interagency clearance        13:46:23

| | | |
|---|---|---|
| 1 | process, that formal clearance are consolidated by | 13:46:26 |
| 2 | the executive secretariat. | 13:46:33 |
| 3 | Q    And is that -- is that formal clearance | 13:46:37 |
| 4 | process established somewhere? | 13:46:41 |
| 5 | A    It is.  It's established within the | 13:46:45 |
| 6 | executive secretariat. | 13:46:47 |
| 7 | Q    Is it required for Federal Register Notice | 13:46:48 |
| 8 | or for final decision? | 13:46:51 |
| 9 | A    I think it's agency policy. | 13:46:54 |
| 10 | Q    Okay. | 13:46:55 |
| 11 | A    And then that G-1056 clearance is a normal | 13:47:02 |
| 12 | clearance process that we use for almost everything. | 13:47:06 |
| 13 | Q    Okay.  So that formal clearance process, | 13:47:13 |
| 14 | what are they formally clearing?  Is that a review | 13:47:15 |
| 15 | of the Federal Register Notice? | 13:47:22 |
| 16 | A    Exactly. | 13:47:24 |
| 17 | Q    And then once that federal -- once that | 13:47:25 |
| 18 | agency -- that G-1056 for the Federal Register | 13:47:27 |
| 19 | Notice is finalized, what's the next step? | 13:47:30 |
| 20 | A    Then it would go to the front office for | 13:47:32 |
| 21 | review.  So that front office would entail the | 13:47:35 |
| 22 | director senior -- this is USCIS front office.  It | 13:47:38 |
| 23 | would entail the senior advisor, the chief of staff, | 13:47:42 |
| 24 | maybe the deputy chief of staff. | 13:47:42 |
| 25 | I'm sorry.  It would entail front office | 13:47:48 |

| | | |
|---|---|---|
| 1 | review which includes senior advisors, chief of | 13:47:49 |
| 2 | staff, deputy chief of staff, the deputy director, | 13:47:52 |
| 3 | and then ultimately the director. | 13:48:01 |
| 4 | Q   And the G-1056 process, is that within the | 13:48:08 |
| 5 | agency or -- | 13:48:12 |
| 6 | A   Just within U.S. Citizenship and | 13:48:12 |
| 7 | Immigration Services. | 13:48:18 |
| 8 | Q   Okay.  And that review within the front | 13:48:18 |
| 9 | office is all those people that you mentioned are | 13:48:21 |
| 10 | also within CIS? | 13:48:24 |
| 11 | A   Yes. | 13:48:25 |
| 12 | Q   And after that process -- oh, sorry. | 13:48:25 |
| 13 | In the USCIS front office review process, | 13:48:27 |
| 14 | what are they reviewing? | 13:48:30 |
| 15 | A   The Federal Register Notice. | 13:48:32 |
| 16 | Q   Okay.  And then what's the next step after | 13:48:34 |
| 17 | that? | 13:48:40 |
| 18 | A   After the director is satisfied with the | 13:48:40 |
| 19 | notice, if he has changes or edits, we adjudicate | 13:48:44 |
| 20 | them, but when he's ultimately happy with it and he | 13:48:48 |
| 21 | clears it, it is transferred by the executive | 13:48:52 |
| 22 | secretariat -- you know what, I misspoke, because | 13:48:55 |
| 23 | there is a process -- a G-1056 process by the | 13:49:01 |
| 24 | executive secretariat, but there's also a process | 13:49:03 |
| 25 | our Regulatory Coordination Division undertakes. | 13:49:07 |

1      Q     Do you remember what this was in response      14:17:48
2   to?                                                     14:17:49
3      A     As I stated, it's probably in response to      14:17:51
4   the secretary wanting the input of other federal        14:17:54
5   agency partners in the review process.                  14:18:06
6      Q     Yeah.  Okay.  Thank you for bearing with me    14:18:29
7   with all those names.                                   14:18:31
8          So I'm not going to make you go through the      14:18:41
9   entire history of -- from 2008 till the present of      14:18:44
10   exactly what that process looks like in as much        14:18:47
11   detail, but I know that you wanted to say something    14:18:51
12   about what the process was and how it differed or      14:18:54
13   didn't differ prior to 2017.                           14:18:55
14     A     Sure.  I think it's important to know that     14:18:58
15   when I came in, again, I deferred to my staff who      14:19:00
16   have done this since about 2008, and so because you    14:19:03
17   had asked about it.  The process was regular --        14:19:06
18   pretty similar.  There is a decision memo, there's a   14:19:09
19   Federal Register Notice.  However, in the previous     14:19:15
20   administration, a decision memo was written in         14:19:18
21   conjunction at the same time as the Federal Register   14:19:23
22   Notice, and that -- that Federal Register Notice,      14:19:34
23   which was cleared by all the relevant personnel, you   14:19:40
24   know, that I mentioned earlier, but that went to OMB   14:19:45
25   prior to the decision-making.                          14:19:48

| | | |
|---|---|---|
| 1 | Q    Why do you think that process changed? | 14:19:58 |
| 2 | A    When I came in as chief, the -- the | 14:19:58 |
| 3 | decision memo was written and because I did not want | 14:20:03 |
| 4 | staff to expend resources to write a Federal | 14:20:10 |
| 5 | Register Notice that went in three or four different | 14:20:13 |
| 6 | directions for every option available, I asked them | 14:20:15 |
| 7 | to withhold writing the Federal Register Notice | 14:20:20 |
| 8 | until a decision was made. | 14:20:21 |
| 9 | Q    To make sure I understand correctly, the | 14:20:24 |
| 10 | Federal Register Notice in previous administrations, | 14:20:26 |
| 11 | it was -- what was sent to the OMB before the | 14:20:32 |
| 12 | decision was made was not just one Federal Register | 14:20:33 |
| 13 | Notice, but various drafts of Federal Register | 14:20:36 |
| 14 | Notices? | 14:20:40 |
| 15 | A    I don't know how many they sent.  Maybe | 14:20:40 |
| 16 | they assumed that they knew what the decision was | 14:20:42 |
| 17 | and they only sent one.  If there were options, they | 14:20:44 |
| 18 | may have sent more.  It's -- I don't know.  But it's | 14:20:47 |
| 19 | during that OMB process where there's input from | 14:20:54 |
| 20 | other agencies during that decision process; | 14:20:57 |
| 21 | whereas, now it's, you know, the decision of the | 14:21:00 |
| 22 | secretary and then it's sent to OMB. | 14:21:02 |
| 23 | Q    Okay.  In previous administrations when the | 14:21:10 |
| 24 | OMB received the Federal Register Notice or Notices, | 14:21:15 |
| 25 | would they then begin that interagency consultation | 14:21:22 |

| | | |
|---|---|---|
| 1 | process prior to -- potentially prior to the | 14:21:27 |
| 2 | decision actually being made? | 14:21:29 |
| 3 | A    Yes. | 14:21:30 |
| 4 | Q    And what would that consultation process | 14:21:31 |
| 5 | look like, to the extent that you know? | 14:21:33 |
| 6 | A    It's the same process I explained before | 14:21:37 |
| 7 | with the Federal Register Notice.  That is, it's | 14:21:40 |
| 8 | sent to agency partners that may have a stake in it. | 14:21:41 |
| 9 | Again, it could be the Department of State.  It | 14:21:44 |
| 10 | could be the Department of Defense.  It could be the | 14:21:46 |
| 11 | Department of Justice.  It could be the Department | 14:21:48 |
| 12 | of Health and Human Services if it had to deal with | 14:21:54 |
| 13 | Ebola so -- and also to the executive office.  I | 14:21:55 |
| 14 | understand that they're part of the review as well. | 14:21:58 |
| 15 | Q    Are there other changes from 2007 -- how | 14:22:07 |
| 16 | the TPS decisions were made from 2007 to the present | 14:22:12 |
| 17 | as compared to prior to 2017? | 14:22:15 |
| 18 | A    No.  For -- for the most part, because the | 14:22:17 |
| 19 | subject matter experts who were there in the | 14:22:21 |
| 20 | previous administration were also there for the last | 14:22:22 |
| 21 | several decisions, the process mainly remained the | 14:22:28 |
| 22 | same.  They shifted slightly, but it had to deal | 14:22:33 |
| 23 | with, you know, what time -- or the timing of a | 14:22:35 |
| 24 | State Department recommendation and assessment, you | 14:22:39 |
| 25 | know, but overall the process was generally the | 14:22:46 |

| | |
|---|---|
| 1   same. | 14:22:48 |
| 2      Q    Okay.  And that shift to sending the | 14:22:48 |
| 3   Federal Register Notice to the OMB earlier, that was | 14:22:55 |
| 4   a shift that you initiated? | 14:22:57 |
| 5      A    Yes. | 14:22:58 |
| 6      Q    When did you initiate that? | 14:23:00 |
| 7      A    I -- I believe it -- the first decision | 14:23:08 |
| 8   that came when I was chief of the Office of Policy | 14:23:09 |
| 9   was Haiti.  I believe that it shifted after that | 14:23:12 |
| 10  when we weren't sure what the decision was going to | 14:23:22 |
| 11  be. | 14:23:33 |
| 12     Q    Did there have to be an approval for that | 14:23:33 |
| 13  decision to not send the Federal Register Notice to | 14:23:36 |
| 14  OMB earlier? | 14:23:39 |
| 15     A    No.  I made that decision. | 14:23:40 |
| 16     Q    Were all stakeholders, including OMB but | 14:23:53 |
| 17  also the other agencies, consulted at all in that | 14:23:57 |
| 18  process -- in that shift in process? | 14:23:59 |
| 19     A    Yes.  The Office of General Counsel was | 14:24:02 |
| 20  consulted because they were used to seeing the | 14:24:04 |
| 21  Federal Register Notice behind the decision memo. | 14:24:06 |
| 22     Q    And when you say Office of General Counsel, | 14:24:09 |
| 23  do you mean the Office of General Counsel -- | 14:24:11 |
| 24     A    At the department of Homeland Security. | 14:24:12 |
| 25     Q    -- at the Department of Homeland Security? | 14:24:14 |

| | | |
|---|---|---|
| 1 | Do you know who Tom B. might refer to? | 16:30:17 |
| 2 | MR. TYLER:  Same objections.  Outside of | 16:30:23 |
| 3 | scope.  She's asked to interpret a communication | 16:30:26 |
| 4 | that she was not part of.  You're asking for | 16:30:29 |
| 5 | speculation. | 16:30:31 |
| 6 | MS. MACLEAN:  Your objection is noted. | 16:30:31 |
| 7 | THE WITNESS:  I can only speculate that Tom | 16:30:33 |
| 8 | B. is Tom Bossert. | 16:30:35 |
| 9 | BY MS. MACLEAN: | 16:30:36 |
| 10 | Q    And who is Tom Bossert? | 16:30:36 |
| 11 | A    I don't know his official title, but I | 16:30:39 |
| 12 | think he's with the National Security Council. | 16:30:42 |
| 13 | Q    And why would you think it's Tom Bossert? | 16:30:44 |
| 14 | A    Because I think she had a meeting or | 16:30:46 |
| 15 | conversed with Tom Bossert at some point in time on | 16:31:00 |
| 16 | decisions. | 16:31:04 |
| 17 | Q    Why do you think that? | 16:31:05 |
| 18 | A    It would not be shocking to seek the advice | 16:31:10 |
| 19 | of National Security Council. | 16:31:13 |
| 20 | Q    With regard to TPS, why would it not be | 16:31:18 |
| 21 | shocking to seek the advice of the National Security | 16:31:21 |
| 22 | Council? | 16:31:25 |
| 23 | A    Because they are a federal partner. | 16:31:25 |
| 24 | Q    Is the National Security Council's advice | 16:31:26 |
| 25 | frequently sought prior to a final decision with | 16:31:29 |

1  BY MS. MACLEAN:                                    16:54:20

2    Q    So you're reading the statute right now.   16:54:20

3  When you read the statute, how do you interpret the  16:54:24

4  sentence that you just read?                       16:54:30

5    A    The attorney general or the secretary now  16:54:33

6  in order to designate one of the prongs for        16:54:44

7  designation consideration is whether the state is  16:54:47

8  able to adequately return -- adequately handle the 16:54:48

9  return of its aliens.                              16:54:52

10   Q    You said previously that Ambassador        16:54:57

11 Nealon's memo does not comport with the statute; is 16:55:02

12 that correct?                                      16:55:04

13   A    I would note that even though he tries to  16:55:05

14 make a case that they cannot adequately handle, I  16:55:09

15 think the case as shown that in this sentence in   16:55:13

16 this memo, in the case of Honduras, for example,   16:55:17

17 they received approximately 80,000 returnees in both 16:55:19

18 2015 and 2016.  The number of people removed to the 16:55:22

19 northern triangle has been quite large.            16:55:25

20   Q    So is it correct to say that you -- you    16:55:36

21 read this as inconsistent with the criterion --    16:55:37

22 sorry -- you read this as Ambassador Nealon raising 16:55:44

23 concerns about the termination that are not relevant 16:55:49

24 under the statute that created temporary protected  16:55:52

25 status?                                            16:55:56

1          MR. TYLER:  Objection, vague.                16:55:57
2          THE WITNESS:  You're asking if I consider    16:56:03
3     the points that he raised would be relevant       16:56:04
4     criteria?                                          16:56:09
5     BY MS. MACLEAN:                                    16:56:09
6          Q    Yes.  That's my question.               16:56:09
7          A    I think there may be points in here that 16:56:11
8     are not relevant.                                  16:56:15
9          Q    What are the points that are not relevant 16:56:15
10    in here?                                           16:56:17
11         A    Data shows that TPS recipients have a very 16:56:32
12    high workforce participation rate, much higher than 16:56:35
13    the national average is one example.  TPS recipients 16:56:40
14    have jobs, have gotten married, have many thousands 16:56:42
15    of American citizen children.  Work legally in great 16:56:46
16    numbers.  Pay taxes.  Own homes.  Own businesses and 16:56:54
17    live the American dream minus a path to citizenship. 16:56:57
18    I'll stop there.  Those are examples.              16:57:11
19         Q    Can you elaborate in the second paragraph 16:57:14
20    and third paragraphs -- and this will be the last  16:57:18
21    point on this document, but what portions of those 16:57:20
22    paragraphs are inconsistent with the statute?      16:57:24
23         MR. TYLER:  What paragraphs are you on?       16:57:27
24         MS. MACLEAN:  The Working Against Ourselves   16:57:28
25    and Foreign Policy Considerations.                 16:57:30

```
 1        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2             I, Joan V. Cain, Court Reporter, the officer

 3   before whom the foregoing deposition was taken, do

 4   hereby certify that Kathy Nuebel Kovarik personally

 5   appeared before me on August 3, 2018 and was duly

 6   sworn; that the foregoing transcript is a true and

 7   correct record of the testimony given; that said

 8   testimony was taken by me stenographically and

 9   thereafter reduced to typewriting under my

10   direction; that reading and signing was not

11   requested; and that I am neither counsel for,

12   related to, nor employed by any of the parties to

13   this case and have no interest, financial or

14   otherwise, in its outcome.

15             IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this 6th day of

17   August 2018.

18

19   My commission expires:

20   July 31, 2019

21   _____

22   NOTARY PUBLIC IN AND FOR THE

23   DISTRICT OF COLUMBIA

24

25
```