# EXHIBIT 34

**CQ Congressional Transcripts**

Apr. 11, 2018

©2018, Provided under license from Bloomberg Government.

Bloomberg Government
Support: 1-877-498-3587
www.bgov.com

All materials herein are protected by United States copyright law and/or license from Bloomberg Government, and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of Bloomberg Government. You may not alter or remove any trademark, copyright or other notice from copies of the content.

Apr. 11, 2018 Revised Final

# House Appropriations Subcommittee on Homeland Security Holds Hearing on the Fiscal 2019 Department of Homeland Security Budget Request

**LIST OF PANEL MEMBERS AND WITNESSES**

CARTER:

I think we got everybody here that's going to be here so let's -- let's get started. We will call today's hearing to order. Welcome to the subcommittee's first hearing on the Department of Homeland Security's fiscal year 2019 budget.

As we begin our oversight process to fund the department for fiscal year '19 I'd like to welcome all of our subcommittee members back. Thank you all for being here and for all the work -- hard work you did in '18.

I'd also like to extend a special welcome to today's witness, Secretary Kirstjen Nielsen. Secretary Nielsen, thank you for your time today, and more importantly, for all that you and everyone at the department does for this great country.

We look forward to hearing your thoughts on the needs that need to be done to keep our homeland safe, our border secure, and as we look forward to working with you on these challenges, we hope that you'll know that we are working together.

I'm pleased to see continued investment in border security. The president's budget request proposes $1.6 billion for 65 miles of physical barrier. Additionally, the budget request also proposes funding for 52,000 detention beds so that we can continue to enforce our nation's immigration laws.

We will use this hearing process to learn more about these proposals and (inaudible) should be concerned in context of the final 2018 appropriations.

Also noteworthy is the request for $1.5 billion to modernize our Coast Guard fleet of -- of vessels including $750 million to construct a new polar icebreaker. This will be the first of several needed to address the security challenges and economic opportunities facing our nation. I hope that this hearing process will help us to determine the department's plans for continued -- for continuing this effort and achieving the United States' strategic goals in the Arctic.

Finally, I'd like to welcome back my good friend the ranking member, Lucille Roybal-Allard. While we don't always agree on policy, we do agree that working together we can get and produce a better product.

With that, I want to thank her and recognize her for any remarks she would like to make.


ROYBAL-ALLARD:
Thank you, Mr. Chairman.

Good morning, Madam Secretary and welcome to your first appearance before our subcommittee. While still relatively new, the department has made significant progress in improving its operations and performance, which is something that DHS personnel, all 240,000 of them, can be very proud.

While there is broad bipartisan support for the department's mission of protection the homeland, there are differences of opinion on some of the policies the department follows to achieve that mission.

I wish that today we were convening under better circumstances. This would allow to focus more on the positive things the department is doing, including significant improvements over the last decade to our border security.

It would help if our country's immigration debate was on a more constructive footing, one based on facts, our American values and compromise that could lead to a comprehensive resolution to the immigration challenges we all face together.

Unfortunately, the path to a compromise solution by this Congress and between the Congress and the president seems steeper today than ever. This is not -- this not only makes your job more difficult, it also causes confusion, fear and uncertainty within our American immigrant communities, among our educators, our business sector, and our nonprofit and social service organizations.

Many have come to Washington to express their concerns and to highlight the valuable contributions immigrants are making to our national economy and American society as a whole.

Unfortunately, these contributions and the dire circumstances that cause individuals to cross our border illegally or appear at a port of entry without admissibility documentation, are too often ignored and immigrants are broadly characterized as criminals or opportunists trying to take advantage of our American generosity.

Regrettably, the administration's rhetoric and aggressive interior enforcement contributes to that perception and is wrongfully demonizing the immigrant community, tearing families apart and upending the lives of millions of people.

Madam Secretary, you have the authority to help alleviate some of this fear and confusion by using your discretion under the law to prioritize how the department enforces immigration laws and carries out policies. The vast majority of immigrants are good, hard-working members of our community with no criminal records. Many have lived among us for years or decades, raising their families, paying taxes and contributing to our communities.

Some came to escape violence, others to seek a better life for themselves and their family. The fact that they arrived without permission, most out of fear or desperation, does not mean we should systematically ignore their plight and contributions to our communities and automatically return them to the circumstances that brought them here in the first place. And we most certainly can treat them and their family humanely, with respect, understanding, and compassion.

Another responsibility of USCIS is to conduct credible, fair interviews of individuals arriving at our borders seeking asylum. Under our laws, as well as under our international agreements, we have committed not to return someone to a country where their life or liberty would be threatened.

While not everyone who applies for asylum will receive it, we have an obligation to make sure every asylum-seeker gets the opportunity for their case to be heard. And while we do not have the capacity to help every deserving refugee, we can help more than we do now, and we can treat them all humanely and compassionately.

In closing, Madam Secretary, let me be perfectly clear. My Democratic colleagues and I fully support securing our borders, and we understand the need and the importance of enforcing our immigration laws. Our objective is to ensure we accomplish those goals in a way that is just and humane, reflective our -- of our American values and moral standing in the world.

I look forward to working with you towards those goals.

Thank you, Mr. Chairman.


CARTER:
Thank you, Ms. Roybal-Allard.

We are joined by the chairman of the full committee, Rodney Frelinghuysen. You're -- Mr. Frelinghuysen...

FRELINGHUYSEN:

Well, thank you very much...

CARTER:

... for any opening comments.

FRELINGHUYSEN:

Thank you, Mr. Chairman. Good to get here under the wire. Let me say on behalf of my Ranking Member Ms. Lowey of New York, who I think will be joining us -- we're running around from hearing to hearing -- it's a pleasure to welcome you, Madam Secretary. And wish you, obviously, Godspeed in your endeavors, and we look forward to your testimony and any frank comments you have.

I -- I often say at every committee we represent the -- and look after and have the power of the purse. So while many -- much time is spent with the authorizers, we -- we actually are the bill payers.

NIELSEN:

Yeah.

FRELINGHUYSEN:

So it's important that you keep us posted. And as things accelerate and focus on border security, it's better to be briefed than read about it in the newspaper some of the things that are happening.

I know you have a large and diverse portfolio under you. So does the Department of Defense, but for members of Congress it's good for us to sort of be well-informed, hopefully before certain actions are taken so they're not misunderstood or misinterpreted.

Just on a personal note, I come from a -- a 9/11 state. Seven hundred New Jersians died on that day in September, seven -- and many of them my constituents. We have a -- continue to have a focus on what's called UASI, the urban area security grants. I know that the president may propose and we dispose.

There's less money in that account, but for many of us in our neck of the woods we take it pretty personally since those dollars have been used to -- to safeguard a lot of our infrastructure. They also have been used to protect a lot of nonprofits and faith-based groups that are subject to the type of terror that is all too common around the world and around the nation.

But I want to wish you all the best in your -- in your efforts with the Department of Homeland Security. And it's amazing since we've watched your predecessors how -- how it all comes together, all these different authorities and -- and programs and departments that are under your jurisdiction.

So thank you, Mr. Chairman, for the time.


CARTER:
Thank you.

Madam Secretary, we are very happy to have you. We'll now hear your -- you summarize your testimony, and we have your written testimony. But at this time I yield the floor to you.


NIELSEN:
OK, thank you.

Chairman Carter, Ranking Member Roybal-Allard, it is my pleasure to be here. And I just want to start by saying that you have my commitment to work with you all. I agree with many of the comments that you've made.

It's very important for us to brief you and give you the information that you need to do your job as directed by the Constitution and the expectations of all of our constituents. So I look

forward to doing that.

I'm honored to present the president's 2019 budget request for the Department of Homeland Security and to discuss how that budget will keep us and the American people safe.

Let me first take a moment again to thank this subcommittee particularly for the $48.2 billion provided to the department in the recently passed consolidated appropriations act. The support of this subcommittee, as you know, is critical to advancing the many DHS missions, and I truly thank you for your continued support.

The president's 2019 budget builds on the '18 and requests $47.5 billion in net discretionary funding for the Department of Homeland Security. It also includes an additional $6.7 billion for the Disaster Relief Fund for response and recovery to major disasters.

Today I'd like to outline several core missions empowered by this budget and quickly walk through how the budget matches our needs: First, security and managing our borders, enforcing our immigration laws; two, protecting our nation from terrorism and countering threats; three, preserving and upholding the nation's prosperity and economic security; four, securing cyberspace and critical infrastructure; and five, strengthening homeland security preparedness and strengthening resilience.

Within all of these missions, we're aiming to put our employees first and to empower our front line defenders to do their jobs. This is of particular importance to me. We recently celebrated our 15th anniversary. It was a time to reflect and thank those who have worked every day to protect our country, but it's also a very sobering time because of why we were created.

At this level and this need for the addition to mature our department, it's very important that we empower those front line men and women. And I know you share that goal, and I thank you.

For border and immigration, first we're focused on securing and managing our borders and enforcing our immigration laws. While we've made vast improvements in border security over the last 15 months, we continue to see unacceptable levels of illegal drugs, dangerous gang and transnational criminal organization activity, and illegal immigration flow across our southern border.

I take the ranking member's opening comments to heart. I do not believe that there should be a choice. We should be able to protect those who need asylum, as well as prevent those who seek to do us harm from crossing our border.

The current statistics for March 1028 tell a dangerous story. Overall, the number of illegal aliens encountered at the border increased more than 200 percent when compared to this same time last year. Perhaps more troubling, the number of unaccompanied alien children encountered has increased over 800 percent. And the number of families encountered increased over 680 percent.

We also have seen a 37 percent increase in drug seizures at the border in March alone. While these numbers are at times higher or lower than in years past, it makes little difference. They are unacceptable and they must be addressed. We must do more to secure our borders against threats and illegal entry and close dangerous loopholes that are making our country vulnerable.

We've been apprehending gangs, TCOs and aliens at the border with historic efficiency. But illicit smuggling groups understand our ability to actually remove those who come here illegally, unfortunately, does not keep pace. They have discovered and continue to exploit legal loopholes to avoid detention and removal and have shown no intention of stopping.

These legal loopholes are strong pull factors that entice those looking to circumvent our laws, in particular the smugglers. For border security to work, violation of the law must have consequences.

As I have said many times, interdiction without the ability to promptly remove those without legitimate cause is not border security. It undermines our national security. This budget

would invest in new border wall construction, technology and infrastructure to stop illegal activity.

I also would be remiss if I did not say that one of the greatest investments is in our people. Recruiting, hiring and training additional U.S. Border Patrol agents, additional U.S. Immigration and Customs Enforcement officers, and additionally enabling personnel to help carry out these important missions.

Second, we must protect our nation from terrorism and decisively counter threats. This is the reason the department was created and it remains a cornerstone of our work. Terrorists are adapting. They're taking an all of the above, do it yourself, learn it on the Internet approach to spreading violence.

This includes promoting attacks on soft targets using homemade weapons, and it includes crowd sourcing their violence through online radicalization, inspiration and recruitment.

But they also remain focused on conducting sophisticated attack methods, including concealed weapons, weapons of mass destruction and modifying new technologies such as drones into deadly weapons. This budget ensures that our defenses keep up with the innovation of our enemies.

For instance, it allows TSA to deploy advanced tools to detect threats. It funds new CBP initiatives to identify high-risk travelers. It ramps up our defenses against weapons of mass destruction. And it provides vital funding to protect soft targets from concert venues to schools against attack.

Third, we are focused on preserving and upholding the nation's prosperity and economic security. On an average day, to put this in perspective, the Coast Guard facilitates the movement of $8.7 billion worth of goods and commodities through the nation's maritime transportation system.

At our nation's 328 air, land and sea ports of entry, U.S. Customs and Border Protection welcomes nearly 1 million visitors, screens more than 67,000 cargo containers, arrests more than 1,100 individuals and seizes nearly six tons of illicit drugs. Annually, CBP

facilitates an average of more than $3 trillion in legitimate trade while enforcing U.S. trade laws and processing more than $2.4 trillion in international trade transactions each year.

The president's budget helps to provide critical resources to these efforts to keep our country's -- to keep our country competitive and to advance the prosperity of our people. The budget will also help us to continue efforts to keep foreign adversaries from stealing our trade secrets, technology and innovation.

Fourth, we must secure cyberspace and critical infrastructure. This has much been in the news. It will continue to be in the news. It is a very important threat that we face.

Our networks are under attack constantly from all corners of the physical world. That's why DHS is taking historic strides to address the systemic cyber risk, secure dot.gov networks and strengthen security and resilience of critical infrastructure in coordination with our partners.

The budget would also enable DHS to support state and local election officials in defending the integrity of our election systems. As you know, the department's mission is to provide assistance to election officials in the form of advice, intelligence, technical support and instant response planning with the ultimate goal of building a more resilient and secure election enterprise. We must do this.

Through investing in hardware, software, intrusion detection and analytical capabilities, we're better able to secure the digital ecosystems that makes our American way of life possible.

Fifth and finally is a core mission of DHS to strengthen homeland security preparedness and achieve national resilience. I look forward to working with you on this. In some of the opening remarks you mentioned some of our grant programs. We must ensure that the grant programs meet the purpose for which they were created and that they adequately support our state and local partners.

Last year, our country experienced one of the most costly and damaging seasons from natural disasters in its history with a cumulative cost exceeding $3 billion. Through the

Federal Emergency Management Agency and in cooperation with our state, local, tribal and territorial governments across the country, we will devote the resources and attention needed to ensure recovery. But we must also help communities across our nation create a culture of preparedness to be more resilient to disasters.

A culture of preparedness is a national effort to be ready for the worst disasters at the federal, state, local, tribal, territorial, community, family and individual levels. This budget helps us with these efforts and supports the disaster relief fund, which as we all know is necessary to help state and local governments respond and recover from catastrophes.

In short, we need to empower the men and women of the department to carry out these missions by giving them the resources and authorities they need. We need a fully funded budget that matches our mission, and I look forward to working with you.

In addition to the various mission areas mentioned today, I am also firmly committed to maturing the department and putting our employees first. I ask the committee to support this budget, support our employees, support our missions and help us make our country more secure.

It's an honor to serve alongside the men and women of the Department of Homeland Security who work tirelessly to secure our country. They are often unrecognized. I'd like to take this opportunity to thank them for their service.

I thank you for your time, and I look forward to your questions. Thank you for the opportunity to appear before you.


CARTER:

Well, thank you very much for your testimony. We've got a -- we always time questions, five minutes for each -- each questioner. I'm going to start out with a pretty simple question. You've been on the job about four months, been at the department for far longer than that on -- on the subject matter, working on it longer than that.

I want you to tell us what's your -- what is your vision for the Department of Homeland Security? And what do you see as the department's biggest challenges and how does this budget request help meet those challenges?

NIELSEN:

OK, the five mission areas, and I'll add the sixth there, which is to support our employees and champion them, are -- form the basis of my priorities. My vision for the department is a department that is agile, that can respond to the threats we face tomorrow and the next day, not just the threats that we faced before.

To do that, we need to re-look at our programs, make sure that they are efficient. We need to leverage capabilities and capacities across the department. We have a variety of ways in which we do that, as you know. Some of the taskforces would be an example.

Cyber is an area that I'm particularly looking at. We have wonderful capabilities within the Secret Service, within ICE, within NPPD. We must bring them all together, including the research and development angles so that we can provide the best service to the American people.

So in short, what I would say, sir, is I'm looking at maturing the department. How can we do this better, faster, smarter and make sure that we stay ahead of the threats that continue to evolve?

CARTER:

And in some -- and in some instances you're going to have to challenge implanted ideas.

NIELSEN:

Yes, sir.

CARTER:

And you're going to have to make those ideas, those -- this is not an easy task. And that's why I ask about the challenges because a lot of the departments in our federal government are entrenched with we've never done in that way before, therefore, we can't do it that way.

And from the way you envision it, and I commend you for your vision, I'm going to suggest to you those are going to be your challenges. We will help you meet those challenges.

NIELSEN:

Thank you.

CARTER:

And that -- that's the way to -- you've got to be willing to shake them up. And if you shake them up...

NIELSEN:

The terrorists certainly are, right?

CARTER:

Yeah, I think you..

NIELSEN:

So we need to...

CARTER:

... might be able to do that.

I'll now yield to Ms. Roybal-Allard.

ROYBAL-ALLARD:

Let me begin by agreeing with the chairman that we will work together to help you meet those challenges.

You know, as you probably know, in October of 2017 I -- I sent a letter signed by 69 of my colleagues to then acting Homeland Security Secretary Elaine Duke regarding our concerns about pregnant women in detention facilities. Reports show that ICE detained nearly 68,000 women in fiscal year 2017, of whom 525 were pregnant.

Our letter included confirmed stories of women who suffered miscarriages and received inadequate medical care while in detention. Additionally, our letter asked for statistics on on the number of pregnant women in detention and asked about ICE and CBP policies regarding the treatment of pregnant women.

We have yet to receive a response to our letter, but we continue to hear reports about pregnant women who have been transferred between facilities multiple times with extremely restrictive access to food and restrooms and who are denied extra blankets, additional food and adequate prenatal care.

It is my belief that no pregnant woman should be forced to live in a facility that lacks adequate medical care or can endanger their unborn child, which is what these women are facing.

On March 29th, ICE released a new policy on detaining pregnant women. ICE's previous policy had a presumption of release and detained women only if their detention was required by law or due to extraordinary circumstances. However, ICE's new policy detains pregnant women on a case-by-case basis.

Is any effort being made to look into alternatives to detention programs that provide dignity and adequate care for pregnant women and their unborn child? And also are there any reporting requirements in place to ensure that you are made aware of any rise in the incidents of negative outcomes for pregnant women and their unborn children, such as miscarriages, other pregnancy complications or mental health challenges related to detention?

NIELSEN:

First let me just start by sharing your concerns. There is no room in any enforcement agency to treat anybody without the particular respect and care that they need. So this is a high priority for me.

We have looked into the detention policies of CBP and ICE. You'd be surprised to learn that some of them are very detailed. For example, CBP checks the temperature in all its detention facilities per hour. So I suspect that some of these cases are outliers. It's not an excuse. We must address each one, but what I'd like to offer is that my staff come and brief you comprehensively on this.

When we get to ICE, let's start with ICE, we do screen any female detainee 18 to 56 to see if they are pregnant. We then offer them a variety of services, everything from counseling through to remote access to specialists. We certainly offer them special needs that they might have depending on how their pregnancy is.

CBP, as you know, has them for a smaller amount of time, generally speaking, before they're transferred to ICE. CBP has similar standards. But these cases confirm -- concern me. what I would like to ask in return is if we could be provided specific examples. We would like to investigate them.

Our I.G. investigates any case that's brought to their attention, as well as the Office of Professional Responsibility. But in short, I'm committing to you that we will ensure that any pregnant woman in our care in detention receives adequate care.


ROYBAL-ALLARD:

OK. Well I mean, the fact is that there are numerous cases that -- that have been documented that show that there has been either the mistreatment or the neglect of pregnant women who have -- in that -- their -- those cases have suffered from miscarriages, as I -- I said in my -- my questioning statement.

So I would like to work with you in that because there may be policies in place that either are not being followed or that in some cases the agents aren't -- or officials aren't aware of and therefore it may be a matter of getting that information out.

But I think that one thing that would be very helpful is if in fact there were reporting requirements that would keep you currently informed of any problems that were happening in detention centers with regards to miscarriages or other issues, health issues of pregnant women, and would you be willing to maybe put together that kind of a reporting requirement to keep you and the members of this committee informed about that?

NIELSEN:
Yes, ma'am.

ROYBAL-ALLARD:
OK, thank you. I appreciate that. and -- and do you know when we could expect a response to that letter?

NIELSEN:
Yes. Let me commit that we will get you a response to that letter by the end of this week. (Inaudible).

ROYBAL-ALLARD:
OK.

And also, Mr. Chairman, for the record, I -- I would like to submit a -- a letter that is being sent to Director Holman with about 200 or more agencies who are concerned about the -- the new detention standard.

CARTER:
Without objection.

ROYBAL-ALLARD:

OK, thank you.


CARTER:

(OFF-MIKE)


FLEISCHMANN:

Thank you, Mr. Chairman.

Madam Secretary, thank you for your service to this critically important department and as our colleagues on both sides of the -- the dais have said, we look forward to working with you in this very important endeavors.

As you might know, I represent a wonderful east Tennessee district, city of Oak Ridge is there. And as part of our mission we do quite a bit of nuclear deterrence and -- and the like. That's one of our key missions there. It's my understanding that last year, Madam Secretary, you set up the Countering Weapons of Mass Destruction Office. I want to thank you for that.

I'm wondering if you could kindly walk us through where the office currently stands, what major gaps in resources there might be, and what our greatest challenges are, please?


NIELSEN:

I -- I'd be happy to. So as you know, sir, we have begun the process of integrating the various parts of DHS that will create that office. We have not, as you've noticed, requested any money in this budget. We are pulling together resources from what we have. We would like to work with you on future requests.

Nuclear deterrence in particular, unfortunately in the news, is one of particular concern to the department. We have done extensive exercising, modeling, understanding of related effects such as electromagnetic pulse. We are also very concerned about the increased use

of chemical weapons by terrorists, whether they be in a particular transportation mode or in mass gatherings.

We have actually piloted some detection devices out into communities to help them understand if an early signal or early warning, if there has been any kind of chemical attack.

On bio, we continue to model. As you know, bio threats change very, very quickly so it's a constant concerted effort to stay on top of them and make sure that we have the appropriate response.

We have taken great lengths to update all of the protected action guides for first responders to make sure that state and locals are trained, that they have what they need to not only understand the threat but to have the equipment and to counter.

My hope is by creating this office we can bring all of this expertise to bear in a way that's much more efficient.


FLEISCHMANN:
Thank you. Madam Secretary, we've seen a disturbing growth in opioid-related deaths. Of particular concern is fatal overdoses involving synthetic opioids such as Fentanyl, which have grown over 84 percent every year between 2013 and 2016. DHS agencies are the front line for the battle to stem the tide of these deadly substances.

I understand there's some major challenges that will require new tools and sizable investments. Can you explain those challenges and your long-term strategy for confront -- for confronting this threat? Could you also go in to some detail on how you plan to utilize the $224 million included in fiscal '18 for the opioid detection and non-intrusive inspection equipment? Thank you.


NIELSEN:
Yes, this -- you know, the president has made clear this is a very important initiative of the entire government. I'm happy to say that we work very closely with my cabinet colleagues.

We all bring something to bear.

Within DHS almost every part of DHS is helping to fight this everything from TSA at the airports to CBP to the land borders to the Coast Guard to the maritime borders, ICE and HSI in the interior. And then CBP also with the mails. So I appreciate Congress passing the Interdict Act last year, which, as you know, gave us additional authority to screen.

But the border is a very important part here because we do see the vast majority of drugs coming through our ports of entry. So the non-intrusive inspection equipment that you mentioned, the $224 million, will enable us to -- hopefully to detect even smaller amounts.

Fentanyl, as you know, 50 percent more unfortunately toxic than heroin, but it's -- it's very, very, very small. So the technology needs to be adjusted. The algorithms need to be adjusted to ensure that we can detect.

We're working with the international mail shippers making sure that we can collect data. We're using targeting starting all the way whether it be in Mexico or China to track packages and ensure that we can bring those to justice in conjunction with the Department of Justice.

This will be a continued effort, so I look forward to working with you as well recognize any additional gaps that we might have in capabilities.


FLEISCHMANN:
Thank you, Madam Secretary. I appreciate your responses.

And Mr. Chairman, I yield back.


CARTER:
Mr. Cuellar?


CUELLAR:
Mr. Chairman, thank you. Ranking Woman, thank you again for your both -- both of you for the leadership. And it's also a pleasure talking to a fellow Hoya.

First of all, I also want to thank the men and women that work for you all. I know it's a difficult...

NIELSEN:

Thank you.

CUELLAR:

I know it's a difficult job, but it's a very important job that they do.

Two parts, one is I might ask you if you can help me applicate some ideas? And then the other one I want to talk about hiring processes.

First of all, catch and release we're on the same page. I think we need to have some sort of deterrent. But if we do this if -- depending on what happens that individual will either go to an immigration judge or could go to a magistrate or district court, depending on the situation.

If it goes to a district court, what we call zero tolerance, I would ask you that as we provide more of those cases to those magistrates or district judges, I would ask you to advocate for making sure that -- we understand you're a state of Texas bar attorney also -- that the caseloads that we have for those district judges on the border are high.

So we'd be adding more of those cases in the first time under the law it's a misdemeanor. If they're removed they come back it becomes a felony.

So just to make sure that we advocate for either more magistrates -- magistrates or judges, district judges, to handle that along with the U.S. Marshals and the assistant U.S. attorneys, because everybody talks about adding more border patrol but we got to look at what the end of the judicial system. So I would ask you on that, advocate for that as you are in the cabinet meetings.

The other thing is immigration judges. Another fellow Hoya, James McHenry also, and I've sat down with him and Tom Holmes (sic) on the -- Holman on trying to get more of those

immigration judges. I don't see John Culberson here, but we added 55 immigration judges. Then we added 25 immigration judges. We got 100 immigration judges here.

The problem is everybody wants to have a judge in Houston, in, let's say, in New York, Chicago, around the corner here in Virginia also, but I'm an advocate to have those judges at the border to make sure we give the people their day in court as close as possible at the border.

One of the issues that we're facing, and this is what we talk to your (inaudible) director and to McHenry also, is to have the office space for those judges. You might have those detention, but you've got to have that -- those office spaces to meet the requirement of the immigration judges.

So I would ask you if you don't mind following up with them so we can have judges in McAllen, which is a high crossing area, and Laredo is another one and -- and then on the border instead of Houston, Dallas, New York and the other places.

I know we use video conferences, but I -- I'm a big believer of having those judges at the border. So I would ask you if you could advocate those -- those two points.

The other part I want to talk about is the hiring processes. Border Patrol one time, I think it's authorized at 21,370. Right now we're at 23,000 according to the Border Patrol chief we're actually losing more border patrol than we're hiring border patrol. Problem with the polygraph and we've tried to work on that.

There's an issue with the polygraph exams. FBI, one-third of them will pass Border Patrol, two-thirds of them will fail. So we've got to look at the polygraph. But the issue that I want to bring up is if you look at the scope and the objectives for recruiting, coordinating on posting vacancies, applicant support care for hiring, there was a $297 million contract awarded.

Nothing against the company. I know the company. They're a good company, but, you know, what's -- what do we need to do to get your folks to do a better job in hiring?

I'd rather use the $297 million to giving bonuses, retain them, because sometimes you have border patrol folks that might not like to be in Presidio, Texas or some rural area or they'd rather be -- you know, they'll get a job with ICE and they can be in New York or Miami. And I understand all that.

But we got to be able to recruit border patrol better, CBP better, and I would have preferred the use of $297 million to give them bonuses over time, whatever the case. But the -- the case is they're here now. And I know ICE has put out a -- a RFI also so I'm sure that will be a couple million dollars also.

What do we need to do to help you where your own agency can do a better job at recruiting and retaining those men and women instead of putting that money out to contractors? And nothing against those companies, but I'd rather give it to the men and women on that.


NIELSEN:
Well, first I just want to say I -- I second your belief that it's much more effective to have the judges and I.G.s at the border working very closely with the attorney general to make sure that we deploy sufficient, because you're right. If we -- if we interdict but we don't have -- there's a backlog and we don't have the ability to put them through the process, nobody wins.


CUELLAR:
Right.


NIELSEN:
So it took -- first of all, you -- you have my commitment to continue to advocate on that.


CUELLAR:
Yes, ma'am.

NIELSEN:

With respect to hiring, you know, this is a problem that has been very difficult, as you know, for CBP, ICE, Secret Service, other parts of DHS.

CUELLAR:
Right.

NIELSEN:

We really have looked at this quite carefully over the last year, the details of which, as many as you want we're happy to come share. The short version is what we need to do is the time to hire needs to be decreased without adjusting the standards.

CUELLAR:
Right.

NIELSEN:

We still want the best and brightest and those who have the integrity that we expect of law enforcement officials, but we do need to speed it up. So with CBP we've looked at their physical exam.

We've looked at streamlining their polygraph, as you noted. It was out of synch with many of the other polygraphs, the ways in which they are performed in other law enforcement agencies. We've also moved the law enforcement -- or excuse me, the polygraph up to the beginning of the process...

CUELLAR:
Exactly.

NIELSEN:

... which will be helpful. I think you and others who are supporting the...

CUELLAR:

It's something that Judge Carter have been...

(CROSSTALK)

NIELSEN:

I -- I thank you for...

CUELLAR:

As you go through the whole process, 18 months and then...

NIELSEN:

It doesn't make any sense.

CUELLAR:

... you fail the polygraph.

NIELSEN:

That's right

CUELLAR:

Thank you so much for that.

NIELSEN:

So we -- we appreciate your support on that. and we also appreciate your support on -- on the waiver authority.

CUELLAR:

Yes.


NIELSEN:

So there are certain people, veterans in particular, who have very high security clearances who have honorably served our country. They would like to then honorably serve in CBP. It does not make sense to put them through a 100-day process. So we're working on that as well.

The intention of the contract specifically is to help us make our hiring practices match the needs and environments today. What we found is we were not reaching all the communities who would like to serve this country. We were reaching the communities who would like to serve our country 10, 15 years ago, which are not the same.

So the idea is to come up with a much more comprehensive, holistic approach for retiring -- for hiring, but that also includes that retention, very important retention piece that you mentioned to get the attrition down. Part of that is a concern about mobility, which you also mentioned.

So we have pilots working on that to make sure that the officers and agents have the ability to move around. We are seeing great success in that pilot and we hope to expand that. But you're -- you're hitting on all of the things that -- that I agree with. We just need to keep after it. It needs to be a concerted effort.


CUELLAR:

Well, thank you. We want to be supportive of you.


NIELSEN:

Thank you.

CUELLAR:

Thank you.


CARTER:

Mr. Harris?


HARRIS:

Thank you very much.

And thank you, Madam Secretary, for coming before the committee. I have just two issues I want to talk about. The first one, let me just dispense with, well, fairly quickly is that, you know, came as a surprise to me that my state, Maryland, is second only to California in the number of MS-13 -- MS-13 activity, which is just amazing.

And maybe that's because Maryland has a reputation of also being a sanctuary state. I just want to get your assurance that your department is going to assert federal pre-emption on immigration enforcement issues.

The fact of the matter is these are not state issues. These are not local issues. The Constitution gives immigration enforcement authority to the federal government, uniquely to the federal government.

Are you willing to assert federal pre-emption over -- over jurisdictions that claim to be sanctuaries?


NIELSEN:

As -- as -- as you know, sir, this is a great concern to many of us in this administration. There are some lawsuits under way to make that point against some states who have chosen to not comply and actually to provide penalties for those who try to assist us in doing our job.

You do have my commitment we will do everything to ensure we can enforce the laws.

HARRIS:

OK. Thank you, very...


NIELSEN:

We'd like to do it in partnership with state and locals. It works quite well when we're able to do that, but we do owe it to the people of this country to protect them from things such as MS-13.


HARRIS:

I -- I agree with you, and I think we have to return to the rule of law. We don't like the laws let's change them, but the laws are pretty clear.

And the other issue is an issue very important to my district. You know, I have the beautiful eastern shore of Maryland. It's the H-2B visa issue. Over the weekend I visited Smith Island, a -- an island settled in the 17th century by folks from England and the population is 240 now.

It used to be 600, 700 people. It's down to 240 descendants of the original English who settled there who earn their -- it's a 45-minute boat ride there. I mean, it's literally out kind of in the middle of the Chesapeake and the hardworking men and women on the island the median family income's $26,000 and they make it by -- a lot of it by catching crabs.

And they have to bring those crabs to be processed somewhere. They have to be picked because you eat a crab cake, believe me, you're not eating the whole crab. You have to -- you have to pick it. And the fact of the matter is that although in the past we had Americans who -- who do it, that generation is not with us anymore and they depend upon H-2B visa workers.

And as you know, the second half cap was reached very quickly. There were not -- almost 100,000 applications for 33,000, and the -- the men and women on the island who depend upon this industry, who bring -- who take their work boats every day. They work all day.

They take them to the processing plant. They've got to have people there to pick that crab otherwise their -- you know, their income goes away. And that would be a shame.

I also met with another person up in the northern end of the eastern shore who is the largest exporter of canned corn from the United States. And, you know, exports are an important industry. Agriculture's an important industry. They depend upon H-2B workers for only an eight-week period in the summer.

And that's significant because they -- their -- their work period is July and August so by the 90-day rule they can't even apply until April 1st unless they want to pay for people for three months not doing work. So they haven't even -- you know, they just applied for their summer workers, but the cap is already exceeded.

So the omnibus bill gave authority, the way we read it, you know, the -- the labor department has already certified 80,000 workers for the second half of the year. And now it rests, I think, on a -- a decision of I think by your department as to how many of these -- how many H-2B visas are going to be issued.

And clearly the need -- I think clearly the need has been demonstrated. Our unemployment's an historic low 4.1 percent, you know, modern historic low. We're just not going to find the American workers.

And more importantly, whether it's Smith Island or whether it's that cannery or those farmers who grow the corn for that cannery, having temporary workers provides jobs -- provides downstream jobs for a lot of Americans.

So Madam Secretary, what -- what can we expect? I mean, it's already been a few weeks since this has passed. The summer is approaching very quickly. In the case of the crab industry, these men and women are going out on their boats in two weeks. As soon as the bay warms up they're -- they have to begin catching crabs.

And it's getting to the point where a lot of the -- the houses, processing houses say, look, if we don't get our visas we just have to close. And, you know, once they close they're gone.

This is not a -- this is an industry that doesn't work on large margins. Once they close they never reopen. And entire industry in my district is threatened.

So Madam Secretary, how quickly can we come to the decision of the number of visas and then how quickly can we reopen the process of working on those Department of Labor certifications or processing new applications for the late summer?

NIELSEN:

Thank you. First, let -- let me just say the -- the concept of -- of H-2B, as you know -- the limitations, I should say, the concept of limitations on H-2B originally were to protect American workers. If, however, we are in a situation where the way in which we administer the program legally actually puts American businesses out of business, that's clearly not the intent.

So what I would ask is two things. First, in response to your first question, I -- I will be consulting with Secretary Acosta in the next, you know, few days here as required by the law. We will -- we'd like to get some additional input from some other constituencies.

I'd be happy to discuss this with you further. But the intent is to make a decision soon so that those who can take advantage of the program are able to do that.

But my request is that we work together this next year. Congress really, in my opinion, is best situated, given your constituencies and your understanding of the employers within your districts, to know the right number of H-2B. it's very difficult when the discretion gets kicked back to the secretary of homeland security. It just is.

So I'd like to work in this next cycle on a way where Congress decides the number. we will implement the number that you provide, but it is very difficult for us to get all of the information that we need to do that.

The third thing, I know I said there were only two, but let me add one more. The seasonal way in which we split up these visas doesn't work, and that's what you're describing.

So as we look at this program, again, we need to make sure that it's meeting the intent of the program, which is to allow employers to provide H-2B. If the timelines were such that it's past the season, if it's past their ability to utilize them, we're not meeting the purpose. So I'd also ask for you to work with me on that.

HARRIS:

Thank you. I couldn't agree more. Thank you.

CARTER:

Mr. Ruppersberger (inaudible).

RUPPERSBERGER:

First thing, I agree with Andy Harris. I don't represent the eastern shore. I spend a lot of time there and I've worked with the seafood industry. It's a unique industry and we need that priority.

I also might want to point out that Congressman Taylor was homegrown and grew up on the eastern shore of Maryland even though you represent Virginia. So you understand the issue. If you've had a Maryland backfin crab cake you'll know what I mean.

NIELSEN:

I -- yes, sir.

RUPPERSBERGER:

OK. First thing, your -- your department was stood up after 9/11. In my opinion, you've got a lot of challenges. You have too many missions but you're doing the best you can.

You know, when you sit here and watch these department heads come and go, I -- I really am impressed with your -- your -- your visa -- your resume, your experience, the fact that you worked with Kelly. I -- I think you're the right person at the right time.

So with that said, you know, as I -- I've long been involved with advocating for all federal agencies and departments to have the resources they need to succeed in their role securing our federal networks and working closely with the private sector.

I was former ranking member of the Intelligence Committee and I've represented -- actually represented NSA for 15 years, so I deal with them. I work on their budget and I think they're probably one of the best in the world. We have more mathematicians there than anyplace in the world.

But as far as homeland is -- is concerned, it -- we -- we need more. We -- we have threatened -- threats and attacks on a regular basis, both major attacks but also unsophisticated attacks. And -- and our country, you know, is being attacked every day, as you know. And we're not where -- where we need to be.

Part of the reason I joined this subcommittee was to focus on the cyber security mission at Department of Homeland Security and help you and your people succeed where -- where in the past we've really fallen short. And not because of their fault. We've been underfunded. We don't have the manpower to do what we need to do. It's my opinion.

I'm going to be providing you with a copy of a report I've been working on for about the last six months for this committee in -- in maybe the next couple weeks. And this report summarizes meetings and -- and roundtables that I've had over the last six months to get a better understanding of the state of the homeland cyber mission.

And these roundtables have been people formerly in your job, people who I respect in this -- in this field, because there are not really a lot of people, including on the Hill, who really focus. We talk about it, cyber security, but not a lot of people know about it or really deal with it.

Now, these recommendations include holding a cyber-specific hearing before this committee focusing more on the department's efforts to protect leaked cyber tools, getting a better foothold on the threat landscape to industrial control systems, and -- and then improving information sharing and other -- other issues that are -- that are out there.

Even though it's GSA's budget, we have a long way to go in our -- in our gov network, too. It's just not where we need to be. We spent $2 billion of dollars. We have a long way to go there, too.

Now, two questions basically, first thing, I would like your commitment to work with me and with members of this committee and I talked to the chairman and the ranking member about having a hearing specifically on cyber security.

And I would hope that you would work with us and I'll get you my report on the issues that we need to deal -- to deal with, which also probably include funding. If you could give us that commitment, and I'm sure you will.

NIELSEN:
Yes, sir. And I look forward to the report and absolutely look forward to any opportunity to explain our needs and gaps.

RUPPERSBERGER:
I mean, this is at some point -- it's -- it's one of -- when I was Gang of Eight on the Intelligence Committee people would say what keeps you up at night? Because you've got the most sense (inaudible). And I'd say, well, the -- the Russia-China nuclear threat. I'd say spicy Mexican food.

(LAUGHTER)

RUPPERSBERGER:
Add a little levity, you know, the -- the issues of cyber, I mean, of terrorism and that. But really more importantly the cyber threat. In space, homeland, wherever we need to be. So we really need to roll up our sleeves and focus in this area and get the funding and the -- and the manpower necessary to do what we need to do in your field.

And NSA is another issue, but we can learn from NSA and use their help to -- to gear up where we need to be.

Secondly, we've recently approved over $380 million for the election assistance commission and in the omnibus to be used by the states to bolster their election systems and process. Can you expand on how the department is working with the states to ensure that they're leveraging the department's expertise and that these funds are being effectively used and will produce real security gains?

How confident do you feel with your current level of engagement with the state and local governments and what more needs to be done? And are -- are the tasks properly resourced there?

NIELSEN:

Yeah, well, thank you very much, and thank you for your -- your focus on this issue. This is also an issue that -- that keeps me up at night. It changes quite quickly. It's prolific. It's non-stop, and it's from many, many, many sectors.

Unfortunately once a vulnerability it found, as you know, anybody can exploit it. So you can't really match and adversary to a particular vulnerability.

With respect to the election, I truly cannot under -- underscore the importance of us working with state and locals to secure our election infrastructure. This is the very heart of our democracy. Every American has the right to know that their vote is counted and counted correctly. And we need to all work together to ensure that that trust is there.

What we've offered is everything from penetration testing to vulnerability assessments, exercises, training. We're working very hard to provide them additional threat information with partners such as NSA and the intel community to quickly declassify, tailor and then provide that information to those network defenders who can best utilize it.

The states themselves have taken, in my opinion, a -- a lot of good steps over the last few months to organize themselves from a governance perspective. This is not a traditional homeland security interaction, as you know. We have not in the past, at least at DHS, worked, for example, with state election officials. We normally work with owner and operators of critical infrastructure.

So bringing them into the fold, helping them understand how to work with their own homeland security advisers, with the governors, with others in the states has been an important part.

What I ask all states to do is take us up on our assistance, our offers of assistance. They're free. We can help you build capacity. We can help you build capability. We can check your systems. We can help you with real-time response.

We can very importantly monitor and help flag any nefarious activity, and we can give you the coordination mechanisms to work with other states to find the patterns of attacks.

So we -- I do feel that we are doing a tremendous amount. Can we do more? I -- I hope that we can. We have a huge focus on it. As you know, we're pulling resources from security of other sectors to make sure that we are doing and offering all that we can.

But this is a partnership so we continue to reach out to those at the state and localities, you know, weekly, if not daily, to -- to ask them to work with us.


RUPPERSBERGER:
Thank you, and I look forward to meeting with you and your staff to go over the report.


NIELSEN:
Thank you.


RUPPERSBERGER:
OK.


CARTER:
Mr. Newhouse?


NEWHOUSE:

Thank you, Chairman Carter, Madam Ranking Member.

Secretary Nielsen, welcome.

NIELSEN:

Thank you.

NEWHOUSE:

Thank you for being here. I appreciate your thorough update and also your service. And it's my humble opinion in the short time you've been on the job that you've done a -- a great job and I appreciate -- appreciate that hard work.

I just want to talk -- ask you about a couple areas. First is -- is the DACA program. I've been an advocate in -- in this Congress, as have many of my colleagues, to find a solution, and I appreciate the administration's help there and the -- the president's determination to do this as well.

It impacts a lot of individuals in my district, and not only those individuals but my communities and our nation. I think it's a very important issue that we need to solve.

Secondly, I wanted to discuss the -- the work your department engages with the Department of Energy and the National Laboratories, of which I'm very proud to have one in my district, the Pacific Northwest National Laboratory.

So as far as DACA is concerned, interestingly the state of Washington we've got about 18,000 of these individuals. The majority, not the majority, the -- about a third of them are in my district. One of those lives in the northern part of the Fourth District in Okanogan County. He was brought to the United States at a very, very young age by a -- a single mother who was a victim of domestic abuse.

And as -- as he grew up in our communities he became a -- a part of the community, developed a deep appreciation for the opportunities provided to him and wanted to give back. And so he did that by -- by fulfilling his dream of becoming a firefighter.

And as you mentioned the catastrophic incidents around the nation have been growing and in my district we've had two record-setting forest fires in just the last couple of years.

Unfortunately for this individual his work permit expired. And so simple question, is this the type of person, this young man, the type of person that your agency will be listing as an enforcement priority for deportation?

NIELSEN:
Thank you for the -- the question. I know there's been a lot of confusion on -- on DACA, so I -- I appreciate that. Let me just start by saying you -- you continue to have my commitment, both personally but as the secretary of homeland security, to help find a permanent solution to the registered DACA population.

NEWHOUSE:
Thank you.

NIELSEN:
We are continuing restarting conversations with leadership in both houses. We -- we would like to get this done. We should get this done and we need to get this done.

In terms of enforcement, what I have decided is given the court cases, the questions that remain while we are waiting to work with Congress on a permanent solution, anybody who is currently registered is -- is -- is legally registered, has a legal status within the system.

I have also taken the step though that anybody that has an application in will also not be an enforcement priority. They will not be deported. So if this young gentleman were to reapply for status, assuming there isn't any derogatory information, he hasn't become a felon, you know, at...

NEWHOUSE:
Sure.

NIELSEN:

... some point here, he would be protected as long as we are in this phase while we're working through the court case and waiting for Congress to act. But I think it's important to be very clear. Those who are registered are registered. They have legal status. Those who are attempting to renew their status will be treated as such as well.

NEWHOUSE:

That's very helpful. And this suggestion may not, after your response, may not be quite so important, but that information, the principal information of individuals like this young man, would that be shared with other agencies to target for deportation enforcement?

NIELSEN:

The -- the only time that we would share that information is if there is a question of public safety, national security or if the person has committed a serious crime.

NEWHOUSE:

Yes, I understand.

NIELSEN:

At that point they are no longer a DACA recipient by virtue of the program. But those are the instances in which we would share information, but it would not be to -- again, they're not an enforcement priority. They're -- they're -- they have legal status so there'd be no need to -- to share the information.

NEWHOUSE:

I appreciate that clarification, and I know the fine line that you have to -- to -- to maintain.

Secondly, as far as the National Laboratories, since homeland security was created Congress has made sure that -- that the department has equal access to that world-class

Department of Energy asset.

In recent years, the Science and Technology Directorate Cyber Security Program enabled multiple technical solutions developed by the Pacific Northwest National Laboratory to be transferred to the private sector, which directly improved the security of our nation and economy.

I'm curious to know how your department views the DOE National Labs and how you intend to leverage the unique capabilities that they have to fulfill your mission, the department's mission, especially when those capabilities don't exist in the private sector?

NIELSEN:

Yes, thank you. I myself am a fan of leveraging what DOE and DOE Labs have learned. We have active agreements with 13 of them, as you know. I've had the opportunity to visit some of them, Sandia, Los Alamos, Pacific National Lab, Idaho. They all provide very important scientifically driven but their able, as you know, to test different defensive measures, protective measures within controlled areas, which is very important.

It's not necessarily, as you say, capabilities that have been developed by the private sector or in some cases they are available to the government in a way that they wouldn't be in terms of what the private sector offers. So it would be my intention to continue that.

The S&T R&D money within the department we have moved to NPPD. And the reason for that is to ensure that it is directly requirement-driven so the network defenders and of my folks at NPPD that day-to-day are fighting this battle are very aware what they need, putting some of the R&D money there enables them to quickly translate that into requirements to make that process more efficient.

NEWHOUSE:

OK, well, thank you very much. And my time's run out, but hopefully we'll have a second round.

Thank you, Mr. Chairman.

CARTER:

Mr. Price?

PRICE:

Thank you, Mr. Chairman.

Welcome, Madam Secretary, glad to have you before the committee. I want to talk to you about refugees. As -- as you know, the administration announced a historically low refugee admission ceiling of 45,000 for fiscal '18 last September, and this was a few months after an executive order that had totally halted the refugee program for 120 days.

Now, this is a shockingly low ceiling for our country, what we've done in the past, what we stood for. But there's more alarming news because as of March, that's the halfway point for fiscal '18, we've only admitted 10,548 refugees. That puts us on track to admit a total of 21,100 refugees in fiscal '18. That would be less than half of that historically low ceiling that we pledged to admit.

Now, I've heard -- I expect we've all heard reports of countless administrative obstacles, a lack of adequate staffing, bureaucratic rerouting of paperwork, drastic reductions to the overseas interviews and I -- enhanced vetting, enhanced security measures that together seem designed, I must say, to prevent our nation from accepting any more than just a trickle of refugees.

And -- and we're doing this at a time when deadly wars and persecutions continue all over the world and -- and they're producing a flow of -- of -- of desperate people.

In my district there are organizations that do the Lord's work as far as I'm concerned. They participate in these refugee resettlement programs. They desperately want to fulfill their promise and yet now in North Carolina they're going weeks without even seeing a refugee. I mean, what is going on?

We -- we've got to protect American citizens at home and abroad, but shutting our borders violates our nation's values, undermines our national security, I would say, by diminishing our standing in the world and making it more difficult for us to confront violent extremism wherever it exists.

Conflating, as -- as the president's rhetoric does, conflating refugees or immigrants in general with terrorists doesn't make us safer. It merely perpetuates an environment of suspicion, anxiety, and it -- and it risks lending credibility to terrorist propaganda.

So we've been a safe haven for refugees historically, regardless of a refugee's origin they share a deep desire to become a member of our communities. And they're thoroughly vetted.

So I have to ask what is happening? What on earth can explain the fact that we're over half way through the fiscal year and have only admitted a quarter of the refugees we pledged to take in during the worst or one of the worst refugee crisis in world history? Are you slow-walking this program? Are the various bans and administrative obstacles and duplicate waiting requirements reflective of some increasing danger that these refugees represent?

Is there some history I've missed that refugees are -- are committing terrorist acts in this country? Are -- is there any indication that the procedures we've had in place for years have been inadequate, have -- have let in dangerous people?

If these refugees are dangerous, why can't we -- which I don't think there's any evidence for, but if -- if they are, or if you fear they are, why are we unable to determine that danger? Why don't we have an appropriate vetting system to deal with this supposed danger and keep the commitment we made to the international community?


NIELSEN:

Thank you. There's a -- a few things here, so bear with me. Let me try to -- to answer the question. First of all, in the United States we have a very unique situation in that we have -- we differentiate between refugees and asylees. As you know, unfortunately we have a unprecedented but also unacceptable backlog in asylee cases.

So those are -- those are men, women and children who are already present in our country and are waiting to find out if they will be granted final asylum. So I think that the bureaucratic issues you mentioned at the front end, unfortunately apply here, which is we have made a decision to process those who are already here seeking asylum as quickly as we can with limited resources.

Not so say we're not processing refugees, but we -- the backlog of asylees I believe will -- let me get back to you on the record, but I believe it's around 300,000. It's -- it's substantial.

On the question of vetting, we are doing exactly what you are describing, which is we are trying to find a better, faster way to vet those who are seeking refuge in our country. Unfortunately, because of some of the areas in which they are originating, the country itself is not able to provide us any information on the refugee.

Further complicating the problem is the refugee is a refugee, so in many cases he or she does not have the paperwork or other documentation to approve -- to prove their identity. So the short answer to your question is I agree we must do better. We must do it faster. We're looking at ways to get additional information to share it to work with the countries.

The last point I would make, sir, is that we as an international community, whether it's through the G-7 or the 5Is, have attempted to take care of refugees closer to where they are leaving. The idea there is that when conditions are safe they can more easily return, and so we're also working with international partners to ensure that together we are taking care of them in the best way possible.

But I would be more than happy to -- to come myself or have my staff give you a more extensive brief on some of the challenges. But we do need to process them faster, I agree.


PRICE:
My time's expired. I'll probably return to this in the next round.

Thank you, Mr. Chairman.

CARTER:

Mr. Palazzo?


PALAZZO:

Well, thank you, Mr. Chairman.

And Madam Secretary, thank you for being here today. Last week when President Trump announced the good news that he's going to deploy the National Guard to the border as a National Guardsman myself, I was elated. And since I've been in Congress I've been calling for the similar actions, take the National Guard, use them as a multiplying force and help secure our border because border security is absolutely correlation with national security. It's extremely important.

If -- if you could, can you take a few moments and expand on what you see the administration's role utilizing the National Guard on the border?


NIELSEN:

Yes, I'd be happy to. So first and foremost, it's to work in conjunction with the governors and the (inaudible) within the -- the different states.

So at the moment we have National Guard deployed from Texas, Arizona, New Mexico. California already has some National Guard deployed. We continue to work with the governor there to see what else might be needed or available to supplement.

What we're looking to do is to supplement what the Border Patrol does so that the Border Patrol can be on the border and do what they do best. So we're looking at everything for support for aviation, for vehicle maintenance, for surveillance, monitoring, intel sharing, things that the National Guard is particularly trained to do that we'd like to utilize their expertise to help get more of our men and women back on the front lines to protect the border.

PALAZZO:

Does the status of the guardsmen make a difference in their mission? Say for example, if the guard was activated under Title 10 versus Title 32 does that limit what roles they can have on the border?

NIELSEN:

It does. Title 10, obviously does limit it. There's other things that come in to play there such as, you know, posse comitatus, but what I would say about Title 32 is that it's very important from a Department of Homeland Security perspective to do this in conjunction with the governors.

Governors are there. They know what they need. They know what works. They know what their constituents need. So we're really approaching this at this time as a partnership in every way possible.

PALAZZO:

Is -- is there going to be an opportunity for other states to allow their guardsmen to basically be called up and work with the -- the border state guardsmen and their governors? Or is there -- are you just limiting the guard personnel to the -- the states on the border?

NIELSEN:

We have had some, which I appreciate, we have had some offers and calls from other governors that are not on the southwest border that are willing to deploy guard. There's a couple different things in -- in play here.

As you know, unfortunately we're heading into hurricane season so for some of these states, particularly Texas, we're very aware that if we get into a natural -- a national disaster -- natural disaster, where the guardsmen would otherwise be needed, we would look to supplement then through other governors who are willing to supply guard.

PALAZZO:

And -- and I guess we've seen that in Hurricane Katrina. We had guardsmen from all across the United States and -- and including the territories come and participate in that massive mission.

And I know if -- if Mississippi's governor hasn't already volunteered them he would, but a majority of our national guardsmen are currently training for an overseas deployment. So but -- but I'm sure, you know, there's -- there's a lot of people back home that didn't deploy would love to be a part of that mission.

Now, because the guard has a huge domestic role as well, in -- in natural disasters and, you know, they can almost be used plug-and-play in any -- any environment. And -- and we've seen what they've been able to do overseas in a combat role. They -- they were instrumental in the surge and turning the tide in Iraq and Afghanistan.

But, you know, recently, you know, as am -- I guess in their role as first responders in natural disasters, the hurricanes Harvey, Irma and Maria, they participated, but they haven't yet been, I guess, the funding hasn't been given back to the states or they haven't been reimbursed or the cost.

So with us activating 4,000 guardsmen to the border, what -- what is your expectation? And -- and are the states going to be reimbursed for that cost and -- and when?

NIELSEN:

The -- the current approach is that the states will be reimbursed. We recently, maybe about a month ago, had a meeting with the Council of Governors, Department of Homeland Security and the Department of Defense and of other partners and this -- this precise issue was raised.

I know the Department of Defense was looking at ways to make that reimbursement process much more efficient. I'm happy to provide you additional information for the record, but I'd

also ask to defer to them because they're the ones that regulate that -- that process in terms of reimbursement.

PALAZZO:

One last basically a statement and DHS has a research, a UAV research facility at Camp Shelby, Mississippi. It's the largest National Guard training site in the nation. Hopefully you will find a way to utilize that facility and the -- and the great resources that you have there in support of our border.

And with that, thank you for your responses.

NIELSEN:

And thank you for that offer.

PALAZZO:

I yield back.

CARTER:

Thank you, Mr. Palazzo.

I'd now like to recognize Ms. -- I think that we've been joined by the ranking member of the full committee, Ms. Lowey, my friend. At this time I'll recognize her for any statement or questions she may have.

LOWEY:

Thank you, Mr. Chairman.

I'll get right to the questions and I want to welcome you, Madam Secretary. I'm very impressed with your response to all the questions and this is an enormous responsibility and I look forward to working closely with you.

NIELSEN:

Thank you.


LOWEY:

Thank you. In the most recent omnibus bill, we provided for the first time funding for grants to nonprofits located outside of areas designated for the Urban Area Security Initiative. This is $10 million in funding which will help those organizations improvement security, which is so important at a time that hate groups are on the rise.

A recent report by the Southern Poverty Law Center reported that neo-Nazi groups grew by more than 20 percent in the past year, anti-Muslim groups grew by nearly 15 percent after tripling the previous year, and according to the ADL, anti-Semitic incidents rose by more than 90 percent in New York in 2017.

Could you possibly let us know when you expect the grant notice to be released and when you think the funding will go out?


NIELSEN:

Yes, as I understand it most of the grants, and I -- I will get back to you on this particular one, most of the grants are 60 days to be obligated after the appropriation goes through. But let me get back to you on this one.

But I do want to just echo your -- your thoughts. Within DHS we have consolidated some of our offices into an Office of Terrorism Prevention. It is certainly my intention to focus on all types of terrorism, not just Islamic jihadism, but hate groups, white supremacy. We must do more across the country. We're seeing instances of all types of hate.


LOWEY:

Thank you. Also Secretary Nielsen, last November the department announced that temporary protected status, or a TPS, for individuals from Haiti would end on July 22nd, 2019. Approximately 59,000 Haitians have been living in this country since at least 1020

under TPS, working, paying taxes, become established in their communities, marrying and having children.

You may also be aware that the Department of State has level three travel advisory for Haiti, meaning that people should reconsider any plans to travel there because of the conditions on the ground. Specifically the State Department cites political violence, civil unrest, says that violent crime is common, including robberies, assaults, vehicle break-ins and home invasions.

It also says the local police may not be able to respond effectively to crime or emergencies. Haiti is the poorest country in the Western Hemisphere with well over half of the population living under the poverty line.

Secretary Nielsen, how can we possibly rationalize sending 59,000 people back to those kinds of conditions? And do you believe that we should find a way to allow this group of people, who in almost every respect are now Americans, to continue living in the United States and will the administration support efforts to do so?


NIELSEN:
Thank you. As you know, there's about 400,000 people here currently under TPS status, a large chunk from Haiti, a much bigger chunk, I think around 250,000 from El Salvador. I've testified before that I am committed to helping to find a permanent status for these TPS recipients.

I would say, ma'am, though, that the law really restricts my ability to extend TPS. The law says that if the effects of the originating event, so that's a causation issue, do not continue to exist then the secretary of Homeland Security must terminate.

So the difficulty there is what you're describing. If the underlying conditions in a country are themselves dangerous, unfortunately that is not something that I can consider in the termination. I can consider that in a drawdown for additional time in which to work with the government.

I have pledged and will continue to pledge to work with all the governments to try to help them repatriate. We're having a variety of discussions with Haiti as well on how to do that. But this is a very unfortunate situation. And so I'd be happy to work with you to find a better solution.

LOWEY:

I thank you very much, because I think that a better solution has to be the response. And I appreciate you're willing to work together. Thank you very much.

And thank you, Mr. Chairman.

CHAIR:

[Presiding.] The chair recognizes Mr. Taylor for five minutes?

TAYLOR:

Thank you, Mr. Chairman.

And Madam Secretary, thank you for being here today answering great questions and having good answers. Thanks for your service. I know you're in a tough job and wearing a lot hats, and -- and certainly give our best and thanks to the many men and women who serve under you...

NIELSEN:

Thank you.

TAYLOR:

... for everything they do. I'd like to just touch really briefly -- I want to foot stomp on what Congressman Ruppersberger said and Mr. Harris, who, yes, I grew up in his district, but now I'm in Virginia.

And -- and in Virginia, of course, which I've been for many years, but a third of the seafood plants won't be open for processing and they should already be at work. So, you know, ultimately this hurts income and economic impact and ultimately American jobs, and not just the seafood industry but tourism and -- and many other areas around the country.

So I guess I want to pin you down a little bit more on -- on it. I know that you -- you -- you guys are working on it and you're -- have you spoken to Secretary Koss about it? Obviously it was passed and signed into law three weeks ago.

What -- you mentioned additional constituencies that you need to speak to. Who -- who are they? And are they people who are not in support of raising the cap? So that's -- I want to kind of pin you down on that because it's we're already behind the curve and we knew we had this problem last year.

NIELSEN:

I know. I know. So the other constituencies are trying to -- two things, trying to understand as we do this that we do it in a way where we're providing it to those who truly are seasonal.

And as you remember last year, we did a rulemaking that required a variety of certifications for the company to first of all say that they did, in fact, need foreign workers, that they couldn't fill them with American workers, but also moving towards what the program was meant to be, which is for seasonal workers, not a worker who works all year round in a certain industry.

So having taken all that into consideration, continuing discussions with secretary Costa, yes, of course, there are two sides of this, as you know. But as I said in response to Congressman Harris, the intent here is not to put American businesses out of business. that can't possibly be the goal.

TAYLOR:

If I -- if I may?

NIELSEN:

Please.


TAYLOR:

But again, this is -- this is something that was last year that we were -- we had this same conversation with -- with Secretary -- then Secretary Kelly.


NIELSEN:

Yes.


TAYLOR:

So this is not a new thing, and it's -- it's hurting economic impact. It's hurting -- it's actually hurting American jobs. Understanding that we, you know, we want to make sure that the -- that the process deals with folks that shouldn't be here and all -- and all that stuff and make sure it's responsible.

But it was over a year ago we had the same problem. It's been signed for three weeks. We want to get a timeline on this because it's -- it's hurting our businesses. So can you -- can you speak to that...


NIELSEN:

So I think...


TAYLOR:

... that timeline?


NIELSEN:

... I believe it's Wednesday, I think, Wednesday, so how -- would -- how about I get back to you on Friday with the timeline?

TAYLOR:

Perfect.

NIELSEN:

I just need to touch up...

(CROSSTALK)

TAYLOR:

And I've love to be a part of any -- any discussions with...

NIELSEN:

Yes (inaudible).

TAYLOR:

Switch topics really quickly, sorry, because I don't have a lot of -- amount of time...

NIELSEN:

OK.

TAYLOR:

... to one that you -- you like better probably, cyber security, you know, which is a huge issue. And -- and I echo what Congressman Ruppersberger said about coming together and I want to see your report, of course, and I -- and I love that, you know, 90 percent of cyberspace, of course is in private hands, right?

So how are we thinking, and -- and, you know, I know that we're working with the private sector more, which of course we have to now that targets aren't necessarily military and civilian anymore. That's all gone. Those days are gone.

How are we working with the private sector in a more efficient way? And can you provide specific examples of sort of how -- how we're doing that? That's obviously that you can speak about.

And then how are you -- you -- you mentioned the -- maturing the department, which is great in some areas, not necessarily in cyberspace, of course. We want to disrupt it, right, in -- in terms of -- because that's what's happening with the increasing amount in computing power, of course, with individuals with terrorist organizations, with transnational actors and, of course, nation-states. So -- so again, how are we working with the private sector to better protect the homeland?

And then also how are we -- how are you and the department disrupting yourselves to figure out ways to be able to be more effective and efficient and not have silos, which has obviously been a problem that I've seen with cyber security, not just in Homeland, but in DOD and -- and other places?


NIELSEN:
Yes, thank you. The -- the jokes about, you know, hacking never cease, so yes, we are trying to hack ourselves to make ourselves more efficient.

On the critical infrastructure side, as you know, we have an extensive partnership that is very efficient. What we are trying to do is get -- we're really focused on getting more threat information into the hands much more quickly and in a tailored way.

The beginning of all of this we were able to tell sectors, all 16 at the same time, there's a heightened threat of X, but that's not very useful. The energy sector's very different than the water sector, different than the financial sector.

The ISACs, the Information Sharing Analysis Centers, a very important role here. We can take in information in an anonymized way, do the pattern analysis and push it back out. So that's another way that we have matured our -- our interaction.

We also are working with other partners, intel community and FBI. As you know, we just put out a -- a guidance memo about hacking into industrial control systems, everything from energy to water, and it's completely cross-sector, to give them more not only understanding of the threat but protective measures, what they need to do to protect against this.

We also have been working to expand our automated indicator sharing program. This is one that works best as sort of a Costco model. The more people who join this program, the -- the better information that we can give out.

So we've asked companies who might not necessarily need it because they themselves are very mature to join anyway so that we can use them to help raise the level of the weakest link of everybody else.

But what I would say is it's a constant communication. When we see anything suspicious we have the ability now, we have the points of contact. It's sometimes -- it's almost that easy, as you know, and that hard to make the phone calls, to work in a collaborative way.

We have the private sector representatives in our ops centers so it's a true partnership. And then we've also brought, of course, in the -- the FBI and the -- the NIC.

TAYLOR:
Thank you, Madam Secretary. I look forward to working with you.

Thank you, Mr. Chairman.

CARTER:
[Presiding.] Thank you. And we are -- we've cleaned one round here. we get you -- you planning on leaving about 12:30? I'm gonna -- I'm gonna -- I thought -- I would like to ask one more question. It'll actually be two, but I'll put them together.

And then I'll let Ms. Roybal-Allard take one and then we'll -- won't have time to do any more. I promised to get her out at 12:30. It will be a little after that; not much.

Mine's real simple. Historically, in this subcommittee we've had two issues that have -- we've been at odds on. and they've been difficult to deal with. We -- we deal with them because, as Ms. Roybal-Allard said, we work well together.

The issues are on the front page of every newspaper. The border wall is one issue, and detention beds is the other. I'd like to know your thoughts on border walls and border barriers as -- as a necessity on the border and your thoughts on the number that's right now proposed for 2,000 beds and what you see that to be as it starts to help us to solve our problem?

NIELSEN:

Thank you. As a person who myself has not been part of CBP, that's not a part of the department I've ever worked at, I suppose I have a particular understanding of recognizing that those on the front lines are uniquely positioned to tell us what they need.

And those on the front lines in CBP, whether they be the Office of Field Operations or the Border Patrol, have consistently said that from an impedance and denial perspective it's very important to have physical infrastructure as part of a broader layered system of border control.

And we've seen this work. We've seen this work in Yuma. We've seen this work in San Diego. Instances of illegal entry in both cases went down 95 percent. That's a very difficult number to argue that's factual.

Do I believe that we need border infrastructure at every place on the border? Absolutely not. Do I believe that the border is the same in every place? Absolutely not. What I think we need is to listen to the operators who are there. They understand the threat. They understand the trends. They understand the environment.

Some places, as you know, we have walls that move with the sand. I mean there we have some very unique requirements on some parts of the border. But pulling all of that together in the great analysis that they've done through the border security improvement plan really

lays out a very technical and tactical way forward with respect to a toolkit and having the wall system.

I also would just say quickly the wall system is not just the infrastructure. That's very important. It's also the technology and it's also the personnel. CBP will tell you about four core capabilities. It's the impedance and denial, it's the surveillance, it's the access roads, and it's the personnel. Together that gives us what we need in the right mix to provide illegal entries.

Third, if I could, a lot of talk about why a wall between ports of entry? Why not just focus on ports of entry? I don't think it's an either/or. We have talked about non-intrusion -- non-intrusive -- non-intrusive detection equipment. We need to be better at the borders to detect drugs and other nefarious activity.

But between the borders what we see is this great increase in traffic. The problem with that is once a smuggler has developed a network they can smuggle anything through that network. It could be drugs. It could be guns. It could be terror. It's not just illegal immigrants.

There's a possibility now for the numbers to increase more. We have about two-thirds of people that we interdict between the points of entry, not at the points of entry.

And then one last thing I'll say on drugs on this topic is although we continue to have more drugs or see more instances of drugs at the ports, there's two very important caveats of that. One, we don't know what we don't know between the ports of entry. And two, what we see are those who facilitate the drug trade, the drug traffickers and the smugglers. They are going between the ports of entry.

So if you want to fight the drug problem you have to fight it both ways. There's the product and then there's those who sell it and who enable the illegal activity.

With respect to the beds, as you know, we base that on a modeling tool that ICE uses on daily population, on trends. We do it two years out. We refine it as we go. We then multiply

the cost out by the daily direct costs, which is everything from medical care to food and clothing for those who are detained.

The numbers can change a bit so sometimes there is room when we have an amount appropriated to work within that appropriation on the number of beds we need. But the current ask is based on solid modeling, solid increases in numbers at both enforcement and those we interdict and what we see coming.

And certainly any time happy to come give you a very in-depth brief on why we believe we need 52,000 beds.


CARTER:
Thank you very much.

Ms. Roybal-Allard?


ROYBAL-ALLARD:
Thank you, Mr. Chairman.

It's been very difficult to decide which one question I'm going to be asking because I have several concerns about unaccompanied children, about TPS, as well as sanctuary cities because I do believe there's mis -- there is some kind of misunderstanding, at least as it pertains to California about what it means to be a sanctuary city. And maybe we can follow up later.

And very quickly, I just want to add to an issue that Mr. Cuellar brought up that I agree that we need more judges, but I also believe that we need to find a way for those who particularly are -- are seeking asylum to have more access to -- to counsel, to attorneys or -- and to advocates.

Also with Dr. Harris, the concerns that he raised, I just think it's just another example of -- of the need and the value of immigrants of -- to sectors of our American economy.

And then finally, when it comes to DACA, I just want to point out while that DACA recipients are protected, the fact is there's probably about 100,000 dreamers who currently are barred from applying for DACA who are vulnerable to deportation. And I hope that we can work together to address that issue.

Lately there have been several stories in the press about the separation of families by CBP and ICE. Given this -- the traumatic and truly irreparable harm, as many experts have told us, that this separation has on children, what is the justification and the circumstances under which departmental components can separate minor children from their parent or their guardian?

And is the department -- if the department has concerns about the validity of a claimed familial relationship, what is the process for verifying of debunking that claim?

NIELSEN:

Thank you. So the current standard at -- at CBP and as you know often if we're talking the border, CBP, the Border Patrol are the first to encounter a family unit. The standard is to in every cases keep that family together as long as operationally possible first of all. So that's the presumption going in.

When we separate we separate because the law tells us to. And that is in the interest of the child. So if we cannot confirm that the adult who is accompanying them is either a legal guardian or a parent, we do seek to, as you say, verify that, and I'll talk about that in a second.

But under the Trafficking Victim Protection Act, it tells us that we need to prevent trafficking, and unfortunately we have seen instances where traffickers have used children to cross the border and gain illegal entry.

So when we do it, we do it to protect the child. The child, as you know, or unaccompanied alien then goes over to the care of HHS as we determine what to do with the adult.

I talked a lot with Commissioner McAleenan about this and Director Holman. What they do in general is they reach out to the consulates. They look for paperwork. Unfortunately, in -- in an increasing number of cases we encounter migrants that do not have paperwork for whatever reason. But we first look if they have paperwork to validate that.

Work with the consulates. We do interviews. In some cases HHS, as I understand it, will do a DNA check, voluntary of course, but to try to prove that there is a relationship there.

But this is an area where I think a lot more clarity would be very important. I also have asked those to our south, partners that we've worked with at the consulate level, to make it very clear that the paperwork is very important to prevent these types of issues. We -- we really are trying to protect the children when we do this.


ROYBAL-ALLARD:

OK. Now, there are, you know, stories that have been validated about a -- a mother, for example, the Congolese mother being separated from her seven-year-old child and that was not given an opportunity to either have a DNA test or any -- anything at -- for months and was separated for months and -- and then finally those tests were given to determine -- and it determined that she was actually the mother of this child.

And I'm just wondering if anything is being considered or being put in place to avoid those kinds of things from happening? And -- and -- and secondly, if -- if any thought has been given to perhaps maybe do some of what under the -- the previous administration was to work with the United Nations High Commissioner on Refugees to identify refugees in the Northern Triangle region so that they would not have to make that dangerous journey to the United States to claim asylum.

Instead they could travel to refugee processing centers in the regions where they could live safely during the vetting process before being settled in the United States or in another country.

And I'm just wondering if any consideration has been given to -- to looking into that as -- as way of protecting the -- the children and those seeking refuge as well as it would alleviate a

lot of what -- the challenges that we have at our -- at our border currently?

NIELSEN:

The Congolese case that you mentioned it took too long. So we are -- are working through that. as you know, it's a case of ongoing litigation, so unfortunately I'm prohibited from giving you additional detail at this time. But it took too long. So we are looking at that particular case and -- and learning from it.

Actually have a planned additional conversation with the UNHCR in upcoming weeks. That is an important partnership. What I have asked of the office as well as those we speak to at the embassies and my counterparts, is exactly what you're describing.

Could we better educate the public in these countries that they can go to the consulate? They can go to the embassy. There are other ways to find safe haven without taking this dangerous journey and then putting themselves at further risk by coming here illegally.

So yes, I think we need to do more education to help them understand their options.

ROYBAL-ALLARD:
Because we -- but also have to make sure that they would be safe in their countries.

NIELSEN:
I understand.

ROYBAL-ALLARD:
There's a reason why they are leaving...

NIELSEN:
Yes.

ROYBAL-ALLARD:

... why they're going to the crossing.

NIELSEN:

Yes, ma'am.

ROYBAL-ALLARD:

OK, thank you.

CARTER:

Well, Secretary Nielsen, thank you for your testimony. I commend you for being very well-prepared, and I -- and we've learned a lot from you today. As I've told you when I talked to you on the phone, and Ms. Roybal-Allard feels the same way, we are part of the team here to help you. Keep us informed. If you need our assistance let us know.

This committee is -- is -- and every member of it -- is placed to try to do the mission you're trying to do, make this country safe. Thank you for being here and we missed our time by six minutes.

NIELSEN:

Thank you. Well, sir, thank you so much and thank you to all of you.

CARTER:

(Inaudible) recess. Thank you.

**List of Panel Members and Witnesses**

PANEL MEMBERS:

REP. JOHN CARTER, R-TEXAS, CHAIRMAN

REP. JOHN CULBERSON, R-TEXAS

REP. CHUCK FLEISCHMANN, R-TENN.

REP. ANDY HARRIS, R-MD.

REP. STEVEN M. PALAZZO, R-MISS.

REP. SCOTT TAYLOR, R-VA.

REP. DAN NEWHOUSE, R-WASH.

REP. RODNEY FRELINGHUYSEN, R-N.J., EX OFFICIO

REP. LUCILLE ROYBAL-ALLARD, D-CALIF., RANKING MEMBER

REP. DAVID E. PRICE, D-N.C.

REP. HENRY CUELLAR, D-TEXAS

REP. C.A. DUTCH RUPPERSBERGER, D-MD.

REP. NITA M. LOWEY, D-N.Y., EX OFFICIO

WITNESSES:

HOMELAND SECURITY SECRETARY KIRSTJEN NIELSEN TESTIFIES

**Testimony & Transcripts**

Complete written testimony for this event April 11, 2018

**About House Appropriations**

Staff

Hearing

Transcripts

Testimony

Committee Reports

Associated Bills

Schedules

Markup

Amendments

© 2018 · CQ - Roll Call, Inc · All Rights Reserved.

1625 Eye Street, Suite 200 · Washington, D.C. 20006-4681 · 202-650-6500

About CQ    Help    Privacy Policy    Masthead    Terms & Conditions