# ATTACHMENT

MARGARET L. CARTER (S.B. #220637)
mcarter@omm.com
DANIEL R. SUVOR (S.B. #265674)
dsuvor@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone:    213.430.6000
Facsimile:    213.430.6407

*Counsel of Record*

*Attorneys for Amicus Curiae*
*County of Los Angeles*

MICHAEL N. FEUER (S.B. #111529)
  City Attorney
VALERIE L. FLORES (S.B. #138572)
MICHAEL J. DUNDAS (S.B. #226930)
200 North Main St.,
City Hall East, Suite 800
Los Angeles, California 90012

*Attorneys for Amicus Curiae*
*City of Los Angeles*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

CRISTA RAMOS, individually and on behalf of others similarly situated, CRISTINA MORALES, BENJAMIN ZEPEDA, individually and on behalf of others similarly situated, ORLANDO ZEPEDA, JUAN EDUARDO AYALA FLORES, individually and on behalf of others similarly situated, MARIA JOSE AYALA FLORES, ELSY YOLANDA FLORES DE AYALA, HNAIDA CENEMAT, individually and on behalf of others similarly situated, WILNA DESTIN, individually and on behalf of others similarly situated, RILYA SALARY, SHERIKA BLANC, IMARA AMPIE, MAZIN AHMED, HIWAIDA ELARABI,

Plaintiffs,

v.

KIRSTJEN NIELSEN, in her official capacity as Secretary of Homeland Security, ELAINE C. DUKE, in her official capacity as Deputy Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,

Defendants.

Case No. 3:18-cv-01554-EMC

**[PROPOSED] BRIEF OF AMICI CURIAE 28 CITIES AND 6 COUNTIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Judge:       Honorable Edward M. Chen

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ................................................................................ 1

ARGUMENT ............................................................................................................. 3

I.  DEFENDANTS' UNLAWFUL DECISION TO TERMINATE TPS FOR EL SALVADOR, HAITI, NICARAGUA, AND SUDAN WILL HARM AMICI JURISDICTIONS AND OUR RESIDENTS ............................................. 3

    A.  TPS Recipients Are Deeply Integrated into Amici's Communities............. 3

    B.  TPS Recipients Contribute Substantially to the Economy Nationwide and in Amici Cities and Counties ............................................. 6

    C.  Terminating TPS Will Undermine Public Safety by Eroding Police-Community Cooperation .............................................................................. 7

II.  DEFENDANTS' TPS TERMINATION VIOLATES EQUAL PROTECTION BECAUSE IT WAS MOTIVATED BY RACIAL ANIMUS .................................................................................................. 9

III.  DEFENDANTS' FAILURE TO ADEQUATELY CONSIDER THE IMPACT OF TPS TERMINATION VIOLATES THE ADMINISTRATIVE PROCEDURE ACT ......................................................... 13

CONCLUSION ....................................................................................................... 14

APPENDIX A .......................................................................................................... 16

# TABLE OF AUTHORITIES

Page

### CASES

Batalla Vidal v. Nielsen,
291 F. Supp. 3d 260 (E.D.N.Y. 2018) .................................................................................. 11

Burlington Truck Lines v. United States,
371 U.S. 156 (1962) ................................................................................................................. 13

California v. Sessions,
No. 17-cv-4701 (N.D. Cal. 2017) ........................................................................................... 9

FCC v. Fox Television Stations, Inc.,
556 U.S. 502 (2009) ........................................................................................................... 13, 14

Grutter v. Bollinger,
539 U.S. 306 (2003) .................................................................................................................. 6

Michigan v. EPA,
135 S. Ct. 2699 (2015) ............................................................................................................. 13

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) ............................................................................................................. 13, 14

Organized Vill. of Kake v. U.S. Dep't of Agric.,
795 F.3d 956 (9th Cir. 2015) ................................................................................................. 13

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,
429 U.S. 252 (1977) ....................................................................................................... 10, 12, 15

### STATUTES

5 U.S.C. § 706(2)(A) ..................................................................................................................... 13

8 U.S.C. § 1254a ............................................................................................................................... 1

8 U.S.C. § 1254a(a)(1), (d)(4) ...................................................................................................... 1

8 U.S.C. § 1254a(b)(1) ................................................................................................................. 10

8 U.S.C. § 1254a(b)(3)(A) ............................................................................................................. 2

8 U.S.C. § 1254a(c) ........................................................................................................................ 1

Las Cruces Municipal Code § 14-26 et seq. ............................................................................... 9

Los Angeles Admin. Code §§ 4.400, 10.8, 10.13 ....................................................................... 9

Los Angeles Charter §§ 104(i), 1024 ........................................................................................... 9

Municipal Code of Chicago, Ill. §§ 2-160-010, 5-8-010, 9-115-180, 13-72-040 ............................. 9

N.Y.C. Admin. Code § 8-107 ......................................................................................................... 9

New York City Charter § 900 ....................................................................................................... 9

**TABLE OF AUTHORITIES**
(continued)

Page

Philadelphia Code §§ 9-1101, 9-1103, 9-1106, 9-1108 ...................................................... 9

**OTHER AUTHORITIES**

82 Fed. Reg. 23830 (May 24, 2017) ........................................................................... 10

83 Fed. Reg. 2648 (Jan. 18, 2018) ............................................................................. 10

Amanda Baran et al., *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, ILRC (Apr. 2017), *available at* https://goo.gl/wELesM ................... 6, 7

Andrea Castillo, *Thousands of Salvadorans in Los Angeles worry about Trump ending temporary legal status*, L.A. Times (Jan. 6, 2018), *available at* https://goo.gl/YmpkjU ........................................................................................... 4

Angela S. Garcia, *The Sanctuary Cities Debate*, Univ. of Chicago, 23 SSA Magazine 1 (2016), *available at* https://goo.gl/iGkrdz ................................................. 8

Anita Khashu, *The Police Foundation, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* 24 (Apr. 2009) ..................... 8

Cecilia Menjívar, *Temporary Protected Status in the United States: The Experiences of Honduran and Salvadoran Immigrants*, Center for Migration Research (May 2017), https://goo.gl/KdS1fU ...................................................... 4, 5

Center for American Progress, *TPS Holders in Massachusetts*, *available at* https://goo.gl/wq9Pu2 (last visited June 14, 2018) ...................................................... 7

Center for Migration Studies, *Temporary Protected Status (TPS) for Haitians in Peril*, *available at* https://goo.gl/TAVK2y (last visited June 14, 2018) ................................... 2

Chuck Wexler, *Police chiefs across the country support sanctuary cities because they keep crime down*, L.A. Times (Mar. 6, 2017), *available at* https://goo.gl/Fut52T ........................................................................................... 8

Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018), *available at* https://goo.gl/3kN9eN ........................................................................................... 9

Donald J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2014, 5:55 AM), https://goo.gl/rS82Ux ................................................................................................ 11

Donald J. Trump (@realDonaldTrump), Twitter (Feb. 23, 2018, 6:28 AM), https://goo.gl/41wxKm ............................................................................................... 11

Donald J. Trump (@realDonaldTrump), Twitter (Feb. 24, 2015, 4:47 PM), https://goo.gl/hZDyao ................................................................................................ 11

Donald J. Trump (@realDonaldTrump), Twitter (July 13, 2015, 5:53 AM), https://goo.gl/2UpESc ................................................................................................ 11

Donald J. Trump (@realDonaldTrump), Twitter (May 25, 2016, 6:28 AM), https://goo.gl/mkqmpN .............................................................................................. 11

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Hearing on the Department of Homeland Security F.Y. 2018 Budget Before the S. Comm. on Homeland Security and Governmental Affairs*, 115th Cong. (June 6, 2017) (statement of Secretary John F. Kelly), *available at* https://goo.gl/wAEZkB ................................................................................................ 14

Jill H. Wilson, *Temporary Protected Status: Overview and Current Issues*, Congressional Research Service at Table 1 (Jan. 17, 2018), *available at* https://goo.gl/7SThKy .................................................................................................. 4

Josh Dawsey, *Trump derides protections for immigrants from "shithole" countries*, Wash. Post (Jan. 12, 2018), *available at* https://goo.gl/7fwa24 ..................... 2, 7, 12

Letter from Martin J. Walsh to Secretary of State Rex Tillerson and Secretary of Homeland Security John F. Kelly (May 16, 2017), *available at* https://goo.gl/9rRcMB ................................................................................................ 5

Letter from Neil L. Bradley, Senior Vice President & Chief Policy Officer, U.S. Chamber of Commerce, to Elaine Duke, Acting Secretary of Homeland Security (Oct. 26, 2017), *available at* https://goo.gl/QkHh5v .................................... 6

Letter from Sheriff Jim McDonnell to Los Angeles County Inspector Gen. (Oct. 3, 2017), *available at* https://goo.gl/deeS4N ...................................................... 9

Letter from U.S. Conference of Mayors to Secretary of State Rex Tillerson and Acting DHS Secretary Elaine Duke (Nov. 10, 2017), *available at* https://goo.gl/cFbtwq ................................................................................................. 5

Maria Sacchetti, *'We will lose practically everything': Salvadorans devastated by TPS decision*, Wash. Post (Jan. 8, 2018), *available at* https://goo.gl/dXy7il ........................... 3

Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://goo.gl/Rg6CRo .............................................................................................. 12

National Immigration Project of the National Lawyers Guild, *New Emails and New Memo Reveal New Depths of DHS and DOS' Lawless Actions in Terminating TPS for Haitians* (May 15, 2018), *available at* https://goo.gl/KJfzsY ................................................................................................. 12

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Ill. Chicago, at 5-6 (May 2013), *available at* https://goo.gl/wK3O7o ...................................................................................... 8

*Oversight of the United States Department of Homeland Security Before the S. Comm. on the Judiciary*, 115th Cong. (Jan. 16, 2018) (statement of Kirstjen M. Nielsen, Secretary, U.S. Department of Homeland Security) ............................... 2, 14

Randy Capps, et al., *Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement* 43, Migration Policy Inst. (Jan. 2011) ................................... 8

1

**TABLE OF AUTHORITIES**
**(continued)**

2

3

**Page**

Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. on Migration & Human Security 577, 582 at Table 2 (2017) .......................... 4, 5, 6

Sarah Stillman, *When Deportation Is a Death Sentence*, The New Yorker (Jan. 15, 2018), *available at* https://goo.gl/4s1P6N ................................................................ 9

U.S. Census Bureau, 2010-2014 American Community Survey Public Use Micro Data Sample (as augmented by the New York City Mayor's Office for Economic Opportunity)......................................................................................... 5, 7

Washington Post Staff, *Full text: Donald Trump announces a presidential bid,* Wash. Post (June 16, 2015), *available at* https://goo.gl/RydLCM (emphasis added)......................................................................................................... 11

*Zillow Research, TPS-Protected Salvadoran Homeowners Paid Approx. $100M in Property Taxes Last Year* (Jan. 8, 2018), *available at* https://goo.gl/oTriuB ........................... 7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

**INTEREST OF AMICI CURIAE**

Congress created the Temporary Protected Status (TPS) program to protect immigrants who cannot return safely to their home country because of armed conflict, natural disaster, or other extraordinary circumstances.  Pursuant to 8 U.S.C. § 1254a, when the Secretary of the Department of Homeland Security (DHS) finds that such conditions exist and prevent nationals from returning safely—or, in certain circumstances, where the country is unable to adequately handle the return of nationals—that country's citizens may live and work in the United States without fear of deportation.

The TPS program enables thousands of immigrants from El Salvador, Haiti, Nicaragua, and Sudan to reside in Amici's communities and lead lives indistinguishable from their citizen-neighbors.  To earn protected status, TPS recipients had to meet rigorous qualifications, including having no serious criminal record and undergoing individual review by the U.S. Citizenship and Immigration Service (USCIS).  *See* 8 U.S.C. § 1254a(c).  Because TPS entitles a recipient to work authorization and protection from deportation, *see id*. § 1254a(a)(1), (d)(4), most TPS holders have, over years and in some cases decades, formed families, purchased homes, obtained educations, and built deep-rooted lives.

In late 2017 and early 2018, Defendants announced the termination of TPS designations for El Salvador, Haiti, Nicaragua, and Sudan.[1]  In so doing, Defendants have taken the position that, in determining whether to extend TPS status, they can only assess the specific condition that served as the basis for the country's original designation, and cannot consider intervening natural disasters, conflicts, and other serious social and economic problems.  DHS Secretary Kirstjen Nielsen asserted that "[t]he law does not allow me to look at the country conditions of a country writ large.  It requires me to look very specifically as to whether the country conditions

---

[1] While this suit challenges TPS terminations for El Salvador, Haiti, Nicaragua, and Sudan, it should be noted that Defendants have also terminated TPS status for other countries, such as Honduras and Nepal.  Many of the same considerations described in this brief would apply with equal weight to those terminations.

originating from the original designation continue to exist."[2]  But such a crabbed view departs from both the plain language of the statute and the consistent practice of multiple prior administrations.  The TPS statute directs that, in reviewing a country's designation, the DHS Secretary "shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met."  8 U.S.C. § 1254a(b)(3)(A).  Nothing in the statute limits the consideration of "conditions" to those in the original designation.  Indeed, such a limit marks a stark departure from TPS designations made by prior administrations, in which DHS consistently considered intervening conditions as well as those conditions in the original designation.

Although the reasons for Defendants' sudden change in their approach to TPS designations were never explained, statements by administration officials, including the President, make clear that the decision was motivated by racial animus.  Put simply, the TPS program was seen as "prevent[ing] [the Trump Administration's] wide strategic goal on immigration," which in President Trump's own words included keeping "all these people from shithole countries" out of the United States.[3]  Defendants' unjustified and ill-advised termination of TPS leaves the future of more than 300,000 immigrants hanging in doubt.

Amici are 28 cities and 6 counties, located in 19 states across the country that are home to TPS recipients whose status is at risk.[4]  There is no doubt that Defendants' TPS terminations will negatively impact Amici, their communities, and thousands of residents.  For each Amicus, TPS recipients contribute meaningfully to economic and cultural life—they work, pay taxes, raise children (hundreds of thousands of whom are U.S. citizens), and participate actively in their local religious communities.  TPS protection also facilitates trust and communication between

---

[2] *Oversight of the United States Department of Homeland Security Before the S. Comm. on the Judiciary*, 115th Cong. (Jan. 16, 2018) (statement of Kirstjen M. Nielsen, Secretary, U.S. Department of Homeland Security).

[3] Josh Dawsey, *Trump derides protections for immigrants from "shithole" countries*, Wash. Post (Jan. 12, 2018), *available at* https://goo.gl/7fwa24.

[4] A full list of proposed Amici is attached here as Appendix A.

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

immigrant communities and law enforcement.  These benefits will evaporate if TPS recipients are put to the impossible choice of either going underground or returning to the disaster-stricken countries from which they fled.  Programs like TPS also impose benefits and burdens on state and local governments, which in turn often impact strategic planning and decisions by local officials.

When federal decision makers make unannounced and unexplained departures from established practices and policies, states and localities must deal with the consequences for local economies, public safety, and U.S. citizen family members and community members.  This in turn undermines Amici's ability to effectively serve their own residents. Defendants' unlawful decision to revoke TPS thus not only threatens the individuals with protected status and their families, but will also materially harm Amici and their other residents.

## ARGUMENT

**I.     DEFENDANTS' UNLAWFUL DECISION TO TERMINATE TPS FOR EL SALVADOR, HAITI, NICARAGUA, AND SUDAN WILL HARM AMICI JURISDICTIONS AND OUR RESIDENTS**

### A.     TPS Recipients Are Deeply Integrated into Amici's Communities

As this Court has acknowledged, Plaintiffs' personal experiences reflect their important roles in each of their communities:  They are public servants, small business owners, students, homeowners, and active members of their communities.  *See* Order Denying Defs.' Mot. to Dismiss, ECF No. 55 ("MTD Order") at 3-6.  These Plaintiffs' stories are representative of the thousands of other TPS recipients affected by Defendants' unlawful actions.  For example, Oscar Cortez rises before dawn to commute to his job as a plumber, which pays for a townhouse in Maryland.  He carries a Costco card, roots for the Boston Red Sox, and sets aside money in a college fund for his daughters.[5]  Helen Avalos works as a janitor at Walter Reed National Military Medical Center, has three children and two grandchildren, and provides financial support to her elderly mother.[6]  Orlando Zepeda is a husband and father whose two children attend private school in Los Angeles.[7]  Yesenia Reyes fled El Salvador 17 years ago to escape gang violence

---

[5] Maria Sacchetti, *'We will lose practically everything': Salvadorans devastated by TPS decision*, Wash. Post (Jan. 8, 2018), *available at* https://goo.gl/dXy7il.

[6] *Id.*

[7] *Id.*

and domestic abuse.  She now works 80 hours a week as a housekeeper at two Los Angeles hotels so that she can afford her daughter's diabetes medication.[8]  Dady Jean brought her 16-month old daughter Schnaika to the United States from Haiti for medical care after Schnaika was seriously injured in the 2010 earthquake.  Schnaika, now in the third grade, attends weekly physical therapy sessions to improve her movement and balance.  Dady believes her daughter could have died if they stayed in Haiti, and that Schnaika's life prospects would be bleak if they were forced to return.[9]  Each of these individuals is a TPS recipient.  They and thousands like them reside in Amici's communities and lead lives that look much like those of their citizen-neighbors.  Now, because of Defendants' decision to terminate their TPS protection for discriminatory reasons, their future in this country hangs in doubt.

For these individuals and more than 300,000 other immigrants from El Salvador, Haiti, Nicaragua, and Sudan, TPS provides the safety and security needed to build productive lives in the United States.[10]  Most of these individuals have lived in the United States for at least one decade; most Salvadoran beneficiaries have lived here for more than two.[11]  Indeed, for many, the United States is the only home they truly know.  About 20 percent of TPS beneficiaries from El Salvador, and 30 percent of those from Haiti, arrived in the United States before they turned 16.[12]  More than 20 percent of Salvadoran and Haitian beneficiaries now own their homes[13] and most have families here, too.  The beneficiaries threatened by Defendants' rescission have hundreds of thousands of U.S.-citizen children, 192,000 born to Salvadoran beneficiaries alone.[14]

---

[8] Andrea Castillo, *Thousands of Salvadorans in Los Angeles worry about Trump ending temporary legal status*, L.A. Times (Jan. 6, 2018), *available at* https://goo.gl/YmpkjU.

[9] *Id.*

[10] Jill H. Wilson, *Temporary Protected Status: Overview and Current Issues*, Congressional Research Service at Table 1 (Jan. 17, 2018), *available at* https://goo.gl/7SThKy.

[11] Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. on Migration & Human Security 577, 582 at Table 2 (2017).

[12] *Id.* at 577.

[13] Cecilia Menjívar, *Temporary Protected Status in the United States: The Experiences of Honduran and Salvadoran Immigrants*, Center for Migration Research (May 2017), https://goo.gl/KdS1fU.

[14] Warren & Kerwin, *supra* n.11, at 581.

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

With these deep roots in place, TPS beneficiaries are fully integrated into their communities.  Among Haitian TPS beneficiaries, for example, nearly all speak at least some English, and three-quarters report speaking English well, very well, or speaking only English.[15] And a survey of TPS recipients from El Salvador, Honduras, and Nicaragua found that 30 percent are civically active, and about 20 percent engage in community service such as volunteering with nonprofit organizations or at children's hospitals.[16]  This level of community involvement is higher than the rates of such participation by U.S. citizens.  Amici cities and counties have benefitted greatly from this engagement, as TPS recipients from the countries at issue are disproportionately concentrated there.  For example, nearly 30,000 Salvadoran TPS recipients reside in Los Angeles County.[17]  And in New York City alone, there are approximately 5,400 Haitian TPS recipients.[18]  Boston Mayor Martin J. Walsh outlined the positive effect these TPS recipients have on Amici communities in a letter urging Defendants to extend TPS for Haiti, noting that the "16,000 Haitian immigrants and nationals who live in the City of Boston" have "enriched and strengthened our City in immeasurable ways."[19]  The U.S. Conference of Mayors echoed this sentiment, arguing that "Haitian TPS recipients are integral members of our neighborhoods, workplaces, religious communities, schools, and health care institutions."[20]

In short, these TPS recipients are interwoven into Amici's community fabric.  As neighbors, families, and community members, they are indistinguishable from their families and neighbors who enjoy citizenship or legal permanent residence.

---

[15] *Id.*

[16] Menjívar, *supra* n.13.  Though Honduras is not a subject of this suit, the survey includes Honduran TPS recipients.

[17] Warren & Kerwin, *supra* n.11, at 587.

[18] U.S. Census Bureau, 2010-2014 American Community Survey Public Use Micro Data Sample (as augmented by the New York City Mayor's Office for Economic Opportunity) ("American Community Survey").

[19] Letter from Martin J. Walsh to Secretary of State Rex Tillerson and Secretary of Homeland Security John F. Kelly (May 16, 2017), *available at* https://goo.gl/9rRcMB.

[20] Letter from U.S. Conference of Mayors to Secretary of State Rex Tillerson and Acting DHS Secretary Elaine Duke (Nov. 10, 2017), *available at* https://goo.gl/cFbtwq.

[PROPOSED] BRIEF OF AMICI COUNTIES & CITIES ISO PLS.' MOT. FOR PI – 3:18-cv-01554-EMC

**B.    TPS Recipients Contribute Substantially to the Economy Nationwide and in Amici Cities and Counties**

TPS recipients also make great contributions to Amici's economies as workers, consumers, entrepreneurs, and taxpayers.  The labor force participation rate of Salvadoran and Haitian beneficiaries is 88 percent and 81 percent, respectively—compared to 63 percent for the U.S. population as a whole.[21]  A number of those individuals are self-employed, meaning they have created jobs for themselves and likely for others as well.[22]  Their work has positive effects on the rest of the economy, as "the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003).

Recognizing the importance of these contributions, in October 2017 the U.S. Chamber of Commerce urged DHS to extend TPS for El Salvador, Haiti, and Honduras.[23]  The Chamber wrote that stripping beneficiaries of work authorization would "adversely impact several key industries where TPS recipients make up a significant amount of the workforce . . . includ[ing] construction, food processing, hospitality, and home healthcare services."[24]  In particular, the Chamber noted that 50,000 TPS recipients from these countries work in construction, which means termination would "exacerbate existing labor shortages in the industry at a time when such workers are essential to hurricane recovery efforts in states like Texas and Florida."[25] Terminating TPS would have other weighty ramifications.  The elimination of work authorization for TPS holders from these three countries would reduce the country's GDP by $45.2 billion.[26] Tax revenues would also suffer; one report concluded that "TPS-protected Salvadoran homeowners paid between $24.7 million and $45.9 million in property taxes in California in 2017

---

[21] Warren & Kerwin, *supra* n.11, at 577.

[22] *Id*.

[23] Letter from Neil L. Bradley, Senior Vice President & Chief Policy Officer, U.S. Chamber of Commerce, to Elaine Duke, Acting Secretary of Homeland Security (Oct. 26, 2017), *available at* https://goo.gl/QkHh5v.

[24] *Id*.

[25] *Id.*

[26] Amanda Baran et al., *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, ILRC (Apr. 2017), *available at* https://goo.gl/wELesM.

[PROPOSED] BRIEF OF AMICI COUNTIES & CITIES ISO PLS.' MOT. FOR PI – 3:18-cv-01554-EMC

. . . .  In the Los Angeles area alone, it's likely these families paid between $22.1 million and $32 million in 2017 property taxes."[27]  Social Security and Medicare would lose $6.9 billion in contributions from TPS holders,[28] and employers would incur nearly $1 billion in turnover costs.[29]  As cities and counties that are home to an outsized proportion of TPS holders, Amici and our residents would bear the brunt of these macro- and microeconomic burdens.

Indeed, Haitian TPS recipients generated an estimated $206 million in Gross City Product (GCP) for New York City in 2017.[30]  Similarly, Massachusetts would lose $203.8 million in GDP without Haitian TPS recipients[31]—and with nearly all of the state's Haitian population living in the Boston metropolitan area, the economy of amici Boston, Cambridge, Chelsea, and Somerville would be most affected.  The loss of such contributions would make it more difficult for Amici cities and counties to provide much-needed investments to support our schools, repair our roads and bridges, and sustain the social services that keep our communities strong.

### C.     Terminating TPS Will Undermine Public Safety by Eroding Police-Community Cooperation

TPS has also helped make our neighborhoods safer.  Because recipients are exempt from deportation, they are able to cooperate freely with law enforcement to report crimes without fear of retribution.  Revoking protected status for over 200,000 individuals would create a new swath of immigrants likely subject to deportation.  Indeed, the revocation of TPS protection is more than a mere symbolic statement of DHS's desire to deport these residents—President Trump himself said, referring to Haitians' legal protections, "[t]ake them out."[32]

All immigrants with TPS have previously submitted to DHS, as part of their TPS application, detailed information about their immigration status and where they and their families

---

[27] *Zillow Research, TPS-Protected Salvadoran Homeowners Paid Approx. $100M in Property Taxes Last Year* (Jan. 8, 2018), *available at* https://goo.gl/oTriuB.

[28] Baran, *supra* n.27.

[29] *Id.*

[30] American Community Survey, *supra* n.19.

[31] Center for American Progress, *TPS Holders in Massachusetts*, *available at* https://goo.gl/wq9Pu2 (last visited June 14, 2018).

[32] Josh Dawsey, *Trump derides protections for immigrants from "shithole" countries*, Wash. Post (Jan. 12, 2018), *available at* https://goo.gl/7fwa24.

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

live.  These factors may create an understandable fear among TPS recipients in Amici's communities that could lead these immigrants to cease communication with law enforcement, even if they are victims of or witnesses to a crime.

As local governments charged with ensuring their residents' safety, Amici understand that if immigrants "fear[] that interaction with police leads to arrest and deportation, they will be reluctant to report crimes, make statements, or testify in court.  This chilling effect leaves cities less safe for everyone."[33]

Research has shown that as immigration enforcement and the threat of deportation increase, the likelihood of undocumented immigrants reporting crimes drops significantly.[34]  In a 2013 survey, for example, 67 percent of undocumented individuals reported they would be less likely to offer information to law enforcement as a witness if officers were free to inquire about their or others' immigration status.[35]  Seventy percent reported being less likely to contact law enforcement authorities *even if they were victims of a crime*.[36]  In a survey conducted by the Police Foundation, for example, 74 percent of law enforcement personnel and public officials reported that aggressive enforcement of immigration law would decrease community trust of police, and 83 percent said it would decrease reporting of criminal activity.[37]

These studies have been borne out in practice.  In jurisdictions across the country, from

---

[33] Angela S. Garcia, *The Sanctuary Cities Debate*, Univ. of Chicago, 23 SSA Magazine 1 (2016), *available at* https://goo.gl/iGkrdz.

[34] *See, e.g.*, Chuck Wexler, *Police chiefs across the country support sanctuary cities because they keep crime down*, L.A. Times (Mar. 6, 2017), *available at* https://goo.gl/Fut52T; Anita Khashu, *The Police Foundation, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* 24 (Apr. 2009).

[35] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Ill. Chicago, at 5-6 (May 2013), *available at* https://goo.gl/wK3O7o.

[36] *Id*. at 5; *see also* Randy Capps, et al., *Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement* 43, Migration Policy Inst. (Jan. 2011) (finding in multiple counties that increased local-federal law enforcement cooperation meant "community respondents were likely to report that immigrants were venturing into public places with less frequency, failing to report crimes or interact with police, interacting less with schools and other institutions, patronizing local businesses less often, and changing their driving patterns").

[37] Anita Khashu, *The Police Foundation, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* 24 (Apr. 2009).

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

Houston[38] to Los Angeles,[39] police have seen a drop in domestic violence reports from their Latino communities, while reporting among non-Latino victims was virtually unchanged.  As a result, 82 percent of the prosecutors surveyed said that domestic abuse cases have become harder to prosecute.[40]  In a sworn declaration last year, Los Angeles County Sheriff Jim McDonnell summed it up plainly: "Public safety . . . . requires that people come forward if they are a crime victim or be willing to come forward as a witness to a crime without fear of being deported."[41] By creating uncertainty and fear, Defendants have not only threatened the well-being of hundreds of thousands of TPS beneficiaries—they have also created a needless risk to broader public safety.

## II.   DEFENDANTS' TPS TERMINATION VIOLATES EQUAL PROTECTION BECAUSE IT WAS MOTIVATED BY RACIAL ANIMUS

Defendants' decision to rescind TPS violates the Fifth Amendment, because it amounts to intentional discrimination on the basis of race, ethnicity, and/or national origin.  Amici have a strong interest in preventing discrimination and enforcing equal protection laws.  In fact, most, if not all, Amici have created local laws prohibiting discrimination based on ethnicity and national origin in all aspects of life—housing, employment, public accommodation, transportation, schooling, and government services.  E.g., Los Angeles Charter §§ 104(i), 1024; Los Angeles Admin. Code §§ 4.400, 10.8, 10.13; Municipal Code of Chicago, Ill. §§ 2-160-010, 5-8-010, 9-115-180, 13-72-040; Las Cruces Municipal Code § 14-26 et seq.; New York City Charter § 900; N.Y.C. Admin. Code § 8-107; Philadelphia Code §§ 9-1101, 9-1103, 9-1106, 9-1108.  Such laws reflect Amici's strong commitment to equal rights, as well as their belief that diversity enriches

---

[38] Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018), *available at* https://goo.gl/3kN9eN.

[39] Sarah Stillman, *When Deportation Is a Death Sentence*, The New Yorker (Jan. 15, 2018), *available at* https://goo.gl/4s1P6N.

[40] Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018), *available at* https://goo.gl/3kN9eN.

[41] Decl. of Jim McDonnell in Supp. of Pl.'s Am. Mot. for Prelim. Inj. ("McDonnell Decl."), *California v. Sessions*, No. 17-cv-4701 (N.D. Cal. 2017), ECF No. 31, ¶ 5; *see also* Letter from Sheriff Jim McDonnell to Los Angeles County Inspector Gen. at 8 (Oct. 3, 2017) (noting sheriff policy to "reassure immigrant communities that there is no need to fear contact with the Sheriff's Department"), *available at* https://goo.gl/deeS4N.

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

communities and diminishes no one.

To prevail on their Equal Protection claim, Plaintiffs do not have to prove that the discriminatory motive was Defendants' sole or even primary purpose, only that it was a "motivating factor." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also* MTD Order at 44-45.  In making this inquiry, courts consider several factors, including "[d]epartures from the normal procedural sequence," which "might afford evidence that improper purposes are playing a role;" "[t]he specific sequence of events leading up to the challenged decision;" and "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 266-68. Each of these factors supports Plaintiffs' claim that Defendants acted with impermissible animus here.

*First*, DHS departed from its normal decision-making process in rescinding TPS. Decisions to extend or terminate a country's TPS designation are historically based on a comprehensive assessment of country conditions to determine whether the foreign state continues to meet the conditions for designation.  *See* 8 U.S.C. § 1254a(b)(1).  Pursuant to this process, DHS typically evaluates current country conditions, including any "intervening natural disasters, conflicts, and other serious social and economic problems," in addition to the conditions supporting the initial determination.  Compl. ¶ 75.  For example, DHS has extended TPS status for Haiti five times since 2010, including last May, when DHS determined that, in addition to the persistence of earthquake-related issues, new disasters—such as Hurricane Matthew, flooding, landslides, and a cholera epidemic—had kept the country from recovering.  *See* 82 Fed. Reg. 23830 (May 24, 2017).  Defendants' abrupt decision to terminate Haiti's status in November 2017 departed starkly from this process: Defendants did not even mention the numerous natural disasters Haiti recently experienced, let alone explain how conditions have changed in the last six months.[42]  By the same token, Defendants' terminations of TPS for El Salvador, Nicaragua, and Sudan similarly neglected to account for intervening events, inexplicably departing from past

---

[42] Termination of the Designation of Haiti Under the Temporary Protected Status Program, 83 Fed. Reg. 2648 (Jan. 18, 2018) ("TPS Termination").

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

1   practice.[43]  This amounts to a clear, unjustified departure from the normal decision-making

2   process.

3        *Second*, the historical background and broader context firmly support this conclusion.

4   President Trump's extensive history of invective towards immigrants of color strongly reinforces

5   the inference that DHS's decisions were motivated by racial discrimination.[44]  The President has

6   repeatedly expressed the view that immigrants of color bring disease and crime into the United

7   States.[45]  President Trump expressed such animus from the very start of his presidential

8   campaign:  In the speech announcing his run for President, then-candidate Trump said, "[w]hen

9   Mexico sends its people, they're not sending their best. . . . They're sending people that have lots

10  of problems, and they're bringing those problems with us.  They're bringing drugs.  They're

11  bringing crime.  They're rapists.  And some, I assume, are good people . . .  It's coming from

12  more than Mexico.  *It's coming from all over South and Latin America*."[46]  Such discriminatory

13  statements have continued after his election.  During a June 2017 meeting, for example, upon

14

15  [43] *See* MTD Order at 27-32 (comparing past practice to Defendants' termination decisions for the
    countries at issue and noting that "[f]or every country (although to varying degrees), factors that
16  were explicitly considered recently by prior administrations were wholly absent from the four
    termination notices issued between October 2017 and January 2018"); Pls.' Mot. for Prelim. Inj.,
17  ECF No. 89 ("PI Motion") at 9-14.

18  [44] The fact that Acting Secretary Duke, and not the President, formally made the decision to
    terminate TPS is of no import.  *See, e.g.*, *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279
19  (E.D.N.Y. 2018) ("[R]eject[ing] . . . Defendants' remarkable argument that the President
    apparently <u>cannot</u> be liable for rescinding the DACA program because only Acting Secretary
    Duke had the legal authority to end that program."); MTD Order at 43-44.

20  [45] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Feb. 23, 2018, 6:28 AM),
21  https://goo.gl/41wxKm ("MS-13 gang members are being removed by our Great ICE and Border
    Patrol Agents by the thousands, but these killers come back in from El Salvador, and through
22  Mexico, like water. El Salvador just takes our money, and Mexico must help MORE with this
    problem. We need The Wall!"); Donald J. Trump (@realDonaldTrump), Twitter (May 25, 2016,
23  6:28 AM), https://goo.gl/mkqmpN ("The protesters in New Mexico were thugs who were flying
    the Mexican flag. The rally inside was big and beautiful, but outside, criminals!"); Donald J.
24  Trump (@realDonaldTrump), Twitter (July 13, 2015, 5:53 AM), https://goo.gl/2UpESc
    ("[B]illions of dollars gets brought into Mexico through the border. We get the killers, drugs &
25  crime, they get the money!"); Donald J. Trump (@realDonaldTrump), Twitter (Feb. 24, 2015,
    4:47 PM), https://goo.gl/hZDyao ("The Mexican legal system is corrupt, as is much of Mexico.
26  Pay me the money that is owed me now - and stop sending criminals over our border."); Donald
    J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2014, 5:55 AM), https://goo.gl/rS82Ux ("Our
27  government now imports illegal immigrants and deadly diseases.").

28  [46] Washington Post Staff, *Full text: Donald Trump announces a presidential bid,* Wash. Post
    (June 16, 2015), *available at* https://goo.gl/RydLCM (emphasis added).

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

1   learning that 15,000 Haitians had received visas to enter the United States in 2017, President

2   Trump reportedly said that they "all have AIDS."[47]  These "contemporaneous statements,"

3   *Arlington Heights*, 429 U.S. at 267, show without a doubt that animus motivated Defendants'

4   decision.

5          *Finally*, the "specific sequence of events" leading up to termination supports the

6   contention that Defendants' actions were motivated by racial and national origin discrimination.

7   *Arlington Heights*, 429 U.S. at 267.  During a meeting on January 11, 2018, President Trump

8   decried the inclusion of protections for Haitians and Salvadorans from "shithole countries" in a

9   proposed immigration deal, expressing a preference, instead, for immigrants from countries like

10  Norway, which is overwhelmingly white.[48]  Within a week, Defendants announced the decisions

11  terminating TPS for Haiti and El Salvador.  Compl. ¶¶ 81, 84.  Defendants' termination of TPS

12  for Sudan and Nicaragua occurred prior to this meeting, but subsequent to myriad other

13  statements made by President Trump reflecting animus against non-white immigrants and other

14  persons of Latino or African origin.  *See supra* notes 45-46.  With respect to Haiti in particular,

15  both internal government documents and the President's public statements indicate that DHS's

16  purported rationale for the termination was pretextual.  Senior administration officials sought

17  information on how many Haitian TPS recipients were on public benefits and how many were

18  convicted of "crimes of any kind," even though neither factor is relevant to whether TPS status

19  should be terminated and both factors indicate reliance on racial stereotypes of immigrants of

20  color.[49]  Yet one official urged that DHS was "going to need this" data to decide whether to

21  terminate TPS for Haiti.[50]

22

23

24  [47] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to*
25  *Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://goo.gl/Rg6CRo.

    [48] Dawsey, *supra* n.32.

26  [49] National Immigration Project of the National Lawyers Guild, *New Emails and New Memo*
27  *Reveal New Depths of DHS and DOS' Lawless Actions in Terminating TPS for Haitians* (May 15,
    2018), *available at* https://goo.gl/KJfzsY.

28  [50] *Id*.

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

**III.    DEFENDANTS' FAILURE TO ADEQUATELY CONSIDER THE IMPACT OF TPS TERMINATION VIOLATES THE ADMINISTRATIVE PROCEDURE ACT**

"Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (citation omitted). When an agency fails this standard—when it acts in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"—its action must be set aside.  5 U.S.C. § 706(2)(A). "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that [an agency] display awareness that it *is* changing position."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).  Indeed, the Administrative Procedure Act (APA) requires an agency to provide "more substantial justification" when "its prior policy has engendered serious reliance interests."  *Id.*

Defendants' unjustified and ill-considered TPS designation terminations for El Salvador, Haiti, Nicaragua, and Sudan do not meet this standard.  Defendants (i) have failed to articulate any explanation for their change of policy, much less an adequate one, and (ii) have neglected to take into account the enormous economic and social harms TPS termination will cause.  These failures violate the APA, which requires agencies to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

When an agency makes an abrupt reversal of longstanding policy, it must explain why: "Unexplained inconsistency between agency actions is a reason for holding an interpretation to be an arbitrary and capricious change."  *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015).  Defendants have failed to do so here.  "Prior to October 2017, extension and/or re-designation notices indicate that DHS consistently considered, at the very least, whether intervening events had frustrated or impeded recovery efforts from the originating conditions in Sudan, Haiti, Nicaragua, and El Salvador."  MTD Order at 27.  With no formal announcement or explanation whatsoever, Defendants have departed from this consistent practice, now asserting that they can consider only the condition that served as the basis for the

1  country's original designation.  The change became public during testimony by then-Secretary

2  Kelly at a Senate hearing on June 6, 2017, when he stated that "[TPS] is for a specific event.  In

3  Haiti, it was the earthquake.  Yes, Haiti had horrible conditions before the earthquake, and those

4  conditions aren't much better after the earthquake.  But the earthquake was why TPS was granted

5  and . . . that's how I have to look at it."[51]  Secretary Nielsen corroborated this change of practice,

6  asserting that "[t]he law . . . requires me to look very specifically as to whether the country

7  conditions originating from the original designation continue to exist."[52]  Defendants have not

8  provided *any* explanation for its change in policy, in clear violation of the APA.

9      This unusual departure from existing practice demonstrates complete disregard for the

10 "serious reliance interests" engendered by TPS recipients' many years of residence in the United

11 States.  *Fox*, 556 U.S. at 515.  More than 300,000 TPS recipients, and many U.S. citizen children,

12 will be directly affected by Defendants' actions.  The effect of such a policy change—and its

13 sudden impact on thousands of families—is surely a "relevant factor" that the government should

14 have taken into account when considering rescission.  *State Farm*, 463 U.S. at 34.  The harm is

15 not limited to individual TPS recipients themselves:  TPS recipients from El Salvador, Haiti,

16 Nicaragua, and Sudan play vital roles in Amici jurisdictions' communities and economies, and

17 termination of their status also undercuts public safety.  *See supra* Part I.  In such circumstances,

18 the APA requires an agency to provide "more substantial justification" for its change in policy.

19 *State Farm*, 463 U.S. at 34.  Here, Defendants have provided none at all.

## CONCLUSION

21     For all of the reasons stated above, the Court should preliminarily enjoin Defendants'

22 unlawful termination of TPS for El Salvador, Haiti, Nicaragua, and Sudan.  In short, when

23 examining the evidence under the proper framework, there can be no question that racial animus

24 and national origin discrimination were at least "motivating factor[s]" behind Defendants'

---

[51] *Hearing on the Department of Homeland Security F.Y. 2018 Budget Before the S. Comm. on Homeland Security and Governmental Affairs*, 115th Cong. (June 6, 2017) (statement of Secretary John F. Kelly), *available at* https://goo.gl/wAEZkB.

[52] *Oversight of the United States Department of Homeland Security Before the S. Comm. on the Judiciary*, 115th Cong. (Jan. 16, 2018) (statement of Kirstjen M. Nielsen, Secretary, U.S. Department of Homeland Security).

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

actions.  *Arlington Heights*, 429 U.S. at 267.  In addition, Defendants' *sub silentio* change in

policy, without regard for the damage such a change would cause, constitutes a violation of the

APA.  Given that evidence, the harm Defendants' decision will wreak, and the Court's authority

and obligation to remedy unconstitutional executive acts, Plaintiffs' motion for preliminary

injunction should be granted.

Dated:  August 30, 2018                    By:      /s/ Margaret L. Carter

                                           Attorneys for *Amicus Curiae* County of Los
                                           Angeles

                                           MARGARET L. CARTER
                                           mcarter@omm.com
                                           DANIEL R. SUVOR
                                           dsuvor@omm.com
                                           O'MELVENY & MYERS LLP
                                           400 South Hope Street, 18th Floor
                                           Los Angeles, CA 90071
                                           Telephone:     213.430.6000
                                           Facsimile:     213.430.6407

                                           *Counsel of Record*

                                           *Attorneys for Amicus Curiae*
                                           *County of Los Angeles*

                                           MICHAEL N. FEUER
                                             City Attorney
                                           VALERIE L. FLORES
                                           MICHAEL J. DUNDAS
                                           200 North Main St., City Hall East Suite 800
                                           Los Angeles, California 90012

                                           *Attorneys for Amicus Curiae*
                                           *City of Los Angeles*

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

1

2

3

4

----

## APPENDIX A
## LIST OF COUNSEL FOR ADDITIONAL
## PROPOSED *AMICI CURIAE*

----

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DONNA R. ZIEGLER
County Counsel, County of Alameda
1221 Oak Street, Suite 450
Oakland, CA 94612

JAMES L. BANKS, JR.
City Attorney of the City of Alexandria
301 King Street
Alexandria, VA 22314

NINA HICKSON
City Attorney for the City of Atlanta
55 Trinity Avenue, Suite 5000
Atlanta, GA 30303

ANNE L. MORGAN
City Attorney, City of Austin
PO Box 1546
Austin, TX 78767

ANDRE M. DAVIS
City Solicitor, City of Baltimore
100 N. Holliday Street, Suite 101
Baltimore, MD 21202

EUGENE O'FLAHERTY
Corporation Counsel for the City of Boston
One City Hall Square, Room 615
Boston, MA 02201

NANCY E. GLOWA
City Solicitor for the City of Cambridge
795 Massachusetts Avenue
Cambridge, MA 02139

CHERYL WATSON FISHER
City Solicitor of the City of Chelsea
500 Broadway, Room 307
Chelsea, MA 02150

EDWARD N. SISKEL
Corporation Counsel of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, IL 60602

KRISTIN M. BRONSON
City Attorney, City and County of Denver
1437 Bannock St., Room 353
Denver, CO 80202

GREGORY L. THOMAS
City Attorney, City of Gary
401 Broadway, Suite 101A
Gary, Indiana, 46402

PAUL PAYER
City Solicitor, City of Holyoke
20 Korean Veterans Plaza, #204
Holyoke, MA 01040

ELEANOR M. DILKES
City Attorney, Iowa City
410 East Washington Street
Iowa City, IA 52240

JENNIFER VEGA-BROWN
City Attorney of the City of Las Cruces
700 North Main
Las Cruces, NM 88001

SUSAN SEGAL
Minneapolis City Attorney
350 S. Fifth St. - Room #210
Minneapolis, MN 55415

CHARLES J. McKEE,
County Counsel, County of Monterey
168 W. Alisal Street, 3rd Floor
Salinas, CA 93901

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC

ZACHARY W. CARTER
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

JEFF P. H. CAZEAU
City Attorney of the City of North Miami
776 NE 125 Street
North Miami, FL 33161

BARBARA J. PARKER
City Attorney, City of Oakland
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612

MARCEL S. PRATT
City Solicitor of the City of Philadelphia
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

TRACY P. REEVE
City Attorney of the City of Portland
1221 SW Fourth Avenue, Suite 430
Portland, OR 97240

JEFFREY DANA
City Solicitor of the City of Providence
444 Westminster Street, Suite 220
Providence, RI 02903

SUSANA ALCALA WOOD
City Attorney of the City of Sacramento
915 I Street, Fourth Floor
Sacramento, CA 95814

LYNDSEY M. OLSON
City Attorney of the City of Saint Paul
15 West Kellogg Boulevard, Suite 400
Saint Paul, MN 55102

MARA W. ELLIOTT
San Diego City Attorney
1200 Third Avenue, Suite 1620
San Diego, CA 92101

DENNIS J. HERRERA
City Attorney for the City and County of San Francisco
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

JAMES R. WILLIAMS
County Counsel, County of Santa Clara
70 W. Hedding Street, East Wing, 9th Floor
San Jose, CA 95110

PETER S. HOLMES
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

FRANCIS X. WRIGHT, JR.
City Solicitor of the City of Somerville
93 Highland Avenue
Somerville, MA 02143

STEPHANIE STEELE
Corporation Counsel for the City of South Bend
227 W. Jefferson Blvd. Suite 1200S
South Bend, IN 46601

MIKE RANKIN
City Attorney of the City of Tucson
P.O. Box 27210
Tucson, AZ 85726

MICHAEL JENKINS
City Attorney of the City of West Hollywood
1230 Rosecrans Avenue, Ste 110
Manhattan Beach, CA 90266

[PROPOSED] BRIEF OF AMICI
COUNTIES & CITIES ISO PLS.' MOT.
FOR PI – 3:18-cv-01554-EMC