# EXHIBIT 2

# HAITI TPS

**USSOUTHCOM INPUT:**

(U//FOUO) The impact of removing Haiti from TPS is unlikely to affect SOUTHCOM contingency plans or operations. However, it may have near and long term repercussions for Haitian stability. In the near term, the removal of an estimated 59,000 Haitians from the US may place considerable additional stress on the Government of Haiti (GOH) and the social services of the country. Current conditions and GOH capacity have improved sufficiently to absorb the return of a moderate flow of Haitian nationals, but a large return would likely overwhelm a fragile government system and infrastructure. The GOH continues to receive weekly flights of between 50 and 100 noncriminal deportees, and even this moderate number is a level that stretches its resources to maintain a secure and orderly reception program.

The return of a large number of citizens may place additional security stress upon the Haitian government, which is contending with rising crime and violence exacerbated by the security vacuum created by the withdrawal of MINUSTAH. MINUSTAH's departure also reduces Haiti's ability to respond to disasters; increased humanitarian challenges in the aftermath of hurricanes and other potential future disasters, combined with the effects of lifting TPS, could compound security challenges and exacerbate drivers of illegal migration. The Haitian National Police (HNP) has been called upon to shoulder increased responsibility for maintaining order throughout the country, but its ability and capacity to contend with security challenges remain in question. In the long term, a mass migration event is not anticipated, although the return of a large number of Haitian citizens may spur increased illegal migration flows. Electoral-related tensions, politically motivated demonstrations, and insecurity negatively affect the humanitarian environment in Haiti, and further stresses on the environment increase the risk of triggering an event that necessitates an external intervention to establish order and stability.

AR-HAITI-00000124



EMBASSY OF THE REPUBLIC OF HAITI
WASHINGTON, DC

October 4, 2017

The Honorable Elaine C. Duke
Acting Secretary of the Department of Homeland Security
Washington, D.C. 20528

Dear Secretary Duke,

Please accept this correspondence in response to the letter from your Department dated September 8, 2017. I want to thank you for your Department's continued collaboration with the Haitian Government in addressing Haiti's Temporary Protected Status (TPS) designation. The Haitian Government is committed to working with the United States to reach a mutually beneficial resolution on this very important issue. Towards that end, the Haitian Government is of the sincere opinion that an extension for an additional eighteen (18) months or a TPS re-designation will serve the shared national interests of both Haiti and the United States.

As the two oldest republics in the Western Hemisphere, we have a long history of collaborating to further our shared values and national interests. Our request for an extension of the TPS designation for an additional eighteen (18) months is meant to ensure that Haiti is able to adequately move forward with its recovery and redevelopment plan and will not have to rely, over the long term, on the United States for temporary residence for its citizens.

We believe that the best way for us to convey our reasoning behind our request for an additional eighteen (18) months extension of the TPS designation is to show you the facts on the ground. Therefore, my Government is extending an invitation to host you in Haiti so that you can personally see the efforts underway to address the issues that warranted TPS designation for Haiti in the first place. Moreover, a visit to Haiti would offer you insight on the challenges that we continue to face. We sincerely believe that once you see the conditions on the ground, it will become clear that an additional eighteen (18) months extension or re-designation is in the shared national interests of both Haiti and the United States. We respectfully suggest that the visit occur no later than the first week of November so that you have sufficient time to assess the situation on the ground before making a decision on TPS for Haitians.

Haiti has undergone a catastrophic and unprecedented series of natural disasters during the last seven years. As you know, the TPS designation for Haiti originated in the aftermath of the January 2010 earthquake that devastated the country, leaving at least 300,000 people dead and more than one million of our citizens internally-displaced. Subsequently, United Nations soldiers introduced a cholera epidemic that killed thousands of people, sickened over 800,000

AR-HAITI-00000125-01

DPP_00002509

AR-HAITI-00000125-02

DPP_00002510

2

and that continues to pose a healthcare risk to our citizenry. Valuable resources initially earmarked for addressing critical earthquake recovery issues had to be re-appropriated to eradicate this epidemic, with limited support from the United Nations, the entity that brought the disease to Haiti in the first place. To add to the devastation, on October 4, 2016, Hurricane Matthew, a Category 4 with 145 mph winds and the worst to strike our nation in 52 years, raged through Haiti, destroying over 200,000 homes, wiping out towns, entire villages, and destroying valuable crops. This caused a severe food crisis of unparalleled magnitude in Haiti's history. The economic loss from Hurricane Matthew alone was estimated at 2.8 billion dollars. As a result of these three extraordinary recent catastrophes, in May 2017, we requested an extension of the TPS designation for an additional eighteen (18) months to allow the Haitian Government more time to implement its ongoing recovery and redevelopment plan.

When former Secretary John Kelly announced a six-month extension of Haiti's TPS designation through January 22, 2018, he stated that, "if Haiti is able to continue its pace of recovery from the 2010 earthquake, then a TPS extension past January 2018 may not be warranted." However, despite best efforts and tangible progress, unforeseen natural disasters, including Hurricanes Irma and Maria, have significantly delayed the Government's ability to adequately maintain the pace of recovery from the 2010 earthquake. Therefore, the Haitian Government contends an 18-month extension or a TPS re-designation is necessary for Haiti to continue on the path of progress.

Since our last request, our ongoing efforts to continue to recover from the earthquake and from the ravages of the cholera epidemic and Hurricane Matthew have been hampered by significant setbacks, as Haiti continued to face unforeseeable and daunting challenges. In the past month, both Hurricanes Irma and Maria have caused serious damage in Haiti. A substantial amount of agricultural crops have been destroyed and communities have been flooded, which has resulted in the further displacement of local communities. Additionally, the impact of the most recent hurricanes on neighboring island countries, such as Turks and Caicos, has caused significant harm to the Haitian economy. As you may know, Haiti's economy relies heavily on the contribution of its Diaspora. A substantial proportion of the labor force in many neighboring islands that were affected by Hurricanes Irma and Maria is of Haitian descent. As many of these countries struggle to rebound from these hurricanes, Haitians expatriates working there have found themselves unable to support their families back home, further complicating Haiti's recovery process and delaying the ability of the country to place itself back in the position that it was in prior to the 2010 earthquake.

As noted in your Department's letter, a statutory basis required to designate a country for TPS is that "there has been an environmental disaster resulting in a substantial, but temporary, disruption of the living conditions in the area affected, the country is temporarily unable to handle adequately the return of its nationals, and the country has officially requested TPS designation." Unfortunately, Haiti has had three such major blows since 2010. The detrimental impacts of the recent hurricanes have complicated our ability to recover from the 2010 earthquake, cholera, and Hurricane Matthew within the projected timeline and have exacerbated the situation on the ground, resulting in major disruptions of living conditions in the short-term. Given the current circumstances on the ground and based on the statutory

AR-HAITI-00000125-04

3

guidelines, an extension or re-designation of TPS for Haitians is fully warranted and would serve the mutual national interests of both countries.

Back in May, your Department's TPS determination stated that "permitting Haitian nationals to continue residing temporarily in the U.S. is not contrary to the national interest of the United States". Since then, we have not received any subsequent communication from the USG that these conditions changed. Our research, as well as our conversations with U.S. law enforcement and elected officials representing districts and states where Haitian TPS recipients reside, has shown that our nationals have been exemplary law-abiding residents and pose no threat to the security of the United States or its people. Moreover, Haitian TPS recipients have not constituted a financial burden on U.S. taxpayers. Rather, Haitian TPS recipients have made significant economic contributions to their communities here in the United States as acknowledged publicly by Congressional Leaders, from the Democratic and Republican side, as well as Mayors, Governors and business leaders.

At this precarious juncture, an 18-month extension or a TPS re-designation beyond January 2018 is a necessity. Not extending TPS beyond January 2018 would force the Government of Haiti not only to halt its ongoing, short-term redevelopment efforts, but also to focus its limited resources on receiving an influx of citizens. Under these circumstances, we fear that a non-renewal may cause TPS beneficiaries to find alternative, and ill-advised, ways to remain in the United States, and would also embolden trans-national human traffickers and cartels to prey upon this group of vulnerable individuals; such an outcome would not be in the best interests of either of our governments.

In the interim, the Haitian Government is diligently working to put the country back on a trajectory towards a swift recovery. The current leadership in Haiti is in the process of implementing a robust and expansive recovery and redevelopment plan. The plan includes enhancing our infrastructure, increasing private investment and incentivizing economic growth. The redevelopment plan is meant not only to significantly improve the lives of Haitians at home, but also to encourage the return of those living overseas to contribute in the long-term sustainability and economic prosperity of our country.

In the spirit of the long shared-history of our two nations, I thank your Department for the continued dialogue with the Government of Haiti on this important matter. I look forward to hearing back from you regarding a suitable date to host you in Haiti.

Sincerely,

Paul G. Altidor
*Ambassador*

AR-HAITI-00000125-05

AR-HAITI-00000125-06



THE SECRETARY OF STATE

WASHINGTON

October 31, 2017

The Honorable
Elaine C. Duke
Acting Secretary of the Department of Homeland Security
Washington, DC 20528

Dear Acting Secretary Duke:

The State Department has assessed that El Salvador, Haiti, Honduras, and Nicaragua no longer meet the conditions required for continued designation for Temporary Protected Status (TPS). The disruption in living conditions in El Salvador, Honduras, and Nicaragua attributable to the environmental disasters that served as the basis for their TPS designations has decreased in severity to a degree that it may no longer be considered "substantial" within the meaning of the TPS statute. The extraordinary and temporary conditions that served as the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety. Attached are country conditions reports that provide the Department's assessment of conditions in each country as they pertain to their respective TPS designations.

Given the number of impacted beneficiaries, and to minimize any negative implications that termination would have on our bilateral relations with these countries, I recommend that should the Department of Homeland Security (DHS) decide to terminate TPS for these countries, that you do so with delayed effective dates of 18 months. An 18-month wind down period would provide adequate time for long-term beneficiaries to arrange for their departure and for their home countries to prepare for their reception and reintegration.

I do not make these recommendations lightly. As you consider your decision, I am sure you are well aware of the significant humanitarian, foreign policy, and political interests at play. First and foremost, termination of TPS would likely leave hundreds of thousands of TPS recipients – many of whom have lived and worked in the United States for more than 15 years and have U.S. citizen children – out of legal status. For those that depart, they will return to countries with limited economic opportunities for their reintegration. In the case of El Salvador and Honduras, both countries continue to have some of the world's highest homicide rates, and weak law enforcement capabilities and inadequate government services will make it difficult for their respective governments to ensure the protection of returning citizens – no less the U.S. citizen children who may accompany their parents.

Termination of TPS will also likely generate a backlash from the governments themselves, particularly the Honduran and Salvadoran governments, who have agreed to engage with the United States in support of the U.S. strategy in Central America. Central American leaders are likely to assert that the resources required for a large-scale re-integration of TPS beneficiaries and their dependents will undermine the Central America Strategy and Central America's complementary Alliance for Prosperity, both of which seek to generate prosperity for the region's citizens and reduce irregular migration to the United States. They may take retaliatory actions counter to our long-standing national security and economic interests like withdrawing their counternarcotics and anti-gang cooperation with the United States, reducing

DPP_00002515

AR-HAITI-00000126-02

-2-

their willingness to accept the return of their deported citizens, or refraining from efforts to control illegal migration.

However, the fact remains that the conditions in these countries do not -- in the State Department's judgment -- meet the legal requirements necessary for extension. Should DHS decide to terminate the programs, I hope our Departments can work together in a thoughtful, coordinated manner to develop a plan to work with the four governments, TPS beneficiaries themselves, Congress, NGOs, and other stakeholders to mitigate any negative impact on U.S. national security and foreign policy priorities. As indicated, an 18-month wind down period will be critical to our efforts.

I thank you in advance for including the Department of State's Bureaus of Western Hemisphere Affairs (WHA) and Population, Refugees, and Migration, as well as our public affairs team, in your Department's planning for the public announcement of any TPS decisions, including to foreign audiences. Additionally, I request that you provide WHA with no less than 48-hours lead time prior to the public announcement so that it can notify counterpart governments, on an embargoed basis, of the decision. I also recommend DHS delay a public announcement for Honduras until November 27, to prevent TPS issues from unduly influencing the November 26 presidential election.

Sincerely,

Rex W. Tillerson

Enclosures:
    As stated.

periodic review

(A) review conditions of the foreign state ...
    shall determine whether the conditions
    for such designation ... continue to be
    met

(C) if AG does not determine that
    a foreign state no longer meets
    the conditions for designation under
    para (1)

(margin note, left: "Nat'l interest or but — (B)(iii) exists")
(margin note, left: "must be or Primarily designated ??")

(1) (A) ongoing armed conflict & due to such
        conflict return would pose a serious
        threat to their personal safety

(margin note, left: "Need for (path) but if ① Congress ② defense ↑ enforcement")

B (i) there has been a ... disaster resulting
      in substantial, but temporary, disruption
      in living conditions

    (ii) the foreign state is unable, temporarily,
         to handle adequately the return of to the
         state of aliens (and)

    (iii) the state has officially requested
          designation

(C) finds that there exists extraordinary
    & temp conditions that prevent aliens
    from returning to the states in safety

AR-HAITI-00000126-04

# Readout Of Secretary Kelly's Trip To Haiti

Release Date:
May 31, 2017
For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

PORT AU PRINCE, Haiti — Today, Secretary of Homeland Security John Kelly met with Haitian President Jovenel Moïse and other senior government officials to discuss the repatriation of returning Haitian nationals and other areas of collaboration. Secretary Kelly also discussed his recent decision to extend Temporary Protected Status for six months and reiterated that the program is meant to be temporary in nature. Secretary Kelly added that Haiti is showing significant signs of recovery following the 2010 earthquake, including the recent decision by the United Nations to withdraw the UN Mission for Stabilization in Haiti (MINUSTAH) in October 2017 and the inauguration of President Moïse in February 2017.

Secretary Kelly thanked Haitian officials for their support in receiving Haitian nationals returned from the United States and discussed the Moïse Administration's plans to draw Haitian nationals currently residing in the United States back to the country, where their skills and capital can be used to help expand the Haitian economy.

Also while in Port-au-Prince, Secretary Kelly held a brief meeting with UN leaders in Haiti, including Special Representative of the Secretary General and Head of Mission Sandra Honoré and MINUSTAH Military Commander Brazilian Lieutenant General Ajax Porto Pinheiro. Secretary Kelly thanked both officials for their service in helping to support Haitian authorities in the wake of Hurricane Matthew in October 2016, and discussed plans by the UN to transition to a smaller mission that will focus on rule-of-law issues and the Haitian National Police following the end of MINUSTAH later this year.

AR-HAITI-00000128

# Temporary Protected Status Designated Country: Haiti

**TPS Extended Through:** Jan. 22, 2018

**Re-registration Period for People Who Already Have TPS:** May 24, 2017 - July 24, 2017

**Employment Authorization Document (EAD) Auto-Extended Through:** Jan. 18, 2018, but only for beneficiaries who re-register and request a new EAD

**Continuous Residence Date in U.S. Since:** Jan. 12, 2011

**Continuous Physical Presence in U.S. Since:** July 23, 2011

**TPS Designation Date:** Jan. 21, 2010

**TPS Re-designation Date:** July 23, 2011

**Federal Register Notice Citations:** 82 FR 23830

On May 24, 2017, USCIS announced the extension of the designation of Haiti for TPS for 6 months. This allows eligible Haitians (and people without nationality who last habitually resided in Haiti) to re-register for TPS. During this 6-month extension, beneficiaries are encouraged to prepare for their return to Haiti in the event Haiti's designation is not extended again, including

AR-HAITI-00000129

requesting updated travel documents from the government of Haiti. At least 60 days before Jan. 22, 2018, Secretary Kelly will re-evaluate the designation for Haiti and will determine whether another extension, a re-designation, or a termination is warranted, in full compliance of the Immigration and Nationality Act.

AR-HAITI-00000130

SENSITIVE BUT UNCLASSIFIED

## DEPARTMENT OF STATE RECOMMENDATION REGARDING
## TEMPORARY PROTECTED STATUS (TPS) FOR HAITI – 2017

### I.    Statutory Basis for Designation

**Have the conditions under which the foreign state was designated for temporary protected status ceased to exist?**

**(SBU) Yes, the conditions have ceased to exist.**  The extraordinary and temporary conditions that served as the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety.  Former Secretary of Homeland Security Janet Napolitano originally designated Haiti for TPS effective January 21, 2010, on the basis of extraordinary and temporary conditions in the wake of Haiti's 2010 earthquake.  Since 2010, a 2011 re-designation and four subsequent extensions of TPS designation for Haiti have been made by DHS Secretaries.  The most recent extension, effective from July 23, 2017 – January 22, 2018, cited not only temporary and extraordinary conditions in the wake of the 2010 earthquake, but subsequent conditions: 2016's Hurricane Matthew, April 2017 heavy rains and landslides, security vulnerabilities that some Haitians who reside in Internally Displaced Persons (IDP) areas experience, and health vulnerabilities due to a weak public health system, which has been strained by a cholera epidemic.  The extension also noted Haiti's serious economic and security challenges (82 FR 23830).

(SBU) Country conditions have improved since the January 2010 earthquake.  The IDP population has decreased 97 percent from its peak in 2010.  A legitimized government is in place after two years of electoral impasse.  As of October 15, 2017, all UN military personnel have been withdrawn from Haiti, to be replaced by a police only successor mission focused on *strengthening rule of law and promoting human rights.*

(SBU) Specific lingering effects of the earthquake remain in the areas of infrastructure, health, sanitation services, and emergency response capacity.  Although significant steps have been taken to improve the stability and the quality of life for Haitian citizens, Haiti continues to lack the capacity to ensure that the large population TPS beneficiaries currently residing in the United States can return in safety.  However, Haiti maintains the ability safely to receive traditional levels of returned Haitian nationals, and is currently doing so.

(SBU) Based on these facts, we assess that the extraordinary and temporary conditions that served as the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety.

### A.  Armed Conflict

#### 1.  Is the foreign state still involved in an ongoing, internal armed conflict?

(U) No.

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED
-2-

      a. **If so, would the return of nationals of the foreign state to that state (or to the part of the state) still pose a serious threat to their personal safety?**

(U) N/A.

    **B. *Environmental Disaster***

      1. **Does there continue to be a substantial, but temporary, disruption of living conditions in the area affected by the environmental disaster?**

(U) N/A.

      2. **Is the foreign state still unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state?**

(U) N/A.

      3. **Does the foreign state continue to support the TPS designation?**

(U) N/A.

    **C. *Extraordinary and Temporary Conditions***

      1. **Has the foreign state experienced extraordinary and temporary conditions that prevent aliens who are nationals of the state from returning to the state in safety?**

(SBU) No. In the wake of the 2010 earthquake, Haiti continues to be affected by lingering earthquake damage. The earthquake destroyed virtually all government offices and ministries in downtown Port-au-Prince, leaving most in long-term temporary facilities spread throughout the city. However, country conditions and the Government of Haiti's capacity have improved sufficiently to allow for the safe return of a moderate flow of Haitian nationals.

(SBU) Since the earthquake, the IDP population had decreased 97 percent (from two million to 37,000) from its estimated peak in 2010, to the point where today, just 27 of the original 1,555 IDP sites remain open. Despite these gains, gender-based violence in the IDP areas remains a serious concern, and personal security is a serious and pervasive problem. An estimated 41,000 Haitians who have been made homeless as a result of various natural disasters since 2010, including Hurricane Matthew in 2016, affecting Haiti remain in IDP areas.

(SBU) With more than a half its total population living in extreme poverty, Hurricane Matthew demonstrated Haiti's weakened ability to cope, recover, and adapt to shocks from natural disasters. This fragility was exposed again most recently by Hurricane Irma, which temporarily displaced over 10,000 people into shelters and exacerbated an existing food security crisis on the northern coast.

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED
-3-

(SBU) With the withdrawal of the United Nations Stabilization Mission in Haiti's (MINUSTAH) military component underway, the Haitian National Police (HNP) will be called upon to shoulder increased responsibility for maintaining order throughout the country. However, the HNP remains highly concentrated in Port-au-Prince and has limited resources, challenging its ability to guarantee security throughout the country. The United States and our international partners continue to work to train and support the development and growth of the HNP, which has been increasingly perceived as professional and capable of providing security.

### 2. Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?

(SBU) No. Permitting Haitians to remain temporarily in the United States would not be contrary to the U.S. national interest. Current TPS beneficiaries have been in TPS status in the United States for six or seven years. The population has been stable and has successfully settled there. The current practice of returning newly arrived illegal migrants via the resumed non-criminal deportation flights has greatly disincentivized new attempts at large-scale illegal migration.

## II.  Discretionary Factors

### What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?

(SBU) An abrupt termination of TPS for Haiti that does not provide a period for an orderly transition could jeopardize progress made in our bilateral relationship, particularly our robust partnership with Haiti on migration.

(SBU) Setting a Negative Historical Precedent: Approximately 58,706 Haitians received TPS benefits following the 7.0 magnitude earthquake in 2010. Since 1990 when the TPS statute was passed, approximately 22 countries have been designated under the statute. Only three countries have had their TPS designation terminated without a period of at least six months provided for orderly transition – those cases involved beneficiary populations of as few as 316, and as many as 4,018. The average duration of a TPS designation has been 8.5 years. By this measure, an immediate effective date for termination of Haiti's TPS designation would be a statistical outlier. Haiti has been designated for TPS for less than eight years, and its sudden termination with no delay in effective date to allow for orderly transition period would affect 14 times more people than the largest group of TPS beneficiaries whose status was terminated without an extended transition period (which last occurred in 1993).

(SBU) A Cooperative Partnership: Haiti is a committed and cooperative partner in stemming the irregular flow of migrants to the United States, accepting regular deportation flights, and preventing further illegal migration of Haitians upon their return. This cooperation was best exemplified through their support in managing the irregular flow of Haitian migrants arriving at the U.S. southwest border with Mexico in 2016. Despite political turmoil and economic uncertainty in Haiti, when more than 6,500 Haitians presented themselves at U.S. ports of entries (a 1,300 percent increase from 2015), the Haitian government agreed to receive non-criminal

SENSITIVE BUT UNCLASSIFIED

-4-

deportation flights for the first time since the 2010 earthquake. This proved to be a strong deterrent mechanism, bringing a near cessation of Haitians presenting themselves at the U.S. southwest border. To date, Haiti has accepted over 5,200 deportees.

(SBU) Haiti has also shown a commitment to adequately prepare in the event TPS is terminated. Since then-DHS Secretary Kelly's visit to Haiti on May 31, Haiti has made the following preparations:

- **(SBU) Establishment of a Working Group:** The Government of Haiti established a minister-level working group focused on efforts to mitigate factors that cause Haitians to migrate illegally. A sub-group was created in order to focus specifically on preparations for the possible DHS termination of TPS; understanding the need to ensure employment opportunities exist for TPS beneficiaries when they return to Haiti.
- **(SBU) Outreach to Diaspora Leaders:** Haiti's Ambassador in Washington has worked to raise awareness amongst influential diaspora leaders, so they can effectively share information with the Haitian community in the United States on how a policy change will affect them.
- **(SBU) Providing Legal Assistance:** The Haitian Mission in the United States established a hotline to provide legal assistance by way of immigration attorneys.

**(SBU) Implications of a Termination:** While the Haitian government has exemplified its commitment to remain a cooperative partner of the United States, an abrupt DHS termination of TPS benefits for Haitian beneficiaries would jeopardize this progress. It would also threaten the strides the Government of Haiti has made towards political stability. After two years of electoral impasse, President Jovenel Moise and his government have been legitimized and are able to focus on developing a more secure, stable, and self-sufficient Haiti. It is in our interest to remain committed to the country's long-term security, democratic development, and economic growth, as well as to recognize when adequate conditions exist to warrant DHS termination of TPS.

(SBU) An immediate DHS termination of benefits at this juncture, when Haiti is focused on developing opportunities that allow Haitians to stay and help build their country, would have implications not only for Haiti's stability, but for the region. Haitians who are involuntarily returned to a country that is not yet able to handle the influx of returns would further incentivize illegal migration, to the United States and other destinations. This would strain the already limited resources of our North American, Central American, and Caribbean partners. To this end, such an irregular flow of Haitian migrants, similar to what was seen in 2016, could threaten the progress made on the U.S. strategy in Central America, and the efforts we have made to further secure our borders. It is therefore in the national security interests of the United States to ensure an orderly transition of Haitian TPS beneficiaries.

## III.   Recommendation

(SBU) The extraordinary and temporary conditions that served as the basis for the 2010 designation and 2011 re-designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety. However, lingering issues from the 2010 earthquake, the aftermath of Hurricane Matthew in 2016, the heavy rains and landslides in 2017, Hurricane

AR-HAITI-00000131-04                                        DPP_00002522

SENSITIVE BUT UNCLASSIFIED
-5-

Irma in September 2017, and the additional effects of the cholera epidemic continue to affect Haiti. It is in the national interest of the United States to ensure that Haiti's inability to absorb a large number of TPS beneficiaries does not jeopardize the progress Haiti has made in receiving criminal and noncriminal deportees from the United States. **Based on these factors, the Department recommends that the Acting Secretary of Homeland Security designate an effective date to provide TPS benefits for an additional 18 months beyond the end of the current designation to provide the Haitian government with adequate time to prepare for the safe reintegration of approximately 58,706 Haitians.**

AR-HAITI-00000131-05

AR-HAITI-00000131-06

# What authority does the Secretary of Homeland Security have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary finds that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). See INA section 244(a)(1)(A), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. See INA section 244(b)(3)(A), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(3)(A). If following this review the Secretary determines that a foreign state continues to meet the conditions for TPS designation (or makes no determination at all), the designation must be extended for an additional period of 6 months or, in the Secretary's discretion, for an additional 12 or 18 months. See INA section 244(b)(3)(A), (C), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. See INA section 244(b)(3)(B), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(3)(B).

# Why is the Secretary extending the TPS designation for Haiti through January 22, 2018?

Since the last extension was announced, DHS has reviewed conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that a limited, 6-month extension is warranted because, although Haiti has made significant progress in recovering from the January 2010 earthquake that prompted its initial designation, conditions in Haiti supporting its designation for TPS persist.

Although lingering effects of the 2010 earthquake remain, Haiti has made significant progress in addressing issues specific to the earthquake, as its economy continues to recover and grow. For example, 98% of people displaced by the earthquake and living in internally displaced person (IDP) camps have left those camps. Over 98% of the IDP camps have closed. However, over 55,000 Haitians who lost their homes in the earthquake are still living in 31 camps for internally displaced persons without viable options to leave. Gender-based violence in these camps continues to be a serious concern, and personal security is a serious and pervasive issue. Some people who were displaced by the earthquake, although no longer in camps, have moved back to unsafe homes or relocated to informal settlements located in hazardous areas. However, demonstrating improvement in Haiti's security situation, in March 2017, the United Nations announced that the mandate of the United Nations peacekeeping mission in Haiti will end in October 2017, to be replaced by a new police-only mission focused on rule of law.

Hurricane Matthew made landfall in Haiti on October 4, 2016, causing extensive damage to crops, housing, livestock, and infrastructure across Haiti's southwest peninsula. The Government of Haiti confirmed 546 fatalities from the storm, and over 175,000 people were left without housing. The most significant impact from the storm was concentrated in 3 of Haiti's 10 departments—Nippes, Grand'Anse, and Sud. Minimal damage was inflicted on the rest of the country, including the capital, Port-au-Prince, and the second largest city, Cap-Haïtien. Still, significant losses of crops and livestock in the regions damaged by Hurricane Matthew impacted the entire country.

Heavy rains in late April 2017 caused flooding and landslides in South, South East, Grand'Anse, and Nippes departments, with South department most impacted. At least four people were killed, nearly 10,000 homes may have been damaged, and at least 350,000 people may have been affected. According to a Haitian government official, an estimated 80% of the spring harvest in South department may have been destroyed. The damage from Hurricane Matthew and the recent heavy rains are compounding the existing food insecurity experienced by an estimated 3.2 million people (approximately 30 percent of the population) in September 2016.

Haiti's weak public health system is further strained due to an ongoing cholera epidemic, whose inception was traced to U.N. peacekeepers assisting with earthquake recovery. Since October 2010, close to 800,000 Haitians have contracted cholera, and nearly 10,000 people have died from the disease. However, progress has been made in combatting cholera, and Haiti has made some progress in the health sector in recent years. Nevertheless, Haiti faces longstanding public health challenges, where 40% of the population lacked access to basic health services before the 2010 earthquake. As of 2016, this figure remains the same—40% of the population lacks access to fundamental health and nutrition services. While the lack of access to safe drinking water and Haiti's weak sanitation infrastructure remain significant concerns, these are not new problems. Extreme poverty, corruption, and low levels of education in Haiti challenge its resilience and have contributed to the government's longstanding inability to adequately provide for the security, health, and safety of its citizenry.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

* The conditions that prompted the July 23, 2011 redesignation of Haiti for TPS continue to be met. See INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(3)(A) and (C).

AR-HAITI-00000132-01

DPP_00002531

AR-HAITI-00000132-02

* There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety. See INA section 244(b)(1)(C), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(1)(C).

* It is not contrary to the national interest of the United States to permit Haitians (or aliens having no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. See INA section 244(b)(1)(C), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(1)(C).

* The designation of Haiti for TPS should be extended for a 6-month period from July 23, 2017, through January 22, 2018. See INA section 244(b)(3)(C), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(3)(C).

* It is in the best interest of TPS beneficiaries to prepare for their return to Haiti in the event that Haiti's TPS designation is not extended again, including requesting updated travel documents from the Government of Haiti.

## Notice of Extension of the TPS Designation of Haiti

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a, I have determined, after consultation with the appropriate U.S. Government agencies, that the conditions that prompted the redesignation of Haiti for TPS on July 23, 2011, continue to be met. See INA section 244(b)(3)(A), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)(b)(3)(A). On the basis of this determination, I am extending the existing designation of Haiti for TPS for 6 months, from July 23, 2017, through January 22, 2018. See INA section 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254 (https://api.fdsys.gov/link?collection=uscode&title=8&year=mostrecent&section=1254&type=usc&link-type=html)a(b)(1)(C) and (b)(2).

John F. Kelly,

Secretary

## Required Application Forms and Application Fees To Register or Re-Register for TPS

To register or re-register for TPS based on the designation of Haiti, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I-821).

* If you are filing an application for late initial registration, you must pay the fee for the Application for Temporary Protected Status (Form I-821). See 8 CFR 244.2 (/select-citation/2017/05/24/8-CFR-244.2)(f)(2) and 244.6 and information on late initial filing on the USCIS TPS Web page at http://www.uscis.gov/tps (http://www.uscis.gov/tps).

* If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I-821). See 8 CFR 244.17 (/select-citation/2017/05/24/8-CFR-244.17).

2. Application for Employment Authorization (Form I-765).

* If you are applying for late initial registration and want an EAD, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I-765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I-765) is required if you are under the age of 14 or are age 66 or older and applying for late initial registration.

* If you are applying for re-registration, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I-765) only if you want an EAD, regardless of age.

* You do not pay the fee for the Application for Employment Authorization (Form I-765) if you are not requesting an EAD, regardless of whether you are applying for late initial registration or re-registration.

* If you do not want to request an EAD now, you may also file Form I-765 later to request an EAD, and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application. Your EAD application will be considered timely filed even if the date on your current TPS-related EAD has expired. But until you timely re-register and properly file an EAD application, your current employment authorization will end on July 22, 2017. Accordingly, you must also properly file your EAD application during the 60-day re-registration period in order for your current employment authorization to be automatically extended for 180 days (i.e., January 18, 2018). You are strongly encouraged to file your EAD application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization.

Start Printed Page 23833

You must submit both completed application forms together, even if you are not currently requesting an EAD. If you are unable to pay for the Application for Employment Authorization (Form I-765) and/or biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I-912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at

AR-HAITI-00000132-03

DPP_00002533

AR-HAITI-00000132-04

DPP_00002534



THE SECRETARY OF STATE

WASHINGTON

October 31, 2017

The Honorable
Elaine C. Duke
Acting Secretary of the Department of Homeland Security
Washington, DC 20528

Dear Acting Secretary Duke:

The State Department has assessed that El Salvador, Haiti, Honduras, and Nicaragua no longer meet the conditions required for continued designation for Temporary Protected Status (TPS). The disruption in living conditions in El Salvador, Honduras, and Nicaragua attributable to the environmental disasters that served as the basis for their TPS designations has decreased in severity to a degree that it may no longer be considered "substantial" within the meaning of the TPS statute. The extraordinary and temporary conditions that served as the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety. Attached are country conditions reports that provide the Department's assessment of conditions in each country as they pertain to their respective TPS designations.

Given the number of impacted beneficiaries, and to minimize any negative implications that termination would have on our bilateral relations with these countries, I recommend that should the Department of Homeland Security (DHS) decide to terminate TPS for these countries, that you do so with delayed effective dates of 18 months. An 18-month wind down period would provide adequate time for long-term beneficiaries to arrange for their departure and for their home countries to prepare for their reception and reintegration.

I do not make these recommendations lightly. As you consider your decision, I am sure you are well aware of the significant humanitarian, foreign policy, and political interests at play. First and foremost, termination of TPS would likely leave hundreds of thousands of TPS recipients -- many of whom have lived and worked in the United States for more than 15 years and have U.S. citizen children -- out of legal status. For those that depart, they will return to countries with limited economic opportunities for their reintegration. In the case of El Salvador and Honduras, both countries continue to have some of the world's highest homicide rates, and weak law enforcement capabilities and inadequate government services will make it difficult for their respective governments to ensure the protection of returning citizens -- no less the U.S. citizen children who may accompany their parents.

Termination of TPS will also likely generate a backlash from the governments themselves, particularly the Honduran and Salvadoran governments, who have agreed to engage with the United States in support of the U.S. strategy in Central America. Central American leaders are likely to assert that the resources required for a large-scale re-integration of TPS beneficiaries and their dependents will undermine the Central America Strategy and Central America's complementary Alliance for Prosperity, both of which seek to generate prosperity for the region's citizens and reduce irregular migration to the United States. They may take retaliatory actions counter to our long-standing national security and economic interests like withdrawing their counternarcotics and anti-gang cooperation with the United States, reducing

-2-

their willingness to accept the return of their deported citizens, or refraining from efforts to control illegal migration.

However, the fact remains that the conditions in these countries do not – in the State Department's judgment – meet the legal requirements necessary for extension. Should DHS decide to terminate the programs, I hope our Departments can work together in a thoughtful, coordinated manner to develop a plan to work with the four governments, TPS beneficiaries themselves, Congress, NGOs, and other stakeholders to mitigate any negative impact on U.S. national security and foreign policy priorities. As indicated, an 18-month wind down period will be critical to our efforts.

*PRM*

I thank you in advance for including the Department of State's Bureaus of Western Hemisphere Affairs (WHA) and Population, Refugees, and Migration, as well as our public affairs team, in your Department's planning for the public announcement of any TPS decisions, including to foreign audiences. Additionally, I request that you provide WHA with no less than 48-hours lead time prior to the public announcement so that it can notify counterpart governments, on an embargoed basis, of the decision. I also recommend DHS delay a public announcement for Honduras until November 27, to prevent TPS issues from unduly influencing the November 26 presidential election.

Sincerely,

Rex W. Tillerson

Rex W. Tillerson

Enclosures:
        As stated.

*11/1*

*CoS Kelly discussion w/ Rex*
*   problem of own own making by not following*
*   intent of Congress*
*   - law doesn't provide for conversion, specifically*
*     prohibits*
*   - asked Amb Shannon to work w/ policy planning         just these 4 countries?*
*     to develop leg framework to Congress*
*   - to fix         clean criteria of merit based immigration*
*     process for green cards basis*

*[ KC leg agenda to fix this ]*

*Bad guy, but bad guy ready to to fix it.*

*[handwritten annotations: "O Hait___ ___ ___ ___ meeting to kinda ___ ministri / Monday ___ / Minister"]*

*[handwritten: "A greatest Mass Migration potential would need Wurms Comp / AUSCCo"]*

# Secretary Kelly's Statement on the
# Limited Extension of Haiti's Designation
# for Temporary Protected Status

*[handwritten: "th District"]*

Release Date:
May 22, 2017
For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

*[handwritten: "Ø need to / equalize ___ / • Honduras — Sodokara / • El Salvador Kunalapa / host a DoD / ___ on conten ing / we are dependent on / — CBP + USCCo"]*

WASHINGTON----Secretary of Homeland Security John F. Kelly today announced his
decision to extend----for an additional six months----the Temporary Protected Status (TPS)
designation for Haiti. This extension is effective July 23, 2017 through January 22, 2018.

*[handwritten: "Russia / replace us as / partner / esp."]*

"After careful review of the current conditions in Haiti and conversations with the
Haitian government, I have decided to extend the designation of Haiti for Temporary
Protected Status for a limited period of six-months," said Secretary Kelly. "Haiti has
made progress across several fronts since the devastating earthquake in 2010, and I'm
proud of the role the United States has played during this time in helping our Haitian
friends. The Haitian economy continues to recover and grow, and 96 percent of people
displaced by the earthquake and living in internally displaced person camps have left
those camps. Even more encouraging is that over 98 percent of these camps have closed.
Also indicative of Haiti's success in recovering from the earthquake seven years ago is
the Haitian government's stated plans to rebuild the Haitian President's residence at the
National Palace in Port-au-Prince, and the withdrawal of the United Nations Stabilization
Mission in Haiti."

*[handwritten: "El Sanadr / "somewhat uneasy" esp. / Elched / be caused / got"]*

*[handwritten: "bitter pill / regards / consider / the gov't"]*

Secretary Kelly was particularly encouraged by representations made to him directly by
the Haitian government regarding their desire to welcome the safe repatriation of Haitian
TPS recipients in the near future. "This six-month extension should allow Haitian TPS
recipients living in the United States time to attain travel documents and make other
necessary arrangements for their ultimate departure from the United States, and should
also provide the Haitian government with the time it needs to prepare for the future
repatriation of all current TPS recipients. We plan to continue to work closely with the

*[handwritten bottom left: "Mexico: Northern / positive country in area"]*

*[handwritten bottom right: "Nicaragua / — TPS decision — / — no mel — me waiver / by State"]*

Haitian government, including assisting the government in proactively providing travel documents for its citizens."

Prior to the expiration of this limited six-month period, Secretary Kelly will re-evaluate the designation for Haiti and decide anew whether extension, re-designation, or termination is warranted. The Department of Homeland Security urges Haitian TPS recipients who do not have another immigration status to use the time before Jan. 22, 2018 to prepare for and arrange their departure from the United States—including proactively seeking travel documentation—or to apply for other immigration benefits for which they may be eligible. "I believe there are indications that Haiti – if its recovery from the 2010 earthquake continues at pace - may not warrant further TPS extension past January 2018. TPS as enacted in law is inherently temporary in nature, and beneficiaries should plan accordingly that this status may finally end after the extension announced today."

Further details about this extension of TPS for Haiti, including the application requirements and procedures, will appear in a Federal Register notice later this week.

9111-97

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

### [CIS No. 2596-16; DHS Docket No. USCIS-2014-0001]

### RIN 1615-ZB63

### Extension of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 6 months, from July 23, 2017, through January 22, 2018. The Secretary has determined that a limited, 6-month extension is warranted because, although Haiti has made significant progress in recovering from the January 2010 earthquake that prompted its initial designation, conditions in Haiti supporting its designation for TPS continue to be met at this time. The Secretary is committed to making TPS determinations that fully comply with the Immigration and Nationality Act and the intent of the program to provide a temporary form of immigration relief and protection to eligible individuals who cannot return to their home country due to ongoing armed conflict, environmental disasters, or other extraordinary and temporary conditions. This Notice also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS). USCIS will issue EADs with a January 22, 2018 expiration date to eligible Haiti TPS beneficiaries who timely re-register and

1

AR-HAITI-00000135

apply for EADs under this extension.  Provided a Haiti TPS beneficiary timely re-registers and
properly files an application for an EAD during the 60-day re-registration period, his or her
employment authorization will be automatically extended for an additional period not to exceed
180 days from the date the current EAD expires, i.e., January 18, 2018.  See 8 CFR
274a.13(d)(1).  TPS beneficiaries are reminded that, prior to January 22, 2018, the Secretary will
re-evaluate the designation for Haiti and decide anew whether extension, redesignation, or
termination is warranted.  During this period, beneficiaries are encouraged to prepare for their
return to Haiti in the event Haiti's designation is not extended again, including requesting
updated travel documents from the Government of Haiti.

**DATES:** Extension of Designation of Haiti for TPS:  The 6-month extension of the TPS
designation of Haiti is effective July 23, 2017, and will remain in effect through January 22,
2018.  The 60-day re-registration period runs from [Insert date of publication in the FEDERAL
REGISTER] through [Insert date 60 days from date of publication in the FEDERAL
REGISTER].

**FURTHER INFORMATION:**

- For further information on TPS, including guidance on the application process and additional
  information on eligibility, please visit the USCIS TPS Web page at http://www.uscis.gov/tps.
  You can find specific information about Haiti's TPS extension by selecting "Haiti" from the
  menu on the left side of the TPS Web page.

- You can also contact Guillermo Roman-Riefkohl, TPS Operations Program Manager, at the
  Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S.
  Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts
  Avenue, NW, Washington, DC 20529-2060; or by phone at 202-272-1533 (this is not a toll-

2

free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

* Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at http://www.uscis.gov, or call the USCIS National Customer Service Center at 800-375-5283 (TTY 800-767-1833). Service is available in English and Spanish.

* Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA – Board of Immigration Appeals

DHS – Department of Homeland Security

DOS – Department of State

EAD – Employment Authorization Document

FNC – Final Nonconfirmation

IJ – Immigration Judge

INA – Immigration and Nationality Act

IER – U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section

SAVE – USCIS Systematic Alien Verification for Entitlements Program

Secretary – Secretary of Homeland Security

TNC – Tentative Nonconfirmation

TPS – Temporary Protected Status

3

TTY – Text Telephone

USCIS – U.S. Citizenship and Immigration Services

The extension allows TPS beneficiaries to maintain TPS through January 22, 2018, so long as they continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the TPS designation, while significantly improved, continue to be met. There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety. The Secretary also has determined that permitting such Haitian nationals to continue to remain in the United States, at this time, is not contrary to the national interest of the United States.

TPS beneficiaries are reminded that, prior to the conclusion of this six-month extension period, the Secretary will re-evaluate Haiti's TPS designation and decide anew whether extension, redesignation, or termination is warranted. Because the designation of TPS was intended by Congress to be temporary in nature, and because the Government of Haiti has expressed a desire for its nationals to return to Haiti, the Secretary will fully re-evaluate the country conditions and any other factors he deems necessary to determine whether Haiti's TPS designation should continue. Among those factors, the Secretary will consider whether permitting Haitian nationals to remain in the United States is contrary to the national interest of the United States.

Thus, during this limited six-month period, beneficiaries are encouraged to prepare for their return to Haiti, including requesting updated travel documents from the Government of Haiti. The Secretary is committed to working with the Government of Haiti to ensure an orderly transition should Haiti's TPS designation be terminated at the conclusion of this limited six-

4

AR-HAITI-00000138

month extension.

Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions if they meet (1) at least one of the late initial filing criteria in 8 C.F.R. 244.2(f)(2), which are also described on the TPS Web page at https://www.uscis.gov/humanitarian/temporary-protected-status, and (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from [Insert date of publication in the FEDERAL REGISTER] through [Insert date 60 days from date of publication in the FEDERAL REGISTER]. USCIS will issue EADs with a January 22, 2018 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on July 22, 2017. But provided a Haiti TPS beneficiary timely re-registers and properly files an application for an EAD during the 60-day re-registration period, his or her employment authorization will be automatically extended for an additional period not to exceed 180 days from the date the current EAD expires, i.e., January 18, 2018. This notice explains how TPS beneficiaries and their employers may determine whether a beneficiary's employment authorization has been automatically extended and the impact on the Employment Eligibility Verification (Form I-9) and E-Verify processes. There are approximately 46,000 current Haiti TPS beneficiaries who are expected to file for re-registration

5

under the extension.

## What is Temporary Protected Status (TPS)?

* TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

* During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

* TPS beneficiaries may also be granted travel authorization as a matter of discretion.

* The granting of TPS does not result in or lead to lawful permanent resident status.

* When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

## When was Haiti designated for TPS?

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010. See Designation of Haiti for Temporary Protected Status, 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. See Extension and Redesignation of Haiti for Temporary Protected Status, 76 FR 29000 (May 19, 2011). This announcement is the fourth extension of TPS for Haiti since the 2011 redesignation. The Secretary last extended Haiti's designation on August 25, 2015. See Extension of the

6

Designation of Haiti for Temporary Protected Status, 80 FR 51582 (Aug. 25, 2015).

**What authority does the Secretary of Homeland Security have to extend the designation of Haiti for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary finds that certain country conditions exist.[1]  The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country).  See INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met.  See INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A).  If following this review the Secretary determines that a foreign state continues to meet the conditions for TPS designation (or makes no determination at all), the designation must be extended for an additional period of 6 months or, in the Secretary's discretion, for an additional 12 or 18 months. See INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C).  If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation.  See INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Why is the Secretary extending the TPS designation for Haiti through January 22, 2018?**

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107-296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security.  See 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, title XV, section 1517).

7

Since the last extension was announced, DHS has reviewed conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that a limited, 6-month extension is warranted because, although Haiti has made significant progress in recovering from the January 2010 earthquake that prompted its initial designation, conditions in Haiti supporting its designation for TPS persist.

Although lingering effects of the 2010 earthquake remain, Haiti has made significant progress in addressing issues specific to the earthquake, as its economy continues to recover and grow. For example, 96% of people displaced by the earthquake and living in internally displaced person (IDP) camps have left those camps. Over 98% of the IDP camps have closed. However, over 55,000 Haitians who lost their homes in the earthquake are still living in 31 camps for internally displaced persons without viable options to leave. Gender-based violence in these camps continues to be a serious concern, and personal security is a serious and pervasive issue. Some people who were displaced by the earthquake, although no longer in camps, have moved back to unsafe homes or relocated to informal settlements located in hazardous areas. However, demonstrating improvement in Haiti's security situation, in March 2017, the United Nations announced that the mandate of the United Nations peacekeeping mission in Haiti will end in October 2017, to be replaced by a new police-only mission focused on rule of law.

Hurricane Matthew made landfall in Haiti on October 4, 2016, causing extensive damage to crops, housing, livestock, and infrastructure across Haiti's southwest peninsula. The Government of Haiti confirmed 546 fatalities from the storm, and over 175,000 people were left without housing. The most significant impact from the storm was concentrated in 3 of Haiti's 10 departments—Nippes, Grand'Anse, and Sud. Minimal damage was inflicted on the rest of the country, including the capital, Port-au-Prince, and the second largest city, Cap-Haïtien. Still,

8

significant losses of crops and livestock in the regions damaged by Hurricane Matthew impacted the entire country.

Heavy rains in late April 2017 caused flooding and landslides in South, South East, Grand'Anse, and Nippes departments, with South department most impacted. At least four people were killed, nearly 10,000 homes may have been damaged, and at least 350,000 people may have been affected. According to a Haitian government official, an estimated 80% of the spring harvest in South department may have been destroyed. The damage from Hurricane Matthew and the recent heavy rains are compounding the existing food insecurity experienced by an estimated 3.2 million people (approximately 30 percent of the population) in September 2016.

Haiti's weak public health system is further strained due to an ongoing cholera epidemic, whose inception was traced to U.N. peacekeepers assisting with earthquake recovery. Since October 2010, close to 800,000 Haitians have contracted cholera, and nearly 10,000 people have died from the disease. However, progress has been made in combatting cholera, and Haiti has made some progress in the health sector in recent years. Nevertheless, Haiti faces longstanding public health challenges, where 40% of the population lacked access to basic health services before the 2010 earthquake. As of 2016, this figure remains the same – 40% of the population lacks access to fundamental health and nutrition services. While the lack of access to safe drinking water and Haiti's weak sanitation infrastructure remain significant concerns, these are not new problems. Extreme poverty, corruption, and low levels of education in Haiti challenge its resilience and have contributed to the government's longstanding inability to adequately provide for the security, health, and safety of its citizenry.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

9

- The conditions that prompted the July 23, 2011 redesignation of Haiti for TPS continue to be met.  See INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

- There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety.  See INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

- It is not contrary to the national interest of the United States to permit Haitians (or aliens having no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily.  See INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

- The designation of Haiti for TPS should be extended for a 6-month period from July 23, 2017, through January 22, 2018.  See INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

- It is in the best interest of TPS beneficiaries to prepare for their return to Haiti in the event that Haiti's TPS designation is not extended again, including requesting updated travel documents from the Government of Haiti.

10

AR-HAITI-00000144

**Notice of Extension of the TPS Designation of Haiti**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, that the conditions that prompted the redesignation of Haiti for TPS on July 23, 2011, continue to be met. See INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Haiti for TPS for 6 months, from July 23, 2017, through January 22, 2018. See INA section 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

John F. Kelly,
Secretary.

11

AR-HAITI-00000145

**Required Application Forms and Application Fees to Register or Re-register for TPS**

To register or re-register for TPS based on the designation of Haiti, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I-821).

- If you are filing an application for late initial registration, you must pay the fee for the Application for Temporary Protected Status (Form I-821). See 8 CFR 244.2(f)(2) and 244.6 and information on late initial filing on the USCIS TPS Web page at http://www.uscis.gov/tps.

- If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I-821). See 8 CFR 244.17.

2. Application for Employment Authorization (Form I-765).

- If you are applying for late initial registration and want an EAD, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I-765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I-765) is required if you are under the age of 14 or are age 66 or older and applying for late initial registration.

- If you are applying for re-registration, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I-765) only if you want an EAD, regardless of age.

- You do not pay the fee for the Application for Employment Authorization (Form I-765) if you are not requesting an EAD, regardless of whether you are applying for late initial registration or re-registration.

- If you do not want to request an EAD now, you may also file Form I-765 later to request an

12

EAD, and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application. Your EAD application will be considered timely filed even if the date on your current TPS-related EAD has expired. But until you timely re-register and properly file an EAD application, your current employment authorization will end on July 22, 2017. Accordingly, you must also properly file your EAD application during the 60-day re-registration period in order for your current employment authorization to be automatically extended for 180 days (i.e., Janaury 18, 2018). You are strongly encouraged to file your EAD application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization.

You must submit both completed application forms together, even if you are not currently requesting an EAD. If you are unable to pay for the Application for Employment Authorization (Form I-765) and/or biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I-912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at http://www.uscis.gov/tps. Fees for the Application for Temporary Protected Status (Form I-821), the Application for Employment Authorization (Form I-765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I-912) or by submitting a personal letter requesting a fee waiver, and

13

providing satisfactory supporting documentation. For more information on the biometric services fee, please see the Instructions to Form I-821 or visit the USCIS website at http://www.uscis.gov. If necessary, you may be required to visit an Application Support Center (ASC) to have your biometrics captured. In such case, USCIS will send you an ASC scheduling notice.

## Re-filing a Re-registration TPS Application after Receiving a Denial of a Fee Waiver Request

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications before the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. See INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS webpage at http://www.uscis.gov/tps. **Note:** As previously stated, although a re-registering TPS beneficiary age 14 or older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I-765) fee until after USCIS has approved the individual's TPS re-registration, if he or she is eligible. If you choose to do this, you would file the Application for Temporary Protected Status

14

(Form I-821) with the fee and the Application for Employment Authorization (Form I-765) without the fee and without requesting an EAD.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

**Table 1-Mailing Addresses**

| If... | Mail to... |
|---|---|
| You live in Florida | For U.S. Postal Service:<br><br>U.S. Citizenship and Immigration Services<br>P.O. Box 4464<br>Chicago, IL 60680<br><br>For FedEx, UPS, and DHL deliveries:<br><br>U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>131 S. Dearborn – 3rd Floor<br>Chicago, IL 60603 |
| You live in the State of New York | For U.S. Postal Service:<br><br>U.S. Citizenship and Immigration Services<br>P.O. Box 660167<br>Dallas, TX 75266<br><br>For FedEx, UPS, and DHL deliveries:<br><br>U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>2501 S. State Highway, 121 Business Suite 400<br>Lewisville, TX 75067 |
| You live in any other state | For U.S. Postal Service:<br><br>U.S. Citizenship and Immigration Services<br>P.O. Box 24047<br>Phoenix, AZ 85074 |

15

AR-HAITI-00000149

| | For FedEx, UPS, and DHL deliveries: |
|---|---|
| | U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>1820 E. Skyharbor Circle S, Suite 100<br>Phoenix, AZ 85034 |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate address in Table 1. When submitting a re-registration application and/or requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will aid in the verification of your grant of TPS and processing of your application, as USCIS may not have received records of your grant of TPS by either the IJ or the BIA.

**Supporting Documents**

What type of basic supporting documentation must I submit?

To meet the basic eligibility requirements for TPS, you must submit evidence that you:

• Are a national of Haiti or an alien having no nationality who last habitually resided in Haiti. Such documents may include a copy of your passport if available, other documentation issued by the Government of Haiti showing your nationality (e.g., national identity card, official travel documentation issued by the Government of Haiti), and/or your birth certificate with English translation accompanied by photo identification. USCIS will also consider certain forms of secondary evidence supporting your Haitian nationality. If the evidence presented is insufficient for USCIS to make a determination as to your nationality, USCIS may request additional evidence. If you cannot provide a passport, birth certificate with photo identification, or a

16

national identity document with your photo or fingerprint, you must submit an affidavit showing proof of your unsuccessful efforts to obtain such documents and affirming that you are a national of Haiti. However, please be aware that an interview with an immigration officer will be required if you do not present any documentary proof of identity or nationality or if USCIS otherwise requests a personal appearance. See 8 CFR 103.2(b)(9), 244.9(a)(1);

• Have continuously resided in the United States since January 12, 2011. See INA section 244(c)(1)(A)(ii); 8 U.S.C. 1254a(c)(1)(A)(ii); 8 CFR 244.9(a)(2); and

• Have been continuously physically present in the United States since June 23, 2011. See INA sections 244(b)(2)(A), (c)(1)(A)(i); 8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i).

The filing instructions on the Application for Temporary Protected Status (Form I-821) list all the documents needed to establish basic eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying for TPS on the USCIS website at www.uscis.gov/tps under "Haiti."

Do I need to submit additional supporting documentation?

If one or more of the questions listed in Part 4, Question 2 of the Application for Temporary Protected Status (Form I-821) applies to you, then you must submit an explanation on a separate sheet(s) of paper and/or additional documentation. Depending on the nature of the question(s) you are addressing, additional documentation alone may suffice, but usually a written explanation will also be needed.

EAD

How can I obtain information on the status of my EAD request?

To get case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online at http://www.uscis.gov, or call the

17

USCIS National Customer Service Center at 800-375-5283 (TTY 800-767-1833). If your Application for Employment Authorization (Form I-765) has been pending for more than 90 days and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at https://infopass.uscis.gov. However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

Am I eligible to receive an automatic extension of my current EAD through January 18, 2018?

Provided that you currently have a Haiti TPS-based EAD, you may be eligible to have your employment authorization automatically extended to January 18, 2018 if you:

* Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);

* Received an EAD under the designation of Haiti for TPS;

* Have an EAD with a marked expiration date of July 22, 2017, bearing the notation "A-12" or "C-19" on the face of the card under "Category";

* Timely re-registered for TPS during the 60-day re-registration period; and

* Properly filed an application for an EAD during the 60-day re-registration period.

Although you may be eligible to automatically extend your employment authorization through January 18, 2018, you must timely re-register for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS. You are strongly encouraged to file your EAD renewal application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization.

When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I-9)?

You can find a list of acceptable document choices on the "Lists of Acceptable

AR-HAITI-00000152

Documents" for Form I-9. You can find additional detailed information about Form I-9 on the USCIS I-9 Central Web page at http://www.uscis.gov/I-9Central. Employers are required to verify the identity and employment authorization of all new employees by using Form I-9. Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (which reflect both identity and employment authorization), or one document from List B (which reflects your identity) together with one document from List C (which reflects employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I-9 Instructions. An EAD is an acceptable document under List A. Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of July 22, 2017, and states "A-12" or "C-19" under "Category," and you timely filed an EAD renewal application during the 60-day re-registration period, you may choose to present your EAD to your employer together with the Form I-797C Notice of Action (showing the qualifying eligibility category of either A12 or C19) as proof of identity and employment authorization for Form I-9 through January 18, 2018 (see the subsection titled "How do my employer and I complete the Employment Eligibility Verification (Form I-9) on the basis of automatically extended employment authorization for a new job?" for further information). To minimize confusion over this extension at the time of hire, you should explain to your employer that your employment authorization has been automatically extended through January 18, 2018. As an alternative to presenting evidence of your automatically extended employment authorization, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid

19

receipt.

<u>What documentation may I show my employer to complete Employment Verification (Form I-9) if I am already employed but my current TPS-related EAD is set to expire?</u>

Even though you may be eligible to have your employment authorization automatically extended, your employer will need to ask you about your continued employment authorization once July 22, 2017, is reached to meet its responsibilities for Form I-9. Your employer will need a new document to re-verify your employment authorization. Once presented, you and your employer must make corrections to the employment authorization expiration dates in Section 1 and Section 2 of Form I-9 (see the subsection titled "What corrections should my current employer and I make to Employment Eligibility Verification (Form I-9) if my employment authorization has been automatically extended?" for further information). In addition, you may also show this <u>Federal Register</u> Notice to your employer to explain what to do for Form I-9.

If you file your Form I-765 to renew your current EAD, and you receive a USCIS receipt notice (Form I-797C) stating that your current "A-12" or "C-19" coded EAD is automatically extended for 180 days, you may show that receipt notice to your employer along with your EAD to confirm automatic extension of employment authorization through January 18, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. To avoid delays in receiving the Form I-797C and a lapse in your employment authorization, you should file your EAD renewal application as early as possible during the re-registration period.

By January 18, 2018, the expiration date of the automatic extension, your employer must re-verify your employment authorization. At that time, you must present any document from List A or any document from List C on Form I-9 to re-verify employment authorization, or an acceptable List A or List C receipt described in the Form I-9 Instructions. Your employer should

20

complete either Section 3 of the Form I-9 originally completed for you or, if this section has already been completed or if the version of Form I-9 has expired (check the date in the bottom left-hand corner of the form), complete Section 3 of a new Form I-9 using the most current version. Note that your employer may not specify which List A or List C document employees must present and cannot reject an acceptable receipt.

Can my employer require that I provide any other documentation to prove my status, such as proof of my Haitian citizenship?

No. When completing Form I-9, including re-verifying employment authorization, employers must accept any documentation that appears on the "Lists of Acceptable Documents" for Form I-9 that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Haitian citizenship or proof of re-registration for TPS when completing Form I-9 for new hires or re-verifying the employment authorization of current employees. If the expired EAD with category A12 or C19 is presented with the Form I-797C Notice of Action as described herein, an employer should accept this document combination as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to the employee. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

How do my employer and I complete Employment Eligibility Verification (Form I-9) on the basis of automatically extended employment authorization for a new job?

To evidence the automatic extension of your employment authorization, you may present

21

your expired EAD with category A12 or C19 in combination with the Form I-797C Notice of Action showing that the EAD renewal application was timely filed and that the qualifying eligibility category is either A12 or C19. This document combination is considered an unexpired Employment Authorization Document (Form I-766) under List A. When completing Form I-9 for a new job before January 18, 2018, you and your employer should do the following:

1.  For Section 1, you should:

a.  Check "An alien authorized to work until" and enter the date that is 180 days from the date your current EAD expires (January 18, 2018) as the "employment authorized until mm/dd/yyyy" date; and

b.  Enter your Alien Number /USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS Number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2.  When completing Section 2, employers should:

a.  Determine if the EAD is auto-extended for 180 days by ensuring:

  *  it is in category A12 or C19;

  *  the "received date" on Form I-797 is on or before the end of the 60-day re-registration period stated in this Notice; and

  *  the category code on the EAD is the same category code on Form I-797C, noting that employers should consider category codes A12 and C19 to be the same category code;

b.  Write in the document title;

c.  Enter the issuing authority;

d.  Provide the document number; and

e.  Insert the date that is 180 days from the date the current EAD expries (January 18, 2018).

22

By January 18, 2018, employers must re-verify the employee's employment authorization in Section 3 of the Form I-9.

What corrections should my current employer and I make to Employment Eligibility Verification (Form I-9) if my employment authorization has been automatically extended?

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job and your employment authorization has now been automatically extended when you timely filed a new application for employment authorization during the 60-day re-registration period, you may present your expired EAD with category A12 or C19 in combination with the Form I-797C Notice of Action. The Form I-797C should show that the EAD renewal application was timely filed and that the qualifying eligibility category is either A12 or C19. Your employer may need to re-inspect your current EAD if your employer does not have a copy of the EAD on file. You and your employer should correct your previously completed Form I-9 as follows:

1.   For Section 1, you should:

a.   Draw a line through the expiration date in Section 1;

b.   Write the date that is 180 days from the date your current EAD expires (January 18, 2018) above the previous date (July 22, 2017); and

c.   Initial and date the correction in the margin of Section 1.

2.   For Section 2, employers should:

a.   Determine if the EAD is auto-extended for 180 days by ensuring:

   • it is in category A12 or C19;

   • the "received date" on Form I-797 is on or before the end of the 60-day re-registration period stated in this Notice; and

23

AR-HAITI-00000157

- the category code on the EAD is the same category code on Form I-797C, noting that employers should consider category codes A12 and C19 to be the same category code;

b.   Draw a line through the expiration date written in Section 2;

c.   Write the date that is 180 days from the date the employee's current EAD expires (January 18, 2018) above the previous date (July 22, 2017); and

d.   Initial and date the correction in the margin of Section 2.

Note:  This is not considered a reverification; do not complete Section 3 until either the 180-day extension has ended or the employee presents a enw document to show continued employment authorization, whichever is sooner.  By January 18, 2018, when the employee's automatically extended employment authorization ends, employers must re-verify the employee's employment authorization in Section 3.

If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended in a Federal Register Notice.  If you have an employee who is a TPS beneficiary who provided a TPS-related EAD when he or she first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire.  After completing the Form I-9 in accordance with the instructions above, the employer may create a case in E-Verify for a new employee using the information provided on Form I-9 and Form I-797C.  The receipt number entered as the document number on Form I-9 should be entered into the document number field in E-Verify.  By January 18, 2018, employment authorization must be re-verified in Section 3.  Employers should not use E-Verify for reverification.

24

AR-HAITI-00000158

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888-464-4218 (TTY 877-875-6028) or email USCIS at I-9Central@dhs.gov. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I-9 and E-Verify), employers may also call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER), formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices, Employer Hotline at 800-255-8155 (TTY 800-237-2515), which offers language interpretation in numerous languages, or email IER at IER@usdoj.gov.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888-897-7781 (TTY 877-875-6028) or email at I-9Central@dhs.gov. Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800-255-7688 (TTY 800-237-2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I-9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to

25

be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I-9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I-9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I-9) differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888-897-7781 (TTY 877-875-6028). For more information about E-Verify related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship or immigration status, or based on national origin, contact IER's Worker Hotline at 800-255-7688 (TTY 800-237-2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I-9) and E-Verify procedures is available on the IER website at https://www.justice.gov/ier and the USCIS website at http://www.dhs.gov/E-verify.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal

26

Government, state and local government agencies establish their own rules and guidelines when granting certain benefits.  Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits.  Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS.  Examples of such documents are:

(1)  Your current EAD;

(2)  A copy of this Federal Register Notice;

(3)  A copy of your receipt notice (Form I-797C) for your application to renew your current EAD providing an automatic extension of your current expired or expiring EAD;

(4)  A copy of your Application for Temporary Protected Status Notice of Action (Form I-797) for this re-registration; and

(5)  A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I-797), if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits.  In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed.  You can check the status of your SAVE verification by using CaseCheck at the following link: https://save.uscis.gov/casecheck/, then by clicking the "Check Your Case" button.  CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number.  If an agency has denied your application based solely or

27

in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures.  If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office.  Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at http://www.uscis.gov/save, then by choosing "For Benefits Applicants" from the menu on the left, selecting "Save Resources," followed by "SAVE Fact Sheet for Benefit Applicants."

AR-HAITI-00000162

USCIS Notice:  Extension of the Designation of Haiti for Temporary Protected Status

_[signature]_
5/18/2017        Extend Haiti`s designation for Temporary Protected Status for
                 six months and approve the notice for publication in the
                 *Federal Register*.

_____ Disapprove the proposed extension of Haiti's Temporary
                 Protected Status designation and the publication of the notice
                 in the *Federal Register*.

_____ Modify per further instructions.

_____ Needs discussion.

5/18/2017
_____
Date/

AR-HAITI-00000164



**U.S. Citizenship
and Immigration
Services**

## TPS CONSIDERATIONS: HAITI (OCTOBER 2017)
### NATURAL DISASTER

### BACKGROUND & OVERVIEW

The January 12, 2010 earthquake that struck Haiti caused extensive damage to the country's physical infrastructure and public health, agricultural, housing, transportation, and educational facilities. Haitian government estimates of the death toll caused by the earthquake have ranged from 230,000 to as high as 316,000 people, though the accuracy of differing estimates is in dispute.[1] Estimates of people internally displaced range from approximately 1.5 million[2] to 2.3 million[3] at the peak of displacement.

Although some progress regarding reconstruction and recovery has been made in a variety of sectors, billions of dollars in pledged foreign assistance never materialized, and the pace and scope of Haiti's recovery has been uneven.[4] Many of the conditions prompting the original January 2010 TPS designation persist, and the country remains vulnerable to external shocks and internal fragility. Haiti has also experienced various setbacks that have impeded its recovery, including a cholera epidemic and the impact of Hurricane Matthew—the latter of which struck Haiti in October 2016 and "severely worsened the pre-existing humanitarian situation" in the country.[5] As of August 2017, Haiti "continues to be affected by a convergence of humanitarian needs,"[6] including food insecurity, internal displacement, an influx of returnees from the Dominican Republic, the persistence of cholera, and the lingering impact of various natural disasters.[7] Moreover, Haiti's recovery has also been impacted by a series of other challenges

---

[1] O'Conner, Maura R., Two Years Later, Haitian Earthquake Death Toll in Dispute, Columbia Journalism Review, Jan. 12, 2012.

[2] Status of Post-Earthquake Recovery and Development Efforts in Haiti (December 2014), U.S. Department of State, Dec. 2014.

[3] Key Statistics, Office of the Secretary-General's Special Adviser on Community-Based Medicine & Lessons from Haiti, United Nations, 2012.

[4] US Gives Haitian Immigrants 6-month TPS Extension, Voice of America News, May 22, 2017; Charles, Jacqueline, Senate Democrats to Trump administration: Let Haitians stay, Miami Herald, Apr. 27, 2017.

[5] Haiti: Humanitarian Snapshot (June 2017), United Nations Office of the Coordination of Humanitarian Affairs (UNOCHA), Jul. 4, 2017.

[6] Haiti - Humanitarian Situation Report - August 2017, United Nations Children's Fund (UNICEF), p.1, Aug. 2017.

[7] Haiti: Humanitarian Snapshot (June 2017), United Nations Office of the Coordination of Humanitarian Affairs (UNOCHA), Jul. 4, 2017; Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.5, Jun. 11, 2017.

AR-HAITI-00000165-01

DPP_00002539

AR-HAITI-00000165-02

DPP_00002540

TPS Considerations: Haiti
Page 2

related to housing, healthcare, economic growth, political instability, security, and environmental concerns.

## HOUSING SHORTAGE & INTERNAL DISPLACEMENT

Even before the 2010 earthquake, Haiti faced a substantial national housing deficit, estimated at 700,000 housing units.[8]  With an estimated $2.3 billion in damages—approximately 40% of the total—housing was the sector most impacted by the earthquake.[9]  The Haitian government estimated that 105,000 houses were destroyed and 188,383 houses collapsed or suffered considerable damage.[10]  The International Organization for Migration (IOM) claimed that 1.5 million Haitians were internally displaced and moved into internally displaced person (IDP) camps and other temporary sites following the disaster.[11]

While the number of IDP camps/sites and displaced individuals from the 2010 earthquake have significantly declined, Haiti still faces considerable obstacles related to housing.  According to data from the International Organization for Migration (IOM), from July 2010 to June 2017, there has been a net decrease in displacement by 97 percent, and 98 percent of sites have closed.[12]  However, as IOM reported in June 2017, "Camp closures, relocation and rental subsidy programs began decreasing substantially in March 2015, a trend which continues today."[13]  According to Amnesty International, many individuals who have left the IDP camps/sites have reportedly "moved back to unsafe houses or started building or reconstructing their houses, in most cases with no assistance or guidance, and often in informal settlements located in hazardous areas."[14]  Amnesty International has also claimed that over 60,000 IDPs have been forcibly evicted from camps since 2010 by private landowners, often with the assistance or implicit support of Haitian authorities.[15]

As of June 2017, around 37,867 IDPs (9,347 households) were still living in 27 camps.[16]  According to IOM, the number of organizations providing assistance to IDPs has declined in

[8] Ten facts about Haiti's housing crisis, Amnesty International, Jan. 12, 2015, https://www.amnesty.org/en/articles/news/2015/01/ten-facts-about-haiti-s-housing-crisis/, (last visited Aug. 16, 2017).
[9] Ten facts about Haiti's housing crisis, Amnesty International, Jan. 12, 2015, https://www.amnesty.org/en/articles/news/2015/01/ten-facts-about-haiti-s-housing-crisis/, (last visited Aug. 16, 2017).
[10] Key Statistics, Office of the Secretary-General's Special Adviser on Community-Based Medicine & Lessons from Haiti, United Nations, 2012.
[11] Five Years After 2010 Earthquake, Thousands of Haitians Remain Displaced, International Organization for Migration, Jan. 9, 2015, https://www.iom.int/news/five-years-after-2010-earthquake-thousands-haitians-remain-displaced, (last visited Aug. 16, 2017).
[12] IOM Haiti – DTM Report – June 2017, International Organization for Migration, p.5, June 2017.
[13] IOM Haiti – DTM Report – June 2017, International Organization for Migration, p.5, June 2017.
[14] Haiti: internal displacement, forced evictions, statelessness - the catalogue to violations continue, Amnesty International, p.6, Mar. 31, 2016.
[15] "15 Minutes to Leave": Denial of the Right to Adequate Housing in Post-Quake Haiti, Amnesty International, p.9, 21, Jan. 2015; Haiti: internal displacement, forced evictions, statelessness - the catalogue to violations continue, Amnesty International, p.6, Mar. 31, 2016.
[16] IOM Haiti – DTM Report – June 2017, International Organization for Migration, p.5, June 2017.

DPP_00002541

AR-HAITI-00000165-04

DPP_00002542

TPS Considerations: Haiti
Page 3

recent years, and "living conditions in the camps are precarious and access to basic services remains a major challenge for the displaced population."[17]  A vast majority of the aforementioned individuals still living in camps/sites "are currently not targeted by partners for durable solutions."[18]

In October 2016, Hurricane Matthew impacted over 236,000 homes—"of which 44% were destroyed and 42% severely damaged"[19]—and displaced approximately 175,000 people in Haiti.[20]  In areas most affected by the storm, approximately 90% of homes were destroyed.[21]  IOM reported in June 2017 that 3,597 individuals were living in 48 displacement sites due to the impact of Hurricane Matthew and spring flooding in Grande' Anse and Sud departments.[22],[23]

While post-earthquake IDP camps are closing, Haiti's housing shortage remains far from resolved.  The 2010 earthquake exacerbated the country's pre-existing shortage of adequate and affordable housing.[24]  The Government of Haiti has estimated that the country will need as many as 500,000 additional housing units over the next 10 years to make up for its shortage prior to the earthquake, to replace housing lost as a result of damage from the disaster, and to accommodate projected urban growth.[25]

## CHOLERA EPIDEMIC & HEALTHCARE

Haiti's longstanding public health challenges were exacerbated by the January 2010 earthquake and an ongoing cholera epidemic that started in October 2010.[26]  According to the U.S. Agency for International Development (USAID), "even before the 2010 earthquake, Haiti's healthcare system was not able to respond to the needs for basic healthcare services."[27]  The 2010 earthquake significantly impacted Haiti's health sector, destroying 50 health centers, the Ministry of Health, and part of the country's primary teaching hospital.[28]  Damages from both the 2010 earthquake and Hurricane Matthew in October 2016—the latter of which affected 99

---

[17] IOM Haiti – DTM Report – June 2017, International Organization for Migration, p.6, June 2017.

[18] IOM Haiti – DTM Report – June 2017, International Organization for Migration, p.5, June 2017.

[19] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.4, Jun. 11, 2017.

[20] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April 2017.

[21] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April 2017.

[22] Haiti is divided administratively into 10 departments.  See The World Factbook: Haiti, CIA, Jul. 27, 2017, https://www.cia.gov/library/publications/the-world-factbook/geos/ha.html, (last visited Aug. 17, 2017).

[23] IOM Haiti – DTM Report – June 2017, International Organization for Migration, p.8, June 2017.

[24] Haiti - Housing and Settlements Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.

[25] Haiti - Housing and Settlements Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.

[26] Haiti - Health Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.

[27] Haiti – Health Infrastructure Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.

[28] Haiti – Health Infrastructure Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017; Haiti - Health Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.

AR-HAITI-00000165-06

TPS Considerations: Haiti
Page 4

health facilities[29]——"exacerbated an existing lack of adequate health infrastructure, such as health care and storage facilities, as well as access to electricity, clean water and sanitation systems."[30]

In June 2017, the United Nations Economic and Social Council reported that "Haiti has some of the worst health indicators in the world, which continue to stymie economic development."[31] Approximately 40 percent of the population lacks access to fundamental health and nutrition services.[32] Maternal and infant mortality rates are respectively three and five times higher than the regional averages,[33] and "only 45 percent of all children between the ages of 12 months and 23 months are fully vaccinated."[34]   Public spending in the health sector is low, and the country has a limited number of health professionals and a deficit of health infrastructure.[35]

A cholera epidemic that began in October 2010—reportedly the largest such outbreak of cholera in recent history—remains ongoing and continues to place additional strains on Haiti's beleaguered public health system.[36]  From October 2010 through June 2017, there have been an estimated 813,000 cases of cholera in Haiti, and 9,676 people have been killed by the disease (which was allegedly introduced by United Nations peacekeepers).[37]

While progress has been made in combatting cholera since the peak of the epidemic in 2011,[38] cholera has become endemic in Haiti, "with seasonal peaks regularly triggering emergency interventions."[39]  In 2016, the number of suspected cholera cases increased, mainly due to a spike in suspected cases in areas affected by Hurricane Matthew in the aftermath of the storm.[40]

---

[29] Haiti: Hurricane Matthew Humanitarian Dashboard (as of Feb. 2017), United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.1, Mar. 3, 2017.

[30] Haiti - Health Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.

[31] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.4, Jun. 29, 2017.

[32] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.4, Jun. 29, 2017.

[33] Better Spending, Better Care: A look at Haiti's Health Financing, The World Bank, http://www.worldbank.org/en/country/haiti/publication/better-spending-better-care-a-look-at-haitis-health-financing (last visited Aug. 21, 2017).

[34] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.4, Jun. 29, 2017.

[35] Haiti - Health Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.

[36] Haiti - Health Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017; Lefevre, Adrienne, The Consequences of Contaminated Water, Centers for Disease Control and Prevention, Mar. 21, 2017, https://blogs.cdc.gov/global/2017/03/21/the-consequences-of-contaminated-water/ (last visited Aug. 21, 2017).

[37] Hurricane Matthew: '1.4 million need help in Haiti', Al Jazeera, Oct. 11, 2016; Partlow, Joshua, In the wake of Matthew, Haitian towns struggle with cholera, Washington Post, Oct. 9, 2016; Zavis, Alexandra, U.N. admits a role in deadly Haiti cholera epidemic, Los Angeles Times, Aug. 18, 2016; Yakupitiyage, Tharanga, UN "Profoundly Sorry" for Haiti Cholera Outbreak, Inter Press Service, Dec. 2, 2016; Haiti: Cholera figures (as of 30 June 2017), United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Jul. 24, 2017.

[38] Fact Sheet: Cholera situation in Haiti, 1 January/15 April 2017, United Nations Country Team in Haiti, Apr. 27, 2017.

[39] Haiti: Fighting the Spread of Mosquito-Borne Diseases, Doctors Without Borders/Médicins Sans Frontières (MSF), Jul. 24, 2017, http://www.doctorswithoutborders.org/article/haiti-fighting-spread-mosquito-borne-diseases (last visited Aug. 21, 2017).

[40] New approach to cholera in Haiti — Report of the Secretary General, United Nations General Assembly, p.4, May 3, 2017.

DPP_00002545

AR-HAITI-00000165-08

DPP_00002546

TPS Considerations: Haiti
Page 5

While the number of suspected cases of cholera has declined since 2016,[41] Haiti nevertheless remains "extremely vulnerable" to the disease.[42] According to the United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), cholera continues to impact Haiti due to a lack of funding for the country's National Plan for the Elimination of Cholera (PNEC), weak water and sanitation infrastructure, the lack of access to quality medical care, and high population density and mobility to urban areas.[43]

## ECONOMY

Haiti is the poorest country in the Western Hemisphere, with poverty, vulnerability to natural disasters, corruption, and low levels of education serving as significant obstacles to sustained economic development.[44] Haiti's weak infrastructure and the difficulty of doing business limit investment, and the country remains vulnerable to damage from natural disasters and dependent on foreign aid or direct budget support for more than 20% of its annual budget.[45] The 2010 earthquake caused $7.8 billion in damages and economic losses—"equivalent to more than 120 percent of Haiti's 2009 gross domestic product (GDP)"[46]—and destroyed an estimated 90 percent of buildings in Port-au-Prince, Haiti's capital, including hospitals, schools, physical infrastructure, and transportation facilities.[47] Although Haiti's economy started to recover from the earthquake—with economic growth at 5.5% in 2011— GDP growth has slowed to 1.2% in 2015 and 1.4% in 2016 as a result of political uncertainty, drought, declining foreign aid, and currency depreciation.[48] According to June 2017 data from the World Bank, Haiti's GDP growth is forecasted to further decline to 0.5% in 2017.[49]

While Haiti has made slight improvements in reducing poverty levels and increasing access to education and sanitation since 2000, a 2014 World Bank report noted that the "wealth generated in the country is largely inadequate to meet the needs of the people."[50] According to the World Bank, "more than 6 million out of 10.4 million (59%) Haitians live under the national poverty line of US$ 2.42 per day and over 2.5 million (24%) live under the national extreme poverty line

---

[41] New approach to cholera in Haiti – Report of the Secretary General, United Nations General Assembly, p.4, May 3, 2017.

[42] Fact Sheet: Cholera situation in Haiti, 1 January/15 April 2017, UN Country Team in Haiti, Apr. 27, 2017.

[43] Haiti: Cholera figures (as of 30 June 2017), United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Jul. 24, 2017.

[44] The World Factbook: Haiti, CIA, Jul. 27, 2017, https://www.cia.gov/library/publications/the-world-factbook/geos/ha.html, (last visited Aug. 17, 2017).

[45] The World Factbook: Haiti, CIA, Jul. 27, 2017, https://www.cia.gov/library/publications/the-world-factbook/geos/ha.html, (last visited Aug. 17, 2017).

[46] Key Statistics, Office of the Secretary-General's Special Adviser on Community-Based Medicine & Lessons from Haiti, United Nations, 2012.

[47] Haiti: Infrastructure, IHS Jane's Sentinel Security Assessment - Central America and the Caribbean, Aug. 15, 2017, http://janes.ihs.com/CentralAmericaCaribbean/Display/1302231 (last visited Aug. 25, 2017).

[48] The World Factbook: Haiti, CIA, Jul. 27, 2017, https://www.cia.gov/library/publications/the-world-factbook/geos/ha.html, (last visited Aug. 17, 2017); Global Economic Prospects: A Fragile Recovery, The World Bank Group, p.90, Jun. 2017.

[49] Global Economic Prospects: A Fragile Recovery, The World Bank Group, p.90, Jun. 2017.

[50] Poverty and Inclusion in Haiti: Social gains at timid pace, The World Bank Group, p.1-2, 2014.

DPP_00002547

AR-HAITI-00000165-10

DPP_00002548

TPS Considerations: Haiti
Page 6

of US$1.23 per day."[51]  An additional one million people are at risk of falling into poverty following an external shock, such as a natural disaster.[52]  An estimated 40% of Haitians are unemployed.[53]

According to the United Nations Economic and Social Council, Haiti "is highly dependent on remittances from its diaspora."[54]  Remittances—estimated at over $2 billion per year in 2015, including more than $1.3 billion from Haitians living in the United States[55]—are Haiti's "primary source of foreign exchange, equivalent to more than a quarter of GDP, and nearly double the combined value of Haitian exports and foreign direct investment."[56]  Moreover, remittances have also "helped to support education, health and the subsistence requirements" of Haiti's population.[57]

## GOVERNANCE & POLITICAL INSTABILITY

Per IHS Jane's, with its history of political instability, economic struggles, political violence, and pervasive human rights abuses, Haiti "has long been seen as a model of poor and corrupt governance."[58]  Even before the earthquake, the Haitian government "could not or would not deliver core functions to the majority of its people."[59]  The January 2010 earthquake had an immediate and significant impact on governance and the rule of law in Haiti, killing an estimated 18 percent of the country's civil service and destroying key government infrastructure, including the National Palace, the Parliament, 28 of 29 government ministry buildings, the Haitian National Police's headquarters, and various judicial facilities (including courts and correctional facilities).[60]

On April 19, 2017, Haitian President Jovenel Moïse announced a project to rebuild the National Palace, which was significantly damaged in the 2010 earthquake and subsequently demolished.[61]

[51] The World Bank in Haiti: Overview, The World Bank, Jul. 27, 2017, http://www.worldbank.org/en/country/haiti/overview#1 (last visited Aug. 18, 2017).
[52] Poverty and Inclusion in Haiti: Social gains at timid pace, The World Bank Group, p.4, 2014.
[53] Haiti - Economic Growth & Agricultural Development Fact Sheet, U.S. Agency for International Development (USAID), Mar. 2017.
[54] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.8, Jun. 29, 2017.
[55] Remittance Flows Worldwide in 2015, Pew Research Center, Aug. 31, 2016, http://www.pewglobal.org/interactives/remittance-map/ (last visited Aug. 17, 2017).
[56] The World Factbook: Haiti, CIA, Jul. 27, 2017, https://www.cia.gov/library/publications/the-world-factbook/geos/ha.html, (last visited Aug. 17, 2017).
[57] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.8, Jun. 29, 2017.
[58] Haiti: Executive Summary, IHS Jane's Sentinel Security Assessment - Central America and the Caribbean, Aug. 15, 2017, http://janes.ihs.com/Janes/Display/haits010-cac (last visited Aug. 25, 2017).
[59] Haiti - Democracy, Human Rights, and Governance Fact Sheet, U.S. Agency of International Development (USAID), p.1, Mar. 2016.
[60] Haiti, Democracy, Human Rights, and Governance, U.S. Agency for International Development (USAID), Jul.24, 2017, https://www.usaid.gov/where-we-work/latin-american-and-caribbean/haiti/democracy-human-rights-and-governance (last visited Aug. 22, 2017).
[61] Haiti to rebuild National Palace toppled in 2010 quake, AFP, Apr. 20, 2017; McFadden, David, Haiti to rebuild National Palace smashed in 2010 earthquake, Associated Press, Apr. 19, 2017.

AR-HAITI-00000165-12

DPP_00002550

TPS Considerations: Haiti
Page 7

Moïse stated that he would like for construction to start before the end of 2017.[62]  President Moïse also pledged that the Parliament and the Palace of Justice would be rebuilt during his five-year term in office.[63]  In August 2017, IHS Jane's reported that, among the public buildings destroyed by the earthquake, only the Supreme Court of Justice had been reconstructed and was operational in 2017.[64]  In October 2017, the Haitian government launched an international architecture competition for proposals to rebuild the National Palace.[65]

In June 2016, the October 2015 presidential election results were annulled, and new elections were scheduled for October 2016—yet were subsequently postponed due to the impact of Hurricane Matthew.[66]  On November 20, 2016, Jovenel Moïse, a banana plantation owner, was elected president with enough votes to avoid a run-off.[67]  Moïse was officially declared the winner of Haiti's presidential election on January 4, 2017,[68] and was sworn in on February 7,[69]  On January 29, 2017, Haiti held elections for eight senators and one seat in the lower chamber of congress.[70]  Nationwide municipal elections were also held on this date for the first time since December 5, 2006.[71]

While Haiti successfully completed its electoral process in February 2017 after two years of contested results and political crises, its new government faces various challenges to promote recovery and reconstruction.[72]  According to USAID, although Haiti possesses "the formal structures of a democracy, many of these have yet to become fully functional."[73]  Haiti's state institutions lack sufficient resources, and "provide limited services to only a small percentage of the population."[74]  In late June 2017, the United Nations Economic and Social Council reported that, while Haiti's new government has expressed a desire to improve the country's political and socioeconomic situation, "it is also clear that the Government has limited capacity to ensure a

[62] Haiti to rebuild National Palace toppled in 2010 quake, AFP, Apr. 20, 2017.
[63] McFadden, David, Haiti to rebuild National Palace smashed in 2010 earthquake, Associated Press, Apr. 19, 2017.
[64] Haiti: Infrastructure, IHS Jane's Sentinel Security Assessment - Central America and the Caribbean, Aug. 15, 2017, http://janes.ihs.com/CentralAmericaCaribbean/Display/1302231 (last visited Aug. 25, 2017).
[65] Fulcher, Merlin, Competition: National Palace, Haiti, The Architects' Journal, Oct. 10, 2017, https://www.architectsjournal.co.uk/competitions/competition-national-palace-haiti/10024240.article (last visited Oct. 12, 2017); Haiti - FLASH : Architecture Competition for the Reconstruction of the National Palace, Haiti Libre, Oct. 4, 2017.
[66] Domonoske, Camila, 14 Months After Elections Began, Haiti Finally Has A President-Elect, NPR, Jan. 4, 2017.
[67] Charles, Jacqueline, Banana farmer wins Haiti presidency, according to preliminary results, Miami Herald, Nov. 28, 2016.
[68] Haiti: Jovenel Moise confirmed winner of presidential election, BBC News, Jan. 4, 2017.
[69] Businessman Jovenel Moise Sworn In as Haiti's President, Voice of America News, Feb. 7, 2017.
[70] Low turnout in Haiti's local elections, AFP, Jan. 29, 2017.
[71] McFadden, David, Haiti holds final round of election cycle started in 2015, Associated Press, Jan. 29, 2017; Charles, Jacqueline, Haiti election cycle nears end with Sunday vote and more than 5,000 seats up for grabs, Miami Herald, Jan. 27, 2017.
[72] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.7, Jun. 29, 2017.
[73] Haiti - Democracy, Human Rights & Governance Fact Sheet, U.S. Agency of International Development (USAID), p.1, Mar. 2017.
[74] Haiti - Democracy, Human Rights & Governance Fact Sheet, U.S. Agency of International Development (USAID), p.1, Mar. 2017.

DPP_00002551

AR-HAITI-00000165-14

DPP_00002552

TPS Considerations: Haiti
Page 8

public administration system that can effectively guarantee the rule of law and a functioning justice system, promote the fight against corruption and effectively protect human rights."[75]

In early October 2017, the *Miami Herald* reported that, "in recent weeks, Haiti has been engulfed in protests over tax hikes, with massive and sometimes violent street demonstrations."[76]  Anti-government protests erupted in mid-September after the Haitian parliament approved the government budget, which opponents have argued contains tax increases that would hurt impoverished families.[77]  Multiple demonstrations have occurred since mid-September, and the protests have spread from Port-au-Prince to other areas of the country.[78]  Some of the protests have become violent, with demonstrators reportedly throwing rocks, damaging property, blocking traffic, and burning cars and tires, and the Haitian police responding to the unrest by firing tear gas and water at protesters.[79]  At least two people have been killed and others have been injured during the demonstrations.[80]

## SECURITY

By creating new security vulnerabilities and stimulating an increase in crime, the 2010 earthquake had a deleterious impact on public security in Haiti.[81]  The escape of thousands of prisoners and the diffusion of gangs throughout Port-au-Prince in the aftermath of the earthquake overwhelmed Haiti's historically weak justice system and police.[82]  An overall climate of insecurity in IDP camps left many IDPs vulnerable to violence and crime, including gender-based violence, theft, and domestic violence.[83]  Violence against women reportedly increased in the aftermath of the earthquake.[84]

---

[75] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.4-5, Jun. 29, 2017.
[76] Charles, Jacqueline, Haiti requests 18-month TPS extension from Trump administration, The Miami Herald, Oct. 9, 2017.
[77] Violence erupts at budget opposition protest in Haiti, Agence France-Presse (AFP), Sep. 30, 2017; HAITI: Budget proves contentious, LatinNews, Regional Report: Caribbean & Central America, Oct. 2017; Charles, Jacqueline, Violent protest erupt in Haiti over budget passed on the eve of Hurricane Irma, The Miami Herald, Sep. 12, 2017.
[78] Violence erupts at budget opposition protest in Haiti, Agence France-Presse (AFP), Sep. 30, 2017; HAITI: Budget proves contentious, LatinNews, Regional Report: Caribbean & Central America, Oct. 2017; Charles, Jacqueline, Violent protest erupt in Haiti over budget passed on the eve of Hurricane Irma, The Miami Herald, Sep. 12, 2017.
[79] Violence erupts at budget opposition protest in Haiti, Agence France-Presse (AFP), Sep. 30, 2017; HAITI: Budget proves contentious, LatinNews, Regional Report: Caribbean & Central America, Oct. 2017; Charles, Jacqueline, Violent protest erupt in Haiti over budget passed on the eve of Hurricane Irma, The Miami Herald, Sep. 12, 2017.
[80] Violence erupts at budget opposition protest in Haiti, Agence France-Presse (AFP), Sep. 30, 2017; HAITI: Budget proves contentious, LatinNews, Regional Report: Caribbean & Central America, Oct. 2017; Charles, Jacqueline, Violent protest erupt in Haiti over budget passed on the eve of Hurricane Irma, The Miami Herald, Sep. 12, 2017.
[81] Berg, Louis-Alexandre, Crime, Politics and Violence in Post-Earthquake Haiti, United States Institute of Peace, p.1-2, Sep. 28, 2010.
[82] Berg, Louis-Alexandre, Crime, Politics and Violence in Post-Earthquake Haiti, United States Institute of Peace, p.1-2, Sep. 28, 2010.
[83] Berg, Louis-Alexandre, Crime, Politics and Violence in Post-Earthquake Haiti, United States Institute of Peace, p.1-2, Sep. 28, 2010.
[84] Haiti: Violence against women, including sexual violence: state protection and support services (2012-June 2016), Canada: Immigration and Refugee Board of Canada, Dec. 15, 2016 .

AR-HAITI-00000165-16

DPP_00002554

TPS Considerations: Haiti
Page 9

Crime rates in Haiti are high, and the general security situation is "unpredictable."[85] The U.S. Department of State's Bureau of Diplomatic Security has reported that homicide, armed robberies, and crimes against persons (including gender-based violence) are major concerns.[86] Demonstrations, roadblocks, and political rallies regularly occur, and have at times led to violent incidents.[87] Violence against women is reportedly widespread, and has been characterized as a chronic or systemic problem.[88] Impunity levels are high, and the capacity of Haiti's police force is "relatively low."[89] In general, Haitians "lack basic policing services," and criminals are reportedly able to operate without fear of the police.[90]

According to the U.S. Department of State, "rates of kidnapping, murder, and rape rose in 2016."[91] The Government of the United Kingdom has reported that "crime levels have continued to increase in 2017."[92] In July 2017, the United Nations Secretary General reported that, since his previous report in March 2017, "growing tensions linked to socioeconomic grievances notwithstanding, key indicators, including crime and civil protests, remained within historically established statistical parameters."[93]

## MINUSTAH

In 2004, the United Nations Stabilization Mission in Haiti (MINUSTAH) was established following a rebellion that led to the removal of President Jean-Bertrand Aristide and subsequent violence, including armed clashes, killings, and kidnappings.[94] In the aftermath of the violence and the establishment of MINUSTAH, "uniformed U.N. troops provided the only real security" in Haiti for years.[95] However, the Associated Press reported in March 2017 that, "these days, Haiti's police do most of the heavy lifting and the mood has changed."[96]

---

[85] Haiti – Safety and Security, Government of Canada, Jul. 21, 2017, https://travel.gc.ca/destinations/haiti (last visited Aug. 22, 2017); Haiti – Safety and Security, GOV.UK, https://www.gov.uk/foreign-travel-advice/haiti/safety-and-security (last visited Aug. 22, 2017).
[86] Haiti 2017 Crime & Safety Report, U.S. Department of State, Apr. 26, 2017.
[87] Haiti – Safety and Security, Government of Canada, Jul. 21, 2017, https://travel.gc.ca/destinations/haiti (last visited Aug. 22, 2017)
[88] Haiti: Violence against women, including sexual violence; state protection and support services (2012-June 2016), Canada: Immigration and Refugee Board of Canada, Dec. 15, 2016.
[89] Haiti: Executive Summary, IHS Jane's Sentinel Security Assessment - Central America and the Caribbean, Aug. 15, 2017, http://janes.ihs.com/Janes/Display/haits010-cac (last visited Aug. 25, 2017).
[90] Haiti 2017 Crime & Safety Report, U.S. Department of State, Apr. 26, 2017.
[91] Haiti Travel Warning, U.S. Department of State, May 22, 2017, https://travel.state.gov/content/passports/en/alerts/warnings/haiti-travel-warning.html (last visited Aug. 22, 2017).
[92] Haiti – Safety and Security, GOV.UK, https://www.gov.uk/foreign-travel-advice/haiti/safety-and-security (last visited Aug. 22, 2017).
[93] Report of the Secretary-General on the United Nations Stabilization Mission in Haiti, United Nations Security Council, p.5, July 12, 2017.
[94] Haiti is Ready for UN Peacekeepers to Leave Soon, Associated Press, Mar. 9, 2017.
[95] Haiti is Ready for UN Peacekeepers to Leave Soon, Associated Press, Mar. 9, 2017.
[96] Haiti is Ready for UN Peacekeepers to Leave Soon, Associated Press, Mar. 9, 2017.

DPP_00002555

AR-HAITI-00000165-18

TPS Considerations: Haiti
Page 10

MINUSTAH's tenure in Haiti has been controversial.[97] The *Los Angeles Times* has described the U.N. military presence in Haiti as "never really welcome,"[98] while some Haitians view the U.N. peacekeeping mission as "an occupying force,"[99] or as an incursion into Haiti's sovereignty.[100] In March 2017, the Associated Press characterized the peacekeepers' tenure as "rocky," noting that they:

> have earned praise for boosting security, paving the way to elections and providing crucial support after disasters, particularly the devastating 2010 earthquake. But some troops have also been accused of excessive force, rape and abandoning babies they fathered.[101]

In addition, U.N. troops from Nepal are "widely blamed" for introducing cholera to the country,[102] with the source of cholera reportedly traced by scientists to a U.N. base.[103] Moreover, some U.N. troops have reportedly been "implicated in a sexual abuse scandal, including a sex ring that exploited Haitian children."[104]

On April 13, 2017, the United Nations Security Council decided that MINUSTAH "would gradually draw down its military component during the next six months, finally withdrawing from Haiti by 15 October 2017."[105] MINUSTAH will be replaced by the United Nations Mission for Justice Support in Haiti (MINUJUSTH), which will seek to "help the Haitian Government strengthen rule-of-law institutions, further develop and support the Haitian National Police and engage in human rights monitoring, reporting and analysis."[106] MINUJUSTH will comprise up to seven Formed Police Units (FPU) consisting of 980 personnel, and 295 Individual Police Officers for an initial six month period from October 16, 2017 to April 15, 2018.[107] In July 2017, the United Nations Secretary General reported that "the ongoing

[97] Simmons, Ann M., U.N. peacekeepers are leaving after more than two decades, but where does that leave Haiti?, Los Angeles Times, Apr. 17, 2017; Lederer, Edith, The U.N. Just Unanimously Voted to End Its Peacekeeping Mission in Haiti, Associated Press, Apr. 13, 2017.
[98] Simmons, Ann M., U.N. peacekeepers are leaving after more than two decades, but where does that leave Haiti?, Los Angeles Times, Apr. 17, 2017.
[99] Haiti is Ready for UN Peacekeepers to Leave Soon, Associated Press, Mar. 9, 2017.
[100] Simmons, Ann M., U.N. peacekeepers are leaving after more than two decades, but where does that leave Haiti?, Los Angeles Times, Apr. 17, 2017.
[101] Haiti is Ready for UN Peacekeepers to Leave Soon, Associated Press, Mar. 9, 2017.
[102] Charles, Jacqueline, A Haiti without U.N. peacekeepers? After almost 13 years, it may happen., Miami Herald, Feb. 14, 2017.
[103] Simmons, Ann M., U.N. peacekeepers are leaving after more than two decades, but where does that leave Haiti?, Los Angeles Times, Apr. 17, 2017.
[104] Simmons, Ann M., U.N. peacekeepers are leaving after more than two decades, but where does that leave Haiti?, Los Angeles Times, Apr. 17, 2017.
[105] Security Council decides UN Mission in Haiti will close by October; approves smaller follow-on operation, UN News Service, Apr. 13, 2017.
[106] In visit to Haiti, Security Council delegation to reaffirm support for country's stability and development, UN News Service, Jun. 23, 2017.
[107] Security Council decides UN Mission in Haiti will close by October; approves smaller follow-on operation, UN News Service, Apr. 13, 2017.

DPP_00002557

AR-HAITI-00000165-20

TPS Considerations: Haiti
Page 11

withdrawal of the MINUSTAH military and police components…has not affected the overall security situation."[108]

## FOOD SECURITY

Damage from the 2010 earthquake exacerbated Haiti's historic food security challenges.  The earthquake displaced over 600,000 people from urban to rural areas and caused significant damage to physical infrastructure; these factors contributed to a sharp decline in income and food availability, as well as an increase in the price of food in the aftermath of the earthquake.[109] While the international community provided emergency food assistance and support for the agricultural sector to help avert a post-earthquake food crisis, food insecurity has remained a significant challenge for Haiti.[110]  Haiti depends on imports to meet more than 50 percent of its food needs,[111] and is extremely vulnerable to fluctuations in global food prices.[112]  Chronic malnutrition impacts approximately half of Haiti's population.[113]

In recent years, food and nutritional security in Haiti have gradually deteriorated due to the impact of Tropical Storm Isaac and Hurricane Sandy in 2012 and three consecutive years of severe drought (exacerbated by *El Niño*).[114]  Hurricane Matthew also exacerbated food insecurity in Haiti.[115]  The impact of the hurricane caused an estimated $580 million in damages to the country's agricultural sector, and extensive damage to "crops, livestock and fisheries as well as to infrastructure such as irrigation — with the most affected areas having up to 100 percent crop damage or destruction."[116]  Approximately "428,000 farmers were decapitalized" and food

---

[108] Report of the Secretary-General on the United Nations Stabilization Mission in Haiti, United Nations Security Council, p.5, July 12, 2017.
[109] Special Report: FAO/WFP Crop and Food Security Assessment Mission to Haiti, Food and Agriculture Organization of the United Nations & The World Food Programme, Sep. 21, 2010, http://www.fao.org/docrep/012/ak353e/ak353e00.htm, (last visited Aug. 21, 2017).
[110] Haiti: six months on, agriculture needs more support, Food and Agriculture Organization of the United Nations, Jul. 15, 2010, http://www.fao.org/emergencies/fao-in-action/stories/stories-detail/en/c/147984/, (last visited Aug. 21, 2017); Haiti – Agriculture and Food Security Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.
[111] Haiti – Agriculture and Food Security Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.
[112] Food Assistance Fact Sheet – Haiti, U.S. Agency for International Development (USAID), Aug. 7, 2017.
[113] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.3, Jun. 29, 2017.
[114] ECHO Factsheet – Haiti – June 2016, European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations, Jun. 10, 2016; Food Assistance Fact Sheet – Haiti, U.S. Agency for International Development (USAID), Aug. 7, 2017; ECHO Factsheet – Haiti – May 2017, European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations, May 2017, http://ec.europa.eu/echo/files/aid/countries/factsheets/haiti_en.pdf (last visited Aug. 21, 2017)
[115] Haiti – Agriculture and Food Security Fact Sheet, U.S. Agency for International Development (USAID), p.1, Mar. 2017.
[116] Damages to agricultural sector in storm-hit Haiti estimated at $580 million – UN agency, UN News Centre, Nov. 23, 2016.

DPP_00002559

AR-HAITI-00000165-22

DPP_00002560

TPS Considerations: Haiti
Page 12

production infrastructure was significantly impacted by the storm.[117]  In August 2017, USAID reported that, "more than six months later, the storm's impact continues to drive elevated levels of food insecurity in the worst-affected communities."[118]  As of May 2017, approximately 5.82 million people were facing food insecurity in Haiti,[119] including 2.35 million people who "were severely food-insecure and in need of immediate assistance."[120]

## NATURAL DISASTERS & ENVIRONMENTAL CONCERNS

Due to its geographic location, weak infrastructure, and limited government resources, Haiti is particularly susceptible to natural disasters.[121]  Per the World Bank, Haiti has been impacted by natural disasters "almost every year since 1971, losing on average two percent of GDP every year due to hydrometeorological events."[122]  An estimated 98 percent of the Haitian population is exposed to two or more types of natural disasters.[123]  As a result of its exposure to natural hazards and the vulnerabilities of its population, Haiti "consistently ranks among the most vulnerable countries in the world to disasters and climate change."[124]  According to the 2017 Global Climate Risk Index, Haiti ranked as the third most affected country in the world by extreme weather events from 1996 to 2015; during this time, Haiti averaged $222 million in damages per year—equivalent to 1.49% of GDP on average.[125]

Located along the "hurricane belt,"[126] Haiti is regularly impacted by tropical storms and floods.[127]  Haiti suffered severe flooding in 2002, 2003, 2006, and 2007.[128]  During the 2008 hurricane season, Haiti was impacted by four storms "which killed more than 800 people and devastated nearly three-quarters of its agricultural land."[129]  In the fall of 2012, Hurricane Sandy

---

[117] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.4, Jun. 11, 2017.
[118] Food Assistance Fact Sheet – Haiti, U.S. Agency for International Development (USAID), Aug. 7, 2017.
[119] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.2, Jun. 11, 2017.
[120] Report of the Secretary-General on the United Nations Stabilization Mission in Haiti, United Nations Security Council, p.5, July 12, 2017.
[121] Five dead, 10 missing after Haiti rains, flooding – officials, Reuters, May 19, 2017.
[122] World Bank Supports Haiti's Post-Matthew Reconstruction, The World Bank, Jun. 8, 2017.
[123] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April 2017.
[124] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4-5, April 2017.
[125] Kreft, Sönke, Eckstein, David and Melchior, Inga, Global Climate Risk Index 2017, Germanwatch, p. 23, Nov. 2016.
[126] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April 2017.
[127] Jones, Sam, Why is Haiti vulnerable to natural hazards and disasters?, The Guardian, Oct. 4, 2016.
[128] Jones, Sam, Why is Haiti vulnerable to natural hazards and disasters?, The Guardian, Oct. 4, 2016.
[129] Jones, Sam, Why is Haiti vulnerable to natural hazards and disasters?, The Guardian, Oct. 4, 2016.

DPP_00002561

AR-HAITI-00000165-24

DPP_00002562

TPS Considerations: Haiti
Page 13

affected 1.8 million Haitians; flooded, damaged, or destroyed 18,000 homes; damaged key infrastructure, including roads, hospitals, and schools; and killed 60 people.[130]

More recently, Haiti has been "grappling with a heavy rainy season" in 2017.[131] The rainy season, which began in April, has resulted in:

> floods and landslides, damage to homes and destruction of harvests, especially in the departments of South, Grand'Anse and Nippes, which were the most affected departments by Hurricane Matthew. Erosion of roads have impacted access to several communes, especially in the South department.[132]

By late May, at least seven people had been killed and 15,000 households were in need of immediate humanitarian assistance.[133] The rainy season coincides with hurricane season in Haiti, which typically lasts from June 1 to November 30.[134] In June 2017, the United Nations Economic and Social Council reported that the Haitian government "has indicated that it does not have the capacity in terms of equipment and personnel to mitigate any disaster that may result" from the current hurricane season.[135]

On September 7, 2017, Hurricane Irma—a Category 5 hurricane—impacted northern Haiti (one of the poorest regions of the country),[136] with heavy rains, wind, and flooding causing "significant damages in the Nord-Est, Nord-Ouest, Nord, Artibonite and Centre departments."[137] The impact of Hurricane Irma led to the evacuation of over 12,500 people, left one person dead and another missing, and injured more than a dozen others.[138] In addition, 4,903 homes were flooded, 2,646 were damaged, and 466 were destroyed.[139] Hurricane Irma also caused extensive

[130] UN relief agency estimates 1.8 million Haitians have been affected by Hurricane Sandy, United Nations Office for the Coordination of Humanitarian Affairs, Nov. 2, 2012.
[131] Five dead, 19 missing after Haiti rains, flooding — officials, Reuters, May 19, 2017.
[132] Haiti - Humanitarian Situation Report - August 2017, United Nations Children's Fund (UNICEF), p.2, Aug. 2017.
[133] Haiti Humanitarian Bulletin - Issue 65 | June-July 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.1, Aug. 17, 2017; Five dead, 19 missing after Haiti rains, flooding — officials, Reuters, May 19, 2017.
[134] Haiti - Humanitarian Situation Report - August 2017, United Nations Children's Fund (UNICEF), p.2, Aug. 2017.
[135] Report of the Ad Hoc Advisory Group on Haiti, United Nations Economic and Social Council, p.6, Jun. 29, 2017.
[136] Charles, Jacqueline, Irma mostly spared Haiti. But for struggling farmers, the damages are devastating, The Miami Herald, Sep. 9, 2017.
[137] ACT Alliance Rapid Response Fund No. 13/2017: Hurricane Irma in Haiti, ACT Alliance, Sep. 26, 2017.
[138] ACT Alliance Rapid Response Fund No. 13/2017: Hurricane Irma in Haiti, ACT Alliance, Sep. 26, 2017.
[139] ACT Alliance Rapid Response Fund No. 13/2017: Hurricane Irma in Haiti, ACT Alliance, Sep. 26, 2017.

AR-HAITI-00000165-26

TPS Considerations: Haiti
Page 14

damage to crops and livestock in affected areas,[140] with an estimated 18,000 families in northern
Haiti losing their food crops due to the impact of the storm.[141]

Located along several major fault lines, Haiti has also been impacted by powerful earthquakes.[142]
In 2016, Haiti suffered from its third consecutive year of drought, which was exacerbated by *El
Niño*.[143]  Extensive deforestation exposes Haiti to and exacerbates flooding, mudslides, and soil
erosion.[144]

## HURRICANE MATTHEW

The strongest hurricane to strike the country in more than 50 years and the third strongest ever
recorded in Haiti, Hurricane Matthew made landfall in southwestern Haiti as a Category 4
hurricane on October 4, 2016.[145]  With 145-mile-an-hour winds and torrential rains,[146] Hurricane
Matthew "violently struck south-western Haiti…causing widespread damage, flooding and
displacement."[147]  Heavy flooding occurred in the most affected departments, including
Grand'Anse, South, Nippes and South East departments.[148]  Per UNOCHA, the impact of the
hurricane occurred at a time when Haiti was "already facing an increase in the number of cholera
cases and severe food insecurity and malnutrition."[149]

According to UNOCHA, Hurricane Matthew caused the greatest humanitarian crisis in Haiti
since the 2010 earthquake.[150]  Hurricane Matthew affected 2.1 million people in Haiti; of this
amount, 1.4 million were estimated to be in need of humanitarian assistance in the aftermath of

[140] After the Hurricane – an overview of the damage Irma and Maria left behind, International Federation of Red
Cross And Red Crescent Societies, Sep. 22, 2017.
[141] Moloney, Anastasia, Floods leave Haitian farmers struggling in Irma's wake: U.N., Thomson Reuters
Foundation, Sep. 13, 2017.
[142] Jones, Sam, Why is Haiti vulnerable to natural hazards and disasters?, The Guardian, Oct. 4, 2016; Thomas,
Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April 2017.
[143] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April
2017; WFP Haiti - Country Brief, World Food Programme, p.2, May 2017.
[144] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April
2017; Jones, Sam, Why is Haiti vulnerable to natural hazards and disasters?, The Guardian, Oct. 4, 2016.
[145] Hurricane Matthew: '1.4 million need help in Haiti', Al Jazeera, Oct. 11, 2016; Haiti: Hurricane Matthew
Emergency Appeal n° MDRHT012, International Federation of Red Cross and Red Crescent Societies, p.1, Oct. 6,
2016; Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4,
April 2017;
[146] Beaubien, Jason, How Many Houses Did Hurricane Leave Standing In Port Salut, Haiti?, NPR Morning Edition,
Oct. 11, 2016; Guyler Delva, Joseph, Hurricane Matthew toll in Haiti rises to 1,000, dead buried in mass graves,
Reuters, Oct. 10, 2016.
[147] Haiti: Hurricane Matthew – Situation Report No.6, United Nations Office for the Coordination of Humanitarian
Affairs (UNOCHA), p.1-4, Oct. 10, 2016.
[148] Haiti: Hurricane Matthew – Situation Report No.6, United Nations Office for the Coordination of Humanitarian
Affairs (UNOCHA), p.1-4, Oct. 10, 2016.
[149] Haiti: Hurricane Matthew – Situation Report No.6, United Nations Office for the Coordination of Humanitarian
Affairs (UNOCHA), p.4, Oct. 10, 2016.
[150] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian
Affairs (UNOCHA), p.4, Jun. 13, 2017.

AR-HAITI-00000165-28

DPP_00002566

TPS Considerations: Haiti
Page 15

the storm.[151]  An estimated 175,000 people were displaced,[152] and 546 people were killed.[153]
Hurricane Matthew also caused "widespread damage to homes, roads, public infrastructure,
hospitals, and schools."[154]  Damages from Hurricane Matthew were estimated at nearly $2.8
billion—equivalent to 1/3 of Haiti's gross domestic product[155]—and were particularly severe in
Haiti's housing and food security sectors.[156]

In the aftermath of Hurricane Matthew, the international humanitarian community coordinated
with the Government of Haiti to provide emergency humanitarian assistance to those affected by
the storm.[157]  Humanitarian assistance was provided in a variety of fields, including emergency
shelter, health, food security, protection, etc.[158]  In early March 2017, UNOCHA reported that
over 1 million people had been reached with humanitarian assistance in the most affected regions
of Grand'Anse, Sud and Nippes departments.[159]  UNOCHA also noted that the emergency
response was ending at this time, with the focus shifting to early recovery.[160]

According to a United Nations official, as of mid-April 2017, shelter and food remained scarce
in Haiti's southern peninsula.[161]  In March 2017, an international non-governmental organization
reported that at least 13 people in Grand'Anse department had died due to hurricane related food
shortages in the region, and some Haitians were reportedly living in caves and eating poisonous
plants to survive.[162]  UNOCHA reported in May 2017 that "affected people continue to live in
precarious conditions, particularly in hard-to-reach areas."[163]

[151] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.4, Jun. 11, 2017.
[152] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April 2017.
[153] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.4, Jun. 11, 2017.
[154] Thomas, Alice, Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.4, April 2017.
[155] Charles, Jacqueline, Senate Democrats to Trump administration: Let Haitians stay, Miami Herald, Apr. 27, 2017; Charles, Jacqueline, Six months after Hurricane Matthew, food, shelter still scarce in Haiti, Miami Herald, Apr. 12, 2017.
[156] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.4, Jun. 11, 2017.
[157] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.4, Jun. 11, 2017.
[158] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.4, Jun. 11, 2017.
[159] Haiti: Hurricane Matthew Situation Report No.35 (04 March 2017), United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.1, Mar. 4, 2017.
[160] Haiti: Hurricane Matthew Situation Report No.35 (04 March 2017), United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.1, Mar. 4, 2017.
[161] Charles, Jacqueline, Six months after Hurricane Matthew, food, shelter still scarce in Haiti, Miami Herald, Apr. 12, 2017.
[162] Charles, Jacqueline, Desperate Haitians living in caves, eating toxic plants in post-hurricane Haiti, Miami Herald, Mar. 24, 2017.
[163] Haiti Humanitarian Bulletin - Issue 64 | May 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.4, Jun. 11, 2017.

AR-HAITI-00000165-30

DPP_00002568

The Haitian government and the international community continued to support Haiti's efforts to recover from Hurricane Matthew during the summer of 2017. On June 30, 2017, President Jovenel Moïse declared a state of emergency in areas hit by the storm.[164] The World Bank announced grants of $100 million in June 2017 and an additional $100 million in July 2017 to support Haiti's recovery from the impact of Hurricane Matthew.[165] In addition, the *Miami Herald* reported in July 2017 that the Inter-American Development Bank would reroute $85 million in funding to support reconstruction efforts in southern Haiti.[166]

Nevertheless, in June 2017, the World Bank reported that reconstruction needs from Hurricane Matthew "were assessed at US$2.2 billion or 25 percent of GDP."[167] In July 2017, the *Miami Herald* reported that residents of the areas most impacted by Hurricane Matthew in southern Haiti felt abandoned by international donors and the Haitian government.[168] The Inter-American Development Bank's representative for Haiti told the *Miami Herald* in July 2017 that, even with the additional funding from its organization for areas impacted by Hurricane Matthew:

> "The situation is so dire that even if we fully disbursed the $85 million that we have committed to the South after the hurricane, there are still a lot of people in need, a lot of villages that were badly affected by the hurricane and need further investment," he said. "We will need lots more resources."[169]

In October 2017, Agence France-Presse reported that—one year after Hurricane Matthew—Haiti was still suffering from the consequences of the storm, and had yet to change "the way the country prepares for natural disasters."[170]

## HAITIAN RETURNEES FROM THE DOMINICAN REPUBLIC

A crackdown on undocumented migrants in the Dominican Republic has contributed to an influx of returnees to Haiti in recent years.[171] From July 2015 through July 2017, IOM recorded that

---

[164] Charles, Jacqueline, After Hurricane Matthew, many victims in Haiti feel abandoned, Miami Herald, Jul. 14, 2017.

[165] Charles, Jacqueline, After Hurricane Matthew, many victims in Haiti feel abandoned, Miami Herald, Jul. 14, 2017; World Bank Approves Additional US$80 Million for Haiti's Hurricane Recovery, The World Bank, Jun. 14, 2017; Haiti - Post-Matthew : Additional $80M grants from the World Bank, Haiti Libre, Jun. 15, 2017.

[166] Charles, Jacqueline, After Hurricane Matthew, many victims in Haiti feel abandoned, Miami Herald, Jul. 14, 2017.

[167] World Bank Supports Haiti's Post-Matthew Reconstruction, The World Bank, Jun. 8, 2017.

[168] Charles, Jacqueline, After Hurricane Matthew, many victims in Haiti feel abandoned, Miami Herald, Jul. 14, 2017.

[169] Charles, Jacqueline, After Hurricane Matthew, many victims in Haiti feel abandoned, Miami Herald, Jul. 14, 2017.

[170] A year after Hurricane Matthew, Haiti more vulnerable than ever, Agence France-Presse (AFP), Oct. 4, 2017.

[171] Azam, Ahmed, Forced to Flee Dominican Republic for Haiti, Migrants Land in Limbo, The New York Times, Dec. 12, 2015; Partlow, Joshua, A Haitian border town struggles with new rules in the Dominican Republic, The Washington Post, Jun. 24, 2015; McFadden, David, An aid agency is relocating several thousand people who had

AR-HAITI-00000165-32

215,121 Haitian migrants spontaneously returned or were deported to Haiti.[172] In June 2017, IOM reported that the "total number of returnees has averaged between 6000 and 8000 individuals on a monthly basis" since August 2016.[173] However, the total number of returnees may actually be higher, as IOM stated that it had only been able to monitor half of border crossings between the two countries since September 2016 due to budget constraints.[174] Deportations from the Dominican Republic have drastically increased since April 2017; July 2017 had the highest number of official deportations since October 2015.[175]

In July 2017, the United Nations Secretary-General reported that returnees from the Dominican Republic:

> continue to find themselves in a situation of vulnerability owing to the insufficient reception capacity of the Haitian authorities and a lack of reintegration opportunities. This group will likely continue to need assistance in the foreseeable future, including with regard to the determination of their legal status.[176]

Similarly, in August 2017, the *Miami Herald* commented on the Haitian government's "inability to absorb the influx" of returnees from the Dominican Republic, also noting that "their arrival, mostly ignored by Haitian authorities, has burdened humanitarian organizations that have struggled to help amid deep budget cuts and indifference."[177] Many migrants reportedly "arrive in precarious conditions,"[178] while some returnees reportedly live in "makeshift camps" along the border similar to those inhabited by IDPs from the 2010 earthquake.[179]

---

fled to Haiti from the Dominican Republic and set up informal settlements along the Haitian side of the border, Associated Press, Mar. 30, 2016; Maloney, Anastasia, U.N. urges Dominican Republic to prevent deportations of Haitians, Thomson Reuters Foundation, Jul. 29, 2015.
[172] UN Migration Agency Opens Haiti's First Border Resource Centre to Help Returning Haitians, International Organization for Migration, Jun. 27, 2017; IOM Haiti border monitoring sitrep: Tracking returnees from the Dominican Republic, International Organization for Migration, International Organization for Migration, Aug. 3, 2017.
[173] IOM Haiti – DTM Report – June 2017, International Organization for Migration, p.24, June 2017.
[174] IOM Haiti border monitoring sitrep: Tracking returnees from the Dominican Republic, International Organization for Migration, International Organization for Migration, Jun. 29, 2017.
[175] IOM Haiti border monitoring sitrep: Tracking returnees from the Dominican Republic, International Organization for Migration, International Organization for Migration, Aug. 3, 2017; Haiti Humanitarian Bulletin - Issue 65 | June-July 2017, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.1-2, Aug. 17, 2017.
[176] Report of the Secretary-General on the United Nations Stabilization Mission in Haiti, United Nations Security Council, p.5, July 12, 2017.
[177] Charles, Jacqueline, The countdown for Haitians with TPS has started. And that has many in Haiti worried., Miami Herald, Aug. 4, 2017.
[178] UN Migration Agency Opens Haiti's First Border Resource Centre to Help Returning Haitians, International Organization for Migration, Jun. 27, 2017.
[179] Following political crisis Haiti must urgently advance human rights agenda, Amnesty International, Mar. 17, 2017.

AR-HAITI-00000165-33

AR-HAITI-00000165-34

TPS Considerations: Haiti
Page 18

## SUMMARY

Haiti's recovery has been hindered by subsequent natural disasters and various political, social, health, security, and economic conditions which have negatively impacted the country in recent years. Haiti remains vulnerable to external shocks, and its internal fragility has left it unable to adequately respond to a wide range of persistent humanitarian needs. As UNOCHA and the United Nations Country Team in Haiti reported in January 2017:

> With more than 98% of Haitians exposed to two or more types of disasters, the impact of recurring natural disasters is particularly severe, especially considering the already pre-existing protection, socio-economic and environmental vulnerabilities and disparities. Most Haitians remain vulnerable to natural hazards and disasters, such as floods, landslides, droughts, earthquakes and hurricanes. With more than a half of its total population living in extreme poverty, Hurricane Matthew has once more demonstrated Haiti's weakened ability to cope, recover and adapt to shocks from natural disasters. Meanwhile, as a result of electoral-related tensions, politically motivated demonstrations and insecurity have affected the humanitarian operating environment since mid- 2015 against the backdrop of a decreasing humanitarian presence in the field due to the lack of humanitarian funding.[180]

Due to the conditions outlined in this report, Haiti's recovery from the 2010 earthquake could be characterized as falling into what one non-governmental organization recently described as "the country's tragic pattern of 'one step forward, two steps back.'"[181]

[180] Haiti: Humanitarian Response Plan January 2017 - December 2018, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA)/United Nations Country Team in Haiti, p.6, Jan. 2017.
[181] Thomas, Alice. Two Steps Back: Haiti Still Reeling from Hurricane Matthew, Refugees International, p.17, April 2017.

AR-HAITI-00000165-36

DPP_00002574



THE SECRETARY OF STATE

WASHINGTON

October 31, 2017

The Honorable
Elaine C. Duke
Acting Secretary of the Department of Homeland Security
Washington, DC 20528

Dear Acting Secretary Duke:

The State Department has assessed that El Salvador, Haiti, Honduras, and Nicaragua no longer meet the conditions required for continued designation for Temporary Protected Status (TPS). The disruption in living conditions in El Salvador, Honduras, and Nicaragua attributable to the environmental disasters that served as the basis for their TPS designations has decreased in severity to a degree that it may no longer be considered "substantial" within the meaning of the TPS statute. The extraordinary and temporary conditions that served as the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety. Attached are country conditions reports that provide the Department's assessment of conditions in each country as they pertain to their respective TPS designations.

Given the number of impacted beneficiaries, and to minimize any negative implications that termination would have on our bilateral relations with these countries, I recommend that should the Department of Homeland Security (DHS) decide to terminate TPS for these countries, that you do so with delayed effective dates of 18 months. An 18-month wind down period would provide adequate time for long-term beneficiaries to arrange for their departure and for their home countries to prepare for their reception and reintegration.

I do not make these recommendations lightly. As you consider your decision, I am sure you are well aware of the significant humanitarian, foreign policy, and political interests at play. First and foremost, termination of TPS would likely leave hundreds of thousands of TPS recipients – many of whom have lived and worked in the United States for more than 15 years and have U.S. citizen children – out of legal status. For those that depart, they will return to countries with limited economic opportunities for their reintegration. In the case of El Salvador and Honduras, both countries continue to have some of the world's highest homicide rates, and weak law enforcement capabilities and inadequate government services will make it difficult for their respective governments to ensure the protection of returning citizens – no less the U.S. citizen children who may accompany their parents.

Termination of TPS will also likely generate a backlash from the governments themselves, particularly the Honduran and Salvadoran governments, who have agreed to engage with the United States in support of the U.S. strategy in Central America. Central American leaders are likely to assert that the resources required for a large-scale re-integration of TPS beneficiaries and their dependents will undermine the Central America Strategy and Central America's complementary Alliance for Prosperity, both of which seek to generate prosperity for the region's citizens and reduce irregular migration to the United States. They may take retaliatory actions counter to our long-standing national security and economic interests like withdrawing their counternarcotics and anti-gang cooperation with the United States, reducing

DPP_00002575

AR-HAITI-00000166-02

DPP_00002576

—
—

-2-

their willingness to accept the return of their deported citizens, or refraining from efforts to control illegal migration.

However, the fact remains that the conditions in these countries do not -- in the State Department's judgment -- meet the legal requirements necessary for extension. Should DHS decide to terminate the programs, I hope our Departments can work together in a thoughtful, coordinated manner to develop a plan to work with the four governments, TPS beneficiaries themselves, Congress, NGOs, and other stakeholders to mitigate any negative impact on U.S. national security and foreign policy priorities. As indicated, an 18-month wind down period will be critical to our efforts.

I thank you in advance for including the Department of State's Bureaus of Western Hemisphere Affairs (WHA) and Population, Refugees, and Migration, as well as our public affairs team, in your Department's planning for the public announcement of any TPS decisions, including to foreign audiences. Additionally, I request that you provide WHA with no less than 48-hours lead time prior to the public announcement so that it can notify counterpart governments, on an embargoed basis, of the decision. I also recommend DHS delay a public announcement for Honduras until November 27, to prevent TPS issues from unduly influencing the November 26 presidential election.

Sincerely,

Rex W. Tillerson

Enclosures:
    As stated.

AR-HAITI-00000166-04

DPP_00002578

SENSITIVE BUT UNCLASSIFIED

## DEPARTMENT OF STATE RECOMMENDATION REGARDING
## TEMPORARY PROTECTED STATUS (TPS) FOR HAITI – 2017

I.    **Statutory Basis for Designation**

**Have the conditions under which the foreign state was designated for temporary protected status ceased to exist?**

(SBU) **Yes, the conditions have ceased to exist.** The extraordinary and temporary conditions that served as the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety. Former Secretary of Homeland Security Janet Napolitano originally designated Haiti for TPS effective January 21, 2010, on the basis of extraordinary and temporary conditions in the wake of Haiti's 2010 earthquake. Since 2010, a 2011 re-designation and four subsequent extensions of TPS designation for Haiti have been made by DHS Secretaries. The most recent extension, effective from July 23, 2017 – January 22, 2018, cited not only temporary and extraordinary conditions in the wake of the 2010 earthquake, but subsequent conditions, including: 2016's Hurricane Matthew, April 2017 heavy rains and landslides, security vulnerabilities that some Haitians who reside in Internally Displaced Persons (IDP) areas experience, and health vulnerabilities due to a weak public health system, which has been strained by a cholera epidemic. The extension also noted Haiti's serious economic and security challenges (82 FR 23830).

(SBU) Country conditions have improved since the January 2010 earthquake. The IDP population has decreased 97 percent from its peak in 2010. A legitimized government is in place after two years of electoral impasse. As of October 15, 2017, all UN military personnel have been withdrawn from Haiti; to be replaced by a police only successor mission focused on *strengthening rule of law and promoting human rights.*

(SBU) Specific lingering effects of the earthquake remain in the areas of infrastructure, health, sanitation services, and emergency response capacity. Although significant steps have been taken to improve the stability and the quality of life for Haitian citizens, Haiti continues to lack the capacity to ensure that the large population TPS beneficiaries currently residing in the United States can return in safety. However, Haiti maintains the ability safely to receive traditional levels of returned *Haitian nationals, and is currently* doing so.

(SBU) Based on these facts, we assess that the extraordinary and temporary conditions that served as the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety.

### A. *Armed Conflict*

1.  **Is the foreign state still involved in an ongoing, internal armed conflict?**

(U) No.

SENSITIVE BUT UNCLASSIFIED

AR-HAITI-00000167-02

DPP_00002580

SENSITIVE BUT UNCLASSIFIED
-2-

a. **If so, would the return of nationals of the foreign state to that state (or to the part of the state) still pose a serious threat to their personal safety?**

(U) N/A.

B. *Environmental Disaster*

1. **Does there continue to be a substantial, but temporary, disruption of living conditions in the area affected by the environmental disaster?**

(U) N/A.

2. **Is the foreign state still unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state?**

(U) N/A.

3. **Does the foreign state continue to support the TPS designation?**

(U) N/A.

C. *Extraordinary and Temporary Conditions*

1. **Has the foreign state experienced extraordinary and temporary conditions that prevent aliens who are nationals of the state from returning to the state in safety?**

(SBU) No. In the wake of the 2010 earthquake, Haiti continues to be affected by lingering earthquake damage. The earthquake destroyed virtually all government offices and ministries in downtown Port-au-Prince, leaving most in long-term temporary facilities spread throughout the city. However, country conditions and the Government of Haiti's capacity have improved sufficiently to allow for the safe return of a moderate flow of Haitian nationals.

(SBU) Since the earthquake, the IDP population had decreased 97 percent (from two million to 37,000) from its estimated peak in 2010, to the point where today, just 27 of the original 1,555 IDP sites remain open. Despite these gains, gender-based violence in the IDP areas remains a serious concern, and personal security is a serious and pervasive problem. An estimated 41,000 Haitians who have been made homeless as a result of various natural disasters since 2010, including Hurricane Matthew in 2016, affecting Haiti remain in IDP areas.

(SBU) With more than a half its total population living in extreme poverty, Hurricane Matthew demonstrated Haiti's weakened ability to cope, recover, and adapt to shocks from natural disasters. This fragility was exposed again most recently by Hurricane Irma, which temporarily displaced over 10,000 people into shelters and exacerbated an existing food security crisis on the northern coast.

SENSITIVE BUT UNCLASSIFIED

AR-HAITI-00000167-04

SENSITIVE BUT UNCLASSIFIED
-3-

(SBU) With the withdrawal of the United Nations Stabilization Mission in Haiti's (MINUSTAH) military component underway, the Haitian National Police (HNP) will be called upon to shoulder increased responsibility for maintaining order throughout the country. However, the HNP remains highly concentrated in Port-au-Prince and has limited resources, challenging its ability to guarantee security throughout the country. The United States and our international partners continue to work to train and support the development and growth of the HNP, which has been increasingly perceived as professional and capable of providing security.

> **2. Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?**

(SBU) No. Permitting Haitians to remain temporarily in the United States would not be contrary to the U.S. national interest. Current TPS beneficiaries have been in TPS status in the United States for six or seven years. The population has been stable and has successfully settled there. The current practice of returning newly arrived illegal migrants via the resumed non-criminal deportation flights has greatly disincentivized new attempts at large-scale illegal migration.

## II.   Discretionary Factors

> **What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

(SBU) An abrupt termination of TPS for Haiti that does not provide a period for an orderly transition could jeopardize progress made in our bilateral relationship, particularly our robust partnership with Haiti on migration.

**(SBU) Setting a Negative Historical Precedent:** Approximately 58,706 Haitians received TPS benefits following the 7.0 magnitude earthquake in 2010. Since 1990 when the TPS statute was passed, approximately 22 countries have been designated under the statute. Only three countries have had their TPS designation terminated without a period of at least six months provided for orderly transition – those cases involved beneficiary populations of as few as 316, and as many as 4,018. The average duration of a TPS designation has been 8.5 years. By this measure, an immediate effective date for termination of Haiti's TPS designation would be a statistical outlier. Haiti has been designated for TPS for less than eight years, and its sudden termination with no delay in effective date to allow for orderly transition period would affect 14 times more people than the largest group of TPS beneficiaries whose status was terminated without an extended transition period (which last occurred in 1993).

**(SBU) A Cooperative Partnership:** Haiti is a committed and cooperative partner in stemming the irregular flow of migrants to the United States, accepting regular deportation flights, and preventing further illegal migration of Haitians upon their return. This cooperation was best exemplified through their support in managing the irregular flow of Haitian migrants arriving at the U.S. southwest border with Mexico in 2016. Despite political turmoil and economic uncertainty in Haiti, when more than 6,500 Haitians presented themselves at U.S. ports of entries (a 1,300 percent increase from 2015), the Haitian government agreed to receive non-criminal

SENSITIVE BUT UNCLASSIFIED

AR-HAITI-00000167-06

deportation flights for the first time since the 2010 earthquake. This proved to be a strong deterrent mechanism, bringing a near cessation of Haitians presenting themselves at the U.S. southwest border. To date, Haiti has accepted over 5,200 deportees.

(SBU) Haiti has also shown a commitment to adequately prepare in the event TPS is terminated. Since then-DHS Secretary Kelly's visit to Haiti on May 31, Haiti has made the following preparations:

- **(SBU) Establishment of a Working Group:** The Government of Haiti established a minister-level working group focused on efforts to mitigate factors that cause Haitians to migrate illegally. A sub-group was created in order to focus specifically on preparations for the possible DHS termination of TPS; understanding the need to ensure employment opportunities exist for TPS beneficiaries when they return to Haiti.
- **(SBU) Outreach to Diaspora Leaders:** Haiti's Ambassador in Washington has worked to raise awareness amongst influential diaspora leaders, so they can effectively share information with the Haitian community in the United States on how a policy change will affect them.
- **(SBU) Providing Legal Assistance:** The Haitian Mission in the United States established a hotline to provide legal assistance by way of immigration attorneys.

**(SBU) Implications of a Termination:** While the Haitian government has exemplified its commitment to remain a cooperative partner of the United States, an abrupt DHS termination of TPS benefits for Haitian beneficiaries would jeopardize this progress. It would also threaten the strides the Government of Haiti has made towards political stability. After two years of electoral impasse, President Jovenel Moise and his government have been legitimized and are able to focus on developing a more secure, stable, and self-sufficient Haiti. It is in our interest to remain committed to the country's long-term security, democratic development, and economic growth, as well as to recognize when adequate conditions exist to warrant DHS termination of TPS.

(SBU) An immediate DHS termination of benefits at this juncture, when Haiti is focused on developing opportunities that allow Haitians to stay and help build their country, would have implications not only for Haiti's stability, but for the region. Haitians who are involuntarily returned to a country that is not yet able to handle the influx of returns would further incentivize illegal migration, to the United States and other destinations. This would strain the already limited resources of our North American, Central American, and Caribbean partners. To this end, *such an irregular flow of Haitian migrants, similar to what was seen in 2016, could threaten* the progress made on the U.S. strategy in Central America, and the efforts we have made to further secure our borders. It is therefore in the national security interests of the United States to *ensure an orderly transition of Haitian TPS beneficiaries.*

## III.  Recommendation

(SBU) The extraordinary and temporary conditions that served as the basis for the 2010 designation and 2011 re-designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety. However, lingering issues from the 2010 earthquake, the aftermath of Hurricane Matthew in 2016, the heavy rains and landslides in 2017, Hurricane

AR-HAITI-00000167-08

Irma in September 2017, and the additional effects of the cholera epidemic continue to affect Haiti. It is in the national interest of the United States to ensure that Haiti's inability to absorb a large number of TPS beneficiaries does not jeopardize the progress Haiti has made in receiving criminal and noncriminal deportees from the United States. **Based on these factors, the Department recommends that the Acting Secretary of Homeland Security designate an effective date to provide TPS benefits for an additional 18 months beyond the end of the current designation to provide the Haitian government with adequate time to prepare for the safe reintegration of approximately 58,706 Haitians.**

AR-HAITI-00000167-09

DPP_00002587

AR-HAITI-00000167-10

DPP_00002588



**U.S. Citizenship and
Immigration Services**

\ slb \ SERVICE LAW BOOKS MENU \ IMMIGRATION AND NATIONALITY ACT \ INA: ACT 244 -
TEMPORARY PROTECTED STATUS
Previous Document | Next Document

---

INA: ACT 244 - TEMPORARY PROTECTED STATUS

Sec. 244. 1/ [8 U.S.C. 1254]

(a) Granting of Status.-

   (1) In general.-In the case of an alien who is a national of a foreign state designated under
subsection (b) (or in the case of an alien having no nationality, is a person who last habitually
resided in such designated state) and who meets the requirements of subsection (c), the Attorney
General, in accordance with this section-

      (A) may grant the alien temporary protected status in the United States and shall not remove
the alien from the United States during the period in which such status is in effect, and

      (B) shall authorize the alien to engage in employment in the United States and provide the
alien with an "employment authorized" endorsement or other appropriate work permit.

   (2) Duration of work authorization.-Work authorization provided under this section shall be
effective throughout the period the alien is in temporary protected status under this section.

   (3) Notice.-

      (A) Upon the granting of temporary protected status under this section, the Attorney General
shall provide the alien with information concerning such status under this section.

AR-HAITI-00000168-01                                                                          DPP_00002591

AR-HAITI-00000168-02

(B) If, at the time of initiation of a removal proceeding against an alien, the foreign state (of which the alien is a national) is designated under subsection (b), the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

(C) If, at the time of designation of a foreign state under subsection (b), an alien (who is a national of such state) is in a removal proceeding under this title, the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

(D) Notices under this paragraph shall be provided in a form and language that the alien can understand.

(4) Temporary treatment for eligible aliens -

(A) In the case of an alien who can establish a prima facie case of eligibility for benefits under paragraph (1), but for the fact that the period of registration under subsection (c)(1)(A)(iv) has not begun, until the alien has had a reasonable opportunity to register during the first 30 days of such period, the Attorney General shall provide for the benefits of paragraph (1).

(B) In the case of an alien who establishes a prima facie case of eligibility for benefits under paragraph (1), until a final determination with respect to the alien's eligibility for such benefits under paragraph (1) has been made, the alien shall be provided such benefits

(5) Clarification.-Nothing in this section shall be construed as authorizing the Attorney General to deny temporary protected status to an alien based on the alien's immigration status or to require any alien, as a condition of being granted such status, either to relinquish nonimmigrant or other status the alien may have or to execute any waiver of other rights under this Act. The granting of temporary protected status under this section shall not be considered to be inconsistent with the granting of nonimmigrant status under this Act.

(b) Designations.-

(1) In general.-The Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if-

AR-HAITI-00000168-03                                                    DPP_00002593

AR-HAITI-00000168-04

(A) the Attorney General finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety,

(B) the Attorney General finds that–

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) the Attorney General finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

A designation of a foreign state (or part of such foreign state) under this paragraph shall not become effective unless notice of the designation (including a statement of the findings under this paragraph and the effective date of the designation) is published in the Federal Register. In such notice, the Attorney General shall also state an estimate of the number of nationals of the foreign state designated who are (or within the effective period of the designation are likely to become) eligible f or temporary protected status under this section and their immigration status in the United States.

(2) Effective period of designation for foreign states.–The designation of a foreign state (or part of such foreign state) under paragraph (1) shall–

(A) take effect upon the date of publication of the designation under such paragraph, or such later date as the Attorney General may specify in the notice published under such paragraph, and

AR-HAITI-00000168-05                                                                    DPP_00002595

AR-HAITI-00000168-06

DPP_00002596

(B) shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B). For purposes of this section, the initial period of designation of a foreign state (or part thereof) under paragraph (1) is the period, specified by the Attorney General, of not less than 6 months and not more than 18 months.

(3) Periodic review, terminations, and extensions of designations.-

(A) Periodic review.-At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continu e to be met. The Attorney General shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register.

(B) Termination of designation.-If the Attorney General determines under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d) (3), but shall not be effect ive earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C).

(C) Extension of designation.-If the Attorney General does not determine under subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months).

(4) Information concerning protected status at time of designations.-At the time of a designation of a foreign state under this subsection, the Attorney General shall make available information respecting the temporary protected status made available to aliens who are nationals of such designated foreign state.

(5) Review.-

(A) Designations.-There is no judicial review of any determination of the Attorney General

AR-HAITI-00000168-07                                                    DPP_00002597

AR-HAITI-00000168-08

Tom & Zack                                    11/5

entirely my decision
decision will be critized
will say bad things
conditions in 4 countries
          no longer exist
gulees fed. bureaucracies have existed

What we should do      extremely
                       disappointed
Honduras               if stuck into        El Salvador
   Nicaragua — end     Port Sec. - Haiti
                       NYT

want up U.S. Congress & gov
     stats.
2nd call _____                              11/5

   Gen Kelly
         n/   We)  LHS annual
                   award ceremony
           issue

         [ cost? ]

Case 3:18-cv-01554-EMC   Document 113-2   Filed 09/05/18   Page 121 of 157

with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

(B) Application to individuals.-The Attorney General shall establish an administrative procedure for the review of the denial of benefits to aliens under this subsection. Such procedure shall not prevent an alien from asserting protection under this section in removal proceedings if the alien demonstrates that the alien is a national of a state designated under paragraph (1).

(c) Aliens Eligible for Temporary Protected Status -

(1) In general.-

(A) Nationals of designated foreign states.-Subject to paragraph (3), an alien, who is a national of a state designated under subsection (b)(1) (or in the case of an alien having no nationality, is a person who last habitually resided in such designated state), meets the requirements of this paragraph only if-

(i) the alien has been continuously physically present in the United States since the effective date of the most recent designation of that state;

(ii) the alien has continuously resided in the United States since such date as the Attorney General may designate,

(iii) the alien is admissible as an immigrant, except as otherwise provided under paragraph (2)(A), and is not ineligible for temporary protected status under paragraph (2)(B); and

(iv) to the extent and in a manner which the Attorney General establishes, the alien registers for the temporary protected status under this section during a registration period of not less than 180 days.

(B) Registration fee.-The Attorney General may require payment of a reasonable fee as a condition of registering an alien under subparagraph (A)(iv) (including providing an alien with an "employment authorized" endorsement or other appropriate work permit under this section). The amount of any such fee shall not exceed $50. In the case of aliens registered pursuant to a designation under this section made after July 17, 1991, the Attorney General may impose a separate, additional fee for providin g an alien with documentation of work authorization. Notwithstanding section 3302 of title 31, United States Code, all fees collected under this subparagraph shall be credited to the appropriation to be used in carrying out this section.

AR-HAITI-00000168-10                                                                                DPP_00002600

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security (Secretary), after consultation with appropriate agencies of the Government, may designate a foreign State (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign State (or aliens having no nationality who last habitually resided in that State).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultations with appropriate agencies of the Government, must review the conditions in a foreign State designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation. See INA § 244(b)(3)(A); 8 U.S.C. § 1254a(b)(3)(A)-(C). If the Secretary determines that the foreign State no longer meets the conditions for the TPS designation, he must terminate the designation. See INA § 244(b)(3)(B); 8 U.S.C. § 1254a(b)(3)(B). Although the Secretary must make his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing his decision must be "on a timely basis." See INA § 244(b)(3)(A). There is also an automatic, minimum six-month extension of a country's TPS designation if the Secretary does not make a decision under INA § 244(b)(3)(A); 8 U.S.C. § 1254a(b)(3)(A) that the foreign state no longer meets the conditions for designation. See INA § 244(b)(3)(C); 8 U.S.C. § 1254a(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 C.F.R. § 244.1 *et seq.* These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant is not ineligible under certain mandatory criminal history, terrorism, and national security bars as specified in INA § 244(c)(2)(A-B); and that the applicant is registering for TPS in accordance with regulatory procedures in 8 C.F.R. §§ 244.2 – 244.9.

If granted TPS, the individual receives employment authorization and an Employment Authorization Document, if requested, that is valid for the period that he or she holds TPS. TPS is a temporary benefit that does not lead to lawful permanent residence or confer any other immigration status. When a TPS country designation ends, TPS beneficiaries maintain the same immigration status, if any, that they held prior to TPS (unless that status has expired or been terminated) or any other status they may have acquired while registered for TPS.

AR-HAITI-00000170

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY


**Homeland Security**
Office of Intelligence and Analysis


**INTELLIGENCE ASSESSMENT**
2 November 2017

## (U) Border Security

## (U) Implications for TPS Expiring for Beneficiaries from El Salvador, Honduras, Haiti, and Nicaragua

(U//FOUO) **Scope.** This Intelligence Assessment provides an overview of how the approximately 434,000 Temporary Protected Status (TPS) beneficiaries from El Salvador, Honduras, Haiti, and Nicaragua would respond these protections were to expire in the second quarter of FY 2018.[1,2] The Assessment focuses on the homeland security implications of expiring TPS protections, including the possibility of former beneficiaries returning illegally after deportation and other operational considerations involving law enforcement, economic, and other concerns. It is intended for US policy makers, Intelligence Community partners, and state, local, tribal, and territorial law enforcement partners. The information cutoff date for this assessment is 24 October 2017.

(U) Prepared by the Office of Intelligence and Analysis (I&A).

### (U) Key Judgment

(U//FOUO) I&A judges that former TPS beneficiaries from all four countries choosing to illegally return to the United States likely would have the personal and economic motivation and the financial means to pay smugglers to assist them. I&A assesses that TPS beneficiaries from El Salvador and Honduras who are returned to their home countries would have the highest rates of illegal return migration due to these countries' established routes for illicit travel and entry at the US Southwest Border. Beneficiaries from Haiti will have more moderate levels of illegal return migration due to well-established maritime deterrence methods. Beneficiaries from Nicaragua may have some illegal return migration due to prevalent economic and social issues there; however, its smaller TPS population would represent a lower impact on DHS interests.

### (U) Key Assumptions

(U//FOUO) Our analysis assumes that host nations would begin to receive repatriated citizens within 6 to 12 months of TPS expiration, and that a significant portion of beneficiaries would not pursue status adjustment, such as seeking asylum or student visas, to remain in the United States.

IA-0XXX-18

(U) LAW ENFORCEMENT SENSITIVE: The information marked (U//LES) in this document is the property of DHS and may be distributed within the Federal Government (and its contractors), US intelligence, law enforcement, public safety or protection officials, and individuals with a need to know. Distribution beyond these entities without DHS authorization is prohibited. Precautions should be taken to ensure this information is stored and/or destroyed in a manner that precludes unauthorized access. Information bearing the LES caveat may not be used in legal proceedings without first receiving authorization from the originating agency. Recipients are prohibited from subsequently posting the information marked LES on a website on an unclassified network.

(U) Warning: This document contains UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need to know without prior approval of an authorized DHS official. State and local homeland security officials may not share this document with critical infrastructure and key resource personnel or private sector security officials without further approval from DHS.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

(U//FOUO)  We assume that former TPS holders would not migrate in significant numbers to Canada or Mexico prior to being deported from or voluntarily leaving the United States.

» (U//FOUO)  Family and economic ties to the United States likely would motivate repatriated TPS holders to return to the United States, possibly via illegal migration.  Many TPS beneficiaries from El Salvador, Honduras, Haiti, and Nicaragua have lived continuously in the United States since the late 1990s, according to ████ [3,4]  TPS beneficiaries made up 80 percent of the labor force, are parents to hundreds of thousands of United States citizen children, and maintain strong economic ties to the United States through home and business ownership, according to the Center for Migration Studies, a US-based think tank and educational institute that studies international migration.[5]

» (U//LES)  Honduras and El Salvador migrants take well-established overland routes to attempt to access the US Southwest Border illicitly using trains, buses, taxis, and personal cars.  Trips take an average of 10 to 21 days and cost up to $8,000, according to a body of ████████████ reporting from 2014 to 2017.[6-13]  Former TPS beneficiaries deported from the United States to Honduras and El Salvador could easily use these routes to return almost immediately to the United States; additionally, they likely have the means to pay any associated smuggling costs because of the income they earned while living and working in the United States, according to ████ ████ research.[14]

» (U//LES)  Since consistent USCG patrolling has successfully deterred migrants from traveling on maritime routes, many are resorting to overland routes to the US Southwest Border via South and Central America, according to a body of ████ reporting.[15,16,17,18] ████ assessed in February 2017 that Haitian maritime migration levels are likely to remain constant through FY 2019, barring any change to US immigration policy, a significant natural disaster, or major degradation of security conditions.[19]

» (U//LES)  Like other Central Americans, Nicaraguan migrants also take overland routes to reach the US Southwest Border, but the number of Nicaraguan migrants who traveled illegally to the United States compared to those from Northern Triangle countries was relatively low, with less than 1,500 total encounters per year in both FY 2016 and FY 2017, according to ████ data.[20,21,22,a]

---

### (U)  What is Temporary Protected Status (TPS)?

(U)  The Secretary of Homeland Security may designate a foreign country for Temporary Protected Status (TPS) due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances, where the country is unable to handle the return of its nationals adequately.  USCIS may grant TPS to eligible nationals of certain countries (or parts of countries), who are already in the United States.  Eligible individuals without nationality who first resided in the designated country may also be granted TPS.[23]

---

a (U//FOUO)  In FY 2016, the total encounters (apprehensions and inadmissibles) for Nicaraguan nationals were 1,347; in FY 2017, the total encounter number was 1,139, according to CBP statistics.

AR-HAITI-00000172

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

## (U) TPS Expiration: DHS's Operational and Tactical Considerations

(U//FOUO) ▓▓▓: Analysts noted that all TPS beneficiaries losing protected status could seek to adjust their status to prevent deportation. These adjustments include, but are not limited to, other LPR applications, asylum claims, student visas, and non-immigrant visas. Any TPS beneficiary eligible for removal could be sponsored for LPR status by a US citizen child over the age of 21. Given that the average TPS beneficiary is in their mid-forties, many may have US citizen children old enough to assist them in adjusting to LPR status. ▓▓▓ analysts also noted that the number of beneficiaries registered does not necessarily reflect the total number of individuals eligible for removal, as many have already adjusted their legal status and have not updated their records with the agency. Any TPS beneficiaries who illegally immigrate to a third nation (such as Canada) would not automatically lose TPS in the United States; however, without advanced permission to leave the country, they would likely be stopped at the border and not allowed to re-enter the United States.[24,25]

(U//LES) ▓▓▓▓ data shows 240,255 removals processed in FY 2016, at a total cost of $4.23 billion. The average cost for a removal in FY 2016 was $11,869 per person, with individuals remaining in detention for an average of 34.9 days. As of 25 September 2017, there were 203 authorized detention facilities in the United States with an average daily population of 38,107.[26] Based on current ▓▓▓ priorities, loss of TPS benefits alone would not meet the threshold for targeted removal unless individuals are found to be a national security threat, convicted of criminal acts, or previously in removal proceedings before TPS was originally designated.

(U//FOUO) State and Local Perspective: ▓▓▓▓ reported many ▓▓ offices commenting that, if TPS expired for any of the four countries, the impact on both federal operations and state-level interests would be dependent on whether the expiration dates were concurrent or staggered. The Massachusetts ▓▓▓ indicated that while the repeal of TPS extensions would increase cost and workload for United States law enforcement, the ▓▓ office in the state could handle the increase without major issues. The ▓▓ offices in North Carolina and Florida indicated that they would not have adequate facilities to house any extra deportees, and they might be burdened by the costs associated with the monitoring of parolees, to include GPS ankle monitors and additional staffing needed to support these services. The ▓▓ office in North Carolina cited the extra burden that TPS expiring would likely have on the federal immigration court system, suggesting that for those without a criminal record, the average wait time for a hearing date would likely be between 12 and 16 months. The ▓▓ offices in Florida, Georgia, and New York indicated that TPS expiration would have a generally low or unknown impact on state tax revenue and social services due to uncertainties over the size of areas of responsibility, prioritization of removals, timelines for work authorization removal, and differing local demographics. Some polled states indicated that other economic impacts would most likely be felt at the local level.[27,28]

### (U) Alternative Analysis

» (U//FOUO) I&A considered the possibility that former TPS beneficiaries returning to their home countries would remain there because they perceive US immigration policy as a barrier to returning to the United States. We also could have overestimated the effect that pull factors (the economy, familial and social ties) would have on their decision to return to the United States. If true, our estimates on return migration would be lowered, as would the potential impact to DHS personnel and resources.

» (U//FOUO) I&A considered the possibility that former TPS beneficiaries would travel to a third nation such as Canada or Mexico. This scenario, if true, was deemed to have no DHS equities.

» (U//FOUO) I&A considered the possibility that a large number of TPS beneficiaries would legally adjust status in the United States.[a] This alternative assumes beneficiaries' knowledge of their legal options to adjust status and could impact wait times for the USCIS case load and federal immigration court. I&A currently lacks data to forecast this scenario.

» (U//FOUO) I&A considered the possibility that TPS beneficiaries could respond to TPS expiration by staying in the United States illegally rather than attempting to adjust status or departing to their home countries. If true, former TPS beneficiaries would contribute to the pool of illegal overstays already residing in the United States, and would burden ICE removal operations depending on prioritization. I&A currently lacks data to forecast this scenario.

(U) Tracked by: HSEC-3

---

[a] (U) Examples of ways TPS beneficiaries could adjust their status include asylum claims, marriage to a US citizen, applications for LPR status, and applications for non-immigrant visas.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000173

AR-HAITI-00000174

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

# (U)  Appendix A:
## TPS Overview El Salvador

(U//SBU)  El Salvador received TPS designation in 2001 after two earthquakes caused serious damage to the country's housing and security.  The country, which experienced subsequent environmental disasters preventing beneficiaries from returning, received its most recent TPS extension in July 2016, expiring on 9 March 2018.  El Salvador will continue to lobby for a TPS extension, almost certainly on the grounds that multiple factors (limited immigration infrastructure, underdeveloped economy, environmental problems) lower its reabsorption capacity for potential returnees.[29,30,31,32]

(U//FOUO)  I&A assesses that, if TPS were to expire, well-established family ties in the United States and a host of push factors in El Salvador, such as poor job prospects, gang-related violence, and potentially poor living conditions at home, would lead to high levels of illegal return migration among returnees. Should they decide to return illegally, existing smuggling routes to the US Southwest border would facilitate their return to the United States.[33,34,35,36]

(U)  Registered TPS Beneficiaries in the United States presented by age and location as of 2 October 2017.[37]



(U) Salvadoran TPS Beneficiaries by Age
*Data Source: USCIS

| (U//FOUO) Top States and Cities For Salvadoran TPS Holders |  |  |  |
| --- | --- | --- | --- |
| Top States | State Population | Top Cities | City Population |
| California | 66,518 | Los Angeles, CA | 19,399 |
| Texas | 40,497 | Houston, TX | 18,057 |
| New York | 32,296 | Silver Spring, MD | 4,266 |
| Virginia | 25,496 | Dallas, TX | 4,034 |
| Maryland | 24,255 | Brentwood, NY | 4,022 |
| Other States | 87,991 | Other Cities | 227,285 |
| TPS National Total: 277,051 |  |  |  |

(U) Warning: This document contains UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official. State and local homeland security officials may not share this document with critical infrastructure and key resource personnel or private sector security officials without further approval from DHS.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000175

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

## (U//FOUO) Push Factors Increase Potential Illegal Return Migration to the United States

» (U) Family ties would certainly lure repatriated TPS beneficiaries back to the United States. TPS holders from El Salvador have some 192,000 US citizen children, while 34 percent have mortgages.[38]

» (U//SBU) TPS returnees likely would have difficulties finding employment in El Salvador. The country created only 12,000 out of the 60,000 jobs needed in 2016, according to ▓▓▓▓▓▓▓▓▓▓.[38] Nearly 85 percent of TPS holders from El Salvador have a median household income of $50,000 in the United States, according to estimates by the Center for Migration Studies of New York.[40] In comparison, the United Nations reports that Salvadorans earn an average of $4,100 annually.[41]

» (U//SBU) Gang-related violence is a dominant push factor for emigration from El Salvador, which would likely continue for any TPS beneficiaries returning to the country. El Salvador has the world's highest homicide rate outside of war zones; 81 per 100,000 people were killed in 2017, caused by increasing gang-on-gang violence.[42]

» (U) TPS returnees would face recurring natural disasters and a government unable to recover from them, making living conditions uninhabitable. El Salvador ranks second in the world for risk exposure to two or more environmental hazards, according to the World Bank—resulting in an estimated 2.5 percent loss in annual GDP and further delay of economic development.[43] On 7 July 2017, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ recommended the extension of TPS, noting El Salvador's slow economic and social recovery from the 2001 earthquakes, as well as their vulnerability to future environmental disasters.[44]

## (U) Host Nation Justifications to Extend TPS

» (U//SBU) Receiving thousands of returned citizens would overwhelm the government's limited migration infrastructure. Despite passing legislation to improve information sharing concerning returned gang members from the United States, El Salvador's migrant reintegration system remains limited, including a single long-term migration center located in San Salvador that can only facilitate up to 200 individuals per day.[45-46] While the center successfully processed approximately 52,560 returning migrants and families in December 2016, embassy reports convey that the center does not have enough resources to meet the needs of returning TPS deportees.[47]

» (U//SBU) El Salvador lacks the financial resources to invest in the reintegration of a returning TPS population. TPS beneficiaries provide necessary remittances to families in El Salvador to supplement food and living expenses, creating a cycle of tax-free income that promotes unemployment and limits funding for social services.[48,49] In 2015, ▓▓▓▓▓▓▓▓ reporting noted that remittances from the United States ($4.27 billion) were four times greater than El Salvador's public investment ($1.02 billion), and 10 times higher than foreign direct investment ($429 million), further preventing economic development, increasing remittance dependency, driving emigration from El Salvador, and increasing crime.[50,51]

» (U//SBU) Environmental and health challenges, according to ▓▓▓▓▓▓▓▓▓ in El Salvador, render El Salvador unable to handle the return of its citizens from the United States.[52-53] Salvadorans face high instances of tropical diseases, respiratory illnesses, and traffic-related mortality rates in the region, according to the World Bank, diverting national expenditures from improving immigration and security programming.[54]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000176

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

## (U) Appendix B:
## TPS Overview Honduras

(U//SBU) Honduras received TPS designation in early 1999 in the aftermath of Hurricane Mitch, which killed 5,657 and displaced 1.1 million people. It received its most recent extension in 2016, as additional natural disasters and pandemic illnesses have prevented the country from recovering. With its TPS expiring on 5 January 2018, Honduras will continue lobbying for a TPS extension, likely on the grounds that multiple factors—including a limited migration infrastructure, lack of resources, and national focus on stopping violent crime—will limit its ability to accept returning citizens.[55,56]

(U//FOUO) I&A assesses that if TPS were to expire, well-established family ties in the United States and a host of push factors in Honduras, such as poor living conditions and fear of gang violence, would very likely lead to high levels of illegal return migration amongst deported beneficiaries. Should these migrants decide to return illegally, existing smuggling routes to the US Southwest border would facilitate their return to the United States.[57,58]

(U) Registered TPS Beneficiaries in the United States presented by age and location as of 2 October 2017.[59]



(U) Honduran TPS Beneficiaries by Age
*Data Source: USCIS

| (U//FOUO) Top States and Cities For Honduran TPS Holders | | | |
|---|---|---|---|
| Data Source: USCIS | | | |
| Top State | State Population | Top Cities | City Population |
| Florida | 17.0% | Miami, FL | 8,198 |
| California | 14.233 | Houston, TX | 6,790 |
| Texas | 13.858 | Los Angeles, CA | 4,348 |
| North Carolina | 5.328 | Bronx, NY | 1,357 |
| New Jersey | 5.227 | Dallas, TX | 1,145 |
| Other States | 38.212 | Other States | 70,118 |
| TPS National Total: 91,954 | | | |

accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need to know without prior approval of an authorized DHS official.

(U) Warning: This document contains UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need to know without prior approval of an authorized DHS official. State and local homeland security officials may not share this document with critical infrastructure and key resource personnel or private sector security officials without further approval from DHS.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000177

Case 3:18-cv-01554-EMC   Document 113-2   Filed 09/05/18   Page 131 of 157

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

**(U//FOUO)  Push Factors Increase Potential Illegal Return Migration to the United States**

» (U)  Family ties would certainly motivate repatriated TPS beneficiaries to migrate back to the United States.  TPS holders from Honduras
have nearly 55,000 US citizen children; over 20 percent have mortgages; and over 75 percent have a median household income of
$40,000, according to estimates by the Center for Migration Studies of New York.[60]  By comparison, the United Nations reports that
Hondurans earn an average of $2,500 per year in their home country.[61]

» (U//SBU)  Hondurans remain dependent on remittances sent from family members working in the United States—another factor likely to
prompt their return to the United States.  Remittances comprise nearly 20 percent of the Honduran GDP, according to ▮▮▮▮▮
▮▮▮▮ .[62,63]

» (U)  Honduras' inadequate living conditions could prompt emigration.  The government has been unable to reconstruct much of the
Honduran infrastructure due to the 2009 economic crisis and subsequent tropical storms in 2010 and 2011.  As of 2013, nearly
40 percent of households did not have electricity and 15 percent had no access to clean water, which increased food and waterborne
illnesses, according to the World Bank.[64]  On 29 June 2017, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ recommended the extension of TPS
because of Honduras' slow economic and social recovery from Hurricane Mitch, as well as their vulnerability to future environmental
disasters.[65]

» (U//SBU)  Honduras' insecurities would likely drive migration to the United States for TPS returnees, who are accustomed to the lower
crime rates of the United States.  While homicide rates in Honduras have decreased since 2011, ▮▮▮▮▮ and UN reports note that the
country ranks as the second most dangerous in the region, with 56 per 100,000 people killed. ▮▮▮▮▮▮▮▮▮ also report
that the country likely would need additional time to formalize initial investments in security reform and infrastructure to decrease illegal
migration.[66,67,68]

**(U)  Host Nation Justifications to Extend TPS**

» (U//SBU)  Limited migration infrastructure and social programs reduces Honduras' ability to support returning citizens.  Honduras
continues to have reintegration challenges, according to the World Bank, due to widespread corruption within public services, inadequate
nutrition resources, and deficient government presence in rural areas, where 45 percent of citizens reside.  In the past year, the country
has improved its ability to accept some returning citizens, ▮▮▮▮▮▮▮▮▮▮▮▮ by opening migration centers in
three urban areas.[69,70,71]

» (U//SBU)  The Honduran Government lacks the ability to provide resources to agencies charged with integrating repatriated citizens.
Honduras has one of weakest economies in Latin America, according to ▮▮▮▮ and World Bank reports, and it is unlikely to improve
in the near future because of limited investment opportunities, decreasing labor participation, and ineffective tax collection services.[72,73]

» (U//SBU)  The Government of Honduras views reintegration of returned citizens as a lower priority and focuses most of its resources on
reducing gang violence and other domestic challenges.  As part of a regional effort to stabilize migration, Honduras prioritized reducing
corruption, battling gangs, and strengthening security services.  Such initiatives would likely require long-term funding and political will,
and, according to ▮▮▮▮▮▮▮▮ accommodating 91,000 TPS compatriots would prevent success.[74,75]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

Page 7 of 17

AR-HAITI-00000178

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

# (U) Appendix D:
# TPS Overview Nicaragua

(U//SBU) Nicaragua received TPS designation in January 1999 after Hurricane Mitch and flooding caused severe damage and disruption to living conditions. TPS designation has been continually extended because of subsequent natural disasters, including extensive flooding, two earthquakes, 426 eruptions of the Telica volcano, a prolonged regional drought, and a coffee rust epidemic. TPS status is set to expire 5 January 2018.[109]

(U//FOUO) I&A assesses that the Government of Nicaragua would not request a new TPS extension because the government appears uninterested in engaging with the United States and is probably capable of reintegrating the considerably small population of TPS holders back into the country. However, if TPS were to expire, I&A assesses that decades-long economic and family ties to the United States, as well as a host of push factors—including low employment opportunities and a corrupt government system—would lead to high illegal return migration among deported beneficiaries.

(U//FOUO) Registered TPS Beneficiaries in the United States presented by age and location as of 2 Oct 2017.[110]

### (U) Nicaraguan TPS Beneficiaries by Age
*Data Source: USCIS



| (U//FOUO) Top States and Cities for Nicaraguan TPS Holders Data Source USCIS | | | |
|---|---|---|---|
| Top States | State Population | Top Cities | City Population |
| Florida | 2,613 | Miami, FL | 1,694 |
| California | 1,017 | Hialeah, FL | 279 |
| Texas | 464 | Houston, TX | 197 |
| New York | 160 | Los Angeles, CA | 136 |
| New Jersey | 156 | San Francisco, CA | 68 |
| Other States | 1,204 | Other States | 3,319 |
| TPS National Total: 5,613 | | | |

(U) Warning: This document contains UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need to know without prior approval of an authorized DHS official. State and local homeland security officials may not share this document with critical infrastructure and key resource personnel or private sector security officials without further approval from DHS.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000179

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

## (U//FOUO) Push Factors Increase Potential Illegal Return Migration to the United States

» (U//SBU) Deported TPS holders are unlikely to find work in Nicaragua comparable to US employment, prompting them to return to the United States. In Nicaragua, over 75 of Nicaraguans work exclusively in informal jobs without official contracts or benefits and are highly vulnerable to employer exploitation, according to ▊▊▊▊▊▊▊▊▊▊▊▊ [111]

» (U//SBU) Migrant returnees would return to Nicaragua with major infrastructure and lack of employment opportunities due to reduced international investment. Significant international aid to Nicaragua's economy and infrastructure was recently suspended following the government's non-transparent and flawed 2011 elections. [112]

» (U) Nicaraguan returnees face fewer security challenges than neighboring countries with high violence levels. Nicaragua's top military official stated in September that Nicaragua has lower levels of crime and drug seizures than neighboring countries, and experts in Nicaragua assert that the transnational gang La Mara Salvatrucha (MS-13) does not have a significant presence there, according to a pro-US Latin American media report. [113,114]

» (U//SBU) Returning TPS holders would find a more authoritarian country in Nicaragua, which could push newly arriving TPS holders to leave. The Nicaraguan presidential administration continues to consolidate power, according to ▊▊▊▊▊▊▊▊▊ In 2016, President Ortega and his wife, the Vice President, openly manipulated the political system to guarantee reelection. Additionally, in 2016, the government increased harassment and intimidation of NGOs, political opposition, and civil society organizations, according to the same report. [115]

### (U) Host Nation Justifications to Extend TPS

» (U//SBU) The current Nicaraguan administration does not appear to be interested in lobbying for TPS despite significant economic and security challenges. Latin American media reported in July that Roger Castano, the Permanent Commission for Human Rights who lobbied for TPS extension for Central Americans, said that President Ortega's administration "has not shown interest in his compatriots settled in the United States." [116,117] ▊▊▊▊▊▊▊ in Managua noted in July 2017 that Nicaragua's extreme weather and drought no longer met the threshold for special protected status. [118]

(U) Warning: This document contains UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need to know without prior approval of an authorized DHS official. State and local homeland security officials may not share this document with critical infrastructure and key resource personnel or private sector security officials without further approval from DHS.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000180

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

#### (U) Source Summary Statement

(U//LES) This Assessment relies heavily upon ▮▮▮▮▮▮▮▮▮▮▮▮▮ NGO, and foreign media reporting to assess current and past economic, social, and environmental challenges, and to assess likely future impacts of TPS expiring for beneficiaries from four Western Hemisphere countries. I&A has **medium confidence** in our assessment of the potential return migration of TPS beneficiaries, as migration trends are susceptible to public perceptions, misinformation, and individual family decisions. This Assessment could have benefited from more reporting to corroborate ▮▮▮▮▮▮ and open source reporting on the countries' motivations for TPS extension and their capabilities for reintegrating returning migrants. I&A also concedes that the ▮▮▮▮▮ and media sources used could have been influenced by host nation priorities. I&A received policy and operational insight and some statistics from ▮▮▮▮▮▮▮ which we considered reliable because of the agencies' firsthand access and experience with TPS and the deportation process. Additionally, we received tactical information from ▮▮▮▮▮ ▮▮▮▮▮▮ outreach to state and local contacts, which we incorporated in the country-specific deep dive sections and in the operational box, which we consider reliable but incomplete. We did not have sufficient time to pursue responses from at least two states that have a large majority of TPS holders—California and Texas—but still received a good survey of operational considerations from five states with sizeable TPS populations: Florida, Georgia, Massachusetts, New York, and North Carolina.

* [(U) | Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security | A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti | July 2012 (577-592) | 21 Sep 2012 ]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000181

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY



29 [Online Publication | RIN 1615-ZB53 | United States Government Publishing Office | Federal Register: Extension of the Designation of El Salvador for Temporary Protected Status | 8 Jul 2016 | 44645-44651 | www.gpo.gov/fdsys/pkg/FR-2016-07-08/pdf/2016-15802.pdf | 14 September 2017 | ]
30 [Online Publication | RIN 1615-ZB53 | United States Government Publishing Office | Federal Register: Extension of the Designation of El Salvador for Temporary Protected Status | 8 Jul 2016 | 44645-44651 | www.gpo.gov/fdsys/pkg/FR-2016-07-08/pdf/2016-15802.pdf | 14 September 2017 | ]
31 [Online Publication | The World Bank Group | Systematic Country Diagnostic | El Salvador: Building on Strengths for a New Generation | May 2015 | x | www.worldbank.org | 20 Sep 2017 | ]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000182

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY



[37] [(U) [Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security | A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti. | July 2017 | 578-592 | | 09/21/2017 | ]

[38] [(U) [Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security | A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti. | July 2017 | 578-582 | | 09/21/2017 | ]

[40] (U) [Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security | A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti. | July 2017 | 578-592 | | 09/21/2017 | ]

[41] [Online Publication | United Nations | El Salvador Profile | 2017 | | n/a| data.un.org/countryprofile.aspx?crname=El%20Salvador | 17 October 2017 | ]

[43] [Online Publication | The World Bank Group | Systematic Country Diagnostic | El Salvador: Building on Strengths for a New Generation | May 2015 | | x | www.worldbank.org | 20 Sep 2017 | ]

[46] [Internet Site | International Organization for Migration | Press Release | IOM Launches Reconstruction of Migration Center | 3 July 2015 | N/A | www.iom.int/news/iom-launches-reconstruction-migrant-reception-center-el-salvador | 26 September 2017 | IOM is the United Nation's Migration Center]

[54] [Online Publication | 2017 World Health Statistics | 2017 World Health Statistics | 2017 | 59-72 | www.who.int | 26 September 2017 | ]

[58] [Online Publication | The World Bank Group | Systematic Country Diagnostic | El Salvador: Building on Strengths for a New Generation | May 2015 | | iii, ix | www.worldbank.org | 20 September 2017 | ]

[59] [Online Publication | USCIS | United States Government Publishing Office | Extension of the Designation of Honduras for Temporary Protected Status | 16 May 2016 | 30331-30337 | www.gpo.gov/fdsys/pkg/FR2016-05-16/pdf/2016-11306.pdf | 13 Sep 2017 | ]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000183

[59] [(U) [Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security | A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti. | July 2017 | 578-592 | | 21 Sep 2017 | ]

[60] [(U) [Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security | A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti. | July 2017 | 578-592 | | 21 Sep 2017 | ]

[61] [Online Publication | United Nations | Honduras Profile | 2017 | | n/a| data.un.org/countryprofile.aspx?crname=Honduras | 17 Oct 2017 | ]

[62] [Online Publication | World Bank Group | Systematic Country Diagnostic | Honduras: Unlocking Economic Potential for Greater Opportunities | 2016 | 13 | www.worldbank.org | 20 Sep 2017 | ]

[Online Publication | World Bank Group | Systematic Country Diagnostic | Honduras: Unlocking Economic Potential for Greater Opportunities | 2016 | 13 | www.worldbank.org | 20 Sep 2017 | ]

[Internet Site | United Nations Office of Drugs and Crime (UNODC) | World Bank Data Open Data | UNODC Intentional Homicide Statistics Database | Periodically | N/A | data.worldbank.org/indicator/VC.IHR.PSRG.P5?end=2015&locations=US-SV-HN&start=1995&view=chart | 26 Sep 2017 | The World Bank displays open license data from international data bases  including the United Nations Office of Drugs and Crime (UNODC) Intentional Homicide Statistics ]

[Online Publication | World Bank Group | Systematic Country Diagnostic | Honduras: Unlocking Economic Potential for Greater Opportunities | 2016 | 13 | www.worldbank.org | 20 Sep 2017 | ]

[70] [Online Publication | World Bank Group | Systematic Country Diagnostic | Honduras: Unlocking Economic Potential for Greater Opportunities | 2016 | 13 | www.worldbank.org | 20 Sep 2017 | ]

[71] [STATE | TEGUCIGALPA 000648 | GUIDE ID: 1008/4c9347 | 11 July 2017 | | (U//SBU) HONDURAS: QUARTERLY UPDATE ON U.S. STRATEGY FOR CENTRAL America | | (U//SBU) | (U//SBU) | ]

[72] [STATE | TEGUCIGALPA 0618 | | June 29, 2017 | June 29, 2017 | Honduras: Temporary Protected Status Recommendation | | (U//SBU) | (U//SBU) | ]

[73] [Online Publication | World Bank Group | Systematic Country Diagnostic | Honduras: Unlocking Economic Potential for Greater Opportunities | 2016 | 13 | www.worldbank.org | 20 September 2017 | ]

[74] [STATE | TEGUCIGALPA 0618 | | June 29, 2017 | June 29, 2017 | Honduras: Temporary Protected Status Recommendation | | (U//SBU) | (U//SBU) | ]

[75] [STATE | 17 TEGUCIGALPA 914 | GUIDE ID: 1008/4hcxwr | 28 Sep 2017 | | (U//SBU) Honduras Quarterly Update on U.S. Strategy for Central America | | (U//SBU) | (U//SBU) | ]

[76] [(U) [Internet Site | CIA | The World Factbook | 13 June 2017 | 08 Sep 2017 | | Https://www.cia.gov/library/publications/the-world-factbook/geos/ha/html | 21 Sep 2017 | ]

[77] [OSE | LAR2017080362932260 | GUIDE ID: 1002/44944fbc-513e-432d-bcf8-7024d148bf4b | 6 Aug 2017 | | (U) Deportations Loom in Dominican Republic for Haitian Migrants | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[78] [STATE | PORT AU PRINCE 000136 | GUIDE ID: 1008/1y5chp | 29 January 2011 | | (U) SUBJECT: HAITI CHOLERA OUTBREAK: USAID/DART DEMOBILIZATION AND TRANSITION | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[79] [STATE | PORT AU PRINCE 003588 | GUIDE ID: 1008/43bfzk | 11 Oct 2016 | | (U//SBU) HAITI: HURRICANE MATTHEW SITUATION REPORT 14 | | (U//SBU) | (U//SBU) | ]

AR-HAITI-00000184

DPP_00002614

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

[OSE | LAW2017090467056773 | GUIDE ID: 1002/fa9cc2bf-5809-4058-aa41-e15e754De954 | 5 Sep 2017 | | (U) Haitian Government Increases Efforts To Extend Temporary Protected Status | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[OSE | LAR2017052278342241 | GUIDE ID: 1002/4e8f4d36-e20e-4c1e-9dde-6f96496119d7 | 23 May 2017 | | (U) Haitian Government Request Temporary Protection Status Renewal in Washington | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

(U) [Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security | A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti | July 2017 | 578-593 | | 21 Sep 2017 | ]

(U) [Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security | A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti | July 2017 | 578-593 | | 21 Sep 2017 | ]

[OSE | LAR2017052278342241 | GUIDE ID: 1002/4e8f4d36-e20e-4c1e-9dde-6f96496119d7 | 23 May 2017 | | (U) Haitian Government Request Temporary Protection Status Renewal in Washington | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[OSE | LAR2017052278342241 | GUIDE ID: 1002/4e8f4d36-e20e-4c1e-9dde-6f96496119d7 | 23 May 2017 | | (U) Haitian Government Request Temporary Protection Status Renewal in Washington | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[OSE | LAR2017082182410564 | GUIDE ID: 1002/340dfb0a-7880-4712-9c90-38abe602c112 | 25 August 2017 | | (U) Haiti Economist Labossiere Labels 2017-2018 Budget 'Deceitful' | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000185

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

[101] [OSE | LAR2017071774194169 | GUIDE ID: 1002/1cfc78ce-2d01-4889-bc63-6e5906a013f2 | 18 July 2017 | | (U) Haiti: Editorial Criticizes Bigger Budget for National Assembly Than for Health | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[102] [OSE | LAW2017090467604683 | GUIDE ID: 1002/73d8716a-88f9-4540-8346-706311587270 | 5 September 2017 | | (U) Haiti: PHTK Senator Joseph Strongly Criticizes Moise Over Draft Budget | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[104] [OSE | LAR2017071771876888 | GUIDE ID: 1002/691c8314-1763-4697-b69b-59fa2cb49175 | 18 July 2017 | | (U) Haiti: Hospitals Remain Paralyzed As Health Workers Continue Strike Unsatisfied With Wage Increase | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[106] [OSE | LAR2017081268196811 | GUIDE ID: 1002/5b04248d-9bd2-4d7c-857a-a268aebd68a8 | 14 June 2017 | | (U//FOUO) Haiti: Profile of New Cabinet Members | | (U//FOUO) | (U//FOUO) | ]

[107] [OSE | LAR2017042775832921 | GUIDE ID: 1002/ad86cb35-0523-4729-b097-05e4e641193a | 28 April 2017 | | (U) Editorial Says Guy Philippe Pleads Guilty Highlighting Haiti's Weak Judicial Institutions | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[108] [OSE | LAR2017071772738671 | GUIDE ID: 1002/bac10f45-cd6c-4aee-867c-1715b5a58a0e | 18 July 2017 | | (U) Haiti: Former Prime Minister Lamothe Rejects Unfounded Accusations in Senator Latortue's Report | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

| | (U//SBU) | (U//SBU) | ]

[110] (U) [Journal | Robert Warren and Donald Kerwin - Center for Migration Studies | Journal on Migration and Human Security : A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti. | July 2017 | 578-592 | | 21 Sep 2017 | ]

[113] [OSE | LAW2017091260887916 | GUIDE ID: 1002/b27bf6cc-33af-4c55-9462-8f0afb7d5fdb | 15 September 2017 | | (U) Experts Say Mara Salvatrucha Organization Does Not Operate in Nicaragua | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

[114] [OSE | LAW2017090658667716 | GUIDE ID: 1002/27eef148-75c7-4dda-9f67-81c258950fde | 6 September 2017 | | (U) Revision: Nicaragua: Report Asserts Existence of Large-Scale Drug Trafficking Operations | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

| | (U//SBU) | (U//SBU) | ]

[117] [OSE | LAR2017072466818957 | GUIDE ID: 1002/55ff8500-1745-4b6f-b130-9117c094f8a8 | 27 July 2017 | | (U) Nicaragua: Thousands of Migrants On Edge Over Possible Expiration of TPS | | (UNCLASSIFIED) | (UNCLASSIFIED) | ]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
DHS INTERNAL ONLY

AR-HAITI-00000186

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

U.S. Department of Homeland Security
**U.S. Customs and Border Protection**

# INTELLIGENCE NOTE

CBP-OI-IN-003U-18

19 October 2017

(U//FOUO) ███████████████████████████████████

(U//FOUO)



— (U) Haitian, Honduran, and Salvadoran nationals combined account for approximately 94 percent (435,048) of all TPS recipients, according to U.S. Citizenship and Immigration Services,[6] with Salvadoran nationals representing the largest diaspora (263,282) receiving TPS benefits in the United States. [†]

— (U//SBU) ██████████████████

**(U) Countering Misinformation**



(U//SBU/FOUO)

---

[*] (U) The Secretary of Homeland Security may designated a foreign country for TPS due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances, where the country is unable to handle the return of its nationals adequately. At least 60 days prior to a country's TPS designation or extension expiration, a review is completed to determine whether the conditions for the TPS designation continue to be met.

[†] (U) TPS status for Nicaragua is also designated to end January 5, 2019; however, given the small number of beneficiaries (5,349), they were not included in this assessment.

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

AR-HAITI-00000187

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE



— (U//LES)

(U//FOUO)

— (U//LES)

— (U//FOUO)

— (U) TPS beneficiaries from Haiti, Honduras, and El Salvador mainly reside in six U.S. states, four of which are in the east:  Florida (45,000), New York (26,000), Virginia (24,000), and Maryland (23,000), according to the Center for Migration Studies.  The remaining two states—located in the West—are California (55,000) and Texas (45,000).[20]

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

AR-HAITI-00000188

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

— (U//FOUO)



(U//FOUO)

---

(U) **This product responds to:** CBP-OI-POA-TOC-2, CBP-OI-POA-TOC-3

(U) **Tracked by:** DHS IE Intelligence Priority-Illicit Immigration and Travel

(U) **Reporting Notice:** This product was prepared by U.S. Customs and Border Protection, Office of Intelligence (OI). It was coordinated with U.S. Border Patrol Intelligence Division (HQ), CBP Attaché- U.S. Embassy Ottawa, Canada Border Security Agency, U.S. Citizenship and Immigration Services, HSI-Human Smuggling Cell, and DHS Office of Intelligence and Analysis.

(U) **FEEDBACK:** For general comments or questions related to the dissemination of this document, please e-mail the CBP OI Production Management inbox at: CBPOIProductionManagement@cbp.dhs.gov or call 202-325-3659.

(U) Please participate in a brief customer feedback survey regarding this product. Your feedback is important to our efforts to improve the quality and impact of our products on your mission. Please scroll to the last page to find the form and then follow a few simple steps to complete and submit your response. Thank you.

---

* (U//FOUO)

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

AR-HAITI-00000189

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

[1] (U) | Federal Register | 24 May 2017 | (U) Extension of the Designation of Haiti for Temporary Protected Status | Accessed on 8 September 2017 | Extracted information is U | Overall record is U | https://www.federalregister.gov/documents/2017/05/24/2017-10749/extension-of-the-designation-of-haiti-for-temporary-protected-status

[2] (U) | DoS | 17 Montreal 314 | 15 September 2017 | (U) Canada: Volume of Asylum Seekers Garners Wide Attention | Extracted information is U | Overall document is U

[3] (U) | Dos | 17 Montreal 326 | 25 September 2017 | (U) Canada: Information Sharing Stems the Tide of Asylum Seekers | Extracted information is U | Overall document is U

[4] (U) | Newsweek | 27 September 2017 | (U) Want to Move to Canada? Canadian Immigration Officials Say You Shouldn't | Accessed on 3 October 2017 | Extracted information is U | Overall record is U | http://www.newsweek.com/want-move-canada-canadian-immigration-officials-say-you-shouldnt-672253

[5] (U//FOUO)

[6] (U) | USCIS | 28 September 2017 | (U) Temporary Protected Status Review Schedule | Extracted information is U | Overall record classification is U

[7] (U)| DoS | 17 Montreal 262 | 10 August 2017 | (U) Canada: Haitian Northbound Asylum Seekers are Not Guaranteed Status in Canada | Accessed on 14 September 2017 | Extracted information is U | Overall document is U

[8] (U)| OSC | LAR20170614737722659 | 15 August 2017 | (U) Haitian Migrants being Misled While Seeking Asylum in Canada | Accessed on 14 September 2017 | Extracted information is U | Overall document is U

[9] (U) | CBC News | 5 August 2017 | (U) Misleading Social Media Messages Entice Haitian Asylum Seekers to Come to Canada | Accessed on 14 September 2017 | Extracted information is U | Overall record classification is U | http://www.cbc.ca/news/canada/montreal/misleading-information-haitian-asylum-seekers-1.4235565

[10] (U) | DoS | 17 Montreal 314 | 15 September 2017 | (U) Canada: Volume of Asylum Seekers Garners Wide Attention | Extracted information is U | Overall document is U

[11] (U) | OSC | LAW20170830552105577 | 30 August 2017 | (U) Northern Central America Media Watch: Guatemala Court Rules Against Expulsion of CICIG Commissioner | Accessed on 8 September 2017 | Extracted information is U | Overall document classification is U

[12] (U) | CBP | IIR 4 042 0690 17 | (U//LES) Migrant Perceptions Regarding U.S. Executive Order 13780 and Perceived Changed in U.S. Immigration and Enforcement Policies | Extracted information is U//LES | Overall document classification is U//LES

[13] (U) | New York Times | 10 August 2017 | (U) A Surge of Migrants Crossing into Quebec Tests Canada's Welcome | Accessed on 4 October 2017 | Extracted information is U | Overall record classification is U | https://www.nytimes.com/2017/08/10/world/americas/a-surge-of-migrants-crossing-into-quebec-tests-canadas-welcome.html

[14] (U)| CBP | 17 May 2016 | (U) Swanton Sector Vermont | Accessed 28 September 2017 | Extracted Information is U | Overall document classification is U | https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/swanton-sector-vermont

[15] (U) | CBP | 3 October 2017 | (U) USBP Norther Border TSM Outbound Report- FY 2017 | Extracted information is U//FOUO | Overall document classification is U//FOUO

[16] (U//FOUO)

[17] (U) | CBP | HSIR-SWB-16-259402 | 13 September 2016 | (U//LES) U.S. Border Patrol Swanton Sector/Canada Threat Assessment | Extracted information is U//LES | Overall document classification is U//LES

[18] (U) | CBS News | 9 August 2017 | (U) Country Road to Canada is Route to Hope for Many Migrants | Accessed on 4 October 2017 | Extracted information is U | Overall document classification is U | https://www.cbsnews.com/news/migrants-flood-canada-roxham-road/

[19] (U//FOUO)

[20] (U) | The Center for Migration Studies- Journal on Migration and Human Security | 2017 | (U) A Statistical and Demographic Profile of the US Temporary Status Populations from El Salvador, Honduras, and Haiti | Accessed on 4 October 2017 | Extracted information is U | Overall document is U | http://cmsny.org/publications/jmhs-tps-elsalvador-honduras-haiti/

[21] (U) | CBP | 3 October 2017 | (U) USBP Norther Border TSM Outbound Report- FY 2017 | Extracted information is U//FOUO | Overall document classification is U//FOUO

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

AR-HAITI-00000190

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

(U//FOUO)

(U//FOUO)



AR-HAITI-00000191

AR-HAITI-00000192



AR-HAITI-00000193



AR-HAITI-00000194



**Evangelical Immigration Table**

Council for Christian Colleges
and Universities

Ethics and Religious Liberty
Commission of the Southern
Baptist Convention

Korean Churches for
Community Development/Faith
and Community Empowerment

National Association of
Evangelicals

National Hispanic Christian
Leadership Conference

The Wesleyan Church

World Relief

November 1, 2017

Acting Secretary of Homeland Security Elaine Duke
U.S. Department of Homeland Security
3801 Nebraska Ave. NW
Washington, DC 20016

Dear Acting Secretary Duke,

As leaders serving and representing millions of evangelical Christians through our respective denominations, churches, colleges, universities, and ministries, we are writing to respectfully ask you to consider extending the Temporary Protected Status (TPS) designation that has been granted by past administrations for nationals of several countries, including Honduras, Nicaragua, Haiti, and El Salvador, each of which requires your decision to renew or terminate the status within the coming weeks or months. **We believe that reform of the TPS program is needed and warranted. Accordingly, we urge you to extend the TPS designation for Honduras, Nicaragua, Haiti, and El Salvador to provide Congress time to provide needed reforms to the TPS program.**

Our concern is driven by our Christian faith and our commitment to the Scriptures, which speak clearly and frequently to God's concern for those who are vulnerable, specifically including immigrants and the poor. Each of these individuals, from a biblical perspective, is endowed with inherent dignity as a person made in God's image, and each is a neighbor whom Jesus commands us to love. The Bible also teaches us that God has established families as the fundamental building block of healthy societies, and we are concerned with the separation of families that withdrawing TPS at this time would likely entail.

The roughly 300,000 individuals from these four countries who currently are lawfully present under TPS protections each voluntarily came forward at the invitation of the federal government, passed a criminal background check (and in many cases multiple subsequent background checks with each renewal), and have demonstrated that they are economically self-sufficient, as they do not qualify for federal means-test public benefits. They contribute significantly to our national economy, including contributing roughly $7 billion in Social Security and Medicare taxes over the past decade and much more as consumers, employees in critical sectors of our economy, and entrepreneurs.

These individuals are now firmly established parts of our communities, including many who are members of our local churches and students within our colleges. Most Central Americans granted TPS have been present in the United States for twenty years or more, and they have put down roots here. Most are parents of one or more U.S. citizen children; if these parents were to be deported or simply no longer be authorized to work, it would create a significant strain on these U.S. citizen children and other immediate family members—and on both public and private social support systems for which these citizen children would qualify.

Withdrawal of TPS at this time—without a long-term, legislative resolution of these individuals' situation—would also have a significantly negative impact on the countries to which these immigrants would potentially be returned. Several of

The Evangelical Immigration Table
www.EvangelicalImmigrationTable.com

AR-HAITI-00000195

AR-HAITI-00000196

**Evangelical Immigration Table**

Council for Christian Colleges and Universities

Ethics and Religious Liberty Commission of the Southern Baptist Convention

Korean Churches for Community Development/Faith and Community Empowerment

National Association of Evangelicals

National Hispanic Christian Leadership Conference

The Wesleyan Church

World Relief

our organizations operate or support ministries in Central America and/or Haiti, and our colleagues there are deeply concerned about the impact of a withdrawal of TPS on the country as a whole, each of which is facing challenges of poverty and violence.

While the Central American countries were initially designated with TPS status because of natural disasters more than 15 years ago, El Salvador and Honduras have competed in recent years for the ignominious title of the highest civilian homicide rate of any country in the world. Haiti, initially designated with TPS after the horrific earthquake of 2010, has recently been hit by several severe hurricanes. In each of these cases, the countries face chronic unemployment and underemployment, dynamics that would likely be exacerbated by a sudden insertion of residents who have lived abroad for many years, harming the poorest of the poor.

When Congress created the TPS program in 1990, it was envisioned as a way for the federal government to provide safe haven on a temporary basis in situations when returning individuals to a country devastated by natural disaster or manmade violence would be inhumane. Regrettably, many of these countries remain unsafe even after many years. In any case, we are working with Congress to make needed reforms to the TPS program. The situations of long-term recipients of TPS status are complex and demand a legislative solution. We urge you to renew the TPS designation for Honduras, Nicaragua, Haiti, and El Salvador to allow Congress to develop such a solution.

Sincerely,

Leith Anderson, President, National Association of Evangelicals

Scott Arbeiter, President, World Relief

Shirley V. Hoogstra, President, Council for Christian Colleges and Universities

Hyepin Im, President & CEO, Korean Churches for Community Development

Jo Anne Lyon, Ambassador, General Superintendent Emerita, The Wesleyan Church

Russell Moore, President, Ethics & Religious Liberty Commission of the Southern Baptist Convention

Samuel Rodriguez, President, National Hispanic Christian Leadership Conference

AR-HAITI-00000197

AR-HAITI-00000198

Only Deciding Honduras and Nicaragua

- I do not agree with rendering a decision on all 4 countries (Honduras, Nicaragua, Haiti and El Salvador) at one time is appropriate. Instead, each country should be viewed individually when their current extension expires.
- The decision on Haiti is not due until November 23 and El Salvador is due January 5, 2018.
- Haiti TPS is dramatically different from the other three countries due to the limited duration of TPS. Haiti – 7 years; Honduras and Nicaragua – 19 years.

Nicaragua – Terminate with 18 months

- It's clear from the Department of State's country assessment that the TPS conditions NO LONGER EXIST
    - Original conditions from Hurricane Mitch do not exist
    - There is no armed conflict preventing folks from returning
    - Nicaragua is capable to adequately handle the return of their nationals (5,349)
    - Nicaragua has not requested an extension
- Similar input – from intelligence and economic reports – have lead me to the same conclusion

Honduras – No Determination/Auto Extension for 6 months

- By not affirmatively extending, I'm stating that I'm NOT satisfied that the country conditions remain – sending a clear signaling that TPS is coming to a close.
- While the Department of State indicated that the original conditions related to the Hurricane do not exist, they also stated that Honduras is UNABLE at this time to adequately handle the return of their nationals (86,163). There is currently no plan in place.
- I am also not convinced that the partnership between Honduras and the US would not be severely damaged – thereby impacting our work with them on TCOs and illegal immigration efforts.
- Thus, I am making a determination that I currently do not have all of the necessary information to make a determination in an appropriately deliberate manner.
- I plan to make it very clear that TPS for Honduras is drawing to a close and that DHS and USG need to develop a plan for the successful assimilation of TPS beneficiaries back to Honduras.
- This is the same approach and message sent during the extension of Haiti's TPS in May 2017 by then Secretary Kelly.

AR-HAITI-00000199-02

## General points

- Separate out Haiti. They have been given a preview of what is likely to happen. Eight years is not the same as 20 years.

- We need to acknowledge proactively the difficulty of these decisions:
    - Violence in the countries
    - Lack of economic opportunity
    - Difficulty reintegrating
    - May impact cooperation with the United States

- The return of children to El Salvador will be especially problematic in the media as MS-13 recruitment stories will be widespread.

- We must push Congress to fix the issue.

## 6 month extension

- While I believe it is likely that conditions do not exist on the ground to warrant an extension, I was not able to personally make that determination with enough certainty prior to the end of the existing period to warrant such a momentous decision.

-
- A delay in making a determination may be appropriate for other reasons as well.
    - The President's nominee – who has a hearing this week and may be confirmed shortly – should have the opportunity to examine the situation and weigh in.

- I expect that at the end of the six month automatic renewal the Secretary will have sufficient time and ability to determine with certainty that conditions on the ground do not warrant an extension, and they will most likely recommend termination.

- I understand that this will be a significant event – but with a six month automatic renewal and a potential 18 month delayed termination, the countries could have two years to prepare for the return of their citizens. Please start preparing.

- We need to do significant work with the countries to prepare for the return of their people. Our hope is that the return of these TPS recipients will be an economic boost to their home nations.

- I encourage TPS recipients who are eligible for other immigration benefits to apply for them now.

- The intention of Congress was for TPS to be temporary (the name gives that away). If Congress wants to further extend TPS for these countries based on their decades long lawful presence in the US, then the Congress – not DHS – must do that. And I encourage them to do so.

not do Haiti - more attention, maybe 1&2
can g thu & Haiti usnly 7yr
rationale: don't know, need to rationalize conflict w/

① I believe America first
- Not sure ending TPS is America first
     strategy
- Intel - nat'l securing impacts w/that — central Am prosperity
     - countries can't absorb — inchoate, fruit
     - partner groundwork — good road, fruit
     - decrease in coop                            are unrelatedly
                    drugs, gangs, TCO,                   away
                    enforcement
? At time we are how we                          tolerate
     loopholes ⊃ illegal imm. push              w/out notice
     or stay in place illegally                 is hard to
     that actually is contrary to               partnership
     our goal of        < illegal immigration

- do we need a better strategy to
     lay a groundwork before terminating
     (diplomacy)
     to ensure neg. consequences don't
     occur.
     better than term in 18 mos & dealing w/
     fallout
     still could end in 18 mos.
     just w/out the "pinch"              20 yr

need
plan for a
@ decision                         est. equitable estoppel
                                   area - cooperation
                                         - economics

decision give full discretion to Kirstjen
                     & prepares her better

hurricane conditions does not exist

AR-HAITI-00000199-04                                      DPP_00002486

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

CRISTA RAMOS, *et al.,*

       Plaintiffs,

v.

KIRSTJEN NIELSEN, *et al.,*

       Defendants.

Case No. 3:18-cv-01554-EMC

**ADMINSTRATIVE RECORD**

ADMINISTRATIVE RECORD

No. 3:18-cv-1554

1        I, David J. Palmer, Chief of Staff, Office of the General Counsel at the United

2  States Department of Homeland Security, certify that the attached is a true, correct and

3  complete copy of the updated Administrative Record pertaining to the Acting Secretary

4  Duke's decision to terminate the Temporary Protected Status for Haiti.

5

6  Dated: September 5, 2018

7                                     Respectfully submitted,

8

9

10                                      David J. Palmer

11                     Chief of Staff, Office of the General Counsel
                           Department of Homeland Security

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ADMINISTRATIVE RECORD

No. 3:18-cv-1554