JOSEPH H. HUNT
Assistant Attorney General
Civil Division
JOHN R. TYLER
Assistant Branch Director
ADAM KIRSCHNER (IL Bar # 6286601)
RHETT P. MARTIN (DC Bar # 999272)
KEVIN SNELL (NY Bar)
JOSEPH C. DUGAN (OH Bar # 0093997)
Trial Attorneys
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTA RAMOS, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>KIRSTJEN NIELSEN, *et al.*,<br><br>    Defendants. | Case No. 3:18-cv-01554-EMC-SK<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Judge:  Hon. Edward M. Chen<br>Date:  September 25, 2018<br>Time:  10:30 a.m.<br>Place:  Courtroom 5, 17th Floor, San Francisco U.S. Courthouse |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A. Statutory Background ............................................................................................. 2

    B. Factual Background ................................................................................................ 3

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ...................................................................................................................... 10

I.    The Court Should Strike or Otherwise Disregard the Inadmissible Evidence on
    Which Plaintiffs Extensively Rely ........................................................................... 10

II.   Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits. ............. 11

    A. Plaintiffs' APA "New Rule" Theory Is Factually Incongruous and Legally
       Untenable. ............................................................................................................ 11

         i.    TPS Designations Are Not Regulations, And Differences in
             Factfinding or Weighing of Criteria by Statutorily Designated
             Decision-Makers Do Not Create A "New Rule" Triggering APA
             Procedural Requirements. ......................................................................... 11

         ii.   In Any Event, Plaintiffs Have Failed to Show That Acting Secretary
             Duke and Secretary Nielsen Departed from Past Practice in Making
             Their TPS Determinations. ....................................................................... 14

    B. Whether the Court Applies the *Trump v. Hawaii* Standard Applicable to
       Animus Claims in the Immigration Context or the Arlington Heights
       Standard Applicable in Some Other Contexts, Plaintiffs Have Not
       Shown That the Challenged TPS Determinations Are Constitutionally
       Suspect. ................................................................................................................ 18

         i.    *Trump v. Hawaii* Controls in This Immigration Context. ........................... 18

         ii.   Regardless of the Applicable Standard of Review, Plaintiffs Have
             Failed to Demonstrate that the TPS Decisions Were Motivated By
             Animus. .................................................................................................... 22

III.  Plaintiffs Have Also Failed to Demonstrate that the Equities Favor Preliminary
    Injunctive Relief ...................................................................................................... 25

A.  Any Harm Plaintiffs May Suffer is Based on the Inherent Nature of the TPS Statute. ................................................................... 25

B.  The Remaining Equitable Factors Balance Each Other Out...................................... 26

CONCLUSION............................................................................................................... 27

# TABLE OF AUTHORITIES

**CASES**

*Am. Trucking Ass'ns v. City of Los Angeles*,
　559 F.3d 1046 (9th Cir. 2009) ................................................................. 9

*American Wild Horse Preservation Campaign v. Perdue*,
　873 F.3d 914 (D.C. Cir. 2017) ................................................................. 13

*Angov v. Lynch*,
　788 F.3d 893 (9th Cir. 2013) ................................................................... 23

*Asetek Danmark A/S v. CMI USA, Inc.*,
　No. 13-cv-00457-JST, 2014 WL 12644295 (N.D. Cal. Nov. 19, 2014).................... 10

*Benisek v. Lamone*,
　138 S. Ct. 1942 (2018) ............................................................... 9, 10, 26

*California Trout v. FERC*,
　572 F.3d 1003 (9th Cir. 2009) ................................................................. 13

*Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*,
　774 F.2d 1371 (9th Cir. 1985) ................................................................. 25

*Drakes Bay Oyster Co. v. Jewell*,
　747 F.3d 1073 (9th Cir. 2014) ................................................................. 9

*Encino Motorcars, LLC v. Navarro*,
　136 S. Ct. 2117 (2016) ......................................................................... 12

*FCC v. Fox Television Stations, Inc.*,
　556 U.S. 502 (2009) ............................................................................ 12

*FCC v. Schreiber*,
　381 U.S. 279 (1965) ............................................................................ 23

*Fiallo v. Bell*,
　430 U.S. 787 (1977) ............................................................................ 20

*Fla. Power & Light Co. v. Lorion*,
　470 U.S. 729 (1985) ............................................................................ 2

*Gen. Elec. Co. v. Wilkins*,
  No. CV F 10-0674 LJO JLT, 2012 WL 3778865 (E.D. Cal. Aug. 31, 2012)........................... 19

*Great Basin Mine Watch v. Hankins*,
  456 F.3d 955 (9th Cir. 2006) ............................................................................................. 2

*Heckler v. Chaney*,
  470 U.S. 821 (1985)........................................................................................................ 12

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)........................................................................................................ 20

*Kohli v. Gonzales*,
  473 F.3d 1061 (9th Cir. 2007) ................................................................................... 22, 23

*Ledezma-Cosino v. Sessions*,
  857 F.3d 1042 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 643 (2018).......................... 21

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997).......................................................................................................... 9

*Nken v. Holder*,
  556 S. Ct. 1749 (2009)..................................................................................................... 27

*Northwest Environmental Defense Center v. Bonneville Power Administration*,
  477 F.3d 668 (9th Cir. 2007) .......................................................................................... 13

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008)............................................................................................. 20

*Ramos v. Nielsen*,
  No. 18-cv-01554-EMC, 2018 WL 3730429 (N.D. Cal. Aug. 6, 2018) ........................ 19, 21

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
  804 F. Supp. 2d 1045 (E.D. Cal. 2011)...................................................................... 25, 26

*Schrill v. Plunkett*,
  760 F. Supp. 1378 (D. Or. 1990), *aff'd*, 932 F.2d 973 (9th Cir. 1991)........................ 26

*Seto v. Thielen*,
  No. CIV. 10-00351, 2010 WL 2612603 (D. Haw. June 28, 2010)................................. 25

*Taiebat v. Scialabba*,

    No. 17-cv-0805-PJH, 2017 WL 747460 (N.D. Cal. Feb. 27, 2017) ........................................ 26

*All. for the Wild Rockies v. Cottrell*,

    632 F.3d 1127 (9th Cir. 2011) ...................................................................................... 10, 27

*Trump v. Hawaii*,

    138 S. Ct. 2392 (2018)............................................................................................... *passim*

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,

    429 U.S. 252 (1977)............................................................................................................... 1

*Winter v. NRDC*,

    555 U.S. 7 (2008)........................................................................................................ 2, 9, 10

**STATUTES**

6 U.S.C. § 557 ................................................................................................................................ 3

8 U.S.C. § 1103 .............................................................................................................................. 3

8 U.S.C. § 1254a ..................................................................................................................... *passim*

**REGULATIONS**

8 C.F.R. pt. 244 ........................................................................................................................... 12

8 C.F.R. § 244.10 ........................................................................................................................ 12

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

*Extension of South Sudan for Temporary Protected Status*,

    82 Fed. Reg. 44,205-01 (Sept. 21, 2017) ................................................................... 24

*Termination of the Designation of Sudan for Temporary Protected Status*,

    82 Fed. Reg. 47,228-02 (Oct. 11, 2017) .................................................................... 18

*Termination of the Designation of Nicaragua for Temporary Protected Status*,

    82 Fed. Reg. 59,636-01 (Dec. 15, 2017)................................................................... 18

*Termination of the Designation of Haiti for Temporary Protected Status*,

    83 Fed. Reg. 2648-01 (Jan. 18, 2018) ................................................................... 17, 18

*Termination of the Designation of El Salvador for Temporary Protected Status*,

    83 Fed. Reg. 2654-01 (Jan. 18, 2018) ........................................................................ 18

*Extension of the Designation of Syria for Temporary Protected Status*,

    83 Fed. Reg. 9329-02 (Mar. 5, 2018) ......................................................................... 24

*Extension of the Designation of Yemen for Temporary Protected Status*,

    83 Fed. Reg. 40,307-01 (Aug. 14, 2018) ............................................................... 24, 25

*Extension of the Designation of Somalia for Temporary Protected Status*,

    83 Fed. Reg. 43,695-01 (Aug. 27, 2018) .................................................................... 25

**INDEX OF EXHIBITS**

| EXHIBIT NO. | DOCUMENT NAME |
|---|---|
| 1 | Transcript Excerpts of Aug. 14, 2018 Deposition of James D. Nealon (Vol. I), Former Assistant Secretary of International Affairs for DHS and Acting Undersecretary of Policy for DHS ("Nealon Dep. Vol. I") |
| 2 | Transcript Excerpts of Aug. 3, 2018 Deposition of Kathy Kovarik, Chief of the USCIS Office of Policy and Strategy ("Kovarik Dep.") |
| 3 | E-mail from Acting Sec'y Elaine C. Duke to White House Chief of Staff, John Kelly (Nov. 10, 2017, 11:03 AM EST). Subject: RE: Reporting |
| 4 | Transcript Excerpts of Aug. 22, 2018 Deposition of James D. Nealon (Vol. II), Former Assistant Secretary of International Affairs for DHS and Acting Undersecretary of Policy for DHS ("Nealon Dep. Vol. II") |
| 5 | Acting Sec'y Memorandum Summarizing TPS Decisions ("Duke Memo") |
| 6 | Transcript Excerpts of Aug. 9, 2018 Deposition of Donald W. Neufeld, USCIS Associate Director for Service Center Operations ("Neufeld Dep.") |
| 7 | E-mail from Acting Sec'y Elaine C. Duke to White House Chief of Staff, John Kelly (Nov. 6, 2017 03:23 PM EST). Subject: TPS |

# **INTRODUCTION**

Defendants Kirstjen Nielsen, in her official capacity as Secretary of Homeland Security; Claire M. Grady, in her official capacity as Acting Deputy Secretary of Homeland Security; the U.S. Department of Homeland Security ("DHS"); and the United States of America, respectfully submit this response in opposition to Plaintiffs' Motion for a Preliminary Injunction ("PI Mot."), ECF No. 89.

As set forth below, Plaintiffs have failed to establish a likelihood of success on the merits of their Administrative Procedure Act ("APA") arbitrary-and-capricious claim, which is based on their unfounded contention that DHS allegedly departed from prior policy when making the decisions at issue without publicly acknowledging the change or providing good reason for it.  The factual record, however, reflects at most a difference in the weighing of various factors by DHS when making the Temporary Protected Status ("TPS") decisions at issue.  A difference or shift in how various factors in a multifactor decision-making process might be weighed by different Secretaries of Homeland Security does not constitute a "new rule" giving rise to APA procedural requirements.  Plaintiffs also fail to establish a likelihood of success on the merits of their constitutional claims,[1] as the evidence they rely on does not establish that former Acting Secretary Elaine Duke or Secretary Nielsen terminated TPS designations for Sudan, Nicaragua, Haiti, or El Salvador because of race or national origin discrimination.  As demonstrated below, Plaintiffs cannot carry the burden on their constitutional claims, all of which are rooted in a theory of animus, regardless of whether the Court applies the deferential standard recognized in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) as applicable to such claims in the immigration context, or the balancing test often applied in other contexts set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

---

[1] Plaintiffs do not appear to rely on either of their due-process claims for their preliminary injunction motion, as they decline to brief either claim.  *See generally* PI Mot.  In any event, per the Court's August 6, 2018, Order Denying Defendants' Motion to Dismiss ("Aug. 6 Order"), ECF No. 55, both of these claims are dependent on Plaintiffs' arbitrary-and-capricious and equal-protection claims that are discussed herein, *see* Aug. 6 Order at 39, 42, and thus fail for the same reasons outlined below.

In deciding the preliminary injunction motion, this Court should focus on whether Plaintiffs can establish a likelihood of success on the merits given that the equities at issue for this motion at most balance each other out. The proximal cause of the harm outlined in support of Plaintiffs' motion is the statute itself—which repeatedly underscores the temporary nature of the relief, *see, e.g.*, 8 U.S.C. § 1254a(b)(1)(B)(i) ("substantial, but temporary"), (b)(1)(B)(ii) ("unable, temporarily"), (b)(1)(C) ("extraordinary and temporary"), (g) ("remain in the United States temporarily")—and the requirement that any TPS designation lasts for no more than 18 months at a time. Further, Plaintiffs needlessly delayed bringing this lawsuit, and most of the challenged TPS terminations will not take effect for many months. In contrast, it is in the public interest that the Secretary of Homeland Security, in consultation with the appropriate agencies, may be given the broad discretion contemplated by Congress in assessing conditions in various countries. Rather than granting preliminary injunctive relief—an "extraordinary remedy never awarded as of right," *Winter v. NRDC*, 555 U.S. 7, 24 (2008)—this Court should allow this matter to proceed along the ordinary course.[2]

## BACKGROUND

### A. Statutory Background

As Defendants more fully explained in their motion to dismiss, *see* Defs.' Mot. to Dismiss ("MTD") at 3-6 (statutory background section), ECF No. 20, the Secretary may designate a foreign state for TPS if, "after consultation with appropriate agencies of the Government":

> **(A)** the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

> **(B)** the [Secretary] finds that--

---

[2] Defendants maintain, as discussed in the May 3, 2018 Joint Discovery Letter, ECF No. 14, the May 17, 2018 Joint Case Management Statement, ECF No. 16, and the June 15, 2018 Joint Discovery Letter, ECF No. 28, that this case, to the extent it is allowed to proceed, should be decided on the administrative record without discovery. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 975 (9th Cir. 2006) (describing limited circumstances in which the court may look beyond an administrative record).

**(i)** there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

**(ii)** the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

**(iii)** the foreign state officially has requested designation under this subparagraph; or

**(C)** the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

*See* 8 U.S.C. § 1254(b)(1). After a country is designated for TPS, the Secretary must conduct periodic reviews and consider, in consultation with the appropriate Government agencies, the current conditions in the foreign state and whether the conditions that formed the basis of the initial designation are still met. *Id.* § 1254a(b)(3).

The statute makes clear that the decision to designate, extend, or terminate a foreign state for TPS belongs to the Secretary of Homeland Security. 8 U.S.C. § 1254a(b)(1), (b)(3); *see also id.* § 1103(a); 6 U.S.C. § 557. If the Secretary decides that the conditions are no longer met, the Secretary "shall terminate the designation" and announce the termination by publishing a notice in the *Federal Register* that provides the basis for the termination. 8 U.S.C. § 1254a(b)(3)(B). A termination may not take effect for at least 60 days after publication of the *Federal Register* Notice ("FRN") or, if later, the expiration of the most recent previous extension of the country designation, *id.*, and the Secretary may delay the effective date for a reasonable period "in order to provide for an orderly transition," *id.* § 1254a(d)(3). If, on the other hand, the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." 8 U.S.C. § 1254a(b)(3)(C).

B. Factual Background

Consistent with the statute's mandate, the record here indisputably confirms that TPS determinations are reserved to the Secretary of Homeland Security. Ambassador James Nealon, the former Assistant Secretary of International Affairs for DHS and Acting Undersecretary of Policy for DHS, repeatedly testified that "[i]t was a secretarial decision whether or not to renew

TPS."  Aug. 14, 2018 Deposition Tr. of James D. Nealon ("Nealon Dep. Vol. I") at 42:11-42:12 (attached herein as Ex. 1).  *See also, e.g.*, *id.* at 49:24-50:3 ("[I]t's a secretarial decision.  So it's as simple as that.  It's a secretarial decision, and various secretaries would go through their distinct processes to gather information before they made their decisions."); *id.* at 131:19-131:20. Likewise, Ms. Kathy Kovarik, the Chief of the U.S. Citizenship and Immigration Services ("USCIS") Office of Policy and Strategy, testified that "[t]he secretary makes the decision."  Aug. 3, 2018 Deposition Tr. of Kathy Kovarik ("Kovarik Dep.") at 95:11 (attached herein as Ex. 2); *see also id.* 143:19-144:2 (explaining that decision is made when the Secretary signs the decision memo.  As the White House Chief of Staff explained in a contemporaneous, internal communication, "the decision on TPS was *entirely* [the Secretary's]," to make.  E-mail from Acting Sec'y Elaine C. Duke to White House Chief of Staff, John Kelly (Nov. 10, 2017, 11:03 AM EST), DPP_00003534 (emphasis added) (attached herein as Ex. 3).[3]

Consistent with past practice, Acting Secretary Duke and Secretary Nielsen received input from both within and outside of the agency in reaching their respective determinations.  *See* Sudan Administrative Record ("AR"), ECF No. 111-1; Nicaragua AR, ECF No. 112-1; Haiti AR, ECF No. 113-1-2; El Salvador AR, ECF No. 115-1.[4]  As described by former USCIS Director Leon Rodriguez (Director of USCIS from July 2014 to January 2017), pursuant to the prior Administration's TPS decision-making process, the Secretary was provided (a) a country conditions report from the USCIS Refugee, Asylum, and International Operations ("RAIO") Directorate; (b) a recommendation from the Secretary of State (often in the form of a letter); (c) a country condition report from the State Department that accompanied the letter; and (d) a

---

[3] In this brief, Defendants are identifying any e-mail exhibit by the top e-mail in the chain.  The email discussed above is the bottom email in the chain sent by John Kelly at 3:14 AM on November 10, 2017.

[4] In filing the complete administrative records for each of the terminations at issue in this litigation, Defendants included the information initially withheld as deliberative or non-responsive to the administrative records in light of this Court's ruling on the deliberative process privilege and the Magistrate Judge's ruling on non-responsive material; Defendants have also added documents to the records they originally certified based on further information that has come to light concerning what was directly or indirectly considered by the decision-makers.

"Decision Memorandum" providing USCIS's recommendation.  *See* Decl. of Leon Rodriguez ("Rodriguez Decl.") ¶¶ 9, 10, 12, ECF No. 90.  The record shows that both Acting Secretary Duke and Secretary Nielsen made their TPS decisions after receiving the same inputs.[5]

Acting Secretary Duke solicited additional information in an effort to get a diverse set of perspectives and, in some cases, received conflicting recommendations.  Nealon Dep. Vol. I at 42:1-42:4 ("So during Acting Secretary Duke's tenure, she was a very active consumer of information about TPS, and so she solicited written materials and – and opinions from staff about TPS."); *id.* at 196:24-197:4 ("So as I've described, this decision was very much on her mind.  She was struggling with it in a good sense of the word, struggling with it as . . . an intelligent, hard-working government employee would struggle with a very consequential decision.").  In particular, she sought the input of James Nealon, who served for more than three decades at the State Department, including as Ambassador to Honduras from 2014 to 2017.  *See* Nealon Dep. Vol. I at 27:8-27:9; *id.* at 194:4-194:9 ("So, as I described, Acting Secretary Duke's information-gathering process in anticipation of making TPS decisions, she was casting a very wide net and reading voraciously and consulting widely, and she asked me to write something for her that gave my opinion on the TPS decision.").  Ambassador Nealon ultimately recommended against terminating TPS for Honduras and El Salvador.[6]  *See* El Salvador AR at 42-43.

---

[5] The RAIO report for each AR can be found at the following locations within the AR: Sudan AR at 28-39; Nicaragua AR at 14-30; Haiti AR at 46-63; and El Salvador AR at 52-69.  The Secretary of State's recommendations for each determination are at: Sudan AR at 49-50 (Deputy Secretary of State's recommendation in lieu of the Secretary of State); Nicaragua AR at 32-33; Haiti AR at 31-32; and El Salvador AR at 14-15.  The State Department's country assessment are at Sudan AR at 51-56; Nicaragua AR at 34-38; Haiti AR at 40-44; and El Salvador AR at 16-21.  Finally, the Decision Memoranda are at: Sudan AR at 5-11; Nicaragua AR at 5-11; Haiti AR at 33-39; and El Salvador AR at 45-51.

[6] Ambassador Nealon included a recommendation in his memo to Acting Secretary Duke that Nicaragua not be terminated, but clarified in his deposition that his "memo is really talking about Honduras and El Salvador," because Nicaragua presented a separate set of circumstances.  *See* Nealon Dep. Vol. I at 207:23-208:12 ("So it's unfortunate that I marked the memo with Nicaragua as well, because Nicaragua wasn't really subject to the same kind of discussion as the other two countries.  First of all, Nicaragua had not requested a renewal of temporary protected status and secondly, the country conditions were just very, very different at that time, a lot less violence, for example, and I don't think anybody saw a real problem with Nicaragua taking back

In addition to seeking Ambassador Nealon's recommendation, Acting Secretary Duke actively sought input from the State Department, as well as from the Department of Defense. When the State Department took longer than anticipated to provide a recommendation, Ambassador Nealon rigorously emphasized the importance of the State Department's recommendation and their equities in the decision. *See, e.g.*, Nealon Dep. Vol. I at 96:20-96:23 ("I do recall talking to the State Department about the Sudan paperwork and expressing the Secretary of Homeland Security's displeasure with the lateness of that paperwork"); *id.* at 108:22-108:24 ("the Department of State manages the foreign policy of the United States, so that's their equity in the decision"). Similarly, Acting Secretary Duke sought input from Admiral ("ADM") Kurt W. Tidd, Commander, United States Southern Command, to assess the impact a TPS termination would have on U.S. military capabilities. *See* Haiti AR at 1-2 (E-mail from Eric Jones to Major General Jon A. Norman (Nov. 16, 2017 4:34 PM EST)) ("As mentioned during her meeting with ADM Tidd on Monday, Acting Homeland Security Secretary Duke will be making a decision regarding the termination of TPS for Haitians in the US . . . . As such, she would like any input SOUTHCOM has on the potential impact/points of consideration to [military operations], U.S.-Haitian relations, or other areas of SOUTHCOM interest."); *see also* El Salvador AR at 1 (Southern Command's assessment to DHS concerning TPS for El Salvador).

As Ambassador Nealon recognized based on his thirty-four years in Government service, any decision of this nature would predictably encompass foreign and domestic considerations. *See* Nealon Dep. Vol. I at 168:12-169:1 (noting that, in addition to considering the statutory framework and the temporal nature of TPS, "there are policy considerations," including "foreign policy consequences" and "domestic policy considerations"). Accordingly, it is unsurprising that White House advisors expressed a perspective about the upcoming TPS determinations, and that a Cabinet Secretary would take that perspective into account together with the other input she received. *See* Aug. 22, 2018 Deposition Tr. of James D. Nealon ("Nealon Dep. Vol. II") at 337:13-337:17 (attached herein as Ex. 4) ("[F]rom my experience in government, I know it's a very normal

repatriated citizens. So Nicaragua was always a different problem set than Honduras and El Salvador.").

thing for people to communicate about upcoming policy decisions across agencies and . . . with the White House.  It's not an unusual thing.").  In this instance, in conjunction with a Principal's Committee's meeting, the National Security Council ("NSC") recommended that Acting Secretary Duke should terminate TPS for Nicaragua, Honduras, El Salvador, and Haiti, and should terminate TPS for Nicaragua, Honduras, and El Salvador at the same time.[7]  National Security Council Memorandum, Principals Small Group Meeting on TPS (Nov. 3, 2017) ("NSC Recommendation") at 13, 15, located at El Salvador AR at 90-105; Haiti AR at 109-01 to 16; Nicaragua AR at 112-01 to 16.  Notwithstanding that recommendation, Acting Secretary Duke decided to *not* terminate TPS for Honduras or El Salvador at that time.  *See* Acting Sec'y Memorandum Summarizing TPS Decisions ("Duke Memo") at 1 (attached herein as Ex. 5).

Beyond seeking input from multiple experts and stakeholders, Acting Secretary Duke also reviewed underlying intelligence assessments and even classified information in certain instances. *See* Duke Memo at 2-3 (discussing "Intelligence and Analysis reporting" and "a CBP Intelligence Note").[8]  Although certain information within these intelligence assessments was withheld as law enforcement sensitive and thus privileged, the unredacted information reveals that these materials contained assessments of the various underlying conditions within the countries at issue.  *See*, *e.g.*, Haiti AR at 65 (discussing risks of return migration to United States).  Acting Secretary Duke reviewed these intelligence reports in addition to being provided country condition reports from

---

[7]  A Principal Committee's meeting is one in which invited cabinet level officials convene to discuss inter-agency coordination for upcoming policy decisions.  *See* Nealon Dep. Vol. II at 340:1-340:6.  Here, the Attorney General and the Deputy Secretary of State attended a Principal Committee's meeting together with White House staff.  *See* Acting Sec'y Duke's White House Meeting Notes (Haiti AR at 108; Nicaragua AR at 85).  While Plaintiffs allege that the President personally "exerted tremendous pressure on the officials charged with making TPS decisions," *see* PI Mot. at 3, they fail to provide any factual support for such a claim.  To the extent that Plaintiffs are relying on news reports of comments made by the President at a January White House meeting, any such comments would have occurred after Acting Secretary Duke and Secretary Nielsen made the decisions at issue in this litigation.

[8]  Defendants have stipulated to Plaintiffs that this document was prepared by Acting Secretary Duke.  The material redacted on the third page of this internal memorandum was redacted as relating to underlying classified information, as indicated in the privilege log Defendants provided to Plaintiffs for this document.

RAIO and the State Department in her formal decision packet.  *See*, *e.g.*, Duke Memo at 1 (discussing report from State Department on country conditions).  The RAIO reports and the State Department country summaries contained information about the current conditions within each country beyond just the description of the original event that precipitated the initial TPS designation and the lingering effects of that specific event.  *See, e.g.*, Haiti AR at 46-63 (RAIO report discussing, *inter alia*, housing shortage and internal displacement, cholera epidemic and healthcare, economy, governance and political instability); Haiti AR at 43-44 (State Department Assessment referring to "lingering issues from the 2010 earthquake, the aftermath of Hurricane Matthew in 2016, the heavy rains and landslides in 2017, Hurricane Irma in September 2017, and the additional effects of the cholera epidemic continue to affect Haiti").

Just as Acting Secretary Duke reviewed the documents described above in reaching her challenged decisions for Sudan, Nicaragua, and Haiti, Secretary Nielsen either directly or indirectly considered similar materials that comprise the El Salvador Administrative Record in making a determination for that country.  In particular, the Decision Memorandum provided to Secretary Nielsen for her decision included not just the USCIS recommendation, but also the RAIO report for El Salvador describing country conditions, the recommendation from the Secretary of State, and the State Department's country assessment.  *See* El Salvador AR at 45-51 (Decision Memorandum for the Secretary); *id.* at 51 (identifying attachments to the Decision Memorandum). In addition, the El Salvador Administrative Record includes input from Southern Command (El Salvador AR at 1-2), the recommendation by Ambassador Nealon (El Salvador AR at 42-44), and the NSC Recommendation (El Salvador AR at 90-105).  Further, Ambassador Nealon recalled an "active process" in which his staff provided "documents to [Secretary Nielsen's] staff so that she could read them" in anticipation of meeting with foreign governments and outside groups advocating for extending TPS.  *See* Nealon Dep. Vol. I at 48:21-49:7.  Ultimately, as Ambassador Nealon described, "[i]t's a secretarial decision, and various secretaries would go through their distinct processes to gather information before they made their decisions," including "a less formal process of soliciting information and reading and talking and discussing" in addition to "the formal

process of the written materials" being provided to the Secretary in anticipation of any decision. *Id*. at 49:25-50:7.[9]

Further, the statute directs the Secretary to explain her reasoning for a TPS decision in the *Federal Register*. *See* 8 U.S.C. § 1254a(b)(3). Here, as explained in Defendants' motion to dismiss, the FRNs provide the explanation of the Secretaries' decisions. *See* MTD at 9-10, 12-13, 17, 20 (citing FRNs for each of the terminations at issue); *see also* Aug. 9, 2018 Deposition Tr. of Donald W. Neufeld ("Neufeld Dep.") at 106:11-106:16 (attached herein as Ex. 6) ("[T]he FRN really is a document that only can be finalized once you know what the decision is going to be because it just announces the decision and then explains the basis for the decision and then the operational process that needs to follow from that.").

## STANDARD OF REVIEW

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (quoting *Winter*, 555 U.S. at 24). "As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Id.*; *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." (citation omitted)). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). The final two factors, the public interest and the balance of the equities, merge when the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

---

[9] *See also* Nealon Dep. Vol. I at 47:18-47:24 ("I would say that Secretary Nielsen started from a much more granular level of understanding of TPS because of her previous experience than did Acting Secretary Duke, who came out of a management background and not a policy background. So I would say that Secretary Nielsen as I say, started at a higher level of understanding of TPS in general"); *id.* at 48:4-48:8 (noting Secretary Nielsen's "previous experience in government, as well as her time as Secretary Kelly's Chief of Staff and then her time at the White House as Kelly's [D]eputy Chief of Staff").

A "possibility" of irreparable harm is insufficient; irreparable harm must be *likely* absent an injunction. *Id.*; *see also Winter*, 555 U.S. at 22 (rejecting the Ninth Circuit's earlier rule that the "possibility" of irreparable harm, as opposed to its likelihood, was sufficient in some circumstances to justify a preliminary injunction). The Ninth Circuit has determined that its alternative "sliding scale" test is still valid after *Winter*, but even that approach still requires "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff [in order to] support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Furthermore, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*, 138 S. Ct. at 1944 (denying preliminary injunction in part because "plaintiffs' unnecessary . . . delay in asking for preliminary injunctive relief weighed against their request").

## **ARGUMENT**

### I.   **The Court Should Strike or Otherwise Disregard the Inadmissible Evidence on Which Plaintiffs Extensively Rely.**

As an initial matter, Plaintiffs throughout their brief rely on inadmissible double and triple hearsay excerpts from newspaper articles and similar sources. *See*, *e.g.*, PI Mot., Ex. 71, ECF No. 96-71 (*Washington Post* article cited throughout their brief). Such statements are generally inadmissible. *See*, *e.g.*, *Asetek Danmark A/S v. CMI USA, Inc.*, No. 13-cv-00457-JST, 2014 WL 12644295, at *2 (N.D. Cal. Nov. 19, 2014). Thus, in evaluating Plaintiffs' motion, this Court should consider only those facts set forth in documents that would be admissible as substantive evidence or those facts for which the Court could properly take judicial notice.[10]

---

[10] Similarly, Plaintiffs make the puzzling assertion that "Defendants have candidly admitted the President made most of these statements and do not deny such statements reflect animus against non-white, non-European immigrants." PI Mot. at 15 (citation omitted). In fact, Plaintiffs' operative complaint is rife with hearsay excerpts from newspaper articles and similar sources, and Defendants reasonably answered that the underlying statements, if accurately reported, speak for themselves.

1  **II.      Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits.**

2      A.  <u>Plaintiffs' APA "New Rule" Theory Is Factually Incongruous and Legally Untenable.</u>

3      Plaintiffs argue that "DHS violated the APA because it departed from prior policy without

4  publicly acknowledging the change and providing a good reason for it."  PI Mot. at 21.  Plaintiffs

5  have referred to this supposed departure in prior filings as a "new rule," and they continue that

6  phrasing in their most recent submission, albeit sparingly.  *See id.* at 8, 25, 27.  But this argument

7  fails for at least two reasons.  As an initial matter, variations in how different Secretaries render

8  their fact-intensive TPS determinations do not trigger any APA procedural requirements.  And

9  even if such procedural requirements could apply, the record shows at most a difference in

10  emphasis rather than what could plausibly be considered a "new rule."

11        i.  <u>TPS Designations Are Not Regulations, And Differences in Factfinding or</u>

12          <u>Weighing of Criteria by Statutorily Designated Decision-Makers Do Not</u>
        <u>Create A "New Rule" Triggering APA Procedural Requirements.</u>

13      Plaintiffs' argument hinges on their fundamental misconception of TPS as a regulatory

14  scheme.  It is not.  Unlike regulatory administrative actions, the designation of a country for

15  temporary protected status and the subsequent termination of that temporary status does not impose

16  regulatory obligations or restrictions on regulated entities, or impose penalties for the violation of

17  those obligations or restrictions.  *See generally* 8 U.S.C. § 1254a (TPS statute).  Such decisions,

18  instead, simply create and then terminate short-term assistance for nationals of designated

19  countries temporarily residing in the United States.  Plaintiffs' administrative claim is

20  fundamentally misconceived because the APA's procedural requirements and the case law that has

21  developed around those requirements largely serve to ensure that regulated entities have fair notice

22  of permissible and impermissible regulated conduct and their obligations under the law, as well as

23  the sanctions they may incur if they breach those obligations.  But, as explained below, those

24  elements do not apply in the TPS context; there is nothing about the Secretary's underlying

25  statutory interpretation and balancing of facts that creates obligations or rights for individuals.

26  Rather, any rights associated with TPS are subsidiary to the designation decision, a matter not

27  subject to judicial review under 8 U.S.C. § 1254a(b)(5).  Indeed, the statute expressly contemplates

28  that the Secretary "shall establish an administrative procedure for the review of the denial of

benefits" to nationals of TPS-designated countries, 8 U.S.C. § 1254a(b)(5)(B), and the Secretary has done so, *see* 8 C.F.R. § 244.10.  *See generally* 8 C.F.R. pt. 244.  Those regulations are the "rules" to which APA procedural protections attach.  In significant contrast, Congress clearly did not intend for or contemplate that any "rule" would be promulgated and thereafter judicially enforced governing the Secretary's process for making TPS decisions.

Plaintiffs nonetheless assert that inconsistencies among different Secretaries of Homeland Security when weighing various factors underlying TPS decisions provide a basis for litigation under the APA.  But the fact that one Secretary might weigh factors differently from his or her predecessor is not proof of a new rule.  Also, had Congress been troubled by the potential for different Secretaries to balance factors differently, it would have included more substantive criteria or procedural requirements in the statute, rather than insulating the Secretary's decision from judicial review.  *Cf. Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion").

Tellingly, Plaintiffs cite no case holding that a shift in fact-finding or the weighing of criteria by a decision-maker with otherwise unreviewable authority is tantamount to a new rule.  They rely heavily on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), but that case involved the FCC's evolving approach to "enforcing the statutory prohibition against indecent broadcasts," *id.* at 507, and the agency's position had the practical effect of imposing burdens (and, potentially, penalties) on a regulated industry.  Indeed, the FCC expressly acknowledged in the opinion leading up to the challenged agency actions that its prior interpretations were "no longer good law."  *Id.* at 510.  Similarly, in *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), the Department of Labor was acting in its regulatory capacity over a regulated industry when it (1) promulgated an interpretive rule that had the effect of excluding automobile dealership service advisors from the overtime exemption under the Fair Labor Standards Act, then (2) issued an opinion letter stating that service advisors could in fact be exempt, then (3) updated its field operations handbook to confirm its change in position, then (4) issued a notice of proposed rulemaking in line with that changed position, but then (5) promulgated a final rule that reverted

to the original position.  And in *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017), the Forest Service similarly acted in a regulatory capacity when promulgating its evolving interpretation through different procedural devices when it first issued a "Wild Horse Territory Plan" specifying two separate regulated areas; later acknowledged that these regulated areas were part of one contiguous whole by promulgating a map and, later still, a "Forest Plan" (a regulatory device with numerous procedural requirements); and then, two decades later, announced through a "scoping letter" and subsequent administrative orders (including, ultimately, a new Wild Horse Territory Plan) that the changed map was the product of clerical error and that the original geographic boundaries would adhere.[11]

    These cases have no bearing here.  They together illustrate only the unremarkable proposition that, when regulatory agencies have changed the rules of the game in a way that bears directly on the rights or interests of regulated entities and other stakeholders, the agencies are

_____

    [11] In assessing Plaintiffs' "new rule" claim at the motion to dismiss stage, the Court cited two additional cases on which Plaintiffs do not presently rely.  Defendants respectfully submit that neither case demonstrates that an arguable shift in discretionary multifactor balancing by an agency decision-maker in a nonregulatory context triggers APA procedural requirements.  In *California Trout v. FERC*, 572 F.3d 1003 (9th Cir. 2009), the agency had promulgated a rule governing untimely motions to intervene in proceedings before the agency.  The petitioners, who had been denied intervention, argued that the agency violated its own precedent, and they cited examples in which the agency had allowed late intervention. *Id.* at 1022.  In finding that the agency had not "deviated irrationally from its prior precedent in failing to make an exception to its general rule for petitioners' untimely motions for intervention," the Ninth Circuit noted that "petitioners knew the rules of the game and assumed the risks of their decision not to intervene." *Id.* at 1025-26. *California Trout* involved a paradigmatic regulatory action (a licensing proceeding) governed by a rule promulgated by the agency to inform stakeholders about their procedural rights, not an unreviewable balancing of facts and circumstances by a statutorily designated decision-maker. *California Trout* is therefore inapposite.  Likewise inapposite is *Northwest Environmental Defense Center v. Bonneville Power Administration*, 477 F.3d 668 (9th Cir. 2007), where petitioners challenged an agency's decision to transfer functions performed by a center it had funded for many years to third-party entities—an indisputable and dramatic change in course.  The Ninth Circuit invalidated that action, finding that it was based on the agency's misapprehension that language in a congressional conference committee report had binding legal effect.  Nothing like that happened here:  Plaintiffs may disagree with the Secretaries' TPS determinations, but they could not seriously contend that those determinations, which are statutorily vested in the Secretaries' judgment and which complied fully with the limited procedural requirements imposed by 8 U.S.C. § 1254a, were based on a flagrant mistake of law akin to the agency's mistake in *Northwest Environmental*.

required to support those changes with reasoned explanations.  Here, by contrast, the Secretary of Homeland Security is charged with exclusive and unreviewable TPS decision-making authority and has exercised that authority in a way that Plaintiffs perceive to be different from the approach taken in prior Administrations.  Even assuming that Plaintiffs are correct in their belief that former Acting Secretary Duke and Secretary Nielsen emphasized different factors or weighed the statutory criteria differently, that is not equivalent to an explicit regulatory change as in the cases on which Plaintiffs rely, nor does it mean the Secretary of Homeland Security failed to act with reasoned explanations.

ii.    <u>In Any Event, Plaintiffs Have Failed to Show That Acting Secretary Duke and Secretary Nielsen Departed from Past Practice in Making Their TPS Determinations.</u>

In trying to show a shift in agency practice that violates the APA, Plaintiffs first suggest that a process that started with "[c]areer civil servants initiat[ing] the TPS decision[-]making process" previously resulted "in extensions of TPS designations on the basis of intervening events," *see* PI Mot. at 21-22 (citation omitted).  The record demonstrates, however, that the decision-making process remained substantially the same in the different Administrations.  Moreover, while Plaintiffs argue that DHS's ultimate decision to terminate these four TPS designations means that there must be some new interpretation rather than a change in emphasis, *see id.* at 22-24, they make no mention in their entire APA argument section of the actual, statutory decision-makers, Acting Secretary Duke and Secretary Nielsen.

As discussed above, the TPS decision-making process employed by Acting Secretary Duke and Secretary Nielsen was consistent with the process in previous Administrations.  Any shifts in that process that Plaintiffs believe they have identified either do not exist or, at most, are merely technical in nature.  First, as in previous Administrations, the decision packets provided to Acting Secretary Duke and Secretary Nielsen included country condition reports from RAIO.  *See Sudan AR* at 28-39; *Nicaragua AR* at 14-30; *Haiti AR* at 46-63; and *El Salvador AR* at 52-69.  The RAIO reports were exhaustive and, contrary to Plaintiffs' suggestion, contained discussion of current country conditions.  *See, e.g., Haiti AR* at 46-63 (RAIO report discussing, *inter alia*, housing shortage and internal displacement, cholera epidemic and healthcare, economy, governance and

political instability).  Plaintiffs make the point that decision-makers in previous administrations were provided "memoranda analyz[ing] wide-ranging country conditions [that] provided the factual basis for agency review," *see* PI Mot. at 21 (citing Rodriguez Decl. ¶ 16), but so too were Acting Secretary Duke and Secretary Nielsen.  *See* Duke Memo at 1 (discussing report from State Department on country conditions).  And, as discussed above, the administrative records in this case include other discussion of current country conditions.  *See, supra*, at 4–9 (listing, *inter alia*, country reports by the State Department, Department of Defense summaries, and intelligence assessments).

Plaintiffs' other arguments fare no better.  Plaintiffs argue that the practice of certain advisors looking at the TPS decisions "holistically" was a departure of previous practices, *see* PI Mot. at 6, and suggest through the declaration of former USCIS Director Leon Rodriguez that the decision to consider certain countries together departed from past practice, *see* Rodriguez Decl. ¶ 11 ("Generally, each country was considered individually.").  But Director Rodriguez acknowledges that Sudan and South Sudan were considered together and that there was joint consideration of countries impacted by the "Ebola epidemic."  *See id.*  On at least one occasion, extensions for Honduras, El Salvador, and Nicaragua were announced jointly.  *See* Press Release, USCIS, DHS Announces Temporary Protected Status  Extension for El Salvador, Honduras, and Nicaragua                 (Feb.                 23,                 2006), https://www.justice.gov/sites/default/files/eoir/legacy/2006/02/23/TPSElSalHonNic022306.pdf. In any event, Acting Secretary Duke wrote in an internal memorandum concurrent with her decision-making that she was considering each country based on the conditions within that country and indeed declined to accept the recommendation of the NSC and the Secretary of State to simultaneously terminate TPS for El Salvador, Honduras, Nicaragua, and Haiti.  *See* Duke Memo at 1 (explaining that "additional time is necessary for me to gather further information and further evaluate . . . the country conditions" for El Salvador and Honduras "*and maybe Nicaragua*" and that she "will review the country conditions of these countries during the extension period").  Further, there was good reason to treat Honduras and El Salvador similarly based on foreign relations considerations.  *See* Nealon Dep. Vol. I at 75:9-75:18 ("there was a general understanding

that Honduras and El Salvador had to be addressed in a similar way because U.S. equities in both countries are very similar, and there would be – there could be implications for U.S. policy if they were treated differently").

Similarly, Plaintiffs suggest that career officials were cut out of the process for drafting the FRNs that explained the TPS decisions at issue.  *See* PI Mot. at 6, 11-12.  But, contrary to Plaintiffs' suggestion, the original drafting of the FRNs were not reassigned from "career staff to political appointees"; they were drafted by career staff, consistent with ordinary procedures.  *Compare* PI Mot. at 6 (incorrectly stating a political appointee reassigned the draft process to political appointees), *with* Neufeld Dep. at 137:12-138:18 (long serving career official explaining that the drafting moved from one career office to another based on the subject matter expertise of that office).  Further, Plaintiffs stress that the FRNs were no longer written at the same time when USCIS was writing its recommendation, *see* PI Mot. at 11.  But there is nothing nefarious about allowing the Secretary to first make a decision, rather than drafting FRNs based on alternative projections of what the Secretary's decision might ultimately be.  *See* Kovarik Dep. at 162:4-162:8 ("I did not want staff to expend resources to write a Federal Register Notice . . . for every option available, I asked them to withhold writing the Federal Register Notice until a decision was made.").

Substantively, Plaintiffs put much emphasis on how certain advisors in DHS and elsewhere in the government interpret TPS, but ignore other advisors and, most importantly, the factors considered by the actual decision-makers.  *See supra*, at 4–9 (detailing process used by and advice relied upon by Acting Secretary Duke and Secretary Nielsen).  It should not be surprising that different political officials had different views, and perhaps even strong views, about how to approach TPS decisions.  But, ultimately, it is the Secretary who makes the decision.  *See, e.g.*, Ex. 3 (contemporaneous internal email from White House Chief of Staff emphasizing that "the decision on TPS was *entirely* [the Secretary's]" to make) (emphasis added); Nealon Dep. Vol. I at 49:24-50:3 ("It's a secretarial decision, and various secretaries would go through their distinct processes to gather information before they made their decisions."); Kovarik Dep. at 95:11 ("[t]he secretary makes the decision").

Further, as detailed above, the collective advice and paperwork provided to Acting Secretary Duke and Secretary Nielsen included information about current conditions of the country.  And, even if Acting Secretary Duke and Secretary Nielsen put more emphasis on the originating event than did the Secretaries of Homeland Security from the last Administration, the statute, nevertheless, requires a consideration of current conditions to determine whether nationals of a given country could safely return or whether a country could adequately handle the return of its nationals. 8 U.S.C. § 1254a(b)(1) (requiring such a consideration under the statute); *see also* Kovarik Dep. at 245:16-246:10 (acknowledging that the state of a TPS country's economy is "relevant to a TPS designation on whether or not a country can adequately handle the return of its nationals").

Indeed, the FRNs for each of the terminations acknowledged the statutory requirement that the nationals of those countries must be able to safely return for a termination to take effect.  *See, e.g.*, *Termination of the Designation of Haiti for Temporary Protected Status*, 83 Fed. Reg. 2648-01, 2650 (Jan. 18, 2018).[12]  Acting Secretary Duke in her contemporaneous notes likewise addressed this issue regarding whether the conditions in the countries under consideration allowed for the safe return of their nationals.  *See* Duke Memo at 1 (concluding that "additional time is necessary" as for Honduras and El Salvador "to make the determination whether the country conditions continue or have been restored to the extent" that the countries can "adequately handle the return of their nationals").  Notably, Acting Secretary Duke ultimately decided not to terminate TPS for Honduras, notwithstanding the conflicting recommendations she received.  *See* E-mail from Acting Sec'y Elaine C. Duke to White House Chief of Staff, John Kelly (Nov. 6, 2017 03:23 PM EST), DHS_RFPD_00000004 (attached herein as Ex. 7) (explaining, *inter alia*, the Acting Secretary's decision to not terminate TPS for Honduras) ("The Dept. of State reports say[] the country conditions do not exist, but it also states that that Honduras is unable at this time to

---

[12] As this Court's opinion denying Defendants' motion to dismiss noted, the FRNs for these terminations at issue do not mirror the previous FRNs extending TPS in what items they discuss. But the purpose of each FRN is to "explain the why of the decision." Neufeld Dep. at 136:14.  As the administrative records and the other materials cited in this brief make clear, information about current conditions, including what were included in the RAIO reports, were amongst the materials provided to the Secretaries for review.

adequately hand[le] the return of their 86,000+ nationals.").  This approach was consistent with the advice she received from James Nealon, who was Ambassador to Honduras prior to serving as Acting Undersecretary of Policy at DHS.  *See* El Salvador AR at 42-44 (Amb. Nealon Memo recommending extensions for, *inter alia*, Honduras upon his discussion of humanitarian considerations, push factors on migration, and U.S. foreign relations).

In sum, TPS decisions require judgment calls based on multiple factors and ever changing circumstances; judgments that Congress recognized should be not subject to judicial second-guessing. 8 U.S.C. § 1254a(b)(5)(A) (judicial review preclusion provision).  As explained in the Defendants' motion to dismiss briefing, the *Federal Register* Notices provided a rational explanation for Acting Secretary Duke' and Secretary Nielsen's decisions.  *See* MTD at 34-35; Defs.' Reply In Supp. of MTD at 9, ECF No. 26.[13]  It is reasonable that different Secretaries of Homeland Security approach these questions differently, with emphasis on different factors within the scope of the statutory criteria on which they make difficult judgments about country conditions. *See* Neufeld Dep. at 68:17-68:19 (longtime USCIS career supervisor discussing how he "heard expressions of concern from this administration and the last administration that the temporary part of TPS seems to be difficult").  But that difference in emphasis does not make a new rule, and does not show any APA violation.

B.  Whether the Court Applies the *Trump v. Hawaii* Standard Applicable to Animus Claims in the Immigration Context or the *Arlington Heights* Standard Applicable in Some Other Contexts, Plaintiffs Have Not Shown That the Challenged TPS Determinations Are Constitutionally Suspect.

i.      *Trump v. Hawaii* Controls in This Immigration Context.

Defendants have explained why the strict scrutiny analysis set forth in *Arlington Heights* should not be applied to TPS decisions.  *See* Defs.' Supp. Br. Regarding Equal Protection Claim ("Defs.' Suppl. Br.") at 1, ECF No. 41.  Specifically, the Supreme Court's June 2018, decision in

---

[13] *See also Termination of the Designation of Sudan for Temporary Protected Status*, 82 Fed. Reg. 47,228-02 (Oct. 11, 2017); *Termination of the Designation of Nicaragua for Temporary Protected Status*, 82 Fed. Reg. 59,636-01, 59,637 (Dec. 15, 2017); *Termination of the Designation of Haiti for Temporary Protected Status*, 83 Fed. Reg. 2648-01, 2648, 2650 (Jan. 18, 2018); *Termination of the Designation of El Salvador for Temporary Protected Status*, 83 Fed. Reg. 2654-01 (Jan. 18, 2018).

*Trump v. Hawaii* "makes clear that, at most, rational basis would be the applicable standard of review given the deference owed to the political branches in this area." *Id*; *see Trump*, 138 S. Ct. at 2418-19 ("Because decisions in . . . matters [involving admission and exclusion of foreign nationals] may implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive." (citations omitted));*Trump*, 138 S. Ct. at 2420 ("[W]e may consider plaintiffs' extrinsic evidence, but will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." (citation omitted)).

This Court disagreed with Defendants, writing that it is "not persuaded that *Trump*'s standard of deferential review applies here" and that the "case at bar is distinguishable from *Trump* in several respects." *Ramos v. Nielsen*, No. 18-cv-01554-EMC, 2018 WL 3730429, at *28-29 (N.D. Cal. Aug. 6, 2018). Respectfully, the Government maintains that *Trump* provides the appropriate legal framework for adjudicating Plaintiffs' likelihood of success on the merits of their equal protection claim at this preliminary injunction stage. *Cf. Gen. Elec. Co. v. Wilkins*, No. CV F 10-0674 LJO JLT, 2012 WL 3778865, at *6 n.3 (E.D. Cal. Aug. 31, 2012) ("[T]his Court is not bound by its interlocutory orders, which are not final, and may reconsider or modify them at any time.").

In distinguishing *Trump*, this Court noted that "Defendants herein did not cite national security as a basis for terminating TPS," *Ramos*, 2018 WL 3730429, at *29,[14] and explained that "the TPS-beneficiaries here, unlike those affected by the Proclamation in *Trump*, are already in the United States," and that "aliens within the United States have greater constitutional protections than those outside who are seeking admission for the first time." *Id.* at 30. Yet the reasoning of *Trump*, by its express language, is not limited to executive actions rooted in national security

---

[14] While it is true that the FRNs announcing the termination of TPS for Sudan, Nicaragua, Haiti, and El Salvador do not specifically discuss national security considerations, such considerations may play a role in TPS determinations that are based on "extraordinary and temporary conditions." *See* 8 U.S.C. § 1254a(b)(1)(C) (requiring the Secretary to ensure that permitting foreign nationals to remain temporarily in the United States would not be "contrary to the national interest of the United States").

DEFS.' RESP. IN OPP'N TO PLS.' MOT. FOR PRELIM. INJ. – No. 3:18-cv-1554 - 19

concerns or to actions restricting entry of foreign nationals.  Rather, in discussing the deference

prescribed by *Kleindienst v. Mandel*, 408 U.S. 753 (1972), on which *Trump* based its deferential

standard of review, the Supreme Court observed that its "opinions have reaffirmed and applied

[that] deferential standard of review across different contexts and constitutional claims." *Trump*,

138 S. Ct. at 2419.  For authority, the Supreme Court cited *Fiallo v. Bell*, 430 U.S. 787 (1977), a

paternity/legitimacy case that had nothing to do with national security.  *Fiallo* rejected the

argument that deference applies only in cases "involving foreign policy matters and congressional

choices to exclude or expel groups of aliens that were specifically and clearly perceived to pose a

grave threat to the national security . . . or to the general welfare of this country," explaining:

> We find *no indication* in our prior cases that the scope of judicial review is a
> function of the nature of the policy choice at issue.  To the contrary, [s]ince
> decisions in these matters may implicate our relations with foreign powers, and
> since a wide variety of classifications must be defined in the light of changing
> political and economic circumstances, such decisions are frequently of a character
> more appropriate to either the Legislature or the Executive than to the Judiciary
> . . . .

*Id.* at 796 (emphasis added) (citations omitted).

The Supreme Court in *Trump* also cited *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), as

an example of a lower-court opinion that "applied *Mandel* to broad executive action." *Trump*, 138

S. Ct. at 2419.  *Rajah* involved challenges to the National Security Entry-Exit Registration System

("NSEERS"), which "required the collection of data from aliens upon entry and periodic

registration of certain aliens present in the United States.  Its purpose was to enhance the

monitoring of aliens and the enforcement of immigration laws." *Rajah*, 544 F.3d at 433.  NSEERS

did not impose an entry ban or some other kind of policy that only impacted persons located

overseas.  Quite the contrary, the plaintiffs in *Rajah* were aliens located in the United States who

had been placed into removal proceedings and who complained about the NSEERS requirement

that "alien males from certain designated countries who were over the age of 16 and who had not

qualified for permanent residence . . . appear for registration and fingerprinting and to present

immigration related documents." *Id.* at 433.  The *Rajah* court found a "rational national security

basis for the Program." *Id.* at 438.

*Trump*'s reliance on immigration cases not involving national security concerns or entry restrictions shows that the deference recognized in *Mandel* and reiterated in *Trump* applies expansively.  If the broad congressional policy at issue in *Fiallo* is entitled to deference, then surely a fact-sensitive decision about whether a particular country has sufficiently recovered from a natural or manmade disaster is entitled to deference, particularly given Congress's admonition that there is "no judicial review of any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS, 8 U.S.C. § 1254a(b)(5)(A);[15] *see also Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) ("[W]e have consistently held . . . that ordinary rational basis review is the appropriate standard in the immigration context. Our sister circuits agree." (citations omitted)), *cert. denied*, 138 S. Ct. 643 (2018).

In its prior Order, this Court also distinguished *Trump* on the theory that "Defendants have not claimed that TPS has been terminated for foreign policy reasons."  *Ramos*, 2018 WL 3730429, at *30.  However, while the FRNs may not state those reasons as a basis for termination, the evidentiary record now before the Court certainly shows that TPS decisions inherently implicate foreign policy considerations and that the materials before the Secretaries highlighted those considerations.  For example, Plaintiffs themselves point to the "input of U.S. ambassadors from TPS-designated countries," PI Mot. at 12 (citation omitted), the record contains letters from diplomats in the affected countries, *see*, *e.g.*, El Salvador AR at 82-86, and the Secretary of State emphasized the "significant humanitarian, foreign policy, and political interests at play," *see, e.g.*, Nicaragua AR at 32-33.  *See also* Nealon Dep. Vol. I at 75:11-75:14 (emphasizing the impact of TPS decisions on U.S. equities in El Salvador and Honduras)  As a practical matter, the decision to end TPS inevitably will impact the United States's relations with the affected countries, a reason

---

[15] This Court noted in its prior Order that "Congress has not given the Secretary *carte blanche* to terminate TPS for any reason whatsoever.  Rather, the TPS statute empowers the Secretary of Homeland Security discretion to initiate, extend, and terminate TPS in specific enumerated circumstances."  *Ramos*, 2018 WL 3730429, at *31.  But that exercise of discretion is based on an antecedent factual determination, which the Secretary is responsible for making after receiving inputs from appropriate government agencies.  So, while the TPS statute may not "exude[] deference to the [Secretary] in every clause," *Trump*, 138 S. Ct. at 2408, it nonetheless reflects a "very broad grant of statutory discretion," *Ramos*, 2018 WL 3730429, at *31.

in and of itself for this Court to proceed with caution given the "substantial deference that is and must be accorded to the Executive in the conduct of foreign affairs," *Trump*, 138 S. Ct. at 2424 (Kennedy, J., concurring); *see also* Nealon Dep. Vol. I at 108:22-108:24 ("the Department of State manages the foreign policy of the United States, so that's their equity in the [TPS] decisions"); Nealon Dep. Vol. I at 207:23-208:12 (noting, *inter alia*, the importance of Nicaragua not requesting an extension of TPS).

The Court should accord the Secretaries' TPS determinations the deference that the Supreme Court has mandated in *Trump v. Hawaii*.

          ii.    <u>Regardless of the Applicable Standard of Review, Plaintiffs Have Failed to Demonstrate that the TPS Decisions Were Motivated By Animus.</u>

Even if the Court continues to rely on the *Arlington Heights* framework, Plaintiffs have shown no equal protection violation. The record makes clear that it "was a secretarial decision whether or not to renew TPS," Nealon Dep. Vol. I at 42:11-42:12; *see also, e.g.*, *id.* at 49:24-50:3, and that the Secretaries received the same input to help make those decisions as did Secretaries in previous administrations, *see* Sudan, Nicaragua, Haiti, and El Salvador ARs; Rodriguez Decl. ¶¶ 9, 10, 12. The record further shows that Acting Secretary Duke "was a very active consumer of information about TPS," Nealon Dep. Vol. I at 42:1-42:4, and that she "was struggling with" the decision "in a good sense of the word . . . as an intelligent, hard-working government employee would struggle with a very consequential decision." *Id.* at 196:24-197:4; *see also supra* at 4–9 (identifying the various sources Acting Secretary Duke turned to for information). Secretary Nielsen received similar information in making her El Salvador determination, as reflected in the administrative records. Specifically, she either directly or indirectly considered USCIS's recommendation, the RAIO report for El Salvador, the recommendation from the Secretary of State, and the State Department's country assessment. *See* El Salvador AR at 14-21, 45-69. And, the FRNs summarize the Secretaries' reasoning for their decisions. *See* 8 U.S.C. § 1254a(b)(3)(A); Neufeld Dep. at 106:11-16; MTD at 9-10, 12-13, 17, 20 (citing FRNs for each of the terminations at issue). In short, the Secretaries acting upon similar input received in prior Administrations came to their determinations as to whether an extension was warranted. *See Kohli v. Gonzales*, 473 F.3d

1061, 1068 (9th Cir. 2007) (explaining that there is a "well established principle of federal law" that recognizes that "administrative agencies are entitled to a presumption that they 'act properly and according to law'" (quoting *FCC v. Schreiber*, 381 U.S. 279, 296 (1965))); *see also Angov v. Lynch*, 788 F.3d 893, 905 (9th Cir. 2013) (collecting cases showing that the "presumption of regularity has been applied far and wide to many functions performed by government officials").[16]

Despite building a massive evidentiary record and obtaining hundreds of the Government's usually protected documents reflecting internal deliberations, Plaintiffs have failed to identify any evidence that shows that either Secretary harbored or acted upon any animus.  Plaintiffs fixate on alleged "pressure[]" from the President and the White House that they claim shows animus here. PI Mot. at 27.  Although Plaintiffs have convinced themselves that agency-level communications with the White House are nefarious, *see id.* at 26-27, "it's a very normal thing for people to communicate about upcoming policy decisions . . . with the White House."  Nealon Dep. Vol. II at 337:14-337:16.  And it is those same communications that prove the exact point that Plaintiffs obfuscate—that the TPS determinations belong to the *Secretary*.[17]  The NSC recommended that DHS terminate on November 6, 2017, the TPS designations for Honduras, El Salvador, and

---

[16] Plaintiffs ascribe a discriminatory motive to Defendants because of an information request regarding Haiti TPS holders that was made *before* then-Secretary Kelly *extended* TPS status in April 2017 for another six months.  *See* PI Mot. at 28.  Plaintiffs suggest that any such information is irrelevant to a TPS determination, but the statute does contain a qualification that allows for consideration as to whether certain designations are in "the national interest of the United States," 8 U.S.C. 1254a(b)(1)(C); *see* Kovarik Dep. at 197:14-198:10 (explaining possible use of information); Neufeld Dep. at 172:14-172:18 (same).

[17] Plaintiffs rely on an e-mail from Acting Secretary Duke to the Chief of Staff stating that Acting Secretary Duke adjusted the effective date for Nicaragua from 18 months to 12 months after discussing the matter with the White House's Homeland Security Advisor.  *See* PI Mot. at 27 (citing PI Mot., Ex. 30, ECF No. 96-30).  But it should not be surprising that Acting Secretary Duke was amenable to such an adjustment given the smaller population at issue for Nicaragua and given that Nicaragua had not even requested an extension.  *See* Nealon Dep. Vol. I at 207:23-208:12 ("So it's unfortunate that I marked the memo with Nicaragua as well, because Nicaragua wasn't really subject to the same kind of discussion as [Honduras and El Salvador].  First of all, Nicaragua had not requested a renewal of temporary protected status and secondly, the country conditions were just very, very different at that time, a lot less violence, for example, and I don't think anybody saw a real problem with Nicaragua taking back repatriated citizens.  So Nicaragua was always a different problem set than Honduras and El Salvador.").

Nicaragua, with Haiti to be terminated shortly thereafter.  Duke Memo at 2; NSC Recommendation at 11, 13, 15.  But Acting Secretary Duke declined to adopt these recommendations in full, and her memo regarding TPS decisions makes clear that she considered each country individually.  Duke Memo at 1 (explaining that "additional time is necessary for me to gather further information and further evaluate . . . the country conditions" for El Salvador and Honduras "*and maybe Nicaragua*" and that she "will review the country conditions of these countries during the extension period").  Nor did Acting Secretary Duke terminate the TPS designations for all three countries on November 6, 2017, as recommended.  In fact, she concluded that she did "not have all the necessary information to make" the determination for Honduras and El Salvador on November 6, 2017, and thus Honduras's TPS designation automatically extended for six months pursuant to 8 U.S.C. § 1254a(b)(3)(C), Duke Memo at 1, and a determination on El Salvador waited until the Acting Secretary had the necessary information to render a determination, and was ultimately made by her successor.  As the White House Chief of Staff explained in an internal, contemporaneous communication, "the decision on TPS was *entirely* hers," Ex. 3 (emphasis added).[18]  Indeed, since September 1, 2017, TPS has been extended for South Sudan, Syria, Yemen, and Somalia.[19]

---

[18] Plaintiffs claim that Acting Secretary Duke's reference to an "America first view of the TPS decision" evinces "direct evidence" of a "racist agenda against non-white, non-European immigrants."  PI Mot. at 26 (citations omitted).  But that argument misconstrues the nature of that comment, as the context of the statement makes plain that such a consideration cautioned *against* terminating TPS at that time.  *See* Duke Memo at 1 (explaining that it was "unclear what the appropriate timing for the termination is and what the United States should do to help the countries and the TPS individuals prepare for the termination," and that "[w]e need to ensure the proper analysis and plan is in place"); *accord* Nealon Dep. Vol. I at 168:12-169:1 (explaining "there are policy considerations," including "foreign policy consequences" and "domestic policy considerations" for decisions like TPS determinations).

Similarly, Plaintiffs strip the context from one of Acting Secretary Duke's emails and claim it represents "direct evidence" that she altered her TPS determination to achieve a "racist agenda against non-white, non-European immigrants" because she wrote that she is making a "strong break with past practice" to signal that "TPS in general is coming to a close."  *See* PI Mot. at 26 (quoting PI Mot., Ex. 30).  But her e-mail explains that her decision would "stat[e] that I'm not satisfied that the country conditions remain – but not yet sure how to best end TPS for this country" given the competing considerations outlined in the email.  PI Mot., Ex. 30.

[19] *Extension of South Sudan for Temporary Protected Status*, 82 Fed. Reg. 44,205-01 (Sept. 21, 2017); *Extension of the Designation of Syria for Temporary Protected Status*, 83 Fed. Reg. 9329-02 (Mar. 5, 2018); *Extension of the Designation of Yemen for Temporary Protected Status*,

**III.    Plaintiffs Have Also Failed to Demonstrate that the Equities Favor Preliminary Injunctive Relief.**

A.    <u>Any Harm Plaintiffs May Suffer is Based on the Inherent Nature of the TPS Statute.</u>

"An essential prerequisite to the granting of a preliminary injunction is a showing of irreparable injury to the moving party in its absence." *Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985).  Not just any showing irreparable harm will suffice.  A party "is only entitled to an injunction that prevents [the] irreparable harm" that is "likely to occur." *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011); *see also* 804 F. Supp. 2d at 1054 (noting that a party's "showing [of irreparable harm] is required in order to justify the specific measures that [the party] request[s]"); *Seto v. Thielen*, No. CIV. 10-00351, 2010 WL 2612603, at *3 (D. Haw. June 28, 2010) (a movant "should tailor the [injunctive] relief requested to appropriate relief for the alleged violation").  Plaintiffs have failed to make that showing here.

First, Plaintiffs contend that their allegations of constitutional and statutory violations *per se* constitute irreparable harm.  PI Mot. at 29.  But these contentions merely restate their merits arguments—the alleged harms only occur if, in fact, Defendants have violated their constitutional or statutory rights.  As explained above, Plaintiffs have established no likelihood of success on the merits.  *See supra* Section II, at 11–24.

Second, Plaintiffs allege numerous injuries resulting from the TPS terminations at issue here that are inherent in the temporary nature of TPS status.  For example, Plaintiffs allege that, because they "have lost the security of knowing they will be able to live and work in the United States, and to live with their families," they are "experiencing resulting anxiety, depression, and fear." PI Mot. at 29 (citations omitted). Similarly, they allege that "TPS holders and their U.S. citizen children are being forced to make impossible decisions" about their professional careers. *Id*. at 30 (citation omitted).  But Plaintiffs' concerns are the inevitable result of the expressly temporary nature of the TPS program.  These alleged harms would exist with or without the

---

83 Fed. Reg. 40,307-01 (Aug. 14, 2018); *Extension of the Designation of Somalia for Temporary Protected Status*, 83 Fed. Reg. 43,695-01 (Aug. 27, 2018).

terminations at issue. As discussed above, a country's TPS designation must be reviewed at least every 18 months, and there is no guarantee of renewal. A TPS beneficiary is therefore always subject to the same uncertainties and concerns that Plaintiffs allege here. It is worth noting again that any country's temporary protected status is temporary, as dictated by law.

For these reasons, even where Plaintiffs' declarations have identified concrete harms, those harms will not be remedied by the requested injunction. The assurances that Plaintiffs seek can only be truly safeguarded through legislative action, not an injunction by this Court. Consequently, Plaintiffs have failed to show a likelihood of irreparable harm that could be remedied by this Court, and their request for a preliminary injunction should therefore be denied. *See Taiebat v. Scialabba*, No. 17-cv-0805-PJH, 2017 WL 747460, at *5 (N.D. Cal. Feb. 27, 2017) (denying preliminary injunction where "plaintiff [could not] establish that the mandatory injunction he seeks would address the alleged harm"); *S. Yuba River Citizens League*, 804 F. Supp. 2d at 1057 ("[T]he court declines to order an interim measure that will provide no benefit to the listed species in the interim period."); *Schrill v. Plunkett*, 760 F. Supp. 1378, 1384 (D. Or. 1990) ("Granting plaintiffs' requested injunctive relief would not prevent the alleged" harm), *aff'd,* 932 F.2d 973 (9th Cir. 1991).

B. <u>The Remaining Equitable Factors Balance Each Other Out.</u>

Aside from their inability to establish irreparable harm warranting the extraordinary relief that they seek here, Plaintiffs have not shown that the remaining equitable factors tip the balance in their favor. As an initial matter, the urgency that underlies Plaintiffs' instant motion is one of their own creation. Sudan's TPS termination was announced in September 2017, and Nicaragua's and Haiti's terminations in November 2017. Yet, Plaintiffs waited a full six months after the announcement of Sudan's termination, and approximately four months after Nicaragua's and Haiti's, to file this suit in March 2018. It is well-established that "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*, 138 S. Ct. at 1944 (denying preliminary injunction in part because "plaintiffs' unnecessary . . . delay in asking for preliminary injunctive relief weighed against their request").

1    Further, as the Supreme Court has explained in an immigration context, the questions of

2  the harm to the defendant and the public interest "merge" when the government is the defendant.

3  *Nken v. Holder*, 556 S. Ct. 1749, 1762 (2009).  The government and public share an interest in

4  ensuring that the process established by Congress—under which the Secretary of Homeland

5  Security is vested with unreviewable discretion to carefully weigh the statutory factors governing

6  TPS designations—is followed as Congress intended.[20]

7    In sum, the injunctive relief sought by Plaintiffs would frustrate and displace the DHS

8  Secretary's substantive judgment as to how to implement the TPS statute.  Accordingly, this factor

9  is at most a net neutral to whether a preliminary injunction should be granted in this case.  *See All.*

10 *for the Wild Rockies*, 632 F.3d at 1138 ("We will not grant a preliminary injunction, however,

11 unless those public interests outweigh other public interests that cut in favor of *not* issuing the

12 injunction.").  Instead, the success or failure of Plaintiffs' motion should turn on the question of

13 whether they have sufficiently established a likelihood of success on the merits.

14                            **<u>CONCLUSION</u>**

15    For the reasons stated herein, this Court should deny Plaintiffs' PI motion in its entirety.

16

17

18

19

20

21

22

23    [20] The *amicus* brief filed by 18 states ("Brief of Amici States") and the *amicus* brief filed

24 by 28 cities and 6 counties ("Brief of Amici Cities and Counties") likewise lay out a number of
   reasons why those states and local communities believe that maintaining TPS for these four

25 countries would be in their interests and the interests of their residents. *See* Brief of Amici States,
   ECF No. 103-1; Brief of Amici Cities and Counties, ECF No. 106-1.  However, none of the

26 reasons cited by these *amici* overcomes the fact that TPS determinations are entrusted to the
   Secretary of Homeland Security, and that the harms alleged by these states, cities, and counties

27 originate from the statute itself.  These *amici* briefs, like Plaintiffs' motion for preliminary
   injunction, invite this Court to make its own independent judgment about TPS designations, a

28 consideration Congress expressly prohibited the judiciary from making.

Dated: September 6, 2018                    Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General
                                           Civil Division

                                           JOHN R. TYLER
                                           Assistant Branch Director

                                           /s/  *Adam Kirschner*
                                           ADAM KIRSCHNER (IL Bar # 6286601)
                                           RHETT P. MARTIN (DC Bar # 999272)
                                           KEVIN SNELL (NY Bar)
                                           JOSEPH C. DUGAN (OH Bar # 0093997)
                                           Trial Attorneys
                                           950 Pennsylvania Avenue NW
                                           Washington, DC 20530
                                           Tel: (202) 353-9265
                                           Fax: (202) 616-8470
                                           Adam.Kirschner@usdoj.gov