# EXHIBIT 1

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN FRANCISCO

 4

 5   - - - - - - - - - - - - - - x

 6   CRISTA RAMOS, et al.,        :

 7              Plaintiffs,       :   Case No.

 8   v.                           :   3:18-cv-1554-EMC

 9   KIRSTJEN NIELSEN, et al.,    :

10              Defendants.       :

11   - - - - - - - - - - - - - - x

12

13        VIDEOTAPED DEPOSITION OF JAMES D. NEALON

14                 Tuesday, August 14, 2018

15                  Boston, Massachusetts

16

17

18

19

20

21

22

23   Job No.:  LA-187775

24   Pages 1 - 276

25   Reported By:  Dana Welch, CSR, RPR, CRR
```

1

2

3                    August 14, 2018

4                      9:04 a.m.

5

6          Videotaped Deposition of JAMES NEALON held

7   at the law offices of SIDLEY AUSTIN, LLP, 60 State

8   Street, 36th Floor, Boston, Massachusetts 02109,

9   Pursuant to Notice, before Dana Welch,

10  Certified Shorthand Reporter,  Registered Professional

11  Reporter, Certified Realtime Reporter, and Notary

12  Public in and for the Commonwealth of Massachusetts.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   primary advisor on international affairs, and as      09:23:56
2   such, you manage a staff that provides information,   09:24:00
3   and you also have to maintain relationships with      09:24:05
4   the State Department, other members of the            09:24:08
5   interagency, foreign embassies, and our own           09:24:13
6   embassies downrange.                                  09:24:17
7       Q.  And how would you answer that question for    09:24:22
8   the policy position, who were the people or           09:24:23
9   entities that you were most often in contact with     09:24:26
10  for that position?                                    09:24:26
11      A.  So for the policy job, that was more of an    09:24:26
12  internal U.S. government job than an external         09:24:32
13  outward-looking job.  So I was most often in          09:24:36
14  contact with my own staff, with other elements of     09:24:40
15  DHS, with the Secretary and her staff, and then       09:24:45
16  other elements of the interagency.                    09:24:49
17      Q.  And when did you leave that position?         09:24:53
18      A.  I believe it was late February of 2018.       09:24:55
19      Q.  What led you to leave that position?          09:24:59
20      A.  Um, I decided I had to leave.  I was a        09:25:02
21  political appointee, and I was no longer a            09:25:13
22  professional career government official, and as a     09:25:16
23  political appointee, I believe very strongly that     09:25:21
24  if you can't support the whole range of policies      09:25:25
25  that you were appointed to support, then you are      09:25:31
```

| | | |
|---|---|---|
| 1 | obligated to leave, so I left. | 09:25:34 |
| 2 |    Q.  Are you currently employed for the | 09:25:36 |
| 3 | government or in any position? | 09:25:38 |
| 4 |    A.  I'm not. | 09:25:40 |
| 5 |    Q.  Okay.  Can you step back from prior to | 09:25:40 |
| 6 | your DHS position, what was your immediately | 09:25:53 |
| 7 | preceding position prior to the DHS position? | 09:25:57 |
| 8 |    A.  So immediately before going to work for | 09:25:59 |
| 9 | DHS, I was Ambassador to Honduras. | 09:26:04 |
| 10 |    Q.  And what was the time period in which you | 09:26:07 |
| 11 | were Ambassador to Honduras? | 09:26:09 |
| 12 |    A.  I was Ambassador to Honduras from August | 09:26:12 |
| 13 | of 2014 to June of 2017. | 09:26:15 |
| 14 |    Q.  Did you have a break in between the period | 09:26:19 |
| 15 | when you ended your ambassadorship and when you | 09:26:24 |
| 16 | started your position at DHS? | 09:26:27 |
| 17 |    A.  I was retired for three weeks.  It was | 09:26:29 |
| 18 | wonderful. | 09:26:36 |
| 19 |    Q.  Probably not quite long enough. | 09:26:37 |
| 20 |      Who did you report to in your position as | 09:26:39 |
| 21 | Ambassador? | 09:26:41 |
| 22 |    A.  That's a good question.  On paper, you | 09:26:43 |
| 23 | report to the President of the United States | 09:26:47 |
| 24 | through the Secretary of State.  In fact, in | 09:26:49 |
| 25 | practice, ambassadors report to the Assistant | 09:26:52 |

```
 1    Secretary of State for the geographic bureau in       09:26:58
 2    which their embassy sits.                             09:27:02
 3         So in my case, I was reporting to the            09:27:05
 4    Assistant Secretary of State for Western Hemisphere   09:27:07
 5    Affairs.                                              09:27:11
 6       Q.  And what would you describe as your main       09:27:11
 7    job responsibilities as Ambassador?                   09:27:13
 8       A.  So an Ambassador's job is to be the            09:27:17
 9    President's personal representative in a country       09:27:21
10    and to manage all U.S. government personnel and       09:27:23
11    programs in that country.                             09:27:26
12       Q.  Did you engage at all in issues related to     09:27:31
13    Temporary Protected Status while you were             09:27:37
14    Ambassador to Honduras?                               09:27:40
15       A.  Yes.                                           09:27:41
16       Q.  How did you engage in issues related to        09:27:41
17    Temporary Protected Status?                           09:27:44
18       A.  So this is not a high definition memory,       09:27:46
19    this is a lower definition memory, but I believe we   09:27:59
20    went through the process of when a country comes up    09:28:02
21    for renewal of Temporary Protected Status, the        09:28:04
22    State Department asks the U.S. embassy in that        09:28:10
23    country to weigh in and make a recommendation on      09:28:12
24    whether the embassy believes that the TPS should be   09:28:15
25    renewed or not.                                       09:28:18
```

| | | |
|---|---|---|
| 1 | about TPS.  Certainly, we were on e-mail chains and | 09:44:10 |
| 2 | we were in meetings, but she is not someone that I | 09:44:14 |
| 3 | would normally reach out to to discuss TPS. | 09:44:17 |
| 4 | Q.  Did you know the role that she played with | 09:44:21 |
| 5 | regard to TPS? | 09:44:26 |
| 6 | A.  I couldn't tell you specifically what her | 09:44:26 |
| 7 | role was, no. | 09:44:29 |
| 8 | Q.  Did you understand that she had a role | 09:44:29 |
| 9 | with regard to TPS? | 09:44:31 |
| 10 | A.  Yes. | 09:44:32 |
| 11 | Q.  Okay.  Did you know Robert Law while you | 09:44:33 |
| 12 | were at DHS? | 09:44:37 |
| 13 | A.  I don't recall the name. | 09:44:39 |
| 14 | Q.  Okay.  Did you know Brandon Prelogar while | 09:44:39 |
| 15 | you were at DHS? | 09:44:44 |
| 16 | A.  Again, I don't recall the name, sorry. | 09:44:46 |
| 17 | Q.  That's okay.  Okay.  So we'll move on from | 09:44:48 |
| 18 | USCIS.  I imagine you have greater understanding of | 09:44:51 |
| 19 | the process at DHS. | 09:44:53 |
| 20 | Can you walk me through at a high level | 09:44:55 |
| 21 | your understanding of the process for a DHS review | 09:45:00 |
| 22 | of a TPS designation for a country that has already | 09:45:05 |
| 23 | been designated for TPS? | 09:45:11 |
| 24 | A.  Yeah.  So I can walk you through what I | 09:45:14 |
| 25 | observed. | 09:45:18 |

| | | |
|---|---|---|
| 1 | So during Acting Secretary Duke's tenure, | 09:45:20 |
| 2 | she was a very active consumer of information about | 09:45:27 |
| 3 | TPS, and so she solicited written materials and -- | 09:45:32 |
| 4 | and opinions from staff about TPS. | 09:45:39 |
| 5 | And then the more formal process, of | 09:45:44 |
| 6 | course, is that she would receive input directly | 09:45:48 |
| 7 | from the Department of State, from the Secretary of | 09:45:51 |
| 8 | State, and from the Director of USCIS, she would | 09:45:54 |
| 9 | receive that input in written form and then she | 09:45:58 |
| 10 | would make a decision. | 09:46:00 |
| 11 | It was a secretarial decision whether or | 09:46:01 |
| 12 | not to renew TPS or not. | 09:46:04 |
| 13 | Q.  What kind of information did she seek in | 09:46:06 |
| 14 | order to make a determination with regard to TPS? | 09:46:09 |
| 15 | A.  So what I observed is that she read | 09:46:12 |
| 16 | voraciously, so she read press reports, she read | 09:46:17 |
| 17 | intel reports, she read outside analyses provided | 09:46:23 |
| 18 | by civil society, and then she solicited oral | 09:46:29 |
| 19 | opinions from staff members. | 09:46:40 |
| 20 | Q.  Did she directly seek the information that | 09:46:42 |
| 21 | you're describing, or did she have staff under her | 09:46:53 |
| 22 | who were collecting this information? | 09:46:57 |
| 23 | A.  What I recall is both. | 09:46:59 |
| 24 | Q.  What is the kind of information that she | 09:47:01 |
| 25 | was directly seeking, in your memory? | 09:47:04 |

```
1       A.  Um, she -- again, in my recollection, she      09:47:07
2   was interested in the law, what does the law say.      09:47:11
3   She was very interested in country conditions.  She    09:47:17
4   was very -- in the countries that had TPS.             09:47:22
5          She was very interested in U.S. policy          09:47:26
6   implications, in other words, what are the             09:47:29
7   implications of sending people back to these           09:47:31
8   countries, how does that play for U.S. interests.      09:47:33
9          She was very interested in the effect of        09:47:36
10  sending people back on -- on -- on migration, on       09:47:39
11  whether or not sending people back would have the      09:47:48
12  net effect of increasing rather than decreasing        09:47:51
13  migration.                                             09:47:54
14         So again, in my experience, she -- she          09:47:55
15  cast a very wide net in terms of gathering             09:47:58
16  information.                                           09:48:01
17      Q.  And who were the staff underneath her who      09:48:01
18  were all -- most responsible for collecting            09:48:05
19  information with regard to TPS determinations?         09:48:07
20      A.  Um, so I don't know specifically who on        09:48:10
21  her inner staff was doing that for her.  I don't       09:48:14
22  know.                                                  09:48:21
23      Q.  From what you recall, she was quite            09:48:21
24  hands-on, though, with regard to TPS                   09:48:26
25  determinations?                                        09:48:29
```

```
 1   process privilege asserted.                         09:50:57
 2           MR. KIRSCHNER:  I will say, though, that     09:50:58
 3   to the extent you can answer this question in ways   09:51:00
 4   that do not implicate the internal government        09:51:03
 5   deliberations, then feel free to answer.            09:51:06
 6       A.  I'm not a lawyer, so --                      09:51:12
 7           MR. KIRSCHNER:  Well --                      09:51:15
 8       A.  So I do recall a conversation with Kelly     09:51:16
 9   about Haiti, but it -- it was not a decision         09:51:18
10   conversation.  It was a discussion, it was a         09:51:25
11   conversation.  So in that sense, I believe it was    09:51:27
12   deliberative, but...                                 09:51:30
13           MR. KIRSCHNER:  Okay.  I'll instruct you     09:51:34
14   not to answer about internal government              09:51:36
15   deliberations.                                       09:51:40
16       Q.  Okay.  You described your understanding of   09:51:41
17   how Secretary Duke was making decisions with regard  09:51:47
18   to TPS and how she consumed information, the kind     09:51:51
19   of information she sought, and how directly she was   09:51:53
20   involved in the TPS determination process.           09:51:56
21           What would you say with regard to            09:51:59
22   Secretary Kelly's overview of -- and oversight of    09:52:01
23   the TPS determination process to the extent that     09:52:07
24   you know?                                            09:52:09
25       A.  You know, I only overlapped with him for     09:52:11
```

```
 1   -- for those three weeks, and as I say, I don't        09:52:15
 2   recall a TPS decision coming to a head during the      09:52:19
 3   time that we were together, so I don't have the        09:52:21
 4   same sense of Kelly's decision-making process that     09:52:25
 5   I have of Acting Secretary Duke's.                     09:52:30
 6       Q.  Did you overlap with Secretary Nielsen         09:52:34
 7   while she was Secretary?                               09:52:37
 8       A.  I did.                                         09:52:38
 9       Q.  Did you overlap with Secretary Nielsen         09:52:39
10   while TPS decisions were being made?                   09:52:44
11       A.  Yes.                                           09:52:46
12       Q.  How would you describe her oversight of        09:52:46
13   the TPS decision-making process?                       09:52:49
14       A.  She's a very different Secretary than          09:52:52
15   Acting Secretary Duke was, they're just different      09:52:58
16   people with different personalities and different      09:53:01
17   styles.                                                09:53:03
18           I would say that Secretary Nielsen started     09:53:08
19   from a much more granular level of understanding of    09:53:11
20   TPS because of her previous experience than did        09:53:16
21   Acting Secretary Duke, who came out of a management    09:53:21
22   background and not a policy background.  So I would    09:53:24
23   say that Secretary Nielsen, as I say, started at a     09:53:36
24   higher level of understanding of TPS in general.       09:53:39
25       Q.  What would you say her understanding of        09:53:41
```

| | | |
|---|---|---|
| 1 | TPS was at that time or -- | 09:53:45 |
| 2 | MS. MacLEAN:  Scratch that. | 09:53:49 |
| 3 | Q.  Where would you say that she gained her | 09:53:51 |
| 4 | understanding of TPS? | 09:53:52 |
| 5 | A.  I think from her previous experience in | 09:53:53 |
| 6 | government, as well as her time as Secretary | 09:53:56 |
| 7 | Kelly's Chief of Staff and then her time at the | 09:54:00 |
| 8 | White House as Kelly's deputy Chief of Staff. | 09:54:02 |
| 9 | Q.  Could you describe her perspective of TPS | 09:54:06 |
| 10 | to the extent that you know? | 09:54:12 |
| 11 | A.  No.  I don't think I could do that. | 09:54:19 |
| 12 | Q.  You described Acting Secretary Duke as | 09:54:21 |
| 13 | seeking substantial information from various | 09:54:25 |
| 14 | sources both directly and indirectly, herself and | 09:54:28 |
| 15 | through her staff, in the process of making a TPS | 09:54:32 |
| 16 | determination.  Would you describe Secretary | 09:54:34 |
| 17 | Nielsen in the same way? | 09:54:37 |
| 18 | A.  So I didn't have the same level of | 09:54:39 |
| 19 | visibility on whatever process Secretary Nielsen | 09:54:41 |
| 20 | went through to prepare herself to make TPS | 09:54:46 |
| 21 | decisions.  But I did participate in meetings with | 09:54:49 |
| 22 | her, with representatives of foreign countries who | 09:54:54 |
| 23 | were lobbying her to extend TPS.  I participated in | 09:54:58 |
| 24 | meetings with her, this is Secretary Nielsen, in | 09:55:04 |
| 25 | meetings with civil society and faith-based groups | 09:55:07 |

| | | |
|---|---|---|
| 1 | who were lobbying her to extend TPS.  Our office | 09:55:11 |
| 2 | provided, at her instruction, written materials | 09:55:16 |
| 3 | that had come in from civil society and faith-based | 09:55:22 |
| 4 | groups making a case for extension of TPS.  We | 09:55:26 |
| 5 | provided those documents to her staff so that she | 09:55:30 |
| 6 | could read them.  So there was a very active | 09:55:33 |
| 7 | process.  But I probably couldn't go any further in | 09:55:37 |
| 8 | describing how she prepared herself to make those | 09:55:42 |
| 9 | decisions. | 09:55:45 |
| 10 | Q.  You said that you didn't have the same | 09:55:46 |
| 11 | visibility into the process for Secretary Nielsen's | 09:55:47 |
| 12 | TPS decision-making as you did for Acting Secretary | 09:55:51 |
| 13 | Duke's decision making.  Why would you say that is? | 09:55:55 |
| 14 | A.  Well, I think it was just personalities, | 09:55:58 |
| 15 | just the way that Acting Secretary Duke gathers | 09:56:01 |
| 16 | information before making a decision is very | 09:56:07 |
| 17 | verbal, very open, very solicitous, and Secretary | 09:56:13 |
| 18 | Nielsen is simply a different personality. | 09:56:20 |
| 19 | Q.  Who do you know to be involved in the TPS | 09:56:22 |
| 20 | decision-making process at DHS? | 09:56:28 |
| 21 | MR. KIRSCHNER:  Objection, vague. | 09:56:31 |
| 22 | Q.  You can answer the question, if you | 09:56:34 |
| 23 | understand it. | 09:56:37 |
| 24 | A.  Well, I mean, it's a secretarial decision. | 09:56:38 |
| 25 | So it's as simple as that.  It's a secretarial | 09:56:42 |

| | |
|---|---|
| 1  decision, and various secretaries would go through | 09:56:48 |
| 2  their distinct processes to gather information | 09:56:53 |
| 3  before they made their decisions.  So there's the | 09:56:56 |
| 4  formal process of the written materials that we've | 09:56:59 |
| 5  discussed, and then there's a less formal process | 09:57:02 |
| 6  of soliciting information and reading and talking | 09:57:06 |
| 7  and discussing. | 09:57:09 |
| 8      Q.  Are there people in particular at DHS who | 09:57:13 |
| 9  are more involved in the DHS TPS determination | 09:57:16 |
| 10  process? | 09:57:22 |
| 11          MR. KIRSCHNER:  Objection, vague. | 09:57:22 |
| 12      Q.  If you understand the question, you can | 09:57:24 |
| 13  answer it.  If not, I can rephrase. | 09:57:26 |
| 14      A.  Yeah.  So I think, again, it's a | 09:57:29 |
| 15  secretarial decision, so everyone else is simply | 09:57:32 |
| 16  giving advice, right?  But the entities within DHS | 09:57:37 |
| 17  that were most concerned with TPS would be the | 09:57:46 |
| 18  Office of Policy, the Office of International | 09:57:52 |
| 19  Affairs, which deals with those countries that have | 09:57:57 |
| 20  TPS and USCIS, which administers TPS. | 09:58:01 |
| 21      Q.  Were there secretarial advisors who were | 09:58:06 |
| 22  also involved in the process? | 09:58:09 |
| 23      A.  Yes. | 09:58:10 |
| 24          MR. KIRSCHNER:  Objection.  I was going to | 09:58:11 |
| 25  say objection, vague.  The word "involved" is | 09:58:13 |

| | | |
|---|---|---|
| 1 | vague. | 09:58:15 |
| 2 |    Q.  Who were the secretarial advisors who were | 09:58:16 |
| 3 | involved in the process? | 09:58:20 |
| 4 |    MR. KIRSCHNER:  Again, objection, vague. | 09:58:21 |
| 5 |    A.  So again, there were a series of | 09:58:23 |
| 6 | decisions, so I'm painting with a bit of a broad | 09:58:27 |
| 7 | brush here.  But on the Secretary's staff there are | 09:58:31 |
| 8 | counsellors who have portfolios, and the counsellor | 09:58:39 |
| 9 | who had the immigration portfolio was a gentleman | 09:58:43 |
| 10 | named Gene Hamilton.  Of course, the Secretary's | 09:58:47 |
| 11 | Chief of Staff advised her on all things, on all | 09:58:52 |
| 12 | decisions.  Yeah. | 09:58:55 |
| 13 |    Q.  Does the phrase "front office review" mean | 09:59:03 |
| 14 | anything to you? | 09:59:10 |
| 15 |    A.  Um, you know, as a longtime bureaucrat, I | 09:59:10 |
| 16 | assume that means that a document goes up to the | 09:59:19 |
| 17 | Secretary's office and gets reviewed by people in | 09:59:22 |
| 18 | the front office before it gets put in front of the | 09:59:25 |
| 19 | Secretary, but I'm not certain that that's a formal | 09:59:27 |
| 20 | technical term. | 09:59:32 |
| 21 |    Q.  Do you have an understanding of who is in | 09:59:36 |
| 22 | the DHS front office? | 09:59:38 |
| 23 |    A.  I have an understanding of who was in the | 09:59:39 |
| 24 | DHS front office when I was there. | 09:59:42 |
| 25 |    Q.  Who was in the DHS front office when you | 09:59:45 |

| | |
|---|---|
| 1  that were at issue in this conversation? | 10:35:24 |
| 2      A.  I recall her at this meeting being very | 10:35:25 |
| 3  interested in getting more information on El | 10:35:28 |
| 4  Salvador and Honduras. | 10:35:36 |
| 5      Q.  Which Secretary was this? | 10:35:37 |
| 6      A.  Acting Secretary Duke. | 10:35:38 |
| 7      Q.  Do you recall who raised the issue of TPS | 10:35:44 |
| 8  at this meeting? | 10:35:48 |
| 9      A.  She did. | 10:35:48 |
| 10     Q.  Do you recall what type of information she | 10:35:49 |
| 11 was specifically seeking? | 10:35:55 |
| 12     A.  I do, but it was a classified discussion | 10:35:55 |
| 13 and I'm afraid I can't go any further. | 10:35:58 |
| 14     Q.  Okay.  Did the -- did -- was the | 10:36:00 |
| 15 information that she sought ultimately provided? | 10:36:05 |
| 16     A.  Some information was ultimately provided | 10:36:08 |
| 17 to her; whether all her questions were answered or | 10:36:14 |
| 18 not, I don't know. | 10:36:18 |
| 19     Q.  So there was a review of TPS for Honduras. | 10:36:19 |
| 20 Well, how many reviews is -- how many times was | 10:36:40 |
| 21 TPS -- was Honduras up for review for TPS at the | 10:36:42 |
| 22 time that you were at DHS? | 10:36:47 |
| 23     A.  Certainly once.  I'm hesitating because, | 10:36:52 |
| 24 you know, it's a rolling thing.  As you know, TPS | 10:37:06 |
| 25 was extended for six months, which means that she | 10:37:10 |

```
 1   immediately had to start thinking about the next          10:37:16
 2   iteration of that.  So that's why I'm hesitating to       10:37:19
 3   say how many times did it come up.                        10:37:23
 4          It was on the plate during the time she            10:37:25
 5   was the Acting Secretary.                                 10:37:28
 6      Q.  And the first time that Honduras was               10:37:30
 7   reviewed for TPS, was it reviewed alongside the           10:37:33
 8   review for El Salvador?                                   10:37:36
 9      A.  So my recollection is that Honduras and El         10:37:41
10   Salvador are on slightly different schedules, but         10:37:46
11   that there was a general understanding that               10:37:48
12   Honduras and El Salvador had to be addressed in a         10:37:51
13   similar way because U.S. equities in both countries       10:37:57
14   are very similar, and there would be -- there could       10:38:02
15   be implications for U.S. policy if they were              10:38:07
16   treated differently, so even though they were on          10:38:09
17   different time frames, there was an effort to treat       10:38:13
18   them similarly and on the same time frame.                10:38:17
19      Q.  So do you recall whether this meeting that         10:38:23
20   you're describing was a meeting that predated the         10:38:30
21   first decision by Acting Secretary Duke with regard       10:38:33
22   to TPS for Honduras?                                      10:38:39
23      A.  I don't recall specifically, no.                  10:38:41
24      Q.  Do you recall -- you said that you                10:38:42
25   recalled one specific meeting and gave some              10:38:45
```

| | |
|---|---|
| 1   background on that meeting. | 10:38:47 |
| 2       Are there any other instances that you | 10:38:48 |
| 3   recall where TPS came up in those morning meetings | 10:38:50 |
| 4   for the DHS Secretary? | 10:38:53 |
| 5     A.  I don't recall specific instances. | 10:38:55 |
| 6       MR. KIRSCHNER:  How are we doing on time | 10:39:00 |
| 7   and questioning -- of where you are with the line | 10:39:02 |
| 8   of questioning and break? | 10:39:06 |
| 9       MS. MacLEAN:  Maybe I'll cover the other | 10:39:07 |
| 10   two standing meetings that you have and then we'll | 10:39:09 |
| 11   take a break, if that -- is that okay with you? | 10:39:12 |
| 12       THE WITNESS:  It's okay with me. | 10:39:14 |
| 13       MS. MacLEAN:  Does that work?  Okay. | 10:39:16 |
| 14     Q.  So you described the second meeting -- | 10:39:16 |
| 15   second type of standing meeting that you described | 10:39:19 |
| 16   was a meeting that was held by the DHS Chief of | 10:39:22 |
| 17   Staff generally a couple of times a week. | 10:39:26 |
| 18       Did TPS ever come up in those meetings, to | 10:39:29 |
| 19   your recollection? | 10:39:32 |
| 20     A.  I'm sure it did.  That meeting -- you | 10:39:33 |
| 21   know, the Secretary's meeting that I described was | 10:39:36 |
| 22   by definition very, very high level, what does the | 10:39:40 |
| 23   Secretary need to know.  The Chief of Staff's | 10:39:43 |
| 24   meeting was a different meeting.  It was more of a | 10:39:46 |
| 25   what do people need to do today, what's going on, | 10:39:49 |

1    Security, but obviously, it has to be in a timely     11:27:20

2    way so that the Secretary of Homeland Security has    11:27:23

3    time to consider that input before rendering her      11:27:26

4    decision.                                             11:27:28

5        Q.  So you started off by saying the way that     11:27:30

6    it's supposed to work and then outlined the           11:27:33

7    process.                                              11:27:36

8        A.  (Nodding head up and down.)                   11:27:37

9        Q.  Is it your recollection that it generally     11:27:38

10   worked in the way that you described?                 11:27:40

11       A.  It's my recollection that the State           11:27:41

12   Department was often very slow and late in getting    11:27:44

13   their materials to the Secretary so that she had      11:27:49

14   sufficient time to consider those materials before    11:27:53

15   making her decision.                                  11:27:55

16       Q.  Do you recall sort of approximately at        11:27:57

17   what stage of the process the Secretary of State or   11:28:02

18   the Deputy Secretary of State engaged with the DHS    11:28:06

19   Secretary or DHS with the recommendations?            11:28:09

20       MR. KIRSCHNER:  Objection, vague.  It's           11:28:11

21   general in the context of the questions at issue in   11:28:16

22   this case.                                            11:28:21

23       A.  So for example, in the case of Sudan, I       11:28:22

24   believe the Department of State's paperwork was       11:28:31

25   very late in arriving at Homeland Security and I      11:28:35

| | | |
|---|---|---|
| 1 | recall that being an issue. | 11:28:43 |
| 2 |     Q.   In what way was it an issue? | 11:28:44 |
| 3 |     A.   It was an issue in that the Secretary's | 11:28:46 |
| 4 | office -- Secretary of homeland security's office | 11:28:50 |
| 5 | was clamoring for that input so that she would have | 11:28:54 |
| 6 | sufficient time to read it, process it, before | 11:28:58 |
| 7 | having to make her decision. | 11:29:00 |
| 8 |     Q.   You had described at the outset your role | 11:29:01 |
| 9 | as engaging with the State Department and as one of | 11:29:04 |
| 10 | the key entities within the Department of Homeland | 11:29:07 |
| 11 | Security that was engaged with the State | 11:29:10 |
| 12 | Department.  Had you engaged with the State | 11:29:12 |
| 13 | Department in your recollection in the -- in | 11:29:14 |
| 14 | connection with the particular case of the TPS | 11:29:18 |
| 15 | determination of Sudan? | 11:29:22 |
| 16 |     A.   Yes, I believe so.  And the reason I say I | 11:29:23 |
| 17 | believe so is because it's sometimes difficult for | 11:29:26 |
| 18 | me to separate in my mind which TPS decision, a | 11:29:29 |
| 19 | particular phone call, or conversation took place | 11:29:33 |
| 20 | regarding.  But I do recall talking to the State | 11:29:36 |
| 21 | Department about the Sudan paperwork and expressing | 11:29:44 |
| 22 | the Secretary of Homeland Security's displeasure | 11:29:49 |
| 23 | with the lateness of that paperwork. | 11:29:53 |
| 24 |     Q.   Do you recall what the response was from | 11:30:04 |
| 25 | the -- | 11:30:04 |

| | |
|---|---|
| 1     MS. MacLEAN:  Well, let me step back. | 11:30:04 |
| 2     Q.  Do you recall who you communicated with at | 11:30:04 |
| 3   the State Department regarding those concerns? | 11:30:06 |
| 4     A.  So I don't specifically in the case of | 11:30:08 |
| 5   Sudan remember who I communicated with.  But I | 11:30:10 |
| 6   generally communicated with a gentleman -- in | 11:30:14 |
| 7   issues regarding TPS, I generally communicated with | 11:30:16 |
| 8   a gentleman named Simon Henshaw.  H-e-n-s-h-a-w. | 11:30:21 |
| 9     Q.  Do you recall what Mr. Henshaw's role was | 11:30:26 |
| 10   at the Department of State? | 11:30:30 |
| 11     A.  So his role was the acting Assistant | 11:30:32 |
| 12   Secretary of the Bureau of Population, Refugees and | 11:30:36 |
| 13   Migration. | 11:30:40 |
| 14     Q.  Do you recall what his response was to | 11:30:41 |
| 15   your expression of concerns about the lateness of | 11:30:44 |
| 16   the State Department's response? | 11:30:49 |
| 17     A.  Yes.  He expressed similar frustration in | 11:30:58 |
| 18   that his office had sent the paperwork forward in | 11:31:02 |
| 19   what he considered to be a timely fashion, but it | 11:31:06 |
| 20   had gotten stuck in the Secretary of State's office | 11:31:09 |
| 21   and was sitting there. | 11:31:12 |
| 22     Q.  Did you recall him expressing any | 11:31:14 |
| 23   explanation as to why it had gotten stuck in the | 11:31:16 |
| 24   front office? | 11:31:20 |
| 25     A.  I don't. | 11:31:20 |

| | | |
|---|---|---|
| 1 | to remember when -- who was Secretary at a specific | 11:44:04 |
| 2 | time. | 11:44:06 |
| 3 | Q.  Um-hum. | 11:44:07 |
| 4 | A.  So I've described the drama surrounding | 11:44:07 |
| 5 | the timeliness of the paperwork on Sudan and then | 11:44:12 |
| 6 | on Central America, and I believe Acting Secretary | 11:44:16 |
| 7 | Duke was the Acting Secretary during both of those | 11:44:19 |
| 8 | periods of time.  So again I just don't recall it | 11:44:24 |
| 9 | being an issue -- that State Department paperwork | 11:44:27 |
| 10 | being an issue during Secretary Nielsen's time. | 11:44:29 |
| 11 | Q.  Do you know what the basis was of the | 11:44:32 |
| 12 | State Department -- | 11:44:35 |
| 13 | MS. MacLEAN:  Let's step back. | 11:44:37 |
| 14 | Q.  Do you know what the process was for the | 11:44:38 |
| 15 | State Department coming up with their | 11:44:40 |
| 16 | recommendations regarding TPS determinations? | 11:44:42 |
| 17 | MR. KIRSCHNER:  Objection, calls for | 11:44:47 |
| 18 | speculation. | 11:44:49 |
| 19 | A.  Yeah, I don't know the specifics of | 11:44:50 |
| 20 | their -- of their internal process. | 11:44:52 |
| 21 | Q.  Do you know generally what the process | 11:44:54 |
| 22 | was? | 11:44:56 |
| 23 | A.  So -- yes.  So the State Department would | 11:44:56 |
| 24 | make a recommendation to the Secretary of State, | 11:45:05 |
| 25 | which the Secretary of State could either accept or | 11:45:10 |

```
 1   reject.  And that recommendation that went up to      11:45:14
 2   the Secretary's office would go through a clearance    11:45:21
 3   process within the Department of State so that all     11:45:26
 4   of the various elements and entities within the        11:45:29
 5   Department of State that had equities in the           11:45:31
 6   decision would have their input.  I described          11:45:34
 7   earlier that the embassy would provide input to the    11:45:37
 8   Department of State, the Bureau of Western             11:45:42
 9   Hemisphere Affairs would provide input and             11:45:46
10   certainly the Bureau of Population, Refugee and        11:45:50
11   Migration would provide input.  But who would          11:45:55
12   actually write the memo to the Secretary of State,     11:45:58
13   I'm not sure.                                          11:46:01
14        Q.  Do you know what the basis was for the        11:46:02
15   recommendation that came from the Department of        11:46:05
16   State or what considerations were at issue?            11:46:06
17        MR. KIRSCHNER:  Objection, calls for              11:46:08
18   speculation.                                           11:46:17
19        A.  Yeah, very difficult question to answer.      11:46:17
20   I mean, in broad terms certainly the statute, what     11:46:19
21   does the statute say, and then foreign policy          11:46:25
22   considerations, the Department of State manages the    11:46:29
23   foreign policy of the United States, so that's         11:46:32
24   their equity in the decision.                          11:46:34
25        Q.  From your experience at the embassy, you      11:46:36
```

| | | |
|---|---|---|
| 1 | described this to some degree, and you also, I | 11:46:46 |
| 2 | imagine, saw this in some capacity in your position | 11:46:48 |
| 3 | as DHS, but did the State Department typically | 11:46:51 |
| 4 | consider the recommendations of diplomats in making | 11:46:56 |
| 5 | a recommendation concerning TPS? | 11:46:59 |
| 6 | MR. KIRSCHNER:  Objection, calls for | 11:47:01 |
| 7 | speculation, vague.  Compound. | 11:47:04 |
| 8 | A.  So generally speaking, an ambassador's | 11:47:11 |
| 9 | input carries a tremendous amount of weight in the | 11:47:14 |
| 10 | Department of State.  So for the Department of | 11:47:18 |
| 11 | State to reject an ambassador's recommendation and | 11:47:20 |
| 12 | make a different recommendation to the Secretary of | 11:47:24 |
| 13 | State, there would generally be a lot of discussion | 11:47:28 |
| 14 | with the ambassador about that.  And so, as I say, | 11:47:34 |
| 15 | an ambassador's recommendation carries a lot of | 11:47:40 |
| 16 | weight. | 11:47:45 |
| 17 | Q.  You said there would generally be a | 11:47:45 |
| 18 | significant amount of discussion if the State | 11:47:49 |
| 19 | Department was to reject a recommendation from the | 11:47:51 |
| 20 | ambassador.  Typically, who would that discussion | 11:47:54 |
| 21 | be between? | 11:47:58 |
| 22 | MR. KIRSCHNER:  Objection, vague, calls | 11:47:58 |
| 23 | for speculation. | 11:48:01 |
| 24 | A.  So in my experience, the way that would | 11:48:02 |
| 25 | normally work is if the ambassador would make a | 11:48:08 |

```
1   the Department?                                      12:15:38
2       A.  Yes.                                         12:15:39
3       Q.  And was that communication related to the   12:15:40
4   expected end of TPS for Haiti?                       12:15:51
5       A.  You know what it was, it was a               12:15:53
6   conversation between two old friends.                12:15:58
7       Q.  Um-hmm.  Can you say anything further        12:16:04
8   about the conversation?                              12:16:07
9           MR. KIRSCHNER:  Again, I object --           12:16:07
10      A.  It was deliberative.                         12:16:08
11      Q.  Okay.                                        12:16:12
12          MS. MacLEAN:  I understand that lunch is     12:16:29
13  ready, so if you don't mind, we'll ask a few more    12:16:31
14  questions and then we take a break for lunch unless  12:16:35
15  you'd rather take a break right now?                 12:16:38
16          MR. KIRSCHNER:  Can we take a two-minute     12:16:38
17  break just to see where we are on timing and check   12:16:40
18  with Ambassador Nealon where he would want to take   12:16:43
19  a break.                                             12:16:48
20          MS. MacLEAN:  No problem.                    12:16:49
21          THE VIDEOGRAPHER:  Time is 12:16.  We are    12:16:50
22  off the record.                                      12:16:52
23          (Proceedings interrupted at 12:16 p.m. and   12:16:53
24  reconvened at 1:00 p.m.)                             13:00:24
25          THE VIDEOGRAPHER:  Time is 1:00 p.m.  We     13:00:26
```

```
 1   are back on the record.                          13:00:36
 2   BY MS. MacLEAN:                                   13:00:37
 3       Q.  Ambassador Nealon, you had mentioned      13:00:38
 4   previously that you would check during the break  13:00:41
 5   about the key DHS Office of Policy staff who were 13:00:44
 6   involved in TPS decisions.  Were you able to      13:00:49
 7   identify that?                                    13:00:52
 8           MR. KIRSCHNER:  Objection.  I think that  13:00:53
 9   misrepresents Ambassador Nealon's testimony.  I   13:00:55
10   think he said that he would try to remember, not  13:00:58
11   that he was going to be checking any documentation. 13:01:01
12           MS. MacLEAN:  Fair enough.                13:01:04
13       Q.  Are there now DHS Office of Policy staff  13:01:05
14   who were involved in TPS decisions that you can   13:01:07
15   recall?                                           13:01:10
16       A.  So I think I can be pretty clear about    13:01:10
17   this.  So there aren't really Office of Policy    13:01:12
18   staff involved in the TPS decisions, because the  13:01:18
19   decision really is -- really was and really is the 13:01:23
20   Secretary's decision.  So there were -- and to the 13:01:28
21   extent that the Secretary wanted the Office of    13:01:34
22   Policy's opinions about TPS, she would come to me. 13:01:37
23   So there are other people in the Office of Policy 13:01:41
24   who would participate in meetings or, you know, get 13:01:45
25   involved in some way, but it wouldn't be accurate  13:01:51
```

| | |
|---|---|
| 1   to say that those people were involved in the TPS | 13:01:56 |
| 2   decision, I wouldn't say. | 13:02:00 |
| 3       Q.  And the -- | 13:02:02 |
| 4       A.  So for example, there are people who would | 13:02:03 |
| 5   help arrange meetings when the Salvadorians or the | 13:02:06 |
| 6   Hondurans called and wanted to meet with the | 13:02:11 |
| 7   Secretary or meet with me, so they would get | 13:02:15 |
| 8   involved in that way.  But I'm having a hard time | 13:02:17 |
| 9   thinking of other people in the Office of Policy | 13:02:23 |
| 10  who were really directly involved in the TPS | 13:02:25 |
| 11  decision process. | 13:02:30 |
| 12       I would say with the exception of my Chief | 13:02:32 |
| 13  of Staff who I mentioned previously, Briana Petyo, | 13:02:37 |
| 14  who -- the Chief of Staff was sort of my alter ego, | 13:02:40 |
| 15  and so she would sometimes substitute for me at | 13:02:45 |
| 16  meetings and things like that.  So she tended to | 13:02:47 |
| 17  know what I knew and vice versa. | 13:02:50 |
| 18       Q.  That's very helpful. | 13:02:53 |
| 19       A.  So I hope that's a better answer. | 13:02:55 |
| 20       Q.  That's a very fair answer, and I don't | 13:02:56 |
| 21  think we need further follow-up questions. | 13:02:59 |
| 22       The one other item that I wanted to ask | 13:03:01 |
| 23  you about from before the break is that you had | 13:03:04 |
| 24  mentioned that when there are concerns from an | 13:03:06 |
| 25  ambassador, they wouldn't be easily rejected and | 13:03:10 |

```
1        MS. MacLEAN:  Is that correct?              13:51:28
2        MR. KIRSCHNER:  Correct.  I mean, I'll       13:51:34
3   instruct you not to answer under deliberative     13:51:34
4   process, kind of the internal deliberations of -- 13:51:34
5   in anticipation of a decision being made, besides 13:51:37
6   the general kind of context of what kind of were  13:51:40
7   considered, of what factored into a decision.     13:51:44
8     Q.  Let me see if I can clarify in a way that   13:51:47
9   doesn't raise deliberative process privilege      13:51:50
10  concerns.                                          13:51:53
11       Were any of these policy considerations       13:51:53
12  discussed after a decision had been made?          13:51:55
13    A.  You know, I -- I don't recall -- I don't     13:52:03
14  recall such discussions after decisions were made, 13:52:09
15  no.                                                13:52:12
16    Q.  Okay.  Let's turn to page --                 13:52:12
17       MR. KIRSCHNER:  I just want to make clear     13:52:18
18  that he -- that Ambassador Nealon can discuss      13:52:20
19  generally what factors played into a decision.  I  13:52:22
20  don't want to suggest that I'm shutting down one   13:52:24
21  line of questioning on this.  I mean, Ambassador   13:52:28
22  Nealon has responded.  And so I don't want to give 13:52:30
23  the misimpression there.                           13:52:32
24       What those internal deliberations were,       13:52:33
25  who was making recommendations along those lines,  13:52:36
```

| | | |
|---|---|---|
| 1 | that I would instruct you not to answer on all | 13:52:38 |
| 2 | these factors, but in terms of general factors, you | 13:52:42 |
| 3 | can provide a general overview of what factors went | 13:52:43 |
| 4 | into a decision for TPS. | 13:52:46 |
| 5 | THE WITNESS:  Thank you.  That's helpful. | 13:52:49 |
| 6 | So maybe I can clarify a little bit. | 13:52:51 |
| 7 | A.  So, you know, whenever someone like the | 13:52:53 |
| 8 | Secretary of Homeland Security is faced with a | 13:52:55 |
| 9 | consequential policy decision like TPS, there are a | 13:52:59 |
| 10 | number of factors that have to be taken into | 13:53:02 |
| 11 | account. | 13:53:04 |
| 12 | And in the case of TPS, we've talked about | 13:53:05 |
| 13 | a couple of them.  One was the legal nature of TPS, | 13:53:07 |
| 14 | whether you interpret the statute strictly or more | 13:53:12 |
| 15 | -- in a more flexible way. | 13:53:16 |
| 16 | The other is the temporal nature of TPS, | 13:53:18 |
| 17 | what does temporary protected status mean after | 13:53:21 |
| 18 | 20 years, for example. | 13:53:26 |
| 19 | Then there are policy considerations, what | 13:53:29 |
| 20 | are the foreign policy consequences for the United | 13:53:32 |
| 21 | States of extending or terminating TPS.  And then | 13:53:36 |
| 22 | finally, what are the domestic policy | 13:53:43 |
| 23 | considerations of either terminating or extending | 13:53:45 |
| 24 | TPS.  So those are the kind of things that any of | 13:53:49 |
| 25 | the secretaries would have taken into account when | 13:53:53 |

| | | |
|---|---|---|
| 1 | contemplating a decision. | 13:53:56 |
| 2 | Q.  And when you referenced domestic policy | 13:53:57 |
| 3 | considerations, what are you referencing? | 13:54:01 |
| 4 | A.  Well, domestic politics, administration | 13:54:03 |
| 5 | policy. | 13:54:08 |
| 6 | Q.  And what would you consider to be | 13:54:08 |
| 7 | administration policy as it applies to TPS? | 13:54:10 |
| 8 | MR. KIRSCHNER:  Objection, calls for | 13:54:13 |
| 9 | speculation. | 13:54:14 |
| 10 | A.  Yeah, I mean, I really refer you to the | 13:54:19 |
| 11 | White House, to the president and his public | 13:54:24 |
| 12 | statements on what -- on what administration policy | 13:54:26 |
| 13 | is. | 13:54:30 |
| 14 | Q.  Okay.  If we can just go to page 4, the | 13:54:30 |
| 15 | fourth full paragraph up, which is actually one | 13:54:50 |
| 16 | sentence which starts with "the White House never | 13:54:52 |
| 17 | got on board with the Senate proposal."  You can | 13:54:53 |
| 18 | maybe read from above "where negotiations break | 13:54:56 |
| 19 | down" so you have the context. | 13:54:58 |
| 20 | A.  Okay. | 13:55:35 |
| 21 | Q.  So the paragraph that starts with "the | 13:55:35 |
| 22 | White House never got on board with the Senate | 13:55:37 |
| 23 | proposal" includes reference to a meeting that was | 13:55:39 |
| 24 | much publicized in which President Trump reportedly | 13:55:41 |
| 25 | made a comment referring to certain immigrants as | 13:55:47 |

```
 1   people from, in shorthand, S-hole countries, in the    13:55:53
 2   Oval Office.                                            13:55:57
 3          Are you aware of those public accounts of        13:55:58
 4   the meeting?                                            13:56:01
 5      A.  I'm aware of the public accounts of that         13:56:02
 6   meeting.                                                13:56:04
 7      Q.  Did you have any internal conversations          13:56:04
 8   within DHS about such a meeting?                        13:56:08
 9          MR. KIRSCHNER:  Objection, characterizing        13:56:10
10   the article, putting facts -- the testimony that        13:56:12
11   counsel was testifying about the article.               13:56:17
12   Ambassador Nealon, I would ask for -- ask               13:56:20
13   Ambassador Nealon to be able to use his own             13:56:25
14   language in responding to the question.  I also         13:56:28
15   would say that the question is calling for              13:56:30
16   speculation about what was discussed at the             13:56:33
17   meeting.  I object on speculative grounds.              13:56:35
18      Q.  You can answer the question, were you            13:56:38
19   aware of conversations about the meeting that was       13:56:40
20   described in this paragraph, did you have such --       13:56:42
21   did you have conversations about such a meeting         13:56:47
22   internally within DHS?                                  13:56:50
23      A.  You know, I don't recall -- I don't recall       13:56:58
24   conversations about the meeting.  I certainly           13:57:04
25   recall commentary about the alleged phrase that you     13:57:08
```

| | | |
|---|---|---|
| 1 | A.  I think the important information here is | 14:34:45 |
| 2 | that my Chief of Staff in my absence was bringing | 14:34:48 |
| 3 | this series of events to the -- to the knowledge of | 14:34:53 |
| 4 | the front office. | 14:35:02 |
| 5 | Q.  Okay. | 14:35:03 |
| 6 | MR. KIRSCHNER:  I just want to -- I know | 14:35:03 |
| 7 | you left out -- I just want to make sure that this | 14:35:04 |
| 8 | was -- counsel's representation of what Ambassador | 14:35:08 |
| 9 | Nealon's reaction is not Ambassador Nealon's | 14:35:11 |
| 10 | recitation of how he reacted to this e-mail chain. | 14:35:15 |
| 11 | MS. MacLEAN:  That's correct.  And I | 14:35:20 |
| 12 | retract that comment.  I apologize. | 14:35:23 |
| 13 | So thank you. | 14:35:25 |
| 14 | Q.  I'm going to give you an exhibit that has | 14:36:21 |
| 15 | previously been marked as Exhibit 12. | 14:36:24 |
| 16 | MR. KIRSCHNER:  Are we going to be able to | 14:36:31 |
| 17 | fit this one in? | 14:36:33 |
| 18 | MS. MacLEAN:  No.  We'll start it now, and | 14:36:34 |
| 19 | we'll come back to it after the phone call. | 14:36:37 |
| 20 | MR. KIRSCHNER:  Sorry.  I didn't mean | 14:36:43 |
| 21 | to... | 14:36:48 |
| 22 | A.  Okay. | 14:36:54 |
| 23 | Q.  Do you recall this document? | 14:36:55 |
| 24 | A.  I do. | 14:36:57 |
| 25 | Q.  Can you describe what this document was | 14:36:57 |

```
 1   and the context in which it was written?            14:37:02
 2          MR. KIRSCHNER:  Objection to the extent it    14:37:04
 3   calls for a narrative answer.                        14:37:06
 4      A.  So as I described, Acting Secretary Duke's    14:37:09
 5   information-gathering process in anticipation of     14:37:20
 6   making TPS decisions, she was casting a very wide    14:37:24
 7   net and reading voraciously and consulting widely,   14:37:30
 8   and she asked me to write something for her that     14:37:36
 9   gave my opinion on the TPS decision.                 14:37:46
10      Q.  At what point did Ambassador -- sorry, did    14:37:49
11   Acting Secretary Duke ask you to write something to  14:37:54
12   provide your opinion?                                14:37:57
13      A.  My guess is since this is dated               14:38:00
14   October 31st, on October 30th or October 31st.  So   14:38:05
15   if she had asked for it, I would have done it and    14:38:09
16   sent it up to her immediately.                       14:38:12
17      Q.  Consistent with your previous answer about    14:38:14
18   responding to the requests from the Acting           14:38:19
19   Secretary or the Secretary.                          14:38:22
20          Do you recall the basis for your -- your      14:38:22
21   representations that are included within this        14:38:32
22   memorandum for the Acting Secretary?                 14:38:33
23      A.  Yes.                                          14:38:36
24          MR. KIRSCHNER:  Going to object as vague.     14:38:36
25      Q.  What was -- what was the basis for your       14:38:39
```

| | | |
|---|---|---|
| 1 | representations expressed in this memorandum for | 14:38:40 |
| 2 | the Acting Secretary? | 14:38:43 |
| 3 | A.  So I knew that she had talked to a | 14:38:46 |
| 4 | tremendous number of people, I knew that she had | 14:38:49 |
| 5 | read volumes and volumes.  She had consulted with | 14:38:52 |
| 6 | faith-based groups, with foreign governments, with | 14:38:57 |
| 7 | civil society, and so what I wanted to do is write | 14:39:01 |
| 8 | her something that was very short and pithy and | 14:39:04 |
| 9 | which might help her weed through and make sense of | 14:39:12 |
| 10 | everything that she had heard and read. | 14:39:14 |
| 11 | Q.  Had you expressed -- well, is it fair to | 14:39:19 |
| 12 | characterize the representations that you include | 14:39:22 |
| 13 | within this memo as expressions of concern about | 14:39:25 |
| 14 | the possible termination of TPS for Honduras, | 14:39:34 |
| 15 | Nicaragua, and El Salvador? | 14:39:38 |
| 16 | MR. KIRSCHNER:  Objection, counsel is | 14:39:40 |
| 17 | testifying.  Ambassador Nealon should be able to | 14:39:43 |
| 18 | address the memo in his own words. | 14:39:46 |
| 19 | Q.  How would you characterize the | 14:39:48 |
| 20 | recommendation that you're making within this memo? | 14:39:52 |
| 21 | A.  I tried to write something that I | 14:39:56 |
| 22 | considered to be very pragmatic.  And so, I mean, I | 14:39:58 |
| 23 | think the memo speaks for itself.  I don't feel the | 14:40:01 |
| 24 | need to describe the memo since you have it.  But | 14:40:04 |
| 25 | that was my motivation.  I wanted to try and help | 14:40:07 |

| | | |
|---|---|---|
| 1 | her because she had spoken to so many people and | 14:40:10 |
| 2 | read so much, I wanted to try and help her boil | 14:40:17 |
| 3 | things down. | 14:40:21 |
| 4 | Q.  And had you expressed sentiments that are | 14:40:22 |
| 5 | similar to the sentiments that are expressed here | 14:40:26 |
| 6 | to Acting Secretary Duke prior to putting it in | 14:40:31 |
| 7 | written form here? | 14:40:34 |
| 8 | A.  Yes. | 14:40:35 |
| 9 | Q.  Do you remember more or less when you made | 14:40:37 |
| 10 | the first expressions to Acting Secretary Duke that | 14:40:41 |
| 11 | you would recommend the extension of TPS for | 14:40:50 |
| 12 | Honduras, Nicaragua, and El Salvador? | 14:40:53 |
| 13 | A.  No.  I don't -- I don't remember a | 14:41:01 |
| 14 | specific first conversation. | 14:41:02 |
| 15 | Q.  Was this conversation -- or were these | 14:41:04 |
| 16 | concerns or representations that are included | 14:41:07 |
| 17 | within this memo following conversations that took | 14:41:10 |
| 18 | place over days before that or weeks before that or | 14:41:15 |
| 19 | months before that, in your recollection? | 14:41:17 |
| 20 | MR. KIRSCHNER:  Objection, counsel | 14:41:19 |
| 21 | testifying about concerns or recommendations.  I | 14:41:20 |
| 22 | just want Ambassador Nealon to speak about the memo | 14:41:23 |
| 23 | in his own words. | 14:41:26 |
| 24 | A.  So as I've described, this decision was | 14:41:31 |
| 25 | very much on her mind.  She was struggling with it | 14:41:34 |

1  in a good sense of the word, struggling with it as     14:41:38
2  a -- as an intelligent, hard-working government         14:41:42
3  employee would struggle with a very consequential       14:41:47
4  decision.                                                14:41:50
5        And so, again, this was just my attempt to        14:41:51
6  write something that was very short, pragmatic, and     14:41:55
7  that might be of some use to her.                        14:42:00
8     Q.  Had you expressed the positions that             14:42:02
9  you've outlined in this memo to others in the           14:42:06
10 Department prior to the writing of this memo?           14:42:08
11    A.  Yes.  Certainly, I mean, I had spoken up         14:42:12
12 at meetings where TPS was raised.  You know,            14:42:16
13 frankly, the other reason I wrote the memo is           14:42:20
14 because I did have a different perspective -- a         14:42:23
15 unique perspective, having been the Ambassador to      14:42:26
16 Honduras, a TPS country, and knowing firsthand the     14:42:30
17 country conditions in a way that other people          14:42:34
18 simply didn't.                                          14:42:36
19       And I thought that articulating that very         14:42:37
20 briefly for her also might help her.                    14:42:41
21    Q.  How did your knowledge of the country           14:42:43
22 conditions in your position as Ambassador to           14:42:54
23 Honduras inform your recommendation to Acting          14:42:57
24 Secretary Duke?                                          14:43:03
25    A.  Well, again, I -- I would say that I            14:43:03

| | | |
|---|---|---|
| 1 | understood the foreign policy implications better | 14:43:13 |
| 2 | than most people did, the foreign policy | 14:43:18 |
| 3 | implications of extending or of terminating. | 14:43:20 |
| 4 | I understood the -- the possible effects | 14:43:28 |
| 5 | on migration, on our ability to help the countries | 14:43:32 |
| 6 | of Central America stem further migration if we | 14:43:37 |
| 7 | were to send back large numbers of TPS grantees. | 14:43:43 |
| 8 | So, I mean, I think this is all pretty | 14:43:47 |
| 9 | clear. | 14:43:51 |
| 10 | Q.  I'm not suggesting that it's not clear. | 14:43:51 |
| 11 | It's just hard to respond to it and not put words | 14:43:55 |
| 12 | in your mouth, but allow a further conversation | 14:43:58 |
| 13 | about this.  So I appreciate your efforts to try to | 14:44:01 |
| 14 | elaborate on that. | 14:44:03 |
| 15 | Do you know who this memo was shared with? | 14:44:05 |
| 16 | A.  Um, so I would have sent it to -- you | 14:44:08 |
| 17 | know, I honestly don't recall exactly how I | 14:44:29 |
| 18 | delivered it to her.  I don't recall whether I went | 14:44:32 |
| 19 | through the Executive Secretary process or whether | 14:44:35 |
| 20 | she asked me to send it directly to her, to her | 14:44:37 |
| 21 | Chief of Staff.  I just don't recall. | 14:44:41 |
| 22 | Q.  Okay. | 14:44:43 |
| 23 | A.  It -- it probably went through the | 14:44:44 |
| 24 | Executive Secretary process because other people in | 14:44:45 |
| 25 | DHS saw it, so it probably did get disseminated | 14:44:49 |

| | | |
|---|---|---|
| 1 | you'd had previously, but also a written document | 15:15:48 |
| 2 | that expressed that TPS should be extended for | 15:15:51 |
| 3 | Honduras, Nicaragua, and El Salvador? | 15:15:59 |
| 4 | A.  I don't know. | 15:16:00 |
| 5 | Q.  Okay.  Do you have any understanding of | 15:16:00 |
| 6 | why she asked you to put in writing your thoughts? | 15:16:11 |
| 7 | MR. KIRSCHNER:  Objection, asked and | 15:16:13 |
| 8 | answered. | 15:16:15 |
| 9 | A.  No, not really.  I mean, I really think | 15:16:16 |
| 10 | she was -- she was struggling with an important | 15:16:29 |
| 11 | decision and she was looking for help, and she | 15:16:33 |
| 12 | thought I might have some perspectives that would | 15:16:40 |
| 13 | be useful for her.  I think it's really as simple | 15:16:42 |
| 14 | as that. | 15:16:45 |
| 15 | Q.  Um-hum.  Do you know how the input that | 15:16:46 |
| 16 | you provided elaborated in this memo was used to | 15:16:51 |
| 17 | inform the decision that was ultimately taken by -- | 15:16:54 |
| 18 | A.  I don't. | 15:16:57 |
| 19 | Q.  -- Acting Secretary Duke? | 15:16:58 |
| 20 | THE WITNESS:  Sorry. | 15:17:01 |
| 21 | A.  I don't. | 15:17:03 |
| 22 | (Exhibit 40, DHS_RFPD_00000040, marked for | 15:17:18 |
| 23 | identification.) | 15:17:54 |
| 24 | MR. KIRSCHNER:  Could we identify the | 15:17:54 |
| 25 | exhibit for the record? | 15:17:56 |

| | | |
|---|---|---|
| 1 | MS. MacLEAN:  Yes.  I've just introduced | 15:17:57 |
| 2 | Exhibit 40, which is a memoranda from Acting | 15:18:00 |
| 3 | Secretary Duke to USCIS Director Cissna and the | 15:18:06 |
| 4 | witness here from November 6, 2017. | 15:18:18 |
| 5 | Q.  So can you describe what this document is | 15:18:27 |
| 6 | that we're looking at? | 15:18:32 |
| 7 | A.  This is Acting Secretary Duke's decision | 15:18:32 |
| 8 | to terminate TPS for Nicaragua. | 15:18:35 |
| 9 | Q.  And this is less than a week after the | 15:18:37 |
| 10 | memo that you provided; is that correct? | 15:18:40 |
| 11 | A.  Yes. | 15:18:42 |
| 12 | Q.  Did Acting Secretary Duke make any | 15:18:42 |
| 13 | decisions with regard to the two other countries | 15:18:48 |
| 14 | that were included in your memo for the Acting | 15:18:51 |
| 15 | Secretary of October 31, 2017 at this time? | 15:18:56 |
| 16 | A.  You know, I honestly don't recall the | 15:19:01 |
| 17 | precise timeline of the various TPS decisions. | 15:19:04 |
| 18 | Q.  Let me go back to the exhibit that was | 15:19:12 |
| 19 | previously marked as Exhibit 12, which is your memo | 15:19:15 |
| 20 | to Acting Secretary Duke.  You had included in that | 15:19:17 |
| 21 | memo Honduras, Nicaragua, and El Salvador.  Why did | 15:19:23 |
| 22 | you include all three of those countries? | 15:19:27 |
| 23 | A.  It's actually a very good question and in | 15:19:30 |
| 24 | retrospect and in re-reading the memo, the memo is | 15:19:33 |
| 25 | really talking about Honduras and El Salvador.  So | 15:19:37 |

| | |
|---|---|
| 1 it's unfortunate that I marked the memo with | 15:19:40 |
| 2 Nicaragua as well, because Nicaragua wasn't really | 15:19:44 |
| 3 subject to the same kind of discussion as the other | 15:19:48 |
| 4 two countries.  First of all, Nicaragua had not | 15:19:51 |
| 5 requested a renewal of temporary protected status | 15:19:57 |
| 6 and secondly, the country conditions were just | 15:20:00 |
| 7 very, very different at that time, a lot less | 15:20:07 |
| 8 violence, for example, and I don't think anybody | 15:20:09 |
| 9 saw a real problem in Nicaragua taking back | 15:20:14 |
| 10 repatriated citizens.  So Nicaragua was always a | 15:20:17 |
| 11 different problem set than Honduras and El | 15:20:27 |
| 12 Salvador. | 15:20:30 |
| 13     Q.  Was it requested by Acting Secretary Duke | 15:20:30 |
| 14 that you provide a memo concerning Honduras, | 15:20:33 |
| 15 Nicaragua, and El Salvador? | 15:20:38 |
| 16     A.  You know, I don't recall exactly what she | 15:20:38 |
| 17 asked me.  But I do recall that she was really | 15:20:40 |
| 18 ruminating about El Salvador and Honduras.  There | 15:20:48 |
| 19 was much less discussion -- I actually don't recall | 15:20:53 |
| 20 very much discussion at all about Nicaragua. | 15:20:54 |
| 21     Q.  Do you recall that Acting Secretary Duke | 15:20:57 |
| 22 at some point during her tenure did not make a | 15:21:07 |
| 23 decision about the TPS designation -- | 15:21:10 |
| 24     MS. MacLEAN:  Sorry.  Let me go back. | 15:21:13 |
| 25     Q.  Do you recall that at some point during | 15:21:15 |

```
 1   her tenure as Acting Secretary, Acting Secretary     15:21:17
 2   Duke did not make a decision about the TPS           15:21:21
 3   determination for Honduras allowing it to            15:21:28
 4   automatically extend for six months?                 15:21:31
 5       A.  Yes.                                          15:21:34
 6           MR. KIRSCHNER:  Objection.  I was going to    15:21:35
 7   say objection.  Counsel testifying and               15:21:36
 8   characterizing the evidence.  I'd ask Ambassador     15:21:39
 9   Nealon be able to put it in his own words.           15:21:40
10       Q.  Then a week later after your memo, Acting     15:21:43
11   Secretary Duke made a determination with regard to   15:21:50
12   Nicaragua.  Do you recall if this is the time        15:21:51
13   period where Acting Secretary Duke did not make a    15:21:53
14   decision with regard to Honduras, allowing Honduras  15:21:58
15   to automatically extend?                             15:22:02
16       A.  Again, I simply don't remember the exact     15:22:04
17   chronology of the various decisions.                 15:22:07
18       Q.  Fair enough.                                 15:22:09
19           (Exhibit 41, NewsRoom article dated May 10,  15:22:34
20   2018, marked for identification.)                    15:22:36
21       Q.  So I'm marking the next exhibit as           15:22:36
22   Exhibit 41.  And this is an op-ed in the Washington  15:22:41
23   Post that you wrote with Ambassador Feeley on        15:22:48
24   May 10th, 2018.                                      15:22:55
25       A.  Okay.                                        15:24:24
```

```
 1              CERTIFICATE OF REPORTER
 2          I, Dana Welch, a Certified Shorthand
 3    Reporter, hereby certify that the witness in the
 4    foregoing deposition was by me duly sworn to tell
 5    the truth, the whole truth, and nothing but the
 6    truth in the within-entitled cause;
 7          That said deposition was taken in
 8    shorthand by me, a disinterested person, at the time
 9    and place therein stated, and that the testimony of
10    the said witness was thereafter reduced to
11    typewriting, by computer, under my direction and
12    supervision;
13          That before completion of the deposition,
14    review of the transcript [X] was [ ] was not
15    requested.  If requested, any changes made by the
16    deponent (and provided to the reporter) during the
17    period allowed are appended hereto.
18          I further certify that I am not of counsel
19    or attorney for either or any of the parties to the
20    said deposition, nor in any way interested in the
21    event of this cause, and that I am not related to
22    any of the parties thereto.
23              Dated:  August 15, 2018.
24    _____
25    Dana Welch, CSR, RPR, CRR, CRC
```