# EXHIBIT 6

DONALD WARREN NEUFELD, 30(B)(6) - 08/09/2018

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN FRANCISCO
 4              Case No. 3:18-cv-1554-EMC
 5   --------------------------------x
 6   CRISTA RAMOS, et al.,
 7                  Plaintiffs,
 8           vs.
 9   KIRSTJEN NIELSEN, et al.,
10                  Defendants.
11   --------------------------------x
12
13         VIDEOTAPE 30(B)(6) DEPOSITION OF
14
         U.S. DEPARTMENT OF HOMELAND SECURITY
15
       VIA ITS REPRESENTATIVE DONALD WARREN NEUFELD
16
17              Thursday, August 9, 2018
18                  Washington, D.C.
19
20
21
22
23   REPORTED BY:
24   Susan Ashe, RMR, CRR
25   Job Number LA-185456
```

 1
 2
 3
 4
 5
 6
 7                              August 9, 2018
 8                              9:47 a.m.
 9
10          Videotape 30(b)(6) deposition of U.S.
11   DEPARTMENT OF HOMELAND SECURITY VIA ITS
12   REPRESENTATIVE DONALD WARREN NEUFELD, taken by
13   plaintiff, pursuant to subpoena, at Sidley Austin
14   LLP, 1501 K Street, Northwest, Washington, D.C.,
15   before Susan Ashe, Certified Realtime Reporter,
16   Registered Merit Reporter, and Notary Public within
17   and for the District of Columbia.
18
19
20
21
22
23
24
25

1     Q.   For the current administration, how did
2  these priority -- how did you ask or how did you
3  find out about this administration's priorities?  Is
4  it the same kind of broad -- you mentioned broadcast
5  e-mails, conversations, executive orders.
6          Was it the same kinds of communications?
7     A.   Yes.
8     Q.   Okay.
9     A.   And the news.
10    Q.   And the news.  Okay.
11         Have you received any documents describing
12 this administration's priorities as they relate to
13 USCIS?
14              MR. KIRSCHNER:  Objection; vague.
15    Q.   Well, let me pick some of these out.
16         You mentioned some broadcast e-mails
17 concerning the administration's priorities.
18         Have you received e-mails concerning this
19 administration's priorities?
20    A.   Yes.
21    Q.   Okay.  Did any of them relate to TPS?
22    A.   Not that I recall.
23    Q.   And are you aware of any executive orders
24 that relate to TPS?
25    A.   No.

1    Q.   And how about conversations?
2    A.   With respect to this administration?
3    Q.   Yes.
4         MR. KIRSCHNER:  I'm going to object
5    to the extent that this is calling for internal
6    deliberations of -- to the extent the question is
7    calling for what those internal deliberations are,
8    I'll instruct him not to answer.
9         MS. DEGEN:  Okay.  I think I'm not so
10   much asking about deliberations concerning
11   particular decisions but just understanding what's
12   been communicated to him with respect to this
13   administration's priorities as it relates to TPS.
14   A.   I'm struggling with this because there
15   hasn't been a communication in terms of priorities
16   for TPS.
17        I have heard expressions of concern from
18   this administration and the last administration that
19   the temporary part of TPS seems to be difficult.
20   Q.   How so?
21   A.   In that some of these designations have
22   been going on for, you know, 15, 16 years.
23        And I want to be clear that I have not
24   heard anybody express as a priority the termination
25   or, you know, a negative decision against them.

1   It's just the general -- the difficulty of dealing
2   with what is supposed to be a temporary program and
3   when is the appropriate time for them to wind down,
4   and that it's a challenge.
5       Q.   And how did you get an understanding of
6   that concern?  Was that in conversations, or was
7   there some written communication?
8               MR. KIRSCHNER:  Objection, again, to
9   the extent this is calling for internal
10  deliberations, I would instruct you not to answer
11  whether it's from this administration or from a past
12  administration.
13      Q.   Does my question implicate internal
14  deliberations in your mind?
15      A.   I don't know what is meant by "internal
16  deliberations."
17      Q.   All right.  Let me think here for a second
18  how to do this a little better.
19              Well, you mentioned that you had not
20  received a communication on this administration's
21  priorities for TPS.
22              Do you have an understanding of this
23  administration's priorities for TPS?
24      A.   I'm not aware that they have a priority
25  for TPS.

 1   description of the -- why the decision that was made
 2   is being made, or was made, you know, why the
 3   decision was -- is what it is.
 4           And with the -- so in the past, we would
 5   have -- we used information from the conditions
 6   report that RAIO would produce.
 7           We would -- we in Service Center
 8   Operations would pull information from that that we
 9   thought would likely be pertinent.
10           All of this is, again, just trying to
11   speed up the process so that we wouldn't be waiting
12   for the FRN to be issued once the decision was made.
13           So we would draft sort of notional
14   language that would be put in there as the
15   explanation for the decision that hadn't even been
16   made yet.
17           With the last Sudan determination, we did
18   draft the FRN, but we left that section that
19   explains the decision blank for the Office of Policy
20   and Strategy to fill in.
21           And then with the most recent Haiti
22   determination, we didn't even draft the FRN.  That
23   was turned over to Policy and Strategy as well.
24      Q.   And how about with the most recent
25   El Salvador, Nicaragua FRNs?

```
 1        A.   So I get the order of these things mixed
 2   up, but I know that Haiti, because I asked Haiti,
 3   was the last one that we -- was the first one that
 4   we did not do the FRN for.  So whatever ones came
 5   after that, we did not do the FRN.
 6        Q.   Okay.  And how did this transition on
 7   drafting the FRN come about?
 8        A.   I'm not sure precisely if it was directed
 9   or just a group decision that that's what made sense
10   to do.
11             Again, the FRN really is a document that
12   only can be finalized once you know what the
13   decision is going to be because it just announces
14   the decision and then explains the basis for the
15   decision and then the operational process that needs
16   to follow from that.
17             And the difference now is that the
18   decisions are less foreseeable what they're going to
19   be.
20             So the effort involved in developing the
21   FRN for one of those possible outcomes is not as
22   worthwhile.
23             If you don't know what the likely decision
24   is going to be, then you can't really draft
25   something that's explaining what that decision that
```

1   hasn't happened yet was based on.
2           And so I don't know whether it was, you
3   know, somebody directed it, I'm guessing it wasn't;
4   it was probably just that Policy and Strategy said,
5   you know, we'll take this and we'll do it once the
6   decision is made.
7       Q.   Okay.  How did you learn about the change?
8       A.   By talking to my staff in preparation for
9   this.
10      Q.   Okay.  So that would be -- I'm sorry --
11  Guillermo whose last name I keep having trouble with
12  and Mr. Massey?
13      A.   Yes.
14      Q.   Okay.
15      A.   I will say that I have a recollection of
16  knowing that we were no longer doing the FRNs that
17  predated, you know, the last couple of days, but I
18  don't -- I didn't really remember any specifics
19  related to that until I talked to them.
20      Q.   Okay.  When Service Center Operations was
21  doing the FRN drafts, were there -- did they have a
22  draft of the recommendation memo already at the time
23  they were putting those together?
24           MR. KIRSCHNER:  Objection; vague,
25  confusing.

1   definitely not, but I want to make sure that I'm not
2   clear on that.
3   BY MS. DEGEN:
4       Q.   Okay.  Thank you for clarifying.
5            So Mr. Neufeld, before the break, we had
6   gone through the process of getting a recommendation
7   memo prepared for USCIS to go to the director, which
8   would then go to the secretary.  The secretary makes
9   a decision, a Federal Register Notice is finalized.
10           Are there any steps in that process
11  through publication of the Federal Register Notice
12  that we've missed?
13      A.   Not that I can think of.
14      Q.   And we also talked about a number of
15  differences between the process that has been
16  experienced with the most recent TPS determinations
17  under this administration and previous TPS
18  determinations.
19           Are there any other process changes that
20  we may have missed?
21              MR. KIRSCHNER:  Objection, assuming
22  facts not in evidence.
23              You used the phrase "a number of
24  differences."  I just -- that's your
25  characterization, not Mr. Neufeld's

1    characterization.
2        Q.   Are there any other differences in the
3    process for the recent determinations under this
4    administration and previous determinations?
5        A.   So I mentioned that we don't do the
6    Federal Register Notices any longer.
7             I wouldn't categorize that as an
8    administration change.  It happened while this
9    administration was in -- is in office, but it wasn't
10   directed that way.
11            The other change with respect to the FRN
12   drafting, and I don't remember whether I've said
13   this or not, but that the section that discusses
14   the -- that explains the why of the decision, I
15   think it was with Sudan we stopped even -- we
16   stopped drafting that piece of it.
17            If I mentioned that before, sorry for
18   repeating, but I wanted to make sure that was
19   understood.
20            So we went from never have we been the
21   ones who decided what the content was, but we took a
22   stab at drafting language that others would then
23   modify.
24            With the most recent Sudan determination,
25   we left that section blank.  We drafted the rest of

1  it but left the "why" section blank.  Policy and
2  Strategy took that role.
3          Then with Haiti we didn't even draft an
4  FRN.  And since then we haven't drafted the FRNs.
5      Q.   Okay.  Thank you for clarifying.
6          Are there any other process differences?
7      A.   Not that I can think of off the top of my
8  head.
9      Q.   Do you know how the decision came about
10  that Service Center Operations left the "why" blank
11  for the Sudan decision?
12     A.   My understanding is it was essentially the
13  working group's consensus or acknowledgment that
14  that is difficult to draft when you don't even have
15  a sense of what the decision's going to be.  And so
16  it was left blank for the Policy and Strategy folks
17  to draft when they had an idea of what it would be.
18         I will also say that even prior to any of
19  this, so, you know, in the middle of the last
20  administration, I can remember my team saying that,
21  you know, it didn't make sense for Service Center
22  Operations to have the pen for drafting the Federal
23  Register Notice, that these kinds of things
24  typically are under the purview of Policy and
25  Strategy, drafting regulatory language, you know,

1   drafting policy memos, those kinds of things
2   typically fall to them.
3         I think that at some point it became --
4   you know, I don't even know how much further back in
5   time you go with the Federal Register Notices and us
6   drafting them for TPS, but the -- what can make
7   sense is that there's a huge operational section
8   that needs to be included, and so that legitimately
9   makes sense for us to have the pen on with our
10  operational folks.
11        But there's always been this other piece
12  of it that doesn't -- didn't -- isn't in our, you
13  know, wheelhouse, if you will.
14        And so this transition was just sort of
15  the evolution of the thought process on that of the
16  working group members, and the evolution of the
17  certainty with which we could predict what the
18  decisions were going to be.
19      Q.  Do you know who from Office of Policy and
20  Strategy now drafts the "why" section of the Federal
21  Register Notices?
22      A.  I don't.
23            MS. DEGEN:  Okay.  Let's put in front
24  of you what's been marked as Exhibit 14.
25            (Whereupon, Exhibit 14 was marked for

DONALD WARREN NEUFELD, 30(B)(6) - 08/09/2018   Page 139

1   identification.)

2        Q.   And for reference, there's a Bates number
3   at the bottom, DHS 001659000087.

4             And this is an e-mail chain with a couple
5   of e-mails, one -- the top one dated April 20, 2017,
6   the next one dated March 28, 2017, and the bottom
7   one dated March 22, 2017.

8             The version that we have has a number of
9   sections that have been redacted.

10            Just a general question here:  Do you
11  recall being someone on this e-mail chain?

12       A.   I do not.

13       Q.   Down in the bottom e-mail, the one that is
14  dated March 22, 2017, the from line says "Prelogar,
15  Brandon."

16            Do you see that?

17       A.   Yes.

18       Q.   And Brandon Prelogar is in the Office of
19  Policy and Strategy.  Right?

20       A.   Yes.

21       Q.   And then the "CC" line under that is a
22  Hamilton, Gene.

23       A.   Um-hum.

24       Q.   Do you see that?

25       A.   Yes.

1           What does RED refer to?
2     A.    I don't know.
3     Q.    Is there any group within USCIS that
4  you've heard referred to as RED before?
5     A.    No.
6     Q.    Is there any group within DHS that you can
7  think of?
8     A.    No.
9     Q.    Does OPQ work with groups in other
10 agencies on data projects?
11    A.    Yes.
12    Q.    Okay.  What agencies are you aware of OPQ
13 working with?
14    A.    So I'm not aware -- I can't recall
15 specific times.
16          I know that -- I mean, we get requests for
17 data all the time and for different contexts, and
18 sometimes that would include data that perhaps CBP
19 might have or ICE.
20          So I know for a fact that they have
21 engaged with ICE.
22    Q.    Okay.  What is CBP?
23    A.    Customs and Border Protection.
24    Q.    This e-mail also has a reference to HHS.
25          Do you know what that would refer to?

1    A.   I would imagine Health and Human Services.
2    Q.   The date that's being discussed in these
3    e-mails, do you know whether any of this information
4    is relative to the question of whether a country
5    designated for TPS should be renewed?
6              MR. KIRSCHNER:  Objection; outside
7    the scope, calls for speculation.
8    Q.   You can answer.
9    A.   So I don't recall which of the three-ways
10   TPS can be designated.
11             There's armed conflict, environmental
12   disaster.  I think the wording I'm probably going to
13   get wrong.  And then extraordinary and temporary
14   conditions.  And I think at least one of those
15   requires for the extension or allows for -- in the
16   extension determination for the Secretary to
17   determine what the impact is on the United States if
18   they were to -- are to remain.
19             That's my understanding.
20   Q.   And did you have an understanding that
21   this data was being pulled in connection with that
22   factor, or is that something that you are
23   extrapolating?  You don't know?
24   A.   No, you asked me if there could be a
25   reason for this, and that would be my -- the only

```
 1   thing I could come up with that might be a reason
 2   for it, but I don't know if that's the reason this
 3   was requested.
 4       Q.   Okay.
 5              MR. KIRSCHNER:  Objection to the
 6   extent like the question was assuming that that --
 7   it was requested in relation to a TPS decision per
 8   se.  Assuming facts not in evidence.
 9              MS. DEGEN:  You can put that one to
10   the side.
11              MR. KIRSCHNER:  Is this a good time
12   for a break?
13              MS. DEGEN:  Yes, if you folks need a
14   break, we can take one now.
15              MR. KIRSCHNER:  I mean, I don't
16   know -- you have your outline, so....
17              MS. DEGEN:  I have some more
18   documents to go through, but if people need a break,
19   I'm happy to take one.
20              MR. KIRSCHNER:  We could take a quick
21   break now.
22              MS. DEGEN:  Okay.  Sure thing.
23              VIDEOGRAPHER:  Going off the record.
24   The time is 3:29 p.m.
25              (Whereupon a recess was taken.)
```

```
 1   DISTRICT OF COLUMBIA       )
 2                              : ss
 3
 4           I, SUSAN ASHE, a Registered Merit Reporter
 5   and Notary Public, do hereby certify:
 6           That the foregoing proceedings were taken before
 7   me at the time and place herein set forth; that any
 8   witnesses in the foregoing proceedings, prior to
 9   testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is a true record
13   of the testimony given.
14           Before completion of the deposition, review of
15   the transcript [X ] was [ ] was not requested.  If
16   requested, any changes made by the deponent (and provided
17   to the reporter) during the period allowed are appended
18   hereto.
19           I further certify that I am not interested in
20   the outcome of the action.
21           WITNESS my hand this date August 10th, 2018.
22
23           _____
24
25   My Commission Expires: May 31, 2022
```