1   Alycia A. Degen (SBN 211350)
    adegen@sidley.com
2   Sean A. Commons (SBN 217603)
    scommons@sidley.com
3   SIDLEY AUSTIN LLP
    555 West Fifth Street
4   Los Angeles, CA 90013
    Telephone: +1 213 896 6010
5   Facsimile: +1 213 896 6600

6   Ahilan T. Arulanantham (SBN 237841)
    aarulanantham@aclusocal.org
7   ACLU FOUNDATION
    OF SOUTHERN CALIFORNIA
8   1313 West 8th Street
    Los Angeles, CA 90017
9   Telephone: +1 213 977 5211
    Fax: +1 213 977 5297

10
    Jessica Karp Bansal (SBN 277347)
11  jbansal@ndlon.org
    Emilou MacLean (SBN 319071)
12  emi@ndlon.org
    NATIONAL DAY LABORER
13  ORGANIZING NETWORK
    674 S. La Fayette Park Place
14  Los Angeles, CA  90057
    Telephone: +1 213 380 2214
15  Fax: +1 213 380 2787

16  Attorneys for Plaintiffs
    [Additional Counsel Listed on Next Page]

17

UNITED STATES DISTRICT COURT

18

NORTHERN DISTRICT OF CALIFORNIA

19

SAN FRANCISCO

20

| | |
|---|---|
| CRISTA RAMOS, *et al.*, | Case No.  3:18-cv-1554-EMC |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| KIRSTJEN NIELSEN, *et al.*, | Date:        September 25, 2018 |
| Defendants. | Time:        10:30 a.m. |
| | Place:       Courtroom 5, 17th Floor |
| | [Filed concurrently with Supporting Declaration of Alycia A. Degen] |

21

22

23

24

25

26

27

28

*Additional Counsel for Plaintiffs*

William S. Freeman (SBN 82002)
wfreeman@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone: +1 415 621 2493
Fax: +1 415 863 7832

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
Part-time Lecturer in Law
USC Gould School of Law*
University of Southern California
699 Exposition Boulevard
Los Angeles, CA 90089-0071
Telephone: +1 213 675 5957

Nicole M. Ryan (SBN 175980)
nicole.ryan@sidley.com
Ryan M. Sandrock (SBN 251781)
rsandrock@sidley.com
SIDLEY AUSTIN LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1219
Facsimile: +1 415 772 7400

Amanda Farfel (SBN 288126)
afarfel@sidley.com
Andrew B. Talai (SBN 300053)
atalai@sidley.com
Marisol Ramirez (SBN 307069)
marisol.ramirez@sidley.com
Mohindra Rupram (SBN 319478)
mrupram@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Katelyn N. Rowe (SBN 318386)
krowe@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA  90067
Telephone: +1 310 595 9598
Facsimile: +1 310 595 9501

Jessica Fishfeld (*Pro Hac Vice*)
jfishfeld@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Telephone: +1 312 853 2031
Facsimile: +1 312 853 7036

Matthew J. Letten (*Pro Hac Vice*)
mletten@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8565
Facsimile: +1 202 736 8711

Jillian R. Dent (*Pro Hac Vice*)
jdent@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Telephone: +1 312 853 7022
Facsimile: +1 312 853 7036

* *Institution listed for identification purposes only*

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I.      PLAINTIFFS HAVE DEMONSTRATED THEY ARE LIKELY TO SUCCEED ON THE
        MERITS OF THEIR STATUTORY AND CONSTITUTIONAL CLAIMS............................2

        A.      Plaintiffs Are Likely To Succeed On Their APA Claim. .............................2

                1.      The APA Constrains DHS' Discretion To Change TPS Policy And Practice...3

                2.      This Administration Adopted A New Rule For Intervening Conditions...........6

                        a.      Defendants Fail To Show DHS Did Not Break From Past Practice......8

                        b.      Defendants' *Post Hoc* Statement That The TPS Statute Requires
                                Consideration Of Current Country Conditions Does Not Undermine
                                Plaintiffs' Showing Of A New Rule. ...................................10

        B.      Defendants' TPS Terminations And New Rule Were Motivated By Racial Animus
                Against Non-White, Non-European Immigrants. ........................................12

                1.      Plaintiffs Are Likely To Prevail Under *Arlington Heights*. .............................12

                2.      The Court Should Not Reverse Its Decision To Apply *Arlington Heights*......18

                3.      Plaintiffs Would Prevail Even Under *Trump*. ...................................19

II.     TPS HOLDERS AND THEIR CHILDREN ARE SUFFERING PROFOUND AND
        IRREPARABLE HARM. .................................................................................22

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN
        FAVOR OF INJUNCTIVE RELIEF. ....................................................................24

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance For The Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ...............................................................23

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ...............................................................6

*Arc of Cal. v. Douglas,*
    757 F.3d (9th Cir. 2014) .......................................................................24

*Arrington v. Daniels,*
    516 F.3d 1106 (9th Cir. 2008) ...............................................................10

*Batson v. Kentucky,*
    476 U.S. 79 (1986) ................................................................................18

*Beck v. City of Upland,*
    527 F.3d 853 (9th Cir. 2008) .................................................................14

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ..........................................................................24

*Cal. Trout v. Fed. Energy Regulatory Comm'n,*
    572 F.3d 1003 (9th Cir. 2009) ............................................................4, 5

*California v. Health & Human Servs.,*
    281 F. Supp. 3d 806 (N.D. Cal. 2017) ..................................................23

*Damus v. Nielsen,*
    313 F. Supp. 3d 317 (D.D.C. 2018) ........................................................6

*Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.,*
    774 F.2d 1371 (9th Cir. 1985) ...............................................................24

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ............................................................................4

*Fed. Power Comm'n v. Texaco, Inc.,*
    417 U.S. 380 (1974) .........................................................................10, 11

*Fiallo v. Bell,*
    430 US 787 (1977) ...........................................................................18, 19

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009) ...............................................................13

ii

*Korematsu v. United States,*
   323 U.S. 214 (1944)..........................................................................................................20

*Ledezma Cosino v. Sessions,*
   857 F.3d 1042 (9th Cir. 2017) (en banc) ..........................................................18, 19

*Lockhart v. Kenops,*
   927 F.2d 1028 (8th Cir. 1991) ..........................................................................................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)............................................................................................................4

*Nw. Envtl. Def. Center v. Bonneville Power Admin.,*
   477 F.3d 668 (9th Cir. 2007) ......................................................................................4, 5

*Rajah v. Mukasey,*
   544 F.3d 427 (2d Cir. 2008)...........................................................................................18

*Regents of Univ. of Cal. V. U.S. Dep't of Homeland Sec.,*
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ..........................................................................6

*Rodriguez v. Robbins,*
   715 F.3d 1127 (9th Cir. 2013) ................................................................................24, 25

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,*
   804 F. Supp. 2d 1045 (E.D. Cal. 2011)..........................................................................24

*Sanchez v. Lynch,*
   614 F. App'x 866 (9th Cir. 2015) ..................................................................................14

*Schrill v. Plunkett,*
   760 F. Supp. 1378 (D. Or. 1990) ..................................................................................24

*Sessions v. Morales-Santana,*
   137 S. Ct. 1678 (2017)...................................................................................................19

*Taiebat v. Scialabba,*
   No. 17-cv-0805-PJH, 2017 WL 747460 (N.D. Cal. Feb. 27, 2017)...............................24

*Ticketmaster L.L.C. v. RMG Techs., Inc.,*
   507 F. Supp. 2d 1096 (C.D. Cal. 2007) ........................................................................13

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018)........................................................................................... *passim*

*U.S. Dep't of Agric. v. Moreno,*
   413 U.S. 528 (1973)........................................................................................................20

*United States v. Gomez-Norena,*
   908 F.2d 497 (9th Cir. 1990) ........................................................................................13

iii

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
    429 U.S. 252 (1977)......................................................................................... *passim*

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ...................................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................................25

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)..................................................................................................19

**Statutes and Regulations**

5 U.S.C. 551(4) ....................................................................................................................4

5 U.S.C. 551 (13) .................................................................................................................4

5 U.S.C. 706.........................................................................................................................4

8 U.S.C. 1254a(b)(5)........................................................................................................6, 7

**Other Authorities**

5 C. Wright et al., *Federal Practice and Procedure* §§ 1279, 1264 & n.4 (3d ed.
    2018) .......................................................................................................................13

*Termination of the Designation of Haiti for Temporary Protected Status*,
    83 Fed. Reg. 2,648, 2,650 (Jan. 18, 2018) .............................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

In support of their motion for a preliminary injunction, Plaintiffs established two fundamental points. First, Defendants violated the APA by changing the Executive's longstanding interpretation of the TPS statute to foreclose consideration of current country conditions unrelated to the events on which a TPS designation (or re-designation) was based. Second, Defendants violated the Fifth Amendment because a substantial factor motivating the adoption of this new policy and the resulting TPS terminations for Sudan, Nicaragua, Haiti, and El Salvador, was racist pressure from the White House to expel non-white, non-European immigrants. Each of these claims is supported by numerous documents and statements—including statements made by DHS Secretaries under oath, correspondence between government officials obtained in discovery, and public statements by the President that Defendants, in their Answer, admit that he made.

In response, Defendants mostly attempt to re-litigate their motion to dismiss. On the APA claim, Defendants again argue a change in informal policy cannot violate the APA. But this Court already held that an unexplained change in longstanding agency policy is actionable under the APA even if the policy was never formally established. *See, e.g.*, Dkt. 55 at 25-26 (citing, *inter alia*, *Cal. Trout v. Fed. Energy Regulatory Comm'n*, 572 F.3d 1003, 1022-23 (9th Cir. 2009); *Nw. Envtl. Def. Center v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir. 2007)). Defendants also deny having changed their policy. But nowhere do they even acknowledge—let alone reconcile their argument with—the sworn testimony of Secretaries Kelly and Nielsen that they were implementing a view of the statute barring consideration of current country conditions unrelated to the original designation. Nor do Defendants address key evidence from agency officials involved in the TPS decision-making process showing the new view departed from longstanding practice and policy.

Similarly, on the Fifth Amendment claim, Defendants re-litigate whether the *Arlington Heights* standard applies. It does, for all the reasons the Court previously explained. Defendants virtually concede—through lack of opposition—that their adoption of the new rule and the resulting TPS terminations violate the Constitution under *Arlington Heights*. Even if the more deferential standard from *Trump v. Hawaii* applied, however, Plaintiffs would still be likely to prevail. Unlike in *Trump*, a rich record reveals the proffered rationales for terminating TPS were not bona fide. Each

1    termination was "a political [decision] by . . . [the Secretary]'s advisors" (Ex. 124)[1] to reach a pre-

2    determined end—to expel non-white, non-European immigrants because of racial animus.

3         The remaining factors—irreparable harm, the balance of equities, and the public interest—all

4    strongly favor issuing a preliminary injunction to preserve the status quo. The grievous harms

5    Plaintiffs will suffer are not "inherent in the temporary nature of TPS status," Dkt. 116 at 25-26, but

6    rather derive largely from Defendants' decisions to end TPS *unlawfully*, forcing TPS holders to

7    accept repatriation to countries that remain unsafe or unstable. Dkt. 89 at 17-20. While the

8    government and public share some interest "in ensuring that the process established by Congress

9    . . . is followed as Congress intended" (Dkt. 116 at 26-27), where Plaintiffs' merits showing is as

10   strong as here, that interest is far outweighed by the stark countervailing threat of harm: If this Court

11   permits Defendants to terminate TPS unlawfully, several hundred thousand people will lose their

12   legal status and their livelihoods, risk family separation and deportation, and suffer trauma that will

13   ripple throughout communities all across the country. Dkt. 89 at 31-33. Defendants have not

14   contested that TPS holders contribute to this nation in countless positive ways. Dkts. 103-1 at 2-13

15   (Br. of Amici States), 106-1 at 3-9 (Br. of Amici Cities & Counties). In contrast, the government and

16   public will suffer little (if any) discernable harm if the status quo is maintained.

17   **ARGUMENT**

18   **I.    PLAINTIFFS HAVE DEMONSTRATED THEY ARE LIKELY TO SUCCEED ON**
19        **THE MERITS OF THEIR STATUTORY AND CONSTITUTIONAL CLAIMS.**

20       **A.    Plaintiffs Are Likely To Succeed On Their APA Claim.**

21        As the Court previously held, while the Secretary has some discretion in assessing country

22   conditions, the statute requires the Secretary to extend TPS where conditions so warrant. Dkt. 55 at

23   40. Moreover, even where the Secretary has discretion, the APA still forbids an agency from

24   departing from a "general policy" (including one defined only by a "settled course of adjudication")

25   absent meaningful explanation. *Id.* at 25-26 (internal quotations and emphasis omitted). Most

26   importantly, the Secretary's discretion is constrained when deciding what legal rules apply to the

27   _____

28   [1] Unless noted, all citations to exhibits (generally as "Ex." or "Exs.") refers to exhibits to the
     concurrently-filed declaration of Alicia A. Degen.

factual assessments she must make. *Id.* at 2425. Because the Secretaries engaged in an unacknowledged, unexplained departure from the prior practice of making those assessments, they violated the APA.

Rather than addressing Plaintiffs' extensive evidence, Defendants spend most of their brief re-litigating arguments they previously lost and responding to arguments of their own invention. Defendants argue that because any change was informal, the APA does not apply. But this Court already rejected that view, and Defendants provide no reason to revisit the Court's conclusion. Dkt. 55 at 34. Defendants' repackaged version of that argument asserting the APA applies only to "regulated entities" fares no better. Neither text nor case law support that radical view.

Defendants contend that "inconsistencies among different Secretaries of Homeland Security when weighing various factors underlying TPS decisions" do not "provide a basis for litigation under the APA." Dkt. 116 at 12. Defendants' argument would matter if Plaintiffs' evidentiary showing were limited to "inconsistencies" in how the relevant factors were weighed. It is not. Plaintiffs have shown, including through Defendants' own public sworn testimony and numerous confirming emails and internal documents, that they categorically disregarded an important class of information that previously was considered. Dkt. 89 at 21-25. The meager evidence Defendants cite in response does not come close to rebutting Plaintiffs' extensive showing.

Defendants also state—for the first time—the statute *requires* consideration of current conditions (Dkt. 116 at 3, 17), and therefore the Secretaries must have considered them. But their admission does not prove the Secretaries followed the law. It only makes their failure to look at intervening country conditions all the more striking. If Plaintiffs establish that Defendants did not consider intervening conditions, then their conduct was illegal under their own view of the law.

### 1.   The APA Constrains DHS' Discretion To Change TPS Policy And Practice.

On the motion to dismiss, this Court already rejected Defendants' argument that the APA does not apply to DHS's change in TPS policy because the policy was not formally announced and, relatedly, because the Secretary has some discretion with respect to TPS determinations. Dkts. 20 at 38-39, 55 at 25-26, 40 ("[The APA's] constraint on changes to agency policy is not limited to formal

1    rules or official policies.").

2         Defendants now raise an even more extreme version of the same argument. They assert the

3    APA "do[es] not apply in the TPS context" *at all* because "the designation of a country for

4    temporary protected status and the subsequent termination of that temporary status does not impose

5    regulatory obligations or restrictions on regulated entities." Dkt. 116 at 11. Defendants cite no statute

6    or case law for their newly-invented limitation on the APA. It is meritless.

7         First, Defendants suggest the APA applies only to agency action that imposes "obligations or

8    restrictions" on regulated entities, not "assistance" to individuals. Dkt. 116 at 11. This is clearly

9    wrong. By its terms, the APA applies to "agency action," broadly defined to include "the whole or a

10   part of agency statement of general or particular applicability . . . to implement . . . policy." 5 U.S.C.

11   551(4), (13); 5 U.S.C. 706; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

12   *Co.*, 463 U.S. 29, 42 (1983) ("[T]he direction in which an agency chooses to move"—*i.e.*, whether

13   the agency is imposing obligations or rescinding them—"does not alter the standard of judicial

14   review established by [the APA]."). This reflects the fundamental principle that all those affected by

15   agency action are entitled to expect the agency to behave in a reasoned, non-arbitrary manner. Just as

16   car dealerships receive the APA's protection from arbitrary policy changes that alter their relations

17   with employees, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126-27 (2016), individual

18   TPS holders receive the APA's protection from arbitrary changes that upend their lives.

19        Second, Defendants argue, again, that the APA applies only to formally-promulgated

20   regulations, rather than informal agency policies and practices utilized for making TPS

21   determinations. Dkt. 116 at 11-12. This Court already rejected that argument. Dkt. 55 at 25. The

22   Ninth Circuit applies the APA to informal changes in agency policies and practices, including

23   policies and practices implied from agency conduct. *See, e.g.*, *California Trout*, 572 F.3d at 1022-23

24   (explaining that irrational departure from settled practice may violate the APA); *Bonneville Power*

25   *Admin.*, 477 F.3d at 690 (holding agency's departure from long-standing practice violated the APA

26   because the agency provided no reasoned explanation for the change).[2]

---

27   [2] Defendants incorrectly assert that Plaintiffs "do not presently rely" on these two cases. Dkt. 116 at
28   13 n.11. Plaintiffs relied on this Court's prior order, which discusses both cases. Dkt. 89 at 21.
     Plaintiffs considered the issue settled.

1       Defendants' effort to distinguish these controlling cases fails. Defendants assert *California*

2  *Trout* concerned "a rule [formally] promulgated by the agency to inform stakeholders about their

3  procedural rights." Dkt. 116 at 13 n.11. While it does discuss whether the agency applied its formal

4  rules in an arbitrary fashion, *California Trout*, 572 F.3d at 1015-22, this Court's Order relies on

5  *California Trout*'s separate discussion of whether the agency arbitrarily deviated from its prior

6  *practice*, which was embodied only in the agency's prior decisions in other cases. Dkt. 55 at 25.

7  Although *California Trout* held the agency's deviation from prior practice was not arbitrary on those

8  specific facts, it made clear the APA did apply to the informal change. *Id.*

9       Defendants' attempt to distinguish *Northwest Environmental Defense Center* is similarly

10 unavailing. That case held the APA required the defendant agency to provide "a reasoned analysis"

11 to support its departure "from its long-standing practice of funding a unitary Fish Passage Center."

12 *Northwest Environmental Defense Center*, 477 F.3d 668, 687-88 (9th Cir. 2007). Defendants argue

13 *Northwest Environmental Defense Center* is distinguishable because it involved "an indisputable and

14 dramatic change in course." Dkt. 116 at 13 n.11. But it disproves Defendants' claim that the APA is

15 limited to formal rules. Moreover, nothing in *Northwest Environmental Defense Center* hinged on

16 whether the agency's change was "dramatic." *Id.* And the change here is no less dramatic than the

17 change there, which concerned a decision to transfer responsibility for technical assistance on fish

18 management from one entity to another.

19      Defendants also assert *Northwest Environmental Defense Center* is distinguishable because

20 the agency's change in practice was "based on a flagrant mistake in law." *Id.* But the legal mistake

21 was not the "trigger," Dkt. 116 at 11, for the Court to *apply* the APA. The agency's departure from

22 longstanding practice gave rise to the APA claim. The change in law was simply the reason the

23 Court held the agency failed to satisfy the APA's requirement that it justify its departure with a

24 reasoned analysis. If Defendants were to acknowledge their change and then provide a justification

25 for it, this Court could then consider whether the new rule was based on a mistaken view of the law,

26 as in *Northwest Environmental Defense Center*. But nothing in that opinion suggests the APA

27 applies only to agency action based on mistakes of law, flagrant or otherwise.

28

1        Moreover, Defendants now state the TPS statute requires "a consideration of *current*

2   [country] conditions." Dkt. 116 at 3, 17 (emphasis added). Accordingly, if Plaintiffs establish DHS

3   has adopted a new rule eschewing consideration of current conditions not "directly tied" to the

4   originating condition, they will have also established that DHS's new rule—just like the change in

5   *Northwest Environmental Defense Center*—was based on legal error under Defendants' own view of

6   the law. *See infra* Section I.A.2.b.

7        Numerous additional cases confirm the APA applies to informal and sub-regulatory agency

8   policies and practices, including in the immigration context. *See, e.g.*, *Am. Wild Horse Pres.*

9   *Campaign v. Perdue*, 873 F.3d 914, 927-28 (D.C. Cir. 2017) (holding that agency's unexplained

10  departure from longstanding practice violated APA); *Lockhart v. Kenops*, 927 F.2d 1028, 1032 (8th

11  Cir. 1991) ("an informal determination by an agency must be set aside if it is 'arbitrary, capricious,

12  an abuse of discretion, or otherwise not in accordance with law'"); *Regents of Univ. of Cal. V. U.S.*

13  *Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1037-43 (N.D. Cal. 2018) (applying APA to review

14  DHS memorandum revoking the DACA program); *cf. Damus v. Nielsen*, 313 F. Supp. 3d 317, 335-

15  39 (D.D.C. 2018) (applying APA to review ICE's compliance with its own "Parole Directive"

16  memorandum). All these cases conflict with Defendant's cramped understanding of the APA.

17       Finally, Defendants resurrect their jurisdictional arguments in an effort to argue the APA

18  does not apply to their policy change, but again ignore this Court's denial of their motion to dismiss.

19  Dkt. 116 at 11 (arguing "any rights associated with TPS are subsidiary to the designation decision, a

20  matter not subject to judicial review under 8 U.S.C. § 1254a(b)(5)"). That courts lack jurisdiction to

21  review the Secretary's ultimate "determination" whether to extend TPS does not mean TPS holders

22  have no right to a determination made through lawful process. Dkt. 55 at 18 (underlying interpretive

23  rule subject to APA constraints); *id.* at 41 (Plaintiffs have due process right to the statutorily-

24  mandated review and determination). Defendants apparently believe the Secretary could flip coins to

25  decide whether to extend TPS. Fortunately, as this Court has already recognized, that is not the law.

26          **2.    This Administration Adopted A New Rule For Intervening Conditions.**

27       Defendants deny that DHS adopted a new rule, claiming it simply has "weigh[ed] factors

28  differently." Dkt. 116 at 12-14. Defendants ignore Plaintiffs' overwhelming evidence that there is, in

fact, a new rule whereby "if the effects of the originating event, so that's a causation issue, do not continue to exist," then DHS "must terminate" TPS, even "[i]f the underlying conditions in a country are themselves dangerous." Dkt. 96-34. The Secretaries repeatedly said so, including in sworn testimony before Congress. *Id.*; *see also* Dkts. 96-35 and 96-36. Indeed, most of the final decision memoranda that provided the bases for the Secretary's decisions explicitly rely on this new rule. Dkt. 96-44 (Nicaragua Decision Memo recommending termination because "Nicaragua's current challenges cannot be directly tied to destruction stemming from Hurricane Mitch"); Dkt. 96-45 (Haiti Decision Memo recommending termination because "[a]ny current issues in Haiti are unrelated to the 2010 earthquake"); Dkt. 96-110 (El Salvador Decision Memo recommending termination because "El Salvador's current challenges cannot be directly tied to destruction stemming from the earthquakes"); *see also* Dkt. 89 at 22 & nn.5-6 (describing termination notice for Sudan disregarding intervening events considered in prior Sudan extension notices).

In contrast, decision memoranda from previous administrations explicitly referenced subsequent country conditions, whether or not tied to the original designation, further confirming the new rule's existence. These pre-Trump decision memoranda specifically relied on intervening conditions in recommending extensions of TPS. Ex. 125 (2016 Nicaragua Decision Memo recommending extension based on "Hurricane Mitch *and subsequent environmental disasters*" (emphasis added)); Ex. 126 (2016 El Salvador Decision Memo recommending extension based on "a series of earthquakes in 2001 *and subsequent environmental disasters*" (emphasis added)).[3] Because DHS's new rule is *not* simply a change in the weight given to various factors, the agency had an obligation to explain its departure from past practice.

---

[3] Defendants produced these documents after Plaintiffs filed their motion. Other new discovery buttresses that a new rule took shape by spring 2017. Ex. 127 (Secretary Kelly seeking to "make [the] case" for "not extending" TPS for Haiti, in May 2017, including through identifying that the "2010 earthquake is the only reason for TPS being granted"); Ex. 128 (DHS Secretary Senior Counsellor—and Trump surrogate—Gene Hamilton raised "concerns . . . on TPS in general" by late February 2017). It also supports Plaintiffs' argument that all of the factors addressed in the Sudan termination notice were originating conditions, including conditions that provided the basis for Sudan's 2013 redesignation. Ex. 142 (email chain describing DOS's "extensive redraft" of Sudan Memo "to focus on whether conditions cited in the 2013 redesignation continue"); Ex. 130 (email chain complaining about Gene Hamilton's "trim[ming]" of human rights abuse information, because "[t]hose abuses were explicitly mentioned in the 2013 Federal Register Notice as one of the reasons for re-designation.").

1

   a.      **Defendants Fail To Show DHS Did Not Break From Past Practice.**

2      The meager evidence Defendants cite to contest the adoption of a new rule is unconvincing.

3   They argue there was no rule because some aspects of the TPS process remained the same. Dkt. 116

4   at 14-18. But the examples they provide are all either inaccurate or immaterial.

5      First, Defendants point to the fact that the decision packets provided to Acting Secretary

6   Duke and Secretary Nielsen included country condition reports from the USCIS research unit

7   (RAIO), which—as in previous administrations—discussed a wide range of current country

8   conditions. Dkt. 116 at 14-18. But the RAIO reports, which were written by career staff, did not

9   provide the ultimate bases for the Secretaries' decisions. The decision memos did. When political

10  appointees wanted to change career staff's recommendation from extension to termination, they

11  rewrote decision memoranda, while leaving country condition reports untouched. *See* Dkt. 89 at 7

12  (Law rewrites Haiti Decision Memo); *id.* at 13 (Kovarik "'repackage[s]'" Sudan Decision Memo);

13  Dkt. 96-2 (Kovarik "tasked with updating the country conditions" in three decision memos because

14  the memos "read[] as though we'd recommend an extension" but DHS wants to terminate). To

15  update decision memoranda, DHS would pull "gems" from the country conditions reports that

16  supported termination, but would otherwise simply disregard the country conditions memos and any

17  inconvenient evidence of ongoing problems they contained. Dkt. 96-2 (career staff "comb through

18  the country conditions [reports] . . . looking for positive gems" to add to the decision memoranda to

19  support termination). Moreover, as described above, the decision memos themselves made clear—in

20  an abrupt departure from past practice—that the only factors that mattered were those related to

21  original conditions. And the Secretaries themselves understood they could base their decisions only

22  on originating conditions, as their testimony and other statements plainly show. Nothing about the

23  inclusion of RAIO memos in the administrative record changes that central fact.

24      Second, Defendants argue it was not unusual for DHS to consider the TPS designations for

25  Honduras, Nicaragua, and El Salvador together, because a 2006 press release addressed TPS

26  extensions for all three countries at the same time. Dkt. 116 at 15. The press release Defendants cite

27  reveals nothing about the agency's internal decision-making process. It does not show whether the

28  agency actually reviewed the three countries in one overarching decision-making process or

8

1    whether, instead, the agency reviewed each country separately, on its own merits, and simply

2    announced its decisions on all three in one press release. In any event, the press release does not

3    disprove the most salient aspect of Plaintiffs' evidence, which is that the Trump administration

4    considered Honduras, Nicaragua, and El Salvador together *because* officials believed that would be

5    the best way to force a restrictionist immigration policy through Congress. Dkt. 89 at 6 (DHS set out

6    to approach TPS "'decisions holistically as opposed to doing them in isolation,'" as part of plan to

7    make TPS decisions consistent with the President's position on immigration).

8         Next, Defendants argue the process for drafting Federal Register Notices was not politicized,

9    but simply transferred from one career office (SCOPS) to another (OP&S). Dkt. 116 at 16. They

10   ignore Plaintiffs' evidence that OP&S, though staffed by career experts, was controlled by political

11   surrogates. Dkt. 89 at 6 (Chief of OP&S was political appointee Kathy Neubel Kovarik, who

12   assumed responsibility for overseeing TPS periodic reviews); this was not the case for SCOPS,

13   which has been run for several years by a career official. Ex. 131 at 27:12-28:10. Once the drafting

14   of Federal Register Notices was transferred to OP&S, political appointees took on a direct role in the

15   drafting process. Ex 132 ("Recently [OP&S] has gotten more and more involved in the initial FRN

16   drafting process and Kathy [Nuebel Kovarik] has been reviewing before it goes into concurrence.").

17   Defendants also assert the decision to delay Federal Register Notice drafting until after the Secretary

18   made her decision was simply an innocent, sensible change so as to avoid drafting multiple notices

19   based on numerous possible decisions. But they fail to grapple with the salient point of this

20   evidence: the *reason* the Secretary's decision had become less predictable, such that drafting a notice

21   based on country conditions reports no longer made sense, was because decision making had

22   become divorced from actual evidence of country conditions. Dkt. 96-19 at 105:5-9 (when SCOPS

23   drafted the Federal Register Notices, "we used information from the conditions report that RAIO

24   would produce . . . that we thought would likely be pertinent"); Ex. 131 at 106:17-19 ("the decisions

25   [under the Trump Administration] are less foreseeable"); Ex. 130 (political appointees "over-

26   trimmed" country conditions information about Sudan "particularly regarding governmental human

27   rights abuses" and SCOPS does not want to be listed on the FRN). Under the Trump Administration,

28   with politics taking precedence over facts, it made more sense to delay notice drafting until later,

1    because the notice had to be conformed to whatever politically-driven decision the Administration

2    made. *E.g.*, Dkts. 96-63 *through* 96-65 (Sudan Federal Register Notice published, withdrawn, and

3    republished more than one month after termination); Ex. 133 (career official explaining "[FRNs

4    have] all been delayed in this administration. No idea what Secretary will decide, so can't write in

5    advance. Write quickly upon decision. Then clearance nightmares. It's frustrating.").

6         In any event, even if Defendants' evidence that certain aspects of the TPS process remained

7    similar were convincing—which, as described above, it is not—it would not weaken Plaintiffs' APA

8    claim. Plaintiffs do not need to prove every detail of the TPS process changed. Plaintiffs need only

9    show that in the past DHS took intervening country conditions into account, but in making the

10   decision to terminate TPS for Sudan, Nicaragua, Haiti and El Salvador, DHS considered only

11   whether the originating conditions continued to exist. Plaintiffs have provided overwhelming

12   evidence of that fact. Dkt. 89 at 5, 8-14, 21-25.

13                    **b.**    **Defendants' *Post Hoc* Statement That The TPS Statute Requires
                                Consideration Of Current Country Conditions Does Not
14                              Undermine Plaintiffs' Showing Of A New Rule.**

15        Defendants now assert, for the first time in this case, that the TPS statute "requires a

16   consideration of current conditions to determine whether nationals of a given country could safely

17   return or whether a country could adequately handle the return of its nationals." *See* Dkt. 116 at 17

18   (citing 8 U.S.C. 1254a(b)(1); Dkt. 117-2 at 245:16-246:10). Thus, they suggest, Secretary Nielsen

19   and Acting Secretary Duke must have actually considered current country conditions, because the

20   statute required them to do so.

21        This Court should not accept Defendants' *post hoc* explanation, which is at odds with the

22   agency's own contemporaneous statements about its actions. *See Arrington v. Daniels*, 516 F.3d

23   1106, 1113 (9th Cir. 2008) ("*Post hoc* explanations of agency action by . . . counsel cannot substitute

24   for the agency's own articulation of the basis for its decision."); *Fed. Power Comm'n v. Texaco, Inc.*,

25   417 U.S. 380, 397 (1974) ("[W]e cannot accept . . . counsel's *post hoc* rationalizations for agency

26   action; for an agency's order must be upheld, if at all, on the same basis articulated in the order by

27   the agency itself." (internal quotation marks omitted)). As Plaintiffs demonstrated through the

28   Secretaries' testimony and numerous contemporaneous documents, Secretary Nielsen and Acting

1   Secretary Duke both believed that, under the TPS statute, they *could not* extend a country's TPS

2   designations based on current country conditions *unless* those conditions were "'clearly linked to the

3   initial disasters prompting the designations.'" Dkt. 89 at 8-10, 22-23 (quoting Dkt. 96-2). In keeping

4   with that understanding, they in fact *did not* consider current country conditions that were not

5   "'directly tied'" to the original basis for designation, as the termination notices explicitly state. *Id.*

6       Defendants offer *no* convincing evidence to contradict Plaintiffs' overwhelming proof that

7   DHS did not consider current country conditions. They point to the Federal Register Notices and a

8   one-page Memorandum from Acting Secretary Duke as evidence that DHS contemporaneously

9   "acknowledged the statutory requirement" that Defendants now present to this Court for the first

10  time. Dkt. 116 at 17. But the Federal Register Notices and the Memorandum actually support

11  Plaintiffs' position. The Federal Register Notices make clear that DHS considered only current

12  conditions that were *related to the originating event*. *See, e.g.*, *Termination of the Designation of

13  Haiti for Temporary Protected Status*, 83 Fed. Reg. 2,648, 2,650 (Jan. 18, 2018) ("[T]he Acting

14  Secretary of Homeland Security determined on November 20, 2017 that the conditions for Haiti's

15  designation for TPS—on the basis of 'extraordinary and temporary conditions' *relating to the 2010

16  earthquake* that prevented Haitian nationals from returning in safety—are no longer met") (emphasis

17  added). Similarly, the natural reading of Acting Secretary Duke's Memorandum, which asks whether

18  "country conditions *continue* or have *been restored* to the extent" that the countries can "adequately

19  handle the return of their nationals," confirms that what mattered in the Acting Secretary's view was

20  the conditions that originally supported designation. Dkt. 117-5 (emphasis added). In the very same

21  document, Acting Secretary Duke concluded that "[t]he TPS program must end for these countries

22  soon" because, among other things, "the original natural disaster conditions no longer exist." *Id.*

23      Defendants also cite deposition testimony from Ms. Kovarik for the proposition that decision

24  makers must have understood that the TPS statute requires consideration of current conditions. Dkt.

25  116 at 17. Ms. Kovarik's *post hoc* opinion about what information may or may not be relevant under

26  the statute is not evidence of what the Secretaries actually considered. It does nothing to undermine

27  the Secretaries' sworn testimony, the decision memoranda stating that current country conditions are

28  irrelevant unless they are "'directly tied'" to the original basis for designation, and Plaintiffs' ample

1    other evidence that DHS did *not* consider current country conditions. Dkt. 89 at 8-10.

2                                    *        *        *

3           Because Defendants fail to establish the APA does not apply to their abrupt change in policy,

4    or to counter Plaintiffs' overwhelming evidence that such a change in fact took place, Plaintiffs are

5    likely to succeed on the merits of their APA claim.

6    **B.    Defendants' TPS Terminations And New Rule Were Motivated By Racial
             Animus Against Non-White, Non-European Immigrants.**
7

8           Plaintiffs are also likely to prevail on their Fifth Amendment claim. Defendants make no

9    attempt to apply *Arlington Heights*, including the five factors Plaintiffs discussed at some length, to

10   the disturbing facts of this case. Dkt. 89 at 25-28. *Village of Arlington Heights v. Metropolitan*

11   *Housing Development Corporation*, 429 U.S. 252 (1977). They advocate for the deferential standard

12   of review from *Trump*. But the Court already correctly rejected that argument. And Plaintiffs'

13   powerful evidence of racist motivation and pretext establishes a violation even under *Trump*.

14          Although the Court could grant the preliminary injunction based only on the APA or only

15   under *Arlington Heights*, given that the deadline for termination is weeks away for Sudan and only

16   slightly later for Nicaragua, Plaintiffs respectfully request that, even if the Court is inclined to rule in

17   Plaintiffs' favor on the APA, it still address the Fifth Amendment and make factual findings under

18   both *Arlington Heights* and *Trump*. This would provide appellate courts the benefit of this Court's

19   factual findings and legal reasoning on all possible alternative grounds.

20          **1.    Plaintiffs Are Likely To Prevail Under *Arlington Heights*.**

21          In response to Plaintiffs' overwhelming showing that the President and members of his

22   immigration policy team are motivated by racial animus against non-white, non-European

23   immigrants, Defendants contend that, in general, much of Plaintiffs' evidence is inadmissible. Dkt.

24   116 at 10 (citing Washington Post article). However, Plaintiffs alleged the statements were made in

25   their Complaint, and Defendants chose not to deny them in their Answer. They are therefore deemed

26

27

28

                                                     12

1  admitted. *See* Dkt. 89 at 15 & n.3 (citing Fed. R. Civ. P. 8(b)(6) and multiple authorities establishing

2  that failure to deny in the Answer constitutes an admission).[4]

3      For instance, the complaint alleges "President Trump referred to countries designated for

4  TPS as 'shithole' countries a mere seven days before Defendants terminated Haiti's TPS status."

5  Dkt. 1 ¶ 66. Defendants respond that "Defendants aver that any such statements speak for

6  themselves." Dkt. 76 ¶ 66. This statement is not a denial, and therefore constitutes an admission. 5

7  C. Wright et al., *Federal Practice and Procedure* §§ 1279, 1264 & n.4 (3d ed. 2018) (a "claim that

8  'the documents speak for themselves'" is insufficient to avoid an admission). The complaint further

9  alleges "President Donald J. Trump, along with other officials in his administration, have repeatedly

10  expressed racially-discriminatory and anti-immigrant sentiments. On the first day of his presidential

11  campaign, Mr. Trump categorically labeled Mexican immigrants as criminals and rapists." Dkt. 1

12  ¶ 67. Defendants' response—*i.e.*, "Defendants aver that any such expressions speak for themselves,"

13  and "Defendants aver that the article and quotation speak for themselves"—again fails to deny *any*

14  part of the allegations. Dkt. 76 ¶ 67. It is therefore irrelevant that the underlying sources are

15  newspaper articles. What is admitted is what is alleged, and the Complaint alleges President Trump

16  and others in the Administration made numerous statements expressing racial and anti-immigrant

17  animus, including those quoted above.[5]

18      Defendants say nothing else to address the evidence Plaintiffs submitted to support their

19  claim that Defendants acted to further the President's white supremacist agenda. They effectively

20  concede the first two *Arlington Heights* factors. Accordingly, this Court should find that the

21  terminations primarily target non-white non-European immigrants, and the President has repeatedly

---

22  [4] Furthermore, district courts may "consider hearsay in deciding whether to issue a preliminary
23  injunction." *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *Ticketmaster L.L.C. v.
   *RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1114 (C.D. Cal. 2007) (noting that "to the extent some of
24  the newspaper articles may be offered for a hearsay purpose, the Court has wide latitude to consider
   such evidence in the preliminary injunction context").

25  [5] The Court also should reject Defendants' evidentiary objection as deficient. There are well over
   one hundred exhibits to the motion. If Defendants dispute admissibility, they must specify which
26  ones and why. *See United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990) ("A party
   challenging the admission of evidence must timely object and state the specific grounds for his
27  objection. This rule serves to ensure that the nature of the error [is] called to the attention of the
   judge, so as to alert him to the proper course of action and enable opposing counsel to take
28  corrective measures.") (internal quotation marks omitted).

1   made statements manifesting his personal racial animus against TPS holders. Dkt. 89 at 25.

2   Defendants point to testimony stating the ultimate termination decisions were made by the

3   respective Secretaries, and argue that they "received the same input" as have past Secretaries. Dkt.

4   116 at 22. Plaintiffs have never disputed that the Secretaries literally made the decisions, but the

5   relevant question is whether they were motivated at least in part by the racial animus of the President

6   and those who sought to carry out his white supremacist agenda. Defendants do not dispute that

7   courts have repeatedly found equal protection violations where biased actors influence the individual

8   (or legislative entity) that makes the ultimate decision. Dkt. 89 at 27 (collecting cases). This Court

9   has also recognized the viability of such a cat's paw theory in this context. Dkt. 55 at 44.

10  Defendants' assertion that Secretaries under prior administrations received "the same input"

11  strains credulity. They say Secretary Duke "'active[ly] consume[d]'" information and "'struggle[d]

12  with'" the decision, Dkt. 116 at 22, but this is entirely consistent with the presence of political

13  pressure from the White House motivated by racism. While past Secretaries no doubt received

14  country conditions evidence from career officials and advice on tough decisions, the Trump era

15  Secretaries have received *other* input from the President himself and others committed to carrying

16  out the President's white supremacist agenda. There is of course no evidence that prior Presidents

17  pressured Secretaries to further racist agendas. *Arlington Heights* does not permit this Court to close

18  its eyes to the massive evidence of White House influence (at multiple decision-making levels) and

19  the equally strong evidence that White House policy on TPS has been motivated by racial animus.[6]

20  Moreover, the complete version of the exhibit on which Defendants most heavily rely to

21  establish the Secretaries' independence actually undermines their position. Dkt. 117-3 (Ex. 3) (relied

22  on at Dkt. 116 at 4, 16, 24); Ex. 135 (complete version of exhibit). Acting Secretary Duke's message

23  makes clear she had to alter her planned decision because there was a "W[hite] H[ouse] strategy"

24  relevant to TPS about which she had not been aware. Dkt. 117-3. Individuals copied on the prior

---

[6] This evidence, along with the evidence of procedural irregularities in the decision-making process, Dkt. 89 at 28, overcomes any presumption of regularity. *E.g.*, *Sanchez v. Lynch*, 614 F. App'x 866, 867 (9th Cir. 2015) (finding presumption of regularity overcome in immigration case where record contradicted BIA's statement that it provided notice of immigrant's briefing schedule); *Beck v. City of Upland*, 527 F.3d 853, 863-64 (9th Cir. 2008) (holding retaliatory motive on prosecuting official's part and a lack of probable cause overcame presumption of regularity).

1   message from Chief of Staff Kelly include Stephen Miller, Donald McGahn, Sarah Sanders, and

2   other White House personnel actively involved in assisting the President to vet or publicize White

3   House decisions on issues of central importance, such as immigration policy. Moreover, Kelly's

4   message shows not only that the White House (*i.e.*, Kelly and National Security Advisor Tom

5   Bossert) called Acting Secretary Duke to give her their own recommendation to *terminate TPS*, but

6   that they provided that recommendation because termination would help their strategy for promoting

7   the President's anti-immigration legislation in Congress. *Id.* (referencing role of a "permanent

8   solution with the hill"). Finally, the Kelly message shows the White House *asked* Acting Secretary

9   Duke to state publicly that she had not been pressured—in essence, to build a false record designed

10  to cover up the role that White House pressure played in influencing the Acting Secretary's decision.

11  She initially complied with this request as well, announcing in a statement that she had no plans to

12  resign. Ex. 136. But she did resign a few months later. Ex. 137. This evidence thus supports—

13  indeed, proves all by itself—Plaintiffs' claim that the White House pressured the Secretary on a TPS

14  decision, that it did so in order to further the President's immigration policy agenda, and that such

15  pressure was a substantial factor motivating Assistant Secretary Duke's decisions.

16         Defendants respond that it is normal for the White House to speak to Secretaries about

17  decisions like TPS terminations. Dkt. 116 at 23. Fair enough. But it is *not* normal for the White

18  House to make policy recommendations based on a white supremacist agenda. Where racial animus

19  drives White House policy and that policy influences TPS decision makers, the resulting decisions

20  are unconstitutional. Having conceded the White House influenced these TPS decisions, and having

21  admitted the President himself made numerous statements manifesting animus toward non-white,

22  non-European immigrants, it is immaterial whether the Secretaries *themselves* harbored such animus.

23  The evidence that the White House itself was motivated by racial bias, and that pressure from the

24  White House was a substantial motivating factor in the Secretaries' TPS decisions, is sufficient to

25  establish a Fifth Amendment violation. *Arlington Heights*, 429 U.S. at 266; Dkt. 89 at 27-28 (citing,

26  *e.g.*, *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016); *Poland*, 494 F.3d

27  at 1182-84; *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 277-279 (E.D.N.Y. 2018)).

28

1    Defendants also argue Plaintiffs have not shown the Secretaries "acted upon" racial animus.

2    Dkt. 116 at 23. But they do not dispute that courts have repeatedly found racist motivation on

3    comparable or less evidence than presented here. Dkt. 89 at 26-28. The evidence shows the

4    Secretaries actually *saying* they took the President's immigration policy agenda into account when

5    making TPS decisions. *Id*. Defendants attempt to provide alternative interpretations of the evidence,

6    Dkt. 116 at 23 n.17, 24 & n.18, but it plainly shows that when the Secretaries made various TPS

7    decisions, they took into account the Administration's "America First" policy, the "President's

8    position on immigration," and the Administration's views that "TPS must end for these countries

9    soon" and "TPS in general is coming to a close." Dkts. 96-29 and 96-30. That the Secretaries did not

10   immediately end TPS for all the countries and follow every White House recommendation could

11   prove, at most, only that racial animus was not the Secretaries' *sole* motivation; such evidence could

12   not overcome Plaintiffs' evidence that racial animus was a substantial factor in the unprecedented

13   series of decisions to terminate TPS that these Secretaries did make.

14   This evidence as well as the uncontested evidence cited in Plaintiffs' motion more than

15   suffices for this Court to find that the third and fourth *Arlington Heights* factors—the historical

16   background and events surrounding the adoption of the Administration's new interpretation of the

17   TPS statute and the resulting terminations for people from these countries—further support a finding

18   that the decisions were motivated by racial animus. The evidence shows the White House applied

19   pressure on the TPS decision-making process directly through the President and through high-level

20   White House officials, that lower-level Administration's surrogates applied further pressure from

21   within the decision-making process by displacing the practices of career officials in order to provide

22   recommendations to the Secretary that would further the President's racist agenda, and that the

23   Secretaries responded to that pressure by altering their decision-making. Courts have found Fifth and

24   Fourteenth Amendment violations based on far less. Dkt. 89 at 27-28.

25   Finally, Defendants do not contest most of Plaintiffs' evidence that the Trump

26   Administration TPS determinations for these four countries departed "from the normal procedural

27   sequence." *Arlington Heights*, 429 U.S. at 268. Dkt. 89 at 28. Indeed, the facts supporting Plaintiffs'

28   APA argument provide overwhelming support for this claim. *See supra* Section I.A.

1    Defendants do contest a few of the procedural irregularities, but even those arguments are not

2    persuasive. They assert that the Administration-initiated efforts to obtain information about the

3    criminal history of and the receipt of public benefits by TPS holders could have been relevant to

4    investigating whether extending TPS was in the "national interest." Dkt. 116 at 23 n.16. But the

5    question for equal protection purposes is not whether the search for this information was itself lawful

6    or could have been grounded in an unbiased evaluation of public policy; instead, the pertinent

7    constitutional question is whether this new initiative was a "departure[] from the normal procedural

8    sequence" that gives further weight, under *Arlington Heights*, to other evidence that racial bias

9    played a role in the decision to terminate TPS. 429 U.S. at 266-68.

10    Here, these particular information-gathering efforts clearly reinforce the conclusion that

11    racism underlies the Administration's new policy on TPS. The newly-sought information was

12    manifestly designed to track and support more general racist rhetoric about non-white, non-European

13    immigrants—that they are criminals and drains on the public fisc. Such characterizations are

14    factually false, as the record before this Court, including the record presented by the amici

15    supporting Plaintiffs, makes clear. Dkts. 89 at 32-33, 103-1 at 9-10, 106-1 at 6-7.

16    Defendants do not dispute that the pursuit of such counter-factual data was a change in

17    policy. Key decision makers had not previously considered information on criminal history or

18    receipt of public benefits to be relevant to a decision whether to extend TPS. This explains why the

19    career officials had not provided that information, and also why Ms. Kovarik offered to research it

20    personally. Nor do Defendants explain why the Trump surrogates in DHS who requested this

21    information later tried to hide the fact they had done so. Dkt. 89 at 8, 12-13 (citing Dkts. 96-60, 96-

22    74 *through* 96-80, 96-84). As the discovery of that attempted subterfuge makes clear, the "national

23    interest" consideration was a *post hoc* justification the Administration came up with after the

24    information-gathering was made publicly known. Ex. 129. This change thus reinforces the broader

25    showing under the other *Arlington Heights* factors that racism infected and was a substantial factor

26    in the decision to terminate TPS.[7]

27    ─────────────────
[7] Defendants note the Administration has not ended TPS for certain countries. Dkt. 116 at 24-25

28    n.19. Without discovery, Plaintiffs know little about those decisions, including whether the
Administration viewed them as precursors to termination like its second-to-last decisions on Haiti

17

For the reasons stated here and *supra* Section I.A.2.a., this Court can find Defendants departed from the normal procedural sequence for TPS determinations for these four decisions, and that their departures further support a finding that they acted out of racial animus.

### 2.     The Court Should Not Reverse Its Decision To Apply *Arlington Heights*.

In tacit recognition that they cannot prevail under *Arlington Heights*, Defendants contend the Court should reverse its prior ruling that *Arlington Heights* applies and instead apply the deferential standard from *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). That assertion is meritless.

First, this argument is procedurally improper. Defendants must file a motion for reconsideration, and meet the high threshold applicable to such a motion, before asking this Court to reconsider its prior ruling. N.D. Cal. Civ. L.R. 7-9 (party must seek leave to file, demonstrate a material change in fact or law or manifest failure by the court to consider material facts or dispositive legal arguments, and must not repeat arguments previously made). Defendants have not complied with this rule in either form or substance. *Compare* Dkt. 116 at 18-22 (arguing for reversal of prior decision in light of *Trump*'s reference to *Fiallo v. Bell*, 430 US 787 (1977); and *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008)), *with* Dkt. 55 at 49 (rejecting that same argument); *see also* Dkt. 40 at 2-3 (Plaintiffs' supplemental brief discussing the same cases)).

Defendants make only two arguably new points regarding the standard of review for Plaintiffs' equal protection claim. They cite *Ledezma Cosino v. Sessions*, 857 F.3d 1042 (9th Cir. 2017) (en banc). However, that case explicitly exempted claims of animus from its general statement about the propriety of rational basis review in the immigration context. "Where, as here, the Congress has neither invaded a substantive constitutional right or freedom, nor enacted legislation

---

and Honduras. In at least some of Defendants' examples, career professionals recommended more generous relief. *E.g.*, Ex. 138 (acknowledging State Department recommendation of redesignation for Syria, in addition to extension, which Administration did not do); Ex. 139 (recommending redesignation for South Sudan, in addition to extension, which Administration did not do). In any event, "a consistent pattern of official racial discrimination is [not] a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act . . . would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions." *Arlington Heights*, 429 U.S. at 266 n.14; *Batson v. Kentucky*, 476 U.S. 79, 95-96 (1986) ("For evidentiary requirements to dictate that several must suffer discrimination before one could object, would be inconsistent with the promise of equal protection to all.") (citation and internal quotations omitted).

that *purposefully operates to the detriment of a suspect class,* the only requirement of equal

protection is that congressional action be rationally related to a legitimate governmental interest."

*Ledezma*, 857 F.3d at 1048 (emphasis added).

Defendants also make an arguably-new assertion based on *Fiallo*, arguing the deferential

standard of review in *Trump v. Hawaii* applies broadly to all immigration cases, or at least those that

affect the "national interest," because *Trump* cited *Fiallo*. Dkt. 116 at 19-20 & n.14. However, as

Plaintiffs previously argued, *Fiallo* involved people seeking visas to gain admission, Dkt. 40 at 2,

and therefore cannot control a case involving the withdrawal of lawful status from individuals

"already in the United States." Dkt. 55 at 51.

Moreover, Defendants' theory cannot explain other controlling cases that have *not* applied

*Trump*'s deferential standard of review. For example, *Zadvydas v. Davis*, 533 U.S. 678 (2001), held

the plenary power over immigration "is subject to important constitutional limitations." *Id.* at 695. It

applied standard Fifth Amendment doctrine (from outside the immigration context) to analyze the

government's power to detain immigrants who had already entered the country. *Id*. at 690-92.

Although the Court ultimately resolved the case on statutory grounds, it rejected the government's

arguments that the Constitution permits the detention of these individuals because their criminal

histories rendered them dangers to society (i.e., contrary to "national interest"). *Id*. at 690-91. It also

rejected the claim that granting their release would interfere with ongoing negotiations with foreign

countries over the detainees' repatriation. *Id*. at 696. Defendants cannot explain why the Court did

not apply *Fiallo*'s review standard to the constitutional claim in *Zadvydas*. *See also Sessions v.*

*Morales-Santana*, 137 S. Ct. 1678, 1686 & n.1 (2017) (applying gender discrimination equal

protection law from outside the immigration context to derivative citizenship issue).

### 3.    Plaintiffs Would Prevail Even Under *Trump.*

Finally, the powerful evidence Plaintiffs have obtained in discovery would be enough to

prevail even under the deferential *Trump* standard. While Plaintiffs need not make that showing

given the Court's prior ruling, Plaintiffs respectfully request the Court make factual findings under

the *Trump* standard as well, in light of the possibility that Defendants will argue on appeal that they

should prevail under *Trump*'s more deferential standard. On the facts here, they cannot.

Where applicable, the *Trump* standard "considers whether the [] policy is plausibly related to the Government's stated objective." 138 S. Ct. at 2420; *see also id.* (asking whether policy "can reasonably be understood to result from a justification independent of unconstitutional grounds"). In making that assessment, the factfinder may consider "extrinsic evidence." *Id. Trump*'s overruling of *Korematsu v. United States*, 323 U.S. 214 (1944), also reaffirms that, even in *Trump*'s highly deferential context, the Constitution forbids policy motivated by "a bare congressional desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *Trump*, 138 S. Ct. 2423 (Kennedy, J., concurring) (citing *Romer v. Evans*, 517 U.S. 620 (1996)).

*Trump* held the Government satisfied this standard because it had conducted a worldwide multi-agency review that supported the policy at issue. *Id.* at 2408, 2421-23. But the plaintiffs (and the Court) knew little about that report other than its length. In particular, "predecisional materials underlying it" were not disclosed. *Id.* at 2421. Thus, the *Trump* plaintiffs had no basis for asserting that, for example, agency experts who drafted the worldwide review disagreed with the final draft's conclusions, or that their draft reviews were altered by politically-motivated individuals who sought to enact policy based on the President's animus.

In contrast, Plaintiffs here *have* reviewed predecisional materials. As explained in detail previously, the limited discovery to date has already shown the real reason for these TPS terminations was the Secretaries' desire to further the President's agenda, not an objective assessment of the relevant country conditions. Unlike in *Trump*, the record here contains predecisional, objective country conditions assessments that politically-motivated officials altered. The Sudan draft decision memo from August 17, 2017—prior to the political interference described in detail at Dkt. 96-13 and Dkt. 96-14—stated unambiguously that "the ongoing armed conflict and extraordinary and temporary conditions that supported Sudan's designation for TPS persist." Dkt. 96-40; *see also* Dkt. 96-6 (career expert explaining that "[t]he country conditions [in Sudan] are what they are" and proposing options for how to explain termination if DHS is "uncomfortable with the termination conclusion following from [the country conditions]"); Dkt. 96-5 (career expert objecting to edit by political appointee removing references to human rights abuses in Sudan because it could be "read as taking another step toward providing an incomplete and lopsided country

1  conditions presentation to support termination"). The career experts at RAIO made clear that Haiti

2  also warranted extension in November 2017, as their detailed description of the country's

3  widespread instability made clear. Dkt. 96-16. In keeping with that assessment, the diplomatic cable

4  from the State Department's U.S. Mission to Haiti recommended extension at that time. Dkt. 96-70.[8]

5  The Department of Defense also expressed concern about the "near and long term repercussions for

6  Haitian stability" of a TPS termination. Dkt. 96-116. With respect to El Salvador and Nicaragua, a

7  career expert stated that TPS extensions were warranted for both El Salvador and Nicaragua under

8  "all of the standard metrics." Dkt. 96-2. Ambassador Nealon went so far as to write a memo

9  declining to concur in the decisions to terminate TPS. Dkt. 96-113. Similarly, the diplomatic cable

10  from the U.S. Mission to El Salvador advocated extension, Dkt. 96-67, and the RAIO career experts

11  painted a dire picture, stating that "El Salvador's recovery to date has been slow and encumbered by

12  subsequent natural disasters and environmental concerns." Dkt. 115-1 at AR-EL_SALVADOR-

13  00000022. Career experts at the State Department similarly concluded that "the conditions under

14  which El Salvador was designated for Temporary Protected Status (TPS) continue to exist." Ex. 134.

15  The Nicaragua report also described country conditions in an objective way that would have

16  supported extension. Ex. 140. Thus, this Court can find, on this extraordinary record, that the

17  purported justifications for terminating TPS are not "bona fide," as the evidence shows they were a

18  sham.

19          In addition, a significant body of evidence shows the Administration pressured the agency to

20  end TPS *in general*, which further supports Plaintiffs' position that the stated reasons for each

21  particular decision was pretext. *See, e.g.*, Dkt. 96-29 (Acting Sec'y Duke explaining in a personal

22  memo: "The TPS program must end for these countries soon. . . . This conclusion is the result of an

23  America first view of the TPS decision.");[9] Dkt. 96-14 (National Security Council "discussion

24  paper" calling for TPS terminations of four countries, presented at a Cabinet-level meeting

25  _____

26  [8] Career officials had similarly recommended an 18-month extension for Haiti during the first TPS
    determination of this Administration—rather than the 6 month extension ultimately given in May
27  2017. Dkts. 96-47 *and* 96-123.

28  [9] Defendants have identified this document as a contemporaneous "internal memorandum" prepared
    by Acting Secretary Duke. *See* Dkt. 116 at 15.

immediately prior to determination deadlines); Ex. 141 (Acting Secretary Duke recorded, in contemporaneous notes prepared during the White House Principals Committee meeting, that Attorney General Jeff Sessions urged her to "just bite the bullet" and terminate TPS: "no one has [the] guts to pull the trigger.").[10] As described above, the record here shows that the Secretaries altered their TPS decisions in response to such pressure.

A recently-disclosed document captures what happened in stark terms: After career officials learned the Administration had decided to terminate TPS for Haitians, a senior individual in USCIS's RAIO research division, politically insulated and responsible for drafting country conditions reports, sent an email to a TPS subject matter expert who worked in OP&S and had knowledge of the Secretary's decision-making process. The RAIO unit had drafted the country conditions report for Haiti, and the senior RAIO employee was confused by the Department's TPS decision for Haiti, which at that time recommended termination. He wanted an explanation. The subject matter expert replied: "the short answer is that the decision was a political one by the [DHS] F[ront] O[ffice, which includes the Secretary] and [the Secretary]'s advisors." *See* Ex. 124.

Plaintiffs can prevail even under *Trump*, and the Court should so find.

## II.   TPS HOLDERS AND THEIR CHILDREN ARE SUFFERING PROFOUND AND IRREPARABLE HARM.

Plaintiffs seek a preliminary injunction to preserve the status quo pending final adjudication of their claims on the merits. Defendants do not dispute that Plaintiffs, their families, and their communities will suffer grievous, irreparable harm as each TPS termination goes into effect. *See* Dkt. 89 at 17-20 (discussing irreparable harms, which include, among other things, being sent to home countries where they feel or are unsafe, losing the ability to work in this country, losing homes, losing businesses, losing educational opportunities, facing the impossible choice of family separation, and experiencing severe emotional distress). Instead, Defendants incorrectly assert these harms cannot support a preliminary injunction because, Defendants claim, the harms stem from the

---

[10] Defendants have identified this document as including contemporaneous meeting notes prepared by Acting Secretary Duke during the November 3, 2017 White House Principals Committee meeting. *See* Dkt. 116 at 7 n.7.

1   temporary nature of TPS and "will not be remedied by the requested injunction." Dkt. 116 at 26. But

2   this is obviously wrong. An injunction to preserve the status quo will permit Plaintiffs and thousands

3   of other TPS holders and their families to live here together while this Court determines whether

4   Defendants in fact violated the APA and made TPS determinations that were infected by racial

5   animus. Defendants make other formalistic arguments to minimize the massive harm Plaintiffs face,

6   but their claims are meritless.

7         First, Defendants assert the constitutional and statutory violations at issue cannot "*per se*

8   constitute irreparable harm" unless Defendants in fact violated Plaintiffs' rights. Dkt. 116 at 25. As

9   explained above, Plaintiffs have established a likelihood of success on the merits using evidence

10   produced through discovery. At a minimum, Plaintiffs have shown "serious questions going to the

11   merits" of both their APA and equal protection claims. *See Alliance For The Wild Rockies v.*

12   *Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (noting "a preliminary injunction could issue where

13   the likelihood of success is such that 'serious questions going to the merits were raised and the

14   balance of hardships tips sharply in [plaintiff's] favor.'"). Plaintiffs have therefore established

15   irreparable harm on the basis of Defendants' constitutional and statutory violations. *See, e.g.,*

16   *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005); *California v. Health & Human*

17   *Servs.*, 281 F. Supp. 3d 806, 829-30 (N.D. Cal. 2017) (noting a procedural injury may "serve as a

18   basis for a finding of irreparable harm").

19         Second, Defendants assert that any harms Plaintiffs have or will suffer cannot support an

20   injunction because, Defendants claim, the harms stem from the inherent nature of the TPS statute.

21   Dkt. 116 at 25-26. This mischaracterizes the irreparable harm that Plaintiffs and their families now

22   face as well as the law. Plaintiffs are entitled to termination decisions that accord with the APA and

23   are free from racial animus. Plaintiffs would not be unlawfully forced to return to unsafe home

24   countries and suffer a host of other harms if Defendants had not violated the APA and made

25   termination decisions infected by racial animus. Moreover, TPS holders have relied on DHS's

26   longstanding practice of objectively considering all current country conditions, and have reasonably

27   come to believe that if conditions remain unstable then TPS will likely be extended. *See, e.g.*, Dkt.

28   91 ¶¶ 11, 13-15; Dkt. 92 ¶¶ 11, 19; Dkt. 95 ¶ 12. There is no legal bar to this Court suspending the

1   effects of an allegedly unlawful decision to preserve the status quo pending a ruling on the merits.[11]

2       Plaintiffs should not be forced to upend their lives and risk their security when this Court will

3   likely eventually conclude that Defendants' decisions forcing these untenable choices are unlawful.

4   **III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN
        FAVOR OF INJUNCTIVE RELIEF.**

5

6       Defendants' opposition similarly fails to offer any meaningful response to Plaintiffs'

7   showing that the equitable factors strongly favor preserving the status quo. Dkt. 89 at 31-33.

8       First, Defendants do not demonstrate any lack of diligence on the part of Plaintiffs to obtain

9   pro bono counsel, investigate their claims, discern the pattern of behavior among TPS terminations

10  that revealed Defendants' new rule, and file a lawsuit, let alone any delay that would overcome the

11  many factors that heavily favor a preliminary injunction. *Compare Benisek v. Lamone*, 138 S. Ct.

12  1942, 1944 (2018) (denying relief where plaintiffs "did not move for a preliminary injunction in the

13  District Court until *six years*, and three general elections, after the [challenged decision] was

14  adopted, and over *three years* after plaintiffs' first complaint was filed") (emphasis added), *with Arc*

15  *of Cal. v. Douglas,* 757 F.3d at 975, 990-91 (9th Cir. 2014) (delay of "only months" did not weigh

16  against finding of irreparable harm because delay was "prudent rather than dilatory"). The period of

17  time at issue is particularly irrelevant here because even if Plaintiffs had filed suit two or three

18  months earlier, that would not have provided enough additional time to conclude this litigation

19  before the first termination dates. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("But

20  the government identifies no prejudice that it has suffered as a result of this delay, and in any event

21  the district court did not abuse its discretion by declining to withhold preliminary relief from a

22

23  _____

24  [11] Defendants' cases confirm a preliminary injunction is appropriate to preserve the status quo, and, unlike in those cases, Plaintiffs seek nothing more than to restrain the challenged decisions.  *See and compare Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th

25  Cir. 1985) (denying injunction because plaintiffs' claim of injury due to inability to obtain insurance was belied by fact insurers had offered to insure); *S. Yuba River Citizens League v. Nat'l Marine*

26  *Fisheries Serv.*, 804 F. Supp. 2d 1045, 1064-65 (E.D. Cal. 2011) (granting injunctive relief so species could spawn without cross-breeding); *Taiebat v. Scialabba*, No. 17-cv-0805-PJH, 2017 WL

27  747460, at *2-3 (N.D. Cal. Feb. 27, 2017) (denying injunction where nationwide TRO already protected plaintiff from injury); *Schrill v. Plunkett*, 760 F. Supp. 1378, 1384 (D. Or. 1990) (holding

28  purely economic loss not ordinarily sufficient to support injunctive relief).

1   constitutionally suspect government practice on the basis that an injunction should have been

2   requested sooner.").

3         Second, Defendants fail to identify any hardships that tip the balance in their favor or contest

4   Plaintiffs' showing of the numerous, significant types of harm they will suffer. *See* Dkt. 89 at 17-20.

5   *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Defendants identify a single

6   alleged harm to the government: that "the injunctive relief sought by Plaintiffs would frustrate and

7   displace the DHS Secretary's substantive judgment as to how to implement the TPS statute." Dkt.

8   116 at 27. But this assumes they win on the merits. The Secretary has no authority to implement the

9   TPS statute in a way that violates the APA or Constitution. *Rodriguez*, 715 F.3d at 1145 ("[The

10  government] cannot suffer harm from an injunction that merely ends an unlawful practice.").

11        Most importantly, Defendants offer no explanation for why a delay of the TPS terminations

12  pending final resolution of this case on the merits tips the balance of equities in their favor, let alone

13  constitutes a sufficiently weighty consideration to render the factor "at most a net neutral." Dkt. 116

14  at 27. If the Court permits Defendants to unlawfully terminate TPS, several hundred thousand people

15  will unfairly lose their jobs and legal status, and face separation from their loved ones and the risk of

16  deportation, creating trauma that will ripple throughout communities all across the country, as Amici

17  Cities and Counties aptly demonstrate. Dkt. 103-1 and 106-1. On the other hand, the TPS

18  designations of Sudan, Nicaragua, El Salvador, and Haiti have been in place without interruption for

19  between eight and twenty-one years, and Defendants will suffer little if any harm from temporarily

20  enjoining the terminations pending final resolution of this case on the merits.

21                                                   **CONCLUSION**

22        For these reasons, the Court should grant Plaintiffs' motion for preliminary injunction.

23

24  Date:  September 11, 2018

25                                              By:  */s/ Alycia A. Degen*

26                                                Alycia A. Degen

                                              Sean A. Commons

27                                                Nicole M. Ryan

                                              Ryan M. Sandrock

                                              Amanda R. Farfel

                                              Andrew B. Talai

28                                                Marisol Ramirez

1   |   Mohindra Rupram
    |   Katelyn N. Rowe
2   |   Jessica Fishfeld
    |   Matthew J. Letten
3   |   Jillian R. Dent
    |   SIDLEY AUSTIN LLP
4   |
    |   Ahilan T. Arulanantham
5   |   ACLU FOUNDATION OF SOUTHERN
    |   CALIFORNIA
6   |
    |   William S. Freeman
7   |   ACLU FOUNDATION OF NORTHERN
    |   CALIFORNIA
8   |
    |   Jessica Karp Bansal
9   |   Emilou MacLean
    |   NATIONAL DAY LABORER
10  |   ORGANIZING NETWORK
11  |   MARK E. HADDAD, ESQ.
12  |   *Attorneys for Plaintiffs*

PLAINTIFFS' REPLY IN SUPPORT OF MOT. FOR PRELIM. INJ. – CASE NO. 3:18-cv-1554-EMC