Alycia A. Degen (SBN 211350)
adegen@sidley.com
Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896 6010
Facsimile: +1 213 896 6600

Ahilan T. Arulanantham (SBN 237841)
aarulanantham@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: +1 213 977 5211
Fax: +1 213 977 5297

Jessica Karp Bansal (SBN 277347)
jbansal@ndlon.org
Emilou MacLean (SBN 319071)
emi@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
674 S. La Fayette Park Place
Los Angeles, CA  90057
Telephone: +1 213 380 2214
Fax: +1 213 380 2787

Attorneys for Plaintiffs
[*Additional Counsel Listed on Next Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| CRISTA RAMOS, *et al.*,<br><br>      Plaintiffs,<br><br>   v.<br><br>KIRSTJEN NIELSEN, *et al.*,<br><br>      Defendants. | Case No.  3:18-cv-1554-EMC<br><br>**CORRECTED PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        September 25, 2018<br>Time:       10:30 a.m.<br>Place:       Courtroom 5, 17th Floor<br><br>[Filed concurrently with Supporting Declarations of Alycia A. Degen, Leon Rodriguez, Elsy Yolanda Flores de Ayala, Wilna Destin, Imara Ampie, Hiwaida Elarabi, and Ebtihal Abdalla] |

*Additional Counsel for Plaintiffs*

William S. Freeman (SBN 82002)
wfreeman@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone: +1 415 621 2493
Fax: +1 415 863 7832

Nicole M. Ryan (SBN 175980)
nicole.ryan@sidley.com
Ryan M. Sandrock (SBN 251781)
rsandrock@sidley.com
SIDLEY AUSTIN LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1219
Facsimile: +1 415 772 7400

Katelyn N. Rowe (SBN 318386)
krowe@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA  90067
Telephone: +1 310 595 9598
Facsimile: +1 310 595 9501

Matthew J. Letten (*Pro Hac Vice pending*)
mletten@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8565
Facsimile: +1 736 8711

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
Part-time Lecturer in Law
USC Gould School of Law*
University of Southern California
699 Exposition Boulevard
Los Angeles, CA 90089-0071
Telephone: +1 213 675 5957

Amanda Farfel (SBN 288126)
afarfel@sidley.com
Andrew B. Talai (SBN 300053)
atalai@sidley.com
Marisol Ramirez (SBN 307069)
marisol.ramirez@sidley.com
Mohindra Rupram (SBN 319478)
mrupram@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Jessica Fishfeld (*Pro Hac Vice*)
jfishfeld@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Telephone: +1 312 853 2031
Facsimile: +1 312 853 7036

Jillian R. Dent (*Pro Hac Vice pending*)
jdent@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Telephone: +1 312 853 7022
Facsimile: +1 312 853 7036

* *Institution listed for identification purposes only*

1

**TABLE OF CONTENTS**

2

Page

3

NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION ...........................1

4

MEMORANDUM OF POINTS AND AUTHORITIES .....................................................................1

5

INTRODUCTION .................................................................................................................................1

6

STATEMENT OF ISSUES TO BE DECIDED ...................................................................................4

7

FACTUAL BACKGROUND ...............................................................................................................5

8

     A.    Prior Administrations Routinely Considered All Conditions to Extend TPS...............5

9

     B.    Trump Administration Political Surrogates Took A "Fresh" Approach To TPS

10

          Extensions. ......................................................................................................................6

11

     C.    DHS Adopted a New Rule That Focused on the Initial Reason for Designation. .........8

12

     D.    Defendants Jettisoned Prior Processes, Practices, and Norms...................................10

13

     E.    Defendants' New Interpretation Advances The Trump Administration's Racist Anti-

14

          Immigrant Agenda. ......................................................................................................14

15

     F.    The White House Applied Pressure To Terminate TPS. ..............................................15

16

     G.    TPS Holders And Their Families Face Imminent, Grievous, And Irreparable Harm. 17

17

LEGAL STANDARD..........................................................................................................................20

18

ARGUMENT .......................................................................................................................................21

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR STATUTORY

19

      AND CONSTITUTIONAL CLAIMS. ....................................................................................21

20

     A.    Defendants Violated The APA By Departing From Past Practices Without

21

          Acknowledging Or Justifying The Change...................................................................21

     B.    Defendants' TPS Terminations And New Rule Were Motivated By Racial Animus

22

          Against Non-White, Non-European Immigrants. ........................................................25

23

II.    TPS HOLDERS AND THEIR CHILDREN ARE SUFFERING PROFOUND AND

      IRREPARABLE HARM AND WILL SUFFER FURTHER IRREPARABLE HARM

24

      ABSENT RELIEF. ..................................................................................................................28

25

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN

      FAVOR OF INJUNCTIVE RELIEF. .....................................................................................31

26

CONCLUSION....................................................................................................................................34

27

28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Trucking Ass'ns v. City of L.A.*,
  559 F.3d 1046 (9th Cir. 2009) ...................................................................................20

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017).................................................................................24

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ...................................................................................25

*Ariz. Dream Act Coa. v. Brewer*,
  855 F.3d 957 (9th Cir. 2017) ...................................................................................30

*Arizona Dream Act Coalition v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) .................................................................................32

*Ave. 6E Invs., LLC v. City of Yuma*,
  818 F.3d 493 (9th Cir. 2016) .......................................................................25, 26, 27

*Batalla Vidal v. Nielson*,
  291 F. Supp. 3d 260 (E.D.N.Y. 2018) ....................................................................27

*California v. Health & Human Servs.*,
  281 F. Supp. 3d 806 (N.D. Cal. 2017) ....................................................................29

*Chalk v. U.S. Dist. Court*,
  840 F.2d 701 (9th Cir. 1988) ...................................................................................29

*Doe v. Vill. of Mamaroneck*,
  462 F. Supp. 2d 520 (S.D.N.Y. 2006)......................................................................28

*Earth Island Inst. v. Ruthenbeck*,
  490 F.3d 687 (9th Cir. 2007), *rev'd in part on other grounds*, 555 U.S. 488 (2009)...................21

*Encino Motorcars LLC v. Navarro*,
  136 S. Ct. 2117 (2016)..............................................................................................24

*Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*,
  630 F.3d 1153 (9th Cir. 2011) .................................................................................30

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..................................................................................................24

*Fontes v. Porter*,
  156 F.2d 956 (9th Cir. 1946) ...................................................................................15

*Health & Human Servs.*,
   281 F. Supp. 3d at 831–32 ........................................................................................32

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ....................................................................20, 29, 32

*Inland Empire Immigrant Youth Collective v. Duke*,
   No. 17-2048, 2017 WL 5900061 (C.D. Cal. Nov. 20, 2017) .......................................30

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014) ....................................................................................31

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) ....................................................................................31

*McGinest v. GTE Serv. Corp.*,
   360 F.3d 1103 (9th Cir. 2004) ..................................................................................26

*Ms. L v. U.S. Immigration & Customs Enforcement*,
   No. 3:18-cv-00428, Dkt. 83 (S.D. Cal. June 26, 2018) ..............................................31

*N. Mariana Islands v. United States*,
   686 F.Supp.2d 7 (D.D.C. 2009)................................................................................29

*N.C. State Conference of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1399 (2017)......................27, 28

*Norsworthy v. Beard*,
   87 F. Supp. 3d 1164 (N.D. Cal. 2015) ......................................................................29

*Padilla v. Kentucky*,
   559 U.S. 356 (2010) .................................................................................................31

*Petties v. Dist. of Columbia*,
   881 F. Supp. 63 (D.D.C. 1995).................................................................................29

*Resident Advisory Bd. v. Rizzo*,
   564 F.2d 126 (3d Cir. 1977).....................................................................................27

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ..................................................................................33

*Stanley v. Illinois*,
   405 U.S. 645 (1972).................................................................................................31

*Stout by Stout v. Jefferson Cty. Bd. of Educ.*,
   882 F.3d 988 (11th Cir. 2018) ..................................................................................26

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981).................................................................................................20

*Vargas v. Meese*,
    682 F. Supp. 591 (D.D.C. 1987) ...................................................................................30

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
    429 U.S. 252 (1977). Dkt 55 ................................................................4, 25, 27, 28

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ...............................................................................29

*Wash. v. Seattle Sch. Dist. No. 1*,
    458 U.S. 457 (1982)........................................................................................26, 28

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .............................................................................31

*Winter v. Natural Res. Def. Council Inc.*
    555 U.S. 7 (2008)..................................................................................................28

**Statutes and Regulations**

5 U.S.C. 706(2)(A)....................................................................................................21

8 U.S.C. 1254a(b)(1)(A)-(C) ......................................................................................5

8 U.S.C. 1254a(b)(3)(A) .............................................................................................6

62 Fed. Reg. 16,608, 16,009 (Apr. 7, 1997) ............................................................22

76 Fed. Reg. 63,635 (Oct. 13, 2011)........................................................................22

78 Fed. Reg. 1,872 (Jan. 9, 2013) ............................................................................22

79 Fed. Reg. 52,027 (Sept. 2, 2014) .........................................................................22

81 Fed. Reg. 4,045 (Jan. 25, 2016) ..........................................................................22

**Other Authorities**

5 C. Wright et al., *Federal Practice and Procedure* §§ 1279, 1264 & n.4 (3d ed.
    2018) .....................................................................................................................15

Fed. R. Civ. P. 8(b)(6)...............................................................................................15

## NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE THAT, on September 25, 2018 at 10:30 a.m., or as soon thereafter as this matter may be heard, before the Honorable Edward M. Chen, in Courtroom 5, 17th Floor, of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Cristina Morales, Orlando Zepeda, Maria Jose Ayala Flores, Elsy Yolanda Flores de Ayala, Wilna Destin, Sherika Blanc, Imara Ampie, Mazin Ahmed, Hiwaida Elarabi ("Plaintiffs") move under Federal Rule of Civil Procedure 65 and Civil Local Rule 65-2 for a preliminary injunction. This Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting Declarations of Alycia A. Degen, Leon Rodriguez, Elsy Yolanda Flores de Ayala, Wilna Destin, Imara Ampie, Hiwaida Elarabi, Ebtihal Abdalla; the pleadings and filings in this case; the limited document and deposition discovery to date, which remains ongoing; any additional matter of which the Court may take judicial notice; and such further evidence or argument as may be presented before or at the hearing.

Plaintiffs seek an order enjoining Defendants from engaging in, committing, or performing implementation and/or enforcement of the decisions to terminate Temporary Protected Status ("TPS")[1] for Sudan, Nicaragua, Haiti, and El Salvador TPS for Sudan, Haiti, El Salvador, and Nicaragua pending resolution of this case on the merits.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The election of a new President cannot change the protections guaranteed by the Constitution and laws of the United States. But they have changed for TPS holders and their families. They hold lawful status under a humanitarian program that authorizes residence and employment for people from countries stricken by war, natural disaster, or other extraordinary circumstances. When the

---

[1] Unless noted, all citations to Exhibits (generally as "Ex." or "Exs.") refer to exhibits to the Declaration of Alycia A. Degen. Plaintiffs also use the following abbreviations or quote materials containing the following abbreviations: Department of Homeland Security ("DHS"); Department of State ("DOS" or "State Department"); Executive Office of the President ("EOP"); Federal Register Notice ("FRN"); Office of Management and Budget ("OMB"); U.S. Citizenship and Immigration Services ("USCIS"); USICS Office of Policy and Strategy ("OP&S"); USCIS Refugee, Asylum, and International Operations ("RAIO"); USCIS Service Center Operations ("SCOPS"); White House Domestic Policy Council ("DPC"); and White House National Security Council ("NSC").

1  Administration changed, Plaintiffs and their families lost that protection, as did hundreds of

2  thousands of TPS holders from Sudan, El Salvador, Haiti, and Nicaragua.

3       Even with limited discovery, Plaintiffs have learned that the decisions to terminate TPS were

4  not the product of a legitimate process: DHS terminated the TPS designations for these countries not

5  because circumstances materially changed on the ground, but because a racist, anti-immigrant

6  Administration pursued a pre-determined agenda to remove non-white, non-European families from

7  this country. Terminating TPS designations fit perfectly with that agenda.

8       To realize an "America First" immigration policy, political surrogates sidelined career

9  personnel, crippled critical interagency review processes, and discarded pre-existing agency

10  decisionmaking procedures. They then justified terminating TPS status for hundreds of thousands of

11  people based on a new, restrictive interpretation of the statute that they adopted without explanation.

12  One of the surrogates for the new regime, the current USCIS Director, put it best when describing a

13  decisionmaking memorandum that flipped from acknowledging an extension of TPS for Sudan was

14  warranted to recommending termination:

15
16         The memo reads like one person who strongly supports extending TPS for Sudan
       wrote everything up to the recommendation section, and then someone who
       opposes extension snuck up behind the first guy, clubbed him over the head, pushed
17         his senseless body out of the way, and finished the memo. Am I missing something?

18       The law does not tolerate such arbitrary and invidious action. Plaintiffs therefore seek a

19  preliminary injunction to halt enforcement of the TPS terminations for Sudan, Nicaragua, Haiti, and

20  El Salvador pending final resolution on the merits for two principal reasons.

21       *First*, the decisions rest on an unexplained departure from agency practice in violation of the

22  Administrative Procedure Act ("APA"). The Trump Administration changed the longstanding

23  interpretation of the TPS statute and bypassed established agency consultative processes. Rather than

24  consider current country conditions, Defendants' new interpretation allows them to disregard

25  anything "bad" unless it can be "clearly linked to the initial disasters prompting the [initial]

26  designations." Real-world conditions that prevent countries from safely accepting the return of TPS

27  holders have become irrelevant, leaving TPS holders vulnerable to the perils of forced repatriation

28

despite living and working in the United States, often for decades. This unexplained, material change to a statute on which several hundred thousand people rely violates the APA.

*Second*, racial animus against non-white, non-European immigrants motivated the Administration's unexplained change to its interpretation of the TPS statute, the TPS decisionmaking process, and the resulting terminations. This Court has already recounted the President's many bigoted statements, including some specifically directed at TPS holders. These include the now-infamous conversation about immigration status for TPS holders in which the President called them "people from shithole countries," rejected a proposal to permit them to live here, and asked for a proposal to encourage more immigration from countries like Norway. Since then, the President has called undocumented immigrants "animals," spoken of how immigration threatens European culture, and made other blatantly racist statements. Defendants have candidly declined to contest that these statements manifest racial animus.

The President's statements were not stray remarks, but a call to action that profoundly changed the TPS decisionmaking process. The President exerted tremendous pressure on the officials charged with making TPS decisions, both personally and through high-level White House officials. The White House even called a Cabinet-level meeting as TPS deadlines approached to urge that TPS be terminated for several hundred thousand people. The directive was to unite behind "immigration reform to include a merit based entry system." In addition, President Trump's surrogates—many of whom came from Candidate Trump's immigration policy transition team— took control within DHS. They disregarded "all of the standard metrics" that traditionally guide TPS decisions and ignored horrific country conditions because they did not lead to "the conclusion [they] [we]re looking for." Natural "disasters" became "challenges." "[E]xamples of human rights violations" vanished, leaving assessments "incomplete," "lopsided," and "sanitized."

Remarkably, internal documents show the Administration's racist agenda directly impacted TPS decisionmaking. Key decisionmakers actually stated they altered TPS decisions *because* they wanted to advance the Administration's "America First" approach to immigration policy to be consistent with the President's position on immigration—*i.e.*, to remove and exclude as many non-white, non-European immigrants as possible. The indisputable public record of racial animus, the

historical background and sequence of events leading to the terminations, and the radical departures from past practice confirm Defendants violated the Fifth Amendment under *Arlington Heights*.

The equitable factors also strongly support granting the injunction. The imminent loss of legal status already has inflicted irreparable harm on TPS holders and their families. Depression, fear, anxiety, and other harms compound with every passing day as parents and children come closer to losing legal status, employment authorization, and associated family support structures. Many of the affected TPS holders have had lawful status for nearly twenty years, yet face imminent separation from loved ones and exile to unstable countries they scarcely know. Plaintiffs' declarations offer a small window into the psychological and economic devastation to individuals, families, and communities caused by the Administration's actions. They will lose their jobs, homes, medical care, access to education, and a host of other irreplaceable opportunities they have earned through lifetimes of hard work and study. The balance of hardships and public interest thus tip sharply toward preserving the status quo pending final resolution of the merits.

## STATEMENT OF ISSUES TO BE DECIDED[2]

1.  Whether Plaintiffs are likely to succeed on their APA claims that Defendants departed from longstanding policy and practice without providing any reasoned explanation for the change.

2.  Whether Plaintiffs are likely to succeed on their Fifth Amendment claims that the TPS termination decisions and departure from longstanding agency policy and practice were motivated in substantial part by racial animus.

3.  Whether Plaintiffs will suffer irreparable harm, the balance of equities tips in their favor, and an injunction serves the public interest.

---

[2] Plaintiffs also assert limited due process claims—of both the school-age U.S. citizen children of TPS holders and the TPS holders themselves—that this Court has already recognized. Dkt. 55 at 39, 41-42. The Fifth Amendment entitles them to a decision free of racial animus, consistent with the statutorily-mandated review process, and neither arbitrary nor capricious (e.g., because it lacks a reasoned explanation or is supported by no evidence). Plaintiffs will seek relief on the broader due process theories on which this Court reserved judgment if needed to obtain the relief they seek.

4

Corrected Plaintiffs' Notice of Mot. & Mot. for Prelim. Inj. – Case No. 3:18-cv-1554-EMC

1

## FACTUAL BACKGROUND

2

**A.      Prior Administrations Routinely Considered All Conditions to Extend TPS.**

3        For over 25 years, the TPS statute has provided humanitarian relief based on current

4   conditions in the designated country. 8 U.S.C. 1254a(b)(1)(A)-(C). As this Court has already

5   recognized, administrations from both major political parties routinely extended TPS for the four

6   countries at issue after evaluating all current conditions in each country, even if those conditions

7   stemmed from events that occurred after an initial designation. Dkt. 55 at 26-34.

8        Prior to this Administration, officials involved in TPS decisions did not believe they were

9   limited to considering current country conditions traceable to events that triggered an original TPS

10  designation. The declaration of the previous Director of USCIS, Leon Rodriguez, explains that the

11  formal recommendations regularly prepared for the DHS Secretary and endorsed by the USCIS

12  Director—known as Country Conditions Memos and Decision Memos—"consistently included a

13  wide range of country conditions information. Neither was limited to conditions related to the

14  original reason for a country's TPS designation." Rodriguez Decl. ¶¶ 9, 12, 16. These documents

15  served as the basis for the Secretaries' ultimate decisions. During Rodriguez's tenure at USCIS,

16  "DHS conducted over a dozen periodic reviews" of TPS designations, and "agency policy did not

17  preclude USCIS's consideration of the full range of current country conditions." *Id.* ¶¶ 1, 5, 14, 17.

18  DHS Secretaries relied upon wide-ranging, in-depth, fact-specific research by career professionals at

19  USCIS and the DOS to evaluate all current conditions. *See id.* ¶¶ 6, 8-10, 12-14, 17-18. "Intervening

20  factors arising after a country's original TPS designation, such as subsequent natural disasters, issues

21  of governance, housing, health care, poverty, crime, general security, and other humanitarian

22  considerations were considered relevant." *Id.* ¶ 17.

23       James Nealon, a former Ambassador who served in multiple administrations, testified that

24  "successive administrations had renewed TPS for Honduras long after the conditions that resulted

25  from" the hurricane that triggered the initial TPS designation "had dissipated." Ex. 12 at 218:9-12.

26  Ambassador Nealon had served in multiple administrations, but resigned from his post as Under

27  Secretary for the DHS OP&S, following a publicized battle over the Trump Administration's TPS

28

1    decisions. He resigned out of obligation because he could no longer "represent the administration."

2    *Id.* at 212:9-12.

3         The testimony of former officials Rodriguez and Nealon is consistent with statements from

4    USCIS's TPS "subject matter experts," who stated in internal memoranda that numerous prior TPS

5    extensions rested on "subsequent" events. Ex. 13. The settled practice—until recently—was to

6    assess all of the facts, including about current conditions. Prior administration officials clearly

7    understood that all current country conditions should be considered when determining whether

8    circumstances justifying a TPS designation "continue to be met," 8 U.S.C. 1254a(b)(3)(A), even if

9    not directly tied to the initial conditions that warranted TPS protection.

10        **B.    Trump Administration Political Surrogates Took A "Fresh" Approach To TPS
             Extensions.**

11

12        Under the Trump administration, a group of new appointees in DHS and USCIS brought a

13   "fresh set of eyes" to TPS decisionmaking. Ex. 17. The Administration set out to approach TPS

14   "decisions holistically as opposed to doing them in isolation," as part of a mission to make TPS

15   decisions consistent with the President's position on immigration. Exs. 13, 28 (describing TPS as

16   part of the Administration's "wider strategic goal"). The direction from the White House was clear:

17   "[t]he TPS program must end for these countries soon" as a "the result of an America first view of

18   the TPS decision." Ex. 29. "[C]onsistent with the President's position on immigration," the plan was

19   to "send a clear signal that TPS in general is coming to a close." Ex. 30.

20        The individuals charged with implementing that vision served as the Administration's

21   surrogates in DHS and USCIS, most of whom hailed from the President's immigration policy

22   transition team (or, in some cases, hate groups that espouse anti-immigrant views). For example,

23   Kathy Nuebel Kovarik, the Chief of OP&S, served on President Trump's transition team on

24   immigration policy before joining DHS as a special advisor to former DHS Secretary Kelly. Ex. 18

25   at 39:7-20, 45:13-25. As the Chief of OP&S, Kovarik assumed responsibility for overseeing TPS

26   periodic reviews. *Id.* at 57:12-21, 58:1-18, 77:13-25, 78:1-13. She reassigned responsibility for

27   drafting TPS Federal Register Notices from career staff to political appointees (*id.* at 38:16-39:20,

28   108:16-22; Ex. 19 at 104:1-105:23), and personally sought to obtain data on the criminal histories of

1   TPS holders, their use of public benefits, and whether they had immigration status prior to TPS,

2   none of which had been sought by prior agency officials, and none of which is a factor under the

3   TPS statute. Exs. 43, 75.

4        Kovarik hired as her senior advisor Robert Law. Ex. 18 at 137:5-16. Before joining USCIS,

5   Law served as a director at the Federation for American Immigration Reform ("FAIR") (Ex. 21), a

6   group classified by the Southern Poverty Law Center as an "anti-immigrant hate group" (Ex. 22).

7   FAIR's leadership contend immigration must be halted for "European-American society and culture

8   to persist" because, without a clear "European-American majority," "everything about what it means

9   to be an American" will be lost. *Id.* While working at FAIR, Law co-authored a report for the 2017

10  Presidential Transition in which he called upon DHS to "revoke TPS for any country that has

11  received more than two renewals." Ex. 23. at 15-16. At USCIS, Kovarik tasked Law with editing

12  Decision Memos prepared by career professionals. Exs. 3 (Law rewrites Haiti Decision Memo after

13  asserting, "The draft is overwhelming *[sic]* weighted for extension which I do not think is the

14  conclusion we are looking for."), 18 at 108:16-22, 111:11-24 ("most of the time I defer to his edits").

15       Another important figure in the TPS termination decisions was Gene Hamilton. He was also

16  part of the Trump transition team on immigration. He has since held important positions within the

17  Trump Administration: as senior counsellor to the Secretary of DHS, and now as an aide to the

18  Attorney General. Ex. 24. A lawyer by training, Hamilton has "spent the past year attempting to

19  realize President Trump's vision of an America that is less welcoming of foreigners" by "shap[ing]

20  Trump's various travel bans, changes to refugee policies, and the implementation of an aggressive

21  new approach to immigration enforcement." *Id.* Hamilton authored the memorandum that "formally

22  terminated DACA." *Id.*

23       Hamilton repeatedly sought to alter the TPS decisionmaking process to restrict the scope of

24  relief available. He recommended "repackag[ing]" the Sudan Decision Memo because the objective

25  country conditions information did not support the termination decision the Administration wanted.

26  Ex. 48. He also requested revisions to a Haiti Decision Memo that had recommended an eighteen-

27  month TPS extension to one presenting "options" and sought an "updated recommendation" on Haiti

28  from the Secretary of State under the new Administration. Ex. 123. And he asked for the collection

1  of data regarding crimes committed by Haitian TPS holders. The agency had not previously sought

2  crime-related information when making TPS decisions, and Hamilton did not want the practice

3  publicized. Exs. 60, 84 ("If you need a specific data set and need to ask someone to pull it, please do

4  not indicate what it is for. I don't want this to turn into a big thing where people start prodding and

5  things start leaking out.")

6  Hamilton works closely with Stephen Miller, President Trump's senior adviser for domestic

7  policy. Ex. 25. Hamilton communicated with Miller regarding TPS and relayed Miller's views

8  favoring termination of TPS to decisionmakers within the agency. Exs. 24, 85 at 291:16-25, 292:1-

9  24 (recalling "Mr. Hamilton, on a couple of occasions, saying that Mr. Miller favored the

10  termination of TPS").

11  The current USCIS Director, Lee Francis Cissna, also served on the President's transition

12  team on immigration. Ex. 18 at 40:13-16. As USCIS director, Cissna is responsible for reviewing

13  and approving all USCIS Decision Memoranda for the DHS Secretary. He made the final USCIS

14  agency recommendation to terminate TPS for El Salvador, Haiti, and Nicaragua. Exs. 120-122.

15  Cissna recently removed the traditional phrase "nation of immigrants" from USCIS's mission

16  statement in favor of the "American people." Ex. 26.

17  All of these individuals worked to implement the President's agenda against non-white, non-

18  European immigrants in close coordination with the White House. In addition to Hamilton's direct

19  communication with Miller, Kovarik, Law, and other surrogates within USCIS and DHS attend a

20  weekly "immigration meeting at the Executive Office Building or the White House"— which Miller

21  attends "pretty regularly." Ex. 18 at 68:22-70:5, 243:5-14.

22  **C.    DHS Adopted a New Rule That Focused on the Initial Reason for Designation.**

23  By spring 2017, the new administration developed an approach to TPS that all but guaranteed

24  longstanding TPS designations would end. DHS's public statements made clear that the new

25  Secretary would consider only "whether the conditions that led to [a country's] *initial* designation ...

26  remain." Ex. 17 (emphasis added). A few weeks later in testimony to Congress, then-Secretary Kelly

27  distanced himself from the approach to TPS taken by "those that have been in [the DHS Secretary]

28  position over the years." Ex. 35 (statement of Secretary John F. Kelly). The test became whether

8

Corrected Plaintiffs' Notice of Mot. & Mot. for Prelim. Inj. – Case No. 3:18-cv-1554-EMC

anything "bad" about current country conditions was "clearly linked to the initial disasters prompting the [initial] designations." Ex. 2; *see also, e.g.*, Ex. 31 ("the INA restricts considerations for continuing designation of TPS to the conditions on the ground as impacted by the initial event").

The Administration's surrogates within DHS and USCIS adopted this new interpretation of the TPS statute precisely because—as career staff made clear—current conditions in many countries supported TPS extensions under "all of the standard metrics." Ex. 2. The Administration's new interpretation became the "strongest argument for termination" of TPS designations. *Id.* It allowed the surrogates to rewrite memoranda that favored extensions, which was not "the conclusion [they] [we]re looking for." Exs. 3, 32 (requesting all prior denials in past ten years to draw analogies), 33 (pressuring Haitians to prepare for repatriation of TPS holders before initiation of periodic review).

The longstanding practice of considering all current conditions—including intervening disasters—for TPS decisions was jettisoned as "gutless fed[eral] bureaucratic[]" shirking of responsibility. Ex. 11. DHS no longer "look[s] at the country conditions of a country writ large." Dkt. 55 at 26. Under the guise of imposing discipline, DHS disavowed the practice of "broad discretion to consider current conditions in the subject country" (Rodriguez Decl. ¶ 17), in favor of an interpretation of the TPS statute that "really restricts [the Secretary's] ability to extend TPS." Ex. 34 (statement of Kirsten M. Nielsen, Secretary, U.S. Department of Homeland Security).

Under this new interpretation, "if the effects of the originating event, so that's a causation issue, do not continue to exist," then DHS "must terminate" TPS, even "[i]f the underlying conditions in a country are themselves dangerous …." Ex. 34. DHS claimed the TPS statute constrains any review to "look[ing] very specifically as to whether the country conditions originating from the original designation continue to exist." Ex. 36; *see also* Exs. 34, 37 (describing analysis as controlled by the "underlying conditions" upon which the original decision was based), 38 (revising Federal Register Notice to claim TPS termination for El Salvador "was required pursuant to the statute," even though earlier internal analyses confirmed the statute supported extension).

Throughout this litigation, Defendants have denied that the agency's practice changed. *E.g.,* Dkt. 20 at 41; Dkt. 76 ¶ 76. This Court has already recounted past practices and Federal Register Notices that contradict this assertion, Dkt. 55 at 26-32, and the record already corroborates that

finding. In addition to the statements above, the acting DHS Secretary recognized her decision permitting a (final) brief extension for Hondurans represented "a strong break with past practice." Ex. 30. Despite multiple discovery requests, Defendants also have been unable to identify or produce a *single* document pre-dating the recommendations leading to the termination of TPS for the four countries at issue that required current conditions to be "directly tied" to the specific conditions caused by events "underlying" the initial designation. According to Defendants' verified discovery responses, they did not consider any "memorandum, directives, guidance, position papers, or statements of policy or practice" prepared by USCIS or DHS from any prior administrations to determine what factors bear on TPS decisions. Ex. 46.

The new interpretation allowed the new DHS officials to fundamentally change the way they assessed country conditions in making TPS decisions. Rather than reviewing "a wide range of country conditions information," Rodriguez Decl. ¶ 16, the administration "pulled some info from the Federal Register" about the original designations (Ex. 4), and organized the Decision Memoranda around that information. Ex. 42 (emails between KNK, Cissna, McCament re "TPS Roll-Out Coordination – El Salvador, Guatemala *[sic]*, Haiti, Honduras"). Under the new approach, "environmental challenges" (formerly known as "disasters") (Ex. 4), traditionally considered for TPS decisions, became irrelevant since they could not "be directly tied to destruction stemming from" the original TPS designation. Exs. 43-44. Even the fact that the exact same humanitarian crisis that warranted an initial designation—such as food insecurity—continued to persist was irrelevant. If the starvation was due to intervening disasters rather than the original one, it did not support extending TPS. Ex. 45 ("Haiti's food insecurity problems seem related to tropical storms and a drought rather than from the lingering effects of the 2010 earthquake. …. Any current issues in Haiti are unrelated to the 2010 earthquake.").

**D.    Defendants Jettisoned Prior Processes, Practices, and Norms.**

The new Trump Administration surrogates also fundamentally changed the *process* by which TPS decisionmaking occurs, sidelining career professional experts who recommended extending TPS. Prior to this Administration, the TPS decision-making process "typically b[egan] ten months before the expiration date of a country's current designation" to permit adequate consultation with

1  the State Department and stakeholders. Ex. 47. By early 2017, the Administration's surrogates

2  rejected that timeline as "bureaucratic." *Id.* Career professionals who typically shaped

3  recommendations and coordinated input from other departments were excluded. *See, e.g.*, Exs. 18 at

4  138:3-140:15; 161:8-163:14 (describing how Kovarik directed the Agency to delay interagency

5  consultation until after the Secretary made her decision), 49 ("We weren't involved in Sudan or

6  South Sudan and we could have been helpful.").

7      The role of career professionals diminished even during the first periodic TPS review of this

8  Administration, and even more so thereafter. Exs. 19 at 104:1-105:23, 47. In the first review, career

9  professionals drafted Country Conditions and Decision Memos as they had done historically—only

10  to see the Memos repeatedly altered in significant ways. Career professionals drafted a Decision

11  Memo and Federal Register Notice for Haiti, which, based on a review of country conditions,

12  recommended an eighteen-month extension. Ex. 47. This sat at the USCIS Director's office for

13  weeks. Hamilton, Kovarik and other Administration surrogates initially weakened USCIS's

14  recommendation (Ex. 47), then flipped the recommendation to an outright denial, and ultimately

15  settled on a six-month extension with language clearly signaling that it would be the last. Exs. 47,

16  50, 51, 52 (original Haiti decision memo), 53, 54 (draft Haiti FRN with six-month extension as

17  additional "option"), 55 (Kovarik edits to foreshadow upcoming termination by "encouraging

18  Haitians to get their affairs in order"), 56, 57; *see also* Ex. 12 at 129:1-10.

19      After the decision on Haiti, the Trump Administration's surrogates further altered the

20  decisionmaking process to divorce the drafting of the Federal Register notices from the process of

21  providing recommendations to the DHS Secretary. Ex. 19 at 104:1-105:23. Notices are no longer

22  written until a decision is made because "the decisions are less foreseeable." *Id*; *see also* Ex. 18 at

23  161:19, 162:8 *and* Exs. 63, 64, 65 (Sudan Federal Register Notice published, withdrawn, and

24  republished in final form more than one month after Sudan TPS termination).

25      The second periodic review of this Administration was even more chaotic than for Haiti.

26  Recommendations previously vetted over the course of months zig-zagged over a matter of days or

27  weeks, relegating DHS components, the State Department, and other government entities to

28  protesting about misstatements and inaccuracies after being sidelined. Exs. 49, 58, 86. Career

1  professionals described the new process as "atypical" (Exs. 19 at 190:21-191:5 *and* 59), and

2  "[t]otally weird" (Ex. 58).

3       DHS and USCIS also began to bypass the formal agency clearance processes for

4  recommendations and Federal Register Notices, compromising inter-agency consultation and ending

5  standardized review of documents produced by USCIS. Ex. 55 ("Are we now taking these FRNs to

6  OMB for clearance or just FYI? I'm afraid we won't get sign off in time if we have to wait for

7  them."), 66 ("I don't anticipate sending this formally through the clearance process, but rather, after

8  you provide your input and we amend …."); *see also* Ex. 19 at 97:9-98:22. Moreover, contrary to

9  past practice, DHS and the State Department conducted joint reviews of multiple countries—even

10  though each had different originating conditions, diverse current conditions, and were not scheduled

11  for periodic review at the same time. *Compare* Rodriguez Decl. ¶ 11 (noting that "a separate review

12  process was conducted for each country at issue") *with, e.g.*, Exs. 14 (discussion paper on

13  "coordinat[ing] the conditions and process for terminating temporary protected status (TPS) for

14  aliens from El Salvador, Honduras, Nicaragua, and Haiti"), 112 (State Department letter

15  recommending termination of TPS for El Salvador, Haiti, Honduras, and Nicaragua).

16       Furthermore, DHS and State Department officials ignored the input of U.S. ambassadors

17  from TPS-designated countries. Exs. 67 (U.S. Mission to El Salvador urging extension), 69 (U.S.

18  Mission to Honduras urging extension), 70 (U.S. Mission to Haiti urging extension), 71 ("the

19  embassy cables were received by Tillerson's aides but generated no reply from the secretary or his

20  staff"), 72. In some cases, recommendations drafted by career State Department staff were stalled

21  until it became too late for DHS to consider their substance. *E.g.*, 73 (recommending extension on

22  same day as termination decision); *see also* Exs. 12 at 95:9-96:7; 253:2-9 *and* 42, 53, 54.

23       When performing periodic reviews, DHS also sought data about factors seemingly unrelated

24  to the TPS decision that the agency had not previously collected for this purpose. For example, in

25  April 2017, with the backing of the DHS Secretary, Hamilton and Kovarik directed DHS and USCIS

26  staff to compile "details on how many [Haitian] TPS holders are on public and private relief" and

27  "how many have been convicted of crimes of any kind." Exs. 74 (seeking such data to justify

28  "Notice for the termination of TPS for Haiti"), 75-80, 84 (offering to "run down personally … news

stories about Haitian criminals"). Kovarik requested information on how many were "out of work," and the number who were "*illegal* pre-TPS designation." *Id.* (emphasis added). Similar data were gathered and considered for TPS holders from Sudan. Exs. 87 (referencing "demographic data" attachment to Sudan Decision Memo), 89 (demographic data attachment, including prior immigration status). Kovarik stated the "Sec[retary] is going to need this [data] to make a decision" regarding the TPS determination for Haiti. Ex. 80. As noted above, Hamilton did not want it publicized that the agency was seeking this information for TPS determinations.

DHS began to gather facts and write memoranda to achieve a pre-determined goal, instead of objectively assessing country conditions. Even when a USCIS analyst agreed with an independent assessment that Haiti's economic progress mirrors "the country's tragic pattern of 'one step forward, two steps back'" (Ex. 16), the Administration sought to paint a rosy economic outlook (Ex. 81). Memoranda were re-written so that they would "fully support[] termination." Ex. 3.

The last-minute changes could be dramatic, as with Sudan, Cissna, now the USCIS Director, complained that a Sudan memorandum finalized and signed by then-Acting Director McCament:

> reads like one person who strongly supports extending TPS for Sudan wrote everything up to the recommendation section, and then someone who opposes extension snuck up behind the first guy, clubbed him over the head, pushed his senseless body out of the way, and finished the memo. Am I missing something?

Ex. 1. So the memorandum was entirely "repackage[d]" by Kovarik just days before the statutory deadline for the DHS Secretary to make a decision. Exs. 84, 117. The "repackage[d]" memorandum claimed "[t]here are no longer reports of the government targeting civilians in aerial bombing campaigns," but failed to mention that reports had stopped because the Sudanese government had restricted access to the areas where the bombings occurred. Exs. 87, 88 ("[T]he overall security situation for civilians in those areas remains dangerous."), 89 ("Indiscriminate attacks on the civilian population (including aerial bombardment) were also reported, but could not be verified due to limitations on access to affected areas placed by the Sudanese government."). It stated "approximately 38,150 persons have reportedly returned" to Darfur (Ex. 87), but failed to mention an estimated 97,500 to 186,275 persons newly displaced (Ex. 88).

Pressed to manufacture an explanation of the Sudan termination decision for the Federal

13

Corrected Plaintiffs' Notice of Mot. & Mot. for Prelim. Inj. – Case No. 3:18-cv-1554-EMC

Register Notice, career staff responded: "[t]he country conditions are what they are. … Providing sanitized country conditions in a public facing document would open us to the charge that our account is lopsided and invite criticism." Ex. 6. Upon seeing DHS's proposed Federal Register Notice, officials at the State Department and in the military expressed concerns about "significant mischaracterizations" (Ex. 7) of the dangers of "deadly conflict-affected areas" in Sudan where even "well-armed UN peacekeeping forces" feared to enter (Exs. 7-8), where the "provision of security … is scarce (at best)" (Ex. 9), where killings spiked 300% in one year (Ex. 7), and where a recent and "significant military offensive" had occurred (Ex. 9). The notice had the "effect of downplaying the actual situation." Exs. 8, 118 (warning "the Sudanese Government could view the current language and inaccuracies in the FRN as a green light from the USG to force the return of internally displaced persons … to deadly conflict-affected areas"). Trump administration surrogates dismissed these concerns as "entirely overblown and completely irrelevant." Ex. 10.

E.     **Defendants' New Interpretation Advances The Trump Administration's Racist Anti-Immigrant Agenda.**

As this Court has already described, President Trump has repeatedly expressed racial animus against non-white, non-European immigrants before, during, and after the TPS decisions at issue in this case. *See* Dkt. 55 at 54 (*e.g.*, comparing immigrants to snakes, claiming Mexicans are rapists, spreading false stories about Muslim immigrants, claiming all Haitians have AIDS); Exs. 91-95.

He also has connected these racist statements to TPS holders. He referred to TPS holders as "people from shithole countries" a mere seven days before DHS issued termination notices for Haiti and El Salvador. Ex. 96. He has asked "[w]hy do we need more Haitians?" and "insisted that lawmakers '[t]ake them out' of any potential immigration deal." *Id.* In the presence of senior DHS officials, he has expressed a preference for immigrants from overwhelmingly white European nations like Norway. *Id.*; *see also* Ex. 97.

The President still regularly makes racist statements against immigrants. In May 2018, he asserted that "[y]ou wouldn't believe how bad [undocumented immigrants] are. These aren't people. These are animals." Ex. 98. A few weeks later, he advised European leaders that Middle Eastern refugees and immigrants have "changed the fabric of Europe," causing a "very negative" effect on

14

its "culture"—remarks he characterized as not "politically correct." Ex. 99. Defendants have
candidly admitted the President made most of these statements and do not deny such statements
reflect animus against non-white, non-European immigrants. *Compare* Dkt. 1 ¶¶ 66-73, *with* Dkt. 76
¶¶ 66-73; Fed. R. Civ. P. 8(b)(6) ("An allegation … is admitted if a responsive pleading is required
and the allegation is not denied.").[3]

**F.     The White House Applied Pressure To Terminate TPS.**

White House officials and President Trump have translated that racist animus into policy,
directly pressuring DHS to terminate TPS designations. For example, in November 2017, White
House Chief of Staff John F. Kelly and former White House Homeland Security Adviser Tom
Bossert repeatedly called Acting Secretary Duke, pressuring her to terminate the TPS designation for
Honduras. Ex. 28. A former official reported that "[t]hey put massive pressure on her." *Id.* Chief of
Staff Kelly warned Secretary Duke that the TPS program stood as an obstacle to the President's
"wider strategic goal" on immigration. *Id.*; *see also* Ex. 12 at 160:2-20). Secretary of State Rex
Tillerson told her that ending TPS "was just something she had to do," implying "[t]his wasn't worth
a showdown with the White House." Ex. 71. Secretary Duke shortened the termination window for
Nicaragua from 18 to 12 months after a call from the White House. Exs. 18 at 227:7-8 *and* 30, 119.

At one point, shortly before deadlines for certain TPS determinations, the White House
hosted a Principals Committee meeting of Cabinet-level officials specifically focused on TPS. *See*
Exs. 14, 85 at 334:17-22. In the "discussion paper" guiding the meeting, White House officials
asserted that "[i]n the cases of El Salvador, Honduras, Nicaragua, and Haiti, the temporary
conditions that arose out of natural disasters and supported TPS designations have long ceased to
exist." Ex. 14. The "discussion paper" explicitly recommended "[t]erminat[ing]" TPS for these
countries. *Id.*[4] Ultimately, Secretary Duke—a career professional with nearly three decades in
federal government—resigned shortly after extending protections for Honduran immigrants for a

---

[3] *Accord* 5 C. Wright et al., *Federal Practice and Procedure* §§ 1279, 1264 & n.4 (3d ed. 2018)
(failure to expressly deny allegations constitutes an admission of the facts alleged; a "claim that 'the
documents speak for themselves'" is insufficient to avoid an admission) (collecting cases)); *Fontes
v. Porter*, 156 F.2d 956, 957 (9th Cir. 1946).

[4] *See* Ex. 85 at 343:1-12 ("normal procedure" for "meetings convened by the White House" was for
the White House to produce the related materials).

15

brief period. *See* Exs. 28, 100. On May 4, 2018, Acting Secretary Duke's successor, Secretary Nielsen, terminated those same protections for Honduran immigrants. Ex. 101.

The White House also has applied pressure through its surrogates within DHS and USCIS. It has been "keenly interested" in TPS decisions, and has regularly communicated with DHS and USCIS about them even apart from the meeting described above. Exs. 12 at 89:20-92:19 *and* 101. White House senior adviser Stephen Miller has been personally and deeply involved in the TPS decisionmaking process. Ex. 12 at 155:18-156:4, 156:11-17, 158:5-20, 224:20-225:23. Miller has had regular communications about TPS with DHS Chief of Staff Chad Wolf and DHS Senior Advisor Gene Hamilton. *Id.* Miller told Wolf and top State Department officials to end TPS. Ex. 85 at 282:15-293:21, 286:14-287:22, 292:16-295:19 (recalling "Mr. Hamilton, on a couple of occasions in meetings, saying that Mr. Miller favored the termination of TPS").

President Trump also has directly exerted pressure on top DHS officials. As early as June 2017, President Trump rebuked his most senior advisers—including then-DHS Secretary John Kelly—about immigrants who had entered the country that year from Haiti, Afghanistan, and Nigeria. Ex. 91. In May 2018, President Trump "berated [DHS Secretary Nielsen] in front of the entire cabinet for what he said was her failure to adequately secure the nation's borders" or implement his policy of separating parents and children at the borders. Exs. 103-104.

In the face of such political pressure, the Secretary of State ceased serving a meaningful advisory role for DHS. The Secretary of State recommended DHS terminate El Salvador, Haiti, and Honduras over the "the counsel and expertise of officials at the State Department and the U.S. Embassies in all three countries, which uniformly argued for an extension of the TPS designations." Ex. 72, 85 at 375:18-376:1, 378:9-378:24. Like DHS, the State Department experienced interference from "the White House Domestic Policy Council," which "sought repeatedly to influence the decisionmaking processes at the State Department and DHS in order to ensure a pre-determined outcome: the termination of TPS designations for all three countries." Ex. 72.

**G.      TPS Holders And Their Families Face Imminent, Grievous, And Irreparable Harm.**

On November 2, 2018, less than three months from now, Plaintiffs Hiwaida Elarabi, Mazin Ahmed, and approximately 1,040 other Sudanese TPS holders will lose their immigration status. Soon after, on January 5, 2019, Plaintiff Imara Ampie and approximately 5,000 other Nicaraguans will suffer the same fate. Defendants' actions will also profoundly disrupt the lives of more than 200,000 other TPS holders from Haiti and El Salvador on July 22, 2019 and September 9, 2019, respectively. These TPS holders have lawfully lived in this country for years or decades—working, paying taxes, owning homes, obeying the law, and contributing to society. In addition, hundreds of thousands of U.S.-citizen school-aged children will face the terrible choice of either separating from their parents or growing up in exile.

The pending TPS terminations of Sudan, Nicaragua, Haiti, and El Salvador are already causing severe psychological, economic and other harm that will be further exacerbated once the terminations go into effect. This harm is amply illustrated in the attached declarations: for both the TPS holders and their families, the consequences of the TPS terminations are enormous and multi-faceted. *See* Abdalla Decl.¶¶ 12-30; Ampie Decl. ¶¶ 10-20; Destin Decl. ¶¶ 13-22; Elarabi Decl. ¶¶ 9-10; Flores de Ayala Decl. ¶¶ 15-26. While space constraints prevent Plaintiffs from repeating here the excruciating details of the harms that termination of TPS will cause, they respectfully submit that when the Court reviews the declarations and other materials accompanying this motion, it will conclude that these harms are real and potentially catastrophic; that they are merely representative of the widespread, crushing damage that the termination decisions will inflict on TPS holders and their families; and that the severity of these harms will grow exponentially as the effective dates for the terminations arrive.

The psychological harm that TPS recipients and their families are suffering, triggered by the impending TPS terminations, is severe. *See* Ampie Decl. ¶¶ 13, 17-18; Abdalla Decl. ¶¶ 19-25; Flores de Ayala Decl. ¶¶ 18, 24-26. Immediately following the announcement that TPS for Nicaragua would be terminated, Plaintiff Imara Ampie began suffering from "severe psychological symptoms" she had "never previously suffered," with increasing anxiety, feeling ill and at times as

though she "could not breath." Ampie Decl. ¶ 17. She went to a psychologist for the first time in her life and was diagnosed with severe depression. *Id.* Maria Jose Ayala Flores has been depressed and found it difficult to get out of bed or focus on schoolwork since the termination announcement. Flores de Ayala Decl. ¶ 24. Declarant Ebitihal Abdalla, a TPS-holder from Sudan who has lived in the United States with her family since the late 1990s and has U.S.-citizen children as young as 12 years old, finds herself gripped by the fear of losing all that she has built in the United States for the past twenty years. Abdalla Decl. ¶¶ 2, 6, 25. Since the termination announcement, she finds herself "cry[ing] uncontrollably," suffering from severe depression and migraines, unable to eat or sleep, fearful of leaving the house, feeling "powerless" and worrying what her family will do when faced with an unthinkable choice. *See id.* ¶¶ 19-23.

The U.S. citizen children of TPS-holders are likewise suffering severe strain and hardship. These children constantly worry about who will take care of them if their parents have to leave, or if they will be placed into foster care. *E.g.*, Destin Decl. ¶¶ 20-22; Abdalla Decl. ¶¶ 14-16, 30. They also fear the alternative: that they will be forced to move to a country they do not know and leave behind their school, friends, and the only home they have ever known. *Id.* They face potentially severe hardships in those new countries, including because those countries cannot meet the abrupt return of thousands of former residents and their families, as documents produced by Defendants explain. *E.g.*, Ex. 105. Some of these U.S.-citizen children may find themselves left to care for younger siblings in the United States without their parents, putting their own futures and dreams in further jeopardy. *E.g.*, Flores de Ayala Decl. ¶ 20. Plaintiff Elsy Flores de Ayala and her husband have lived in the United States for nearly twenty years. *Id.* ¶ 2. Their eldest daughter is a TPS holder who arrived in the United States as a baby; and their two youngest children were born in the United States. *Id.* ¶¶ 12, 15. Yet, with the announcement that TPS would be terminated for El Salvador, Elsy faces the prospect of having to return to a country where she has no family, home, or security, and her daughter—still in high school—is considering how she would start college, work, and raise her younger brother, if her parents are forced to leave. *Id.* ¶¶ 7, 15, 20.

The TPS terminations will inflict—and already are inflicting—severe economic harm on TPS recipients facing imminent loss of legal status. TPS holders face imminent threats to their

livelihoods. This includes Elsy Yolanda Flores de Ayala, a professional caretaker, and her husband Juan Eduardo Alyala Flores, who has worked for the same company for sixteen years, both of whom will lose their ability to work legally here if TPS for El Salvador is terminated. Flores de Ayala Decl. ¶¶ 2, 13. Some TPS holders, like Imara Ampie and Wilna Destin, risk losing their homes and or other material assets, leading to further economic harm. Destin Decl. ¶¶ 8, 14-15; Ampie Decl. ¶¶ 10-12. Another TPS holder dreams of becoming a doctor and is preparing to transition to a four-year college where she has been accepted—but has already forgone an out-of-state internship that would benefit her professional dreams because of her family's current precarious state. Now she fears she will lose the opportunity to continue her education and pursue her professional dreams. Abdalla Decl. ¶¶ 26-29. Other TPS holders will lose access to identification documents, credit, and various forms of equity. *E.g.*, Ampie Decl. ¶ 12; Abdalla Decl. ¶ 18.

These losses include significant investments TPS holders had made in their lives and communities in the United States given conditions in their home countries. For example, because of the Sudan TPS termination, Plaintiff Hiwaida Elarabi made the "heartbreaking decision" to sell the business she had only recently purchased, becoming burdened with "substantial debt, from buying and selling the business so quickly." Elarabi ¶ 10. Plaintiff Imara Ampie and her family also made significant investments in their home and business, yet will be forced to liquidate at a significant loss as a result of TPS termination. Ampie Decl. ¶¶ 8-9, 11-12; Abdalla Decl. ¶ 10; Flores de Ayala Decl. ¶¶ 11-12; Elarabi Decl. ¶ 10; Destin Decl. ¶ 10.

The lives that TPS holders have created in the United States over years and decades cannot be rebuilt in the countries to which they may be forced to return. As a general matter, for people who have lived outside of the countries of their birth for years or decades, they face seemingly insurmountable challenges to re-integrate themselves or secure employment in a country they have long since left. *See, e.g.*, Abdalla Decl. ¶¶ 14-15; Elarabi Decl. ¶¶ 12-14; Ampie Decl. ¶¶ 2, 16, 18, Flores de Ayala Decl. ¶ 15. They face the prospect of returning to countries where they do not feel, or are not, safe. *See, e.g.*, Abdalla Decl. ¶¶ 13, 15; Elarabi Decl. ¶¶ 11-12; Ampie Decl. ¶ 19, Flores de Ayala Decl. ¶ 19. Most devastating to many is the prospect of family separation, for parents who "cannot imagine continuing to live" if separated from their children. Destin Decl. ¶ 13; *see also, e.g.*,

1   Abdalla Decl. ¶ 16; Ampie Decl. ¶ 18; Flores de Ayala Decl. ¶¶ 16, 20; Destin Decl. ¶¶ 21-23. And

2   of course, absent judicial intervention, the severity of the harms they face will grow exponentially as

3   the effective dates for the terminations arrive.

4        The harms resulting from the termination of TPS also extend well beyond the TPS holders

5   and their families, causing myriad social, economic, and communal harms to local communities and

6   the United States. Members of Congress and local leaders have stressed that termination "would

7   needlessly tear apart families and communities across the country" and lead to the loss of TPS

8   holders who "are integral members of our neighborhoods, workplaces, religious communities,

9   schools, and health care institutions." Exs. 106 (letter from bipartisan group of 116 members of

10  Congress), 108 (letter from 41 mayors). The elimination of TPS "is projected to result in a $6.9

11  billion reduction in Social Security and Medicare contributions and an overall $45.2 billion

12  reduction in GDP over ten years." Ex. 107 (letter from 32 Massachusetts health care provider

13  organizations). More broadly, the TPS terminations will cause harm to the United States by—for

14  example—undermining national security interests. *See, e.g.*, Exs. 67 (explaining "a termination of

15  TPS could undermine US-Salvadoran efforts on a range of issues of mutual concern and fighting

16  transnational criminal organizations, such as MS-13"), 109 (letter signed by 329 organizations and

17  leaders explaining that TPS termination would be "destabilizing" to Haiti and that "Haiti's stability

18  is in the national security interest of the United States").

19                                    **LEGAL STANDARD**

20        Preliminary injunctions "preserve the relative positions of the parties until a trial on the

21  merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Plaintiffs seeking

22  preliminary injunctive relief must establish that: (1) they are "likely to succeed on the merits,"

23  (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance

24  of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Am. Trucking Ass'ns

25  v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (internal quotation omitted). The Ninth Circuit

26  applies a "sliding scale"—that is, "a stronger showing of one element may offset a weaker showing

27  of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Pimentel v. Dreyfus*,

28  670 F.3d 1096, 1105 (9th Cir. 2012) (per curiam)).

## ARGUMENT

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR STATUTORY AND CONSTITUTIONAL CLAIMS.**

**A.    Defendants Violated The APA By Departing From Past Practices Without Acknowledging Or Justifying The Change.**

"The APA constrains an agency's ability to change its practices or policies without acknowledging the change or providing an explanation." Dkt. 55 at 24. Under 5 U.S.C. 706(2)(A), a reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." An agency violates that standard if it "depart[s] from a prior policy *sub silentio*," "disregard[s] rules that are still on the books," or fails to show "good reasons" for a new policy. *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The APA's text "compel[s]" reviewing courts to issue "nationwide injunction[s]" when holding agency action unlawful. *See Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007), *rev'd in part on other grounds*, 555 U.S. 488 (2009).

Here, DHS violated the APA because it departed from prior policy without publicly acknowledging the change and providing a good reason for it. In the past, DHS considered a wide range of intervening factors when deciding whether to extend or terminate TPS. Rodriguez Decl. ¶ 17. But in terminating TPS for Sudan, Nicaragua, Haiti, and El Salvador, DHS took the position that it could not consider conditions that were not "directly tied to" the event that originally triggered the TPS designation. Ex. 110. DHS has failed to provide *any* "good reason" for this abrupt change in how it interprets the TPS statute. Instead, it denies that any change took place. *See* Dkt. 76 ¶ 76; Dkt. 20 at 34. The evidence proves otherwise.

Before the Trump Administration, it was DHS policy and practice to consider intervening country conditions when making TPS determinations. Rodriguez Decl. ¶ 17. Career civil servants initiated the TPS decisionmaking process by drafting memoranda that "provided a comprehensive picture of current country conditions without regard to whether those conditions were related to the originating condition or to the country's recovery from the originating condition." *Id.* ¶ 16. These memoranda analyzed wide-ranging country conditions and provided the factual basis for agency review. *Id.* The USCIS Director then exercised "broad discretion to consider current conditions in

CORRECTED PLAINTIFFS' NOTICE OF MOT. & MOT. FOR PRELIM. INJ. – CASE NO. 3:18-cv-1554-EMC

1   the subject country" and formally recommend whether the DHS Secretary should extend or

2   terminate a TPS designation. *Id.* ¶ 17.

3          This Court has already described how this process regularly resulted in extensions of TPS

4   designations on the basis of intervening events. Dkt. 55 at 26-34. Internal statements shared by

5   career officials within the agency confirm that prior extensions rested on later events. Ex. 111

6   (explaining that the TPS designations of El Salvador, Nicaragua, and Honduras "ha[ve] been

7   continuously extended since [their original designation] due to the lingering effects of [the

8   earthquakes and Hurricane Mitch, respectively] *and subsequent compounding environmental*

9   *disasters*") (emphasis added). It also identified how changes in the notices for Haiti, Nicaragua, and

10  El Salvador illustrate how the Trump Administration adopted a new interpretation. Dkt. 55 at 30-31.

11         The Court described the termination notice for Sudan as "arguably more complete," noting it

12  "touches, albeit indirectly and with much less specificity, on nearly all the themes discussed in the

13  more recent extension notice." *Id.* at 33. However, examination of all the Sudan notices makes clear

14  that the termination notice was also a product of Defendants' new interpretation of the TPS statute.

15  As with Haiti, Nicaragua, and El Salvador, all of the factors addressed in the Sudan termination

16  notice were *originating conditions* that provided the basis for Sudan's re-designation for TPS on

17  January 9, 2013.[5] As with the other three termination notices, the termination notice for Sudan

18  disregarded numerous intervening events considered in prior Sudan extension notices, including

19  such conditions as recent increases in criminal activity, the erosion of health services, instability in

20  neighboring countries, growing poverty, and natural disasters.[6]

21  _____

22  [5] *Compare* Dkt. 55 at 32 (identifying armed conflict, human rights violations, forced displacement, and food insecurity as relevant factors), *with* Extension and Redesignation of Sudan for Temporary

23  Protected Status, 78 Fed. Reg. 1,872 (Jan. 9, 2013) (citing armed conflict, human rights violations, forced displacement, and food insecurity as relevant factors). Redesignation "designates [a country]

24  anew … under the TPS program" to grant TPS protection to individuals who entered after the last designation. *See* Extension of Designation & Redesignation of Liberia Under TPS Program, 62 Fed.

25  Reg. 16,608, 16,009 (Apr. 7, 1997); Dkt. 20 at 19 (describing redesignation).

26  [6] Extension of the Designation of Sudan for Temporary Protected Status, 81 Fed. Reg. 4,045 (Jan. 25, 2016) (considering "increase in criminal activity" and erosion of health services); Extension of

27  the Designation of Sudan for Temporary Protected Status, 79 Fed. Reg. 52,027 (Sept. 2, 2014) (considering instability in neighboring countries); Extension of the Designation of Sudan for

28  Temporary Protected Status, 76 Fed. Reg. 63,635 (Oct. 13, 2011) (considering "growing poverty" and "[n]atural disasters").

The new evidence obtained by Plaintiffs removes any doubt that DHS adopted a new interpretation of the TPS statute. Internal emails and memoranda prove agency officials believed extensions could not be justified by country conditions unrelated to the event triggering the initial TPS designation. *Supra* Background Part D; *see also* Ex. 2 (USCIS career "subject matter expert" explaining the "basic problem" is country conditions in Nicaragua, El Salvador, and Honduras were "bad … [with respect to] all of the standard metrics," and the "strongest argument for termination" was "just that it is not bad in a way clearly linked to the initial disasters prompting the designations"). Under its new interpretation, DHS had no choice except to terminate designations if current country conditions were unrelated to the event that triggered the initial designation. *Supra* Background C; Ex. 37 (opining that "when the conditions prompting a country's designation for TPS no longer exist, the Secretary must terminate the country's TPS designation").

Trump Administration surrogates also manipulated objective evidence if it was incompatible with their goal of terminating TPS. *Supra* Background C-F. This was evident in the case of Sudan. Career officials who prepared USCIS's original Sudan decision memo found without any qualification that "the ongoing armed conflict and extraordinary and temporary condition that supported Sudan's designation for TPS persist." Ex. 40. Trump Administration surrogates nonetheless recommended terminating TPS. Ex. 20. The disconnect between the country conditions reports (Ex. 87-88), and the recommendation itself was so glaring that current USCIS Director Cissna equated it to a mugging. Ex. 1 (Cissna observing the memo reads like "someone who opposes extension snuck up behind the first guy, clubbed him over the head … and finished the memo"). To the extent USCIS offered *any* facts to support the recommendation to terminate Sudan's TPS, the facts were incomplete and distorted. *Supra* Background D-E.[7]

Taken singly or together, the Federal Register Notices, the statements of current and former DHS officials, and the internal communications and memoranda prove definitively that agency policy has changed. Intervening conditions—previously a key factor in TPS extensions—no longer

---

[7] These facts establish that, at least with respect to Sudan, Defendants failed to conduct the "statutorily-mandated review" at all, Dkt. 55 at 41, as required by the APA and due process. *See supra* Background B-F; Rodriguez Decl. ¶¶ 9, 17 (explaining that, in the past, agency decisions regarding TPS were based on country conditions).

1   can provide a sufficient, if any, basis for extending a TPS designation. DHS has failed to provide any

2   "good reason" for this abrupt change in policy. Defendants instead deny that any change took place.

3       The APA requires that, at minimum, the agency must recognize its departure from prior

4   policy. *Fox* 556 U.S. at 515-16; *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C.

5   Cir. 2017). Because Defendants deny any change occurred, they cannot satisfy this requirement. Dkt.

6   76 ¶ 76 (denying DHS "adopted" a "new interpretation" of the TPS statute and that it was required to

7   make any "formal announcement … disclos[ing] its rationale"); Dkt. 20 at 48 ("[T]he Secretaries'

8   terminations of TPS for Sudan, Nicaragua, Haiti, and El Salvador did not deviate from any previous

9   rule or interpretation."). For this reason alone, the new policy underlying the challenged TPS

10  terminations is arbitrary and capricious. *Fox*, 556 U.S. at 515 ("[T]he requirement that an agency

11  provide reasoned explanation for its action would ordinarily demand that it display awareness that it

12  *is* changing position.").

13      Defendants may argue DHS has claimed its interpretation is required by the TPS statute and

14  that doing so is sufficient "good reason" under the APA for a change in policy. But conclusory

15  explanations do not suffice. For instance, in *Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117

16  (2016), the Department of Labor attempted to justify a new policy based on its "reading of the

17  statute." *Id.* at 2127. The Supreme Court rejected that approach. While an agency may justify a

18  policy by explaining that it is "more consistent with statutory language than alternative[s]," mere

19  "conclusory statements" cannot suffice to "analyze or explain" why a new interpretation is

20  preferable. *See id.* (quotation marks omitted). Here too, Defendants' conclusory assertions do not

21  comply with their obligations under the APA.

22      A "more detailed justification" is especially warranted because the prior policy "engendered

23  serious reliance interests." *Fox*, 556 U.S. at 515; *Encino Motorcars*, 136 S. Ct. at 2126-27 (holding

24  APA required "a more reasoned explanation" of agency policy change where dealerships had

25  structured compensation plans in reliance on prior policy exempting employees from overtime laws).

26  Plaintiffs and several hundred thousand other TPS holders and their families have made key life

27  decisions based on an understanding that TPS would be extended so long as conditions in their home

28

---

24

countries remained unsafe. *Supra* Background G. The APA does not permit Defendants to so profoundly disrupt the lives of thousands of people without an adequately reasoned explanation.

For these reasons, Plaintiffs are likely to succeed on the merits of their APA claims.

**B.     Defendants' TPS Terminations And New Rule Were Motivated By Racial Animus Against Non-White, Non-European Immigrants.**

This Court has ruled that Plaintiffs' equal protection claim is governed by *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). Dkt 55 at 49, 54. To prevail, Plaintiffs need not show the discriminatory purpose was the sole or primary purpose of the challenged action, only that it was a "motivating factor." *Arlington Heights*, 429 U.S. at 265-66; *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015).

This Court should conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," starting with the (non-exhaustive) factors identified in *Arlington Heights*: (1) "[t]he impact of the official action—whether it bears more heavily on one race than another"; (2) "[t]he legislative or administrative history," including contemporaneous statements of decision-makers; (3) "[t]he historical background of the decision"; (4) "[t]he specific sequence of events leading up to the challenged decision"; and (5) "[d]epartures from the normal procedural sequence." *Id*. at 266-68. "[A] plaintiff need not establish any particular element in order to prevail." *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016).

Straightforward application of these factors establishes the TPS terminations at issue were motivated by racial animus. *First*, DHS's termination of TPS for Salvadoran, Nicaraguan, Sudanese, and Haitian immigrants harms primarily (if not exclusively) non-European immigrants generally considered by the Trump Administration as non-white. *Supra* Background B, E.

*Second*, bigoted statements by President Trump litter the legislative and administrative history leading up to the TPS terminations. He targeted non-white immigrants generally and TPS beneficiaries specifically, making no attempt to hide behind coded language. *Supra* Background E (e.g., comparing immigrants to "snakes" and "animals," claiming all Haitians have AIDS, opining Middle Eastern refugees have a "very negative" effect on European "culture," complaining Nigerian migrants would never "go back to their huts" in Africa, labeling Mexican immigrants "rapists").

25

1    Defendants do not deny—and thereby admit—the obvious: these statements manifest racist animus

2    against TPS holders. Dkt. 76 ¶¶ 66-73; Dkt. 55 at 45.

3        Courts have relied on far less overtly racist statements as evidence of animus. *E.g.*, *Stout by*

4    *Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1000, 1001, 1006-07 (11th Cir. 2018) (affirming

5    discriminatory intent finding, citing coded language that children from predominantly African

6    American schools look "totally different"); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th

7    Cir. 2004) (affirming because reference to African American as "drug dealer" was plausibly a coded

8    reference to race); *Ave. 6E Invs.*, 818 F.3d at 504 (reference to Latinos as having large households);

9    *Wash. v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471 (1982) ("racial nature" of anti-busing initiative

10   apparent where proponents also sought to halt desegregation).

11       *Third and fourth*, the historical background and specific sequence of events at issue confirm

12   the TPS terminations were substantially motivated by racial animus. Discovery has uncovered direct

13   evidence that officials involved in these terminations altered TPS decisions to achieve President

14   Trump's racist agenda against non-white, non-European immigrants. *See* Exs. 29 (memorandum

15   written by Acting DHS Secretary stating "The TPS program must end for these countries soon ....

16   This conclusion allows me to terminate in 18 months .... [and] is the result of an America first view

17   of the TPS decision."), 30 (DHS Acting Secretary admitting Honduras decision "is a strong break

18   with past practice … [that] will send a clear signal that TPS in general is coming to a close. I believe

19   it is consistent with the President's position on immigration."). In addition, as detailed above,

20   officials from Candidate Trump's immigration transition team, and others who worked for anti-

21   immigrant organizations, inserted themselves into the TPS decisionmaking process, upending long-

22   standing practice. *Supra* Background B-D. These surrogates assumed key positions in DHS and

23   USCIS, which enabled them to implement the President's racist anti-immigrant agenda. *Supra*

24   Background B.

25       Defendants admit the White House influenced these decisions. Dkt. 26 at 9 ("Of course

26   something of this nature would involve the White House."). The White House did so in several

27   ways. The surrogates placed in DHS and USCIS closely collaborated with the White House as to

28   TPS decisions in particular. *Supra* Background F; Exs. 12 at 89:20-92:19, 155:18-156:4, 156:11-17,

158:5-20; 224:20-225:23 (White House remained keenly interested in TPS decisions, and Stephen Miller actively involved through surrogates). The President personally pressured officials to take actions against non-white, non-European immigrants, not only during the infamous "people from shithole countries" meeting, but also during other discussions. Exs. 20-21 (pressure on high-level government officials to implement extreme anti-immigrant agenda, often mixed with racist statements), 96-97 (racist statements specifically in context of TPS or people from TPS-designated countries). And other high-level White House officials pressured DHS Secretaries directly and indirectly (e.g., via the Secretary of State) to terminate TPS. *See* Exs. 14 (as to Secretary of State), 28 (as to other White House officials), 30 (email from Acting DHS Secretary, stating "I had a discussion with [White House NSA] Tom [Bossert] this evening and he informed me of a strategy I was not previously aware of. I incorporated this new information into my final decision and the published timeframe for the Nicaragua termination"). Indeed, the White House convened a meeting about TPS to advocate for terminations in service of its immigration agenda. *See* Ex. 14.

Courts have treated far weaker evidence that racist animus influenced a decision as sufficient under *Arlington Heights*. *E.g.*, *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 130, 142 (3d Cir. 1977) (affirming post-trial award of injunctive relief against City after finding of discriminatory intent based on racially-motivated political support, racist statements by Mayor, and manifest awareness of discriminatory effect); *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1399 (2017) (imputing discriminatory intent to legislature based on indirect evidence of racist animus). Moreover, the President's direct involvement is independently significant. Even though not charged by statute with making TPS decisions, the record shows his animus "influenced or was involved in" these decisions. Dkt. 55 at 43 (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007)); *Ave. 6E Invs.*, 818 F.3d at 504 (trier could find discriminatory motive "even if the officials do not personally hold such views"); *Batalla Vidal v. Nielson*, 291 F. Supp. 3d 260, 277-79 (E.D.N.Y. 2018) (recognizing "liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action"). Overwhelming evidence establishes that the Administration adopted the new rule and sought to terminate TPS "because of, not merely in spite of" its adverse effects on thousands of non-white,

non-European immigrants. *Seattle Sch. Dist. No. 1*, 458 U.S. at 471 (internal quotation omitted); *cf.* *Arlington Heights*, 429 U.S. at 266-69 (considering statements by decisionmakers and other circumstantial evidence of discriminatory intent). Courts rarely, if ever, come across such clear evidence that racially discriminatory intent motivated a governmental decision.

*Fifth*, and finally, the Trump Administration's recent TPS determinations clearly departed from the normal procedures for TPS terminations. *Arlington Heights*, 429 U.S. at 267. Defendants abandoned longstanding practices—for example, bypassing and disempowering career professionals, altering responsibility for preparing Federal Register Notices, gathering irrelevant information about TPS holders intended to reinforce racial stereotypes, excluding relevant information traditionally considered, and doctoring country conditions evidence. *Supra* Background D. For instance, Kelly, Hamilton, and Kovarik gathered irrelevant criminal history and public benefits information about Haitian TPS holders, which never had been requested for prior TPS determinations, and later tried to conceal that fact. *Id.* Other changes, while procedural, effectively gave individuals from President Trump's immigration policy team undue power to shape the TPS program. For example, TPS determinations no longer go through the "concurrence process," which historically requires input from coordinate components and departments. *Id*. Courts have found equal protection violations under *Arlington Heights* based on comparable or lesser procedural irregularities. *E.g.*, *McCrory*, 831 F.3d at 227 (procedural irregularities, including rushed decisionmaking and truncated debate, and timing of enactment were evidence of discriminatory intent); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 548 (S.D.N.Y. 2006) (procedural irregularities in police deployment, adoption of municipal resolution, and traffic regulation were evidence of racial animus)

Plaintiffs thus are likely to establish that Defendants' TPS determinations were motivated, at least in part, by racial and ethnic animus. Defendants therefore violated the equal protection guarantee of the Fifth Amendment's Due Process Clause. *Arlington Heights*, 429 U.S. at 265-66.

## II.   TPS HOLDERS AND THEIR CHILDREN ARE SUFFERING PROFOUND AND IRREPARABLE HARM AND WILL SUFFER FURTHER IRREPARABLE HARM ABSENT RELIEF.

Plaintiffs "seeking a preliminary injunction must establish" they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council Inc.*, 555

1   U.S. 7, 20 (2008).

2          "'It is well established that the deprivation of constitutional rights 'unquestionably

3   constitutes irreparable injury.'" *Hernandez*, 872 F.3d at 994 (quoting *Melendres v. Arpaio*, 695 F.3d

4   990, 1002 (9th Cir. 2012)). "When an alleged deprivation of a constitutional right is involved, most

5   courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418

6   F.3d 989, 1001-02 (9th Cir. 2005) (quotations and citation omitted). A procedural injury may also

7   "serve as a basis for a finding of irreparable harm when a preliminary injunction is sought."

8   *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 829-30 (N.D. Cal. 2017). A party

9   "experiences actionable harm when 'depriv[ed] of a procedural protection to which he is entitled'

10  under the APA." *N. Mariana Islands v. United States*, 686 F.Supp.2d 7, 17 (D.D.C. 2009) (quoting

11  *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002)). For the

12  reasons discussed above, *supra* Part I.A-B, Defendants have violated Plaintiffs' constitutional and

13  statutory rights.

14          But the injury in this case is far more than harm generally flowing from a constitutional

15  violation. As discussed above and in the declarations attached to this motion, Defendants' actions

16  have already inflicted irreparable injury on TPS holders and their families. Plaintiffs will suffer

17  further irreparable harm if this Court does not issue preliminary injunctive relief.

18          *First*, the TPS terminations are inflicting severe, continuing emotional harm on TPS holders

19  and their U.S. Citizen children and family-members. TPS holders have lost the security of knowing

20  they will be able to live and work in the United States, and to live with their families, so long as

21  conditions in their home countries remain unsafe. As a result, they are already experiencing resulting

22  anxiety, depression, and fear. *See* Ampie Decl. ¶¶ 17-18; Abdalla Decl. ¶¶ 14-22; Flores de Ayala

23  Decl. ¶¶ 18-19, 24. Their children, including hundreds of thousands of U.S. citizen children, face the

24  agonizing prospect of leaving their home country or growing up without their parents. *See supra*

25  Background G. These emotional and psychological injuries indisputably constitute irreparable harm.

26  *See, e.g.*, *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 709-10 (9th Cir. 1988) (explaining "emotional

27  stress, depression and reduced sense of well-being" can constitute irreparable injury); *Norsworthy v.*

28  *Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015) ("Emotional distress, anxiety, depression, and

29

1   other psychological problems can constitute irreparable injury."); *Petties v. Dist. of Columbia*, 881 F.

2   Supp. 63, 68 (D.D.C. 1995) (recognizing stress, anxiety, and deteriorating scholastic performance

3   caused by uncertainty about government action constitutes irreparable harm).

4        *Second*, TPS holders and their U.S. citizen children are being forced to make impossible

5   decisions that have life-altering consequences. *See* Elarabi Decl. ¶ 10; Destin Decl. ¶¶ 16, 20-22;

6   Ampie Decl. ¶¶ 13-15; Flores de Ayala Decl. ¶¶ 17-20. For example, the "loss of opportunity to

7   pursue one's chosen profession constitutes irreparable harm." *Ariz. Dream Act Coa. v. Brewer*, 855

8   F.3d 957, 978 (9th Cir. 2017). This irreparable injury is further "exacerbated" when plaintiffs are of

9   a "young age and fragile socioeconomic status" because "[s]etbacks early in their careers" are likely

10   to haunt Plaintiffs for the rest of their lives. *Id.*; *see* Abdalla Decl. ¶¶ 26-29, 30. Thousands of

11   school-age U.S. citizen children will be forced to make decisions, over the next few months, that will

12   have lasting consequences for their whole lives. *See* Ampie Decl. ¶¶ 13-15; Flores de Ayala Decl. ¶¶

13   20, 25. Under these circumstances, "[a] delay, even if only a few months, pending trial represents

14   precious, productive time irretrievably lost." *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630

15   F.3d 1153, 1166 (9th Cir. 2011).

16        *Third*, in a matter of months, TPS recipients from Sudan and Nicaragua will lose their

17   immigration status and work authorization. Shortly afterward, TPS holders from El Salvador and

18   Haiti will face a similar fate. *See* Destin Decl. ¶ 14; Elarabi Decl. ¶ 13. Some TPS holders will no

19   longer be able to support themselves or their families. *See* Destin Decl. ¶¶ 14-15; Elarabi Decl. ¶ 14.

20   These are quintessentially irreparable harms. *See, e.g.*, *Inland Empire Immigrant Youth Collective*

21   *v. Duke*, No. 17-2048, 2017 WL 5900061, at *9-10 (C.D. Cal. Nov. 20, 2017) (recognizing that

22   deprivation of ability to work and support family is irreparable harm); *Vargas v. Meese*, 682 F. Supp.

23   591, 595 (D.D.C. 1987) (recognizing denial of "the benefits of protection from deportation and work

24   authorization, as well as the right to travel outside this country without forfeiting these benefits" is

25   irreparable harm).

26        Worse still, when the Plaintiffs lose their TPS status, if they remain in the United States, they

27   will be at immediate risk of deportation. In some cases, TPS holders will risk their lives and safety if

28   they return to their native countries. *See* Ampie Decl. ¶ 19; Abdalla Decl. ¶¶ 13-15; Elarabi Decl.

30

¶¶ 11-12. Defendants' actions will like cause family separation, estrangement from friends, collapse of professional networks, and, in the case of those who arrived in the U.S. as young children, exclusion from the only country they have ever truly known. Flores de Ayala Decl. ¶¶ 23-24; Abdalla Decl. ¶¶ 26-30. This injury is, again, severe and irreparable. *See Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (describing "[t]he severity of deportation" as "the equivalent of banishment or exile" (citation omitted)).

Most devastating to many is the prospect of family separation. Plaintiff Elsy Flores de Ayala and her husband have lived in the United States for nearly twenty years. Flores de Ayala Decl. ¶ 2. Their eldest daughter is a TPS holder who arrived in the United States as a baby; their two youngest children were born in the United States. *Id.* ¶¶ 12, 23. Elsy faces the imminent prospect of having to return to an extremely unsafe country where she has essentially no family and no home. *Id.* ¶¶ 7, 19. Her daughter—still in high school—must now consider whether to go there, or instead to stay, and somehow start college, work, and raise her younger brother without her parents. *Id.* ¶ 20. Thousands of people will face similarly impossible decisions. *See, e.g.*, Ampie Decl. ¶ 18; Abdalla Decl. ¶¶ 14-17; Destin Decl. ¶¶ 6, 19-23. The Ninth Circuit has repeatedly found separation of a parent from his or her child constitutes irreparable harm. *See, e.g.*, *Stanley v. Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of h[er] child[], and the child[] suffer[s] from uncertainty and dislocation."); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011); *Ms. L v. U.S. Immigration & Customs Enforcement*, No. 3:18-cv-00428, Dkt. 83 (S.D. Cal. June 26, 2018). Defendants' actions—unlawfully terminating TPS for Sudan, Nicaragua, Haiti, and El Salvador—are imposing and will continue to impose irreparable harms on Plaintiffs, their families, and their communities. A preliminary injunction will eliminate or mitigate these harms by preserving the status quo pending a final decision on the merits.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF INJUNCTIVE RELIEF.

The final two considerations for a preliminary injunction—the balance of the equities and the public interest—merge when the government is a party. *League of Wilderness Defs./Blue Mountains*

31

1  *Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). In assessing these factors,

2  courts consider the impacts of the injunction on nonparties as well. *Id.* at 766.

3        Where plaintiffs establish "a likelihood that Defendants' policy violates the U.S.

4  Constitution, they also "establish[] that both the public interest and the balance of the equities favor

5  a preliminary injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir.

6  2014). So too for APA violations: the "public interest is served when administrative agencies

7  comply with their obligations under the APA." *Health & Human Servs.*, 281 F. Supp. 3d at 831–32

8  (finding "the public interest favors the granting of a preliminary injunction") (quoting *N. Mariana*

9  *Islands*, 686 F.Supp.2d at 21).

10        Other public interests and equities overwhelmingly support Plaintiffs' motion. The State

11  Department concluded that Defendants' actions would harm the national interests because

12  "termination of TPS would likely leave hundreds of thousands of TPS recipients—many of whom

13  have lived and worked in the United States for more than 15 years and have U.S. citizen children—

14  out of legal status." Exs. 112-113 ("TPS recipients have jobs, have gotten married, have many

15  thousands of American citizen children … work legally in great numbers, pay taxes, own homes,

16  own businesses, and live the American dream minus a path to citizenship."). Many TPS holders

17  "will return to countries with limited economic opportunities for their reintegration … [and] weak

18  law enforcement capabilities and inadequate government services [that] will make it difficult for

19  their respective governments to ensure the protection of returning citizens—no less the U.S. citizen

20  children who may accompany their parents." Ex. 112, 114-115. Others will remain here, forced into

21  the shadows. As Ambassador Nealon explained, and diplomatic cables confirmed, the termination of

22  TPS is likely to "spur further irregular migration to the United States" and "jeopardize our

23  cooperation and partnership" with Central American nations. Ex. 113; *see also* Exs. 67, 69.

24        Defendants' actions also threaten to harm the community as a whole. *See Hernandez*, 872

25  F.3d at 996 (affirming that courts may consider "indirect hardship to [immigrants'] friends and

26  family members" when issuing injunctive relief) (citation omitted)). Discovery has revealed an

27  extraordinary number of letters to DHS from congressional representatives; state and local officials;

28  faith, labor, and civil rights leaders; and other concerned individuals describing the positive

contributions made by TPS holders and the harms that will result from their loss of status. *See* Ex. 106. Members of Congress and local leaders have stressed that termination "would needlessly tear apart families and communities across the country" and lead to the loss of TPS holders who "are integral members of our neighborhoods, workplaces, religious communities, schools, and health care institutions." Ex. 106 (letter by bipartisan group of 116 members of Congress ); Ex. 108 (letter by 41 mayors). Defendants' termination of TPS will also devastate thousands of school-age U.S. citizen children, whose communities will bear the economic, social, and moral burden of caring for children separated from their parents. *See, e.g.,* Flores de Ayala Decl. ¶ 20.

The State Department also has recognized that terminating TPS will have negative consequences for the "long-standing national security and economic interests" of the United States and the long-term stability of TPS holders' countries. Exs. 67 (explaining "a termination of TPS could undermine US-Slavadoran efforts on a range of issues of mutual concern and fighting transnational criminal organizations, such as MS-13."), 70 ("Extending TPS for Haiti is in the national interest"); *see also* Ex. 116 (Letter from Major General Jon Norman explaining that "removing Haiti from TPS … may have near and long term repercussions for Haitian stability"). "Termination of TPS will … likely generate a backlash from the governments themselves. … They may take retaliatory actions … like withdrawing their counternarcotics and anti-gang cooperation with the United States, reducing their willingness to accept the return of their departed citizens, or refraining from efforts to control illegal migration." Ex. 112 (Tillerson Letter).

In contrast, Defendants will suffer no material harm. If this Court issues a preliminary injunction to preserve the status quo, then Defendants' ability to enforce the relevant TPS determinations will merely be delayed pending resolution of this case on the merits. Put another way, if Defendants' conduct was somehow lawful, then the termination decisions may lawfully go into effect. If Plaintiffs prevail on the merits, however, then Defendants have no interest in enforcing unlawful or unconstitutional decisions. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice.").

1

## CONCLUSION

2

For these reasons, the Court should grant Plaintiffs' motion for preliminary injunction.

3

Plaintiffs respectfully request that the Court issue an order enjoining Defendants from implementing

4

or enforcing the decisions to terminate TPS for Sudan, Nicaragua, Haiti, and El Salvador pending

5

final resolution on the merits.

6

Date:  September 20, 2018

7

By:  */s/ Alycia A. Degen*
Alycia A. Degen
Sean A. Commons

8

Nicole M. Ryan
Ryan M. Sandrock

9

Amanda R. Farfel
Andrew B. Talai

10

Marisol Ramirez
Mohindra Rupram

11

Katelyn N. Rowe
Jessica Fishfeld

12

Matthew J. Letten
Jillian R. Dent

13

SIDLEY AUSTIN LLP

14

Ahilan T. Arulanantham
ACLU FOUNDATION OF SOUTHERN

15

CALIFORNIA

16

William S. Freeman
ACLU FOUNDATION OF NORTHERN

17

CALIFORNIA

18

Jessica Karp Bansal
Emilou MacLean

19

NATIONAL DAY LABORER
ORGANIZING NETWORK

20

21

MARK E. HADDAD, ESQ.

22

*Attorneys for Plaintiffs*

23

24

25

26

27

28