Xavier Becerra
Attorney General of California
Michael Newman
Senior Assistant Attorney General
James F. Zahradka II (SBN 196822)
Deputy Attorney General
  1515 Clay Street, 20th Floor
  Oakland, CA  94612-0550
  Telephone: (510) 879-1247
  Fax: (510) 622-2270
  E-mail:  James.Zahradka@doj.ca.gov
*Attorneys for the State of California*

[Additional Counsel Listed on Signature Page]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTA RAMOS, individually and on behalf of others similarly situated; CRISTINA MORALES; BENJAMIN ZEPEDA, individually and on behalf of others similarly situated; ORLANDO ZEPEDA; JUAN EDUARDO AYALA FLORES, individually and on behalf of others similarly situated; MARIA JOSE AYALA FLORES; ELSY YOLANDA FLORES DE AYALA; HNAIDA CENEMAT, individually and on behalf of others similarly situated; WILNA DESTIN; RILYA SALARY, individually and on behalf of others similarly situated; SHERIKA BLANC; IMARA AMPIE; MAZIN AHMED; and HIWAIDA ELARABI, | Case No. 3:18-cv-01554-EMC |
| Plaintiffs, | **BRIEF OF AMICI STATES CALIFORNIA, DISTRICT OF COLUMBIA, MASSACHUSETTS, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, IOWA, MAINE, MARYLAND, MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| KIRSTJEN NIELSEN, in her official capacity as Secretary of Homeland Security; ELAINE C. DUKE, in her official capacity as Deputy Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and UNITED STATES OF AMERICA, | |
| Defendants. | |

i

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND INTEREST OF AMICI STATES ................................................. 1

II.   THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION
      BECAUSE DHS'S POLICY WILL INFLICT SERIOUS AND IRREPARABLE
      HARM ON INDIVIDUALS, FAMILIES, COMMUNITIES, AND THE AMICI
      STATES. ................................................................................................................................ 2

      A.    Families Will Be Torn Apart ................................................................................. 5

      B.    Amici States' Economies and Workforces Will Suffer. ....................................... 9

      C.    Vulnerable Residents Will Suffer from Disruptions in Care Provided by

            TPS Holders. ...................................................................................................... 10

      D.    Public Health Will Suffer ................................................................................... 12

      E.    Public Safety Will Suffer. .................................................................................. 13

III.  CONCLUSION ............................................................................................................... 13

# TABLE OF AUTHORITIES

**Page**

### CASES

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*
 458 U.S. 592 (1982) .............................................................................................13

*All. for the Wild Rockies v. U.S. Forest Serv.*
 2016 U.S. Dist. LEXIS 78984 (D. Idaho June 14, 2016).................................4

*City of Sausalito v. O'Neill*
 386 F.3d 1186 (9th Cir. 2004)...........................................................................4

*Colo. River Indian Tribes v. DOI*
 2015 U.S. Dist. LEXIS 182548 (C.D. Cal. June 11, 2015)..............................4

*Cty. of Santa Clara v. Trump*
 250 F. Supp. 3d 497 (N.D. Cal. 2017) ..............................................................4

*Doe v. Trump*
 288 F. Supp. 3d 1045 (W.D. Wash. 2017) .......................................................3

*Earth Island Inst. v. Elliott*
 290 F. Supp. 3d 1102 (E.D. Cal. 2017) ............................................................4

*Earth Island Inst. v. Quinn*
 2014 U.S. Dist. LEXIS 105647 (E.D. Cal. July 31, 2014) ...............................4

*Golden Gate Rest. Ass'n v. City & Cty. of S.F.*
 512 F.3d 1112 (9th Cir. 2008)....................................................................2, 3, 4

*Hawaii v. Trump*
 878 F.3d 662 (9th Cir. 2017).............................................................................3

*Hernandez v. Sessions*
 872 F.3d 976 (9th Cir. 2017).........................................................................2, 3

*Int'l Refugee Assistance Project v. Trump*
 857 F.3d 554 (4th Cir. 2017).............................................................................3

*Morris v. N. Haw. Cmty. Hosp.*
 37 F. Supp. 2d 1181 (D. Haw. 1999) ...............................................................4

*Ms. L. v. U.S. Immigration & Customs Enf't*
 310 F. Supp. 3d 1133 (S.D. Cal. 2018)..........................................................2, 3

*NAACP v. Trump*
 2018 U.S. Dist. LEXIS 139663 (D.D.C. Aug. 17, 2018).................................2

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health and Hum. Servs.*
2018 U.S. Dist. LEXIS 69213 (E.D. Wash. Apr. 24, 2018) ........................................4

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013)..................................................................................2

*Ross v. Inslee*
2014 U.S. Dist. LEXIS 151364 (E.D. Wash. Oct. 24, 2014)...................................4

*Smith v. California*
361 U.S. 147 (1959) ...................................................................................................4

*Spiegel v. City of Houston*
636 F.2d 997 (5th Cir. 1981).....................................................................................4

*Stormans, Inc. v. Selecky*
586 F.3d 1109 (9th Cir. 2009)..................................................................................4

*United States v. Odessa Union Warehouse Co-op*
833 F.2d 172 (9th Cir. 1987).....................................................................................4

*Vidal v. Nielsen*
279 F. Supp. 3d 401 (E.D.N.Y. 2018) ....................................................................3

*Washington v. Trump*
847 F.3d 1151 (9th Cir. 2017)..................................................................................3

*Zepeda v. I.N.S.*
753 F.2d 719, 727 (9th Cir. 1983)............................................................................2

## STATUTES

8 United States Code

§ 1254a(b)(1)(A) ........................................................................................................7

§ 1254a(c)(2)(B)(i) .....................................................................................................3

§ 1254a(c)(3)(A) .........................................................................................................3

## OTHER AUTHORITIES

83 Fed. Reg. 2654 (Jan. 18, 2018) .................................................................................8

Am. C. of Obstets. & Gynecols., *Health care for unauthorized immigrants*, Comm.
Op. No. 627, 125 Obstet. Gynecol. 755 (2015), https://tinyurl.com/ACOG627 .....................12

iv

Amanda Baran & Jose Magaña-Salgado, *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, Immigrant Legal Resource Ctr. (Apr. 2017), https://tinyurl.com/TPSEcon...................................................................................9

Amer. Immig. Council, *Fact Sheet: Temporary Protected Status in the United States* (Oct. 23, 2017), https://tinyurl.com/AIC-TPS ...............................................3

Cal. Employ. Dev. Dep't, *2016-2026 Statewide Employment Projections Highlights*, https://tinyurl.com/CALabMar...........................................................11

Cecilia Menjívar, *Temporary Protected Status in the United States: The Experiences of Honduran and Salvadoran Immigrants*, U. Kan. Ctr. Migration Res. (May 2017), http://ipsr.ku.edu/migration/pdf/TPS_Report.pdf .............................11

Christine Olsen et al., *Differences in quality of life in home-dwelling persons and nursing home residents with dementia – a cross-sectional study*, 16 BMC GERIATRICS 137 (2016), https://tinyurl.com/NursHomeQual .....................................12

Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* (Dec. 2007), https://tinyurl.com/CBOImm............................12

D.C. Council, Rep. on PR-22-448 (Nov. 21, 2017)...........................................................10

Decl. of Anne McCleod, *Regents v. U.S. Dep't of Homeland Security* 3:17-cv-05211, ECF No. 118-1 (App. 789–90) (N.D. Cal. Nov. 1, 2017) ..............................12

Decl. of Jesse M. Caplan, *New York v. Trump* 1:17-cv-05228, ECF No. 55-83 (E.D.N.Y. Oct. 4, 2017) ......................................12, 13

G. Thomas Kingsley et al., *The Impacts of Foreclosures on Families and Communities*, The Urb. Inst. (May 2009), https://tinyurl.com/GTKUrban .............................10

Gustavo López, *Hispanics of Nicaraguan Origin in the United States, 2013* Pew Research Center (Sept. 15, 2015), https://tinyurl.com/Nic-constr ........................................9, 10

Heather Koball et al., *Health and Social Service Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, Migration Pol'y Inst. (Sept. 2015), https://tinyurl.com/MIRFinal ...........................................................................6

HIROKAZU YOSHIKAWA, IMMIGRANTS RAISING CITIZENS: UNDOCUMENTED PARENTS AND THEIR YOUNG CHILDREN (2011) ...............................................................6

Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigration Enforcement and Latino Foreclosures* 3 SOC. SCI. 1053 (2016), https://tinyurl.com/Rugh-frclse ...........................................................................10

James Queally*, Fearing deportation, many domestic violence victims are steering clear of police and courts*, L.A. TIMES, Oct. 9, 2017, https://tinyurl.com/Queally ...........................................................................13

v

Jens Hainmueller et al., *Protecting unauthorized immigrant mothers improves their children's mental health*, SCIENCE (Aug. 31, 2017), https://tinyurl.com/HainScience ....................................................................6

K. Yun et al., *Parental immigration status is associated with children's health care utilization*, 17 MATERN. CHILD HEALTH J. 1913 (2013) ...................................12

Kim Slowey, *DACA Expiration, TPS Elimination Threaten 100K+ Construction Jobs*, Construction Dive (Jan. 24, 2018), https://tinyurl.com/TPSConst ...........9, 10

Kristen Lee Gray*, Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood*, Cal. Poly. St. U., San Luis Obispo (June 2011), https://tinyurl.com/j3lgrno .......................................................................6

Kristen McCabe, *African Immigrants in the United States*, Migration Policy Institute (July 21, 2011), https://tinyurl.com/Afr-immig .......................................9

Louis Hansen, *Another problem for fire victims — shortage of construction workers*, SAN JOSE MERCURY NEWS, Aug. 2, 2018, https://tinyurl.com/Merc-Contstr ..............................................................................................................10

Marva Serotkin & Tara Gregorio, *Nursing facilities, and their residents, will feel impact if Haitians' status ends*, BOSTON GLOBE, Dec. 4, 2017, https://tinyurl.com/Serotkin ..............................................................................11

Mass. Exec. Off. of Labor & Workforce Dev., *Labor Market Information: Most Job Openings for Massachusetts*, https://tinyurl.com/MASSLabMar ......................11

Melissa Bailey, *As Trump Targets Immigrants, Elderly Brace to Lose Caregivers*, KAISER HEALTH NEWS, Mar. 26, 2018, https://tinyurl.com/KHNImmig ...............11

Meredith L. King, *Immigrants in the U.S. Health Care System*, Ctr. for Am. Progress (June 2007), https://tinyurl.com/ImmHealth ...........................................12

New Amer. Econ. Res. Fund, *How Temporary Protected Status Holders Help Disaster Recovery and Preparedness* (Nov. 6, 2017), https://tinyurl.com/NewAmTPS.............................................................................9, 10

Nicholas Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, Nat'l Council for Adoption (May 1, 2011), https://tinyurl.com/ZillFoster ...............................................................................7

Nicole Prchal Svajlenka et al., *TPS Members Are Integral Members of the U.S. Economy and Society*, Ctr. Am. Progress (Oct. 20, 2017), https://tinyurl.com/TPSCAP .........................................................................2, 9

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, U. of Ill. at Chi. (May 2013), https://tinyurl.com/InsecComm ................................................................13

vi

NPR, Robert Wood Johnson Found., Harv. T.H. Chan Sch. of Pub. Health, *Child Care and Health in America* (Oct. 2016), https://tinyurl.com/RWJchildcare ......................... 11

Randy Capps et al., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Migration Pol'y Inst. (Sept. 2015), https://tinyurl.com/CappsMPI ............................................. 6

Robert Espinoza, *Immigrants and the Direct Care Workforce*, Paraprofessional Healthcare Institute (June 2017), https://tinyurl.com/PHI-Immig ............................................. 11

Robert Warren & Donald Kerwin*, A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. MIGRATION & HUM. SECURITY 577 (2017), https://tinyurl.com/WarKer ............................................................................. 5, 9, 10, 11

Ctr. Am. Progress, *TPS Holders in California, Temporary Protected Status: State-by-State Fact Sheets* (Oct. 20, 2017), https://tinyurl.com/CAP-CA-TPS ................................. 5

Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Res. Ctr. (Nov. 2011), https://tinyurl.com/ARCFam ............................................................................. 7

U.S. Dep't of St., *Nicaragua Travel Advisory* (July 7, 2018), https://tinyurl.com/Nic-trv-adv ............................................................................. 8

U.S. Dep't of St., *Recommendations Regarding TPS for Haiti, Honduras, and El Salvador* (Oct. 31, 2017), https://tinyurl.com/TPS-St-Dept ................................. 7

U.S. Dep't of St., *Sudan Travel Advisory* (July 2, 2018), https://tinyurl.com/Sud-trv-adv ............................................................................. 8

Wendy Cervantes et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, Ctr. Law & Soc. Pol'y (Mar. 2018), https://tinyurl.com/ChildFears ............................................................................. 6

Zillow Res., *TPS-Protected Salvadoran Homeowners Paid Approx. $100M in Property Taxes Last Year* (Jan. 8, 2018), https://tinyurl.com/zillow-tax ................................ 10

vii

## I.  INTRODUCTION AND INTEREST OF AMICI STATES

The Amici States[1] are home to hundreds of thousands of people from El Salvador, Haiti, Nicaragua, and Sudan who hold Temporary Protected Status ("TPS")—a legal status provided to foreign nationals who are present in the United States when their countries of origin become unsafe and cannot handle their return. TPS holders are nurses, roofers, pastors, chefs, bus drivers, teachers, landscapers, and child care providers. They are homeowners, business owners, union members, class presidents, and civic leaders. They are our neighbors, co-workers, family members, and friends.

The Department of Homeland Security's ("DHS") termination of TPS for El Salvador, Haiti, Nicaragua, and Sudan would strip these community members of legal authorization to work and could result in their deportation to countries that are unsafe and unprepared to receive them. Many TPS holders would presumably be deported or otherwise have no choice but to leave; others would go into the shadows; all would lose the right to remain legally in the United States and support themselves and their families under the terms of TPS. The result would be harm to the welfare of TPS holders and their families, shuttered businesses, labor shortages, empty church pews, and greater strain on public and private social services.

Already, TPS terminations are hurting our economy and civil society, as the prospect of widespread deportation has left whole communities uncertain, confused, and afraid. But these terminations will inflict even greater damage in the months ahead if they are not enjoined, including considerable harm to a range of Amici States' interests. The public interest, as seen through the lens of these harms to Amici States discussed below, weighs strongly in favor of the preliminary injunction sought by plaintiffs; accordingly, Amici States have a profound interest in this matter.

---

[1] The States are California, the District of Columbia, Massachusetts, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington. The District of Columbia is included as an "Amici State" for the purposes of this brief.

1

## II.    THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION BECAUSE DHS'S POLICY WILL INFLICT SERIOUS AND IRREPARABLE HARM ON INDIVIDUALS, FAMILIES, COMMUNITIES, AND THE AMICI STATES.

The public interest strongly favors plaintiffs as evidenced, in part, by the significant harm that Amici States will suffer without the preliminary relief that plaintiffs seek.[2] DHS's decisions are already inflicting broad and systemic harm on the public. The overwhelming majority of TPS holders have lived here for many years—in some instances, decades. For example, on average, Salvadoran recipients have lived in the United States for 21 years and Haitian recipients for 13 years.[3] These individuals have built lives in the United States. They have started families, founded businesses, bought homes, joined churches, received degrees, and advanced in their careers. They contribute to our economy and civic life in countless ways, both quantifiable and intangible. Granting the injunction that plaintiffs seek could prevent needless harm not only to TPS holders, but to those who rely on them for care, friendship, family and community cohesion, and economic vitality.

On the other side of the ledger, the federal government can assert little to no legally cognizable harm from entry of the injunction. As the Ninth Circuit has held, "the government[] . . . cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citing *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)).[4] The only conceivable harm to

---

[2] In cases like this one, which affects many non-parties (including Amici States), courts consider the hardship to third parties as part of the public interest analysis even when the government is a party. *See Golden Gate Rest. Ass'n v. City & Cty. of S.F.*, 512 F.3d 1112, 1126–27 (9th Cir. 2008); *see also Ms. L. v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1148 (S.D. Cal. 2018) (considering public interest in case involving separation of minor immigrant children from their parents) (citing *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017)).

[3] Nicole Prchal Svajlenka et al., *TPS Members Are Integral Members of the U.S. Economy and Society*, Ctr. Am. Progress (Oct. 20, 2017), https://tinyurl.com/TPSCAP. TPS holders from El Salvador and Haiti represent 75 percent of the total TPS population.

[4] *See also NAACP v. Trump*, 2018 U.S. Dist. LEXIS 139663, at *15 (D.D.C. Aug. 17, 2018) (finding lack of injury to federal government from order "simply correct[ing] the improper exercise of [DHS] authority" in case relating to rescission of Deferred Action for Childhood Arrivals ["DACA"]).

2

the federal government here would be some period of delay in effectuating the TPS terminations

if its actions are ultimately found to have been legal, a "harm" of vanishing significance when

juxtaposed with the harms that will befall plaintiffs, Amici States, and others if TPS is terminated

for the countries at issue. TPS recipients have been vetted extensively and, in many instances,

repeatedly,[5] and their individual status is subject to withdrawal if they lose eligibility by, for

example, being convicted of a felony.[6] Clearly, this group cannot be said to present a public

safety or national security threat such that immediate termination of their status is required even if

defendants' actions were legal.[7] Thus, as discussed by plaintiffs, the balance of equities tips in

favor of an injunction here. Pls.' Mot. for Prelim. Inj. 31–33.

   Courts have repeatedly taken the kinds of public harms asserted by Amici States here into

account when assessing whether issuing a preliminary injunction is appropriate. These have

included **harms to family members**, *Hernandez*, 872 F.3d at 996 (citing "indirect hardship to

[plaintiffs'] friends and family members," including harm to children who "had to receive

counseling because of the trauma of their government-compelled separation from their father")

(citing *Golden Gate Rest. Ass'n*, 512 F.3d at 1126), *Doe v. Trump*, 288 F. Supp. 3d 1045, 1084

(W.D. Wash. 2017) (citing "public interest in uniting families") (citation omitted);[8] **economic**

---

   [5] Amer. Immig. Council, *Fact Sheet: Temporary Protected Status in the United States* (Oct. 23, 2017), https://tinyurl.com/AIC-TPS (noting that TPS holders are subjected to background checks every time their TPS is renewed).

   [6] 8 U.S.C. §§ 1254a(c)(2)(B)(i), 1254a(c)(3)(A).

   [7] *See Vidal v. Nielsen*, 279 F. Supp. 3d 401, 436 (E.D.N.Y. 2018) (entering injunction against rescission of DACA, holding that DHS's interest in ending program was "not so compelling" because, *inter alia*, former DACA recipients would not be enforcement priorities and DHS could revoke specific recipients' deferred action and work authorization if needed).

   [8] *See also Hawaii v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017), *rev'd and remanded on other grounds*, 138 S. Ct. 2392 (2018) (holding that harm caused to third parties by "prolonged separation from family members" due to immigration decisions is cognizable) (citation omitted); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (citing "separated families" due to Muslim travel ban); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 612 (4th Cir. 2017), *vacated and remanded on other grounds* sub nom. *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) ("the public has an interest . . . in avoiding separation of families") (citation omitted); *Ms. L.*, 310 F. Supp. 3d at 1148 (citing "relationship between parent and child" in family separation context).

3

**and employment-based harms**, *All. for the Wild Rockies v. U.S. Forest Serv.*, 2016 U.S. Dist. LEXIS 78984, at *16 (D. Idaho June 14, 2016) (denying injunction against project on National Forest land, citing "employment and economic benefits to the surrounding communities"), *Colo. River Indian Tribes v. DOI*, 2015 U.S. Dist. LEXIS 182548, at *107 (C.D. Cal. June 11, 2015) (citing job creation in analysis of public interest factor); *Earth Island Inst. v. Quinn*, 2014 U.S. Dist. LEXIS 105647, at *22 (E.D. Cal. July 31, 2014) (citing potential job losses in analysis of injunction against timber harvesting project);[9] **increased public health care expenses**, *Golden Gate Rest. Ass'n*, 512 F.3d at 1126 (citing municipality's "overall health care expenses"); **public health harms**, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (citing potential impact on "health of state residents") (quotation marks omitted), *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health and Hum. Servs.*, 2018 U.S. Dist. LEXIS 69213, at *43 (E.D. Wash. Apr. 24, 2018) (finding that public interest served by issuing injunction to prevent termination of federal pregnancy prevention program), *Ross v. Inslee*, 2014 U.S. Dist. LEXIS 151364, at *23 (E.D. Wash. Oct. 24, 2014) (citing public interest "in assuring that people with mental health issues receive adequate treatment");[10] **public safety harms**, *Spiegel v. City of Houston*, 636 F.2d 997, 1002 (5th Cir. 1981) (finding injunction's impact on overbroad range of law enforcement practices contrary to public interest), *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1125 (E.D. Cal. 2017) (examining public safety implications of proposed injunction on Forest Service tree removal project);[11] and **impacts to public services**, *Morris v. N. Haw. Cmty. Hosp.*, 37 F. Supp. 2d 1181, 1188–89 (D. Haw. 1999) (discussing public interest in ensuring that eligible people receive home health care benefits).[12] All of these types of harms will clearly be

---

[9] *See also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000)).

[10] *See also United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987) (citing "the public interest in the purity of its food") (citing *Smith v. California*, 361 U.S. 147, 152 (1959)).

[11] *See also City of Sausalito*, 386 F.3d at 1198 (addressing alleged "public safety" harms to municipality).

[12] *See also Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) *appeal dismissed as moot, City & Cty. of S.F. v. Trump*, 2018 WL 1401847 (9th Cir. Jan. 4, 2018)

4

felt by Amici States and their residents if the TPS terminations at issue are not enjoined.

### A.      Families Will Be Torn Apart.

Having lived and worked legally in the United States for years, many TPS holders have gotten married, had children, and raised families in the Amici States. In fact, hundreds of thousands of children—each of whom is a U.S. citizen by birth—have been born to TPS holders in the United States.[13] As a result, hundreds of thousands of people live in "mixed-status" households, where one or both parents hold TPS, while some or all of their children (and, sometimes, a spouse) are U.S. citizens.

Terminating TPS guarantees that these "mixed-status" families will—at the very least— face agonizing choices. With the loss of TPS, a parent will face the unacceptable options of (1) returning to her country of origin alone, leaving her children behind; (2) taking her U.S. citizen children with her to a dangerous country that the children do not know, and where the safety of the TPS holder and her children cannot be ensured; or (3) staying in the United States and retreating into the shadows, knowing she cannot work legally and could be deported at any time. These are choices no parent should have to face, yet DHS is forcing hundreds of thousands of families to make these decisions through its new policy.

In fact, the prospect of confronting these choices is already harming children. Due to fears about family members' deportation, children across the country are experiencing serious mental

---

(holding that uncertainty generated by Executive Order denying federal funds to "sanctuary" jurisdictions "interferes with the Counties' ability to . . . properly serve their residents . . . [T]he Counties will be obligated to . . . mak[e] cuts to services") (citing *United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) [entering injunction based, in part, on public interest in avoiding reduction or elimination of "programs that support vital public services"]).

[13] TPS holders from El Salvador and Haiti have almost 220,000 United States citizen children, over 50,000 of whom live in California. Ten percent of Salvadoran and nine percent of Haitian TPS holders are married to a legal U.S. resident. Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Security 577, 577–78, 581 (2017), https://tinyurl.com/WarKer; Ctr. Am. Progress, *TPS Holders in California, Temporary Protected Status: State-by-State Fact Sheets* (Oct. 20, 2017), https://tinyurl.com/CAP-CA-TPS.

5

1   health problems, including depression, anxiety, self-harm, and regression.[14] Studies show that

2   children's concerns about their parents' immigration status can impair their socioemotional and

3   cognitive development.[15] And perhaps unsurprisingly, children whose immigrant mothers are

4   subject to deportation have higher incidence of adjustment and anxiety disorders.[16]

5          Of course, these harms are worsened when fears of forcible separation come true. In one

6   study, children with deported parents refused to eat, pulled out their hair, had persistent stomach-

7   aches and headaches, engaged in substance abuse, lost interest in daily activities, and had trouble

8   maintaining positive relationships with non-deported parents.[17] These traumatic childhood

9   experiences can also inflict lasting harm, including severe impairments of a child's self-worth and

10   ability to form close relationships later in life, increased anxiety, and depression.[18]

11          In addition to threatening children's health, deporting a family's financial breadwinner

12   can lead to economic hardship and loss of housing for remaining family members, and can put the

13   care of children, seniors, and disabled family members at serious risk.[19] As a result, many

14   families will be forced to seek increased social services, stretching the limited resources of the

15   Amici States. For example, as of 2011, more than 5,000 children nationally were estimated to be

16

17   _____

18          [14] Wendy Cervantes et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, Ctr. Law & Soc. Pol'y (Mar. 2018), https://tinyurl.com/ChildFears.

19          [15] HIROKAZU YOSHIKAWA, IMMIGRANTS RAISING CITIZENS: UNDOCUMENTED PARENTS AND THEIR YOUNG CHILDREN 120–36 (2011).

20          [16] Jens Hainmueller et al., *Protecting unauthorized immigrant mothers improves their*
21   *children's mental health*, SCIENCE (Aug. 31, 2017), https://tinyurl.com/HainScience (concluding that "[p]arents' unauthorized status is [] a substantial barrier to normal child development and
22   perpetuates health inequalities through the intergenerational transmission of disadvantage").

23          [17] Heather Koball et al., *Health and Social Service Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, Migration Pol'y Inst. 5 (Sept. 2015),
24   https://tinyurl.com/MIRFinal.

25          [18] Kristen Lee Gray, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood*, Cal. Poly. St. U., San Luis Obispo (June 2011),
26   https://tinyurl.com/j3lgrno.

27          [19] Randy Capps et al., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Migration Pol'y Inst. (Sept. 2015), https://tinyurl.com/CappsMPI.

28

6

living in foster care due to their parents' detention or deportation.[20] With long-term foster care estimated to cost about $25,000 per child per year,[21] these immigration enforcement actions cost states and local governments $125 billion dollars annually.[22] That burden could substantially increase if TPS holders lose status and are forced to separate from their families.

All of these harms are exacerbated by the fact that—despite DHS's determination to the contrary—returning TPS holders to their countries of origin would "pose a serious threat to their personal safety."[23] As recently as last year, the United States itself warned that that the affected countries do not have the ability to ensure that large numbers of TPS beneficiaries and their U.S. citizen children can safely return. Specifically, the State Department concluded that:[24]

- "Haiti continues to lack the capacity to ensure that the large population [of] TPS beneficiaries currently residing in the United States can return in safety."

- "El Salvador. . . continue[s] to have [one] of the world's highest homicide rates, and weak law enforcement capabilities and inadequate government services will make it difficult for [its] government[] to ensure the protection of returning citizens—no less the U.S. citizen children who may accompany their parents."

- "El Salvador remains unable, due to ongoing security and economic conditions, to handle adequately the precipitous return of its nationals . . . . including a significant amount of children, most of whom are dual U.S.-Salvadoran nationals . . . . Parents in many communities in El Salvador fear boys may be targeted for gang recruitment and

---

[20] Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Res. Ctr. 22 (Nov. 2011), https://tinyurl.com/ARCFam.

[21] Nicholas Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, Nat'l Council for Adoption (May 1, 2011), https://tinyurl.com/ZillFoster.

[22] *See also* Section D, *infra*, for a discussion of increased public health care costs to states and their political subdivisions if TPS holders are left without legal status.

[23] 8 U.S.C. § 1254a(b)(1)(A).

[24] U.S. Dep't of St., *Recommendations Regarding TPS for Haiti, Honduras, and El Salvador* (Oct. 31, 2017), https://tinyurl.com/TPS-St-Dept.

7

girls may be forced into sexual relations with gang members. Many parents in El Salvador refuse to even send their children to school out of fear of the gangs."

In addition, the State Department has issued a "Level 3: Reconsider Travel" advisory for Sudan, citing, *inter alia*, civil unrest and terrorism.[25] Indeed, some areas of Sudan (including Darfur) are under a "Level 4: Do Not Travel" advisory, where "violent crime, such as kidnapping, armed robbery, home invasion, and carjacking, is particularly prevalent." The State Department will not allow family members under 21 years of age (still less young children) to accompany U.S. government employees to Sudan.

Nicaragua is also under a Level 3 advisory, due to, *inter alia*, crime and civil unrest.[26] Conditions are so severe that on July 6, 2018, the U.S. government ordered non-emergency personnel to leave the county.  According to the State Department, "government-controlled parapolice forces" engage in "kidnapping and detaining individuals, taking over privately owned land, and committing other crimes . . . . Government authorities detain protesters, and some people have disappeared. Human rights groups have documented credible claims of torture of detainees . . . . Violent crime, such as sexual assault and armed robbery, is common and has increased as security forces focus on the civil unrest."

Although defendants claim to have received and reviewed input from "other appropriate U.S. Government agencies" in the course of their decisions to terminate TPS,[27] they seem to have ignored not only these warnings from State Department experts, but the in-depth, fact-specific research of USCIS professionals as well. In fact, as set forth in detail by plaintiffs, communications among decisionmakers and staff in the Administration show a radical departure from the normal process, with political appointees repeatedly overriding career expert staff who had concluded that the TPS countries were, in fact, far too dangerous for people to safely return.

---

[25] U.S. Dep't of St., *Sudan Travel Advisory* (July 2, 2018), https://tinyurl.com/Sud-trv-adv.

[26] U.S. Dep't of St., *Nicaragua Travel Advisory* (July 7, 2018), https://tinyurl.com/Nic-trv-adv.

[27] *See, e.g.*, Termination of Designation of El Salvador for TPS, 83 Fed. Reg. 2654, 2655 (Jan. 18, 2018).

*See* Pls.' Mot. for Prelim. Inj. 2-3, 6-14, 15-16. These warnings show that the impossible choices faced by TPS holders are, literally, matters of life and death, despite the Administration's efforts to whitewash these conditions to justify its actions.

### B.    *Amici States' Economies and Workforces Will Suffer.*

State economies will also suffer if the TPS terminations are upheld. The labor force participation rate for TPS holders from El Salvador is 88 percent, and for TPS holders from Haiti 81 percent, significantly higher than the overall national rate (63 percent).[28] Over ten years, loss of legal status for these TPS holders is projected to cost $132.6 billion in GDP (due to lost earnings as well as decreased industry outputs),[29] $5.2 billion in Social Security and Medicare contributions,[30] and $733 million in employers' turnover costs.[31]

This impact will be felt most acutely in fields where TPS holders are concentrated, including construction, hospitality, food service, landscaping, child care, and retail.[32] These jobs may prove difficult to fill, leading to a lack of needed services and economic strain. For example, an estimated 37,000-70,000 construction workers are TPS holders.[33] In the Los Angeles and District of Columbia metropolitan areas, almost one in five TPS holders (16,000 individuals) works in construction.[34] More broadly, almost 16 percent of employed African-born immigrants (including Sudanese immigrants) work in construction,[35] as do 17,000 Nicaraguan immigrants.[36]

---

[28] Warren & Kerwin, *supra* note 13 at 577, 582.

[29] Svajlenka, *supra* note 3 (data in appendix: https://tinyurl.com/CAP-APPX).

[30] Amanda Baran & Jose Magaña-Salgado, *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, Immigrant Legal Resource Ctr. 7 (Apr. 2017), https://tinyurl.com/TPSEcon.

[31] *Id.* at 8.

[32] Warren & Kerwin, *supra* note 13 at 583–84.

[33] Kim Slowey, *DACA Expiration, TPS Elimination Threaten 100K+ Construction Jobs*, Construction Dive (Jan. 24, 2018), https://tinyurl.com/TPSConst.

[34] New Amer. Econ. Res. Fund, *How Temporary Protected Status Holders Help Disaster Recovery and Preparedness* (Nov. 6, 2017), https://tinyurl.com/NewAmTPS.

[35] Kristen McCabe, *African Immigrants in the United States*, Migration Policy Institute (July 21, 2011), https://tinyurl.com/Afr-immig.

[36] Gustavo López, *Hispanics of Nicaraguan Origin in the United States, 2013*, Pew Research Center (Sept. 15, 2015), https://tinyurl.com/Nic-constr.

9

Construction companies in the District of Columbia area estimate that termination of TPS will cause them to lose 20 percent of their skilled workforce.[37] The loss of these workers would hurt the construction industry, which is already "having trouble hiring workers."[38] Among other things, this labor shortage jeopardizes the Amici States' ability to prepare for natural disasters,[39] as well as rebuild after them (for example, the recent California wildfires).[40]

The Amici States will also suffer by losing TPS holders as homeowners. Thirty-two percent of TPS holders from El Salvador and Haiti have mortgages,[41] and almost 42 percent of Nicaraguan immigrants are homeowners,[42] an important measure of their economic contribution to the Amici States. Salvadoran TPS homeowners pay an estimated $100 million in property taxes annually, including up to $32 million in the Los Angeles area alone.[43] These homeowners' loss of status could lead to job loss or deportation, which would in turn result in more foreclosures.[44] In turn, foreclosures cause hardship for families and require more local resources to be spent to address the effects of foreclosure, including declining property values, abandoned homes, crime and social disorder.[45]

### C.    Vulnerable Residents Will Suffer from Disruptions in Care Provided by TPS Holders.

Terminating TPS will also disrupt child care facilities, nursing homes, home healthcare companies, and hospitals, many of which rely on TPS holders in their workforce. Almost seven

---

[37] D.C. Council, Rep. on PR-22-448 at 9, 37, & 58 (Nov. 21, 2017).

[38] Slowey, *supra* note 33.

[39] New Amer. Econ. Res. Fund, *supra* note 34.

[40] Louis Hansen, *Another problem for fire victims — shortage of construction workers*, SAN JOSE MERCURY NEWS, Aug. 2, 2018, https://tinyurl.com/Merc-Contstr.

[41] Warren & Kerwin, *supra* note 13 at 582.

[42] López, *supra* note 36, https://tinyurl.com/Nic-homeowner.

[43] Zillow Res., *TPS-Protected Salvadoran Homeowners Paid Approx. $100M in Property Taxes Last Year* (Jan. 8, 2018), https://tinyurl.com/zillow-tax.

[44] *See* Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigration Enforcement and Latino Foreclosures*, 3 SOC. SCI. 1053 (2016), https://tinyurl.com/Rugh-frclse.

[45] G. Thomas Kingsley et al., *The Impacts of Foreclosures on Families and Communities*, The Urb. Inst. 13 (May 2009), https://tinyurl.com/GTKUrban.

1   percent of female TPS holders work in child care,[46] including 6,100 TPS holders from El

2   Salvador and Haiti alone.[47] Children rely on these providers for care and education, and parents

3   require these services to maintain their own employment. Losing child care workers will be

4   disruptive for the children and families they serve and for the economy, especially given how

5   difficult it is for parents to find affordable, trustworthy, and convenient child care.[48]

6        TPS terminations will also hurt seniors and people with disabilities. Studies show that

7   77,400 direct care workers across the country are immigrants from Haiti and El Salvador.[49] In

8   Massachusetts alone, nursing facilities employ about 4,300 Haitians.[50] If TPS holders can no

9   longer legally work in these jobs, vulnerable residents will lose the services of health care

10  workers with whom they have established trusting relationships. This loss of care could cause a

11  serious deterioration in their physical and mental health. Moreover, it may prove difficult for

12  employers to fill the positions TPS holders are forced to leave. Workers in direct care fields

13  generally receive low wages and no or minimal benefits, and the work is physically and

14  emotionally demanding. As a result, turnover in the industry is high. In Massachusetts, one in

15  seven certified nursing assistant positions is vacant, leaving a shortage of 3,000 workers.[51]

16  Making matters worse, the demand for direct care assistance is increasing with a growing elderly

17  population.[52] If home care positions go unfilled, patients who would otherwise be able to stay in

18
19       [46] Cecilia Menjívar, *Temporary Protected Status in the United States: The Experiences of Honduran and Salvadoran Immigrants*, U. Kan. Ctr. Migration Res. 14 (May 2017), http://ipsr.ku.edu/migration/pdf/TPS_Report.pdf.

20       [47] Warren & Kerwin, *supra* note 13 at 583–84.

21       [48] NPR, Robert Wood Johnson Found., Harv. T.H. Chan Sch. of Pub. Health, *Child Care and Health in America* (Oct. 2016), https://tinyurl.com/RWJchildcare.

22       [49] Robert Espinoza, *Immigrants and the Direct Care Workforce*, Paraprofessional Healthcare Institute (June 2017), https://tinyurl.com/PHI-Immig.

23
24       [50] Marva Serotkin & Tara Gregorio, *Nursing facilities, and their residents, will feel impact if Haitians' status ends*, BOSTON GLOBE, Dec. 4, 2017, https://tinyurl.com/Serotkin.

25       [51] Melissa Bailey, *As Trump Targets Immigrants, Elderly Brace to Lose Caregivers*, KAISER HEALTH NEWS, Mar. 26, 2018, https://tinyurl.com/KHNImmig.

26       [52] In California and Massachusetts, the position of home health aide is the fastest growing job, predicted to grow by 41% and 38%, respectively, in the next few years. Cal. Employ. Dev.

27  Dep't, *2016-2026 Statewide Employment Projections Highlights*, https://tinyurl.com/CALabMar ("CA Long-Term" tab); Mass. Exec. Off. of Labor & Workforce Dev., *Labor Market*

28

11

their homes may be forced to move to nursing facilities, incurring higher costs for them and the Amici States and, in many cases, significantly decreasing patients' quality of life.[53]

### D.      Public Health Will Suffer.

The TPS terminations will also harm public health and strain state resources. When TPS holders lose work authorization, many will lose employer-sponsored health insurance for themselves and their families, hindering their access to health care.[54] For example, studies show that children of undocumented immigrants are often sicker when seeking emergency room care and frequently miss their preventive annual exams.[55] In the same vein, undocumented women are less likely to receive needed healthcare and preventive screenings than the general U.S. population; this leads to significantly higher rates of adverse conditions, including cervical cancer and birth complications, neonatal morbidity, respiratory distress syndrome, and seizures for newborns.[56] All these individual health problems add up, creating public health consequences that could have been prevented if these patients had had better access to preventive and routine care. Less employer-sponsored health insurance increases Amici States' costs to provide care to uninsured residents—including emergency health insurance, payments to hospitals and community health centers, and funding for public health programs that serve underinsured patients.[57]

*Information: Most Job Openings for Massachusetts*, https://tinyurl.com/MASSLabMar.

[53] *See, e.g.,* Christine Olsen et al., *Differences in quality of life in home-dwelling persons and nursing home residents with dementia – a cross-sectional study*, 16 BMC GERIATRICS 137 (2016), https://tinyurl.com/NursHomeQual.

[54] *See, e.g.,* Decl. of Anne McCleod, *Regents v. U.S. Dep't of Homeland Security*, 3:17-cv-05211, ECF No. 118-1 (App. 789–90) (N.D. Cal. Nov. 1, 2017); Decl. of Jesse M. Caplan, *New York v. Trump*, 1:17-cv-05228, ECF No. 55-83 (E.D.N.Y. Oct. 4, 2017); Meredith L. King, *Immigrants in the U.S. Health Care System*, Ctr. for Am. Progress (June 2007), https://tinyurl.com/ImmHealth.

[55] King, *supra* note 54; K. Yun et al., *Parental immigration status is associated with children's health care utilization*, 17 MATERN. CHILD HEALTH J. 1913, 1913–21 (2013).

[56] Am. C. of Obstets. & Gynecols., *Health care for unauthorized immigrants*, Comm. Op. No. 627, 125 OBSTET. GYNECOL. 755 (2015), https://tinyurl.com/ACOG627.

[57] *See, e.g.,* Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007), https://tinyurl.com/CBOImm (stating that county governments that share a border with Mexico incurred almost $190 million in costs for providing

1

### E. Public Safety Will Suffer.

2

The signatories to this brief are Attorneys General, most of whom serve as the Amici

3

States' chief law enforcement officers. In that role, the Attorneys General are dedicated to

4

ensuring that police and prosecutors are able to do their jobs to protect public safety. Terminating

5

TPS will make that job harder because former TPS holders and their families will be less likely to

6

report crime, even if they are victims, after they lose legal status.[58] When law enforcement is

7

unable to obtain evidence of crimes, public safety suffers, and the Amici States will have more

8

difficulty enforcing their criminal codes, a core aspect of state sovereignty. *See, e.g.*, *Alfred L.*

9

*Snapp & Son, Inc. v. P.R.* ex rel. *Barez*, 458 U.S. 592, 601 (1982).

10

### III. CONCLUSION

11

Plaintiffs' motion for preliminary injunction should be granted.

12

Dated: August 30, 2018                                    Respectfully Submitted,

13

XAVIER BECERRA
*Attorney General*
*State of California*

14

15

*James F. Zahradka II*

16

James F. Zahradka II
*Deputy Attorney General*
1515 Clay Street, Suite 2000
Oakland, CA 94612

17

18

19

20

21

22

uncompensated care to unauthorized immigrants in 2000, representing about one-quarter of all their uncompensated health costs); Caplan Decl., *supra* note 54 (discussing fiscal harms to Massachusetts when immigrants lose employer-sponsored health insurance).

23

24

[58] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, U. of Ill. at Chi. (May 2013),

25

https://tinyurl.com/InsecComm (70 percent of undocumented immigrants reporting they are less likely to contact law enforcement if they were victims of a crime "for fear they will ask me or other people I know about our immigration status"); James Queally, *Fearing deportation, many*

26

*domestic violence victims are steering clear of police and courts*, L.A. TIMES, Oct. 9, 2017,

27

https://tinyurl.com/Queally (Los Angeles law enforcement officials reporting precipitous drop in domestic violence reports in Latino community, which they attributed to victims' fear of

28

deportation).

13

| | | |
|---|---|---|
| 1 | MAURA HEALEY<br>*Attorney General* | KARL A. RACINE<br>*Attorney General* |
| 2 | *Commonwealth of Massachusetts*<br>One Ashburton Place | *District of Columbia*<br>441 4th Street, N.W. |
| 3 | Boston, MA 02108 | Washington, D.C. 20001 |
| 4 | GEORGE JEPSEN<br>*Attorney General* | MATTHEW P. DENN<br>*Attorney General* |
| 5 | *State of Connecticut*<br>55 Elm Street | *State of Delaware*<br>Carvel State Building, 6th Floor |
| 6 | Hartford, CT  06106 | 820 North French Street<br>Wilmington, DE 19801 |
| 7 | RUSSELL A. SUZUKI<br>*Attorney General* | LISA MADIGAN |
| 8 | *State of Hawaii*<br>425 Queen Street | *Attorney General*<br>*State of Illinois* |
| 9 | Honolulu, HI 96813 | 100 W. Randolph St, 12th Fl.<br>Chicago, IL 60601 |
| 10 | TOM MILLER<br>*Attorney General* | LORI SWANSON |
| 11 | *State of Iowa*<br>1305 E. Walnut Street | *Attorney General*<br>*State of Minnesota* |
| 12 | Des Moines IA 50319 | 75 Rev. Dr. Martin Luther King Jr. Blvd.<br>St. Paul, MN 55155 |
| 13 | BRIAN E. FROSH<br>*Attorney General* | JANET T. MILLS |
| 14 | *State of Maryland*<br>200 St. Paul Place | *Attorney General*<br>*State of Maine* |
| 15 | Baltimore, MD 21202 | 6 State House Station<br>Augusta, ME  04333 |
| 16 | GURBIR S. GREWAL<br>*Attorney General* | HECTOR BALDERAS |
| 17 | *State of New Jersey*<br>25 Market Street, Box 080 | *Attorney General*<br>*State of New Mexico* |
| 18 | Trenton, NJ 08625 | 408 Galisteo St.<br>Santa Fe, NM 87501 |
| 19 | BARBARA D. UNDERWOOD<br>*Attorney General* | ELLEN F. ROSENBLUM |
| 20 | *State of New York*<br>28 Liberty Street | *Attorney General*<br>*State of Oregon* |
| 21 | New York, NY 10005 | 1162 Court Street NE<br>Salem, OR 97301 |
| 22 | PETER F. KILMARTIN<br>*Attorney General* | THOMAS J. DONOVAN, JR. |
| 23 | *State of Rhode Island*<br>150 S. Main St. | *Attorney General*<br>*State of Vermont* |
| 24 | Providence, RI 02903 | 109 State Street<br>Montpelier, VT 05609 |
| 25 | MARK R. HERRING<br>*Attorney General* | ROBERT W. FERGUSON |
| 26 | *Commonwealth of Virginia*<br>202 North Ninth Street | *Attorney General*<br>*State of Washington* |
| 27 | Richmond, VA 23219 | P.O. Box 40100<br>Olympia, WA 98504 |
| 28 | | |

14