# EXHIBIT 18

KATHY NUEBEL KOVARIK - 08/03/2018

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                    SAN FRANCISCO

4    - - - - - - - - - - - - - - - - -x

5    CRISTA RAMOS, et al.,          :

6                      Plaintiffs,  :  Case No.

7         v.                        :  3:18-cv-1554-

8    KIRSTJEN NIELSEN, et al.,      :  EMC

9                      Defendants.  :

10   - - - - - - - - - - - - - - - -x

11

12

13            VIDEOTAPED DEPOSITION OF

14       U.S. DEPARTMENT OF HOMELAND SECURITY

15       By and Through Its Corporate Designee

16                KATHY NUEBEL KOVARIK

17                  Washington, D.C.

18                Friday, August 3, 2018

19                     9:35 a.m.

20

21

22

23   Job No.:  LA-185448

24   Pages 1 - 289

25   Reported By:  Joan V. Cain

| | | |
|---|---|---|
| 1 | currently in the review process by the magistrate | 10:14:31 |
| 2 | judge and have been part of ongoing discussions with | 10:14:36 |
| 3 | opposing counsel, but we certainly have reviewed the | 10:14:39 |
| 4 | letter and -- and take the concerns expressed into | 10:14:43 |
| 5 | account. | 10:14:47 |
| 6 | BY MS. MACLEAN: | 10:14:54 |
| 7 |    Q   Did you prepare any notes in preparation | 10:14:54 |
| 8 | for your deposition today? | 10:14:57 |
| 9 |    A   During conversations yesterday and on | 10:15:02 |
| 10 | Wednesday, I did take notes to remind myself of | 10:15:04 |
| 11 | certain facts regarding the four TPS designations at | 10:15:09 |
| 12 | hand. | 10:15:17 |
| 13 |    Q   Did you bring those with you today? | 10:15:18 |
| 14 |    A   I do not have them. | 10:15:20 |
| 15 |    Q   In total how long have you spent preparing | 10:15:48 |
| 16 | for today's deposition? | 10:15:50 |
| 17 |    A   I'd say approximately ten hours. | 10:16:08 |
| 18 |    Q   How would you define that time -- divide | 10:16:12 |
| 19 | that time? | 10:16:14 |
| 20 |      MR. TYLER:  Objection, vague. | 10:16:14 |
| 21 |      THE WITNESS:  How would you like me to | 10:16:21 |
| 22 | define that time? | 10:16:23 |
| 23 | BY MS. MACLEAN: | 10:16:23 |
| 24 |    Q   Well, you spent -- just to be clear, you | 10:16:24 |
| 25 | spent a few hours in deposition prep I guess over a | 10:16:26 |

```
 1   couple of days, and then it sounds like you may have     10:16:30
 2   spent maybe three or four hours reviewing documents.     10:16:32
 3   Is that accurate?                                        10:16:36
 4       A    Maybe six or seven with counsel and maybe a     10:16:37
 5   few hours on my own looking at my own notes, talking     10:16:43
 6   to myself.                                               10:16:48
 7       Q    Great.  Thank you.                              10:16:51
 8            MS. MACLEAN:  So we'll mark the letter that     10:16:56
 9   has been discussed that was sent by Rhett Martin to      10:17:01
10   Sean Commons as Exhibit 2 for the record.               10:17:06
11            (Deposition Exhibit 2 was marked for            10:17:08
12   identification.)                                         10:17:18
13   BY MS. MACLEAN:                                          10:17:18
14       Q    What is your current position at USCIS,         10:17:19
15   Ms. Nuebel Kovarik?                                      10:17:23
16       A    I am chief of the Office of Policy and          10:17:25
17   Strategy.                                                10:17:29
18       Q    And when did you begin that position?          10:17:29
19       A    I was appointed to that position on April      10:17:30
20   2nd of 2017.                                             10:17:32
21       Q    What was your position before that?            10:17:34
22       A    I was special advisor to the secretary.        10:17:38
23       Q    When did you begin that position?              10:17:41
24       A    Around January -- it might have been on        10:17:43
25   January 26, 2017.                                        10:17:46
```

| | |
|---|---|
| 1    Q    Did you have any informal role with the -- | 10:17:56 |
| 2  with the department or with the administration | 10:17:59 |
| 3  prior -- prior to January 26, 2017? | 10:18:02 |
| 4        MR. TYLER:  Objection, vague. | 10:18:06 |
| 5        THE WITNESS:  Define informal role. | 10:18:08 |
| 6  BY MS. MACLEAN: | 10:18:10 |
| 7    Q    Were you serving on any of the transition | 10:18:10 |
| 8  committees or providing information to the secretary | 10:18:18 |
| 9  or to the administration prior to that date? | 10:18:23 |
| 10   A    I volunteered on the transition team. | 10:18:26 |
| 11   Q    When did you volunteer on the transition | 10:18:28 |
| 12  team? | 10:18:32 |
| 13   A    I don't know the exact date.  Up until -- | 10:18:32 |
| 14  until the inauguration, but I don't remember the | 10:18:36 |
| 15  start date. | 10:18:39 |
| 16   Q    Okay.  And what did you do during the time | 10:18:40 |
| 17  that you were volunteering? | 10:18:44 |
| 18   A    I discussed immigration policies with the | 10:18:54 |
| 19  transition team and prepared for the | 10:18:56 |
| 20  President-elect's first 100 days in office. | 10:19:04 |
| 21   Q    Approximately how much time did you devote | 10:19:12 |
| 22  to that volunteer role? | 10:19:15 |
| 23   A    I don't recall. | 10:19:19 |
| 24   Q    Could you give me your best guess? | 10:19:21 |
| 25   A    Given that I don't know when I started, I | 10:19:25 |

1  would say it was a couple of hours during the week.    10:19:27
2  I had a full-time job on top of that.    10:19:35
3     Q    Were you part of an immigration committee    10:19:42
4  or an immigration group?    10:19:45
5     A    It wasn't an immigration group.  I don't    10:19:47
6  know if it had a formal name.    10:19:49
7     Q    Who else was part of that group?    10:19:51
8     A    There were several dozen or more    10:19:54
9  individuals.    10:19:57
10    Q    Can you recall as many as possible?    10:19:58
11    A    Well, okay.  So on the transition team, a    10:20:17
12  number of people volunteered:  Kate Laborde,    10:20:18
13  L-A-B-O-R-D-E; Andrea Loving; George Fishman;    10:20:26
14  Tiffany Cissna; Gene Hamilton; Jon Feere; John    10:20:35
15  Zadrozny; Lee Francis Cissna; Lora Ries; Tracy    10:20:47
16  Short.  I'm blanking on other names.    10:21:23
17    Q    Was Dimple Shah a part of that?    10:21:26
18    A    Dimple Shah.    10:21:29
19    Q    Was Stephen Miller part of that?    10:21:30
20    A    I don't recall if he was.  I never saw him.    10:21:33
21    Q    Was Jeff Sessions involved in that group?    10:21:36
22    A    I don't -- I don't know.    10:21:39
23    Q    Was Steve Bannon?    10:21:45
24    A    I don't know.    10:21:46
25    Q    What were you involved with particularly --    10:21:56

1  workers?                                               10:28:38

2     A     Well, the H-1B Visa program, is one program   10:28:41

3  in particular that is rife with fraud and abuse, and   10:28:47

4  there are a number of legislative changes that need    10:28:52

5  to be made.  We were looking at what could be done     10:28:54

6  administratively to protect U.S. workers.  We had an   10:28:58

7  interest in making sure that foreign workers as well   10:29:07

8  as U.S. workers were protected and that employers      10:29:10

9  were living up to their obligation to pay the wages    10:29:15

10  that they claimed to pay and to ensure that           10:29:18

11  employers were not benching U.S. citizen workers to   10:29:26

12  get around worker protections under the statute.      10:29:29

13     Q    So after your time with the transition        10:29:45

14  team, you became a special advisor to DHS Secretary   10:29:48

15  John Kelly.  How -- how did you initiate that role?   10:29:52

16     A    It was a logical outgrowth of I guess the     10:29:58

17  transition team.  I had applied, like everybody else  10:30:00

18  did, on the Whitehouse.gov web site to be involved,   10:30:08

19  and at the time they were looking for people to       10:30:14

20  start immediately upon inauguration and -- and there  10:30:17

21  was a group of people that started right away, also   10:30:24

22  known as the beachhead team.  We went in              10:30:29

23  immediately, and I believe everyone was given the     10:30:32

24  same title of special assistant or special advisor    10:30:34

25  to the secretary.                                     10:30:39

1    Q    Who else was part of that beachhead team?          10:30:41

2    A    There's some overlap with a lot of the          10:30:48

3 transition team members, but there are many          10:30:50

4 transition team members that did not.  I don't          10:30:53

5 recall exactly who started, but I can tell you          10:30:58

6 around the inauguration time, Gene Hamilton, Lora          10:31:00

7 Ries, Jon Feere, Julie Kirchner was part of the          10:31:11

8 beachhead, and I forgot she was on the transition          10:31:20

9 team, but I never communicated with Julie on the          10:31:23

10 transition team.  That's why I left her out.  Tracy          10:31:25

11 Short I believe started almost after the          10:31:30

12 inauguration.  There were other members of the -- of          10:31:33

13 the, quote, homeland security beachhead team.          10:31:49

14    Q    And what was your role during those first          10:31:53

15 three months before you took the position of chief          10:31:57

16 of the Office of Policy and Strategy?          10:32:02

17    A    There were two other individuals within the          10:32:10

18 U.S. Citizenship and Immigration Service that were          10:32:15

19 also on this beachhead team that were not on the          10:32:18

20 transition team, and so I worked with those two          10:32:20

21 individuals.          10:32:23

22    Q    Who were those individuals?          10:32:23

23    A    Craig Symons and Carl Risch.          10:32:24

24    Q    Carl Risch?          10:32:29

25    A    Yeah.          10:32:29

```
 1   documents, review anything -- any material that        10:46:17
 2   comes before us.                                       10:46:21
 3      Q    So Mr. Prelogar has been with the              10:46:22
 4   administration -- been -- been with the department     10:46:24
 5   since 2008?                                            10:46:26
 6      A    At least.                                       10:46:27
 7      Q    Ms. Hamilton, how long has she been with       10:46:28
 8   the department?                                        10:46:32
 9      A    She served in the INS, so she's been there     10:46:32
10   for a while.                                           10:46:35
11      Q    Okay.  And Mr. Law?                            10:46:36
12      A    He started approximately in October of        10:46:41
13   2017.                                                   10:46:42
14      Q    Where had he been before?                     10:46:46
15      A    Federation for -- I don't know the acronym,   10:46:48
16   but it's FAIR.                                         10:46:56
17      Q    Is it Federation for American Immigration     10:46:57
18   Reform?                                                 10:47:00
19      A    Sure.                                          10:47:01
20      Q    And what was his role there?                  10:47:01
21      A    I think he was a policy advisor.  He may      10:47:08
22   have been a registered lobbyist.  I -- I don't know   10:47:11
23   his exact title.                                       10:47:13
24      Q    Am I missing anyone who had been involved     10:47:22
25   with the TPS?  I think not.                            10:47:24
```

| | | |
|---|---|---|
| 1 | A    To make it clear, Jacob Stubbs receives | 10:47:26 |
| 2 | material because when things come through our | 10:47:30 |
| 3 | executive secretariat Jacob works with them, and so | 10:47:35 |
| 4 | he may touch material.  He doesn't advise me on | 10:47:41 |
| 5 | these issues.  He does like to do research on | 10:47:43 |
| 6 | country conditions, but he really more deals with | 10:47:47 |
| 7 | the paperwork. | 10:47:51 |
| 8 | Q    Mm-hmm.  Just to clarify, Mr. Levine had | 10:47:52 |
| 9 | been an advisor to the prior chief as well you had | 10:48:06 |
| 10 | said, right? | 10:48:10 |
| 11 | A    Yes. | 10:48:11 |
| 12 | Q    Can you describe your job responsibilities | 10:48:11 |
| 13 | generally? | 10:48:13 |
| 14 | A    Sure.  As chief I oversee subject matter | 10:48:17 |
| 15 | experts in all areas of immigration under the | 10:48:26 |
| 16 | portfolio of USCIS.  Our office oversees the policy | 10:48:29 |
| 17 | manual, policy memorandum, guidance, Federal | 10:48:38 |
| 18 | Register Notices.  It is our job to review all | 10:48:50 |
| 19 | documents related to policy generally, and my job is | 10:48:51 |
| 20 | also to advise the director on issues related to | 10:48:57 |
| 21 | policy.  I work with operators and counsel. | 10:49:00 |
| 22 | Q    Sorry.  When you say operators and counsel, | 10:49:11 |
| 23 | what do you mean? | 10:49:14 |
| 24 | A    I work with other directorates that have | 10:49:14 |
| 25 | adjudicatory responsibilities. | 10:49:17 |

1    Q    Okay.  What is your decision-making

2  authority at USCIS?

3          MR. TYLER:  Objection, vague.

4          THE WITNESS:  My decision-making

5  authorities, can you clarify?  What I make decisions

6  on?

7  BY MS. MACLEAN:

8    Q    Yes.  What you have the -- the authority

9  within the department to make decisions on.

10   A    Most of what we do is ultimately approved

11  by the front office, or we -- my office does a lot

12  of things.  I have decision-making authority over

13  our budget, travel, salaries, personnel issues.

14   Q    Other matters or policy or practice where

15  you have decision-making authority?

16   A    Only insofar as what may go into a decision

17  memo, but ultimately that's not my -- my

18  decision-making authority.

19   Q    Who do you communicate with most in your

20  current role?

21   A    My Deputy Nathan Stiefel, my senior advisor

22  Robert Law.

23   Q    I'm sorry.  Was Nathan -- how long has

24  Nathan Stiefel been at the department?

25   A    He was recently selected this year, so in

| | |
|---|---|
| | 10:49:19 |
| | 10:49:29 |
| | 10:49:31 |
| | 10:49:39 |
| | 10:49:41 |
| | 10:49:45 |
| | 10:49:45 |
| | 10:49:45 |
| | 10:49:47 |
| | 10:49:53 |
| | 10:49:54 |
| | 10:50:05 |
| | 10:50:09 |
| | 10:50:15 |
| | 10:50:19 |
| | 10:50:29 |
| | 10:50:32 |
| | 10:50:35 |
| | 10:50:38 |
| | 10:50:40 |
| | 10:50:45 |
| | 10:50:49 |
| | 10:50:54 |
| | 10:50:56 |
| | 10:51:03 |

```
 1   the last six months has he been deputy.          10:51:05

 2       Q    And where was he before that?           10:51:09

 3       A    He was in the Office of Citizenship within   10:51:15

 4   USCIS.                                            10:51:18

 5       Q    For -- for approximately how long, to the   10:51:18

 6   extent that you know?                             10:51:22

 7       A    Years.  It may have been before 2008.    10:51:22

 8       Q    Okay.  You'd mentioned in response to my   10:51:32

 9   question about who you communicate with most Mr. Law   10:51:33

10   and Mr. Stiefel.  Are there others?              10:51:36

11       A    I communicate with them all.  I communicate   10:51:39

12   with them all.                                    10:51:47

13       Q    How often when Mr. Kelly was the DHS      10:51:48

14   secretary, did you communicate with the DHS       10:51:54

15   secretary in your current role?                   10:51:56

16       A    Infrequently.                            10:51:58

17       Q    How would you define infrequently?       10:52:00

18       A    I don't recall a time when I directly    10:52:04

19   communicated with him.                            10:52:06

20       Q    And with -- when Acting Secretary Duke was   10:52:09

21   acting secretary, how often did you communicate with   10:52:17

22   her?                                              10:52:21

23       A    Not frequently.  I would say a handful of   10:52:21

24   times.                                            10:52:23

25       Q    When you communicated with then Acting   10:52:24
```

| | | |
|---|---|---|
| 1 | I have a standing meeting every other week | 11:03:20 |
| 2 | with my managers, all the chiefs of the divisions. | 11:03:22 |
| 3 | I have a standing meeting -- I have standing | 11:03:35 |
| 4 | meetings depending on if there are PCCs at the White | 11:03:37 |
| 5 | House.  Those might be standing, you know, every | 11:03:46 |
| 6 | month. | 11:03:49 |
| 7 | Q    Sorry.  What is PCC? | 11:03:49 |
| 8 | A    I'm sorry.  I don't even know what it | 11:03:50 |
| 9 | stands for.  Policy coordinating committee.  It's an | 11:03:52 |
| 10 | interagency meeting. | 11:03:56 |
| 11 | Q    Who attends those meetings? | 11:04:00 |
| 12 | A    It could be a variety of staff depending on | 11:04:01 |
| 13 | the topic.  Those were in place before this | 11:04:04 |
| 14 | administration.  It's a way to bring the | 11:04:06 |
| 15 | interagencies together to talk about certain issues, | 11:04:08 |
| 16 | and then there's a standing meeting on Fridays -- | 11:04:11 |
| 17 | Q    Sorry.  Just to be clear, the PCC meetings | 11:04:16 |
| 18 | will have sort of different agenda items -- | 11:04:19 |
| 19 | A    Yes. | 11:04:21 |
| 20 | Q    -- and then depending on what the agenda | 11:04:21 |
| 21 | item is, different people will come? | 11:04:24 |
| 22 | A    Right.  And then we do an immigration | 11:04:26 |
| 23 | meeting at the Executive Office Building or the | 11:04:35 |
| 24 | White House on Fridays. | 11:04:40 |
| 25 | Q    Who attends that meeting? | 11:04:41 |

| | | |
|---|---|---|
| 1 | A    It's myself -- U.S. Citizenship and | 11:04:43 |
| 2 | Immigration Services could be represented by myself, | 11:04:48 |
| 3 | Craig Symons, or Robert Law. | 11:04:51 |
| 4 | Q    And who else attends? | 11:05:03 |
| 5 | A    There are officials from the Domestic | 11:05:04 |
| 6 | Policy Council as well as Department of Justice. | 11:05:06 |
| 7 | Q    Who from the Domestic Policy Council | 11:05:08 |
| 8 | attends? | 11:05:11 |
| 9 | A    Well, it has varied over time because staff | 11:05:11 |
| 10 | come and go, but John Zadrozny, Theo Wold -- | 11:05:14 |
| 11 | Q    Sorry.  Theo Wold? | 11:05:20 |
| 12 | A    Wold, W-O-L-D.  Morgan Hunter.  There's | 11:05:22 |
| 13 | been a variety.  I mean, a number of staff. | 11:05:32 |
| 14 | Q    And who from the Department of Justice is | 11:05:41 |
| 15 | usually there? | 11:05:45 |
| 16 | A    Dave Whetstone, Chad Mizelle. | 11:05:46 |
| 17 | Q    Mizelle or Yizelle? | 11:05:55 |
| 18 | A    Mizelle.  There are other Department of | 11:05:59 |
| 19 | Homeland Security directorates.  I should note that | 11:06:13 |
| 20 | the Immigration Customs Enforcement as well as | 11:06:15 |
| 21 | Office of Policy within the Department of Homeland | 11:06:16 |
| 22 | Security also attends at times.  And potentially the | 11:06:18 |
| 23 | Department of State may have a represent- -- | 11:06:23 |
| 24 | representative. | 11:06:25 |
| 25 | Q    Mm-hmm.  Does anyone come from the White | 11:06:25 |

1    House besides the Domestic Policy Council?                11:06:28

2      A    Aside from -- well, Stephen Miller will            11:06:37

3    attend.                                                   11:06:39

4      Q    Regularly?                                         11:06:40

5      A    Pretty regularly.                                  11:06:44

6      Q    Anyone else?                                       11:06:50

7      A    Not that I can think of.  I think they all         11:06:51

8    work for the Domestic Policy Council.                     11:06:54

9      Q    Okay.  Has TPS ever come up in that White          11:06:56

10   House immigration meeting?                                11:07:00

11     A    If anything, it's mentioned in passing that        11:07:01

12   decisions are coming up, but we don't discuss TPS         11:07:03

13   normally.  These are --                                   11:07:06

14     Q    Are --                                             11:07:11

15     A    These are issues that we discuss with the          11:07:12

16   Department of Justice.                                    11:07:14

17     Q    Sorry.  The issues at the White House --           11:07:15

18   immi- -- at the White House immigration meeting are       11:07:19

19   issues that you discuss with Department of Justice         11:07:21

20   or you discuss TPS with Department of Justice?            11:07:24

21     A    No.  It's issues normally that involve both        11:07:27

22   homeland and the Department of Justice.                   11:07:31

23     Q    Okay.  Which of your standing meetings             11:07:33

24   would be -- if -- if any of your standing meetings        11:07:44

25   would be meetings where TPS was discussed, which          11:07:50

| | |
|---|---|
| 1 know, policy and practice has been when a country | 11:16:35 |
| 2 that has already been designated for TPS is up for | 11:16:37 |
| 3 review in these periodic reviews, what would you | 11:16:42 |
| 4 look to to determine whether the TPS should be | 11:16:46 |
| 5 extended, terminated, or no decision would be made? | 11:16:50 |
| 6    A    I think to answer that question, you need | 11:16:55 |
| 7 to understand the processes, and that includes | 11:16:56 |
| 8 the -- the research done by USCIS as well as the | 11:17:02 |
| 9 Department of State.  The criteria used are the | 11:17:07 |
| 10 legal standards under the statute, and the best | 11:17:13 |
| 11 evidence is what is in those decision memos and | 11:17:17 |
| 12 research. | 11:17:19 |
| 13    Q    Were you given any guidance when you | 11:17:35 |
| 14 started at USCIS with regard to how TPS periodic | 11:17:38 |
| 15 reviews are conducted? | 11:17:43 |
| 16    A    There's no standard policy, no written | 11:17:45 |
| 17 policy or guidance, and no training. | 11:17:47 |
| 18    Q    Do you know if there ever has been any | 11:17:59 |
| 19 standard written policy guidance? | 11:18:02 |
| 20    A    Not that I'm aware of. | 11:18:02 |
| 21    Q    Any training that has taken place with | 11:18:08 |
| 22 regard to TPS periodic reviews? | 11:18:10 |
| 23    A    Not that I'm aware of. | 11:18:14 |
| 24    Q    When you started in your current position | 11:18:29 |
| 25 as chief at USCIS, you got into the weeds in TPS | 11:18:30 |

| | |
|---|---|
| 1 | very quickly.  Were you given any directives or | 11:18:34 |
| 2 | guidance from the secretary or the -- I think then | 11:18:37 |
| 3 | acting director about how you should move forward | 11:18:42 |
| 4 | with regard to TPS? | 11:18:46 |
| 5 |     A    Not to kick start our interagency review | 11:18:47 |
| 6 | process.  I -- for that process I deferred to my | 11:18:50 |
| 7 | staff who had been there, the subject matter experts | 11:18:53 |
| 8 | to kick start that process. | 11:18:55 |
| 9 |     Q    Were you given any guidance about any -- | 11:18:56 |
| 10 | beyond kick starting the process, but how you from | 11:19:05 |
| 11 | your position as chief and how CIS would look at TPS | 11:19:07 |
| 12 | periodic reviews and determinations? | 11:19:12 |
| 13 |     A    Not that I recall. | 11:19:13 |
| 14 |     Q    What do you understand about the intents -- | 11:19:25 |
| 15 | and I think just a few more questions and then we | 11:19:27 |
| 16 | can take a break. | 11:19:29 |
| 17 |         What do you understand about the intents of | 11:19:31 |
| 18 | the TPS statute beyond what's written on the paper? | 11:19:32 |
| 19 |         MR. TYLER:  Objection, vague.  Calls for a | 11:19:34 |
| 20 | legal conclusion. | 11:19:42 |
| 21 |         THE WITNESS:  You want me to opine on | 11:19:42 |
| 22 | the -- the legality or the -- | 11:19:45 |
| 23 | BY MS. MACLEAN: | 11:19:45 |
| 24 |     Q    No. | 11:19:45 |
| 25 |     A    -- the purpose behind what Congress was | 11:19:47 |

1   intending?                                              11:19:49

2      Q    Yes, not the legality of it, but the -- the    11:19:50

3   purpose.  What do you understand that the TPS          11:19:53

4   statute is intended to achieve?                        11:19:56

5           MR. TYLER:  I'll object.  This goes beyond     11:20:02

6   the 30(b)(6) scope.  You're asking this question of    11:20:05

7   her as a fact witness, if you will, asking her         11:20:07

8   opinion.                                               11:20:10

9   BY MS. MACLEAN:                                        11:20:14

10     Q    What is the agency's position about the        11:20:14

11  intent of the statute?                                 11:20:16

12          MR. TYLER:  I'll object to that as beyond      11:20:17

13  the scope of the 30(b)(6) notice.  She's speaking as   11:20:19

14  a fact witness now, speaking to her own opinion.       11:20:24

15          THE WITNESS:  The temporary protected          11:20:32

16  status was created by Congress in order to give        11:20:35

17  temporary relief to individuals in the United          11:20:37

18  States.                                                11:20:43

19  BY MS. MACLEAN:                                        11:20:43

20     Q    When you read that, I noticed that you         11:20:44

21  emphasized temporary.  Was there -- is that correct?   11:20:46

22     A    Temporary -- it -- it does say temporary,      11:20:48

23  yes.  I emphasized it.                                 11:20:53

24     Q    And is there a reason that you emphasized      11:20:55

25  temporary?                                             11:20:58

```
 1      A     Because it's not a long-term legal status.        11:20:58
 2   It's a temporary status.  There's no reason I --           11:21:01
 3      Q     Is that the agency's position as well             11:21:14
 4   that -- that there's an emphasis and importance on         11:21:19
 5   the temporary nature of the status?                        11:21:21
 6            MR. TYLER:  Objection.  It is beyond the          11:21:24
 7   30(b)(6) scope.  You are asking these questions of         11:21:25
 8   this witness now as a fact witness.  She can only          11:21:29
 9   provide her own individual opinion.                        11:21:31
10            THE WITNESS:  I emphasized temporary              11:21:37
11   because I think Congress intended to provide               11:21:45
12   temporary relief to individuals who are in the             11:21:47
13   United States and to protect them if there was an          11:21:49
14   event or a reason for their not being able to              11:21:58
15   return.                                                    11:22:01
16   BY MS. MACLEAN:                                            11:22:01
17      Q     Have you had conversations with people in         11:22:01
18   the department about the fact that the -- the              11:22:06
19   temporary nature of TPS status should be emphasized        11:22:12
20   or prioritized?                                            11:22:17
21            MR. TYLER:  Same objection.  Beyond the           11:22:18
22   scope of the 30(b)(6).                                     11:22:20
23            THE WITNESS:  The one time I recall               11:22:32
24   emphasizing temporary would be in communicating our       11:22:32
25   decisions to the public that it was a temporary           11:22:41
```

| | | |
|---|---|---|
| 1 | international operations directorate, also known as | 12:18:31 |
| 2 | RAIO.  This evaluation team consists of maybe a | 12:18:37 |
| 3 | dozen people that do -- their job is to do country | 12:18:40 |
| 4 | condition reports for their directorate and for the | 12:18:43 |
| 5 | work that they do, and we utilize them to provide | 12:18:45 |
| 6 | country conditions on particular countries.  So we | 12:18:49 |
| 7 | reach out to them and ask for their input. | 12:18:55 |
| 8 | We also -- my staff reaches out to the | 12:18:59 |
| 9 | State Department to get their -- to get them to | 12:19:01 |
| 10 | consider a country condition assessment. | 12:19:06 |
| 11 | Q    Sorry.  Around what time do you reach out | 12:19:08 |
| 12 | to the State Department? | 12:19:10 |
| 13 | A    It could be any time in advance of the 60 | 12:19:11 |
| 14 | days.  It most likely could be six months in | 12:19:13 |
| 15 | advance.  Enough time to do the research, to compile | 12:19:19 |
| 16 | it, and to present it in a decision memo draft. | 12:19:21 |
| 17 | My staff begins to write the -- to write | 12:19:27 |
| 18 | the draft decision memo with that input.  It is | 12:19:31 |
| 19 | then -- | 12:19:41 |
| 20 | Q    Sorry.  Who from your staff writes that | 12:19:41 |
| 21 | decision memo? | 12:19:44 |
| 22 | A    It could be one of my two or three subject | 12:19:44 |
| 23 | matter experts, Brandon, Kathryn.  Yeah. | 12:19:48 |
| 24 | Once they are done writing a draft -- I | 12:19:54 |
| 25 | should note that they also reach out to other -- | 12:19:57 |

| | |
|---|---|
| 1 | maybe our Office of Performance and Quality that -- | 12:19:59 |
| 2 | that tracks data.  They reach out to our service | 12:20:05 |
| 3 | center operations.  They adjudicate TPS requests as | 12:20:11 |
| 4 | well as adjudicate employment authorization | 12:20:18 |
| 5 | documents that go along with it, and they may | 12:20:20 |
| 6 | provide input as to the number of people who | 12:20:22 |
| 7 | register and apply for EADs, employment | 12:20:25 |
| 8 | authorization documents. | 12:20:34 |
| 9 |         The team may also reach out to other | 12:20:34 |
| 10 | components within Department of Homeland Security, | 12:20:37 |
| 11 | including the Office of Immigration Statistics, who | 12:20:39 |
| 12 | keeps all statistics for the department on | 12:20:43 |
| 13 | immigration.  They may reach out to Immigration and | 12:20:47 |
| 14 | Customs Enforcement to get a better understanding | 12:20:51 |
| 15 | and data on removals to that country. | 12:20:56 |
| 16 |         So all of that research is compiled into a | 12:21:11 |
| 17 | decision memo.  That decision memo then is drafted | 12:21:12 |
| 18 | for my review, although my senior advisor may look | 12:21:16 |
| 19 | at it and may have edits and return it back to the | 12:21:20 |
| 20 | subject matter experts to make those edits. | 12:21:23 |
| 21 | Q    Sorry.  Who would -- who would make edits? | 12:21:27 |
| 22 | A    My senior advisor Robert Law.  Generally, I | 12:21:30 |
| 23 | like to meet with my staff to go over their first | 12:21:35 |
| 24 | draft to get briefed on the country conditions, to | 12:21:37 |
| 25 | understand the history of the designation.  At which | 12:21:41 |

| | |
|---|---|
| 1    together data from various different sources within | 12:24:24 |
| 2    the Department of Homeland Security? | 12:24:27 |
| 3      A     They rely on the research unit.  They may | 12:24:28 |
| 4    receive data from other -- other sources that they | 12:24:32 |
| 5    talk to our research unit about to verify.  There | 12:24:35 |
| 6    may be statistics or -- or information provided by a | 12:24:39 |
| 7    stakeholder group or maybe it's included in a | 12:24:42 |
| 8    letter.  They may look at that and ask the research | 12:24:45 |
| 9    unit to verify, and that may be included in the | 12:24:48 |
| 10    research. | 12:24:50 |
| 11      Q     And then the subject matter experts are | 12:24:54 |
| 12    ultimately responsible for drafting the memo that | 12:24:57 |
| 13    then goes to you and your senior advisor? | 12:25:00 |
| 14      A     Correct. | 12:25:02 |
| 15      Q     And the senior advisor makes the first set | 12:25:02 |
| 16    of edits to the -- | 12:25:06 |
| 17      A     Generally. | 12:25:07 |
| 18      Q     Generally.  And then it goes back to the | 12:25:08 |
| 19    subject matter experts? | 12:25:10 |
| 20      A     Yes.  I mean, at times they'll share it | 12:25:11 |
| 21    with me to make sure that I agree with his edits, | 12:25:18 |
| 22    and most of the time I defer to his edits or -- or | 12:25:21 |
| 23    ask him to ask the subject matter experts to | 12:25:26 |
| 24    adjudicate them. | 12:25:29 |
| 25      Q     Okay.  And then after the subject matter | 12:25:34 |

| | | |
|---|---|---|
| 1 | written in conjunction with Service Center | 13:43:48 |
| 2 | Operations.  That draft is provided to my senior | 13:43:54 |
| 3 | advisor.  Those comments are adjudicated.  Then it's | 13:43:57 |
| 4 | provided to me. | 13:44:04 |
| 5 | Q    Just to confirm because you have two senior | 13:44:05 |
| 6 | advisors, the senior advisor is the same Mr. Law who | 13:44:08 |
| 7 | is involved in the Federal Register process? | 13:44:13 |
| 8 | A    So my senior advisor -- I have one senior | 13:44:16 |
| 9 | advisor and -- at two different times, so like I | 13:44:18 |
| 10 | said, up until October it was -- it was Lawrence | 13:44:23 |
| 11 | Levine -- | 13:44:25 |
| 12 | Q    It was, sorry, who? | 13:44:25 |
| 13 | A    Lawrence Levine. | 13:44:27 |
| 14 | Q    Okay. | 13:44:28 |
| 15 | A    And then after around October it became | 13:44:28 |
| 16 | Robert Law. | 13:44:30 |
| 17 | Q    Oh, okay. | 13:44:31 |
| 18 | A    So generally it goes through that same | 13:44:36 |
| 19 | review, and we adjudicate comments with our subject | 13:44:38 |
| 20 | matter experts. | 13:44:41 |
| 21 | Q    And just so that I don't ask again, | 13:44:41 |
| 22 | whenever you mention senior advisor, you're talking | 13:44:44 |
| 23 | about, depending on the time period, either | 13:44:47 |
| 24 | Mr. Levine or Mr. Law? | 13:44:49 |
| 25 | A    That is correct. | 13:44:51 |

1    Q    Okay.  And then what happens after comments                13:44:52

2    have been adjudicated?                                          13:44:54

3    A    So because the Federal Register Notice                     13:44:56

4    impacts other components, including the Service                 13:45:00

5    Center Operations which adjudicates the registration            13:45:07

6    in the employment authorization documents, they                 13:45:12

7    would review it, but so would our division.  It's               13:45:14

8    known as IRIS.  The acronym stands for identity and             13:45:16

9    records division.  I can't remember what it stands              13:45:20

10   for, IRIS.  They do verification issues and would               13:45:27

11   have input as well.                                             13:45:31

12        And so that Federal Register Notice is                     13:45:37

13   circulated in a formal process called the G-1056                13:45:39

14   process, where it goes to the executive secretariat.            13:45:43

15   That executive secretariat tasks each component to              13:45:46

16   review it.  The executive secretariat collects those            13:45:49

17   comments and returns it to my subject matter experts            13:45:52

18   to adjudicate those comments.                                   13:45:57

19   Q    Sorry.  And who are the comments from?                     13:45:58

20   A    So all those comments are from agency                      13:46:01

21   partners.  It could be from the IRIS division, the              13:46:03

22   SCOPS division.  It could be from the Refugee and               13:46:07

23   Asylum International Operations unit.  It could be              13:46:10

24   from -- it's mostly the chief counsel's office.  So             13:46:13

25   all of the comments from the interagency clearance              13:46:23

```
 1  process, that formal clearance are consolidated by    13:46:26
 2  the executive secretariat.                            13:46:33
 3      Q    And is that -- is that formal clearance       13:46:37
 4  process established somewhere?                         13:46:41
 5      A    It is.  It's established within the           13:46:45
 6  executive secretariat.                                13:46:47
 7      Q    Is it required for Federal Register Notice    13:46:48
 8  or for final decision?                                13:46:51
 9      A    I think it's agency policy.                   13:46:54
10      Q    Okay.                                         13:46:55
11      A    And then that G-1056 clearance is a normal    13:47:02
12  clearance process that we use for almost everything.   13:47:06
13      Q    Okay.  So that formal clearance process,     13:47:13
14  what are they formally clearing?  Is that a review     13:47:15
15  of the Federal Register Notice?                        13:47:22
16      A    Exactly.                                      13:47:24
17      Q    And then once that federal -- once that       13:47:25
18  agency -- that G-1056 for the Federal Register         13:47:27
19  Notice is finalized, what's the next step?             13:47:30
20      A    Then it would go to the front office for      13:47:32
21  review.  So that front office would entail the         13:47:35
22  director senior -- this is USCIS front office.  It     13:47:38
23  would entail the senior advisor, the chief of staff,   13:47:42
24  maybe the deputy chief of staff.                       13:47:42
25          I'm sorry.  It would entail front office       13:47:48
```

| | |
|---|---|
| 1  review which includes senior advisors, chief of | 13:47:49 |
| 2  staff, deputy chief of staff, the deputy director, | 13:47:52 |
| 3  and then ultimately the director. | 13:48:01 |
| 4      Q    And the G-1056 process, is that within the | 13:48:08 |
| 5  agency or -- | 13:48:12 |
| 6      A    Just within U.S. Citizenship and | 13:48:12 |
| 7  Immigration Services. | 13:48:18 |
| 8      Q    Okay.  And that review within the front | 13:48:18 |
| 9  office is all those people that you mentioned are | 13:48:21 |
| 10  also within CIS? | 13:48:24 |
| 11      A    Yes. | 13:48:25 |
| 12      Q    And after that process -- oh, sorry. | 13:48:25 |
| 13          In the USCIS front office review process, | 13:48:27 |
| 14  what are they reviewing? | 13:48:30 |
| 15      A    The Federal Register Notice. | 13:48:32 |
| 16      Q    Okay.  And then what's the next step after | 13:48:34 |
| 17  that? | 13:48:40 |
| 18      A    After the director is satisfied with the | 13:48:40 |
| 19  notice, if he has changes or edits, we adjudicate | 13:48:44 |
| 20  them, but when he's ultimately happy with it and he | 13:48:48 |
| 21  clears it, it is transferred by the executive | 13:48:52 |
| 22  secretariat -- you know what, I misspoke, because | 13:48:55 |
| 23  there is a process -- a G-1056 process by the | 13:49:01 |
| 24  executive secretariat, but there's also a process | 13:49:03 |
| 25  our Regulatory Coordination Division undertakes. | 13:49:07 |

```
 1      Q    Do you remember what this was in response     14:17:48
 2    to?                                                   14:17:49
 3      A    As I stated, it's probably in response to     14:17:51
 4    the secretary wanting the input of other federal     14:17:54
 5    agency partners in the review process.               14:18:06
 6      Q    Yeah.  Okay.  Thank you for bearing with me   14:18:29
 7    with all those names.                                 14:18:31
 8         So I'm not going to make you go through the     14:18:41
 9    entire history of -- from 2008 till the present of   14:18:44
10    exactly what that process looks like in as much      14:18:47
11    detail, but I know that you wanted to say something  14:18:51
12    about what the process was and how it differed or    14:18:54
13    didn't differ prior to 2017.                         14:18:55
14      A    Sure.  I think it's important to know that    14:18:58
15    when I came in, again, I deferred to my staff who    14:19:00
16    have done this since about 2008, and so because you  14:19:03
17    had asked about it.  The process was regular --      14:19:06
18    pretty similar.  There is a decision memo, there's a 14:19:09
19    Federal Register Notice.  However, in the previous   14:19:15
20    administration, a decision memo was written in       14:19:18
21    conjunction at the same time as the Federal Register 14:19:23
22    Notice, and that -- that Federal Register Notice,    14:19:34
23    which was cleared by all the relevant personnel, you 14:19:40
24    know, that I mentioned earlier, but that went to OMB 14:19:45
25    prior to the decision-making.                        14:19:48
```

1    Q    Why do you think that process changed?          14:19:58

2    A    When I came in as chief, the -- the          14:19:58

3    decision memo was written and because I did not want          14:20:03

4    staff to expend resources to write a Federal          14:20:10

5    Register Notice that went in three or four different          14:20:13

6    directions for every option available, I asked them          14:20:15

7    to withhold writing the Federal Register Notice          14:20:20

8    until a decision was made.          14:20:21

9    Q    To make sure I understand correctly, the          14:20:24

10   Federal Register Notice in previous administrations,          14:20:26

11   it was -- what was sent to the OMB before the          14:20:32

12   decision was made was not just one Federal Register          14:20:33

13   Notice, but various drafts of Federal Register          14:20:36

14   Notices?          14:20:40

15   A    I don't know how many they sent.  Maybe          14:20:40

16   they assumed that they knew what the decision was          14:20:42

17   and they only sent one.  If there were options, they          14:20:44

18   may have sent more.  It's -- I don't know.  But it's          14:20:47

19   during that OMB process where there's input from          14:20:54

20   other agencies during that decision process;          14:20:57

21   whereas, now it's, you know, the decision of the          14:21:00

22   secretary and then it's sent to OMB.          14:21:02

23   Q    Okay.  In previous administrations when the          14:21:10

24   OMB received the Federal Register Notice or Notices,          14:21:15

25   would they then begin that interagency consultation          14:21:22

| | | |
|---|---|---|
| 1 | process prior to -- potentially prior to the | 14:21:27 |
| 2 | decision actually being made? | 14:21:29 |
| 3 | A    Yes. | 14:21:30 |
| 4 | Q    And what would that consultation process | 14:21:31 |
| 5 | look like, to the extent that you know? | 14:21:33 |
| 6 | A    It's the same process I explained before | 14:21:37 |
| 7 | with the Federal Register Notice.  That is, it's | 14:21:40 |
| 8 | sent to agency partners that may have a stake in it. | 14:21:41 |
| 9 | Again, it could be the Department of State.  It | 14:21:44 |
| 10 | could be the Department of Defense.  It could be the | 14:21:46 |
| 11 | Department of Justice.  It could be the Department | 14:21:48 |
| 12 | of Health and Human Services if it had to deal with | 14:21:54 |
| 13 | Ebola so -- and also to the executive office.  I | 14:21:55 |
| 14 | understand that they're part of the review as well. | 14:21:58 |
| 15 | Q    Are there other changes from 2007 -- how | 14:22:07 |
| 16 | the TPS decisions were made from 2007 to the present | 14:22:12 |
| 17 | as compared to prior to 2017? | 14:22:15 |
| 18 | A    No.  For -- for the most part, because the | 14:22:17 |
| 19 | subject matter experts who were there in the | 14:22:21 |
| 20 | previous administration were also there for the last | 14:22:22 |
| 21 | several decisions, the process mainly remained the | 14:22:28 |
| 22 | same.  They shifted slightly, but it had to deal | 14:22:33 |
| 23 | with, you know, what time -- or the timing of a | 14:22:35 |
| 24 | State Department recommendation and assessment, you | 14:22:39 |
| 25 | know, but overall the process was generally the | 14:22:46 |

```
1    same.                                                   14:22:48

2         Q    Okay.  And that shift to sending the          14:22:48

3    Federal Register Notice to the OMB earlier, that was    14:22:55

4    a shift that you initiated?                             14:22:57

5         A    Yes.                                          14:22:58

6         Q    When did you initiate that?                   14:23:00

7         A    I -- I believe it -- the first decision       14:23:08

8    that came when I was chief of the Office of Policy      14:23:09

9    was Haiti.  I believe that it shifted after that        14:23:12

10   when we weren't sure what the decision was going to     14:23:22

11   be.                                                     14:23:33

12        Q    Did there have to be an approval for that     14:23:33

13   decision to not send the Federal Register Notice to     14:23:36

14   OMB earlier?                                            14:23:39

15        A    No.  I made that decision.                    14:23:40

16        Q    Were all stakeholders, including OMB but      14:23:53

17   also the other agencies, consulted at all in that       14:23:57

18   process -- in that shift in process?                    14:23:59

19        A    Yes.  The Office of General Counsel was       14:24:02

20   consulted because they were used to seeing the          14:24:04

21   Federal Register Notice behind the decision memo.       14:24:06

22        Q    And when you say Office of General Counsel,   14:24:09

23   do you mean the Office of General Counsel --            14:24:11

24        A    At the department of Homeland Security.       14:24:12

25        Q    -- at the Department of Homeland Security?    14:24:14
```

```
 1          Do you know who Tom B. might refer to?          16:30:17
 2          MR. TYLER:  Same objections.  Outside of        16:30:23
 3   scope.  She's asked to interpret a communication       16:30:26
 4   that she was not part of.  You're asking for           16:30:29
 5   speculation.                                           16:30:31
 6          MS. MACLEAN:  Your objection is noted.          16:30:31
 7          THE WITNESS:  I can only speculate that Tom     16:30:33
 8   B. is Tom Bossert.                                     16:30:35
 9   BY MS. MACLEAN:                                        16:30:36
10     Q    And who is Tom Bossert?                         16:30:36
11     A    I don't know his official title, but I         16:30:39
12   think he's with the National Security Council.        16:30:42
13     Q    And why would you think it's Tom Bossert?      16:30:44
14     A    Because I think she had a meeting or           16:30:46
15   conversed with Tom Bossert at some point in time on   16:31:00
16   decisions.                                            16:31:04
17     Q    Why do you think that?                         16:31:05
18     A    It would not be shocking to seek the advice    16:31:10
19   of National Security Council.                         16:31:13
20     Q    With regard to TPS, why would it not be        16:31:18
21   shocking to seek the advice of the National Security  16:31:21
22   Council?                                              16:31:25
23     A    Because they are a federal partner.            16:31:25
24     Q    Is the National Security Council's advice      16:31:26
25   frequently sought prior to a final decision with      16:31:29
```

| | | |
|---|---|---|
| 1 | BY MS. MACLEAN: | 16:54:20 |
| 2 | Q   So you're reading the statute right now. | 16:54:20 |
| 3 | When you read the statute, how do you interpret the | 16:54:24 |
| 4 | sentence that you just read? | 16:54:30 |
| 5 | A   The attorney general or the secretary now | 16:54:33 |
| 6 | in order to designate one of the prongs for | 16:54:44 |
| 7 | designation consideration is whether the state is | 16:54:47 |
| 8 | able to adequately return -- adequately handle the | 16:54:48 |
| 9 | return of its aliens. | 16:54:52 |
| 10 | Q   You said previously that Ambassador | 16:54:57 |
| 11 | Nealon's memo does not comport with the statute; is | 16:55:02 |
| 12 | that correct? | 16:55:04 |
| 13 | A   I would note that even though he tries to | 16:55:05 |
| 14 | make a case that they cannot adequately handle, I | 16:55:09 |
| 15 | think the case as shown that in this sentence in | 16:55:13 |
| 16 | this memo, in the case of Honduras, for example, | 16:55:17 |
| 17 | they received approximately 80,000 returnees in both | 16:55:19 |
| 18 | 2015 and 2016.  The number of people removed to the | 16:55:22 |
| 19 | northern triangle has been quite large. | 16:55:25 |
| 20 | Q   So is it correct to say that you -- you | 16:55:36 |
| 21 | read this as inconsistent with the criterion -- | 16:55:37 |
| 22 | sorry -- you read this as Ambassador Nealon raising | 16:55:44 |
| 23 | concerns about the termination that are not relevant | 16:55:49 |
| 24 | under the statute that created temporary protected | 16:55:52 |
| 25 | status? | 16:55:56 |

| | | |
|---|---|---|
| 1 | MR. TYLER:  Objection, vague. | 16:55:57 |
| 2 | THE WITNESS:  You're asking if I consider | 16:56:03 |
| 3 | the points that he raised would be relevant | 16:56:04 |
| 4 | criteria? | 16:56:09 |
| 5 | BY MS. MACLEAN: | 16:56:09 |
| 6 | Q    Yes.  That's my question. | 16:56:09 |
| 7 | A    I think there may be points in here that | 16:56:11 |
| 8 | are not relevant. | 16:56:15 |
| 9 | Q    What are the points that are not relevant | 16:56:15 |
| 10 | in here? | 16:56:17 |
| 11 | A    Data shows that TPS recipients have a very | 16:56:32 |
| 12 | high workforce participation rate, much higher than | 16:56:35 |
| 13 | the national average is one example.  TPS recipients | 16:56:40 |
| 14 | have jobs, have gotten married, have many thousands | 16:56:42 |
| 15 | of American citizen children.  Work legally in great | 16:56:46 |
| 16 | numbers.  Pay taxes.  Own homes.  Own businesses and | 16:56:54 |
| 17 | live the American dream minus a path to citizenship. | 16:56:57 |
| 18 | I'll stop there.  Those are examples. | 16:57:11 |
| 19 | Q    Can you elaborate in the second paragraph | 16:57:14 |
| 20 | and third paragraphs -- and this will be the last | 16:57:18 |
| 21 | point on this document, but what portions of those | 16:57:20 |
| 22 | paragraphs are inconsistent with the statute? | 16:57:24 |
| 23 | MR. TYLER:  What paragraphs are you on? | 16:57:27 |
| 24 | MS. MACLEAN:  The Working Against Ourselves | 16:57:28 |
| 25 | and Foreign Policy Considerations. | 16:57:30 |

```
 1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
 2           I, Joan V. Cain, Court Reporter, the officer
 3   before whom the foregoing deposition was taken, do
 4   hereby certify that Kathy Nuebel Kovarik personally
 5   appeared before me on August 3, 2018 and was duly
 6   sworn; that the foregoing transcript is a true and
 7   correct record of the testimony given; that said
 8   testimony was taken by me stenographically and
 9   thereafter reduced to typewriting under my
10   direction; that reading and signing was not
11   requested; and that I am neither counsel for,
12   related to, nor employed by any of the parties to
13   this case and have no interest, financial or
14   otherwise, in its outcome.
15           IN WITNESS WHEREOF, I have hereunto set my
16   hand and affixed my notarial seal this 6th day of
17   August 2018.
18
19   My commission expires:
20   July 31, 2019
21   _____
22   NOTARY PUBLIC IN AND FOR THE
23   DISTRICT OF COLUMBIA
24
25
```