# EXHIBIT 24



THE NEW YORKER
NEWS DESK

# A TRUMP OFFICIAL BEHIND THE END OF DACA EXPLAINS HIMSELF

By Jonathan Blitzer    November 10, 2017



*The recent deposition of Gene Hamilton offers a rare glimpse of an Administration official candidly discussing the development of a major policy area.*

Photograph by Matt McClain / The Washington Post via Getty

A handful of officials in the White House, the Justice Department, and the Department of Homeland Security have spent the past year attempting to realize President Trump's vision of an America that is less welcoming of foreigners. John Kelly, the White House chief of staff; Jeff Sessions, the Attorney General; and Stephen Miller, Trump's senior adviser, have led this

effort. A crucial role has also been played by a lesser-known figure: Gene Hamilton, a lawyer in his mid-thirties who works as a top aide to Sessions at the Justice Department. Federal officials, congressional staffers, advocacy groups, and think-tank researchers know that Hamilton has helped shape Trump's various travel bans, changes to refugee policies, and the implementation of an aggressive new approach to immigration enforcement. And yet, as one immigration lawyer told me of Hamilton, "he's had such a light footprint." Hamilton has rarely spoken to the press, and his relatively short career means that few can claim to know the exact nature of his beliefs or goals.

Last week, I obtained a two-hundred-and-thirty-five-page transcript of a deposition that Hamilton was compelled to give, in late October, as part of a federal lawsuit over the Administration's handling of DACA, the Obama-era program that protected from deportation some eight hundred thousand undocumented immigrants who had been brought to the U.S. as children. The lawsuit was brought by Make the Road New York, the National Immigration Law Center, and the Worker and Immigrant Rights Advocacy Clinic at Yale Law School. The groups' argument is that, while the government may have been within its power to cancel DACA, the manner in which it did so—suddenly, and without warning—violated the rights of the people who relied on DACA for work permits, student loans, and other benefits. During the proceeding, Hamilton was pushed to describe the part he'd played in various Administration decisions. Over four hours, he detailed his interactions with senior officials such as Kelly and Miller, shared his personal views on immigration policy, and acknowledged, notably, that he'd been the author of the September 5th D.H.S. memo that formally terminated DACA. And, while Hamilton was careful not to answer more than he had to, the transcript offers a rare glimpse of an Administration official candidly discussing the development of a major area of policy.

Hamilton's deposition took place on October 20th, in an office building on I Street, in Washington, D.C. In the room were lawyers for the organizations

involved in the lawsuit, as well as two DACA recipients—Antonio Alarcon and Martin Vidal, the latter of whom is the named plaintiff in the case. On Hamilton's side of the table were two lawyers from the Justice Department and one from D.H.S. At the time, Hamilton was serving as a senior counsellor to the Secretary of Homeland Security, a position to which he'd been appointed after Trump's Inauguration, in January.

Get the best of *The New Yorker* every day, in your in-box.

Enter your e-mail                              Sign me up

The deposition began by covering some biography. Hamilton stated that until he was sixteen he'd lived in Arizona, but that he later moved around, from Georgia to Florida and then to Virginia. He was from "all over the place," he said. After college, he worked at a commercial landscaping company in Georgia before enrolling in law school. The summer after his first year, he got an internship at an Immigration and Customs Enforcement detention center in Miami. He didn't go into the internship with a career in mind. "It was interesting, but I don't know that it was necessarily anything that I thought I would do forever," he said.

When he graduated from law school, in 2010, he was accepted into an honors program at D.H.S., and he eventually landed back at ICE, as a lawyer in the Office of Chief Counsel in Georgia. In February, 2015, he left ICE to work as the general counsel to Jeff Sessions, who was then the chairman of the Senate subcommittee on immigration. "I had a tremendous working relationship with then Senator Sessions, and we spoke on a nearly daily basis, if not multiple times a day," Hamilton said during the deposition. In Sessions's office, Hamilton met Stephen Miller, who was Sessions's communications director at the time. In August, 2016, after Sessions had endorsed Donald Trump for President and Miller had begun writing speeches for the candidate, Hamilton

volunteered to work for Trump's transition team. When Trump won last November, Hamilton's responsibilities increased. "I was generally the lead on development of all immigration-policy issues for the transition entity, and so everyone who worked on that reported to me," he said. He oversaw a team of roughly a dozen people, and one of his jobs was to recommend appointees for agencies including D.H.S., ICE, and the Justice Department.

Throughout the deposition, Hamilton declined to discuss many aspects of his work at D.H.S., citing privilege. He also said that he had signed a nondisclosure agreement to cover his time on the Trump transition team. As a result, his testimony often became choppy, a crosstalk of interruptions from Hamilton's lawyers on one side and rephrased and reiterated questions from Karen Tumlin, an attorney with the National Immigration Law Center who was conducting the deposition, on the other. At times, there was extensive back and forth just to elicit a yes or no answer from Hamilton.

The subject that most interested Tumlin, of course, was DACA, and how the Administration had come to end it despite Trump's very public wavering on the issue. "To your knowledge, did the 'day-one book' include any policy proposals that would affect DACA recipients?" she asked Hamilton at one point, referring to a collection of policy proposals that the Administration planned to pursue as soon as the new President took office. (Hamilton had been in charge of compiling the day-one book.) "Answer that with a yes or no," one of Hamilton's lawyers interjected. "Maybe," Hamilton replied. He declined to elaborate.

Hamilton acknowledged that he'd had several conversations, before Trump's Inauguration, with Stephen Miller about cancelling DACA. He'd discussed the matter with John Kelly, too, when Kelly was the Secretary of D.H.S., as early as February—seven months before the Administration ended the policy. Hamilton acknowledged having strong personal views on the matter dating back to his time as an attorney at ICE. His friends and associates knew how he felt about DACA, he said. "They would generally be aware of my position that

the program was illegal and that there should be some kind of disposition associated with it," he said.

VIDEO FROM THE NEW YORKER
The Immigrants Deported to Death and Violence

Hamilton also discussed his contact with Ken Paxton, the attorney general of Texas, who had led a group of state attorneys general who sent a letter to Sessions, in June, threatening to sue the federal government if it did not dismantle DACA. Hamilton said that he'd met with Paxton at least twice before the letter was sent, but insisted that the conversations they'd had were "not related to DACA." On another occasion, "at the request of the Attorney General," Hamilton said, he'd met with members of Paxton's staff while on a tour of the U.S.-Mexico border. After the letter from the state attorneys general had reached Sessions, Hamilton spoke with a member of Paxton's staff twice on the phone to discuss DACA. "I reached out to find out what might be the realm of the possible," he said. Tumlin pressed Hamilton to explain why, in July, when twenty Democratic attorneys general wrote a letter to the

Administration urging it to "maintain and defend" DACA, Hamilton didn't contact them, too. "We received a number of different letters about this issue from a lot of different people," he said. "They are all very similar in structure."

Members of the Trump Administration—including the President—have argued that they had no choice but to cancel DACA because the Republican attorneys general would have prevailed in a lawsuit. Paxton had set an arbitrary deadline of September 5th for the Administration to announce the end of the program. "Did you inquire as to whether the state of Texas or other attorneys general were already working on legal papers?" Tumlin asked Hamilton. "I did not," he replied. On September 4th, Jeff Sessions sent a letter to D.H.S. arguing that DACA was illegal, and the next day he made the formal announcement that the Administration was terminating it. That morning, the acting Secretary of D.H.S., Elaine Duke, signed a memo that officially terminated the policy. "Did you draft that memo?" Tumlin asked in the deposition. "Yes," Hamilton said.

Near the end of the session, Tumlin pressed Hamilton to discuss the effect of the Administration's DACA decision. "Do you consider the decision . . . a significant decision by the Department of Homeland Security?" she asked. "What do you mean by 'a significant decision?'" Hamilton answered. "A decision with a large impact on the country?" she said. If Congress takes no action before March 5th, DACA recipients will lose the protections conferred by the program, lapsing back into fully undocumented status, vulnerable to arrest and deportation at any moment. (Thousands stand to lose their DACA status before then.)

"What do you mean by a 'large impact?'" Hamilton asked Tumlin. "I don't know that I can give you an answer on that." Alarcon, one of the two DACA recipients in the room, was incensed. "This was the person who's changing my life?" Alarcon told me. "It felt like my blood was coming out of my body." When Tumlin asked how the cancellation of DACA would affect the educational prospects of current recipients, Hamilton replied, "That would

require me to know the laws of every educational universe—every educational institute of the United States, all of the policies and procedures." He added, "I have no idea."

Last week, Hamilton left D.H.S. to begin a new job, at the Justice Department, where he rejoined his old boss, Sessions. He issued a short statement to the press about his tenure at D.H.S.: "It's been a privilege." His deposition on October 20th was never finished. The lawyers broke for the day around 3:30 P.M., and they agreed to continue the session the following week. But, before they could, the Justice Department petitioned an appeals court to block any further depositions or document discovery in the lawsuit. A judge agreed to a temporary block pending a final ruling on the matter.



*Jonathan Blitzer is a staff writer at The New Yorker.* *Read more »*

Video

*The Underground University That Won't Be Stopped*
*In Georgia, undocumented immigrants, who are banned from the top public universities, have a school of their own.*

CONDÉ NAST

© 2018 Condé Nast. All rights reserved. Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement (updated 5/25/18) and Privacy Policy and Cookie Statement (updated 5/25/18). Your California Privacy Rights. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast. *The New Yorker* may earn a portion of sales from products and services that are purchased through links on our site as part of our affiliate partnerships with retailers. Ad Choices