# EXHIBIT 35

**CQ Congressional Transcripts**

Jun. 6, 2017

©2018, Provided under license from Bloomberg Government.

Bloomberg Government
Support: 1-877-498-3587
www.bgov.com

All materials herein are protected by United States copyright law and/or license from Bloomberg Government, and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of Bloomberg Government. You may not alter or remove any trademark, copyright or other notice from copies of the content.

Jun. 06, 2017 Revised Final

# Senate Homeland Security and Governmental Affairs Committee Holds Hearing on the Fiscal 2018 Budget for the Department of Homeland Security

**LIST OF PANEL MEMBERS AND WITNESSES**

JOHNSON:

Morning. This hearing will come to order. I would ask consent that my opening -- my written opening statement be entered in the record without objection.

I want to welcome Secretary Kelly. This is a hearing on the Department of Homeland Security's fiscal year 2018 budget. This is the third time that Secretary Kelly has appeared before this committee, the second time as secretary of the department. And again we welcome you and appreciate your service to this country -- many, many years of it.

In lieu of my written opening statement, I just want to make a couple comments. I'm -- by vocation I'm -- I'm an accountant, so I've gone through budget meetings many, many times. First, I want to just talk about the history of the budget of the Department of Homeland Security.

We're not quite ready for the chart.

When you take a look at total budget authority, when the -- the department was first stood up, the first fiscal year was 2014 and the department's budget was -- this was total budgetary authority, mandatory and discretionary -- is $36.5 billion.

JOHNSON:

Now, had that budget just grown by inflation, today's request would be a little under $50 billion -- $48.25 billion. Instead, total -- total budget authority is $70.6 billion, about a 93 percent increase.

Now, from my standpoint, that represents in a bipartisan fashion, President Bush, President Obama and now President Trump realized that the threat environment that America faces has become more severe. It's growing. It's evolving. It's metastasizing. And the department needs more resources to try and keep this homeland safe.

And so as much as I am concerned about the long-term budget situation in this country, the $20 trillion we're already in debt, we cannot be penny wise and pound foolish. I mean, I don't think there's -- I've seen an accurate assessment of how much economic loss we suffered because of 9/11. We have to do everything we possibly can. And let's face it, the defense of this nation and the defense of our homeland is the top priority of government.

So, I want to be completely supportive of the secretary's request. Tough budget times, but we need to allocate the resources to keep this nation and our homeland safe.

Next point I'd want to make is just the dramatic change we've had in terms of total apprehension. We have a little chart here. What I've done, because we really only have three months worth of history under the new administration, I've just gone back and had my staff prepare a three-month moving average of apprehensions along the southwest border.

And it's -- it's incredibly revealing. Prior to the last three months, on average, we were apprehending a little more than 122,000 individuals coming to this country illegally -- 122,000. In the last three months total, it was just under 56,000. In other words, we're 45, about 46 percent of the previous four or five years average. That's a pretty remarkable result.

I've been, you know, since taking over this chairmanship and really been on this committee looking at the problem of our illegal entry into our southwest border, I've been saying repeatedly that the first thing we need to do is be committed to securing our border, and then eliminate the incentives for illegal immigration. I would say lack of enforcement of our immigration laws has been a huge incentive for people coming to this country.

Under the new administration, under a new secretary, we have obviously committed to securing our border. And I was a little concerned when people were taking credit for this reduction I think after three months. We'll see what happens after four months. I think just that signal alone that we are committed to securing this border and we're going to enforce our laws has had a powerful effect, and I think we're seeing the results of it right now.

So again, I commend the secretary for standing strong against severe criticism and actually enforcing the laws of this nation.

With that, I'll turn it over to our ranking member, Senator McCaskill.

MCCASKILL:
Thank you, Mr. Chairman.

And thank you, Secretary Kelly, for being here. You appeared before this committee a couple of months ago for the first time, after being confirmed, and just look at the developments that have occurred in the few months since then where you have had to be all hands on deck for serious issues facing the national and homeland security.

On May 11th, you met with the airline industry executives about your concern about large electronic bands in terms of international travel. On May 12th, we had a ransomware cyber attack that struck more than 200,000 computers in 150 countries, shutting down auto production in France, police departments in India, and closing doctors' offices in Britain. And then, of course, tragically on May 22nd, a terrorist suicide bomber killed 22 innocent children and adults in Manchester, England; and then this past weekend terrorists killed seven in London.

These are just a few examples of why we are counting on you and why we respect the job that you have to do every day, and how difficult it truly is.

The importance of your work also speaks to the critical responsibility this committee has in providing oversight. I've never, ever, ever known of a government agency that works better with less oversight. Asking hard questions is, of course, the way you do aggressive oversight. And I'm really particularly pleased that you're not afraid to answer tough questions. It's kind of who you are. You've been that way throughout your career.

In fact, I noticed in the speech you gave to the Coast Guard cadets -- I'll quote you here -- "Tell the truth to your seniors, even though it's uncomfortable, even though they may not want to hear it. They deserve that, tell the truth." I know that you will continue to speak truth to power, and I look forward to your honest assessment of what we can do to help you in that regard.


MCCASKILL While none of the three terrorists who did the attack over this past weekend would have been impacted by the president's proposed travel ban, a lot of discussion in the United Kingdom is now about the government -- the Conservative Party's cuts in police resources over the last decade and how many fewer resources there were actually on the ground to try to prevent those terrorist attacks.

I'm concerned that the president's budget plans to cut critical TSA programs at a time that we cannot afford to let up on these security measures.

A large portion of this cut is taken from the VIPER teams, the Visible Intermotive -- Intermodal Prevention and Response teams, which are deployed all over the country to provide critical assistance with securing airports, subways, and bus terminals, some of the most attractive soft targets for terrorists in our country. The president's budget aims to cut the VIPER teams from 31 down to just eight teams to cover the entire country.

The Urban Area Security Initiatives, which has been an -- a -- a lifeline for major urban areas that have so many soft -- soft targets -- targets because of the large populations -- those also

have been cut.

Additionally, the police -- the president's budget is going to completely eliminate the Law Enforcement Officer Reimbursement Program, which provides assistance to local law enforcement agencies who help secure our airports. Hundreds of airports across the country take part in this program, and particularly for smaller airports, this assistance is critically important.

The president's budget will also slash other DHS programs that provide critical security to our transportation systems. The Transit Security Grant Program will be cut in half. The Port Security Grant Program will be cut in half. The president is calling for a complete elimination of the Complex Coordinated Terrorist Attacks Grant Program.

I'm concerned that these priorities are not getting the attention they deserve, especially in light of what's going on around the world. I think we may be focused on a shiny object which has come to be known as the travel ban, when instead we need to be focused on how many people we have, in your terminology, General, boots on the ground, in terms of being able to identify, track and prevent these terrorist attacks.

We're being asked to fund additional Border Patrol agents and air and marine officers, but there's no provision in the budget for additional CBP officers. And the difference in terminology is very important because, as you know, Secretary Kelly, the majority of drugs are other contraband come through our country through the ports of entry, and the CBP officers are the ones responsible for finding them and stopping them. We cannot neglect our ports of entry as we try to increase resources in terms of Border Patrol and ICE agents.

So, I'm glad you're here today, Secretary Kelly. There are a lot of important issues before us. I have a lot of questions. I know the rest of the committee does, too. And I can't tell you how much it means to all of us that you're willing to come here, to both Democrats and Republicans, and answer our questions.

I -- I hope the rest of the administration follows your example, because I think -- think you're setting a very good one.

JOHNSON:

Thank you, Senator McCaskill.

It is the tradition of this committee to swear in our witnesses, so if you'll please rise and raise your right hand, do you swear that the testimony you will give before this committee will be the truth, the whole truth and nothing but the truth, so help you God?

KELLY:

I do.

JOHNSON:

Please be seated.

Secretary John F. Kelly is the fifth secretary of homeland security. Prior to joining DHS, General Kelly served as commander of the U.S. Southern Command, where he worked closely with U.S. law enforcement and DHS personnel in a coordinated effort to combat the flow of drugs, people and other threats against the homeland into the United States from across the southern border.

Secretary Kelly's career has included extensive service in the Marine Corps where he commanded Marine Force -- Forces Reserve and Marine Forces North and served as senior military assistant to two secretaries of defense, Secretaries Gates and Secretary Panetta.

Less than a year after his retirement from service, Secretary Kelly returned to serve the American people as secretary of homeland security.

General Kelly is a retired four-star general, a gold star parent.

America could not be more appreciative and more fortunate to have you serving in this capacity. And we thank you for your service and look forward to your testimony.

KELLY:

Chairman Johnson, Ranking Member McCaskill and the distinguished members of the committee, every day the men and women of the Department of Homeland Security protect Americans from the threats we face. And so it is a great pleasure to appear before you today to talk about the tremendous men and women of the department, and the critical missions they carry out in service of our America every day and night, 24/7/365.

I believe as anyone who fully understands the fundamental role of our government also believes that the federal government's responsibility every day begins and ends with the protection of the homeland and the security of our people. No other mission is as important. No other consideration more pressing. None.

The president's fiscal year 2018 budget request for the department will make it possible for us to continue and expand in many ways on our ability to protect our nation and its people.


KELLY:

The world is a different place today. We can no longer think in terms of defense over there, but rather must think in terms of the -- the security overall of the homeland across the numerous domains of potential attack and defense.

The Department of Homeland Security is making a difference in fighting the home game while the Department of Defense fights the away game.

And together with and because of the dedication and effective interagency integration with the DNI, CIA, NCTC, FBI, NSA, DEA, ATF and over a million state and local and tribal enforcement professionals, America today is safe, secure and prepared in a way that most could not have envisioned the day before 9/11.

But the plots to attack the nation are numerous, the perpetrators relentless. But we fully -- we need a fully funded budget that matches our mission -- no more continuing resolutions -- and I think this budget does that.

The president's F.Y. 2018 budget requests $44.1 billion in net discretionary funding for the Department of Homeland Security. It also requests $7.4 billion to finance the cost of emergencies and major disasters in FEMA's disaster relief fund.

When you're talking about numbers like these, it's easy to lose sight on what's behind each dollar. But when you get right down to it, behind each and every dollar are hardworking men and women who have dedicated their careers, and in many ways risked their lives, to protect the American people. Every dollar invested in the men and women of DHS and every dollar invested in the tools, infrastructure, equipment and training they need to get the job done is an investment in prosperity, freedom and the rule of law. Above all, it is in investment in the security of the American people.

As far as I'm concerned, recent events show you cannot invest too much in security. The terrorist attacks on innocent civilians in Kabul, Cairo, South Asia, Manchester and now London are horrific reminders of the dangers we face globally.

They also illustrate the need to do everything we can to keep our people safe. That means getting better about verifying identity, making sure people who -- are who they say they are, and working with our international partners to raise their awareness and raise their defenses and force them to do so, if need be, to at least operate at the levels that we work at.

Domestically, one of the most important enhancements to this effort is the Real ID Initiative, an enhancement passed into law 12 years ago by the United States Congress, one which most of our states and territories have taken seriously and have already adopted. Many others are working hard at compliance.

In those 12 years, some in elected or appointed state and federal positions who have the fundamental and sacred responsibility to safeguard the nation have chosen to drag their feet or even ignore the law passed by Congress. I will not.

Real ID will make Americans safer; it already is. Real ID will soon be enforced at our airports, land ports of entry and all federal facilities, and it is a critically important 9/11 Commission recommendation that others have been willing to ignore, but which I will

ensure is implemented on schedule, with no extension for states that are not taking the effort seriously.

For those states and territories that cannot or will not make the January 2018 deadline, they should encourage now their citizens to acquire other forms of ID compliant with the Real ID law, like passports, available of course from the State Department.

We need to prevent bad actors regardless of religion, race or nationality from entering our country. In recent years, we have witnessed an unprecedented spike in terrorist travel. There are more terrorist hot spots and foot soldiers now than almost any time in modern history.

In Syria and Iraq, for instance, we have thousands of jihadists fighters that have converged from more than 120 countries. As our superb military machine, acting in coalition with and leading many other like-minded partners, as they succeed on the battlefield in the caliphate in Iraq and Syria, these jihadi fighters are returning home to Europe, South Asia, Southeast Asia, Australia and even the Western Hemisphere, and who knows what they're up to but we can guess. They are heading to what they think are safe havens to continue their plotting and otherwise advance their toxic ideology of hate, death and intolerance with -- wherever they are allowed to hide. We expect that some will look to travel to the United States to carry out attacks.


KELLY:

With this context in mind, the president has issued clear direction in the form of an executive order to the entire executive branch to prevent the entry of aliens who seek to do us harm. But the current court injunction, of course, prevents us from taking steps right now to improve the security of the homeland until we see how that court action plays out. While some discuss, debate and argue the name, title, or label that best describes the president's E.O., professional men and women like me are actually in the business of implementing the president's intent to secure the nation and we are doing that.

We'll let the chattering class and self-appointed critics talk about the name. I just hope the Congress sees the wisdom of what the president is trying to do to protect America and its people and that the Congress is willing to work with those of us in the business of securing the nation. And it's been my experience in less than four months on the job that the Congress is in fact committed to that.

The Congress -- the court's injunction has prevented us from implementing a temporary ban on travel by aliens from six countries that are in states of civil war or state sponsors of terrorism, and are basically failed states. They are the same countries identified by the Congress in a previous administration in 2015 as nations of great concern.

At the time, the expectation was that those in the business of securing the nation lawfully would focus additional attention on these nations and others in similar circumstances for supplementary and accurate vetting. It has nothing to do with religion or skin color or the way they live their lives, but all about security for the United States and nothing else.

These are countries that are either unable or unwilling to help us validate the identities and backgrounds of persons within their borders. I can tell your right now because of the injunctions, I am not fully confident that we're doing the best we -- all that we can to weed out potential wrongdoers from these locations.

The injunction also prevents me from actually looking into the information that we need from each country to conduct proper screening, not just from the six countries identified in the executive order, but from every country across the globe. It also prevents me from conducting a review under the executive order with the goal of improving the security of our refugee program.

Bottom line, I've been enjoined from doing these things that I know would make America safe and I anxiously await the court to complete its action one way or the other so I can get to work. The men and women of DHS will do everything we can and always, always, always within the law to keep the American people safe. But the delay has prevented us from doing that -- what I and those most familiar with the reality of the threats we face believe we need to do to protect our homeland.

Again, sir, I appreciate the opportunity to appear before the committee today and I think -- thank you for your continued support and the committee's continued support for the great men and women of the department and the mission we take so seriously. I remain committed to working with Congress and protecting the American people. I have made changes within the organization since I've been the department head to do exactly that -- to increase responsiveness, availability of witnesses. And we've done all of that in a big way.

I'm glad to answer any questions you may have, sir.

Thank you.

JOHNSON:
Thanks, Secretary Kelly.

I really appreciate the attendance by my colleagues. I know everybody's got tight schedules. So I'm going to defer my questioning so people have their opportunities. And I'll start out with Senator McCaskill.

MCCASKILL:
Thank you, Mr. Chairman.

I appreciate the note you ended on, Secretary Kelly. And I'm -- while I condemn the leak and the person who leaked it, we now have in the public domain verified information that the Russians made an aggressive attempt to access not only a vendor of voter software in this country, but also a number of states the voter file databases in the month prior to our election.

I mean, in any other circumstances, this would be an earthquake. But because of everything else that's going on, I don't think enough attention has been given to something that is your responsibility as the secretary of homeland security, and that is critical infrastructure, including the election system.

I have asked for a number of pieces of information. This is one area where we have not gotten a response yet. I do appreciate that you all have not frozen us out. Many of my colleagues are being frozen out across the government. You have not frozen us out, and I'm deeply grateful for that.

I am anxious to get more information about what we know about these attempts. Whether or not they accessed the tabulation, it's clear they were trying to get into that voter file. And I don't think they were going there to try to just hang out. Imagine the disruption -- we spend a lot of time in this country talking about voter ID. Imagine the disruption if thousands of people showed up to vote and their names were no longer on the voter file. What would we do? How would we address that in terms of fairness and open and free elections?

So I guess my question to you is, are you deferring the investigation of this to the FBI? Or is the department actually actively engaged in investigating the penetration or the attempts to penetrate the voter files in this country immediately before the election by the Russian government?


KELLY:

Thanks, Senator.

You know me, I'm not going to dodge any question relative to anything that anyone in the United States Congress asks. I would say, though, up front, I would not be in a -- because of the allegations and the things that have been allegedly released are so highly classified, I wouldn't want to kind of confirm or deny anything in there. I think we just have to wait for the investigation.

Happy to come over or send people over to talk to you to the level that they can about what actually took place. And I believe certainly members of Congress deserve that, given the levels of classification. But I share your concern. I don't disagree with anything you said relative to the sanctity of our voting process.

Clearly, it's an -- should be an interagency investigation, and that is taking place. DHS will be part of that. As you know, just prior to his leaving, Jeh Johnson went out and declared that

the voter -- voting infrastructure was in fact critical infrastructure. I've had a large amount of push-back on that from states, some members -- many members of Congress.

It was done before I took over. We're looking at that, trying to help the states understand what that means. And it's voluntary entirely. We're here to help, so to speak. But I am meeting with the state homeland security professionals I think next week here in the city. I'm going to put that question to them.

Should we back off on that? I don't believe we should, but should we back off on it? Do you see us as partners and helpers in this, to help, you know, down -- down inside the states and help you make sure that your systems are protected? But there is nothing more fundamental to our democracy than voting.


MCCASKILL:
Well, you know, in following up with that, I just hope that you convey -- I mean, it would be one thing for the states to say we don't want the federal government to be -- I like that our elections are decentralized. I don't think the federal government should be telling each state how to run their elections or what vendors to use.

On the other hand, this was Russia.


KELLY:
Right.


MCCASKILL:
I mean, this was Russia. This was not, you know, some hacker in -- at a university trying to screw around with one individual state. This was an international attempt to impact the elections of the United States of America. So it really would be, I think, distressing if the United States would then pull back from the ability to help states protect these voter files. And you all are going to be in the best position to be able to do that.

So is someone from the department working in the investigation over this intrusion into our data files -- our voter data files?

KELLY:
Yes, we are involved.

MCCASKILL:
OK.

The other area I wanted to talk about and give you a chance to respond to the things I said in my opening statement about cutting funding for the VIPR program and for the Law Enforcement Officer Reimbursement Program, the urban area grants that are so important to large cities in this country in terms of protecting soft targets for terrorism.

Could you address those cuts? And if -- if you would be OK with the fact that we would maybe want to restore those cuts?

KELLY:
I'd like to comment for sure. The first thing I would -- and I kind of referenced it a little bit in my opening statement. We are as a nation in a different place entirely from the law enforcement and local protection point of view. We're in a different place today than we were 15 years ago when 9/11 first took place.

I mean, whether it's New York City and the largest non-federal law enforcement organization in the country, the New York City Police Department, or small towns and counties, with very few professionals, this kind of thinking -- this anti-terrorism, counterterrorism is in the DNA. We have certainly, and should have right after 9/11, for years afterwards, I think to the tune now of $45 billion in 15 years, helped states, whether it was acquire equipment, hire people. DOD has a program where they give excess equipment away. You know all of that.

So we're in a different place today. New York City Police Department -- I was just up there last week, and sat with them for several hours getting their -- their concept of how they protect the city from a terrorism point of view. And I don't think there's anyone better in the world.

So, in a perfect world, I'd love to fund everything, but 15 years on, we are in a different place locally and federally in terms of protecting the homeland. Again, in a perfect world, I'd love to fund everything.

MCCASKILL:

OK. Well, I -- I understand the point you're making, although I will say that I don't think any of us would think that the threat of a terrorist attack is less today than it was 15 years ago, and I can speak for many of these communities that are struggling with enough officers now.

St. Louis is a good example, where we have a serious crime problem, and in order to have the resources they need to cover the airport, to do some of the things that this money allows them to do -- is really important. So I'm hoping that we can work together and figure that out.

KELLY:

Senator, if I could explain (ph), I wouldn't disagree at all, and -- and the threat since 9/11 is -- I think certain types of threats are much more than they were during 9/11, much more metastasized, some of it local, some of it potentially from outside the country.

I'm with you 1,000 percent. But the one fundamental difference is we have different state, local and federal focus on this, and training and equipment, so...

MCCASKILL:

We do.

KELLY:

... yes, ma'am.

JOHNSON:

Senator Tester.

TESTER:

Thank you, Mr. Chairman.

And once again, thank you for being here, Secretary Kelly. I think that you have bipartisan support on this committee because of your track record. And you were in front of the subcommittee on homeland security here a few weeks back, and I appreciate your testimony there.

Since then, it was reported that the president's son-in-law, Jared Kushner, attempted to establish secret back channel communications with the Kremlin through Russian Ambassador Sergey Kislyak.

You were asked about these back channel communications with Russia on TV, and you -- you supported Kushner setting up back channel communications. The White House has been mum about these communications. I believe that these communications did occur.

Whether there was anything classified or not that went through, I think this is a big deal, because we're talking about Russia. I looked up your age and I thought we might be similar in age and to your credit, you're a little bit older than me but you look younger. OK, Mr. Secretary?

But -- but you -- you remember Russia in the height of the Cold War. I don't trust them any more today than I did when I was a first grader in school. And to have somebody this close to the president setting up back channels before they were in office through a -- through a Russian embassy is very disturbing to me, if, in fact, this happened.

And so have you spoken to Mr. Kushner about this issue?

KELLY:

I have not.

TESTER:

OK, so has anybody spoken to him about this issue in -- in your department, or to find out if this happened and what kind of information was related?

We just heard the ranking member talk about potential impacts on elections. We've talked about potential money flowing to the Trump business enterprise. There's all sorts of smoke here that we need to get to the bottom of, and so I'm curious about that.

KELLY:

I hope no one in my department's spoken to him. That would be inappropriate. I'm the interaction with the White House, as a general rule, he doesn't work -- like many of the White House staff do not work directly...

TESTER:

So...

KELLY:

... but if I could, sir, on the back channel...

TESTER:

Yes, go ahead.

KELLY:

... back channel communications -- I mean, I have back channel communications, myself, from -- through religious leaders in the United States to leaders in, say, Latin America. It's

one thing if I call the president of a country and tell him -- you know, have a conversation with him. It's different if it comes from another direction. It's just the reality of the way things work.

TESTER:
So...

KELLY:
I would just offer to you, sir, that we have to make the assumption...

TESTER:
... yeah.

KELLY:
... and I will...

TESTER:
Yeah.

KELLY:
... that Jared Kushner is a great American.

TESTER:
Yeah.

KELLY:
He's a decent American, he has -- he has a -- he has a security clearance at the highest level, as I understand it...

TESTER:

Didn't then, though, did he?


KELLY:

... and if he was opening, he -- I believe he should have had.


TESTER:

OK.


KELLY:

Now, if he was trying to open back channel communications to pass information through that back channel to get to Putin or anyone else over there, to say, "Hey, look, we're concerned about this," or...


TESTER:

Yes.


KELLY:

... "This is what you might want to consider doing," because if it's official, then it's a whole different dynamic...

(CROSSTALK)


TESTER:

I got you. So there -- but the question is -- is there were -- there was no -- no red flags that come up for you at all on this?


KELLY:

Not at the time. I didn't know about it. Since it's been reported, back channels are the normal -- are -- are in the course of normal interactions with other countries. Very, very common.

TESTER:

Can you tell me if -- if it's also normal to go to an embassy of a country that has been our foe for -- since World War II, and do this -- is that normal?

KELLY:

I don't know if that was the case, but if that is the case, I'm not so sure it's normal. But certainly, it would be one way to communicate through the back channel.

TESTER:

So if I were to do that, you guys would think that's OK? If -- I've got a security clearance. If I were to talk over to an embassy and say, "Hey, look, I want to -- I want to have a back channel communication, and -- and by the way, even though it appears that nobody in the United States will know what I'm talking about and this is why I did it, it's OK because I'm not..."

KELLY:

Well, Senator, I think...

TESTER:

Is that -- I mean, really.

KELLY:

... if -- if you went over to, whether you met them here in the building or you...

TESTER:

Went to the embassy.


KELLY:

... or went to the embassy...


TESTER:

The Russian embassy.


KELLY:

... "Let me tell you something, as a senator from the great state of Montana and a member of these committees, this is B.S. what you're doing, and you better stop it or whatever or this..."

(CROSSTALK)


TESTER:

Yes.


KELLY:

That's -- that's essentially a back channel -- back channel of communication.


TESTER:

Well, I would -- I would just say this. I appreciate your faith in the system. I'm going to tell you that whether classified information was delivered or not, I find this unacceptable. I just do.

To have somebody who is son-in-law to the president that goes in and sets up with -- with Russia, the -- the country that I was told to hide under the desk when the nuclear bombs came -- what the Hell good that would do I don't know -- when I was in first grade.

I just think if we don't get to the bottom of what's going on and what's happening, we've talked about the Russians, we've talked about money, there's all sorts of stuff going on here. And as Claire -- I mean, as the -- the ranking member said, there's so much going on here that we don't know which direction to have the investigation happen.

And I -- if it needs to be you, you've got the credentials, by the way, and you've got to respect I believe on this committee and probably in Congress to really find out what the Hell's going on. Because it doesn't make -- it doesn't make me sleep better at night, I will just tell you. And if it doesn't make me sleep better at night, you -- your probably eyes are wide open on this.

Am I -- am I just...

KELLY:

No, Senator, I think -- again, I think we have to make the assumption that...

TESTER:

But don't you think we should ensure that that assumption is correct?

KELLY:

Well, sure. And I think there's numerous...

TESTER:

But nobody's doing that.

KELLY:

I think there's numerous investigations that'll look into this -- looking into this. I mean, I think it's part of the Bob Mueller investigation. I think there's a number of congressional committees looking into it.

TESTER:

OK.

Another topic. I just want to echo what the ranking member said: There have been folks that have been frozen out by different agencies. I think that's inappropriate. Whether you're on that committee or whether you're a member of Congress, oversight is our big job.

I appreciate you not doing that and I hope that policy continues. I would assume that that's going to be the case, correct?

KELLY:

Yes, sir. And if I could comment...

TESTER:

Yes.

KELLY:

... as I was going through the process of confirmation, those senators that gave me and -- and House members gave me the courtesy of a -- of an office call prior to the hearing, the one single thing I heard repeatedly was how nonresponsive this department, my department, our department was...

TESTER:

Was.

KELLY:

... prior to.

I would tell you that since I've been running the show, to the degree that I think I'm running it, we've got over 37 appearances in congressional hearings...

TESTER:

Yeah, yeah.


KELLY:

... 57 witnesses, 973 Hill engagements. That is -- that is -- prior to that, it was a tiny fraction.

In fact, I was just talking to Senator Grassley, who was the -- the biggest critic of my department relative to congressional engagement. And he was -- I was on an open phone with him and his staff and asked him how we were doing and he gave me nothing but high marks.

We're going to make that better. And some of the things I've been -- first of all, we're leaning forward, and whether it's -- regardless of who the letter comes from, and it doesn't have to just come from a ranking member or chairman, we'll respond to any congressional inquiry.


TESTER:

Thank you.


KELLY:

If we can't get to it right away -- and some of the letters, as you might imagine, are lengthy and -- and in need of great detail...


(UNKNOWN)

Too lengthy, sometimes.


KELLY:

... my folks will call -- if it falls into the category we can't get to it real quick and respond, we'll call the -- the staff and say, "Hey, we got it and we're -- we're on it, but it'll be some weeks or even perhaps months before we can get it to you." If need be, we'll send a letter or

I'll call the -- the member and say, "Boy, this is a big one. I'm going to have set some people to work on this. It'll be a while, but if we're on it."

And I think in every case thus far, and certainly in the last 90 days -- 60 days anyways -- we're getting high marks. I will not freeze you out, sir.

TESTER:

Thank you, Mr. Secretary. And I look forward to seeing you in Montana.

Thank you, Mr. (inaudible).

JOHNSON:

Senator Peters?

PETERS:

Thank you, Mr. Chairman.

And thank you, Secretary Kelly, for being here today. And I'd like to once again thank you for your trip to Detroit. I think it was very -- it was well received by the community, and I appreciate you taking the -- the effort to come out to my state.

Secretary -- secretary Kelly, I'm particularly concerned about some of the proposed cuts to several FEMA preparedness grant programs that are in the president's budget.

PETERS:

Our first responders in Michigan used the Urban Area Security Initiative and State Homeland Security Program funding to support lifesaving efforts, including bomb search and rescue equipment, simulation drills, maintenance of local early warning and emergency response centers.

The proposed 25 percent cost-share matching requirement for local governments would prevent a number of these efforts because, quite frankly, many of the departments simply don't have the money available for that cost-share.

And I know you think it's important that there's skin in the game -- you've used that term frequently -- that our local communities have some cash as they are in these matching programs. But given the fact that we're -- we're facing lone-wolf attacks and a lot of changes in -- in how our domestic homeland security folks have to deal with -- with situations, do you believe that -- how are they able to make the appropriate investments to make sure that they're equipped for these types of attacks? Are there some other alternatives, or are there ways that we could perhaps adjust that figure in the budget?

KELLY:
Yes, Senator.

Referencing a couple of my previous comments in this hearing as well as in the past, we -- our local law enforcement -- city, state, county, big city, small city -- they're in a different place today than they were right after 9/11, and we all know that. They're just much better at what they do. Their -- their head is in the game. They have skin in the game.

The -- the --- the grants over the years have -- have, to a degree, caused that to happen, because we've given additional funding to the various municipalities to -- to improve themselves.

We're at the point now where much of that effort is already accomplished and we're in the sustainment phase. That is to say, states and local governments now are -- need to sustain what we've helped them -- the points at which and the equipment and all that we've helped them get to. That, combined with the -- there aren't unlimited resources.

One of the things you mentioned, lone-wolf attacks -- a lone wolf -- and you know this, sir. And I beg your forgiveness. I'm not -- don't mean to lecture -- not lecture, but to -- to go too low in terms of my response.

But the -- the thing we're facing now with the lone-wolf attacks is a different dynamic. It is absolutely -- you know, New York City is at risk. Detroit's at risk. Yet some tiny little town in the middle of Arkansas is at risk. Every small town, big town is at risk from this lone-wolf stuff.

I don't know, as hard as I've thought about it, if there's a way to prevent it, predict it, get our arms around it, other than, you know, local cops and -- and -- and sheriffs getting in -- getting into people's business and -- legally, outreach and all of that kind of.

But my point is, an unlimited amount of money parceled out to every big city, small municipality in America might prevent a lone- wolf attack. I don't know if it will, but might. But, of course, we don't have an unlimited amount of money.

We -- we make these decisions in many ways based on formulas that we receive from the -- from the -- from the Congress. We plug in numbers and try to somehow evaluate what might be a logical target. Not necessary for the whole -- the lone-wolfers; they're everywhere, but a logical target or a target that might be at higher risk, say New York City, than another municipality, particularly from an external terrorist.


PETERS:
I understand that. And -- and I appreciate the fact that this is a big challenge. And we -- we don't have unlimited amounts of money. But I want to just challenge a little bit of the assessment that other -- the communities are adequately prepared for it.

Certainly, we've come a long way, as you mentioned. We've come a long way and provided those resources. But I'm certainly hearing from my departments in Michigan, there're still unmet needs that they think are pretty critical. Resources are tight for them as well, and we still have a ways to go.

So, hopefully we can revisit some of those matching programs to make sure that those communities that may be at the highest risk, but also have a fairly challenging budget situation in that community -- that we're able to work something out. But I would appreciate having further discussion in that area.

Also, Mr. Secretary, the first travel ban executive order required the secretary of homeland security to submit a report in 30 days that provides a list of countries that do not provide adequate information for vetting within 30 days of the date of this order. And it's my understanding, the district court in Seattle did not stay that aspect of the order.

The second executive order required the exact same report within 20 days of its effective date. And as you know, aside from Sections 2 and 6, the remainder of the revised executive order is not affected by any subsequent injunctions.

So that means as of today, May 6, 2017, the report required by the first executive order is overdue by over 60 days, more than twice as much time as required, and a report required by the second executive order is overdue by about 30 days.

Mr. Secretary, did you begin the report reviewing screening procedures that the initial executive order required?


KELLY:

Senator, we've -- we've been very, very, very cautious, extra cautious in getting anywhere near where the court might consider we're not following the -- their instructions. I would have to get back to you on exactly where we are on the reports.

One of the things that -- regardless of whether the court has told us not to do, we've looked for things that we could do, as in -- as an example, thinking -- thinking about other countries, but not studying it and looking at vetting procedures, additional vetting, extreme vetting, but not studying it.

Some of them are very -- some of the procedures would be very obvious, some of the countries very obvious. But if -- if I -- if you don't mind, I'd like to get back to you on the question.


PETERS:

I appreciate it, because it seems to me a court injunction's not going to limit you from doing your own internal reviews of policies and procedures. That's -- that...

(CROSSTALK)

KELLY:
I actually have lawyers telling me, sir, that -- that we are too close on some of these issues, not necessarily the ones you've addressed, but on some of these issues, and it's best just to show extra good faith and -- not getting too close to it.

PETERS:
Very good. Well, I'd appreciate further discussions on that, as well.

KELLY:
Sure.

PETERS:
Thank you Mr. Secretary.

KELLY:
Yes sir.

JOHNSON:
Senator Hassan.

HASSAN:
Thank you, Mr. Chair and Ranking Member.

And good morning, Secretary Kelly, and thank you for being here. Like all of my colleagues, I appreciate your willingness to have this conversation with us.

Last week, I visited our CBP base covering New Hampshire's northern border with Canada. The men and women at the station are working overtime, and on a shoestring budget, to secure our northern border, including intercepting human traffickers and preventing narcotics smuggling. I think they're doing an incredible job with truly limited resources, but they really need more support.

And while CBP is getting a huge boost in their funding in this budget, we know that this funding isn't going to be used to shore up the northern border. And it isn't just CBP's northern border forces -- they aren't the only ones getting shorted in this budget.

As some of the other members here have indicated, TSA, in charge of protecting our aviation borders and stopping terrorists from taking down our aviation system is facing a sizable cut to some of its key programs and renewed aviation threats.

And the Coast Guard protects our nation's largest border, but despite its aging maritime assets, run-down and frankly outdated facilities, the Coast Guard's also getting cut. So this budget tells me that your priority is to secure the southern border, and that fighting off all other threats is secondary.

I certainly support securing the southern border and reducing narcotics trafficking, but this budget presents, really, I think, a false choice. We can and should secure the southern border, and also secure our other land, sea and air borders as well.

So what is your plan for making sure that our northern border forces, TSA and the Coast Guards get the funding increases they so desperately need?

KELLY:

Well, Senator, the -- the good news is, from my perspective and certainly what I've learned in the last going on four months -- is we have two great partners in this effort to secure our borders: Canada in the north, obviously, and Mexico to the south.

The bad news for Mexico and the southwest border is, largely because of our drug demand, an incredibly efficient network has developed that stretches, frankly, from around the world,

goes through the Western Hemisphere, Caribbean, up the Central American isthmus, Mexico, into the United States.

So that's where the overwhelming amount of drugs, illegal aliens -- special interest aliens come through, because of that network. Not because Mexico's not a partner, not because they're not great friends, but because of they -- they're unfortunately astride a network or a -- or a land mass or a geographical feature that -- the drug traffickers has decided that that's how they're coming.

HASSAN:
And, Secretary Kelly, I'm well -- I'm well aware of that. I'm also well aware of how able, nimble, evolving and creative these cartels and networks are. And so it just seems to me a totally false choice to leave a border inviting and open -- relatively open. It may disrupt things on the southwest border for a time, but it doesn't do us any good if there are other ports of entry.

And you know, you talk to the Coast Guard right now and they are not able to intervene in some of the narcotics traffic on our seas because they simply don't have the resources, even when they know that they're there. And that would be a very important aspect of our -- our war on this drug epidemic we have.

KELLY:
Well, you're right on the northern border versus the southern border, but for right now, the southern border is the problem. If we were to seal the southern border, and I believe we can get -- I know we will get control of our southern border.

That doesn't mean seal it, but control it -- go from where we were several months ago to almost -- to -- almost no control to some -- some pretty good control, they will -- given the drug demand in the United States, they will figure other ways to get through. We have to watch that and react to it.

HASSAN:

And we also have to keep people in the northern part of our country safe. And so, one of the things, you know -- that's not a very reassuring answer to the people of New Hampshire or the other northern border states.

I want to move on to another issue that we discussed the last time you were here. I asked you about an innovative way to protect DHA's -- DHS's systems from cyber attacks, and the possible application of the Pentagon's pilot program to use hackers to probe the Pentagon's networks for vulnerabilities.

The pilot program was called Hack The Pentagon, and it's been very successful. In the few weeks that the program ran, the Pentagon collected 138 previously undiscovered vulnerabilities. Since then, the Pentagon has expanded the program, and GSA has announced an effort to launch a similar program.

A little over a week ago, Senator Portman and I, along with others on this committee, introduced the Hack DHS Act. That bill would instruct DHS to hold a pilot program to allow hackers to probe DHS's systems for vulnerabilities and report them to DHS.

In return, DHS would pay the hackers a small sum of money for each vulnerability they discover and report. As my friend Senator Harris said, we will fight hackers with hackers.

So, as you can see, a lot has happened since you were last here. At the last hearing, you promised to look into whether the Pentagon's pilot program would be a fit for DHS. So I'm just asking you today that you take a hard look at this bill.

There's also been a similar bill introduced today in the House by Representatives Lieu and Taylor. And so would you just commit to taking a hard look at those bills and seeing what the department thinks of them?


KELLY:

Senator, absolutely will, and probably will not wait to see if this law is -- passes.

HASSAN:

OK. Thank you.

Lastly, I just wanted -- I don't want to reiterate -- I guess I have two more points.

I don't want to reiterate everything Senator Peters said, but I -- I will just let you know, as -- as a former governor, who is in a state with lots of volunteer first responder forces, part-time police departments and ongoing efforts to keep our state -- and do our part for our country's national security -- safe too, the elimination or severe cuts to critical state aid and grant programs for everything from airport security to other kinds of security efforts to fight homegrown terrorism -- you have to train ongoing. You need ongoing resources.

We have an enemy who's evolving. And the -- the notion that, just because we've made improvements since 9/11, we can -- we can absorb this kind of drastic cut, I think, is just a really false notion.

And I would tell you that, having talked with my homegrown -- homeland security people in New Hampshire about the myriad of threats we're facing, The cuts here are really troubling.

And lastly, if I may, Mr. Chair, I just would encourage -- and maybe we could talk off-line about the president's opioid commission. I understand that the first interim report is due shortly. We just haven't heard anything about it. I know you're on the commission, and I'd love to talk later about that.


KELLY:

Well and on that, if I could just have a minute, Mr. Chairman, to respond. Myself, Rex Tillerson -- you may or may not have seen us with the Mexicans, a couple weeks ago -- they're on board with -- with our attempts to not only safeguard the southwest border, their northern border, but also get at the demand problem.

I know Secretary Tillerson, Secretary Price, myself and the head of ONDCP, who I've spoken to and I -- I -- I'd like to think changed his attitude to -- to what his job is going

forward. We'll get together and put some real energy behind the demand reduction, to include, obviously, the opioids.

But I think a big part of it -- I think you will agree, I think we spoke about this -- is this overmedicated society that we suffer from in the United States that just suggests to people, all I got to do is put something up their nose, in their mouth, or in their arm to solve all their problems.


HASSAN:

And -- and one of the things that's going to be really important, and really concerning, obviously, is the administration's support for eliminating things like Medicaid expansion and -- and requirements that insurance companies treat addiction, which gets at the overmedication and the overprescribing issues. So I look forward to talking with you more about it.

Thank you.


JOHNSON:

Thank you, Senator Hassan.

I -- I will, again, just point out, based on the baseline budget, 2004, those $36.5 million (ph) -- had it grown by inflation, would be about $48 billion. Instead, it's about $70 billion.


JOHNSON:

So $22 billion more growth in spending for this department because of those evolving threats. So, I just want to point out what the reality is in terms of the -- the increase in spending over the last whatever that is, 13 years.


MCCASKILL:

And if I may -- and I appreciate that, Mr. Chair. My concern is that we are only as strong as our weakest link...

(CROSSTALK)

JOHNSON:
Well, yeah, we don't want to be penny-wise and pound- foolish, but we have dramatic increase of resources for this department.

Senator Paul?

PAUL:
Secretary Kelly, thanks for your testimony.

The last time you were here, we talked about U.S. citizens coming across the border and being threatened with non-entry or detention if they did divulge the contents of their phone -- all of the contents of their phone. And your response was, "I just don't believe we're doing it."

So we asked some questions in writing and we're still waiting on the response. It's been about six weeks or so.

But I thought I'd list for you a couple of the public episodes of this happening.

This year, a NASA engineer and a U.S. citizen was pulled aside after coming back from Chile. They demanded the PIN for his phone and they handed him a form that explained how CBP had the right to copy the contents of his phone, all the contents of his phone. He recalled that the form indicated that his participation in the search was mandatory and it threatened detention and/or seizure if he did not comply.

The phone, ironically, was already a government phone, it was a NASA phone that we were wanting to search.

Two citizens were stopped on return from Canada. NBC did an investigation of 25 different cases of U.S. citizens being told to turn over the phones, unlock them or provide passwords. A U.S. citizen was taken off of a flight in L.A., handcuffed and released after a Homeland Security agent looked through his phone for 15 minutes. A U.S. citizen journalist was also had their phone taken.

So I guess my question is, is your answer still, "I just don't believe we're doing it"?

KELLY:

My answer is, we don't do it routinely unless there's a reason why, so that's a change.

We do it whether they're citizens or noncitizens coming in, I think it's -- of the -- of the million or so people are coming in the country, about half of one percent is checked.

Now, typically the officer -- and always according to the law.

Now typically the officers who are -- who are engaged in the front-line defense at the ports of entry, in their questioning of individuals for whatever has tipped them off, will cause them to have certain conversations, go down certain avenues of -- of not interrogation, but again, the conversation, in the event of some indicator that perhaps the individual is returning from, you know, sex tourism or something like that. We do catch a fair number of people in that regard.

But again, Senator, very seldom done and always for a reason and always within the law.

PAUL:

So the answer now is not, "I just don't believe we're doing it." It's, "We are doing it and not -- not that often"?

KELLY:

Right.

PAUL:

The policy they're being threatened with, though, is detention. How long will they be detained if they don't give the PIN to their phone?

KELLY:

It's a relatively short period of time. They generally call secondary with a -- with a -- our -- our -- you know, these follow-up questions and what -- once a decision might be made to put them into some legal justice system, then that's the -- that's the...

(CROSSTALK)

PAUL:

But you -- but to you it's -- it's still -- you're just fine with a policy that arbitrarily takes someone's phone, says you can't come back into your own country?

KELLY:

Not arbitrarily. There's a reason why they do it, Senator.

PAUL:

Well, no, the thing is it is arbitrarily unless there are rules as to how you do it. What are the rules? In our country, if you want to look at my phone...

KELLY:

There are rules...

PAUL:

... you -- you call a judge, in my country. You know, so this wouldn't necessarily be American jurisprudence if you're just saying, "We might have some internal rules." Have you published what your rules are?

KELLY:

At the ports of entry, whether they're a citizen or a noncitizen, the officers have procedures to follow, but certainly (inaudible) checked baggage and in this case look into electronics.

There are procedures, whether they're published or not or specific enough to publish I don't know, but I can certainly get back to you.

PAUL:

We'd like to see that. We'd also like to see the form that threatens them with detention and/or seizure if they don't comply.

KELLY:

Sure.

PAUL:

I can tell you I'm not happy with the policy and I wish it were different. And we have actually introduced legislation to try to stop you from doing this and to make you go to a court the way we do in our country. Typically, we go to a court and you ask a judge and you have to present evidence, you have to specify an individual, and you have to have a reason for doing it...

(CROSSTALK)

PAUL:

Searching someone's phone is not the same as searching someone's luggage.

KELLY:

Would that law -- that law also prohibit us from looking in the, you know, bags and things like that?

PAUL:

No, and I think there's a difference. And I think that that's the whole point here is that looking at someone's -- in someone's luggage for an immediate threat to a -- you know, to the country, to the people, to the plane, et cetera, I think we've decided that that's within the scope of -- of your jurisdiction.

But looking at someone's phone is a much more personal and much more extensive look into their life. And we just don't think you should be -- you know, it -- it, sort of, horrifies us to think that you couldn't come back in your country, you know? People are now talking, there are whole people giving you advice to not take your phone abroad because when you come back home, your country won't let you come home unless you let them look at your entire life.

That doesn't seem like a fair tradeoff to be able to travel or for safety. And I think there is a point at which we give up so much of our liberty to travel that, you know, has it been worth it, you know, really? I mean, we can live in a secure state if we -- if we clamp down and we have no freedom to travel, you know, and we give up all of our privacy to travel. I just don't think that's necessary.

And I think there can also be two different standards, frankly. I think there can be one standard for somebody who's coming for the first time from Afghanistan who's got one name and no background. I'm with you all, and we need to do more scrutiny on people coming to our country.

But if an American citizen leaves and comes back, I think, for goodness sakes, they ought to still be protected by the Bill of Rights when they come home.


JOHNSON:

Senator Hoeven?


HOEVEN:

Thank you, Mr. Chairman.

Thank you, Mr. Secretary, for being here and for your good and very important work.

Where are we -- or where are you, I guess, in terms of this extreme vetting process, as far as having the procedures in place that you want, and particularly as regards to the six countries included in the president's E.O.?

KELLY:
I'm sorry, sir. Where are you...

HOEVEN:
Where are you in the process of establishing your extreme vetting procedures the way you want to have them set up, and particularly as regards to the E.O. countries?

KELLY:
Because again of -- of my not wanting to get crosswise with the courts in any law, we've been pretty -- we've been very reserved in that.

I will tell you that, you know, it's -- there's two aspects of this; some of it I control, some of it the State Department controls.

The State Department has recently issued a number of additional questions, as an example, that their consular officers will ask those that want to visit the United States on visas. That's a little bit of an easier thing, because typically those people are coming out of countries -- well, they would present the passport, as an example.

And -- and there's always been certain questions in place that they would ask. Now there'll be some additional questions about where they've lived and -- and, you know, it could be access to their electronic devices, but that's outside the country.

In the case of -- of refugees, I think the senator knows that in many, many cases, the refugees that we deal with have no paperwork that we can rely on, they have no passports,

and we have to take their word for it.

The U.N., as hard as they try -- and obviously (ph) I think the last time I was here, one of the recent hearings talked about my interaction with the -- with the U.N. -- they're in the same position we are, although they're not in the position of allowing people to come to a given country. They themselves, as they do their initial refugee screening -- they don't do screening; they do refugee registration. What's your name? Where you from? All of that taken on -- on faith -- good faith. And then it comes to us.

In the past we have I think exercised entirely too much good faith and I think the -- the things that we are looking at is, "OK, if you don't have a passport, you have no proof of who you are, then we need to know some additional facts and figures about you. Well, who's your -- who's your -- how did you support yourself in a given country? Do you have -- do you have any way to prove that you work for a living, so that we can kind of prove who you are? What village are you at? Can you give us points of contact in a given country that we can call?" That kind of thing.

But in many, many cases, many of these refugees don't have any of that. So it'd be very, very hard for me in good faith to then move them into the United States to -- to establish, you know, a home here.

But we are -- I believe what will give us an advantage is when we start to deal with them on their social media accounts, their telephone registrations, that kind of thing.

HOEVEN:

What about the visa waiver countries?

You mentioned earlier that as we inflict defeat on ISIS in the Middle East, that there are individuals who've been in the Middle East and returning to other Western European and other countries, with which we have visa waiver in place. What -- what procedures -- extra procedures, precautions are you taking to protect them from coming to the United States?

KELLY:

Well, as I -- as I think the senator knows, there are 38 visa waiver countries. As you might imagine, I know you realize this, they're countries that have more or less what we have. They have a working relationship with the United States, to say the least. They have a U.S. embassy locally to handle our affairs and look out for us.

They have kind of an FBI and an intelligence community, and all the rest, with databases that allow us to tap into what they do. That's getting better, by the way, and I've got commitments from many countries around the world because of the laptop ban that we implemented in 10 airports about mid-March.

But the point is, we're in pretty good shape in those. We're in very good shape in those countries. We have confidence in their -- in their systems and now they interact with our systems. Not every country, though, say in Europe, is a visa-waiver country, because some of them have not got, even though they're, you know, Western countries, first world, they don't have what we think they need. So we set the bar very high. And they have in most countries, certainly 38 have met that bar.

But that said, again the long pole in the tent is, as Jim Comey would say, the database is only good if you're on it. And not to get into it. I don't want to be too open about this in an open hearing, but some of the more recent terrorists in England or U.K. may not have been on any of those lists. So that had they decided to come here, you're exactly right. Had they...

HOEVEN:

Answer my question.

KELLY:

... had they come to the United States, they would have certainly been able to buy a ticket and fly to the United States. Now, they're baggage and everything would have been subject to the normal protocol. So my sense would be that, you know, they wouldn't be getting on

the airplane with a bomb or something like that if they got here, hopefully. And if they got here and were trying to do something about that, (inaudible) know that. But if they got here, then it would possibly be problematic.

But the point is there's a certain point where I don't think we can -- we either have a visa waiver program or not. And I can tell you that 38 countries that are on it, are committed to it. We're all committed to making it better. Right now, I'm comfortable with where we are on it.

HOEVEN:

But clearly, we have to react to events and take out sure precautions. Right?

KELLY:

We do.

HOEVEN:

In regard to Senator Hassan's comments regarding the northern border, one of the best tools you have, and you and I have talked about this both at Homeland Committee Appropriations, as well as this committee, is the unmanned aerial systems, UAS.

Kevin McAleenan, your acting CBP director, who by the way is absolutely fantastic, was out in Grand Forks. We have 900 miles of border responsibility, all different kind of terrain, all the way from Lake Superior, all the way throughout most of Montana. The UAS is a great tool.

You're co-located in the Grand Forks Air Force Base. We're looking at new facilities. We're working with him. I would ask for your strong support for him in that effort. And also, with the technology park we have there at the Grand Forks Air Force Base, it is really a unique opportunity to develop that UAS tool, which helps you on the northern border and the southern border.

So again, I want to commend him and comment him to you, and ask for your support for his good efforts. That's a tool that can really address some of the concerns that she raised.

KELLY:

Senator, I agree with you. Thanks for the comments about Kevin. He is really a first-round draft choice.

HOEVEN:

He's an all-star.

KELLY:

I can't wait to get him confirmed.

HOEVEN:

I agree.

KELLY:

Hopefully, the Senate will confirm him.

HOEVEN:

Thank you for all you're doing.

JOHNSON:

Senator Harris?

HARRIS:

Thank you.

Secretary Kelly, as a followup to Senator Tester's question, you mentioned that you have, in your career, had back-channel conversations with foreign governments. Is that correct?

KELLY:
People I could rely on to pass information to foreign leaders.

HARRIS:
And was that in your current capacity as a member of the president's Cabinet?

KELLY:
That was in my capacity when I was in uniform.

HARRIS:
And did you ever initiate...

KELLY:
I wouldn't (ph) hesitate to do it now.

HARRIS:
And did you initiate any of those conversations such that you initiated that they would take place inside the embassy of a foreign government?

KELLY:
I have gone to embassies both in my current assignment, as well as in past assignments, or met with members of the diplomatic corps from other countries.

HARRIS:
Have you initiated back-channel conversations to occur...

(CROSSTALK)

KELLY:

Can I finish what I was saying?

HARRIS:

... inside of those embassies as opposed to attending a cocktail party?

KELLY:

I have had -- I've had conversations with members of foreign -- foreign diplomats in various places, and talked to them about my perception of what they could do better in response to things that the United States government would like to see them do.

HARRIS:

Thank you.

Secretary Kelly, included in the president's budget is a provision that says, quote, "the secretary of homeland security may condition a grant or cooperative agreement awarded by the Department of Homeland Security to a state or political subdivision of a state for a purpose related to immigration, national security, law enforcement or preventing, preparing for or protecting against or responding to acts of terrorism."

Specifically, the budget authorizes the secretary to condition grants on compliance with any lawful request by DHS to detain an alien for a period not to exceed 48 hours. Are you familiar with that?

KELLY:

I'm fairly familiar with it, yes.

HARRIS:

I'm sorry?

KELLY:

Fairly familiar with it, yes.

HARRIS:

Grants that are subject to new conditions would include the urban area security initiative, a DHS grant that provided California last year with $124 million to help urban areas prevent, mitigate and respond to acts of terrorism. This grant supports more than 100 incorporated jurisdictions in 12 counties in the Bay Area of California alone. It supports them to buy equipment, enhance systems and conduct training so that localities can prevent, mitigate and respond to acts of terrorism.

Are you aware of that?

KELLY:

That's a good thing.

HARRIS:

Another DHS grant is the State Homeland Security Grant Program that provided California $60.2 million last year to support state, local and tribal efforts to prevent terrorism and to prepare the nation for threats and hazards that pose the greatest risk to security in the United States.

Is that correct?

KELLY:

I wish I had the same document I could read from as you do.

HARRIS:

Are you familiar with this grant program in your department?

KELLY:

I'm familiar with the grant program.

HARRIS:

And are you aware that there are a number of federal courts that have imposed civil liability on local governments for complying with ICE detainer orders that were not supported by probable cause?

Can you answer the question?

KELLY:

Am I aware of that?

HARRIS:

Yes.

KELLY:

I am.

HARRIS:

And in order, then, to comply with the 48-hour ICE detainer made with no probable cause, wouldn't that force the jurisdiction to choose whether to comply with the federal court ruling or forfeit vital public safety funds that are administered by your department?

KELLY:

I'm not a lawyer, but I think that federal law is federal law, as state law is state law. And if, you know, we have a different view of the impact of some of the state rulings. But...

(CROSSTALK)

HARRIS:

Well, imagine, sir, if you will, that you were a local law enforcement leader presented with a choice of either complying with federal law that means that you may expose your department in your jurisdiction to civil liability, or forfeiting DHS funds that are designed and intended to help you fight terrorism at a local level. Wouldn't you agree that puts those law enforcement leaders in an -- it's almost a Hobson's choice -- a Hobson's choice? What -- how are they supposed to choose?

KELLY:

Well, Senator, had you not cut me off, I would have said the same thing you just said. Probably not as eloquently, but I'd have said the same thing you said. I appreciate the fix they're in. I appreciate that they get their legal advice from the state and locals. And below the radar, we work with every police and sheriff department in this country to the degree that they can and are comfortable with.

HARRIS:

Secretary Kelly, what do you mean "below the radar"? They have two choices, and they are accountable...

(CROSSTALK)

HARRIS:

Excuse me, sir.

They are accountable to their jurisdiction, to the bodies that may have appointed or elected them. And they have to make choices. What do you mean "below the radar"?

KELLY:

We talk to them on the telephone. And...

HARRIS:

And what are you instructing them to do when presented with those two choices?

KELLY:

... and we tell them to whatever they can do within the law, the interpretation, we're willing to work with them. So...

HARRIS:

So are you aware that there are local law enforcement...

(CROSSTALK)

KELLY:

Let me at least finish once before you interrupt me?

HARRIS:

Sir, with all due respect...

KELLY:

With all due respect, Senator.

HARRIS:

Are you instructing local law enforcement leaders that they can overlook at DHS detainer request so they're not exposed to criminal liability?

KELLY:

We talk to them about whatever they're comfortable with, whatever they think they can do within the interpretation of their local attorneys general, as an example, or local lawyers...

HARRIS:

So when they're...

(CROSSTALK)

KELLY:

Would you let me finish once?

HARRIS:

Excuse me? I'm asking the questions.

KELLY:

But I'm trying to answer the questions.

HARRIS:

When they are -- when they tell you, as I know local police officers -- police chiefs are being told, that it would expose their municipality to civil liability if they comply with the detainer requests, are you telling them that you will not withhold the DHS federal funding that they rely on?

KELLY:

OK. Before I start to answer, will you let me finish?

HARRIS:

If it's responsive to the question, of course.

KELLY:

We talk to them on the phone and tell them whatever they're comfortable with, whatever they can do within the interpretation of their local lawyers or legal advisers, we'll work with them.

HARRIS:

So, are you willing to, then, not withhold federal funding when police chiefs tell you that they cannot comply with the detainer request because they've been told by their lawyer that they will expose their jurisdiction or their department to civil liability?

KELLY:

I'm willing to work with them in any way I can within the law -- federal and local law. Yeah, whatever they're comfortable with. I don't make threats to people, Senator.

HARRIS:

Thank you. And my time...

(CROSSTALK)

JOHNSON:

By -- by the way, there's actually a very simple fix for this predicament, and it's a huge predicament. Let's pass a law to give those local law enforcement officials liability protection against those civil suits. there's part of Pat Toomey's sanctuary city law that could clear up this whole difference.

So there's actually a pretty simple fix here, which I would certainly support.

HARRIS:

Well, and -- and I would support...

JOHNSON:

Senator...

HARRIS:

... any fix that would not withhold funding for local law enforcement to meet the demands that they face around combating terrorism in their local jurisdictions.

JOHNSON:

Great. So, this could be a bipartisan solution here. Let's provide that...

(CROSSTALK)

JOHNSON:

... civil -- that civil liability protection against those civil suits so local law enforcement aren't caught between a rock and a hard place, in a very difficult situation. So, let's -- let's work on that together. I'd appreciate that.

I'm sure Secretary Kelly would enjoy working with us on that as well.

Senator Carper?

CARPER:

Thanks, Mr. Secretary. Thank you for -- for joining today. It's good to see you.

I -- when I first heard the -- the -- the words "St. Elizabeths," I thought why would we spend that much money on a -- of -- of creating a campus, if you will a home -- a consolidated home for the Department of Homeland Security.

And over time, I became convinced that one of the better -- one of the ways to actually enable the leadership of this department to manage their department and to improve their

performance, and frankly improve the morale of the employees is to actually pursue and implement the -- the plan to create this campus.

When Jeh Johnson became the secretary, he had same kind of misgivings that I originally had about the -- the proposal. Could you just take a moment and tell us where you're -- you've had a chance to -- to -- to get a feel for this, and how your department is just so far flung.


KELLY:

Right.


CARPER:

And what -- what do you think we ought to do? And how does the -- the -- the administration's budget actually take us in that -- in that direction, or not?


KELLY:

Well -- well, the Senate -- you know, Senator, that we are -- and I -- I can't count the number of locations around the city, various -- various parts -- every part of Homeland Security is just spread out over all of hell's half-acre here.

To -- to bring all, or most of it, or some of it together over at St. Elizabeths makes a lot of sense, just from the point of view of -- of time management. I mean, first -- and money. We -- we spend a huge amount of money renting, you know, choice downtown real estate here in the city. We could avoid much of that.

I think the -- the -- we would realize, if and when St. Elizabeths opened, billions of dollars of savings over five or 10 years. But the other issue is time management. I mean, it takes me half an hour to get from where I -- my -- I sit most of the time to meet with CBP (ph) or ICE, whatever. And then if -- obviously, you know, half an hour to get back.

Sometimes I do that two, three times a day. It kills either my time management or their time management. I do the best I can not to inconvenience the people that work for me. But it

would be an advantage to be more or less in one place.

St. Elizabeths seems to be the -- the locale. And over -- but frankly, as I looked -- as I've gotten smart on that particular location, there are some -- some worker issues that we -- we need to sort out, and we can do that in terms of transportation, access to Metro, that kind of thing.

But overall, it would be a -- a cost savings, as well as a time savings, if we were to consolidate much of the headquarters effort in one location, St. Elizabeths.


CARPER:
There are -- there are two pieces of funding. One is for GSA and the other is for the Department of Homeland Security. I think one is for infrastructure and one is for -- if you go (ph) for a fit-out.

And one of them is -- I think the GSA piece is funded in the '18 budget. The DHS funding is -- is not there. So, I'd like to follow up with you on that, and certainly talk with our appropriators, some of whom are on this committee, I believe.


KELLY:
Yes, sir.


CARPER:
I want to go back down to the -- the southern -- the southern border. We see some substantial increases in funding for CBP, for ICE, money for detention centers, money for a wall.

The -- there's also money for what I call force multipliers. And I'm a big believer in force multipliers. I'm not a big believer that -- that we need a 2,000-mile wall.

There are some places where a wall makes sense. But the -- the idea of investing in these force multipliers that are -- have been demonstrated be effective is -- is good.

You and I have talked often about root causes, and the -- the root causes of why the people continue to come from Honduras, Guatemala, El Salvador has -- has lots to do with our insatiable demand for drugs. The drugs are trafficked through those countries. They come to us. We send them money and guns.

And we set up something called the Alliance for Prosperity a couple of years ago. Actually, the -- those three countries set it up, and we came in. And -- and as you know well -- you were there at the creation, to -- to try to emulate what was accomplished -- what's been accomplished in Colombia.

And do you have a -- a sense for how things are going in those three countries with respect to the -- the goals that they set themselves on the Alliance for Prosperity?

KELLY:
A -- a great question and -- and, really, a great story. Not perfect, but a great story.

Based on the confidence that the Congress and the previous administration put into the three northern tier countries in helping them out, recognizing that, first and foremost, they have a problem, much of it is generated by -- by our drug -- you know, insatiable appetite for drugs -- that those countries are nearly failed states, much as Colombia was 20 years ago, and isn't today.

So, the miracle can happen. I mean, Colombia did it. And frankly, at the time, Plan Colombia was put together by the United States Congress with a lot of resistance in other places.

And -- and, as, you know, I think Senator put some American money -- I think 4 cents on the dollar. But ultimately, there's a miracle that's happened in Colombia. So, when people say it -- tell me it can't happen in Central America, I tell them to look at Colombia.

So, that said, the Alliance for Prosperity, the three countries putting their own money into it, and then through the Congress, the Obama administration, Senator -- Senator -- Vice

President Biden was a huge help in this, as -- as you know, got some additional U.S. funding put against it, you know, controlled in -- in the right way.

So, what's happened in -- in Central America since we worked on -- on -- on Alliance for Prosperity? Violence is down. You know, Honduras, El Salvador, Guatemala used to be the three most dangerous countries on the planet -- more dangerous, frankly, than Afghanistan and Iraq was at the time.

They have cut their murder rates by either a third or more. Still horrific, but cut it a third or more, all with human rights in mind, all with the rule of law in mind. They have a long way to go. But their economies are starting to grow. They've gotten their arms around the corruption.

Four or five years ago, when I took SOUTHCOM, everything was going in the wrong direction on Colombia, just -- or -- or in Central America. I just read a report this morning where they've either stabilized, not getting worse, or getting better. That's huge.

I think, you know, in -- in addition to my outreach, back channel communications, in some respects, to the -- the leadership down there through religious organizations and NGOs, so that I don't make it official, but they know where I'm -- I am and where I'm going on these issues, we have also asked them to -- ask their -- their citizens to not waste the money and head north, do not get on that terribly dangerous network that I've described before, stay where they are, because if they come here, this is no longer an illegal-alien-friendly environment. It is a very legal (ph) alien.

And, as the senator knows, 1.1 million people a year. But it is no longer a friendly environment for illegal aliens. Don't waste your money. Don't go on the dangerous network.

What we're doing, we've put together, frankly -- the DHS has been the energy behind it, although it's not my job. We've passed it off to the State Department.

So next week, in Miami, we're bringing together as cosponsors of -- of a conference on the northern countries -- northern tier countries -- Mexico -- great country, great partner -- and the United States cosponsoring.

We've got observers coming in. Canada, I think Spain, certainly Costa Rica, Panama, Colombia, maybe Peru, for due day (ph) conference. That conference will be led by the vice president. I'll be there. Senator -- or Secretaries Tillerson as well as home -- Commerce and Treasury will be there.

The point is, the first day, we'll bring together investors to do the best we can to stimulate what's going on in -- in those three countries economically. And then the next day will be security issues, trying to get at the human trafficking and the drug trafficking.

I mean, just last week, I was down in Haiti meeting with the new leadership there on another issue. Suggested that maybe the Haitian president come on board for one of those days, or at least do a cameo- type appearance.

So, what we're trying to do is help them solve their problems at home, economically. We've already helped them solve the security -- not solved -- helped them go in the right direction on security. And with a little luck and a little -- with a little luck, we might actually be able to help them.

But if we don't reduce the drug demand in the United States for heroin, cocaine and methamphetamine, this is all a complete waste of time.


CARPER:
Yeah. I may say (ph) to my -- to my colleagues, the secretary said I asked a great question. I thought he gave a great answer. And -- and I think you've made the case for continued support for the Alliance for Prosperity.

Though -- though -- just like in Colombia, the lion's share of the responsibility rests on these three countries. We didn't just say to Colombia, "We're going to come in and solve your problems." We said, "You solve them. You can do it, and we can help."

And we said the same thing with these three countries. And you made the case for one. I'm (ph) delighted to hear about the some (ph) -- I don't believe our schedules allow us to go and

participate unfortunately, but my thoughts and prayers will be with you and on your efforts in this regard.

Thanks so much.


JOHNSON:
Thanks, Senator Carper.

Just a moment of clarification. You mentioned 2,000 miles. So there's no confusion, this budget is literally requesting 74 miles of fencing, 60 new miles of fencing, 14 replacement in San Diego sector. I was just down there. It's amazing how many holes have been cut into that San Diego wall and been repaired. And the 60 new miles, 32 miles of that is in Rio Grande sector, new wall and 28 is part of a levy system.

So again, just so we're talking about 74 miles over 1,700 to 2,000 mile -- I think that's a pretty reasonable request.

Senator Heitkamp.


HEITKAMP:
Thank you, Mr. Chairman. And again, welcome, Mr. Secretary.

Of course you know what my question's going to be. How soon are we going to see the Northern Border Report as mandated by federal law.


KELLY:
I'll get back to you today. I don't know but let me take it -- all seriousness. Let me take it for the record. I'm sorry.


HEITKAMP:
OK. If -- obviously we had hoped we would see it in June. I think we have some reason to believe it's going to be delayed, but it makes my broader point, which is we need a strategic

plan in terms of border security, and one thing that we hear about is fencing, and I've spent a lot of time on the southern border. I believe that barriers can be enormously effective, as they have been in the San Diego area.

But again, we know that most drugs -- at lest the previous administration would tell us that most of the drugs that we're talking about are coming through the points of entry, and not walking across the border in remote locations.

What additional strategies do you have to do additional screenings? Where's the investment in more personnel, more screenings, more technology at the points of entry?

KELLY:
(OFF-MIKE)

I'm sorry. In a sense, that's part of the border strategy. There's no doubt -- and I'm a -- I know a lot about this from my last job in particular, but there's no doubt that heroin, methamphetamine and cocaine primarily come through the border in vehicles, primarily. Marijuana is...

HEITKAMP:
Yes.

KELLY:
... in some cases humped around through the desert, but for the most part, the three big killers in the United States come in, and what I've -- if we -- if Kevin McAleenan, just a tremendous professional and dedicated -- my hopes is that the Senate confirms him -- and -- but he's already in a role that makes him very, very valuable.

I've asked him to look at the technology after next, in terms of looking into -- looking into vehicles, tractor trailers, things like that to look at the voids as they're called so we can decide which vehicles get searched, broken down, and to increase the number vehicles. The other way to do that -- we already do it in Canada, we're doing it in Mexico, and that is to

work across the border, where -- with the Mexicans or the Canadians in terms of facilitating movement of transportation, looking at vehicles before they're locked and sealed on the way north.

So this -- it's a multifaceted approach, but if I could -- and I'll just end with, but if we're trying to do this on our border, we've kind of already lost. The place to take the tonnages out are working with the Mexicans, which we are, to help them locate the heroin, the poppy fields, which they can destroy, working with the Mexicans to identify and we are -- and they are destroying the methamphetamine labs...

HEITKAMP:

And just to raise a concern there, we obviously have in the past had pretty good relationships with the country of Mexico. We saw in a regional election, the ruling party coming very close, and in fact not getting a majority. The last thing we need is to not have strong and great relations with the country of Mexico, and so I just ask you and urge you, given your experience in the region, to encourage this administration to look at the entire relationship, whether it's a trade relationship, whether it's a border security relationship or whether it's just respectful talk. That does us no good. I want to just...

KELLY:

I work it every day.

HEITKAMP:

I want to cover a couple quick points. I have beekeepers who can't get -- I don't know what happened there -- I didn't do it, though.

KELLY:

No, you didn't.

HEITKAMP:

Secretary, I didn't hurt your shoulder.

I have beekeepers who can't get seasonal workers in, and it just seems like the delays are getting longer and longer for the H-2B visas and the H-2A visas, and seasonal workers can't wait.

How long do you think is a proper timeframe to get an answer on whether we can get workers in the country, and what are you doing to, you know, meet the requirements of the law, but to expedite especially for seasonal A workers.

KELLY:

The A workers -- you know, I know we already have large numbers that come in and have been coming in over the years, but looking on the B side -- H-2B, working with labor. This is all about -- in the current administration, this is all about American jobs versus people that come in and do the work.

HEITKAMP:

Yes. Except I have doctors who can't get in. You know, if the administration wants to send me beekeepers and doctors, and a whole list of Americans who want those jobs we'll be glad to do that in my state, but we've got to recognize that in the meantime, especially as it relates to physicians, it's extraordinarily difficult to recruit physicians to my state. And we have seasonal workers who we can't -- I mean, obviously we would love to hire locally, but that is becoming increasingly impossible, and so I'll probably submit a question for the record.

Finally, because I'm running out of time and I want to get enough of this in, if you look at local border enforcement, the critical component in states like ours is not just technology, as Senator Hoeven talked about, but it's having a strategy and plan, and that strategy and plan has to involve local law enforcement.

You have Border Patrol in North Dakota that when they are patrolling the border they aren't in (ph) in radio contact with your people back in your points of entry, back where Border Patrol would muster and deploy.

So, we know that we have to have that back-up. One thing that concerns me and it goes to the FEMA grants, it goes to this idea that we can cut grant programs and still provide those services -- Stone Garden's been an enormously successful program. Really concerned about reductions in the commitments to local law enforcements not just for border security, but for safety of the personal who are on the border.

So, I would ask you to play -- please pay close attention to this budget as it relates to working with local law enforcement, local first responders.

They are force multipliers, and without those resources, they're going to have to cut back on resources, and that reduces our readiness. I don't think there's any doubt about it. OK.


KELLY:
I will.


HEITKAMP:
Thank you, Mr. Secretary.


KELLY:
Senator Heitkamp, I would ask you to take a look at my state-based temporary visa program; I think would solve an awful lot of that problem right there.

And just kind of a comment to majority staff, minority staff as well as the secretary, we should really have an alert for witnesses to be prepared to answer questions on the northern border. I think...

(LAUGHTER)

(CROSSTALK)

JOHNSON:

Yes, but there's not much of the northern boarder that isn't represented on this committee, so that's always (ph) an issue.

KELLY:

That's why I love appearing before this committee.

(LAUGHTER)

JOHNSON:

Senator Lankford.

LANKFORD:

So, my northern border's Kansas, and we've had our moments but we're getting along just fine.

So, let me talk to you about a couple of other things as well. One is, you and I have spoken, even in fact in the past two weeks about Real ID, and some of the extensions in the process and the decision making on that.

At the time we talked before, I said, hey, the deadline's coming up, June 6th. For that, we were going to try to get back to it quickly. There's been a delay on this. So there's several issues that are pending out there for states like mine and others that are working for the Real ID process.

For those we -- our legislatures past issues with Real ID, working through the implementation and such, that's been fairly automatic that if you're making progress and your working through implementation then those extensions are coming.

It seems to have delayed this time, to literally the very last second, and then we're still waiting to be able to determine what's the decision making factor on that. So help me understand a little bit better so we can take that back.

KELLY:

Sure. The first thing I'd say, I had a lengthy meeting earlier this week, yesterday, on this because, actually today was the day that normally I would have made the decision to extend or not.

Now, I think the senator knows the -- I think it's the 22nd of July, before anything would stop.


LANKFORD:

Right.


KELLY:

So, I have a little bit of time and I've sent my staff back to kind of take a harder look at where -- as you know, most states are either compliant or getting (inaudible) towards compliant. In fact, there's really only one state that is kind of not going to -- I believe, if all the promises are met, will not make it.

But I've asked my folks to go back and start looking at some of the states that are -- that are -- have not been as active as they maybe should have been over the last 12 years to -- to implement.

They've been in contact with these states, the governors, the attorneys general, the -- whoever's in charge of this kind of -- if we have, for the most part, commitments from the states to really get at this issue. But I've asked them to just go back one more time, if need be, talk to the states about -- about the extension of what it means.

Bottom line, in that meeting, they told me, "Secretary, three -- three months ago, we had states that weren't even paying attention to this, that were getting dangerously close to not being able to implement before the deadline.

"They've all got the message," they said, "Mr. Secretary, and with the exception with one state, they are -- they are all in there, doing the right thing, getting close to it."

So my -- my sense is -- I know I will make a decision next week, likely that will extend for six months, until October, and then we'll take a hard look then. But the good news is, with a lot of pushing and shoving and gnashing of teeth, over the last 10 -- 10 years or so, most states are on board, and I believe all but one will be compliant.


LANKFORD:

So let me -- let me give you a couple of -- just inside pieces on this. When you talk about -- we've got a little bit of time until, basically, late July, let's say that, at some point, DHS comes out and says, "Nope, that driver's license is not going to be extended." Then that means everyone has to get to a passport, which, in the summertime, takes six weeks minimum...


KELLY:

Right.


LANKFORD:

... to be able to do.

Plus you've got to contact people. And let's just start with a military base or a federal courthouse, and to be able to tell everyone coming to a federal courthouse, you're going to have to have something different -- you're going to have to get a passport.

Well, first, you've got to identify who's coming to the federal courthouse, and be able to contact those folks and give them six weeks of leave time to get their paperwork to be able to do it. We're out of time.

Once you get to a June the 6th time period to know that deadline's really coming up, if drivers that are doing deliveries, if people that are refreshing the convenience store in a federal building, if people that are bring groceries into the facility onto a military base, if

they've got to all have a -- some sort of other passport or something, that's going to take a long time to be able to get geared up.

So the earlier those waivers can be released, the less anxiety it is in all of those locations. Because all of them are currently spinning up, in each of those states, to try to figure out how we're going to accommodate around this, just to be able to get supplies and equipment brought in, or people coming in to apply for a job, onto a military base as a civilian -- can't even come and do that without an escort to be able to do it, so that -- that will be a big issue.

The hiring process we've talked about before, for CBP -- any progress on that of late? Because we're still talking 460 days for hiring, and the polygraph issues -- have there been any changes since you and I spoke in the last...

(CROSSTALK)

KELLY:
Yes, Senator. A couple things, one on the polygraph issue. You know, we'll continue to polygraph, but there are other ways to polygraph.

I didn't realize this, but Kevin McAleenan, who's the designate, hopefully will one day be confirmed for the Directorship of CBP, has told me that there are other techniques, other questions, things like that, that still maintain the -- the vetting process, but are faster.

There are other parts of the federal government, to -- not to -- not to mention the state and local, that have polygraph -- that are a lot less...

LANKFORD:
Right. So they've got a fail rate in the 30s...

KELLY:
Right.

(CROSSTALK)

LANKFORD:

... so it would be as (ph) in the high 60s.


KELLY:

My daughter works for the FBI. She said her polygraph was a fairly pleasant experience.
Took an hour and 10 minutes. They asked all the right questions, and she was out of there.
By contrast, six, seven hours. So I just, when I came in, said, let's take a look at...


LANKFORD:

That -- that could be the first time I've ever heard anyone say that polygraph was a fairly
pleasant experience.


KELLY:

... right. Yes.


LANKFORD:

So I (ph)...


KELLY:

I love it.


LANKFORD:

... yes. So let me ask about the entry-exit program. Is everything still on schedule for that?
We've spoken about that before.


KELLY:

Well, it's like anything. The -- the entry at the airports are doing well...


(CROSSTALK)

LANKFORD:

Right. It's the exit.


KELLY:

... working hard and -- and entry at the ports of entry. But the exit is -- it's not a bridge too far, but it will -- it will take some time, effort -- but we're working toward it.


LANKFORD:

So the pilot is on track. I guess what I'm trying to figure out is, by the end of next year, we're trying to implement that as a -- nationwide. Are we on track, at this point, to be able to implement that at airports nationwide? We still have a long way to go on vehicles and -- and other -- other entry-exit points. But...


KELLY:

Airports, I think I'm comfortable with saying yes.


LANKFORD:

... OK.

So there -- there was an announcement made by DHS on temporary protected status for Haitians, to extend it for six months, but it basically raised the red flag for them and said, "Hey, this is it." The situation has changed in Haiti that demanded the temporary protected status years ago -- may or may not be there.

What I want to ask you is is this a -- an alert for the Hondurans, for Salvadoreans, for everybody on temporary protected status, that DHS is going to look at the situation that started temporary protected status, and ask if that situation has changed?


KELLY:

Senator, it's an alert. But, that said, for whatever reason, once someone goes on this status, they -- traditionally or historically, they just automatically renew it.

LANKFORD:
Right.

KELLY:
The Central Americans have been on -- some of the Central Americans have been on status over 20 years, and they were put on status because of a hurricane that happened over 20 years ago.

I can tell you that things are going better in Central America, much, much better over the last 20 years, in many ways better. But, no one's ever looked at it. And I think that's something -- we have to do that. It's the law. In Honduras -- not Honduras -- Haiti, seven years ago.

And -- and the program is for a specific event. In -- in Haiti, it was the earthquake. Yes, Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. But the earthquake was why TPS was -- was granted and -- and that's how I have to look at it.

Now, that said, and I don't want to get too far out in front here and -- and I certainly wouldn't suggest anything hard to the -- to the Congress, but they're both -- we don't know. Two to four hundred thousand people in the United States are on TPS, vast majority of them behaving themselves, vast majority of them have clearly got jobs and all the rest of it.

They are here more or less legally. A lot of them weren't, but they were given TPS, so I'd make the assumption they're here legally. That may be -- we may think -- you may think that a solution to this would be to look at them and say, "OK, how many of them do we know are here?" and -- and use that against the 1.1 million legal migrants with a -- with a -- with a way towards citizenship. That may be a way to solve it.

I can -- I can look at the Haitian situation, say seven years is a long time, but it's not so long that some of them -- all of them might be able to go back. Twenty years, it's kind of hard. But I'd like to see this solved in another way. But according to the law, I don't have the ability to solve it.

But the word is "temporary," and I -- I think those that have been in my -- in my position over the years have simply automatically extended it. So the six months -- and I was down in Haiti last week, spoke with the leadership.

I said, "During the six months, you, Haiti, need to start thinking about travel documents and how you're going to bring these people," who, by the way, are generally better educated, entrepreneurial, would be, I think, a boost to the Haitian economy in -- in -- in social function.

And by the same token, those that have been allowed to the United States -- to remain in the United States under TPS should start thinking about going back to their homeland unless they -- and if they feel as though -- and I said this in Miami right after the Haitian trip -- many of them, at this point, probably have different immigration status anyway, in the sense that they've married local men and women or whatever, so they need to go down and get -- consult with an immigration expert to find out if they have status.

But at the end of it, the word is "temporary" unless we change that -- unless you change that -- to "permanent," somehow.


LANKFORD:
Got it. Thank you.

Thank you, Mr. Chairman.


JOHNSON:
Senator Daines.

DAINES:

Thank you, Mr. Chairman.

Secretary Kelly, it's good to see you again.

Montana recently passed a law, and it's been signed by our governor, for Real ID that I think is going to bring us a solution to the dilemma we faced, by the way. We still need an extension to get it put in place.

But we will offer Montanans two IDs. You can get a Real ID- compliant driver's license, or one that's not, and pay a premium for the Real ID-compliant. But I think we have a path going forward.

We'll need an extension just so (ph) we get this system implemented, but the governor has signed the bill. I think we finally have a path forward with the impasse we've had here for, certainly, quite some time.

I got to say something here, Secretary Kelly. This chart you shared, showing the reduction in apprehensions across the southwest border, I think, is one of the most under-told stories in the country at the moment.

To think that we have seen a nearly 70 percent drop in illegal southern border crossings under your first few months of leadership, and it was accomplished by sending a message to the world, and particularly down south, that the United States would enforce its laws.


DAINES:

Thank you, as we are a nation of law and not a nation of men, that you have led with President Trump, and I think we need to get this message out more. I -- I've spoken to a lot of my friends and constituents back in Montana, and that message needs to get out. So congratulations.

And as we have seen these horrific attacks in London, there's breaking news now of a crazed man in Notre Dame Cathedral here in the last few hours.

Who knows if it's a terrorist attack or not, but the point is it's -- it's -- it seems like we're 24/7 breaking news with these horrific attacks around the world, we've seen in London our homeland security will remain our top priority and challenge, and I look forward to continue to work with you to ensure you have the resources to keep our nation safe.

Secretary Kelly, we've discussed the impact of methamphetamines coming from the south of the border on Montana's families. In fact, about one-third of the children in the Montana foster care system are there because of parental meth use. And most of that meth we believe is coming from Mexico.

Recently, Senator Peters joined me in introducing the Child Protection Family Support Act. It's going to help these children. But we also need to continue to fight against the flow of drugs. I know CBP is requesting an additional $2.9 billion. What will this mean for the interdiction of meth at the border?

KELLY:
I hate to say this, probably a drop in the bucket -- necessary. And you and I have talked about this, Senator, and made a few comments since this hearing. It's really we've got to take a much more holistic approach to this, demand reduction, rehabilitation. Certainly law enforcement plays a role in the homeland. The southwest border plays a role.

Our partnership with Mexico -- and here I think it gets more and more important. Our partnership with Mexico, to use the example of heroin and meth as you -- as you say. They're cooperative with us. Just recently, within the last 60 days, they destroyed two massive methamphetamine labs.

And by the way, the reason the -- the production of meth has migrated so heavily towards Mexico -- and this is the balloon effect we talk about -- when we do something that's effective, the cartels figure out a way to get around it. And it's a cat and mouse game that

never ends. Right now it's the southern border. As I mentioned earlier, tomorrow could be the southern border or containers, depending on how effective we are.

So the United States Congress passed legislation, I don't know, 10 years ago, something like that, and restricted the -- the precursor chemicals, the availability of the precursor chemicals to make meth. Up until that point, meth was made in a million little, you know, places in the United States and tiny little laboratories. And I use the term loosely, there.

We -- we -- two things, we reduced -- the Congress reduced the availability of the precursors, and the cartels, as they have become more and more successful and sophisticated said, "OK, well if the United -- they're (ph) responding to a market, the United States wants to try to kill themselves with methamphetamine, heck, we can do it for them."

And so that's why it's migrated, again, congressional action in terms of restricting the precursors, and then simply the cartels taking it up and marketing it. So that's -- that's primarily, in my view, the solution to the problem.

Working with Mexico, yes, the southwest border for sure, and increasing the amount of take we take there. Yes, you know, internal U.S. law enforcement.

But you know sir, senator, it really is all about demand reduction. We will always have addicts. Studies tell you that you know, there's -- any population, ours included, there's certain people predisposed to being addicted to something. But an awful lot of these people, from my personal experience as a kid, an awful lot of people start doing drugs because its cool, there's no argument against it, and suddenly they're -- they're hooked on something, fill in the blanks, and they can't get away from it.

We have solved -- not solved, I've appeared in this hearing a year ago, April and talked about this issue of how we have managed to convince people over the years, seatbelts, smoking, a lot of different things. You never get to zero, but we could do a lot better.

The president has -- has got DHS, State, HHS in the lead, ONDCP. So if we could get a comprehensive drug demand strategy put together that just -- it's not law enforcement, it's Hollywood, it's professional sports, college sports, the president of the United States, the

Senate, everyone out there, the influencers, we can solve this problem. Or reduce this problem significantly.

But back to your original question, we need the money but it's a holistic thing and it's not just a CBP guy on the border.


DAINES:

You know, Senator Portman and I and a couple others were over in Beijing just a couple months ago, working on getting U.S. beef into China was one of our missions. We were talking to North Korea as well. But Senator Portman brought up the issue with the Chinese government to stop the flow of fentanyl and carfentanil, which you can buy on the dark web. Oftentimes it comes out of China. So I -- this holistic approach is certainly the right approach, and I'll continue to work with you on that.

I want to shift gears -- we're running out of time -- and talk cyber. As the budget request, reflects cyber is a national priority. The request has increased, and (inaudible) the protection programs directorate will help meet the current cyber threats, but we need to also stay ahead of these emerging threats that we see everywhere.

Back in February, in fact, they introduced a bill, Support for Rapid Innovation Act, which provided the science and technology directorate, direction and authority to leverage limited resources within the -- with the private sector and academia to research and develop the next generation cyber-protection capabilities.

Despite the proposed cuts, Secretary Kelly, how will the S&T continue to support cyber R&D in fiscal '18?


KELLY:

Sir, first of all, I'd like to just say a couple of words about the effort right now. On the morning that the -- the malware was unleashed on -- on Europe, and I went to the White House situation room, and as we watched that worm its way around the world, infecting hundreds of thousands of systems.

And we had FBI, DHS, and -- well, everybody, we had already made -- we, when it first started, we, DHS, had made notification to those private and public entities that we deal with constantly and said, something's up, you know, put the word out, put the alert out.

Other parts, including DHS, started to do the forensics on the thing, what is it, what's it doing, what's it made up of, where'd it come from. And I'm very proud to say that -- that everyone in the room was constantly deferring to, "What's next? What do we do next?" This includes NSA with DHS. Not -- not that DHS professionals did it all, but we were the central focus of it.

And I am very proud to say that -- that through the efforts of my predecessors and the United States Congress and others, that malware came to the United States but was constrained to a handful of systems and contained within those systems. It's as if it never came across the ocean, so to speak, and we helped nations overseas contain it.

That said, we need to get better because the threat is -- is changing, morphing, and this administration, to pat it on the back, and certainly my Department of Homeland Security have focused on increasing the protections better than they are now, particularly as we interact, and we do heavily interact, with private entities, Microsoft, people like that. Is it one team, one fight, and can only get better.


DAINES:
Thank you, Secretary Kelly. And I just want to thank you again for when the president asked you to serve in this capacity, that you said yes. I'm just grateful for your leadership and -- and the early results you're already seeing because of your leadership. Thank you.


KELLY:
Thank you, sir.


JOHNSON:

Senator Daines, I've just got a couple of closing questions for Secretary Kelly. First of all, I am concerned about funding for the Coast Guard, I was -- when I'm going through this I've asked staff you know, how much I was hoping Department of Defense made up a fair amount of funding too but they really contributed only about $1.5 billion per year.

So you take a look since 2009, the funding for the coast -- or the budget was about $9.6 billion. Now it's about $10.6 billion. It gained a 10 percent increase, but with the kind of threats we're facing, can you give me any kind of comfort that that's adequate?

KELLY:
I can't.

I think the Coast Guard, first of all, is just an amazing organization. I really came into my view when I was in Southern Command. I mean I had seen them sprinkled around the world in the Persian Gulf, places like that, but it really came into my view in Southern Command about how good they are.

You know, obviously they're one of the five military services, small, and in my opinion, in exactly the right place, DHS. But the myriad of missions that they execute and the authorities they have are just -- make them value added to say the least.

But it's not big enough. I mean they're -- the biggest problem with the Coast Guard -- I think, the commandant was sitting right here, he would be pat me on the back. I say we need to recapitalize.

They have, you know, they have brand -- some brand new cutters coming on, national security cutters, valuable, essential, but so much of the Coast Guard is so old that it just limps along, and I think we have a plan. I'd love to add to that plan, but I think we have a plan.

And all of this is not to mention, we've got to, got to, got to get involved in the Arctic more than we are. We have some -- a couple of broken-down old icebreakers. We're looking to buy

six -- three heavy, three medium -- to work up there in the northern reaches. We've -- we've got to be up there, not to contest anyone's claims, but to simply work up there. Particularly, as -- as importantly work in terms of the environmental protection of that precious, you know, international asset.

So -- but it's not big enough...

JOHNSON:

Well, let's work together with Senator Boozman, his subcommittee. Let's see what we can do on that. Because I'm -- I share your concern.

I -- I was just in Bratislava. And your former -- your predecessor, Secretary Chertoff, was there. Gave a speech, and he -- he talked about the impact that the visa waiver program had when they were able to expand it to some of these nations.

You know, I am highly concerned. I'm also chairman of the European subcommittee of foreign relations, and I'm concerned about destabilizing nature of Russia, their pervasive disinformation propaganda campaign. And if we ignore Central and Southeastern Europe, we have a -- you know, there's a real concern -- those nations don't join the West.

And Secretary Chertoff made a very powerful comment about how that visa waiver program was sort of the -- the stamp that -- that really did solidify the fact that these nations that -- that were granted the visa waiver were going to remain in the West and stay western-facing.

I personally think the visa waiver program enhanced our security. It's not -- you know, there are risks associated with it, but the safeguards put in place to qualify -- it just seems like such a political heavy lift right now.

Secretary Chertoff certainly offered every ounce of help he could have. Can you just kind of comment on -- on your viewpoint of the visa waiver program in expansion? Because, let's face it, every one of those nations wants it.

KELLY:

Yes sir, Senator, I'd love to extend it to everybody. You know, we -- we've set the bar very, very high, and, countries that meet that -- that standard, welcome aboard.

There are -- and I share your concern with the -- with the -- with the Eastern European countries. And I've -- as -- as kind of a sidebar comment, when I was in -- working in Mons, Belgium, years ago, as a colonel, the -- after the wall fell, the enthusiasm of all of those countries -- they -- falling all over themselves, "How do we get into NATO? How do we become observers? How do we" -- that's been cooled a little bit, for whatever reason. Well, you and I both know the reason.

So, I think -- anything we can do to expand it. The good news is, there's a lot of countries out there that are trying to get up to our level of security and satisfy us. And there are some countries that are close, some countries that are not so close.


JOHNSON:

We -- we should kind of review some of those metrics. Are they realistic? You know, can we -- can we look at those and still maintain the kind of security we're looking for? So I'd like to work with you. I mean, it's kind of a long-term project.

And just finally, because I think -- I think some people may -- may view this with skepticism. But I -- I was just assuming, truthfully, that even with this injunction in place, the Department was to be able to move forward with the vetting process and -- and really reviewing that.

And -- and you've said that -- that, no, that injunction really has inhibited your -- your efforts. I think the ranking member may want to jump into this.

But can you explain in greater detail how that injunction is hampering your efforts in moving forward in terms of, you know, how do we properly vet refugees and -- and other people coming in from those countries?

KELLY:

Yes, sir.

Just being as conservative as -- as we can be, so that I (ph) don't -- and -- and frankly, with due respect to the -- to Congress, I get an awful lot of phone calls, and an awful lot of ugly phone calls, about how I'm not following some law. I learned very early on, if there's a perception that we're not executing the law, then -- then a lot of people get agitated and call.

That said, we have moved forward, as I mentioned a -- a little earlier -- the State Department, some enhanced questions and -- and -- and et cetera in terms of the normal visa process. In my case, looking very, very hard.

And some of this is -- is, by the way, a cultural change, whether it's my people as CSIS or -- or the consular people, we -- we are changing the culture -- culture to reflect the reality of -- of security.

That is to say, rather than the idea being bringing as many refugees as you can to meet some number set by the last administration, or bring in, you know, as many visas as you can, we actually, now, are changing the culture to say, "Look, if you want to come to America, you convince me you are who you are and you're coming here for a period of time, and then you'll go home, and you won't do anything wrong when you're here."

Or -- you know, in the case of refugees, same thing. Get a -- I -- I know you're a refugee, but you got to prove to me who you are and that you will come to the United States for all the right reasons. And if this -- and then ultimately, if you stay, then you'll assimilate into our society.

So -- but -- but the kind of things I think -- the studies worldwide, and the studies throughout the regions, about what's the best way to do this -- I think I'm restricted in that. But it doesn't mean...

(CROSSTALK)

KELLY:

... we're not thinking about it.

JOHNSON:

From my standpoint, I don't want to feel (ph) you constrained. I don't want you restricted.

Maybe -- maybe Senator McCaskill is the same way, and maybe we can, you know, at least lend that support from two U.S. Senators.

MCCASKILL:

Yeah, I -- and I've looked briefly at the decisions, Secretary, and I don't -- I don't see -- I know the State Department's moving forward in terms of trying to prepare a report. And so, clearly, their lawyers are not seeing what your lawyers are seeing.

So -- and specifically, in a couple of the orders, it's clear that you're not restricted in terms of moving forward, which -- with -- with what I think your job is, regardless of -- of requests by the executive to pause.

I mean, really, what this appeal is about is whether or not he has the right, under the executive order, to say certain people cannot come here during a period of time that you are preparing underlying policies.

I -- I can't imagine anybody is going to argue with you about the fact that you should be preparing policies that will keep this country safe. And I -- you know, we've now been paused. I mean, there's been plenty of time that was envisioned in the executive orders for those policies to be done.

So, I -- I -- I would love further conversation with your lawyers that are telling you that you can't begin to, you know, give us more clarity about what the extra vetting is going to be.

JOHNSON:

So, let -- let's -- let's look on a bipartisan basis, working...

MCCASKILL:

Yeah.


JOHNSON:

... with the department, and make sure that they're not restrained so they can move forward...

(CROSSTALK)


MCCASKILL:

Yeah. We'd be glad to work with you on that.


KELLY:

At the risk of running through too much of a list here, we are doing some things. The examples I would give you is enhanced automated screening by USIS, enhanced interviews, enhanced biometrics integration, enhanced data collection. So, we are doing something.


MCCASKILL:

That's great.


KELLY:

And I could go on if you want. But there are more things here.


MCCASKILL:

Yeah, we can follow up together.


JOHNSON:

So, let's -- let's -- let's work together on this...

(CROSSTALK)

KELLY:
So we haven't stopped. We're just being very -- as I say, very, very cautious about not getting out in front of the courts that -- you know, I don't (ph) genuflect to them every day.

MCCASKILL:
Well, it would -- if you've -- if you've done it, then the -- the whole case is moot.

KELLY:
Right.

MCCASKILL:
And we could -- you know, the president could move on and tweet about something else.

(LAUGHTER)

JOHNSON:
So, again, -- let -- let's -- great committee, bipartisanship -- let's -- let's work together...

(CROSSTALK)

JOHNSON:
... and -- and make sure that you can do your job.

Again, Secretary Kelly, I think, for -- from every member of this committee, thank you for your service. It's -- it's not a job I envy. But thank you for doing it, and to all the members of your staff and -- and the Department.

This hearing record will remain open for 15 days, until June 21st at 5 p.m., for the submission of statements and questions for the record. This hearing's adjourned.

Thanks.

**List of Panel Members and Witnesses**

PANEL MEMBERS:

SEN. RON JOHNSON, R-WIS. CHAIRMAN

SEN. JOHN MCCAIN, R-ARIZ.

SEN. ROB PORTMAN, R-OHIO

SEN. RAND PAUL, R-KY.

SEN. JAMES LANKFORD, R-OKLA.

SEN. MICHAEL B. ENZI, R-WYO.

SEN. JOHN HOEVEN, R-N.D.

SEN. STEVE DAINES, R-MONT.;

SEN. CLAIRE MCCASKILL, D-MO. RANKING MEMBER

SEN. THOMAS R. CARPER, D-DEL.

SEN. JON TESTER, D-MONT.

SEN. HEIDI HEITKAMP, D-N.D.

SEN. GARY PETERS, D-MICH.

SEN. MAGGIE HASSAN, D-N.H.

SEN. KAMALA HARRIS, D-CALIF.

WITNESSES:

JOHN KELLY, SECRETARY OF HOMELAND SECURITY

**Testimony & Transcripts**

Complete written testimony for this event June 6, 2017

**About Senate Homeland Security and Governmental Affairs**

Staff

Hearing

Transcripts

Testimony

Committee Reports

Associated Bills

Schedules

Markup

Amendments

© 2018 · CQ - Roll Call, Inc · All Rights Reserved.

1625 Eye Street, Suite 200 · Washington, D.C. 20006-4681 · 202-650-6500

About CQ    Help    Privacy Policy    Masthead    Terms & Conditions