# EXHIBIT 36

CQ Congressional Transcripts

Jan. 16, 2018

©2018, Provided under license from Bloomberg Government.

Bloomberg Government
Support: 1-877-498-3587
www.bgov.com

All materials herein are protected by United States copyright law and/or license from Bloomberg Government, and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of Bloomberg Government. You may not alter or remove any trademark, copyright or other notice from copies of the content.

Jan. 16, 2018 Revised Final

# Senate Judiciary Committee Holds Hearing on Homeland Security Department Oversight

**LIST OF PANEL MEMBERS AND WITNESSES**

GRASSLEY:

Everybody in this room, welcome. But particularly to our new secretary of homeland security, Secretary Nielsen. We welcome you. Thank you for taking time from your busy schedule to be here for a very important part of Congress's responsibility to do congressional oversight.

Your department is a very important part of the Executive Branch, plays a very central role in overseeing our lawful immigration system, besides protecting the country and our people. Oversight is a very important part of what we do here in Congress. Events like today's hearing provide an opportunity for the people's representatives to investigate and question the policies and actions of the executive branch.

There are important issues in your department's jurisdiction that are facing our country. One of those important issues is the continuing fate of at least 690,000 individuals enrolled in the DACA Program. Every member of this committee, especially this member, has an interest in ensuring that we find a fair and equitable solution for that population. I hope my

colleagues also share my concern about the continued integrity of our nation's lawful immigration system and the safety of those who call America home.

It's imperative that we make sure that 20 years from now, we don't just wind up right back where we are now, at the negotiation table on the same immigration issues. In order to do that, the simple fact is that any DACA solution has to answer issues like border security, interior enforcement, chain migration.

So let me take a minute and explain what I mean by border security. Real robust border security is a puzzle and it has many pieces. One piece of this puzzle, but just one piece, is the need for technical and technological infrastructure. That includes a combination of wall where appropriate, fencing, drones, radar, everything in between. But another piece, and I believe you will agree, a very important piece, is the legal authority to apprehend, detain and remove people that illegally enter our country.


GRASSLEY:
Unfortunately, our current legal authorities are riddled with loopholes and don't allow us to effectively do that. Just ask any CBP officer about how effective our current authorities are. The answer you will hear is pretty clear; they aren't very effective.

That's why border security provisions in any eventual DACA deal need to be -- include changes in authorities. Infrastructure without legal authority changes is useless. But border security alone isn't enough. We also have to make changes to our interior enforcement to allow us to easily remove dangerous criminal aliens.

Your department needs increased authority to remove human traffickers, sex offenders, criminal gang members, drunk drivers and terrorists. Public safety threats should not be given free rein to roam our country.

We owe the American people a real solution to this problem and the only way to provide it is to address these other pieces as well, but DACA isn't the only issue your department is facing. American workers are increasingly at risk because the United States admits so many

foreign workers, some of whom are permitted to stay for years or even decades. Many companies use cheap foreign labor, driving down salaries.

Worse still, many of these employers commit terrible abuses. That's why I was pleased to see this administration take on the issues with its Buy America, Hire American executive order. However, it is unclear whether efforts, to date, have really moved the needle when it comes to protecting American workers and I hope you, Madam Secretary, can shed some light on that.

This committee is also well aware that the department is facing larger structural problems. DHS still doesn't operate like a single agency. You may disagree, but that's the way I see it. It operates like a bunch of little agencies that don't always work well together.

Time and again, I hear reports that the various components within the departments do not have adequate mechanisms for data collection and information sharing. This means that the right hand often doesn't know what the left is doing; a practice that causes inefficiency. That criticism is particularly concerning with regard to DHS's founding mission, to protect the United States from terrorism.

When the agency doesn't adequately share information, it's hard to see how the department will be well-equipped to foresee the next New York City attack or the next San Bernardino shooting. The threat from overseas continues to be real, but this country has also seen a rise in homegrown violent extremists. Collecting and sharing information within DHS and with other law-enforcement partners is critical to combating these threats.

In 2017, the department was criticized by its own inspector general for the lack of unified immigration strategy, for poor information sharing between sub agencies and for serious I.T. challenges.

Regarding the immigration strategy, last November, DHS Office of Inspector General, criticized the agency for failing to unify the approach across agency subcomponents like ICE, CBP and USCIS.

GRASSLEY:

These sub-agencies enforce the same laws and they must -- just common sense, say they must be reading from the same page. Otherwise, you'll continue to suffer from conflicting enforcement priorities. Regarding information sharing; for years, I've been raising concerns about this very real and serious problem which affects all U.S. government agencies. And your department is no exception.

In October 2017, Special Inspector General for the Afghan Reconstruction reported a significant problem with Afghan military officers in the U.S. for training often going AWOL. These AWOL Afghan soldiers are considered high-risk because of their military training and low-risk for detention. In fact, out of 150 AWOL Afghan trainees, the inspector general found 83 either fled the country or remain unaccounted for.

Apart from the obvious national security concerns, this also negatively impacts operational readiness and wastes millions of taxpayers' dollars. In some of these cases, ICE failed to note -- notify other U.S. government agencies that the Afghan officials had gone AWOL. And I hope the department is working to implement the inspector general's important recommendations. Another case that also happened under the Obama administration, ICE was investigating a DACA recipient accused of child exploitation.

Because ICE failed to share information with the rest of the department, the man was issued an employment authorization document and was able to get a job at a summer camp, where he harmed several children before he was caught. And, of course, it's obvious that that's a tragedy. This kind of completely avoidable failure should never happen. But all of your department's OIG reports, the recent ones at least, suggest that DHS needs serious improvement when it comes to sharing information between components.

The same is true of information technology. In 2017, every single department OIG report that touched on the I.T. system had something critical to say. And, in some cases, like the CBP, your OIG said that the I.T. systems are so old and ineffective that they're a risk to public safety and national security. This risk became real for hundreds of thousands of

holiday travelers when CBP's system went down two weeks ago on January 2nd, stranding them at U.S. airports around our country.

On top of that, the department still has not fulfilled its decades-old promise to create a working exit/entry system. Because DHS has never been able to complete this system, we don't know who has departed this country. And that means we also don't know who is still here. Statistics show that almost half of the aliens, unlawfully present in the United States, came here legally but overstayed their status -- when their status expired.

If we knew they were still here, we could track them down and penalize the -- the people who overstay, but the department has not been able to build the I.T. system necessary to make this possible. Despite all of these concerns, it's clear that under the current administration, DHS is making real progress to improve homeland security.

In 2017, we saw real efforts to curb illegal immigration, close loopholes in legal immigration authorities, and protect the American people from international terrorism. For these and other reasons, I'm grateful for your service, as we ought to be for a lot of cabinet secretaries, but particularly, your big department you have to oversee. So I look forward to hearing more from you today as we explore ways to improve your agency and address our country's needs.

So I thank you, Secretary Nielsen, for your participation in this important hearing.

And now I call on Senator Feinstein.


FEINSTEIN:
Thanks very much, Mr. Chairman. And as you know, I agree with you about your strong feelings on oversight and -- excuse me.

I'd like to take this opportunity to welcome you, Madam Secretary, to the committee. The Department of Homeland Security actually, more than any other agency, impacts the lives of tens of thousands of the residents of the largest state, California, on a daily basis.

Through its policies affecting tourism, immigration, as well as efforts fighting wildfires and other national -- natural disasters and protecting our nation's security, your agency, Madam Secretary, impacts my state in profound ways.

Since the Trump administration assumed power in January of last year, Californians have watched with great concern as the department has implemented a series of concerning policy changes.

This administration has systemically announced a series of changes targeted at immigrants and their families. They include the reckless and poorly drafted Muslim ban in the first days of the administration; the decision to slash and cripple the refugee program; the rescission of DACA before a legislative solution was in place to protect these young people who trusted our government; the systematic deconstruction of the legal immigration system, including the cumbersome expansion of immigration application forms; and the termination of temporary protected status for Salvadorans, and shockingly, Haitians, meaning individuals will likely be deported to some areas with the highest rate of violent crime and poverty next year.

These policies have had a ripple effect throughout communities and neighborhoods in my state. We have seen children afraid to go to school, parents afraid to go to work, distinguished professors denied visas, husbands and wives separated, and families torn apart. One case that really stood out for me is that of the Sanchez family from the Oakland area. The parents, Maria and Eusebio Sanchez, were deported late last year.

They weren't criminals. They owned a home, they paid their taxes, they lived in the United States for 23 years. The mother was an oncology nurse at Highland Hospital; the father, a truck driver. Their deportation meant that their children, one a United States citizen, and one a DACA recipient, ages 23, 21, respectively, have to be the caretakers for their two younger siblings, ages 16 and 12.

FEINSTEIN:

In fact, I personally pled -- pled with your predecessor to spare this family from deportation. However, my requests were rebuffed. Let me just share a few other examples from California. A teacher from Los Angeles writes, "I woke up this morning to the Trump administration's decision to rescind the immigration status for Salvadorans. Tomorrow I have to face my high school students and try to reassure them that they will be OK, even though they will be facing tremendous uncertainty and possible deportation in the coming months." That's a quote. A young DREAMer from Riverside wrote, and I quote, "I came to the United States in 2005, when I was only six years old. Ending DACA would mean that my dreams and opportunities to be successful will be destroyed. I would not have been able to reach and afford a higher education if it were not for DACA.", end quote.

So my office has been inundated with hundreds of these stories, Madam Secretary. Since this administration assumed office, my office and I have met with Muslim Americans afraid that their families will be denied visitor VISA's because of their faith .

We have met with DACA recipients who have told me personally that they've contemplated suicide for the potential exposure to ICE that may have -- be inflicted on the rest of their undocumented families. What's worse is that this is just the tip of the iceberg. I understand the administration is considering even more drastic policy changes.

For instance, the press has reported that the administration is, once again, considering a generalized policy of separating small children from their parents at the southwest border. Candidly, woman to woman, I can't believe that and I hope you will clarify the department's position in your remarks. Because not only would such a systemic policy encroach upon the Constitutional rights of parents, it is callous and, quite frankly, stunningly un-American. The American Academy of Pediatrics called such a proposal, quote, "Inhumane and counterproductive" end quote, citing the potential for trauma and stress to cause permanent harm on the developing brains of children.

The America I know does not rip small children from their parents. And I can't imagine the fear that a small child must fear if this were to happen, and for what? Because the child had no choice in any of this, so please, I hope you will set that straight today.

When I heard for the first time that this policy was being considered, I wrote to your predecessor, Mr. Kelly, and asked him to soundly reject this cruel proposal. And I now hope that today you, here, will reject it as well, immediately and forcefully.

Lastly, in light of the reports about the President's recent comments, I hope you're ready to specifically address one issue in particular and that's the termination of Temporary Protected Status, known as TPS for Haitians.

In light of the president's comments, I'm forced to question whether the decision to terminate protected status for Haitian nationals was in fact racially motivated. I hope not. I thank you, Madam Secretary, for appearing here today. I know that some of the decisions made by the -- the department came before your tenure in office. However, given your proximity to General Kelly during many of them, I hope you're prepared to answer the questions that my colleagues and I have, and I thank you, Mr. Chairman. GRASSLEY: Thank you, Senator Feinstein.

Before you give your opening statement I would like to have you be sworn. Would you please stand?

Do you affirm that the testimony that you are about to give before the committee will be the truth, the whole truth and nothing but the truth, so help you God?


NIELSEN:
(OFF-MIKE)


GRASSLEY:
Yes. Please be seated, and you are welcome now to give your opening statement and when we go to questions we'll have 10 round of questions. Let me say something, mostly for the benefit of Senator Harris and Senator Booker. My practice on -- on questioning is, if there's one second left and you haven't -- you start your question before the time runs out, you can complete your question and we'll complete an answer.

But at that point, I hope we don't have give and take back and forth. And we're going to have to -- since we have 10 rounds, this is going to be a long meeting so I hope you will understand if I ask people to stay within the 10 minutes.

FEINSTEIN:

Ten rounds?

GRASSLEY:

Ten minutes.

FEINSTEIN:

Oh, 10 minutes.

GRASSLEY:

I'm sorry. I misspoke.

FEINSTEIN:

I didn't bring my dinner. So...

(LAUGHTER)

GRASSLEY:

OK, thank you. Yes.

Secretary Nielson please proceed as you desire.

NIELSON:

Thank you, Chairman. Chairman Grassley, Ranking Member Feinstein, and members of the committee, thank you for the opportunity to testify before you today.

I have submitted my full written statement for the record and would like to take this opportunity to share a few thoughts with you. The men and women of the Department of Homeland Security are working tirelessly everyday to make our communities safer and our nation more secure. I am honored to be here today to speak on their behalf. I look forward to working with the committee, and each of you, to give these heroes the authorities and resources they need to do the job that you have asked of them.

Today, DHS and the Department of Justice issued the initial so-called Section 11 Report, prescribed by Executive Order 13780, protecting the nation from foreign terrorist entry into the United States. I will encourage you all to take time and read it and we'll be happy to work with your staff in the coming days to answer any questions you might have.

But I'd like to, today, just take the opportunity to highlight some of the findings. So much of what we do to protect our citizens from terrorist attack is classified, and as you know, must remain so. However, the idea behind the Section 11 Report is to allow us to be more transparent with the American people, giving them a glimpse of the gravity of our national security environment.

The report includes truly chilling data, including information about how many foreign nationals have been convicted of international terrorism related offenses in Federal court since 9/11, and how many known or suspected terrorists DHS have encountered in the past year. We are ready, as I say, to answer any specific questions you might have with the Department of Justice.

According to the list maintained by the Department of Justice National Security Division, at least 549 individuals were convicted of international terrorism related charges in U.S. Federal Courts since September 11th, 2001 and ending December 31st, 2016. Of those 549 individuals, 402 were foreign born, that's 73 percent. Three out of four individuals convicted in this country of international terrorism related charges in the last 15 years were foreign born.

NIELSON:

This does not include those convicted of domestic terrorism or those convicted on separate charges, or those convicted in state courts, and it does not, of course, include those that law enforcement has yet to encounter. This report, unfortunately, is likely just the tip of the iceberg and we will continue to work with those in law enforcement to get the best data that we can so that we can all assess this situation.

I'll give you just one example; a national of Uzbekistan. He was admitted to the United States as a diversity visa lottery recipient in 2011. In 2015, he pleaded guilty to conspiring to support ISIS and in 2017, was subsequently sentenced to 15 years in prison.

According to court documents, he posted a threat on a website to kill then-President Obama in an act of martyrdom on behalf of ISIS. In subsequent interviews by federal agents, he stated his belief in ISIS's terrorist agenda, including the establishment, by force, of an Islamic caliphate in Iraq and Syria.

The report also covers likely terrorists we prevented from entering the United States. In 2017 alone, DHS had 2,554 encounters with individuals on the terrorist watchlist who were attempting to travel to the United States. That equates to seven terrorists a day, 50 a week. The vast majority, 2,170, were attempting to enter by air, but 335 were attempting to cross a land border and 49 were attempting to enter by sea.

That's just one year, and again, that's only those that we know about, the known known, if you will. This does not include illegal border crossers who may be known or suspected terrorists, but whom we did not interdict or have not yet encountered. These threats against our homeland drive our mission every day. That's why we're working to block known or suspected terrorists from entering the country and why we're focusing on combating terrorist radicalization and recruitment within our communities.

Over the past year, we've implemented sweeping enhancements to keep terrorists from infiltrating our country. The department and our interagency partners have put tough security protocols in place to intensify vetting of U.S.-bound travelers. This includes

increased security across every route a terrorist could use to get to the United States. Whether as a tourist, a business visitor, an immigrant or a refugee.

Through the global aviation security plan, we've made flights bound for the United States more secure against concealed explosives, insider threats, and potentially dangerous passengers. These new measures, both unseen and seen, represent some of the biggest aviation security enhancements since 9/11.

In cybersecurity, DHS has increased its coordination with industry and with state, local, tribal and territorial governments to protect vital networks as evidenced by our response to the Wannacry cyber attack. We have also renewed our focus on the rule of law, securing our borders and enforcing our nation's immigration laws.

Apprehensions at the border reached a 45 year low in F.Y. 2017, a 45 percent decrease from the last year of the previous administration. Meanwhile, ICE and customs enforcement -- excuse me, Immigration and Customs Enforcement, ICE, arrests increased by 30 percent and interior removals increased by 27.

But for all of our accomplishments over the past year, our work is far from done. Our continued success relies on the support and authorities only Congress can provide. This is especially true with respect to immigration. Even with our progress, we still apprehend 1,100 people a day who attempt to enter the country illegally. People unfortunately who are encouraged by our judicial and congressional loopholes.

I urge Congress to fix these loopholes so we can effectively execute the missions Congress entrusted to the men and women of the Department of Homeland Security. Thanks to the president's efforts, we have consensus on four corners of an immigration deal; border security, ending the diversity visa extended family chain migration and finding a permanent solution for the current DACA recipients.

I look forward to working with Congress to reach a legislative solution. Time is of the essence. I also encourage Congress to empower us to address emerging dangers. For example, we currently lack the authorities needed to counter threats from unmanned

aircraft systems. We are concerned that UASs could be used as weapons, for surveillance, or to smuggle illicit goods into the homeland.

Finally, I look forward to working with Congress to pass the DHS reauthorization bill. We can't keep the United States and its citizens secure with authorities drafted for a different era (ph) to address the threats of the last decade. We need updated authorities, updated support and updated accountability for the world we live in today.

Finally, I would, of course, be remiss if I didn't mention DHS's extensive disaster response efforts over this past year. We continue to be fully engaged in the recovery in Puerto Rico and other states and territories affected by this season's massive hurricanes. Additionally, I was recently in California visiting with wildfire victims and first responders.

And unfortunately, we have now seen how these survivors have had to confront mudslides. DHS and FEMA will continue to work with California state and local partners to help our fellow Americans. As always, I want to take a moment to thank the great men and women of DHS for their service, dedication and passion in day-to-day, performing the difficult and dangerous job on behalf of the American people.

Again, it is on their behalf I am here today. I want to thank you for your leadership, your support of the department and for the opportunity to testify today. I look forward to answering your questions.


GRASSLEY:
To clarify, we aren't having 10 rounds of questioning, we're having 10 minute timeslots, so I'll start, and then Senator Feinstein.

Again, for the new members, sometimes if you wonder why Senator Feinstein and Senator Leahy and Senator Hatch may get a little extra time, it's out of respect for them being Ranking Member or former Chairman.


FEINSTEIN:

Wow. Thank you. That's a first.

GRASSLEY:

OK. I'll let -- I'll let the Democrats decide the order.

Secretary Nielsen, as you are fully aware, Congress is currently debating what border security measures to team up with DACA. Clearly, infrastructure, including fencing, walls where appropriate and technology are key parts of border security, but infrastructure by itself is not sufficient. This is a -- positions that Senator Perdue, Cotton and I made very clear last year, particularly the speedy deportation of dangerous criminal aliens.

Unfortunately, some of my colleagues seem to believe that robust border security is achieved by infrastructure alone. As head of the department with front line responsibility of securing the border, I'm curious to hear your thoughts. My first question I'm going to make as a statement, and unless you disagree, tell me, so I can get to more important things.

Our conversations with people in your department make it very clear that construction of a border wall system alone is not sufficient to provide operational control of the border. If you accept that, do you agree that legal loopholes in the current border enforcement authority have weakened your agency's ability to effectively secure the border?

NIELSEN:

Yes, (inaudible). Yes, sir, I couldn't agree more.

GRASSLEY:

OK. Are changes needed in -- to existing legal authorities to make it easier to apprehend, detain and deport danger criminal aliens, specifically, which authority which authority should Congress consider changing as part of the DACA deal?

NIELSEN:

Yes, sir.

We must look to address the loopholes that are created, both by the TVPRA, as well as the Flores Settlement. The men and women of DHS need the ability not just to apprehend, but to quickly remove those we apprehend. They have to go hand in hand. I cannot claim security if we can merely interdict, but not remove.

GRASSLEY:
No.

If Congress provides amnesty for, potentially, millions of individuals, without changes to existing legal authorities, what impact will that have on your agency's ability to secure the border?

NIELSEN:
Unfortunately, we will be back here again. Without closing the loopholes, we will encourage those who attempt this dangerous journey to come here illegally, to do just that.

We will end up with additional temporary populations, which are not fair to those undertaking the journey, are not fair to Americans, are not fair to our communities and to our workers. We must close the loopholes so we don't end up here again.

GRASSLEY:
I want to discuss, now, interior enforcement. I'm assuming you're familiar with stories like Kate Steinle and Sarah Root's deaths at the hands of dangerous criminal aliens. And, if those aliens hadn't been here, it would have been entirely preventable.

Sadly, Congress has long refused to pass enhanced penalties for dangerous criminal aliens, penalties that could have prevented these killers from being in our country.

Many of my colleagues have long claimed that they support removing dangerous criminal aliens in this country, yet they're refusing to consider interior enforcement measures as part

of a DACA deal. My colleagues claim it's unfair to have the whole weight of immigration reform on the backs of DACA kids, to harm their dreams with enhanced enforcement measures.

But I think it's pretty clear that state -- Kate Steinle and Sarah Root's -- have dreams as well. My question to you: I -- I'm sure you'd agree that they deserved to live in peace and harmony. Is it fair to their memories and legacies to continue allowing dangerous criminal aliens to remain at large in our country?

NIELSEN:
No, sir.

GRASSLEY:
What new authority does your department need to make it easier to detain, punish and speedily remove dangerous criminal aliens? Should such measures be a part of any potential DACA deal?

NIELSEN:
We need to re-look at the basis for which we can remove an alien. There are loopholes that prevent us, in various cases, from removing somebody from what we would all generally consider to be a serious crime.

We also are limited, through court cases, for how long we can detain a criminal alien after we apprehend them. We need to address that. There's a deterrence issue there, just as there is in any other law enforcement context. We need the ability to remove, once we detain dangerous criminals.

GRASSLEY:
Yeah.

I want to go to unaccompanied children. As you know, Customs and Border Protection has reported that a number of apprehensions at our southern border -- are down, including apprehensions for unaccompanied alien children. Obviously, good news.

The journey from a minor's home country can be perilous for children. For years, I've written about cases in which smugglers have exploited unaccompanied alien children and taken advantage of lenient detention systems.

GRASSLEY:

Most recently, I wrote about another incentive for vulnerable children to come here, to access our government-facilitated abortion services. I will ask you to answer this more fulsomely in your response to my letter.

But has the department seen evidence of smugglers exploiting unaccompanied alien children by promising access to certain health services in custody? If so, what steps has the department taken, through Human Smuggling Cell or other directorates, to -- taken to detour smuggling or trafficking of unaccompanied alien children?

NIELSEN:

Yes, sir. Thank you for the question.

As you know, this month, we particularly look at human trafficking at DHS and how to prevent it. It is, make no mistake, modern-day slavery. We all need to work together. I know that various members have bills on human trafficking, and I look forward to work on that.

But, with respect to your specific, broader question, the transnational criminal organizations, the coyotes and those who traffic in people and illicit goods, do it as a business. So, yes, they exploit any reason in which somebody might have the opportunity to either receive a benefit that they do not qualify for, or to be able to stay in this country in an illegal status.

They have that information. They provide it to those, and encourage them to take that dangerous journey, in exchange for a false promise that they will not be captured and deported by the United States.

GRASSLEY:

Have you seen a decrease in the unaccompanied alien children asylum cases, since decision to an -- end the Central American Minor program?

NELSEN:

Sir, we have seen some decreases overall, but I would like to point out, unfortunately, we have a 30 percent increase in UACs from October through December. And we also have a 68 percent increase in family units during that same time period.

GRASSLEY:

As you know, Congress is currently considering a number of young men and women to provide legal status to in any potential deal on DACA. Some people, like this senator, believe that we should limit any status to the 690,000 individuals currently enrolled in DACA. These young men and women came out of the shadows and built their life around DACA.

They were brought to this country through no fault of their own, and didn't make a conscious choice to break our nation's laws. I believe there is an equity issue that necessitates addressing their status.

However, that equity issue isn't present for their parents. Those men and women did choose to violate our nation laws and did make a conscious choice to immigrate here without papers. We shouldn't reward that behavior.

Reports suggest several of my colleagues are now considering providing legal work authorization to these individuals. To the best of your knowledge -- my first question -- how

many million of people would benefit from an amnesty that provides work authorization to the parents of Dreamers?


NIELSEN:

Sir, what I would say is I can tell you the number of DACA registers -- registered, which, as you said, is 690,000 -- 690,000 is the number that the Department of Homeland Security begins with in any discussion.

There are a variety of bills that you know that then -- takes that population and expands it by either increasing the time period in which they could have first entered, increasing the age for which one is considered to be a so-called "Dreamer" and/or capturing family members and providing and some sort of status, as well.

I would just say, though, that it is our position to find a permanent solution. We are not interested in addressing this through piecemeal, through year-after-year renewals, through anything less than a permanent solution.


GRASSLEY:

What impact would such an amnesty have on our nation's border security?


NIELSEN:

It would -- it -- it's almost separate issues. It would take 690,000 and place them into a permanent status of some sort. Hopefully, that will indicate to others that that group is alone, that we are not having a larger discussion, that we have to balance what the folks that are here and the folks who watch what we do here and decide to undertake that journey.

So, it will have the effect of addressing the population we're talking about, but I hope it does not have a negative effect of incentivizing others to come here in hopes of eventually receiving status.

GRASSLEY:

Senator Feinstein?


FEINSTEIN:

Thanks, Mr. Chairman.

Madam Secretary, I wanted to ask you about this. A few weeks ago, it was reported that a one-year-old child was separated from his father when they presented themselves at the border. It appears, and I don't know whether it is, that this was not an isolated case and that the administration is considering a proposal that would separate children from their parents at the Southwest border.

As I understand it, you have yet to sign off on this proposal, and your predecessor, John Kelly, rightly rejected it. Is this policy still under consideration and what is your position?


NIELSEN:

Thank you, ma'am, for the question. I'm not familiar with the specific example that you provide, but I would just say under TVPRA, when an unaccompanied child or child presents itself at the border and we cannot confirm that they are with a parent, we have to follow the protocols to assume there is a possibility they are trafficked.

So just to be clear, one is a policy, which I know is your question, I'll get to. But I just want to make sure that we also, of course, when you take care of the children who come here and make sure that they actually are with somebody who is a family member who can prevent -- who can take care of them.

With respect to your question, we have not made any policy decisions. We are in a position where we are trying to be able to promptly remove those we apprehend. What we find at the border is, given a variety of court cases, we are forced, in conjunction with the HHS to let children, after 20 days, we can no longer detain them. So what that means is, that once we release the child, we then release their parents as well.

So we're looking at a variety of ways to enforce our laws to discourage parents from bringing their children here illegally, but no ma'am, no policy decision has been made on that. And I'd be happy to work with you and look at other alternatives.

FEINSTEIN:

Well, how big a problem this?

NIELSEN:

UACs is a big problem, as I said. We have seen a 30 percent increase in just the last few months and a 68 percent increase in so-called family units, which, in some cases, include very young children.

FEINSTEIN:

And what is the current policy as to how to handle this? Say the child is young, part of a family, what happens?

NIELSEN:

When we encounter the child, whether they're part of a family unit or not. We try to detain them, if you will, in a family unit, but in some cases, given a variety of court cases, they are treated as an unaccompanied child. In that situation, we turn them over to Health and Human Services after 72 hours.

Health and Human services then looks for either a parent located in the United States or another sponsor who will come forward and care for that child. If we are not able to bring that child to court within 20 days, or otherwise adjust or determine their status, we must let them go.

FEINSTEIN:

How many did you bring to court within 20 days?

NIELSEN:

Not enough. I don't have that figure. We can get back, but what we do find is that 90 percent of those released never show up for court, 90 percent.


FEINSTEIN:

They just disappear?


NIELSEN:

Yes, ma'am.


FEINSTEIN:

So, what do you think the solution is?


NIELSEN:

I think we have to look more broadly at all of the different rules and how they are put together. I think we need a comprehensive approach. There are quite a few loopholes.

For example, it should be clear if you're unaccompanied or not. If you're with your parents, you should be treated as a child coming with your parents. If you're unaccompanied, perhaps we have different duties and we need to look at that child in a different way.

They also should not, in my opinion, receive any additional benefit. They need protection, but, for example, right now, they have not only two bites of the apple, in terms of our immigration process. They go through a regular process and the immigration courts, but they also have well over a year in which they can claim asylum. If you are an adult, you have a year in which you can claim asylum.


FEINSTEIN:

You said they can claim asylum?

NIELSEN:

The children. Yes, ma'am.

FEINSTEIN:

The children?

NIELSEN:

Yes.

FEINSTEIN:

How young can you be and claim asylum?

NIELSEN:

I -- I wonder that myself, but the point being that you can many -- be here many, many years as a so-called unaccompanied minor, and then claim asylum. So there's the -- it's a problem because, unfortunately, the way that the coyotes and others have provided information to them, they realize that there's a loophole. So they can wait many, many years before they make that claim. And, frankly, what that does is that just adds to our backlog.

We have hundreds of thousands of cases in backlog. It's very important for us to be able to focus on those who, of course, truly need asylum. But they sometimes are buried within the larger numbers of those who perhaps do not need asylum.

FEINSTEIN:

How do you assess the size of this problem? Is it a major problem? Is it restricted just to some areas and some groups of people?

NIELSEN:

I -- I would say it's a growing problem because, unfortunately, what we find through interviews of those that we do apprehend at the border, they have the magic words, if you will, of credible fear. The standard is quite low, that's something else that we have asked as part of our discussions to work with Congress on.

There are those who truly do fear for their lives. We need to be able to protect those. There are many other -- many others, unfortunately, that we find who are trained by those who are trafficking them to just use those words. And given the laws in court cases, we must immediately treat them as if they are seeking asylum and put them into the system.

FEINSTEIN:

How many children now do you have in custody in this situation?

NIELSEN:

I -- that I can get back to you, I don't know the number.

FEINSTEIN:

Would you?

NIELSEN:

Yes, ma'am.

FEINSTEIN:

Appreciate that. The administration's decision to terminate temporary protected status for Haiti, Nicaragua, the Sudan and El Salvador looks like it's going to have a significant economic and humanitarian consequence. TPS holders work in key industries, as you know, performing a lot of indispensable jobs and they're important. Additionally, it looks like this is going to have an adverse affect on children.

It's my understanding that around 273,000 U.S. citizen children have a parent who's a TPS holder. And it's my understanding that El Salvador requested that this designation for its nationals continue, expressing concern about whether they could manage the return of some 200,000 individuals. Can you just tell us some of the arguments that El Salvador made in support of TPS designation and why those were not persuasive?

NIELSEN:

Yes, ma'am. I did have the opportunity to speak to a variety of government officials from El Salvador. In our discussions, they were very concerned about the time period in which it might take for them to be ready to bring back their citizens. We did not talk generally about the country conditions, and I want to be very clear on this. The law does not allow me to look at the country conditions of a country, writ large.

It requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist, in this case, the 2001 hurricanes in El Salvador. So we didn't dispute the country conditions are difficult in El Salvador, but unfortunately, the law requires me, if I cannot say that the conditions emanating from the earthquakes still exist, regardless of other systemic conditions, I must terminate TPS. So the discussion was around the time period. The reason that we delayed it for 18 months was because they were persuasive.

FEINSTEIN:

Do you believe the law should be changed? Because ...

NIELSEN:

I believe we...

FEINSTEIN:

...maybe we should take a look at that and work with you.

NIELSEN:

I think we should take a look at it, absolutely. I think what we -- and I know there are some bills that have been proposed to do just that. This was meant to be a temporary status, as you know. The difficulty with that is when people are here for 20 plus years, in the case of El Salvador, they have roots. They're contributing to the society. They are otherwise making our economy strong. So, yes, we do need to look at this and find a better way to come up with a permanent solution.

FEINSTEIN:

Would you be willing to work with us in that regard?

NIELSEN:

Absolutely.

FEINSTEIN:

Good, thank you. I think I'll end it there. Thank you.

GRASSLEY:

Thank you.

Senator Hatch?

HATCH:

Thank you, Mr. Chairman.

I'd like to begin with R-1 religious worker visas, which are a crucially important issue for my state. I had been scheduled to meet, last week, with USCIS personnel -- or Director Francis Cissna on the issue. But unfortunately, the meeting had to be canceled at the last minute. I'm hopeful it can be rescheduled soon.

I'm planning to ask Director Cissna to consider revising the R-1 regulation to allow a blanket petition for traditionally uncompensated missionaries in instances where the petitioning church is a frequent user of R-1 visas, and has a strong record of compliance with R-1 rules and regulations.

Increased delays in R-1 visa processing times have had a sharply negative effect in -- on R-1 visa applications and applicants, and the important humanitarian an ecclesiastical work that -- that they do. Will you please follow-up with Director Cissna and ask him to give this request all possible consideration?


NIELSEN:

Absolutely. Yes, sir.


HATCH:

Thank you. This issue may not be a headline grabber but it's tremendously important to me and to my state, and I will be pushing on it.

I'd like to turn now to H-1B visas. Reports indicate that the department is -- is preparing to rescind a 2015 rule allowing spouses of H-1B visa holders to obtain work authorizations -- work authorization if the H-1B visa holder is being sponsored for a green card.

And I have to say that the -- that the 2015 rule, seemed to me to be a pretty sensible policy. It's the same policy reflected in my bipartisan Immigration Innovation Act and in the Republican sponsored SKILLS Visa Act that was reported out of House Judiciary two Congresses ago.

Can you explain why DHS is planning to rescind this policy?


NIELSEN:

Sir, we'd be happy to work with you on that. I think, broadly, we're looking at all of the visa categories, which are -- which, as you know, are numerous. I think, unfortunately, over the

years, in general, we have gotten away from the intent of Congress with respect to some of the visa categories, so we need to look holistically. H-1B -- I will happy to get back to you specifically on that, what you just described.

HATCH:

Well, thank you so much. Now reports also indicate that the department is evaluating ways it can stop granting three-year extensions for H-1B visa holders who are being sponsored for green cards and who are subject to lengthy delays because of per-country green card limits.

Now, I believe that Congress previously addressed this issue in 2000, and indicated its intent to allow such extensions. Can you tell me if the department is, in fact, considering ways to stop granting these three-year extensions? And, if so, why? And I'd also be interested in hearing the department's explanation of how ending these extensions squares with the 2000 law.

NIELSEN:

Thank you, sir. I'm not familiar with the very specific example on H-1B, but I will get back to you immediately after this.

HATCH:

OK. I appreciate that. I'd like to turn now to the issue of cybersecurity. This is a critically important part of the department's mission and one that demands close attention.

Last month, Jeanette Manfra, the Assistant Secretary for Cybersecurity and Communications, announced that DHS is planning to significantly expand its engagement with the private sector to combat threats like the 2017 WannaCry cyber attack, which was attributed to North Korea.

Can you provide specific examples of how you expect DHS's cybersecurity collaboration with the private sector to change, following last month's announcement?

NIELSEN:

Sure. And, sir, I will keep it short because I'd be happy to talk about this all day and all the great things we are doing. In general, we're looking to do a couple of things.

We have, as you know, an automated indicator sharing program. We're looking to make sure that, once we've identified threats, we can disseminate that in not only a way that's actionable but a way that's tailored to different companies in different sectors.

We're also working with the private sector to understand what it is that's really critical. Traditionally, as you know, we have looked at 16 critical infrastructure sectors, but given the interconnectivity of the world today, we're moving towards a look at essential functions which might cross sectors.

So, what is the function that is truly critical? And how can we partner with the private sector to not only give them information on known threats, but to help them anticipate threats before they get there?

In terms of network defenders, we need to continue to connect them. As we see, these threats propagate across the world as we saw with WannaCry the patching is extraordinarily important. I would say that the reason we did not have as many effects in the United States as we did in other places of the world was due to the good work of DHS and Jeanette Manfra's folks, in terms of making sure that they communicated quickly with the private sector and that the appropriate patching was taken.

So, it's information sharing. It's making sure we are sharing in the right way. It's helping them with vulnerability assessments and, overall, it's agreeing together what is critical and what is the best way that we can protect it together.

HATCH:

OK. Continuing on this issue of cybersecurity, I'd like to ask about active defense which is sometimes inaccurately referred to as hacking back. Active defense is a term that captures a

spectrum of proactive cybersecurity measures that fall somewhere between traditional passive defense and offense. Some commentators believe that active defense is inappropriate and that current legal restrictions on the practice are, therefore, warranted.

Others believe that active defense should be more widely available to the private sector. Now, I have two questions for you, first is, active defense a component of the department's current or planned cybersecurity assistance to the private sector?

NIELSEN:

It is. Yes, sir. But as you say, there is a wide disagreement with respect to what it means. What we mean is, we want to provide the tools and resources to the private sector to protect their systems, so if we can anticipate are we aware of a given threat, and as you know, we've gone to great links this year to work with the Intel community to also include otherwise classified information, with respect to malware, bot nets, other types of infections. We want to give that to the private sector, so that they can proactively defend themselves before they are, in fact, attacked.

HATCH:

OK. Second, do you believe that current law imposes any unnecessary constraints on the private sector's ability to deploy active defense?

NIELSEN:

I would say that I would be happy to work with your staff. It is rather complicated, as you know. There's some limitations with respect to liability, there's other questions with respect to insurance and we do need to continue to work with the private sector to understand if there's any barriers that would prevent them from taking measures to protect themselves and the American people.

HATCH:

OK. Turning to the department's counterterrorism efforts. A March 2017 report by the inspectors general of the DHS intelligence community and DOJ identified a series of concerns that the report authors concluded, quote, "Have made the DHS intelligence enterprise less effective and valuable to the intelligence community than it could be," unquote.

Can you provide an update regarding the department's implementation of the I.G. report's specific recommendations and any other changes the department has made in the way it shares counterterrorism information?

NIELSEN:

Yes. I -- first of all, I'd just like to say I think that the inspector general plays a vital role, especially at a department such as DHS, with such a broad scope. So, it's certainly my intent to continue to work with the I.G.'s office and to track all of their recommendations and to make sure that we implement them.

With respect to this particular report and the intelligence apparatus at DHS writ large, what we're looking to do is make our Intel more requirement-driven. In other words, what is it do the men and women on the front lines need and then let us look at how to gather and work with our Intel partners on collection to provide that information. We're well past a point where we can be responsive and defensive, if you will, after something happens.

We need to be able to gather that information to prevent, so it's moving towards a operational-based Intel posture that would be requirement-based on the threat.

HATCH:

OK. Let me just say, for nearly 20 years, we've been talking about the DREAMer population, we've been talking about border security for just as long. It's time we did something and there is a lot desire among my colleagues to find a path forward to make a deal, if you would.

But to do that we need to be realistic to my Democratic friends and say, "It's time to stop pushing for a clean DREAM act." It's a matter of simple political reality, it's not going to

happen. To my Republican friends, I say, we're not going to get the sun, moon and the stars, we should push for the best deal we can get, but we shouldn't let the perfect be the enemy of the good, so let's be realistic.

And I say, I well, my time is up, but I actually think that we can get this done. I hope that you will be helpful in doing so.

NIELSEN:
Yes, sir. It not only is my great hope but I'd like to, again, reiterate I am happy to work with any member and every number who would like to work on this with the Department of Homeland Security. It is a very, very important issue.

HATCH:
Thank you.

GRASSLEY:
Senator Leahy?

LEAHY:
Thank you.

Madam Secretary, welcome. I know seeing you here and again in Appropriations Committee. You mentioned a report you just issued, saying that foreign -- two individuals were convicted of terrorism since 9/11, and that they were foreign-born.

Now, most of them were convicted during Bush administration and the Obama administration, very few during this administration. How many of them -- does your report say how many of them came form countries subject to the travel ban and how long each of them had been in this country?

NIELSEN:

I don't have that information on hand, sir. But as you say, you're right. It is over a 15 year period, that one particular ...

LEAHY:

Will you get to me how many of them, by the numbers, how many of them were foreign-born in a country subject to the travel ban and what was the amount of time they'd been here?

NIELSEN:

Yes, to the extent that information is available, yes.

LEAHY:

But it's all available. The number of convictions, you certainly should have number of where they were from and how long they have been here.

NIELSEN:

Yes, sir. But oftentimes, as you know, what we might have is where they came from because that would be what their visa would indicate ...

LEAHY:

I understand that ...

NIELSEN:

So, yes. Within the data that we have, absolutely ...

LEAHY:

I really would -- (inaudible) the convictions, when I was a prosecutor, they would have in the reports how long they've been here and what they were doing.

Now, last week at the Oval Office, President Trump reportedly said the most vulgar and racist things I have ever heard a president of either party utter.

In fact, I've never heard any president, Republican or Democrat, utter anything even similar. Now, he denies using the specific word and there has been some -- maybe he used a different word, maybe he didn't.

Now, Madam Secretary, you were in the room, you're under oath. Did President Trump use this word, or a substantially similar word, to describe certain countries?

NIELSEN:

I did not hear that word used. No, sir.

LEAHY:

That's not the question. Did he use anything similar to that describing certain countries?

NIELSEN:

The conversation was very impassioned, I don't dispute that the president was using tough language, others in the room were also using tough language.

LEAHY:

Was he ...

NIELSEN:

If I could, the concept and the context, I believe, in which this came up, was the concept that the president would like to move to a merit-based system. He would like to not and no longer look at quotas from countries ...

LEAHY:

And then, did he use what would be considered vulgar language referring to certain countries?

NIELSEN:

The president used tough language in general, as did other Congressmen in the room. Yes, sir.

LEAHY:

The others aren't the president. You imply the president was articulating support for a merit-based immigration system like those in Australia or Canada. When he downgraded Haiti, El Salvador and Africa, a country where we are trying to have some ability to match China and others, in influence, he didn't say it was because we needed more Ph.D. students or skilled workers. He said, he wanted more people from Norway. Being from Norway is not a skill, and with the standard of living in Norway better than ours, you're not going to have too many people from there.

What does he mean when he says he wants more immigrants from Norway?

NIELSEN:

I don't believe he said that specifically. What he was saying was, he was using Norway as an example of a country that is -- what he was specifically referring to is, the prime minister telling him that the people of Norway work very hard. And so, what he was referencing is, from a merit-based perspective, we'd like to have those with skills who can assimilate and contribute to the United States, moving away from country quotas and to an individual merit-based system.

LEAHY:

Norway is a predominantly white country, isn't it?

NIELSEN:

I actually do not know that, sir, but I imagine that is the case.


LEAHY:

Now, the Obama administration focused its limited enforcement resources and everybody would have to admit -- enforcement -- the ability for enforcement is limited. You can't hit every single thing.


NIELSEN:

That's correct.


LEAHY:

He -- the Obama administration focused on those who posed public safety threats. President Trump has expanded those. Now, he has those who could be charged with a crime are a priority. That means, millions of undocumented immigrants are subject to removal. They are a priority for removal.

One of the things I learned as a prosecutor -- if everyone is a priority; nobody is a priority, because you can't do them all. In Texas, border patrol agents detained a 10-year-old girl with cerebral palsy on the way to a hospital for surgery; one hell of a threat she was.

In Ohio, the father and sole caregiver of a six-year-old paraplegic boy is facing deportation. Just yesterday, in Michigan, a man brought to this country at the age of 10 was deported after living here for over 30 years -- torn away from his wife and children who are U.S. citizens. He has never committed a crime and he pays his taxes every year.

Now, that's how we're using our limited-enforcement resources? Is it to strike fear in the hearts of everybody -- whether they've done something wrong or not, or they tell them they can be targeted at any time? I'm sure that 10-year-old girl with cerebral palsy is scared.

NIELSEN:

Sir, first of all, I am not sure we would agree on the facts of that Texas case, but we're happy to meet with you and...

LEAHY:

Fine. Submit the facts.

NIELSEN:

I'm sorry?

LEAHY:

Submit the facts under oath.

NIELSEN:

She was not detained. We actually helped her and escorted her to the hospital and then turned her over to HHS.

But to your larger question, what we focus on in terms of enforcement priorities are those who have committed crimes and those with final orders of removal. Our statistics show that that is, in fact, what we're doing.

Last year, 92% of those that were arrested and taken into custody by ICE were criminals. So, I understand that there will always be exceptions. There's a lot of misunderstandings in the press. I'd be happy to work with you at any time if there is a case of concern to make sure that we understand.

LEAHY:

On that -- we do ask questions of your department and on occasion -- on occasion we've gotten answers. Let's try to get answers to all of them.

Now, you know the president says he wants to build a big, beautiful wall, have Mexico pay for it. The president has promised Mexico would pay for it. Have we opened an account that Mexico can put the money in to pay for it? I'm sure the president wouldn't make that promise and not tell the truth. What arrangements do we have with Mexico to pay for it?

NIELSEN:
Sir, as the Secretary of Homeland Security what I'm concerned about is getting the front-line...

LEAHY:
Do you know whether we have arrangements with Mexico to pay for it?

NIELSEN:
I know that we have arrangements with Mexico to secure our border.

LEAHY:
Do we have arrangements with them to pay for the wall, as President Trump promised the American people they would do? That's an easy answer; yes or no.

NIELSEN:
I am not aware. I don't know what you mean by arrangement. We have a lot of agreements with them to increase border security.

LEAHY:
Are any of them to pay for a wall?

NIELSEN:
How do you mean, pay, sir? Do you mean through fees? Do you mean through -- there's a variety of ways.

LEAHY:

Well, usually when something is paid for you pay for it with money.


NIELSEN:

I understand that. But I'm saying there are many ways to do that and collect that.


LEAHY:

Are they paying for a wall? Are they paying for a wall?


NIELSEN:

My priority is to increase border security and to build that wall, that will work. That's my priority, sir. That's what I'm focused on.


LEAHY:

Well, let's then talk about that. CBP estimates that building a wall will result in taking land from 900 ranchers and other landowners in two Texas counties alone -- that's just two counties. And I'll insert that letter, Chairman, if I might, in the record.


GRASSLEY:

Without objection, so ordered.


LEAHY:

And what is your estimate of the number of eminent domain cases against ranchers and other American land owners that would be required in order to build a wall?


NIELSEN:

Sir, the initial wall that we are building right now, as you know for this year, is replacement wall. I couldn't possibly give you how many people will decide in the future to have an issue

with eminent domain.

LEAHY:

Well, if you build a wall on the U.S. side of the border you have to create a no man's land between the wall and the Rio Grande River. How many acres of American land do we have to cede to Mexico to do that?

NIELSEN:

What we'll have to do is look at the terrain, the traffic, the accessibility -- and you're right, we have to tailor the solutions for each part of the border to make sure that we don't have to do anything that's unnecessary. Whether that's additional land acquisition...

LEAHY:

If we don't have an agreement with Mexico to pay for it and if, as many say, a wall is last century's technology, with that $18 billion, how many more CBP agents could you hire or TSA screeners to shorten lines at our airports which have become ridiculous in some places, or how many Coast Guard cutters could you build in order to rescue those at sea, interdict drugs and protect our ports?

NIELSEN:

Sir, all I can tell you is that walls work. We have examples of that. We have documented data. And I don't know about anyone saying it's last generation's technology.

2006, as you know, we had a bipartisan agreement in the Secure Fence Act which Senators Obama, Clinton and Schumer all voted for so, I disagree that it's last generation's, last century's technology.

LEAHY:

And parts of that wall was built.

NIELSEN:

Parts of it were built.


LEAHY:

(Inaudible) to do it. We're talking about a wall the length of our country.


NIELSEN:

We're not. The president has made that clear.


LEAHY:

I'm not going to play back a lot of his campaign speeches to you about a wall -- a great big, beautiful wall the length of our southern border, paid for by Mexico. I've heard a lot of promises in my decades here. I'm waiting to see this one fulfilled.

Thank you, Mr. Chairman, for the extra time.


GRASSLEY:

I think, since you were at the same meeting I was at Tuesday, the president said 700 miles of additional wall.


NIELSEN:

722. Yes, sir. Initial down payment.


GRASSLEY:

Senator Cornyn?


CORNYN:

Thank you, Madam Secretary, for your willingness to take on what is probably one of the most difficult jobs in the United States government and that is the leadership of the

Department of Homeland Security, but it's also one of the most important jobs in the U.S. government.

CORNYN:

I want to continue the line of questioning from my -- send from -- friend from Vermont about the -- border security. It's no surprise to you that I come from a state that has 1,200 miles of common border with Mexico, and what we're talking about is what measures are going to be put into place to provide that border security, which my constituents all want. They want security.

NIELSEN:

Yes, sir.

CORNYN:

And so I have been struck by your use of the phrase "wall system" and just want to explore with you a little bit what you mean by that. One of the people that I've taken advice from is Rio Grande Valley Border Sector Chief Manny Padilla, who I believe you were with recently, who has told me that, in his vast experience in -- with the Border Patrol, that border security's composed of three elements.

He said infrastructure's important. You can call it a secure fence, as we did in 2006. You can call it a wall, as the president does from time to time. But it includes not only that infrastructure, but also technology and, of course, the Border Patrol agents to be able to respond to sensors when they get -- when they go off, or radar and the like.

Is that what you mean when you talk about a wall system, some configuration of those three components -- infrastructure, technology and personnel?

NIELSEN:

Yes, sir. The president has asked us, as you know, to look at operational control of the border. The wall system, therefore, is infrastructure, as you describe, technology, personnel and, I would add, it's also closing those loopholes so that we can promptly remove those we interdict.

But, in general, we look at four main mission sets. So we look at impedance and denial, which is partly granted through that infrastructure. We look at domain awareness, which are the sensors, the cameras, et cetera. We look at access and -- access and mobility, so that the Border Patrol agents can respond to threats. And then we look at mission readiness, which is having that personnel that we need to be able to do the job.

CORNYN:
Because of -- because of the impact to local communities in -- in Texas and elsewhere along the border, do you have any objection to consulting with local stakeholders as they try to come up with, perhaps, innovative solutions to deal with the border security challenge?

NIELSEN:
It's an open invitation. The only way that we will be able to protect the border is by working with both state and local officials, as well as those land owners in private sector, so absolutely.

CORNYN:
I was at the Rio Grande -- in the Rio Grande Valley on Friday and Saturday and Sunday, hunting the ever-elusive wild Texas quail. And I did happen to go over to the -- to a wildlife sanctuary on Friday, which is a unique tourist attraction, and one that's located within several hundred yards of the Texas border.

What I'm told there is that the smugglers, the transnational criminal organizations you alluded to before, do see that as a vulnerability. And so obviously we need to meet that challenge. And I know that Chief Padilla and others are working hard to do that.

But we also need to be sensitive to the concerns, I think, that the local community has about a huge economic element there, and something that -- we entertain a lot of folks from up north they call, affectionately, snowbirds down there. When it's cold up north, they come down south, and they're great. It's great for them. It's great for the economy. It's great for jobs.

So that would be one example of a -- of a need to work collaboratively with the local community and local stakeholders, as well as state and local officials, to come up with the right solution.

CORNYN:
I remember, a few years back, in Hidalgo, Texas -- Hidalgo County, Texas, using that same local stakeholder input approach, we were able to come up with a win-win proposition. You're familiar with the levee wall.

NIELSEN:
Yes, sir.

CORNYN:
There was obviously a need to improve the levee system down there and protect property values and to make flood insurance affordable. But, in consultation -- I remember J.D. Salinas, who was the -- who was the county judge in Hidalgo, Texas -- they put a bond election on the -- on the ballot, and came up with a dual-use system, which actually provided that levee improvement, but also provided a wall in critical areas that the Border Patrol -- that they said they needed in order to slow down the flow of illegal immigration and drug trafficking and the like.

So that's just one example of what I consider a win-win proposition and where one size does not fit all. So I appreciate your willingness to work with all of us to come up with those kind of win-win situations, where possible.

Chief Padilla told me that the majority of people who are coming across the border and who are detained in the Rio Grande Valley sector are from Central America. I can't remember the exact percentage, but it's a high percentage, as you know.

And what these traffickers are doing is exploiting, as you point out, a vulnerability in our system. We passed the Trafficking Victims Protection Reauthorization Act years ago, in order to protect children from human trafficking. It's a highly worthy cause.

NIELSEN:
Agree.

CORNYN:
But the traffickers have now figured out that -- since children who come from Central America are treated differently than other people who enter the country illegally, they have found a way to exploit it. And I believe you mentioned that 90 percent of them who were notified of a future court hearing on their claim for asylum, for example, never show up. And that's a real glitch.

But I know there's been some attention paid -- not enough attention paid, in my view -- to the threat of criminal gangs that exploit this vulnerability, as well. I was told by Chief Padilla, again, that they're -- they have MS-13 gang members as young as 12 years old, and of course, from 12 to 17, you'd still qualify as a minor.

And let me ask, if border patrol identifies, by the tattoos or other signs on a -- on a -- somebody under 18, that they are likely a member of a criminal gang, are they permitted to detain them? Or are they required to treat them same way they would every other minor child, and place them with a sponsor, ultimately, and -- only to have them never show back up for their court hearing in the future? Are criminal gang members who happen to be minors treated any differently?

NIELSEN:

Unfortunately, no. We have to treat them the same. We do, if we have that information, provide it to HHS, when -- of course, they have them once we turn them over to HHS.

But no, sir, it is a problem. We need to look at removability in general, to make sure that we can address this gang problem. We see gangs all the way up to New York recruiting illegal immigrants and children to come across the border for the purposes of joining MS-13.

CORNYN:
I know, when we talk about unaccompanied children, people think about very young children...

NIELSEN:
Small (ph)...

(CROSSTALK)

CORNYN:
... children of tender age. They don't think about a 17-year-old member of a criminal gang like MS-13, which is exploiting this very same vulnerability.

I have every confidence that you and the Trump administration is going to do what you say you're going to do, when it comes to border security. And it's -- I believe it's our responsibility as members of Congress to provide you the resources and tools and to make the appropriate changes in the law so that you can do what needs to be done.

I know there have been requirements for border assessments in the past, but do you have any objection to Congress, perhaps as part of this negotiated border security part of the DACA fix -- so-called -- mandating that the department come up with a plan that would provide for 100 percent situational awareness and operational control of the border?

NIELSEN:

No, sir, I don't. I would encourage -- if you haven't had the opportunity to look at the border security investment plan that we recently provided, there's some detail in there. But, yes, on domain (ph) awareness, which is one of those four missions I mentioned, absolutely.

CORNYN:

Well, I think it would be important to put that in the law, because, of course, when administrations change, different administrations have different priorities in terms of border security and the like.

And I'd like to make sure that the focus of this administration remains part of the congressional mandate and the law, and so would look forward to working with you on that.

I know that there's been some discussion of the DACA population, and certainly I, together with my colleagues on a bipartisan basis, want to find a solution for these young adults who came here as minor children and, through no fault of their own, find themselves in a dead end.

I do know that there was a court decision which created some confusion the other day, and it would -- it strikes me as wildly wrong to say that President Obama can create a program, and that President Trump cannot end it, because of -- certainly the executive authority would seem to be the same.

But do you -- can you tell us about the plans of the administration to appeal that, or otherwise how you plan to address it?

NIELSEN:

Yes, sir.

Of course, the -- as the Department of Homeland Security, we defer to the Department of Justice, who, as you know, are looking at a variety of ways in which to respond to that.

What I can tell you is DHS is complying with the court order. We have begun to accept renewals for DACA. We are treating the program as pre-September of last year. So, if you

are a current DACA recipient, you can currently reapply, while we're pending this court action.

GRASSLEY:
Senator Durbin.

DURBIN:
Thank you, Mr. Chairman.

Before I ask questions of the secretary, I'd like to ask the indulgence of the committee to introduce two guests that I have brought here today.

Alejandra Duran Arriola is a second-year student at Loyola University School of Medicine in Chicago. Alejandra, would you please stand?

Alejandra grew up in Savannah, Georgia. In addition to medical school, she volunteers at a clinic, educating uninsured patients about disease prevention. Her dream is to become an OB/GYN, working in underserved communities. She is protected by DACA.

Thank you very much, Alejandra, for being here.

Her future is in doubt. Without the protection of DACA, she does not have a legal permission to work in America. You cannot become a doctor without a residency. A residency is a job. If DACA is eliminated and her protection is eliminated and her right to work is eliminated, then her future as a doctor is in doubt.

John Magdaleno, would you please stand?

John came from Venezuela at the age of nine. In high school, he was the commander of the air honor society and Junior ROTC. He graduated from Georgia Tech, one of the best engineering schools in America, with a degree in chemical and biomolecular engineering with the highest honors. He now works as a chemical engineer. His dream is to serve in the United States military.

John, thanks for being here.


DURBIN:

That's what this debate is all about. That's what DACA is all about. There's been a lot of talk about terrorists and threats to America. We stand as one; not as Democrats or Republican, but as one in saying, "Let's keep America safe," but, for goodness' sake, not at the expense of young people like the two I just introduced. That is what this conversation and debate is all about.

Madam Secretary, I hope you remember me. We were together at two meetings last week. I would like to ask you about one of those meetings. It occurred about noon on January the 11th. You were a few minutes late, I know, and asked forgiveness, but you were called at the last minute to come and attend.

Some things were said at that meeting which I believe we have to address today. People across the United States and around the world want to know what this president believes should be our priorities when it comes to immigration.

I'm going to ask you, as best you can, to recall what you heard the president say, when it came to those priorities. What do you remember the president saying about immigration from African countries to the United States?


NIELSEN:

What I heard him saying was that he'd like to move away from a country-based quota system to a merit-based system, so it shouldn't matter where you're from, it should matter what you can contribute to the United States.


DURBIN:

How did he characterize those countries in Africa?

NIELSEN:

In -- I don't -- I don't specifically remember a category -- categorization of countries in Africa. I think what he was saying is, as far as best I could tell, and as you know, there were about a dozen people in the room. There were a lot of cross conversations. There was a lot of rough talk by a lot of people in the room. But what I understood him to be saying is, let's move away from the countries and let's look at the individual and make sure that those we bring here can contribute to our society.

DURBIN:

Do you remember the president saying expressly, "I want more Europeans. Why can't we have more immigrants from Norway?"

NIELSEN:

I do remember what he -- I do remember him asking about the concept of underrepresented countries as a fix.

This was in the conversation about removing the diversity lottery, and how we could reallocate that. And I do remember him asking if we do that, and we then assign those two countries that are unrepresented, aren't we just continuing non-merit based immigration?

So from that perspective, I think he did ask, would that cover European countries, or by its nature, would that mean that we are further establishing immigration to purposefully exclude Europeans?

DURBIN:

What did the president say about immigrants from Norway?

NIELSEN:

I heard him repeating what he had learned in a meeting before, that they are industrious, that they are a hard working country. They don't have much crime there. They don't have

much debt. I think, in general, I just heard him giving compliments to Norway.

DURBIN:

You said on Fox News that the president used strong language. What was that strong language?

NIELSEN:

Let's see, strong language, there was -- I -- apologies, I don't remember a specific word. What I was struck with, frankly, as I'm sure you were as well, was just the general profanity that was used in the room by almost everyone.

DURBIN:

Did you hear me use profanity?

NIELSEN:

No, sir. Neither did I.

DURBIN:

Did you hear Senator Graham use profanity?

NIELSEN:

I did hear tough language from Senator Graham. Yes, sir.

DURBIN:

What did he say?

NIELSEN:

He used tough language. He was impassioned. I think he was feeling very strongly about the issue, as was everyone in the room. And to underscore a point, I think he was using some

strong language.

DURBIN:

Do you recall that the strong language he used repeated exactly what the president had said prior to that?

NIELSEN:

I remember specific cuss words being used by a variety of members.

DURBIN:

I'm not going to ask you to say those words here. But I will just say for the record, Senator Graham spoke up in a way that I respect very much, countering what the president had said about countries in Africa, reminding the president that his family did not come to America with great skills or wealth, but they came here as most families do; looking for a chance to prove themselves and make this a better nation.

In the defense of Senator Graham, his strong words repeated exactly the words used by the president, which you cannot remember.

Let me ask you another question...

NIELSEN:

If I just could, sir, I -- I do want to say that I greatly appreciate not only Senator Graham's leadership, but yours as well. I know you're both very passionate about this. As you know, afterwards I approached you and asked that I'm happy to come talk to you anytime to try to work on this deal.

I do think that Senator Graham very impassionately described what he believed America is about, and what we should move towards. Yes, I agree with that.

DURBIN:

Do you support a path to citizenship for DACA recipients and those who were in the DREAM Act?

NIELSEN:

I think we have to find a permanent solution, yes, sir.

DURBIN:

I hate that phrase, permanent solution. Do you support a path to citizenship?

NIELSEN:

I believe, that as part of the discussion, and to make sure that we don't continue temporary populations that continue to exist, we should talk about that.

I'm not here to get in front of the president or any final decisions on that particular issue, but yes, I'm happy to discuss it.

DURBIN:

Do you recall the president saying that he wanted $20 billion now, and he would build this wall within one year?

NIELSEN:

I do remember him saying that. He was concerned that given the appropriations cycle, that any deal that we made now would be limited to this year's appropriation. I remember him asking, is there a way to authorize the full down payment of the wall, such that we could have assurances that we could in fact build it.

DURBIN:

So, let's take a look at what your department has done, when it comes to building walls. As of December 6th, 2017, less than 1 percent of the $341 million appropriated for 40 miles of replacement funding had been expended.

Actual construction has yet to begin on money appropriated in the last fiscal year. So, is the president realistic when he says he wants $20 billion so he can build the wall in one year?

NIELSEN:

I think the president is encouraging us to go as quickly as we can. As you know, it's a very complicated issue, building the wall, for a whole variety of -- a whole variety of reasons.

What we're doing right now is we are testing and evaluating those prototypes, and will continue to determine that not only the design, but what's best per some of the other Senators' comments, for any particular part of the border, because it will be different. We need a full tool kit.

DURBIN:

Madam Secretary, the president made it clear in that meeting that one of the conditions for his assent, or agreement to protect DACA was $20 billion, so he could build this wall in one year.

The fate of John and Alejandra lies in the balance here. The president is insisting on something that is physically, legally impossible as a condition for him to give them a chance to be here in the United States legally.

Now, you've seen, because you commented on it on Fox News, the proposal, which Senator Graham and I, as well as four other Senators have made on a bipartisan basis. And you've rejected it.

You said at one point, I believe, that -- let me see if I can quote here, "There's nothing in there that would prevent us from getting here again."

Are you aware of the fact that included in this proposal is the entire request of the administration for border security in this fiscal year, $1.6 billion for walls and barriers and fences, and another billion dollars for technology, exactly what you asked for?

If you don't believe this is going to solve the problem, which is what you said on Fox News, why did the administration request it in the first place?

NIELSEN:

Well, sir, that's not all we requested, as you know. We also requested to close the loopholes that serve as the pull factors that continue to exacerbate the problem.

I cannot apprehend if I cannot remove. That's not border security.

DURBIN:

Let me -- let me add: the first meeting we had last week, we agreed, and the president agreed there would be two phases to this conversation. The first, immediately, to deal with the DACA challenge and the three other elements the president (inaudible)...

NIELSEN:

Including border security, sir.

DURBIN:

... including border security, every penny that you asked for. And then the president said, phase 2 goes into comprehensive immigration reform; many of the issues which you described as must-haves. We understand that. To put the entire burden of immigration reform on the shoulders of these DACA recipients is fundamentally unfair, not practical, and jeopardizes their future and their lives.

What we're trying to do is an honest, bipartisan approach to deal with the first phase of this and you have rejected it.

NIELSEN:

I thank you for your passion. I hope you understand mine. I cannot agree to a deal that does not give the tools and resources to the men and women of Department of Homeland

Security to do the job you've asked them to do.

DURBIN:

We gave you every penny you asked for.

NIELSEN:

Sir, it's not the pennies.

DURBIN:

No (ph)…

NIELSEN:

It's closing the loopholes.

DURBIN:

Then can we cut back on some of this money? Because we could sure use it.

NIELSEN:

We need the wall too. The wall works, as you know. It's part of border security.

DURBIN:

Thank you, Mr. Chairman.

GRASSLEY:

Senator Tillis?

TILLIS:

Thank you, Mr. Chairman.

Madam Secretary, thank you for being here. I'm glad I missed that meeting the latter part of the week, but I really enjoyed and thought it was productive, the meeting we had, you were in the room with a couple of dozen of us, and I'm deeply disappointed that we can't get people to think reasonably about this and bridge the gap. I don't necessarily think it's that wide now, if we just sit down and lower the temperatures.

What's the distance between the Pacific Ocean and the Gulf Coast, the total miles of border?

NIELSEN:

DHS looked at over 2,000 miles for purposes of assessing where we need a wall.

TILLIS:

OK, but geographically it's even a bit more than that...

NIELSEN:

It is. Yes, sir.

TILLIS:

...somewhere around 2,300?

NIELSEN:

Yes.

TILLIS:

When your full plan for the border security is implemented, how much of that will be in a wall, versus fences or other structures?

NIELSEN:

So, there's three different infrastructures we talk about. There's a primary wall, there's a secondary wall, and then, in some cases, there's infrastructure in the form of access roads or

the mobility piece of the mission. But the current down payment request is 722 miles. So that's replacement and secondary and new wall.

TILLIS:

OK. When this is fully built out, would you ever envision -- I think the president said in the meeting twice in front of the press, and then once or twice after the press left the room, that he's dispensed with the notion of this large, monolithic, one-size-fits-all wall, right?

NIELSEN:

Yes, sir.

TILLIS:

So, I don't know why people would go back to campaign discussions. You know, both parties tend to have a little bit of flourish when they're on the stump. But it seems to me, the president has came here, he's listened to the people who are down at the border, and has determined that the department has a good idea that involves people, technology and infrastructure. So it would be fair to say in the face of the direct comments and the data now from the department, it would just be disingenuous to suggest that anybody is proposing a large, monolithic wall?

NIELSEN:

Yes, sir. That would be disingenuous.

TILLIS:

Yes. Now let's talk about the pull factor. Because, I think, if you learn nothing else from the amnesty of 1986, you learn, if you don't address the pull factor, that all you've done with amnesty is invite a lot more people in, waiting for the next amnesty. What's been your experience since we've started talking about DACA, in terms of border crossings over the past few months?

NIELSEN:

Well, in general, we have to reduce those pull factors, as you say. And some of those pull factors are of the loopholes. Again, I just cannot stress it enough...

TILLIS:

Once they get here, it's hard for them to go.

NIELSEN:

Yes, sir. And even those that we interdict, apprehend, takes over two years to get them through the system when they have a removable offense to begin with.

TILLIS:

So what's our batting average, then, on actually removing when somebody gets into the system? It's got to be fairly low.

NIELSEN:

It's fairly low, yes, sir. I can get you an exact figure but...

TILLIS:

The -- in border security, do you all -- or this may be over in justice, take a look at how dangerous the -- the communities are as a result of the -- Senator Cornyn mentioned gang members. Is it true, or is there data to suggest, that many of the dangerous people that cross the border, the majority aren't? But the dangerous ones find themselves in the very Hispanic communities after they cross the border, making them less safe, than say, my community?

NIELSEN:

Yes, sir. And in fact, I think when I went to the Rio Grande Valley, which was the area that Senator Cornyn was reviewing, we were talking about the rip crews, if you will. So those are

those that are part of a TCO that are raiding a house where they believe weapons or drugs are stashed, where they might have prepositioned them.

TILLIS:

I've been to one.

NIELSEN:

But on both sides of the border, so without that wall, the rip crews go back and forth, back and forth. It's a danger to the Mexican side, it's a danger to our side as well.

TILLIS:

We were in Laredo, Senator Cornyn led a CODEL down to the border and we were in various places. Laredo was one that stuck in my mind, because a couple of weeks earlier, border patrol agents who were in a helicopter were shot at. They actually had the door with a hole in it in the briefing room.

Would you characterize, I mean, a lot of people think the Rio Grande is wide and deep. It's actually relatively narrow and shallow. So much so that they've got low draft or no draft boats to get to many places because you can walk across it. So you're 40, 50 yards away. How would you characterize Nuevo Laredo in terms of safety and security?

NIELSEN:

I wouldn't be able to tell you specifically Laredo compared to others, but what I can tell you is, very unfortunately, the occurrences of attacks and violence against my agents has increased 63 percent. I'm working very closely with the Department of Justice and the attorney general. We will prosecute. This has got to stop. I will not continue to put my folks in danger.

TILLIS:

It's very dangerous and it's very porous. And crossings happen frequently when you go down the Rio Grande. You see the spotters out there, they know when border patrol's coming, they retreat and then they come back into it. It's very dangerous. It seems odd to me that someone would not support providing you all the tools you need to keep our border patrol safe, but keep those communities safe.

There are bad people crossing the border probably daily. And until we get serious about border security, we're going to continue to make this country less safe and the Hispanic communities less safe. I -- I wanted to ask a little bit about -- first off, I also want to welcome Alejandra and John, thank you all for being here and standing up. I actually want a solution for DACA. I actually want people to start acting reasonable instead of creating ad hoc gains and trying to get something done that's simply not going to get done.

And I think at the root of it is the president is passionate about securing this nation, as he should be. And we need to get people in the room and actually solve the problem. The proposal that you were presented with that was rejected later in the week, tell me what the major deficiencies were, in your mind, that particularly as compared to what we seemed to have the four pillars ironed out where we're going to negotiate those, where would the gaps between what you envisioned would occur as a result of that meeting and what you were presented with on Thursday?

NIELSEN:

Yes, sir. And just to be clear, I do not have any written proposal emanating from that meeting. So I received part of the briefing in that meeting, my staff has, in good faith, continued to work with staff over -- since that time...

TILLIS:

What were the major deficiencies though?

NIELSEN:

The major deficiencies were the concept that border security is, in and of itself, only the wall and only when you're funding of the wall. And I would add, through those staff conversations, what I've also learned is that that bill then goes further and removes my ability to actually build a wall because it prohibits the use of any current technology, whether that be the prototypes that we're looking at or whether that be current technology that we have on the border.

That doesn't even make any sense. That means I can't build a wall...

TILLIS:
So that's the authority that you have to have?

NIELSEN:
Yes, sir.

TILLIS:
And the other -- the other issue, when it's -- it's also not completely accurate to say that we've provided all the funding you wanted. I mean, they -- we have addressed the -- the administration's request for the budget for the next fiscal year.

NIELSEN:
For one year. Yes, sir.

TILLIS:
But we are not looking at what you need longer term, at least in terms of authorizations. And this fits into a whole raft of authorizations that you want, to immediately start securing the border, but also try to dampen the pull factors along the way.

Those are authorities that you think are critically important to securing the border, is that correct?

NIELSEN:

Yes. Absolutely.


TILLIS:

On the people's side of things, the People Technology Infrastructure, PTI as they refer to in our briefings down there, what do you really need for people? Because there are some people saying we got $1.8 billion, by the way, it is just a single appropriation is not recurring multiyear appropriation, so you can't go out and hire a lot of people and hope that you have the funding to pay them a year out.

But what do you really need in terms of the people component? We haven't talked that much about it. We talked about the infrastructure and some billion dollars that you need for, I think, compliance or enforcement, but on the people side of things, what more and we going to get to either immediately or over the next three to five years?


NIELSEN:

Yes, the president, in his executive order, indicated 10,000 ICE agents 8000 border patrol. We need another thousand about lawyers. Of course, we need some additional immigration judges that we can process. We need to look at hiring and we're doing that at DHS. How can we more quickly hire, how can we retain, what additional authorities might we need, if any.

We're looking very carefully at that and I'd like to come back with you if there's any that we need.


TILLIS:

And, on the technology front, one of the things that I was struck by in Laredo was the enormous number of successful crossings that included illicit drugs. I know there's estimates from 10 to 25 percent in terms of seizing what's coming across the borders.

So, that really means that there are millions of doses of poison, whether it is heroin -- heroin, methamphetamine, run down the list that's coming in this country every day across

the legal ports of entry. Is that correct?

NIELSEN:

Yes, sir.

TILLIS:

And how much of your border plan is to increase -- and I know through technology they're talking about things that can increase throughput so that you can actually search more vehicles or have insights into what's in them. How much of the plan is really focused on accelerating that so we can try and get ahead of the narco-terrorism that comes across our border every day?

NIELSEN:

The plan itself addresses all the major threats. So that's TCOs in general, if you will, which of course are not only, unfortunately, the illicit trafficking of drugs as you say, but also people. But it's also any other kind of threat that might come across. We talked about the numbers today from our report that show, unfortunately, we need to do more screening and vetting to ensure that terrorists also don't come into our country.

TILLIS:

We need to do a lot more. And I, for one, think that we have to have a balanced proposal, a compromise, that solves and addresses the DACA problem in a compassion sustainable way, but we also have to understand we need to be compassionate in terms of the threat to our community and to our homeland by not securing the border, to the threat to the people who come across the border who are dying.

NIELSEN:

That's right.

TILLIS:

Ten thousand over the last 20 years. Who knows how many thousands died trying? We need to end the exploitation, we need to end the human trafficking, we need to end the narco-terrorism that's coming across this border and you can only do that when people lower the temperatures and recognized that securing the border is an absolutely appropriate request as we're solving the DACA problem.

It's balanced and it's going to make it less likely that we're going to have an uncertain population 10 or 12 years from now, coming back and revisiting DACA when we get this right.

Thank you for being here and thank you for your service.

GRASSLEY:

Senator Whitehouse?

WHITEHOUSE:

Thank you, Chairman.

Thank you, Madam Secretary, for being with us today. Cybersecurity is an area in which your department has very considerable responsibilities, correct?

NIELSEN:

Yes, sir.

WHITEHOUSE:

Do you believe that there is any effort required by Congress to address our cybersecurity gaps, at this point?

NIELSEN:

As you know, we have a variety of conversations about reorganizing the NPPD, where cyber is. First is starting with the name. It really is important...

WHITEHOUSE:

I mean, something a little more significant than changing the name...

NIELSEN:

Yes, but I just -- if I can pause on that really -- if I could...

WHITEHOUSE:

Is there anything else you think we should be doing other than changing names and bureaucratic structures?

NIELSEN:

It's not bureaucratic structure, sir. Nobody knows what they do. Do you know what NPPD is? Nobody does. That's the point. So we need to make it clear that cybersecurity is within the Department of Homeland Security. The name change is important so that our stakeholders know that. OK. So, what else?

WHITEHOUSE:

Changing the name is important.

NIELSEN:

What we need to do is...

WHITEHOUSE:

Is there anything else important?

NIELSEN:

Yes, sir. What we need to do is we need to look at additional ways that we can share information, that we can use information that we gain from our Intel community...

WHITEHOUSE:

And Congress should be allowing that?

NIELSEN:

Congress should allow that in appropriate circumstances. Yes, sir.

WHITEHOUSE:

What do you specifically request of Congress? I am trying to figure out what the legislative agenda of your department is in Congress, with respect to cyber. Is there a specific proposal that you have in writing, any place, that we could see that we could consider with respect to having hearings and trying to augment whatever authorities you need?

NIELSEN:

Sure. We have multiple technical assistance that we've provided to a variety of bills, but we're happy to sit down with you and walk-through...

WHITEHOUSE:

But is there an actual proposal? Technical assistance is something the departments do in response to legislative proposals from Congress to try to amend legislation that we've proposed to make it work effectively in your system. It's not -- I don't think, in my view, properly characterized as a proposal by the executive branch. I'm trying to find out what the executive branch is proposing to us.

NIELSEN:

We do not have a separate proposal. No, sir.

WHITEHOUSE:

OK. I would actually urge that you consider it. I think there is bipartisan interest. I think cyber is a real issue and I think the silence from the administration, with respect to legislative recommendations, is deafening right now. You also participate in the so-called NIST Framework for protecting critical infrastructure, correct?

NIELSEN:

Yes.

WHITEHOUSE:

What is your view of the adequacy of the security for our electric grid that is presently provided by the NIST Framework?

NIELSEN:

So, the NIST Framework, as you know, in conjunction with a variety of protocols and guidance provided by the Department of Energy encourages those owners and operators of electric utilities to take a variety of measures. We need to...

WHITEHOUSE:

And with respect to guaranteeing an American that their electric service is secure from cyber attack, how confidently can you assert to us that the NIST Framework does that job?

NIELSEN:

The NIST Framework is voluntary.

WHITEHOUSE:

In other words?

NIELSEN:

In other words, we need to continue to do more. We need to update it. We need to keep up with the threat. The threats continue to evolve.

WHITEHOUSE:

And what would make it more than involuntary -- more than voluntary? What would make it mandatory? What would get -- what are you looking for to go beyond voluntary with respect to the NIST Framework?

NIELSEN:

I think voluntary works, but what I'm suggesting is I will never be able to sit here and guarantee that we have full security.

WHITEHOUSE:

When I asked you if security was adequate due to the NIST Framework your answer to me was, it's voluntary.

NIELSEN:

It is. Yes, sir. So we need to continue to...

WHITEHOUSE:

... matters.

NIELSEN:

We need to continue to update it and make sure that we're addressing the threats of today and not the threats of six years ago when we first started looking at the NIST Framework.

WHITEHOUSE:

So do you think that the NIST Framework, on its own, without any legislation from Congress, is adequate for Americans to rely on security in the electric grid from cyber attack?

NIELSEN:

It needs to be updated.

WHITEHOUSE:

OK. And, does it need to be updated with help from Congress or is it something that you're going to do to update it on your own?

NIELSEN:

I believe it's something NIST is doing under its own authority and direction from Congress to do. But the United States -- the Department of Homeland Security is a strong partner with them.

WHITEHOUSE:

Yes.

NIELSEN:

...along with industries. So, we will continue to provide them with guidance and support.

WHITEHOUSE:

I'll make it a question for the record, but I'd love to know what exact guidance the Department of Homeland Security has given NIST, with respect to these updates that you recognize are required. And if there is any legislative effort that you think is required to support or to supplement the NIST framework, I would like to have that.

NIELSEN:

Yes, sir.

WHITEHOUSE:

I'll make that a question for the record, also, if I may. I don't think it's an unfair question. Do you?

NIELSEN:

I do not. Cybersecurity is a huge and emerging issue. DHS continues to expand under the authorities that we have, working both with international partners, as well as industry. And, yes, sir, I think it is worth further discussing.

WHITEHOUSE:

Good. Election interference, does the Department of Homeland Security have a role in election interference?

NIELSEN:

We are looking at the cybersecurity of election systems upon requests of states, as you know. So we have 11 states right now where we are conducting risk and vulnerability assessments at their requests. And we have prepared for any other requests from the 50 states and will ensure that it occurs upon request before the next election cycle.

WHITEHOUSE:

Was there Russian election interference in the 2016 elections? And can we anticipate further Russian and foreign election interference in the 2018 election?

NIELSEN:

I believe that Russia, in general, will continue to try to test our systems and where they can extract information and, perhaps, disrupt, they will.

WHITEHOUSE:

So yes and yes.


NIELSEN:

Yes, there was interference. To my knowledge, no votes were changed.


WHITEHOUSE:

And in 2018 do you expect them to come at it again?


NIELSEN:

In 2018, I think we can expect a variety of actors to test our systems. Yes, sir.


WHITEHOUSE:

And what steps do you recommend or are you taking to protect the 2018 elections from that continued interference?


NIELSEN:

So the first is the risk and vulnerability assessments that we're offering. We're working within our national infrastructure protection plan framework to provide guidance to help states and localities...


WHITEHOUSE:

That was the guidance to the 21 states that there's actually been technical hacking of their election machinery?


NIELSEN:

That wasn't guidance, that was a notification. So the guidance that I'm talking about is looking at the full system, if you will, of the election cycle. So, going all the way back to

supply chain concerns through to the dissemination of votes upon capture.

WHITEHOUSE:

The reports that have looked at this from places like the Atlantic Council and the CSIS have all reported that the avenues of Russian election interference are not limited to specific cyber intrusions. They also involve propagandizing, the propagation of fake news, the creation of phony people, who are actually bots, to drive information -- efforts to manipulate American companies like Facebook and Google, and so forth. Are you interested in those means of interference as well, or are you limited in your effort to the specific cyber intrusion and the potential for actually changing a vote between the machine where it's cast and the register where it's tallied?

NIELSEN:

We are working on our core mission which, as you know, is cybersecurity, but yes, we're working with other interagency partners on the broader issue of Russian propaganda as you called it, but Russian insertion of...

WHITEHOUSE:

Do you have a better name for it?

NIELSEN:

No. That's what it is.

WHITEHOUSE:

OK. Do you have any legislative proposals related to election interference with -- and that would help us protect our 2018 elections from continued interference?

NIELSEN:

I do not believe that, at least from a DHS perspective at this time, that we need any additional authority in that area. But we'll be sure to follow up with you.

WHITEHOUSE:
OK. So you're comfortable that you can protect America from having Russians or other foreign actors interfere in all of the ways that I mentioned from our 2018 elections?

NIELSEN:
No, sir. That's not what I said. Statement...

WHITEHOUSE:
Well then why would you not need additional either resources or authorities in order to address the problem if you can't do it with what you have now?

NIELSEN:
Because, as you know, DHS does not play that role. That is a state and local role to ensure the integrity of their election systems. We are providing support and guidance and will continue to do so.

WHITEHOUSE:
OK. So you are testifying that the United States Department of Homeland Security has no role in protecting the country from...

NIELSEN:
Sir, that's not what I said. I said, we're providing guidance and support...

WHITEHOUSE:
You said it was a state role.

NIELSEN:

...we're proving risk and vulnerability assessments upon request, but it is...


WHITEHOUSE:

To the states.


NIELSEN:

...the role and responsibility of a state to ensure its election process.


WHITEHOUSE:

So, I guess what I'm trying to get clear response of what your interest and -- and concerns are in this area. But it sounds to me as if what you have told us is that you see the Federal role in protecting American elections as subordinate to the role of the states and the role of your department is only to provide guidance and whatever other support you are offering to the states...


NIELSEN:

Guidance, support, information sharing, vulnerability and risk assessments. Yes, sir.


WHITEHOUSE:

And does that include all the other areas of Russian election interference that I addressed beyond just a pure cyber intrusion into the state-run election systems?


NIELSEN:

We are working with our Federal interagency departments to try to address a broader conversation just as we are with terrorist...


WHITEHOUSE:

So there is a Federal role in that? That you're engaged in with the Federal interagency process not just...

NIELSEN:
Discussions. Yes, sir.

WHITEHOUSE:
...correct? And out of that, have there been any legislative recommendations whatsoever from any department to your knowledge?

NIELSEN:
Not to my knowledge on the propaganda, no.

WHITEHOUSE:
Thank you very much.

GRASSLEY:
Senator Klobuchar?

KLOBUCHAR:
Thank you, Mr. Chairman.

I want to follow up with Senator Whitehouse's questions as the Ranking on the Rules Committee. Senator Lankfod and I have a bill, along with Senator Harris and Senator Graham, that focuses on getting some resources to the state to better share with Homeland Security.

As you know, in 21 states, attempts were made to hack into their election equipment. A lot of the state election officials didn't even know about it for months. And so, the bill requires that kind of information sharing and then also puts in some resources and we've found a

way to fund this to help states to ramp up their efforts to protect their election equipment with back-up paper ballots with better equipment. Are you aware of this bill? It's called the Secure Elections Act.

NIELSEN:

I -- I am aware of the bill and I really look forward to working with you all on it.

KLOBUCHAR:

And do you think that would be helpful to get some resources to the state to do that?

NIELSEN:

I think what we hear from the states because it's a voluntary relationship, is that they are concerned, from their perspective, about resources. So I think looking at ways in which we can support them makes sense to me.

KLOBUCHAR:

OK. Very good, because a number of the Secretary of States, Democratic and Republican, are coming out for this idea that we start helping, because, to me, it's our fundamentals of our democracy that we have the freedom to vote.

Now, when the President disbanded and it is along the same lines, the Presidential Advisory Commission on Election Integrity, there's a lot of controversy, as you know, about that. He initially called on your department to review the findings of the commission and are you going to be spending DHS time working on this issue?

KLOBUCHAR:

Given that I don't think it's in your jurisdiction.

NIELSEN:

Yes ma'am. So, there are parts of it that are -- we covered the cyber security part to be able to ensure the integrity from a cyber security perspective...

KLOBUCHAR:

Agreed. As we just talked about...

NIELSEN:

Yes. And then I think the larger question of voter fraud, some of that -- if the findings are such, exist within the Department of Justice, exist with other parts of the federal interagency which we will work with.

There is a voluntary system, right now, whereby a state that is concerned -- that those who are not appropriately registered to vote, or who, perhaps, are not even registered to vote, vote. From an immigration perspective, we will work with states to help them determine if voters are in fact not appropriately registered for federal election, but it's voluntary and we do it upon request.

KLOBUCHAR:

I'm trying to -- do you agree that the department's jurisdiction over elections though is related to the critical infrastructure designation?

NIELSEN:

Yes. First and foremost; yes.

KLOBUCHAR:

OK. But you're also going to be working on this issue of registrations; is that correct?

NIELSEN:

We do now. If somebody requests us to run some questionable, in their mind, voters, we're happy to do so.

KLOBUCHAR:

But you are going to have to focus of the department be on legitimate threats to our election systems?


NIELSEN:

We are working very closely with the states on the cybersecurity, yes.


KLOBUCHAR:

OK. So, I'm going to go back to what we were talking about earlier here with DACA and the meeting. And I really wasn't going to go into this until I listened to the exchange with Senator Durbin who, I believe, has a lot of integrity and I think people on both sides of the aisle would agree with me, as well as Senator Graham.

And I was listening to your answers under oath that you did not hear -- and I'm not going to again repeat this word and give it any dignity -- we'll just call it the word, s-hole -- do you know what that word means, then?


NIELSEN:

I -- I -- yes.


KLOBUCHAR:

OK. So, you testified under oath that you did not hear the president use that word at the meeting; is that correct?


NIELSEN:

That's correct.


KLOBUCHAR:

And is it possible he said the word at the meeting and you didn't hear it?

NIELSEN:

Anything is possible. Yes, ma'am.


KLOBUCHAR:

And did you hear him say the word s-house?


NIELSEN:

I -- no, I did not.


KLOBUCHAR:

So, is it possible he also said that word and you didn't hear it?


NIELSEN:

Again, it's possible. It was a meeting of 12 people; there was crosstalk. I, unfortunately, was not -- the meeting as you know was unscheduled, so last minute, when I was notified, I had to clear my schedule -- I came in a bit late, so anything is possible. I can't testify to what I don't know.


KLOBUCHAR:

OK. I appreciate that. Because words like this matter; do you agree with that?


NIELSEN:

I do. I also agree that if you can forgive me -- and I won't actually -- other profane words I don't think were appropriate either and they were not used by the president. And I actually was struck more by the fact that the conversation, although passionate and appropriately so, had gotten to a place where many people in the room were using inappropriate language in the Oval Office in front of the president -- that's what struck me.

KLOBUCHAR:

Was it true that Senator Graham though pushed back to...

NIELSEN:

Senator Graham gave an impassioned speech on what he believes are the American ideals. Yes, he did do that.

KLOBUCHAR:

Very good. So, let's get to that and the matter at hand which is DACA and the DREAM Act and trying to protect 800,000 people who, most of us on this committee agree, came here through no fault of their own. And, right now, we have a situation where an estimated 15,000 young people have lost their DACA status already, leaving these DREAMers with tremendous uncertainty.

Can you give us assurances that the administration is not planning to pursue enforcement actions on young people whose DACA status has expired while the current court order is in effect?

NIELSEN:

If you are a current DACA register, you are still -- you still have status. No one has lost their status. No one will lose their status until March 5th or later, depending on what happens with the court.

KLOBUCHAR:

Are there any circumstances under which the administration would remove a DACA beneficiary from the U.S. at this time?

NIELSEN:

At this time, no. Unless they commit a crime. And unfortunately, we've had 2100 that have -- they have lost their status and now they would be targeted for deportation.

KLOBUCHAR:

Were there any circumstances under which the administration would have removed a DACA beneficiary from the United States before the recent court issue -- order was issued?

NIELSEN:

Not if they appropriately retained their status. Again, if they committed a crime or a national security threat there's always exceptions to that.

KLOBUCHAR:

On the issue of schools, the University of Minnesota is really concerned about this. I had asked about this at a previous hearing -- has DHS engaged with universities and institutions of higher education regarding the elimination of DACA?

NIELSEN:

We did in -- I don't believe that -- I don't know -- and we'll get back to you -- I don't know if we have in recent months, but as part of the ongoing conversation; absolutely.

KLOBUCHAR:

OK. Because it falls in the middle of their semester -- a lot of them are in school and I just ask that you look into that because it's a major concern there.

The issue of steel dumping -- we're now moving into an entirely different area. This is something that we worked hard with the -- your predecessors on this issue with the Commerce Department -- and this is illegal steel that's being dumped on our shores.

In 2015 we passed legislation to strengthen the tools that custom officials have to ensure that our trading partners in foreign industries are competing fairly. Because there was some

change in tariffs, that meant hundreds of people went back to work last year and the year before in my state. What is CBP doing to level the playing field for domestic manufacturers? We had talked before with Secretary Johnson about work being done to look at the shipments that are brought over if they contain illegal steel.


NIELSEN:

Yes. So, the Department of Homeland Security, through CBP, is working with the Commerce Department, the U.S. trade representative in the State Department to see what else might be warranted to ensure that not only the law is able to enforce, but that we can identify the illegal or illicit transfer -- the dumping, if you will. So, there's the dumping that comes here legally, but is dumping because it's under, as you know, the tariffs, but then there's also the illegal shipments. So, we're doing both.


KLOBUCHAR:

Exactly. I was trying to envision like a perp walk where the ship would be sent away with all the illegal steel. I just think we have to make a point of this -- that we've got a situation where this is still going on. I think there's been some enforcement and we gave some resources for that. So, I think I'll follow-up with you...


NIELSEN:

Please do.


KLOBUCHAR:

Thank you. I've introduced the Stop Act with Senator Portman to help our customs and border agents crack down on illicit shipments of fentanyl and other dangerous synthetic drugs from overseas. Our bill was endorsed by the president's opioid commission and I'm hopeful that it will advance in the Senate. Will you commit to working with us on this issue?


NIELSEN:

Absolutely. I am a big fan. We've been working very closely with the United States Postal Service to ensure that we can, in fact, implement it upon passage. Was very happy to see the Interdict Act as the beginning of the conversation, but the Stop Act is very important, and I do look forward to working with you and Senator Portman to very quickly pass that.

KLOBUCHAR:

OK. Another priority is this Conrad 30 bill which addresses physician shortages in rural areas by allowing physicians who were educated in the U.S. to remain in the U.S. in exchange for three years of service in an underserved area. That could be an urban hospital. That could mean a rural hospital where we don't have enough doctors.

I wanted to thank Chairman Grassley for working with me on improvements to this critical program. Are you aware of this? And will you commit to working with me on this legislation? It was an issue I had raised with General Kelly when he was in your chair.

NIELSEN:

I am aware of it. I'd be happy to work with you.

NIELSEN:

There clearly is a continued demonstrated need in such areas. So let's find a way to meet it.

KLOBUCHAR:

OK. And finally, last year I was concerned with the USCIS decision to suspend the premium processing for the visas, which included the doctors under this program, who could not begin practicing medicine in these rural areas as scheduled, as a result of the delay.

I led a bipartisan letter about this. Do you know if steps have been taken to insure that an additional suspension of premium processing will not take place in the future?

NIELSEN:

I do not, but I'm happy to get back to you on that.

KLOBUCHAR:

OK, very good. And then, Mr. Chairman, I'm going to put on the record a editorial that was in our paper...

GRASSLEY:

Without objections.

KLOBUCHAR:

...by a Liberian, who came from one of these countries, whose son just graduated from Carleton College, and making the point here, which he does so well, the great addition so many of these immigrants have made to our country.

GRASSLEY:

That will be so ordered.

KLOBUCHAR:

Thank you.

GRASSLEY:

Senator Blumenthal?

BLUMENTHAL:

Thank you, Mr. Chairman.

Thank you so much for being here, Madam Secretary.

And I want to join you in thanking the very dedicated men and women who work in the Department of Homeland Security, often at great sacrifice to themselves and at substantial

risk. And I've met many of them and I think your pride in their work is very well justified.

I am interested in a number of the statistics that you provided. I didn't find them in your testimony. You said that there has been a 30 percent increase in ICE arrests?

NIELSEN:

A 30 percent that -- well, there's probably a lot of 30 percents. The one that I mentioned was the 30 percent increase in unaccompanied minors crossing the border between October and December.

BLUMENTHAL:

Has there been an increase in the number of ICE arrests of ...

NIELSEN:

Over last year. Yes, sir.

BLUMENTHAL:

And what is that?

NIELSEN:

I believe it's around 30 percent.

BLUMENTHAL:

So ICE is arresting more people who are undocumented in this country and would you agree that many of them have no criminal records, because the priorities of the Department of Homeland Security have changed so that there no longer is a priority on individuals with criminal records being arrested?

NIELSEN:

Actually, sir, that's not true. The priority remains: those who are criminals, serious criminals, and those who have final orders of removal. Ninety two percent of those removed last year were criminals. So I think...

BLUMENTHAL:
When you say criminals...

NIELSEN:
Yes.

BLUMENTHAL:
...they have criminal convictions ...

NIELSEN:
Correct.

BLUMENTHAL:
...or felonies?

NIELSEN:
Yes.

BLUMENTHAL:
And so that means 8 percent had orders of removal that...

NIELSEN:
Ninety two percent is both -- both together. So the other 8 percent...

BLUMENTHAL:

So you count someone with an order of removal against him or her as a criminal?

NIELSEN:

No, sir. I'm just saying the priority of the department are those with final orders of removal and criminals. That number is 92 percent.

BLUMENTHAL:

Well, I would like you to get back to me with more precise and exact numbers, because our experience is that many individuals who've been in this country, playing by the rules, paying taxes, working hard, raising families, they may have orders of removal, but they have appeared regularly at Department of Homeland Security checks.

And they are notified suddenly, without any real notice that they are going to be deported a week or two or three from that time that they appeared.

I'm also eager that you respond to my letters on that topic. I've received no response. And I have written, also, about apparent DHS policies on sensitive locations, in terms of arrests at places where, according to ICE policy, there should not be arrests, including, possibly, courthouses, churches and other places that are regarded as sensitive locations.

As you know, a woman who is a victim of domestic abuse, if she seeks help at law enforcement, police station, may be fearful about doing so if she is undocumented and she's threatened with deportation.

So it works against proper law enforcement also, in terms of people who may have leads about crimes or seeking to report crimes, generally.

So, I'd like answers to my letters of October 17th and November 13th on that topic.

NIELSEN:

We'd be happy to clarify some of that information. It sounds like needs to be clarified, happy to do so.

BLUMENTHAL:

Thank you.

Let me ask you about the testimony that you gave, very helpfully, to Senator Whitehouse about the Russian attack on our -- you would agree that Russian meddling and interference in our elections constituted, in effect, an attack on our democracy, correct?

NIELSEN:

It's highly concerning. I want to be careful about the word, attack, but yes.

BLUMENTHAL:

And there's no question that it happened on a massive scale. You'd agree with the unanimous opinion of the intelligence community in that regard?

NIELSEN:

Yes, I have no -- I have no reason to doubt that.

BLUMENTHAL:

Would you agree also that the Russians need to pay a price, otherwise they'll repeat it?

NIELSEN:

I believe, yes, we need to put all kinds of activities in place, not only to prevent them and to mitigate, but to deter their -- their behavior.

BLUMENTHAL:

And any American who supported or aided that attack, call it interference, or meddling if you prefer that word, should also be held accountable, correct?

NIELSEN:

Should be held accountable in some way, sir. I'm not familiar with the laws that might apply in that situation, but yes, they should be held accountable.

BLUMENTHAL:

Well, there are laws that prohibit conspiracy when a law is violated, correct?

NIELSEN:

As far as I know. Yes, sir.

BLUMENTHAL:

So, at a minimum, whether through the law of conspiracy, or the Computer Fraud and Abuse Act, or money laundering, those individuals who supported or aided or abetted the Russian interference with our election should be held accountable, correct?

NIELSEN:

Yes.

BLUMENTHAL:

Would you agree with me that the investigation by the Special Counsel is not a hoax or a witch hunt?

NIELSEN:

I believe that investigations by Special Counsels are important.

BLUMENTHAL:

And, in particularly, the investigation by Robert Mueller is necessary and appropriate, correct?

NIELSEN:

It's -- yes, sir.


BLUMENTHAL:

And should be protected from political interference?


NIELSEN:

On all sides, yes.


BLUMENTHAL:

I want to ask you about Puerto Rico. I visited Puerto Rico twice since the hurricane. And I think that the Federal response there has been shamefully and disgracefully inadequate.

Almost half the island is still without electricity. Much of the water is undrinkable. Many of the major roads are impassable. And the economy is on the brink of failure. Half the hotels are still closed.

And many of the manufacturing plants are going to move out of the island -- and manufacturing is a mainstay of its economy, if electricity is not restored.

When I first visited, I was told that electricity would be restored by December.


BLUMENTHAL:

In my latest visit, a couple of weeks ago, the date shifted to March.

I would like a commitment, from you, that you and the department, through FEMA and coordinating with the Corps of Engineers, will give us a date by which electricity is restored.


NIELSEN:

You have my commitment to give you the best guess that we have, in terms of estimating the time of restoration.

WHITEHOUSE:

Well, the people of Puerto Rico deserve more than a guess.

(CROSSTALK)

NIELSEN:

They do, sir. But, as you know, it's very complicated. We have to account for weather. We have to account for terrain. We have to account for aging infrastructure. We have to account for a variety of factors that I cannot predict.

But, yes, you will have our best estimate, given all the data that we have as to when electricity will be restored.

WHITEHOUSE:

Last week, I wrote to FEMA, and specifically the administrator, Brock Long, because of reports -- and we verified them with people in Connecticut -- that they have been told that the transitional shelter assistance program will be ended for them, because their homes are now habitable in Puerto Rico, despite the absence of water, electricity and reliable structures.

Would you agree with me that the standard of habitability should include those factors?

NIELSEN:

I would agree with you that we need to do more, and we are doing more. As you know, we have the first and foremost duty to protect the safety and security immediately after an event, in response. HUD works with us on the longer-term housing. And, right now, what we're seeing is the transition from short-term housing to longer-term housing through recovery.

WHITEHOUSE:

Correct. But people are now being evicted from their temporary shelters in Connecticut and, likely, in Puerto Rico, without the Section 8 or other HUD programs.

NIELSEN:

I'm happy to look into that, sir.

WHITEHOUSE:

I would like you to look into it, and I'd like you to also give me what the standard is for habitability, because, certainly, it should include water, electricity and a reliable roof that is a structure that can be regarded as safe and secure. Would you agree?

NIELSEN:

I'd be happy to look into it. Yes, sir.

WHITEHOUSE:

Let me just close on the topic that's been raised, unfortunately, repeatedly, and I know it's one that's uncomfortable for all of us here, and I'm not going to repeat the word.

But, at any point in that conversation on Thursday did the president of the United States use that four-letter word beginning with S, in combination with any other words, or alone, that you heard?

NIELSEN:

Sir, respectfully, I have answered this. I've been very patient with this line of questioning. I am here to tell you about the threats our country faces and the needs and authorities that are needed by the Department of Homeland Security.

I have nothing further to say about a meeting that happened over a week ago. I'd like to move forward and discuss ways in which we can protect our country.

WHITEHOUSE:

Let's -- then, I agree -- expand on the compromise that was offered, the proposal that Senator Durbin and Senator Graham and others -- the bipartisan proposal that was suggested.

Would you agree with me that it's an encouraging step and should be built on, because we want to avoid the mass, draconian deportation that otherwise will occur to these very brave and talented young people who have come to our country?

NIELSEN:

Yes, sir. I think anyone who is willing to work towards a solution to this -- as I said, my staff has continued to meet with their staff since that meeting.

NIELSEN:

And I'm very hopeful that we can agree upon a deal, amongst us all, that increases border security, that ends chain migration and the diversity lottery and that also accounts a permanent solution for the DACA population.

GRASSLEY:

Senator Hirono?

BLUMENTHAL:

Thank you.

HIRONO:

Thank you, Mr. Chairman.

We would all like to move on. So, I would like a very short yes or no answer to this question. Before I move onto ask you questions about what happened in Hawaii this weekend, you

testified that you did not hear the President use the words s-hole or s-house, though he could have said those words and you just didn't hear it. My question is, did you hear Senator Graham use the s-hole or s-house words at the meeting with the president, yes or no?

NIELSEN:

Ma'am, no.

HIRONO:

Now, there is no question that there are heightened tensions between North Korea and the United States. And you touched upon the Department of Homeland Security's efforts with regard to disaster responses and what happened in Hawaii could qualify as that, of course.

So, the false emergency alert about a ballistic missile threat to Hawaii induced real fear and panic throughout the islands and while the threat was false, the panic and the fear were real.

I understand that there were human factors and system failures involved, and I'd like to ask you some questions about what we can learn from this about the system's failures and how we can improve the emergency alert systems, not just for Hawaii, but for every state.

So, can you explain to me exactly what the role of your department is in overseeing state emergency alert systems.

NIELSEN:

Yes, ma'am.

So, we provide the backbone of an alerting system, which state and locals are able to tap into to reach their citizens. It's called the Integrated Public Alert and Warning System. It provides for a variety of capabilities including geo-targeting, so we that can alert those who are in harm's way.

But the decision in this case to utilize that backbone and how it was utilized was the state's decision.

HIRONO:

Yes, we realize that it all started with human error. So, obviously, we need to identify the human failures and correct them and then to the extent there were system failures, because there was a very long span of time from the first alert and then correcting that alert.

So, that seems to point to some communication and other kinds failures that we ought to be addressing. So, do you have the responsibility to convene state emergency managers to make sure that each state has an alert system that functions properly?

NIELSEN:

We do request a variety of information from state and locals on their alert and warning systems as part of our threat assessments conducted by FEMA, as well as any time we provide grant assistance.

Often, the request is to use federal money to improve alert and warning systems, in which case, of course, we work with the states to ensure that that is done in a way that makes sense.

HIRONO:

So do have an overall responsibility or a part of your responsibilities to make sure that every state's alert systems work properly?

NIELSEN:

What we do -- yes and no. So, in other words, we provide the backbone to ensure that at any time if the president or the Department of Homeland Security would need to send an alert to citizens with an impending catastrophic event, for example, we can do that.

The state and localities then often use that backbone to distribute and disseminate their own messages. I will say, in some areas, as you know, state and locals have their own system that you can opt into with other types of non-catastrophic events. Snow, for example, or major rainstorms. Something else that their citizens should be aware of.

HIRONO:

Well, this had the potential for being totally catastrophic. So, do you have a role in setting standards and ensuring that state emergency management agencies use best practices in a situation like what occurred in Hawaii on Saturday?

NIELSEN:

So, FEMA has been in touch with the emergency manager in Hawaii. We have offered our support for any after action that they have performed. I have asked my folks at DHS to do their own after action to ensure that we are clear when we receive a alert and warning from a state, both that it is disseminated properly, but also that we can verify.

Initial lessons learned, you know, we would work with the states, particularly in this threat to ensure that they are connected to those who can quickly verify whether that threat is real or not. In that case, that would be the Department of Defense. So, we are in active conversations with them to ensure that they can improve their system. Yes, ma'am.

HIRONO:

So you would agree that there are responsibilities, the FCC, for example, they have acknowledged they have a certain responsibility. DHS, the state and Pacific Command because the order to send out this alert should have come from Pacific Command, upon getting the notification from Northern Command and there was a missile launch and where it was heading. So, we can improve all of those communications.

NIELSEN:
Yes.

HIRONO:

Was your department aware that the Hawaii Emergency Management Agency did not have a mechanism currently in place to address the false alarm situation and alert -- and an alert

retraction mechanism?

NIELSEN:

We were not aware before this occurrence. No, ma'am.

HIRONO:

Are you going to make sure that every state has that kind of fail-safe mechanism?

NIELSEN:

We will work with states to ensure that, yes.

HIRONO:

So, the White House called the false alert purely a state exercise, but I think that understates the problem, because I believe that addressing issues with alerts about a ballistic missile threat from a foreign country, everyone assumed that it was from North Korea, is not only a state problem.

Would you commit to working with me to ensure that states, not just Hawaii, we have to include Guam, are already in a uniform and effective way to alert their people of missile threats?

NIELSEN:

Yes, I will. And I'd also like to work with you to ensure that we're providing specific instructions on what to do upon an alert.

HIRONO:

And once Hawaii EMA, the Emergency Management Agency realized that it had sent out a false alert, it apparently wasn't clear to them whether or not they needed to consult with FEMA before sending a retraction.

Do you know what the requirements are? Were they supposed to get FEMA's, somehow, agreement, involvement in order to send out a false alarm message?

NIELSEN:

No, ma'am. There's no requirement for them to get any permission from FEMA to retract a mistaken alert and warning.

HIRONO:

So, the fact that that seemed to have been a concern, that's yet another clarification of clearer communication that has to occur.

NIELSEN:

Yes, we all should clarify that.

HIRONO:

So, how can DHS play a role in ensuring that all of the systems involved in sending out alerts and retracting them are understood by all the states? Are you taking some very specific steps to make sure that this is happening?

NIELSEN:

Yes, I have asked the administrator of FEMA to work with the state emergency management agencies to ensure that the protocols and standard operating procedures are clear, both on issuing initial alerts, understanding the basis on which they have been alerted and then, of course, making a course correction in the very, very small cases when that might be necessary.

HIRONO:

Are there formal plans in place on how to respond to a domestic missile attack, because we're not just talking about Hawaii, of course, or Guam. But North Korea is developing

missiles that can reach continental U.S. So, is there -- is there a formal plan in place through your department on how states are to respond to a domestic missile attack?

NIELSEN:

We continue to work with the states to understand the threat and the effects of it. At the Federal Inner Agency we've had a variety of exercises leading up to the cabinet level exercise in February, where we will discuss the federal rules and responsibilities in support of state and local response.

HIRONO:

I understand that though when you say that they cabinet level, it was the subcabinet level, not at your level.

NIELSEN:

No, I'm sorry. I said the cabinet level will occur in February. We did have a deputy secretary exercise in the fall. Yes, ma'am.

HIRONO:

So, you are going to have a cabinet level?

NIELSEN:

We are. Absolutely.

HIRONO:

Make sure that every state has in place what they need to...

NIELSEN:

To meet -- well, let me just be clear. The cabinet level exercise will clarify the roles and responsibilities with the federal government. So that includes, as you say, DoD, to the extent that we're talking about an alert and warning system. We would like to make sure that the FCC which is undertaking an assessment, as you know, is clear.

So, we'll clarify that. At the same time, we're working with state and locals to make sure that they have the information that they need.

HIRONO:

Thank you. It sounds as though everybody's on board, especially after what happened in Hawaii, to make sure that this doesn't happen in Hawaii or anyplace else, for that matter. I want to get to question of DACA because I was at the meeting at the White House where you said that, and you also said that today, that no DACA participants had lost their status.

NIELSEN:

I did not say that. I said 21 have lost their status because they committed a crime.

HIRONO:

I'm talking about 15,000 that I'm informed have lost their status. And so, DACA participants have to renew their status and only those whose status expired at a certain timeframe were allowed to renew after the ending of DACA was announced. So there were thousands of participants in DACA who were already on renewal status and now they -- so they couldn't apply for renewal.

So, these are the young people who have lost DACA status, 15,000 of them. Take my word for it. So, I'm glad that after the California court ordered DHS to begin to renew these applications, and you have done so.

NIELSEN:

Yes, we have.

HIRONO:

I commend you for that. I want to know what's happening to the 15,000 who have lost their status. Are you creating an expedited procedure for them to have their DACA status restored?

NIELSEN:

I will get back to you on that, ma'am. I'm not familiar with 15,000 who have lost their status. As I understand it the programs ends March 5th. So, let me get you this...

HIRONO:

Well, people were on rolling renewal. So, obviously, not everybody ended at the same time.

NIELSEN:

I understand. I also understand there was about 20,000 who decided not to renew who were able to renew. So I'm not sure if we're talking about the same ...

HIRONO:

We're talking about those people who lost their status because they were in the middle of renewal and so they could not renew in the timeframe that they were given after the announcement.

NIELSEN:

I'm happy to get back to you with details.

HIRONO:

Thank you. Can you see my sense of urgency about this?

NIELSEN:

I do.

HIRONO:
Thank you.

GRASSLEY:
Senator Booker? Senator Booker?

BOOKER:
Thank you very much, Mr. Chairman.

First of all, I just want to say about the DACA issue going on right now. To me, this is a very profound, moral issue in our country. It's a moral issue because, as you know, many of these children do not have even memories of their home country and now in our nation they're doing things that are extraordinary.

In my state, we have DACA recipients, DREAMers, who are servants in the military. We are DREAMers who are first responders. We have DREAMers who are entrepreneurs. One young lady sat in my office and employs hundreds and hundreds of people. And I am sure you are aware, because you've probably met with these people, correct? You've met with DREAMers, yes?

NIELSEN:
I have not met with DACA recipients as secretary of homeland security. No, sir.

BOOKER:
Have you met with them before? DREAMers before?

NIELSEN:
Not as self identified, no.

BOOKER:

So, then, for your knowledge, a lot of these folks are now hanging not only the balance of waiting for policy, but it's an -- a grievous anxiety, it's undermining their life and their well-being and their ability to serve.

This moment for them, these weeks and weeks of waiting on something where 80 percent of Americans agree, Republicans and Democrats agree, that we should find a way for these folks to stay in this country. What is happening to them right now is unacceptable treatment to people who are fellow Americans, but for the documentation. I want to just turn though and you'll have to forgive me, listening to the testimony has changed my line questioning a bit because this is very personal to me.

I sit here, right now, because when good white people in this country heard bigotry or hatred they stood up. Moving into my home community we were denied housing because of the color of our skin. And it was white Americans from Bergen County who banded together to fight against racism, to fight against hate speech.

To fight against people who had broadbrush generalities about people based upon their ethnicity, based upon their origin, based upon their religion. What went on in the White House, what went on in the Oval Office is profoundly disturbing to me.

And I'll tell you this, I heard about when I was in Puerto Rico when it happened. And here I was, there, trying to help a community dealing with savage challenges. I can't tell you how many Puerto Ricans brought up that conversation in the White House. I returned to Atlanta to go to the King Center Awards and from the greatest luminaries from the civil rights movement, down to average Americans, this was on their mind.

I returned to Newark, New Jersey, and I talked to African-Americans from Africa, I talked to Central American Americans, I talked to regular Newarkers and this was top on their mind. Yesterday, I talked to the ambassador from Haiti and to see all that they are doing as a result of this conversation.

Now, I've been in the Oval Office many times, and when the commander in chief speaks I listened. I don't have amnesia on conversations I had in the Oval Office going back months and months and months, and I have had individual meetings with the president and I have had group conversations were there was, as you said, crosstalk.

And why is this so important, why is it so disturbing for me, why am I, frankly, seething with anger? We have this incredible nation where we have been taught that it does not matter where you are from. It doesn't matter your color, your race or religion it is about the content of your character, it's about your values and your ideals.

And yet, we have a language that from Dick Durbin to Lindsey Graham, they seem to have a much better recollection of what went on. You're under oath. You and others in that room that suddenly cannot remember. It was Martin Luther King that said, "There is nothing in this world more dangerous than sincere ignorance and conscientious stupidity".

And so here we are in the United States of America and we have a history that is beautiful and grand and also ugly where from this nation to others we know what happens when people sit by and are bystanders and say nothing. When Oval Office rhetoric sounds like social engineering. We know, from human history, the dangers of that.

Our greatest -- our greatest heroes in this country spoke out about people who have convenient amnesia or who are bystanders. King said, "A man dies when he refuses to stand up for that which is right. A man dies when he refuses to stand up for justice. A man dies when he refuses to take the stand." Elie Wiesel says, "We must take sides. Neutrality helps the oppressor, never the victim. Silence encourages the tormentor, never the tormented."


BOOKER:
Gandhi said, "Silence becomes cowardice -- cowardice." "When we occasion -- when the occasion demands speaking out," like Lindsey Graham did, "and acting accordingly."

This idea that the commander-in-chief of this country could, with broad brushes, talk about certain nations, and thus, cast a shadow over the millions of Americans who are from those

communities, and that you could even say in your testimony that Norwegians were -- were preferenced by him, because they're so hard working.

NIELSEN:
I -- I didn't...

BOOKER:
Excuse me. Let me finish.

NIELSEN:
Happy to.

BOOKER:
Let me just draw a connection of why that matters. I'm sure you remember the six words from our president; the six words that he said after Charleston, Virginia last summer. People marching with tiki torches and hate, and he said, "There are very fine people on both sides" -- "very fine people on both sides." When the commander-in-chief speaks, or refuses to speak, those words just don't dissipate like mist in the air. They fester. They become poison. They give license to bigotry and hate in our country.

I know you're aware of a 2017 GAO report that found, and I quote, "Out of the 85 violent extremist incidences that resulted in death since September 12th, 2001, far right-wing violent extremist groups were responsible for 73 percent."

When I go through the black belt in the south, when I'm in Atlanta, black churches in Newark, they're concerned about jihadist Islamic terrorism. We watched the twin towers, from Newark, go down. But since 9/11, 85 violent incidents, 73 percent were with people that hold bigoted, hateful ideas about minorities.

One American killed in Charleston, Virginia, dozens injured; nine Americans killed in a church shooting in Charleston, South Carolina by a white supremacist; an American killed

and another wounded in Kansas after a white supremacist targeted them for their ethnicity, saying, "Get out of my country"; six -- six Americans killed and four others wounded in Wisconsin, where white supremacists targeted individuals for their religion.

The commander-in-chief, in an Oval Office meeting, referring to people from African countries and Haitians with the most vile and vulgar language. The language festers. When ignorance and bigotry is allied with power, it is a dangerous force in our country. Your silence and your amnesia is complicity.

Right now, in our nation, we have a problem. I don't know if 73 percent of your time is spent on white supremist hate groups. I don't know if 73 percent of your time is spent concerned about the people in fear in communities in this country -- Sikh Americans, Muslim Americans, Black Americans. The fact pattern is clear of the threats in this country.

I hurt. When Dick Durbin called me, I had tears of rage when I heard about this experience in that meeting, and for you not to feel that hate -- hurt, and that pain, and to dismiss some of the questions of my colleagues, saying, "I've already answered that line of questions," when tens of millions of Americans are hurting right now because of what they're worried about what happened in the White House. That's unacceptable to me.

There are threats in this country; people plotting. I receive enough death threats to know the reality. Kamala receives enough death threats to know the reality. Mazie receives enough death threats to know the reality. And I've got a president of the United States, whose office I respect, who talks about the countries of origins of my fellow citizens in the most despicable of manner. You don't remember, you can't remember the words of your commander-in-chief. I find that unacceptable.

Mr. Chairman, I'm grateful to be on this committee. I'm more than ever, today, happy I'm here.

Thank you.


GRASSLEY:

Thank you.

Senator Graham?

NIELSEN:

Sir, could I just respond, if you don't mind, after that?

GRAHAM:

(inaudible)

NIELSEN:

I would just like to say that...

GRASSLEY:

Wait -- wait, Senator Graham. Go ahead and respond.

NIELSEN:

Would -- would that be OK?

GRASSLEY:

Yeah.

NIELSEN:

I would just like to say, I -- I do, clearly -- and I want to be clear on this -- abhor violence in all of its forms. I couldn't agree with you more, that the Department of Homeland Security has a duty to stop and prevent violence in all of its forms. Our preventing terrorism programs have been reassessed and re-looked at, just this year, to ensure that we actually are going after the threats, to include white supremacy, not just to focus on what was focused on in years' past.

So just -- just to -- I would just like to say that to you. I share your passion. It's unacceptable.
It can't be tolerated in the United States. Under the authorities that I have at the Department
of Homeland Security, violence, in any form, will not be tolerated.

GRASSLEY:

Senator Graham?

GRAHAM:

Thank you very much.

Welcome, Senator Booker. I'm glad you're here, too.

So do you agree with me that the threats to the nation are -- are pretty severe, and if we shut
down the government, that'd be a bad idea?

NIELSEN:

Yes, sir.

GRAHAM:

OK. Does the president intend to extend DACA past March 5th by executive order?

NIELSEN:

Not that I'm aware of.

GRAHAM:

Do you think he has the legal authority to do so?

NIELSEN:

I believe the attorney general has made it clear that he believes such exercise is
unconstitutional. It's for Congress to fix.

GRAHAM:

So I agree with that. I just want everybody on this committee to know that I don't believe the president can extend this by executive order, and March 5th, a lot of bad things begin to happen. And it seems to me we ought to try to avoid that if we can. Do you agree with that?

NIELSEN:

Yes, sir.

GRAHAM:

Now, let's talk about two Trumps: the Tuesday Trump, and the Thursday Trump. Whose idea was it to do the meeting on Tuesday?

NIELSEN:

As far as I know, it was the president's.

GRAHAM:

I will say something that some people may not like, but I thought he did a really good job. Did he -- he talked about comprehensive immigration reform. Do you remember that from Tuesday?

NIELSEN:

I do remember that being raised. Yes, sir.

GRAHAM:

Is he still supportive of comprehensive immigration reform?

NIELSEN:

I believe what he made clear is, he's happy to listen to proposals and have the discussion, but there are some immediate needs. I think those are (inaudible)

(CROSSTALK)

GRAHAM:

Right, I agree with that, but he said he wanted to do comprehensive?

NIELSEN:

He said he was open to it, absolutely. Yes, sir.

GRAHAM:

Yeah. I think he said he wanted to. Do you remember him saying we need to be bipartisan, when it comes to immigration reform?

NIELSEN:

Very important.

GRAHAM:

OK, and he still believes that?

NIELSEN:

Yes.

GRAHAM:

Do you remember him saying the word love?

NIELSEN:

I don't remember him saying the word love. I remember him saying care. I've heard him use love before, compassion.

GRAHAM:

Well, we'll get the tape. He said love. We should do this with love. And so, what I heard Tuesday was a president who seemed to understand, it had to be bipartisan. Phase One is just a down payment. It needs to be comprehensive. We need to go to merit-based immigration. We need to secure our border, and we need to be fair to the illegal immigrants, and we need to emphasize security, but he said love.

GRAHAM:

Thursday. Do you (ph) -- are you aware that the Senator Durbin and the president talked at 10 o'clock, around that time, Thursday morning?

NIELSEN:

Only through news reporting after the fact.

GRAHAM:

Are you aware of the fact that Dick Durbin called me and said I had the best conversation ever with the president? We should follow up on it.

NIELSEN:

I am now.

GRAHAM:

OK, so is everybody else. Are you aware of the fact that I said great, Dick, I'll call The White House and see if we can set up a meeting? You are now?

NIELSEN:

Yes, sir.


GRAHAM:

So what happened between 10 and 12?


NIELSEN:

I don't know, since I didn't hear any of that until just...


GRAHAM:

I don't either and I'm going to find out and I'm not going to ask you because between 10 o'clock and 12 o'clock, we went from having conversations between Senator Durbin, which I believe every word, and the president that was very hopeful and by the time we got there, something had happened.

So, Tuesday, we had a president that I was proud to golf with, call my friend, who understood immigration had to be bipartisan; you had to have border security as essential, you have border security with a wall. But he also understood the idea that we had to do it with compassion.

Now, I don't know where that guy went, I want him back. As we go forward, how does this movie end? What's going to happen?


NIELSEN:

I hope that we can find a legislative package that addresses those four pillars that, it appeared to me, all the Congressional leaders...


GRAHAM:

Yes, let's go through those four pillars...

NIELSEN:

Sure.

GRAHAM:

Border security; do you expect that the Democrats will give the president everything he wants for border security in Phase I.

NIELSEN:

No, sir. That's why we took the priorities that he issued in the fall and we culled them down.

GRAHAM:

Merit-based immigration, do you believe we will move to a merit-based immigration system in Phase 1?

NIELSEN:

Completely and fully, no.

GRAHAM:

OK. Do you agree with me that the reason we won't (ph) is if the Democrats give us everything we want on border and merit-based immigration and go to nuclear family in terms of future immigration flow, they won't have any leverage when it comes to the rest of the 11 million.

NIELSEN:

I have not seen any proposal where they give us everything we need on border security.

GRAHAM:

Well just trust me on that, I deal with them a lot; they're not. I'm going to tell y'all guys, I'm not going to give the 11 million legal status and hope one day y'all will deal with us on border and merit-based immigration. Do you understand leverage?

NIELSEN:

Yes, sir.

GRAHAM:

Do you think the president understands leverage?

NIELSEN:

Yes, sir.

NIELSEN:

So here's what I would suggest to you. In Phase 1 to expect my friends on the other side to go comprehensive for us and DACA for them, it's not going to happen. I'm telling my friends on the other side, DACA and nothing else, is not going to happen. The sweet spot is DACA plus, more than the DACA kids and making down payments on border security; moving slowly, but surely, toward a merit-based immigration system; to be followed by Phase 2. Can I describe Phase 2 as I see it?

NIELSEN:

Yes, sir. Please.

GRAHAM:

Thank you very much. Phase 2, as I see it, is we move further toward border security in its full sense; that we begin to find a pathway forward for the 11 million not included in Phase 1 who or not crooks, drug dealers, rapists, felons, which is the overwhelming majority of the 11 million.

That once we get a glide path for them, I expect, in return, that when they're through the system we'll have a merit-based immigration system based on the economic needs of the country, that we'll have a secure border and we'll increase legal immigration so people in the future don't have to cheat. Does that sound pretty reasonable?

NIELSEN:
It sounds like a Phase 2.

GRAHAM:
OK. So, I'm going to try to get you through Phase 1, that the president's watching, I'm still in the phone book, don't give my number out, but call me. This has turned into a S show and we need to get back to being a great country where Democrats and Republicans have worked together to do something that we should have done years ago. To the 700,000 young people; some young, some older, we're not going to leave you behind.

I don't know how this movie ends, but you're going to be taken care of. To those who want to begin to fix a broken immigration system, you're going to get something too. I don't know how we right the ship; Dr. King said something pretty poignant about us, he said, "We came on different ships, we're all in the same boat now."

So here's my hope, that we can find through Phase 1, a reasonable down payment on border security, begin to correct some of the problems when it comes to chain migration, deal with the DACA population fairly and with a sense of compassion and set up Phase 2, and all I would say, Madam Secretary, we need your help.

NIELSEN:
Sir, I've been ready. I've offered to meet with anybody who would like to meet with me to further this discussion. I would like to do it, we need to do it.

GRAHAM:

I'm going to take you up on that offer. And to the country at large, things are going to get better; it's not going to end this way. The president ran hot and I think I know why, something happened between Tuesday and Thursday and we'll get to the bottom of that, and quite frankly, I got pretty passionate and I ran a little hot too. Somebody needs to fix this problem, Obama couldn't do it; Bush couldn't do it and both of them, to their great credit, tried. Do you think President Trump can do this?

NIELSEN:
I think he wants to do it. Yes, sir.

GRAHAM:
And I think Dick Durbin has been one of the best people you could ever hope to work with, that he's a decent, honest man, a liberal Democrat. Yeah, he said yeah. And I'm a conservative Republican, but on this and other things, we can find a way forward.

GRAHAM:
So, Mr. President, I'm going to end today where I ended Tuesday. Close this deal. Thank you, Madam Secretary.

NIELSEN:
Thank you, sir, for your leadership on this.

GRASSLEY:
Before I call on Secretary Harris, I would hope, Senator Graham...

HARRIS:
I don't know if that's a demotion or a promotion.

(LAUGHTER)

GRASSLEY:

I'm sorry. Before I do that I -- you don't have to answer this, Senator Graham, but it seems to me that in phase 1, we ought to at least be able to agree that we should make it -- make it easier to remove dangerous criminals in phase 1, instead of waiting for that.

You know, that's just kind of a simple thing...

GRAHAM:

Yeah, that's a...

GRASSLEY:

That's a common sense task. You ask that to any American, and they would say yes.

GRAHAM:

I think that's a good idea, among other good ideas. And I'm glad we're talking about phase 1, rather than s-holes.

GRASSLEY:

Senator Harris?

HARRIS:

Thank you, Mr. Chairman. There's so much that has taken place over the last week and during the course of this hearing, that, frankly, stirs in me, as in my colleague Senator Booker, and others, great emotion. I join issue with the statements of Senator Booker.

I am deeply concerned and troubled about the words that, I believe, that Dick Durbin has shared with us, that came from the president of the United States. I believe that the words spoken by any president of these United States are powerful words, and should be spoken with the spirit of unifying and not dividing our country. Should be spoken in a way that brings dignity to other human beings and does not demean them.

I am deeply concerned when we are just having celebrated the birth of Dr. Martin Luther King, who spoke about the effect of racism in this country, and words that are motivated by racism -- for so many reasons, they are harmful, they have led to death, at their mildest form, which is not mild, it suggests to one group of people that they are inferior and to another that they are superior to their fellow man.

This is a pivotal moment in the history of our country. When we are having discussions about whether the people of Norway, and I will use your words, Madam Secretary, and you spoke about how they were referred to as, by contrast to the people of Africa and the various country -- the 54 countries of Africa, and Haiti, and we speak of them, and you've spoke of them according to the President as, "The people of Norway, well, you know, they work very hard."

The inference being the people of the 54 states of Africa and Haiti do not. That is a fair inference. And you run the Department of Homeland Security, and when you say you don't know if Norway is predominantly white when asked by a member of the United States Senate, that causes me concern about your ability to understand the scope of your responsibilities and the impact of your words, much less the policies that you promulgate in that very important department.

You opened by talking about a number of statistics that paint the threats the country faces from terrorism, and particularly, you spoke of those who commit acts of terror who were not born in this country. The study you mention, however, leaves out some of the most rampant terror attacks that we've seen lately, which are domestic acts of terror.

As has been mentioned, there is a report from the FBI and DHS which outlines white supremist extremists, and I quote, the report says, "Will likely continue to pose a threat of lethal violence over the course of the next year." The report states that, "White supremist extremists are responsible for 49 homicides in 26 attacks from the year 2016, more than any other domestic extremist movement," I'm quoting.

It is deeply troubling that in your opening comments, when you talk about the threats to our nation, our homeland, to national security, that you failed to mention a report that outlined

a very specific threat to us as the American people. Deeply troubled.

You must understand the inference, the reasonable inference, that the American public is drawing from the words you speak, much less the words of the President of the United States.

Now, I'd like to move on and talk about your management of your agency. You and I spoke several times during your confirmation process, both at a personal meeting on November 2nd and in your November 8th confirmation hearing before the Homeland Security Committee.

In your confirmation hearing on November 8th, you stated you would issue guidance to your agents, stating that DACA recipients and DREAMers are not enforcement priorities.


HARRIS:

Have you done that?


NIELSEN:

They are not enforcement priorities, ma'am.


HARRIS:

Have you issued that statement and that to your agents, that guidance?


NIELSEN:

That is clear from the ICE...

(CROSSTALK)


HARRIS:

That's not my question.

NIELSEN:

I, personally, have not. No.

HARRIS:

You also committed that you would make clear to DHS employees that DACA recipients' information would not be shared for enforcement purposes. Have you done that?

NIELSEN:

I have verified that. It is not proactively shared. If it's a national security threat, that's a different matter. The DACA information is not proactively provided. I have verified that.

HARRIS:

That's not my question. Not, "Have you verified it?" That's clear to me. My question...

(CROSSTALK)

NIELSEN:

It's in policy. It's in existing, written documentation.

HARRIS:

My question, I will repeat, is based on a commitment you made to me, in another United States Senate hearing.

NIELSEN:

And I'm saying that "written" it already exists. So I didn't need to redo it. It already exists.

HARRIS:

That is not the point. Have you made that clear?

NIELSEN:

Yes, I have.


HARRIS:

Hundreds of thousands of employees in your department?


NIELSEN:

Yes. I have had multiple meetings where we have discussed this, and I have clarified, again and again. Yes, ma'am.


HARRIS:

Have you issued some kind of directive, written directive, to the hundreds of thousands of employees of your agency?


NIELSEN:

It already exists.


HARRIS:

So you've not done that? That's the short...


NIELSEN:

Why would I do it again? It already exists.


HARRIS:

OK. Let's talk about why you would do it again. Let's talk about the data that shows that there has been a -- an increase of, I think, threefold, of the number of people who are non-criminals, by ICE's own definition, who have been detained in your department.

How do you reconcile your point, which is that it's clear to the agents in your department, when the data supplied by your own agency does not reflect that?

NIELSEN:

The data that I have has 92 percent, last year, being criminals and those with final orders of removal.

HARRIS:

And so, where we have information that there has been an increase of the number of people -- nearly three times the number of individuals with no criminal history, as compared -- as compared to the same period last year, are you saying that's incorrect?

NIELSEN:

I'm saying I don't have the data that you're looking at. Is it final orders of removal, or is there another national security threat?

HARRIS:

No criminal history.

NIELSEN:

That's not what I asked. Is it a final order of removal?

HARRIS:

We're talking about the people that you are contacting. Are you prioritizing, equally, people with no criminal history, as you are those who you described earlier, as being criminals because they are felons?

NIELSEN:

We prioritize those with criminal convictions, as well as those with final orders of removal.



HARRIS:

So my question is, do they have equal priority in your agency?


NIELSEN:

They're both top-tier priority for enforcement.


HARRIS:

Do they have, then, equal priority?


NIELSEN:

Ma'am, we're going to enforce the law. If there's a final order of removal, we will seek to remove you.


HARRIS:

OK. What is your budget request for this year?


NIELSEN:

I -- I don't have the figure for -- for F.Y. '18.


HARRIS:

Do you believe that your department and agency is adequately funded, or that you are in need of resources?


NIELSEN:

I -- it depends on the particular area, but we have worked very closely with the administration to ensure that we do have the tools and resources we need to do our job.


HARRIS:

So I'm assuming that you have adequate resources, which is why you can apply equal priority to those who are felons and those who have no criminal records?

NIELSEN:

Ma'am, we will not ignore the law. If you have gone through the system and you have a final order of removal, you are a priority to be removed.

HARRIS:

This past Saturday, following a recent U.S. district court ruling, your agency resumed accepting DACA renewal applications. Will you commit to providing direct notice to all DACA recipients about their ability and right to renew?

NIELSEN:

We -- I will look into that. Yes, ma'am.

HARRIS:

You will recall that, when you...

NIELSEN:

It's, by the way, it's posted on the website and it's posted for anyone who is a current DACA recipient, that they can read it and understand how they can reapply.

HARRIS:

It is also posted on your website. Is it my understanding that we are no longer accepting initial or renewal requests for deferred action for childhood arrivals? Are you aware that that's on your website right now?

NIELSEN:

No, I am not.

HARRIS:

I would suggest that you get to that right away.


NIELSEN:

We will clarify.


HARRIS:

During your confirmation hearing, you also told me you would issue written guidance to frontline officers on DHS' Sensitive Locations policy. And in light of the case that you have now been asked about at this hearing, about the 10-year-old will with cerebral palsy surgery, can you tell me, have you don't that? Which is, issue guidance to your agents on Sensitive Location policies?


NIELSEN:

We've clarified the guidance, and we have had discussions with leadership on how to ensure that every person who enforces the law understands what the sensitive locations are. Those sensitive locations have not changed since 2012.


HARRIS:

And what guidance -- did you provide the guidance, that you're now referring to, in writing? To all the agents in your department?


NIELSEN:

It's in writing.


HARRIS:

Can you submit that to my office? And when did you issue that?

NIELSEN:

We can submit it. We can provide it to you, yes, ma'am.

HARRIS:

When did you issue that?

NIELSEN:

It's the same guidance that's been in existence since 2012. What we have done is clarify and reinforce the existing guidance.

HARRIS:

And you'll send me that -- that clarification?

NIELSEN:

Yes.

HARRIS:

And you mentioned, in your testimony today, that, in that case of Rosa Maria Hernandez, that your agents were being helpful in escorting that family, the 10-year-old who needed surgery...

NIELSEN:

To the hospital.

HARRIS:

... to the hospital. So I would suggest to you, it is not helpful for Border Patrol agents to follow an ambulance to a hospital and then arrest a 10-year-old after her surgery. And I

would ask you to review the efficacy of the conduct of your agents, and your perspective on what happened that day.

(CROSSTALK)

NIELSEN:

I am happy to provide you the actual facts of what happened.

I'd also just like to say, if I could, Chairman, if you don't mind...

GRASSLEY:

Yes?

NIELSEN:

It's not a fair inference, at all, to say that my comments about Norway were in contrast to any other country. What I was describing was the president's views upon meeting with the prime minister.

And what I was quoting was what he was told, in meeting with the Norwegian delegation. That's what he was repeating. That were words that they said that he repeated that, then, I repeated. It was not meant to be in contrast.

With respect to white supremacy, we take that very seriously. As I said, that we have expanded our prevention efforts of terrorism in the Department of Homeland Security, to ensure that we, in fact, are going after violence of any kind. Any kind is not appropriate, and I will not allow it to occur if it's within our authority to stop.

HARRIS:

Mr. Chairman, I would just ask that the record -- I'm sure, and we can all review it, will reflect that, in the opening statements, when discussing challenges to our homeland in terms of security, the white supremist threat was not mentioned.

Thank you. I have no further questions.

GRASSLEY:

Thank you.

Here's where we are now. We have Senator Coons, when he comes back, for 10 minutes. And then I've had requests from Durbin, Leahy, Whitehouse and Hirono for a second round. That would be five minutes apiece.

I'd like to ask some second-round questions, too, but I'm going to go to Senator Durbin first, while we're waiting for Coons. But I do -- you can see, I've been abandoned by everybody on my side. So -- so I -- I've got to get done by 2 o'clock.

DURBIN:

Thank you, Mr. Chairman.

(CROSSTALK)

GRASSLEY:

... everybody understand, cooperate in that respect.

Go ahead, Senator.

NIELSEN:

And, sir, if I could just ask, since it's been three hours, could we take just a five-minute break?

GRASSLEY:

Sure. Now is a...

NIELSEN:

I greatly appreciate it.

GRASSLEY:

... now's the time to do it.

NIELSEN:

OK. Thank you.

GRASSLEY:

Then that may mean that we go with Coons first.

FEINSTEIN:

Senator Durbin?

DURBIN:

Thank you very much.

Madam Secretary, I want to try to put into context a time table because here's what we face, as I understand it. Because of the California court decision, your agency is opening for those who previously were protected by DACA and whose protection or registration has come to an end an opportunity to reapply. Is that correct?

NIELSEN:

Yes.

DURBIN:

Need to turn your mike on.

NIELSEN:

Sorry. Yes, sir.

DURBIN:

OK. And we also know that come March 5th, the president said the program's over. So those who would have expiring DACA protection as of March 5th would not be able under the president's directive of September 5th to apply for new DACA status. Is that correct?

NIELSEN:

Yes, that's correct.

DURBIN:

And you have said and I -- I assume it -- it reflects the Administration that you do not believe that President Trump has the authority to extend the March 5th deadline.

NIELSEN:

Yes, sir.

DURBIN:

OK. We also have heard, two weeks ago, from your agency that any changes to DACA that we decide to go forward with will take several months, I think they said six months, to implement. Have you heard that?

NIELSEN:

I -- I have not.

DURBIN:

I think that's true. The point I'm getting to is this. This is a matter of urgency. I hope you agree.

NIELSEN:

I do.

DURBIN:

And this week, we think, is a critical week. Do you know what the position the administration is on the California decision? Are they going to accept it or are they going to appeal it?

NIELSEN:

I don't. Last I checked in with the Department of Justice they were considering their options. I -- I don't have an update.

DURBIN:

Should they choose to appeal it, it could end in a matter of hours, it is possible, because I believe it's injunctive relief that has led to this decision, and a higher court can decide differently on that. Do you understand that as well?

NIELSEN:

Yes, sir.

DURBIN:

OK. The point I want to get back to from Lindsey Graham. There are many things we can talk about, I'm going to, just in a minute or two, address one issue. We are talking about two phases. That's what the president said on Tuesday of last week. We believe, Senator Graham and I, and many others, there are lots of big issues involving immigration involving security. But we also believe there's a sense of urgency and immediacy to dealing with DACA and to doing it -- doing it in a fashion where the president's checklist of four items are included. That's why we've brought forward this bipartisan approach.

So, I just urge my colleagues on both sides of the aisle, join with us in bringing this matter forward this week. We -- we know. I think we know the parameters of what we are discussing and we should act with that sense of urgency.

One of the things on your must have list which you passed out on Tuesday, and have brought to us again today in a different form, relates to asylum protection. And you use the example of a child at the border being coached to use the words credible fear and that triggers a certain reaction. But I would like to call your attention to something that, I hope, can add another perspective.

It's an article entitled, "When Deportation is a Death Sentence". It was written by Sarah Stillman, published in the New Yorker. I want you to read it. I hope you'll read it. Because it talks about what happens when the agents who are involved in this don't ask the right question, don't hear the answer and send many women back to their death and they go through cataloguing where that occurred.

There is a requirement, as I understand it, in the CBP manual that before deportation a person must be asked, do you have any fear or concern about being returned to your home country or being removed from the United States? Would you be harmed if you return? And that the agent asking the question has no authority to evaluate the validity of that fear, instead if the answer is in the affirmative, they are referred to an asylum officer. Is that your understanding as well?

NIELSEN:
Yes, sir.

DURBIN:
OK. They are then told in the same manual, err on the side of caution, apply the criterion generously. Yet, it turns out, an ACLU report in 2014, now this is before your time, found that 55 percent of those who were stopped and questioned were not asked that critical

question. And that, of those who ended up saying, affirmatively, they were concerned, only 40 percent were protected and allowed to stay.

It's -- it's known, I'm thinking, and I hope you'll concede, asylum seekers are not entitled to lawyers. Children as young as 3-years of age have been asked to represent themselves. With a lawyer in the process, someone seeking asylum has five times the likelihood that they'll be allowed to stay in the United States. So when you get into the area of asylum and making this quicker, you also run the risk that you're sending people to their death.

I am not exaggerating because we know the Central American countries have, unfortunately, the highest murder rates in the world. And the gang activity down there that we fear coming to the United States is rampant down there. How would you balance that? How would you address those two concerns?

NIELSEN:
Well, I'd -- I would look at them separately. First of all, I do look forward to reading this article and certainly to see what we have done since 2014 to ensure that the manual and those questions are asked and are followed-up on appropriately. We have a duty to protect those who are in fear of their life. I stand very firmly on that. So I'm happy to work with you if there's anything else we could do or it's not clear, we need to do both of those.

DURBIN:
Thank you. I'll just conclude by saying refugee and asylum officers have a dual mission, according to one of their own who stated this. Identify people who aren't refugees and who just might harm us, but also to identify and protect real refugees. Would you agree with that?

NIELSEN:
Absolutely.

DURBIN:

Thank you. Thank you, Madam Chair.

FEINSTEIN:

Thank you. Senator Coons is next, for 10 minutes.

COONS:

Thank you, Madam Chair.

Thank you, Madam Secretary. Thank you for your service and thank you for your answers to so many questions today. I want to cover some ground that's already been touched on and, in a few places, open some new questions, if I might.

Like so many of us, I've had the opportunity to meet with DREAMers, both in my home State of Delaware where quite a few are attending Delaware State University, but also in the hallway here, both before and during this hearing. Did I hear correctly, you have yet to meet with any DREAMers?

NIELSEN:

We've met with many of the associations. We've met with many members of Congress. But I personally have not, to my knowledge, met with a DREAMer. No, sir.

COONS:

I just find it a compelling circumstance, an opportunity to hear from them about how they came to this country, what their concerns are, and what sort of pressures they're under as we wait to find a bipartisan path towards resolving this situation. And I won't go through it in detail. We've heard from Senators Graham and Durbin today, I think, a compelling summary of how they've reached a responsible compromise where each side has given, and where we should be ready to move forward on a bipartisan compromise to address DACA. I think it's urgent we do so.

We on this committee have heard from a bipartisan group of former secretaries of Homeland Security that we cannot wait until March to fix DACA. They say, quote, "The realistic deadline for successfully establishing a DREAMer program in time to prevent large-scale loss of work authorization is actually mid-January." Do you agree with Secretaries Chertoff, Napolitano, and Johnson, that implementing a successful program by the White House's self-imposed March 5th deadline, requires at least 45 days of lead time?

NIELSEN:

What I would hope is that I -- we could work with Congress to address that. As long as we are finding a permanent solution for that population, it would seem to me, through law we can adjust any timelines we need to, to ensure that they can continue to work.

COONS:

So the administration would be open to delaying further its self-imposed March 5th deadline?

NIELSEN:

Well, if we are finding a permanent solution, in part of that, we can adjust the timelines. But, no, as I had testified earlier, the administration itself is not looking to extend the March 5th deadline upon a determination it's unconstitutional.

COONS:

Well, I think there remains real urgency. And the reason for meeting with DREAMers and hearing from them is to get a clearer sense of how it's impacting their lives.

NIELSEN:

And, sir, if I could -- I -- I cannot stress how strong I feel about finding a permanent solution for this population. So I'm happy to work with you and anyone in days and minutes that

follow this hearing, to do just that. So I -- I do feel the urgency. I think we owe it to them and we owe it to the American people and our ideals to find a solution.

COONS:

Thank you, Madam Secretary. As for the travel ban, we're now on the third version of President Trump's travel ban which blocks individuals from certain countries, primarily Muslim-majority countries from entering the United States. And I have joined more than 100 of my colleagues in the House and the Senate in filing a series of amicus briefs or amici briefs, that have challenged these different travel bans. Do you agree that citizenship is an unlikely indicator of terrorism threat, as a draft DHS report recently concluded?

NIELSEN:

I -- if you're talking about the Section 11 Report, what we found, unfortunately, is that 73 percent of those convicted of international terrorism-related charges were foreign-born. So, in that case, that is an indicator.

COONS:

Foreign-born, yet, what has been at issue in a number of these challenges is the correlation between foreign-born and the specific nations that have been identified for the development of this travel ban. I'll just remind you that we -- we continue, those of us who have challenged it in court, to see a lack of clear correlation between risk to the United States and the nations that are identified.

Let me move on, if I could, to the incidents in Charlottesville. A May 2017 joint intelligence bulletin from DHS and the FBI concluded that, quote, "White Supremacist Extremism Poses a Persistent Threat of Lethal Violence" close quote. Do you know whether DHS issued a warning to state and local law enforcement authorities before the deadly attack in Charlottesville? That the Unite the Right rally could -- could turn violent and, from this assessment, was expected to likely become violent?

NIELSEN:

I am not aware. No, sir.

COONS:

So my concern here is that there were reports several days before the event, where DHS was clear that an escalating series of clashes had created a potential powder keg. And a failure to notify state and local law enforcement may have prevented them from being fully prepared to confront this latest episode of white supremacist extremism. Have you personally briefed the President on the threat of violent white supremacist movements within the United States?

NIELSEN:

What we've talked about, generally, is terrorism and violence in all its forms. As a part of that, yes, we have briefed at a high level the instances that we know. The FBI -- as you know -- and the Department of Justice is also very involved in that topic.

COONS:

And is it your sense that the President places a sufficiently high priority on being prepared for and responding to white supremacist violence, among the various threats to security within the United States?

NIELSEN:

I believe that he has been clear that he abhors violence in any -- any form that it might take. I think at DHS, we need to continue to do more, not only to ensure that the state and local officials have the information they need, but to be able to provide the warning signs, the what are we looking for, how do we know as this starts to occur within a community, what more can we do, and we're looking at that now.

COONS:

Well, thank you.


COONS:

As a member of the committee and the co-chair of the law enforcement caucus, I welcome opportunities to hear from you about how you think -- understand and respond to unacceptable incidents of violence that are rooted in white supremist thinking.

I also think it's important that all elected leaders send messages that make it clear how unacceptable these practices and attitudes are within the United States, rather than winking at them or inflaming them.

I'm a member of the Senator Foreign Relations Committee as well as this committee, which just released a minority report on Vladimir Putin's assault on our democracy. And in particular, actions outside the United States; actions around the world to interfere with elections among our vital Western allies and its implications for U.S. National Security.

The report notes that Russian intelligence actually circulated a fake U.S. Department of Homeland Security assessment that the 2016 U.S. election was not a victim of cyberattacks. What's the president's strategy, what's the department's strategy, for countering the Kremlin's disinformation operations like this one, which can be significantly misleading to Americans who are trying to better understand what happened and what may happen?


NIELSEN:

It's a very serious issue, first of all, so let's underscore that. Anything that in any way interferes with the integrity of our election system should be taken very, very seriously. The State Department, as you know, as part of a strategy to address a whole variety of issues both positive and negative with our relationship with Russia, continues to look at this issue.

As you know, it's a balance. We have to find the ways to target our reaction that will have the effect of having them reduce their specific actions. So we have to find the way in which best to do that. But it will continue to be a priority in terms of conversations and certainly, from a

DHS perspective, we're looking at a variety of ways to do that just in our general conversations with the private sector; how can they ensure that the information they're providing is, in fact, accurate? Whether it be about elections or something else.

COONS:

The report actually recommends that the president establish an interagency fusion cell modeled on the National Counterterrorism Center to coordinate the United States' response to Russia's influence operations. Is that something you'd endorse?

NIELSEN:

Not familiar with it, but I'd certainly be happy to look at it. It will take all of government to be able to fight this, so.

COONS:

It will. And I must say, in response to questioning by a previous senator, I heard you say that you agree that Russia interfered in our 2016 presidential election. You agree that that is the unanimous conclusion of our intelligence community and that given that, they're likely to interfere with our next elections in 2018. Did I hear that correctly?

NIELSEN:

They certainly will try.

COONS:

And, Madam Secretary, I'm very encouraged to hear you say that so clearly, because bluntly, for us to be prepared and for us to work together and for us to defend our democracy requires clarity about what happened. Can you offer any understanding for me about whether it undermines your leadership in this role to have a president who repeatedly changes the subject, suggests this didn't happen...

(CROSSTALK)

BLUMENTHAL:

...suggests it somehow is Democrats complaining about the outcome of the election...

(CROSSTALK)

BLUMENTHAL:

... or suggests that it's a misleading witch hunt...

(CROSSTALK)

COONS:

... for us to continue to try and understand what happened in 2016 and to prepare to defend our own democracy from a likely repeated attempt by Russia or other adversaries in 2018?

NIELSEN:

I do think that clarity is important and I do think that we all need to work together to be very clear what specifically happened and how to prevent it in the future.

COONS:

Is it at all puzzling to you that the president hasn't been in the lead in defending our democracy from these attacks?

NIELSEN:

I'm not sure I would agree with the characterization, but I do think we need to do more and that's certainly my intent and the Department of Homeland Security's perspective.

COONS:

Last question. This month, President Trump disbanded the Commission on Election Integrity, citing the opposition of many states and ongoing legal challenges. And he

subsequently tweeted that he asked the Department of Homeland Security to review these issues and determine next courses of action.

What prior experience does the Department of Homeland Security have in investigating allegations of voter fraud?

NIELSEN:

So, voter fraud, as I mentioned earlier, is a large topic. The part that DHS plays, we're looking at the integrity of the cyber systems. We'll continue to work with state localities on that. We also do have a program where states come to us with concern about illegal immigrants voting in a federal election. It's purely voluntary, if they ask us to look to see if some of their voters have the right to vote, we do that in a system that we currently have.

So those would be the type of roles. Other than that, we're just working with state and locals to ensure if there's anything they need with respect to their infrastructure or systems, working with the secretaries of state, that we can provide that.

GRASSLEY:

Senator Leahy?

COONS:

Thank you. Madam Secretary, I'm convinced that we face a genuine threat to our next election and I think it's important that our president speak clearly about this and I'm grateful for the opportunity to work with you to try and both resolve our pressing challenges in immigration and in finding a reasonable compromise on immigration law to protect DREAMers. But also, more importantly, to protect our democracy, itself, in the next election. I think both are important issues for our nation going forward.

Thank you for your testimony.

GRASSLEY:

Senator Leahy?

LEAHY:

I was watching on the questions and answers, and I was thinking several months ago the DHS inspector general completed a report on the implementation of President Trump's travel ban. Inspector general asked for it to be released, but it's still being kept secret. Why haven't you released this report?

NIELSEN:

Sir, as I understand it, that's part of ongoing discussions with the I.G. There is no issue with respect to issuing the report. What's at issue...

LEAHY:

Doesn't the American public have a right to know?

NIELSEN:

Absolutely. But some of the information in it is protected by privilege. And we also want to be sure that employees at the Department of Homeland Security have the ability to talk to each other and in a pre-deliberative (ph) way.

LEAHY:

Did the report acknowledge that certain DHS officials acted in violation of federal court orders by preventing some people from boarding flights to the United States?

NIELSEN:

It does draw a conclusion that is similar to what you're characterizing, but unfortunately that particular conclusion is mistaken. We were looking at a population whose visas had been revoked from. So from a DHS perspective, we cannot allow entrance if a visa is revoked.

LEAHY:

So no DSA -- or no DHS, rather, officials acted in violation of the federal court order by preventing people from boarding flights to the U.S.? That did not happen?

NIELSEN:

No, sir. We complied in a timely manner. We also complied with the court orders.

LEAHY:

So the inspector general is wrong when he -- if he says that there is a violation of federal court orders by preventing passengers who boarded flights to the U.S.?

NIELSEN:

Unfortunately, there is two parts of the coin here. By law we have to follow executive orders. By law we have to follow court orders. We cannot take a court order and decide not to comply with any part of the executive order, whether or not...

LEAHY:

Let's just take the court order. Did certain DHS officials...

NIELSEN:

We complied with all court orders.

LEAHY:

You do, OK.

Now the report you released this morning, there has been a lot of press on it, but it doesn't answer a lot of questions. The 402 foreign-born individuals convicted of terrorism, was that terrorism exclusively in the United States? Or was it terrorist acts abroad? Or were they arrested abroad and brought to the U.S. for trial?

NIELSEN:

It includes all of that, I believe, sir, and it is detailed in the report.

They had to be annexus (ph) to the United States, so (inaudible) ...

LEAHY:

Well, the report -- the report says exactly which countries they had come from?

NIELSEN:

I don't believe it says which countries, no, sir. But it does talk about what that population of convictions (inaudible) ...

LEAHY:

But you're going to get me the list of how many ...

NIELSEN:

The breakdown.

LEAHY:

... were here in the United States for years, how many came from abroad, how many were -- committed acts elsewhere? I know you have to go back through -- most of them were prosecuted by either the Bush Administration or the Obama Administration. But I'd like to know how it's broken down.

NIELSEN:

Yes, sir.

LEAHY:

Now, earlier this month, CBP issued a derivative -- a directive on searching electronic devices at the border, including at airports.

It says they have the right to thumb through travelers' phones and other electronics, without any basis for suspicion. They can demand a pass code to unlock it. And they can keep the device if they don't get this pass code, without any probable cause, without any basis or suspicion.

So I want to make sure I understand this. I live an hour's drive from the Canadian border. If I go to Canada and visit some of my wife's relatives, and I come back, you can -- and I drive up in my Vermont license plate car, and it's easy to remember it; it has license plate "1".

I pop in (ph) and they say we want your -- your laptop and your phone and your pass code. And I say, well, do you have any reason? They say, we don't need one, is that correct? They can do that?


NIELSEN:
There ...


LEAHY:
I -- I understand they might not with me, but they can do that, is that correct?


NIELSEN:
They can search the data that is apparent on the phone. They can't use the phone to access anything that might be stored remotely.


LEAHY:
Well, they can demand the resident unlock their phone or laptop, then search through its contents.


NIELSEN:

Through the content on the phone.

LEAHY:

And the contents might be on the Cloud, which is remote.

NIELSEN:

No, they -- actually, sir, if I could, they will actually ask the person, in the 100th of 1 percent cases in which this occur, they will ask the person to disconnect the phone from the network. In unusual circumstances, if the person is not able to do that, the CBP official will. But it actually prevents pulling down any data from the Cloud.

LEAHY:

They can -- they can require their pass code and all, without any probable cause, if they want, according to the directive they have. Is that correct?

NIELSEN:

Yes.

LEAHY:

Boy, ...

NIELSEN:

Probable cause, though is -- let's just be clear ...

LEAHY:

(Inaudible) (CROSSTALK) ...

NIELSEN:

... it has to be a -- there has to be a reason. There has to be a reasonable suspicion ...

LEAHY:

Welcome to America.


NIELSEN:

... probable cause, then allows them to of course look into other things. But, again, we're talking about 1 100th of 1 percent.


LEAHY:

I don't care what it is, welcome to America. Incidentally, and I will be asking this question when you come before the Appropriations Committee, I've been trying to get answers from DHS about the hiring and retention issues at the Law Enforcement Support Center in Williston, Vermont. Please have your staff give us some understanding of that. I want to know -- I realize I'm going slightly over my time here. I want to know where the Federal dollars that we have voted for, and being assigned where they're going, because we can't seem to find out.

And as your budget comes before my -- the committee where I'm Vice Chairman, I'm going to want to know the answers to that. And I want to know how quickly DHS and CBP will work with the Canadian government on preclearance.


NIELSEN:

On the Williston, Vermont issue, I'd be happy to provide that. I'm actually going to Canada on Thursday, as my first international trip. We'll be talking about a variety of issues, but of course including preclearance.

So, I'm happy to get back to you after that meeting and let you know what the path forward is.


LEAHY:

OK, well please -- please let me know. But on the Williston one, we have been trying, and trying, and trying to get an answer. Frankly, I've been trying to be very helpful, but I don't want to vote more money unless we know what to expect.

NIELSEN:
We will follow up, sir.

LEAHY:
Thank you.

NIELSEN:
Absolutely.

GRASSLEY:
Senator -- you weren't on the list, but if you want a second round, you're next up.

BLUMENTHAL:
Thank you, Mr. Chairman.

Thank you, again, Madam Secretary.

I want to emphasize how important the Special Counsel investigation of Russian meddling and collusion and possible obstruction of justice is. And I welcome your constructive and positive attitude toward that investigation.

I hope you'll talk to the president and ask him to agree with you that it isn't a witch hunt, it isn't a hoax. It has to be supported. Political interference, as you put it, on any side, is abhorrent.

On the question that we all want to move on from, which is that meeting on Thursday, I heard Senator Graham make reference to a tape. He, I believe, said that on the issue of

whether or not the president used the word "love", we'll have to check the tape. Are you …

NIELSEN:

Oh, I'm sorry, the -- yes, sorry, now I know what you are referencing. That was the Tuesday meeting he was referencing the one that was publicly aired. So I think he was saying to go back to the tape, because that was on the -- that was on the news.

BLUMENTHAL:

You're not aware of any tape of the Thursday meeting?

NIELSEN:

I am not. No, sir.

BLUMENTHAL:

Have you spoken to others about that meeting who might recall what words were used?

NIELSEN:

I actually have not. I haven't spoken to Senators Cotton or Purdue or Leader McCarthy, others who were there. I have not.

BLUMENTHAL:

How about anyone in the White House?

NIELSEN:

No.

BLUMENTHAL:

Have you discussed that meeting?

NIELSEN:
No, sir.

BLUMENTHAL:
Let me talk about the compromise that Senators Durbin and Graham have helped to lead. You mentioned that you had not seen anything before that meeting reduced to writing. You're aware that there is a summary now in writing?

NIELSEN:
I do not have -- I personally do not have it. I would love to have it.

BLUMENTHAL:
I have a copy of it.

NIELSEN:
OK.

BLUMENTHAL:
I don't believe that it is classified. But you have security clearance and I think, you would agree, it is the only bipartisan deal in town right now, correct?

NIELSEN:
There is a bill that I understand was introduced in the House. It has not been voted on, as you know. But there is a Goodlatte, McCaw bill as well.

BLUMENTHAL:
That's not bipartisan.

NIELSEN:

I -- I -- like I said, it hasn't been voted on, so I ...

BLUMENTHAL:

Well, it has no bipartisan sponsorship, correct?

NIELSEN:

Understood.

BLUMENTHAL:

So, if we're going to reach a deal by the end of the week, we ought to be working with this deal, correct?

NIELSEN:

And my staff continues to do that, yes.

BLUMENTHAL:

And no one is going to get everything they want at this stage, correct?

NIELSEN:

Correct.

BLUMENTHAL:

Let me move on to, again, Puerto Rico, and ask you; in past crises there have been agreements between FEMA and the Department of Housing and Urban Development.

You made reference to HUD earlier in terms of HUD carrying out FEMA's Individual Assistance Program. Why have FEMA and HUD not reached such agreement?

NIELSEN:

With respect to housing?


BLUMENTHAL:

Correct.


NIELSEN:

Yes. So, we were -- a couple -- a couple reasons. One, we have some requests, as you know, that might come through the supplemental, or when the budget gets passed. So some of it is money that HUD needs to be able to implement its program. But, generally speaking, the roles and -- and the rules between the departments are very clear.

They're in the national disaster recovery framework and they're spelled out there in terms of the transitional period between response moving through to recovery.


BLUMENTHAL:

But they have to enter into an interagency agreement. It's customary for your agency and HUD to do so. We're more than three months after the hurricane and there is no such agreement here. I hope that you will reach this agreement because so far, only 350,000 of the one million applications for assistance in individual disaster relief have been approved by FEMA and HUD could be a really partner, correct?


NIELSEN:

Happy to look into that.


BLUMENTHAL:

Would you agree with me that the relief package is essential in meeting Puerto Rico's needs? The House has allocated, I believe, $81 billion, but none of it targeted to Puerto Rico. Would you agree that money has to be specifically allocated to Puerto Rico?

NIELSEN:

The governor continues to be clear what he believes he needs for his state to recover. I don't have those figures in front of me but yes.

BLUMENTHAL:

Well, he has said he needs $94 billion in my visits. He has a lot of evidence in support for it. Let me just finish by asking you -- it's a simple question -- can you commit that the policies on sensitive locations, that there will be no enforcement operations at churches, hospitals, schools, courts will be rigorously followed by both CBP and ICE?

NIELSEN:

Yes, sir with one exception. In the courthouse, not all of the courthouse is considered sensitive location. Part of the courthouse is a controlled area. We will not target victims in that area. But it is controlled. It is much safer for my officers to pick up a criminal in that environment.

But with respect to the 2012 list that continues to exist today, yes, you have my commitment, we will not enforce in those locations.

BLUMENTHAL:

And would you respond to my letters regarding...

NIELSEN:

Yes.

BLUMENTHAL:

...those failure (inaudible).

NIELSEN:

Yes, sir. Yes, sir.

BLUMENTHAL:
Thank you.

GRASSLEY:
Senator Hirono.

HIRONO:
Thank you.

Madam Secretary, how would it be possible for someone who entered this country through the visa lottery program and who was a legal permanent resident, but had not yet gotten his U.S. citizenship to be responsible for sponsoring 23 other people for visas in the space of seven years?

NIELSEN:
As an LPR, you have the ability to sponsor.

HIRONO:
Is it possible to sponsor 23 others in a span of seven years? Let me put this into context. Because President Trump has been very vocal about the diversity lottery program as well as the chain migration and he cited numerous times at the meeting that I was at in the White House on Thursday about a horrible terror attack, which happened on the West Side Highway in New York City.

And several times, he mentioned that the attacker who was admitted through the diversity visa program was responsible for 23 other immigrants entering the U.S. So I would like to get the factual basis for the president's assertion that this person has managed to bring in 23 other people into the country.

Because this is what the president repeated many times. Can you -- do have that information or can you get that information?

NIELSEN:

I don't have it in front of me. I'm happy to provide it. As you know, there's no ceiling on the number of people -- to my knowledge, there's no ceiling on the number of people that you can sponsor. But happy to provide you the information requested.

HIRONO:

There seems to be this -- this misconception about so-called chain migration that, somehow, someone can bring in an entire family tree, which includes just about anybody you can think of. And that is not how migration works. Because you have different groupings of family members that can come in under that kind of system.

So I would really like to get the factual basis for what the president was asserting as -- as to this particular immigrant who came to this country. Somehow, I don't think that there is a factual basis. So turning to unaccompanied minors, who are apprehended at the border and who are released to HHS, you stated that -- and they do have to show up for their deportation hearings.

You said that 90 percent of them do not show up?

NIELSEN:

Yes, ma'am. And not just to deportation hearings per se, but just to their initial hearing...

HIRONO:

Any kind of hearings? (ph)

NIELSEN:

...before they -- yes.

HIRONO:

So the -- the statistics from the Executive Office of Immigration Review shows that the vast majority of children do show up and almost every child who has legal representation does show up. So I cosponsored a bill introduced by Senator Reed last Congress, and am introducing it again this Congress, that would require the government to appoint counsel to unaccompanied children coming across our border.

And we know that there are children as young as three and four and I -- I have been to immigration court where there these young children. It is very true that if they are accompanied by a lawyer, that they are more likely to succeed in their request for asylum or whatever, the -- they refugee status.

So if you would -- if you would like to see all the children return for the hearings, don't you agree that providing counsel is a good way to that -- to do that?

NIELSEN:

We have a duty to protect the children that come here, ma'am. So I'm happy to work with you and look at the proposal.

HIRONO:

I think one of the ways is to ensure that they be provided counsel, because you can hardly expect four, five, six year old children to be able to represent themselves in these proceedings. I want to turn to the priorities -- the deportation priorities that you have.

And you indicated that those who have final orders of -- for removal, even those people who have not been convicted of any criminal -- no criminal convictions, that they may have a final orders of removal. And many of them -- a number of them have received waivers from your department, waivers against deportation.

So, you know, nobody's arguing that we should not be deporting people with criminal convictions but do you consider that anyone who has a deportation order, regardless of what

the basis for that order was and where waivers have been granted in the past should not be looked at and provided waivers?

Because we know of examples of -- in Hawaii, there was a coffee farmer who had married an American citizen, who had American children, who was deported. And he had received a number of waivers. So is it not within the authority of your department to grant these waivers?

NIELSEN:
Ma'am, we look at each case on a case-by-case basis. What I was trying to assert before and I'll reassert now is we can't ignore the law. So if they've gone through all of the courts, they've exhausted all possible appeals and they have a final order removal, we will remove...

HIRONO:
There are a number of people with final orders of removal who have had waivers of their deportation. Is it not within the authority of your department to grant these waivers?

NIELSEN:
We look at them case-by-case.

HIRONO:
Yes or no. Do you have the -- you have the authority to grant the waivers?

NIELSEN:
In some cases, yes.

HIRONO:
Yes, you do. Thank you.

GRASSLEY:

Senator Booker, before you talk, we've got -- I -- I said I had to quit around 2:00. Maybe it's more like 2:10. So I've got you and Harris. Senator Coons, do you want five minutes? That's 15, so I hope that we can -- that nobody else comes in here, because I'd like to get my questions in.

Go ahead, Senator Booker.

BOOKER:
After I speak, I can Katie (ph) bar the door if you'd like me too, sir.

GRASSLEY:
Go ahead, OK thank you. I'll -- I'll trust you.

BOOKER:
Thank you sir. Well, just real quick, the -- I, like you, agree that dangerous criminals, we should get them out of our country, but when you say that bucket of criminals, you're talking about people that could be low level crimes from a decade ago. That still counts as a criminal, correct?

NIELSEN:
The ones that we target are criminal offenses, in other words, there are some civil offenses that would not fall within our top tier prioritization.

BOOKER:
But -- but it's a felony for marijuana possession, say, that somebody might have done 10, 15 years ago. That's a -- that's a criminal in your definition.

NIELSEN:
Yes sir, yes sir.

BOOKER:

And that person would be prioritized for deportation?

NIELSEN:

One of however many we agree on are here illegally, 11 million, yes.

BOOKER:

OK, you said earlier, and this might be a question for the record, because I know you weren't in your position at this time, but you said earlier that the customs border patrol follows court orders, correct?

NIELSEN:

Yes, sir.

BOOKER:

And so I had a personal experience with this last year when I went to Dulles Airport during the first iteration of the Muslim ban, there was a -- there was a temporary injunction from a federal judge, requiring the customs and border patrol to provide individuals effected by the executive order access to counsel.

I was called to go up there because they were refusing to abide by that and provide counsel for those individuals. This was a question for the record, would you please explain to me -- I was there myself, they refused to even talk to me or discuss it as I was holding the court order to let the people being detained.

Could you please, for the record -- I have yet to get an understanding of why customs and border patrol was refusing to abide by a court order.

NIELSEN:

I'd be happy to look into that.

BOOKER:

Thank you very much. On December 1st, 2017, Department of Homeland Security's office of Inspector General released a detail of report detailing the results of on and out spot inspections of six ICE detention facilities.

I'm sure this is a yes question, but you believe in the dignity of all human beings, correct?

NIELSEN:

Absolutely.

BOOKER:

And that they should be treated with a certain level that respects that dignity and affirms your humanity. Well, the Inspector General's report raised serious questions regarding the treatment and the care of ICE detainees.

The report stated, and I quote, we identified problems that undermine the protection of detainee's rights, their humane treatment and the provision of a safe and healthy environment. In light of this administration's highly aggressive posture towards the immigrant community, and putting people into these facilities, it's very troubling to me that your own Inspector General would have a report detailing the United States of America treating others in an inhumane manor that's an assault to their dignity.

And so can you affirm to me that you're aware of this report?

NIELSEN:

I am aware of this report, yes sir.

BOOKER:

And then what actions are you taking right now to address the concerns?

NIELSEN:

First of all, looking into both the recommendations and the facts provided, as you might know, the Homeland Security Advisory Counsel did its own review independently for the department just a year ago, over a year ago I guess at this point, on detention centers.

I'd like to look at the recommendations from both to address any issues that remain, and certainly any concerns of inhumane treatment.

BOOKER:

OK, and so you're saying that you're going to try and implement the recommendations of the report, can you give me some kind of timeline or show us (ph) and -

NIELSEN:

I'm happy to come and brief you myself, sir. I have not had an opportunity to understand the depth of any changes that might be necessary, or whether the facts -- I just need more information, as you said it just came out in December.

So I'd be happy to do that.

BOOKER:

I'm really grateful, and I will take you up on that offer. On September 11th, right after the attacks, the federal government created a -- I know you -- the NSEER System, the National Security Entry and Exit Registration System.

The program requires non-citizen Visa holders from certain countries to register with the federal government. The registration process included finger printing, photo -- photo taking, interrogations. Once an individual was registered, NSEERS required the person to regularly check in with immigration officials.

And finally, NSEERS monitors people who registered with the program to ensure that no one remained in the country longer than the law permitted them. Notably, the only people

who had to register for the list were from Muslim countries with the exception of North
Korea.

And so, I'm wondering, do you believe that it is legal in keeping with the values of our
country and trying in our (ph) constitution to force people from Muslim nations to register
their presence in the United States?

NIELSEN:

Based on the fact that they're Muslim, absolutely not.

BOOKER:

And I've introduced legislation trying to prevent that kind of registry from being created
through NSEERS, is that something that you'd be willing to commit to making sure that does
not happen in terms of creating something akin to a Muslin registry?

NIELSEN:

Yes.

BOOKER:

Thank you.

HARRIS:

Thank you.

I think you would agree that all federal agencies, in fact all government agencies, have
limited resources to perform their duties and responsibilities, and have to make priorities
therefore about where they will use the limited resources and prioritize based on whatever
they perceive to be their mission.

Your testimony before the Homeland Security Committee, which I am a member, on
November 8th, you -- I asked you if you agreed with what your predecessor Secretary Kelly

at the time, said which is that in terms of enforcement priorities, there has to be something else, we're operating more or less at the other end of the spectrum in terms of the range of offenses for which you can detain, and he said and we're operating more or less at the other end of the spectrum, and that is criminals, multiple convictions, he said.

I asked you that, and I quoted that, you said yes I agree, we should prioritize criminals and any others that we are concerned may present a national security concern. I asked you whether the definition of criminals would include people who have violated the law in terms of the violation of the penal code.

And I asked you to urge -- I urged you to consider those as the definition of a criminal. You said, quote, yes, so the criminal -- the criminally -- criminality that I would be talking about, with respect to enforcement priority, is above and beyond the original illegal entry.

The Washington Post reported in September of this past year, a three fold increase in arrests of non criminals by your agency. You also, in addition, apparently have changed the way that you report data in your department, and in the past, ICE would provide data broken down by individuals who committed the most serious offenses.

And, however, this year, you're report has lumped all criminal offenses and convictions together so you have combined serious crimes with traffic offenses. I would urge you to recall and review your testimony before a Senate Committee only a couple of months ago, where you at that point, in seeking confirmation of this United States Senate, indicated that you saw a difference between criminal offenses, felonies, and those who have entered the country illegally.

For example, I would ask you to consider the case U.C. Berkeley student Luis Mora, who remains in DHS custody, I believe as of today, but was apprehended on January 4th. He came to this country as a child, he is a political science major, he volunteers at his church, he was the winner of the San Diego Union-Tribune's Young Latino Champion Award, and today's the first day of instruction at U.C. Berkeley for their Spring semester, and instead of being in class he is in ICE custody, at the Otay Mesa Detention Center.

Madam secretary, I would ask you to consider the previous comments you have made to a committee about your priorities regarding enforcement. Take a look at this case and determine whether he in fact fits what you have indicated before in your priorities. Because if you stand by your previous testimony, he does not.

NIELSEN:

I stand by my testimony. I am happy to look into the facts. I can't -- not prepared to testify to them today because I'm not aware of them.

HARRIS:

I appreciate if you'll look into the facts. Thank you for that.

During a January 4th, 2018 interview on Fox news ICE agency Acting Director Homan said he asked the Justice Department to, quote, "Look into criminal charges for elected officials with sanctuary policies, as they are harboring illegal aliens, according to 8-USC 1324." This comment was specifically about California elected officials after the enactment of the California Values Act. My question is whether DHS is currently working with the Justice Department to bring section 8-USC 1324 charges or any criminal charges against state or local officials.

NIELSEN:

I believe the request was made. The Department of Justice is reviewing what avenues might be available. The context of this is of course not only putting my ICE officers at risk but also finding an efficient and effective way to enforce our immigration laws.

HARRIS:

So, you are aware of cases in which this code will be used to criminally charge elected officials?

NIELSEN:

I am not aware of any cases, no ma'am. I believe it was just a request to look into it.

HARRIS:

And was that a request to from your department?

NIELSEN:

Yes.

HARRIS:

At your confirmation hearing, you committed that you would report to Congress within three months about what you have done to address the OIG's November 3rd report which is entitled, Major Management and Performance Challenges Facing the Department of Homeland Security. Are you prepared to keep that commitment which would be March 5?

NIELSEN:

Yes, ma'am

HARRIS:

Last week, the White House disbanded the controversial Election Integrity Commission because -- without finding widespread evidence of voter fraud. Following it's disbanding Chris Kovach said claimed he would "be working closely with DHS and the White House on this issue." And my question -- my final question Mr. Chairman -- could you please specify, does Mr. Kovach have an advisory role or any role at DHS on this matter or any other matter?

NIELSEN:

He does not have an advisory role. He is as you know a secretary of state. We're working with all of the secretaries of state to ensure the integrity of our systems but, no, he does not have any advisory, informal or formal role.

HARRIS:

Thank you.

GRASSLEY:

Senator Coons?

COONS:

Thank you, Chairman Grassley.

Thank you, Madam Secretary, for a chance to continue questioning you on some of the issues I've raised previously and a few additional.

First, about conditions of detention. On September 26 last year the ACLU filed a complaint asking DHS to investigate 10 cases of pregnant women who were held for weeks at detention facilities in California and Texas despite a memo signed by Acting Director Homan last year barring the practice "absent extraordinary circumstances or the requirement of mandatory detention." I also raised this in person with then Acting Director Homan.

The complaint by ACLU alleges at least two of these women miscarried while in ICE detention centers because of insufficient healthcare support during detention. How many pregnant women are currently in ICE detention centers and what has DHS done to ensure they get the healthcare they need?

NIELSEN:

Sir, I can't give you the number, but the guidance that you referenced by Acting Director Homan goes into quite some detail about the provisions and support that ICE detention centers would provide. Many of the instances I believe that have been in the press are actually in our sister agency related to HHS. So, we're working with HHS as well to ensure that the policies are aligned.

COONS:

Thank you. The administration sought in this year's budget proposal, F.Y. '18 that we're now well into, to cut funding for the Port Security Grant Program by half from $100 million to $50 million. And I understand there's a proposal being discussed to cut it even further to 36 million. Needless to say, this program's important to a number of ports on the Delaware River.

My home state is Delaware. Why do you think it's prudent to significantly reduce investments in port security?

NIELSEN:

What I believe, sir, is that we -- what we did, what the administration did, was look at all of the grant programs across the board from a risk basis. There are other risks that we need to address so it's more of an allocation issue. It's not to say there isn't a risk at the ports. As you know, the Coast Guard continues to be very involved, as do other parts of DHS and the government that help with the security of the ports.

COONS:

In April, Senator Rubio and I introduced the Counterterrorism and Screening Assistance Act. And there is a companion in the House. It would strengthen the ability of our allies and partners around the world to track terrorist and foreign fighter travel, in particular. It directs DHS to provide appropriate versions of custom and border protections, global travel, targeting and analysis systems, software, and other systems to foreign partner governments.

And it also authorizes DHS to provide excess nonlethal equipment, supplies, training to foreign governments to further U.S. Homeland Security interests. Does DHS support these goals? And, in your understanding, would it support the passage of this bill?

NIELSEN:

To prevent foreign fighters from coming to the United States, absolutely. Yes, sir. We'd look forward to working with you on it.

COONS:

We appreciate your engagement on that. About four months ago, Hurricane Maria slammed into the island of Puerto Rico and both the U.S. Virgin Island. And Puerto Rico particularly, and to some extent, Florida, suffered significant damage, but it was catastrophic for Puerto Rico. What's your sense today, four months later, of roughly what percentage the Island has power and water?

NIELSEN:

Well, the power, as you know, goes up and down. We're around 60 percent to 70 percent water. The story with water's a little better. But there's a lot more that we need to do, sir. It's going to be a road of recovery, we need to continue to work with them.

COONS:

And what's your sense of the official death toll in Puerto Rico as a result of Hurricane Maria?

NIELSEN:

So, I know they're looking at that. As you know, it's a state and local determination to determine causation. We've been in close contact with the governor as he does his review and assessment. It's an important figure for us all to understand.

COONS:

Do you believe your department's response to Hurricane Maria could have been better?

NIELSEN:

I believe that we learn lessons as we go. It was an unprecedented response, is what I can tell you, both from a prepositioning to an immediate response to the men and women who are

there on the ground now. We had one of the largest surge forces that we've ever had, meaning we had people coming from all parts of government to join with FEMA. But I'm very anxious to learn the lessons learned and just see how we can do better in the future.

COONS:

I'll say, while I'm grateful for the service of those, the United States military and FEMA who responded, I think it could have been, and still needs to be, better than it has been. I hear regularly from the Puerto Rican community in Delaware about family members who are still stranded, and about failures to respond in a way that I would expect Delaware would have received or other states on the mainland would have received.

And I am gravely disappointed in the response to date and would love to work with you to try and, as you would put it, learn those lessons but also to strengthen the response. My last question; since November, the department has terminated TPS designations, temporary protected status designations, for quite a few countries. If I'm not mistaken, Haiti, the poorest country in the Western Hemisphere, they've suffered a devastating earthquake. El Salvador, a country with very high homicide levels; as well as Liberia, Guinea and Sierra Leone which suffered near catastrophic civil wars.

Our country has long welcomed those seeking refuge from natural disasters and from civil strife. There was, as has been discussed at great length, an unfortunate meeting last week where the president was reported to have suggested that we don't welcome people from certain countries and in particular countries under difficult circumstances.

In my experience, some of the greatest Americans have come from countries suffering through difficulties. Alexander Hamilton immigrated here from Nevis. I have been to Haiti, I have been to Liberia and there are Liberian Americans and Haitian Americans in my home state who make great contributions to our state and our economy and our culture every day.

Will you produce the analysis and the input the DHS received from other agencies that justify these terminations in TPS status (ph).

NIELSEN:

I'm happy to work with your staff to the extent that some of the information does not belong to me, if you will. I'd have to work with my colleagues to be able to give you an affirmative. But yes I'm happy to walk you through the full analysis.

COONS:

Thank you, Madam Secretary, for the answers and, in my view, it is important that we find a way working together to both protect our homeland from those threats we both see clearly yet to do so in a way that reflects and respects the values that have made this a country that has long been a beacon for human rights and a place that has welcomed refugees and that has been strengthened by the contributions of immigrants from all of the world.

Thank you, Mr. Chairman.

GRASSLEY:

Two members left. Me with my second round. I'll have a couple questions and then I'm going to go and Senator Flake is going to finish up and he's going to use his 10 minutes. Since October 31st, and that's the terror attack that we had in the United States, call for an end to the Diversity Visa, those calls have increased.

As you know, the controversial program functions as a lottery allowing aliens from countries with low rates of immigration to the United States a chance to register to submit visa application. Due to random selection applicants many have expressed concern with the program's susceptibility to fraud.

2017 GAO report found that consular officer reported widespread use of fake documents to verify applicant's identity. In addition the state inspection general report found that aliens from countries with ties to terrorism were permitted to apply for this visa. In a recent response to a letter that I sent asking for a candied assessment of this program the State Department described the document an identify fraud that exists in the application process and the resource intensive method for uncovering it.

Due to the Diversity Visa Lottery's vulnerability to fraud and abuse it's document use by terrorists do you think the Diversity Visa Lottery Program should be eliminated? Do you think that this visa program has an increased potential for use by terrorists and criminals entering the country and receiving status? And the second question is more important than the first one.

NIELSEN:

Sir, I believe, as you said, it's documented. There's a lot of fraud and abuse in this program and with the 80 plus programs that we have for legal immigration I believe that we can and should do better for the American people to ensure that those who come here are able to contribute, willing to contribute and to assimilate into our communities.

GRASSLEY:

In regard to sanctuary cities and states, I applaud this administration's efforts to crack down on sanctuary jurisdictions and encourage communities to participate in the 287(g) program. Unfortunately since President Trump took office a number of jurisdictions decided to stop honoring ICE detainer requests.

That's dangerous and I worry about the impact an entire state becoming sanctuary will have on public safety. So, considering that, can you describe the Trump administration ongoing efforts to crack down on sanctuary jurisdictions and what steps you are taking encourage communities to cooperate?

NIELSEN:

Yes, sir. First of all, as you know, we've asked Congress make clear that the detainer authority applies and also to provide indemnification from those who want to work with us. This is truly an issue of safety. This is an issue of safety for immigrant communities. It is also an issue of safety for the officers and men and women of DHS.

The safest place to take someone into custody is in a controlled environment which is in the jails after they have committed the crime. The container, as you know, allows for a state and

local jurisdiction to give us 48 hours notice. It does not have to be that they hold 48 hours after.

They can give us 48 hours notice and we will come and pick them up in a controlled environment which is safer to all of the communities and to my officers.

GRASSLEY:
Yes. I think I'll submit the rest of my questions for answer in writing. Thank you for being here. And now, Senator Flake for your 10 minutes.

FLAKE:
Thank you, Mr. Chairman.

Thank you and sorry I may have missed a lot of what is going on. I tried to get some of it coming in but if I plow old ground, I'm sorry. With regard to, I know, I heard mention of the president wanted to get a full $20 billion appropriated for the border wall or wall system.

Do we have left over money even from last year, money that has been authorized that has not been spent on border infrastructure?

NIELSEN:
Sir, the money, as you know, is allocated and there's plans to spend it. So the 20 that the president was speaking of is moving into the future in other needs that we've identified.

FLAKE:
How quickly, if you moved as fast as fast as you can, could a border structure wall system be built?

NIELSEN:
We will build it as fast as we can. As you know, there are a lot of variables that are hard to count for and not just the land acquisition but the willingness of states and localities to work

with us.

FLAKE:
Right.

NIELSEN:
I would just note that California has a blacklisting law that they have proposed which would prevent contractors from working with the Department of Homeland Security and if they do they are not able to get state and local contracts. So, variables such as that are hard for me to account for but we will work on it as fast as we can, sir.

FLAKE:
I believe I have heard you say we're talking seven years at the soonest that this could be built and that says nothing of eminent domain issues and litigation in Texas, for example, where it's almost all private land. Is there any -- do you believe it could be done faster than seven years?

NIELSEN:
We are certainly looking into it, yes, sir.

FLAKE:
If it can't be done in one year, is there any reason for the Congress to appropriate all $20 billion for this at this time?

NIELSEN:
I think the discussion was around authorization not appropriation. The idea there is if we only authorized year-by-year there's a question of whether we would have the funds for the next year. And, as you know, these contracts are quite complicated.

Being able to know that the money will be there the next year, at least from an authorization perspective makes quite a difference in terms of efficiency and effectiveness of acquisition programs.

FLAKE:

Let me drill down a little on what the border wall or wall system actually means. The president is -- some language he's used is, to me, a little confusing. Right after he was elected, I believe he said we're not talking about a fence, we're talking about a wall.

And he's talked about a big beautiful wall. I have appreciated what you've said and what has been said recently by the president and others and appreciation that it can't and shouldn't be a 2000 mile wall that the topography simply does not allow it.

And -- but I just like to talk about Arizona for a minute. We have over 300 miles of border. Is there any place in Arizona that you are aware of that has an opaque style wall that somebody would think of as a wall?

NIELSEN:

In terms of planning for future?

FLAKE:

No, in terms of current.

NIELSEN:

I -- sir, I don't know. I'm happy to get back to you on that.

FLAKE:

I can answer some of that. We have had, in the past, through some of the communities, the old landing mats from Vietnam era that were turned on their end and cemented into the ground. The problem is you can't see through them. And so kids on the other side or others

on the other side of the wall can throw rocks and there's property damage and injury to our border agents.

So we've actually been taking those out, the plan has been taking those walls out and putting in a bollard style fence, which works better. In fact, the president visited near -- well, in Yuma. Near Yuma, near San Luis. We have probably the best border infrastructure anywhere along the southern border. It's two fences with an access road in the middle.

But two fences, not a wall. I -- I'm struggling to think of any place in Arizona now where we have what could properly be called a wall or anywhere were such an opaque kind of structure that one thinks about when they say wall would be appropriate. Can you correct me there?


NIELSEN:
I think your -- your point is well taken. What has changed is the president asked the men and women of CBP what is it that you need. What is it that you need to provide operational control of the border.

And what the men and women on the front lines came back and said is we do not need a wall from sea to shining sea, what we need is a variety -- and that's why we call it a wall system -- a variety of components that together help us reach those four missions that I mentioned earlier. I'll just say quickly because I think you -- you were outside. But impedance and denial, which is that infrastructure, access and mobility admission readiness and domain awareness.


FLAKE:
All right. There some parts of Arizona, actually, where we have a lot of our border traffic, near Naco or Douglas, where if you did put a border wall, it would actually drown out communities on the southern side. You have a watershed and river and floods that -- that go northward. And if you had a wall, it would impede the progress.

In fact, even the fences that we have there, the new fences have to have storm gates in them. And in certain times of the year, those storm gates have to be left open for the floods come through. And so I -- I just -- I hope that the -- the evolution of discussion on this will continue.

And that when you talk about a border wall and the wall and the wall has to be funded, it -- it conjures up images that don't exist, to say nothing of who would pay for it. And we won't even get into that. But -- but just when talking about the wall and insistence that the wall be funded, it -- it -- that may be a good rhetorical device or campaign device, but in the real world it doesn't mean much.

And I'm pleased, like I said, that you've been moving in a different direction, talking about a wall system, which really isn't a wall. Fences are better. Good fences make good neighbors is probably apt here. And we certainly do need more structures, more barriers more infrastructure. In previous iterations of immigration reform legislation, we've provided for that.

It's not just now. The president wasn't the first one to talk about needing a border barrier. So -- so anyway, that -- I'll move on from -- from that and talk a little about CBP hiring. We have the CBP Hire Act to make it easier to retain and hire border agents and port agents. Can you talk about what the needs are there?

NIELSEN:
Yes...

FLAKE:
We've had difficulty hiring them fast enough.

NIELSEN:
We -- hiring continues to be a challenge but one that we're taking very seriously. Commissioner -- Acting Commissioner McAleenan has been very clear both on the need to

hire and to retain. So we're looking not just at our authorities and how we can innovatively reach new and expanded audience, but also we're looking at things like the polygraphs that they have to take as officers, to ensure that they are done efficiently and that they're not inappropriately, if you will, and unnecessarily weeding some out.

FLAKE:

All right. With regard to the -- the wall systems. Can you talk about the need for border roads or access roads?

NIELSEN:

They're vital. It's the way in which CBP can then respond to an alert, whether it be a visual alert or whether it be from a sensor or camera so that access and mobility is key not only for safety of the agents, but also for their ability to do their job.

FLAKE:

Let me just say for Arizona, when I talk to the property owners down there, the ranchers and others, that is one of the most important items that they reference again and again and again. And the border agents. You know, you -- you can have decent barriers, which we can't have everywhere. As I mentioned, the topography doesn't allow it. But you've got to have roads. You've got to have access.

And sometimes, the -- there can be activity, illegal activity or crossings just a few miles away. But without access roads to get there, it can take a couple of hours for agents to -- to -- to respond. So I -- I hope that that's on the list in the bipartisan bill that we've been working on. That is part of the -- what -- what is authorized, so I hope that -- that that can move ahead.

With -- with that, let me say do you support body cameras for DHS law enforcement?

NIELSEN:

I have not had the opportunity to have that discussion with my component heads but I understand the need for it and I look forward to discussing with them. I'm happy to get back to you on that.

FLAKE:
All right. Senator Whitehouse?

WHITEHOUSE:
Thank you, Chairman Flake.

FLAKE:
You're recognized for five minutes.

WHITEHOUSE:
I think I may be the last questioner that you see. So I hope that as you go back and reflect on today's hearing, that a few things stick out. I think Senator Graham's conversation with you -- I hope that you take that very much to heart. I think it's formulation of the need for there to be a Phase 1 and then a phase two and that if either side wants everything in phase two pushed forward to Phase 1, we'll crash right at the very beginning, we won't be able to move forward.

Phase 1, I think, is a very constructive idea. And I thought that after the first meeting with the president, we were very close to the outline of a Phase 1 resolution. I think also the notion that's been discussed here of wall systems is a very good idea because I think there's a difference between being in support of border security and being in pursuit of massive, unnecessary, overly-expensive and unwanted public works spending programs, just walls for the sake of walls.

And particularly where they will do damage to local communities, local farmers, local access to the river and so forth. I think the more we calm down and think this thing through, the more you'll find that there is in fact support for considerable reasonable increases to

border security. And I hope that's the key message you take away. I would like to change the topic in my last minutes to fentanyl.

Fentanyl is killing Americans at a phenomenal, appalling rate. Fentanyl is a compound created chemically that behaves in the mind, in the brain, as if it were heroin, but it can be dialed up to far more lethal concentrations.

And the result is that very often, an addict who is accustomed to heroin gets suddenly into Fentanyl, and they die. Rhode Island has a small town called Burrilllville, it's got just a couple thousand people.

It's got, I think, only two funeral parlors. There may be 25, 30 people in the entire police department, so in one three month period, beginning of the year a couple of years back when I was working on the Comprehensive Addiction Recovery Act with Senator Portman, they had six fatalities in that little community.

That is a little bit like beating on a bruise, you know? People get hurt by the first fatality, and then the second, and then the third, and then the fourth, and people know each other and it's back to the same funeral homes and the police are starting to get very agonized at what they have to see and how hard it is for them to respond and that they can't deal with it.

And the lethal aspects of Fentanyl, I think, are felt all across the country in all of our states. My understanding is that a very good deal of it is coming from China, that it is so potent that it can be dialed down to fairly small packages and still shipped, and I would like to urge that you make it a really important border security priority, as important as walls and fences, to try to figure out how our shipping services and our postal service, through which customs controlled materials come from overseas, can find the damn Fentanyl before it gets into our children and kills them.

NIELSEN:

You have my commitment, sir. Earlier, we talked about the STOP Act, we talked about the INTERDICT Act, but we need to do more and couldn't -- I couldn't agree more.

WHITEHOUSE:

I think the topics that I've mentioned in my previous questioning, election interference and cybersecurity, are ones where I think there's very considerable partisan eagerness to protect our country on both sides of the aisle.

Republicans and democrats alike feel very strongly about that. Fentanyl's exactly the same way.

NIELSEN:

I agree.

WHITEHOUSE:

There is a bipartisan door that is open to you on all three of these issues, so I urge you, come knocking.

NIELSEN:

I look forward to it sir.

WHITEHOUSE:

OK, good.

NIELSEN:

Thank you for bringing all three up.

WHITEHOUSE:

Now, I'm a little frustrated that there seems to be no proactive legislative effort coming from any part of the administration on cyber, coming from any part of the administration on election interference, and very little coming on -- on Fentanyl, and I think these are

opportunities that you are missing to accomplish important things in a bipartisan way that will save American lives.

NIELSEN:

We will be by to talk about it.

WHITEHOUSE:

Very well, thank you.

NIELSEN:

Thank you.

WHITEHOUSE:

Thank you, Chairman Flake.

FLAKE:

Thank you, Senator Whitehouse.

I'm glad that Senator Graham mentioned the phases, I know we spoke about that in that Tuesday meeting. But those of us who have been involved in immigration reform legislation before recognize that some of these issues are extremely thorny.

They take a lot of negotiation and compromise on all sides, things like chain migration asylum policy -- policies dealing with unaccompanied minors, worker programs, enforcement issues, those are all things that will need to be part of comprehensive reform.

But in order to make sure that we protect those who came, through no fault of their own, the so called DACA kids, there's got to be a Phase 1, and phase two and probably a phase three. And I hope that that -- that message is taken back and certainly recognized, in order to get the votes that we need to pass this important legislation.

The hearing record will be open for one week. I would ask those who need to get questions in, and ask those who are answering the questions, to do it as quickly as possible.

And I ask unanimous consent that the closing statement of Senator Grassley be part of the record, without objection, and with …

(LAUGHTER)

… nobody to object to. With that, the hearing stands adjourned.


NIELSEN:
Thank you, sir.


**List of Panel Members and Witnesses**

PANEL MEMBERS:
SEN. CHARLES E. GRASSLEY, R-IOWA, CHAIRMAN

SEN. ORRIN G. HATCH, R-UTAH

SEN. LINDSEY GRAHAM, R-S.C.

SEN. JOHN CORNYN, R-TEXAS

SEN. MIKE LEE, R-UTAH

SEN. TED CRUZ, R-TEXAS

SEN. JEFF FLAKE, R-ARIZ.

SEN. THOM TILLIS, R-N.C.

SEN. BEN SASSE, R-NEB.

SEN. MICHAEL D. CRAPO, R-IDAHO

SEN. JOHN KENNEDY, R-LA.

SEN. DIANNE FEINSTEIN, D-CALIF., RANKING MEMBER

SEN. PATRICK J. LEAHY, D-VT.

SEN. RICHARD J. DURBIN, D-ILL.

SEN. SHELDON WHITEHOUSE, D-R.I.

SEN. AMY KLOBUCHAR, D-MINN.

SEN. CHRIS COONS, D-DEL.

SEN. RICHARD BLUMENTHAL, D-CONN.

SEN. MAZIE K. HIRONO, D-HAWAII

SEN. CORY BOOKER, D-N.J.

SEN. KAMALA HARRIS, D-CALIF.

WITNESSES:

HOMELAND SECURITY SECRETARY KIRSTJEN NIELSEN TESTIFIES

**Testimony & Transcripts**

Complete written testimony for this event Jan. 16, 2018

**About Senate Judiciary**

Staff

Hearing

Transcripts

Testimony

<u>Committee Reports</u>

<u>Associated Bills</u>

<u>Schedules</u>

<u>Markup</u>

<u>Amendments</u>

© 2018 · CQ - Roll Call, Inc · All Rights Reserved.

1625 Eye Street, Suite 200 · Washington, D.C. 20006-4681 · 202-650-6500

About CQ　　Help　　Privacy Policy　　Masthead　　Terms & Conditions