# EXHIBIT 85
## (Corrected)

JAMES D. NEALON - 08/22/2018

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN FRANCISCO

 4                      Case No. 3:18-cv-1554-EMC

 5    - - - - - - - - - - - - - - - - - - -x

 6    CRISTA RAMOS, et al.,

 7              Plaintiffs,

 8    v.

 9    KIRSTJEN NIELSEN, et al.,

10              Defendants.

11    - - - - - - - - - - - - - - - - - - -x

12                    VOLUME II

13      VIDEOTAPED DEPOSITION OF JAMES D. NEALON

14        Wednesday, August 22, 2018 1:15 p.m.

15                  Sidley Austin LLP

16        60 State Street, Boston, MA 02109

17

18

19

20    Reported by:

21    Janet Sambataro, RMR, CRR, CLR

22    JOB NO. LA-189184

23

24

25
```

| | | |
|---|---|---|
| 1 | P R O C E E D I N G S | |
| 2 | THE VIDEOGRAPHER:  Here begins Media | 13:14:58 |
| 3 | No. 1 in today's deposition of James Nealon in | 13:15:01 |
| 4 | the matter of Crista Ramos versus Kirstjen | 13:15:07 |
| 5 | Nielsen, et al., in the United States District | 13:15:12 |
| 6 | Court, Northern District of California, San | 13:15:16 |
| 7 | Francisco, Case No. 3:18-cv-1554-EMC. | 13:15:19 |
| 8 | Today's date is August 22nd, 2018.  The | 13:15:29 |
| 9 | time on the video monitor is 1:15 p.m. | 13:15:35 |
| 10 | The video operator today is Jody | 13:15:41 |
| 11 | Urbati.  And this deposition is taking place at | 13:15:43 |
| 12 | Sidley Austin in Boston, Massachusetts.  The | 13:15:50 |
| 13 | court reporter today is Janet Sambataro. | 13:15:55 |
| 14 | Counsel, please identify yourselves, | 13:16:00 |
| 15 | state whom you represent, and then the witness | 13:16:04 |
| 16 | shall be sworn. | 13:16:07 |
| 17 | MS. MacLEAN:  Emilou MacLean for the | 13:16:09 |
| 18 | plaintiffs. | 13:16:12 |
| 19 | MS. FISHFELD:  Jessica Fishfeld from | 13:16:13 |
| 20 | Sidley Austin for the plaintiffs. | 13:16:14 |
| 21 | MR. KIRSCHNER:  Adam Kirschner from the | 13:16:16 |
| 22 | Department of Justice for the defendants. | 13:16:18 |
| 23 | MS. BROWNE:  René Browne from the | 13:16:21 |
| 24 | United States Department of Homeland Security for | 13:16:22 |
| 25 | the defendants. | 13:16:24 |

| | | |
|---|---|---|
| 1 | JAMES D. NEALON, | 13:16:25 |
| 2 | having been duly sworn, after presenting | 13:16:25 |
| 3 | identification in the form of a driver's license, | 13:16:25 |
| 4 | deposes and says as follows: | 13:16:25 |
| 5 | CONTINUED EXAMINATION | 13:16:33 |
| 6 | BY MS. MacLEAN: | 13:16:33 |
| 7 | Q.   Hello again, Ambassador Nealon.  So | 13:16:36 |
| 8 | we -- I imagine you have not had any depositions | 13:16:40 |
| 9 | since we last spoke? | 13:16:42 |
| 10 | A.   I have not. | 13:16:43 |
| 11 | Q.   We went over admonitions and basic | 13:16:44 |
| 12 | ground rules for the depositions at the outset of | 13:16:47 |
| 13 | the previous deposition. | 13:16:50 |
| 14 | Are you still familiar with those and | 13:16:51 |
| 15 | comfortable with those or would you like me to go | 13:16:53 |
| 16 | over them again? | 13:16:55 |
| 17 | A.   I'm comfortable. | 13:16:56 |
| 18 | Q.   Okay.  I think the most important is | 13:16:57 |
| 19 | that you should feel comfortable also letting us | 13:17:00 |
| 20 | know if you want a break or need a break.  It's | 13:17:02 |
| 21 | not as long as the previous deposition, but I | 13:17:05 |
| 22 | presume it will be at least one break at some | 13:17:07 |
| 23 | point during the day.  If I'm in the middle of a | 13:17:11 |
| 24 | question, we'll probably go through that | 13:17:14 |
| 25 | question, but don't hesitate to let us know. | 13:17:16 |

| | | |
|---|---|---|
| 1 | And the same goes for the court reporter. | 13:17:19 |
| 2 | So you recall that at the last deposition, | 13:17:23 |
| 3 | there were a number of objections that were made | 13:17:29 |
| 4 | by your counsel and there was a legal dispute | 13:17:31 |
| 5 | around whether you would be required to answer | 13:17:36 |
| 6 | questions related to what is called "deliberative | 13:17:42 |
| 7 | process."  There were also a number of documents | 13:17:46 |
| 8 | that the government had identified that were | 13:17:49 |
| 9 | relevant to the case but that had been withheld | 13:17:51 |
| 10 | on the ground that they were related to | 13:17:54 |
| 11 | deliberative process. | 13:17:58 |
| 12 | In the intervening time, the Court resolved | 13:18:00 |
| 13 | that you can answer those questions and that the | 13:18:03 |
| 14 | government could provide us and needed to provide | 13:18:10 |
| 15 | us with the information that they had withheld. | 13:18:12 |
| 16 | So the questions that we're going to go over | 13:18:15 |
| 17 | today are related to the topics that you had been | 13:18:17 |
| 18 | asked about but had not been able to talk about | 13:18:20 |
| 19 | further. | 13:18:24 |
| 20 | Are you -- are you aware of that? | 13:18:25 |
| 21 | A.   Yes. | 13:18:26 |
| 22 | Q.   And they'll also be related to some of | 13:18:27 |
| 23 | the documents that we've received over the course | 13:18:30 |
| 24 | of the last week. | 13:18:32 |
| 25 | Are you familiar with that as well? | 13:18:33 |

```
1        A.    Yes.                                    13:18:34
2        Q.    Have you seen any of the documents that 13:18:35
3   the government has produced?                       13:18:37
4        A.    I haven't seen any additional documents 13:18:40
5   since the last deposition.                         13:18:42
6        Q.    Okay.                                   13:18:44
7        A.    With the exception of, I did look at    13:18:45
8   parts of the transcript from the last deposition.  13:18:47
9        Q.    Okay.  And did you have any other       13:18:50
10  meetings with your counsel or anyone else since    13:18:55
11  the last deposition, about either the litigation   13:18:57
12  or the subject matter of the litigation?           13:18:59
13       A.    Yes.  I met this morning with counsel.  13:19:03
14       Q.    Okay.  And about how long did you meet? 13:19:05
15       A.    For a couple of hours.                  13:19:08
16       Q.    Okay.  So one of the topics that we had 13:19:10
17  discussed previously was your knowledge of any     13:19:16
18  engagement with the White House concerning or      13:19:22
19  anyone affiliated with the White House concerning  13:19:24
20  TPS.  So I'm going to start there and go back to   13:19:30
21  ask you, who do you know was engaged from the      13:19:34
22  White House in questions related to Temporary      13:19:39
23  Protected Status?                                  13:19:41
24       A.    Just so that I can answer your question 13:19:45
25  as thoroughly as possible, could you just be a     13:19:47
```

| | |
|---|---|
| 1  little more specific?  Just restate the question | 13:19:51 |
| 2  another way? | 13:19:53 |
| 3      Q.   Yes. | 13:19:54 |
| 4      A.   It's easier to answer. | 13:19:55 |
| 5      Q.   Yes. | 13:19:56 |
| 6      Are you aware that there were any | 13:19:57 |
| 7  conversations with anyone who worked at the White | 13:19:58 |
| 8  House in any capacity with anyone in the | 13:20:01 |
| 9  Department of Homeland Security -- we'll start | 13:20:05 |
| 10  there -- related to Temporary Protected Status? | 13:20:07 |
| 11      A.   Yes. | 13:20:09 |
| 12      Q.   And who were the people from the White | 13:20:10 |
| 13  House who you know or have reason to believe were | 13:20:12 |
| 14  involved in conversations related to Temporary | 13:20:16 |
| 15  Protected Status? | 13:20:18 |
| 16      A.   So I was told that Stephen Miller, from | 13:20:20 |
| 17  the White House, was in touch with Chad Wolf, who | 13:20:26 |
| 18  was the Secretary's Chief of Staff, regarding | 13:20:29 |
| 19  TPS. | 13:20:36 |
| 20      Q.   And who told you that? | 13:20:37 |
| 21      A.   Chad Wolf. | 13:20:38 |
| 22      Q.   And do you have an understanding of | 13:20:40 |
| 23  approximately how many times Stephen Miller had | 13:20:43 |
| 24  communications with Chad Wolf? | 13:20:48 |
| 25      A.   I don't.  I don't have a number.  Chad | 13:20:50 |

```
 1   Wolf told me that he was in frequent touch with      13:20:53
 2   Stephen Miller.                                       13:20:57
 3          Q.   And --                                    13:20:59
 4          A.   Or, better said, that Stephen Miller      13:20:59
 5   was in frequent touch with him.                       13:21:01
 6          Q.   So is it your understanding that Chad     13:21:02
 7   Wolf reached out to Stephen Miller or that            13:21:06
 8   Stephen Miller reached out to Chad Wolf?              13:21:09
 9          A.   My understanding, from a very brief       13:21:11
10   conversation with Chad Wolf, is that                  13:21:14
11   Stephen Miller was reaching out to Chad Wolf.        13:21:16
12          Q.   Okay.  And when Stephen Miller was        13:21:19
13   reaching out to Chad Wolf, from what you              13:21:21
14   understand from that conversation with Mr. Wolf,      13:21:23
15   was that conversation -- was the outreach             13:21:27
16   specifically related to Temporary Protected           13:21:29
17   Status?                                               13:21:30
18          MR. KIRSCHNER:  Objection.  Calls for          13:21:31
19   hearsay testimony.                                    13:21:33
20          A.   So I had one conversation, a very brief   13:21:38
21   conversation with Chad Wolf, in which he told me      13:21:41
22   that Stephen Miller had been reaching out to him      13:21:43
23   frequently regarding TPS.                             13:21:46
24          Q.   Do you remember approximately when that   13:21:49
25   conversation took place?                              13:21:50
```

| | | |
|---|---|---|
| 1 | A.   I don't. | 13:21:52 |
| 2 | Q.   Do you remember if it was before or | 13:21:53 |
| 3 | after the decision regarding the termination of | 13:21:56 |
| 4 | TPS for Sudan? | 13:22:00 |
| 5 | A.   I believe it was after. | 13:22:04 |
| 6 | Q.   Do you remember if it was before or | 13:22:05 |
| 7 | after -- strike that. | 13:22:07 |
| 8 | So, just to make it clear, we're talking | 13:22:10 |
| 9 | about the conversation that you had with | 13:22:13 |
| 10 | Mr. Wolf? | 13:22:14 |
| 11 | A.   (Witness nodded.) | 13:22:14 |
| 12 | Q.   And I understand that you might not | 13:22:15 |
| 13 | know exactly when the conversations took place | 13:22:16 |
| 14 | with Mr. Miller. | 13:22:18 |
| 15 | The conversation that you had with Mr. Wolf, | 13:22:20 |
| 16 | was that conversation, to your recollection, | 13:22:21 |
| 17 | before or after the decision had been made with | 13:22:24 |
| 18 | regard to TPS for Nicaragua? | 13:22:28 |
| 19 | A.   I believe it was before. | 13:22:32 |
| 20 | Q.   And what did Mr. Wolf convey about the | 13:22:39 |
| 21 | communications that he had with Mr. Miller? | 13:22:43 |
| 22 | MR. KIRSCHNER:  Objection.  Again, | 13:22:45 |
| 23 | calling for hearsay. | 13:22:46 |
| 24 | A.   So it was a very brief conversation | 13:22:49 |
| 25 | with Mr. Wolf in which he told me that | 13:22:53 |

| | | |
|---|---|---|
| 1 | Stephen Miller had been reaching out to him | 13:22:58 |
| 2 | frequently regarding TPS.  And that -- that was | 13:23:01 |
| 3 | the extent of the conversation. | 13:23:05 |
| 4 |     Q.   And what was the context in which | 13:23:10 |
| 5 | Mr. Wolf conveyed that that conversation took | 13:23:12 |
| 6 | place? | 13:23:14 |
| 7 |     A.   So I remember we were -- I believe we | 13:23:16 |
| 8 | were in a -- I believe we were outside of his | 13:23:20 |
| 9 | office, either coming out of a meeting or going | 13:23:23 |
| 10 | into a meeting, and he conveyed that to me. | 13:23:27 |
| 11 |     Q.   Okay.  And was it in the context of a | 13:23:30 |
| 12 | conversation around TPS or was it in the context | 13:23:34 |
| 13 | of a conversation around broader political | 13:23:36 |
| 14 | issues?  Was it in the context of a conversation | 13:23:40 |
| 15 | around Mr. Miller?  Do you remember the context | 13:23:43 |
| 16 | of the conversation? | 13:23:45 |
| 17 |     A.   I don't remember the specific context. | 13:23:45 |
| 18 | No. | 13:23:47 |
| 19 |     Q.   Did he convey any thoughts about how he | 13:23:49 |
| 20 | felt about the communications with Mr. Miller? | 13:23:54 |
| 21 |     A.   No.  What I've described to you is | 13:24:00 |
| 22 | really the extent of the -- of the conversation. | 13:24:04 |
| 23 |     Q.   Okay.  And did anyone else, to your | 13:24:07 |
| 24 | knowledge, have communications with Mr. Miller | 13:24:11 |
| 25 | regarding TPS, besides you?  We'll leave you | 13:24:13 |

| | | |
|---|---|---|
| 1 | aside for now. | 13:24:19 |
| 2 | A.   So maybe be more specific in your | 13:24:21 |
| 3 | question -- | 13:24:22 |
| 4 | Q.   Yes. | 13:24:22 |
| 5 | A.   -- it would just help me answer. | 13:24:22 |
| 6 | Q.   Yes.  Definitely. | 13:24:24 |
| 7 | So you shared that Mr. Wolf communicated to | 13:24:26 |
| 8 | you that he had frequent conversations with | 13:24:28 |
| 9 | Mr. Miller; that Mr. Miller reached out to him | 13:24:30 |
| 10 | frequently regarding TPS. | 13:24:34 |
| 11 | Do you know of anyone else who Mr. Miller | 13:24:36 |
| 12 | was reaching out to regarding TPS in the | 13:24:39 |
| 13 | Department of Homeland Security? | 13:24:43 |
| 14 | MR. KIRSCHNER:  Objection.  It calls | 13:24:44 |
| 15 | for speculation. | 13:24:47 |
| 16 | A.   So, yes, I know that, for example, | 13:24:51 |
| 17 | Gene Hamilton mentioned on a couple of occasions, | 13:24:55 |
| 18 | at least, that he had been in touch with | 13:25:01 |
| 19 | Mr. Miller regarding TPS. | 13:25:04 |
| 20 | Q.   Do you remember the context in which | 13:25:06 |
| 21 | Mr. Hamilton mentioned that he had been in touch | 13:25:09 |
| 22 | with Mr. Miller? | 13:25:12 |
| 23 | A.   I remember that coming up in meetings. | 13:25:12 |
| 24 | Q.   Were these meetings meetings | 13:25:16 |
| 25 | specifically related to TPS? | 13:25:19 |

```
1        A.   You know, I don't recall if the          13:25:21
2   meetings were specifically called to discuss TPS    13:25:24
3   or whether they were meetings where TPS came up.    13:25:27
4        Q.   Okay.  And what did Mr. Hamilton convey   13:25:30
5   regarding his communications with Mr. Miller?       13:25:36
6             MR. KIRSCHNER:  Objection.  Calls for     13:25:38
7   hearsay.                                            13:25:40
8        A.   I'm pausing, because I'm trying to        13:25:50
9   recall specific conversations, and I don't recall   13:25:52
10  specific conversations.  But what I do recall is    13:26:01
11  being in meetings where Mr. Hamilton was present    13:26:04
12  and where he stated that he had been in touch       13:26:07
13  with Mr. Miller about TPS.                          13:26:10
14       Q.   Did he convey that Mr. Miller had an      13:26:15
15  opinion with regard to TPS?                         13:26:17
16       A.   I believe he did, on a couple of          13:26:19
17  occasions.                                          13:26:21
18       Q.   And what did he convey about the          13:26:21
19  opinion that Mr. Miller had with regard to TPS?     13:26:25
20            MR. KIRSCHNER:  Objection.  Calls for     13:26:27
21  hearsay.                                            13:26:28
22       A.   So I recall Mr. Hamilton, on a couple     13:26:32
23  of occasions, saying that Mr. Miller favored the    13:26:34
24  termination of TPS.                                 13:26:39
25       Q.   When he said that he favored the          13:26:41
```

| | | |
|---|---|---|
| 1 | termination -- when Mr. Hamilton conveyed that | 13:26:44 |
| 2 | Mr. Miller favored the termination of TPS, was it | 13:26:46 |
| 3 | your understanding that Mr. Miller favored the | 13:26:50 |
| 4 | termination of TPS for a particular country or | 13:26:53 |
| 5 | the termination of TPS as a program? | 13:26:57 |
| 6 | MR. KIRSCHNER:  Objection to the extent | 13:27:01 |
| 7 | it calls for speculation or hearsay testimony. | 13:27:02 |
| 8 | A.   You know, I just don't recall the | 13:27:07 |
| 9 | specific context of -- of those remarks. | 13:27:10 |
| 10 | Q.   Let's try to go back to the -- if you | 13:27:16 |
| 11 | can recall, sort of the first time that that | 13:27:20 |
| 12 | conversation came up in a meeting. | 13:27:23 |
| 13 | Can you recall one specific conversation? | 13:27:25 |
| 14 | A.   You know, I remember in the -- in the | 13:27:34 |
| 15 | last deposition, when I was struggling to | 13:27:35 |
| 16 | remember specific conversation, I made the point | 13:27:39 |
| 17 | to you that, you know, I probably had 10,000 | 13:27:42 |
| 18 | meetings over the last couple of years.  And it's | 13:27:45 |
| 19 | just very difficult for me to isolate what a | 13:27:47 |
| 20 | certain person said in a certain meeting and | 13:27:51 |
| 21 | recall when that meeting was and the specific | 13:27:53 |
| 22 | reason why it was called.  So I -- so if you'll | 13:27:57 |
| 23 | restate the question -- | 13:28:01 |
| 24 | Q.   Yes. | 13:28:02 |
| 25 | A.   -- I'll try to give you the best answer | 13:28:02 |

| | | |
|---|---|---|
| 1 | that I can. | 13:28:04 |
| 2 | Q.   Yes.   I understand the difficulty as | 13:28:05 |
| 3 | well, and I appreciate trying to go back into | 13:28:06 |
| 4 | your recollection from some months back and | 13:28:09 |
| 5 | recall some of these conversations at what I | 13:28:11 |
| 6 | imagine was a very turbulent time as well. | 13:28:13 |
| 7 | You said that you recalled on a couple of | 13:28:16 |
| 8 | occasions Mr. Hamilton, in meetings, raising that | 13:28:21 |
| 9 | Mr. Miller and he were in communication with | 13:28:27 |
| 10 | regard to TPS. | 13:28:32 |
| 11 | Can you think of one particular meeting | 13:28:37 |
| 12 | where that came up? | 13:28:39 |
| 13 | A.   So, again, I recall meetings where -- | 13:28:45 |
| 14 | where it came up, but I -- I can't really tell | 13:28:47 |
| 15 | you when that meeting was or -- or which meeting | 13:28:54 |
| 16 | was first and which meeting was second.  I'm | 13:28:57 |
| 17 | sorry.  I just -- I don't recall. | 13:28:59 |
| 18 | Q.   If you can't think of the order, that's | 13:29:01 |
| 19 | fine.  What I'm trying to get at is if there is a | 13:29:03 |
| 20 | particular meeting where you recall that this | 13:29:06 |
| 21 | came up, something about the context in which it | 13:29:08 |
| 22 | came up, and something about what was said. | 13:29:12 |
| 23 | So rather than speaking generally about how | 13:29:14 |
| 24 | Mr. Hamilton was conveying -- what Mr. Hamilton | 13:29:19 |
| 25 | was conveying about his communications with | 13:29:22 |

1   Mr. Miller, if you could jog your memory by          13:29:24

2   thinking back to a particular meeting, where         13:29:27

3   Mr. Hamilton conveyed that he had communications     13:29:30

4   with Mr. Miller about TPS.                           13:29:33

5        A.   So, again, I just -- I'm not able to       13:29:39

6   isolate a particular meeting and the context of      13:29:42

7   that meeting and -- and the context of why he        13:29:44

8   would have said what he said, but I do remember      13:29:48

9   him saying that.                                     13:29:51

10        Q.   Were all of the meetings that you         13:29:56

11   recall Mr. Hamilton raising his communications      13:29:57

12   with Mr. Miller about TPS at the Department of      13:30:01

13   Homeland Security?                                  13:30:06

14             MR. KIRSCHNER:  Objection.  Vague.       13:30:12

15   Confusing.                                          13:30:13

16        Q.   The meetings that you're describing,      13:30:15

17   where you recall Mr. Hamilton conveying that he     13:30:17

18   was in communication with Mr. Miller about TPS,     13:30:21

19   did those meetings take place at the Department     13:30:24

20   of Homeland Security?                               13:30:27

21        A.   I believe they did.  Yes.                 13:30:28

22        Q.   Do you remember who else was present in   13:30:31

23   the room at those meetings?                         13:30:32

24        A.   Again, it's just very difficult for me    13:30:35

25   to isolate a particular meeting and see who was     13:30:37

```
 1   else in the Department of Homeland Security about     13:32:04
 2   the fact that Mr. Miller had communications           13:32:06
 3   regarding TPS?                                        13:32:10
 4        A.   So I don't have a specific memory but       13:32:12
 5   it wouldn't be unusual for me to -- to give a         13:32:14
 6   very small selective group of staff a readout of      13:32:19
 7   an important meeting.                                 13:32:22
 8        Q.   From -- so before I go there, was there     13:32:24
 9   anyone else that you recall communicating that        13:32:28
10   they were having -- that they had had                 13:32:31
11   conversations with Mr. Miller regarding TPS?          13:32:34
12        A.   No.  I don't have a specific memory of      13:32:48
13   anyone else telling me that they had had a            13:32:50
14   conversation with Stephen Miller about TPS.           13:32:52
15        Q.   Did it have any significance to you         13:32:59
16   when you heard that Mr. Miller was communicating      13:33:02
17   with Mr. Wolf and Mr. Hamilton about TPS?             13:33:05
18        A.   Did it have any significance for me?        13:33:11
19        Q.   Yes.                                        13:33:13
20        A.   Yes.  You know, that's important            13:33:14
21   information that an important adviser to the          13:33:16
22   President and the White House has an opinion          13:33:19
23   about an important policy decision.                   13:33:21
24        Q.   And in what way was that significant to     13:33:25
25   you that an important adviser to the President        13:33:27
```

```
 1   had an opinion about TPS?                        13:33:29
 2            MR. KIRSCHNER:  Objection.  Vague.  The  13:33:31
 3   word "significant" is vague.                     13:33:35
 4       A.   You know, as government employees, we   13:33:46
 5   all ultimately work for the President.  And so   13:33:49
 6   having policy input from people from the White   13:33:53
 7   House is a -- is a normal and important thing.   13:33:56
 8   And so -- so, yes, it's significant.             13:34:03
 9       Q.   Was it your sense that Mr. Miller was   13:34:11
10   conveying a position from the White House when   13:34:13
11   you heard that?                                  13:34:15
12       A.   So I'm not quite sure how to answer     13:34:21
13   that question.  I don't know if Mr. Miller was   13:34:26
14   conveying someone else's opinion or his own      13:34:29
15   opinion, if that's -- if that's what you're      13:34:32
16   asking.                                          13:34:34
17       Q.   Was it your sense at the time that      13:34:35
18   Mr. Miller was conveying an opinion of the White 13:34:37
19   House?                                           13:34:41
20            MR. KIRSCHNER:  Objection.  Calls for   13:34:43
21   speculation.                                     13:34:44
22       A.   If I could ask for a clarification.     13:34:46
23       Q.   Yes.                                    13:34:48
24       A.   I'm not sure what you mean by "the      13:34:48
25   White House."  Stephen Miller works in the White 13:34:50
```

| | |
|---|---|
| 1    House.  So I suppose, by definition, an opinion | 13:34:52 |
| 2    of Mr. Miller's is an opinion of someone who | 13:34:54 |
| 3    works in the White House. | 13:34:57 |
| 4          Q.    Did you believe that Mr. Miller was | 13:34:59 |
| 5    conveying a position that was a position that was | 13:35:01 |
| 6    not just Mr. Miller's personal opinion? | 13:35:06 |
| 7              MR. KIRSCHNER:  Objection.  Calls for | 13:35:10 |
| 8    speculation. | 13:35:10 |
| 9          A.    You know, I don't know.  I really don't | 13:35:16 |
| 10   know how to answer that question. | 13:35:18 |
| 11         Q.    Okay.  We may come back to that. | 13:35:20 |
| 12         Did you believe that Mr. Miller was speaking | 13:35:27 |
| 13   on behalf of the White House when you heard that? | 13:35:29 |
| 14             MR. KIRSCHNER:  Objection.  Asked and | 13:35:31 |
| 15   answered.  Calls for speculation. | 13:35:32 |
| 16        A.    Yeah.  Again, I don't know how to | 13:35:38 |
| 17   answer that, because, you know, I worked for the | 13:35:40 |
| 18   government for 34 years and sometimes you would | 13:35:42 |
| 19   hear from someone from the Department of Defense | 13:35:45 |
| 20   and someone from the Department of Justice and | 13:35:46 |
| 21   someone from the White House, and sometimes | 13:35:48 |
| 22   they're giving you their opinion; sometimes | 13:35:57 |
| 23   they're speaking in a broader sense on -- on the | 13:36:00 |
| 24   part of the Administration.  But, you know, at | 13:36:02 |
| 25   the end of the day, Stephen Miller is an | 13:36:05 |

| | | |
|---|---|---|
| 1 | important actor in the White House, so what he | 13:36:07 |
| 2 | says about an important policy matter is | 13:36:12 |
| 3 | significant, whether he is speaking for himself | 13:36:16 |
| 4 | or speaking for -- in the name of the | 13:36:20 |
| 5 | Administration. | 13:36:24 |
| 6 | Q.   And what made you think that Mr. Miller | 13:36:25 |
| 7 | was an important actor in the White House? | 13:36:26 |
| 8 | MR. KIRSCHNER:  Objection.  Calls for | 13:36:30 |
| 9 | speculation. | 13:36:32 |
| 10 | A.   You know, I can't point to anything | 13:36:39 |
| 11 | specific.  It was well known, was and is well | 13:36:40 |
| 12 | known that he was and is. | 13:36:43 |
| 13 | Q.   Is it -- was it well known at the time | 13:36:46 |
| 14 | that you were working in the Department of | 13:36:49 |
| 15 | Homeland Security that he was very close to the | 13:36:50 |
| 16 | President? | 13:36:53 |
| 17 | MR. KIRSCHNER:  Objection.  Assumes | 13:36:53 |
| 18 | facts not in evidence.  Calls for speculation. | 13:36:55 |
| 19 | A.   So I don't know for a fact that he's | 13:37:00 |
| 20 | very close to the President, but I certainly know | 13:37:01 |
| 21 | that -- that people believe he's close to the | 13:37:03 |
| 22 | President. | 13:37:08 |
| 23 | Q.   You communicated in the previous | 13:37:17 |
| 24 | deposition that you were in a couple of meetings | 13:37:20 |
| 25 | with Mr. Miller and a gentleman named John | 13:37:22 |

```
1        A.    It would have come up simply as one of      14:27:37
2   the elements that would be important to U.S.          14:27:39
3   policy in Latin America.                              14:27:43
4        Q.    Do you recall expressing a position        14:27:50
5   about that issue?                                     14:27:52
6        A.    Yes.  I recall saying that -- that it      14:28:01
7   was important to be conscious of how issues like      14:28:09
8   trade and TPS play in Latin America, as you           14:28:14
9   formulate a policy toward Latin America.              14:28:18
10       Q.    And do you recall the name of the          14:28:22
11  person who worked for Mr. Kushner?                    14:28:24
12       A.    His first name is John.  I'll think of     14:28:30
13  it.                                                   14:28:31
14       Q.    Okay.  Do you recall John -- we'll call    14:28:34
15  him John since that's what we know right now --       14:28:36
16  engaging in that conversation?                        14:28:38
17       A.    I recall him listening respectfully.       14:28:43
18       Q.    Do you recall him responding at all?       14:28:46
19       A.    I don't.                                   14:28:49
20       Q.    Do you recall TPS coming up in any         14:28:51
21  other context in these meetings?                      14:28:52
22       A.    I don't.                                   14:28:59
23       Q.    Did any of these meetings concern          14:29:04
24  borders and immigration-related issues?               14:29:08
25       A.    Sort of obliquely.  The meeting about      14:29:16
```

| | | |
|---|---|---|
| 1 | A.   So a PC is different from a PCC.  A PC | 14:38:03 |
| 2 | is a principals committee meeting.  And a | 14:38:07 |
| 3 | principals committee meeting is a -- generally a | 14:38:10 |
| 4 | cabinet-level meeting.  It's not -- it's not a | 14:38:15 |
| 5 | cabinet meeting.  It's a meeting of people at the | 14:38:21 |
| 6 | cabinet level to coordinate policy. | 14:38:23 |
| 7 | Q.   So who -- and -- | 14:38:26 |
| 8 | A.   And, sorry, just to finish. | 14:38:29 |
| 9 | A paper PC would be a virtual meeting that | 14:38:31 |
| 10 | takes place on paper rather than convening those | 14:38:36 |
| 11 | people in a meeting. | 14:38:41 |
| 12 | Q.   Okay.  And then two e-mails up, | 14:38:48 |
| 13 | Mr. Hamilton is speaking about three different | 14:38:52 |
| 14 | types of convenings, either convenings on paper, | 14:38:56 |
| 15 | I imagine, or convenings in person, that PCC and | 14:39:00 |
| 16 | the PC which we spoke about, and then also a DC. | 14:39:04 |
| 17 | Do you see that? | 14:39:06 |
| 18 | A.   I do. | 14:39:07 |
| 19 | Q.   What does a DC refer to? | 14:39:08 |
| 20 | A.   A DC is a deputies committee meeting. | 14:39:11 |
| 21 | Q.   And what is that? | 14:39:15 |
| 22 | A.   So there's a -- there's an order to | 14:39:18 |
| 23 | these things.  A PCC is the lowest level of the | 14:39:20 |
| 24 | three.  As I say, it takes place at the -- sort | 14:39:25 |
| 25 | of high-working level.  A deputies committee | 14:39:28 |

```
 1        A.    So these meetings, PCCs, deputies      14:43:07
 2   committee meetings and principals committee       14:43:13
 3   meetings are convened by the White House.         14:43:16
 4        Q.    Is there a particular entity or        14:43:21
 5   particular people in the White House convene such 14:43:23
 6   meetings?                                          14:43:26
 7        A.    So, in my experience, the ones I'm     14:43:30
 8   familiar with, they're convened by the National  14:43:32
 9   Security Council.                                  14:43:35
10        Q.    Have you attended a principals         14:43:36
11   committee meeting?                                 14:43:38
12        A.    Well, I'm trying to remember now if I  14:43:44
13   attended this one or not with the Secretary.  I   14:43:45
14   don't recall attending any other principals       14:43:51
15   committee meetings but I may have been at this     14:43:54
16   one.                                               14:43:56
17        Q.    Do you have an understanding, not      14:43:57
18   specifically speaking about this one, but         14:44:00
19   generally about how many people are at principals 14:44:01
20   committee meetings --                              14:44:04
21        A.    So, again, it's --                     14:44:06
22        Q.    -- if there's a standard?             14:44:06
23        A.    -- it's ad hoc.  It's as necessary.  So 14:44:08
24   they don't invite people to principals committee  14:44:09
25   meetings just because they think everybody should 14:44:13
```

| | | |
|---|---|---|
| 1 | just don't have a vivid memory of it. | 14:49:57 |
| 2 | Q.   You don't -- do you know either from | 14:49:59 |
| 3 | your recollection of recognizing that it is | 14:50:02 |
| 4 | incomplete or from your understanding of how | 14:50:05 |
| 5 | principals committee work -- how principals | 14:50:08 |
| 6 | committees work who would have been the author of | 14:50:12 |
| 7 | this document, which does not have an author? | 14:50:14 |
| 8 | MR. KIRSCHNER:  Objection.  Calls for | 14:50:17 |
| 9 | speculation. | 14:50:17 |
| 10 | A.   Right.  So I don't know who would have | 14:50:21 |
| 11 | been the author of this document.  My assumption, | 14:50:24 |
| 12 | and it's -- it is an assumption, is that the | 14:50:28 |
| 13 | document would -- would have been produced by the | 14:50:32 |
| 14 | White House for discussion by the principals. | 14:50:35 |
| 15 | Q.   What gives you that suspicion? | 14:50:38 |
| 16 | A.   That would be a -- a normal procedure. | 14:50:42 |
| 17 | Q.   Is that a normal procedure for | 14:50:47 |
| 18 | principals committees? | 14:50:49 |
| 19 | A.   That's a normal procedure for meetings | 14:50:51 |
| 20 | convened by the White House for discussion with | 14:50:54 |
| 21 | the inner agency. | 14:50:56 |
| 22 | Q.   So the document has two pages that have | 14:51:00 |
| 23 | text on them.  I think you don't need to go over | 14:51:03 |
| 24 | the first page and a half, which I think probably | 14:51:08 |
| 25 | generally will be familiar with you from all the | 14:51:10 |

| | | |
|---|---|---|
| 1 | Q.   Do you recall whether there was the | 15:51:27 |
| 2 | same divide between the Western Hemisphere | 15:51:29 |
| 3 | Affairs and PRM regarding the recommendation from | 15:51:31 |
| 4 | the State Department with regard to Honduras? | 15:51:37 |
| 5 | A.   I believe there was. | 15:51:39 |
| 6 | MR. KIRSCHNER:  I was going to object | 15:51:41 |
| 7 | as speculative and lack of foundation. | 15:51:43 |
| 8 | Q.   Do you recall whether there were | 15:51:45 |
| 9 | essentially the same issues that were being | 15:51:47 |
| 10 | presented by Western Hemisphere as to why TPS | 15:51:51 |
| 11 | should be extended? | 15:51:54 |
| 12 | MR. KIRSCHNER:  So objection.  Hearsay. | 15:51:55 |
| 13 | A.   Yes.  I believe so, because there was | 15:51:59 |
| 14 | an understanding, both in my office and in the | 15:52:01 |
| 15 | Department of State, that it was important, to | 15:52:06 |
| 16 | the extent possible, treat Honduras and | 15:52:09 |
| 17 | El Salvador in a similar fashion. | 15:52:13 |
| 18 | Q.   So what kinds of conversations did you | 15:52:19 |
| 19 | have with Mr. Henshaw? | 15:52:21 |
| 20 | A.   So they were the same sorts of | 15:52:28 |
| 21 | conversations that I had with Mr. Creamer.  You | 15:52:30 |
| 22 | know, what I was doing was I was pulling all the | 15:52:32 |
| 23 | levers that I could among the people I knew in | 15:52:35 |
| 24 | the Department of State to try and serve my | 15:52:38 |
| 25 | Secretary by getting her the gosh darn paperwork | 15:52:42 |

| | | |
|---|---|---|
| 1 | in the most timely fashion possible. | 15:52:46 |
| 2 | Q.   So do you recall about how often you | 15:52:56 |
| 3 | had conversations with Mr. Henshaw about TPS? | 15:53:00 |
| 4 | A.   I don't.  You know, we're all busy | 15:53:05 |
| 5 | people, so, you know, I would have started | 15:53:10 |
| 6 | engaging him on this, as with Mr. Creamer, you | 15:53:13 |
| 7 | know, as -- as the time began to draw near, | 15:53:20 |
| 8 | right?  As it became clear that we -- that we | 15:53:23 |
| 9 | needed the paperwork soon and we didn't have it, | 15:53:28 |
| 10 | you know.  And as time went on, I would engage | 15:53:31 |
| 11 | more frequently as -- as the deadline loomed. | 15:53:34 |
| 12 | Q.   Can you describe to me who Ken Merton | 15:53:49 |
| 13 | is at the State Department? | 15:53:51 |
| 14 | A.   Yes.  Ken, during my time at DHS, was a | 15:53:53 |
| 15 | Deputy Assistant Secretary of State, who covered, | 15:54:01 |
| 16 | among other things, Haiti. | 15:54:08 |
| 17 | Q.   Can you describe about how often you | 15:54:13 |
| 18 | had communications with Mr. Merton about TPS? | 15:54:16 |
| 19 | A.   Just a couple of times. | 15:54:21 |
| 20 | Q.   In the previous deposition, you | 15:54:28 |
| 21 | described your communications with Mr. Merton as | 15:54:30 |
| 22 | essentially having the backdrop of an expected | 15:54:32 |
| 23 | termination of TPS for Haiti; to be clear, that | 15:54:37 |
| 24 | was my question, rephrasing one of the things | 15:54:39 |
| 25 | that you had said earlier, so those are not your | 15:54:41 |

```
 1   words.  But you responded with, "That's my        15:54:43
 2   recollection."                                     15:54:46
 3       Do you recall conversations with Mr. Merton    15:54:48
 4   about -- about the expected termination of TPS     15:54:52
 5   for Haiti?                                          15:54:59
 6       A.   Yes.                                       15:55:01
 7       Q.   Do you recall when you had those           15:55:02
 8   conversations?                                      15:55:03
 9       A.   I don't, but, again, it would have been    15:55:05
10   driven by -- by time; right?  So those             15:55:08
11   conversations would have taken place near to the   15:55:11
12   deadline for making the Haiti TPS decision.        15:55:15
13       Q.   You previously testified that early on    15:55:19
14   in your time at DHS, from conversations that you   15:55:22
15   had had with then Secretary of Homeland Security   15:55:25
16   Kelly, that there was an understanding that        15:55:30
17   Haiti -- that TPS for Haiti would be terminated.   15:55:33
18   Is that your recollection?                         15:55:37
19       A.   So my recollection is that in talking     15:55:39
20   to then Secretary Kelly, I had the impression      15:55:44
21   that he had foreshadowed the termination, the      15:55:47
22   eventual termination of TPS for Haiti.             15:55:52
23       Q.   What gave you that impression from your   15:55:55
24   conversations with Secretary Kelly?               15:55:56
25            MR. KIRSCHNER:  Objection.  Assumes        15:56:00
```

```
 1   facts not in evidence.  It's not exactly what          15:56:02
 2   Ambassador Nealon testified to.                        15:56:07
 3        A.   So I do recall having a conversation         15:56:10
 4   with then Secretary Kelly about TPS for Haiti.         15:56:12
 5   And he expressed his -- he expressed a lot of          15:56:16
 6   sympathy for -- for Haitians and for Haitians who      15:56:22
 7   are here on TPS.  But he also expressed a lot of       15:56:28
 8   frustration with the Haitian government.  And          15:56:31
 9   specifically that he didn't believe that they          15:56:36
10   were doing what he had asked them to do in order       15:56:39
11   to help make conditions better so that they could     15:56:43
12   bring their people home and prepare to eventually      15:56:49
13   bring their people home.  And I recall that he         15:56:54
14   was frustrated at that.                                15:56:56
15        Q.   Was it your recollection that it had         15:56:58
16   been communicated to the Haitian government that       15:57:00
17   TPS was likely to be terminated at the next            15:57:02
18   review?                                                15:57:05
19        A.   So I don't know what he had                  15:57:07
20   communicated to the Haitian government, because        15:57:09
21   this had all taken place before I came on board.       15:57:13
22   But my impression, and, again, this is my              15:57:16
23   impression from talking to General Kelly, was          15:57:19
24   that he had foreshadowed with them the                 15:57:22
25   termination of TPS.                                    15:57:29
```

```
 1   whoever.                                          15:59:53
 2        But I do recall having conversations with    15:59:54
 3   people at State Department about the fact that    15:59:57
 4   the paperwork seemed to be stuck in the policy    16:00:02
 5   planning office and wondering if that was because 16:00:06
 6   they didn't like the recommendation that had come 16:00:18
 7   forward or -- or if they were putting their own   16:00:20
 8   political stamp on it or what.  But it seemed     16:00:25
 9   unusual to me that the paperwork seemed to be     16:00:28
10   stuck in that office for such a long time.        16:00:34
11        Q.   And did you get any response from       16:00:37
12   anyone in the State Department about whether your 16:00:40
13   presumption that that was strange was a shared    16:00:43
14   assumption or was accurate?                       16:00:47
15        A.   Again, you know, these are              16:00:50
16   conversations between old friends and colleagues. 16:00:51
17   And, you know, I recall talking about this --     16:00:54
18        Q.   Mm-hmm.                                 16:00:59
19        A.   -- I -- I don't recall either of the    16:01:00
20   two gentlemen we've discussed saying, yeah, this  16:01:02
21   is how it is there.  I remember us postulating,   16:01:05
22   wondering, you know, thinking out loud.  But I    16:01:09
23   don't recall anyone saying, yes, the -- this is   16:01:12
24   now a political process and that office is        16:01:17
25   politicized.                                      16:01:22
```

```
 1        Q.   Do you recall that they -- that any one    16:01:22
 2   of the people that you were in touch with at the     16:01:25
 3   State Department had a feeling, suspicion that        16:01:27
 4   the process had become politicized in some way?      16:01:32
 5             MR. KIRSCHNER:  Objection.  Calls for      16:01:35
 6   speculation.                                          16:01:35
 7        A.   Yeah.  Again, I don't recall anyone         16:01:36
 8   saying that to me.  I recall discussing the          16:01:39
 9   issue.                                                16:01:42
10        Q.   Do you recall what others at the State      16:01:44
11   Department were saying about the issue?              16:01:45
12             MR. KIRSCHNER:  Objection.  Calls for      16:01:47
13   speculation.                                          16:01:48
14        A.   You mean other people?                      16:01:49
15        Q.   Yeah.  I mean, the people -- either the     16:01:50
16   people that you have mentioned already or other      16:01:52
17   people.  But whether -- I mean, you expressed        16:01:53
18   your feelings about this.  And, obviously, as we     16:01:56
19   talked about in the previous deposition, there      16:01:59
20   were extraordinary delays even though there were    16:02:01
21   records that, you know, the recommendation had       16:02:03
22   been sitting at a very high level in the             16:02:05
23   Secretary's office or the Office of Policy           16:02:08
24   Planning for an extended period of time.  So, you   16:02:09
25   know, did you have an understanding from any of      16:02:14
```

| | |
|---|---|
| 1   these people what their suspicions were? | 16:02:17 |
| 2        MR. KIRSCHNER:  Objection.  Calls for | 16:02:20 |
| 3   speculation. | 16:02:21 |
| 4     A.   No.  I mean, I think I understand the | 16:02:24 |
| 5   question.  And, again, there -- there was a lot | 16:02:26 |
| 6   of frustration expressed all around. | 16:02:33 |
| 7     Q.   Mm-hmm. | 16:02:35 |
| 8     A.   Because I kept calling and they kept | 16:02:36 |
| 9   having to take my calls because we're friends, | 16:02:40 |
| 10  and they had to keep giving me the same answer, | 16:02:42 |
| 11  which was that they didn't know when the memo was | 16:02:45 |
| 12  going to pop out and they didn't know what it was | 16:02:48 |
| 13  going to say. | 16:02:51 |
| 14       And so there was frustration all around. | 16:02:52 |
| 15  And that sort of became the tenor of the | 16:02:55 |
| 16  discussions as time went on, as the deadline | 16:02:57 |
| 17  loomed. | 16:03:01 |
| 18    Q.   What gave you the suspicion that there | 16:03:01 |
| 19  had been some politicalization or political stamp | 16:03:02 |
| 20  that was put on the decision-making process at | 16:03:07 |
| 21  the State Department? | 16:03:09 |
| 22       MR. KIRSCHNER:  Objection. | 16:03:10 |
| 23  Mischaracterizes testimony.  Assumes facts not in | 16:03:10 |
| 24  evidence. | 16:03:13 |
| 25    A.   So I thought that this wasn't the most | 16:03:22 |

```
 1   consequential decision that Secretary Tillerson      16:03:33
 2   would ever make and that, you know, if you look      16:03:36
 3   at the range of things that are on his plate         16:03:39
 4   every day, this isn't one that should take a         16:03:41
 5   really long time to -- for him to sign.              16:03:45
 6        And so what that told me, rightly or            16:03:49
 7   wrongly, is that -- is that politics had entered     16:03:53
 8   the game and that the thing had gotten stuck.        16:03:59
 9        Q.   Thank you.  I understand that's not,       16:04:12
10   you know, definite, but it's obviously informed      16:04:14
11   understanding.                                       16:04:18
12             MR. KIRSCHNER:  Objection.  Counsel is     16:04:18
13   testifying.                                          16:04:19
14   BY MS. MacLEAN:                                      16:04:25
15        Q.   So you testified previously that           16:04:43
16   Secretary Tillerson -- or that you were aware        16:04:45
17   that then Secretary Tillerson had communicated       16:04:48
18   with both Chad Wolf and Secretary Duke regarding     16:04:55
19   TPS as had been publicly reported?                   16:05:01
20             MR. KIRSCHNER:  Objection.  I'm -- I'm     16:05:04
21   not sure that -- I --                                16:05:07
22             MS. MacLEAN:  I don't want to              16:05:09
23   mischaracterize.                                     16:05:10
24             MR. KIRSCHNER:  -- don't want you to       16:05:10
25   mischaracterize evidence, so I just -- if you        16:05:11
```

| | | |
|---|---|---|
| 1 | have a perfect -- a cite to the testimony | 16:05:12 |
| 2 | previously, that Ambassador Nealon said, I would | 16:05:16 |
| 3 | prefer to do that. | 16:05:19 |
| 4 | BY MS. MacLEAN: | 16:05:21 |
| 5 |     Q.   So on Page 158, Line 5, and it was in | 16:05:25 |
| 6 | reference to the exhibit that is marked | 16:05:40 |
| 7 | Exhibit 35, which you have in front of you as | 16:05:43 |
| 8 | well. | 16:05:45 |
| 9 |     "Tillerson told Homeland Security's Acting | 16:05:49 |
| 10 | Secretary Elaine Duke that conditions in Central | 16:05:53 |
| 11 | America and Haiti had improved." | 16:05:54 |
| 12 |     That was a direct quote from the article. | 16:05:56 |
| 13 | And I asked: | 16:05:59 |
| 14 |     "QUESTION:  Are you aware" -- | 16:06:03 |
| 15 |     The direct quote is, in quotes from the | 16:06:04 |
| 16 | article, "Tillerson told Homeland Security's | 16:06:06 |
| 17 | Acting Secretary Elaine Duke that conditions in | 16:06:08 |
| 18 | Central America and Haiti had improved and that | 16:06:11 |
| 19 | TPS protections were no longer warranted.  When | 16:06:13 |
| 20 | the two spoke by phone, Tillerson told Duke | 16:06:16 |
| 21 | ending TPS 'was just something she had to do.'" | 16:06:19 |
| 22 |     And I asked: | 16:06:21 |
| 23 |     "QUESTION:  Are you aware of conversation | 16:06:22 |
| 24 | like the conversation that's described in this | 16:06:23 |
| 25 | paragraph?" | 16:06:26 |

1                C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    SUFFOLK, SS.

4         I, Janet M. Sambataro, a Registered Merit

5    Reporter and a Notary Public within and for the

6    Commonwealth of Massachusetts do hereby certify:

7         THAT JAMES NEALON, the witness whose testimony

8    is hereinbefore set forth, was duly sworn by me and

9    that such testimony is a true and accurate record of

10   my stenotype notes taken in the foregoing matter, to

11   the best of my knowledge, skill and ability; that

12   before completion of the deposition review of the

13   transcript was requested.

14        I further certify that I am not related to any

15   parties to this action by blood or marriage; and that

16   I am in no way interested in the outcome of this

17   matter.

18        IN WITNESS WHEREOF, I have hereunto set my hand

19   this 23rd day of August, 2018.

20                              *Janet Sambataro*

21                              _____

22                              JANET M. SAMBATARO
                                Notary Public
     My Commission Expires:
23   July 16, 2021

24

25