Pages 1 - 94

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

```
CRISTA RAMOS, individually and )
on behalf of others similarly  )
situated,                      )
                               )
          Plaintiffs,          )
                               )
  VS.                          )    NO. C 18-01554 EMC
                               )
Kirstjen Nielsen, in her       )
official capacity as Secretary )
of Homeland Security; et al.,  )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Tuesday, September 25, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

　　　　　　　　ACLU OF SOUTHERN CALIFORNIA
　　　　　　　　1313 West Eighth Street - Suite 200
　　　　　　　　Los Angeles, California  90017
　　　BY:　**AHILAN ARULANANTHAM, ATTORNEY AT LAW**

　　　　　　　　NATIONAL DAY LABORER ORGANIZING NETWORK
　　　　　　　　674 South La Fayette Park Place
　　　　　　　　Los Angeles, California  90057
　　　BY:　**EMILOU MACLEAN, ATTORNEY AT LAW**
　　　　　　**JESSICA KARP BANSAL, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
　　　　　　　　Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiffs:

3                             SIDLEY AUSTIN LLP
                             555 West Fifth Street - Suite 4000
                             Los Angeles, California 90013
4                    BY:  **SEAN COMMONS, ATTORNEY AT LAW**
                          **NICOLE M. RYAN, ATTORNEY AT LAW**

5    For Defendants:

6                             U.S. DEPARTMENT OF JUSTICE
                             Civil Div. - Federal Programs Branch
7                             1100 L Street, N.W.
                             Washington, D.C.  20005
8                    BY:  **ADAM KIRSCHNER, TRIAL ATTORNEY**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Tuesday - September 25, 2018** **10:33 a.m.** |

 2                    P R O C E E D I N G S

 3                        ---oOo---

 4        **THE CLERK:** Calling Civil Action 18-1554, Ramos,

 5   et al., versus Nielsen, et al.

 6       Counsel, please approach the podium and state your

 7   appearances for the record.

 8            **MR. KIRSCHNER:** Adam Kirschner for defendants.

 9            **THE COURT:** All right.  Good morning, Mr. Kirschner.

10            **MR. KIRSCHNER:** Good morning.

11            **MR. ARULANANTHAM:** Good morning, Your Honor.  Ahilan

12   Arulanantham for the plaintiffs.

13            **THE COURT:** All right.  Thank you.  Good morning,

14   Mr. Arulanantham.

15            **MS. MACLEAN:** Good morning, Your Honor.  Emilou

16   MacLean for the plaintiffs.

17            **THE COURT:** All right.  Thank you.

18            **MR. ARULANANTHAM:** Your Honor, the slides that I think

19   we discussed with the Court in advance, we've given copies to

20   the government and to the court reporter, and we have some here

21   for Your Honor as well if you'd like.

22            **THE COURT:** All right.  Thank you.

23       Now, what would you like to do?  My general practice is to

24   ask questions that I have.  I don't generally do presentations

25   unless -- in certain cases I do.  So is it your intent to use

```
 1  these sort of selectively, or do you have a plan to sort of
 2  make a formal presentation going through all these slides?
 3          MR. ARULANANTHAM:  No.  We'll use them selectively,
 4  and you should certainly ask questions anytime you feel you
 5  want, and we will refer to them just interspersed throughout
 6  our arguments as we proceed.
 7          THE COURT:  All right.  So you will show them as
 8  needed?
 9          MR. ARULANANTHAM:  Yes, Your Honor.
10          THE COURT:  And I assume you have good knowledge and
11  access to know when these might be handy in terms of any
12  response?
13          MR. ARULANANTHAM:  Exactly, Your Honor.
14          THE COURT:  All right.  Good.
15      And does the government have any slides or anything you'd
16  like to --
17          MR. KIRSCHNER:  No, Your Honor.
18          THE COURT:  All right.
19      First, let me ask -- I think the first thing that we have
20  to address on a motion for preliminary injunction is a balance
21  of hardships and the question of irreparable injury because if
22  there is a finding of irreparable injury and a potential
23  irreparable injury to the plaintiffs if the injunction is
24  denied and if the balance of hardships tips sharply in favor,
25  for instance, of the TPS beneficiaries, then the showing in
```

1   terms of the merits are affected.  Rather than having to show a

2   likelihood of prevailing, the plaintiffs need only show serious

3   questions raised on the merits.

4        On the other hand, if the balance of hardships does not

5   tip sharply in their favor, then a more robust showing on the

6   merits is needed.

7        So there obviously, at least in this circuit, is a sliding

8   scale.  So it makes sense to address the preliminary

9   injunction -- I mean, the balance of hardships issue, and so I

10  have a couple questions in that regard.

11       There were no -- obviously no counteraffidavits to the

12  declarations of the plaintiffs, various plaintiffs, about their

13  actual situation and the kind of hardships that would befall

14  them if the TPS terminations were to go forward without an

15  injunction.

16       The government's argument seems to be more of a legal

17  argument about the nature of their interests and the fact that

18  the harm that they are facing is sort of inherent in the

19  temporary nature of the program.  Is there some factual -- any

20  factual data that I should be aware of that would sort of

21  counter the showing of hardship?

22            MR. KIRSCHNER:  Well, Your Honor, you're correct.  Our

23  argument is primarily a legal argument.  There are operational

24  components that can be impacted on a preliminary injunction,

25  but that's not what we're resting on.  Our argument is, as we

1    laid out in our briefs, kind of the legal underpinning for both

2    the government's equities and also a causal relationship

3    vis-a-vis what plaintiffs have identified in their papers as

4    well.  So it's more of a legal argument than a factual

5    argument.

6            THE COURT:  And when you say "the causal

7    relationship," what do you mean by "causal relationship"?

8            MR. KIRSCHNER:  Well, the way I understand plaintiffs'

9    argument is if there is an illegal reason to terminate TPS,

10   then their hardships relate to that illegal decision and so

11   it's premised on a decision on the merits.

12       So there -- we are not up here trying to put doubt on

13   anything that's identified in plaintiffs' declarations by any

14   means.  That's not what we're trying to do.  What we're

15   addressing is the fact is that the inherent nature of TPS is

16   the causal relationship to any harms that are identified unless

17   the action itself was illegal, but that would be -- require a

18   decision or an assessment of the likelihood of success on the

19   merits.

20       And so what we believe is that this preliminary injunction

21   motion wins or loses on the likelihood of success on the merits

22   because the argument that plaintiffs are putting forth is

23   premised on that question.

24           THE COURT:  Well, that sort of creates a bit of an

25   intellectual quandary.  You're saying, well, if they are wrong

 1   on the merits, they're not really suffering any harm.  Only if

 2   they're right on the merits would they suffer any harm is

 3   essentially what you're saying.

 4        **MR. KIRSCHNER:**  Well, no, the harm would be flowing

 5   from the statute.  The statute itself -- the temporary nature

 6   of the statute is kind of mixed up into the inherent nature of

 7   the statute and would be the proximate cause of any harm that

 8   they identify if the action is lawful.

 9        **THE COURT:**  Well, but technically what I'm supposed to

10   look at is the harm, the practical harm, to one party -- the

11   plaintiff typically -- if the preliminary injunction is denied

12   versus the harm to the defendant if the preliminary injunction

13   is granted.  That balance is what then informs how deeply and

14   what kind of a -- how robust the showing must be on the merits.

15        You're suggesting we look almost at the merits because if

16   you win on the merits, they really are not suffering any

17   cognizable harm is what you're saying.

18        **MR. KIRSCHNER:**  From the decision at issue.  And what

19   I would say is that the harm, the legal harm, that we

20   identified to the government is the Congress setting up a

21   system that provides deference and discretion for the Secretary

22   to make these difficult judgment calls and that assuming a

23   world where this was a lawful decision, then that disrupts kind

24   of the scheme established by Congress again premised on the

25   question of the merits.

1      So our point is that the --

2          **THE COURT:**  And that would be true with any

3  preliminary injunction against any governmental action seeking

4  to enforce some statute.  Whether it's a congressional statute,

5  a state statute, some municipal ordinance, the court would be

6  upsetting the regulatory scheme enacted duly -- arguably duly

7  enacted by the Legislature and the Executive.  I mean, that's

8  almost true for every public injunction is what you're saying.

9          **MR. KIRSCHNER:**  This one's a little bit different

10 because of such discretion given to the Secretary.  The scene

11 set up by Congress is an understanding more so than in other

12 contexts of the deference given and how it's a balancing of the

13 various factors in assessing something that Congress had

14 precluded from judicial review for the ultimate decision.

15     And so this takes on a different nature than maybe just a

16 run-of-the-mill arbitrary and capricious claim about some

17 regulation.

18         **THE COURT:**  Is there some concrete harm to the

19 government if the temporary -- the status quo were continued

20 until this case is adjudicated?  In other words, is there any

21 claim of threat to national security or economic harm that

22 would befall the nation or some industry or -- other than the

23 idea that Congress, especially in this area of immigration

24 policy, and Executive should be able to carry out with the

25 deference they normally do without interference from the

 1   judiciary?  Is there some concrete harm?

 2        **MR. KIRSCHNER:**  There is an operational harm of kind

 3   of starting and stopping employment authorization documents,

 4   trying to figure out how to carry that out, timing.  It's the

 5   idea of the old analogy of turning around a battleship that the

 6   government uses all the time where operationally things are not

 7   as easy as a light switch when it involves the government.

 8        But, again, I do want to emphasize that that's not really

 9   the main issue we're putting forth to you today.  It's really

10   the legal concept of the fact that the harms identified

11   throughout -- on both sides of the briefs are kind of premised

12   on this question of the merits.

13        And so our point is that this court -- we understand that

14   the Ninth Circuit has a sliding scale, but this is the type of

15   case which really does turn or fall on the likelihood of

16   success on the merits.

17        **THE COURT:**  All right.  Let me ask you just a

18   practical question on some statistics.  I don't know if you

19   know the answer to this.

20        We know the numbers of TPS beneficiaries from the four

21   countries.  El Salvador has over 263,000 people; Haiti almost

22   59,000 people; fewer numbers, 5,000 or so for Nicaragua; and a

23   little over 1,000 from Sudan.

24        Do we know -- do we have any idea what percentage or how

25   many of these beneficiaries will be subject to deportation in

 1   all likelihood upon termination of TPS status; i.e., they don't

 2   have any other documented status, that maybe some might apply

 3   for some form of relief?  But just can we assume that absent

 4   some either asylum or something else, that nearly all these

 5   beneficiaries are going to be subject to removal?

 6           **MR. KIRSCHNER:**  Not -- not substantially all, no.

 7           **THE COURT:**  No?

 8           **MR. KIRSCHNER:**  You're not to assume that.  What -- I

 9   don't have a specific statistic for you, but I do understand

10   that for Sudan, the last I had heard, and this is a little -- a

11   little dated, but that it was somewhere between 250 to 300

12   individuals registered for TPS.

13       My understanding, and this is based on my understanding,

14   is that the way it works is that if you had TPS when TPS was

15   designated, then you're still eligible for TPS.  And so the

16   thousand number, I think it might be including individuals who

17   might have adjusted status since they've been in the

18   United States, and so the thousand number is kind of the outer

19   limit.  It's not the minimum.

20       Though, I will say that there are -- there certainly are

21   some individuals, a large number of individuals, who might not

22   have other legal status or other -- or other visas available.

23           **THE COURT:**  What about for the larger numbers from,

24   like, El Salvador and Haiti?  Do we have any idea how many

25   folks have adjusted status, what percentage, as opposed to

1    being vulnerable to removal?

2            MR. KIRSCHNER:  Well, so I should say that that

3    number -- there might be various reasons someone didn't

4    register.  Someone might have moved out of the country, and so

5    that might have -- someone might have adjusted status; and

6    someone might have not registered because maybe the reason for

7    registering was for employment authorization purposes and

8    decided not to register for whatever reason.

9            So I don't want to say that the number of 264 or 250 -- I

10   have that number 264 in my mind -- is the end-all-be-all number

11   for Sudan.  I'm not quite sure.  I don't have the statistics

12   for the others, but I do think that there's, you know, a

13   sizable percentage that falls into every camp of adjustment of

14   status, maybe other visas, maybe left this country, and not

15   having any other legal status as well.

16           So --

17           THE COURT:  Does the government have any idea, just

18   roughly, out of the 263 how many are likely to be facing

19   removal proceedings?  I mean, is it half?  Is it 90 percent?

20   20 percent?

21           MR. KIRSCHNER:  I would assume, this is -- that most

22   of the people who register for TPS do not have other avenues.

23   TPS is not in lieu of other status.  It's in addition to other

24   status.  But if others have other status, then they might not

25   have --

1          **THE COURT:**  They might have registered for TPS?

2          **MR. KIRSCHNER:**  Yeah.  Exactly.

3          **THE COURT:**  And the 263- or 264,000 beneficiaries, is

4    that the number of people who have registered?

5          **MR. KIRSCHNER:**  That was my understanding.  It is a

6    little dated but that was my understanding for Sudan.

7          **THE COURT:**  So it's a fair assumption that most of

8    these folks would not have other adjusted status otherwise they

9    wouldn't have registered for TPS?

10          **MR. KIRSCHNER:**  I think it's a fair assumption that

11    there's a considerable amount of those individuals.

12          **THE COURT:**  Okay.

13          **MR. KIRSCHNER:**  And we're not -- let me put it this

14    way:  We're not disputing the fact that there are individuals

15    who do not have other status --

16          **THE COURT:**  All right.

17          **MR. KIRSCHNER:**  -- but we do say that there are

18    individuals who do have other status.

19          **THE COURT:**  And do we know what percent of, let's say

20    from El Salvador, of the 263 are children?

21          **MR. KIRSCHNER:**  I don't have those numbers,

22    Your Honor, available to me today.

23          **THE COURT:**  Did the government in making its decision

24    have those numbers?

25          **MR. KIRSCHNER:**  Your Honor --

1          **THE COURT:**  The Secretary.

2          **MR. KIRSCHNER:**  -- there may be some numbers in the

3    record.  I just don't have them off the top of my head.

4          I do know that that's one of plaintiffs' claims, is

5    whether that was taken into account.  There was some general

6    statements about the impact on children, the humanitarian

7    impact.  Secretary of State Rex Tillerson talks about that in

8    his letter, not by number but by -- but talks about the --

9    about taking into consideration the humanitarian impact; but

10   said that, in the end of the day, from his perspective, his

11   recommendation was based on how he interpreted the law of TPS

12   and kind of looking at the impacts with whether those

13   countries -- the conditions within those countries.

14         **THE COURT:**  So I take it the government would not have

15   the more specific number of how many are citizen children --

16   how many citizen children would be affected or would it?

17         **MR. KIRSCHNER:**  Not that I have today.

18         And I would say that -- I mean, just to -- for purposes of

19   today, we are not disputing the fact that there will be

20   individuals who have TPS who might be children nor are we

21   disputing the fact of -- the fact that there would be U.S.-born

22   children of TPS beneficiaries.

23         I will note that -- as I'm talking here today, is that I

24   believe Nicaragua and El Salvador were not ever redesignated,

25   and redesignation is very important to understand.

1  Redesignation kind of starts the clock over again of who's

2  eligible for TPS.  So you have to -- when you get designated

3  for TPS, a country does, the individuals who are eligible are

4  the individuals who are currently in the United States.  It's

5  set up for people in the United States already at the time of

6  the designation.

7       And so Nicaragua and El Salvador were in 1999 or 2000, and

8  so I do not believe they've ever been redesignated and that

9  means that by definition everybody who was in the United States

10  at that time would now be -- would be an adult.

11       THE COURT:  So if there wasn't redesignation, then

12  there wasn't a new group of people then being designated?

13       MR. KIRSCHNER:  Correct.

14       THE COURT:  These would have been families who were

15  already here under the original designation?

16       MR. KIRSCHNER:  Exactly.

17       THE COURT:  And what about Haiti?  Was there a

18  redesignation?

19       MR. KIRSCHNER:  The following year.  So the original

20  designation I believe was 2010 and then there was a

21  redesignation in 2011.

22       And I believe -- and Sudan has been redesignated.  And off

23  the top of my head, I believe the last redesignation was 2013,

24  though that's -- one thing to point out about the history of

25  designations and redesignations and extensions, that's all in

 1   our motion to dismiss briefing.  We tried to lay out the

 2   history in our motion to dismiss briefing of the Federal

 3   Register notices filed for each of these countries.

 4           **THE COURT:**  Right.

 5       And then let me ask about Sudan in particular.  I think

 6   the initial -- some of the initial documents indicated that

 7   there were concerns about the safety, the conditions in Sudan

 8   being still insufficiently safe to return; and then that was

 9   refined at some point to say, "Well, certain parts of Sudan are

10   now safe, certain parts are not so safe; and, therefore, the

11   conditions to terminate TPS status have been met."

12       Is there some indication as to what regions and how much

13   of the population in Sudan are in areas that DHS still

14   considers not safe to return to?

15           **MR. KIRSCHNER:**  Well, so in the Federal Register

16   notice it refers to regions such as -- I think Darfur might

17   have been one of the regions discussed.  So the Federal

18   Register notices themselves refer to the regions.

19       I will note that --

20           **THE COURT:**  Do you have any idea of what percentage of

21   the population is affected in those designated regions?

22           **MR. KIRSCHNER:**  No, Your Honor, I don't.

23       What I do know is that the Federal Register notice talks

24   about the ability of Sudan as a general matter of being able to

25   provide for the safe return of its nationals given the

1    population involved and the remainder of the country.

2          THE COURT:  The remainder of the country, but I guess

3    it seems like it's an obvious question but, you know, you would

4    think you would want to know what parts of the country and

5    where the population centers are and how much of the population

6    is still affected by areas acknowledged by DHS as not being

7    safe.

8          And more to the point, if you're going to remove the

9    Sudanese beneficiaries, would it make a difference which

10   regions -- if you're going to start parceling up a country by

11   regions that are safe and unsafe, wouldn't it matter before you

12   deport somebody that their family is in a safe or an unsafe

13   region?  I mean, would that -- does that make any difference?

14         MR. KIRSCHNER:  Well, I think that it's a question

15   that the Federal Register notice discussed, is -- it kind of

16   discussed it in two different ways.  First, the question of

17   whether the originating conditions no longer apply, and then

18   whether there could be provided for a safe return of the

19   nationals, and you're talking about the second component.

20         THE COURT:  Yes.

21         MR. KIRSCHNER:  And on that second component, what it

22   made finding, as discussed in the Federal Register notice, is

23   that the country as a whole could sufficiently provide for the

24   return of up to 1,000 nationals if it was for all of the TPS

25   beneficiaries.

1           **THE COURT:**  But what if their family, their roots are

2     in a region like in Darfur, in an area that is problematic?  To

3     say, "Well, okay, they can safely reside and they can go back

4     to a country" but they're going to go back to a country where,

5     you know, they're not from, a different part of the country

6     where they don't have any roots or connections or cultural ties

7     or whatever it is?  I'm just wondering whether that was

8     considered.

9           **MR. KIRSCHNER:**  So what was -- what the Federal

10    Register notice -- I just refer you to the Federal Register

11    notice in terms of the explanation about what was considered

12    for those regions.

13          **THE COURT:**  All right.  Do you have any reaction to

14    the *amicus* brief filed by California and various other states

15    that talk about the impact, not just to the beneficiaries but

16    to the economy, with their estimate that 132 billion in cost to

17    the GDP if all the beneficiaries were to be removed, a decline

18    of over $5 billion in Social Security and Medicare

19    contributions that these folks are making paying into the

20    system, and then hundreds of millions of turnover costs because

21    a lot of these folks are working, involved, deeply entrenched

22    in the economy?  Does the government take issue with any of

23    those estimates?

24          **MR. KIRSCHNER:**  It is, again, a legal argument on the

25    causation question that we discussed vis-a-vis the individual

1    plaintiffs.

2         **THE COURT:**  Okay.

3         All right.  I'd like to hear from the plaintiffs' counsel

4    on this main argument about the causation, about the harm being

5    really tied to really the government -- or the plaintiff being

6    able to prevail on the merits, which is essentially your

7    argument.  Because if they're -- if the action is legal, then

8    there's real no net harm.

9         **MR. KIRSCHNER:**  The net harm not based on an illegal

10   decision.

11        **THE COURT:**  Yes.  What's your response to that?

12        **MS. MACLEAN:**  Well, we would certainly say that we

13   make a case that plaintiffs can present a likelihood of success

14   on the merits of both the APA and equal protection claim, but

15   we would also identify that the asymmetry here, as the Court

16   has recognized, is indisputable.

17        The harm for the government if there is a preliminary

18   injunction that's entered here is really a delayed termination

19   of TPS for people who've held that status for years or decades;

20   where the harm for the TPS holders, both the plaintiffs and

21   hundreds of thousands of other TPS holders, is immediate and

22   not possible to remedy if a preliminary injunction is not

23   issued before the end of the case.

24        **THE COURT:**  So what is your legal answer to the

25   government's argument that you have to look to -- you only

consider the harm that befalls the plaintiff if the action is
illegal; but if it's legal, they really suffer no cognizable
harm for balance of hardship purposes?

   **MS. MACLEAN:**  Well, the issue at this case -- at this
point in the case is whether a preliminary injunction needs to
be entered to preserve the status quo, and in this case the
balance of -- the analysis of the balance of harms and the
remedies is different.

  It's also important to note that the plaintiffs --
sorry -- the defendants are misrepresenting in part what the
intention of the statute is.  The statute is about humanitarian
protection.  Congress did not identify within the statute a
limited number of times that the TPS status could be renewed
for individuals who are on that status.  Temporary Protected
Status during these periodic reviews must be extended if the
country conditions should be met.

  So in this case if plaintiffs -- if defendants wrongly
terminated TPS, the proximal cause of the harm is defendants'
actions, not anything related to any sort of temporary nature
of the statute or temporary nature of periodic designation
within the statute.

   **THE COURT:**  Well, the argument, though, is if they're
right, then there's no harm so you should look at who prevails
on the merits almost as a precondition to determining whether
there's an irreparable injury and balance of hardships.

1      And your legal position --

2          **MS. MACLEAN:**  Your Honor, we don't assert that it is

3  not relevant for this Court to consider whether we have a

4  likelihood of success on the merits of both the APA and the

5  equal protection claim.  We believe that there is a

6  likelihood -- a strong likelihood of success on the merits of

7  the APA and equal protection claim, but also that there is a

8  dramatic difference in the balance of equities and the harms

9  that are at issue in this case.

10         As Your Honor identified is found in the *amicus* briefs in

11  this case and as well in defendants' own evidence that they

12  have presented statements from the Department of Defense, the

13  Department of State, the Department of Homeland Security.

14  We've tried to catalog those in what you have as Slide 14 of

15  the slides before you.

16         So the balance is markedly on the side of plaintiffs for

17  harms, public interest, and the balance of equities, but that

18  is not to say that the Court should not also consider and find

19  in favor of the plaintiffs on the question of the likelihood of

20  success on the merits of both of the claims that are at issue

21  here.

22         **THE COURT:**  Do you have any comments on some of the

23  stats that I asked about, whether there are stats that show how

24  likely it is of people who will be removed once Temporary

25  Protected Status is terminated and how many children will be

1    affected?

2          MS. MACLEAN:  We can't know what the government will

3    do with their action -- with any ultimate terminations of TPS

4    status, but it is fair to say, as the government has already

5    acknowledged, that people who have TPS are also eligible for

6    other status.  So people and many of the people -- all of the

7    people who have TPS status from these countries have had it for

8    years or decades.  So presumably if they were eligible for some

9    other status, they would have sought it already.

10         THE COURT:  So you interpret these -- and the numbers

11   that I have are numbers of people who are registered TPS

12   recipients?

13         MS. MACLEAN:  Yes.  The numbers, as we understand

14   them, and they're from the government's Federal Register

15   notices, is that there are over 300,000 people from the four

16   countries at issue in this litigation who have TPS.

17         This is not to say that individuals would not seek other

18   forms of protection and are not already seeking other legal

19   remedies that are available, but we would not dispute the

20   assertion that the government has made that likely a very large

21   number of those 300,000-plus people would not have another form

22   of protection available and would be at grave risk of removal,

23   family separation, and all of the harms that result from a loss

24   of legal status.

25         THE COURT:  All right.  Let's get to the likelihood of

success and a showing on the merits.   The two claims that are

at issue here is the one under the Administrative Procedure Act

and the equal protection component of the due process clause.

So let's talk about the APA first.

      **MS. MACLEAN:**  Okay.

      **THE COURT:**  The government's argument, as I understand

it, and there's several-fold, one is there was no real change,

but on the legal question the government seems to argue that

the requirement that any change in policy be accompanied by an

explanation by the agency in order to comply with the APA only

applies -- the purpose of that is to make sure that, quote,

"regulated entities have fair notice" and that this rule sort

of only applies to regulatory administrative actions; and that

this is not the kind of regulatory action like in the *Encino*

case, I guess it was, where it's about regulating exemptions

under the Fair Labor Standards Act and, you know, a change in

regulation of people who have to -- those who are affected have

to conform their conduct to a regulation and so when the

regulation changed, they need fair notice.

    Do you have -- what's your position on that and what case

law suggests that you don't have to be a regulated entity in

order to impose the strictures that you are arguing are

required by the APA?

      **MS. MACLEAN:**  First, if I may, Your Honor, I would

just like to say that I will, with the Court's permission, I

1    will cover issues related to the APA and my co-counsel will

2    address issues related to equal protection, as well as any

3    issues that the Court may have --

4            **THE COURT:**  All right.

5            **MS. MACLEAN:**  -- with regard to remedy.

6        The government really cites no evidence for this

7    distinction between regulated entities and nonregulated

8    entities.  And, in fact, in the language of their opposition,

9    the government identifies that the purpose of the APA is to --

10   they cite an unremarkable proposition from various cases that

11   are cited that regulated entities and other interested parties

12   should be able to have reasonable notice of a government -- of

13   a change in agency practice.

14       And that's precisely what's at issue here, is that TPS

15   holders are at least interested parties who are affected by

16   agency decision-making in this case, the agency changing the

17   rules of the game with regard to how TPS decisions are made.

18       There's myriad cases, some of which Your Honor cited in

19   the order on the motion to dismiss, which make plain that the

20   APA applies broadly to agency action, including settled

21   practice.

22           **THE COURT:**  What's an example of -- unlike *Encino*

23   *Motors* where dealerships have to kind of figure out what

24   they're going to do and how they're going to compensate service

25   managers, can you give me some examples of where there's not

1  that kind of reliance interest on the relation?

2        **MS. MACLEAN:**  Yeah.  The Ninth Circuit recognized this

3  in *Bonneville Power* and *California Trout* even though in

4  *California Trout* the Ninth Circuit did not find an APA

5  violation in this case.  The Northern District of California

6  also recently recognized this in the *Regents* case regarding the

7  DACA rescission policy of this Administration.

8        **THE COURT:**  Why don't you explain that a little bit,

9  for instance, the *Bonneville Power*, of why that's not an

10  example of a regulated entity whose reliance interests are then

11  upset by a change in policy?

12        **MS. MACLEAN:**  So *Bonneville Power* concerns the

13  authority governing a fish passage center, and there were

14  concerns from environmental groups about the change in the

15  entity that had control over the fish passage center.

16      The Ninth Circuit recognized that the practice over

17  decades of the fish passage center being managed by one entity

18  could not be readily upset by a new solicitation that

19  changed -- that would change the authority that was overseeing

20  the fish passage center.

21      Similarly, in *California Trout*, while the court did not

22  find an APA violation in that case, the court recognized that

23  an APA violation could be found and could be determined by the

24  implied rules of the court with regard to whether a late

25  intervention would be permissible.

1        Obviously, these are different from the context of *Encino*

2   *Motorcars* where you're talking about, you know, a regulated

3   entity and a statute that's at issue.

4        **THE COURT:**  And so your view is that you don't have to

5   show sort of any particular reliance interest on the part of

6   those subject to the regulation being unsettled or upset in

7   order to trigger the APA requirement?

8        **MS. MACLEAN:**  Certainly not, and the case law from the

9   Supreme Court on down is clear that a reliance interest is not

10  required.

11       **THE COURT:**  When you say case -- what's a good example

12  of case law that says no reliance interest is required?

13       **MS. MACLEAN:**  Well, the -- I would say *Bonneville*

14  *Power* is an example of that case.  *American Wild Horse*

15  *Preservation* in the D. C. Circuit is an example of that.

16       Where the reliance interests are relevant, and we

17  certainly do think that there are reliance interests that are

18  at play here, is that there is a particular obligation for a

19  detailed reasoned explanation where there have been serious

20  reliance interests.  The U.S. Supreme Court has recognized that

21  in *State Farm*, obviously in *Encino Motorcars*; and the

22  Northern District of California cited to that holding in the

23  *Regents* case identifying that DACA recipients, community

24  members, colleges, and government actors had relied on the past

25  practice with regard to the DACA policy of this

1    Administration -- of the prior Administration.  Sorry.

2         **THE COURT:**  So what would be the reliance interest

3    here that TPS beneficiaries are relying not on the fact that

4    there would never be a termination?  Because as the government

5    points out, the TPS is by its nature and its name temporary,

6    but a more subtle reliance on the fact that the Administration

7    and subsequent Administrations would look at all country

8    conditions and not just those subject to the originating

9    condition.

10        **MS. MACLEAN:**  Yes, Your Honor.  As the plaintiffs'

11   declarations make clear, they have relied on the interpretation

12   of the Temporary Protected Status statute over the years, in

13   some cases decades that they've had TPS protection, to presume

14   that as long as the country conditions remained such that it

15   was unsafe for them to return, the TPS would not be terminated.

16        They have paid attention to what the Administration --

17   what various Administrations have done with regard to TPS, and

18   they have responded by becoming more integrated in their

19   communities based on an analysis of both the Administration

20   over time, various Administrations' practices, and an analysis

21   of what was happening in their countries.  So plaintiffs have

22   bought homes, bought businesses, settled in communities,

23   et cetera.

24        **THE COURT:**  And so what your argument is that reliance

25   interest does not preclude a change or a termination if

1  properly done but does preclude a change in the rules without

2  an explanation?

3          MS. MACLEAN:  Exactly, Your Honor.

4          THE COURT:  And how fundamental must there be a

5  change?  How fundamental must a change be in order to trigger

6  this requirement of an explanation?  The government argues that

7  they didn't really radically change the rules, it was just

8  weighing factors differently.  Now, if that were factually

9  true, would that be sufficient or insufficient to trigger the

10 explanation mandate?

11         MS. MACLEAN:  First of all, that's not factually true.

12 The change here, as voluminous evidence demonstrates, and I

13 would be glad to discuss with you if that's of interest, but

14 the evidence demonstrates that there was a category of

15 information that was considered central as evident in the

16 declaration of Leon Rodriguez, the former USCIS director,

17 paragraphs 16 through 18 of his declaration, that was precluded

18 from consideration by this Administration in their TPS

19 determinations.  That's precisely the kind of legal question

20 that is at issue and that does constitute a rule.

21     This is not just a change in emphasis.  It's not -- there

22 are various other changes in agency practice that we have

23 identified and is identified in the record, evidence including

24 a change of the timing of when Federal Register notices are

25 presented and who was responsible for drafting certain things,

1    those are not the kinds of changes where the APA obligation for

2    a reasoned explanation would inherently be triggered.  This is

3    a fundamentally different kind of change.

4          **THE COURT:**  So how do you distinguish between those

5    that are, quote, "fundamentally different" and those that are

6    not?

7          **MS. MACLEAN:**  Well, the difference is made in the

8    definition of agency action.  Under the APA, agency action

9    includes a rule and where -- and a rule includes and is defined

10   to include an interpretation or implementation of law or

11   policy.  This is precisely what that is.

12        Some of the other changes that are identified may be

13   relevant for the equal protection analysis but don't invoke

14   that definition and would not be considered rules under the

15   APA.

16        **THE COURT:**  So the question is whether the change is

17   to a rule?

18        **MS. MACLEAN:**  The question is whether a change is

19   agency action as defined under the APA.  An agency action

20   includes a rule.  It's not limited to a rule, but the rule is

21   what is at issue here.

22        **THE COURT:**  Of course, there was no rule -- there was

23   no explicit rule here.  There was really more of a -- either an

24   unwritten rule or a practice or a policy, which I had already

25   found can constitute agency action.

1      **MS. MACLEAN:**  Yes, and Your Honor is not the only one

2  that has found that.  The Ninth Circuit has found that.  The

3  D. C. Circuit has found that.  Your Honor's decision previously

4  recognized that in citations to *American Wild Horse*

5  *Preservation Campaign* and *California Trout* and

6  *Bonneville Power*.

7      But, yes, a settled practice can constitute -- can be a

8  way that a rule is identified, delineated, and where -- and it

9  can create that expectation where a reasoned explanation is

10  required for any change.

11      **THE COURT:**  But I guess I'm asking this question maybe

12  in a third different way.  How does one judge whether you call

13  it a change in practice, a change in policy, a change in rule?

14  When is it fundamental enough to trigger -- to constitute

15  agency action that must be justified by an explanation?  Is

16  it -- does it depend -- is it a test of materiality somehow?

17  Is it a test of how outcome determinative it is?  Is it a test

18  of -- how do you determine whether that change is significant

19  enough?

20      **MS. MACLEAN:**  It's difficult to identify exactly where

21  something would fall on the line.  In this case it's clear

22  we're talking about a change in the law governing how decisions

23  are made by the agency.  Certainly other changes that are less

24  clear may also trigger agency action.

25      So, for instance, you know, *California Trout* was speaking

```
 1   about late interventions, which I would say is arguably a less
 2   significant change in law or policy than the change that we're
 3   talking about here.
 4        Certainly not any change in the way that governments make
 5   decisions or the processes that governments go through -- the
 6   government or an agency goes through in making a decision would
 7   implicate the APA obligations.
 8             THE COURT:  So if you compare it to the case law, you
 9   get some idea where on the scale this is is your best answer, I
10   guess?
11             MS. MACLEAN:  Yes, Your Honor.
12             THE COURT:  Okay.  All right.  Let me hear the
13   government's counterview.
14             MR. KIRSCHNER:  Yes, Your Honor.
15        And just as kind of a clarification, when we differentiate
16   between APA and equal protection, just our view is they're both
17   APA.  One is an arbitrary and capricious claim and one is an
18   equal protection claim pursuant to the APA.  That's neither
19   here nor there.  I just kind of wanted to clarify that position
20   for the record.
21             THE COURT:  Okay.
22             MR. KIRSCHNER:  So it's not our position that there
23   aren't any regulated parties or interested parties here.  There
24   are.  They are when there's a TPS determination, and that is
25   where the interests lie.
```

 1      And what's becoming clear is that this is not a collateral

 2   challenge, that this is a garden-variety challenge of what you

 3   would make to argue when an agency action determination is

 4   arbitrary and capricious.

 5      And what's important in terms of thinking about this and

 6   taking a step back, plaintiffs' arguments really try to write

 7   out of the statute the judicial review preclusion provision the

 8   way that they have presented it for the PI and that this is not

 9   just challenging the terminations at issue today but really

10   puts at risk future designations.

11      Because each Administration when it comes into power

12   has -- puts different emphasis and different focus on different

13   factors from its policy perspectives; and just as plaintiffs

14   today are challenging a termination, another plaintiff can

15   argue at a future date against a designation as a disruption

16   from the practice of the current Administration.

17      And so --

18          **THE COURT:**  Well, they would have to demonstrate that

19   there was a change in some more systemic -- a systemic change

20   that's not just, "Well, we've now looked at the same facts and

21   think it's now safe to return because certain conditions have

22   changed.  We applied the same criteria."  I think they've

23   conceded that that kind of individualized decision would not be

24   subject to review under the TPS statute but the change in

25   systemic rules of what are you going to consider, do you

 1 consider current conditions or only the originating conditions.

 2     And as I understand the plaintiffs' argument, they're not

 3 even saying, at least not yet at this point, that an

 4 Administration could not adopt the view that you only look at

 5 originating conditions.  They may take issue with that later, I

 6 don't know, if that ever happens; but I think the argument

 7 before us right now is that having made that change, it needs

 8 to be accompanied by an explanation and an acknowledgment and

 9 that hasn't happened here.  So it's a very modest argument in a

10 sense.

11     **MR. KIRSCHNER:**  So I wanted to get into the case law,

12 but I just wanted to -- because I think the case law sheds

13 light on this because -- and why this really is putting at

14 issue all of TPS in general.

15     They cite several cases and in each of those cases, the

16 claim of a change in rule was something that impacted

17 substantive or procedural rights.  That's true for *McNary*

18 itself, which is the idea of the interview process.  That's --

19 *McNary* involved a procedural right that didn't go to the

20 substantive decision of adjustment of status and, therefore, it

21 was viewed as collateral because there was a procedural right

22 at issue.

23     Taking the cases that plaintiffs cite, *Bonneville* was a

24 challenge to a substantive decision of the decision to transfer

25 to a third-party contractor.

*California Trout* was at issue a procedural right, the idea of whether and at what time someone can intervene.

*Regents*, again, is a challenge to a substantive decision of whether DACA is or was in existence or was to be terminated.

*Wild Horses*, a substantive decision, whether a tract of land was protected or not protected for wild horses.

Again, every single instance that plaintiffs identify is that there is a procedural or a substantive right that is impacted by the purported new rule in those cases.

And so to answer your question at the end, when would this trigger the idea of a need for a new explanation for a new rule, it's when there are substantive or procedural rights impacted.

Here, and this goes back to my point about this not really being a collateral challenge, really their dispute is with the termination, which without dispute impacts substantively the individuals.  But plaintiff -- but the key here is that, for the reasons we've discussed and is laid out in the statute previously, that Congress explicitly said that decision is not subject to judicial review.

And so plaintiffs, since they're making a collateral challenge, the collateral challenge has to be something that's impacting procedural or substantive rights for it to trigger the question of whether this is actually a new rule as a regulatory action subject to the APA arbitrary and capricious

standard.

     **THE COURT:**  Well, so a change -- whether you call it collateral or systemic, nonindividualized -- about what criteria to consider in extending or terminating TPS status, I mean, how does that not affect the substantive rights of the beneficiaries?

     **MR. KIRSCHNER:**  So that's what our -- I guess that's the point I'm trying to make, is that it's all tied up into the substantive decision of whether to terminate or not.

    And so this is -- this is exactly how one would bring an arbitrary and capricious --

     **THE COURT:**  Well, it may result in the same -- you know, it's a -- you only get two choices:  You terminate or you extend.  I mean, it's one or the other, but the reason for reaching that decision may be different.  One is due to a disagreement with the Secretary's assessment of the facts; another would be based on a change in the rules changing the criteria by which those facts are going to be considered across the board, not just one country to another.

    There are individualized decisions and there are more systemic decisions, and they brought a more systemic challenge.

     **MR. KIRSCHNER:**  But how a Secretary weighs those factors, Your Honor, is not something that in itself is impacting the substantive or procedural rights.  Every single case relied on by plaintiffs, the matter that was being

1   challenged impacted a substantive or procedural right in every

2   single instance.  They have not identified a single case in

3   which the collateral challenge is itself not impacting

4   procedural or substantive rights.  It is only to the extent

5   that they are in those cases challenging the procedural impact

6   or the substantive impact of the decision.

7        **THE COURT:**  I'm just -- I'm having trouble

8   understanding what the distinction is.  This is a procedural

9   challenge to a systemic -- what they contend to be a systemic

10  change in the procedure which in turn has a real-world

11  substantive impact on rights.  So I'm not sure I understand

12  your distinction.

13       **MR. KIRSCHNER:**  Because there's no interface with the

14  public.  Everything else, all those other cases are involving

15  interfacing with the public.  The interfacing with the public

16  is the termination.

17       And it seems to us that plaintiffs are trying to have it

18  both ways.  To get around the judicial review preclusion

19  provision, they argued at the motion to dismiss stage that this

20  was collateral; but then when they were putting forth their

21  arguments in the PI stage, they are talking about the impact of

22  the ultimate decision, which is not subject to judicial review.

23       And so the key is, in each of these cases --

24       **THE COURT:**  Well, I thought their argument is what's

25  not subject to review is the ultimate decision whether it's

1    based on sort of judging the facts, applying the standard to

2    the facts, and different Administrations and different

3    Secretaries can come out differently on the same set of facts,

4    but their challenge here is to the broader question of how

5    those decisions are made.  And even though it may result in an

6    invalidation of that decision, at least temporarily, it is for

7    a different reason.

8         MR. KIRSCHNER:  Well, just I would posit that if

9    plaintiffs were bringing an APA arbitrary and capricious

10   challenge to the termination, it would look no different than

11   the way they have brought their challenge today.

12        And our point is that when you're dealing with a

13   collateral challenge like in *McNary*, at least there are

14   procedural and substantive rights impacted under the new rule

15   theory that plaintiffs are putting forth here.  There is not

16   anything in terms, again, interfacing with the public or rights

17   or obligations that are flowing from the decision of how to

18   weigh the factors.

19        What does impact the public is the termination or

20   designation.  That's what impacts the public, but that is

21   something that is not subject to judicial review.

22        THE COURT:  All right.  Let me hear the response to

23   that argument.

24        MR. ARULANANTHAM:  I feel as though we're relitigating

25   the jurisdictional question, Your Honor, but I'll cover it just

 1    very briefly.

 2         We don't put at issue other TPS decisions.  I think their

 3    argument is actually foreclosed by *McNary*, and we actually had

 4    this exact discussion the last time; but under *McNary*,

 5    thousands of decisions, which obviously do actually affect the

 6    public, were set aside but that was permissible even though

 7    that statute foreclosed review of determinations because the

 8    underlying legal rules or predicate legal rules that go into

 9    those determinations were not covered by the jurisdiction-

10    stripping provision.

11         Now, if we were bringing an arbitrary and capricious

12    challenge, we would have said on the merits that the Sudanese

13    Civil War is still continuing, which it is, and that there's a

14    lot of violence in El Salvador and things like that.

15         Those are the arguments.  The assessment on the country

16    conditions, that's the -- that's what's foreclosed by the

17    determination provision in the jurisdiction-stripping statute.

18         Instead what we're arguing about, what my co-counsel was

19    arguing about is whether or not there is a category of

20    evidence, intervening country conditions, which is no longer

21    available for consideration.  That is obviously different.

22    That's a procedural argument.  It's not about the substance of

23    the determination itself.

24         That's really all we have to say on this subject.  I don't

25    know if you want to hear more about the APA, or if we should --

1    I leave it to you, Your Honor.

2           **THE COURT:**  I have just a couple of questions more

3    about the APA.  One is, is there an easy way to locate the RAIO

4    reports?  They seem to be scattered throughout the record and I

5    had some trouble locating them.  Is there an easy --

6           **MS. MACLEAN:**  Yes, Your Honor.  I think there's

7    actually a footnote in defendants' opposition to the PI motion

8    that references the RAIO country conditions reports.  We've

9    cited some of them but I think not all of them.

10          **THE COURT:**  So there's a footnote that identifies

11   where they all can be found?

12          **MS. MACLEAN:**  I believe so, and we can identify that

13   when I sit down.

14          **THE COURT:**  Okay.

15          **MS. MACLEAN:**  And they should all be available in the

16   administrative record that defendant submitted.

17          **THE COURT:**  That would be helpful.

18       Is it your view that the -- you have sort of painted a

19   narrative about how some of the initial reports -- and I don't

20   know if these include the RAIO reports or other things that

21   were done by career people in the department -- contrasts with

22   what was ultimately produced by the, quote, more political or

23   political-appointed people.

24       Would a review of the RAIO reports and contrasting them --

25   and the country reports I guess -- and contrasting that with

1    the decisions, would that underscore this point or --

2         **MS. MACLEAN:**   It would absolutely underscore this

3    point, Your Honor.   We can identify Haiti, for instance, as an

4    example where the country conditions reports that are produced

5    by RAIO are in stark contrast to the ultimate decision memo

6    that was presented.

7         The decision memo in the case of Haiti terminating TPS for

8    Haiti explicitly identifies that country conditions that are

9    elaborated at length in the RAIO report are not relevant if

10   they're not directly related to the original reason for

11   designation.

12        Similar language is found in the decision memos with

13   regard to other countries -- El Salvador, Nicaragua and

14   Sudan -- despite the fact that the RAIO reports are

15   overwhelming in their elaboration of various country conditions

16   that would be challenging for people to return.   That is

17   explicitly excluded from consideration in the decision memos.

18        I would also point the Court to an analysis of the various

19   different drafts of decision memos where original drafts are

20   prepared by the career experts.   We see that in the case of

21   Haiti and Sudan.   These are elaborated as well in one of the

22   slides that you have where early drafts of the decision memos,

23   including the decision memo for Sudan that was described by

24   Francis Cissna, who's the current USCIS director, was

25   identified as entirely incoherent.   That was the e-mail that

described the decision memo as looking like someone was clubbed
over the head.

        **THE COURT:**  Like a mugging?

        **MS. MACLEAN:**  Like a virtual mugging.

    And that's because the first part of the decision memo was
drafted by a career expert who had elaborated relying on the
country conditions report by RAIO as he had always done.  He's
someone who has worked in the Administration for a decade to
consider various country conditions that were at issue.

    The latter part of the memo, which at the time that
Francis Cissna saw it had already been signed by the acting
director of USCIS, included a set of recommendations that were
added on by political appointee of the head of the Office of
Policy and Strategy, Kathy Nuebel Kovarik, that excluded any
country conditions that were not originating conditions.

        **THE COURT:**  All right.  So those facts go to whether,
in fact, there was a change in terms of whether intervening
conditions were considered or not?

        **MS. MACLEAN:**  Yes, Your Honor.

        **THE COURT:**  And they also might inform the equal
protection analysis --

        **MS. MACLEAN:**  Yes, Your Honor.

        **THE COURT:**  -- as well.

    Let me ask.  Did the change in -- the changes in the
process, for instance instigating an inquiry as to whether

1    Haitian beneficiaries -- what the crime reporting and the

2    public benefits rate is; whereas -- and you contend that had

3    never been done previously by anybody -- is that a change that

4    triggers or that just informs whether or not there was a change

5    in the rules?

6              **MS. MACLEAN:**  Your Honor --

7              **THE COURT:**  What's the relevance of that under the

8    APA?

9              **MS. MACLEAN:**  It is not directly relevant to the APA

10   analysis.  For the APA analysis, all that needs to be found is

11   that there is a settled past practice, that there was a change

12   in that practice, and that there was no reasoned explanation

13   about that change.

14        In this case the third issue is almost irrelevant because

15   the government denies, in fact, that there was a change.  So

16   the main issue at play with regard to the APA analysis is

17   whether there was a settled past practice and whether there is

18   a current practice.

19        There are various changes that the record makes crystal

20   clear, including changes of the timing for the Federal Register

21   notices, the seeking of irrelevant data that the government had

22   not sought previously and, thus, had great difficulty in

23   actually acquiring because it had not previously been

24   collected, as well as these sort of eleventh-hour radical

25   transformations of the decision memos which the Secretary

1    signed and which had not happened before a long-time career

2    official, Don Neufeld, the head of the Service Center

3    Operations, said that this was something that was very

4    inconsistent with past practice as identified at the -- with

5    the first periodic review, with the periodic review of Haiti,

6    but became -- the inconsistency and incoherence and dramatic

7    changes became consistent over time with this Administration,

8    although they varied dramatically from previous

9    Administrations.

10            THE COURT:  So how is that relevant to the APA?

11            MS. MACLEAN:  It's not relevant to the APA.  It's

12   circumstantial for the APA.  It is directly relevant for the

13   *Arlington Heights* analysis in the equal protection claim.

14            THE COURT:  And how is it circumstantially relevant to

15   the APA?

16            MS. MACLEAN:  To be clear, it is not -- the Court need

17   not identify even that any of those changes occurred with

18   regard to the APA.  The APA claim specifically is around the

19   rule change in terms of the interpretation of the statute.

20        The fact that that rule change is so readily apparent

21   exists alongside these dramatic additional changes that we see

22   with this Administration, which is relevant to the APA analysis

23   that that rule change was in part driven by racial animus.

24            THE COURT:  Is it relevant to -- I understand the

25   equal protection argument, but is it relevant to the APA

1    because it shows some motive for rule change and, therefore, it

2    tends to substantiate that there was, in fact, a rule change?

3         **MS. MACLEAN:**  It could substantiate that there was a

4    change.  It is not required.  Really the APA claim is

5    extraordinarily narrow and the Court can find that without any

6    other changes.  If the only change that the Court identified

7    was this change in the statutory interpretation or the way that

8    the statute was being interpreted by the agency, that would

9    create this obligation for reasoned explanation that the

10   government acknowledges that they have not provided because

11   they deny that the rule change, in fact, occurred.

12        **THE COURT:**  All right.  So subsequent to this Court's

13   order denying motion to dismiss and the various facts,

14   quote/unquote, that were mainly documents that were quoted in

15   that order, what has -- if you could summarize what has emerged

16   through discovery to substantiate the fact of a rule change,

17   what would you point to?

18        There's the declarations of former Director Rodriguez and

19   Ambassador Nealon.  What else would you point to?

20        **MS. MACLEAN:**  Yes.  So certainly the testimony of

21   former Director Rodriguez, as directly contrasted with the

22   sworn testimony of current DHS Secretaries, is highly relevant

23   in identifying that there was a rule in the past and that rule

24   has been dramatically changed.

25        A comparison of the decision memos, the decision memos

```
 1    from prior --
 2            THE COURT:  I went through that in my order fairly
 3    extensively.
 4            MS. MACLEAN:  But we didn't have actually, at the time
 5    of your order, the decision memos.
 6            THE COURT:  Oh, the decision memos.
 7            MS. MACLEAN:  Yeah.
 8            THE COURT:  So contrasting the decision memos?
 9            MS. MACLEAN:  Yes.
10        I would just add that in Footnote 12 of the defendants'
11    opposition, defendants for the first time also acknowledge that
12    the Federal Register notices terminating TPS in this
13    Administration diverge markedly from Federal Register notices
14    of previous Administrations, something that Your Honor had
15    already found.
16        The decision memos we now have and were not part of the
17    record at the time.
18            THE COURT:  What do they show regarding the change?
19            MS. MACLEAN:  So with -- the decision memos are, in
20    the interest of clarity, based on the country conditions
21    reports.  They're prepared by USCIS.  They're ultimately signed
22    by the USCIS director with a recommendation to the DHS
23    Secretary and then ultimately signed by the DHS Secretary that
24    Kathy Nuebel Kovarik identified as the way that a decision is
25    ultimately made.
```

1          And we have in the record past decision memos that were
2     signed by Leon Rodriguez from 2016 specifically for El Salvador
3     and Nicaragua and those differ markedly from the termination
4     decision memos of this Administration for the same countries.
5     That's evident in Slides 3 and 4 that you have before you where
6     in Leon Rodriguez's decision memo we see exactly what he
7     described in his declaration, that the TPS is being extended
8     not only for the originating conditions but also and explicitly
9     because of subsequent environmental disasters.

10         In contrast, in Slide 4 we see the termination decision
11    memos of this Administration for the same countries where the
12    termination memos state that termination is recommended
13    because, quote, "current challenges cannot be tied to," end
14    quote, the original conditions.  There's a clear conflict
15    there.

16         Your Honor already identified the comparison between the
17    RAIO country conditions reports and the decision memos.  That's
18    extraordinarily important for this analysis as well.  From the
19    record evidence in this case, we know that the RAIO country
20    conditions reports, unlike the decision memos, have largely
21    remained unimpacted by political influence, and so they do
22    provide a detailed analysis of the facts on the ground at a
23    particular point in time where the career experts are
24    conducting their analysis.

25         It's the country conditions reports that USCIS draws on in

1    crafting a decision memo.  And what we know is in -- and the

2    record evidence makes clear under prior Administrations a broad

3    array of country conditions within the RAIO reports would be

4    drawn on where that was not the case with regard to this

5    Administration.

6        And specifically Slide 5 includes the language from the

7    Haiti TPS termination decision memo, which states that any

8    current issues in Haiti are unrelated to the 2010 earthquake.

9    So it doesn't deny that the country conditions in the RAIO

10   report exists; it just excludes them from the calculus.

11       The last thing that I would highlight is the statements of

12   both -- of decision-makers, political actors, and the career

13   experts.  So we have, for instance, DHS Secretary Duke stating

14   explicitly in an e-mail to then DHS Secretary Kelly that the

15   TPS decisions represented a strong break with past practice.  I

16   believe that's Exhibit 30 in plaintiffs' exhibits.

17       We have also in the record Plaintiffs' Exhibit 2 which

18   provides *prima facie* evidence of the old and the new rules

19   where Kathy Nuebel Kovarik, the head of the Office of Policy

20   and Strategy, expresses concern about three presumably Central

21   American memos which, quote, "read as though they'd recommend

22   an extension."  This is identified in Slide 6.

23       The career expert responds that all the standard metrics

24   do justify extension and the only way to justify termination

25   would be to limit consideration to country conditions that are,

1  quote, "clearly linked to the initial disasters prompting the

2  designations."

3      So in sum, it reads as the old rule or all the standard

4  metrics that the career expert was familiar with and had used

5  when prior Administrations required that TPS be extended, and

6  to get to the termination decisions, a new rule had to be

7  applied.

8          **THE COURT:**  All right.  Let me ask the government.  It

9  seems to me that by every measure there was a change inasmuch

10 as it -- whether you look at the Federal Register notices,

11 whether you look at the decision memos, whether you look at the

12 testimony of Secretary Nielsen to Congress, whether you look at

13 the memo from Ms. Kovarik, whether you look at the Duke e-mail,

14 they all indicate there was a change.

15     Now, you can say that's not a fundamental change, that's

16 not one triggering the APA for various reasons, but how can you

17 possibly say that there wasn't a change from prior practice of

18 considering all conditions that may affect the conditions in

19 the country that would make it safe or unsafe for people to

20 return and one that says now it has to be clearly tied to the

21 originating condition only?

22         **MR. KIRSCHNER:**  Your Honor, plaintiff spent a lot of

23 time not talking about the actual decision-makers, and I would

24 point you to two specific exhibits that we cited in our brief.

25 Acting Secretary Duke wrote an e-mail, contemporaneous e-mail,

to Chief of Staff of the White House John Kelly explaining her decision to not terminate Honduras.  She said (reading):

> "The originating conditions no longer exist but I am not terminating because I've received information that Honduras cannot adequately provide for the safe return of its nationals."

**THE COURT:**  But she made the decision that that's the only reason to save Honduras, and that was a temporary extension as I recall, not to say that they're going to stay on the list but right now things are so -- we can't figure out a safe way to bring people home.

**MR. KIRSCHNER:**  Well, but that's --

**THE COURT:**  The predicate of there no longer being a lingering condition tied to the originating event seemed to have been found there as well.

**MR. KIRSCHNER:**  So that's exactly the same language from the 2016 memos on Slide 3 of plaintiffs' slides.  In talking about Nicaragua, it said (reading):

> "Subsequent environmental disasters have substantively disrupted living conditions such that Nicaragua remains unable temporarily to handle adequately the return of its nationals."

Same for El Salvador.  Again, they both are talking about current conditions in the context of safe return of its nationals.

 1          And this was not just an e-mail that Acting Secretary Duke

 2   wrote to Chief of Staff John Kelly?

 3          THE COURT:  What exhibit number is that?

 4          MR. KIRSCHNER:  I believe it's Exhibit 3 -- sorry --

 5   Exhibit 7.  Exhibit 7 of our opposition.  And she's writing

 6   about Nicaragua and Honduras, and for these purposes I'm

 7   talking about the Honduras discussion in that e-mail.

 8          THE COURT:  Do you know where it is in the Degen?

 9          MR. KIRSCHNER:  Yeah, if I can get a binder from here

10   to pull up.

11          THE COURT:  Yeah.  Yeah.

12                    (Pause in proceedings.)

13          MR. KIRSCHNER:  Yeah, so it's -- it's Exhibit 7 and

14   it's the e-mail from what says S2ECD to John Kelly, and we

15   would stipulate that that e-mail is from -- well, at the bottom

16   of the e-mail it says Elaine Duke, Acting Secretary, Department

17   of Homeland Security.  It's Monday, November 6th, at 3:23 p.m.

18          THE COURT:  Does this have a DPP Bates number?

19          MR. KIRSCHNER:  Yes.  It's RFPD4, 0004.

20          THE COURT:  Okay.  For some reason I only have it -- I

21   have the plaintiffs' exhibit numbers.  I don't know -- I know

22   there's a version of that somewhere in here because I remember

23   reading what you just said, and I don't --

24          MR. KIRSCHNER:  I'm happy to give you my copy here.

25          THE COURT:  All right.

1          MR. KIRSCHNER:  Just --

2          THE COURT:  Unless the plaintiff knows which number it

3     is in the Degen.

4          MS. MACLEAN:  Your Honor, 135 is the full e-mail.

5     It's a slightly more limited version than defendants have

6     produced.

7          MR. KIRSCHNER:  It's the bottom e-mail that we're

8     citing for those purposes.

9          THE COURT:  135?  That's DPP Number 3533?  3531?  Is

10    that the same?

11         MR. KIRSCHNER:  I'm happy -- plaintiffs -- there is

12    another e-mail that plaintiffs rely on for other purposes that

13    had a top e-mail.  Our purposes for relying on this document

14    was for the --

15         THE COURT:  Why don't you give me your copy because

16    I'm not sure.

17         MR. KIRSCHNER:  Okay.  In the third -- the sentence I

18    want to give to you is the second bullet point and it's the

19    third full sentence and it starts with "The Department of State

20    reports."  That's the sentence I'm referring to.

21                    (Pause in proceedings.)

22         THE COURT:  So it's the second bullet point?

23         MR. KIRSCHNER:  Second bullet point, third full

24    sentence.  It starts "The Department of State."

25         THE COURT:  So this is where -- this is from --

1              **MR. KIRSCHNER:**  The bottom of the e-mail is signed

2    Elaine Duke.

3              **THE COURT:**  From Secretary Duke to Kelly saying

4    that -- referring to the extension of six months under no

5    decision -- deferring the decision essentially.  (reading)

6              "Much documentation I received is conflicting.  The

7         Department of State reports that country conditions do not

8         exist but it also states that Honduras is unable at this

9         time to adequately hand the return" -- maybe that's

10        "handle the return of their 86,000-plus nationals."

11   So it does state that the country conditions do not exist.

12   Does that mean the country conditions tied to the original or

13   generally?

14             **MR. KIRSCHNER:**  I understand it as the original

15   conditions no longer exist.

16             **THE COURT:**  Okay.

17             **MR. KIRSCHNER:**  And what in support is, Acting

18   Secretary Duke wrote an internal memo -- this is a different

19   exhibit that I'm referring to now -- that's consistent with

20   this e-mail, and that is her internal memo that talks about her

21   struggling with her decisions -- of the various decisions

22   before her.  And in that, she makes the decision not to

23   terminate El Salvador or Honduras at that time, and she says,

24   both about Honduras and El Salvador, that the originating

25   conditions no longer exist but -- and she uses the term --

"discretionary factors," is the term she uses in that internal

memo, "provide that neither El Salvador nor Honduras can

provide for the safe return of their nationals and, therefore,

I am not terminating at this time."

THE COURT:  But I don't see how that changes the basic

premise; and that is, at this point they are looking only at

country conditions tied to the originating event which gave

rise to TPS status, whether at that point having found that

that no longer obtains, whether they should go forward and

terminate or defer given that the government says they can't --

the Honduran government says they can't handle it and maybe in

the exercise of discretion to delay.

That doesn't mean that the fundamental analysis is not

consistent with what the plaintiffs are saying; that is, at

this point they are only looking at country conditions that are

tied to the original conditions.  They're not saying, "Let's

look at everything."

MR. KIRSCHNER:  So a couple of responses to that,

Your Honor.  First, if you look at Slide 3 of plaintiffs'

slides, that's exactly the same thing that they're saying in

terms -- that plaintiffs are pointing out about whether they

can provide for the adequate return of the nationals.

THE COURT:  Well, that's due to subsequent

environmental disasters subsequent to the originating

condition, which was Hurricane Mitch.

1          **MR. KIRSCHNER:**  But by definition, Your Honor, the

2     question of whether individuals can safely return to those

3     countries, which is the term in the statute, it requires the

4     conditions on the ground at that time, and that's exactly what

5     Acting Secretary Duke is both explaining to Ambassador -- I

6     mean, not Ambassador -- Chief of Staff John Kelly and in her

7     internal memo.

8          And I want to -- kind of further to illustrate this point

9     is plaintiff spent a lot of time talking about the USCIS

10    decision memo.  They ignore that Acting Secretary Duke

11    explicitly asked for the recommendation of or the assessment of

12    Admiral Tidd, head of Southern Command, about how a termination

13    would impact military operations.  And, indeed, explains in an

14    e-mail to Chief of Staff John Kelly, a different e-mail on

15    Exhibit 3 of our opposition, that those foreign policy

16    considerations about Honduras and how she's going to be meeting

17    with Admiral Tidd factored into her decision.

18         She also explicitly asked for the input of

19    Ambassador Nealon.  Ambassador Nealon was Assistant Secretary

20    of International Affairs and Acting Undersecretary of Policy

21    under Elaine Duke.  He had served for 33 years in the State

22    Department previously and had served for three years as

23    ambassador to Honduras from 2014 to 2017, and he wrote a memo

24    explaining his thought process for Nicaragua, El Salvador, and

25    Honduras.

1          **THE COURT:**  And he recommended against termination;

2     didn't he?

3          **MR. KIRSCHNER:**  And Elaine Duke decided not to

4     terminate Honduras or El Salvador at that time.

5          And so she -- and he says in his deposition testimony that

6     she explicitly asked him for his input.  So she went out of her

7     way to ask for input from Southern Command from

8     Ambassador Nealon.

9          **THE COURT:**  But getting input and making the ultimate

10    decision in deciding what to weigh or what to consider in that

11    ultimate decision are two different things.

12         **MR. KIRSCHNER:**  Well, but we have -- but we have

13    realtime communications and internal notes from Acting

14    Secretary Duke both in her e-mails to John Kelly and in her

15    internal memo that she took into account what the conditions of

16    the countries were at the time of making the decision to

17    whether they could provide for the adequate return of their

18    nationals.

19         She also talked about looking at intelligence assessments.

20    She talked about the State Department assessments and other

21    intelligence assessments and the various recommendations that

22    she received.

23         And so if you look at the totality of the record, we would

24    posit that it's -- that there might be a difference in

25    emphasis, as every Administration has differences in emphasis,

1   as would be expected, but that the language that Acting

2   Secretary Duke used in her e-mails is not very different than

3   the emphasis put on with these decision memos that they cited

4   in their Slide 3.

5          THE COURT:  Well, and, actually, as I understand your

6   argument and the briefs, that the government argues that the

7   TPS statute requires consideration of current conditions in

8   determining whether folks can be safely returned; and that is

9   evidence that if it requires it, then you presume that the

10  Secretary followed that.  That's part of your argument?

11         MR. KIRSCHNER:  Correct, Your Honor, and that the

12  evidence backs that up, the evidence I just cited.

13         THE COURT:  So -- well, that's interesting because

14  that suggests that the TPS statute, if we ever got to this

15  issue, actually does require as a substantive matter

16  consideration of conditions other than the originating

17  conditions.

18         MR. KIRSCHNER:  Well, and in the deposition of Kathy

19  Nuebel Kovarik, she acknowledged that as well.  They talked a

20  lot about her deposition and her e-mails, but she also

21  acknowledged that that we cited in our brief.

22       And so I would just say that I would refer Your Honor to

23  the full record and to the materials that we have cited that we

24  think supports the notion that there might be a change of

25  emphasis, but that is not -- and this goes back to the legal

1  question that we were discussing earlier is what do you do when

2  there's a change in emphasis coming in with different -- a

3  different Administration comes in maybe with a different

4  perspective but it's a question of how to weight certain

5  factors.

6       THE COURT:  All right.  Let me hear the response from

7  the plaintiffs on this question, including the fact that

8  Secretary Duke, you know, appears to be, in looking at whether

9  or not it's practical at this point to return beneficiaries

10  back to Honduras, talking to the admiral, talking to the former

11  ambassador, et cetera, about assessing all conditions, not just

12  the originating condition.  What's your response to that?

13       MR. ARULANANTHAM:  Well, you know, on the first one

14  about whether it's really always been considered as part of

15  repatriation, whether it's safe to repatriate people, I think

16  the best answer to that is former Director Rodriguez's

17  declaration in paragraph 17 he specifically refutes this point.

18  What he says is he says, "We always considered, you know,

19  everything:  Disasters, issues of governance, housing,

20  healthcare, et cetera."  And he says (reading):

21       "This was true regardless of whether those intervening

22       factors had any connection to the event that formed the

23       basis of the original designation or to the country's

24       recovery from that originating event."

25       And that's, I think, the clearest crystallization of the

 1   point; but if you read, Your Honor, the RAIO reports or these

 2   other reports, there's extensive discussion of the various

 3   problems that exist in these countries that are not talking

 4   about the context of whether it's safe to return their

 5   nationals.  I mean, it's just overwhelmingly just discussions

 6   about country conditions, about in general whether country

 7   conditions remain very serious.

 8       And if their account were true, I don't know how you would

 9   explain -- you know, Your Honor had said it yourself -- all the

10   testimony and all these other statements, which are obviously

11   describing something which is different.

12       And they also point to this -- to Exhibit 30, the

13   statement from Ambassador -- excuse me -- Secretary -- the

14   e-mail exchange between Acting Secretary Duke and Chief of

15   Staff John Kelly, and I think that's a really bad piece of

16   evidence for them because she says about Honduras (reading):

17           "This decision is a strong break with past practice."

18       And she says (reading):

19           "These decisions" -- and here she's talking about all

20           the decisions she's making at that same time together --

21           "will send a clear signal that TPS in general is coming to

22           a close.  I believe it is consistent with the President's

23           position on immigration and puts it in the best position

24           to work with Congress to address DACA and TPS recipients."

25       Which was, you know, what was actually going on here, was

1    that the President was trying to end TPS for all these

2    countries to create pressure for a more restrictionist

3    immigration bill.

4         So this does not prove that the preexisting objective

5    analysis of country and conditions, which happened before, was

6    continuing to happen.  I mean, this proves our statutory

7    argument.

8         **THE COURT:**  So what's your interpretation of the

9    discussion about Honduras and the fact that country conditions

10   don't exist, we can't just send back 86,000 nationals at this

11   point; therefore, that implicitly means that consideration is

12   given to other conditions than the country conditions narrowly

13   defined?

14        **MR. ARULANANTHAM:**  Yeah.  I think it's true that she

15   was obviously -- in trying to decide this decision, she wasn't,

16   you know, strictly adhering to, you know, the newly formulated

17   rule in that description, you know, in that particular passage.

18   What she does is issue -- is not make a decision and then

19   Honduras ends, you know, just a few months after we filed this

20   lawsuit.

21        And, you know, when they say El Salvador -- you know, she

22   decides not to terminate El Salvador at that time, the decision

23   date wasn't at that time.  The Administration was pushing them

24   to make the decision right then in advance.  Instead, she just

25   waited and the decision happened at the next decision point,

```
 1    which was January.
 2         That was Secretary Nielsen who made that decision, and the
 3    next time El Salvador came up, it got terminated.  So it's
 4    quite deceptive I think -- or misleading.  I don't mean to say
 5    something against my opponent.  I don't think it's fair to
 6    characterize this as saying that she chose to extend
 7    El Salvador in some way.  El Salvador is terminated two months
 8    after this conversation takes place.
 9         Now, as to the input, Your Honor --
10              THE COURT:  Yeah.
11              MR. ARULANANTHAM:  -- SOUTHCOM -- what SOUTHCOM said
12    is quite striking.  It says, "If you end TPS for Haiti, there
13    will be all kinds of instability."  It implies that the U.S.
14    might have to get involved in Haiti, and similar statements
15    from SOUTHCOM are made as to El Salvador.  So the input is
16    "Don't end TPS for these countries" and, of course, they do it
17    anyway.
18         Similarly, Ambassador Nealon obviously says in his report,
19    his nonconcurrence memo, that he would extend TPS for these
20    countries.
21         So, yes, it's true that she was considering sources from
22    elsewhere but the effect of that consideration was obviously
23    ignored in favor of the overwhelming pressure created by the
24    new rule and the Administration's politics underlying it, which
25    I'll get to, you know, as soon as we talk about the equal
```

1   protection clause.

2        **THE COURT:**  All right.  What's your -- do you have a

3   legal response to the argument that the TPS statute actually,

4   in assessing whether people can be safely returned, actually

5   mandates consideration of all current conditions?

6        **MR. ARULANANTHAM:**  I see in the evidence a distinction

7   that the agency has drawn between this question of assessing

8   current country conditions writ large on the one hand and then

9   what I see is a different although related question, which is:

10  Is the country in a position to accept the return of its

11  nationals, which seems to depend on how many there are and what

12  time frame, and things like that?

13       So to me those are analytically distinct questions, but I

14  think Your Honor is right that the way -- if this is what you

15  intended to say, I think the government is now boxed into

16  they're committed to the view that the statute requires

17  consideration of current country conditions.

18       So I think if we win, that, in fact, the agency was not

19  considering current country conditions, which is what their

20  testimony said, and there's lots of evidence of that, then they

21  have sort of boxed them into the fact that they have violated

22  the statute.

23       **THE COURT:**  All right.  Let's go on to equal

24  protection.

25       The government -- since you're up, obviously there's a

1   threshold question as to what standard of review applies here

2   in light of the *Trump versus Hawaii* case, and they've cited

3   what is cited in the *Hawaii versus Trump* case three decisions:

4   *Kleindienst*, *Fiallo versus Bell*, and *Rajah versus Mukasey*.  So

5   there's some broad language in there about deference to the

6   government, to the Legislative and Executive Branches when it

7   comes to matters of immigration, particularly admission of

8   alien -- admission, which is one distinction.  There's also

9   mentioned in *Fiallo* about national security.

10      But there's also reference in there to Congress' and the

11  Executive's power to exclude or expel.  So there is reference

12  not just to admission but also the removal.

13      How do you -- what's your analysis of that language?  I

14  mean, one could read that broadly as saying, well, anything

15  having to do with the admission or expulsion of aliens falls

16  under this kind of overpowering authority of the Executive and

17  the Legislative Branch subject to very little judicial

18  scrutiny.  What do you say about that language in *Kleindienst*

19  and *Fiallo*?

20      **MR. ARULANANTHAM:**  Two thoughts, Your Honor.  I think,

21  first, that formulation, exclude or expel, goes right back to

22  the 1890s, and you'll find similar language I believe in *Fong*

23  *Yue Ting* -- F-O-N-G Y-U-E T-I-N-G -- in *Yamataya v. Fisher*,

24  right back this exclude or expel language is there.

25      But from very early on, the courts, nonetheless,

distinguished between the power to exclude people and the power

to deport them.  And, you know, from 1903, the due process

protections for people in the country have been different from

those who are seeking admission and, similarly, other

substantive rights have followed along accordingly.

          **THE COURT:**  And what's the first landmark case that

draws that distinction?

          **MR. ARULANANTHAM:**  *Yamataya v. Fisher* in 1903 says

that the due process clause protects a woman facing

deportation.  She'd been here just a matter of days.  And

that's the first case in terms of constitutional immigration

law which draws the line between exclusion and expulsion.  But

then the line persists and you see case after case saying

"We've long drawn this distinction between people seeking

admission and people who are already here."

          This gets to the second point on this, Your Honor, is that

*Zadvydas v. Davis*, which we cite in the reply brief here, is

about people who are living here, then are ordered removed,

have lost the right to live here, and there's a debate now

about whether they can be detained given that the countries

will not take them back.  Their countries of origin will not

take them back.

          It applies hornbook substantive due process law to that

question ultimately ruling on statutory grounds but only after

a fairly substantial constitutional analysis.  It's about

1    expelling people, not excluding them, yet nonetheless implies

2    normal due process law.  And it's about foreign policy.  In

3    fact, there's extensive discussion about the effect of this on

4    repatriation negotiations.  That's one.

5         There are other cases too that do not apply the extremely

6    deferential standard of review that's operating in *Trump* -- in

7    *Kleindienst*.

8              THE COURT:  Is there a difference, though, between due

9    process, Fourth Amendment, Fifth Amendment rights and equal

10   protection rights, especially an equal protection challenge

11   that's based on national origin, which, of course, gets to the

12   core of a lot of immigration policy?

13        There's an argument that at least equal protection

14   involves a different set of considerations in looking at

15   whether procedural due process was violated or whether the

16   Fourth Amendment violation was violated.

17             MR. ARULANANTHAM:  So you're pressing me a little bit

18   here because we haven't briefed this subject and this isn't a

19   motion for reconsideration I think, but going a bit from

20   memory, the Ninth Circuit's decision in *Kwai Fun Wong* is

21   involving an excludable, so it's a person who is denied

22   admission and subject to expedited removal but the court,

23   nonetheless, holds that the proscriptions against I believe

24   it's either race discrimination or religious discrimination, or

25   maybe it's a combination of them, would still apply to that

 1    person.

 2         And my underlying point here is to say that, if anything,

 3    I think the courts would view equal protection as on the other

 4    side of that line, and they would say the proscription on race

 5    discrimination is tantamount to the proscription on torture or

 6    the proscription on, you know, certain other very basic

 7    fundamental protections that we would apply to people, and even

 8    as long as they were on the territory of U.S. soil, whether or

 9    not they were seeking admission or instead being expelled.

10         But, I mean, I'm struggling a bit.  I know this issue is

11    open in the dissent in *Jean v. Nelson*, which is a Supreme Court

12    case about Haitians, about the racially discriminatory

13    treatment of Haitians versus Cubans, and the majority

14    Supreme Court rules in favor of the plaintiffs on a statutory

15    ground.  The dissent on other grounds, basically

16    Justice Marshall dissent says, "Well, we should look at the

17    constitutional question here," and then provides a long

18    explanation for why the proscriptions on race discrimination

19    should operate in that context.

20         So I don't think that the government has really a leg to

21    stand on if they want to say, "Oh, we can engage in race

22    discrimination because these are people who are -- even if they

23    were people who were seeking admission," and they certainly

24    can't -- don't have authority to support that proposition with

25    respect to people who are already here.

1          I think the critical point about *Kleindienst* and *Fiallo*

2     and *Rajah* -- there's two.  One, as Your Honor said, is there

3     people who are seeking admission and people who are --

4               **THE COURT:**  *Rajah* was a deportation.

5               **MR. ARULANANTHAM:**  Yes, in *Rajah*.

6          And the second one is selective enforcement claims are

7     fundamentally different, and I think *Arab-American*

8     *Anti-Discrimination* v. *Reno*, *AADC* v. *Reno*, was really the

9     genesis of this idea, although I think it's also in *Kleindienst*

10    to some extent because in *Kleindienst* it's because this person

11    had previously violated their visa.  That's the facially

12    legitimate reason that is given for denying the professor the

13    visa to come back now.

14         So these strands have come together and in *Trump* they come

15    together because *Trump* is citing *Rajah* even though it's a case

16    about people who are here.

17         But the point is *Rajah* is a case about a person who has

18    violated their visa.  There's no dispute about that.  They

19    violated their visa.  The only reason they're called in is

20    because of the special registration program.  They bring an

21    equal protection challenge to that, and what the court says is,

22    "You've already violated the terms of your visa so here you're

23    just making a selective enforcement argument.  That even though

24    you violated the terms of your visa, we still shouldn't proceed

25    against you because you say you're being targeted because of

your race."

And in that situation, we apply a very, very low standard
of review.  And in that sense they're following very precisely
*AADC v. Reno*, which is exactly the same.  You have a set of
people, they're Palestinian activists.  They have violated the
terms of their visa.  They allege that they're being targeted
because of their First Amendment activity, and the court says,
"Because you are already -- everyone agrees you are here in
violation of the immigration laws and you're just saying that
the motivation that went to why you were being targeted is
impermissible, we apply a deferential standard of review."

That's fundamentally different from a situation like our
case where our claim is they are lawfully here and the
government is taking away that status based on racial animus.
That's fundamentally different from a situation where the
person is already in violation of the immigration laws and
they're essentially asking for a reprieve on the ground that
the motive is impermissible.

Here, if we win our equal protection argument, there is no
basis to deny all of our clients the right to remain here until
the government promulgates a decision free of racial animus.

**THE COURT:**  All right.  Thank you.

**MR. ARULANANTHAM:**  So I can proceed into the merits of
the equal protection claim, Your Honor, or --

**THE COURT:**  Well, I've got a couple questions for the

```
 1    government's attorney and then if you want to highlight a

 2    couple points, I'll give you a chance to do that.

 3         Mr. Kirschner, there's some reference in the documents --

 4    I think Exhibit 29, 30 -- about the decisions regarding TPS

 5    being consistent with the President's America First policy or

 6    the President's position on immigration.

 7         What does that mean?  What is America First policy as it

 8    relates to TPS?

 9         MR. KIRSCHNER:  So I would just refer you to just look

10    at the full context of those documents, and they were kind of

11    described in the context of the way I believe this is Acting

12    Secretary Duke is referring to it.

13         But in terms of the merits, she actually in her internal

14    memo when referring to America First says that termination of

15    Honduras and El Salvador, I believe is what she's talking

16    about, could actually hinder our current immigration and drug

17    enforcement agenda.

18         This is -- Ambassador Nealon in his deposition said that

19    Acting Secretary Duke was really grappling with this decision

20    in a good sense of the word.  She was a voracious reader and

21    she was struggling with trying to get to a decision; and when

22    she refers to America First, it kind of points in both

23    different directions and it's her kind of working her way

24    through that.

25         I would kind of let the documents do the talking in terms
```

1    of how she addresses that, but I think that that kind of

2    discussion is pointing in various directions.  As you can see

3    in her internal memo, which is really written just for her own

4    eyes, her struggling at trying to reach a decision here.

5        THE COURT:  But the sentence that says "This

6    conclusion is the result of an America First view of the TPS

7    decision," which follows a paragraph that starts "The TPS

8    program must end for these countries soon."  So the decision

9    has been made you've got to do it soon.  Now, how best to do it

10   and what time frame, we've got to figure that out because

11   there's conflicting things, but it suggests that the

12   America First view is what's driving the conclusion that the

13   TPS program must end soon.

14       So what is the -- all I'm asking is:  What is the

15   America First policy?  How would you -- what are they talking

16   about?

17       MR. KIRSCHNER:  Well, I would also point you to the

18   following paragraph of what you're looking at, I believe, if my

19   memory serves me correct.  If I could get -- look at my --

20   bring my binder up to point you to the --

21       THE COURT:  Yeah.  That's the one that says the

22   Department of State recommends that neither El Salvador nor

23   Honduras have the current capacity to accept and assimilate the

24   TPS individuals back into the country.

25       MR. KIRSCHNER:  Well, then it maybe is at the end of

the same paragraph you were talking about.  The language which
she says that termination could actually hinder our current
immigration and drug enforcement agenda.

      **THE COURT:**  Yeah.

      **MR. KIRSCHNER:**  And so it's that America First for her
is the outlook on the immigration and drug enforcement agenda,
and that she is finding that it kind of points in both
different directions here and that this is with her struggling
to reach a conclusion.

      **THE COURT:**  So I guess my question is:  What is she
referring to when she says the America First issues or agenda
or -- what does that refer to?

      **MR. KIRSCHNER:**  I think it's referred to in the
discussion in that -- in the -- in that entire memo, which she
refers -- she kind of describes it herself about migration and
about drug enforcement issues and a general kind of
perspective.

   And this, again, was her grappling with this decision.
And so not to put words in her mouth, I would really just
suggest that it's in the context of the entire memo as she's
struggling with her decision.

      **THE COURT:**  The other inference, then, I think that
the plaintiffs seek to draw is America First means ending
immigration status for those who are nonwhite.  What do you say
to that?

1        **MR. KIRSCHNER:**  I would just say -- I would just --

2   again, Your Honor, look at the full record.  I would look at

3   the full record before you that is Acting Secretary Duke again

4   grappling with the decision, not just her internal memo, her --

5   the descriptions of her processes by Ambassador Nealon trying

6   to get to the right decision, trying to figure out how to make

7   a decision here.

8        And that -- and that, in fact, plaintiffs do not suggest

9   that there's animus by Acting Secretary Duke.  They try to draw

10  inferences elsewhere, but I -- again, this was her -- as Chief

11  of Staff John Kelly referred in a contemporaneous e-mail, that

12  this was her decision to make; and, of course, she received

13  input from various sources.  She received input from the

14  National Security Council but didn't accept all the

15  recommendations from the National Security Council.  She's

16  received input from Ambassador Nealon the other way, did not

17  accept all the recommendations from Ambassador Nealon.

18       So I think that it just shows an effort of her trying to

19  grapple, using Ambassador -- I believe that's the word

20  Ambassador Nealon uses -- grapple with the decision.

21       **THE COURT:**  In another memo, this is Exhibit

22  Number 30, she talks about the no decision -- again we talked

23  about this before -- for the termination of Nicaragua, the no

24  decision for six months on Honduras.  Let's see (reading):

25       "These decisions, along with public statements, will

1          send a clear signal that TPS in general is coming to a

2          close.  I believe it is consistent with the President's

3          position on immigration and, under the circumstances, is

4          the best position to work with Congress," et cetera,

5          et cetera.

6          So, again, what does that refer to when she refers to the

7     "President's position on immigration"?

8          **MR. KIRSCHNER:**  Again, I refer back to

9     Ambassador Nealon's deposition where he talks about kind of the

10    different considerations and domestic policy considerations,

11    that every Administration comes in with different perspectives

12    of how to look at these decisions.  That's consistent with -- I

13    believe it's consistent with Director Rodriguez's declaration

14    as well of how they approach -- his -- his -- under him about

15    how USCIS approached these questions.

16         And so I think that though documents themselves -- to

17    point to one document in particular shows a robust record of

18    Acting Secretary Duke looking from different sources, looking

19    at -- that internal memo talks about intelligence assessments,

20    classified information which we redacted, input from a variety

21    of sources, that was often conflicting perspectives.  She did

22    not seek a monolithic perspective.

23         **THE COURT:**  It appears she's keeping in mind the

24    Administration's view on the America First doctrine and the

25    President's immigration policy.  So this is not just --

 1  otherwise she wouldn't have had to state that, I mean, right?

 2       **MR. KIRSCHNER:**  Well, this is an internal memorandum

 3  to herself as she's trying to struggle through the answer.

 4  It's not that she's stating this for anybody but herself.

 5       **THE COURT:**  Well, in some ways that makes it even --

 6  I'm not sure which way that cuts.  The fact that she's mindful

 7  of the President's policy suggests that there's a degree of

 8  influence coming from the White House on the merits of this TPS

 9  decision.

10       **MR. KIRSCHNER:**  And plaintiffs don't suggest that any

11  previous Administration had input from the White House.  They

12  even acknowledge in their briefs that you would -- that that's

13  not their argument here.  It is that in a decision such as this

14  one, as we've acknowledged all along, is that you would expect

15  input from the White House.

16       But what Chief of Staff John Kelly makes very clear is

17  that, in an internal e-mail within the White House, that his

18  concern was to ensure that the Acting Secretary made a decision

19  but the ultimate decision was hers to make, and that is backed

20  up by the deposition testimony of the different individuals

21  that plaintiffs have taken.

22       **THE COURT:**  Well, certainly technically and by statute

23  it is hers to make.  The question is if there's an allegation

24  of less than pure motivation on the part of the White House

25  with respect to immigration policy and TPS in particular and

1   those who are subject to this particular decision who were

2   characterized as coming from shithole countries, whether that

3   influenced her in any way, then that may be relevant.

4       I mean, that's what we're talking about; that is, an equal

5   protection violation can arise not just from the

6   decision-maker's animus, but if they're influenced by others, I

7   think it's long-established antidiscrimination law that you

8   then consider whether that person was influenced by those whose

9   motives were not so pure.

10      And all I'm suggesting is that here this is certainly an

11  awareness on Secretary Duke's part, never mind all the other

12  meetings and the high-level meetings that occurred and contacts

13  between various officials of the White House and DHS, but just

14  this fact alone suggests certainly an awareness, if nothing

15  else, and maybe some concern about consistency with the

16  President's larger immigration policies and agenda.

17      **MR. KIRSCHNER:**  And I think that that's a key

18  distinction, immigration policy versus something in any other

19  sense of the context.

20      What I would say is we do know that Acting Secretary Duke

21  did not accept the recommendations for two of the four

22  countries as recommended by the National Security Council.

23      And we do know of a contemporaneous e-mail by John Kelly

24  of the decision-making process about how it's Acting Secretary

25  Duke's decision to make.

1       And we do know of the deposition testimony of

2   Ambassador Nealon referring specifically to Acting Secretary

3   Duke being a voracious reader trying to get input from various

4   sources.

5       And we do have the memo to file -- the memo, internal

6   memo, that she writes of her struggling with her decision.

7       But, you know, what I would ultimately say, Your Honor, is

8   that plaintiffs put out a description of the documents and

9   evidence, and we've done it as well, in terms of what we think

10  kind of tells the story, and we really do just rest -- I refer

11  you back to the briefs because the briefs cite within them the

12  documents and the exhibits that kind of make out the story that

13  we think is the apt story in deciding plaintiffs' motion for a

14  preliminary injunction.

15      **THE COURT:**  All right.  Let me just ask you the

16  request for data regarding the crime rate and public relief

17  claims -- I think it was for Haitian beneficiaries in

18  particular -- what's the purpose of that?

19      **MR. KIRSCHNER:**  So there's two responses, Your Honor.

20  One is one of the designation criteria -- there's three

21  designation criteria in the statute.  One of them allows you to

22  take into account the interest of the United States or some

23  general term along those lines; and one of the exhibits that

24  plaintiffs cite is one of the career individuals addressing

25  whether to include that discussion in the Federal Register

1    notice.

2        And this goes to my second point, is that that was not

3    ultimately relied upon in the decision to extend Haiti by six

4    months, because this goes to the decision to extend Haiti by

5    six months, and acknowledges -- that career person acknowledges

6    that that would go to that element of the statute.

7        But I think a larger point is that this goes to a

8    different decision than what is at issue in this case.  That

9    was that the timing of that request is in the spring of 2017

10   when Haiti was extended by six months by Secretary Kelly, and

11   we are looking today at the decision to terminate Haiti,

12   amongst others, by Acting Secretary Duke.

13          **THE COURT:**  All right.  Let me hear the response.

14   Anything you might want to add?

15          **MR. ARULANANTHAM:**  Yes, Your Honor.

16       As to what America First means, I think it's quite clear

17   what America First means.  As Your Honor had said, there's a

18   mountain of statements and it's striking to me that the

19   government has said nothing, and they had extra pages in their

20   brief.  They don't make any attempt to explain all of these

21   horrific statements.

22       As to specifically the connection between those statements

23   and TPS holders -- Your Honor referred to the S-hole countries

24   comment, which is in a conversation about TPS -- we have more

25   now from discovery on this subject.  Robert Law, who in

1    Slide 9, is described.  He's the senior adviser to Kathy

2    Kovarik who is the person who is brought in from the Trump

3    transition team.  So she volunteered for the Trump transition

4    team after obviously hearing all of the President's statements

5    on the campaign trail.  She coordinates the TPS review process

6    and collects all this information.  She hires as her senior

7    adviser Robert Law.  Robert Law came into that position from

8    being the government relations director at Federation for

9    American Immigration Reform.

10       And at Exhibit 23, it's page 15, it's right at the bottom

11   of that, you can see he wrote a memo to the Trump transition

12   team asking for a number of extremely restrictive immigration

13   policy changes, one of which was to end TPS for any country

14   that had had it for more than two extensions.

15       So there is an incredibly tight nexus between the

16   President's animus and people who joined up with the

17   Administration in order to implement the President's

18   immigration policy, which flows directly out of that animus,

19   and the particular decisions on TPS that we're challenging in

20   this case.

21       And I have to say, Your Honor, I've read a number now of

22   *Arlington Heights* cases.  People win *Arlington Heights* cases

23   with no statements.  They win *Arlington Heights* cases with no

24   direct evidence about the decision-maker's motivation.  In some

25   cases it's impossible even to have direct evidence of the

decision-maker's motivation because the decision-maker is a
legislature or a City Council.

I have not seen an *Arlington Heights* case with evidence as
strong as what we have here both on the question of whether the
supporters or, you know, on the catspaw theory, those people
have animus and on the question of whether that animus actually
influenced the decisions of the people who were the actual
decision-makers.

I mean, for one thing, as Your Honor had suggested in the
motion to dismiss order, this is not like the catspaw.  This is
like saber-tooth tiger paw or something; right?  This is the
President of the Unites States, the most powerful person in our
government.  There's repeated statements from him.

Then you have these conversations that we are sort of
debating over how to interpret about coming from
Secretary Kelly, these e-mail conversations.  Excuse me.  At
this point he's the Chief of Staff Kelly so he's, you know, the
President's right-hand person in this context.

If you look at, for example, the exhibit that the
government was relying on about this e-mail exchange where, you
know, he says she's wrestling with the decision, where Acting
Secretary Duke is wrestling with it, in her e-mail exchange
with Secretary Kelly on this -- this is Exhibit 135, I think,
is where the whole context of that is -- she's defending the
information that he had gotten on her suggesting that she

1    wasn't in line with White House policy.  And what she says is

2    (reading):

3           "The internal controversy was at least in part because

4       there was a White House strategy that DHS and me, as the

5       decision-maker, wasn't informed of and that's why I had

6       done" whatever it is that she's talking about.

7       But what that statement proves, Your Honor, is that her

8    decision-making is being altered in part because of what a

9    White House strategy is.  And we don't have to prove under

10   *Arlington Heights* that the sole reason for the decision was

11   racial animus.  We don't even have to prove that the primary

12   reason was racial animus.  We have to prove it was a motivating

13   factor, and here she is saying that it's a motivating factor.

14          **THE COURT:**  I have a Degen supplemental declaration,

15   and 135 seems to be a different document.

16          **MR. ARULANANTHAM:**  Let me -- give me one moment and

17   see if I'm making a mistake.

18                     (Pause in proceedings.)

19          **MR. ARULANANTHAM:**  Your Honor, if I can give it to

20   your courtroom deputy.

21          **THE COURT:**  Okay.

22          **MR. ARULANANTHAM:**  And this is the first page of it

23   for context.

24       Robert Law, by the way, Your Honor, is the person who said

25   about the Haiti decision (reading):

1   "The draft is overwhelmingly weighted for extension,

2   which I do not think is the conclusion we are looking

3   for."

4  You know, that was right after he came into the government

5 and he got involved in TPS decision-making right away.

6  Courts normally look at a bunch of other factors because

7 they don't have direct evidence of the decision-maker's motive.

8 So you would look, for example, at the fact -- the government

9 doesn't ever contest this -- that now 98 percent of the people

10 who had TPS, at the time the Trump Administration had it, now

11 no longer have it.  It's our four countries plus Honduras and

12 Nepal.  If you add them up, it's now 98 percent of people.  So

13 the Administration has done what they sought to do, which is --

14   **THE COURT:**  In other words, the remaining countries

15 still on TPS status only represent 2 percent?

16   **MR. ARULANANTHAM:**  2 percent.  If you look at

17 Exhibit 14, at the back of it there's a chart with all the

18 numbers, the population breakdowns, there.  Unfortunately we

19 didn't put the math in the brief, though, so you can -- it

20 actually doesn't even include Sudan because at the time that

21 that tab was written, Sudan had already been terminated.  But,

22 yes, it's 98 percent of the people have lost it.

23  And there's just a lot of other evidence.  Exhibit 14,

24 that same tab, which showed the numbers, that was a tab to a

25 discussion paper that had been circulated for a White House

1  principals-only meeting that was held on November 3rd, just

2  days before the decision deadline for -- what the

3  Administration wanted was for there to be an announcement that

4  they were ending for Nicaragua, El Salvador, Haiti, and

5  Honduras all at the same time.

6      And the White House passes out a discussion memo which

7  says we should end TPS for all of these countries, basically so

8  we can use it as a bargaining chip in creating a merit-based

9  immigration system that most of these people would be left out

10 of but then, you know, now we'll have leverage to negotiate

11 over it.  That's what the White House is saying.

12     Now, she doesn't follow exactly -- as government counsel

13 said, she doesn't do exactly what they say.  She ends it for

14 Nicaragua, ends it for Haiti, and then waits a little while so

15 that El Salvador gets ended two months later, and, you know,

16 her successor does that and ends Honduras.  But that doesn't

17 prove that it wasn't a motivating factor in the decision.  It

18 proves it obviously was a motivating factor in the decision.

19         **THE COURT:**  Well, what was a motivating factor?  The

20 decision to end TPS generally?

21         **MR. ARULANANTHAM:**  Yes, Your Honor.

22         **THE COURT:**  Okay.  That alone -- you're not saying

23 that that itself is an unlawful motive that violates equal

24 protection because yours is a much more specific.  It's a

25 race-based --

1          **MR. ARULANANTHAM:**  That's right, Your Honor.

2          **THE COURT:**  -- argument, which is the same question I

3    have about Mr. Law's past relationship with FAIR.  In reading

4    the materials, it's evident that they have a very restrictive

5    view on immigration, but you have to make an inference to say,

6    "Well, that is an anti, nonwhite, race-based animus."  And so

7    that's going a step further.

8          **MR. ARULANANTHAM:**  Yes.  This is a very important

9    question, Your Honor.

10        It is definitely possible to be -- to favor immigration

11   restriction and not to be racially -- motivated by racial

12   animus.  The government hasn't made this argument but I think

13   it's a fair question that we have to address.

14        And the first thing is you have to look at the context of

15   the statements -- the context in which these decisions are

16   made, and in particular the statements of the President.  The

17   President is providing context for why he advances this

18   restriction, this immigration agenda, through this constant

19   stream.  I won't repeat them again but just a persistent

20   stream.

21         **THE COURT:**  All right.  So, in addition, anything

22   other than the President's statements, which do contain --

23   arguably can be interpreted as being correlated with racial

24   views --

25         **MR. ARULANANTHAM:**  Yes, Your Honor.

1          **THE COURT:**  -- what else do we have to suggest this?

2          **MR. ARULANANTHAM:**  Yes, Your Honor.  So, one, if this

3    was really about the reasons for restricting immigration that

4    are sort of acceptable reasons -- or I shouldn't say -- that

5    are nonrace-based reasons, that are often in the rhetoric, then

6    you would see that targeted at people who have criminal

7    convictions, people who are law breakers by virtue of being

8    undocumented.

9          I think that's one reason which makes our case

10   particularly strong on this point.  It's a group of people who

11   by definition are lawfully present -- and many of them for more

12   than a decade, some almost 20 years, in some cases more than 20

13   years -- and by definition don't have a criminal conviction

14   other than I think it's a misdemeanor.  I can't remember the

15   exact rule, but you're ineligible for TPS if you have anything

16   more than an extremely minor conviction.

17         And so the fact that they've chosen to target about

18   400,000 people who are lawfully present in this country without

19   a significant criminal history is irrelevant to the question of

20   what is the motive underlying the government's behavior.

21         **THE COURT:**  And if the motive, as indicated by some of

22   these memos, is to move to a so-called merits-based immigration

23   policy, would that be unconstitutional?

24         **MR. ARULANANTHAM:**  Certainly not in and of itself, but

25   I think -- well, here, I'd point the Court to *McCrory*, which is

the North Carolina voting rights case.  And there there's an
adoption of a whole set of voting scheme rules that make it
much harder for African Americans to vote, and the state's
argument essentially is what Your Honor is suggesting, "We just
don't want Democrats to vote," and it just so happens that the
Democrats are -- or African Americans are overwhelmingly
democratic.

     And what the court says is that may be your ulterior
motive, but if you are targeting people on the basis of their
race, then you are violating the equal protection clause.  And
it is often true that you can have the same policy -- this is I
think hornbook equal protection doctrine in this area of law --
you can have the same policy that would be permissible if it
were one motive and impermissible if it were the other motive.

     So what the Court has to look for yourself and ask is:
Does the totality of this record here show that a motivating
factor -- a motivating factor in these decisions is the racial
animus of the President?

     And, as I said, you look at the other cases where they
find race is a motivating factor, many of the statements
have -- many of the cases have no statements.  In *McCrory*
there's not a single statement in the record, at least that the
court identifies, that invokes any kind of negative statement
toward African Americans.  It's done entirely on the basis of
the impact, disparate impact, and the departure from the normal

1    procedural sequence and normal substantive rules.

2        Look at *Avenue 6E*, the Ninth Circuit's case.  They're

3    speaking in code and they say, "We don't -- we're worried about

4    people with large households or people who park their cars, you

5    know, in the yard."  We don't have code in this case.  We just

6    have blatant rank discrimination animus statements coming from

7    the most powerful person in the government coupled with we know

8    massive deviations from the normal way things operated even

9    under --

10       **THE COURT:**  So if you rely on the statements as

11   showing that the real motivation here or a real motivation here

12   is not general immigration policy restrictions or going to

13   merit-based for race-neutral reasons but really motivated in

14   the ultimate analysis by racial animus or stereotyping, what

15   does that suggest in terms of any future action?

16       If you were to prevail in this case, would that prevent

17   DHS from going back and revising the rules, let's say make

18   explicit reliance on only originating conditions and then

19   trying to justify that somehow or going back and considering

20   those conditions but then reaching the same decision?  Would

21   everything be -- when does the taint end?

22       **MR. ARULANANTHAM:**  Well, there's two slightly

23   different questions there.  On the question of when the taint

24   ends at all, I think the taint ends when there are steps that

25   are taken to counteract it.

So on the question of whether the government will be able to say at some point "The President's racial animus has no role in this decision," that's not going to change until the President stops making these deeply racist statements.  And some of them, like "the undocumented people are animals," that "people -- migrants to Europe, who are mostly from the Middle East, are changing the fabric of European culture," those came even after we filed I think the opening brief -- or after we filed -- after we litigated the motion to dismiss.

So as to any taint at all, there's not going to be a change until the Administration or the President stops denigrating our clients and large numbers of other immigrants.

But that doesn't mean that it's a motivating factor.  Just because -- that's one factor and under *Arlington Heights*, there's a rich set of evidence that the Court is entitled to look at.

For example, if when they went back the country conditions career people wrote -- instead of saying, "Well, under all the standard metrics, TPS should be continued, the problem is the conditions on the ground are that bad," if instead they said, "We don't think that extension is required here because the Sudanese Civil War has dramatically improved," or things like that, then that's, you know, relevant evidence.  Even if the President is still, you know, making his racist statements, that's relevant evidence that it's not a motivating factor in

1    the decision at this point.

2         In addition, Your Honor, and I think this is a reason why

3    the equal protection claim is especially easy for us to win in

4    the TPS context compared to a bunch of other immigration

5    policy -- it's not an accident that we haven't brought equal

6    protection challenges against so many things that the

7    Administration has done in the immigration courts -- asylum

8    policy, all kinds of things -- because where the government has

9    more discretion and the statutory criteria are not so narrow

10   and fixed by Congress, it's much harder to ascertain whether

11   the influence that's operating is somehow impermissible.

12        In contrast here -- and I really disagree with the

13   government counsel on this subject -- while the Secretary has

14   discretion to initially designate, once the designation has

15   happened, the Secretary must continue if the conditions warrant

16   an extension.  That's what the statute says.

17        And, therefore, it's very easy to figure out in this

18   context, compared to others, whether the motivation that's

19   underlying the decision-making is permissible or impermissible.

20   So here if the country conditions experts say that TPS should

21   be terminated, then it's easy to figure out.

22        That's not to say, Your Honor, that the Secretary

23   obviously does still have discretion -- sorry.  Let me rephrase

24   that.

25        The Secretary does still have some discretion in making

1    the country conditions assessment; right?  But you can see from

2    these e-mails and from the phone calls and the White House

3    meetings and Secretary Kelly calling from Asia to pressure this

4    decision, this is not about disagreement over the country

5    conditions.  This is about driving the President's

6    anti-immigrant agenda.  That's clearly what this evidence

7    overwhelmingly shows.

8        The last point I want to make on this subject before I

9    answer any further questions Your Honor has, *Trump* -- you had

10   asked earlier, well, should we be governing -- should we be

11   applying *Trump* here rather than *Arlington Heights*, and I think

12   for all the reasons Your Honor had said previously and as I

13   discussed earlier today, the answer is *Arlington Heights*.

14       But even if we were in the *Trump v. Hawaii* world, because

15   of the discovery that we have gotten in this case, we can

16   prevail in showing that the decision that the government made

17   here was not *bone fide*.  Even under *Kleindienst* and under

18   *Trump*, we can show that the reason that was proffered by the

19   government is not the real reason why these decisions were

20   made.

21       And we can make that showing and because, as you discussed

22   with my co-counsel and is illustrated more in the country

23   slides, it's, like, Slide 10 -- I have one for each country,

24   Slide 10, 11, 12, 13 -- you can see what the country conditions

25   experts, the objective country conditions experts, wanted to do

1  after they had objectively analyzed the country conditions in

2  each of our four countries because they say, "Well, the

3  conditions on the ground warrant TPS continuing," for each of

4  them.  The RAIO reports show it in some cases.  In some cases

5  it's the Diplomatic Mission.  That's the U.S. Embassy in Haiti

6  and in El Salvador.  They're on the ground, they know what's

7  happening, and they're describing in their letters what is

8  happening.

9       So we actually have a very unusual set of evidence here

10  because we have predecisional material.  And the Supreme Court

11  in *Trump* specifically noted the absence of predecisional

12  materials in that case, that "We don't have predecisional

13  materials.  We knew that there was this 17-page memo that had

14  apparently analyzed the travel ban worldwide, but the court

15  didn't have it and the plaintiffs didn't have it."

16       But here we have it, and we know that if you took out the

17  political motivation, you took out the racist motivation

18  driving the President's immigration agenda, the result would be

19  that they would have continued TPS for all of these four

20  countries because that's what the people who were analyzing the

21  conditions on the ground actually wanted.

22       And it's only then when the people from the Trump

23  transition team who had come into DHS got involved, that they

24  rewrote the memos, changed, you know, "disastrous" to

25  "challenges," or whatever other rhetorical moves that they made

1    were, and, you know, altered the conclusions that the objective

2    decision-makers had made.

3         So I think the analogy is to imagine what if we had in

4    *Trump* gotten the first draft of this country analysis, you

5    know, for the travel ban and what if that first draft said,

6    "Oh, the countries that have the biggest problems when it comes

7    to vetting their nationals are Mongolia and Uganda and, I don't

8    know, some other country," and then the Trump Administration

9    people had come in and said, "No, that's not the conclusion

10   we're looking for so let's rewrite this, let's rewrite that,

11   and change it to, you know, the countries that were part of the

12   ban."  I think in that situation the Supreme Court would have

13   been -- found that even under *Trump*, you have not presented a

14   *bone fide* reason because we know what the reasons are and

15   actually they're not the ones that you have put forward.

16        So I think I'm very confident that *Arlington Heights* is

17   what governs this case, but the very unusual record we have

18   here is strong enough to win even under *Trump* because we

19   actually have this counterfactual evidence which courts almost

20   never get.

21        **THE COURT:**  When the *Trump* decision, *Hawaii versus*

22   *Trump* decision, says "The standard of review considers whether

23   the entry policy," which is at issue there, "is plausibly

24   related to the government's stated objective," does the court

25   engage -- is plausibly just a standard of review and you still

1   have to make the determination what was the true motivating

2   factor, or is this more like any conceivable justification test

3   of the old brand of equal protection?

4         **MR. ARULANANTHAM:**  I think it's the former because

5   they're speaking in the context where you don't know the

6   underlying motivation.  In most of these cases you won't get to

7   the discovery.  Like, if we knew in advance that this were the

8   standard, then it would be hard in some cases to get the

9   underlying evidence of what the actual motive is.

10        But I think "plausibly related" means that -- I mean, it

11  must mean -- "plausibly related" must mean if I can show you

12  objectively that that's not the reason, then it's not --

13        **THE COURT:**  Then it's not plausible.

14        **MR. ARULANANTHAM:**  Yeah, then it's not plausible.

15        **THE COURT:**  In light of the evidence.

16        **MR. ARULANANTHAM:**  Exactly.

17        **THE COURT:**  So it is an evidence-based analysis; it's

18  just the standard is very low.

19        **MR. ARULANANTHAM:**  It is, Your Honor.  If you look at

20  the facially legitimate and *bone fide* cases that the lower

21  courts -- when the lower courts apply facially legitimate and

22  *bone fide* -- and, again, here we're outside the briefing for

23  which I apologize, but there's a Tenth Circuit case.  It's

24  *Marczak v. Greene*, which is an application -- M-A-R-C-Z-A-K v.

25  Greene -- it's an application of the facially legitimate and

1   *bone fide* standard in the parole context in domestic

2   immigration law.  This is people being released from the border

3   to come into the United States.  And in that context the court

4   reviews a number of cases and says, "You do do some evidentiary

5   review even in this context to see whether there's some basis

6   for the underlying rationale that's been proffered."

7        There's a Ninth Circuit case on that subject as well

8   where -- it's *Nadarajah* -- N-A-D-A-R-A-J-A-H --

9            **THE COURT:**  Sorry.  What's that?

10           **MR. ARULANANTHAM:**  N-A-D-A-R-A-J-A-H, *Nadarajah*.

11       And these are just lower courts applying facially

12   legitimate and *bone fide* review, and they're doing some amount

13   of evidentiary assessment.

14       I read even the Supreme Court's decision to do some amount

15   of evidentiary assessment.  The court has this discussion about

16   the waiver policy and whether the waiver policy is real or, you

17   know, only kind of for show.  They wouldn't be doing any of

18   that if you didn't have to make some evidentiary assessment in

19   deciding whether the justification was even plausible.  So

20   definitely there is some looking beneath that goes on

21   underneath that standard.

22       Now, I imagine that not in every case will you get the

23   predecisional information actually handed to you because a lot

24   of them involve national security, which is what happened in

25   *Trump v. Hawaii*.  Our case doesn't have any national security

1    considerations in it, and so we were able to get -- or if there

2    is a national security consideration, it cuts in our favor when

3    you have people like SOUTHCOM saying "You should not end TPS

4    for these countries."  But we were able to get that information

5    and so we actually know what the underlying decisions would

6    have been if you didn't have this political interference going

7    on in the decision-making process.

8         THE COURT:  All right.  Let me give the government a

9    chance to respond to the last question, which I think is really

10   central to the analysis.  Assuming for the moment that we are

11   under a *Trump* rational basis review and not the more searching

12   scrutiny of *Arlington Heights*, do you agree that whether the

13   challenged policy is, quote, "plausibly related to a legitimate

14   purpose" or, quote, "can be understood to result from a

15   justification independent of unconstitutional grounds," is that

16   an evidence-based analysis?

17        MR. KIRSCHNER:  I guess I'm a little confused with the

18   question.  When you say "evidence-based analysis," compared

19   versus --

20        THE COURT:  Well, there's the old branch of an equal

21   protection law that even a court, if you can conceive of any

22   reasonable basis, even if it was never argued by the

23   government, even if there's no evidence, even if the Court

24   conceives of it, you uphold it.  There's *Leon versus Williams*,

25   there's a whole line of cases.

1          And then there's the more modern cases that say, no, it's

2     a rational basis but we're going to look and see what's the

3     motivating -- what could have been the motivation of the voters

4     in Colorado, for instance.

5          So what branch is this?  When it says "plausibly related

6     reasonably can be understood," does that mean in light of the

7     facts it can be plausibly related to an independent purpose or

8     is this something that's anything conceivable?

9          **MR. KIRSCHNER:**  Well, a couple things.  One,

10    Your Honor, is that in that decision they analogize rational

11    basis so I think it's pulled from the rational-basis line of

12    reasoning.

13         The other thing I would say is that we contend that this

14    would be a record review case even on equal protection grounds.

15    And so it's the rationale as explained by the government and

16    the assessment of that of whether it's the plausibly stated

17    objective.  So I would say you would look at the -- dig

18    somewhere into the merits of it to the stated rationale by the

19    government.

20         **THE COURT:**  So your position is that the Court cannot

21    look beneath the stated rationale, it cannot look to the

22    underlying documents that weren't public?  Or what's your

23    position on that?

24         **MR. KIRSCHNER:**  Well, Your Honor, I think that it is

25    again a record review, administrative record review, and so

the -- so the administrative records are -- include materials
that are not public *per se* but they do not include in the
normal course deliberative materials.

      **THE COURT:**  So some of the memos we've been talking
about would not be included in the administrative record here?

      **MR. KIRSCHNER:**  And for your benefit, we have -- we
have a certified administrative record so you could see the
record that we have relied upon.  And we filed each of those
administrative records with the court.

      **THE COURT:**  All right.  Your position is that even on
a constitutional claim that is being asserted independent of
the APA claim, that the court should be restricted to the
administrative record?

      **MR. KIRSCHNER:**  And 706(a)(2) refers to constitutional
claims.

      **THE COURT:**  All right.  I will take the matter under
submission.  This has been helpful.  I understand the urgency
of resolving at least this motion.  I suspect that however it
is resolved, appellate relief will be sought so I'm aware of
that and the timeline so I'm going to try to get to this as
soon as possible.

    I appreciate the arguments.  It was very helpful.  Thank
you.

        (Proceedings adjourned at 12:52 p.m.)

            ---oOo---

1

2

3                    **CERTIFICATE OF REPORTER**

4         I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, September 28, 2018

8

9

10

11    _____

12        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25