1
2
3
4                     UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    CRISTA RAMOS, et al.,                Case No. 18-cv-01554-EMC

8                   Plaintiffs,

9          v.                            **ORDER GRANTING PLAINTIFFS'**
                                         **MOTION FOR PRELIMINARY**
10   KIRSTJEN NIELSEN, et al.,           **INJUNCTION**

11                  Defendants.          Docket No. 120

12

13        The federal government seeks to terminate the Temporary Protected Status ("TPS")

14   designations for four countries: Haiti, Sudan, Nicaragua, and El Salvador.  Under three prior

15   administrations, the TPS designations of these countries have been repeatedly extended based on

16   adverse and dangerous conditions in these countries.  Under the designations, approximately

17   300,000 TPS beneficiaries have been allowed to stay and work in the United States because of

18   dangerous or unsafe conditions in their home countries.[1]  Without TPS designations, these

19   beneficiaries will be subject to removal from the United States.

20        Plaintiffs in this case are TPS beneficiaries (who have resided in the United States for

21   years) along with their U.S.-citizen children.  In this suit, Plaintiffs challenge the Trump

22   administration's decision to terminate TPS status for the affected countries.  Currently pending

23   before the Court is Plaintiffs' motion for a preliminary injunction.  Plaintiffs seek to enjoin the

24   government from implementing or enforcing the decisions of the Secretary of the Department of

25   Homeland Security to terminate TPS designations of these countries pending a final resolution of

26

27   [1] *See* Degen Decl., Ex. 14 (NSC Memo) (indicating that there are 5,349 TPS beneficiaries from
     Nicaragua; 263,282 TPS beneficiaries from El Salvador; and 58,706 TPS beneficiaries from
28   Haiti); Degen Decl., Ex. 87 (Decision Memo at 2) (indicating that there are 1,039 TPS
     beneficiaries from Sudan).

United States District Court
Northern District of California

the case on the merits.

As described below, absent injunctive relief, TPS beneficiaries and their children indisputably will suffer irreparable harm and great hardship.  TPS beneficiaries who have lived, worked, and raised families in the United States (many for more than a decade), will be subject to removal.  Many have U.S.-born children; those may be faced with the Hobson's choice of bringing their children with them (and tearing them away from the only country and community they have known) or splitting their families apart.  In contrast, the government has failed to establish any real harm were the status quo (which has been in existence for as long as two decades) is maintained during the pendency of this litigation.  Indeed, if anything, Plaintiffs and amici have established without dispute that local and national economies will be hurt if hundreds of thousands of TPS beneficiaries are uprooted and removed.

The balance of hardships thus tips sharply in favor of TPS beneficiaries and their families.  And Plaintiffs have made substantial showing on the merits of their claims, both on the facts and the law.  They have presented a substantial record supporting their claim that the Acting Secretary or Secretary of DHS, in deciding to terminate the TPS status of Haiti, El Salvador, Nicaragua and Sudan, changed the criteria applied by the prior administrations, and did so without any explanation or justification in violation of the Administrative Procedure Act.  There is also evidence that this may have been done in order to implement and justify a pre-ordained result desired by the White House.  Plaintiffs have also raised serious questions whether the actions taken by the Acting Secretary or Secretary was influenced by the White House and based on animus against non-white, non-European immigrants in violation of Equal Protection guaranteed by the Constitution.  The issues are at least serious enough to preserve the status quo.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Plaintiffs' motion.  It also sets a Case Management Conference for October 26, 2018 at 10:30 a.m. to discuss with the parties the possibility of an expeditious adjudication of the merits.

# I.       FACTUAL & PROCEDURAL BACKGROUND

A.      Statutory Background

The TPS statute is 8 U.S.C. § 1254a.  Section 1254a(b) covers TPS designations.  It provides in relevant part as follows.

> (1)   In general.  The Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if –
>
> (A)   the Attorney General finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B)   the Attorney General finds that –
>
> (i)    there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
> (ii)   the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
> (iii)  the foreign state officially has requested designation under this subparagraph; or
>
> (C)   the Attorney General finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b).

Per the statute, "the initial period of designation of a foreign state . . . is the period, specified by the Attorney General, of not less than 6 months and not more than 18 months."  *Id.* § 1254a(b)(2).  Thereafter, there is periodic review to see whether the TPS designation should be terminated or extended.  *See id.*  Under § 1254a(b)(3)(A), "[a]t least 60 days before end of the initial period designation, and any extended period of designation, . . . the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the

foreign state (or part of such foreign state) . . . and shall determine whether the conditions for such designation under this subsection continue to be met."

- "If the Attorney General determines . . . that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall *terminate* the designation . . . ." *Id.* § 1254a(b)(3)(B) (emphasis added).

- "If the Attorney General does not determine . . . that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is *extended* for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C) (emphasis added).

Section 1254a(b)(5)(A) provides that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).  However, the Court previously held that this provision does not bar the Court from considering Plaintiffs' particular claims brought in the instant case, including their Administrative Procedure Act ("APA") and Equal Protection claims.  *See* Docket No. 55 (Order at 15, 20-21) (holding that this provision does not preclude a challenge to general collateral practices or certain colorable constitutional claims).

B.   General Process for TPS Designation Decision (on Periodic Review)

For the most part, the parties agree that the general process for a TPS designation decision (on periodic review) is as follows.  The decisions are formally made by the Secretary for the Department of Homeland Security ("DHS").  For her review, RAIO[2] (a division within USCIS) provides a Country Conditions Memo.  In addition, OP&S[3] (another division within USCIS) drafts a Decision Memo that contains USCIS's recommendation on what to do about the TPS designation.  Once the Decision Memo is finalized, the USCIS Director passes it on to the DHS

---

[2] RAIO stands for Refugee, Asylum and International Operations Directorate.

[3] OP&S stands for Office of Policy and Strategy.

United States District Court
Northern District of California

1   Secretary.  The State Department provides further input (*e.g.*, country conditions,

2   recommendations).  At times, input can also come from other government sources, but the above

3   is the information consistently provided to the DHS Secretary.  *See generally* Rodriguez Decl.

4   (former USCIS director during part of the Obama administration).

5   C.   General Timeline for Countries at Issue

6       Below is a general timeline of events for each of the countries at issue.

7       1.   Haiti

8   "Haiti was originally designed for TPS on January 21, 2010 based on the 7.0-magnitude

9   earthquake on January 12, 2010 that prevented Haitians from returning safely."  Docket No. 55

10  (Order at 6); *see also* 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010).  "Haiti's designation was

11  subsequently extended and re-designated four times by the Obama administration and once by the

12  Trump administration."  Docket No. 55 (Order at 6).

13      Although the Trump administration extended Haiti's TPS designation one time (in or about

14  May 2017), the extension was for six months only, and the Federal Register Notice announcing

15  the extension emphasized that "the designation of TPS was intended by Congress to be temporary

16  in nature"; that "the Government of Haiti has expressed a desire for its nationals to return"; that

17  the DHS Secretary would – after the six months – "consider whether permitting Haitian nationals

18  to remain in the United States is contrary to the national interest of the United States"; and that

19  beneficiaries are therefore "encouraged to prepare for their return to Haiti."  82 Fed. Reg. 23830,

20  23831 (May 24, 2017); *see also* Degen Decl., Ex. 45 (Decision Memo at 2) (noting that former

21  DHS Secretary Kelly "extended Haiti's TPS designation for a limited period of 6 months, with

22  strong public messaging to the Haitian community to prepare for their return to their homeland").

23  In short, the Notice portended the end of Haiti's TPS designation.

24      Subsequently, on November 20, 2017, Acting Secretary Duke made the decision to

25  terminate Haiti's TPS designation.  *See* 83 Fed. Reg. 2648, 2650 (Jan. 18, 2018).  The termination

26  was formally announced on January 18, 2018.  *See* Docket No. 55 (Order at 6).  The Federal

27  Register Notice stated that the Acting Secretary was terminating the TPS designation for Haiti as

28  of July 22, 2019, because "the conditions for Haiti's designation for TPS – on the basis of

United States District Court
Northern District of California

'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety – are no longer met." 83 Fed. Reg. 2648, 2650 (Jan. 18, 2018).

### 2.   Sudan

"Sudan was designated for TPS in November 1997 due to an ongoing armed conflict and extraordinary conditions preventing nationals from returning safely." Docket No. 55 (Order at 10); *see also* 62 Fed. Reg. 59737 (Nov. 4, 1997). The TPS designation "was periodically extended and/or re-designated . . . 15 times by the Clinton, Bush, and Obama administrations." Docket No. 55 (Order at 10).

It appears that, in early September 2017, Acting Secretary Duke made the decision to terminate Sudan's TPS designation. *See, e.g.*, Degen Decl., Ex. 5 (email) (discussing "edits to the FRN [Federal Register Notice] announcing the termination of TPS for Sudan").

"On October 11, 2017, Acting Secretary . . . Duke announced the termination of Sudan's TPS [designation] . . . ." Docket No. 55 (Order at 11). The Federal Register Notice stated that the TPS designation was being terminated as of November 2, 2018, because "[t]he ongoing armed conflict no longer prevents the return of nationals to Sudan to all regions of Sudan without posing a serious threat to their personal safety. Further, extraordinary and temporary conditions within Sudan no longer prevent nationals from returning in safety to all regions of Sudan." 82 Fed. Reg. 47228, 47230 (Oct. 11, 2017).

### 3.   Nicaragua

"Nicaragua was originally designated for TPS on January 5, 1999 on the basis of Hurricane Mitch." Docket No. 55 (Order at 8). Its "designation was extended 13 times by the Clinton, Bush, and Obama administrations." Docket No. 55 (Order at 9).

On or about November 5, 2017, Acting Secretary Duke made the decision to terminate Nicaragua's TPS designation. *See* Degen Decl., Ex. 30 (email).

"On December 15, 2017, Acting Secretary Duke announced that Nicaragua's designation would terminate . . . ." Docket No. 55 (Order at 9). The Federal Register Notice stated that the TPS designation was being terminated as of January 9, 2019, because "conditions for Nicaragua's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by

1  Hurricane Mitch are no longer met." 82 Fed. Reg. 59636, 59637 (Dec. 15, 2017).

2         4.      El Salvador

3         "El Salvador was designated for TPS on March 9, 2001 based on a series of earthquakes."

4  Docket No. 55 (Order at 7).  Its designation was "extended 11 times by the Bush and Obama

5  administrations."  Docket No. 55 (Order at 7).

6         It is not clear from the record when Secretary Nielsen made the actual decision to

7  terminate but it appears to have taken place some time in early to mid-January 2018.  *See* El

8  Salvador AR at 1 (email, dated January 4, 2018, from Maj. Gen. Norman (U.S. Southern

9  Command)) (providing comments on what might happen if the TPS designation were terminated);

10  El Salvador AR at 5-01 (memo on January 5, 2018, phone call to President of El Salvador)

11  (referring to "your upcoming decision regarding the future of El Salvador's Temporary Protected

12  Status (TPS) designation").

13         The termination of El Salvador's TPS designation was formally announced on January 18,

14  2018.  *See* Docket No. 55 (Order at 8).  The Federal Register Notice stated that the TPS

15  designation was being terminated as of September 9, 2019, because "the conditions supporting El

16  Salvador's 2011 designation for TPS on the basis of environmental disaster due to the damage

17  caused by the 2001 earthquakes are no longer met."  83 Fed. Reg. 2654, 2655-56 (Jan. 18, 2018).

18                          **II.      DISCUSSION**

19  A.      Legal Standard

20         "[The] purpose of a preliminary injunction . . . is to preserve the status quo and the rights

21  of the parties until a final judgment issues in the cause."  *U.S. Philips Corp. v. KBC Bank N.V.*,

22  590 F.3d 1091, 1094 (9th Cir. 2010); *see also Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011,

23  1024 (9th Cir. 2016) (stating that "[t]he 'purpose of a preliminary injunction is to preserve the

24  status quo ante litem pending a determination of the action on the merits'; '[s]tatus quo ante litem'

25  refers to 'the last uncontested status which preceded the pending controversy'").  "A preliminary

26  injunction . . . is not a preliminary adjudication on the merits but rather a device for preserving the

27  status quo and preventing the irreparable loss of rights before judgment."  *Sierra On-Line, Inc. v.*

28  *Phx. Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

United States District Court
Northern District of California

1
2
3
4
5
6
7

> A party seeking a preliminary injunction must meet one of two variants of the same standard.  Under the original *Winter* standard, a party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Under the "sliding scale" variant of the *Winter* standard, "if a plaintiff can only show that there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."

8   *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

9   B.      Likelihood of Irreparable Injury/Balance of Hardships/Public Interest

10          The Court addresses first the likelihood of irreparable injury, the balance of hardships, and

11  the public interest.

12          The record evidence establishes a compelling case as to these factors in favor of Plaintiffs.

13  Plaintiffs have submitted a number of declarations which establish that, without a preliminary

14  injunction, TPS beneficiaries are likely to suffer irreparable injury.  *See, e.g.*, Docket No. 91

15  (Abdalla Decl.); Docket No. 92 (De Ayala Decl.); Docket No. 93 (Elarabi Decl.); Docket No. 94

16  (Ampie Decl).  The declarants are TPS beneficiaries who have lived in the United States for a

17  significant number of years, some as many as twenty.  Without a preliminary injunction, the

18  declarants risk being removed.  At the hearing, the government conceded that there are

19  approximately 300,000 TPS beneficiaries registered as such and that they are likely to be subject

20  to removal.[4]  TPS beneficiaries thus risk being uprooted from their homes, jobs, careers, and

21  communities.  They face removal to countries to which their children and family members may

22  have little or no ties and which may not be safe.  Those with U.S.-citizen children will be

23  confronted with the dilemma of either bringing their children with them, giving up their children's

24  lives in the United States (for many, the only lives they know), or being separated from their

25  children.  *See* County/Citi Amici at 4 (noting that "[t]he beneficiaries . . . have hundreds of

26

27  [4] Removal of TPS status returns beneficiaries to their former status.  Those who have an independent status entitling them to stay in the U.S. are not likely to be registered under TPS status.  Hence, those who are so registered likely do not enjoy any other status entitling them to stay.  The government essentially conceded such at the hearing.

28

United States District Court
Northern District of California

thousands of U.S.-citizen children, 192,000 born to Salvadoran beneficiaries alone"). Understandably, this prospect is a source of great emotional distress, fear, and anxiety.

For example, Ebtihal Abdalla and her husband are TPS beneficiaries from Sudan. They have been beneficiaries since the late 1990s. They have three children. One is a TPS beneficiary and has lived in the United States since she was a baby. The other two are U.S. citizens. Once Sudan's designation is terminated, her husband will be unable to work and, as he is the primary breadwinner, this will have significant impact on the family's livelihood. Furthermore, since the announcement of Sudan's termination, Ms. Abdalla has suffered bouts of uncontrollable crying and serious migraines. She has also found it difficult to eat and to leave the house. She was recently diagnosed with severe depression and prescribed medications. Ms. Abdalla's children have also been impacted by the announcement of Sudan's termination. For example, Ms. Abdalla's oldest daughter is currently at a community college. Once Sudan's termination is terminated, she will not be able to work, and she needs the work in order to help pay for tuition. She is fearful that she will not be able to attend a four-year college or university, as planned, if Sudan's TPS is terminated before she completes her coursework at the community college. As for Ms. Abdalla's youngest daughter, she is only twelve and, after learning that her family's immigration status is in jeopardy, she has struggled at school, with a teacher even expressly voicing concern.

Similar testimony is provided in the declarations of Elsy Yolanda Flores De Ayala, *see* De Ayala Decl. (testifying about the impact of the announcement of El Salvador's termination on her, her husband, her U.S.-citizen sister who has cancer, and her three children, one who is a TPS beneficiary and the other two who are U.S. citizens); Hiwaida Elarabi, *see* Elarabi Decl. (testifying about the impact of the announcement of Sudan's termination on him, her extended family with whom she lives in the United States and whom she helps support, and her parents in Sudan whom she helps support); Imara Ampie, *see* Ampie Decl. (testifying about the impact of the announcement of Nicaragua's termination on her, her husband, and her two U.S.-citizen children, both of whom have special needs); and Wilna Destin. *See* Destin Decl. (testifying about the impact of the announcement of Haiti's termination on her and her two U.S.-citizen children). *See*

United States District Court
Northern District of California

*also* Docket No. 55 (Order at 3-6) (discussing Plaintiffs' backgrounds as alleged in the complaint).

The amicus briefs underscore that the harms to TPS beneficiaries will also harm the public interest.  For example, many TPS beneficiaries are part of the workforce and have a significant presence in the construction, hospitality, food service, landscaping, home health care, child care, and retail industries.  *See, e.g.*, Docket No. 103-1 (State Amici at 9) (noting that "an estimated 37,000-70,000 construction workers are TPS holders").  Without a preliminary injunction, these TPS beneficiaries will no longer be able to work, thus adversely impacting state and local economies.  The State Amici estimates that "loss of legal status for these TPS holders is projected to cost $132.6 billion in GDP (due to lost earnings as well as decreased industry outputs), $5.2 billion in Social Security and Medicare contributions, and $733 million in employers' turnover costs."  Docket No. 103-1 (State Amici at 9).  Also, if TPS beneficiaries cannot work, then they will lose their employer-sponsored health care which will put a strain on public resources.  Furthermore, many TPS beneficiaries are homeowners; if these TPS beneficiaries are no longer able to work, they may not be able to pay their property taxes, and their homes may become subject to foreclosure.  *See, e.g.*, Docket No. 103-1 (State Amici at 10) (stating that "[t]hirty-two percent of TPS holders from El Salvador and Haiti have mortgages, and almost 42 percent of Nicaraguan immigrants are homeowners"; adding that "Salvadoran TPS homeowners pay an estimated $100 million in property taxes annually, including up to $32 million in the Los Angeles area alone").  Finally, TPS beneficiaries also contribute to their communities in other less tangible, but equally important, ways.  *See, e.g.*, County/Citi Amici at 5 (noting that "a survey of TPS recipients from El Salvador, Honduras, and Nicaragua found that 30 percent are civically active, and about 20 percent engage in community service such as volunteering with nonprofit organizations or at children's hospitals").

The government does not dispute the practical and human hardships upon TPS beneficiaries and their children that will be caused if TPS status were terminated.  Nor has the government taken issue with the estimates of adverse impact upon the economy resulting from the termination and resulting *en masse* removal of TPS beneficiaries.

Indeed, the government's own documents reflect that public interest considerations weighs

10

United States District Court
Northern District of California

in favor of a preliminary injunction.  Apart from adversely impacting the domestic economy, terminating TPS status may have adverse ramifications internationally.  For example, in a memo dated October 2017, James Nealon, then-Assistant Secretary for International Affairs in OP&S (and a former ambassador to Honduras), gave examples as to why terminating the TPS designations for, *inter alia*, Nicaragua and El Salvador would be against the United States' own interest – *e.g.*, returning aliens to these countries would put a strain on the countries' systems and "possibly spur further irregular migration to the United States."  Degen Decl., Ex. 161 (Memo at 2); El Salvador AR at 1 (U.S. Southern Command, making a similar point regarding El Salvador); *see also* Degen Decl., Ex. 70 (U.S. embassy in El Salvador, recommending extension of TPS designation because it was in the United States' own interest).  In an email dated September 2017, the Department of Defense raised concerns that termination of Sudan's TPS designation could negatively impact the United States from a foreign policy perspective.  *See* Degen Decl., Ex. 9 (email from Department of Defense, expressing concern about draft language in Federal Register Notice regarding Sudan's TPS designation; adding that "[w]e are entering a delicate phase in our relationship with the Government of Sudan that may set the future trajectory of the relationship for years to come, and maintaining domestic and international partner support through consistent and credible messaging will be critical to achieving defense interests in Sudan").

     As noted, the government does not challenge the record evidence compiled by Plaintiffs and amici.  That is, as a *factual* matter, the government does not contest any of the injuries or hardships catalogued above.  Instead, the government offers only two *legal* arguments as to why there is no likelihood of irreparable injury, the balance of hardships does not tip sharply in Plaintiffs' favor, and/or the public interest weighs against a preliminary injunction.  Those legal arguments are: (1) Plaintiffs will suffer an irreparable injury only if they prevail on the merits and Plaintiffs are likely to lose on the merits and (2) Plaintiffs' injuries "are inherent in the temporary nature of TPS status" – *i.e.*, "[a] TPS beneficiary is . . . always subject to the same uncertainties and concerns that Plaintiffs allege here" because the TPS program is inherently temporary in nature.  Opp'n at 26.  Neither of these arguments is persuasive.

     The government's first argument is problematic because it effectively makes the factor of

likelihood of success on the merits dispositive.  But likelihood of success on the merits is not the sole consideration at the preliminary injunction phase; rather, irreparable injury and the balance of hardships must also be taken into account.  The government's position cannot be squared with the sliding scale test expressly endorsed by the Ninth Circuit – *i.e.*, that the balance of hardships defines the showing on the merits the plaintiff must make at the preliminary injunction stage.  Instead, the government's argument assumes there is no merit to Plaintiffs' claims and thus no irreparable injury.  But at this stage, the merits cannot be definitively resolved, as evident in this Court's order denying the motion to dismiss, its assessment of the merits below, and the District Court's decision in *Centro Presente v. United States Dep't of Homeland Sec.*, No. 18-10340, 2018 U.S. Dist. LEXIS 122509 (D. Mass. July 23, 2018) (in similar TPS case, largely denying government's motion to dismiss).  At bottom, the government's argument ignores the fact that "[a] preliminary injunction . . . is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment."  *Sierra On-Line*, 739 F.2d at 1422.

The government's second argument fares no better.  Although the TPS program is temporary in nature, that does not mean that Plaintiffs' injuries claimed herein are the purely result of the temporary nature of the program as opposed to the government's actions.  For example, if (as Plaintiffs argue) the government were to follow the APA's procedural requirements as Plaintiffs contend is mandated by law, then, at the very least, TPS beneficiaries would have additional time in the United States to, *e.g.*, work, wrap up their affairs in the United States, and prepare for a return to their countries of origin.  Although their stay is temporary in nature, the shortening of their time in the United States and acceleration of their removal if relief is not granted may constitute irreparable injury.  There is also the possibility that were DHS to apply properly the requisites of the APA in assessing the TPS designation at issue, and to do so free of any Equal Protection taint, the Secretary might determine the extension(s) of TPS status for one or more of the affected countries is justified.

Balanced against Plaintiffs' injuries if a preliminary injunction were not to issue are the government's injuries if a preliminary injunction were to issue.  As an initial matter, the Court

United States District Court
Northern District of California

notes that the government cannot argue in good faith that the continued presence of TPS beneficiaries in the country pending a final adjudication of the merits causes any concrete harm to the United States.  By and large, TPS beneficiaries have been in the United States for a significant number of years, and there is nothing in the record suggesting their continued presence until the merits of this case can be adjudicated threatens the national interest or, *e.g.*, national security.  Rather, as amici have underscored and the government has not disputed, TPS beneficiaries are contributors to state and local communities.[5]  Moreover, the Court intends to expedite trial and final adjudication on the merits without delay, thereby minimizing any prejudice to the government.

The government nevertheless protests that it and the public "share an interest in ensuring that the process established by Congress – under which the Secretary of Homeland Security is vested with unreviewable discretion to carefully weigh the statutory factors governing TPS designations – is followed as Congress intended."  Opp'n at 27.  The government also states that "the injunctive relief sought by Plaintiffs would frustrate and displace the DHS Secretary's substantive judgment as to how to implement the TPS statute."  Opp'n at 27.  But these arguments are lacking because they relate to jurisdictional issues upon which this Court has already ruled in denying the government's motion to dismiss – *e.g.*, the APA claim herein focuses on process only (not the actual substantive determination as to TPS status of each country), and thus judicial review is not barred.  While the equal protection claim could impact the ultimate determination as to each country, it would do so not on the Secretary's factual findings about country condition which would be insulated from judicial review, but because of the influence of an overarching unconstitutional consideration that transcends each individual determination.

Furthermore, the government's argument would apply to any public injunction enjoining the implementation or execution of any legislation or agency/executive policy.  The risk of interference with governmental actions inheres in any public injunction, but that does not

---

[5] At the hearing, the government mentioned for the first time that there would be operational costs involved if the Court were to issue a preliminary injunction in favor of Plaintiffs.  However, this argument is waived as it was never presented in the government's papers.  Moreover, there is no record evidence to substantiate any "operational harm."

categorically bar such injunctions.  While courts must exercise particular caution in issuing

injunctions on matters that concern immigration given Congress and the President's extensive

authority in this arena, it is beyond peradventure that governmental decision, even those that

concern on immigration, are not immune from judicial review.  *See, e.g., Zadvydas v. Davis*, 533

U.S. 678, 682 (2001) (with respect to "aliens who were admitted to the United States but

subsequently ordered removed," considering "whether the post-removal-period statute authorizes

the Attorney General to detain a removable alien indefinitely beyond the removal period or only

for a period reasonably necessary to secure the alien's removal") (emphasis added); *Osorio-

Martinez v. AG United States*, 893 F.3d 153, 175 (3d Cir. 2018) ("recogniz[ing] that, while the

political branches' plenary power over immigration is 'by no means . . . subject to judicial review

in all contexts,' it is 'certain[ly]' subject to judicial review in some contexts because that power 'is

[not] limitless in all respects'"; thus, distinguishing between aliens seeking initial admission to the

country and those who had developed substantial connections with the country).

The bottom line is there is nothing in the record establishing the continued presence of TPS

beneficiaries in the United States causes harm to the country; in contrast, if the Court were to deny

an injunction, Plaintiffs stand to suffer substantial irreparable injury.  Any ultimate adjudication on

the merits in their favor may come too late if they have been removed prior to final adjudication.

Once the TPS beneficiaries are removed, the government's actions – if deemed unlawful in this

lawsuit – could not practically be undone.

Accordingly, the Court finds that, without a preliminary injunction, there is a strong

likelihood that Plaintiffs would suffer irreparable injury, with concomitant harm to state and local

communities as well.  In addition, any harm to the government or the public if a preliminary

injunction were issued is strongly outweighed by the harm to Plaintiffs and their communities

should a preliminary injunction not issue.[6]  The balance of hardships tips decidedly in Plaintiffs'

---

[6] To the extent the government argues laches (*i.e.*, Plaintiffs should have brought their case and/or moved for a preliminary injunction earlier), that contention is without merit because Plaintiffs have been diligent.  Plaintiffs filed their case in March 2018, which was only a few months after decisions were made on Haiti and El Salvador.  While the decisions on Sudan and Nicaragua were made a little earlier, Plaintiffs' lawsuit was still filed well in advance of the actual termination dates.  As for the motion for preliminary injunction, although it was not filed until August 2018,

United States District Court
Northern District of California

1  favor.

2  C.      Likelihood of Success on the Merits/Serious Questions Going to the Merits

3          The Court now turns to the issue of likelihood of success on the merits.  Because Plaintiffs

4  have established that the balance of hardships tips sharply in their favor, they need only show

5  serious questions on the merits have been raised in order to obtain preliminary injunctive relief.

6  Plaintiffs argue that they are likely to succeed, but, at the very least, there are serious questions

7  going to the merits, on both their APA and Equal Protection claims.  Each claim is addressed

8  below.

9          1.      APA Claim

10         The Court previously laid out the legal standard for Plaintiffs' APA claim in its order

11 denying the government's motion to dismiss:

12             Under the APA, agency action may be set aside if it is arbitrary or
               capricious. See 5 U.S.C. § 706(2)(A). Under this standard, an
13             agency must "examine the relevant data and articulate a satisfactory
               explanation for its action."  *Motor Vehicle Mfrs. Assn. of United*
14             *States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43
               (1983).  But "a court is not to substitute its judgment for that of the
15             agency" and "should uphold a decision of less than ideal clarity if
               the agency's path may reasonably be discerned."  *F.C.C. v. Fox*
16             *Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation and
               quotation omitted).
17
               The APA constrains an agency's ability to change its practices or
18             policies without acknowledging the change or providing an
               explanation.  "[T]he requirement that an agency provide reasoned
19             explanation for its action would ordinarily demand that [an agency]
               display awareness that it *is* changing position."  *Id.* at 515 (emphasis
20             in original). Thus, agencies "may not . . . depart from a prior policy
               *sub silentio* or simply disregard rules that are still on the books," and
21             "must show that there are good reasons for the new policy."  *Id.*
               (emphasis in original).  An agency need not demonstrate that "the
22             reasons for the new policy are better than the reasons for the old
               one; it suffices that the new policy is permissible under the statute,
23             that there are good reasons for it, and that the agency *believes* it to
               be better, which the conscious change of course adequately
24             indicates."  *Id.* (emphasis in original).

25             This constraint on changes to agency policy is not limited to formal
               rules or official policies.  It applies to practices implied from the
26             agency conduct.  For example, in *California Trout v. F.E.R.C.*, 572

27  _____

28 that is because the parties first decided to litigate the 12(b)(6) issues, which included a
    jurisdictional issue.

F.3d 1003 (9th Cir. 2009), the plaintiffs challenged the Federal Energy Regulatory Commission's (FERC) denial of their untimely attempt to intervene in a proceeding concerning the renewal of an operating license for a dam and power plant. In essence, the plaintiffs argued that FERC's decision to grant late intervention requests in three prior adjudications had given rise to an implicit rule that FERC would always grant late requests in certain circumstances, and that FERC was required to offer a reasoned explanation before abandoning that practice. Although it ultimately held against the plaintiffs, the Ninth Circuit agreed that the alleged change in adjudicative practice was subject to the APA's requirements for reasoned decision-making. It explained that "while an agency may announce new principles in an adjudicatory proceeding, it may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case." *Id.* at 1022 (quotation and citation omitted)). Rather, "if [an agency] announces and follows – *by rule or by settled course of adjudication* – a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act.'" *Id.* at 1023 (quoting *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996)) (emphasis added, alteration in original). The court proceeded to consider the claim on the merits and held that the agency's prior decisions had *not* "establish[ed] a broad principle that the Commission will allow untimely intervention." *Id.* at 1024.

Thus, *California Trout* establishes that a shift in agency practice (as opposed to a formal rule or policy) is also reviewable under the APA. Courts have also looked, in part, to whether an agency's past practice evinces the existence of an implicit rule or policy. *See, e.g.*, *Northwest Env. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007) (holding that BPA's decision to stop funding Fish Passage Center and to divert its responsibilities to two other entities after nearly two decades was arbitrary and capricious where no reasoned explanation was provided); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017) (after "longstanding practice" of treating certain land as if it were part of the Wild Horse Territory, agency's unexplained change in practice was arbitrary-and-capricious, particularly where it "fail[ed] even to acknowledge its past practice . . . let alone to explain its reversal of course in the 2013 decision").

Docket No. 55 (Order at 24-26). The alleged changes in policy – eliminating consideration of intervening conditions not directly related to the originating condition – is substantive and highly consequential; it is at least as significant and impactful as the changes in *California Trout*, *Bonneville Power Admin.*, and *Am Wild Horse Pres. Campaign*. Indeed, the significance of the change was recognized by Acting Secretary Duke as "a strong break with past practice." Degen Decl., Ex. 30. *See Centro Presente*, 2018 U.S. Dist. LEXIS 122509, at *62 (in a similar TPS case,

United States District Court
Northern District of California

1    noting that "even if the alleged new policy is interpretive [rather than legislative, with only the

2    latter requiring the notice-and-comment process], Defendants would be required to provide some

3    rationale acknowledging the change in position to provide the 'observance of procedure required

4    by law'"). *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (noting that,

5    in explaining its changed position, an agency must also be cognizant that longstanding policies

6    may have "engendered serious reliance interests that must be taken into account").

7    Based on the above legal standard, all that Plaintiffs must show to establish a likelihood of

8    success on the merits – or least serious questions going to the merits – is a change in DHS

9    practices with respect to TPS designations.  There is no dispute that DHS never acknowledged any

10   change in practice and thus has not provided any explanation for any such change.

11   Recognizing the impact of the Court's order on the motion to dismiss, the government

12   implicitly suggests that the Court should reconsider its ruling that the APA's restrictions apply to

13   agency practices, and not just formal rules or official policies.  This is evidenced by the

14   government's attempt to distinguish the cases cited by the Court in its order on the motion to

15   dismiss.  *See* Opp'n at 12-13 & n.11 (addressing, *inter alia*, three cases discussed in the Court's

16   order – namely, *California Trout*, *Bonneville Power*, and *Wild Horse*).  The Court rejects the

17   government's implicit suggestion because (1) the government has not formally moved for

18   reconsideration of the Court's order on the motion to dismiss and (2) even if it had, it has made no

19   showing that, *e.g.*, the Court manifestly failed "to consider material facts or dispositive legal

20   arguments which were presented to the Court before" it ruled on the motion to dismiss.  Civ. L.R.

21   7-9(b)(3).

22   Left with this, the government has come up with a slightly different legal argument:

23   (1) that the purpose behind the APA's procedural requirements is "to ensure that regulated

24   entities have fair notice of permissible and impermissible regulated conduct and their

25   obligations under the law, as well as the sanctions they may incur if they breach those

26   obligations";

27   (2) that the APA's procedural requirements therefore kick in only when an agency

28   "change[s] the rules of the game in a way that bears directly on the rights or interests of

17

1    regulated entities and other stakeholders"; and

2    (3) that, here, "[u]nlike regulatory administrative actions, the designation of a country for

3         [TPS] and the subsequent termination of that temporary status does not impose

4         regulatory obligations or restrictions on regulated entities, or impose penalties for the

5         violation of those obligations or restrictions."  Opp'n at 11, 13.

6    This argument is not convincing for two reasons.  First, although there are cases in which

7    regulated entities have challenged regulating agency policy or practices, there are also cases in

8    which the challenging party is not a regulated entity – including *California Trout*, *Bonneville*

9    *Power*, and *Wild Horse*.  For example, the plaintiffs in *California Trout* were organizations

10   designed to preserve California's wild trout populations and to preserve California's rivers; they

11   argued that an agency's denial of their ability to intervene in a license renewal proceeding for a

12   dam operator was arbitrary and capricious.  *See Cal. Trout*, 572 F.3d at 1011; *see also Bonneville*

13   *Power*, 477 F.3d at 672 (plaintiff-environmental groups challenging an action of the federal

14   agency that operates dams on the Columbia River – *i.e.*, transferring the functions of the Fish

15   Passage Center to other entities); *Wild Horse*, 873 F.3d at 922 (plaintiff-advocates for the

16   protection of wild horses asserting that the Forest Service's revision of the Devil's Garden Wild

17   Horse Territory violated various federal statutes).  Second, TPS beneficiaries clearly have a stake

18   in whether their countries of origin maintain their TPS designations.  A person cannot become a

19   TPS beneficiary unless he or she is, in the first place, "a national . . . of a foreign state" with a TPS

20   designation.  8 C.F.R. § 244.2(a).  Therefore, TPS beneficiaries have a sufficient interest – as

21   much interest as any regulated entity – to challenge the agency actions: here DHS's decisions to

22   terminate TPS designations.

23   In its opposition, the government contends that, to the extent TPS beneficiaries are

24   regulated, the only rules to which APA procedural requirements attach are the regulations found in

25   8 C.F.R. Part 244, which expressly apply to TPS beneficiaries.  *See, e.g.*, 8 C.F.R. § 244.2

26   (providing that "an alien may in the discretion of the director be granted [TPS] if the alien

27   establishes" certain facts); *id.* § 244.10 (providing, *inter alia*, that "USCIS will grant temporary

28   treatment benefits to the applicant if the applicant establishes prima facie eligibility for [TPS]" and

United States District Court
Northern District of California

18

that, if TPS is denied, the alien may appeal).  But the government offers no principled reason why the APA's procedural requirements attach to these regulations only.  Even though these regulations deal with TPS beneficiaries specifically, that does not mean that TPS beneficiaries are not impacted by rules that relate to TPS designations more broadly, including the practices and policies at issue here.  As noted above, broader rules on TPS designations *do* impact TPS beneficiaries since a TPS beneficiary's status is dependent on a TPS designation.

The government protests that, even if Plaintiffs are allowed to challenge the process related to a TPS designation, they have still failed to show that there is any new policy or practice that would trigger the APA's procedural requirements (*i.e.*, an acknowledgment of the change in policy or practice and an explanation thereof).  According to the government, there have simply been "variations in how different Secretaries render their fact-intensive TPS determinations" – "at most a difference in emphasis rather than what could plausibly be considered a 'new rule.'"  Opp'n at 11.  The Court disagrees.  There is a wealth of record evidence to support Plaintiffs' position that the DHS changed its practices with regard to TPS designations – notably, evidence *beyond* a comparison of the Federal Register Notices on TPS designations before and after the Trump administration took over which this Court previously undertook.  *See* Docket No. 55 (Order at 27-33) (noting, *inter alia*, that "[p]rior to October 2017, extension and/or re-designation notices indicate that DHS consistently considered, at the very least, whether intervening events had frustrated or impeded recovery efforts from the originating conditions in Sudan, Haiti, Nicaragua, and El Salvador"; in contrast, "the termination notices for Sudan, Haiti, Nicaragua, and El Salvador [under the Trump administration] are curt and fail to address numerous conditions that justified extensions of TPS status in the most recent notices issued by prior administrations").  The comparative table set forth in this Court's prior order is relevant here.  *See* Docket No. 55 (Order at 30-32).

Since that order, Plaintiffs have developed additional evidence of a change in DHS process and policy.  For example, Leon Rodriguez, a former USCIS director, testified that, both before and during his tenure at USCIS, there was no agency policy or practice that precluded "consideration of the *full range* of current country conditions" in assessing whether a TPS designation should be

United States District Court
Northern District of California

terminated or extended.  Rodriguez Decl. ¶ 17 (emphasis added).

> Rather, USCIS had broad discretion to consider current conditions in the subject country.  Intervening factors arising after a country's original TPS designation, such as subsequent natural disasters, issues of governance, housing, health care, poverty, crime, general security, and other humanitarian considerations were considered relevant to determining whether a country continued to meet the conditions for continuing TPS designation.  *This was true regardless of whether those intervening factors had any connection to the event that formed the basis for the original designation or to the country's recovery from that originating event.*

Rodriguez Decl. ¶ 17 (emphasis added).  *See, e.g.*, Degen Decl., Exs. 125-26 (Decision Memos, signed by Mr. Rodriguez while USCIS director) (recommending extensions for Nicaragua and El Salvador because of "subsequent environmental disasters").

Evidence that DHS/USCIS under the Trump administration changed the above practice – now disregarding current conditions if they are not the originating condition or directly related to the originating condition – is substantiated by the following:

- On April 14, 2017, a career USCIS staff member sent an email to a senior RAIO official regarding Haiti's TPS designation.  The staff member indicated that the decision regarding Haiti "was a political one . . . . *Their position was that Haiti was designated on account of the 2010 earthquake, and those conditions have significantly improved.  The extraordinary conditions Haiti currently faces are longstanding, intractable problems, not 'temporary' as the statute requires.*"  Degen Reply Decl., Ex. 124 (email) (emphasis added).

- On May 22, 2017, there was a press call on Haiti's TPS designation.  During the call, there were reporter questions about, *e.g.*, what "evidence and information that the [DHS] Secretary looked at to make the decision and what went into his determination that conditions were improving."  Degen Decl., Ex. 17 (email, with attachment).  "The most common response [from DHS] was that the Secretary was doing exactly what Congress asked us to do via the INA and that is to determine whether conditions *that led to Haiti's initial designation in 2010* remain."  Degen Decl., Ex. 17 (email, with attachment) (emphasis added).

United States District Court
Northern District of California

- On May 23, 2017, an email was sent from USCIS to OP&S which provided guidance from the DHS Secretary with respect to "drafting response letters regarding TPS for Haiti." Degen Reply Decl., Ex. 127 (email). "'From S1 [the Secretary], make case as such: Highlight temporary nature; *2010 Earthquake is the only reason for TPS being granted – Not based on hurricane, or current economic conditions – Not based on cholera epidemic*.' Suggested language, 'As you know, granting TPS was based solely on 2010 earthquake that ravaged Port au Prince. Primarily localized damage in capital region of Port au Prince. Recovery slow but steady, UN has determined their stabilization force is no longer needed. Decision to rebuild palace shows economic [sic] is recovering.'" Degen Reply Decl., Ex. 127 (email) (emphasis added).

- On June 6, 2017, then-DHS Secretary Kelly testified before the Senate Homeland Security and Governmental Affairs Committee and was asked whether DHS was "going to look at the situation that started temporary protected status, and ask if that situation has changed." Degen Decl., Ex. 35 (Tr. at 69). Secretary Kelly responded: "[O]nce someone goes on this status, they – traditionally or historically, they just renew it"; "some of the Central Americans have been on status over 20 years, and they were put on status because of a hurricane that happened over 20 years ago. [¶] I can tell you that things are going better in Central America, much, much better over the last 20 years, in many ways better. But no one's every looked at it. And I think that's something – we have to do that." Degen Decl., Ex. 35 (Tr. at 70). Secretary Kelly continued: "[A]nd the program is for a specific event. In – in Haiti, it was the earthquake. Yes, Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. *But the earthquake was why TPS was – was granted and – and that's how I have to look at it.*" Degen Decl., Ex. 35 (Tr. at 70) (emphasis added).

- On November 6, 2017, Acting Secretary Duke wrote an email to White House Chief of Staff Kelly, informing him of her decisions on TPS for Nicaragua and

Honduras (terminate and extend for six months, respectively).  She noted that her decisions "will send a clear signal that TPS in general is coming to a close" – "a strong break with past practice."  Degen Decl., Ex. 30 (email).

- On November 6, 2017, there was a moderated press call regarding Acting Secretary Duke's decisions on Nicaragua and Honduras's TPS designations.  *See* Degen Decl., Ex. 31 (transcript).  During the call, Mr. Hoffman (the Assistant Secretary of Public Affairs at DHS) was asked the following question: "If you talk to immigrant advocates in the Central American community, they'll raise the issue of creasing violence in Central America in the northern triangle and while that was not the cause for the initial TPS, they say that that warrants continuing the program.  Is that a factor that you are considering?"  Degen Decl., Ex. 31 (Tr. at 8).  Mr. Hoffman responded: "So, under the Statute, the INA restricts considerations for continuing designation of TPS to the conditions on the ground *as impacted by the initial event*, whether it's a civil war or a natural disaster.  So, the conditions on the ground and how they were impacted by that event is what we have to consider under the State. I will say that if individuals believe that there are other reasons that they cannot return, there are other avenues available and they can apply for other immigration benefits outside of TPS."  Degen Decl., Ex. 31 (Tr. at 8) (emphasis added).

- In January 2018, DHS Secretary Nielsen testified before the Senate Judicial Committee, noting that "[w]e did not talk generally about the country conditions, and I want to be very clear on this.  The law does not allow me to look at the country conditions of a country, writ large"; rather, "[i]t requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist" so, for El Salvador, "we didn't dispute the country conditions are difficult . . . , but unfortunately, the law requires me, *if I cannot say that the conditions emanating from the earthquakes still exist, regardless of other systemic conditions, I must terminate TPS*."  Degen Decl., Ex. 36 (Tr. at 26) (emphasis added).

22

- In April 2018, DHS Secretary Nielsen testified before the House Appropriations Subcommittee on Homeland Security.  She was asked about the termination of Haiti's TPS designation – more specifically, "[H]ow can we possibly rationalize sending 59,000 people back to those kinds of conditions?" which included "political violence" and "civil unrest" such that the DOS has a "level three travel advisory for Haiti, meaning that people should reconsider any plans to travel there because of the conditions on the ground."  Degen Decl., Ex. 34 (Tr. at 47).  Secretary Nielsen responded in part as follows: "[T]he law really restricts my ability to extend TPS.  The law says that *if the effects of the originating event, so that's a causation issue, do not continue to exist* then the secretary of Homeland Security must terminate."  Degen Decl., Ex. 34 (Tr. at 47) (emphasis added).

- The Decision Memos for the countries at issue reference recovery from the originating condition as the basis for termination and, in three out of four instances, explicitly reject consideration of current country conditions not directly related thereto.[7]  *See, e.g.*,

  ❖ Degen Decl., Ex. 45 (Haiti Decision Memo at 1, 5) (noting that Haiti was

---

[7] The Country Conditions Memos, which the government does not dispute were prepared by career DHS/RAIO employees rather than political appointees, did not limit discussion of country conditions to those only directly related to the originating conditions for the TPS designations. *See, e.g.*, Haiti AR at 46-47 (noting that "Haiti has also experienced various setbacks that have impeded its recovery, including a cholera epidemic and the impact of Hurricane Matthew"; that "Haiti 'continues to be affected by a convergence of humanitarian needs,' including food insecurity, internal displacement, an influx of refugees from the Dominican Republic, the persistence of cholera, and the lingering impact of various natural disasters"; and that "Haiti's recovery has also been impacted by a series of other challenges related to housing, healthcare, economic growth, political instability, security, and environmental concerns"); Sudan AR at 29, 37-38 (noting that, "while armed conflict has been the primary driving force behind the humanitarian needs in Sudan, poverty, floods, drought, and environmental degradation have also significantly affected the livelihoods of vulnerable people, particularly children"; also taking note of "an inadequate transportation infrastructure prevents efficient access to markets," "significant economic instability after the secession of South Sudan in 2011," and a "cholera outbreak" that began in 2016); Nicaragua AR at 17, 22 (taking note of environmental disasters occurring after Hurricane Mitch, as well as violence and conflict in the country); El Salvador AR at 52 (taking note of "subsequent natural disasters and environmental concerns, including: hurricanes and tropical storms; heavy rains and flooding; volcanic and seismic activity; a coffee rust epidemic; and prolonged and severe drought; and an increase in various mosquito-borne diseases"; also taking note of "widespread gang activity and one of the highest homicide rates on earth").

1    designated for TPS in 2010 "due to extraordinary and temporary conditions
2    resulting from the earthquake" that struck the country on January 12, 2010,
3    and ultimately recommending termination of TPS designation because
4    "Haiti has made significant progress in recovering from the 2010
5    earthquake and no longer continues to experience the extraordinary and
6    temporary conditions that formed the basis of Haiti's designation and
7    redesignation of TPS"; "[a]ny current issues in Haiti are unrelated to the
8    2010 earthquake")[8];

9    ❖ Degen Decl., Ex. 87 (Sudan Decision Memo at 2, 6) (noting that Sudan
10   was designated for TPS in 1997 "due to ongoing armed conflict and
11   extraordinary and temporary conditions in Sudan" and ultimately
12   recommending termination of TPS designation because, *inter alia*, "[t]here
13   were unilateral ceasefires in October 2016 which led to a reduction in
14   violence and rhetoric from the conflict parties" and, although "[t]here is
15   ongoing conflict in some regions, [it is] not the entire country");

16   ❖ Degen Decl., Ex. 44 (Nicaragua Decision Memo at 1, 4) (noting that
17   Nicaragua was designated for TPS in 1999 "because of the devastation
18   caused by Hurricane Mitch in October of 1998" and ultimately
19   recommending termination of TPS designation because "the country
20   suffers few remaining residual effects of Hurricane Mitch, which formed
21   the basis of Nicaragua's designation for TPS in 1999"; "current challenges
22   cannot be directly tied to damage from the storm");

23   ❖ Degen Decl., Ex. 110 (El Salvador Decision Memo at 1, 5) (noting that El
24   Salvador was designated for TPS in 2001 "because of the devastation

25

26   ———————————
27   [8] *See also* Degen Decl., Ex. 52 (Haiti Decision Memo at 4) (in memo dated April 10, 2017, stating that "it is not in the national interest to extend a TPS designation when the specific extraordinary and temporary conditions giving rise to a TPS designation no longer exist[;] in addition, the law only permits an extension of Haiti's TPS designation if the extraordinary and temporary conditions that prompted designation continue to exist").
28

United States District Court
Northern District of California

caused by major earthquakes in January and February of that year" and
ultimately recommending termination of TPS designation because "El
Salvador suffers few remaining residual effects related to the major
earthquakes that led to its designation for TPS in 2001"; "current
challenges cannot be directly tied to damage from the earthquakes").

A particularly telling communication is an internal email exchange within DHS/OP&S,
dated October 13, 2017.  Ms. Kovarik (Chief of OP&S) stated that, with respect to the draft
Decision Memos for what appear to be Honduras, Nicaragua, and El Salvador, there was a
"problem" in that the memos "read[] as though we'd recommend an extension b/c we talk so much
about how bad it is, but there's not enough in there about positive steps that have been taken since
it's designation."  Degen Decl., Ex. 2 (email).  A responsive email from a career employee stated:
"We can comb through the country conditions to try to see what else there might be, but the basic
problem is that it IS bad there [with respect to] all of the standard metrics.  *Our strongest
argument for termination, we thought, is just that it is not bad in a way clearly linked to the initial
disasters prompting the designations.*  We can work with RU to try to get more, and/or comb
through the country conditions we have again looking for positive gems, but the conditions are
what they are."  Degen Decl., Ex. 2 (email) (emphasis added).

The government makes much of the fact that Acting Secretary Duke – who made the TPS
decisions on Haiti, Sudan, and Nicaragua – was given information about current conditions (and
from many different sources), *see* Opp'n at 4-5; that Acting Secretary Duke was required to
consider current conditions per the TPS statute (*e.g.*, in the case of an environmental disaster, to
assess whether the country of origin could adequately handle the return of its nationals); and that
Acting Secretary Duke did give current conditions weight as reflected by her November 2017
decision not to terminate Honduras's TPS designation and extend it for six months.

However, the fact that Acting Secretary Duke *received* information regarding current
conditions, does not prove she ultimately considered and relied on those conditions in deciding to
terminate TPS status.  The substantial record recited above strongly suggests she did not.  As to
the government's new claim that the Acting Secretary (or Secretary) was now *required* under TPS

statute to consider country conditions other than the triggering condition, that assertion is belied by the record evidence above.  It is also not supported by any reference by the Acting Secretary or Secretary to any document acknowledging any such requirement.

As to Honduras, the Court notes that (1) Honduras was given only a brief extension of six months; (2) Honduras's TPS designation was eventually terminated; (3) whether a foreign country can adequately handle the return of its nationals is – at least arguably – a secondary issue, separate and distinct from whether the originating condition or conditions directly related thereto persist; (4) Acting Secretary Duke's November 2017 decision did not disavow the general approach that a TPS designation must ultimately be terminated if the existence of the originating condition or conditions directly related do not exist; and (5) Acting Secretary Duke seemed to endorse that approach, stating, in an email dated November 6, 2017, that her actions on Honduras were "a strong break with past practice . . . . By not affirmatively extending, I'm stating that I'm not satisfied that the country conditions remain – but not yet sure how to best end TPS for this country."  Degen Decl., Ex. 30 (email).  Finally, regardless of what Acting Secretary Duke did with respect to Honduras, the fact remains that she did not grant any extension for Haiti, Sudan, and Nicaragua and that, as reflected in the Federal Register Notices related to the termination of those countries' TPS designations, termination largely turned on whether the originating condition or conditions directly related thereto persisted.

Accordingly, the Court concludes that not only have Plaintiffs have shown serious questions going to the merits, they have demonstrated a likelihood of success on the merits for their APA claim.  DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad, and that this was a clear departure from prior administration practice.[9]  This departure was a substantial and consequential change in practice – indeed, as the

---

[9] In their briefs, Plaintiffs also describe other changes in the TPS decision-making process.  These changes are more relevant to the Equal Protection claim and therefore are addressed there.  However, the Court acknowledges that the changes in the TPS decision-making process do have some probative value for the APA claim as well – i.e., the changes underscore that there was a conscious choice by DHS under the Trump administration to take a different approach.

United States District Court
Northern District of California

1  government now argues, it could violate the TPS statute itself.  The government has offered no

2  explanation or justification for this change.  The evidence submitted by Plaintiffs (discussed above

3  and below) suggests this change may have been made in order to implement and justify a pre-

4  ordained result.

5       In light of the balance of hardships, which, as discussed above, tips sharply in Plaintiffs'

6  favor, Plaintiffs are entitled to a preliminary injunction based on their showing on the merits of the

7  APA claim.

8       2.    Equal Protection Claim

9       Regarding the Equal Protection claim, the Court finds that there are, at the very least,

10  serious questions going to the merits, thus justifying the issuance of a preliminary injunction on an

11  independent ground.

12       a.    *Arlington Heights*

13       In its order denying the government's motion to dismiss, the Court held that *Village of

14  Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) – and not

15  *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) – provides the governing legal standard.  *See* Docket No.

16  55 (Order at 44-45).  Under *Arlington Heights*, "[p]roof of a racially discriminatory intent or

17  purpose of required to show a violation of the Equal Protection Clause," and, "[w]hen there is

18  proof that a discriminatory purpose has been a motivating factor in the [government's] decision, . .

19  . judicial deference [to that decision] is no longer justified." *Arlington Heights*, 429 U.S. at 265-

20  66. *Arlington Heights* sets forth various factors to consider in discerning whether the decision at

21  issue was based on an impermissible purpose.

22       Here, Plaintiffs have provided sufficient evidence to raise serious questions as to whether a

23  discriminatory purpose was a motivating factor in the decisions to terminate the TPS designations.

24  In particular, Plaintiffs have provided evidence indicating that (1) the DHS Acting Secretary or

25  Secretary was influenced by President Trump and/or the White House in her TPS decision-making

26  and (2) President Trump has expressed animus against non-white, non-European immigrants.  As

27  this Court noted, even if the DHS Secretary or Acting Secretary did not "personally harbor animus

28  . . . , their actions may violate the equal protection guarantee if President Trump's alleged animus

United States District Court
Northern District of California

influenced or manipulated their decisionmaking process."  Docket No. 55 (Order at 43).

As to the first issue, Plaintiffs have pointed to several pieces of evidence suggesting that the White House was putting pressure on DHS to end TPS.  For example, there is evidence that "the White House was keenly interested in the [DHS] Secretary's decisions related to TPS," Degen Decl., Ex. 12 (Nealon Depo. at 89-90), and that Stephen Miller, "an important [senior] adviser to the President and the White House," "frequently" reached out to Chad Wolf, the DHS Chief of Staff, about TPS, Degen Decl., Ex. 85 (Nealon Depo. at 288, 297, 300), as well as Gene Hamilton, the Senior Counselor to the DHS Secretary.  On more than one occasion, Mr. Hamilton stated that "Mr. Miller favored the termination of TPS."  Degen Decl., Ex. 85 (Nealon Depo. at 292).

As another example, shortly before Acting Secretary Duke was to make a decision on the TPS designations for Nicaragua, Honduras, and El Salvador, a White House Principals Meeting was held to discuss the TPS designations.[10]  It appears that attendees included high-level White House officials such as Chief of Staff Kelly, then-Principal Deputy Chief of Staff Nielsen, and Press Secretary Sanders.  A memo distributed by the White House National Security Council in advance of the meeting recommended that the TPS designations be terminated and that Congress be engaged "to pass a comprehensive immigration reform to include a merit based entry system." Degen Decl., Ex. 14 (NSC Memo at 2).  The National Security Council recommendation to terminate TPS status was given to Acting Secretary Duke.  *See* Degen Decl., Ex. 29 (Memo at 2). In addition, White House Chief of Staff Kelly subsequently had a conversation with Acting Secretary Duke about the TPS designations for the Central American countries.[11]  *See* Degen

---

[10] A Principals Meeting is "a meeting of people at the cabinet level to coordinate policy."  Docket No. 117-4 (Martin Decl., Ex. 4) (Nealon Depo. at 340).

[11] The Washington Post reported that White House Chief of Staff Kelly had put pressure on Acting Secretary Duke to terminate Honduras's TPS designation.  *See* Degen Decl., Ex. 28 (Washington Post article, dated November 9, 2017).  The Court acknowledges, however, that, in an email that was eventually passed on to Acting Secretary Duke, White House Chief of Staff Kelly maintained that he merely told Acting Secretary Duke that the decision was hers and that he would recommend a limited extension no longer than twelve months for the Central American countries.  *See* Martin Decl., Ex. 3 (email) (White House Chief of Staff maintaining that he simply conveyed that his "view was to grant limited (no more than 12 months or so [versus] the maximum 18 months allowed by the TPS program) to the Central American TPS recipients who

United States District Court
Northern District of California

1   Decl., Ex. 30 (email).

2          That the White House did, in fact, have influence on the TPS decisions is supported by the

3   fact that, soon after the above, Acting Secretary Duke terminated the TPS designation for

4   Nicaragua.  Also, Acting Secretary Duke essentially indicated to White House Chief of Staff Kelly

5   that Honduras's TPS designation would eventually be terminated as well, although she was not, at

6   that point, formally terminating that country's status.  *See* Degen Decl., Ex. 30 (email) (stating

7   that, "[b]y not affirmatively extending [Honduras's TPS designation], I'm stating that I'm not

8   satisfied that the country conditions remain – but not yet sure how to best end TPS for this

9   country"; also stating that "[t]hese decisions along with the public statements will send a clear

10  signal that *TPS in general is coming to a close*") (emphasis added).

11         Notably, Acting Secretary Duke's writings suggest that she, in her role at DHS, was

12  largely carrying out or conforming with a predetermined presidential agenda to end TPS.  For

13  example, in a November 2017 email to White House Chief of Staff Kelly, in which she reported

14  on her decision to terminate for Nicaragua and temporarily extend for Honduras, Acting Secretary

15  Duke stated that "[t]hese decisions along with the public statements will send a clear signal that

16  TPS in general is coming to a close.  *I believe it is consistent with the President's position on*

17  *immigration . . . .*" Degen Decl., Ex. 30 (email) (emphasis added).  She added: "[T]his decision is

18  really just a difference in strategy *to get to the President's objectives*."  Degen Decl., Ex. 30

19  (email) (emphasis added).  In a subsequent email to White House Chief of Staff Kelly, Acting

20  Secretary Duke noted that Tom Bossert of the White House National Security Council had

21  "informed me of a strategy I was not previously aware of" and she had now "incorporated this

22  new information into my final decision."[12]  Degen Decl., Ex. 30 (email).  In a draft memo

23  regarding her TPS decisions, Acting Secretary Duke was equally direct:  "The TPS program must

24  end for these countries soon . . . . [¶] *This conclusion is the result of an America first view of the*

25  _____

26  have been here for 20 years," and that he simply told Acting Secretary Duke to make a decision –
    and "[t]hat the decision on TPS was entirely hers").

27  [12] *Cf.* Degen Reply Decl., Ex. 135 (email) (Acting Secretary Duke stating that there was an
    "internal controversy . . . at least in part because there was a WH strategy that DHS, and me as the

28  decision maker, wasn't informed of").

United States District Court
Northern District of California

*TPS decision.*"  Degen Decl., Ex. 29 Memo at 1 (emphasis added).

Because there is evidence that President Trump and/or the White House influenced the DHS on the TPS decisions to at least raise serious question on the merits, the remaining issue is whether there is evidence that President Trump harbors an animus against non-white, non-European aliens which influenced his (and thereby the Secretary's) decision to end the TPS designation.  As Plaintiffs have catalogued, there is evidence of such as reflected by statements made by President Trump before, during, and after the TPS decision-making process[13]:

- In June 2015, Mr. Trump announced that he was running for President and delivered remarks characterizing Mexican immigrants as drug dealers or users, criminals, and rapists.  *See* Degen Decl., Ex. 92 (Washington Post article).

- "In December 2015, [Mr.] Trump called for 'a total and complete shutdown of Muslims entering the United States.'"  Degen Decl., Ex. 95 (New York Times article).

- In June 2017, President Trump stated that "15,000 recent immigrants from Haiti 'all have AIDS' and that 40,000 Nigerians, once seeing the United States, would never 'go back to their huts' in Africa."  Degen Decl., Ex. 95 (New York Times article).

- On January 11, 2018, during a meeting with lawmakers where immigrants from Haiti, El Salvador, and African countries were discussed, including with respect to TPS designations that had been terminated, President Trump asked: "'Why are we having all these people from shithole countries come here?'  [He] then suggested

---

[13] The government has objected to "hearsay excerpts from newspaper articles and similar sources."  Opp'n at 10.  However, the objection lacks merit for several reasons.

First, Plaintiffs cited the statements in their complaint, but the government did not clearly deny them in the answer.  *See, e.g.*, Ans. ¶ 66 ("Defendants aver that any such statements speak for themselves.").  Second, it is not apparent that President Trump's statements are even hearsay in the first place.  See Fed. R. Evid. 801(d)(2) (providing that an opposing party's statement, when offered against the opposing party, is not hearsay).  Finally, as Plaintiffs point out, the Ninth Circuit has held that "[a] district court may . . . consider hearsay in deciding whether to issue a preliminary injunction" – in fact, "'may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.'"  *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

United States District Court
Northern District of California

that the United States should instead bring more people from countries such as
Norway," which has a predominantly white population.  Degen Decl., Ex. 96
(Washington Post article).  He also told lawmakers that immigrants from Haiti
"must be left out of any deal."  Degen Decl., Ex. 96 (Washington Post article).

- In February 2018, President Trump gave a speech at the annual Conservative
  Political Action Conference where he used MS-13 – a gang with many members
  having ties to Mexico and Central America – to disparage immigrants, indicating
  that that they are criminals and comparing them to snakes.  *See* Degen Decl., Ex.
  93 (article from www.vox.com); *see also* Degen Decl., Ex. 98 (New York Times
  article) (stating that President Trump characterized undocumented immigrants as
  "'animals'").

- In July 2018, President Trump told European leaders that "they 'better watch
  themselves' because a wave of immigration of 'changing the culture' of their
  countries,'" which he characterized as being "'a very negative thing for Europe.'"
  Degen Decl., Ex. 99 (Washington Post article).

*See also Centro Presente*, 2018 U.S. Dist. LEXIS 122509, at *15-19 (cataloguing evidence of
possible animus, including but not limited to those identified above).

The Court also notes that not only is there direct evidence of animus, but there is also
circumstantial evidence of race being a motivating factor.  Under *Arlington Heights*,
circumstantial evidence of a discriminatory intent can be inferred from, *e.g.*, "[t]he impact of the
official action – whether it bears more heavily on one race than another"; "[t]he historical
background of the decision" and "[t]he specific sequence of events leading up to the challenged
decision"; and "[d]epartures from the normal procedural sequence."  *Arlington Heights*, 429 U.S.
at 266-67 (internal quotation marks omitted).  In the instant case, consideration of these factors
weighs in favor of Plaintiffs.

First, the impact of the TPS terminations clearly bears more heavily on non-white, non-
European individuals; indeed, it affects those populations exclusively.

Also, the sequence of events leading up to the challenged decisions are irregular and

suggestive of a pre-determined outcome not based on an objective assessment.  The record

evidence indicates that, after receiving Decision Memos from career DHS employees, higher-level

DHS employees – *i.e.*, the political appointees – were "repackaging" the memos in order to get to

the President/White House's desired result of terminating TPS.  This was especially apparent with

respect to the process on Sudan.

- On August 17, 2017, USCIS submitted a Decision Memo on Sudan to the Acting
  DHS Secretary.  (The memo was signed by James McCament, the USCIS Deputy
  Director and then-Acting USCIS Director.)  In the memo, USCIS noted that the
  State Department had submitted a draft package to the Secretary of State and that
  the draft package "assesses that the statutory conditions supporting Sudan's TPS
  designation continue to be met and recommends an 18-month extension of Sudan's
  designation for TPS."  Degen Decl., Ex. 40 (Decision Memo at 1).  USCIS further
  indicated that, per its own country conditions report, "the ongoing armed conflict
  and temporary conditions that supported Sudan's designation for TPS persist."
  Degen Decl., Ex. 40 (Decision Memo at 1).  USCIS concluded the memo by listing
  the Acting Secretary's options – *i.e.*, extend, redesignate, or terminate.  Although
  USCIS did not formally make a recommendation at that time, it did note, under the
  extend option, that "[t]he review of conditions in Sudan indicates that *it remains*
  *unsafe for individuals to return to Sudan and that the statutory requirements to*
  *designate a country for TPS under Immigration and Nationalit Act § 244(b)(1)(A)*
  *(ongoing armed conflict) and under § 244(b)(1)(C) (extraordinary and temporary*
  *conditions) continue to be met*."  Degen Decl., Ex. 40 (Decision Memo at 4)
  (emphasis added).  Similarly, under the terminate option, USCIS stated: "Because
  the conditions supporting Sudan's TPS designation persist, *termination does not*
  *appear to be warranted*."  Degen Decl., Ex. 40 (Decision Memo at 5) (emphasis
  added).
- A week and a half later, on August 28, 2017, USCIS submitted a second Decision
  Memo on Sudan to the Acting DHS Secretary.  In the memo, USCIS reiterated

largely reiterated *all* of the above – but in spite of such, USCIS now made a formal recommendation that Sudan's TPS designation be terminated.  Degen Decl., Ex. 41 (Decision Memo at 5).

- The very next day, August 29, 2018, Frank Cissna, who would later become the USCIS Director, sent an email noting that the Decision Memo "seems a bit confused" – *i.e.*, the extend and terminate options indicated that TPS should be extended but the recommendation came to the opposite conclusion.  Degen Decl., Ex. 1 (email).  Mr. Cissna added: "*The memo reads like one person who strongly supports extending TPS for Sudan wrote everything up to the recommendation section, and then someone who opposes extension snuck up behind the first guy, clubbed him over the head, pushed his senseless body out of the way, and finished the memo.  Am I missing something?*"  Degen Decl., Ex. 1 (email) (emphasis added).

- The same day, Kathy Kovarik, the Chief of OP&S (a political appointee), informed Mr. Hamilton, the Senior Counselor to the DHS Secretary (and another political appointee), that she was to blame: "The options memo went up, and because of our rush to add recommendations, I didn't catch the contradiction.  How would like you us to proceed?"  Degen Decl., Ex. 48 (email).  Mr. Hamilton's response was: "We need to repackage."  Degen Decl., Ex. 48 (email).

- On September 1, 2017, the Decision Memo was "repackaged" and included a recommendation to extend Sudan's TPS designation for six months.  *See* Degen Decl., Ex. 27 (email and attachment).  In the memo, USCIS noted that the Deputy Secretary of State recommended a six-month extension because "the statutory conditions supporting Sudan's TPS designation continue to be met."  Degen Decl., Ex. 27 (Decision Memo at 1).  USCIS further noted that, per its own country conditions report, "the ongoing armed conflict and extraordinary and temporary conditions that supported Sudan's designation for TPS persist."  Degen Decl., Ex. 27 (Decision Memo at 2).  Finally, USCIS made its own recommendation that a

six-month extension be given because, *inter alia*, the Deputy Secretary of State had recommended such and because USCIS had "assesse[d] the conditions related to the most recent designation continue to be met," that is, "there is an ongoing armed conflict limited to certain parts of Sudan and extraordinary and temporary conditions continue to exist preventing nationals from returning in safety." Degen Decl., Ex. 27 (Decision Memo at 5). That recommendation, however, was apparently not satisfactory to Mr. Hamilton, the Senior Counselor to the DHS Acting Secretary. Thus, following a discussion with Mr. Hamilton, Mr. McCament, the Acting USCIS Director, prepared a new Decision Memo "to clearly support the AS1 decision to terminate with a delayed effective date of 12 months." Degen Decl., Ex. 27 (email).

- In the new Decision Memo, USCIS acknowledged the recommendation of the Deputy Secretary of State (a six-month extension) but now stated that its review of country conditions indicated that there was "emerging progress and improvement in certain areas while noted challenges remain." Degen Decl., Ex. 87 (Decision Memo at 2). Ultimately, USCIS recommended that Sudan's TPS designation be terminated with a delayed effective date by twelve months. Included as support for the recommendation was the statement that "[t]here is ongoing conflict in some regions, but not the entire country." Degen Decl., Ex. 87 (Decision Memo at 6). USCIS did not explain, however, whether it made an assessment of any kind as to whether some TPS beneficiaries would likely be returned to those unsafe areas where conflict persisted.

- Subsequently, DHS took steps to prepare the Federal Register Notice for the termination. Following an edit of the notice by Mr. Hamilton (the Senior Counselor to the Acting DHS Secretary), a DHS career employee noted that, "based on what we've seen to date, [the] State [Department] would likely object to the removal of human rights violations – pared down as the language already was – that was in there. For our part, we'd just say that this could be read as taking

34

another step toward providing an incomplete and lopsided country conditions presentation to support termination, which may increase the likelihood of criticism from external stakeholders to that effect." Degen Decl., Ex. 5 (email).

- The DHS career employee rightly noted that the State Department would have concerns about the Federal Register Notice. The State Department stated that it believed there were "some significant mischaracterizations that are at odds with the Department's understanding of circumstances on the ground." Degen Decl., Ex. 7 (email); *see also* Degen Decl., Ex. 8 (email) (State Department again expressing concern about mischaracterizations and downplaying of the actual situation). Mr. Hamilton responded that, while DHS would work to accommodate some of the State Department's concerns, it would not do all, deeming many of the concerns as overblown and irrelevant to the legal determination for TPS designation. *See* Degen Decl., Ex. 9 (email).

The TPS decision-making for the other countries underwent a similar process. For example, for the decisions on Honduras, Nicaragua, and El Salvador, Ms. Kovarik, the Chief of OP&S, complained that the Decision Memos "read[] as though we'd recommend an extension b/c we talk so much about how bad it is, but there's not enough in there about positive steps that have been taken since its designation." Degen Decl., Ex. 2 (email). A career DHS employee responded:

> We can comb through the country conditions to try to see what else there might be, but the basis problem is that it IS bad wrt [with respect to] all of the standard metrics. Our strongest argument for termination, we thought, is just that it is not bad in a way clearly linked to the initial disasters prompting the designations. We can work with RU to try to get more, and/or comb through the country conditions we have again looking for positive gems, but the conditions are what they are

Degen Decl., Ex. 2 (email). After the career employee "cleaned up [the Central American] TPS decisions memos," Degen Decl., Ex. 4 (email), Ms. Kovarik was still not satisfied with the repackaging, noting, *e.g.*, that "disasters" should be changed to "challenges." Degen Decl., Ex. 4 (email).

United States District Court
Northern District of California

1    For Haiti, the same career employee submitted a Decision Memo "written so that it could

2    support either extension or termination, but left the recommendation blank, pending further

3    discussion."  Degen Decl., Ex. 3 (email).  Robert Law, a Senior Adviser to Ms. Kovarik, still

4    responded:

> The draft is overwhelming[ly] weighted for extension which I do not
> think is the conclusion we are looking for.  The memo seems to
> dismiss or downlay the positive developments that should suggest
> reauthorization is inappropriate.  The memo also makes no mention
> of the substantial amount of foreign aid the U.S. and charities have
> invested in Haiti since the earthquake[,] another relevant factor to
> indicate that Haiti no longer meets the definition of TPS.

9    Degen Decl., Ex. 3 (email).  Mr. Law then made edits to the Decision Memo: "I made the

10    document fully support termination and provided comment boxes where additional data should be

11    provided to back up this decision."  Degen Decl., Ex. 3.

12    And in addition to the above "repackaging," Acting Secretary Duke expressly

13    acknowledged that the terminations of TPS designations were "a strong break with past practice,"

14    Degen Decl., Ex. 30 (email) – designed to fit the President's objectives on immigration which

15    would put "America first."  *See* Degen Decl., Ex. 30 (email) ("These decisions along with the

16    public statements will send a clear signal that TPS in general is coming to a close.  *I believe it is*

17    *consistent with the President's position on immigration* . . . .") (emphasis added); Degen Decl.,

18    Ex. 29 (memo) ("The TPS program must end for these countries soon . . . . [¶] *This conclusion is*

19    *the result of an America first view of the TPS decision.*") (emphasis added).  This begs the

20    question what "America first" means.  Plaintiffs suggest this is a code word for removal of

21    immigrants who are non-white and/or non-European.  When the Court asked the government's

22    counsel at the hearing what "an America first view of the TPS decision" meant, counsel was

23    unable to provide a clear and direct response.  *See* Docket No. 127 (Tr. at 69-70) (defense counsel

24    arguing that Acting Secretary Duke was referring to "migration and . . . drug enforcement issues

25    and a general kind of perspective" and that she was "grappling with the decision" on what to do

26    about TPS).

27    Finally, as discussed above in the context of the APA claim, there were departures from

28    the normal procedural sequence during the TPS decision-making process; that is, instead of

United States District Court
Northern District of California

36

considering all current country conditions as had been done in previous administrations, the DHS

political appointees in the current administration made TPS decisions turn on whether the

originating condition or conditions directly related thereto continued to exist, disregarding all

other current conditions no matter how bad.  Moreover, at the apparent behest of then-DHS

Secretary Kelly, there was an effort to gather negative information about Haitian TPS beneficiaries

prior to the decision on Haiti's TP designation – in particular, whether Haitian TPS beneficiaries

had been convicted of crimes or were on public or private relief.  *See* Degen Decl., Ex. 84 (email).

There is no indication that these factors had previously been considered by DHS in making TPS

decisions[14]; indeed, the email indicated that the request for the information should be kept quiet.

*See* Degen Decl., Ex. 84 (email) ("Please keep the prep for this briefing limited to those on this

email.  If you need a specific data set and need to ask someone to pull it, please do not indicate

what it is for.  I don't want this to turn into a big thing were people start prodding and things start

leaking out.").  The information sought by the Secretary coincides with racial stereotypes – *i.e.*,

that non-whites commit crimes and are on the public dole.

      Accordingly, the Court holds that, at the very least, the evidence submitted by Plaintiffs

supports serious questions on the merits on the Equal Protection Claim.  Combined with a balance

of hardships that tips sharply in Plaintiffs' favor, a preliminary injunction based on the Equal

Protection claim (and not just the APA claim) is also warranted.

          b.    ***Trump v. Hawaii***

      The government protests that the above analysis is incorrect because *Arlington Heights*

does not provide the proper legal standard and that the Equal Protection claim should be evaluated

based on the deferential standard articulated in *Trump v. Hawaii*, 138 S. Ct. at 2392.  But this is

essentially a request for reconsideration of the Court's prior order denying the government's

---

[14] Although the government argues that such information is relevant to the "national interest of the United States," 8 U.S.C. § 1254a(b), this appears to be a post-hoc justification.  *Cf.* Degen Reply Decl., Ex. 129 (email exchange, dated May 20, 2017) (in response to email recommending that, as a talking point, the agency deny having used crime and public benefits data to make the TPS decision on Haiti, acknowledging that "[w]e did try to dig up some data on crime and public benefits" but proposing that "there is a fair argument that that sort of data could be considered under the [TPS] statute . . . given the national interest component").  No document presented to this Court substantiates this was the purpose of the request.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   motion to dismiss.  The Court shall not reconsider its earlier ruling because (1) the government has

2   not formally moved to reconsider and (2) even if it had, it has not shown that the Court manifestly

3   failed "to consider material facts or dispositive legal arguments which were presented to the Court

4   before" it ruled on the motion to dismiss.  Civ. L.R. 7-9(b)(3).

5           However, even if the Court were to reconsider and take into account the government's new

6   argument, the government would still fare no better.  The Court previously held that a deferential

7   standard was applied in *Trump v. Hawaii* because the case involved "the entry of aliens from

8   outside the United States, express national security concerns[,] and active involvement of foreign

9   policy."  Docket No. 55 (Order at 50).  The instant case was distinguishable from *Trump v. Hawaii*

10  because (1) there was no indication that national security or foreign policy was a reason to

11  terminate TPS designations[15]; (2) unlike the aliens in *Trump v. Hawaii*, the aliens here (*i.e.*, the

12  TPS beneficiaries) are already in the United States and "aliens within the United States have

13  greater constitutional protections than those outside who are seeking admission for the first time";

14  and (3) "the executive order in *Trump [v. Hawaii]* was issued pursuant to a very broad grant of

15  statutory discretion" whereas "Congress has not given the Secretary *carte blanche* to terminate

16  TPS for any reason whatsoever."  Docket No. 55 (Order at 52-53); *see also* Docket No. 55 (Order

17  at 53) (stating that *Trump v. Hawaii* "did not address the standard of review to be applied under

18  the equal protection doctrine when steps are taken to *withdraw* an immigration status or benefit

19  from aliens lawfully present and admitted into the United States for reasons unrelated to national

20  security or foreign affairs") (emphasis in original).  In another TPS case pending in the District of

21  Massachusetts, the district court made a similar analysis of *Trump v. Hawaii*.  *See Centro*

22  _____

23  [15] The Court notes that the record evidence presented in conjunction with the preliminary
    injunction motion continues to reflect that national security was not tendered as a reason to

24  terminate TPS designation.  As for foreign policy, although the State Department provided DHS
    with its evaluation of country of conditions and recommendations, and although Acting DHS

25  Secretary did appear to consider foreign policy for at least the Central American TPS designations,
    ultimately, the decisions to terminate (or, for Honduras, temporarily extend but with the indication

26  that termination would be forthcoming) were ultimately driven by the question of whether the
    originating condition or conditions directly related thereto continued to exist.  Notably, the foreign

27  policy considerations appeared to warrant extension, *not termination*, of TPS status of the affected
    countries.  In short, the termination decisions were *not justified* by foreign policy considerations.

28  In contrast to the travel ban at issue in *Trump v. Hawaii*, the TPS statute was enacted primarily for
    humanitarian reasons, not as a tool for foreign policy.

*Presente*, 2018 U.S. Dist. LEXIS 122509, at \*44 (stating that the Supreme Court's "decision to apply rational basis review [in *Trump v. Hawaii*] was based on two considerations not at issue here: first, the limited due process rights afforded to foreign nationals seeking entry into the United States and the particular deference accorded to the executive in making national security determinations").  Applying *Arlington Heights*, the Massachusetts court found that there were sufficient allegations in the complaint to withstand the government's motion to dismiss.  *See id.* at \*56 ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision").

The government argues that the Court's analysis above is inconsistent with cases cited in *Trump v. Hawaii*, *see* Opp'n at 19-20 (arguing that *Trump v. Hawaii* "is not limited to executive actions rooted in national security concerns or to actions restricting entry of foreign nationals").  The Court does not agree.

*Kleindienst v. Mandel*, 408 U.S. 753 (1972), is a case that involved *admission* of an alien into the United States, and thus is distinguishable from the instant case where the TPS beneficiaries are already lawfully present and admitted into the country.  In fact, the alien in *Mandel* was actually ineligible for a visa under the Immigration and Nationality Act (because of his advocacy of Communist doctrines) and could only enter the United States if he first obtained a waiver from the Attorney General.  *See id.* at 756-59.

Similarly, *Fiallo v. Bell*, 430 U.S. 787 (1977), is an admission case and is therefore distinguishable.  *See id.* at 790 n.3 (noting that appellants all sought immigrant visas on the basis of a parent-child relationship where the parent was the natural father and the child the illegitimate offspring).  The Court acknowledges that, in *Fiallo*, the appellants "characterize[d] [the Supreme Court's] prior immigration cases as involving foreign policy matters and congressional choices to exclude or expel groups of aliens that were specifically and clearly perceived to pose a grave threat to the national security . . . or to the general welfare of this country" and that the Supreme Court noted there was

> no indication in our prior cases that the scope of judicial review is a function of the nature of the policy choice at issue. To the contrary, [s]ince decisions in these matters may implicate our foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary, and [t]he reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

*Id.* at 796 (internal quotation marks omitted). *Fiallo* also contains other broad language that could be read unfavorably to Plaintiffs (*i.e.*, suggesting limited judicial review). *See Fiallo*, 430 U.S. at 792 ("Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"). However, this language of "expel" and "exclude" appears to be a dated or historical phrase, *see Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893) (indicating that "'[t]he control of the people within its limits, and the right to expel from its territory persons who and dangerous to the peace of the State, are too clearly within the essential attributes of sovereignty to be seriously contested'"), and does not detract from evolved and well-established authority that aliens lawfully within the United States have rights from those seeking admission in the first instance into the United States. *See Zadvydas*, 533 U.S. at 693 (noting that "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders"); *cf. Yamataya v. Fisher*, 189 U.S. 86, 101 (1903) (stating that "it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States").

In any event, this Court does not hold that *Trump v. Hawaii* inapplicable to the instant case solely because the decisions to terminate did not rest on national security – or foreign policy – concerns. Rather, the Court's holding is predicated on an amalgam of factors: the fact that the TPS beneficiaries are living and have lived in the United States for lengthy periods with

established ties to the community, no foreign policy or national security interest has been relied upon the DHS to support its decision to terminate TPS status for the affected countries, and the TPS statute does not conferred unfettered authority upon the Secretary.  The justification for a kind of super deference advocated by the government in this case is not warranted.

Finally, *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), is distinguishable from the instant case as well.  Although *Rajah*, like the instant case, is *not* an admission case, it is still distinguishable because the aliens in *Rajah* were, undisputedly, deportable from the country, and the only issue was whether the aliens might be able to get a reprieve from deportation because the "deportation proceedings were so tainted by the [post-9/11] Program [that required nonimmigrant alien males over the age of 16 from designated countries to appear for registration and fingerprinting] and associated events."  *Id.* at 434.  *See, e.g.*, *id.* at 434-38 (addressing petitioners' arguments that, *inter alia*, "the Attorney General had no statutory authority to enact the Program," that "the Program was invalidly promulgated because the relevant regulations were not subject to the required public notice and comment," and that the petitioners' "deportation orders violate their rights under . . . Equal Protection . . . because the immigration laws were selectively enforced against them based on their religion, ethnicity, gender, and race").  Moreover, *Rajah* is distinguishable because, while the case (like the instant case) involved an Equal Protection claim, the claim was really one for selective prosecution/enforcement, an area in which the courts have applied substantial deference to the exercise of prosecutorial discretion.  *See, e.g.*, *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 489-90 (1999) (noting that, "[e]ven in the criminal-law field, a selective prosecution claim is a *rara avis*" because "such claims invade a special province of the Executive" and therefore a "criminal defendant [must] introduce 'clear evidence] displacing the presumption that a prosecutor has acted lawfully"; adding that "[t]hese concerns are greatly magnified in the deportation context" but also stating that "we need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome").

At the very least, the above analysis indicates that there are serious questions going to the merits as to whether *Trump v. Hawaii* governs in the instant case.  Even if *Trump v. Hawaii* did

United States District Court
Northern District of California

provide the governing legal standard for the Equal Protection claim here, the Court nevertheless finds that there are serious questions going to the merits that warrant a preliminary injunction.  In *Trump v. Hawaii*, the Supreme Court stated that the "standard of review considers whether the [challenged decision] is plausibly related to the Government's stated objective."  *Trump v. Hawaii*, 138 S. Ct. at 2420.  The Supreme Court also indicated that, in spite of this deferential standard of review, it assumed a court could "look behind the face of the [challenged decision] to the extent of applying rational basis review."  *Id.*  In other words, a court could "consider [a plaintiff's] extrinsic evidence," including statements by the President, and should "uphold [the challenged decision] so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds."  *Id.*  Judicial review, though more deferential than traditional strict scrutiny, remains fact based.  Here, considering the substantial extrinsic evidence submitted by Plaintiffs, there are serious questions as to whether the terminations of TPS designations could "reasonably be understood to result from a justification independent of unconstitutional grounds."  *Id.*; *see also Centro Presente*, 2018 U.S. Dist. LEXIS 122509, at *58-59 (in similar TPS case, stating that, "even if rational basis review were to apply, Plaintiffs' claims, at this early stage of litigation, would still survive"; noting that "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees").

## III.      CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for a preliminary injunction.

1.      It is hereby ORDERED THAT Defendants, their officers, agents, employees, representatives, and all persons acting in concert or participating with them, are ENJOINED AND RESTRAINED from engaging in, committing, or performing, directly or indirectly, by any means whatsoever, implementation and/or enforcement of the decisions to terminate TPS for Sudan, Haiti, El Salvador, and Nicaragua pending resolution of this case on the merits.

2.      It is further ORDERED that Defendants shall take all administrative actions needed to preserve the status quo pending completion of discovery and a ruling on the merits of the

action, including all steps needed to ensure the continued validity of documents that prove lawful status and employment authorization for TPS holders. Defendants shall report to the Court within fifteen (15) days of this Order on the administrative steps taken to comply with this paragraph and otherwise preserve the status quo.

The preliminary injunction shall take effect immediately and shall remain in effect pending resolution of this case on the merits or further order of this Court. The Court shall hold a Case Management Conference on October 26, 2018 at 10:30 a.m. The parties shall file a joint case management conference statement by October 19, 2018 and shall address, *inter alia*, the expedited setting of trial or other means of adjudication of the merits.

This order disposes of Docket No. 120.

**IT IS SO ORDERED**.

Dated: October 3, 2018

_____

EDWARD M. CHEN
United States District Judge