Ahilan T. Arulanantham, SBN 237841
arulanantham@law.ucla.edu
UCLA CENTER FOR IMMIGRATION LAW
AND POLICY
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: +1 310 825 1029

Jessica Karp Bansal (SBN 277347)
jessica.b@uwunited.org
UNEMPLOYED WORKERS UNITED
1355 N. Mentor Ave, #40583
Pasadena, CA 91104
Telephone: +818-570-6731

Alycia A. Degen (SBN 211350)
adegen@sidley.com
Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896 6010
Facsimile: +1 213 896 6600

Attorneys for Plaintiffs
[*Additional Counsel Listed on Next Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTA RAMOS, individually and on behalf of others similarly situated; CRISTINA MORALES; BENJAMIN ZEPEDA, individually and on behalf of others similarly situated; ORLANDO ZEPEDA; JUAN EDUARDO AYALA FLORES, individually and on behalf of others similarly situated; MARIA JOSE AYALA FLORES; ELSY YOLANDA FLORES DE AYALA; HNAIDA CENEMAT, individually and on behalf of others similarly situated; WILNA DESTIN; RILYA SALARY, individually and on behalf of others similarly situated; SHERIKA BLANC; IMARA AMPIE; MAZIN AHMED; HIWAIDA ELARABI; and SALMA AHMED, <br><br> *Plaintiffs,* <br><br> v. | Case No. 3:18-cv-1554-EMC <br><br> **CLASS ACTION AMENDED COMPLAINT** |

1   ALEJANDRO MAYORKAS, in his official
    capacity as Secretary of Homeland Security;;
2   UNITED STATES DEPARTMENT OF
    HOMELAND SECURITY; and UNITED
3   STATES OF AMERICA,

4            *Defendants.*

5

6   KESHAV BHATTARAI; SAJJAN PANDEY;        Case No.  3:19-cv-00731-EMC
    SUMNIMA THAPA; DONALDO POSADAS
7   CACERES; SORAYDA RODRIGUEZ             **CLASS ACTION AMENDED COMPLAINT**
    MOTIÑO; DENIS MOLINA CHAVEZ; S.S.,
8   individually and on behalf of others similarly
    situated; and G.D.P., individually and on       The Honorable Edward M. Chen
9   behalf of others similarly situated,

10           *Plaintiffs*,

11       v.

12  ALEJANDRO MAYORKAS, in his official
    capacity as Secretary of Homeland Security;
13  UNITED STATES DEPARTMENT OF
    HOMELAND SECURITY; and UNITED
14  STATES OF AMERICA

    *Defendants.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Additional Counsel for Plaintiffs

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
William S. Freeman (SBN 82002)
wfreeman@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone: +1 415 621 2493
Fax: +1 415 863 7832

Michael Kaufman (SBN 254575)
mkaufman@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: +1 213 977 5236

Nicole M. Ryan (SBN 175980)
nicole.ryan@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1219
Facsimile: +1 415 772 7400

Kimberly Leaman (SBN 85925)

kimberly.leaman@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington D.C., 20005
Telephone: +1 202 736 8000
Fax: +1 202 736 8711
Admitted Pro Hac Vice


*Institution listed for identification purposes
only

Marisol Ramirez (SBN 307069)
marisol.ramirez@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Winifred Kao (SBN 241473)
winifredk@advancingjustice-alc.org
ADVANCING JUSTICE – ASIAN LAW
CAUCUS
55 Columbus Avenue
San Francisco, California 94111
Telephone: +1 415 896 1701
Fax: +1 415 896 1702

Keally Cieslik (SBN 55413)
keally.c@uwunited.org
UNEMPLOYED WORKERS UNITED
100 N. Howard Street, Suite 4000
Spokane, WA 99201
Telephone:+508-250-0518
Admitted Pro Hac Vice

**INTRODUCTION**

1.     Plaintiffs in this case are U.S. citizen children, their non-citizen parents, and other non-citizen adults who are in the United States legally, and who have lived in this country lawfully for years, in some cases decades. They challenge the Department of Homeland Security's ("DHS") new rule for deciding whether to terminate Temporary Protected Status ("TPS") designations for countries facing armed conflict, natural disasters, or other crises that make the return of people from those countries untenable.

2.     During the Administration of former President Donald J. Trump, DHS announced six TPS terminations—for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. To terminate TPS for these countries, DHS—without any formal announcement or other explanation—adopted a new, novel interpretation of the TPS statute that eschews consideration of any intervening country conditions. If permitted to take effect, these terminations would have eliminated TPS protection for approximately 400,000 individuals, making up 98 percent of all TPS holders at the time.

3.     TPS holders who would have been affected by these terminations have lived legally with this status for years, and in most cases decades. They have homes, spouses, jobs, and other profound social ties to their communities that now entwine their lives with this country. TPS allows them to live and work lawfully in the United States when they cannot return safely to their country of origin. In addition to the harm of the terminations on TPS holders themselves, over 250,000 U.S. citizen children, each of them with a parent or parents who are TPS holders, would have faced an impossible choice between leaving the only home they have ever known, or growing up without one or both parents.

4.     This Court granted a preliminary injunction that preserved the status of the TPS holders for most of the last five years. The injunction was reversed on appeal by a panel of the Ninth Circuit, but that decision was then vacated when the full Ninth Circuit granted Plaintiffs' petition for rehearing en banc. The government moved to dismiss its appeal of the injunction days before the en banc argument took place. As a result, the injunction remains in place as of this time.

5.      Since President Biden took office, DHS has authorized TPS holders from the six countries who would have been affected by the Trump-era terminations to remain in the United States, either through new TPS designations (in the case of Haiti and Sudan), or through rescinding terminations and replacing them with extensions (in the case of El Salvador, Honduras, Nepal and Nicaragua). However, in either designating or extending TPS for these countries, DHS did not disavow the illegal terminations of the prior administration or its new rule for determining which countries warrant TPS. As a result, Plaintiffs and hundreds of thousands of other TPS holders remain vulnerable to a future illegal termination under the same legal theory DHS used before.

6.      DHS's new designations and extensions also establish irrational, grossly premature registration deadlines which all but guarantee that many thousands of TPS holders who have been protected by this Court's injunction for the past five years—will lose their status. For example, although the TPS extension for El Salvador does not expire until June 30, 2024, the newly-established registration period for Salvadorans to benefit from DHS's recently-issued extension began on July 12, 2023 and expires on September 10, 2023, *nine months before* the TPS extension itself is currently set to expire. TPS holders who fail to re-register within this time period will lose their status on July 1, 2024, even though they have held this legal status for more than twenty years and would otherwise be eligible to have the status continue.

7.      Moreover, DHS imposed an illegal $50 registration fee on Haitian and Sudanese TPS holders who were required to re-register as new applicants as a result of the unlawful terminations Plaintiffs originally challenged.

8.      Therefore, in this Amended Complaint, Plaintiffs challenge both the unlawful terminations issued in 2017 and 2018, which DHS has never recognized as unlawful, and certain aspects of the new TPS rescission and extension decisions, to which they are now subject.

9.      First, Plaintiffs challenge the legality of DHS's novel interpretation of the TPS statute that eschews consideration of any intervening country conditions, to terminate TPS status for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. Because any individual TPS period of designation is by its nature temporary—and the time to designate, extend or terminate it

will return—the current Administration's failure to acknowledge and disavow the illegality of the prior Administration's process for reaching termination decisions leaves Plaintiffs and other TPS holders at risk of unlawful loss of status in the future.

10.     Defendants' new rule violates the Fifth Amendment's Due Process Clause in two related respects. The rule violates the Equal Protection guarantee of the Due Process Clause because it was motivated by intentional race- and national-origin-based animus against individuals from what former President Trump referred to as "shithole countries," i.e., non-white, non-European immigrants.

11.     The new rule also violates the due process protection against arbitrary government invasion of personal liberty. The new rule constitutes an arbitrary, unexplained abandonment of the government's longstanding interpretation of the TPS statute, on which several hundred thousand people have come to rely. The Due Process Clause does not permit the government to engage in such arbitrary action when individual liberty interests are at stake.

12.     Second, Defendants' sudden and unexplained departure from decades of consistent interpretation and corresponding practice violates the Administrative Procedure Act in two respects. The *sub silentio* departure from pre-existing practice, with complete disregard for the reliance interests that years of peaceful residence in this country had engendered, failed to meet the minimum standards of considered judgment that the APA requires. Separately, the rule itself violates the TPS statute insofar as it limits the set of country conditions that the Secretary may consider in determining whether to extend TPS to only those conditions directly related to the events that triggered the original designation.

13.     Third, in its new TPS extensions for TPS holders affected by its prior termination decisions, DHS violated both the APA and the Due Process Clause in establishing arbitrary registration deadlines. Because these grossly premature deadlines are untethered to the existing timeline for when the TPS extensions for these populations will expire, they will cause thousands of TPS holders who have benefited from this Court's preliminary injunction since 2018 to lose their status.

14.     Fourth, DHS illegally charged Haitian and Sudanese TPS holders $50 to register as initial applicants after the re-designation of Haiti and Sudan for TPS in 2021 and 2022, respectively. Absent the prior illegal termination of TPS for Haiti and Sudan, existing TPS holders from these countries would not have been obligated to pay a fee for re-registration.

15.     Finally, Plaintiffs preserve their claim that Defendants' new rule violates the constitutional rights of school-age U.S. citizen children of TPS holders, by presenting them with an impossible choice: they must either leave their country or live without their parents.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. This Court has additional remedial authority under the Declaratory Judgment Act, *see* 28 U.S.C. § 2201 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

17.     The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702. *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989). Sovereign immunity does not bar claims against federal officials seeking solely to prevent future violations of federal law (rather than monetary relief). *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

18.     Venue is proper in the Northern District of California under 28 U.S.C.§ 1391(e)(1) because at least one plaintiff resides in this judicial district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

## INTRADISTRICT ASSIGNMENT

19.     Assignment is proper in the San Francisco division because a majority of the claims of the named *Ramos* plaintiffs arise in Alameda, Contra Costa, and Marin Counties and one of the claims of the named *Bhattarai* plaintiffs arises in Alameda County. Civil Local Rule 3-2(d) and 3-5(b).

**THE PARTIES**

*__Ramos__* **Plaintiffs**

20.     Plaintiff Crista Ramos, fourteen years old at the time DHS announced the termination of TPS for El Salvador, is a U.S. citizen who was born in Northern California and raised in San Pablo, California. She resides permanently in San Pablo, but is currently a university student in San Francisco, California. Her mother is a TPS holder from El Salvador, Plaintiff Cristina Morales. Crista has a younger brother who is also a U.S. citizen.

21.     Plaintiff Cristina Morales was born in El Salvador and has lived in the United States since 1993. She has held TPS status since 2001. Her two children were born and raised in the United States. She and her family live in San Pablo, California.

22.     Plaintiff Benjamin Zepeda, fourteen years old at the time DHS announced the termination of TPS for El Salvador, is a U.S. citizen who was born and raised in Los Angeles, California, where he now lives. His parents are TPS holders from El Salvador, including his father Plaintiff Orlando Zepeda. He has a younger sister. He continues to suffer stigmatic harm from the racism that motivated DHS's termination decisions.

23.     Plaintiff Orlando Zepeda was born in El Salvador and has lived in the United States since 1984. He has been a TPS holder since 2001. He is the father of two U.S. citizen children who were twelve and fourteen years old at the time of the announcement terminating TPS for El Salvador. He lives in Los Angeles, California.

24.     Plaintiff Juan Eduardo Ayala Flores, thirteen years old at the time DHS announced the termination of TPS for El Salvador, is a U.S. citizen who was born and raised in Washington, D.C. His mother, Plaintiff Elsy Yolanda Flores de Ayala, is a TPS holder from El Salvador. He has two older sisters. One is a TPS holder, Plaintiff Maria Jose Ayala Flores, while the other sister, Joanna Gabriela, is also a U.S. citizen. He lives in Washington, D.C.

25.     Plaintiff Maria Jose Ayala Flores was born in El Salvador and moved with her parents to Washington, D.C. as a baby. She has held TPS status since she was about two years old. Her mother is TPS holder Plaintiff Elsy Yolanda Flores de Ayala. Maria has two younger siblings who were born and raised in the United States. She lives in Washington, D.C.

26.     Plaintiff Elsy Yolanda Flores de Ayala was born in El Salvador and has lived in the United States since 2000. She and her husband acquired TPS status in 2001. They have three children, two of whom are U.S. citizens and one of whom is a TPS holder, Plaintiff Maria Jose Ayala Flores. They live in Washington, D.C.

27.     Plaintiff Hnaida Cenemat, fourteen years old at the time DHS announced the termination of TPS for Haiti, is a U.S. citizen who was born and raised in Orlando, Florida, where she now lives. Her younger brother is a U.S. citizen, and her mother, Plaintiff Wilna Destin, is a TPS holder from Haiti.

28.     Plaintiff Wilna Destin was born in Haiti, has lived in the United States since 2000, and has held TPS status since 2010. She is the mother of two U.S. citizen children. Her husband also has TPS, and her father and brothers live in the United States and are either U.S. citizens, lawful permanent residents, or TPS holders. Wilna lives with her family in Orlando, Florida.

29.     Plaintiff Rilya Salary, five years old at the time DHS announced the termination of TPS for Haiti, is a U.S. citizen who was born in Rockledge, Florida. She lives in Lexington, Kentucky. Her two younger sisters also are U.S. citizens, and her mother, Plaintiff Sherika Blanc, is a TPS holder from Haiti who has lived in the United States since arriving as a child.

30.     Plaintiff Sherika Blanc immigrated to the United States from Haiti with her parents and two brothers when she was eight years old. She currently holds TPS and has held either TPS or Deferred Action for Childhood Arrivals ("DACA") status for the last thirteen years. She is pregnant, and is the mother of three U.S. citizen daughters, all of whom were under the age of six at the time DHS announced termination of TPS for Haiti. She and her family live in Lexington, Kentucky.

31.     Plaintiff Imara Ampie was born in Nicaragua and has lived in the United States since 1998. She and her husband have held TPS status since 1999. Their two sons, fourteen and eight years old at the time of the announcement of the termination of TPS for Nicaragua, are U.S. citizens. She and her family live in Contra Costa County, California.

32.     Plaintiff Mazin Ahmed is Sudanese and has lived in the United States since he was fourteen years old. He came into the country as a child with his mother and two younger siblings.

At the time of the announcement of the termination of TPS for Sudan, Mazin, his mother, and his siblings had held TPS since 2013. He and his family live in Westbrook, Maine. Mazin has recently adjusted status to lawful permanent residency, but continues to suffer stigmatic harm from the racism that motivated DHS's termination decisions.

33.     Plaintiff Hiwaida Elarabi is Sudanese and has lived in the United States since 1997. She had TPS for more than twenty years, beginning in November 1997, before recently adjusting her status to lawful permanent residency. She lives in Newton, Massachusetts. Despite having adjusted status, Hiwaida continues to suffer stigmatic harm from the termination announcement.

34.     Plaintiff Salma Ahmed was born in Sudan and moved to the United States as a baby. She has held TPS status since she was about two or three years old. Both of her parents also had TPS, although both have since adjusted to lawful permanent residency. She has two younger siblings who were born and raised in the United States. She lives in Chicago, Illinois.

### *Bhattarai* **Plaintiffs**

35.     Plaintiff Keshav Raj Bhattarai was born in Nepal. He and his wife have lived in the United States and held TPS since 2015. He lives in Sunnyvale, California.

36.     Plaintiff Sajjan Pandey was born in Nepal and has lived in the United States since 2006. He has held TPS since 2015. He lives in Alameda, California.

37.     Plaintiff Sumnima Thapa was born in Nepal and has lived in the United States since 2002. She and her husband hold TPS, and they have two young U.S.-citizen sons, aged six and ten at the time of the termination announcement. She lives in Apple Valley, Minnesota.

38.     Plaintiff S.S. was ten years old at the time DHS announced termination of TPS for Nepal. He is the son of Plaintiff Sumnima Thapa and her husband. He was born in Minnesota and is a U.S. citizen. He lives in Apple Valley, Minnesota.

39.     Plaintiff Donaldo Posadas Caceres was born in Honduras and has lived in the United States since 1998. He, his wife, and his eldest son have held TPS since 1999. He has two U.S.-citizen daughters, who were aged eighteen and nine at the time DHS announced termination of TPS for Honduras. He lives in Baltimore, Maryland.

40.     Plaintiff G.D.P., nine years old at the time DHS announced the termination of TPS for Honduras, is the daughter of Donaldo Posadas Caceres and his wife. She was born in the United States and is a U.S. citizen. She lives in Baltimore, Maryland.

41.     Plaintiff Sorayda Betzabe Rodriguez Motiño was born in Honduras. She has lived in the United States since 1998 and has had TPS since 1999. Her husband is a TPS holder as well, and they live with their two U.S.-citizen children, who were aged fifteen and eight at the time of the announcement of the termination of TPS for Honduras. Sorayda lives in Harrisonburg, Virginia.

42.     Plaintiff Denis Alen Molina Chavez was born in Honduras. He has lived in the United States since 1997 and has had TPS since 1999. At the time DHS announced the termination of TPS for Honduras, Denis was a widower and a single father to two U.S.-citizen children, who were then aged thirteen and twelve. He now resides in Shelton, Connecticut with his children and new spouse.

**Defendants**

43.     Defendant Alejandro Mayorkas, sued in his official capacity, is the Secretary of Homeland Security. As the highest-ranking officer for DHS, Defendant Mayorkas has ultimate statutory authority over all TPS extension, termination, and designation decisions. *See* 8 U.S.C. § 1254a(b); 6 U.S.C. § 557 (transferring functions from the Attorney General).

44.     Defendant U.S. Department of Homeland Security is a cabinet-level department of the Executive Branch of the federal government, and is an "agency" within the meaning of 5 U.S.C. § 551(1). DHS includes various component agencies, including the U.S. Citizenship and Immigration Services ("USCIS"). DHS, together with all of its component agencies, is responsible for administering and enforcing the TPS program.

45.     Defendant United States of America includes all other government agencies and departments responsible for the implementation, administration, and change in policy concerning the TPS program.

1

## STATUTORY FRAMEWORK

2     46.     Congress established the Temporary Protected Status ("TPS") program through the

3     Immigration Act of 1990.[1] TPS is a form of humanitarian relief, providing lawful immigration

4     status to eligible foreign nationals who cannot safely return home to war-torn or disaster-stricken

5     countries. By enacting the TPS statute, which is codified at 8 U.S.C. § 1254a, Congress

6     established formal criteria for relief and set forth predictable procedures.[2]

7     47.     Under the TPS statute, the Secretary of Homeland Security[3] makes a "designation"

8     determination for a given country. After consulting with "appropriate" government agencies, the

9     Secretary may designate a foreign state, or any part of that state, for TPS based on: (A) an

10    "ongoing armed conflict within the state" that would "pose a serious threat" to the "personal

11    safety" of the foreign nationals of that state; (B) an "earthquake, flood, drought, epidemic, or other

12    environmental disaster in the state resulting in a substantial, but temporary, disruption of living

13    conditions," which makes the foreign state "unable, temporarily, to handle adequately the return to

14    the state" of its nationals, and where the foreign state has "officially" requested a designation; or

15    (C) the existence of "extraordinary and temporary conditions in the foreign state" that prevent

16    foreign nationals from safely returning, and where the temporary presence of those foreign

17    nationals in the United States is not "contrary to the national interest of the United States."[4]

18    48.     An initial designation period for a given country lasts between six and eighteen

19    months.[5] Before the designation can become effective, the Secretary must publish a notice in the

20

---

21    [1] Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030–36.

22    [2] The Executive Branch previously used *ad hoc* enforcement mechanisms to allow individuals to
      remain in the United States for humanitarian reasons. *See* Adam B. Cox & Cristina Rodríguez,

23    *The President and Immigration Law*, 119 Yale L.J. 458, 501–02 (2009) (discussing use of the
      "parole power," which is currently codified at 8 U.S.C. § 1182(d)(5)). Presidents have

24    occasionally exercised their discretion to designate countries for "Extended Voluntary Departure"
      and "Deferred Enforced Departure." Somewhat like TPS, both of those delayed-departure

25    practices allowed foreign nationals to lawfully remain and work in the United States while
      conditions in their homeland were unsafe or return was impracticable.

26    [3] References to the Attorney General in provisions describing functions transferred from the
      Department of Justice to the Department of Homeland Security "shall be deemed to refer to the

27    Secretary" of Homeland Security. *See* 6 U.S.C. § 557.

      [4] 8 U.S.C. § 1254a(b)(1).

28    [5] 8 U.S.C. § 1254a(b)(2), (b)(3)(C).

---

9

Federal Register that includes, among other things, a statement of findings, the effective date of the designation, and a tally of eligible foreign nationals.

49.     Once the Secretary has designated a particular country for TPS, individuals from that country (or persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, however, individuals from a designated country must meet stringent requirements. These requirements include, among other things, continued physical presence and continued residence in the United States from the most recent date of designation; satisfaction of the criteria for admissibility as an immigrant; lack of disqualifying criminal history; and submission of an application, extensive documentation, and fees.[6]

50.     Congress ensured that individuals who are ultimately granted protected status could enjoy the freedom to live and work in the United States without fear of deportation. Under the statute, as enacted by Congress, an individual who receives and maintains TPS shall be authorized to engage in employment in the United States; shall not be detained by the Secretary of Homeland Security on the basis of immigration status; and shall not be removed from the United States by the Department of Homeland Security.[7]

51.     Under the TPS statute, the Secretary must periodically re-evaluate country designations. At least 60 days before a particular designation expires, the Secretary must "review the conditions in the foreign state . . . for which a designation is in effect" and determine whether the country still meets the conditions for TPS.[8] If the Secretary does not terminate TPS for a particular country, then—by default—the designation will be extended for a period of six months, or by discretion of the Secretary, for a period of twelve or eighteen months.[9] This periodic-review requirement also entails consultation with appropriate government agencies and, ultimately, publication of notice in the Federal Register.

---

[6] 8 U.S.C. § 1254a(c)(1); 8 C.F.R. §§ 244.2, 244.4, 244.9.

[7] 8 U.S.C. § 1254a(a)(1), (d)(4).

[8] 8 U.S.C. § 1254a(b)(3).

[9] 8 U.S.C. § 1254a(b)(3)(C).

52.     The TPS statute requires, or, alternatively, permits the Secretary to consider intervening events—*i.e.* events occurring after the initial designation—during the periodic review process, without regard to whether they are directly related to the crisis that triggered the country's initial TPS designation.

53.     When a designation for a particular country is terminated, the individual TPS holder's status will typically revert back to his or her original immigration status.[10]

54.     In the event of a designation or extension of a designation, USCIS establishes periods for registration or re-registration. 8 C.F.R. § 244.17(a). The failure to register or re-register within a designated time period results in the loss of TPS status. 8 U.S.C. § 1254a(c)(3)(C); 8 C.F.R. §§ 244.14(a)(3), 244.17. Historically, the agency's practice has been to require TPS holders to re-register during the period immediately before the effective date of termination of the existing status (i.e., the date of expiry of their TPS-related documentation and employment authorization). *See, e.g.*, 71 Fed. Reg. 54,300, 54,302 (Sept. 14, 2006) (registration period until Nov. 13, 2006 for Burundi extension otherwise expiring on Nov. 2, 2006); 81 Fed. Reg. 44,646, 44,646 (July 8, 2016) (registration period until Sept. 6, 2016 for El Salvador extension otherwise expiring on Sept. 9, 2016).

55.     On information and belief, this practice is in keeping with the near-universal practice for comparable re-registration periods. For example, if an individual wants to renew a driver's license, that individual must do so during some period shortly before the existing license expires, not at some other period that ends long before the license expires.

56.     The TPS statute provides that DHS may require payment of a "reasonable fee" not to exceed $50 for the registration of new applicants subject to new TPS designations. 8 U.S.C. § 1254a(c)(1)(B), 8 U.S.C. § 1254a(c)(1)(A)(iv). USCIS may not charge the initial registration fee for the renewal of TPS for existing TPS holders. 8 C.F.R. §§ 244.17(a).

## THE TRUMP ADMINISTRATION ADOPTED A NEW STANDARD FOR TPS DECISIONS IN ORDER TO BRING ABOUT THE END OF TPS

---

[10] 8 C.F.R. § 244.19.

57.     After President Trump took office, White House officials[11] began to pressure DHS to end TPS. *See also infra* ¶¶ 138-152.

58.     The White House Domestic Policy Council sought repeatedly to influence the decision-making process at the State Department and DHS to ensure a predetermined outcome: the termination of TPS designations. Stephen Miller, President Trump's senior advisor for domestic policy, frequently reached out to DHS to urge the termination of TPS.[12]

59.     In addition, a number of political surrogates[13] working to advance President Trump's agenda took positions with DHS. Officials from President Trump's immigration transition team, including Kathy Nuebel Kovarik, Lee Francis Cissna, and Gene Hamilton, assumed high-level positions at DHS and USCIS, where they directly shaped TPS policy.

60.     In October 2017, Kovarik hired Robert Law to join USCIS as a Senior Adviser and assigned him responsibility for editing career staffs' TPS recommendations. Law had previously worked as the Government Relations Director for the "anti-immigrant hate group" Federation for American Immigration Reform ("FAIR"),[14] where he co-authored a report for the 2017 Trump

---

[11] Hereinafter, the terms "White House" and "White House officials" refer to political appointees and surrogates who worked directly for President Trump to advance and effectuate his immigration policy agenda.

[12] ECF No. 122-12 (Ex. 12) at 10–11, 19–20; ECF No. 122-85 (Ex. 85) at 7–8, 11–12, 16–19; ECF No. 122-71 (Ex. 71). All "ECF" citations refer to filings in *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1101 (N.D. Cal. 2018), vacated and remanded sub nom. Ramos v. Wolf, 975 F.3d 872 (9th Cir. 2020), reh'g en banc granted, opinion vacated, 59 F.4th 1010 (9th Cir. 2023) unless otherwise indicated.

[13] Hereinafter, the term "political surrogate" refers to individuals such as Kathy Nuebel Kovarik, Robert Law, Lee Francis Cissna, and Gene Hamilton and other individuals working to advance President Trump's political agenda who took positions within DHS.

[14] *Federation for American Immigration Reform: SPLC Designated Hate Group*, SOUTHERN POVERTY LAW CENTER, https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform ("FAIR leaders have ties to white supremacist groups and eugenicists and have made many racist statements. . . One of the group's main goals is upending the Immigration and Nationality Act of 1965, which ended a decades-long, racist quota system that limited immigration mostly to northern Europeans."). *See also* Tess Owen, *A radical anti-immigration group infiltrated the GOP. Now it's in the White House,* VICE NEWS (May 3, 2017), https://www.vice.com/en/article/mb9nb3/fair-trump-white-house-federation-for-american-immigration-reform; Bess Levin, *Trump Wants Former 'Hate Group' Leader for Top Immigration Job*, VANITY FAIR (April 10, 2019), https://www.vanityfair.com/news/2019/04/julie-kirchner-dhs-immigration.

Presidential Transition calling on the new administration to "revoke TPS for any country that has received more than two renewals."[15]

61.     In order "to get to the President/White House's desired result of terminating TPS," President Trump's political surrogates within DHS made numerous changes to TPS practices.[16] Most significantly, under their leadership, DHS adopted a new, novel—and legally erroneous— interpretation of the TPS statute that precluded consideration of intervening events during the periodic review process.

62.     Pursuant to this new, erroneous interpretation of the TPS statute, DHS abandoned a long-established practice under which it considered all current conditions—including intervening events—in deciding whether to extend or terminate a country's TPS designation. In its place, DHS adopted a new, narrow practice in which DHS considers only whether the original conditions that initially gave rise to the TPS designation persist, and only those ongoing harms directly tied to those original conditions.

63.     Before the Trump Administration, for at least twenty years, Republican and Democratic Administrations alike regularly relied on intervening factors arising after a country's original TPS designation to extend TPS. Secretaries considered the full range of current country conditions in making TPS decisions, regardless of whether those conditions traced back to the event that triggered the original designation.

64.     Under the Trump Administration, in contrast, extensions would be permitted only when warranted by the continued effects of the original event triggering the TPS designation.

65.     In June 2017, then-Secretary Kelly described the new standard. He testified at a Senate hearing that DHS could only consider the original reason for a country's designation when recommending extension or termination. He explained that, in the Administration's view, TPS "is for a specific event"—for instance, an earthquake in Haiti—"and that's how I have to look at it."[17]

_____

[15] ECF No. 122-23 (Ex. 23) at 15-16.

[16] *See* Order Granting Plaintiffs' Motion for Preliminary Injunction, *Ramos v. Nielsen*, No. 3:18-cv-01554-EMC, ECF No. 128, at 32.; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1101 (N.D. Cal. 2018), vacated and remanded sub nom. Ramos v. Wolf, 975 F.3d 872 (9th Cir. 2020), reh'g en banc granted, opinion vacated, 59 F.4th 1010 (9th Cir. 2023).

[17] ECF No. 122-35 (Ex. 35) at 70.

66.     Secretary Nielsen later echoed Kelly's view. She testified, "[t]he law does not allow me to look at the country conditions of a country writ large. It requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist. . . . [T]he law requires me, if I cannot say that the conditions emanating from the [originating condition] still exist, regardless of other systemic conditions, I must terminate TPS."[18] She also testified, "[t]he law says that if the effects of the originating event, so that's a causation issue, do not continue to exist[,] then the Secretary of Homeland Security must terminate [TPS]. . . . If the underlying conditions in a country are themselves dangerous, unfortunately that is not something that I can consider in the termination."[19]

67.     Internal agency guidance prepared by the Trump-era DHS directed, "the law requires that when the conditions prompting a country's original designation for TPS no longer exist, the Department must terminate the country's TPS designation."[20]

68.     White House officials directly urged the new standard as part of its overall effort to end TPS and as applied to specific countries. For example, in November 2017, three days before the statutory deadline for TPS decisions for Nicaragua and Honduras, the White House convened a Cabinet-level meeting urging termination for Nicaragua, Honduras, Haiti, and El Salvador. In a "Discussion Paper" to guide the meeting, the White House applied the new standard, asserting that termination was required because "the temporary conditions that arose out of natural disasters and supported [the original] TPS designations have long ceased to exist."[21]

69.     As one source described, following the meeting, White House Chief of Staff John Kelly and Homeland Security Advisor Tom Bossert called Acting Secretary Elaine Duke and "put

---

[18] ECF No. 122-36 (Ex. 36) at 25-26.
[19] ECF No. 122-34 (Ex. 34) at 47.
[20] ECF No. 122-37 (Ex. 37) at 1 (DPP_00003099).
[21] ECF 122-14 (Ex. 14) at 14 (DPP_00003578).

massive pressure on her" to terminate TPS for Honduras and Nicaragua.[22] They told her that TPS was an obstacle to the President's "wider strategic goal" on immigration.[23]

70.    Subsequently, Acting Secretary Duke determined that "[t]he TPS program must end for these countries soon."[24] She acknowledged that "[t]his conclusion [was] the result of an America first view."[25] She then terminated TPS for Nicaragua. She declined to make a decision on TPS for Honduras, with the result that its TPS designation was automatically extended for six months. 8 U.S.C. § 1254a(b)(3)(C). She made clear, however, that termination for Honduras was imminent under the new standard. In an email to White House Chief of Staff Kelly, she explained that her "no decision" on Honduras was "a strong break with past practice. . . . By not affirmatively extending, I'm stating that I'm not satisfied that the country conditions remain—but not yet sure how best to end TPS for this country."[26] She described her decisions as "send[ing] a clear signal that TPS in general is coming to a close . . . consistent with the President's position on immigration."[27]

71.    In addition to adopting a new standard for TPS decisions, the Trump Administration altered the process for conducting TPS reviews in other ways.

72.    Prior to the Trump Administration, TPS review began with an objective country conditions report prepared by career specialists. The reports formed the basis for decision memos containing the USCIS Director's recommendation to the DHS Secretary and Federal Register notices announcing the decision. Career officials would draft Federal Register notices in tandem with the decision memos, because the final decisions published in those notices were guided by the recommendations from the career staff in the decision memos.

---

[22] Nick Miroff, *White House chief of staff tried to pressure acting DHS secretary to expel thousands of Hondurans, officials say*, WASH. POST (Nov. 9, 2017), https://www.washingtonpost.com/world/national-security/white-house-chief-of-staff-tried-to-pressure-acting-dhs-secretary-to-expel-thousands-of-hondurans-officials-say/2017/11/09/914d3700-c54a-11e7-a441-3a768c8586f1_story.html?utm_term=.a3d52a717ec9.

[23] *Id.*

[24] ECF No. 122-29 (Ex. 29) at DPP_00003582.

[25] *Id.*

[26] ECF No. 122-30 (Ex. 30) at DHS_RFPD 00000005.

[27] *Id.*

73.     In the Trump era, this process changed. Political surrogates assumed responsibility for the periodic TPS reviews. They disregarded the recommendations of career professionals and rewrote decision memos so that the memos would "fully support" the pre-determined decision to terminate TPS.[28] Political surrogates also assumed control of drafting the Federal Register notices. Whereas under prior administrations the Federal Register notice followed logically from career officials' drafts of the decision memos, under the Trump Administration this was no longer the case.

74.     In addition, whereas prior administrations had typically conducted separate review processes for each country, the Trump Administration reviewed multiple countries together, even though each had different originating and current conditions. For example, White House officials "coordinat[ed] the conditions and process for terminating [TPS] for aliens from El Salvador, Honduras, Nicaragua, and Haiti."[29]

75.     Moreover, input from U.S. embassies, traditionally accorded great weight, was disregarded by the Trump-era DHS, because the input did not support the goal of termination. As James D. Nealon, chief of the DHS Office of Policy and former U.S. Ambassador to Honduras, testified, the State Department traditionally afforded great weight to ambassadors' input. Under prior administrations there would have been significant debate if DHS were to reject an ambassador's recommendation in favor of a contrary, internal recommendation. However, this all changed under the Trump Administration. State Department leadership ignored cables from U.S. embassies in TPS-designated countries that sought to convey country conditions and offer recommendations on TPS decisions. Additionally, in some cases, State Department leadership stalled providing recommendations drafted by career State Department professionals until it was too late for DHS to substantively consider them.

76.     The first TPS termination announced by the Trump Administration was for Sudan in September 2017. In a draft decision memo, career officials reviewed a broad range of country conditions, including intervening conditions, and recommended *against* terminating TPS for

---

[28] ECF No. 122-3 (Ex. 3) at 2–3.
[29] ECF No. 122-14 (Ex. 14) at 12.

Sudan. Political surrogates then edited the memo to recommend termination. The resulting

decision memo was so incoherent that then USCIS Director Francis Cissna said it read "like one

person who strongly supports extending TPS for Sudan wrote everything up to the

recommendation section and then someone who opposes extension snuck up behind the first guy,

clubbed him over the head, pushed his senseless body out of the way, and finished the memo."[30]

The memo was changed several more times before ultimately being revised "to clearly support the

. . . decision to terminate."[31]

77.     Subsequent terminations underwent a similar process. For example, Kovarik

complained in October 2017 of a "problem" in decision memos drafted by career professionals for

Honduras, Nicaragua, and El Salvador, because they "read[] as though we'd recommend an

extension b/c we talk so much about how bad it is, but there's not enough in there about positive

steps that have been taken since it's designation."[32] A career professional responded, "We can

comb through the country conditions to try to see what else there might be, but the basic problem

is that it IS bad there [with respect to] all of the standard metrics. Our strongest argument for

termination, we thought, is just that it is not bad in a way clearly linked to the initial disasters

prompting the designations."[33]

## DHS APPLIED ITS NEW ERROENOUS INTERPRETATION OF THE TPS STATUTE TO THE TPS TERMINATIONS AT ISSUE IN THIS CASE

78.     The Trump Administration applied its new rule to its TPS decisions. In at least five

announcements terminating a TPS designation, the DHS Secretary explicitly stated that she

compared "the conditions upon which the country's original designation was based" with "an

assessment of whether those originating conditions continue to exist."[34] Even where she did not

---

[30] ECF No. 122-1 (Ex. 1) at DPP_00000472.

[31] ECF No. 111-1 at 12–15.

[32] ECF No. 122-2 (Ex. 2) at DPP_00003139–45.

[33] *Id*. at DPP_00003139.

[34] Press Release, Dep't of Homeland Sec., Sec'y of Homeland Sec. Kirstjen M. Nielsen Announcement on Temp. Protected Status for El Sal. (Jan. 8, 2018); Press Release, Dep't of Homeland Sec., Acting Sec'y Elaine Duke Announcement on Temp. Protected Status for Haiti

refer to the new policy explicitly, the Secretary's new interpretation of the TPS statute was evident in its TPS termination decisions.

**<u>Sudan</u>**

79.     Sudan was first designated for TPS on November 4, 1997, in the midst of a long-running civil war.[35] Since that time, successive administrations reviewed Sudan's TPS status and saw fit to maintain TPS protection for the county eighteen times. Nine of these reviews occurred *after* Sudan's civil war officially concluded in January 2005 with the signing of the Comprehensive Peace Agreement. Attorneys General and Secretaries of Homeland Security consistently considered intervening factors wholly or partially unrelated to the civil war, including natural disasters, "perennial environmental shocks, such as flooding and droughts," new armed conflicts, growing poverty,[36] criminal activity, and "deteriorating economic conditions" leading to "increased food and fuel prices."[37]

80.     Nevertheless, in September 2017, Acting Secretary Duke ignored intervening conditions to terminate Sudan's TPS designation. The TPS country conditions memo for Sudan, drafted by career staff, provided that "while armed conflict has been the primary driving force behind the humanitarian needs in Sudan, poverty, floods, drought and environmental degradation have also significantly affected the livelihoods of vulnerable people, particularly children"; "an inadequate transportation infrastructure prevents efficient access to markets"; there was "significant economic instability after the secession of South Sudan in 2011"; and the country had

_____

(Nov. 20, 2017); Press Release, Dep't of Homeland Sec., Acting Sec'y Elaine Duke Announcement on Temp. Protected Status for Nicaragua & Honduras (Nov. 6, 2017); Press Release, U.S. Dep't of Homeland Security, Secretary Kirstjen M. Nielsen Announcement on Temporary Protected Status for Nepal (Apr. 26, 2018), https://www.dhs.gov/news/2018/04/26/secretary-kirstjen-m-nielsen-announcement-temporary-protected-status-nepal; Press Release, U.S. Dep't of Homeland Security, Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras (May 4, 2018) (emphasis added), https://www.dhs.gov/news/2018/05/04/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.

[35] 62 Fed. Reg. 59,737 (Nov. 4, 1997).

[36] *See* 46 Fed. Reg. 63,637 (Oct. 13, 2011); *see also, e.g.,* 72 Fed. Reg. 10,541 (March 8, 2007); 68 Fed. Reg. 52,410 (Sept. 3, 2003).

[37] 79 Fed. Reg. 52,027, 52,029 (Sept. 2, 2014).

been affected by a "cholera outbreak" that began in 2017."[38] However, the Acting Secretary did not even consider, let alone make a finding as to these or other intervening factors.

81.   The 2017 decision memo recommending the termination of TPS for Sudan was far more limited. It provided that Sudan was designated for TPS in 1997 "due to ongoing armed conflict and extraordinary and temporary conditions in Sudan," and that TPS for Sudan should be terminated as "[t]here were unilateral ceasefires in October 2016 which led to a reduction in violence and rhetoric from the conflict parties" and, that while "[t]here is ongoing conflict in some regions, [it is] not the entire country."[39] The Federal Register notice stated curtly that "the ongoing armed conflict and extraordinary and temporary conditions that served as the basis for Sudan's most recent designation have sufficiently improved such that they no longer prevent nationals of Sudan from returning in safety to all regions of Sudan." [40]

82.   The periodic review process for Sudan was highly irregular, and included a series of memoranda in which the recommendations were delinked from the country conditions analyses. In a draft decision memo, career officials reviewed a broad range of conditions, including intervening events such as a cholera outbreak and lack of access to drinking water, and concluded, "termination does not appear to be warranted."[41] But political surrogates edited the decision memo to recommend termination. In support, they tacked on a section focused narrowly on the factors that triggered Sudan's original designation. USCIS Director Francis Cissna identified the memo's incoherence which read like different people drafted the analysis and the recommendations.[42] The memo was then "repackage[d]"[43] several more times before ultimately being revised "to clearly support the . . . decision to terminate."

83.   Internal communications demonstrate that government personnel involved in the TPS decision-making for Sudan understood that they could not consider intervening conditions,

---

[38] ECF No. 111-1 (Ex. 1) at DPP_00002275, DPP_00002281.-

[39] ECF No. 122-87 (Ex. 87) at AR-SUDAN-00000006, AR-SUDAN-00000010.

[40] 82 Fed. Reg. at 47,228, 47,230 (Oct. 11, 2017).

[41] ECF No. 122-1(Ex. 1) at DPP_00000472.

[42] *Id*. at DPP_00000471–00000472.

[43] ECF No. 128 at 33–34; ECF No. 111-1 at 12–15.

but instead could only consider factors identified in the earlier Federal Register notices designating or redesignating Sudan for TPS.

84.    Later, Gene Hamilton, working as Senior Counselor to the DHS Secretary, removed "examples of human rights" violations from the draft Federal Register Notice announcing the termination of TPS for Sudan. A career subject matter expert recognized that Hamilton's edits would be "read as taking another step toward providing an incomplete and lopsided country conditions presentation to support termination[.]"[44] The disconnect between the termination and the dangerous conditions in Sudan drew criticism from within DHS and the State Department.

**Nicaragua**

85.    Nicaragua was designated for TPS by Attorney General Janet Reno on January 5, 1999 after Hurricane Mitch caused severe damage to the country.[45] Multiple Attorneys General and DHS Secretaries subsequently agreed that conditions in Nicaragua warranted maintenance of its TPS designation, which occurred thirteen times in all. Those decisions took into consideration social, economic, and infrastructural challenges that were not directly attributable to the hurricane.[46] They cited to environmental disasters that occurred *after* Hurricane Mitch,[47] a fractured economic foundation and "chronic poverty," and problems of governance and political

---

[44] ECF No. 122-5 (Ex. 5) at DPP_00003177.

[45] Hurricane Mitch killed more than 3,000 people, and destroyed an estimated 145,000 homes, ninety health clinics, nearly 350 schools, and seventy percent of Nicaragua's roads. The severe flooding and landslides resulting from Hurricane Mitch buried entire villages and caused more than $1.3 billion of damage. *See* 64 Fed. Reg. 526 (Jan. 5, 1999); 72 Fed. Reg. 29,534, 29535 (May 29, 2007); 81 Fed. Reg. 30,325, 30,326 (May 16, 2016).

[46] 72 Fed. Reg. 29,534 (May 29, 2007).

[47] 67 Fed. Reg. 22,454, 22,454 (May 3, 2002) (considering "recent droughts as well as flooding from Hurricane Michelle in 2001"); 68 Fed. Reg. 23,748, 23,748 (May 5, 2003) (considering "a prolonged drought as well as flooding from Hurricane Michelle"); 72 Fed. Reg. 29,534, 29,535 (May 29, 2007) (considering that Hurricane Beta and Tropical Storm Stan "severely affected thousands of people, destroying houses, medical centers, and schools in October 2005"); 76 Fed. Reg. 68,493, 68,494 (Nov. 4, 2011) (considering Tropical Storm Alma in May 2008, Tropical Depression 16 in 2008, Hurricane Ida in 2009, and Hurricane Felix and Tropical Storm Matthew in 2010); 78 Fed. Reg. 20,128, 20,130 (Apr. 3, 2013) (considering Tropical Depression 12E in 2011); 79 Fed. Reg. 62,176, 62,178 (Oct. 16, 2014) (considering the 2013 Hurricane Barbara, several tropical storms, and heavy seasonal rains); 79 Fed. Reg. 62,176, 62,178 (Oct. 16, 2014) (considering a 2014 drought); 81 Fed. Reg. 30,325, 30,325 (May 16, 2016) (considering "a prolonged regional drought" in 2016).

tension.[48] Prior decision memos recommending the extension of TPS also expressly considered intervening conditions—including the 2016 Nicaragua decision memo which recommended the extension of TPS for Nicaragua based on Hurricane Mitch "and subsequent environmental disasters."[49]

86.    In November 2017, Acting Secretary Duke reversed course, terminating TPS for Nicaragua and relying on the Trump Administration's new rule that only permitted the consideration of originating conditions. The November 2017 decision memo recommending the termination of TPS for Nicaragua provides that "Nicaragua's current challenges cannot be directly tied to destruction stemming from Hurricane Mitch."[50] The December 2017 Federal Register notice which announced the termination of TPS for Nicaragua included only a three-paragraph explanation that failed to address any of the intervening conditions considered by previous administrations.[51]

87.    This termination decision followed immense pressure from White House officials working at the President's behest to persuade Acting Secretary Duke to terminate TPS for Nicaragua and three other countries—Honduras, El Salvador, and Haiti. On October 31, 2017, State Department Secretary Rex Tillerson recommended the termination of TPS for these four countries, and the next day called Secretary Duke saying this was "just something she just had to do."[52] White House officials made repeated entreaties to Acting Secretary Duke in the final days before the deadline for her to make a decision regarding Nicaragua: holding a Cabinet-level

---

[48] 75 Fed. Reg. 24,737, 24,738 (May 5, 2010); 76 Fed. Reg. 68,493, 68,495 (Nov. 4, 2011) (noting a rise in "political tension," "including violent demonstrations and seizures of government offices" which "could hinder the efforts of already-weak local institutions to provide services and help reintegrate returned Nicaraguans").

[49] ECF No. 119-02 (Ex. 125) at DPP_00003865–00003866.

[50] ECF No. 122-44 (Ex. 44) at AR-NICARAGUA-00000088.

[51] 82 Fed. Reg. at 59,636–37 (Dec. 15, 2017.). Acting Secretary Duke delayed the effective expiration date until January 5, 2019 to "provide for an orderly transition." *Id.*

[52] Nick Miroff *et al.*, U.S. embassy cables warned against expelling 300,000 immigrants. Trump officials did it anyway, Wash. Post (May 8, 2018) https://www.washingtonpost.com/world/national-security/us-embassy-cables-warned-against-expelling-300000-immigrants-trump-officials-did-it-anyway/2018/05/08/065e5702-4fe5-11e8-b966-bfb0da2dad62_story.html ("The implication of Tillerson's message was clear: This wasn't worth a showdown with the White House.").

1    Principals meeting recommending TPS terminations; making separate phone calls urging

2    termination to express that the White House would be "extremely disappointed if [the decisions

3    were] kick[ed] into lap of next Sec[retary]," and conveying a "strategy" that urged a twelve-month

4    effective date for Nicaragua's TPS termination.[53]

5    **Haiti**

6        88.    Haiti was first designated for TPS by Secretary Napolitano on January 21, 2010 after

7    a 7.0 magnitude earthquake struck the country,[54] killing as many as 300,000 people.[55] Since then,

8    DHS provided protection for Haiti under the TPS program from 2011 to 2017.[56] In continuing

9    Haiti's status under the TPS program, Secretaries Napolitano and Johnson considered a variety of

10   factors and conditions that arose subsequent to the earthquake, many of which were wholly or

11   partially unrelated to it, including crime, poverty, unemployment, lack of adequate social

12   services,[57] and successive health and environmental disasters, including destruction caused by

13   Hurricane Matthew.[58]

14       89.    In the first TPS decision of the Trump Administration, Secretary Kelly extended

15   Haiti's TPS designation in May 2017, but did so for the minimum six months allowed by statute.

16   In an extraordinary Federal Register notice providing for this "limited 6-month" extension, DHS

17   Secretary Kelly announced that "[t]he Secretary is committed to making TPS determinations that

18   fully comply with the Immigration and Nationality Act and the intent of the program to provide a

19   temporary form of immigration relief and protection."[59] The notice repeatedly suggested TPS

20   would shortly end by, *inter alia*, warning TPS holders to obtain travel documents.[60] and Secretary

21
22   [53] ECF No. 122-11 (Ex. 11) at DPP_00002599; ECF No. 122-30 (Ex. 30) at DHS_RFPD
     00000005.

23   [54] 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010).

     [55] *See* 77 Fed. Reg. 59,943, 59,944 (Oct. 1, 2012).

24   [56] 82 Fed. Reg. 23,830 (May 24, 2017); 80 Fed. Reg. 51,582 (Aug. 25, 2015); 79 Fed. Reg. 11,808
25   (Mar. 3, 2014); 77 Fed. Reg. 59,943 (Oct. 1, 2012); 76 Fed. Reg. 29,000 (May 19, 2011).

     [57] 79 Fed. Reg. 11,808, 11,810 (Mar. 3, 2014); 76 Fed. Reg. 29,000, 29,001 (May 19, 2011).

26   [58] 82 Fed. Reg. 23,830, 23,832 (May 24, 2017); 79 Fed. Reg. 11,808, 11,810 (Mar. 3, 2014); 77
27   Fed. Reg. 59,943, 59,944 (Oct. 1, 2012); 76 Fed. Reg. 29,000, 29,001 (May 19, 2011).

     [59] 82 Fed. Reg. 23,830 (May 24, 2017).

28   [60] *Id.* at 23,830–23,832.

Kelly also admonished that Haitian TPS holders should "make other necessary arrangements for their ultimate departure from the United States." [61]

90.      Six months later, and one week after President Trump's "shithole countries" comment, Acting Secretary Duke terminated Haitian TPS citing only conditions associated with the 2010 designation and the 2011 redesignation. The Federal Register notice terminating TPS for Haiti ignored intervening conditions identified in prior extensions of TPS for Haiti. [62] The decision memo recommending the termination of TPS for Haiti incorporated the new rule, noting that Haiti was designated for TPS in 2010 "due to extraordinary and temporary conditions resulting from the [2010] earthquake" and recommending termination because "[a]ny current issues in Haiti are unrelated to the 2010 earthquake" and "Haiti has made significant progress in recovering from the 2010 earthquake." [63]

91.      In response to questions from legislators about the status of TPS for Haiti, both Secretary Kelly and Secretary Nielsen testified that the law required only a consideration of originating conditions. Secretary Kelly testified to the Senate in 2017 that "Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. But the earthquake was why TPS was – was granted and – and that's how I have to look at it." [64]

92.      Secretary Nielsen testified similarly in response to a question about Haiti in April 2018: "[T]he law really restricts my ability to extend TPS. The law says that if the effects of the originating event, so that's a causation issue, do not continue to exist then the secretary of Homeland Security must terminate." [65] DHS publicly said the same, in communications to the press, asserting that the law required them "to determine whether conditions that led to Haiti's initial designation in 2010 remain." [66]

---

[61] Press Release, Dep't of Homeland Sec., Sec'y Kelly's Statement on the Limited Extension of Haiti's Designation for Temporary Protected Status (May 22, 2017).

[62] 83 Fed. Reg. 2,648, 2,650 (Jan. 18, 2018).

[63] ECF No. 122-45 (Ex. 45) at AR-HAITI-00000033–00000037.

[64] ECF No. 122-35 (Ex. 35) at 70.

[65] ECF No. 122-34 (Ex. 34) at 47.

[66] ECF No. 122-17 (Ex. 17) at 3.

93.     Internal communications within USCIS demonstrate that the agency had established a new rule limiting the consideration of intervening conditions relevant to the Haitian TPS decision, and manufactured the decision memos to reach a preordained outcome. On April 14, 2017, a career USCIS staff member sent an email to a senior official responsible for analyzing country conditions. The staff member indicated that the decision regarding Haiti "was a political one" and that "[t]heir position was that Haiti was designated on account of the 2010 earthquake, and those conditions have significantly improved."[67]

94.     In a separate email exchange, USCIS political appointee Kovarik received feedback from the person she appointed to serve as her Senior Policy Advisor that he edited the Haiti decision memo to "fully support termination" after finding that the draft memo compiled by career employees was "overwhelmingly weighted for extension," which he did "not think [was] the conclusion we are looking for."[68]

**El Salvador**

95.     El Salvador was the first country designated for TPS, as part of the Immigration Act of 1990.[69] Advocacy for Salvadorans denied fair asylum processes—while the United States was supporting one of the warring parties in the civil war in El Salvador—was one of the primary motivations for that decision.[70]

96.     El Salvador was most recently designated for TPS on March 9, 2001 after three devastating earthquakes.[71] All told, various administrations continued TPS for El Salvador eleven times based on a variety of factors and conditions that did not exist at the time of the original designation, and that were unrelated to the earthquakes. Among other considerations, they cited

---

[67] ECF No. 119-1 (Ex. 124) at DPP_00018751.

[68] ECF No. 122-3 (Ex. 3) at DPP_00003349.

[69] Immigration Act of 1990, Pub. L. 101-649, § 303, 104 Stat. 4978.

[70] *See, e.g.*, Katherine Bishop, U.S. Adopts New Policy for Hearings on Political Asylum for Some Aliens, N.Y. Times (Dec. 20, 1990), https://nyti.ms/2tEcmpB.

[71] A devastating, 7.6 magnitude earthquake hit El Salvador on January 13, 2001, followed by over 3,000 aftershocks. The earthquakes killed over 1,100 people, damaged or destroyed approximately 220,000 homes, 1,696 schools, and 856 public buildings, and affected approximately 1.5 million people. *See* 66 Fed. Reg. 14,214 (Mar. 9, 2001).

1  droughts and a leaf rust epidemic that caused destabilizing food insecurity and malnutrition,[72]

2  health emergencies,[73] subsequent environmental disasters, including another earthquake in 2012,

3  volcanic eruptions, hurricanes, mudslides and flooding,[74] economic instability, and crime[75] as

4  grounds for continuing TPS. The 2016 El Salvador decision memo, which was issued at the end of

5  the Obama Administration, expressly considered intervening conditions as part of its

6  recommendation that TPS be extended for El Salvador based on the 2001 earthquakes "and

7  subsequent environmental disasters."[76]

8       97.    But when terminating TPS for Salvadorans in January 2018, Secretary Nielsen

9  ignored the contemporary realities of life in El Salvador by asking only whether disruptions

10  traceable to the 2001 earthquakes had abated. The Secretary summarized the agency's reason for

11  termination by asserting that "DHS has reviewed conditions in El Salvador" and "determined that

12  the conditions supporting El Salvador's 2001 designation for TPS" based on a series of

13  earthquakes "are no longer met" because "[r]ecovery efforts . . . have largely been completed" and

14  "social and economic conditions affected by the earthquakes have stabilized."[77] The Secretary

15  ignored natural and environmental disasters, pervasive gang violence, mass food insecurity, and

16  other humanitarian crises since the 2001 earthquake.[78] The decision memo expressly rejected as

17  irrelevant current conditions not clearly related to the 2001 earthquakes—recommending the

---

[72] 80 Fed. Reg. 893, 895 (Jan. 7, 2015); 67 Fed. Reg. 46,000, 46,000–01 (July 11, 2002).

[73] 81 Fed. Reg. 44,645, 44,647 (July 8, 2016) (identifying that the environmental and social conditions plaguing the country spurred an outbreak of mosquito borne illnesses, including chikungunya and dengue).

[74] 80 Fed. Reg. 893, 894 (Jan. 7, 2015) (noting that Tropical Storm Barry hit El Salvador in June 2013, causing flooding, and in December 2013, the Chaparrastique volcano erupted in December 2013, forcing thousands of people to evacuate their homes); 78 Fed. Reg. 32,418, 32,419 (May 30, 2013); 77 Fed. Reg. 1710, 1712 (Jan. 11, 2012); 75 Fed. Reg. 39,556, 39,558 (July 9, 2010); 71 Fed. Reg. 34,637, 34,638 (June 15, 2006).

[75] 80 Fed. Reg. 893, 895 (Jan. 7, 2015) (considering that almost half of all Salvadorans lived in poverty, a third were underemployed, and El Salvador's annual GDP growth fell way behind its neighboring countries); 68 Fed. Reg. 42,071, 42,072 (July 16, 2003) (considering that a large number of returnees would "creat[e] social unrest and exacerbat[e] a critical crime situation").

[76] ECF No. 119-3 (Ex. 126) at DPP_00005404.

[77] 83 Fed. Reg. 2654, 2656 (Jan. 18, 2018).

[78] *Id.*

termination of TPS for El Salvador because "El Salvador suffers few remaining residual effects related to the major earthquakes that led to its designation for TPS in 2001" and "current challenges cannot be directly tied to damage from the earthquakes."[79]

98.     Soon after making the decision to terminate TPS for El Salvador, DHS Secretary Nielsen testified before the Senate, noting that for El Salvador, "we didn't dispute the country conditions are difficult . . . , but unfortunately, the law requires me, if I cannot say that the conditions emanating from the earthquakes still exist, regardless of other systemic conditions, I must terminate TPS."[80]

**Nepal**

99.     Nepal was first designated for TPS by Secretary Jeh Johnson on June 24, 2015, after a 7.8 magnitude earthquake and a number of significant aftershocks struck the country, killing nearly 9,000 people, injuring more than 20,000 people, displacing millions, and destroying or significantly damaging over 750,000 homes.[81] On October 26, 2016, DHS extended Nepal's designation for eighteen months.[82] The extension took into account a variety of factors and conditions that arose subsequent to the original designation, many of which were wholly or partially unrelated to the earthquakes, including civil unrest, the obstruction of crossings at the Nepal-India border, and inadequate sanitation.[83]

100.     On April 26, 2018, Secretary Nielsen announced her decision to terminate TPS for Nepal, with a twelve-month delayed effective date.[84] Like previous Trump-era TPS terminations, the decision was the product of the White House's persistent and ongoing effort to end TPS.

---

[79] ECF No. 122-110 (Ex. 110) at AR-EL_SALVADOR-00000045, AR-EL_SALVADOR-00000049.

[80] ECF No. 122-36 (Ex. 36) at 25-26.

[81] 80 Fed. Reg. 36,346, 36,347 (June 24, 2015).

[82] 81 Fed. Reg. 74,470 (Oct. 26, 2016).

[83] *Id.* at 74,471.

[84] Press Release, *U.S. Dep't of Homeland Security, Secretary Kirstjen M. Nielsen Announcement on Temporary Protected Status for Nepal* (Apr. 26, 2018) (emphases added), https://www.dhs.gov/news/2018/04/26/secretary-kirstjen-m-nielsen-announcement-temporary-protected-status-nepal.

1
2
3
4

101.   In terminating Nepal's TPS, DHS applied its new standard. The Secretary considered only whether Nepal had recovered from the earthquake that triggered its original designation; intervening conditions that affected the country were not considered except to the extent they related directly to the original basis for designation.

5
6
7
8
9

102.   During the periodic review process for Nepal, Trump surrogate Kovarik instructed career employees to focus the country conditions report specifically on progress in earthquake and recovery efforts as opposed to the extremely comprehensive overview usually provided. In response, career employees agreed not to devote research to political crises and other intervening conditions not directly related to the earthquake.

10
11
12
13
14
15
16

103.   An early draft decision memo for Nepal described the decision whether to extend or terminate as a close case. It described the destructive intervening events that had befallen Nepal but then dismissed them, because they were not primarily related to the original event, stating that, in August 2017, the worst rains in 15 years struck Nepal, triggering widespread large-scale flooding and landslides, causing significant property damage, and impacting access to food, water, and healthcare, albeit primarily in the southern plains region that has been little affected by the earthquake. The draft recommended termination with an eighteen-month wind down period.

17
18
19
20

104.   Upon reviewing a subsequent draft decision memo, USCIS Director Cissna complained that it did not adequately support the proposal to terminate TPS. He noted specific sections of the memo that he viewed as problematic, including factual statements about challenges to Nepal's rebuilding efforts and the number of individuals still living in temporary shelters.

21
22
23
24
25
26
27

105.   The final Nepal decision memo recommended termination with a twelve-month wind-down period and no longer described the decision as a close case. The memo emphasized original conditions and significantly downplayed the significance of any intervening factors. For example, it limited consideration of the damage caused by severe, post-earthquake flooding in Nepal to simply one of several factors delaying the completion of recovery and reconstruction efforts but otherwise unrelated to the earthquake that led to the TPS designation and, therefore, not relevant to the termination decision. To the extent the decision memo considered the independent

28

effects of severe flooding, it was only to assert that disruption caused by the flooding did not rise to the level of a new event that would warrant a new TPS designation.

106.   In a press release announcing the termination of TPS for Nepal, DHS explained, "[t]he decision to terminate TPS for Nepal was made after a review of the environmental disaster-related conditions upon which the country's original designation was based and an assessment of whether those originating conditions continue to exist as required by statute."[85]

107.   Accompanying DHS Press Affairs Guidance stated that based on careful consideration of available information, the Secretary determined that the original conditions caused by the 2015 earthquake no longer exist. Thus, as required under the applicable statute, the current TPS designation must be terminated.

108.   The announcement terminating Nepal's TPS was published in the Federal Register on May 22, 2018.[86] The Federal Register notice made no mention of intervening events and did not discuss the severe flooding of August 2017.

**Honduras**

109.   Honduras was originally designated for TPS on January 5, 1999 by Attorney General Janet Reno, after Hurricane Mitch caused severe damage to the country.[87] Multiple Attorneys General and DHS Secretaries extended TPS for Honduras in regular periodic reviews over nearly twenty years—fourteen times in all. Those extensions took into consideration social, economic, environmental, and infrastructural challenges that were not directly attributable to the hurricane.[88] For instance, decisions to extend TPS for Honduras cited environmental disasters that

---

[85] Press Release, U.S. Dep't of Homeland Security, Secretary Kirstjen M. Nielsen Announcement on Temporary Protected Status for Nepal (Apr. 26, 2018) (emphases added), https://www.dhs.gov/news/2018/04/26/secretary-kirstjen-m-nielsen-announcement-temporary-protected-status-nepal.

[86] 83 Fed. Reg. 23,705 (May 22, 2018).

[87] 64 Fed. Reg. 524 (Jan. 5, 1999); 75 Fed. Reg. 24,734, 24,735 (May 5, 2010) ("Hurricane Mitch resulted in the loss of thousands of lives, displacement of thousands more, collapse of physical infrastructure, and severe damage to the country's economic system.").

[88] *See, e.g.*, 68 Fed. Reg. 23,744 (May 5, 2003).

occurred *after* Hurricane Mitch,[89] a "deteriorating economy," and a "political crisis" that "significantly reduc[ed] economic activity."[90]

110.   On May 4, 2018, Secretary Nielsen announced her decision to terminate TPS for Honduras with an eighteen-month delayed effective date. Like the previous Trump-era TPS terminations, her decision was the product of the Trump Administration's systematic effort to end TPS. It effectuated a predetermined conclusion articulated by Acting Secretary Duke months earlier, when she allowed a short, automatic six-month extension for Honduras because she was not yet sure how best to end TPS for this country.

111.   In terminating TPS for Honduras, DHS applied its new rule. The Secretary assessed only whether Honduras had recovered from Hurricane Mitch and did not consider intervening conditions. For example, the Honduras decision memo explicitly dismissed current challenges because they cannot be directly tied to damage from the storm 20 years ago.

112.   The DHS press release announcing the Secretary's decision explained, "[T]he Secretary determined that the disruption of living conditions in Honduras from Hurricane Mitch that served as the basis for its TPS designation has decreased to a degree that it should no longer be regarded as substantial. . . . Thus, as required under the applicable statute, the current TPS designation must be eliminated."[91]

113.   On the same day that DHS publicly announced the termination of TPS for Honduras (and about six weeks after the filing of *Ramos*, challenging the new practice as unlawful), an addendum was added to the Honduras decision memo. The addendum provides supplemental information on environmental conditions related to problems caused by pine beetles and coffee

---

[89] *See, e.g.*, *id.* ("[R]ecent droughts as well as flooding from Hurricane Michelle in 2001 have added to the humanitarian, economic, and social problems initially brought on by Hurricane Mitch in 1998."); 75 Fed. Reg. 24,734, 24,735 (May 5, 2010) ("[O]ther natural disasters have occurred since Hurricane Mitch, including flooding in October 2008 and an earthquake in May 2009, which have further delayed the recovery from Hurricane Mitch.").

[90] 75 Fed. Reg. 24,734, 24,735 (May 5, 2010).

[91] Press Release, U.S. Dep't of Homeland Security, Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras (May 4, 2018) (emphasis added), https://www.dhs.gov/news/2018/05/04/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.

rust. The Federal Register notice announcing the termination of TPS for Honduras, published on June 5, 2018, similarly mentions pine beetles and coffee rust, along with a range of other factors.

114.   The addendum and similar information in the Federal Register notice were added as post hoc justifications for DHS's decision to terminate TPS for Honduras. They do not reflect the narrower range of factors—based solely on the impact of Hurricane Mitch—actually considered by DHS in deciding to terminate.

115.   In a May 11, 2018 memorandum, members of the Senate Foreign Relations Committee complained that Defendants "deliberately disregarded the counsel and expertise of officials at the State Department and the U.S. Embassies in [Honduras, El Salvador, and Haiti], which uniformly argued for an extension of the TPS designations."[92] As the memorandum observed, the termination "was the result of an overtly political process."[93]

## THE CHANGES TO THE TPS CRITERIA AND THE ULTIMATE TERMINATIONS WERE MOTIVATED BY RACIAL ANIMUS

116.   The Secretary's adoption of a new rule for making TPS determinations was motivated in significant part by racial and national-origin animus.

**Former President Trump's Racist Statements**

117.   The animus motivating the new rule resulting in the termination of TPS is evidenced by numerous statements made by former President Donald J. Trump and other officials in his administration. A limited number of those statements are described herein, and they leave no doubt as to the speaker's racially discriminatory motives against non-white and non-European immigrants.

118.   In particular, President Trump referred to countries designated for TPS as "shithole" countries a mere seven days before Defendants terminated Haiti's TPS status, in a conversation

---

[92] Press Release, U.S. Dep't of Homeland Security, Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras (May 4, 2018) (emphasis added), https://www.dhs.gov/news/2018/05/04/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.

[93] *Id.*

with legislators about TPS. On or about January 11, 2018, several lawmakers gathered with the President in the White House's Oval Office to discuss a bipartisan immigration proposal. President Trump grew frustrated when the conversation turned to a proposal that would grant permanent status to some people with TPS protections from certain Latin American and African countries. "Why," the President asked, "are we having all these people from shithole countries come here?"[94] He expressed a preference, instead, for immigrants from countries "like Norway."[95]

119.   Senator Dick Durbin, who was present at the January 11, 2018 meeting in the Oval Office, characterized the President's comments as "clearly racial," "hate-filled," and "vile."[96] Senator Durbin reportedly warned the President that excluding immigrants based on those grounds would be "an obvious racial decision."[97] Secretary Nielsen, also present at the January 11, 2018 Oval Office meeting,[98] acknowledged that the President used "tough language."[99] Although she claimed that she did not know whether Norway was a "predominantly white country," she admitted that she "imagine[d] that is the case."[100]

120.   Throughout his candidacy and presidency, President Trump repeatedly denigrated non-white, non-European immigrants and has expressed his interest in resurrecting a vision of U.S. identity that privileges whiteness.

121.   On the very first day of his presidential campaign, then-candidate Trump categorically branded Mexican immigrants as criminals and rapists: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and

---

[94] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[95] *Id.*

[96] Carl Hulse, *Inside the Oval Office Immigration Meeting that Left a Senator Stunned*, N.Y. Times (Jan. 19, 2018), https://nyti.ms/2DiqhlM.

[97] *Id.*

[98] Walter Shapiro, *Opinion: White People in Norway? Who Knew?*, Roll Call (Jan. 17, 2018), https://www.rollcall.com/news/opinion/kirstjen-nielsen-trump-norway.

[99] *Id.*

[100] *Id.*

they're bringing those problems with [them]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."[101]

122.   Both during his campaign and after taking office, President Trump repeatedly compared immigrants to snakes that will bite and kill anyone foolish enough to shelter them.[102]

123.   President Trump repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, thereby endorsing their racist views and amplifying their message.[103]

124.   When a lawsuit against Trump University was assigned to Judge Gonzalo Curiel, then-candidate Trump repeatedly asserted that the Judge would be biased against him due to the Judge's Mexican heritage.[104]

125.   After a crowd of white nationalists marched on Charlottesville, Virginia, President Trump praised some of the protesters as "very fine people."[105]

126.   Former President Trump often conflated large groups of immigrants, and sometimes even all of them, with members of the MS-13 gang.[106] In his first State of the Union address, he suggested that the Deferred Action for Childhood Arrivals ("DACA") program, recipients of which are immigrants first brought to the United States as children many years ago, contributed to the spread of MS-13.[107]

---

[101] Wash. Post Staff, *Full Text: Donald Trump announces a presidential bid*, WASH. POST (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.0b727c71c4c8.

[102] Dara Lind, *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC*, VOX (Feb. 23, 2018), https://www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac.

[103] Donald J. Trump (realDonaldTrump), TWITTER (Jan. 22. 2016), https://twitter.com/realdonaldtrump/status/690562515500032000?lang=en.

[104] Matt Ford, *Trump Attacks a 'Mexican' U.S. Federal Judge*, THE ATLANTIC (May 28, 2016), https://www.theatlantic.com/politics/archive/2016/05/trump-judge-gonzalo-curiel/484790/.

[105] Politico Staff, *Full text: Trump's comments on white supremacists, 'alt-left' in Charlottesville*, POLITICO (Aug. 15, 2017), https://www.politico.com/story/2017/08/15/full-text-trump-comments-white-supremacists-alt-left-transcript-241662.

[106] Terry Gross, *Trump Uses MS-13 To 'Sell Draconian Overhauls of Border Issues,' Journalist Says*, NPR (Feb. 15, 2018), https://www.npr.org/2018/02/15/585937834/trump-uses-ms-13-to-sell-draconian-overhauls-of-border-issues-journalist-says.

[107] Liz Robbins, *Why was MS-13 Targeted in Trump's Speech?*, N.Y. TIMES (Jan. 31, 2018).

127.   President Trump also made disparaging remarks about certain Central American, African, Caribbean, and South Asian countries and people, frequently relying on crude and derogatory stereotypes to stoke fear about immigration.

128.   In February 2018, President Trump gave a speech at the annual Conservative Political Action Conference, where he used MS-13 to disparage immigrants more generally, comparing them to snakes and animals.[108] Again, in May 2018 at an immigration roundtable discussion, President Trump relied on MS-13 to claim that undocumented immigrants "aren't people. These are animals."[109]

129.   On Twitter, President Trump lamented that Honduras is "doing nothing for the United States but taking our money."[110]

130.   While studying a map of the region in preparation for a meeting with the Prime Minister of India, then- President Trump deliberately "mispronounced Nepal as 'nipple' and laughingly referred to Bhutan as 'button.'"[111] The President is also "known to fake an Indian accent to imitate Indian Prime Minister Narendra Modi during Oval Office meetings."[112]

131.   President Trump also expressed general animus toward other South Asian countries and individuals.

---

[108] Dara Lind, *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

[109] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals'*, POLITIFACT (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/.

[110] Donald J. Trump (realDonaldTrump) TWITTER (Dec. 28, 2018), https://twitter.com/realdonaldtrump/status/1078638249562775552?lang=en.

[111] Daniel Lippman, *Trump's diplomatic learning curve: Time zones, 'Namibia' and 'Nipple'*, POLITICO (Aug. 13, 2018), https://www.politico.com/story/2018/08/13/trump-world-knowledge-diplomatic-774801.

[112] Cristina Maza, *Trump Fakes Indian Accent When Speaking About Indian Prime Minister Modi, Report Claims*, NEWSWEEK (Jan. 22, 2018), https://www.newsweek.com/trump-racist-president-imitates-modis-indian-accent-meetings-787071.

1

2

132.   On October 5, 2016, President Trump gave a speech discussing how "our country is being infiltrated . . . by terrorists," referring to "immigrants from high-risk regions."[113]

3

4

5

6

7

133.   In August of 2016, then-candidate Trump gave speeches lamenting that the United States is not "smart" because of the "problem [of terrorism] across our refugee and immigration programs." President Trump used an example of "two immigrants from Pakistan who later applied for and received U.S. citizenship" and who "were sentenced to decades long prison sentences for plotting to detonate a bomb" in New York City.[114]

8

9

10

11

12

13

134.   On June 13, 2016, President Trump remarked how the male shooter from San Bernardino, California "was the child of immigrants from Pakistan and he brought his wife – the other terrorist – from Saudi Arabia through another one of our easily exploited visa programs."[115] He further noted that immigration from Afghanistan is increasing and that "99% of people in Afghanistan support oppressive Sharia Law. We admit many more from other countries in the region who share these same oppressive views."[116]

14

15

16

135.   The former President's repeated statements denigrating immigrants, including many directed at immigrants from TPS-designated countries, were not merely hateful rhetoric. They were also a call to action.

17

**Trump Surrogates Targeted TPS Termination**

18

19

20

21

136.   White House officials working directly for former President Trump were keenly interested in TPS, and engaged in targeted efforts to terminate the program and TPS designations.[117] High-level decision-makers at DHS were aware of this White House interest in terminating TPS.

22

23

[113] *Speech: Donald Trump in Reno, NV*, FACTBASE, https://factba.se/transcript/donald-trump-speech-reno-nv-october-5-2016.

24

[114] *Speech: Donald Trump in Green Bay, WI*, FACTBASE, https://factba.se/transcript/donald-trump-speech-green-bay-wi-august-5-2016.

25

26

[115] *Remarks: Donald Trump at Saint Anselm College in Manchester NH*, FACTBASE, https://factba.se/transcript/donald-trump-remarks-manchester-nh-june-13-2016.

[116] *Id.*

27

28

[117] *See, e.g.*, Nick Miroff *et al.*, "U.S. embassy cables warned against expelling 300,000 immigrants. Trump officials did it anyway," Wash. Post, May 8, 2018, *at*

137. In a Discussion Paper prepared for the November 2017 Principals Meeting, White House officials recommended the immediate termination of TPS for four countries, even though the deadlines for TPS decisions for two of those countries were months away. The White House officials' memo relied on the new rule to justify the terminations, which it recognized would deprive 95 percent of TPS holders of status. In the Discussion Paper, the White House officials stated: "the temporary conditions that arose out of natural disasters and supported TPS designations have long ceased to exist."[118]

138. As described above, *supra* ¶¶ 57-115, political appointees working directly for the President and high-ranking agency officials subverted the normal decision-making process on TPS by sidelining the work and recommendations of career staff members at DHS and repeatedly inserting themselves to influence the process to favor termination. In several instances, these officials manipulated the decision-making process by manufacturing reasoning that reflected racial animus against non-white people in order to justify the end of TPS.

139. Subordinates of then Secretary Kelly covertly sought data on the number of TPS holders who committed crimes and relied on public assistance, despite that a single felony or two misdemeanor convictions render individuals ineligible for TPS. Gene Hamilton, who was "the lead on development of all immigration-policy issues" for President Trump's Transition Team and subsequently worked as Senior Counselor to the DHS Secretary,[119] intervened to override the research of career officials by directing his staff to collect information to emphasize the criminal histories and public benefits usage of TPS recipients from Haiti. Hamilton advised his staff to "not indicate what" such data was for when retrieving it, because he did not want the efforts to influence the TPS determination for Haiti to "turn into a big thing where people start prodding and

---

https://www.washingtonpost.com/world/national-security/us-embassy-cables-warned-against-expelling-300000-immigrants-trump-officials-did-it-anyway/2018/05/08/065e5702-4fe5-11e8-b966-bfb0da2dad62_story.html.

[118] ECF 122-14 (Ex. 14) at 14 (DPP_00003578).

[119] Jonathan Blitzer, *A Trump Official Behind the End of DACA Explains Himself,* THE NEW YORKER (Nov. 10, 2017), https://www.newyorker.com/news/news-desk/trump-official-behind-the-end-of-daca-explains-himself.

things start leaking out."[120] *See also supra* ¶ 84 (describing Hamilton's role revising the Federal Register Notice regarding termination of TPS for Sudan by removing examples of human rights violations).This Court previously found that "[t]he information sought by the secretary [Kelly] coincides with racial stereotypes – i.e., that non-whites commit crimes and are on the public dole."[121]

140.   Similarly, Kathy Nuebel Kovarik, another member of President Trump's transition team, and later head of policy and strategy for USCIS, fixated on replacing the work of career officials who documented conditions in Haiti with information about crimes committed by Haitian TPS recipients in the United States. She repeatedly emailed staff to request information on "crimes of any kind" committed by TPS recipients. She reminded her staff that they should "find any reports of criminal activity by any individual with TPS," despite acknowledging that such data is "only a snapshot and not representative of the entire situation." Kovarik explained that the data was needed so that DHS could establish a narrative of "more than 'Haiti is really poor' stories."[122]

141.   Like former President Trump, several officials who exerted influence to ensure that DHS's decision-making process on TPS favored termination harbored racial animus against non-white, non-Europeans. These officials were motivated by their racial animosity to intervene in and influence the TPS decision-making process towards termination.

142.   For example, Stephen Miller, the senior advisor to the President who repeatedly called DHS to urge termination of TPS, *see supra* ¶ 58, had long expressed support for White Nationalism, "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[123] Miller lauded historical immigration laws that imposed quotas based on racist

---

[120] ECF No. 122-84 (Ex. 84) at DPP_00001105.

[121] *Ramos v. Nielsen*, No. 3:18-cv-01554-EMC, ECF No. 128 at 37.

[122] Alicia A. Caldwell, *US digs for evidence of Haiti immigrant crimes*, ASSOCIATED PRESS (May 9, 2017), https://apnews.com/article/crime-immigration-haiti-only-on-ap-united-states-government-740ed5b40ce84bb398c82c48884be616

[123] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOUTHERN POVERTY LAW CENTER (November 12, 2019), https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

assumptions.[124] For years, Miller promoted the ideas that non-white immigrants were uniquely violent and targeted Americans with that violence. He also sought to promote the false narrative that Muslim refugees, in particular, were highly susceptible to committing acts of terrorism.[125]

143.   Miller's history of racial animus is reflected not only in his pressure campaign on DHS to terminate TPS, *see supra* ¶ 58, but also in his role as the architect of the former President's Muslim-country travel bans, family separation policy, and dramatic reduction in refugee admissions.

144.   Miller's views were embraced and lauded by other officials working for the Trump Administration who influenced the TPS decision-making process. One such official was Robert Law, who was recruited from a top position at the anti-immigrant hate group FAIR to join the Trump Administration as a Senior Adviser to USCIS. *See supra* ¶ 60 & n.14. Law publicly praised Miller's influence in crafting the Trump Administration's anti-immigrant policy agenda, remarking, "[e]very single component of it is basically what we [referring to his leadership of FAIR] have fought for, for a very long time."[126]

145.   Law used his opportunity working at USCIS to implement his anti-immigrant views in the TPS determination process, including by stepping in to generate cover for the Administration to reject the advice of career officials to extend TPS for Haiti. In one instance, Law rewrote a memorandum on behalf of the USCIS Director to unequivocally support termination of TPS for Haiti.[127] The memorandum had initially been drafted by a USCIS career official to analyze the evidence in favor of and against extending TPS, but Law was displeased

---

[124] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (November 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails. . . show Miller praising racist immigration restrictions from a century ago, while bitterly lamenting the law that repealed them.").

[125] Nicole Narea, *Stephen Miller sought to link immigrants to crime and terrorism in private emails to Breitbart,* VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[126] Stephanie Akin, *The Other 'Steve' in the White House*, ROLL CALL (Feb. 13, 2017), https://rollcall.com/2017/02/13/the-other-steve-in-the-white-house/.

[127] *Saget v. Trump*, 375 F. Supp. 3d 280, 322 (E.D.N.Y. 2019).

that analysis of the situation in Haiti yielded a narrative that was "overwhelmingly weighted for extension."[128] He intervened to rewrite the memorandum to support termination.[129]

146.    John Kelly, too, has a documented history of racial animus against non-white people and immigrants. Kelly has defended the conscience of those who fought to preserve slavery during the American Civil War and lauded the honor of Confederate General Robert E. Lee.[130] He lumped together the entirety of Haitian TPS-holders and referred to them categorically as "welfare recipients."[131] Kelly also publicly announced his belief that individuals who lack immigration status in the United States "don't integrate well," "don't have skills," and cannot "easily assimilate into the United States into our modern society."[132] He has also remarked that he believed many individuals without immigration status were "too lazy" to participate in the legal process.[133]

**Racism Infected the TPS Periodic Reviews**

147.    The racism of President Trump and his surrogates, and their targeting of TPS for termination, was reflected in the TPS termination decisions.

148.    The motivation and methods for terminating TPS designations, including subversion of the normal agency decision-making process, reveal that the President's documented animus against non-white, non-European immigrants, and that of his political subordinates and high-ranking agency officials infected the TPS decision-making process.

149.    Kelly's insistence that the DHS Secretary terminate TPS, *see supra* ¶¶ 69-70, while he was White House Chief of Staff, and his personal involvement directing his subordinates to

---

[128] *Id.* at 351.

[129] *Id.*

[130] Glenn Thrush, *White House Chief of Staff's Civil War Remarks Elicit an Angry Response*, NEW YORK TIMES (Oct. 31, 2017), https://www.nytimes.com/2017/10/31/us/john-kelly-civil-war-compromise.html.

[131] Patricia Hurtado, *As the Wall Consumes Washington, Another Immigrant Drama Unfolds in Brooklyn*, BLOOMBERG NEWS (January 11, 2019), https://www.bnnbloomberg.ca/as-the-wall-consumes-washington-another-immigrant-drama-unfolds-in-brooklyn-1.1197229.

[132] CNN Wire*, Kelly Says Undocumented Immigrants 'Don't Have The Skills' To Assimilate Into US Society* (May 11, 2018), https://www.cbsnews.com/chicago/news/john-kelly-undocumented-immigrants-dont-have-skills-integrate/.

[133] *Id.*

influence the decision-making process to terminate TPS for Haiti, *see supra* ¶ 140, operationalized his racial animus against non-white immigrants.

150.   Acting Secretary Duke, in separate personal memos, expressed that her TPS decision-making was based on "an America first view," a term that invoked then-President Trump's racist views preferring immigration from majority-white European countries.

151.   Duke also wrote to White House Chief of Staff Kelly, contemporaneously with her November 2017 TPS decisions, to justify her actions as "consistent with the President's position on immigration," and describing them as a "strategy to get to the President's objectives."

152.   This Court previously found that "Acting Secretary Duke's writing suggest that she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS."[134]

## THIS COURT'S ORDERS HAVE PREVENTED THE TPS TERMINATIONS FROM TAKING EFFECT AND PRESERVED THE TPS STATUS OF HUNDREDS OF THOUSANDS OF TPS HOLDERS

153.   In the wake of the initial terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, TPS-holder plaintiffs from those countries and their U.S.-citizen children successfully challenged the legality of those decisions. On October 3, 2018, this Court granted a preliminary injunction against those TPS terminations.[135]

154.   This Court concluded that the *Ramos* plaintiffs were likely to succeed on the merits of their claim under the Administrative Procedure Act because "a wealth of record evidence" showed that, under President Trump, "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted,

---

[134] ECF No. 128 at 37.

[135] ECF No. 128.

1   regardless of other current conditions no matter how bad, and that this was a clear departure from

2   prior administration practice."[136]

3       155.   This Court also found that the *Ramos* plaintiffs had raised serious questions on the

4   merits of their Fifth Amendment claim, which alleged that DHS's TPS termination decisions and

5   departures from prior practice were motivated and influenced by racial animus against non-white,

6   non-European immigrants.[137]

7       156.   Defendants appealed this Court's preliminary injunction order to the Ninth Circuit.

8   The Parties in *Ramos* stipulated to stay further district court proceedings pending the outcome of

9   the appeal. Pursuant to that stipulation, and in order to comply with this Court's preliminary

10  injunction, Defendants agreed to issue periodic Federal Register notices automatically extending

11  TPS status and employment authorization for TPS holders from El Salvador, Haiti, Nicaragua, and

12  Sudan during the pendency of the appeal, for at least nine months at a time.

13      157.   After *Ramos* was filed but before this Court granted the preliminary injunction,[138]

14  Defendants announced the termination of TPS for Nepal and Honduras. Those decisions were

15  made using the same flawed procedures described in *Ramos* and were infected by the same race-

16  based motivation as the prior terminations.

17      158.   On February 10, 2019, TPS-holder plaintiffs from Nepal and Honduras and their

18  U.S.-citizen children filed litigation challenging the terminations of TPS for those countries.[139].

19  This Court granted the *Bhattarai* Plaintiffs' motion to relate *Bhattarai* to *Ramos*.

20      159.   After this Court granted leave to take early discovery, the Parties in *Bhattarai*

21  stipulated to stay further proceedings pending the outcome of the *Ramos* appeal. Defendants

22  stipulated that TPS for Nepal and Honduras would remain in effect during the pendency of the

---

[136] *Id.* at 19, 26.

[137] *Id.* at 2.

[138] *Ramos* was originally filed on March 12, 2018. *See* Class Action Complaint, *Ramos v. Nielsen*, No. 3:18-cv-01554 (N.D. Cal. Mar. 12, 2018), ECF No. 1. The court denied Defendants' motion to dismiss five months later. *See* Order Denying Defendants' Motion to Dismiss, *Ramos v. Nielsen*, No. 3:18-cv-01554 (N.D. Cal. Aug. 6, 2018), ECF No. 55.

[139] *Bhattarai v. Nielsen*, Case No. 19-cv-00731-EMC.

1   *Ramos* appeal.[140] Defendants further stipulated that they would "take steps with respect to TPS

2   holders from Honduras and Nepal equivalent to those that they agreed to take with respect to the

3   TPS holders at issue in *Ramos*," including issuing periodic Federal Register notices automatically

4   extending TPS status and employment authorization for TPS holders from Honduras and Nepal

5   during the pendency of the *Ramos* appeal.[141]

6       160.   On September 14, 2020, a divided panel of the Ninth Circuit reversed this Court and

7   vacated the *Ramos* preliminary injunction. Plaintiffs filed a petition for rehearing en banc in

8   response to that decision. The Ninth Circuit stayed its mandate during the pendency of that

9   petition.

10      161.   Pursuant to this Court's orders and the stipulated agreements between the Parties in

11  *Ramos* and *Bhattarai*, Defendants have issued five Federal Register notices automatically

12  extending TPS status and employment authorization for TPS holders protected by this Court's

13  orders.[142] The most recent notice, published on November 16, 2022, automatically extends TPS

14  and employment authorization for all TPS holders subject to the terminations challenged in this

15  litigation through June 30, 2024.

16  <u>**AFTER TAKING OFFICE, THE BIDEN ADMINISTRATION EVENTUALLY MADE**</u>

17  <u>**NEW TPS DECISIONS BUT DID NOT REPUDIATE THE TRUMP**</u>

18  <u>**ADMINISTRATION'S ERRONEOUS INTERPRETATION OF THE TPS STATUTE**</u>

19
20      162.   On November 3, 2020, Joseph Biden was elected President of the United States.

21  During President Biden's campaign, he criticized the TPS decisions that are the subject of this

22  litigation, and DHS's new rule engineered to terminate TPS. His campaign website stated: "In the

23  first 100 days, a Biden Administration will: . . . Order an immediate review of Temporary

24  Protected Status (TPS) for vulnerable populations who cannot find safety in their countries ripped

25  _____

26  [140] *Id.* at Dkt. 23.

    [141] *Id.* at ¶ 7.

27  [142] *See* Continuation of Documentation for Beneficiaries of Temporary Protected Status
    Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 Fed. Reg. 68,717,
28  68,718 (Nov. 16, 2022) (describing history of automatic extensions).

apart by violence or disaster. The Trump Administration's politically-motivated decisions to rescind protected status for hundreds of thousands of people fleeing countries impacted by war and natural disasters – without regard for current country conditions – is a recipe for disaster.."[143]

163.   On November 30, 2020, the *Ramos* Plaintiffs filed a petition for panel rehearing and rehearing en banc. Defendants opposed Plaintiffs' petition.

164.   President Biden took office on January 20, 2021. On February 11, 2021, the *Ramos* Plaintiffs filed an unopposed motion to stay proceedings on their petition for rehearing, citing President Biden's stated intention to take swift action on TPS.[144] On April 19, 2021, the *Ramos* Plaintiffs and Defendants moved jointly to continue the stay.[145]

165.   The Biden Administration did not take action on TPS during the first 100 days after President Biden assumed office.

166.   On June 22, 2021, the *Ramos* Plaintiffs and Defendants moved jointly to refer Defendants' *Ramos* appeal to the Ninth Circuit Mediation program and enter a stay for the duration of mediation proceedings.[146] The Ninth Circuit granted the motion on June 25, 2021.[147]

167.   Settlement negotiations were unsuccessful. On October 26, 2022, the Ninth Circuit released the *Ramos* appeal from the mediation program.[148]

168.   On February 10, 2023, the full Ninth Circuit granted the *Ramos* Plaintiffs' motion for rehearing en banc and vacated the three-judge panel opinion. The court set oral argument for June 22, 2023.[149]

---

[143] The Biden Plan for Securing Our Values as a Nation of Immigrants, Dec. 12, 2019, available at https://web.archive.org/web/20191212040308/https://joebiden.com/immigration/.

[144] 9th Cir., No. 18-16981, ECF No. 109.

[145] *Id.*, ECF No. 109.

[146] *Id.*, ECF No. 116.

[147] *Id.*, ECF No. 117.

[148] *Id.*, ECF No. 150.

[149] *Id.*, ECF No. 176.

1
2
3

169.    While settlement negotiations had been ongoing, DHS redesignated Haiti and Sudan for TPS. But despite doing so, DHS did not did not vacate or in any way disavow its prior termination of TPS for these countries, or the new rule by which it did so.

4
5
6
7
8
9

170.    On August 3, 2021, DHS published a Federal Register notice designating Haiti for TPS for 18 months, effective August 3, 2021 through February 3, 2023. The Federal Register notice cites human rights violations and abuses by law enforcement officials and non-state actors; serious security concerns, including violent criminal gangs; a dire economic situation, including a poverty rate of nearly 60%; a weak healthcare system suffering from "the lingering impact of the 2010 earthquake and Hurricane Matthew in 2016"; and the impact of the COVID-19 pandemic.[150]

10
11
12
13
14

171.    On April 19, 2022, DHS published a Federal Register notice designating Sudan for TPS for 18 months, from April 19, 2022 through October 19, 2023. The Secretary explained that he had "determined that an eighteen-month designation is warranted because of the extraordinary and temporary conditions," including ongoing armed conflict and civil unrest, political instability, flooding, droughts, widespread poverty, and "deteriorating economic conditions."[151]

15
16
17
18
19
20
21
22
23

172.    In redesignating Haiti and Sudan for TPS, DHS required Haitian and Sudanese TPS holders to file a request for TPS as new applicants, which requires the payment of a $50 fee which does not apply to TPS holders renewing their registrations. Specifically, DHS instructed "ALL APPLICANTS" for TPS under the new TPS designations, "including individuals whose TPS under the previous designation [] has been continued" under preliminary injunctions to submit an Application for Temporary Protected Status (Form I-821) as a new applicant by "selecting '1.a This is my initial (first time) application for Temporary Protected Status (TPS). I do not currently have TPS," along with the required $50 fee for Form I-821 or request for fee waiver.'"[152] In contrast to initial TPS applicants, applicants re-registering for TPS are not required to pay any fee.

24
25

173.    Pursuant to DHS's instructions, TPS holders protected by this Court's preliminary injunction were required to pay a $50 fee to register for TPS under these new designations. These

26
27
28

---

[150] 86 Fed. Reg. 41,863, 41,863, 41,867 (Aug. 3, 2021).

[151] 87 Fed. Reg. 23,202, 23,204 (Apr. 19, 2022).

[152] *Id.*

AMENDED COMPLAINT – CASE NO. 3:18-CV-1554-EMC

individuals would not have had to pay any fee if TPS for Haiti and Sudan had not been terminated during the Trump Administration, because they would have been able to apply for TPS as re-registrants, rather than initial applicants.

174.   On June 13, 2023—one week before en banc oral argument in the *Ramos* appeal—DHS issued a Press Release announcing "the rescission of the prior Administration's terminations of the Temporary Protected Status (TPS) designations for El Salvador, Honduras, Nepal, and Nicaragua and the extension of TPS for these for countries for 18 months." The Press Release explicitly acknowledged that "[t]oday's actions are relevant to the litigation challenging the now-rescinded terminations."[153]

175.   The next day, Defendants moved to voluntarily dismiss the *Ramos* appeal and remove the case from the en banc calendar, citing DHS's new TPS decisions. The *Ramos* Plaintiffs opposed, arguing that the case continued to present a live controversy because Defendants had refused to disavow the position that DHS could not consider intervening conditions when making TPS decisions.

176.   On June 21, 2023—one day before the en banc oral argument in the *Ramos* appeal—DHS published Federal Register notices announcing the rescission of the 2017 and 2018 terminations of the TPS designations of El Salvador, Honduras, Nepal, and Nicaragua and extending each country's TPS designation.[154] The Federal Register notices assert that DHS has "inherent authority to reconsider any TPS-related determination and, upon reconsideration, to change the determination." Each notice explains that, "[a]fter conducting an independent assessment of the country conditions" as they existed at the time of termination and as of the present day, the Secretary determined that the country's TPS designation "should not have been terminated" because "the conditions . . . that gave rise to [the country's initial TPS designation] persisted in [the time of the termination decision] and persist to this day." The notices fault the

---

[153] Press Release, DHS Rescinds Prior Administration's Termination of Temporary Protected Status Designations for El Salvador, Honduras, Nepal, and Nicaragua, June 13, 2023, at https://www.uscis.gov/newsroom/news-releases/dhs-rescinds-prior-administrations-termination-of-temporary-protected-status-designations-for-el.

[154] 88 Fed. Reg. 40,282 (June 21, 2023); 88 Fed. Reg. 40,304 (June 21, 2023); 88 Fed. Reg. 40,317 (June 21, 2023); 88 Fed. Reg. 40,294 (June 21, 2023).

termination decisions for failing to "adequately assess" or "give sufficient weight" to country conditions "that were either insufficiently considered or not considered."

177.   On June 29, 2023, the Ninth Circuit granted Defendants' motion to voluntarily dismiss their appeal. The Ninth Circuit did not address whether Defendants' actions had mooted this litigation.[155]

178.   The June 21, 2023 Federal Register notices do not acknowledge that DHS's newly-rescinded terminations had applied a rule that precluded the Secretary from considering intervening conditions when making TPS decisions; do not say that the TPS statute, properly interpreted, permits or requires the Secretary to consider intervening conditions when making TPS decisions; and do not recognize that the 2017 and 2018 terminations of TPS for El Salvador, Honduras, Nepal, and Nicaragua were unlawful (as opposed to merely wrong in their assessment of ground country conditions).

179.   Although the TPS extensions for El Salvador, Honduras, Nepal, and Nicaragua were all announced on June 21, 2023, and although every TPS holder from those countries currently has TPS under an extension that runs until June 2024, each new extension decision states that it runs for a *different* 18-month period. Each one also sets a different 60-day registration period during which TPS holders from each country must re-register to maintain their TPS status. Each such period ends months before June 30, 2024, the current expiry date of their status.

180.   Since the 2021 and 2022 designation dates for Haiti and Sudan, DHS has extended and redesignated TPS for these countries. On January 26, 2023, DHS Secretary Mayorkas extended and redesignated TPS for Haiti for an 18-month period.[156] On April 19, 2022, and again on August 21, 2023, DHS Secretary Mayorkas extended and redesignated TPS for Sudan for additional 18-month periods.[157] In order to be protected under the new extensions, TPS holders must re-register during a designated 60-day registration period, each of which ends months before June 30, 2024, the current expiry date of their status pursuant to this Court's injunction.

---

[155] 9th Cir., No. 18-16981, ECF No. 191.

[156] 88 Fed. Reg. 5022 (Jan. 26, 2023).

[157] 87 Fed. Reg. 23,202 (Apr. 19, 2022); 88 Fed. Reg. 56,857, 56,864 (Aug. 21, 2023).

181.   The current deadlines for registration—established by the June 21, 2023 Federal Register notices (for El Salvador, Honduras, Nepal, and Nicaragua), and the January 26, 2023 and August 21, 2023 notices for Haiti and Sudan—require TPS holders to complete re-registration long before this June 30, 2024 date. The current extension periods and re-registration dates for the six countries subject to the Trump Administration's TPS terminations are as follows:

A)  El Salvador for 18 months, from September 10, 2023, through March 9, 2025 (60-day re-registration period from July 12, 2023, through September 10, 2023)[158];

B)  Honduras for 18 months, from January 6, 2024, through July 5, 2025 (60-day re-registration period from November 6, 2023, through January 5, 2024)[159];

C)  Nepal for 18 months, from December 25, 2023, through June 24, 2025 (60-day re-registration period from October 24, 2023, through December 23, 2023)[160];

D)  Nicaragua for 18 months, from January 6, 2024, through July 5, 2025 (60-day re-registration period from November 6, 2023, through January 5, 2024)[161];

E)  Haiti for 18 months, from February 4, 2023, through August 3, 2024 (60-day registration period for existing TPS holders ended March 27, 2023; registration for new applicants benefiting from the most recent designation, from January 26, 2023, through August 3, 2024)[162];

F)  Sudan for 18 months, from October 20, 2023, through April 19, 2025 (60-day registration period for existing TPS holders from August 21, 2023, through October 20, 2023; registration for new applicants benefiting from the most recent designation, from August 21, 2023, through April 19, 2025).[163]

182.   As a result of this Court's preliminary injunction, hundreds of thousands of TPS holders who would have been affected by DHS's terminations have had TPS auto-extensions—

---

[158] 88 Fed. Reg. 40,282 (June 21, 2023).

[159] *Id.* at 40,304.

[160] *Id.* at 40,317.

[161] *Id.* at 40,294.

[162] 88 Fed. Reg. at 5,022–5,023 (Jan. 26, 2023).

[163] 88 Fed. Reg. 56,864 (Aug. 21, 2023).

with no action required on their part, and at no cost—since 2018. The latest auto-extension was established through the November 16, 2022 Federal Register notice, and guarantees TPS through June 30, 2024 for people from all six of the countries protected by this Court's injunction.[164] However, under DHS's recently-announced decisions, for TPS holders to benefit from the new designations or extensions, they must register for TPS within the set periods of time identified above. If they fail to do so, they will lose their TPS status on July 1, 2024.

183.   DHS has not proactively engaged in any individual outreach to TPS holders to provide them notice about the new requirement that they register by the dates described above in order to avoid losing status. Nor has DHS taken significant action to publicize the registration dates and their significance. For instance, certain relevant portions of the USCIS website provide a comprehensive summary of the status of TPS for those affected by the terminations. However, they do not clearly state that TPS holders must register by the new dates to avoid losing status on July 1, 2024.[165]

184.   The different extension and registration periods for each country, and their expiry long before the end of the current period of TPS status, have resulted in significant confusion among TPS holders protected since 2018 by this Court's preliminary injunction. As a result, many TPS holders will inadvertently fail to re-register by the new deadlines DHS has set.

## DEPORTATION OF TPS HOLDERS WOULD IMPOSE EXTRAORDINARY AND IRREPARABLE HARM ON TPS HOLDERS, THEIR U.S.-CITIZEN CHILDREN, AND THEIR COMMUNITIES

---

[164] Continuation of Documentation for Beneficiaries of TPS Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 Fed. Reg. at 68,717.

[165] *See, e.g.*, Update on Ramos v. Nielsen | USCIS ("Failure to submit an application under the new extension [or Designation] of [El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan], however, does not affect the continuation of the validity of the TPS and TPS documents through June 30, 2024.").

185.   All told, approximately 400,000 TPS holders who were protected by this Court's preliminary injunction currently reside in the United States.[166] The scale of the harm wrought by Defendants' TPS policies and practices has been truly massive. These TPS holders remain vulnerable both to future illegal terminations under DHS's new rule and the inadvertent loss of status due to the new re-registration timelines.

186.   TPS holders have built lives in the United States over the course of years or decades, establishing roots and contributing to their communities. The circumstances of the TPS-holder Plaintiffs in this case vividly illustrate the irreparable harm that will occur if they (and other TPS holders) lose their TPS status.

187.   Plaintiff Cristina Morales was born in San Miguel, El Salvador. She came to the United States from El Salvador at the age of twelve as an unaccompanied minor. Her mother had escaped domestic violence and fled to the United States before her, and Cristina followed. Cristina currently does not have family in El Salvador with whom she is in contact. Cristina's mother advised her to apply for TPS soon after she graduated from high school, immediately after El Salvador was designated for TPS. Cristina has now lived in the United States for over thirty years and had TPS for seventeen years at the time of the termination of TPS for El Salvador. Cristina and her husband met when she was in high school, and they have been married since 2008. They have two children. Plaintiff Crista Ramos, their daughter, was fourteen years old when DHS announced the termination of TPS for El Salvador. Diego, their son, was eleven at the time. Cristina and her family have lived in San Pablo, California in a home they purchased in 2008. At the time of the termination announcement, Cristina served as the director of the extended care program at the Saint Raphael School, a private Catholic school in Marin County. At the time, Cristina struggled to complete the applications for her daughter's high school because of the stress she experienced due to the looming expiration of TPS for El Salvador. She feared that her family would be divided, and that she would be forced to return to El Salvador where she has no family

---

[166] Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Population from El Salvador, Honduras, and Haiti*, 5 J. ON MIGRATION & HUM. SEC. 577, 578 (2017); *see also* JILL H. WILSON, CONG. RES. SERV., TEMPORARY PROTECTED STATUS: OVERVIEW AND CURRENT ISSUES 4–5 (2018).

1   and which she fled as a child. Currently, she works as a preschool teacher in Berkely,

2   California and is a leader in her community. DHS's illegal termination of TPS for El Salvador,

3   and the failure of Secretary Mayorkas to acknowledge its unlawfulness, continues to create

4   vulnerability for Cristina and cause her fear that she will lose her legal status, be separated from

5   her family, and be forced to return to a country she has not been to for thirty years.

6        188.   Plaintiff Orlando Zepeda came to the United States from his birth country of El

7   Salvador in 1984, at the age of eighteen years old. He has lived in two homes in Los Angeles,

8   California during his time in the United States. About twenty years ago, he and his wife, TPS

9   holder Lorena Arana, bought the home in which they raised their two U.S. citizen children. At the

10   time of the termination announcement, his children were twelve and fourteen years old. Orlando

11   was granted TPS in 2001, when El Salvador was designated. For over a decade, Orlando has

12   worked providing building maintenance, and since the announcement of the termination of TPS

13   for El Salvador, has worked for an assisted living facility for people with Alzheimer's disease. He

14   has also volunteered as a chaplain in prisons and hospitals for over twenty years. His family and

15   life are in the United States, and his children and brother are U.S. citizens. He has lived in the

16   United States for twice as long as he lived in El Salvador. He is also a leader with the National

17   TPS Alliance, which organizes TPS holders to defend their rights. He left El Salvador in the

18   middle of the country's violent armed conflict and fears he would not even recognize the country

19   now. Orlando's employment authorization continues to depend on TPS, and he fears for what may

20   happen if a future president attempts to once again terminate the program unlawfully.

21        189.   Plaintiff Maria Jose Ayala Flores is the oldest daughter of TPS holder Plaintiff Elsy

22   Yolanda Flores de Ayala and her husband Juan Amilcar Ayala Rovira. Maria was nineteen years

23   old when DHS announced the termination of TPS for El Salvador. She arrived in the United States

24   when she was one year old and has had TPS since she was about two years old. She discovered

25   she had TPS only when it came time to apply for college, when she realized that her immigration

26   status made her ineligible for many available college scholarships. Since she arrived in the United

27   States, she has only been to El Salvador once, in 2009 for approximately one month to visit her

28   grandmother. She graduated from high school in 2016 and at the time of the termination

announcement was a sophomore at Montgomery College in Maryland studying mathematics, hoping to teach math to elementary school students. In part due to the uncertainty of her TPS status, Maria took time off from college. She eventually returned and graduated in 2022. She currently works at a café. She has two younger siblings, Joanna Gabriela and Plaintiff Juan Eduardo. Because of the illegal termination of TPS for El Salvador in 2018, and DHS' failure to repudiate the new rule, Maria feels vulnerable to a future termination of TPS for El Salvador on illegal grounds.

190.    Plaintiff Elsy Yolanda Flores de Ayala is from El Salvador. Her father and siblings fled El Salvador during the country's brutal civil war in the 1980s, and are now all either U.S. citizens or lawful permanent residents in the United States. As she was the youngest and unable to travel safely, she remained in El Salvador during the war. Elsy married Juan Amilcar Ayala Rovira in 2000 in El Salvador. They traveled to the United States in March 2000 with their daughter, Plaintiff Maria Jose Ayala Flores, who was one year old at the time. One year later, following the earthquakes in El Salvador and El Salvador's TPS designation, Elsy, her husband, and their daughter obtained TPS. She now has three children. In addition to Maria, Elsy and Juan are parents to Joanna Gabriela Ayala Flores, and Plaintiff Juan Eduardo Ayala Flores, who were both born and raised in the United States. Since 2000, Elsy and her family have lived in Washington D.C. Elsy has worked as a child-care provider since 2008. This fall she will go back to school to pursue her high school equivalency certification. She has only been to El Salvador twice to visit since arriving in the United States. Elsy cannot imagine being forced to return to El Salvador and being separated from her family in the United States.

191.    Plaintiff Wilna Destin was raised in Thomassique, a small township in central Haiti. She fled Haiti in 2000 to seek a better life in the United States after experiencing threats of violence in her hometown. She received TPS in 2010, following the earthquake in Haiti, and has had TPS since then. Her father is a U.S. lawful permanent resident. She also has two brothers in the United States. One is a U.S. citizen and the other has TPS. She is married to a TPS holder and is the mother of two U.S. citizen children, Plaintiff Hnaida Cenemet and her younger brother John Walker. Her children were fourteen and ten years old at the time of the termination announcement

1   for Haiti. At that time, Wilna worked as a labor organizer with the union UNITE-HERE. She also

2   previously worked at Disney World, and more recently started her own small business. Wilna has

3   lived in Florida for over twenty years. For the last fourteen years she has owned a home in

4   Orlando, which she shares with her family. She is an active member of her community and

5   church, and volunteered to travel to New Orleans after Hurricane Katrina to support the

6   humanitarian relief efforts and help with the cleanup. Wilna must actively work to counteract the

7   stress and uncertainty of the future of TPS for Haiti, in light of the Trump Administration's illegal

8   termination of TPS, and the Biden Administration's failure to repudiate it. Her husband, also a

9   Haitian TPS-holder, continues to experience stress-related health symptoms such as headaches and

10  anxiety, due to the family's ongoing uncertainty about the future of TPS for Haiti.

11      192.   Plaintiff Sherika Blanc was born in Port de Paix, Haiti, and immigrated to the United

12  States with her parents and two brothers when she was eight years old. Sherika discovered that she

13  was then undocumented only when she graduated from high school in 2009 and realized that she

14  could not apply for financial aid to go to college because of her immigration status. In 2010, soon

15  after she graduated from high school, Haiti was designated for TPS. Sherika applied shortly

16  thereafter, and has had either TPS or DACA since 2010. Her TPS status has changed her life by

17  giving her the opportunity to work, buy a car, rent a house, and raise a family. Her parents and her

18  two brothers have all had TPS since 2010. Because she could not go to university when she

19  graduated from high school, Sherika trained successfully to become a certified nursing assistant

20  ("CNA") and a health unit coordinator ("HUC"), and received her license in 2011. At the time

21  DHS announced the termination of TPS for Haiti, Sherika worked as a nursing assistant and HUC

22  at the South Florida Baptist Hospital, in Plant City, Florida. She continues to work in the

23  healthcare industry. She has three young daughters: Plaintiff Rilya Salary, and her younger sisters

24  Alaya and Almara. Her daughters were five, three and under one years old at the time of the

25  termination announcement. Sherika is currently pregnant and resides with her daughters in

26  Lexington, Kentucky. Sherika is a primary financial support for her daughters and depends on

27  TPS for her work authorization, and ability to support her family. She fears for a future where

28

1   another president could terminate TPS for Haiti in an instant, just like DHS attempted to do in

2   2018.

3       193.   Plaintiff Imara Ampie was born and raised in Managua, Nicaragua. In August 1998,

4   at the age of twenty-six years old, Imara traveled to the United States to procure material for her

5   mother's tailoring business. While she was in the United States, Nicaragua was devastated by

6   Hurricane Mitch and the U.S. government designated Nicaragua for TPS. She has had TPS since

7   then, and lived in the Bay Area for almost all that time. She and her family have owned a home in

8   Contra Costa County in northern California since 2010. Imara is married to a Nicaraguan TPS

9   holder, and they are raising two sons with disabilities that require a high level of attention and

10  care. Imara is a homemaker and the primary caregiver to her two sons. Her husband has also been

11  battling a long-time fight with lung cancer. Imara continues to be concerned that if TPS for

12  Nicaragua is terminated, she and her husband may be forced to return to Nicaragua even though

13  their lives and family are here, and there will be inadequate options to satisfy the health care and

14  educational needs for her family. She relies on in-home support services from public agencies, and

15  she continues to worry about the future because she fears that she would be unable to access these

16  services if she were to lose lawful immigration status due to the termination of TPS for Nicaragua.

17  Her children would suffer if forced to relocate to Nicaragua, but particularly because of their

18  disabilities, would also face tremendous obstacles if forced to remain in the United States without

19  their parents.

20      194.   Plaintiff Mazin Ahmed, came to the United States with his mother and two younger

21  siblings in 2012, and all had TPS starting in 2013. Mazin is Sudanese and was born in Sudan, but

22  lived in Qatar with his parents and siblings from 1997 until 2012. He was a baby when he and his

23  family moved from Sudan to Qatar, and left Qatar for the United States with his mother and

24  siblings when he was fourteen years old. Mazin arrived in the United States in time to start high

25  school, and graduated with honors from Westbrook High School, in Westbrook, Maine where he

26  has lived since he arrived. At the time that DHS announced the termination of TPS for Sudan,

27  Mazin was a sophomore majoring in Human Biology at the University of Southern Maine, where

28  he was the recipient of a merit-based President's Scholar Award. He does not believe that he could

safely return to Sudan, has no right to return to Qatar, and has built a community and excelled in his studies in the United States. Mazin recently adjusted his status to become a lawful permanent resident but still suffers stigmatic harm from the racism that motivated the Trump-era termination announcement and the intended termination of TPS for Sudan.

195.   Plaintiff Hiwaida Elarabi, is from Sudan but has lived in the United States since 1997 when she arrived with a visitor's visa to visit her aunt and her family—all of whom are now U.S. citizens. During the time that Hiwaida was in the United States, the security situation deteriorated in Sudan, which was in the midst of a decades-long conflict. Before the expiration of her visitor's visa, the U.S. government designated Sudan for TPS and Hiwaida remained because she could not safely return. She has now lived in the United States for over twenty-five years, with her aunt's family. She has a Bachelor's degree in biochemistry from before she arrived in the United States, and a Master's degree in Bioinformatics from Brandeis University. She lives in Newton, Massachusetts and works as a Data Analyst at Western Governors University, where she has worked since before the announcement of the termination of TPS for Sudan. Prior to that, she worked for sixteen years as a Health Educator at the Massachusetts Department of Public Health. Hiwaida is also an entrepreneur who opened up a restaurant in 2015. She took on extensive debt to do so, and suffered from the termination of TPS. While the restaurant was doing well in its early years, she made the difficult decision to sell it, at great cost, after Defendants terminated TPS. She felt that her future was uncertain and she did not know whether she would be able to sustain the restaurant. Hiwaida recently adjusted her status to become a lawful permanent resident but still suffers stigmatic harm from the racism that motivated the Trump-era termination announcement and the intended termination of TPS for Sudan. She is also an advocate with African Communities Together and member of the National TPS Alliance, and concerned about the vulnerability of TPS for her community in light of the prior TPS terminations, and the refusal of DHS to repudiate them.

196.   Plaintiff Salma Ahmed was born in Sudan and moved to the United States as a baby. She has had TPS since she was about two or three years old. She has lived in Chicago, Illinois since she was about ten years old. Salma learned that she had TPS when she was in middle school,

and was twenty years old when the termination of TPS for Sudan was announced. Salma graduated with honors from Lane Tech College Prep High School in 2016. As a high school student, she was accepted at various four-year colleges, including Loyola University Chicago. However, due to the limited financial aid available because of her immigration status, and her family's limited income, she was not able to attend any of them. At the time of the termination announcement, Salma was enrolled in Harold Washington Community College. She was close to completing her coursework and transitioning to a four-year program. The termination announcement made it almost impossible to plan for her future. It called into question her plans to travel out of state for an internship, to purchase a car, to obtain a credit card, and to pursue a four-year degree. Salma graduated in 2022 with a degree in biochemistry from Dominican University. She is now working as a medical laboratory technician and planning to pursue a graduate degree to become a physician's assistant. Salma has only been back to Sudan for a few short visits, during which she struggled to communicate comfortably with people, including close family members, because she does not speak Arabic fluently. She has not registered for TPS for Sudan under the new designations or extensions because she was not aware she had to. She carries the November 2022 Federal Register notice in her wallet and believed that was sufficient to maintain her TPS status. Salma fears that because of the lack of confirmation about the illegality of prior terminations, she could still be vulnerable to an illegal termination of her status in the future. This would affect her ability to work, drive, and remain legally in the United States, the country she has lived in for the vast majority of her life and the only home she has ever known.

197.   Plaintiff Keshav Raj Bhattarai was born in Nepal. Keshav's home was significantly damaged in the April 2015 earthquake, and he and his wife had to sleep outside in a tent for about a month. In May 2015, Keshav and his wife traveled to the United States to see their son graduate from his medical fellowship program. About a month later, Nepal was designated for TPS and Keshav and his wife successfully applied for TPS status. Since receiving TPS, Keshav has worked in restaurants and gas stations. Keshav lives in Sunnyvale, California, and works as a manager at a Chevron gas station, where he has lived and worked since the announcement of the termination of TPS for Nepal. His son is a doctor, trained in geriatrics and nephrology, and has lived and

practiced in the United States for over ten years. He fears for what may happen to him, his family, and his Nepali community in the future if TPS for Nepal were to be terminated again on illegal grounds.

198.   Plaintiff Sajjan Pandey was born in Nepal, and before arriving in the United States, ran a restaurant and technical school there. Sajjan arrived in the United States in 2006, and has lived here ever since. He lives with his cousin, who is a U.S. citizen, in Alameda, California. He is an attendant and cashier at a Chevron gas station in Oakland, California. TPS is essential to his ability to work and support himself. He regularly sends money back to Nepal to help family members whose homes were damaged after the earthquake. Additionally, for over fifteen years Sajjan has been an active volunteer and leader of Motherland Nepal, a nonprofit cultural organization based in the Bay Area that creates cultural programming and fundraises for people in need. He fears what could happen if a new president were to decide to again terminate TPS for Nepal on illegal grounds as he relies on TPS for work authorization.

199.   Plaintiff Sumnima Thapa was born in Nepal and arrived in the United States in 2002. She spent most of her childhood in Thailand, where she moved with her family at the age of four. Sumnima obtained her bachelor's degree in business management and her master's degree in project management. At the time of the termination announcement, she worked as a research specialist at Omni Data Retrieval, and she also previously volunteered with Lutheran Social Services. She now works as a project coordinator for clinical trial projects. At the time of the termination announcement, Sumnima lived in Apple Valley, Minnesota with her husband, also a TPS holder, and their two U.S.-citizen children, who were then aged six and ten. Her sons are now eleven and fifteen. The eldest is Plaintiff S.S. and he is now starting tenth grade. Her youngest son has only been to Nepal once, and her eldest son has visited Nepal only three times, once as an infant. Neither of Sumnima's sons speak Nepali fluently. Sumnima and her family continue to live in Apple Valley, Minnesota where she and her husband own their home. Without TPS Sumnima will be unable to work and will have difficulty paying her mortgage. Sumnima and her husband continue to worry about a future illegal termination of TPS for Nepal because they depend on TPS

for work authorization and their children depend on them entirely for financial, emotional and material support.

200.   Plaintiff Donaldo Posadas Caceres was born in Honduras. When he was young, his brother was murdered in Honduras, leading Donaldo to drop out of school for his protection and move to another city. He, his wife, and his eldest son, who was then a baby, entered the United States in July 1998. They have held TPS since 1999. Donaldo has worked as a bridge painter and is a member of the International Union of Painters and Allied Trades (IUPAT), since the time of the announcement of the termination of TPS for Honduras. He owns his home in Baltimore, Maryland, where he lives with his wife and children. In addition to their eldest son, Donaldo and his wife have two U.S.-citizen daughters, who were aged eighteen and nine at the time of the termination announcement. His eldest daughter has been to Honduras only once, to visit her ailing grandfather, and his youngest daughter only twice, to visit her ailing grandfather and to attend a family member's funeral. Donaldo continues to fear the illegal termination of TPS for Honduras as he is dependent on TPS for work authorization and his legal status in the United States, as well as the opportunity to keep his family together.

201.   Plaintiff Sorayda Betzabe Rodriguez Motiño was born in Honduras, where she was raised by her grandmother from a young age. A few days after Sorayda turned sixteen, she and her siblings came to the United States to look for their mother. They arrived at a port of entry on or around Christmas Eve of 1998 and Sorayda was placed in a shelter for unaccompanied minors. About two weeks later, Honduras was designated for TPS and Sorayda was released to her mother. She has held TPS ever since. Sorayda lives in Harrisonburg, Virginia with her husband, also a TPS holder, and two U.S. citizen children. Her eldest child is autistic and continues to live with his parents, who provide a critical level of support and assistance to him. At the time of the termination announcement, Sorayda worked at Great Eastern Resort as a supervisor of housekeeping. Today she works at the same resort as the manager of the housekeeping department for the hotel. Sorayda is concerned about a future termination of TPS on illegal grounds. Sorayda is terrified at the thought of losing her status and having to bring her children to Honduras, a place they have never been. Her children do not speak Spanish.

1   202.   Plaintiff Denis Alen Molina Chavez was born in Honduras. He entered the United

2   States in July 1997 and has had TPS since 1999. After a short time in New Jersey, he settled in

3   Bridgeport, Connecticut, where he lived until moving to Shelton, Connecticut in 2019. At the time

4   that DHS announced termination of TPS for Honduras, Denis was a widow and the single father

5   of two U.S.-citizen children, a son aged thirteen- at the time and a daughter aged twelve at the

6   time. Denis's wife passed away in 2013 from ovarian cancer. Denis is the lead pastor at the

7   Church of Jude Mount Zion (Iglesia de Juda Monte de Sion) in Bridgeport, which has thirty-one

8   active members. He gives sermons and provides religious teaching for children and youth. Denis

9   has been a pastor for more than twenty years, and has been an active member of the church since

10  he was a child. Denis also works as a mechanic at Service My Auto in Bridgeport, where he has

11  been employed for over a decade. Denis is very worried about what will happen to his life and the

12  lives of his children if TPS is terminated again, as the 2018 announcement of the termination of

13  TPS for Honduras caused an high level of emotional and physiological stress and anxiety for him

14  and his family. Denis is a homeowner; he relies on TPS to afford his mortgage, pay for the

15  children's necessities, work, and serve as a pastor. Connecticut is the only home his children have

16  ever known. Denis' children have only been to Honduras once.

17  203.   At the time of the termination announcements, it was estimated that TPS holders

18  were the parents of more than 270,000 U.S.-citizen children.[167] The U.S. citizen children of TPS

19  holders, including the Plaintiff children in this case, confront an impossible choice if TPS is

20  terminated. On one hand, they can continue to live with their parents, but only by relocating to a

21  foreign country, leaving behind their schools, their communities, and the benefits of living in the

22  United States—the only country they have ever known. On the other hand, they can choose to

23  remain in the United States, but then must give up living with one or both parents, which in many

24  cases would involve their becoming a ward of the state subject to foster care, or otherwise subject

25  to the supervision of persons who are not their parents.

26

27

---

28  [167] Warren & Kerwin, *supra* note 166, at 578.

204.   Plaintiff Crista Ramos is the eldest child of TPS holder Plaintiff Cristina Morales. She was fourteen years old at the time DHS announced the termination of TPS for El Salvador. Crista was born in Marin, California, and was an eighth grade student at Saint Raphael School at the time of the termination announcement. At the time she was applying to high school and dreaming of being an immigration lawyer. She lived with her mother, father, and her then eleven-year-old brother Diego in San Pablo, California. She continues to reside in California and attends University of San Francisco. Crista continues to suffer stigmatic harm from the racism that motivated the Trump-era termination announcement and further worries about what will happen if her mother loses her TPS status and is deported.

205.   Plaintiff Benjamin Zepeda is the eldest child of TPS holder Plaintiff Orlando Zepeda and TPS holder Lorena Arana. He was fourteen years old at the time DHS announced the termination of TPS for El Salvador. Benjamin was born and raised in Los Angeles, California, and at the time of the termination announcement was a ninth grade student at St. John Bosco High School. He has a younger sister, Lizbeth, who was then twelve years old. He is currently working and planning to return to college, which he began after graduating from high school. His sister graduated high school and enrolled at Cerritos College. Benjamin and his sister depend on their parents for emotional, psychological, educational, spiritual, and material support. He has never visited El Salvador and cannot imagine moving there. He continues to suffer stigmatic harm from the racism that motivated the DHS termination decisions, and also struggles to consider how much his life would be upended if his parents lost their TPS status and did not have documentation in the United States, moved to El Salvador, or were deported there.

206.   Plaintiff Juan Eduardo Ayala Flores is the youngest son of TPS holder Plaintiff Elsy Yolanda Flores de Ayala and TPS holder Juan Amilcar Ayala Rovira. He was thirteen years old when DHS announced the termination of TPS for El Salvador. He has two older sisters, TPS holder Plaintiff Maria Jose Ayala Flores and Joanna Gabriela Ayala Flores, who was born in Washington, D.C. Juan was a seventh grade student at Washington Latin Public Charter School at the time of the termination announcement. He is now about to begin an undergraduate degree at George Washington University, from which his sister Joanna just graduated. Juan's parents are

from El Salvador, but he has only been to El Salvador twice, to visit family. He was born in Washington, D.C., and has lived there his entire life. Juan's parents continue to provide him with economic support and emotional guidance. He continues to suffer stigmatic harm from the racism that motivated the DHS termination decisions, and worries about what could happen to his sister, who still has TPS and has no pathway to permanent status, if DHS were to again terminate TPS for El Salvador on the same illegal grounds it utilized in 2018.

207.   Plaintiff Hnaida Cenemat is the eldest child of TPS holder Plaintiff Wilna Destin, who was raised in Haiti and has lived in the United States for eighteen years. Hnaida was fourteen years old when DHS announced the termination of TPS for Haiti. Hnaida's younger brother, John, was just ten years old. Hnaida was born in Orlando, Florida, and has lived there her entire life. She visited Haiti only once for a brief period when she was one year old. At the time of the termination announcement, Hnaida was a motivated high school freshman at Dr. Phillips High School. She aspired to become an obstetrician/gynecologist because she wanted to help people. Prior to Defendants' decision to end TPS, Hnaida did not understand that it was a legal status that could be terminated. She was afraid of moving to Haiti with her mother and living in a country that she did not know, but she was also afraid of remaining in the United States with a foster family. She, her brother, and their parents spent a lot of time speaking about TPS. In 2021, Hnaida graduated from high school and went on to obtain her real estate license. She now works as a real estate agent and lives independently. She continues to suffer stigmatic harm from the racism that motivated the DHS termination decisions, and worries about her parents losing their immigration status.

208.   Plaintiff Rilya Salary was born in Rockledge, Florida and is the eldest child of TPS holder Plaintiff Sherika Blanc. Rilya was just five years old when DHS announced the termination of TPS for Haiti. Rilya has never been to Haiti. She has two younger sisters who were three and one years old at the time of the termination announcement. Rilya is now in sixth grade in Lexington, Kentucky where she enjoys going to classes and participating in band. Rilya depends on her mother for economic support and emotional care and guidance. Rilya would also suffer hardship if TPS were once again to be illegally terminated because her mother relies on TPS for work authorization and her ability to support and maintain her family. And, like the other U.S.

citizen children of TPS holders, Rilya would suffer harm from the impossible choice she would have to make between living with her mother and living in her country, should her mother lose her status.

209.   Plaintiff S.S. is the eldest son of TPS holder Plaintiff Sumnima Thapa and her husband. S.S. was ten years old at the time that DHS announced the termination of TPS for Nepal. S.S. was born in Minnesota, where he continues to live with his parents and younger brother. At the time of the termination announcement, S.S. was in fifth grade. Today, S.S. is in tenth grade and enjoys swimming, tennis, jiu jitsu and theatre. He is also interested in IT and enjoys practicing coding. A future illegal termination of TPS for Nepal would be devastating for S.S. who is in the middle of a promising high school education.

210.   Plaintiff G.D.P. is the youngest daughter of TPS holder Plaintiff Donaldo Posadas Caceres. At the time that DHS announced the termination of TPS for Honduras, G.D.P was nine years old. She was born in Maryland, and continues to live there with her parents and older siblings. At the time of the termination announcement, G.D.P dreamed of growing up to be President because she wants to help people who come here from other countries. G.D.P is now starting high school, and enjoys school and sports.

211.   TPS holders are an integral part of the economic and social fabric of American communities, and they give back to this country in countless ways. They are active in civic life and volunteer at schools, neighborhood and work organizations, and religious institutions.[168] They pay federal, state, and local taxes, and support government social welfare programs. A 2023 report estimates that the over 500,000 TPS holders living in the United States contribute $12.8 billion dollars annually to the US economy.[169] The net positive economic contributions of TPS holders are not surprising in light of their consistently high employment rate. For example, eighty-five percent of Honduran TPS holders are employed. About seventeen percent are entrepreneurs,

---

[168] CELIA MEJÍVAR, CTR. FOR MIGRATION RES., UNIV. OF KAN., TEMP. PROTECTED STATUS IN THE U.S.: THE EXPERIENCES OF HONDURAN & SALVADORAN IMMIGRANTS 19 (2017).

[169] Fwd.Us, Temporary Protected Status Protects Families While Also Boosting U.S. Economy <https://www.fwd.us/wp-content/uploads/2023/02/230306_FWD_TPSReport_v2-2.pdf> accessed August 18, 2023.

1  creating jobs not just for themselves but also for their communities.[170] About thirty percent of

2  TPS-holder households have mortgages.[171]

3      212.  In light of the overwhelming evidence of the contributions of TPS holders,

4  bipartisan groups of mayors and legislators,[172] business leaders,[173] labor unions,[174] and faith-based

5  leaders[175] recognize the need to maintain the TPS program. To end TPS "would harm [U.S.]

6  national security interests by undermining the fragile security in these countries," as well as

7  "negatively impact hundreds of thousands of American children."[176]

8  **CLASS ALLEGATIONS**

9      213.  Representative Individual Plaintiffs Rilya Salary, S.S., and G.D.P. bring this action

10  under Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(2), on behalf of themselves and a

11  nationwide class of all similarly situated persons.

---

[170] Warren & Kerwin, *supra* note 66, at 582–83.

[171] CTR. FOR AM. PROGRESS, TPS HOLDERS IN THE UNITED STATES 2 (2017).

[172] Letter from Ed Pawlowski, Mayor of Allentown, Penn., et al. to Kirstjen Nielsen, Sec'y of Homeland Sec. (Jan. 3 2018) (letter from 19 U.S. mayors and Cities for Action, a national coalition of more than 175 cities and counties); Letter from Ben Cardin, U.S. Senator, et al. to Rex Tillerson, Sec'y of State, & Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 19, 2017); Letter from James P. McGovern, Member of Congress, et al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Sept. 11, 2017) (bipartisan letter from 116 Members of Congress); Letter from Kirsten Gillibrand, U.S. Senator, et al. to Rex Tillerson, Sec'y of State, & John F. Kelly, Sec'y of Homeland Sec. (July 18, 2017) (letter from 26 U.S. Senators).

[173] Letter from Neil L. Bradley, Senior Vice President & Chief Policy Officer, U.S. Chamber of Commerce, to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 26, 2017); Letter from Embassy Suites Miami Airport, et al. to Marco Rubio, U.S. Senator (Nov. 3, 2017); Letter from Tex. Agric. Irrigation Ass'n, et al. to John Cornyn, U.S. Senator (Nov. 3, 2017).

[174] *See, e.g.*, Press Release, Rachel Gumpert, UNITE HERE!, Labor Unions Launch Nearly One Million Dollar Campaign to Save TPS (Nov. 16, 2017), http://unitehere.org/press-releases/labor-unions-launch-nearly-one-million-dollar-campaign-to-save-tps/; Terry O'Sullivan & Stephen Sandherr, *Trump Immigration Acts Will Hurt Families, Slow Hurricane Recovery*, HOUSTON CHRON. (Feb. 23, 2018) (General President of Laborers' International Union of North America, which represents half a million workers, calls for extension of TPS).

[175] Letter from The Evangelical Immigration Roundtable to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Nov. 1, 2017); Letter from Faith Leaders & Faith-Based Organizations to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Sept. 17, 2017) (560 faith leaders and 129 national, state, and local faith-based organizations); Letter from the U.S. Conference of Catholic Bishops Migration and Refugee Services et al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Oct. 26, 2017).

[176] Letter from Dick Durbin, U.S. Senator, et al. to Elaine C. Duke, Acting Sec'y of Homeland Sec. (Nov. 9, 2017), *available at* https://www.durbin.senate.gov/newsroom/press-releases/lawmakers-call-for-reversal-of-administration-decision-to-expose-thousands-to-dangerous-deportations.

214.   Individual Plaintiffs seek to represent the following nationwide class: The U.S. citizen children, from ages five to eighteen, of all TPS holders from El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan.

215.   The proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is so numerous that joinder of all members is impracticable.

216.   On information and belief, there are tens of thousands of U.S. citizen children of TPS holders from El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan. Given the dates of TPS designations for those countries, thousands of those children are from ages five to eighteen confronted with the possibility of losing either the ability to live in their country or the care and support of a TPS-holder parent.

217.   Due to the actions of Defendants, the U.S. citizen children of TPS holders will be forced to choose between their absolute and fundamental due process right to reside in this country, and their due process right to the care and support of their parents.

218.   The class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). Members of the class are subject to a common practice or policy: Defendants' adoption of a new rule that caused the termination of the TPS designations for their parents' respective countries without any consideration of the impact on the class members—*i.e.*, these U.S. citizen children—or any valid reason justifying the harm that decision imposes on them. When the TPS terminations were issued, these children were forced by law to choose between their right to reside in this country as citizens, and their right to reside with their parents. Whether the Due Process Clause permits the government to force these children into that choice presents a common legal question, resolution of which will greatly aid the efficient resolution of this case.

219.   The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Individual Plaintiffs are typical of the claims of their class. Individual Plaintiffs and the proposed Citizen-Children Class members are the school-aged children, from ages five to eighteen, who are U.S. citizens. Their parents will be subject to removal once the TPS termination decisions take effect. Individual Plaintiffs and their

proposed class also share the same legal claims, which challenge the legality of these termination

policies and practices under the Fifth Amendment.

220.   The proposed class meets the adequacy requirements of Federal Rule of Civil

Procedure 23(a)(4). Individual Plaintiffs seek the same relief as the other members of the class. In

defending their own rights, Individual Plaintiffs will defend the rights of all proposed class

members fairly and adequately.

221.   Additionally, the proposed class is represented by *pro bono* counsel from the

American Civil Liberties Union of Northern California, the American Civil Liberties Union of

Southern California, Unemployed Workers United, the UCLA Law School Center for

Immigration Law and Policy, and Sidley Austin LLP. Plaintiffs' counsel have extensive

experience litigating class action lawsuits and other complex cases in federal court, including civil

rights lawsuits on behalf of non-citizens.

222.   The members of the class are readily ascertainable through Defendants' records.

223.   Finally, the proposed class satisfies Federal Rule of Civil Procedure 23(b)(1)(A) and

(b)(2). Competing rulings as to whether Defendants must permit the TPS-holding parents of U.S.

citizen children to reside in the United States could create inconsistent adjudications and establish

incompatible standards of conduct governing Defendants' behavior. In addition, Defendants have

acted on grounds that are generally applicable to the class by terminating the TPS designations for

El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan without considering the massive harm

that decision causes to U.S. citizen children or providing reasons to justify that harm. Thus, final

injunctive and declaratory relief is appropriate for the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the Equal Protection Guarantee of the**

**Due Process Clause of the Fifth Amendment**

**(Against All Defendants by All Plaintiffs)**

224.   Plaintiffs reallege and incorporate by reference each and every allegation contained

in the preceding paragraphs.

225.   The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

226.   Defendants' decisions to terminate the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin.

227.   Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of the TPS designations. Although the TPS termination decisions for El Salvador, Honduras, Nepal, and Nicaragua themselves are now rescinded, and there are new TPS designations for Haiti and Sudan, Plaintiffs continue to suffer stigmatic harm from the racial animus that motivated the terminations and Defendants' failure to repudiate them.

## SECOND CLAIM

### Violation of the Due Process Clause of the Fifth Amendment

### (Against All Defendants by All TPS-Holder Plaintiffs)

228.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

229.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

230.   Due process protections extend to "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). TPS holders are lawfully present in this country. They have significant liberty interests, protected by the Due Process Clause, in a non-arbitrary decision as to the continuation of their TPS status.

231.   The "very essence" of due process is the "protection of the individual against arbitrary action." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 584 (1972). Any deprivation of liberty or property interests must, at the very least, pass a test of rationality. The burden on the government is greater when, as here, the liberty interests at stake derive from well-established and significant reliance interests.

232.   The government has not articulated, and cannot establish, any rational basis for reversing course on decades of established TPS policy and ignoring the current capability of TPS countries to safely receive longtime TPS holders, their families, and their U.S. citizen children.

233.   Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of the TPS designations.

### THIRD CLAIM

### Violation of the Administrative Procedure Act

### (Against All Defendants by All TPS-Holder Plaintiffs)

234.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

235.   The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

236.   Among other things, the APA empowers the federal courts to "hold unlawful and set aside agency actions, finding, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The right of review under the APA includes a right to judicial review of "executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

237.   To engage in procedurally appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position," and may not "depart from a prior policy *sub silentio*." *Id.* at 515. The APA requires an agency to provide "more detailed justification" when

"its new policy rests upon factual findings that contradict those which underlay its prior policy," or "its prior policy has engendered serious reliance interests." *Id.*

238.   Defendants' termination of the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan constitutes "final agency action for which there is no other adequate remedy in a court" pursuant to 5 U.S.C. § 704, because the Defendants' termination results in the TPS holders' loss of TPS "automatically and without further notice or right of appeal," 8 C.F.R. § 244.19.

239.   Defendants' adoption of a new, drastically narrower interpretation of the TPS statute was arbitrary, capricious, and contrary to law in violation of the APA because it represented a sudden and unexplained departure from decades of decision-making practices and ordinary procedures. By shifting the decision-governing standard for country designations without explanation, Defendants have ignored a clear statutory command and engaged in procedurally flawed decision-making. Further, Defendants changed their policy without taking into account the serious reliance interests that their prior policy had engendered.

240.   Plaintiffs will suffer irreparable injury resulting from the arbitrary termination of the TPS designations, and Defendants' continued failure to repudiate the narrow interpretation of the TPS statute they previously adopted without explanation.

**FOURTH CLAIM**

**Violation of the Administrative Procedure Act**

**(Against All Defendants by All TPS-Holder Plaintiffs)**

241.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

242.   Defendants' interpretation of the TPS statute to preclude consideration of intervening events was "not in accordance with law," in violation of 5 U.S.C. § 706(2)(A) because the TPS statute does not prohibit the Secretary from considering intervening events when determining whether to extend TPS.

243.   Plaintiffs will suffer irreparable injury resulting from the legally erroneous termination of the TPS designations, and face the possibility of future injury from Defendants' failure to repudiate the legally erroneous interpretation they previously adopted.

**FIFTH CLAIM**

**Violation of the Administrative Procedure Act**

**(Against All Defendants by All TPS-Holder Plaintiffs)**

244.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

245.   Defendants' decision to impose re-registration deadlines that expire long before the current TPS extensions expire, contrary to all historical practice in the administration of TPS, was "arbitrary, capricious, [and] an abuse of discretion" in violation of 5 U.S.C. § 706(2)(A).

246.   Due to these arbitrary and capricious registration deadlines, Plaintiffs will suffer irreparable injury, and many thousands of TPS holders will be deprived of TPS status for which they are otherwise eligible.

**SIXTH CLAIM**

**Violation of the Due Process Clause of the Fifth Amendment**

**(Against All Defendants by All TPS-Holder Plaintiffs)**

247.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

248.   Defendants' adoption of re-registration deadlines that expire long before the current TPS extensions expire is so lacking in justification and contrary to past practice that it fails to satisfy the rationality constraints imposed by the Fifth Amendment on governmental decision-making in this context.

249.   Due to these arbitrary and capricious registration deadlines, Plaintiffs will suffer irreparable injury, and many thousands of TPS holders will be deprived of TPS status for which they are otherwise eligible.

**SEVENTH CLAIM**

**Violation of the Due Process Clause of the Fifth Amendment**

**(Against All Defendants by All U.S. Citizen Children Plaintiffs)**

250.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

251.   The Fifth Amendment guarantee against the deprivation of liberty without due process bars the government from infringing on certain "fundamental" liberty interests, regardless of the procedures involved, unless the action is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).

252.   Three such fundamental rights are implicated here. First, the plaintiffs here who are school-aged U.S. citizens have an absolute right to live in the United States. To compel them to live abroad at any time, let alone in their formative years, would deny them a core aspect of their liberty protected by the Fifth Amendment. *See, e.g.*, *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).

253.   Second, for at least so long as these U.S. citizen plaintiffs remain school-aged, they have a fundamental right protected by both the First and Fifth Amendments to live with and be raised by their parents. *E.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977); *Board of Dirs.of Rotary Intern. v. Rotary Club*, 481 U.S. 537, 545 (1987).

254.   Third, the government's decision to end the lawful immigration status of their parents impinges upon the U.S. citizen plaintiffs' constitutionally-protected liberty interests. These U.S. citizen children have a powerful interest in not being compelled to choose between two alternatives when each alternative will deprive them of a substantial, constitutionally-protected aspect of liberty. *See United States v. Jackson*, 390 U.S. 570 (1968); *cf. New York v. United States*, 505 U.S. 144, 176 (1992).

255.   In invading these fundamental constitutional rights, Defendants have articulated no substantial governmental interest and have failed adequately to tailor their action to promote any legitimate interest they may have. Nowhere in the notices terminating the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan, for example, have Defendants identified any risk to the interests of the United States that would follow from allowing the school-aged U.S.

citizen children to remain in the United States with their TPS holder parents until the children reach the age of majority.

256.   Similarly, nowhere in the notices terminating the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan has the Secretary adequately explained the Secretary's new interpretation of the governing statute, reconciled it with the Secretary's longstanding prior interpretation, or justified its extraordinary invasion of the U.S. citizen children's constitutional rights.

257.   Plaintiffs and Individual Plaintiffs' class will suffer irreparable injury resulting from the termination of the TPS designations.


/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**PRAYER FOR RELIEF**

Individual Plaintiffs, on behalf of themselves and others similar situated, ask this Court to grant the following relief:

1. Declare that Defendants' termination of the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua and Sudan, was unconstitutional under the Due Process Clause of the Fifth Amendment and unlawful under the Administrative Procedure Act;

2. Declare that the Defendants' interpretation of the TPS statute to preclude consideration of intervening conditions was legally erroneous in violation of the Administrative Procedure Act.

3. Declare that Defendants' refusal to consider intervening conditions in making TPS decisions was arbitrary, capricious, and contrary to law in violation of the APA because it represented a sudden, unacknowledged, and unexplained departure from decades of decision-making practices and ordinary procedures. Further, Defendants changed their policy without taking into account the serious reliance interests that their prior policy had engendered.

4. Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concern or participation with any of them, from terminating TPS for any TPS holders protected by this Court's preliminary injunction who registers for a TPS extension by June 30, 2024, the last date at which TPS is protected pursuant to the preliminary injunction;

5. Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concern or participation with any of them, from requiring or collecting an initial application fee for Form I-821, Application for Temporary Protected Status, from any TPS applicant whose TPS status was preserved by this Court's preliminary injunction in *Ramos* or stay of proceedings in *Bhattarai*;

6. Order Defendants to take all steps necessary to return any initial application fee for Form I-821, Application for Temporary Protected Status, paid by TPS holders whose

status was preserved by this Court's preliminary injunction in *Ramos* or stay of proceedings in *Bhattarai* pursuant to the April 19, 2022 designation of Sudan for TPS or the August 3, 2021 designation of Haiti for TPS;

7. Alternatively, certify this case as a class action lawsuit as proposed herein, appoint Individual Plaintiffs Rilya Salary, S.S., and G.D.P. as class representatives of their class and the undersigned counsel as class counsel;

8. And enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concern or participation with any of them, from rescinding the immigration status of those TPS holders who have school-aged U.S. citizen children for so long as the children remain age five to eighteen;

9. Grant an award of attorneys' fees and costs; and

10. Grant any other and further relief that this Court may deem fit and proper.

Date:  August 24, 2023

Respectfully submitted,

SIDLEY AUSTIN LLP

*/s/ Sean A. Commons\**
Sean A. Commons
Alycia A. Degen
Nicole Ryan
Kimberly Leaman
Marisol Ramirez

UCLA CENTER FOR IMMIGRATION
LAW AND POLICY

*/s/ Ahilan T. Arulanantham*
Ahilan T. Arulanantham

ACLU OF NORTHERN CALIFORNIA

*/s/ Emilou MacLean*
Emilou MacLean
William S. Freeman

UNEMPLOYED WORKERS UNITED

/s/ Jessica Karp Bansal
Jessica Karp Bansal
Keally Cieslik

ADVANCING JUSTICE – ASIAN LAW CAUCUS

/s/ Winifred Kao
Winifred Kao

ACLU OF SOUTHERN CALIFORNIA

/s/ Michael Kauffman
Michael Kauffman

*Attorneys for Plaintiffs*

* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.