UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTA RAMOS, et al.,<br><br>　　　　Plaintiffs,<br><br>　　　v.<br><br>KIRSTJEN NIELSEN, et al.,<br><br>　　　　Defendants. | Case No. 18-cv-01554-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 206 |

　　　　Plaintiffs are individuals, some noncitizen adults and some citizen children with noncitizen parents, who live in the United States legally. The noncitizen individuals have permission to be in the country pursuant to the Temporary Protected Status ("TPS") designations for six countries, specifically: (1) Sudan; (2) Haiti; (3) Nicaragua; (4) El Salvador; (5) Honduras; and (6) Nepal. Plaintiffs filed suit in 2018 and 2019, challenging the Trump administration's termination of the TPS designations for those six countries. In October 2018, this Court granted Plaintiffs a preliminary injunction. The government appealed and prevailed, but, subsequently, in February 2023, the Ninth Circuit granted Plaintiffs' petition for an en banc hearing. Shortly before the en banc hearing, the government announced that it would be rescinding the 2017 and 2018 terminations of the TPS designations for El Salvador, Honduras, Nepal, and Nicaragua. By that time the government had already newly designated Haiti and Sudan for TPS. The government thereafter voluntarily moved to dismiss its appeal with the Ninth Circuit , and the Ninth Circuit granted that relief.

　　　　Following the appellate proceedings, Plaintiffs took the position before this Court that the case was still not moot. The Court allowed Plaintiffs to file a consolidated amended complaint.

The government then filed the pending motion to dismiss for lack of subject matter jurisdiction. The government primarily argues that the case should be dismissed based on mootness, whether Plaintiffs are arguing (1) that the Trump administration's TPS terminations were improper or (2) that the government has improperly charged TPS holders from Haiti or Sudan a $50 registration fee.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the motion to dismiss.

## I.   FACTUAL & PROCEDURAL BACKGROUND

In the operative class action amended complaint ("CAC"), Plaintiffs allege as follows.

Congress established the TPS program through the Immigration Act of 1990. *See* CAC ¶ 46. The TPS statute is codified at 8 U.S.C. § 1254a. *See id.* Under the program, foreign nationals of designated countries are given lawful immigrant status because they cannot safely return home. Specifically, the Attorney General has the authority to issue a TPS designation based on certain criteria – *e.g.*, an ongoing armed conflict or an environmental disaster such as an earthquake or flood. *See id.* ¶ 47; *see also* 8 U.S.C. § 1254a(b)(1). An initial designation lasts between 6 to 18 months. *See* CAC ¶ 48; *see also* 8 U.S.C. § 1254a(b)(2). "Before the designation can become effective, the Secretary [of Homeland Security] must publish a notice in the Federal Register that includes, among other things, a statement of findings, the effective date of the designation, and a tally of eligible foreign nationals." CAC ¶ 48; *see also* 8 U.S.C. § 1254a(b) ("A designation of a foreign state . . . under this paragraph shall not become effective unless notice of the designation (including a statement of the findings under this paragraph and the effective date of the designation) is published in the Federal Register. In such notice, the Attorney General shall also state an estimate of the number of nationals of the foreign state designated who are (or within the effective period of the designation are likely to become) eligible for temporary protected status under this section and their immigration status in the United States.").

Thereafter, the Secretary engages in a periodic review of TPS designations. *See id.* ¶ 51; *see also* 8 U.S.C. § 1254a(b)(3). The statute provides in relevant part as follows:

(A)   Periodic review.   At least 60 days before end of the initial

2

|   |   |   |
|---|---|---|
|   |   | period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met. The Attorney General shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register. |
|   | (B) | Termination of designation. If the Attorney General determines under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d)(3), but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C). |
|   | (C) | Extension of designation. If the Attorney General does not determine under subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months). |

*Id.*

In 2017 and 2018, the Trump administration terminated the TPS designations of four countries: (1) Sudan; (2) Haiti; (3) Nicaragua; and (4) El Salvador. *See id.* ¶¶ 2, 8. The termination was based on a new interpretation of the TPS statute. According to Plaintiffs,

> DHS abandoned a long-established practice under which it considered all current conditions – including *intervening* events – in deciding whether to extend or terminate a country's TPS designation. In its place, DHS adopted a new, narrow practice in which DHS considers only whether the *original* conditions that initially gave rise to the TPS designation persist, and only those ongoing harms directly tied to those original conditions.

*Id.* ¶ 62 (emphasis added). The new interpretation was "motivated by intentional race- and national-origin-based animus against individuals from what former President Trump referred to as 'shithole countries.' *i.e.*, non-white, non-European immigrants." *Id.* ¶ 10.

3

In October 2018, this Court granted Plaintiffs' motion for a preliminary injunction, barring enforcement of the decisions to terminate TPS for Sudan, Haiti, El Salvador, and Nicaragua. *See id.* ¶ 153; *see also* Docket No. 128 (order). The government appealed to the Ninth Circuit. However, pending appeal, it agreed "to issue periodic Federal Register notices automatically extending TPS status and employment authorization for TPS holders from El Salvador, Haiti, Nicaragua, and Sudan . . . for at least nine months at a time." CAC ¶ 156. The government later agreed to the same procedure for Nepal and Honduras, after it was announced their TPS designations would also be terminated.[1] *See id.* ¶ 158-59; *see also id.* ¶ 161 (alleging that "Defendants have issued five Federal Register notices automatically extending TPS status and employment authorization for TPS holders protected by this Court's orders").

In September 2020, a Ninth Circuit panel reversed this Court's decision granting a preliminary injunction. Plaintiffs sought rehearing en banc. *See id.* ¶ 160.

In January 2021, President Biden took office. Shortly thereafter, Plaintiffs asked the Ninth Circuit to stay proceedings on their petition, "citing President Biden's stated intention to take swift action on TPS." *Id.* ¶ 164.

In June 2021, the parties jointly moved the case to be referred to the Ninth Circuit's mediation program. *See id.* ¶ 166.

In August 2021,

> DHS published a Federal Register notice designating Haiti for TPS for 18 months . . . . The Federal Register notice cites human rights violations and abuses by law enforcement officials and non-state actors; serious security concerns, including violent criminal gangs; a dire economic situation, including a poverty rate of nearly 60%; a weak healthcare system suffering from 'the lingering impact of the 2010 earthquake and Hurricane Matthew in 2016'; and the impact of the COVID-19 pandemic.

*Id.* ¶ 170 (citing 86 Fed. Reg. 41,863 (Aug. 3, 2021)). *Compare id.* ¶ 88 (alleging that Haiti was first designated for TPS in January 2010 after a major earthquake). Haiti was subsequently

---

[1] The challenge to the TPS terminations for Nepal and Honduras were initially brought in a different case, *Bhattarai v. Nielsen*, No. C-19-0731 EMC (N.D. Cal.). *Bhattarai* was subsequently consolidated with this case.

4

redesignated for TPS. *See id.* ¶ 180 (citing 88 Fed. Reg. 5022 (Jan. 26, 2023)).

In April 2022,

> DHS published a Federal Register notice designating Sudan for TPS for 18 months . . . . The Secretary explained that he had "determined that an eighteen-month designation is warranted because of the extraordinary and temporary conditions," including ongoing armed conflict and civil unrest, political instability, flooding, droughts, widespread poverty, and "deteriorating economic conditions."

*Id.* ¶ 171 (citing 87 Fed. Reg. 23,202 (Apr. 19, 2022)). *Compare id.* ¶ 79 (alleging that Sudan was first designated for TPS in November 1997 during a civil war). Sudan was later redesignated for TPS. *See id.* ¶ 180 (citing 88 Fed. Reg. 56,857 (Aug. 21, 2023)).

In October 2022, after settlement negotiations between the parties were not successful, the Ninth Circuit released the appeal from the mediation program. *See id.* ¶ 167.

In February 2023, the Ninth Circuit granted a rehearing en banc. *See id.* ¶ 168.

On June 13, 2023, "one week before [the] en banc oral argument in the *Ramos* appeal," DHS announced in a press release that it was rescinding the Trump administration's terminations of TPS for the remaining four countries at issue – *i.e.*, El Salvador, Honduras, Nepal, and Nicaragua. *Id.* ¶ 174. DHS also stated that it would be extending the TPS designations for those countries. *See id.*

The next day, Defendants moved to voluntarily dismiss the *Ramos* appeal. *See id.* ¶ 175.

On June 21, 2023, "one day before the en banc oral argument," DHS published Federal Register notices announcing the rescission of the TPS terminations and the extension of the TPS designations." *Id.* ¶ 176 (citing 88 Fed. Reg. 40,282 (June 21, 2023) (El Salvador); 88 Fed. Reg. 40,304 (June 21, 2023) (Honduras); 88 Fed. Reg. 40,317 (June 21, 2023) (Nepal); and 88 Fed. Reg. 40,294 (June 21, 2023) (Nicaragua)).[2]

---

[2] The Federal Register notice for El Salvador is representative:

- "After conducting an independent assessment of the country conditions in El Salvador as they existed in 2018 and exist today, the Secretary has determined that El Salvador's 2001 TPS designation should not have been terminated." 88 Fed. Reg. 40,282, at 40,285.
- "El Salvador was initially designated for TPS in 2001 on environmental disaster grounds following two separate earthquakes that occurred that year." *Id.* "While some progress on reconstruction projects had been made by 2018, many of the problems caused by the 2001

1  On June 29, 2023, the Ninth Circuit granted Defendants' motion to voluntarily dismiss the
2  appeal. The court did not address whether Defendants' actions related to the countries at issue had
3  mooted the case. *See id.* ¶ 177.
4  In addition to the above, Plaintiffs allege that, for Haiti and Sudan, there is another
5  problem related to TPS designations. Specifically, "[i]n redesignating Haiti and Sudan for TPS,
6  DHS required Haitian and Sudanese TPS holders to file a request for TPS as *new* applicants,
7  which requires the payment of a $50 fee which does not apply to TPS holders *renewing* their
8  registrations." *Id.* ¶ 172 (emphasis added).
9  Based on, *inter alia*, the above allegations, Plaintiffs assert the following claims for relief:

10  (1) **Violation of equal protection.** "Defendants' decisions to terminate the TPS
11  designations for [the six countries] are unconstitutional because they were
12  motivated, at least in part, by intentional discrimination based on race, ethnicity, or
13  national origin." *Id.* ¶ 226.
14  (2) **Violation of due process.** "The government has not articulated, and cannot
15  establish, any rational basis for reversing course on decades of established TPS
16  policy and ignoring the current capability of TPS counties to safely receive
17  longtime TPS holders, their families, and their U.S. citizen children." *Id.* ¶ 232.
18  (3) **Violation of the Administrative Procedure Act ("APA").** Defendants violated

---

earthquakes persisted. Since the disastrous effects of the earthquakes in 2001, El Salvador has been encumbered by several natural disasters, environmental challenges, high levels of violence, and economic instability, all of which significantly slowed its recovery and continued to render El Salvador unable to handle the return of its nationals at the time of the decision to terminate the designation." *Id.* at 40,285-86.

- "At the time of the determination to terminate the designation of TPS, DHS found that the social and economic conditions affected by the earthquakes had stabilized. That conclusion was in error and reflects an inadequate assessment of conditions in El Salvador leading up to the announcement of the decision to terminate. Although some social and economic progress had been made by 2018, frequent and significant environmental disasters occurred after the 2001 earthquakes causing additional challenges. Recovery from the earthquakes continued to be slow and encumbered by hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, a coffee rust epidemic, a prolonged and severe drought, and an increase in various mosquito-borne diseases, among other things." *Id.* at 40,286. "Numerous natural disasters have negatively affected El Salvador since the 2001 earthquakes and have adversely impacted its ability to adequately handle the return of its nationals granted TPS." *Id.*

the APA by making a "sudden and unexplained departure from decades of decision-making practices and ordinary procedures. By shifting the decision-governing standard for country designations without explanation, Defendants have ignored a clear statutory command and engaged in procedurally flawed decision-making. Further, Defendants changed their policy without taking into account the serious reliance interests that their prior policy had engendered." *Id.* ¶ 239.

(4) **Violation of the APA.** Defendants did not interpret the TPS statute in accordance with the law because the statute "does not prohibit the Secretary from considering intervening events when determining whether to extend TPS." *Id.* ¶ 242.

(5) **Violation of the APA.** *The parties agree that this claim is now moot. See* Mot. at 15; Opp'n at 18 n.6. Plaintiffs had alleged that Defendants violated the APA by "impos[ing] re-registration deadlines that expire long before the current TPS extensions expire." *Id.* ¶ 245.

(6) **Violation of due process.** *The parties agree that this claim is now moot. See* Mot. 15; Opp'n at 18 n.6. Plaintiffs had alleged that "Defendants' adoption of re-registration deadlines that expire long before the current TPS extensions expire is so lacking in justification and contrary to past practice that it fails to satisfy the rationality constraints imposed by the Fifth Amendment on governmental decisionmaking in this context." *Id.* ¶ 248.

(7) **Violation of due process.** The due process rights of U.S. citizen children have been violated. They have an absolute right to live in the United States and they have a fundamental right to live with and be raised by their parents. *See id.* ¶¶ 252-53. "[T]he government's decision to end the lawful immigration status of their parents" forces the children "to choose between two alternatives when each alternative will deprive them of a substantial, constitutionally-protected aspect of liberty." *Id.* ¶ 254.

## II. DISCUSSION

A. Legal Standard

In the pending motion, the government argues that Plaintiffs' case is now moot. Because mootness "pertain[s] to a federal court's subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

> A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. . . .
>
> In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. The court need not presume the truthfulness of the plaintiff's allegations. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."

*Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *see also NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016).

In the instant case, the government makes both a facial attack and a factual one. The government makes a facial attack to the extent Plaintiffs are challenging the Trump administration's TPS terminations.[3] The government makes a facial and a factual attack to the extent Plaintiffs are asserting that the government has failed to refund the $50 registration fee to TPS holders from Haiti and Sudan.

B. Mootness

"A case becomes moot – and therefore no longer a 'Case' or 'Controversy' for purposes of Article III – 'when the issues presented are no longer "live" or the parties lack a legally cognizable

---

[3] Although the government made a facial attack, Plaintiffs have somewhat tried to convert the attack into a factual one by submitting a notice about recent statements made by Candidate Trump's team – *i.e.*, regarding an intend to rescind TPS if Trump is elected President in 2024. *See* Docket No. 219 (notice).

8

interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013). According to the government, to the extent Plaintiffs challenge the Trump administration's TPS terminations, that challenge is now moot because there are no live issues to resolve: (1) the government has given new TPS designations to Haiti and Sudan and (2) the government has rescinded the TPS terminations and granted TPS extensions for the remaining four countries at issue.

In response, Plaintiffs argue that their claims are not moot because of the voluntary cessation exception to mootness. *See Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964 (9th Cir. 2007) (taking note of "several major exceptions to mootness, including for (1) 'collateral legal consequences,' (2) 'wrongs capable of repetition yet evading review,' and (3) 'voluntary cessation'"). Under the voluntary cessation exception, "'a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued.'" *Brach v. Newsom*, 38 F.4th 6, 12 (9th Cir. 2022). The exception is based on "'the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Id.*; *see also Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (stating that the "'[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a *resumption* of the challenged conduct as soon as the case is dismissed'") (emphasis added).

"[V]oluntary cessation can yield mootness if a 'stringent' standard is met: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* "Reasonable expectation means something more than 'a mere physical or theoretical possibility.'" *Brach*, 38 F.4th at 14 (where plaintiffs alleged state officials violated federal law by suspending in-person instruction in schools during COVID-19 pandemic but restrictions had since been lifted and schools reopened, stating that the "speculative contingency [that pandemic conditions might change] and the fact 'the Governor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot'").

"The party asserting mootness bears a 'heavy burden' in meeting [the] standard [of no reasonable expectation of recurrence]." *Rosebrock*, 745 F.3d at 971. This is true even where it is

1 the government that claims mootness. But a court

> nonetheless "treat[s] the voluntary cessation of challenged conduct by government officials with more solicitude . . . than similar action by private parties." This is no bare deference: we probe the record to determine whether the government has met its burden, even as we grant it a presumption of good faith.

*Brach*, 38 F.4th at 12-13; *see also Rosebrock*, 745 F.3d at 971 ("We presume that a government entity is acting in good faith when it changes its policy, but when the Government asserts mootness based on such change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again.").

According to the government, a government entity generally meets the heavy burden of establishing no reasonable expectation of recurrence when a plaintiff is challenging a regulation and the government then "changes or repeals the regulation at issue." *M.W.*, 2017 WL 10456732, at *5; *cf. Rosebrock*, 745 F.3d at 971 ("'A statutory change . . . is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'"). The government adds that, with this kind of voluntary cessation, the burden shifts to the plaintiff to show that the government entity will likely reenact the regulation. The government's position is supported by Ninth Circuit precedent. In *Board of Trustees of the Glazing Health & Welfare Trust v. Chambers*, 941 F.3d 1195 (9th Cir. 2019), the Ninth Circuit stated:

> [W]e join the majority of our sister circuits in concluding that legislative actions should not be treated the same as voluntary cessation of challenged acts by a private party, and that we should assume that a legislative body is acting in good faith in repealing or amending a challenged legislative provision, or in allowing it to expire. Therefore, in determining whether a case is moot, we should *presume* that the repeal, amendment, or expiration of legislation will render an action challenging the legislation moot, *unless* there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it.
>
> The *party challenging the presumption of mootness* need not show that the enactment of the same or similar legislation is a "virtual certainty," only that there is a *reasonable expectation of reenactment*. But a determination that such a reasonable expectation exists must be founded in the record, as it was in *City of Mesquite*,[4]

---
[4] *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.11 (1982) (stating that "the

10

rather than on speculation alone.

*Id.* at 1199 (emphasis added); *see also Rentberry, Inc. v. City of Seattle*, 814 Fed. Appx. 309, 309 (9th Cir. 2020) (stating that "[a]ppellants have not met their burden of showing a 'reasonable expectation' that Seattle will enact a same or similar ordinance in the future"); *Cocina Cultura LLC v. Oregon Dep't of Admin. Servs.*, No. 3:20-cv-01866-IM, 2021 U.S. Dist. LEXIS 162629, at *16 (D. Or. Aug. 27, 2021) (stating that, "[n]otably, *Glazing Health* placed the burden on the plaintiff to show the case is not moot"); *Cal. Rental Hous. Ass'n v. Newsom*, No. 2:21-cv-01394-JAM-JDP, 2022 U.S. Dist. LEXIS 186483, at *9 (E.D. Cal. Oct. 11, 2022) (stating that, "[a]s the party seeking to rebut the presumption of mootness, Plaintiffs must show there is a reasonable expectation that the State will reoffend").[5]

However, in the case at bar, the government has not repealed or amended any statute or regulation. The government's TPS determinations did not undergo the same rigorous process that statutes and regulations generally do (whether for repeal or amendment). On the other hand, there is also no dispute that the government's TPS designations/extensions have the force of law, and its actions have been formalized through publication in the Federal Register. Thus, it may be argued that the government's TPS designations/extensions are akin to regulations – in which case, arguably, mootness should be presumed and the burden shifted to Plaintiffs, *i.e.*, to show that that there is a reasonable expectation that the government will terminate the TPS designations in the future.

For purposes of this order, the Court need not decide whether it would be appropriate to presume mootness based on the government's TPS determinations and shift the burden to

---

city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated"; "[i]ndeed, the city has announced just such an intention").

[5] In addition to the Ninth Circuit, the Eleventh Circuit has adopted the same approach. *See Walker v. City of Calhoun*, 901 F.3d 1245, 1270 (11th Cir. 2018) ("When a government voluntarily ceases the challenged action, however, there is a presumption that the government will not later resume the action, so the plaintiff bears the burden of showing that there is 'a reasonable expectation' that the government 'will reverse course and reenact the allegedly offensive' policy.") (emphasis omitted).

Plaintiffs. This is because, even under the typical standard – which imposes a heavy burden on the government to prove mootness – the government has sufficiently established there is no reasonable expectation that the government will reverse course on the TPS designations. In this regard, the Ninth Circuit's decision in *Rosebrock* is instructive. There, the Ninth Circuit noted that

> a policy change not reflected in statutory changes or even changes in ordinances or regulations will not necessarily render a case moot, but it may do so in certain circumstances.
>
> We have not set forth a definitive test for determining whether a voluntary cessation of this last type – one not reflected in statutory changes or even in changes in ordinances or regulations – has rendered a case moot. But we have indicated that mootness is more likely if (1) the policy change is evidenced by language that is "broad in scope and unequivocal in tone"; (2) the policy change fully "addresses all of the objectionable measures that [the Government] officials took against the plaintiffs in th[e] case"; (3) "th[e] case [in question] was the catalyst for the agency's adoption of the new policy"; (4) the policy has been in place for a long time when we consider mootness; and (5) "since [the policy's] implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiff[ ]." On the other hand, we are less inclined to find mootness where the "new policy . . . could be easily abandoned or altered in the future."

*Rosebrock*, 745 F.3d at 971-72.

At the hearing, Plaintiffs argued that the government's actions in the case at bar did not amount to a change in policy. The Court rejects that position. The government clearly made a policy change: it considered intervening conditions for each of the six countries in making its TPS determinations (contrary to the Trump administration considering only originating conditions).[6] Furthermore, the government's consideration of intervening conditions was memorialized in written form – indeed, documented publicly in the Federal Register. It is also worth noting that each designation granted TPS status for the statutory maximum of eighteen months. *Cf. White*, 227 F.3d at 1223 (stating that "it is clear that the Achtenberg memorandum [a document issued by the Assistant Secretary for Fair Housing and Equal Opportunity] represents a permanent change in the way HUD conducts HFA investigations, not a temporary policy that the agency will refute

---

[6] And for Haiti and Sudan, there were two designations each; the first TPS designation took place in 2022 and the second in 2023.

12

once this litigation has concluded").

At the hearing, Plaintiffs suggested that the government's TPS determinations did not amount to a policy change because the government simply considered intervening factors as a factual matter and never stated outright that it was legally required to do so. Plaintiffs' position is strained. Because the government considered intervening conditions in making its TPS determinations, it implicitly endorsed consideration of intervening conditions as a legal matter, even if it never expressly stated so.[7] Even in the absence of a statement that it was legally required to consider intervening circumstances, the government's clearly articulated decision to do so negates a reasonable expectation that it will revert to the previous administration's contrary policy.

Because the government's TPS determinations did amount to a policy change, the Court turns to the *Rosebrock* factors. Those factors point to mootness.

(1) The government's policy change is unequivocal for the reasons stated above – *e.g.*, it consistently considered intervening conditions in multiple TPS determinations as publicly documented in the Federal Register.

(2) The policy change fully addressed Plaintiffs' objections by granting TPS status and/or rescinding TPS terminations at issue.

(3) Although it is not definitively evident whether the instant case was the catalyst for the government to make the policy change, the case was referred to in the Federal Register notices, thus indicating that the case was in fact a consideration for the government.

(4) Of the six countries at issue, Haiti was the first to be given a TPS designation after the Trump administration ended. Since Haiti's TPS designation issued in 2021, the policy change has been in effect for at least two years. This is not an insignificant period of time, especially as eighteen months is the statutory maximum for a TPS designation. Furthermore, it is notable that, by Plaintiffs' own account, the government's policy change was a return to a "'long-established practice' . . . used

---

[7] To the extent Plaintiffs are asserting that mootness cannot be established absent an express renunciation of a prior policy or practice by the government, that issue is addressed *infra*.

'by Republican and Democratic Administrations alike.'" Mot. at 11 (quoting CAC); *see also* CAC ¶ 11 (alleging that the Trump administration "abandoned a long-established practice under which [DHS] considered all current conditions – including intervening events – in deciding whether to extend or terminate a country's TPS designation"). The current policy is a long standing one.

    (5) Since the policy change, agency officials have not engaged in conduct similar to that challenged by Plaintiffs. In fact, Haiti and Sudan have each been designated twice, which reflects a commitment to the policy change.

In short, there is no indication that the government's policy change here is a "temporary [one] that [it] will refute once this litigation has concluded."[8] *White*, 227 F.3d at 1223.

    In their papers, Plaintiffs protest it is not absolutely clear that the challenged conduct could not reasonably be expected to recur because the government has failed to acknowledge that the Trump administration's interpretation of the TPS statute "ever existed" and has refused to explicitly acknowledge the unlawfulness of that interpretation. Opp'n at 1; *see also* Opp'n at 5 ("Defendants appears to have departed from a past practice . . . for the time being, but have never acknowledged using it, let alone disavowed it."). But Plaintiffs' position cannot be squared with the Ninth Circuit's decision in *Brach*. There, the court stated: "'[T]he mere power to reenact a challenged [policy] is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists.'" *Brach*, 38 F.4th at 14. Moreover, as noted above, even if the current administration does not concede the prior policy was unlawful, it has squarely rejected that policy.

    Plaintiffs contend still that case authority supports their position that there is no mootness where the government changes its conduct but fails to clearly renounce its prior conduct (*i.e.*, it does not clearly repudiate that prior conduct). *See* Opp'n at 6-7. The cases that Plaintiffs cite,

---

[8] To be sure, the Court is recognizes Plaintiffs' concern that there is the possibility of another policy change in the future, in particular, if Candidate Trump is reelected. But at this point in the proceedings, that possibility is too speculative. Furthermore, nothing precludes Plaintiffs from reinitiating a challenge if Candidate Trump were to be reelected and reinstates the challenged policy.

14

however, are distinguishable. For example, in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), the EPA promulgated what was known as the Clean Power Plan rule (pursuant to the Clean Air Act). The Clean Power Plan never went into effect because the same day that the EPA promulgated the rule, a number of parties petitioned for review in federal court. The Supreme Court granted a stay which prevented the rule from taking effect. Before the lower appellate court could issue a decision on the merits, there was a change in Presidential administrations, and "[t]he new administration requested that the litigation be held in abeyance so that EPA could reconsider the Clean Power Plan." *Id.* at 2604.

Subsequently, the EPA repealed the rule, concluding that the Plan had been in excess of its statutory authority. The agency also replaced the Clean Power Plan by promulgating a new regulation known as the Affordable Clean Energy rule. This agency action precipitated a new round of petitions for review. The D.C. Circuit thereafter held that the EPA's repeal of the Clean Power Plan rested on a mistaken reading of the Clean Air Act and thus vacated the agency's repeal of the Clean Power Plan and further vacated the replacement rule. This court decision was followed by another change in Presidential administrations. The EPA then asked the D.C. Circuit to partially stay issuance of its mandate so that the Clean Power Plan "would not immediately go back into effect. EPA believed that such a result would not make sense while it was in the process of considering whether to promulgate a new [replacement] rule." *Id.* at 2606.

One of the issues before the Supreme Court was whether any petitioners had standing to seek relief from the federal court. The Supreme Court held that at least one group of petitioners did, specifically because they had suffered injury as a result of the D.C. Circuit decision vacating the repeal of the Clean Power Plan. That decision "purports to bring the Clean Power Plan back into legal effect." *Id.* at 2606. The government argued that the petitioners' challenge should be deemed moot because the EPA had made a representation that it had "no intention of enforcing the Clean Power Plan prior to promulgating a new . . . rule." *Id.* at 2607. The Supreme Court rejected the government's position, stating as follows: "[T]he Government 'nowhere suggests that if this litigation is resolved in its favor it will not' reimpose emissions limits predicated on generation shifting; indeed, it 'vigorously defends' the legality of such an approach. We do not dismiss a

15

case as moot in such circumstances." *Id.*

As the government points out in its papers, *West Virginia* is of limited support to Plaintiffs. The facts in *West Virginia* are markedly different from those in instant case as (1) *West Virginia* involved a mere promise, not a policy change as in the case at bar, and (2) the promise in *West Virginia* was that the government would *not* enforce an existing policy whereas, here, the government has acted to enforce its policy and demonstrated a commitment to the same.

This, of course, is not to say that it is entirely irrelevant whether the government expressly repudiates its prior conduct. *See, e.g.*, *Brach*, 38 F.4th at 13 ("California has presented a strong case that the current order opening schools is not a temporary move to sidestep the litigation. Most importantly, the State has 'unequivocally renounce[d]' the use of school closure orders in the future. The State has consistently worked to reopen schools and Governor Newsom has publicly 'reaffirm[ed]' his 'commitment to keeping California's schools open for safe, in-person learning.' That reaffirmance is no mere statement of aspiration.'"). But as one district court has noted, *Brach*'s reference to the government's unequivocal renouncing of prior conduct should not be overstated:

> Although the Ninth Circuit found it compelling that the State "renounce[d] its use of school closure orders in the future," the court did not *require* an explicit renouncement for its analysis. The renouncement was significant only because it demonstrated the State's "commitment" to keeping schools open. As such, where the State shows through other means that it is committed to quitting the challenged conduct, the State does need an explicit announcement denouncing its previous conduct.

*Cal. Rental Hous. Ass'n*, 2022 U.S. Dist. LEXIS 186483, at *9-10 (emphasis added); *see also Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1152 (9th Cir. 2019) (stating that government "still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again" and "[i]t *may* do so by persuading the court that the change in its behavior is entrenched or permanent") (emphasis added; internal quotation marks omitted). While an express repudiation of prior policy may make for an exceptionally clear case for mootness, unequivocal action which implicitly repudiates prior policy may also establish mootness, particularly when all or nearly all the *Rosebrock* factors are satisfied.

16

Accordingly, the Court concludes that the government has met its burden of showing that the challenged conduct cannot reasonably be expected to recur. Plaintiffs' challenge to the TPS terminations is moot.

C.     Registration Fee of $50

Plaintiffs argue that, even if the Court finds their challenge to the TPS terminations moot, the case still has another live component. Plaintiffs have alleged that, when DHS issued new TPS designations for Haiti and Sudan (in August 2021 and April 2022), it required TPS holders from those countries to pay a $50 registration fee – "which does not apply to TPS holders *renewing* their registrations." CAC ¶ 172 (emphasis added). "These individuals would not have had to pay any fee if TPS for Haiti and Sudan had not been terminated during the Trump Administration, because they would have been able to apply for TPS as re-registrants, rather than initial applicants." *Id.* ¶ 173.

In response to this claim of injury, the government has provided a declaration from a USCIS employee, Sharon Orise. In her declaration, Ms. Orise testifies to the following:

- "On August 3, 2021, an FRN was published newly designating Haiti for TPS. Everyone who applied for Haiti TPS under this designation had to file as an initial registrant and pay the $50 registration fee, regardless of whether an individual had TPS prior to the January 18, 2018 termination [by the Trump administration]." Orise Decl. ¶ 15.

- "On April 19, 2022, an FRN was published designating Sudan for TPS. Everyone who applied for Sudan TPS under this designation had to file as an initial registrant and pay the $50 registration fee, regardless of whether an individual had TPS prior to the October 2017 termination [by the Trump administration]." Orise Decl. ¶ 18.

- But "[i]n August 2021, USCIS began refunding the $50 registration fee to Sudanese and Haitian TPS beneficiaries who paid this fee a second time due to the 2021 and 2022 FRNs. This would include applicants who paid the $50 fee under the Haiti 2021 designation, provided they had Haiti TPS prior to January 2018, and applicants who paid the $50 fee under the Sudan 2022 designation, provided they

17

|   |   |
|---|---|
|   | had Sudan TPS prior to October 2017. The first certified refund request was received on August 3, 2022. Thereafter, USCIS has been refunding on a quarterly basis. USCIS efforts to identify and refund applicable payments continue. There are currently no refunds pending." Orise Decl. ¶ 20. |
| • | "As of August 29, 2023, USCIS has processed 24,227 refunds for TPS Haiti applicants and 43 refunds for TPS Sudan applicants." Orise Decl. ¶ 21. |

The Orise declaration's statements regarding refunds are consistent with statements regarding registration fees made in the TPS extension given to Haiti in January 2023. *See* 88 Fed. Reg. 5,022, at 5,028 (Jan. 26, 2023) ("Individuals with existing TPS granted under the 2021 designation of Haiti must file Form-821 for re-registration as discussed above. Individuals who currently retain their TPS under the *Ramos* injunction noted in footnote 1 above, may file Form I-821 for re-registration if they wish to help ensure that their TPS continues should the *Ramos* court order end and they remain eligible. Re-registrants do not pay the $50 filing fee for the Form I-821 but must pay the biometric services fee if age 14 or older (or request a fee waiver).").

The government argues that any injury claimed by Plaintiffs with respect to the $50 registration fee is at most a collateral consequence (the primary injury being the TPS terminations by the Trump administration).[9] Plaintiffs somewhat disagree, asserting that the injury here could be construed as an ongoing injury, and not just a collateral consequence. How exactly the injury is characterized is not material. The government's position is that:

(1) Plaintiffs themselves have not suffered that injury – *i.e.*, those Plaintiffs who are from

---

[9] There is an exception to mootness for collateral legal consequences. This exception applies where a party would suffer collateral legal consequences "although the primary injury may have passed." *EEOC v. Fed. Express Corp.*, 558 F.3d 842, 847 (9th Cir. 2009) (stating that "[t]he collateral legal consequences exception applies [where], although the primary injury may have passed . . . , there remains 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment'"); *see also Ctr. for Biological Diversity*, 511 F.3d at 964-65 (the exception "applies where an appellant 'would suffer collateral legal consequences if the actions being appealed were allowed to stand'"). "It is commonly applied in habeas corpus proceedings where mootness would generally bar relief if the petitioner completes his sentence before the court has addressed the merits of his petition, but not if the plaintiff demonstrates he will suffer collateral legal consequences if the challenged conviction is allowed to stand." *San Luis & Delta-Mendota Water Auth. v. United States DOI*, 870 F. Supp. 2d 943, 959 (E.D. Cal. 2012).

18

Haiti or Sudan did not themselves pay a $50 registration fee even if other Haitian or Sudanese TPS holders did. *See* Mot. at 11 ("No Plaintiff alleges that they have actually had to pay a $50 registration fee."); Reply at 9 ("Whether cast as a continuing harm or collateral legal consequence, Plaintiffs do not allege that they are affected by the now-rescinded and already refunded $50 re-registration fee and thus have no standing to challenge it.").

(2) Even if Plaintiffs could amend to correct this deficiency (either amending to allege that they suffered this injury or amending to add a new plaintiff who did, *see* Opp'n at 14 n.3), "the latest amended complaint seeks only declaratory and injunctive relief," and "a moot case seeking [such] relief cannot be revived by a damages claim raised for the first time in briefing challenging mootness." Reply at 9; *see also Seven Words LLC v. Network Solns.*, 260 F.3d 1089, 1097 (9th Cir. 2001) ("The Supreme Court has admonished us to be wary of late-in-the-day damages claims . . . , cautioning that 'a claim for . . . damages, extracted late in the day from [plaintiff's] general prayer for relief and asserted solely to avoid otherwise certain mootness, [bears] close inspection.'").

(3) Even if the Court were inclined to allow a damages claim, there is sovereign immunity. *See* Reply at 9.

For purposes of this order, the Court need only address the first argument. Plaintiffs agree that no named Plaintiff has paid a $50 registration fee following the new designations of Haiti and Sudan. That being the case, there is no Plaintiff in this case who has standing to proceed with this claim.

### III.    CONCLUSION

For the foregoing reasons, the Court grants the government's motion to dismiss. Plaintiffs' claims challenging the TPS terminations are moot. Those claims are therefore dismissed. The dismissal is with prejudice as Plaintiffs have not indicated that they could plead additional facts to overcome this deficiency.

As for Plaintiffs' claim challenging the $50 registration fee, it is also dismissed but based

19

on lack of standing. The Court shall give Plaintiffs sixty (60) days to file an amended complaint to the extent they wish to pursue any claim based on the $50 registration fee.[10]

This order disposes of Docket No. 206.

**IT IS SO ORDERED**.

Dated: December 28, 2023

EDWARD M. CHEN
United States District Judge

---

[10] At the hearing, Plaintiffs indicated that, if the Court were to dismiss their primary claims challenging the TPS terminations, they would need some time to decide whether they still wanted to pursue their claim based on the $50 registration fee.