Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Jessica Karp Bansal (SBN 277347)
jessica.b@uwunited.org
UNEMPLOYED WORKERS UNITED
P.O. Box 142
Claremont, CA 91107
Telephone: (818) 570-6731

Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 896-6000

Attorneys for Plaintiffs

[*Additional Counsel Listed on Next Page*]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTA RAMOS, individually and on behalf of others similarly situated; CRISTINA MORALES; BENJAMIN ZEPEDA, individually and on behalf of others similarly situated; ORLANDO ZEPEDA; JUAN EDUARDO AYALA FLORES, individually and on behalf of others similarly situated; MARIA JOSE AYALA FLORES; ELSY YOLANDA FLORES DE AYALA; HNAIDA CENEMAT, individually and on behalf of others similarly situated; WILNA DESTIN; RILYA SALARY, individually and on behalf of others similarly situated; SHERIKA BLANC; IMARA AMPIE; MAZIN AHMED; HIWAIDA ELARABI; and SALMA AHMED, *Plaintiffs*, v. ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF | Case No. 3:18-cv-01554-EMC  The Honorable Edward M. Chen  **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES**  Date:   August 15, 2024 Time:   1:30 p.m. Place:  Courtroom 5, 17th Floor |

HOMELAND SECURITY; and UNITED
STATES OF AMERICA,

         *Defendants*.

KESHAV BHATTARAI; SAJJAN
PANDEY; SUMNIMA THAPA; DONALDO
POSADAS CACERES; SORAYDA
RODRIGUEZ MOTIÑO; DENIS MOLINA
CHAVEZ; S.S., individually and on behalf of
others similarly situated; and G.D.P.,
individually and on behalf of others similarly
situated,

         *Plaintiffs*,

    v.

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of Homeland Security;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; and UNITED
STATES OF AMERICA,

         *Defendants*.

Case No. 3:19-cv-00731-EMC

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES**

The Honorable Edward M. Chen

*Additional Counsel for Plaintiffs*

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
William S. Freeman (SBN 82002)
wfreeman@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Michael Kaufman (SBN 254575)
mkaufman@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Nicole M. Ryan (SBN 175980)
nicole.ryan@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1250
Facsimile: (415) 772-7400

Leslie A. Ridings (SBN 349465)
lridings@sidley.com
Amelia Mazzarella (SBN 35168)
amazzarella@sidley.com
Robert P. McMahon (SBN 351271)
rmcmahon@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Winifred Kao (SBN 241473)
winifredk@advancingjustice-alc.org
ADVANCING JUSTICE – ASIAN LAW
CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

Keally Cieslik (SBN 55413)
keally.c@uwunited.org
UNEMPLOYED WORKERS UNITED
100 N. Howard Street, Suite 4000
Spokane, WA 99201
Telephone: (508) 250-0518
Admitted Pro Hac Vice

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELIEF REQUESTED ............................................................................... 1

ISSUES TO BE DECIDED .................................................................................................... 1

INTRODUCTION .................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................................ 4

      A.     Plaintiffs Prevailed By Securing A Multi-Year Preliminary Injunction ...................... 4

      B.     Multiple Courts Found The TPS Terminations Represented An Arbitrary And Pronounced Break From Past Practice and Were Motivated by Animus. .................... 8

      C.     Despite Vigorously Disputing The Merits At Every Stage Of These Proceedings, Defendants Have Now Acknowledged The Terminations Were Erroneous. ............... 9

      D.     Defendants Only Ended This Litigation By Granting Plaintiffs TPS Protection. ....... 11

ARGUMENT ........................................................................................................................ 12

I.     PLAINTIFFS ARE ELIGIBLE AND PREVAILING PARTIES. ......................................... 12

II.    NEITHER DEFENDANTS' PRE-LITIGATION CONDUCT NOR THEIR LITIGATION POSITION WAS SUBSTANTIALLY JUSTIFIED. ................................................ 13

      A.     The TPS Terminations Were Not Substantially Justified. ........................................... 13

      B.     Defendants' Positions During the Litigation Were Not Substantially Justified. ......... 17

III.   PLAINTIFFS SEEK REASONABLE FEES AND COSTS. ................................................... 19

      A.     Plaintiffs Claim a Reasonable Number of Hours .......................................................... 20

      B.     Plaintiffs' Attorneys Are Entitled to Enhanced Rates. ................................................. 21

      C.     Plaintiffs Are Entitled to Recover Out-Of-Pocket Costs. ............................................ 22

IV.   CONCLUSION ........................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrew v. Bowen*,
   837 F.2d 875 (9th Cir. 1988) ...................................................................................13, 17

*Berardo v. INS*,
   No. 01796, 2021 WL 228890 (D. Or. Jan. 22, 2021) ............................................16, 21

*Bhattarai v. Nielsen*,
   No. C-19-0731 EMC (N.D. Cal. Feb. 10, 2019)...........................................................6

*Bickley v. CenturyLink, Inc.*,
   No. CV 15-1014-JGB, 2016 WL 9046911 (C.D. Cal. Nov. 29, 2016) .......................23

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*,
   532 U.S. 598 (2001)....................................................................................................12

*CASA de Maryland Inc. v. Trump*,
   355 F. Supp. 3d 307 (D. Md. 2018) ................................................................ *passim*

*Centro Presente v. DHS*,
   332 F. Supp. 3d 393 (D. Mass. 2018) .............................................................. *passim*

*Corbin v. Apfel*,
   149 F.3d 1051 (9th Cir. 1998) ....................................................................................14

*Costa v. Comm'r of SSA*,
   690 F.3d 1132 (9th Cir. 2012) ....................................................................................20

*Dennis v. Chang*,
   611 F.2d 1302 (9th Cir. 1980) ....................................................................................20

*Flores v. Shalala*,
   49 F.3d 562 (9th Cir. 1995) ........................................................................................14

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983).....................................................................................................19

*Higher Taste, Inc. v. City of Tacoma*,
   717 F.3d 712 (9th Cir. 2013) ......................................................................................13

*Ibrahim v. DHS*,
   912 F.3d 1147 (9th Cir. 2019) ...............................................................13, 15, 17, 20

*Int'l Woodworkers of Am., AFL-CIO, Local 3-98 v. Donovan*,
   792 F.2d 762 (9th Cir. 1985) ......................................................................................22

*Li v. Keisler,*
   505 F.3d 913 (9th Cir. 2007) ....................................................................................12

*Medina Tovar v. Zuchowski,*
   41 F.4th 1085 (9th Cir. 2022) ............................................................................15, 18

*Meier v. Colvin,*
   727 F.3d 867 (9th Cir. 2013) .....................................................................12, 14, 16

*Meza-Vazquez v. Garland,*
   993 F.3d 726 (9th Cir. 2021) ....................................................................................12

*Mitford v. Kijakazi,*
   No. 20-cv-05360-TSH, 2021 WL 6052006 (N.D. Cal. Dec. 21, 2021).......................14

*Murphy v. Colvin,*
   No. 4:14-cv-03784-YGR, 2016 WL 1410279 (N.D. Cal. Apr. 11, 2016)...................14

*NAACP v. DHS,*
   364 F. Supp. 3d 568 (D. Md. 2019).....................................................................9, 18

*Nadarajah v. Holder,*
   569 F.3d 906 (9th Cir. 2009) ..............................................................................12, 21

*Nat. Res. Def. Council, Inc. v. Winter,*
   543 F.3d 1152 (9th Cir. 2008) ..................................................................................21

*Nat'l Family Farm Coal. v. EPA,*
   29 F.4th 509 (9th Cir. 2022) ....................................................................................21

*Pa. v. Del. Valley Citizens Counsel for Clean Air,*
   478 U.S. 546 (1986).................................................................................................19

*Pierce v. Underwood,*
   487 U.S. 552 (1988).....................................................................................15, 18, 21

*Pirus v. Bowen,*
   869 F.2d 536 (9th Cir. 1989) ....................................................................................21

*Ramos v. Nielsen,*
   336 F. Supp. 3d 1075 (N.D. Cal. 2018) ........................................................... *passim*

*Ramos v. Wolf,*
   59 F. 4th 1010 (9th Cir. 2023) ...................................................................................5

*Ramos v. Wolf,*
   975 F.3d 872 (9th Cir. 2020) ........................................................................... *passim*

*Saget v. Trump,*
   345 F. Supp. 3d 287 (E.D.N.Y. 2018) ............................................................. *passim*

iii

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................................8, 15, 16, 17

*Sampson v. Chater*,
    103 F.3d 918 (9th Cir. 1996) ...................................................................................14

*Scarborough v. Principi*,
    541 U.S. 401 (2004)..................................................................................................19

*Spurlock v. Sullivan*,
    790 F. Supp. 979 (N.D. Cal. 1992) ..........................................................................14

*Thangaraja v. Gonzales*,
    428 F.3d 870 (9th Cir. 2005) .........................................................................14, 17, 18

*Tobeler v. Colvin*,
    749 F.3d 830 (9th Cir. 2014) ...................................................................................14

*Trump v. Hawaii*,
    585 U.S. 667 (2018).............................................................................................7, 18

*United States v. $12, 248 U.S. Currency*,
    957 F.2d 1513 (9th Cir. 1991) .................................................................................14

*United States v. Marolf*,
    277 F.3d 1156 (9th Cir. 2002) .......................................................................13, 14, 16

*Yaide v. Wolf*,
    No. 19-cv-07874-CRB, 2020 WL 5816890 (N.D. Cal. Sept. 30, 2020)................14, 17

**Statutes & Regulations**

28 U.S.C. § 2412 .......................................................................................12, 13, 21, 22

86 Fed. Reg. 41,863 (Aug. 3, 2021)..............................................................................9, 10

87 Fed. Reg. 23,202 (Apr. 19, 2022) ...........................................................................9, 10

88 Fed. Reg. 40,282 (June 21, 2023) .....................................................................2, 9, 11, 16

88 Fed. Reg. 40,294 (June 21, 2023) .....................................................................2, 9, 11, 16

88 Fed. Reg. 40,304 (June 21, 2023) ..........................................................................2, 9

88 Fed. Reg. 40,317 (June 21, 2023) ..........................................................................2, 9

**Other Authorities**

Department of Homeland Security, "DHS Rescinds Prior Administration's
    Termination Of Temporary Protected Status Designations For El Salvador,
    Honduras, Nepal, And Nicaragua" (June 13, 2023) ......................................................................11

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES; CASE NO. 3:18-CV-01554-EMC

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 15, 2024 at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Edward M. Chen, Plaintiffs move for the recovery of attorneys' fees and costs in the amount of $3,654,132.56, pursuant to 28 U.S.C. § 2412, the Equal Access to Justice Act ("EAJA"). This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, concurrently filed declarations and exhibits, all pleadings and papers on file, and any other arguments and evidence that may be presented.

## STATEMENT OF RELIEF REQUESTED

Plaintiffs seek an award of fees and costs as prevailing parties under EAJA in the amount of $3,654,132.56 ($3,507,052.12 in fees; $147,080.44 in costs).

## MEMORANDUM OF POINTS AND AUTHORITIES

### ISSUES TO BE DECIDED

1.  Are Plaintiffs eligible and prevailing parties under EAJA?
2.  Can Defendants demonstrate substantial justification for adopting and then defending decisions to terminate Plaintiffs' Temporary Protected Status ("TPS"), which they later rescinded or replaced as erroneous?
3.  Are the fees requested reasonable, including because certain counsel should receive market rates in light of their expertise with complex immigration litigation?

### INTRODUCTION

Plaintiffs filed this litigation six years ago, when Defendants terminated the humanitarian legal status that Plaintiffs and over 400,000 others had held in many cases for decades. By any measure, Plaintiffs have prevailed. They maintained their legal status and work authorizations—preserving their families, homes, and the very fabric of their lives in this country—by securing a historic injunction. Plaintiffs also protected the rights of hundreds of thousands of other TPS holders and their families from El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan, including roughly 200,000 U.S. citizen children of TPS holders.

This case ended only because Defendants essentially confessed error by replacing or rescinding the challenged decisions so thoroughly that this Court ruled the case moot. Against this

backdrop, Defendants cannot possibly establish substantial justification for *all* of the following: (1) the original TPS termination decisions, (2) the core factual positions they took in litigation, or (3) the legal arguments they advanced to defend those positions. Crucially for present purposes, Defendants must establish substantial justification for *all three* to avoid an award of attorneys' fees. They cannot do so as to even one of them.

*First*, every court to consider the issue (and every judge to opine on it) has concluded that DHS acted arbitrarily when terminating TPS for these six countries. Their findings rest upon a body of evidence that leaves no doubt that the government's pre-litigation conduct—i.e., the TPS terminations themselves—were not substantially justified. Indeed, after years of litigation, Defendants essentially confessed error by either re-designating countries for TPS protection based on the very kinds of country conditions they previously said they could not consider (as for Haiti and Sudan), or by literally confessing "error"[1] and vacating TPS decisions for the first time *ever* in thirty years of TPS decision making (as for El Salvador, Honduras, Nepal, and Nicaragua).

*Second*, once litigation began, Defendants took the objectively indefensible factual position that they had not made any change in their policy or practice about how to evaluate country conditions. This defied the clear record evidence—including the sworn public testimony of the DHS Secretary and other high-level government officials. This Court rejected that position as contradicted by "a wealth of record evidence," which it exhaustively reviewed in its orders denying Defendants' motion to dismiss and granting Plaintiffs' motion for preliminary injunction. *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1092 (N.D. Cal. 2018). It found the record evidence to establish a "substantive" and "highly consequential" change, despite Defendants' asserting the opposite. *Id.* at 16.

*Third*, Defendants repeatedly took extreme and unreasonable legal positions, including that this Court lacked jurisdiction over Plaintiffs' *constitutional* claim, Mot. to Dismiss 21–22, ECF No. 20; Appellants' Opening Brief at 39, *Ramos v. Nielsen*, No. 18-16981 (9th Cir. Nov. 29, 2018), ECF

---

[1] 88 Fed. Reg. 40,282, 40,286 (June 21, 2023) ("[t]hat conclusion was in error," referring to the termination of TPS for El Salvador); 88 Fed. Reg. 40,294, 40,297 (June 21, 2023) ("Nicaragua's 1999 TPS designation should not have been terminated."); *see also* 88 Fed. Reg. 40,317, 40320 (June 21, 2023) ("the Secretary determined that Nepal's 2015 TPS designation should not have been terminated."); 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("Honduras's 1999 designation should not have been terminated.").

No. 11—a position "squarely contradicted by controlling precedent," *Ramos v. Wolf*, 975 F.3d 872, 924-25 (9th Cir. 2020), *vacated upon rehearing en banc*, 59 F.4th 1010 (9th Cir. 2023) (Christen, J. dissenting).

Defendants undoubtedly will point to the decision by two members of the Ninth Circuit panel whose now-vacated decision held the Court lacked jurisdiction over Plaintiffs' APA claim. However, that decision does nothing to show that the terminations themselves *or* Defendants' *factual* positions during this litigation were substantially justified, nor does it establish that Defendants' legal positions *overall* were substantially justified. The only judge on the panel who considered the factual questions (Judge Christen, in dissent), agreed with every other court that looked at the evidence, concluding "[t]here is no real room for debate that the agency changed its practice" to effect the terminations. *Compare Ramos*, 975 F.3d at 895 (panel majority declining to address the Administrative Procedures Act ("APA") claim on the merits) *with id.* at 920 (Christen, J., dissenting). The agency's own words permit no other conclusion. In the frank assessment of then-USCIS Director L. Francis Cissna, the challenged terminations were the product of people who opposed TPS "sn[ea]k[ing] up" behind those who recommended extensions consistent with decades of practice, "clubb[ing] [them] over the head, push[ing] [their] senseless bod[ies] out of the way, and finish[ing]" decisions to ensure terminations. *Ramos*, 336 F. Supp. 3d at 1102.

Plaintiffs' fee request also is reasonable given the complex and demanding nature of this litigation. It raised the first-ever challenge to a TPS termination since Congress created the program in 1990. It required a host of specialized legal skills and knowledge about the complex and unique jurisdictional scheme associated with review of TPS decisions; the interaction of administrative, immigration, and constitutional law; and the unique issues that arise in cases seeking relief for large numbers of immigrants. *See* Decl. of Ahilan Arulanantham ¶¶ 16–21, 23 ("Arulanantham Decl."); Decl. of Jessica Bansal ¶ 3 ("Bansal Decl."); Decl. of Sean Commons ("Commons Decl.") ¶¶ 4, 5, 11, 12; Decl. of Emi MacLean ¶¶ 5–6, 12, 19 ("MacLean Decl."); Decl. of Jayashri Srikantiah ¶¶ 9–15 ("Srikantiah Decl."). All of those specialized skills and knowledge were brought to bear to address profound constitutional and jurisdictional questions in this case, including novel issues raised by direct evidence of racial animus at the highest levels of the executive branch and complex

1   questions regarding jurisdiction to review a rule change an agency denies took place.

2       The difficulty of this case was further compounded by several additional factors. First,

3   Defendants resisted all discovery, including by interposing a variety of privilege objections, resulting

4   in numerous discovery motions and hearings, before ultimately being compelled to produce

5   voluminous documents as well as witnesses. *See, e.g.*, Commons Decl. ¶ 7. Second, Plaintiffs'

6   counsel had to complete all of the trial-level work on a compressed schedule given the immediate

7   and irreparable threat to the lives and families of TPS holders, which required marshalling teams of

8   lawyers across multiple organizations. *See, e.g.*, Arulanantham Decl. ¶¶ 18, 21–23; Commons Decl.

9   ¶¶ 11–13; MacLean Decl. ¶¶ 5, 21; Srikantiah Decl. ¶¶ 10–11. Third, the Plaintiffs (and the

10   communities from which they came) included many people who needed to receive important legal

11   information in their best languages, which were Spanish, Haitian Creole, and Nepali. *See, e.g.*,

12   Arulanantham Decl. ¶ 21; Bansal Decl. ¶ 12; MacLean Decl. ¶¶ 5–6, 12; Srikantiah Decl. ¶ 13.

13   Finally, Plaintiffs' counsel vigorously litigated this matter through appeal, including securing *en*

14   *banc* review to vacate an adverse panel decision, after which Defendants dismissed the appeal.

15       For these and other reasons, Plaintiffs respectfully request that the Court award prevailing

16   party fees and costs of $3,654,132.56 ($3,507,052.12 in fees; $147,080.44 in costs).

17   **FACTUAL AND PROCEDURAL BACKGROUND**

18       **A.**     **Plaintiffs Prevailed By Securing A Multi-Year Preliminary Injunction.**

19       Since its inception in 1990, the TPS program has allowed foreign nationals who are unable to

20   return safely to their countries of origin to reside and work lawfully in the United States. Until the

21   termination decisions challenged in this litigation, Defendants consistently considered intervening

22   events—such as natural disasters or socio-economic crises that occurred ***after*** a country's initial TPS

23   designation—when deciding whether to extend TPS designations. Compl. ¶ 75, ECF No. 1.

24       This abruptly changed in 2017. Without any formal announcement or explanation, DHS

25   adopted a novel interpretation of the TPS statute that precluded considering any intervening country

26   conditions. *Id*. ¶¶ 76–77. Enforcing that novel interpretation, DHS suddenly terminated the TPS

27   designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan over the span of a few

28   months in late 2017 and early 2018. Those decisions threatened the immigration status of

approximately 400,000 people in the United States, most of whom had lived here for decades. They faced potential removal within a matter of months. *Id.* ¶¶ 78–88.

In 2018, Plaintiffs brought the first of four lawsuits filed across the country to challenge TPS terminations. Compl., ECF No. 1.[2] After surviving a motion to dismiss that raised complex jurisdictional and constitutional issues, *see* Order Den. Defs.' Mot. Dismiss, ECF No. 55, ("MTD Order"), Plaintiffs then brought the first motion for a preliminary injunction to halt enforcement of the challenged TPS terminations. Pls.' Mot. Prelim. Inj., ECF No. 89. After an exhaustive review, this Court found "a wealth of record evidence to support Plaintiffs' position that the DHS changed its practices with regard to TPS designations" in late 2017 and 2018. *Ramos*, 336 F. Supp. 3d at 1093. This Court found that "[t]his departure was a substantial and consequential change in practice." *Id.* at 1097. The Court relied in part on its prior finding that, on their face, TPS decisions "[p]rior to October 2017 . . . consistently considered . . . whether intervening events had frustrated or impeded recovery efforts from the originating conditions in Sudan, Haiti, Nicaragua, and El Salvador," whereas the new decisions did not. MTD Order 27.

As a result, the Court found that DHS's "deliberate choice to base the TPS decision solely on whether the originating conditions" persisted was "a clear departure from prior administration practice" that Defendants had failed to explain. *Ramos*, 336 F. Supp. 3d at 1097; *id.* at 1101 ("the sequence of events leading up to the challenged decisions are irregular and suggestive of a pre-determined outcome not based on an objective assessment").

Crucially for present purposes, this Court's core finding on that central factual issue was never disturbed on appeal or contradicted by any of the fifteen *other* judges to consider the TPS terminations in any form (including the six judges that wrote lengthy rulings either at the trial or appellate levels).[3]

---

[2] Only this lawsuit challenged all of the terminations. The other lawsuits challenged just the Haiti decision, just the El Salvador decision, or in one case both the Haiti and El Salvador decisions.

[3] *Saget v. Trump*, 345 F. Supp. 3d 287 (E.D.N.Y. 2018) (Kuntz, J.); *CASA de Maryland Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018) (Hazel, J.); *Centro Presente v. DHS*, 332 F. Supp. 3d 393 (D. Mass. 2018) (Casper, J.); *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020) (Callahan, J., Christen, J., Nelson, J.) (on appeal) and *Ramos v. Wolf*, 59 F. 4th 1010 (9th Cir. 2023) (Callahan, J., Christen, J., Marguia, J. Rawlinson, J., Friedland, J., Lee, J., Forrest, J., Koh, J., Sanchez, J., Mendoza Jr., J., Desai, J.) (en banc).

This Court also found "at the very least, serious questions going to the merits" of the Fifth Amendment discrimination claim—that the termination decisions were motivated by racial animus– "justifying the issuance of a preliminary injunction on an independent ground." *Ramos*, 336 F. Supp. 3d at 1089.

The Court's order enjoining DHS from enforcing TPS terminations predicated on a departure from past practice would remain in force for more than five years, protecting all TPS holders threatened by this new policy. *Ramos*, 336 F. Supp. 3d at 1108.

After Defendants terminated TPS for Honduras and Nepal on the same flawed logic, Plaintiffs filed a companion case challenging those terminations. Class Action Complaint, *Bhattarai v. Nielsen*, No. C-19-0731 EMC (N.D. Cal. Feb. 10, 2019), ECF No. 1.[4] Plaintiffs began to pursue discovery in *Bhattarai*, but the parties agreed to stay discovery on condition that Defendants "take steps with respect to TPS holders from Honduras and Nepal equivalent to those that they agreed to take with respect to the TPS holders at issue in *Ramos*," including by continuing TPS protections for people from Honduran and Nepal during the pendency of *Ramos.* Stipulation to Stay Proceedings ¶ 7, *Bhattarai* (No. C-19-0731 EMC), ECF No. 23.

Defendants appealed the preliminary injunction order, initially obtaining a 2-1 ruling at the Ninth Circuit. *Ramos v. Wolf*, 975 F.3d 872, 899 (9th Cir. 2020), *vacated upon rehearing en banc*, 59 F.4th 1010 (9th Cir. 2023). That decision, however, did not accept Defendants' version of the facts; nor did it conclude that the TPS decisions complied with the APA. Rather, it concluded that the court lacked jurisdiction to review the APA claim. *Ramos*, 975 F.3d at 895 ("Given that Plaintiffs may not raise their APA claim as a matter of law, the claim cannot serve as a basis for the preliminary injunction and we need not consider its likelihood of success on the merits."). The panel majority also denied relief on Plaintiffs' Fifth Amendment discrimination claim, but not on the broad legal theory Defendants advanced (which every member of the panel rejected). Nor did the panel endorse Defendants' attempt to white-wash then-President Trump's statements denigrating non-white non-European immigrants as objective descriptions of country conditions. Appellants'

---

[4] *Bhattarai* was subsequently related to *Ramos* by this Court on February 25, 2019 (Related Case Order, *Ramos*, No. 18-16981, ECF No. 142), and consolidated with *Ramos* by this Court on August 3, 2023. Order Granting Stip. Consol. Cases, *Ramos*, No. 18-16981, ECF No. 201.

Opening Brief at 8–13, *Ramos* (No. 18-16981), ECF No. 11. Rather, the panel rejected the claim for an alleged lack of evidence showing that the President's animus influenced lower-level decisionmakers. *Id.* at 896 ("Given the similarities between the EPC claim in this case and *Regents*, we reject the Government's contention that *Trump v. Hawaii's* standard of review should apply in this case. We therefore review Plaintiffs' likelihood of success on their EPC claim under the *Arlington Heights* standard."); *id.* at 899 ("[E]ven accepting that the agency made its decisions with a predetermined objective to terminate TPS, there is still no evidentiary support for the conclusion that this overarching goal was motivated by racial animus[.]").

Judge Christen dissented, finding both jurisdiction on the APA claim and ample basis to affirm this Court's finding of a likelihood of success on the merits of that claim. *See, e.g.*, *Ramos*, 975 F.3d at 921 (Christen, J., dissenting) (describing "the very apparent flaw in the government's reasoning" on the APA claim, using El Salvador as an example); *id.* at 923 (describing evidence, and concluding it "leave[s] no doubt that there was ample support for the district court's preliminary conclusion that the subject TPS terminations may have been the result of an irregular, non-evidence based process" given "compelling[] support[]" in record evidence). Because she found the APA ground sufficient, Judge Christen would not have reached the discrimination claim. However, she did address Defendants' argument that the court lacked jurisdiction to address the discrimination claim, rejecting it as inconsistent with "black-letter law" and "squarely contradicted by controlling precedent." *Id.* at 924-25 (Christen, J., dissenting). She also strongly rejected the government's attempt to redescribe former President Trump's statements as benign, saying:

> Remarkably, the government urges us to interpret the many denigrating comments in the record as descriptions of inferior living conditions in foreign countries, rather than evidence of racial animus. But we cannot sweep aside the words that were actually used, and it would be worse for us to deny their meaning. Some of the statements expressly referred to people, not to places. The President's statements require no deciphering.

*Id*. She also noted that this finding was undisputed by the majority. *Id.*

Plaintiffs sought rehearing *en banc*, which the full Ninth Circuit granted, thereby vacating the Court of Appeal's order. One week before the *en banc* argument, Defendants rescinded the termination decisions they had defended for the prior four years and moved to abandon their appeal.

After oral argument, the *en banc* court granted Defendants' motion to dismiss their appeal, over Plaintiffs' objection. Order, *Ramos* (No. 16981), ECF No. 191.

**B.    Multiple Courts Found The TPS Terminations Represented An Arbitrary And Pronounced Break From Past Practice and Were Motivated by Animus.**

In every other case to consider the factual record and applicable law—whether in the context of a motion to dismiss or motion for preliminary injunction—district courts rejected the same core position Defendants advanced here—that the TPS terminations were consistent with past practice, rather than an abrupt, unexplained, and arbitrary break from it. *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 417 (D. Mass. 2018) (motion to dismiss); *Saget v. Trump*, 345 F. Supp. 3d 287, 298 (E.D.N.Y. 2018) (motion to dismiss); *Saget v. Trump*, 375 F. Supp. 3d 280, 354–59 (E.D.N.Y. 2019) (preliminary injunction); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 327–28 (D. Md. 2018) (motion to dismiss). Those courts made those findings based on overwhelming evidence, including that Defendants "historically interpreted" the TPS statute not merely to permit, but "to require an analysis of conditions at the 'particular point in time when the adjudication is occurring'"—i.e., to require analysis of "'intervening factors' arising after a country's original TPS designation," including "conditions 'not necessarily caused by,' and conditions 'untethered' to, the initial event that led to an initial TPS designation." *See, e.g.*, *Saget*, 375 F. Supp. 3d at 300 (granting preliminary injunction after trial). Those courts also found unrebutted evidence that Defendants further departed from settled practice by seeking out and considering irrelevant evidence, such as evidence of crime rates and the use of public benefits by TPS recipients, in their unlawful attempt to justify terminating TPS. *Id.* at 300, 308.

In addition, those courts recognized that, despite every opportunity, Defendants "have given no explanation at all—much less one acknowledging the change in position—for the new policy." *Centro Presente*, 332 F. Supp. 3d at 417; *accord Saget* 345 F. Supp. 3d at 298–99 (Defendants "have provided no 'reasoned explanation' for their departure from prior practices" or the decision to "abandon[] their well-established standard for reviewing TPS designations in favor of a narrower construction"); *CASA de Maryland, Inc.*, 355 F. Supp. 3d at 312–13, 328 (finding that there was a "lack of an explanation for a changed approach" and thus "[p]laintiffs plausibly allege[d] the

terminations [were] arbitrary and capricious."). Those courts often considered this Court's analysis persuasive. *Saget*, 375 F. Supp. 3d at 353–60; *CASA de Maryland, Inc.*, 355 F. Supp. 3d at 327–28.

Further confirming the weakness of Defendants' position, other district courts also rejected Defendants' view of the evidence concerning discrimination, finding sufficient allegations that "discriminatory purpose was a motivating factor" for the decisions to terminate TPS, and therefore denying Defendants' motion to dismiss these claims. *Centro Presente*, 332 F. Supp. 3d at 415; *accord Saget*, 375 F. Supp. 3d at 302–304; *CASA de Maryland, Inc.*, 355 F. Supp. 3d at 325–26 ("One could hardly find more direct evidence of discriminatory intent towards Latino immigrants."); *NAACP v. DHS*, 364 F. Supp. 3d 568, 577–78 (D. Md. 2019). In one case, the court conducted a four-day bench trial and enjoined the challenged TPS termination of Haiti in part based on a finding that "animus against Haitian foreign nationals" "influenced the Secretary's decision to end [the] TPS designation." *Saget*, 375 F. Supp. 3d at 365–74. Though the Ninth Circuit panel disagreed with those findings, that ruling was vacated, and the *en banc* panel never reached the issue because Defendants abandoned their appeal.

## C. Despite Vigorously Disputing The Merits At Every Stage Of These Proceedings, Defendants Have Now Acknowledged The Terminations Were Erroneous.

After resisting nearly every step taken by Plaintiffs in this litigation for years, and denying that any deviation from past practice had occurred, DHS ultimately reversed course, conceding via official action that the terminations were the product of the very "errors" Plaintiffs alleged and proved at the outset. *See* 88 Fed. Reg. 40,294, 40,297 (June 21, 2023) ("Nicaragua's 1999 TPS designation should not have been terminated."); 88 Fed. Reg. 40,282, 40286 (June 21, 2023) (El Salvador's TPS termination "reflect[ed] an inadequate assessment" of intervening conditions); 88 Fed. Reg. 40,317, 40,320 (June 21, 2023) ("the Secretary has determined that Nepal's 2015 TPS designation should not have been terminated."); 88 Fed. Reg. 40,304, 40,307 ("Honduras's 1999 designation should not have been terminated.").

In August 2021 and April 2022, respectively, DHS undid the terminations for Haiti and Sudan by newly designating them for TPS status for 18 months. 86 Fed. Reg. 41,863 (Aug. 3, 2021); 87 Fed. Reg. 23,202 (Apr. 19, 2022). For Haiti, the Federal Register notice pointed to ongoing

1  human rights violations, security concerns (including violent criminal gangs), poverty, a weak

2  healthcare system, and high rates of food insecurity exacerbated by natural disasters. 86 Fed. Reg.

3  41,863 (Aug. 3, 2021). These are the very types of conditions that were present—but ignored—when

4  TPS for Haiti was terminated. *Ramos*, 336 F. Supp. 3d at 1096 (citing career employee country

5  conditions memos documenting that, at the time of termination, Haiti "continues to be affected by a

6  convergence of humanitarian needs, including food insecurity, internal displacement, an influx of

7  refugees from the Dominican Republic, the persistence of cholera, and the lingering impact of

8  various natural disasters" as well as "a series of other challenges related to housing, healthcare,

9  economic growth, political instability, security, and environmental concerns") (internal quotation

10  marks and citations removed); *see also* Ex. 1 to Notice Filing Adminstrative R. 46–63, ECF No.

11  113-1 (2017 Haiti Country Conditions Memo discussing security concerns, violent criminal gangs,

12  poverty, weak healthcare system, food insecurity, and natural disasters).

13       For Sudan, the Federal Register notice newly designating TPS described ongoing armed

14  conflict and civil unrest, and noted that "Sudan also *continues* to suffer from one of the world's

15  largest protracted humanitarian crises" exacerbated by extreme poverty, widespread food insecurity,

16  and disease outbreaks. 87 Fed. Reg. 23,202, 23,206 (Apr. 19, 2022) (emphasis added, internal

17  quotation marks omitted). Again, these were the very types of conditions present when TPS for

18  Sudan was terminated in 2017. 87 Fed. Reg. 23,202 (Apr. 19, 2022). *See Ramos*, 336 F. Supp. 3d at

19  1087 (USCIS and State Department Officials found "the ongoing armed conflict and temporary

20  conditions that supported Sudan's designation for TPS persist"); *see also* Ex. 1 to Notice Filing

21  Administrative R. 46–63, ECF No. 111-1 at 51–62 (2017 Sudan Country Conditions Memo

22  describing ongoing armed conflict, civil unrest, extreme poverty, widespread food insecurity, and

23  disease outbreaks); *Ramos*, 336 F. Supp. 3d at 1103 (State Department objecting that Sudan TPS

24  termination was based on "significant mischaracterizations . . . at odds with the Department's

25  understanding of circumstances on the ground").

26       Then, on June 13, 2023 (one week before the *en banc* argument), DHS announced via a press

27  release that they would rescind the remaining terminations at issue in this case—for El Salvador,

28

Honduras, Nepal, and Nicaragua—and instead extend those TPS designations.[5] The Federal Register notices that followed acknowledged that terminating TPS designations for these countries "was in error" (88 Fed. Reg. 40,282, 40,286), that they "should not have been terminated" (88 Fed. Reg. 40,294, 40,297), and that they "reflect[ed] an inadequate assessment" of intervening conditions (88 Fed. Reg. 40,282, 40,286).

Notably, the notices pointed out errors that occurred because DHS failed to account for events that occurred after the initial designations—precisely the issue Plaintiffs had litigated for four years via their APA claim. For example, one pointed to the failure to account for "frequent and significant environmental disasters . . . causing additional challenges," such as "hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, a coffee rust epidemic, a prolonged and severe drought, and an increase in various mosquito-borne diseases, among other things." 88 Fed. Reg. 40,282, 40,286. Another pointed out that, "at the time of the decision to terminate TPS, Nicaragua continued to experience ongoing environmental disasters that were either insufficiently considered or not considered in the termination decision." 88 Fed. Reg. 40,294, 40,298.

**D.      Defendants Only Ended This Litigation By Granting Plaintiffs TPS Protection.**

On the heels of the TPS terminations, Defendants moved to dismiss on the ground that "[t]he currently in-force agency decisions extend TPS designations for the maximum amount of time permitted under law, and there is no further relief for this Court to provide. This case is moot." Defs.' Reply in Supp. Mot. Dismiss 1, ECF No. 212. Among other things, Defendants asserted that Plaintiffs were challenging "*no-longer operative policies*," *id.*, and had "no evidence that the challenged policies are likely to be reinstated"—effectively admitting after years of denials that Defendants *had* adopted policies that led to the TPS terminations, *id.* at 5. Defendants also conceded that, by rescinding the terminations and granting TPS extensions, Defendants "adopted an approach [to TPS decisions] that comports with plaintiffs' understanding of the law and their view of

---

[5] Department of Homeland Security, "DHS Rescinds Prior Administration's Termination Of Temporary Protected Status Designations For El Salvador, Honduras, Nepal, And Nicaragua" (June 13, 2023), *available at* https://www.dhs.gov/news/2023/06/13/dhs-rescinds-prior-administrations-termination-temporary-protected-status. The press release expressly noted that this action was "relevant to the litigation challenging the now-rescinded terminations."

11

1  longstanding agency practice," *id.* at 3, including by "explain[ing]" in the Federal Register notice

2  why the terminations "were incorrect" and "explicitly referenc[ing] this case and the impacts it has

3  had on TPS policy, *id.* at 6. In light of Defendants' representation that "the new policy will be in

4  place for as long as the [TPS] statute allows" (*id.*), the Court dismissed this action as moot, Order

5  Granting Mot. Dismiss, ECF No. 222.

6  **ARGUMENT**

7      The "policy goal of EAJA is to encourage litigants to vindicate their rights" where, due to

8  flawed pre-litigation or litigation conduct, the government has "forced the litigant to seek relief from

9  a federal court." *Li v. Keisler*, 505 F.3d 913, 919 (9th Cir. 2007). EAJA entitles Plaintiffs to recover

10 fees and costs where they meet the statutory eligibility requirements and are the prevailing parties.

11 Defendants can avoid fees only by establishing that: (1) their pre-litigation conduct (here the TPS

12 terminations), (2) their factual positions in litigation, and (3) their legal arguments in support of

13 those positions were all substantially justified. As the Ninth Circuit recently explained, "[t]he

14 government bears the burden of showing that it was substantially justified in 'both its litigation

15 position and the underlying agency action giving rise to the civil action.'" *Meza-Vazquez v. Garland*,

16 993 F.3d 726, 729 (9th Cir. 2021) (citing *Meier v. Colvin*, 727 F.3d 867, 870 (9th Cir. 2013)). That

17 means "the government's position must have a 'reasonable basis both in law and fact.'" *Meier*, 727

18 F.3d at 870. Because Defendants cannot satisfy that burden, and because the fees Plaintiffs seek are

19 reasonable, the Court should grant this motion.

20 **I.    PLAINTIFFS ARE ELIGIBLE AND PREVAILING PARTIES.**

21     Plaintiffs are eligible to recover fees and costs under EAJA. For a plaintiff to recover, their

22 net worth must not exceed $2,000,000 at the time they filed the relevant action. 28 U.S.C.

23 § 2412(d)(2)(B)(i); *Nadarajah v. Holder*, 569 F.3d 906, 912 (9th Cir. 2009) (awarding EAJA fees on

24 behalf of immigrant). Here, Plaintiffs clearly qualify. *See* Bansal Decl. ¶¶ 24–26, Exs. D–V.

25     Plaintiffs also are the prevailing parties. By securing a preliminary injunction that lasted for

26 years and preserved the immigration status of hundreds of thousands of individuals, plaintiffs

27 achieved a "material alteration of the legal relationship of the parties" that was "judicially

28 sanctioned." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S.

12

598, 604–605 (2001) (internal quotations omitted). The preliminary injunction was "subsequently rendered moot [only] by the defendant's own actions" that, in Defendants' own words, granted Plaintiffs all the relief they sought. *Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 717 (9th Cir. 2013) (holding a preliminary injunction later rendered moot conveyed prevailing party status). By the time the preliminary injunction was rendered moot, Plaintiffs had secured "relief that was as enduring as a permanent injunction would have been and, by virtue of the case's mootness, that relief was no longer subject to being 'reversed, dissolved, or otherwise undone by the final decision in the same case.'" *Id*. (quoting *Sole v. Wyner*, 551 U.S. 74, 83) (2007)); *see also* Srikantiah Decl. ¶ 8.

## II.    NEITHER DEFENDANTS' PRE-LITIGATION CONDUCT NOR THEIR LITIGATION POSITION WAS SUBSTANTIALLY JUSTIFIED.

Defendants cannot satisfy their burden to prove that *both* the TPS terminations themselves and their legal defense of those terminations were substantially justified in light of *both* the law and the facts. 28 U.S.C. § 2412(d)(1)(B); *Ibrahim v. DHS*, 912 F.3d 1147, 1167 (9th Cir. 2019). As to the terminations themselves, Defendants admitted their own decisions had been "erroneous," and took the unprecedented step of rescinding them. Nor can Defendants justify their litigation positions here.

### A.    The TPS Terminations Were Not Substantially Justified.

As this Court's findings already make clear, the agency actions that produced the TPS terminations at issue in this litigation were not substantially justified in several respects. Most obviously, adopting an unpublished policy without proper notice or explanation as required by the APA constitutes "clearly unjustified underlying action." *United States v. Marolf*, 277 F.3d 1156, 1164 (9th Cir. 2002). The Ninth Circuit considered a similar situation in *Andrew v. Bowen*, where the Social Security Administration adopted "an unpublished policy to effectively deny . . . benefits" to a large group of fishermen. 837 F.2d 875, 877–80 (9th Cir. 1988). After winning a preliminary injunction, the fishermen moved for fees. Although the government's litigation position was reasonable, the court found it liable for fees because the agency's decision to deny benefits using an unpublished policy issued without notice was "wholly without merit and therefore not substantially justified." *Id*. In *Marolf*, the Ninth Circuit described the conduct in *Andrew* as a paradigmatic

1    example of agency behavior that is not substantially justified. *Marolf*, 277 F.3d at 1164.

2         Courts have consistently found similarly-serious procedural errors render agency conduct

3    unjustified. Because everyone is entitled to "a result reached through the correct procedures,"

4    *Spurlock v. Sullivan*, 790 F. Supp. 979, 981 (N.D. Cal. 1992), an underlying agency decision

5    infected by "serious" procedural error lacks substantial justification. *Murphy v. Colvin*, No. 4:14-cv-

6    03784-YGR, 2016 WL 1410279, at *2 (N.D. Cal. Apr. 11, 2016). That is why failing to make

7    necessary findings or properly weigh evidence are "serious" procedural errors that strip decisions of

8    substantial justification. *Corbin v. Apfel*, 149 F.3d 1051, 1053 (9th Cir. 1998); *Spurlock*, 790 F.

9    Supp. at 981 (finding lack of substantial justification where "serious procedural problems" resulted

10   in "questionable or baldly incorrect factual findings").

11        Courts also regularly find underlying decisions lack substantial justification when

12   "unsupported by substantial evidence," *Meier v. Colvin*, 727 F.3d 867, 872 (9th Cir. 2013) (internal

13   quotation omitted), reached by disregarding competent evidence without a reasoned explanation,

14   *Tobeler v. Colvin*, 749 F.3d 830, 832–33 (9th Cir. 2014); *Sampson v. Chater*, 103 F.3d 918, 922 (9th

15   Cir. 1996), founded on a flawed legal framework about what evidence to consider and how to weigh

16   that evidence, *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir. 1995); *accord United States v. $12,

17   248 U.S. Currency*, 957 F.2d 1513, 1517–19 & n.5 (9th Cir. 1991) (holding lack of substantial

18   justification for "poor investigation"), or due to other "administrative blunders," *Yaide v. Wolf*, No.

19   19-cv-07874-CRB, 2020 WL 5816890, at *3 (N.D. Cal. Sept. 30, 2020). "It will be only a 'decidedly

20   unusual case in which there is substantial justification under the EAJA even though the agency's

21   decision was reversed as lacking in reasonable, substantial and probative evidence in the record.'"

22   *Thangaraja v. Gonzales*, 428 F.3d 870, 874 (9th Cir. 2005) (quoting *Al-Harbi v. I.N.S.*, 284 F.3d

23   1080, 1085 (9th Cir. 2002)); *Mitford v. Kijakazi*, No. 20-cv-05360-TSH, 2021 WL 6052006 at *2

24   (N.D. Cal. Dec. 21, 2021) (finding no substantial justification for decision that was reversed

25   following voluntary remand to ALJ for reconsideration).

26        Here, the underlying TPS terminations alone support an award of fees. This Court found the

27   terminations were a "substantial," "consequential," "deliberate," and "clear" departure from past

28   practice, *Ramos*, 336 F. Supp. 3d at 1097, which Defendants concededly did not explain (because

14

they contended no change had occurred). Consistent with this Court's findings, sister courts also found that the agency provided "no explanation or justification for" the TPS terminations. *Ramos*, 336 F. Supp. 3d at 1097; *accord Saget*, 345 F. Supp. 3d at 298–99 ("no 'reasoned explanation'"); *Centro Presente*, 332 F. Supp. 3d at 417 ("no explanation at all—much less one acknowledging the change in position—for the new policy"); *CASA de Maryland, Inc.*, 355 F. Supp. 3d at 312–13, 328 (finding a "lack of an explanation for a changed approach" and thus "[p]laintiffs plausibly allege[d] that the terminations [were] arbitrary and capricious"). That district courts throughout the country agreed with this Court's finding that the agency's action was arbitrary further confirms that the government's pre-litigation conduct was not substantially justified. *See Pierce v. Underwood*, 487 U.S. 552, 568 (1988) (explaining a "string of losses . . . can also be an objective indicator" of the lack of reasonableness); *Medina Tovar v. Zuchowski*, 41 F.4th 1085, 1090 (9th Cir. 2022).

Defendants may point to the initial 2-1 decision on appeal as evidence of substantial justification, but that is hardly dispositive, particularly given that nothing in the majority's (now-vacated) opinion supported the legality of the challenged TPS terminations. *See generally Pierce*, 487 U.S. at 569 (recognizing "the fact that one other court agreed or disagreed with the Government does not establish whether its position was substantially justified"). The panel majority found no jurisdiction; it never reached the merits of the APA issue. The only discussion of that subject by any Ninth Circuit judge came in Judge Christen's dissent, which concluded that there was "no real room for debate that the agency changed its practice" in violation of the APA. *Ramos*, 975 F.3d at 920 (Christen, J., dissenting). Indeed, no judge has ever accepted Defendants' position that the TPS terminations were reached in a manner consistent with settled practice. This Court's finding on that central factual question remains undisturbed to this day.

In addition, discovery in this and later cases uncovered that the terminations were "pretextual and, accordingly, made in bad faith." *Saget*, 375 F. Supp. 3d at 345; *see also id.* at 360–62.[6] The terminations were the result of political actors disregarding "all of the standard metrics" that

---

[6] Although the Court need not reach it, the bad faith TPS terminations here give rise to an independent basis on which to grant fees. *See*, *e.g.*, *Ibrahim*, 912 F.3d 1180 (holding fees may be awarded when incurred "during the various phases of litigation . . . in some way traceable to the [government's] bad faith").

1    traditionally guided TPS decisions, and ignoring country conditions evidence where it did not lead to

2    "the conclusion [they] [we]re looking for." *Ramos*, 336 F. Supp. 3d at 1104; *see also id.* at 33

3    (comparing the Sudan termination decision to a mugging). Beyond being intellectually bankrupt,

4    multiple sources of evidence obtained during discovery and from the public record "raised serious

5    questions whether the actions taken [were] based on animus against non-white, non-European

6    immigrants." *Ramos*, 336 F. Supp. 3d at 1081; Corrected Pls.' Mot. Prelim. Inj. 3, 14–15, 25–28,

7    ECF No. 120; *accord Saget*, 375 F. Supp. 3d at 374 (finding "both direct and circumstantial

8    evidence [of] a discriminatory purpose"); *Berardo v. INS*, No. 01796, 2021 WL 228890, at *3 (D.

9    Or. Jan. 22, 2021) (finding lack of substantial justification when evidence showed outcome of

10   original agency decision was "preordained", rather than a "serious evaluation" of available

11   evidence).

12        When this litigation finally forced Defendants to reexamine the terminations years later,

13   Defendants admitted their decisions were the product of errors and deliberate decisions to abandon

14   past practice by ignoring readily available information about country conditions. Defendants have

15   now squarely admitted that the terminations they defended for nearly six years "reflect[ed] an

16   inadequate assessment of conditions," 88 Fed. Reg. 40,282, 40,286, and "either insufficiently

17   considered or [did] not consider[]" key evidence about intervening conditions, 88 Fed. Reg. 40,294

18   at 40298. *See, e.g.*, *Berardo*, 2021 WL 228890, at *3 (finding "agency's own redetermination of its

19   decision based on the same evidence" warranted finding that "first denial was unreasonable" and,

20   thus, lacked substantial justification).

21        If this Court agrees that Defendants' *pre-litigation conduct* (i.e., the TPS terminations

22   themselves) were not substantially justified, it need not decide whether Defendants' *litigation*

23   *conduct* (i.e., its defense of the agency's actions) was substantially justified. EAJA entitles Plaintiffs

24   to fees where an agency engaged in unreasonable pre-litigation conduct, irrespective of whether

25   Defendants later made reasonable arguments to defend it. *Marolf*, 277 F.3d at 1163–64 ("reasonable

26   litigation position does not establish substantial justification in the face of a clearly unjustified

27   underlying action."); *Meier*, 727 F.3d at 872 ("Because the government's underlying position was

28   not substantially justified, we need not address whether the government's litigation position was

justified"); *Andrew*, 837 F.2d at 880 ("Since we held that the Secretary's underlying action was not substantially justified, it is not dispositive whether or not the Secretary's litigation position is substantially justified. Thus we decline to reach this issue"); *Yaide*, 2020 WL 5816890, at *3–4 (awarding EAJA fees in light of underlying conduct, even though jurisdictional argument during litigation was reasonable).

Having disavowed the underlying TPS decisions as fundamentally flawed on the very grounds that gave rise to this litigation—the failure to consider intervening conditions—Defendants cannot meet their burden to prove that this is an "unusual" case where terminations lacking factual or legal support could nonetheless be substantially justified. *See Thangaraja*, 428 F.3d at 874.

**B.    Defendants' Positions During the Litigation Were Not Substantially Justified.**

Although the underlying terminations alone support fees, Defendants' factual and legal positions during this litigation provide separate and independent support for awarding fees here.

*First*, Defendants refused to acknowledge any departure from past practice when making the challenged decisions. They instead tried to recharacterize damning evidence as mere "variation[]" in how Secretaries exercised their discretion that "at most [amounted to] a difference in emphasis rather than what could plausibly be considered a 'new rule.'" Defs.' Resp. to Mot. Prelim. Inj. 11, ECF No. 116; *see also, e.g.*, *Ibrahim*, 912 F.3d at 1170–71 (finding no substantial justification where "the government essentially doubled-down over the course of the litigation with a no-holds-barred defense" before admitting a lack of a factual basis on a crucial issue at trial). Every court to consider the issue rejected this revisionist history, yet Defendants persisted, including on appeal. *Compare Ramos*, 336 F. Supp. 3d at 1092 (recognizing "a wealth of record evidence" to the contrary); *Saget*, 375 F. Supp. 3d at 350 (finding based on extensive evidence that "[d]efendants departed from their past practice"); *Centro Presente*, 332 F. Supp. 3d at 412 (finding allegations consistent with the evidence developed in this case would establish that DHS "adopted a new policy with respect [to] TPS designation decisions"); *CASA de Maryland, Inc.*, 355 F. Supp. 3d at 312–13, 328 (finding that there was a "lack of an explanation for a changed approach" and thus "[p]laintiffs plausibly allege[d] the terminations [were] arbitrary and capricious."), *with* Appellants' Opening Brief at 32, *Ramos* (No. 18-16981), ECF No. 11 (Defendants' brief on appeal arguing "[t]he district court erred in

concluding that Secretaries Duke and Nielsen's focus on whether the conditions that gave rise to a country's TPS designation persist constituted a break from past practice"). Because Defendants must establish that their litigation position was both *factually* and legally justified, Defendants' string of losses on this core factual position separately renders their legal position unjustified, and independently warrants awarding fees. *Pierce*, 487 U.S. at 568; *Medina Tovar*, 41 F.4th at 1090; *Thangaraja*, 428 F.3d at 874.

*Second*, over the course of this litigation, Defendants took extreme and unreasonable legal positions. While Defendants admittedly convinced two of the many judges across the country to consider the issues in this case that their jurisdictional position as to the APA claim was correct, they uniformly lost virtually every other significant legal argument they made, with judges often rejecting their positions in strong language. For example:

- Defendants insisted this Court lacked jurisdiction over Plaintiffs' *constitutional* claim, Mot. to Dismiss at 21–22, ECF No. 20; Appellants' Opening Brief at 39, No. 18-16981 (9th Cir. Nov. 29, 2018), ECF No. 11—a position "squarely contradicted by controlling precedent," *Ramos*, 975 F.3d at 925 (Christen, J. dissenting), and flatly rejected by this Court, all three members of the Ninth Circuit panel, and every other court to consider the question. MTD Order 20; *Ramos*, 975 F.3d 872 at 891–92; *CASA de Maryland, Inc*, 355 F. Supp. 3d at 321; *Centro Presente*, 332 F. Supp. 3d at 404–408; *Saget*, 345 F. Supp. 3d at 294–97; *NAACP*, 364 F. Supp. 3d at 574–75. They continued to assert that position before this Court even *after* abandoning their *en banc* appeal. MTD Order 15.

- Defendants insisted Plaintiffs' constitutional claim was subject to rational basis review under *Trump v. Hawaii*, 585 U.S. 667 (2018) rather than the controlling *Arlington Heights* standard—a position also rejected by this Court, the initial Ninth Circuit panel, and four other district courts. Ex. 1 to Decl. of Alycia Degen in Supp. Pls.' Mot. Prelim. Inj. 47, ECF No 96-1; MTD Order 49–53; *CASA de Maryland, Inc*, 355 F. Supp. 3d at 322–25; *Centro Presente*, 332 F. Supp. 3d at 412; *Saget*, 345 F. Supp. 3d at 301–302; *NAACP*, 364 F. Supp. 3d at 576.

- After losing on the deliberative process privilege before the magistrate and this Court for a variety of reasons (Order Regarding Joint Letter Br., ECF No. 63; Order Den. Mot. Relief from Disc. Order, ECF No. 79; Notice of Presentation of White House Deliberation Docs., ECF No. 81),

18

1    Defendants attempted to raise "a hybrid, new" type of deliberative process privilege when back

2    before the magistrate (Order Regarding Produc. of Docs. 1, ECF No. 84), even though they had not

3    been granted leave to raise that "hybrid" privilege after several rounds of briefing, *id.* at 2.

4    Defendants could offer "no common law" support for the supposed "hybrid privilege," which the

5    magistrate readily rejected. *Id.*; *see also* Order Den. Mot. Relief from Disc. Order 3 n.4, ECF No. 79

6    ("The Court also notes that, as Plaintiffs point out, Defendants submitted no declaration, and hence

7    no evidence, that any of the documents reviewed is typically kept confidential or that disclosure of

8    such is likely to inhibit frank discussions and debate in any deliberative process.").

9        •    As described above, Defendants attempted to reframe statements expressing racial

10   animus as objective descriptions of country conditions. Again, no judge to consider the issues ever

11   accepted that counterfactual position. *See supra* at 7 (Christen, J., dissenting) ("we cannot sweep

12   aside the words that were actually used").

13       Although the Court need not consider whether Defendants' legal positions alone were not

14   substantially justified given the clear errors in the terminations themselves and Defendants' baseless

15   factual position throughout this litigation, Defendants' unreasonable legal arguments further

16   demonstrate the unreasonableness of their position as a whole.[7]

17   **III.    PLAINTIFFS SEEK REASONABLE FEES AND COSTS.**

18       To calculate an award of attorneys' fees, the Court begins with the "lodestar," the number of

19   hours reasonably expended multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S.

20   424, 435 (1983). The "resulting product *is presumed* to be the reasonable fee to which counsel is

21   entitled." *Pa. v. Del. Valley Citizens Counsel for Clean Air*, 478 U.S. 546, 564 (1986) (internal

22   quotations omitted). "Where a plaintiff has obtained excellent results, [their] attorney should recover

23   a fully compensatory fee. Normally this will encompass all hours reasonably expended on the

24   litigation, and indeed in some cases of exceptional success an enhanced award may be justified."

25   *Hensley*, 461 U.S. at 435. In particular, because substantial justification is merely a threshold for

26   eligibility to recovery fees, it does not provide a basis for Defendants to try to carve out hours spent

27   _____

28   [7] Defendants cannot satisfy their burden of establishing that a special circumstance relieves them of
     liability for paying fees and costs. Plaintiffs have no unclean hands or other conditions that might
     warrant such a finding. *Scarborough v. Principi*, 541 U.S. 401, 422-23 (2004).

1    responding to individual positions Defendants believe were substantially justified. *See, e.g.*, *Ibrahim*,

2    912 F.3d at 1172–75.

3        **A.    Plaintiffs Claim a Reasonable Number of Hours.**

4        "'[L]awyers are not likely to spend unnecessary time on contingency fee cases in the hope of

5    inflating their fees' because [t]he payoff is too uncertain.' . . . . As a result, courts generally defer to

6    the 'winning lawyer's professional judgment as to how much time was required to spend on the

7    case.'" *Costa v. Comm'r of SSA*, 690 F.3d 1132, 1136 (9th Cir. 2012). This principle applies equally

8    in pro bono cases, including because private and public interest law firms forego matters where they

9    would receive rates far above those permitted under EAJA and opportunities to help others in need.

10   *Cf. Dennis v. Chang*, 611 F.2d 1302, 1306 n.12 (9th Cir. 1980) ("Legal services organizations often

11   must ration their limited financial and manpower resources. Allowing them to recover fees enhances

12   their capabilities to assist in the enforcement of congressionally favored individual rights.").

13       Here, the number of hours devoted to this matter reflect the extraordinary efforts required to

14   develop arguments and evidence to secure a preliminary injunction before the TPS terminations took

15   effect, which would have caused irreparable harm, and then to preserve that injunction through a

16   multi-year appeal. Arulanantham Decl. ¶¶ 12–23, 26–37, 40–41, Exs. B–H; Bansal Decl. ¶¶ 3, 17–

17   22, Ex. B; Commons Decl. ¶¶ 7–10, 13, 16, Exs. B–F; Decl. of Paul J. Estuar ¶¶ 4-7, Ex. A; Decl. of

18   Winifred Kao ¶¶ 5-11, Ex. A ("Kao Decl."); Decl. of Michael Kaufman ¶¶ 4–11 ("Kaufman Decl.");

19   MacLean Decl. ¶¶ 4–6, 25–33, 36–40, 42, Exs. A–B. The time also reflects the challenges Plaintiffs

20   faced in obtaining document and deposition discovery from Defendants, which required multiple

21   rounds of motion practice and several hearings. *See, e.g.*, Commons Decl. ¶¶ 7–9; *see also, e.g.*,

22   Joint Disc. Letter, ECF No. 28, June 15, 2018; Order Regarding Suppl. Br., ECF No 29, June 19,

23   2018; Pls.' Suppl. Br. Opp'n to Mot. Dismiss, ECF No. 30, June 21, 2018; Joint Disc. Letter, ECF

24   No. 43, July 17, 2018; Order Referring Disc. Br. to Judge Kim, ECF No. 44, July 20, 2018; Joint

25   Letter Br., ECF No. 47, July 30, 2018; Order Regarding Joint Letter Br., ECF No. 49, Aug. 1, 2018;

26   Second Order Regarding Disc. Letter Br., ECF No. 53, Aug. 2, 2018; Pls.' Letter Id'ing Docs. for

27   Review, ECF No. 58, Aug. 6, 2018; Pls.' Am. Letter Identifying Docs. for Review, ECF No. 59,

28   Aug. 7, 2018; Order re Joint Letter Br., ECF No. 63, Aug. 10, 2018; Order Denying Defs.'

Emergency Mot. Stay, ECF No. 67, Aug. 13, 2018; Mot. Relief from Disc. Order, ECF No. 73, Aug. 13, 2018; Order Den. Mot. Relief from Disc. Order, ECF No. 79, Aug. 15, 2018; Order Regarding Production Docs., ECF No. 84, Aug. 17, 2018. All this motion practice, and the time required, was compounded by the time required to explain the complex TPS legal landscape to several immigrant communities in multiple languages, and coordinate with them as they created political pressure to protect TPS holder communities. Arulanantham Decl. ¶¶ 12, 21–23; Bansal Decl. ¶ 12; MacLean Decl. ¶¶ 5–6, 12, 16–18; Srikantiah Decl. ¶ 13. Moreover, this fee request will not result in a windfall for Plaintiffs' counsel. Sidley Austin LLP has committed to donate its portion of any EAJA award to non-profit organizations. Commons Decl. ¶ 6.

## B. Plaintiffs' Attorneys Are Entitled to Enhanced Rates.

Enhanced rates above the cost-of-living adjusted rate can be justified by "a special factor" (28 U.S.C. § 2412(d)(2)(A)(ii)), such as when there is a limited availability of "attorneys having some distinctive knowledge or specialized skill needful for the litigation in question." *Pierce*, 487 U.S. at 571–72. In general, special factors can include "an identifiable practice specialty such as patent law, or knowledge of foreign law or language." *Id.* Pertinent here, "distinctive knowledge and specialized skill in immigration law and, in particular, constitutional immigration law and litigation involving the rights of detained immigrants" qualifies for enhanced fees. *Nadarajah*, 569 F.3d at 912 (awarding enhanced rates); *accord Pirus v. Bowen*, 869 F.2d 536, 541–42 (9th Cir. 1989) (affirming enhanced fees in litigation that was not "routine," counsel "had already developed familiarity and expertise" in the area, and the litigation "required substantial knowledge of the legislative history"); *Berardo*, 2021 WL 228890, at *4 (awarding enhanced rates in light of "distinctive knowledge and enhanced skill" in immigration law). An attorney's experience in earlier litigation involving similar issues is sufficient prior experience to justify an enhanced fee award (*Nat. Res. Def. Council, Inc. v. Winter*, 543 F.3d 1152, 1160–61 (9th Cir. 2008)) when their "knowledge or skill is not available elsewhere at the statutory rate" within the market where they practice (*Nat'l Family Farm Coal. v. EPA*, 29 F.4th 509, 511 (9th Cir. 2022) (internal quotation omitted)).

In this case, Plaintiffs' lead attorneys are specialists in complex immigration litigation, including cases involving the constitutional rights of immigrants; jurisdictional limits on judicial

relief in the immigration context; the interrelationship between immigration, administrative, and constitutional law; and other specialized issues that arise when seeking relief on behalf of large groups of immigrants—a unique mix of expertise that is not easily replicated in the bar at large. Arulanantham Decl. ¶¶ 4–11, 15–19, 23–25, Ex. A; Bansal Decl. ¶¶ 4–15, Ex. A; Commons Decl. ¶¶ 2–5, 11, 12, Ex. A; Srikantiah Decl. ¶¶ 10–16; MacLean Decl. ¶¶ 3–15, 20–24, 34–35, 41. Plaintiffs' counsel are also uniquely suited to their role in this case, being familiar with DHS and having a deep understanding of the unique economic, cultural, and language needs of communities served by TPS borne out of years of experience working with—and within—the organizations that serve them. Arulanantham Decl. ¶¶ 6–11, 13–17, 20–23; Bansal Decl. ¶¶ 6–12; MacLean Decl. ¶¶ 5–6, 12–13, 16–22; Commons Decl. ¶¶ 4–6. In addition, this case occurred under an unusually compressed schedule, requiring lead counsel knowledgeable enough to research highly technical substantive and procedural issues including the jurisdictional questions, their right to obtain discovery in this APA case, and their entitlement to a "universal injunction" in very little time. Arulanantham Decl. ¶¶ 16–18, 23; Bansal Decl. ¶ 3; MacLean Decl. ¶¶ 5, 19–21; Commons Decl. ¶¶ 7, 8, 11–13. The complexity and specialization required is reflected in the fact that the Court issued a 57-page opinion on the motion to dismiss and a 43-page opinion on the motion for a preliminary injunction addressing a variety of complex jurisdictional and constitutional questions, as well as technical matters of administrative law—all within the immigration context. Plaintiffs would not have been able to locate counsel with comparable knowledge or skill within the relevant markets who would have taken on a matter of this size, complexity, and intensity at the statutory rate. *See, e.g.*, Arulanantham Decl. ¶¶ 11, 16, 20, 23, 25, 37–39; Bansal Decl. ¶ 21; Commons Decl. ¶¶ 11–12; Srikantiah Decl. ¶¶ 10, 14, 16; MacLean Decl. ¶¶ 4, 34–35, 41; Decl. of Carol A. Sobel ¶¶ 4–33, B-L; *see also* Kao Decl. ¶ 6; Kaufman Decl. ¶¶ 4, 7, 9–10.

### C. Plaintiffs Are Entitled to Recover Out-Of-Pocket Costs.

The EAJA provides that the prevailing party can recover litigation expenses and costs in addition to attorneys' fees. 28 U.S.C. §§ 2412(a)(1), 2412(d)(1)(A); *see Int'l Woodworkers of Am., AFL-CIO, Local 3-98 v. Donovan*, 792 F.2d 762, 767 (9th Cir. 1985) (upholding "costs that are ordinarily billed to a client," including those for telephone calls, postage, air courier and attorney

travel expenses); *Bickley v. CenturyLink, Inc*., No. CV 15-1014-JGB, 2016 WL 9046911, at *8 (C.D. Cal. Nov. 29, 2016) (awarding costs for travel expenses and time). Here, Plaintiffs seek an award for "other expenses" including out-of-pocket costs typically billed to a client, including the cost of computerized legal research, deposition fees, and travel expenses. Arulanantham Decl. ¶ 42; Bansal Decl. ¶ 23, Ex. D; Commons Decl. ¶¶ 8, 10, Exs. D-F; MacLean Decl. ¶¶ 43–44, Ex. C; *see also* Kao Decl. ¶ 6; Kaufman Decl. ¶ 4.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court award them attorneys' fees and costs in the amount of $3,654,132.56.

Date:  May 24, 2024                              Respectfully submitted,

SIDLEY AUSTIN LLP

By:  */s/ Sean A. Commons*
     Sean A. Commons
     Nicole M. Ryan
     Leslie A. Ridings
     Amelia Mazzarella
     Robert P. McMahon

CENTER FOR IMMIGRATION LAW AND POLICY, UCLA SCHOOL OF LAW

By:  */s/ Ahilan T. Arulanantham*
     Ahilan T. Arulanantham

ACLU FOUNDATION OF NORTHERN CALIFORNIA

By:  */s/ Emilou MacLean*
     Emilou MacLean
     William S. Freeman

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

By:  */s/ Michael Kaufman*
     Michael Kaufman

UNEMPLOYED WORKERS UNITED

By:  */s/ Jessica Karp Bansal*
     Jessica Karp Bansal
     Keally Cieslik

ADVANCING JUSTICE – ASIAN LAW CAUCUS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Winifred Kao*
Winifred Kao

Attorneys for Plaintiffs

## **ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I am the ECF User whose identification and password are being used to file the foregoing Plaintiffs' Notice of Motion and Motion For Attorneys' Fees. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other signatories have concurred in this filing.

Dated: May 24, 2024                                  By:  */s/ Sean A. Commons*
                                                                          Sean A. Commons

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES; CASE NO. 3:18-CV-01554-EMC