1  Ahilan T. Arulanantham (SBN 237841)
   arulanantham@law.ucla.edu
2  CENTER FOR IMMIGRATION LAW AND
   POLICY, UCLA SCHOOL OF LAW
3  385 Charles E. Young Dr. East
   Los Angeles, CA 90095
4  Telephone: (310) 825-1029

5  Jessica Karp Bansal (SBN 277347)
   jessica.b@uwunited.org
6  UNEMPLOYED WORKERS UNITED
   P.O. Box 142
7  Claremont, CA 91107
   Telephone: (818) 570-6731
8
   Sean A. Commons (SBN 217603)
9  scommons@sidley.com
   SIDLEY AUSTIN LLP
10 350 South Grand Avenue
   Los Angeles, CA 90071
11 Telephone: (213) 896-6010
   Facsimile: (213) 896-6600
12
   Attorneys for Plaintiffs
13
   [*Additional Counsel Listed on Next Page*]
14

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CRISTA RAMOS, individually and on behalf of others similarly situated; CRISTINA MORALES; BENJAMIN ZEPEDA, individually and on behalf of others similarly situated; ORLANDO ZEPEDA; JUAN EDUARDO AYALA FLORES, individually and on behalf of others similarly situated; MARIA JOSE AYALA FLORES; ELSY YOLANDA FLORES DE AYALA; HNAIDA CENEMAT, individually and on behalf of others similarly situated; WILNA DESTIN; RILYA SALARY, individually and on behalf of others similarly situated; SHERIKA BLANC; IMARA AMPIE; MAZIN AHMED; HIWAIDA ELARABI; and SALMA AHMED,<br>　　　　　*Plaintiffs*,<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF | Case No. 3:18-cv-01554-EMC<br><br>The Honorable Edward M. Chen<br><br>**DECLARATION OF AHILAN T. ARULANANTHAM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**<br><br>Date:　August 15, 2024<br>Time:　1:30 p.m.<br>Dept.:　Courtroom 5, 17th Floor |

| | |
|---|---|
| HOMELAND SECURITY; and UNITED STATES OF AMERICA,<br><br>　　　　*Defendants.* | |
| KESHAV BHATTARAI; SAJJAN PANDEY; SUMNIMA THAPA; DONALDO POSADAS CACERES; SORAYDA RODRIGUEZ MOTIÑO; DENIS MOLINA CHAVEZ; S.S., individually and on behalf of others similarly situated; and G.D.P., individually and on behalf of others similarly situated,<br><br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and UNITED STATES OF AMERICA<br><br>　　　　*Defendants.* | Case No.  3:19-cv-00731-EMC<br><br>**DECLARATION OF AHILAN T. ARULANANTHAM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**<br><br>The Honorable Edward M. Chen |

*Additional Counsel for Plaintiffs*

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
William S. Freeman (SBN 82002)
wfreeman@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Michael Kaufman (SBN 254575)
mkaufman@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Nicole M. Ryan (SBN 175980)
nicole.ryan@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1219
Facsimile: (415) 772-7400

Leslie A. Ridings (SBN 349465)
lridings@sidley.com
Amelia Mazzarella (SBN 35168)
amazzarella@sidley.com
Robert P. McMahon (SBN 351271)
rmcmahon@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Winifred Kao (SBN 241473)
winifredk@advancingjustice-alc.org
ADVANCING JUSTICE – ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, California 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

Keally Cieslik (SBN 55413)
keally.c@uwunited.org
UNEMPLOYED WORKERS UNITED
100 N. Howard Street, Suite 4000
Spokane, WA 99201
Telephone: (508) 250-0518
Admitted Pro Hac Vice

# DECLARATION OF AHILAN T. ARULANANTHAM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES

I, Ahilan T. Arulanantham, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am a member of the Bar of the State of California. I am admitted to practice before several federal courts, including the United States Supreme Court and this Court.

3. I am counsel of record in *Ramos* and *Bhattarai*, the cases at issue in this fee motion.

**My Experience**

4. I graduated from Yale Law School in 1999, after which I served as a law clerk to the Honorable Stephen Reinhardt of the United States Court of Appeals for the Ninth Circuit. I then worked for two years as an Equal Justice Works (formerly "NAPIL") Fellow and attorney for the ACLU Immigrants' Rights Project in New York, practiced as an assistant Federal Public Defender in the Western District of Texas for two years, and then came to work at the ACLU of Southern California in June 2004. In 2011, I became the Deputy Legal Director at the ACLU of Southern California. In 2012, I also became a Senior Staff Attorney at the ACLU IRP. In 2016, I became the Advocacy and Legal Director at the ACLU of Southern California.

5. In 2018, I stepped down as Advocacy and Legal Director and took the title of Senior Counsel primarily in order to litigate this case, as I could not spend the time needed to lead this litigation while performing all of the management and supervision duties required of the Advocacy and Legal Director. In 2021, I left the ACLU to join the law faculty at UCLA School of Law, where I now serve as Professor from Practice and Faculty Co-Director of the Center for Immigration Law and Policy. A copy of my c.v. is attached as Exhibit A to this declaration.

6. I have extensive experience working on cases involving the civil rights of immigrants. I was lead counsel or co-lead counsel in the following cases involving individual litigants whose cases raised complex statutory and/or constitutional issues: *Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006) (granting habeas petition and ordering release of refugee detained indefinitely as a national security threat); *Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009)

(awarding fees at market rates for habeas litigation); *Perez Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019) (affirming motion suppressing evidence obtained during worksite raid in removal proceedings, for unlawful seizure); *Diouf v. Mukasey (Diouf I)*, 542 F.3d 1222 (9th Cir. 2008); *Diouf v. Napolitano (Diouf II)*, 634 F.3d 1081 (9th Cir. 2011) (establishing right to bond hearing for individuals detained for more than six months pending review of denied motion to reopen); *Casas-Castrillon v. DHS*, 535 F.3d 942 (9th Cir. 2008) (similar, for individuals detained pending petition for review of removal order) (argued as amicus); *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011) (establishing procedural protections in hearings under *Casas*) (argued as amicus).

7.  I have also litigated a number of more procedurally-complex cases because they involved class actions, mass actions, or otherwise sought relief for large numbers of individuals. I was lead counsel or co-lead counsel in the following such cases: *Franco Gonzales v. Holder*, 767 F. Supp.2d 1034 (C.D. Cal. 2010) (first case establishing a system for identifying individuals with serious mental disorders in removal proceedings and ensuring them counsel if they could not represent themselves); *Castellano v. Napolitano*, CV 09-2281-PA-VBK (C.D. Cal. 2009) (class action challenge to detention conditions at ICE holding facility in Los Angeles) (settled with requirements to remedy violations); *NLG v. Chertoff*, CV 08-1000-GW (Shx) (C.D. Cal. 2008) (mass action challenge to government policy refusing to allow workers arrested in immigration raid to consult with counsel) (settlement eliminated the policy with respect to the workers); Diouf v. Chertoff, CV 07-3977-TJH (Ctx) (C.D. Cal. 2007) (successful class action challenge to government's policy of forcibly drugging non-citizens prior to removal*); JEFM v. Lynch*, 837 F.3d 1026 (9th Cir. 2016) (dismissing class action challenge to government's failure to appoint counsel to children in removal proceedings for lack of subject matter jurisdiction*); CJLG v. Barr*, 923 F.3d 622 (en banc) (9th Cir. 2019) (reversing removal order against unrepresented child, but not addressing counsel claim); *see also* 923 F.3d at 629 (Paez, J., concurring) (arguing that due process requires appointed counsel for children facing deportation*); Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015) (holding that immigration detainees held for six months while their cases remain pending are entitled to rigorous bond hearings), *rev'd Jennings v. Rodriguez*, 138 S.Ct. 830 (2018) (reversing statutory ruling, remanding for consideration of constitutional claims), *Rodriguez v. Marin*, 909 F.3d

252 (9th Cir. 2018) (remanding to district court but maintaining injunction requiring bond hearings); *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) (holding class certification warranted in action challenging prolonged immigration detention without bond hearings).

8. In addition to serving as counsel in these and many other cases, I have also served as a resource for other non-profit and pro bono attorneys litigating complex immigration cases throughout the Ninth Circuit, and in other parts of the country as well, since approximately 2010. I have provided advice and editorial assistance to at least dozens of attorneys during this time, and shared our briefing in these and other cases on many occasions.

9. I was named California Lawyer of the Year in 2007 in the area of Immigration Law for my work in the *Nadarajah* case, and again in 2014 for my work in *Rodriguez*. I have been repeatedly named by the Daily Journal as one of the Top 100 most influential lawyers in California for my work in the immigrants' rights area. In 2010, I received both the Daniel Levy Award for Outstanding Achievement in Immigration Law from the National Immigration Project of the National Lawyers' Guild, and also the Arthur C. Helton Human Rights Award by the American Immigration Lawyers' Association. In 2014, I and other members of the *Franco* litigation team were awarded the American Immigration Lawyers' Association Jack Wasserman Memorial Award for Excellence in Litigation in the Field of Immigration Law for our work on this case.

10. In 2016 I received a MacArthur Fellowship (aka a "genius grant") for my litigation and advocacy in the immigrants' rights field.

11. Through all of the experience described above, I have come to have distinctive knowledge and specialized skills in complex immigrants' rights litigation in the federal courts. The Ninth Circuit held that I was entitled to market rates under EAJA for work done on issues involving the constitutional rights of detained immigrants *in Nadarajah v. Holder*, 569 F.3d 906, 912-13 (9th Cir. 2009). The Honorable Terry Hatter of the U.S. District Court for the Central District of California similarly held that I was entitled to market rates for work done on a case involving the constitutional and statutory rights of a detained immigrant in *Martinez v. Gonzales*, CV 06-07609 TH (C.D. Cal.). I have also settled fee disputes against the federal government in several other

immigrants' rights cases where the parties assumed that my work was entitled to compensation at market rates under EAJA.

**The *Ramos* and *Bhattarai* Litigation Team**

12. *Ramos and Bhattarai* arose out of the federal government's unlawful attempt to strip the immigration status of approximately 400,000 people from six countries, most of whom had lived here lawfully for more than a decade at the time the case was filed. The government's goal was to effectively end the Temporary Protected Status program by terminating TPS status for nearly everyone who had it.

13. I first learned of this imminent crisis when the federal government announced the Sudan termination in 2017. I was quite surprised to learn of that decision because I had some general familiarity with the conflict in Sudan and I did not understand how the government could have determined it was now safe for people to return there. At that time, I was entirely unaware of the Trump administration's plan to end virtually all TPS, and did not understand the relationship between the Sudan decision that had just been made and the other TPS terminations that were yet to come.

14. I came to understand that connection within a day or two of the Sudan decision's announcement, because it was explained to me by Jessica Bansal, who was then an attorney at the National Day Laborer Organizing Network (NDLON), which is a founding member of the National TPS Alliance (NTPSA). Ms. Bansal discussed the issue with me at an immigrants' rights conference we were both attending.

15. I knew both Ms. Bansal and her colleague Emi MacLean from their extensive prior work in immigrants' rights litigation, and recognized them as among the most knowledgeable and experienced immigrants' rights litigators in the country. At that time, we decided to explore the possibility of litigation to challenge the Sudan decision and other anticipated TPS terminations.

16. From the outset I recognized the complexity of the litigation we would have to build in order to defend the TPS holder community. I and others on the team suspected that the administration's TPS decisions could violate the Administrative Procedure Act given their implausible conclusions, but I also recognized that the statute contains a jurisdiction-limiting

provision that on its face appears quite broad. From my litigation experience involving other immigrants' rights matters, I knew that the jurisdictional provision likely did not foreclose all statutory claims we might seek to raise, but I also understood that determining the particular contours of this statutory scheme would require a careful analysis of the similarities and differences between the statutory scheme governing TPS and other comparable schemes governing different immigration provisions.

17.     I and others on the team also recognized a need to develop an anti-discrimination claim, given the manifest racism motivating the Trump Administration's immigration policies. However, because of my experience litigating constitutional immigration law cases, I also recognized the possibility of problems with that argument. In particular, I had brought some of the early litigation against the government's first Muslim Ban, and was very aware of on-going litigation against later iterations of the Ban. I suspected the government would defend against any anti-discrimination claim we raised in this case using arguments similar to those raised in the Muslim Ban litigation.

18.     I also recognized that obtaining information about the reasons on which the government relied in making TPS decisions—both the stated reasons and the actual ones—would be crucial for our claims, and would require substantial expertise in aggressive discovery practice. For that and other reasons, I understood that our success would require engaging a large law firm with an extensive immigrants' rights litigation background.

19.     After consulting with Ms. Bansal and Ms. MacLean, I recruited Sidley Austin, LLP, and in particular Sean Commons, to co-counsel this case with us. I was very familiar with Mr. Commons' work on immigration cases from several prior experiences, including our on-going work as co-counsel in *Jennings v. Rodriguez*. Through his work with me in that case in particular, I knew that Mr. Commons possessed extraordinary discovery expertise, and that he had a detailed knowledge of the law governing class and other forms of mass action that would be essential for us to litigate this case.

20.     These were not the only ways in which the *Ramos* case presented unique complexities. To name just some of the others: Because the National TPS Alliance sought to build a

political movement to protect the vast TPS holder community, it was crucial to conduct the case in a way that kept NTPSA leadership informed of legal developments to the extent consistent with privilege, and that respected their plans about how to create the political momentum needed to preserve TPS.

21. In addition, because we sought to protect all TPS holders threatened by the Trump Administration's actions, we had to work with TPS holders from six different countries. Many of them were most comfortable in languages other than English - Spanish, Arabic, Nepali, and Haitian Creole. Although Ms. Bansal, Ms. MacLean, and I all speak Spanish (as did some of the other attorneys who worked on this case), we had to organize translation into Nepali, Arabic, and Haitian Creole for significant communications with members of the TPS community, including in some cases with the plaintiffs. This also required sustained engagement with community organizations of Central American, Nepali, African, and Haitian immigrants.

22. Furthermore, over the course of the five years of litigation in this case, we held regular meetings with some or all of our clients, and numerous other large informational meetings with different segments of the TPS community. To prepare for those meetings, I and my co-counsel had to explain the key aspects of the case in ways that would be comprehensible to the TPS holder community. This often involved our developing an understanding of the precise timing of the various TPS extensions for each country and their relationship to the injunction, which was at risk of vacatur in the appellate process for several years; and the concrete ways that TPS protections were implemented, and had been jeopardized by the terminations.

23. Finally, this case was unusually complex for another reason. Because of the highly politicized nature of the TPS terminations, successful advocacy for our clients often required me (as well as Ms. Bansal and Ms. MacLean) to work with people engaged in advocacy in Washington, D.C. to defend the TPS holder community. We worked extensively with both the NTPSA and other groups working on TPS-related issues to serve the needs of our clients. We also engaged in sustained advocacy with legislative and administrative actors over nearly the entirety of the litigation, and in particular from early 2020 (the period leading up to the last presidential election) until our settlement negotiations failed in early 2022. That advocacy, coupled with the success of this litigation in court,

may well have contributed to then-candidate Joseph Biden's campaign promise to review all the TPS termination decisions of the Trump administration, which in turn may well have played a role in Defendants' ultimate decision to rescind the TPS decisions challenged in this case.

24. In recognition of this aspect of our multi-faceted work to protect TPS holders through the *Ramos and Bhattarai* litigation, in September 2023 my co-counsel Jessica Bansal, Emi MacLean, and I received the Champion of Justice Award from the Central American Resource Center (CARECEN), a large community organization that has provided legal and other resources to Central American refugees for decades, and that also played a central role in the National TPS Alliance. At the same time, we were also recognized by the Los Angeles County Board of Supervisors for our work to protect the TPS community.

25. For all these reasons, the team of attorneys who came together to litigate this complex case possessed specialized skills that allowed us to litigate it with extraordinary efficiency. The combination of experience with immigrants' rights cases involving complex jurisdictional schemes; experience with cases at the intersection of immigration law, administration law, and constitutional law; and experience working with large and diverse immigrant communities both in various community settings and in advocacy circles were essential to our success.

**Other Attorneys**

26. A number of attorneys other than Ms. Bansal, Ms. MacLean, Mr. Commons and I worked on this case. As part of my job responsibilities both here at the Center for Immigration Law and Policy at UCLA School of Law and previously at the ACLU of Southern California, I supervised the other attorneys who worked on this case for those two organizations. This was consistent with my past practice in other cases, as I have supervised attorneys working on complex immigrants' rights cases since at least 2008.

27. Zoe McKinney is an attorney who worked with the ACLU of Southern California during this litigation. Mónika Langárica and Sofia Lopez Franco are attorneys who work at the Center for Immigration Law and Policy, both of whom also worked on this case. They all worked under my supervision. We do not seek market rates for their work on this fee motion.

28.     I also worked with Ms. Bansal on this case during the time she worked at the ACLU of Southern California.

**Timekeeping Protocol and Fees Waived to Ensure Reasonableness**

29.     It is the practice of the attorneys and other legal staff at the Center for Immigration Law and Policy at UCLA School of Law to keep track of their time through contemporaneous timekeeping software. During this litigation, all attorneys and other legal staff in our office used some form of computer timekeeping program (in most cases Toggl) to maintain contemporaneous time records of all work performed on this case. An assistant then downloaded those records and generated a billing statement that lists, among other things, the task performed, the hours worked on the task, the billing rate for the person who worked those hours, a total "lodestar" for each person who billed, and a cumulative lodestar for the office as a whole. Once this document was constructed, I reviewed the entries and deleted those that were improperly assigned to the matter or otherwise unreasonable in an exercise of my billing judgment.

30.     During my time at the ACLU of Southern California working on this case, it was the practice of the attorneys at that office who worked on this case to use the same timekeeping software and produce time records using the same methods described above. Because I supervised much of the ACLU's work on this case during my time there, I also reviewed the ACLU's time entries in this case, and again deleted those that were improperly assigned to the matter or otherwise unreasonable in an exercise of my billing judgment.

31.     In keeping with the protocol described above, I have reviewed the billing records of Ms. McKinney, Ms. Langárica, and Ms. Lopez Franco (attached as Exhibits E, F and G), and believe that the time they spent for which we seek compensation is reasonable. In addition, I have also reviewed Ms. Bansal's billing records (attached as Exhibit D) for the work she performed on this case while at the ACLU. I believe the time she spent for which we seek compensation is reasonable.

32.     In order to ensure that the fees sought remained reasonable, I have categorically excluded the work of some attorneys and law students, even though that time is compensable. For the ACLU of Southern California, I categorically excluded the time spent by Jennifer Poon, a junior attorney who worked on the case in the fall of 2017. Although she did research and drafting on

various important issues, including some which were discussed in our initial litigation analysis memos, I excluded her work in the exercise of billing judgment, in part because she was at that time a very junior attorney.

33. For somewhat similar reasons I also did not seek compensation for hours of very helpful research conducted by Kate Huddleston, who worked on *Ramos* for several months while at the ACLU of Southern California in the spring of 2018. Much of Ms. Huddleston's time was spent on our claim that the citizen children of TPS holders suffered a distinct Fifth Amendment violation. Although that research was crucial to developing the claim and allowing us to defeat the government's motion to dismiss it, because we did not pursue it further, I have not chosen to seek compensation for her work in the exercise of billing judgment.

34. In addition, I have not sought compensation for the hours of various student interns who worked on this case in the summer intern program at the ACLU of Southern California, even though I recall using their research to advance our arguments on several occasions. For example, I cut 16 hours of time spent by Astghik Hairapetian, an ACLU summer intern who did valuable, painstaking work for this case by going through the record to determine which documents were and were not in the Administrative Record in order to deal with an issue on which the Ninth Circuit requested supplemental briefing. Although that work too was compensable, I chose not to seek compensation for it in order to ensure our overall request remained reasonable.

35. I also excluded a few hours of my own work in related litigation to protect TPS holders' ability to adjust status because I did not believe it sufficiently connected to this litigation to warrant inclusion, even though I did that work in order to protect our clients.

36. For the Center for Immigration Law and Policy, I also excluded compensable work in the exercise of billing judgment. As a general matter, I litigated this case more efficiently during my time at the Center by utilizing the research assistance of students working in the Immigration Policy Clinic, both under my supervision and under the supervision of the Center's Deputy Director Talia Inlender, who is herself a very experienced immigrants' rights attorney. Students researched several issues in this case. In particular, several of them spent substantial time developing evidence on the anti-discrimination claim by conducting research into publicly-available sources in order to

1  document the racist motivations of individuals who served in the Trump Administration, and the
2  connections between those officials and the TPS terminations we challenged in this case. The clinic
3  students produced very helpful research that we used as the basis for additional allegations on the
4  discrimination claim that we included in our amended complaint. That evidence was directly
5  responsive to the asserted deficiencies in our discrimination claim identified by the Ninth Circuit
6  panel majority's decision (that was subsequently vacated). We would have relied on that research
7  extensively had the government not rescinded the TPS decisions we challenged. The work these
8  students did is compensable, and certainly would have been compensable if done by me or another
9  attorney, but we have sought no compensation for it. Similarly, although the supervision time Ms.
10  Inlender spent with them would also itself have been compensable at market rates, I have chosen not
11  to seek fees for her work in order to ensure that our fee request remains reasonable.

12  37.     After making these and other determinations in the exercise of billing judgment, I
13  directed a legal assistant to prepare revised statements for the fees sought from both the ACLU of
14  Southern California and the Center for Immigration Law and Policy. The revised statement is
15  attached as Exhibit H to this declaration.

**Rate-Setting**

17  38.     To set the rates for which we seek compensation under EAJA, I have used two sets of
18  rates. I used market rates for the year in which the work was performed for me and Ms. Bansal (for
19  the work she performed while at the ACLU) because I believe we are entitled to enhanced rates
20  under EAJA given the distinctive knowledge and specialized skill we brought to bear on this case, as
21  described above. For the other attorneys and staff at both the ACLU of Southern California and
22  Center for Immigration Law and Policy, I have used the rates specified by the statute or, where no
23  rate is specified (as for paralegals), a rate comparable to that awarded in other EAJA litigation.[1]

24  39.     With respect to the market rates charged for my and Ms. Bansal's work, which is
25  reflected in the summary tables attached to this declaration as Exhibits B, C and D, I have relied
26  upon the declaration of Carol Sobel and a review of the materials she has provided in support of her

---

[1] For rates under the Equal Access to Justice Act, I have relied on the rates published by the Ninth Circuit, available at http://1.usa.gov/1gkxUMC.

declaration. Ms. Sobel has conducted extensive analysis of the fees charged by and awarded to attorneys in the Southern California region in a variety of civil rights and other contexts, as set forth in her declaration. The rates we seek for me and for Ms. Bansal are very reasonable in light of Ms. Sobel's analysis.

40. A summary of the total hours, rates, and fees sought by the ACLU of Southern California and the Center for Immigration Law and Policy is contained in Exhibit H.

41. Based on the calculations above, the combined fees sought by the ACLU of Southern California total is $727,887.62. The combined fees sought by the Center for Immigration Law and Policy is $321,745.29.

42. With respect to costs, the Center for Immigration Law and Policy tracks all its expenses in litigation under the case name (here, *Ramos*). It incurred a total of $1,183.08 in expenses while litigating this case.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 24th day of May, 2024 at Los Angeles, California.

_____
Ahilan T. Arulanantham