**Exhibit 1**

Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., and HENDRINA VIVAS CASTILLO, | Case No. 25-cv-1766 |
| *Plaintiffs*, | **COMPLAINT** |
| v. | **Administrative Procedure Act Case** |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, | |
| *Defendants*. | |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (pro hac vice forthcoming)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

**INTRODUCTION**

1.      This lawsuit presents a challenge to Department of Homeland Security ("DHS") Secretary Kristi Noem's decision to deprive 600,000 Venezuelans protected by Temporary Protected Status ("TPS") of the right to live and work legally in the United States for the 18-month period lawfully authorized by her predecessor. Secretary Noem took two illegal actions within one week of assuming her role at the head of DHS. Three days after her confirmation, she "vacated" an extension of TPS protections for Venezuelans residing in the United States, just weeks after the extension was duly published in the Federal Register. Two days later, she terminated TPS for the Venezuelans who initially registered in 2023. These actions have the effect of robbing 600,000 Venezuelan TPS holders of the right to live and work in this country for the next 18 months. Approximately 350,000 Venezuelan TPS holders stand to lose this humanitarian legal status on April 7, 2025, and their work authorization as soon as April 2, 2025. Secretary Noem announced the vacatur decision in an exclusive interview she gave to Fox News, saying that "the American people . . . want these dirtbags out of the country."

2.      Plaintiffs in this case are the National TPS Alliance ("NTPSA"), a member-led organization representing TPS holders across the country, and individuals from Venezuela who have TPS ("Individual Plaintiffs"). These individuals cannot return safely to their country of origin. TPS allows them to live and work lawfully in the United States. They represent the diverse population of Venezuelans who have relied on TPS to provide them the most basic forms of human security—a stable place to live and a chance to work for a living during this time of severe crisis in Venezuela. They are educators, laborers, caretakers, and advocates; parents, students, and children. They live all across the country, with homes, families, jobs, and deep community ties. If Secretary Noem's TPS termination goes into effect, they will be subject to deportation yet unable to return safely to their home country; and without legal authorization to live or work in the United States.

3.      The Secretary's actions are illegal for multiple reasons. At the outset, DHS has no authority to "vacate" a prior TPS extension. The TPS statute tightly regulates the conditions under which TPS decisions can be made, setting time periods and other procedural rules that must be

followed for both extensions and terminations. The agency does not have implicit authority to accomplish the same objectives on whatever timeframe it wants, and without following the requisite procedures.

4. Even if DHS did have such authority, the reasons provided by the Secretary to vacate the extension are arbitrary and capricious, contrary to law, pretextual, and inexplicably deviate from past practice in violation of the Administrative Procedure Act ("APA"). Contrary to the claims made in the Federal Register, there was nothing unusual about the timing of the now-vacated extension. Nor did it suffer from any of the other purported defects on which Secretary Noem relied to justify her decision—defects which, in any event, should have been resolved by alternatives short of vacatur.

5. Even if DHS's vacatur order were somehow valid, the termination decision that followed suffers from additional defects. Among other things, DHS's decision to terminate TPS for Venezuelans rests on the assumption that TPS is itself illegal, and that Venezuelans with TPS in the United States are here illegally. This error is evident on the face of the decision. It is also evident from statements made by Secretary Noem. Before she assumed leadership of DHS, she—along with President Trump, Vice President J.D. Vance, and high-level Trump advisors—made plain their position that TPS was "illegal," that persons protected by TPS are here "illegally," and that this justified their plan to terminate TPS. But neither their disdain for TPS nor the Secretary's decision can nullify a statute.

6. The Secretary's decisions also were motivated at least in part by racial animus, in contravention of the Fifth Amendment. That is clear from statements the Secretary made when announcing the decisions themselves, labeling Venezuelan TPS holders as "dirtbags"—an expression of racism made by the official decisionmaker as part of her explanation for the decision. Making matters worse, that statement is just one among a torrent of similar racist statements that Secretary Noem, President Trump, and members of the Trump campaign and administration have made to attack and marginalize nonwhite immigrants generally, and the Venezuelan TPS community in particular.

7.     For each of these reasons, this Court should set aside the agency's unlawful vacatur and termination orders, and reinstate the prior extension.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. 1331 because this action arises under the Constitution and laws of the United States. This Court has additional remedial authority under the Declaratory Judgment Act, *see* 28 U.S.C. 2201 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. 701–706. Article III and the Fifth Amendment independently grant this Court subject matter jurisdiction over Plaintiffs' Fifth Amendment claim.

9.     The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. 702. *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989). In addition, sovereign immunity does not bar claims against federal officials seeking to prevent violations of federal law (rather than monetary relief). *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

10.     Venue is proper in the Northern District of California under 28 U.S.C. 1391(e)(1) because at least one Plaintiff resides in this judicial district and each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

## INTRADISTRICT ASSIGNMENT

11.     Assignment is proper in the San Francisco division because the claims of Plaintiffs that reside in this judicial district arise in Alameda and San Mateo Counties. Civil Local Rule 3-2(d) and 3-5(b).

## THE PARTIES

### Plaintiffs

12.     **Plaintiff National TPS Alliance (NTPSA)** is a member-led organization whose mission is to defend the TPS program and win a path to permanent residency for TPS holders. NTPSA is fiscally sponsored by the Central American Resource Center - CARECEN - of California, a non-profit organization headquartered in Los Angeles, California, which has worked for more than four decades to provide immigrant integration programs, deliver immigration legal

services, and foster civic participation and community engagement on immigration policy, education reform, and workers' rights.

13.     NTPSA advocates to defend TPS and win a path to permanent status for TPS holders; organizes actions to raise public awareness about TPS and the contributions TPS holders make to this country; facilitates community and civic engagement by TPS holders; and provides access to timely and accurate TPS-related information and services to its members. Membership in the NTPSA is free and voluntary. Individuals can become NTPSA members either by joining a local NTPSA committee or by submitting an individual membership application. NTPSA's members set the organization's priorities, lead and participate in NTPSA's local committees and working groups, and select and serve on NTPSA's Executive Committee.

14.     NTPSA brings this action on behalf of its members. The vast majority of NTPSA's members are TPS holders, including TPS holders from Afghanistan, Burma (Myanmar), Cameroon, El Salvador, Haiti, Honduras, Lebanon, Nepal, Nicaragua, Sudan, Ukraine, Venezuela, and Yemen; the rest are family members of TPS holders and other individuals who wish to support the TPS community. The NTPSA has over 84,000 Venezuelan TPS holder members living in all 50 states and the District of Columbia. They face irreparable harm from the challenged vacatur and termination.

15.     **Plaintiff Mariela González** is a Venezuelan who has TPS under the 2021 designation and, as a result of the challenged vacatur, is at risk of losing her TPS and work authorization on September 10, 2025. She is a resident of San Mateo County, California, and has lived in the United States for the past fourteen years. Mariela works as an instructional coach with an urban school district. Her mother, father, brother, sister, and nephews all live in the United States and are U.S. citizens. She is an NTPSA member.

16.     **Plaintiff Freddy Jose Arape Rivas** is a Venezuelan who has TPS under the 2023 designation and, as a result of the challenged vacatur and termination, is at risk of losing his TPS on April 7, 2025. He applied to renew his TPS and work authorization on January 17, 2025, pursuant to the now-vacated extension of TPS for Venezuelans. USCIS already automatically extended his employment authorization for up to 540 days in response to his application. But the

new Federal Register Notice vacating the January 17 extension provides that "USCIS will invalidate EADs" and TPS-related documentation issued pursuant to the January extension. Thus Freddy's work authorization is at risk of expiring on April 2, 2025. Freddy lives in Collin County, Texas, and works for a technology company. He has family in Texas, including a cousin who, along with his wife and seven-year-old daughter, also have TPS. He is an NTPSA member.

17.     **Plaintiff M.H.** is a Venezuelan who has TPS under the 2023 designation and, as a result of the challenged vacatur and termination, is at risk of losing her TPS status on April 7, 2025. Her work authorization expires on April 2, 2025. She lives in a Tennessee suburb with her husband and two children. Her seven-year-old daughter also has TPS. Her husband, an engineer, is a U.S. citizen employed by a government subcontractor, and together they have a two-year-old U.S. citizen son. M.H. is a full-time caregiver for her two young children. Her driver's license expires when her TPS does, and she depends on it for her daily needs. She is an NTPSA member.

18.     **Plaintiff Cecilia Daniela González Herrera** is a Venezuelan who has TPS under the 2021 designation and, as a result of the challenged vacatur, is at risk of losing her TPS on September 10, 2025. She lives with her parents and younger brother in Kissimmee, Florida, and is a derivative applicant on her parents' long-pending asylum application. She is a student at the University of Central Florida and expects to graduate with a bachelor's degree in May. She is also employed as the Voting Rights Advocacy Coordinator for Latino Justice PRLDEF. She is an NTPSA member.

19.     **Plaintiff Alba Cecilia Purica Hernández** is a Venezuelan who has TPS under the 2023 designation and, as a result of the challenged vacatur and termination, is at risk of losing her work authorization on April 2, 2025 and TPS on April 7, 2025. She had been a university student in Venezuela. She lives in San Leandro, California and works as a childcare provider. She is an NTPSA member.

20.     **Plaintiff E.R.** is a Venezuelan who has TPS under the 2023 designation and is at risk of losing her TPS on April 7, 2025 and her work authorization on April 2, 2025. She is a single parent to a twelve-year-old daughter, who is also a TPS holder. She lives in New York,

where she works in a factory. She relies on TPS for her work authorization and legal status. She is an NTPSA member.

21.     **Plaintiff Hendrina Vivas Castillo** is a Venezuelan who has TPS under the 2023 designation, and, as a result of the challenged vacatur and termination, is at risk of losing her TPS on April 7, 2025. Her work permit expires on April 2, 2025. She lives in Culver City, California and works as a delivery driver. She is an NTPSA member.

**Defendants**

22.     **Defendant Kristi Noem**, sued in her official capacity, is the Secretary of Homeland Security. As the highest-ranking officer for DHS, Defendant Noem has ultimate statutory authority over all TPS extension, termination, and designation decisions. *See* 8 U.S.C. 1254a(b); 6 U.S.C. 557 (transferring functions from the Attorney General).

23.     **Defendant U.S. Department of Homeland Security** is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. 551(1). DHS includes various component agencies, including the U.S. Citizenship and Immigration Services ("USCIS"). DHS, together with all of its component agencies, is responsible for administering and enforcing the TPS program.

24.     **Defendant United States of America** includes all other government agencies and departments responsible for the implementation, administration, and change in policy concerning the TPS program.

## STATUTORY FRAMEWORK

25.     Congress established the Temporary Protected Status program in the Immigration Act of 1990.[1] TPS is a form of humanitarian relief, providing lawful immigration status to eligible foreign nationals who cannot safely return home to war-torn or disaster-stricken countries. By

---

[1] Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030–36.

enacting the TPS statute, which is codified at 8 U.S.C. 1254a, Congress established formal criteria for relief and set forth predictable procedures.[2]

26.    Under the TPS statute, the Secretary of Homeland Security[3] makes a "designation" decision for a given country.[4] After consulting with "appropriate" government agencies, the Secretary may designate a foreign state, or any part of that state, for TPS based on: (A) an "ongoing armed conflict within the state" that would "pose a serious threat" to the "personal safety" of the foreign nationals of that state; (B) an "earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions," which makes the foreign state "unable, temporarily, to handle adequately the return to the state" of its nationals, and where the foreign state has "officially" requested a designation; or (C) the existence of "extraordinary and temporary conditions in the foreign state" that prevent foreign nationals from safely returning, and where the temporary presence of those foreign nationals in the United States is not "contrary to the national interest of the United States."[5]

---

[2] Before Congress created TPS, the Executive Branch previously used *ad hoc* enforcement mechanisms to allow individuals to remain in the United States for humanitarian reasons. *See* Adam B. Cox & Cristina Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 501–02 (2009) (discussing use of the "parole power," which is currently codified at 8 U.S.C. 1182(d)(5)); Lynda J. Oswald, Extended Voluntary Departure: *Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152 (1986) (discussing use of "Extended Voluntary Departure"). Presidents have continued to employ such programs even after the creation of TPS. For example, President Trump exercised his discretion to designate Venezuela for "Deferred Enforced Departure" in 2020. Somewhat like TPS, deferred enforced departure allows foreign nationals to remain and work in the United States lawfully while conditions in their homeland are unsafe or return is impracticable.

[3] References to the Attorney General in provisions describing functions transferred from the Department of Justice to the Department of Homeland Security "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557.

[4] The agency has long recognized authority to designate a country more than once, which is called "redesignation." *See* Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program, 62 Fed. Reg. 16608-01 (April 7, 1997) (concluding that the TPS statute "explicitly contemplates more than one designation" for one country" because 8 U.S.C. 1254a(c)(1)(A)(i) refers to "the most recent designation of the state"). A TPS designation for a country that is already designated for TPS is called a "redesignation." When DHS redesignates a country for TPS, it generally has the effect of expanding the pool of potential beneficiaries to include individuals who came to the United States after the country was first designated for TPS.

[5] 8 U.S.C. 1254a(b)(1).

27.     An initial designation period for a given country lasts for six, twelve, or eighteen months, at the Secretary's discretion.[6] Before the designation can become effective, the Secretary must publish a notice in the Federal Register that includes, among other things, a statement of findings, the effective date of the designation, and a tally of eligible foreign nationals. Once the designation is ordered, it "shall remain in effect" for a period "of not less than 6 months," and remains operative until terminated under procedures specified in the statute.

28.     Once the Secretary has designated a particular country for TPS, individuals from that country (or persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, however, individuals from a designated country must meet stringent requirements. These requirements include, among other things, continuous physical presence in the United States from the most recent date of designation; continuous residence in the United States from a (potentially earlier) date designated by the Secretary; satisfaction of the criteria for admissibility as an immigrant; lack of disqualifying criminal history (where more than one misdemeanor or a single felony is disqualifying); and submission of an application, extensive documentation, and fees.[7]

29.     Congress ensured that individuals who are ultimately granted protected status could enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, an individual who receives and maintains TPS "shall [be] authorize[d]" to engage in employment in the United States; "shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States by the Department of Homeland Security.[8]

30.     The TPS statute requires the Secretary to periodically re-evaluate country designations. At least 60 days before a particular designation expires, the Secretary must "review the conditions in the foreign state . . . for which a designation is in effect" and determine whether

---

[6] 8 U.S.C. 1254a(b)(2), (b)(3)(C).

[7] 8 U.S.C. 1254a(c)(1); 8 C.F.R. 244.2, 244.4, 244.9.

[8] 8 U.S.C. 1254a(a)(1), (d)(4).

the country still meets the conditions for TPS.[9] The review requires "consultation with appropriate agencies of the Government" and, ultimately, publication of notice in the Federal Register.[10]

31.  The review and consultation process typically begins months before the 60-day deadline. First,

> RAIO [the Refugee, Asylum and International Operations Directorate] (a division within USCIS) provides a Country Conditions Memo. In addition, OP&S [Office of Policy and Strategy] (another division within USCIS) drafts a Decision Memo that contains USCIS's recommendation on what to do about the TPS designation. Once the Decision Memo is finalized, the USCIS Director passes it on to the DHS Secretary. The State Department provides further input (e.g., country conditions, recommendations). At times, input can also come from other government sources, but the above is the information consistently provided to the DHS Secretary.[11]

32.  The Secretary must terminate TPS only if the designated country "no longer continues to meet the conditions of designation."[12] The statute does not permit consideration of other grounds for termination. The effective date of any TPS termination must be at least 60 days after publication of an official notice of termination, and may not precede the expiry of "the most recent previous extension."[13] In other words, the statute does not permit the Secretary to cut short a TPS period. The Secretary may, however, extend the period "to provide for an orderly transition."[14]

33.  If the Secretary does not terminate TPS for a particular country, either because she affirmatively finds that the country continues to meet the conditions for designation or because she simply fails to make a decision, then the designation "is extended" for a period of six months, or by discretion of the Secretary, for a period of twelve or eighteen months.[15]

---

[9] 8 U.S.C. 1254a(b)(3).

[10] 8 U.S.C. 1254a(b)(3)(A).

[11] *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018).

[12] 8 U.S.C. 1254a(b)(3)(B).

[13] *Id.*

[14] 8 U.S.C. 1254a(d)(3).

[15] 8 U.S.C. 1254a(b)(3)(C).

9

34.     When a designation for a particular country is terminated, an individual TPS holder's status will typically revert back to their original immigration status so long as that status remains valid.[16]

## IN AN UNPRECEDENTED ACTION, DHS TERMINATED TPS FOR VENEZUELAN TPS HOLDERS TO WHOM THE GOVERNMENT HAD GRANTED RENEWED PROTECTION ONLY WEEKS EARLIER

### Venezuelan TPS Designations

35.     Venezuelans living in the United States first received temporary protection from removal on January 19, 2021, when President Trump—on the last day of his first Administration—directed the Secretaries of State and Homeland Security to "take appropriate measures to defer for 18 months the removal of any national of Venezuela . . . who is present in the United States as of January 20, 2021," with limited exceptions, and "to take appropriate measures to authorize employment for aliens whose removal has been deferred, as provided by this memorandum, for the duration of such deferral." Memorandum re Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6845 (Jan. 19, 2021).

36.     In designating Venezuela for Deferred Enforced Departure, President Trump declared:

> [T]he Maduro regime is responsible for the worst humanitarian crisis in the Western Hemisphere in recent memory. A catastrophic economic crisis and shortages of basic goods and medicine have forced about five million Venezuelans to flee the country, often under dangerous conditions. . . . The deteriorative condition within Venezuela, which presents an ongoing national security threat to the safety and well-being of the American people, warrants the deferral of the removal of Venezuelan nationals who are present in the United States. *Id.*

37.     On March 9, 2021 (under the Biden Administration), DHS designated Venezuela for TPS based on the Secretary's determination that "extraordinary and temporary conditions in the foreign state prevent [Venezuelans] from returning in safety" and "permitting [Venezuelans] to remain temporarily in the United States" is not "contrary to the national interests of the United

---

[16] 8 C.F.R. 244.19.

States." 86 Fed. Reg. 13574, 13575 ("2021 Venezuela Designation"). The Secretary found that "Venezuela is currently facing a severe humanitarian emergency" and:

> [H]as been in the midst of a severe political and economic crisis for several years . . . marked by a wide range of factors including: Economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID-19 pandemic, among other factors.

*Id.* at 13576.

38. Also on March 9, 2021, via the same Federal Register Notice, DHS provided employment authorization for Venezuelans covered by Deferred Enforced Departure. *Id.* at 13579.

39. The 2021 Venezuela Designation allowed eligible Venezuelans who had continuously resided in the U.S. since March 8, 2021 and been physically present in the United States since March 9, 2021 to apply for TPS.

40. On July 11, 2022, DHS issued a press release announcing then-Secretary Alejandro Mayorkas's decision to extend Venezuela's TPS designation. The press release instructed:

> Venezuelans who are currently eligible for TPS under the existing designation but may have not yet applied with U.S. Citizenship and Immigration Services (USCIS) should file their applications prior to the September 9, 2022, application deadline, including those Venezuelans who are covered under the January 2021 grant of Deferred Enforced Departure (DED). Venezuela's DED is set to expire July 20, 2022.[17]

41. Venezuela's Deferred Enforced Departure expired on July 20, 2022. Every person who had been eligible for it was by then eligible for TPS, provided they could satisfy the more stringent background check criteria required for TPS.

42. On September 8, 2022, DHS extended Venezuela's TPS designation for 18 months, through March 10, 2024. 87 Fed. Reg. 55024. The Secretary found that extension was warranted

---

[17] *See* DHS Announces Extension of Temporary Protected Status for Venezuela (July 11, 2022), *available at* https://www.dhs.gov/archive/news/2022/07/11/dhs-announces-extension-temporary-protected-status-venezuela.

due to ongoing "[e]xtraordinary and temporary conditions that prevent Venezuelan nationals from returning in safety includ[ing] severe economic and political crises ongoing within Venezuela, which have an impact across sectors, including limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights." *Id.* at 55026. The Secretary also determined that "it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily." *Id.* at 55027. However, because the decision was only an extension, and not also a re-designation, it did not provide protection to Venezuelans who had arrived in the U.S. after March 9, 2021.

43.     On October 3, 2023, DHS again extended the 2021 designation of Venezuela for 18 months, and also re-designated Venezuela for TPS for 18 months. 88 Fed. Reg. 68130 ("2023 Venezuela Designation"). The extension of the 2021 designation ran from March 11, 2024 to September 10, 2025. The new 2023 re-designation ran from October 3, 2023 through April 2, 2025. The Secretary again found that

> [E]xtraordinary and temporary conditions continue to prevent Venezuelan nationals from returning in safety due to a severe humanitarian emergency which has resulted in food insecurity and the inability to access adequate medicine, healthcare, water, electricity, and fuel. Additionally, human rights violations and abuses, high levels of poverty, high levels of crime and violence, and heavy rains and flooding prevent Venezuelan nationals from returning in safety and permitting Venezuelan noncitizens to remain in the United States temporarily would not be contrary to the interests of the United States.

*Id.* at 68134.

44.     In order to qualify under the 2023 Venezuela Designation, TPS applicants had to prove that they had continuously resided in the United States since July 31, 2023 and had been continuously physically present since October 3, 2023. *Id.*

45.     All individuals who were eligible for TPS under the 2021 Designation were also eligible for TPS under the 2023 Designation, provided they registered in accordance with DHS instructions.

46.     DHS estimated that 243,000 Venezuelan TPS beneficiaries who first registered for TPS under the 2021 Venezuela Designation were eligible to re-register for TPS under its extension. *Id.*

47.     In addition, DHS estimated "approximately 472,000 additional individuals may be eligible for TPS under the redesignation of Venezuela. This population includes Venezuelan nationals in the United States in nonimmigrant status or without immigration status." *Id.* Such individuals were not eligible under the first designation because they arrived after March 9, 2021.

**January 2025 TPS Extension for Venezuela**

48.     On January 17, 2025, Secretary Mayorkas extended the 2023 Venezuela Designation by 18 months, through October 2, 2026. 90 Fed. Reg. 5961 ("January 2025 Extension"). The Secretary found that extraordinary and temporary conditions in Venezuela continued to prevent nationals from returning in safety. He explained:

> Venezuela is experiencing a complex, serious and multidimensional humanitarian crisis. The crisis has reportedly disrupted every aspect of life in Venezuela. Basic services like electricity, internet access, and water are patchy; malnutrition is on the rise; the healthcare system has collapsed; and children receive poor or no education. Inflation rates are also among the highest in the world. Venezuela's complex crisis has pushed Venezuelans into poverty, hunger, poor health, crime, desperation and migration. Moreover, Nicolas Maduro's declaration of victory in the July 28, 2024 presidential election—which has been contested as fraudulent by the opposition—has been followed by yet another sweeping crackdown on dissent.

*Id.* at 5963 (internal quotation marks and citations omitted).

49.     The Secretary also determined that "it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily." *Id.*

50.     The extension was effectively immediately. The registration period opened that day and extended through September 10, 2025.

51.     The January 2025 Extension also explained that there would no longer be two separate filing process for TPS designations for Venezuela. Rather:

> To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension. This would not, however, require that a beneficiary registered under the March 9, 2021 designation re-register at this time. Rather, it would provide such individuals with the option of doing so. Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are

13

approved by USCIS will obtain TPS through the same extension date of October 2, 2026.

*Id.* at 5963.

52. The January 2025 Extension also automatically extended relevant employment authorization documents. The notice instructed TPS holders that "if you already have an EAD with a 'Card Expires' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022, this Federal Register Notice automatically extends it through April 2, 2026 without any further action on your part." *Id.* at 5967. It further instructed employers that they "should accept" an expired EAD accompanied by a copy of the January 17, 2025 Federal Register Notice as proof of work authorization through April 2, 2026. *Id.* at 5969-70.

53. DHS estimated that, as of January 17, 2025, there were 607,000 beneficiaries under the 2021 and 2023 Venezuela Designations combined. *Id.*

**Vacatur of TPS Extension Three Days After Secretary Noem's Confirmation**

54. On January 20, 2025, President Trump was sworn in as President of the United States.

55. That same day, President Trump issued an Executive Order titled "Protecting the American People Against Invasion." The Order mandated that TPS designations be "appropriately limited in scope" in order to ameliorate the "continued presence of illegal aliens in the United States":

> The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to . . . ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. § 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute.[18]

56. On January 25, 2025, Secretary Noem was sworn in as DHS Secretary.

---

[18] Exec. Order 14159 (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/.

57.     On January 28, 2025, Secretary Noem vacated the January 2025 Extension for Venezuela, rendering more than 600,000 Venezuelans vulnerable to the loss of legal status and associated benefits in April or September 2025.[19]

58.     Secretary Noem's decision was the first vacatur of a TPS extension in the 35-year history of the TPS statute.

59.     On February 3, 2025, DHS formally published a notice in the Federal Register vacating the January 2025 Extension. 90 Fed. Reg. 8805.

60.     The vacatur asserted that the Secretary has "inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination." *Id.* at 8806.

61.     In the vacatur, Secretary Noem did not find any error in Secretary Mayorkas's conclusion that Venezuela continued to meet the conditions for TPS designation. Instead, her sole reason for vacating the extension was her objection to the registration requirement procedures established by Secretary Mayorkas, specifically his decision to permit individuals who initially applied for TPS under the 2021 Venezuela Designation to re-register under the 2023 Designation.

62.     The vacatur states that it vacates: "(1) [the] extension of the Venezuela 2023 TPS designation, (2) the consolidation of filing processes for both designations, which, in effect resulted in the extension of the 2021 TPS designation, and (3) the EADs that were extended." *Id.* at 8807.

63.     The vacatur further rescinds the automatic extension of employment authorization granted by the January 2025 extension; invalidates employment authorization and approval notices already granted; and cancels the ongoing processing of applications already filed. The notice states:

> Pursuant to this vacatur, USCIS will no longer accept Venezuela TPS re-registration applications (Form I-821) and associated Applications for Employment Authorization (Form I-765) filed under the [January 2025 Extension]. For TPS beneficiaries who have already filed

---

[19] USCIS, *Temporary Protected Status Designated Country: Venezuela*, *available at* https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-venezuela.

applications to re-register for TPS pursuant to the [January 2025 Extension] and paid any fees associated with their applications, USCIS will cease processing their applications, and issue refunds of any fees paid by those aliens.[FN5] Additionally, USCIS will invalidate EADs; Forms I-797, Notice of Action (Approval Notice); and Forms I-94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the [January 2025 Extension]. USCIS will provide refunds to any fees paid by these aliens as well.

Additionally, pursuant to this vacatur the automatic EAD extensions provided in the [January 2025 Extension] are hereby rescinded. USCIS will provide additional guidance regarding the two Venezuela TPS designations on a future date in accordance with applicable laws.

### Fast-Track Termination of TPS for 350,000 Venezuelans

64.     On February 1, 2025, Secretary Noem "decided to terminate" the 2023 Venezuela Designation, ordering an end to the legal status of approximately 350,000 Venezuelans, effective in April.[20]

65.     The reasoning in Secretary Noem's decision would also justify the termination of TPS for the approximately 250,000 people protected by the 2021 Venezuela Designation. Under the statute that decision must be made no later than July 2025.[21]

66.     On February 5, 2025, DHS published a notice in the Federal Register terminating the 2023 Venezuela Designation. 90 Fed. Reg. 9040.

67.     The termination notice does *not* contend that the crisis conditions supporting the 2023 Venezuela Designation have ended, finding instead that "the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary.'" Secretary Noem nonetheless "determined that Venezuela no longer continues to meet the conditions for the 2023 designation" because "it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States." *Id.* at 9041.

---

[20] USCIS, *Temporary Protected Status Designated Country: Venezuela*, *available at* https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-venezuela.

[21] The statute requires a decision at least 60 days prior to the expiry of any particular TPS designation. 8 U.S.C. 1254a(b)(3).

68.     In her review of whether TPS for Venezuela is in the national interest, Secretary Noem cited President Trump's directives—his Executive Order, "Protecting the American People Against Invasion," his "recent, immigration and border-related executive orders and proclamations [which] clearly articulated an array of policy imperatives bearing upon the national interest"; his declaration of a "national emergency at the southern border," and his directive to put "America and American citizens first." *Id.* at 9042–43.

69.     Most TPS holders lack *any* criminal history. Indeed, individuals are ineligible for TPS if they have more than a single misdemeanor conviction. Yet the termination notice justifies terminating the status of nearly 350,000 Venezuelan TPS holders because alleged members of a Venezuelan gang have been "blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants," and because President Trump recently placed that gang on a "list of transnational criminal organizations." In elaborating why extension is not in the national interest, the Notice provides: "TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States[.] . . . Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua." *Id.*

70.     Despite that the termination notice issued only two days after the vacatur notice (and less than two weeks after Noem took office), the Notice proclaims that the decision to terminate the 2023 Venezuela Designation followed "consultation with the appropriate U.S. Government agencies," a review of "country conditions," and a "consider[ation of] whether permitting Venezuelan nationals covered by the 2023 designation is contrary to the national interest." *Id.* at 9041.

71.     The termination takes effect April 7, 2025 or 60 days after the publication of the termination notice. This is the earliest possible date of termination allowed by law; it provides for no orderly transition period.[22] While the termination notice recognizes the discretionary authority

---

[22] 8 U.S.C. 1254a(b)(3)(B) (termination may be effective no earlier than 60 days after publication in the Federal Register or, "if later, the expiration of the most recent previous extension"); 8 U.S.C. 1254a(d)(3) (Secretary may establish an orderly transition period).

of the DHS Secretary to provide for an "'orderly transition' period if she determines it to be appropriate," it rejects one as improper here. The termination notice justifies this in light of the Secretary's determination that the termination is compelled in the "national interest," and her finding that there are limited "putative reliance interests." *Id.* at 9042–44.

72.      The termination notice does *not* extend the employment authorization documents for 2023 Venezuela registrants beyond the date permitted by the original 2023 Designation. Thus, TPS holders protected by the 2023 Venezuela Designation have TPS-related work authorization only until April 2, 2025—five days prior to the expiry of their legal status—even though the statute requires that individuals protected by TPS have "effective" work authorization "throughout the period [they are] in temporary protected status."[23]

## THE TRUMP ADMINISTRATION PUBLICLY COMMITTED TO END TPS PROTECTIONS AND DESTROY THE TPS PROGRAM

**Secretary Noem and President Trump Promised to Terminate TPS**

73.      Secretary Noem, President Trump and Vice President J.D. Vance have repeatedly characterized TPS itself as illegal, and committed to terminate TPS long before the Secretary had any opportunity to consider the factors required by the statute. Secretary Noem's decision to terminate the 2023 Venezuela Designation treats the program itself as illegal.

74.      DHS never acknowledged or explained the departure from the agency's prior recognition that Congress lawfully authorized TPS designations, that TPS is itself legal, and that individual TPS designations may be in the national interest.

75.      Both prior to and since assuming her position running DHS, Secretary Noem has reiterated her view that TPS, as it has been used, is illegal. At her confirmation hearing, Secretary Noem stated that "[TPS] has been abused and manipulated by the Biden Administration, and that

---

[23] 8 U.S.C. 1254a(a)(1)(B).

will no longer be allowed . . . and these extensions going forward the way that they are. The program was intended to be temporary[.]"[24]

76. Secretary Noem defined TPS holders as law violators just by virtue of having this humanitarian status. In announcing her decision to end TPS for Venezuela, Secretary Noem said the termination "stopped" former Secretary Mayorkas from letting Venezuelan TPS holders "stay here and violate our laws for another 18 months."[25]

77. In a February 2, 2025 "Meet the Press" appearance the day the vacatur was published, Secretary Noem said, "The TPP *[sic]* program has been abused and it doesn't have integrity right now."[26]

78. President Trump, Vice President Vance, and Trump surrogates have likewise championed the view that TPS designations are "illegal"—or, in the Vice President's words, "a magic amnesty wand."[27] They have made clear their intent to target TPS and/or TPS designations for termination.

79. President Trump, while campaigning, said that he would personally revoke TPS and that he did not consider it legal. President Trump responded to an interviewer's question as to whether Haitian TPS holders in Springfield, Ohio were "legal or illegal" and whether he would

---

[24] C-SPAN, *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing* (Jan. 17, 2025) at approx. 1:51:50, *available at* https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-gov-kristi-noem-testifies-at-confirmation-hearing/654484.

[25] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, FOX AND FRIENDS (Jan. 29, 2025) at approx. 1:00, *available at* https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad686037.

[26] NBC*, Meet the Press*, YOUTUBE (Feb. 2, 2025) at approx. 16:25, *available at* https://www.youtube.com/watch?v=FpeMXrvxHco.

[27] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), *available at* https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. TIMES (Nov. 15, 2024), *available at* https://www.nytimes.com/2024/11/15/trump-immigrants-temporary-protected-status.html.

"revoke TPS status" by saying: "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal. . . . Absolutely I would revoke [TPS]."[28]

80.     Though TPS holders in Springfield, Ohio were welcomed by local officials and employers, and legally authorized to live and work in the United States through the TPS program, President Trump said, "they are illegal immigrants as far as I'm concerned. They're destroying the towns. . . . [T]hey'll end up destroying the state!"[29]

81.     Vice President Vance, during the campaign, expressed a goal of ending TPS: "We're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[30] Given that TPS is, by statute, designed to *be* a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief), this statement can only be understood as an attack on TPS itself.

82.     According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[31]

---

[28] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NEWSNATION (Oct. 2, 2024) at approx. 12:00, *available at* https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/.

[29] Edith Olmstead, *Trump Is Now Threatening All Immigrants, "Illegal" or Not,* THE NEW REPUBLIC (Oct. 9, 2024), *available at* https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie ("[L]ook at Springfield, where 30,000 illegal immigrants are dropped, and it was, they may have done it through a certain little trick, but they are illegal immigrants as far as I'm concerned.").

[30] Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), *available at* https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html.

[31] Charlie Savage *et al.*, *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), *available at* https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

83.    Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations"—without elaboration as to any consideration of country conditions or any other review criteria or processes.[32]

84.    President Trump's motivation to terminate TPS is not new. During the first Trump Administration, DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. Those termination decisions were ultimately struck down in litigation.[33]

85.    Secretary Noem's actions follow this familiar pattern, and show that she was motivated in part in response to a clear mandate from President Trump and other Trump administration immigration officials. This is evident by her reliance on President Trump's policy objections as the sole support for her determination that termination of TPS for Venezuela was not in the national interest.

**SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY ANIMUS TOWARDS VENEZUELAN TPS HOLDERS**

86.    Secretary Noem's vacatur and termination decisions were motivated in significant part by animus against Venezuelans based on their perceived race, ethnicity, and national origin . The animus is evidenced by numerous statements made by Secretary Noem, President Trump and

---

[32] Paul Dans & Steven Groves, eds., "Mandate for Leadership: The Conservative Promise," at 150, *available at* https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

[33] *Ramos*, 336 F. Supp. 3d at 1081 (granting preliminary injunction enjoining implementation of TPS terminations for Sudan, Haiti, El Salvador, and Nicaragua); *see also Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) (finding Plaintiffs likely to succeed on claims that 2018 termination of Haiti's TPS designation violated the APA and the equal protection component of the Fifth Amendment Due Process Clause and issuing preliminary injunction); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 416 (D. Mass. 2018) (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"); *Casa de Md., Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018) (denying motion to dismiss because plaintiffs plausibly alleged equal protection and APA challenge).

other Trump administration officials. A limited number of those statements are described herein. They leave no doubt as to the speaker's discriminatory motives against nonwhite immigrants in general and Venezuelans in particular.

**Secretary Noem's Racist Statements**

87.    In announcing the vacatur in a "Fox and Friends" interview on January 29, 2025, Secretary Noem described Venezuelans in the United States as "dirtbags": "Today we signed an executive order within the Department of Homeland Security and a direction that we were not going to follow through on what he did to tie our hands, that we are going to follow the process, evaluate all of these individuals that are in our country, including the Venezuelans that are here and members of TdA [transnational gang Tren de Aragua]. Listen, . . . the people of this country want *these dirtbags* out. They want their communities to be safe . . . So, this is part of our plan to make sure we are protecting America and keeping it safe again, just like President Trump promised."[34]

88.    This was not an isolated occurrence. Secretary Noem has repeatedly described immigrants, and particularly those from Venezuela, as "dirtbags."[35]

89.    The vast majority of Venezuelan TPS holders have no criminal history, and in general people are ineligible for TPS if they have more than a single misdemeanor conviction. Nonetheless, Secretary Noem has also sought to disparage Venezuelan TPS holders as "criminals." At her confirmation hearing, Secretary Noem said: "[T]his extension [of TPS] of over

---

[34] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, FOX AND FRIENDS (Jan. 29, 2025) at approx. 1:00, *available at* https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad68603 7 (emphasis added).

[35] @Sec_Noem, X (Jan. 28, 2025, 7:35 AM), *available at* https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, CBS MORNINGS (Jan. 29, 2025) at approx. 1:10, *available at* https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem on New York City raids she references reported that nearly half of those arrested had no criminal history.

COMPLAINT – CASE NO. 25-CV-1766

600,000 Venezuelans [] is alarming when you look at what we've seen in different states including Colorado with gangs doing damage and harming the individuals and the people that live there."[36]

90.     She has also repeatedly conflated Venezuelan TPS holders with members of a Venezuelan gang which the Trump administration designated as a foreign terrorist organization. On the January 29 "Fox and Friends" interview, Secretary Noem described ending TPS for Venezuelans as necessary in order to "evaluate all of these individuals that are in our country, including the Venezuelans that are here and members of TdA," referring to Tren de Aragua.[37]

91.     Secretary Noem also conflated TPS holders and Tren de Aragua gang members in the termination notice itself.

92.     On February 2, 2025, the publication date of the Federal Register Notice announcing the vacatur, Secretary Noem appeared on NBC News' "Meet the Press" and said: "Folks from Venezuela that have come into this country are members of TdA. And remember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America. So we are ending that extension of that program, adding some integrity back into it, and this administration is evaluating all of our programs to make sure they truly are something that is to the benefit of the United States, so that they are not to the benefit of criminals."[38]

93.     Secretary Noem's baseless assertion that Venezuela emptied out prisons and mental institutions to send people to the United States long predates her term as Secretary. She has made

---

[36] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025) at approx. 1:52:00, *available at* https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-gov-kristi-noem-testifies-at-confirmation-hearing/654484.

[37] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, FOX AND FRIENDS (Jan. 29, 2025) at approx. 1:10, *available at* https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad686037.

[38] NBC, *Meet the Press*, YOUTUBE (Feb. 2, 2025) at approx. 16:27, *available at* https://www.youtube.com/watch?v=FpeMXrvxHco.

this false claim repeatedly.[39] One year before she was named DHS Secretary, Noem already targeted Venezuelans for deportation, saying "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America. Deportations need to start on DAY ONE of [President Trump's] term" in office.[40]

94.     In a CBS News interview on March 5, 2024, Secretary Noem asserted that the "invasion" by Venezuelan (and Cuban) immigrants constituted an existential threat to the country. "We've seen these countries that hate us empty out their prisons, their mental institutions. They've given us their responsibilities and some of the most dangerous people in the world have made their way to the United States of America. . . . [C]ountries such as Venezuela and Cuba have been emptying out their prisons. . . . So we know for a fact that this was facilitated, that the White House has this invasion happening on purpose, and it is to remake the foundation of this country."[41]

95.     Secretary Noem's assertions are not just unsubstantiated; they are false. Tren de Aragua's "reputation" is overblown, and not matched by "its actual presence in the United

---

[39] @KristiNoem, X (Feb. 26, 2024, 11:19 AM), *available at* https://x.com/KristiNoem/status/1762195636491825295 ("Nations like Venezuela are emptying their prisons of dangerous criminals to send them to America. They are happy to let America's open border be the solution to their problem."); @KristiNoem, X (Feb. 27, 2024, 5:26 PM), *available at* https://x.com/KristiNoem/status/1762650522920652828 (Venezuela didn't send us their best. They emptied their prisons and sent criminals to America."); @KristiNoem, Instagram (Mar. 6, 2024), *available at* https://www.instagram.com/kristinoem/reel/C4ML17eRBYr/ ("Countries like Venezuela are emptying their prisons, their mental institutions, and sending them to America. The White House is facilitating this invasion. They're doing it on purpose."); @KristiNoem, X (Mar. 14, 2024, 9:24 AM), *available at* https://x.com/KristiNoem/status/1768312288560247199 ("At least 300,000 illegal immigrants from Venezuela have been encountered at the border. Remember, Venezuela emptied their prisons and told them to come to America."); @KristiNoem, Instagram (Dec. 9, 2024), *available at* https://www.instagram.com/kristinoem/reel/DDVjJnURRqw/ ("[N]ations like Venezuela are using our open border to solve their own crime and mental health crises.").

[40] @KristiNoem, X (Feb. 27, 2024, 5:26 PM), *available at* https://x.com/KristiNoem/status/1762650522920652828.

[41] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS (Mar. 5, 2024) at approx. 3:58, *available at* https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/.

States."[42] "[N]early no claims made by U.S. law enforcement about crimes committed by purported members of TdA have been substantiated by hard evidence that directly connects the accused with the organization in Venezuela."[43]

96.     When investigative journalists sought to study claims about the gang's activity last year, "none of the [numerous] national, state, and local law enforcement agencies contacted in the U.S. reported any significant presence of Tren de Aragua" in their jurisdictions.[44] A 2024 review of state and federal legal databases found zero "U.S. criminal cases mentioning Tren de Aragua."[45] The police chief and Republican mayor of the Colorado town that President Trump and Secretary Noem claimed had been ravaged by the gang each thoroughly refuted that assertion, instead identifying a delinquent property manager as the primary culprit for dilapidated properties with "'criminal elements,' not widespread gang activity."[46] And a Washington Post investigation laid bare the fallacy of DHS's claim that it had transferred to Guantanamo Tren de Aragua members described as the "worst of the worst." The Washington Post found no evidence that those transferred were even Tren de Aragua members; most had not even made it *into* the United States

---

[42] Venezuela Investigative Unit, *What We Know About Tren de Aragua's US Presence*, INSIGHT CRIME (Oct. 4, 2024), *available at* https://insightcrime.org/news/what-we-know-about-tren-de-araguas-us-presence/.

[43] Charles Larratt-Smith & John Polga-Hecimovich, *How Much of a Threat is Tren de Aragua in the U.S.?*, AMERICAS QUARTERLY (Dec. 9, 2024), *available at* https://americasquarterly.org/article/how-much-of-a-threat-is-tren-de-aragua-in-the-u-s/ ("[I]t's unlikely the group has much power or reach in the U.S., where other organized criminal organizations pose much more of a threat to citizens and TdA itself.").

[44] Venezuela Investigative Unit, *Is Venezuela's Tren de Aragua 'Invading' the US?*, INSIGHT CRIME (Apr. 1, 2024), *available at* https://insightcrime.org/news/is-venezuelas-tren-de-aragua-invading-us/ ("Police agencies in major urban areas across the United States – including Los Angeles, Phoenix, Dallas, San Antonio, and Denver – told InSight Crime that they had no reports of crimes committed by Tren de Aragua in their jurisdictions.").

[45] *Id.*

[46] Jonathan Weisman, *How the False Story of a Gang 'Takeover' in Colorado Reached Trump*, N.Y. TIMES (Sept. 15, 2024), *available at* https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html.

at the time of their arrest; and experts consistently rejected the assertion that there were more than a few hundred TdA members in the United States at all.[47]

97.     DHS itself identified only 600 Venezuelan migrants "who may have connections" to Tren de Aragua—including not just members, but also victims, witnesses or subjects of interest.[48]

98.     The claim that Venezuelan prisons and mental health facilities are being emptied out to send their residents to the United States is also false. "There is no evidence that the Venezuelan government is systemically or selectively releasing prisoners and expelling them from the country."[49] Nor has President Trump provided any substantiation for this repeated assertion.[50] Experts contend that there simply *aren't* psychiatric hospitals filled with mentally ill people in Venezuela to be released.[51]

**President Trump's Racist Statements**

99.     From his candidacy for his first term as president through the present, President Trump has repeatedly denigrated people perceived to be non-white immigrants. He has specifically targeted both TPS holders generally and Venezuelans in particular.

---

[47] Silvia Foster-Frau et al., *Relatives and Records Cast Doubt on Guantánamo Migrants Being 'Worst of the Worst'*, WASH. POST (Feb. 16, 2025), *available at* https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/.

[48] Julia Ainsley, *DHS Is Seeking More than 600 Migrants for Possible Ties to Venezuelan Gang*, NBC NEWS (Oct. 23, 2024), *available at* https://www.nbcnews.com/news/dhs-identified-600-migrants-possible-ties-venezuelan-gang-rcna176020.

[49] Jorge Valencia, *Trump Says Venezuela Sends Criminals to the U.S. Here's What to Know*, N.Y. TIMES (July 31, 2024), *available at* https://www.nytimes.com/2024/07/31/world/americas/trump-crime-venezuela-us.html (describing the lack of any evidence for the assertion that Venezuela is emptying prisons and expelling prisoners to the United States, and considering it "highly unlikely").

[50] Daniel Dale, *Fact Check: Trump's Own Campaign Can't Find Proof for His 'Mental Institutions' Immigration Story*, CNN (Apr. 29, 2023), *available at* https://www.cnn.com/2023/04/29/politics/fact-check-trump-mental-institutions-migrants-doctor/index.html.

[51] Maria Ramirez Uribe & Amy Sherman, *Trump's Ridiculous Claim that 'Millions' of Immigrants Came Illegally from Jails, Mental Facilities*, POLITIFACT (June 6, 2024), *available at* https://www.politifact.com/factchecks/2024/jun/06/donald-trump/fact-check-trumps-ridiculous-claim-that-millions-o/ (quoting an immigrant behavioral health expert to conclude that President Trump's assertion that Venezuela was emptying mental health facilities and sending residents to the United States "does not make sense because those numbers are not there").

100.    Secretary Noem's reliance on President Trump's objectives in justifying the termination of TPS for Venezuela demonstrated her adoption of President Trump's animus as well as her response to pressure from President Trump and the White House to reach a quick decision to terminate TPS.

101.    During his prior administration, President Trump repeatedly denigrated immigrants from countries designated for TPS, including Haiti, El Salvador, and Honduras. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS. He expressed a preference, instead, for immigrants from countries "such as Norway."[52]

102.    During his recent campaign, President Trump defended these remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.[53]

103.    President Trump has sought to dehumanize immigrants, including TPS holders in particular, through other statements. For months, he repeated and amplified the false claim that Haitian TPS holders were "eating the dogs" and "eating the cats," "eating the pets of the people that live" in Springfield, Ohio.[54]

---

[52] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan. 12, 2018), *available at* https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[53] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), *available at* https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[54] *See, e.g.*, CBS NEWS, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024) at approx. 29:26, *available at* https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383; *see* Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sept. 15, 2024), *available at* https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html ("The American media totally ignored this stuff until Donald Trump and I started talking about cat memes. If I have to create stories so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do.").

104.   President Trump has often compared immigrants to snakes that will bite and kill anyone foolish enough to shelter them.[55] He has also described nonwhite immigrants as "animals."[56] For example, President Trump said about some undocumented immigrants during a March 2024 rally, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[57]

105.   President Trump has repeatedly described immigrants in the United States as an "invasion," repeatedly conflating migrants with "[drug dealers], criminals, gang members and terrorists."[58]

106.   President Trump, while campaigning in December 2023, decried nonwhite immigrants for "poisoning the blood of our country."[59]

---

[55] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), *available at* www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), *available at* www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), *available at* https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border…. And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.].")

[56] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), *available at* https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[57] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), *available at* https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.

[58] *See, e.g.*, Donald Trump, *Donald Trump: This Is How I Will End Joe Biden's Border Disaster on Day One*, DES MOINES REGISTER (Jan. 3, 2024), *available at* https://www.desmoinesregister.com/story/opinion/columnists/caucus/2024/01/03/donald-trump-joe-biden-border-disaster/72093156007/; TIME, *Read the Full Transcripts of Donald Trump's Interviews with TIME*, Apr. 2024, *available at* https://time.com/6972022/donald-trump-transcript-2024-election/ ("This is an invasion of our country. An invasion like probably no country has ever seen before. They're coming in by the millions.").

[59] *Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country'*, C-SPAN (Dec. 16, 2023), *available at* https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439.

107.   At a rally one week before the 2024 election, President Trump described the country as "occupied" by criminal migrants—heaping scorn on "savage" Venezuelan gang members in particular. "We're not going to have a country any longer. That's who we're allowing in. The United States is now an occupied country, but it will soon be an occupied country no longer . . . November 5, 2024 . . . will be Liberation Day in America. . . . I will rescue every city and town that has been invaded and conquered."[60]

108.   During his first term in office, President Trump also conflated large groups of immigrants, and sometimes even all of them, with members of the MS-13 gang.[61] In his first State of the Union address, he suggested that the Deferred Action for Childhood Arrivals ("DACA") program, recipients of which are immigrants first brought to the United States as children many years ago, contributed to the spread of MS-13.[62]

109.   President Trump has also falsely claimed that "jails and mental institutions from other countries and gang members right off the streets of the toughest cities of the world are being brought to the United States of America and emptied out into our country."[63] There is no basis for this claim.

110.   Like Secretary Noem, President Trump has singled out Venezuela for particular opprobrium. He has contended that Venezuelans have "destroyed the fabric of our country."[64]

---

[60] Speech by Donald Trump at Madison Square Garden Presidential Campaign Rally (Oct. 27, 2024) at approx. 16:13, *available at* https://www.youtube.com/watch?v=bzVT4YEYsuI.

[61] Terry Gross, *Trump Uses MS-13 To 'Sell Draconian Overhauls of Border Issues,' Journalist Says*, NPR (Feb. 15, 2018), *available at* https://www.npr.org/2018/02/15/585937834/trump-uses-ms-13-to-sell-draconian-overhauls-of-border-issues-journalist-says.

[62] Liz Robbins*, Why was MS-13 Targeted in Trump's Speech?*, N.Y. TIMES (Jan. 31, 2018), *available at* https://www.nytimes.com/2018/01/31/nyregion/ms-13-gang-trump.html.

[63] FOX NEWS, *President Donald Trump: We Will Bring Our Country Back*, YOUTUBE (Jan. 22, 2025) at approx. 18:26, *available at* https://www.youtube.com/watch?v=mQUmy6gkwWg.

[64] *See also* CBS NEWS, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024) at approx. 33:40, *available at* https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 ("They allowed people to come in, drug dealers, to come into our country, and they're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. . . . There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in.").

111. President Trump has used dehumanizing language and repeatedly called Venezuelan immigrants "animals": "[E]veryday Americans . . . are living in fear all because [former Vice President] Kamala Harris decided to empty the slums and prison cells of Caracas [Venezuela] and many other places . . . . [A]nd we have to live with these animals, but we're not going to live with them for long, you watch."[65] One analysis by Axios of 109 of President Trump's speeches, debates, and interviews found that he called Venezuelan migrants "criminals" at least seventy times between September 1, 2023 to October 2, 2024.[66]

112. He has alleged that Venezuelan "prisons are . . . at the lowest point in terms of emptiness that they've ever been" because Venezuela was "taking their people out of those prisons by the thousands" and sending them to the United States.[67]

113. President Trump has also made disparaging remarks about Latin American countries and people, frequently relying on crude and derogatory stereotypes to stoke fear about immigration.

114. President Trump has also repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, as well as publicly dined with prominent, self-declared white supremacists, thereby endorsing their racist views and amplifying their racist message.[68]

---

[65] FOX 4 DALLAS-FORT WORTH, *Trump Rally in Aurora, Colorado: FULL SPEECH*, YOUTUBE (Oct. 12, 2024) at approx. 41:05, *available at* https://www.youtube.com/watch?v=_xguaneoZ5A; *see also* NBC NEWS, *Meet the Press*, YOUTUBE (Dec. 8, 2024) at approx. 8:52, *available at* https://www.youtube.com/watch?v=-UsHJWEAj_I ("Did you know that Venezuela their prisons are . . . at the lowest point in terms of emptiness that they've ever been? They're taking their people out of those prisons by the thousands and they're drop—.").

[66] Russell Contreras, Delano Massey, & Erin Davis, *Trump keeps calling Venezuelan and Congolese migrants criminals*, AXIOS (Oct. 5, 2024), *available at* https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[67] NBC NEWS, *Meet the Press*, YOUTUBE (Dec. 8, 2024) at approx. 8:42, *available at* https://www.youtube.com/watch?v=-UsHJWEAj_I.

[68] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), *available at* https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sep. 23, 2024), *available at* https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

115.   The Trump Administration has not shown similar opposition to immigrant populations perceived as white. On the contrary, on February 7, 2025 President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Secretary Noem (among others) to:

> [T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination.

116.   Trump's Executive Order to protect white South Africans yet again makes clear that his administration strongly prefers white immigrants over those perceived as non-white.

117.   Together, all of President Trump's repeated statements denigrating immigrants, and targeting Venezuelans and TPS holders in particular, have not functioned merely as hateful rhetoric. They have also worked as a call to action for those serving him.

**Statements of Trump Surrogates**

118.   Like President Trump, prominent officials who exerted influence to ensure that DHS's decision-making process on TPS favored termination also harbor racial animus against immigrants perceived as non-white in general and Venezuelans in particular. These officials have been motivated by their racial animosity to intervene in and influence the TPS decision-making process towards termination.

119.   For example, Stephen Miller, Deputy Chief of Staff to the President, has long expressed support for White Nationalism, "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[69] Miller lauded historical immigration laws that imposed

---

[69] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOUTHERN POVERTY LAW CENTER (Nov. 12, 2019), *available at* https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

1  quotas based on racist assumptions.[70] For years, Miller promoted the ideas that non-white

2  immigrants were uniquely violent and targeted Americans with that violence.[71]

3      120.   Miller has been described as an "early architect[] of the Trump administration's

4  immigration policies," and has prioritized curtailing both legal and illegal immigration.[72] When he

5  was the senior advisor to the President during Trump's first term in office, Miller repeatedly called

6  DHS officials to urge termination of TPS.[73]

7      121.   Secretary of State Marco Rubio, who was purportedly consulted in Secretary

8  Noem's review of the Venezuela TPS designations, has demonstrated how Trump surrogates

9  respond to his call to action. In 2022, the Senator Rubio advocated *for* the extension of TPS for

10  Venezuela, calling it "absolutely essential" to avoid a "very real death sentence for countless

11  Venezuelans who have fled their country."[74] He even co-sponsored legislation to re-designate TPS

12  for Venezuela.[75] However, more recently, Secretary Rubio embraced President Trump's racist

13  talking points about Venezuela, espousing in 2024 the "exaggerate[ed]" depiction of Tren de

---

[70] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), *available at* https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration restrictions from a century ago, while bitterly lamenting the law that repealed them.").

[71] Nicole Narea, *Stephen Miller sought to link immigrants to crime and terrorism in private emails to Breitbart,* VOX (Nov. 25, 2019), *available at* https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[72] THE CHARLIE KIRK SHOW, *Sweeping Raids, Mass Deportations: Donald Trump's 2025 Plan to Fix the Border* (Nov. 14, 2023), *available at* https://thecharliekirkshow.com/podcasts/the-charlie-kirk-show/sweeping-raids-mass-deportations-donald-trumps-202; *see also* Lauren Villgran, *Who is Stephen Miller, architect of Donald Trump's mass deportation plans?*, USA TODAY (Nov. 25, 2024), *available at* https://www.usatoday.com/story/news/politics/elections/2024/11/21/stephen-miller-trumps-mass-deportation-architect/76260908007/; Elliot Spagat, *Trump picks a pair of experienced advisers motivated to carry out his immigration crackdown*, ASSOCIATED PRESS NEWS (Nov. 12, 2024), *available at* https://apnews.com/article/immigration-deportation-homan-miller-trump-border-abb1a75497d11c978c369cb20016eecb.

[73] *See Ramos*, 336 F. Supp. 3d. at 1098.

[74] Senators Marco Rubio & Robert Menendez, *Letter to Secretary Alejandro Mayorkas* (Mar. 31, 2022), *available at* https://www.foreign.senate.gov/imo/media/doc/menendez-rubio-letter-to-dhs-re-venezuela-tps-april12022.pdf.

[75] *See* Venezuela Temporary Protected Status Act of 2021, S. 50, 117th Cong. (2021-2022).

Aragua as "an invading criminal army from a prison in Venezuela that has spread their brutality and chaos to U.S. cities and small towns."[76]

**The Trump Administration's Previous Racist Attempts to End TPS**

122.   This is not the first time that an administration guided by President Trump has embarked on an unlawful campaign to destroy TPS in violation of the APA and Equal Protection Clause.

123.   During President Trump's first term, every federal district court to consider the question found "evidence that President Trump harbors an animus against non-white, non-European aliens which influenced his (and thereby the Secretary's) decision to end the TPS designation[s]" for El Salvador, Haiti, Sudan, and Nicaragua in 2017 and 2018.[77]

124.   The evidence adduced in those cases further illustrates that the conduct challenged here is part of a premeditated effort to terminate TPS without regard to applicable law or standards, and to further a racist agenda.[78]

125.   Political appointees during the first Trump administration also sought to paint TPS holders as criminals and to manufacture evidence to support this impossible claim—to justify the termination of designations, and the undermining of the TPS program. Subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed

---

[76] Charles Larratt-Smith & John Polga-Hecimovich, *How Much of a Threat is Tren de Aragua in the U.S.?*, AMERICAS QUARTERLY (Dec. 9, 2024), *available at* https://americasquarterly.org/article/how-much-of-a-threat-is-tren-de-aragua-in-the-u-s/.

[77] *Ramos*, 336 F. Supp. 3d at 1100; *see also Centro Presente*, 332 F. Supp. at 415 ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras); *Saget*, 375 F. Supp. 3d at 372 (finding that "evidence of [White House] animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti).

[78] *See, e.g.*, *Ramos*, 336 F. Supp. 3d at 1101–04 (describing how, *i.e.,* "the record evidence indicates that, after receiving Decision Memos from career DHS employees, higher-level DHS employees – *i.e.*, the political appointees – were 'repackaging' the memos in order to get to the President/White House's desired result of terminating TPS"; and how "Acting Secretary Duke expressly acknowledged that the terminations of TPS designations were 'a strong break with past practice,' [citation omitted] - designed to fit the President's objectives on immigration which would put 'America first.'"); *Saget*, 375 F. Supp. 3d at 322.

crimes and relied on public assistance, despite that virtually any criminal record is disqualifying for TPS.[79] A federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole."[80]

126.   During President Trump's first term in office, the pressure from President Trump and the White House into the DHS Secretary's TPS decision-making was less evident and public than here. The federal district court nonetheless found that "Acting Secretary Duke's writings suggest that she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS."[81] There, Acting Secretary Duke, in separate personal memos, expressed that her TPS decision-making was based on "an America first view," a term that invoked then-President Trump's racist views preferring immigration from majority-white European countries.[82] Here, by contrast, Secretary Noem has included President Trump's "America First" objectives expressly in the published Federal Register Notice terminating TPS.

## THE TERMINATION OF TPS STATUS WOULD IMPOSE EXTRAORDINARY AND IRREPARABLE HARM ON TPS HOLDERS, THEIR FAMILIES, AND THEIR COMMUNITIES

127.   More than 600,000 TPS holders will lose the TPS status they were scheduled to have until October 2026 as a result of Defendants' vacatur. More than 350,000 of them stand to lose their employment authorization as soon as April 2, 2025 and their legal status on April 7, 2025 as a result of the termination of the 2023 Venezuela Designation. The scale of the harm wrought by Defendants' actions to eliminate TPS protection for Venezuelans will be massive if not reversed.

[79] *Ramos*, 336 F. Supp. 3d at 1104–05; *Saget*, 375 F. Supp. 3d at 307–09.

[80] *Ramos*, 336 F. Supp. 3d at 1105.

[81] *Id.* at 10099.

[82] Brief of Amici Curiae, The Anti-Defamation League, et. al, *Ramos v. Nielson,* Case No. 18-16981, ECF No. 31 at 21 (9th Cir Feb. 7, 2019).

**Loss of Legal Status, Employment Authorization and Drivers Licenses**

128.   TPS holders are facing the imminent loss of legal status, and as a result, are already being forced to make the impossible choice whether to return to a country in crisis, remain in the United States without lawful immigration status, or uproot themselves again to try to find refuge in some third country. For most, this is not a choice at all. Venezuelan TPS holders cannot safely return to Venezuela.[83] Moreover, due to the lack of diplomatic relations between the United States and Venezuela, TPS holders without valid passports lack the requisite documentation to travel voluntarily to Venezuela or a third country.

129.   Without TPS, many Venezuelans will be at immediate risk of deportation to Venezuela—a country which has experienced an exodus of one-fourth of its population in the past decade. Some Venezuelan TPS holders may currently be seeking other legal avenues to remain in this country (such as asylum or adjustment of status). However, due to the yearslong asylum backlog, affirmative asylum applications remain long-pending, and do not guarantee an individual protection from either detention or deportation in the interim. Defendants' actions also threaten detention and deportation for TPS holders who do not presently have alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot safely return but may not fit the stringent legal requirements of asylum. The loss of TPS in some instances also limits the possibility of acquiring a permanent legal status for which an individual would otherwise be eligible, but for which present legal status is a prerequisite.[84]

130.   Venezuelan TPS holders also face the prospect of losing employment authorization. This may result in their summary dismissal from their place of work, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes

---

[83] *See, e.g.*, *Venezuela*, U.S. STATE DEPARTMENT BUREAU OF CONSULAR AFFAIRS (Sep. 24, 2024), *available at* https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Venezuela.html ("Do not travel to Venezuela due to the high risk of wrongful detentions, terrorism, kidnapping, the arbitrary enforcement of local laws, crime, civil unrest, poor health infrastructure.").

[84] *See* Temporary Protected Status: An Overview, AMERICAN IMMIGRATION COUNCIL (Jan. 2025), *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/temporary_protected_status_-_an_overview_1-16-2025.pdf (noting some TPS recipients may be eligible to adjust status).

or other material assets, leading to further economic harm. Many Venezuelan TPS holders also face the imminent loss of their drivers' licenses and, with them, their mobility and freedom of movement, because drivers' licenses are limited to those with legal status in many states.[85] And because the Secretary's termination decision goes into effect so quickly, Venezuelan TPS holders have been afforded almost no time to make alternative arrangements for themselves and their families, including by applying for other forms of immigration relief, employment authorization, or drivers' licenses.

**Other Harms to TPS Holders: Family Separation, Psychological Harm, and Stigma**

131.   The loss of legal status renders TPS holders vulnerable to separation from U.S. citizen children and other loved ones. There are many Venezuelan TPS holders in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens or Green Card holders. These TPS holders face the risk of being forced to leave their family members behind, or bringing their U.S. citizen children (or other family members) to a country in economic and political ruin, where severe repression is pervasive.

132.   Venezuelan TPS holders have been experiencing tremendous emotional and psychological harm since the challenged decisions. This has resulted in heightened anxiety, trauma, insomnia, and depression, in some cases severe enough to result in acts of self-harm. The psychological harms resulting from Defendants' actions will only increase as the effective date approaches.

133.   Venezuelan TPS holders have also suffered the additional constitutional harm of being subject to an administrative action motivated by racial, ethnic, or national-origin discrimination. Many describe the emotional pain of being subjected to racist attacks by high-ranking U.S. government officials. Some also live in fear of leaving the house, speaking Spanish, or disclosing their nationality due to the racist targeting of Venezuelans and other nonwhite migrants.

---

[85] *See, e.g.*, California DMV, REAL ID Checklist, *available at* https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

1    **Harm to Plaintiffs**

2       134.   **Plaintiff National TPS Alliance** has over 84,000 Venezuelan TPS holder members.

3    These members are anxious and desperate. Many are making plans to sell homes and cars, end

4    leases, and collect their belongings in preparation to leave the country. But they do not believe

5    they can safely return to Venezuela because it remains politically unstable and repressive, and

6    because the economy is in total collapse. If the United States will not allow them to stay, they do

7    not know where they will go or what they will do. Among them:

8           a)      NTPSA member **A.V.** has TPS under Venezuela's 2023 designation. He

9    lives in Alabama and works full-time on the night shift at an auto parts manufacturer. As the

10   2024 presidential election drew near, A.V. began struggling with severe anxiety and fears

11   that he would lose his TPS status. News reports about President Trump's plans to deport all

12   immigrants awakened a deep sense of dread in him, as he is terrified to return to Venezuela.

13   He faces the April 2025 loss of his job, driver's license, and legal right to remain in the

14   United States. His uncle, uncle's wife, and their three-year old son all rely on TPS. Another

15   cousin relies on TPS, and lives with her two U.S. citizen children.

16          b)      NTPSA member **M.R.** has TPS under Venezuela's 2021 designation. She

17   lives in West Virginia and works two jobs—full-time in the health care sector and part-time

18   at McDonalds. She is the sole provider for her two minor children and elderly mother. As a

19   result of Defendants' actions, in September 2025 M.R. faces the loss of her legal status,

20   work authorization, and driver's license, as well as health care for her chronically ill

21   daughter and mother. Her twelve-year-old daughter and elderly mother also rely on TPS for

22   their legal status; her five-year-old daughter is a U.S. citizen and faces the prospect of being

23   separated from her family if their TPS is terminated.

24          c)      NTPSA member **Laura Guerrero** has TPS under Venezuela's 2021

25   designation. She has been waiting over nine years with a pending asylum application. She

26   fears being in limbo—with limited access to employment, without legal status, and at risk of

27   deportation if her TPS is terminated. Her elder daughter, a TPS holder, is currently in her

28   first year as an undergraduate at a prestigious music school but stands to lose the full

scholarship that TPS affords her. Laura has suffered panic attacks since the vacatur announcement.

    d)    NTPSA member **C.D.**, a 60-year old father of three, holds TPS under Venezuela's 2021 designation. He lives in Houston, Texas with his wife, where they own their own home. They have consistently paid their taxes. C.D. works for a temporary staffing agency and was recently diagnosed with prostate cancer. If he loses his TPS in September 2025 he would lose his job and be unable to pay for his mortgage and health care, which would be economically devastating for him and his wife. Losing TPS would also expose C.D. to risk of being deported from the United States, which would inflict many harms, including preventing him from accessing the medical care he needs to treat his cancer.

135. **Plaintiff Mariela González**, a long-time educator, has lived in the United States for fourteen years and is currently employed by an urban school district. She faces termination of her legal status and work authorization in September 2025 as a result of Defendants' actions. She lacks a valid passport and could not legally travel even if she could safely return to Venezuela, which she cannot. Moreover, all of Mariela's immediate family—her parents, siblings, and nephews—reside in the United States and have permanent status.

136. **Plaintiff Freddy Jose Arape Rivas** fled Venezuela due to worsening conditions, including rising repression and violence against opposition members, and a collapsing economy where it became impossible to obtain basic necessities. He works in the IT sector in Texas. He will lose his legal status, employment authorization, and driver's license in April 2025 as a result of Defendants' actions. He also fears he will lose the possibility of an H1B visa, for which he has a pending application through his employer, because he has been told he will no longer be eligible without lawful status.

137. **Plaintiff M.H.** lives in Tennessee, graduated from a Venezuelan university with a nursing degree, and is currently the primary caregiver for her two children—the elder a TPS holder, and the younger a U.S. citizen with severe asthma. M.H.'s husband works full-time for a government subcontractor. M.H.'s two-year-old son faces an uncertain fate should TPS be

terminated—unable to live safely in Venezuela, particularly with a serious and chronic health condition, but facing the possibility of being separated from his mother and sister following the termination of their TPS in April 2025 as a result of Defendants' actions. M.H. has a mandatory check-in with ICE in May 2025, the month after she is scheduled to lose her TPS.

138.    **Plaintiff Cecilia González Herrera** came to the United States in 2017, at the age of 18, and has lived her entire adult life in this country. She was a student activist in Venezuela, and now attends university and works as a voting rights advocate in Florida. Her mental health has suffered as a result of Defendants' actions, and she faces the loss of the ability to pay in-state tuition for university, which TPS affords her. She has also abandoned the prospect of postgraduate education as a result of the uncertainty created by the termination announcement. And because of Defendants' repeated statements targeting Venezuelans as "dirtbags" and gang members, she feels unwanted in a country that has been her home for eight years.

139.    **Plaintiff Alba Cecilia Purica Hernandez** is a childcare provider in San Leandro, California. Her deportation proceedings were terminated on account of her TPS registration. However, she risks losing her legal status and employment authorization in April 2025 as a result of Defendants' actions. She cannot safely return to Venezuela. Nor can she practically return as she lacks a valid Venezuelan passport. Alba has felt sad, scared and adrift since the announcement of the termination of TPS for Venezuela, and feels that the decision is reflective of a perception at the highest levels of the U.S. government that Venezuelans and non-white migrants are less than human.

140.    **Plaintiff E.R.** and her twelve-year-old daughter live in New York where E.R. works the night shift in a makeup packaging factory to be able to take her daughter to and from school. E.R. has legal status and employment authorization only through TPS and risks losing her employment on April 2, 2025 as a result of Defendants' actions. She is the sole provider for her twelve-year-old daughter, who also has TPS. E.R. also requires medical care which she would not be able to get in Venezuela, as a result an accident in which she suffered an injury  which required her to get twenty staples in her head. She and her daughter have a mandatory check-in with ICE in June 2025, two months after they are scheduled to lose their TPS status.

141.  **Plaintiff Hendrina Vivas Castillo** is a mother and former business owner who works as a delivery driver in Los Angeles, California. In Venezuela, the economic crisis forced her to shut down her business and she faced mounting political repression, including the arrest of her business's co-owner. She risks losing her TPS and employment authorization in April 2025. Hendrina is terrified of going back to Venezuela and does not know what she will do if her TPS is terminated.

**Harm to Communities and the Public**

142.  TPS holders are an integral part of the economic and social fabric of U.S. communities, and they give back to the country in countless ways. Venezuelan TPS holders are health care providers, factory workers, engineers, agricultural workers, childcare providers, educators, and students. They are active in civic life and volunteer at schools, neighborhood and work organizations, and religious institutions. They pay federal, state, and local taxes, and support government social welfare programs. Summarily withdrawing hundreds of thousands of people from the workforce will strain the social safety net and have economic repercussions on citizen and noncitizen communities alike.

143.  Recognizing the diverse public benefits of designating countries for TPS when they are in the midst of crisis, the mayors of 33 cities urged Secretary Mayorkas in 2023 to extend TPS for Venezuela and other countries. Among the public benefits these local leaders emphasized were adding eligible workers to the workforce, taking pressure off the social safety net by allowing beneficiaries to secure work and be self-sufficient, and helping to clear the asylum backlog.[86]

144.  TPS for Venezuela is serving the exact purpose intended by Congress—providing nationality-based humanitarian immigration relief due to a country's severe instability, regardless of whether individuals meet the narrow eligibility requirements for other forms of humanitarian protection, such as asylum.[87]

---

[86] Letter from Cities for Action Mayors to Secretaries Mayorkas and Blinken (Sept. 6, 2023), *available at* https://www.citiesforaction.us/expand_tps_protections.

[87] *See generally* Brief of Amici Curiae, Immigration Law Scholars, *Ramos v. Nielson,* Case No. 18-16981, ECF No. 30 at 2 (9th Cir Feb. 7, 2019).

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of the Administrative Procedure Act (Vacatur)

### (Against All Defendants)

145.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

146.   The Administrative Procedure Act, 5 U.S.C. 701 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. 704.

147.   The APA empowers the federal courts to "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. 706(2)(A), (C), (D). The right of review under the APA includes a right to judicial review of "legal question[s] of statutory authority," *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1222 (9th Cir. 2019), and review of "executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). To engage in procedurally appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position." *Id.* at 515. Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy." *Id.* at 515–16.

148.   Defendants' February 3, 2025 vacatur of the TPS extension for Venezuela constitutes "final agency action for which there is no other adequate remedy in a court" pursuant to 5 U.S.C. 704, because the Defendants' vacatur has resulted in all of the Individual Plaintiffs and tens of thousands of members of Plaintiff NTPSA losing TPS protection until October 2026,

which had been granted to them pursuant to the January 17, 2025 extension, "automatically and without further notice or right of appeal." 8 C.F.R. 244.19.

149.   Defendants' vacatur of the TPS extension decision they had made on January 17, 2025 exceeded their statutory authority and was arbitrary and capricious, contrary to law, pretextual, and deviated from past practice, including because, among other things:

      a)     The TPS statute carefully regulates the length of TPS extensions, the conditions under which they may be terminated, and the timetable for doing so. Defendants had no authority to annul a TPS extension under the timetable and procedures they utilized here.

      b)     Defendants objected to the January 2025 extension for allowing 2021 TPS holders to re-register under the 2023 extension, but failed to consider that 2021 TPS holders were necessarily eligible for TPS under the 2023 designation as well. *See San Luis Obispo Mothers for Peace v. United States Nuclear Regul. Comm'n*, 100 F.4th 1039, 1055–56 (9th Cir. 2024) ("An agency action is arbitrary and capricious if . . . the agency has . . . entirely failed to consider an important aspect of the problem.").

      c)     Defendants' decision rested on a misinterpretation of the TPS statute's flexible registration requirements and failed to "consider the alternatives that are within the ambit of the existing policy" before vacating the January 17, 2025 extension in its entirety. *DHS v Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up); *see Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case.").

      d)     The decision assumed that TPS designations, including the 2023 Venezuela Designation, are themselves illegal.

      e)     The decision assumed that TPS holders are present in the United States illegally.

      f)     The decision presupposed that prior TPS designations or extensions can be rescinded merely because of policy disagreements between administrations.

g)      The decision occurred under circumstances and a timeline that reflect that it was pretextual. *Cf. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (reversing agency action because stated reason for decision was pretextual).

h)      To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute and deviating from past practice and rules regarding the applicable process.

150.   Plaintiffs will suffer irreparable injury from the unlawful vacatur.

### SECOND CLAIM

### Violation of the Administrative Procedure Act (Termination)

### (Against All Defendants)

151.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

152.   The order terminating the 2023 TPS designation for Venezuela constitutes "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. 704 because it will result in TPS holders' loss of TPS "automatically and without further notice or right of appeal." 8 C.F.R. 244.19.

153.   Defendants' termination of the 2023 Venezuela Designation exceeded their statutory authority and was arbitrary and capricious, contrary to law, pretextual, and deviated from past practice, including because, among other things:

a)      The decision assumed that TPS designations, including the 2023 Venezuela Designation, are illegal.

b)      The decision assumed that TPS holders are present in the United States illegally.

c)      The research, consultation, and review process leading up to the decision deviated dramatically from past practice without explanation.

d)      The decision occurred under circumstances and a timeline that reflect that it was pretextual. *Cf. Dep't of Com.*, 139 S. Ct. at 2575 (reversing agency action because stated reason for decision was pretextual).

e)     To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute.

154.   Plaintiffs will suffer irreparable injury from the unlawful termination.

## THIRD CLAIM

### Violation of the Equal Protection Guarantee of the

### Due Process Clause of the Fifth Amendment

### (Against All Defendants by All Plaintiffs)

155.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

156.   The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

157.   Defendants' decisions to vacate the January TPS extension for Venezuela, and to terminate the 2023 Venezuela Designation, are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin.

158.   Plaintiffs will suffer irreparable injury resulting from the illegal vacatur and the arbitrary termination of the 2023 Venezuela Designation.

## **PRAYER FOR RELIEF**

Plaintiffs ask this Court to grant the following relief:

1.     Declare that Defendants' vacatur of the January 17, 2025 TPS extension for Venezuela and Defendants' purported termination of TPS for Venezuela on February 5, 2025 were unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment and;

2.     Declare that Defendants have no authority to vacate a TPS extension under 8 U.S.C. 1254a;

3.     Declare that the January 17, 2025 TPS extension for Venezuela remains in effect under the terms specified in that extension, 90 Fed. Reg. 5961;

4.     "Set aside" Defendants' vacatur order of February 3, 2025, and termination order of February 5, 2025, as beyond Defendants' authority and/or unlawful under the APA;

5.     Postpone or stay the vacatur order of February 3, 2025, and termination order of February 5, 2025, from taking effect or being put into effect;

6.     Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them from enforcing the vacatur order of February 3, 2025, and termination order of February 5, 2025;

7.     Order Defendants to take all steps necessary to ensure that the extension of TPS issued on January 17, 2025 remains in full force and effect;

8.     Grant an award of attorneys' fees and costs; and

9.     Grant any other and further relief that this Court may deem fit and proper.

Date:  February 19, 2025

Respectfully submitted,

ACLU FOUNDATION
OF NORTHERN CALIFORNIA

 /s/* *Emilou MacLean*
Emilou MacLean
Michelle (Minju) Y. Cho

CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

 /s/  *Ahilan T. Arulanantham*
Ahilan T. Arulanantham
Stephany Martinez Tiffer

ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

 /s/  *Eva L. Bitran*
Eva L. Bitran

NATIONAL DAY LABORER
ORGANIZING NETWORK

 /s/  *Jessica Karp Bansal*
Jessica Karp Bansal
Lauren Michel Wilfong (pro hac vice
forthcoming)

Attorneys for Plaintiffs

\* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.